## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GWG Holdings, Inc. *et al.*,[1] | ) | Case No. 22-90032 (MI) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |
|  | ) |  |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
(II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING
LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,
(V) AUTHORIZING THE DLP VI OPTION UPON ENTRY OF THE FINAL ORDER,
<u>(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested. Relief is requested not later than 3:30 p.m. on April 21, 2022. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on Thursday, April 21, 2022, at 3:30 p.m. (prevailing Central Time) in Courtroom 404, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1]   The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); and GWG Life USA, LLC (5538). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201.  Further information regarding the Debtors and the chapter 11 cases is available at the website of the Debtors' proposed claims and noticing agent: https://donlinrecano.com/gwg.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

GWG Holdings, Inc. ("GWGH") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, collectively, "GWG" or the "Company")[2] hereby submit this motion (this "Motion"), pursuant to sections 105(a), 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), for entry of an order, substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors to obtain senior secured superpriority postpetition financing, (ii) granting liens and superpriority administrative expense claims, (iii) authorizing the use of Cash Collateral, (iv) modifying the automatic stay, (v) authorizing the DLP VI Option upon entry of the Final Order, (vi) scheduling a final hearing, and (vi) granting related relief.  In support of this Motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously with this Motion and the *Declaration of Peter Laurinaitis in Support of the Debtors' Motion to Obtain Senior Secured Superpriority Financing and Related Relief* (the

---

[2]   For the avoidance of doubt, the definitions of "GWG" and "Company" do not include non-affiliated entities The Beneficient Company Group, L.P., FOXO Technologies, Inc., or their respective direct and indirect subsidiaries.

"Laurinaitis Declaration"), attached as **Exhibit A** to the Motion.  In further support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[3]

1.      The Debtors enter the Chapter 11 Cases with minimal cash in their bank accounts, unable to (a) access the capital markets for liquidity as they have traditionally done or (b) use cash inflows (*i.e.*, Policy proceeds from maturities) from non-debtors GWG DLP Funding IV, LLC ("DLP IV") and GWG DLP Funding VI, LLC ("DLP VI") operations to fund their expenses due to the restrictions set forth in the DLP IV Documents and DLP VI Documents.  The Debtors' need for financing cannot be overstated.  Absent immediate financing, the Debtors cannot continue as a going concern and will face immediate liquidation.  The Debtors' efforts to obtain medium or long-term prepetition "bridge" financing failed to materialize from any of the Company's existing lenders or the wide group of third parties canvassed by the Debtors and their investment banker. However, the Debtors' exhaustive efforts have resulted in receipt of a debtor-in-possession financing proposal from the DIP Lenders that would not only provide immediate liquidity to the Debtors, but would also provide the Debtors with essential time to craft a comprehensive restructuring solution to maximize value for the Debtors' estates, creditors, and other stakeholders.

2.      After the Debtors secure funding on an interim basis, the Company will then seek Court approval (at the final hearing on this Motion) of an option held by the DIP Lenders (the "DLP VII Option"), under which the DIP Lenders may elect to refinance in full the SPV Credit Facilities (held at non-Debtors) by entering into a new credit facility at (and transfer the entire Policy Portfolio, pursuant to section 363 of the Bankruptcy Code, to) a newly formed non-debtor subsidiary special purpose vehicle ("DLP VII").  Exercising the DLP VII Option would also be

---

[3]      Capitalized terms used but not otherwise defined in this preliminary statement shall have the meanings ascribed to them elsewhere in the Motion.

expected to result in payment in full of amounts then owing by the Debtors under the DIP Facility, thus completely satisfying the DIP Obligations under the DIP Facility while still allowing the Debtors to retain the proceeds of the DIP Facility to fund critical expenses in the Chapter 11 Cases, pay postpetition service providers, and develop and implement a value-maximizing restructuring transaction to preserve value for the benefit of their stakeholders.

3.       As set forth in detail in the Laurinaitis Declaration, the Debtors have labored intensely to achieve a resolution to their liquidity issues.  In addition to reaching out to the existing SPV Lenders, the Debtors and their advisors contacted approximately 49 financial institutions regarding providing financing.  Of those contacted, 27 signed NDAs and received access to the "first round" dataroom.  The Debtors also discussed with the SPV Lenders the terms by which they would provide short-term or long-term financing, including a potential release of reserves held by the SPV Lenders under the terms of the respective SPV Credit Facilities.

4.       Following the marketing process, the Debtors (a) did not receive any out-of-court short-term or long-term financing proposals, and (b) initially received three proposals for debtor-in-possession financing.  *See* Laurinaitis Decl. ¶ 19.  The first proposal required several weeks of additional diligence by the lenders, which was difficult for the Debtors to accommodate, given their precarious liquidity position.  The second proposal was viable, providing 9-12 months of liquidity but at a high cost of capital.  This second proposal would have required repayment of the DLP IV Facility and DLP VI Facility with proceeds from the proposed $500 million debtor-in-possession financing facility upon entry of an interim order. Further, this second proposal would have required a further refinancing upon the termination or maturity of the debtor-in-possession financing.  The third proposal required an immediate and potentially non-value-maximizing sale of the Policy Portfolios.  *See id.*

4

5.      The Debtors initially proceeded toward negotiating a credit agreement related to the second proposal, which appeared to be the Debtors' best option out of the three available proposals, even though it was deemed to be at a high cost of capital.  The Debtors were moving towards documenting and finalizing the second proposal until the Debtors received an "eleventh hour" proposal from the DIP Lenders.  The Debtors, with the assistance of their advisors, quickly evaluated this new proposal and determined that it would save the estates tens of millions of dollars relative to the second proposal.  *See id.* at ¶ 20.

6.      After determining that the offer for financing from the DIP Lenders was viable and, taken as a whole, better than the other proposal received, GWGH's board of directors voted to proceed with negotiating and documenting the final terms of the DIP Facility.  Throughout the DIP marketing process, the Debtors (as well as the board) were adamant that despite any requests to grant exclusivity from various potential financing lenders, the Debtors would continue to evaluate any and all offers to obtain the best available financing for the Company and its stakeholders.  GWGH's board determined the most viable and best financing proposal overall, was that of the proposed DIP Facility.  With the board's approval, the Debtors and their advisors undertook extensive good-faith negotiations with the DIP Lenders that culminated in the Debtors and DIP Lenders agreeing to the terms and conditions of the proposed DIP Facility.  *See id.* at ¶ 21.

7.      The Debtors believe the proposed DIP Facility (which includes the DLP VII Option described herein and is required by the DIP Lenders) will provide the Debtor with the best available financing and is critical to operate their businesses and fund administrative expenses associated with the Chapter 11 Cases while the Debtors seek to achieve a value-maximizing restructuring transaction to preserve value for the benefit of their stakeholders.  Absent access to the DIP

Facility, and the liquidity provided thereunder, the Debtors would suffer immediate and irreparable

harm, and accordingly request the Court's approval of the DIP Facility.

## **RELIEF REQUESTED**

8.       The Debtors request entry of the Interim Order, [4] substantially in the form attached

hereto, and the Final Order, respectively:

> (a)      Authorizing the Debtors to act as borrowers under a senior secured,
> superpriority, debtor-in-possession postpetition delayed draw term loan
> financing facility (the "DIP Facility") and for Debtor GWG Life USA, LLC,
> non-debtor GWG MCA Capital, Inc., GWG DLP Funding V Holdings,
> LLC, and GWG DLP Funding V, LLC (each, a "Guarantor," and
> collectively, the "Guarantors") to unconditionally guarantee the Debtors'
> obligations under the DIP Facility provided by (i) National Founders LP, in
> its capacity as the post-petition administrative agent and collateral agent (in
> such capacity, the "DIP Agent") under that certain *Superpriority Secured
> Debtor-in-Possession Credit and Guaranty Agreement* which shall be in
> form and substance acceptable to the Debtors and the DIP Agent and
> substantially similar to the form attached to the Interim Order as **Exhibit 1**
> (as the same may be amended, restated, amended and restated,
> supplemented or otherwise modified from time to time pursuant to the terms
> thereof, the "DIP Credit Agreement") and any related documents and
> instruments delivered pursuant to or in connection therewith (collectively,
> and together with the DIP Credit Agreement, the "DIP Credit Documents"),
> and (ii) certain DIP Lenders that are party to the DIP Credit Agreement (in
> their capacity as post-petition lenders under the DIP Credit Agreement,
> collectively, the "DIP Lenders," and together with the DIP Agent and the
> other Secured Parties, the "DIP Secured Parties").  The DIP Facility consists
> of new money commitments available for the making of new money term
> loans in an aggregate amount not to exceed $65,000,000 (the "DIP
> Commitment") *plus* any Discretionary DIP Overadvance, of which
> $18,000,000 (the "Initial DIP Loan") of the DIP Commitment shall be
> funded and available upon the entry of the Interim Order to fund the
> working capital and liquidity needs of the Debtors and other uses as
> provided for in the DIP Credit Agreement and the Interim Order.  If the
> Final Order has not been entered by the thirty-sixth (36th) day after the
> Petition Date, the DIP Agent may make a single supplemental loan (such
> loan, the "Supplemental Initial Loan"), the proceeds of which may be used
> solely to pay premiums on the Policy Portfolio during the month of June
> 2022, which Supplemental Initial Loan shall count against the DIP
> Commitment.   The remaining amount of the DIP Commitment will be

---

[4]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the DIP
Credit Agreement.

available upon entry of the Final Order and the satisfaction of the conditions to borrowing set forth in the DIP Credit Agreement, which will permit the DIP Lenders to make delayed draw term loans to the Debtors from time to time, in an aggregate principal amount for all such borrowings not to exceed such remaining amount of the DIP Commitment (each a "Delayed Draw Loan," together with the Initial DIP Loan, and Supplemental Initial Loan, the "DIP Loans").  Further, upon entry of the Final Order, the DIP Agent will be permitted, in its sole discretion, to make any DIP Loan in excess of the Delayed Draw Commitment in an aggregate amount not to exceed $10,000,000 outstanding at any time (each, a "Discretionary DIP Overadvance" and also constituting a DIP Loan), if the DIP Agent deems such additional DIP Loans to be necessary or desirable to preserve or protect any DIP Collateral, or any portion thereof or to enhance the likelihood of repayment of the DIP Obligations;

(b)     Approving the DLP VII Option, DLP VII Transaction, and all steps necessary to effectuate the DLP VII Option and DLP VII Transaction as part of entry of the Final Order;

(c)     Approving the terms of and authorizing the Debtor parties thereto to execute and deliver the DIP Credit Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Credit Documents;

(d)     Approving the DIP Facility and granting all obligations owing thereunder and under the DIP Credit Documents to the DIP Secured Parties (collectively, and including all "Obligations" as described in the DIP Credit Documents, the "DIP Obligations") which is payable by its terms upon expense claim status in each of the Chapter 11 Cases and any successor cases;

(e)     Granting the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and superpriority liens on all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth herein;

(f)     Authorizing and directing the Debtors to use proceeds of the DIP Facility to (i) pay the principal, interest, fees, expenses, and other amounts payable under the DIP Credit Documents as such become due, including, without limitation, commitment fees, and the fees and disbursements of the DIP Professionals and (ii) provide financing for working capital and other general corporate purposes; all to the extent provided in, and in accordance with, the Approved Budget, the Interim Order, and the DIP Credit Documents;

(g)     Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Documents and the DIP Orders;

(h)     Authorizing the DIP Agent, at the direction of the DIP Lenders (or as otherwise provided in the DIP Credit Agreement), to, subject to the terms of the DIP Orders and the DIP Credit Documents, (i) terminate the DIP Credit Agreement in accordance with its terms; (ii) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (iii) be granted relief from the automatic stay to foreclose on the DIP Collateral; and

(i)     Scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules, and rules 1075-1, 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules.

## GENERAL BACKGROUND

12.     On April 20, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that the Chapter 11 Cases be jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. To date, no creditors' committee has

been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

13.    The Company is a financial services firm with two principal types of assets: (i) economic interests in independent, non-affiliated entities that operate in the alternative assets and epigenetics spaces; and (ii) secondary life insurance assets, comprised of a portfolio of near-duration, intermediate-duration, and long-duration life insurance policies (each a "Policy" and collectively, the "Policy Portfolio").  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Chapter 11 Cases, are set forth in greater detail in the First Day Declaration filed contemporaneously herewith.  In further support of this Motion, the Debtors rely upon and incorporate by reference herein the First Day Declaration.

## THE COMPANY'S PREPETITION CAPITAL STRUCTURE

### *Bonds*

14.    As of the Petition Date, GWGH has outstanding (i) approximately $1.25 billion bonds (the "Public L Bonds") issued under that certain *Amended and Restated Indenture* dated as of October 23, 2017, by and between GWGH as issuer and obligor, GWG Life, LLC ("GWG Life") as guarantor, and Bank of Utah as indenture trustee (the "A&R Indenture"), (ii) approximately $0.8 million Liquidity Bonds issued under that *Supplemental Indenture* dated as of December 31, 2020 (the "2020 Supplemental Indenture"), by and between GWG Life as issuer and obligor, GWGH as guarantor, and Bank of Utah as indenture trustee, and (iii) approximately $366.89 million of Seller Trust L Bonds issued under that certain *Supplemental Indenture to the A&R Indenture*, dated as of August 10, 2018 (the "2018 Supplemental Indenture" and collectively with the A&R Indenture and 2020 Supplemental Indenture, the "Indenture"), by

and between GWGH as issuer and obligor, GWG Life as guarantor, and Bank of Utah as indenture trustee.

15.     To secure GWGH's and GWG Life's obligations under the Public L Bonds, the Liquidity Bonds, and the Seller Trust L Bonds (collectively, the "<u>Bonds</u>"), GWGH and GWG Life have granted the Bank of Utah in its capacity as indenture trustee under the Indenture (the "<u>Indenture Trustee</u>") with liens on substantially all of GWGH's and GWG Life's assets–including GWGH's and GWG Life's interests in The Beneficient Company Group, L.P. ("<u>Ben LP</u>")–and certain stock pledged by certain of Ben LP's principals (all such collateral, the "<u>Bond Collateral</u>").

16.     The Bonds are not obligations of either non-debtors DLP IV or DLP VI and are not directly secured by any of the assets of DLP IV or DLP VI.  The Bonds, per the express provisions of the Indenture, are completely and entirely subordinated to the DLP IV Facility and the DLP VI Facility (collectively, the "<u>SPV Credit Facilities</u>"), as well as any future Senior Debt (as expansively defined in the Indenture) incurred by the Debtors.  For example, holders of the Bonds (each, a "<u>Bondholder</u>" and collectively, the "<u>Bondholders</u>") and the Indenture Trustee:[5]

(a)     have agreed that GWGH can enter into any "Qualified Sales and Financing Transaction" for additional Senior Debt that in all respects will be senior in priority to the Bonds and the Indenture Trustee's interest in the Bond Collateral;[6]

(b)     are restricted from exercising remedies during the pendency of a chapter 11 case filed by GWGH, GWG Life, or any other direct or indirect subsidiary or affiliate thereof;[7]

(c)     cannot challenge the validity, priority, or extent of the liens granted with respect to any Senior Debt, including under the SPV Credit Facilities;[8]

---

[5]     The A&R Indenture is attached hereto as **Exhibit B.**
[6]     *See* A&R Indenture at § 4.9.
[7]     *See* A&R Indenture at § 10.5.
[8]     *See* A&R Indenture at § 10.15(a)(i).

(d)      cannot seek relief from the automatic stay or appointment of a chapter 11 trustee without the consent of the holders of any Senior Debt, including the DLP IV Lender and the DLP VI Lender (collectively, the "SPV Lenders");[9]

(e)      have agreed to turn over to the holders of Senior Debt any "adequate protection" received during a bankruptcy proceeding;[10]

(f)      must turn over proceeds of Bond Collateral to holders of Senior Debt until the Senior Debt is paid in full;[11] and

(g)      acknowledge the validity of the DLP IV Liens and the DLP VI Liens, the SPV Lenders' interest in the DLP IV Collateral and the DLP VI Collateral (collectively, the "SPV Collateral"), and that none of GWG, GWG Life, the Indenture Trustee, nor the Bondholders have any lien, claim, encumbrance, security interest, or other interest in any of the SPV Collateral.[12]

### *DLP IV Facility*

17.      Pursuant to that certain *Fifth Amended and Restated Loan and Security Agreement*, dated as of December 14, 2021 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DLP IV Agreement"), and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "DLP IV Documents"), among (i) non-debtor DLP IV, (ii) CLMG Corp. as administrative agent (in such capacity, the "DLP IV Agent"), and (iii) the term loan lender party thereto (the "DLP IV Lender" and together with the DLP IV Agent, collectively, the "DLP IV Parties"), the DLP IV Lender provided a secured term loan facility to the Debtors (the "DLP IV Facility") in the original aggregate principal amount of $325 million with a maturity date of September 27, 2029.

18.      As of the Petition Date, the aggregate principal amount outstanding under the DLP IV Facility was approximately $271 million (together with accrued and unpaid interest, any fees,

---

[9]    *See* A&R Indenture at § 10.15(a)(iv).
[10]   *See* A&R Indenture at § 10.15(a)(iv).
[11]   *See* A&R Indenture at § 10.15(a)(v).
[12]   *See* A&R Indenture at § 10.15(d).

expenses, disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees, financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of DLP IV's obligations in connection with the DLP IV Facility pursuant to the DLP IV Documents, including all "Obligations" as defined in the DLP IV Agreement, the "DLP IV Obligations").

19.     DLP IV granted to the DLP IV Agent, for the benefit of the DLP IV Parties, a security interest in and continuing lien (the "DLP IV Liens") on substantially all of the assets of DLP IV (the "DLP IV Collateral").[13]

20.     As set forth in further detail in the First Day Declaration, in order to address purported defaults under the DLP IV Facility, prior to the Petition Date, DLP IV and the DLP IV Lender entered into various letter agreements, waivers and amendments to the DLP IV Documents. In exchange for certain waivers and concessions from the DLP IV Lender, (a) in November 2021, DLP IV assigned to the DLP IV Lender an approximate 3.0% residual death benefit in the Policy Portfolio under the DLP IV Facility and (b) in December 2021, DLP IV paid to the DLP IV Lender $40,000,00 as settlement for a yield maintenance fee of approximately $93 million asserted by the DLP IV Lender.  As a result of these agreements, the current approximate amount of the yield maintenance claim in favor of the DLP IV Lender under the DLP IV Facility is approximately $32 million, which is payable by its terms upon the repayment or prepayment of the obligations thereunder, including upon any acceleration thereof.[14]   Additionally, the DLP IV Agent has agreed

---

[13]   To be clear, the Bonds have no direct rights or interests in the DLP IV Collateral.
[14]   For the avoidance of doubt, the filing of the Chapter 11 Cases does not trigger an acceleration of the DLP IV Facility.

to vary the terms of the DLP IV Facility to make advances under the DLP IV Facility to pay Policy premiums in March, April and May 2022.

### DLP VI Facility

21.     Pursuant to that certain *Credit Agreement*, dated as of August 11, 2021 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DLP VI Agreement," and collectively with all other agreements, instruments, and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "DLP VI Documents"), among (i) non-debtor DLP VI, (ii) GWGH (the "DLP VI Guarantor"), and (iii) National Founders LP as administrative agent and collateral agent (in such capacity, the "DLP VI Agent") and the term loan lender party thereto (the "DLP VI Lender" and together with the DLP VI Agent, collectively, the "DLP VI Parties"), the DLP VI Lender provided a secured term loan facility to the Debtors (the "DLP VI Facility") in the original aggregate principal amount of $107.6 million with a maturity date of August 11, 2031.

22.     As of the Petition Date, the aggregate principal amount outstanding under the DLP VI Facility was approximately $111 million (together with accrued and unpaid interest, any fees, expenses, disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees, financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of DLP VI's and DLP VI Guarantor's obligations in connection with the DLP VI Facility pursuant to the DLP VI Documents, including all "Obligations" as defined in the DLP VI Credit Agreement, the "DLP VI Obligations").

23.     DLP VI, and its parent, GWG DLP Funding Holdings VI, LLC (the "<u>DLP VI Parent</u>"), granted to the DLP VI Agent, for the benefit of the DLP VI Parties, a security interest in and continuing lien (the "<u>DLP VI Liens</u>") on substantially all of their respective assets (the "<u>DLP VI Collateral</u>").[15]

24.     On March 31, 2022, prior to the Petition Date, DLP VI entered into an amendment to the DLP VI Facility that, among other things, (a) waived an "Event of Default" under the DLP VI Facility, (b) provided DLP VI with an additional advance by National Founders of $4.0 million, of which $1.0 million was an amendment fee payable to National Founders and the remaining balance being available to the Company for the payment of professional fees and other expenses, (c) amended the terms under which a "make-whole" would be due under the DLP VI Facility (*i.e.*, upon acceleration, not solely upon "prepayment") so long as the DLP VI Lender or an affiliate thereof provided an initial DIP Loan in the amount of at least $10,000,000 and there was no failure to enter the Final Order as a result of an inability or unwillingness on the part of the DLP VI Lender to perform under the DIP Facility.

## DLP VII OPTION

25.     The DLP VII Option is a critical component of the DIP Facility and the liquidity to be provided to the Debtors, and its approval is a required aspect of the Final Order. The economic terms of the DLP VII Option are advantageous to the Debtors and reflect the best available financing terms for the Debtors, and accordingly, the Debtors support and request the Court's approval thereof. The DLP VII Transaction (as outlined below) is a long-term refinancing of the SVP Credit Facilities that both offers the Debtors $65 million of critically necessary liquidity to facilitate the Chapter 11 Cases and achieve confirmation of a chapter 11 plan and solves the current

---

[15]     Similar to the DLP IV Collateral, the Bonds have no direct rights or interest in the DLP VI Collateral.

mismatch of assets and liabilities in the DLP IV Facility (~75% of the Policy Portfolio) by providing fixed rate, matched duration financing for the entire Policy Portfolio.  The Debtors would continue to hold the equity interests in the non-debtor special purpose vehicles and would receive cashflows related thereto over the term of the transaction (which are expected to total in the hundreds of millions of dollars) and would subsequently receive all cash flows of, the residual interest in the Policy Portfolio (which the Debtors believe is significant) after the corresponding term loan debt is repaid.  In short, the DLP VII Option provides the Debtors with essential liquidity and maximizes the value of the Debtors' assets with a transaction that combines combines the Policy Portfolios under one non-debtor special purpose vehicle subsidiary (as opposed to two). Additionally, pursuant to the A&R Indenture, the Bonds are subordinated to any "Senior Debt," which, as of the Petition Date, includes the SVP Credit Facilities–*i.e.*, the loans extended to non-debtor special purpose vehicle subsidiaries and secured by the Policy Portfolios.  If the DIP Lender elects to exercise the DLP VII Option, the Bonds will still be subordinated to the "Senior Debt"– this time to the DLP VII Facility as opposed to the SPV Credit Facilities–*i.e.*, the loans extended to a non-debtor special vehicle subsidiary secured by the Policy Portfolio.  Thus, exercise of the DLP VII Option places the Bonds in substantially the same position relative to the Policy Portfolio as they are now.

26.     If elected, the DLP VII Option would be effectuated as follows (the "DLP VII Transaction"):

> (a)     GWG Life shall form a newly created special purpose vehicle that is similar to GWG DLP Funding Holdings VI, LLC (the "DLP VII Parent");
>
> (b)     The DLP VII Parent shall form a newly created special vehicle that is similar to DLP VI (the "DLP VII Borrower"); and
>
> (c)     The following shall occur contemporaneously:

(i) The DIP Agent (or its affiliate) shall make a term loan (the "<u>DLP VII Term Loan</u>") pursuant to documentation substantially similar to the DLP VI Credit Agreement and the loan documents executed in connection therewith (with modifications thereto as described in the DIP Credit Agreement) in a principal amount that results in the loan-to-value ratio at closing equaling the Initial Advance Rate set forth in Schedule 5.17 of the DIP Credit Agreement;

(ii) The DLP VII Term Loan shall be secured by a first priority perfected Lien on all of the assets and property of the DLP VII Parent and the DLP VII Borrower and be on the economic terms set forth in Schedule 5.17 of the DIP Credit Agreement;

(iii) The proceeds of the DLP VII Term Loan shall be applied (A) by DLP IV and DLP VI to satisfy in full their obligations under the SPV Credit Facilities and (B) by the DLP VII Borrower to fund a reserve account as described in Schedule 5.17 of the DIP Credit Agreement, and any proceeds of the DLP VII Term Loan remaining after the application of clauses (A) and (B) of the foregoing clause (iii) may be distributed to GWG Life;

(iv) DLP IV and DLP VI shall distribute their life settlement portfolios to GWG Life (unless doing so is not necessary for such life settlement portfolios to be transferred to the DLP VII Parent or the DLP VII Borrower pursuant to section 363 of the Bankruptcy Code under subclause (v) of this paragraph;)

(v) GWG Life shall contribute such life settlement portfolios to the DLP VII Parent free and clear of any liens, claims, encumbrances or other interests pursuant to Section 363 of the Bankruptcy Code, and the DLP VII Parent shall contribute such life settlement portfolios to the DLP VII Borrower (or such other structure that is reasonably acceptable to the DIP Agent); and

(vi) In connection with exercising the DLP VII Option, the proceeds of the DLP VII Facility shall be used to satisfy and repay all obligations under the DIP Facility.

27.   In connection with and subject to entry of the Final Order, the DIP Agent will require findings and decrees in the Final Order that authorize and approve the Debtors' and DIP Agent's entry into the DLP VII Transaction including that:

(a) Any transfer made in connection with the DLP VII Transaction, including any distribution, sale, capital contribution, intercompany transfer, or

intercompany loan, shall be free and clear of all liens, claims, interests and encumbrances;

(b)     The obligations under the SPV Credit Facilities are valid and due and owing without offset, challenge, avoidance or counter claim;

(c)     Payments made in connection with the DLP VII Transaction to satisfy the obligations under the SPV Credit Agreements are not subject to avoidance, recovery, claw back, challenge, or disgorgement; and

(d)     Each Debtor, on its own behalf and on behalf of its estate and each of its subsidiaries, on the one hand, and the DLP IV Agent, DLP IV Lenders, DLP VI Agent and DLP VI Lender Parties and each of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, on the other hand, absolutely, irrevocably and unconditionally releases and forever discharges and acquits each other  from any and all "claims" (as defined in the Bankruptcy Code), controversies, disputes, obligations, counterclaims, offsets, defenses, demands, debts, damages, expenses, losses, liens, accounts, contracts, liabilities, actions, causes of action, choses in action, rights of disgorgement or recovery arising prior to the closing date of the DLP VII Transaction of any kind, nature or description, whether known or unknown, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, suspected or unsuspected, or liquidated or unliquidated, pending or threatened, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of, based upon or related to, in whole or in part, any of the SPV Credit Facilities, the DLP IV Obligations, the DLP VI Obligations, the DLP VII Transactions or any transactions related to any of the foregoing (except for any continuing obligations following consummation of the DLP VII Transaction).

28.     The DLP VII Option, to the extent exercised by the DIP Lenders, provides the Debtors with incremental liquidity and runway inside the Chapter 11 Cases and provides long-term financing for 10 years that will extend well past emergence.  The SPV Lenders currently hold valid, perfected, first priority liens in the Policy Portfolios, and the value of the Policy Portfolios are well in excess of the outstanding respective obligations under the SPV Credit Facilities.  By refinancing the SPV Credit Facilities and transferring the Policy Portfolios to DLP VII, a newly formed wholly-owned non-debtor subsidiary of GWG Life, free and clear of all claims, liens, and encumbrances pursuant to section 363 of the Bankruptcy Code, the Debtors will have access to substantial additional liquidity.  If the DLP VII Option is exercised by the DIP Lender, the DIP

Facility will cease to be an obligation of the estates and would become an obligation of non-Debtor DLP VII under the DLP VII Facility, thus providing the Debtors with $65 million in proceeds (less a paydown of the Initial DIP Loan and all related fees and expenses in connection therewith) without ongoing budget testing, security interests in the Debtors' other assets, or other requirements under the DIP Credit Agreement.   The Debtors will have the liquidity, on an unfettered basis, to pursue a value-maximizing broader restructuring for the benefit of all stakeholders.  Moreover, if the Court enters a Final Order and the DIP Lenders do not exercise the DLP VII Option, the Debtors will still receive the balance of the overall DIP Commitment, which will permit the Debtors to pursue a sale transaction or other transaction to realize value from the Policy Portfolios.  While the refinancing of the DLP IV Facility will require payment of a make-whole call premium to DLP IV amounting to approximately $30 million, the DLP VII Facility will permit Policy premiums to be paid from proceeds of Policy maturities, and the DIP Lenders have agreed to a structure allowing for lending at significantly higher loan to value ("LTV") ratios than what is currently in place under the existing SPV Credit Facilities.  The value of the structure is a drastic improvement for the Debtors compared to the terms of the existing SPV Credit Facilities– under which the Debtors currently have no ability to use cash generated by Policy maturities outside of a straight waterfall.  While the terms of the new financing under the DLP VII Facility include yield maintenance protection which reduces over the term of the facility, but could theoretically result in a make-whole call premium amounting to no more than 43% of the DLP VII Facility size at issuance (and reducing significantly to no more than 15% after year 3) this is because the Lenders would be funding the entire Policy Portfolio to term with fixed rate funding, thereby eliminating the significant rate risk in the current rising interest rate environment.  Moreover, such financing provides for (i) a mechanism to distribute incremental funds to the

Company pursuant to higher LTV thresholds, (ii) runway to allow the Policy Portfolios to realize their full potential value, (iii) committed financing to provide much needed liquidity to facilitate a value-maximizing restructuring and exit from the Chapter 11 Cases, and (iv) the ability for the Debtors to secure competing proposals prior to the Final Order, including from parties who have already undertaken meaningful diligence.  The Debtors will also be able to avoid priming and adequate protection disputes with the SPV Lenders.

29.     The DLP VII Option is beneficial to the Debtors and is an integral component and condition of the DIP Lenders' agreement to provide the Delayed Draw Loan (i.e. the bulk of the DIP Commitment), which can only be drawn after entry of the Final Order.  Absent the Court's approval of the DLP VII Option upon entry of the Final Order, the Debtors would be unable to access the Delayed Draw Loan and would face value-destructive options and likely cease operations as a going concern and proceed to liquidation.

## THE DEBTORS' IMMEDIATE NEED FOR POSTPETITION FINANCING

30.     The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to use cash collateral as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral") in order to, among other things, (a) pay operating expenses and fund working capital needs, (b) fund the policy reserve accounts at DLP IV and DLP VI and pay premiums on the Policy Portfolio, (c) pay administrative expenses incurred in the Chapter 11 Cases, (d) pay the DIP Obligations owing by the Borrowers, including any fees and expenses owed to the DIP Agent or DIP Lenders pursuant to the DIP Agent Fee Letter (attached hereto as **Exhibit C**) or otherwise, and (e) make payments pursuant to any orders entered by the Court pursuant to any "first day" motions permitting the payment by the Debtors of any prepetition amounts then due and owing, each to the extent permitted by, and in accordance with, the Approved Budget and subject to the Variance Limit and the Interim Order.  The incurrence of new debt under the DIP

Credit Documents (which is "Senior Debt" under the Indenture) and the use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their estates if financing is not obtained imminently and permission to use Cash Collateral is not granted. The terms of the proposed financing are expressly permitted by the Indenture, are otherwise fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

31.    For these reasons, and for the reasons set forth herein, in the Laurinaitis Declaration, and in the First Day Declaration, the Debtors believe that access to the proposed DIP Facility and use of Cash Collateral will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court enter the DIP Orders.

## APPROVED BUDGET

32.    The Debtors and the DIP Secured Parties have agreed upon an interim budget. Attached to the proposed Interim Order as **Exhibit 2** is a 13-week budget approved by the DIP Agent, which sets forth, among other things, forecasted (a) cash receipts of the Debtors and the Guarantors (collectively, the "Credit Parties"), (b) cash operating disbursements of the Credit Parties, and (c) non-operating, bankruptcy-related cash disbursements of the Credit Parties, in each case on a week-by-week basis during such 13-week period (the "Approved Budget"). Beginning on the Thursday after the end of the fourth full calendar week following the Petition Date and on the corresponding Thursday following the end of every fourth calendar week thereafter, the Borrower shall deliver to the DIP Agent an updated DIP Budget (each, a "Proposed Budget"), together with a reconciliation for the periods included in the prior Approved Budget, which such

Proposed Budget shall be in form and substance satisfactory to the DIP Agent in its reasonable discretion; provided that the DIP Agent shall have five (5) business days to approve any revised Proposed Budget and upon such approval, it shall become the Approved Budget unless, prior to 11:59 p.m. on the fifth business day following the delivery of the Proposed Budget, the DIP Agent shall have objected to such Proposed Budget on the basis of the Proposed Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and/or covenants of the DIP Credit Agreement or it being based on information that is incorrect in any material respect, in which case the Approved Budget will be as agreed reasonably and in good faith by the DIP Agent and the Borrower.  The Borrower shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget, subject to the Variance Limit.

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 AND THE PROCEDURES FOR COMPLEX CASES IN THE SOUTHERN DISTRICT OF TEXAS**

33.     The following chart contains a summary of the material terms and significant provisions of the proposed DIP Credit Agreement, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and paragraph 8 of the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").[16]

---

[16] The summaries contained in this Motion are qualified in their entirety by the provisions of the DIP Credit Documents and the DIP Orders.  In the event of any inconsistency between the Motion, on one hand, and the DIP Credit Documents and the DIP Orders on the other hand, the DIP Credit Documents and DIP Orders shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.  Further, the DIP Credit Agreement also contains other customary affirmative and negative covenants and representations and warranties that are not described herein but are customary for a transaction of this nature.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>DIP Borrower</u>:  Debtors GWGH and GWG Life<br><br><u>Guarantors</u>:  Debtor GWG Life USA, LLC and non-debtors GWG MCA Capital, Inc., GWG DLP Funding V Holdings, LLC, and GWG DLP Funding V, LLC.<br><br><u>DIP Agent</u>:  National Founders LP<br><br><u>DIP Lenders</u>:  Each lender from time to time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Loan Commitment and Borrowing Limits**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The $65 million DIP Facility shall consist of the following:<br><br>(a)   $18 million Initial DIP Loan;<br><br>(b)   If the Final Order has not been entered by the thirty-sixth (36th) day after the Petition Date, a Supplemental Initial Loan (the proceeds of which may be used solely to pay premiums on the Policy Portfolio during the month of June 2022); and<br><br>(c)   Delayed Draw Loans not to exceed the remaining amount of the DIP Commitment (after taking into account the Initial DIP Loan and any Supplemental Initial Loan)<br><br>In addition, following entry of the Final Order, the DIP Agent may make Discretionary DIP Overadvances (*i.e.*, additional DIP Loans in an aggregate amount not to exceed $10,000,000).<br><br>*See* DIP Credit Agreement §§ 1.1 ("<u>Aggregate Supplemental Initial Commitment</u>"), 2.1, 2.2 , and 3.2; Interim Order ¶ 1. |
| **Maturity**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Stated Maturity Date</u>: October 20, 2022<br>*See* DIP Credit Agreement §§ 1.1 ("<u>Stated Maturity Date</u>"), 2.11.<br><br><u>Maturity Extension</u>: Extension of maturity requires the written consent by the Borrower and the Requisite Lenders.<br>*See* DIP Credit Agreement §§ 10.5(a) and (b)(ii). |
| **Duration of Use of Cash Collateral** | The DIP Facility and authorization to use the proceeds of the DIP Loans and the Cash Collateral will terminate upon the earliest of (a) the Stated Maturity Date, (b) the termination of unused Commitments with respect to the DIP Facility and/or the date of acceleration of the |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| Bankruptcy Rule 4001(b)(1)(B)(iii) | Loans in accordance with the terms of the DIP Credit Agreement upon and during the continuance of an Event of Default, (c) the date of payment in full in cash of all Obligations (other than any contingent Obligations that survive the expiration or termination of the DIP Credit Agreement) and termination of all of the Commitments pursuant to the terms herein or (d) the effective date of the Debtors' Approved Plan.<br><br>*See* DIP Credit Agreement, §§ 1.1, 2.11, and 8.2; Interim Order ¶ 3. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Credit Documents include standard and customary conditions of borrowing, the satisfaction of which are conditions precedent to the obligations of each DIP Lender to provide the DIP Facility.<br><br>*See* DIP Credit Agreement § 3. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | For a Term SOFR Loan:<br><br>(a) Adjusted Term SOFR (*i.e.*, Term SOFR, 1% floor, and 0.11448%) *plus* Applicable Rate of 10.00% per annum<br><br>For a Base Rate Loan:<br><br>(b) Base Rate (*i.e.*, rate per annum equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1% per annum and (iii) the Term SOFR for a one-month tenor in effect on such day plus 1% per annum; provided that, notwithstanding the foregoing, the Base Rate shall at no time be less than one percent (1%) per annum) *plus* Applicable Rate of 9.00% per annum<br><br>*See* DIP Credit Agreement §§ 1.1 and 2.7. |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rules 4001(b)(l)(B)(ii), 4001(c)(1)(B);<br><br>Complex Case Procedures ¶ 8(g) | To the extent permitted by, and in accordance with, the Approved Budget (subject to the Variance Limit), the proceeds of the DIP Facility shall be used to:<br><br>(a) pay operating expenses and fund working capital needs;<br><br>(b) fund the policy reserve accounts at DLP IV and DLP VI and pay premiums on the Policy Portfolio;<br><br>(c) pay administrative expenses incurred in the Chapter 11 Cases; |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | (d)         pay the DIP Obligations owing by the Borrowers, including any fees owed to the DIP Agent or DIP Lenders pursuant to the DIP Agent Fee Letter or otherwise; and<br><br>(e)         make payments pursuant to any orders entered by the Court pursuant to any "first day" motions permitting the payment by the Debtors of any prepetition amounts then due and owing.<br><br>*See* DIP Credit Agreement § 2.5; Interim Order ¶ 8. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | DIP Agent (on behalf of and for the benefit of the DIP Secured Parties).<br><br>*See* DIP Credit Agreement § 2.26; Interim Order ¶ 6. |
| **Fees, Expenses, and Additional Payments**<br>Bankruptcy Rule 4001(c)(1)(B) | (a)    The Borrowers agree to pay the fees set forth in the DIP Agent Fee Letter, in the amounts and at the times specified therein.<br><br>(b)    The Borrower agrees to pay to the DIP Agent for the account of each Lender a ticking fee, which shall accrue at 0.50% on the daily undrawn amount of the Lender's Delayed Draw Commitment, commencing on the Closing Date, and continuing through and including the Delayed Draw Commitment Termination Date.<br><br>*See* DIP Credit Agreement §§ 2.10, 2.11, and 10.2. |
| **Approved Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | In accordance with the terms of the DIP Credit Agreement, beginning on the Thursday after the end of the fourth full calendar week following the Petition Date (the "Initial Reporting Date") and on the corresponding Thursday following the end of every fourth calendar week following the Initial Reporting Date, the Debtors shall deliver to the DIP Agent an updated budget (each, a "Proposed Budget"), together with a reconciliation for the periods included in the prior Approved Budget which such updated Proposed Budget shall be in form and substance satisfactory to the DIP Agent in its reasonable discretion; provided that the DIP Agent shall have five (5) business days to approve any revised Proposed Budget and upon such approval, it shall become the Approved Budget; provided, further, that the DIP Agent shall be deemed to have approved such Proposed Budget and such Proposed Budget shall become the Approved Budget unless the DIP Agent shall have objected to such Proposed Budget prior to 11:59 p.m. on the fifth business day succeeding the delivery of such Proposed Budget on the basis of such Proposed Budget not being based on reasonable assumptions, as being |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | inconsistent with the terms, conditions and/or covenants of the DIP Loan or it being based on information that is incorrect in any material respect, in which case the Approved Budget will be as agreed reasonably and in good faith by the DIP Agent and the Borrower.<br><br>*See* DIP Credit Agreement § § 1.1 ("DIP Budget") and 5.1(m); Interim Order ¶ G. |
| **Variance Limits**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Beginning on the Initial Reporting Date, and on each Thursday thereafter that is the two (2)-week anniversary of the Initial Reporting Date (each such date, the "Bi-Weekly Variance Testing Date" and each such two (2)-week period the "Bi-Weekly Variance Testing Period"), the Borrower shall deliver to the DIP Agent a variance report detailing, by line item, (A) the actual disbursements of the Borrower and actual receipts (on an aggregated basis) and operating disbursements (on an aggregated basis for all operating disbursement line items and excluding payment of professional fees, and DIP Obligations made pursuant to the DIP Loan including fees and expenses of Term Loan Lender Advisors) for each four-week period prior to the Bi-Weekly Variance Testing Date for such period as reflected in the applicable Approved Budget for such Bi-Weekly Variance Testing Period, as set forth in the applicable Approved Budget (a "Bi-Weekly Variance Report"). The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Secured Parties to provide the DIP Facility and consent to this Interim Order.  The Debtors represent that the Initial Approved Budget is reasonable under the facts and circumstances. The Debtors believe that the Initial Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay postpetition obligations as they come due.  The Debtors shall operate solely in accordance with the Approved Budget and all disbursements of the Debtors shall be consistent with the provisions of the Approved Budget, subject to the Variance Limit.<br><br>*See* DIP Credit Agreement § 6.7; Interim Order ¶ G. |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B);<br><br>Complex Case Procedures ¶ 8(a) | Entry of the Final Order (including Court approval of the DLP VII Option) no later than 35 days following entry of the Interim Order; provided there will be an automatic extension to June 24, 2022 (or such later date as the Borrower and the DIP Agent may agree in their respective reasonable discretion from time to time) if the Court does not enter the Final Order within thirty-five (35) days of the Court's entry of the Interim Order; provided that, the DIP Agent and the Borrower may mutually agree to not extend the Final Order Deadline.<br><br>*See* DIP Credit Agreement § 5.17(a); Interim Order ¶ 6. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i);<br><br>Complex Case Procedures ¶ 8(i) | As security for the DIP Obligations, the Debtors shall grant to the DIP Agent, upon entry of the Interim Order, automatically perfected first priority DIP Liens and superpriority claims in the DIP Collateral, subject only to the Carve-Out and Priority Liens.<br><br>The DIP Obligations shall constitute "Senior Debt" for all purposes under the Indenture and shall benefit from a first priority senior secured priming lien on all assets which secure the Indenture.<br><br>*See* DIP Credit Agreement §§ 2.26(a) and (d), 3.1(l)(vi); Interim Order ¶¶ 9, 10. |
| **Cross-Collateralization**<br><br>Complex Case Procedures ¶ 8(b) | There is no cross-collateralization for any prepetition debt. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Interim DIP Order provides a "Carve-Out" for certain statutory fees and allowed professional fees of the Debtors and the Committee pursuant to sections 327, 328, 363, and/or 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶¶ 13, 14. |
| **DLP VII Option**<br><br>Complex Case Procedures ¶ 8(c) | The DIP Lenders may elect to effectuate the DLP VII Option during the DLP VII Option Period.<br><br>*See* DIP Credit Agreement § 5.17. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | None because the Bonds are not entitled to adequate protection per the Indenture (as discussed above). |
| **Events of Default and Remedies**<br><br>Bankruptcy Rule 4001(c)(l)(B);<br><br>Complex Case Procedures ¶ 8(e) | The DIP Credit Documents contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with certain covenants in the DIP Credit Agreement and will allow for remedies by the DIP Agent (upon direction by or consent of the Requisite Lenders) following the occurrence of an Event of Default, subject to providing written notice of the default and prior to the exercise or enforcement of certain rights. |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | *See* DIP Credit Agreement § 8; Interim Order ¶ 23. |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims, (b) permit the Debtors to perform such acts as the DIP Agent may reasonably request to assure the perfection and priority of the liens granted herein, (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties under the DIP Credit Documents, the DIP Facility, and this Interim Order, as applicable, (d) authorize the Debtors to effectuate the DLP VII Option, and (e) to pay, and for the DIP Agent and DIP Lenders to retain and apply, payments made in accordance with the terms of the Interim Order.<br><br>*See* Interim Order ¶ 24. |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi);<br><br>Complex Case Procedures ¶ 8(d) | Upon entry of the Final Order, the DIP Collateral shall include the proceeds of avoidance actions pursuant to chapter 5 or section 724(a) of the Bankruptcy Code or applicable state law equivalents but shall exclude the actual claims and causes of action.<br><br>*See* Interim Order ¶ 10. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | No obligation, payment, transfer or grant of security under the DIP Credit Documents or this Interim Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim.<br><br>*See* Interim Order ¶ 8. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Usual and customary for financings of this type, including that the Debtors shall agree to indemnify the DIP Agent (and any sub-agents thereof), each DIP Lender and each of their respective Related Parties (each, an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, among other things, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) asserted against any Indemnitee by any third party or by the Debtors arising out of, in connection with, or as a result of, without limitation, the execution or |

27

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
| --- | --- |
| | delivery of the DIP Credit Agreement or any other DIP Credit Document or the parties' performance under the foregoing.<br><br>*See* DIP Credit Agreement §§ 1.1 ("<u>Indemnified Liabilities</u>") and 10.3; Interim Order ¶ 7. |
| **Waiver of 506(c) and 552**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x);<br><br>Complex Case Procedures ¶ 8(i) | Subject to entry of the Final Order, the DIP Secured Parties are entitled to a waiver of the provisions of sections 506(c) and 552 of the Bankruptcy Code.<br><br>*See* DIP Credit Agreement § 4.23(b); Interim Order ¶ 19. |
| **Non-Consensual Priming Liens**<br><br>Complex Case Procedures ¶ 8(h) | The DIP Credit Agreement provides for priming of the Bonds; however, Bondholder consent to priming is deemed under the terms of the Indenture (as discussed above).<br><br>*See* DIP Credit Agreement § 2.26(g)(iv); Interim Order ¶ 10(c). |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii);<br><br>Complex Case Procedures ¶ 8(f) | Each of the Borrower and the Guarantors acknowledge effective upon entry of the Final Order, and subject to the terms thereof, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or their respective Subsidiaries' liability to repay the DIP Agent or any DIP Lender as provided in the DIP Credit Agreement.  Upon entry of the Final Order, the Borrower and the Guarantors, each in their own right and on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, fully, finally and forever release and discharge the DIP Agent and Lenders and all of DIP Agent's and Lenders' officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them, each solely in their capacity as such of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Final Order, whether in law, equity or otherwise (including, without limitation, those arising under sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or |

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions |
|---|---|
| | relating to the DIP Credit Agreement, the Interim Order, the Final Order and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. *See* DIP Credit Agreement § 2.23; Interim Order ¶ 32. |

## BASIS FOR RELIEF

**I.      The Court Should Authorize the Debtors' Entry into the DIP Facility.**

**A.      Entering into the DIP Credit Documents Is a Sound Exercise of the Debtors' Business Judgment.**

34.      The Court should authorize the Debtors to enter into the DIP Credit Documents, obtain access to the DIP Facility, and continue using Cash Collateral as an exercise of their sound business judgment.  Section 363 of the Bankruptcy Code applies the business judgment standard for a debtor's use of property of the estate.  *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard.").  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit. *See In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

35.      The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an exhaustive financing marketing process and

careful evaluation of alternatives given the timing of the Debtors' liquidity crisis.  The Debtors and their advisors determined that the Debtors would require incremental liquidity of approximately $65 million to operate in the ordinary course of business postpetition, satisfy administrative expenses, and maintain an adequate liquidity cushion.  *See* Laurinaitis Decl. ¶ 17. The Debtors conducted a robust marketing process that resulted in multiple competitive DIP proposals and negotiated the proposals in good faith, at arm's length, and with the assistance of their advisors.  *See id.* ¶¶ 18-21, 28.  As a result, the Debtors believe the proposed DIP Facility (which includes the DLP VII Option) is critical to operate their businesses and fund administrative expenses associated with the Chapter 11 Cases, while the Debtors seek to achieve a value-maximizing restructuring transaction to preserve value for the benefit of their stakeholders.  *See id.* ¶ 22.  Absent access to the DIP Facility, including providing the liquidity to pay premiums on the Policy Portfolios, the Debtors would suffer immediate and irreparable harm.  *See id.*  The Debtors do not currently have sufficient cash flow or liquidity to fund their operations and have not been able to obtain other financing on more favorable terms. *See id.* ¶ 32, 34.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Priming Liens and Superpriority Claims to the DIP Lenders.**

36.      The Debtors propose to obtain the DIP Facility under the DIP Facility, in part, by providing, among other things, superpriority claims and liens pursuant to sections 364(c) and (d) of the Bankruptcy Code.  As security for the DIP Obligations, the Debtors propose to provide to the DIP Agent, on behalf of and for the benefit of the DIP Secured Parties, valid, enforceable, binding, and fully perfected security interests in and liens upon (the "DIP Liens") all present and after-acquired property of the Debtors of any kind or nature whatsoever, including, but not limited

to, all real, personal, intangible and mixed property, all Equity Interests and any assets or property

in which the DIP Agent is granted a lien under any DIP Credit Document and all cash and cash

equivalents contained in any account maintained by any of the Debtors, and, subject to entry of a

Final Order, all proceeds of, recoveries related to, and property received or recovered on account

of claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the

Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (but not the claims

or causes of action themselves) (collectively with all rents, issues, products, offspring, proceeds

and profits of any or all of the foregoing, but excluding Excluded Assets (as defined in the DIP

Credit Agreement), the "DIP Collateral"), which liens shall be subject only to the payment of the

Carve Out and the Priority Liens.

37.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur

debt: (i) with priority over any and all administrative expenses as specified in sections 503(b) or

507(b) of the Bankruptcy Code; (ii) secured by a lien on property of the estate that is not otherwise

subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

38.    In determining whether to approve postpetition financing under 364(c), courts

consider whether: (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under

sections 364(a) and (b) of the Bankruptcy Code; (b) the credit facility is necessary to preserve

estate assets; and (c) the terms of the credit facility are fair, reasonable, and adequate, given the

circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*,

No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re L. A. Dodgers*, 457 B.R. at 312; *In re Ames Dep't Stores*, 115 B.R. at 40.

39.    First, as underscored in the Laurinaitis Declaration, no party that the Debtors contacted as part of the marketing process described above was interested in providing, or willing to provide, long-term post-petition financing to the Debtors on an unsecured, non-priming or *pari passu* basis.  *See* Laurinaitis Decl. ¶ 29.

40.    Secondly, approval of the DIP Facility on the terms set forth in the DIP Credit Agreement will provide the Debtors with immediate access to funds necessary to pay current and ongoing operating expenses, including the critical payment of Policy premiums and lease payments and invoices for critical postpetition goods and services (including those related to servicing the Policy Portfolio).  Without access to sufficient funds to pay these costs, the Debtors cannot continue to operate.  Cessation of operations would destroy the Debtors' value as a going concern to the detriment of the debtors, their estates, creditors, and stakeholders.

41.    Thirdly, in the Debtors' view, the DIP Facility represents the most favorable, cost-effective source of postpetition financing available because it's designed to provide them with sufficient and certain liquidity to, among other things, pay operating expenses, fund working capital needs, pay premiums on the Policy Portfolio, and administer the Chapter 11 Cases.  As such, the Debtors believe that they have obtained the best financing available to them under the circumstances and that, taken as whole, the terms and conditions of the DIP Facility (including approval of the DLP VII Option) are fair and reasonable.

42.    Further, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the Court may only authorize incurring debt secured by such liens if, among other things, "there is adequate protection

of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d).  However, consent by the secured creditors to a priming lien can obviate the need to show adequate protection.  *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

43.     The advances under the DIP Credit Agreement will be secured by a postpetition priming lien on the Debtors' assets, which will prime the Indenture Trustee's liens on the Bond Collateral.  However, adequate protection for the Bonds is not required because, pursuant to the Indenture, Bondholders are deemed to consent to the additional incurrence of Senior Debt and have agreed to turn over any adequate protection of their interest in any SPV Collateral to the holders of Senior Debt.  *See* A&R Indenture § 10.15(a)(iv).  Moreover, the DIP Credit Agreement provides that the DIP Liens shall be junior to (i) the Carve Out and (ii) liens of the type described in section 6.2(e), (f), and (j) of the DIP Credit Agreement (such liens, the "Priority Liens").  Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and lack of viable unsecured or non-priming financing alternatives.

44.     As set forth above, the Debtors have demonstrated that the DIP Facility should be approved under sections 364(c) and 364(d).  Because the Debtors have satisfied the requirements of section 364(c) and 364(d), the Court should approve the superpriority administrative claim and DIP Liens provided to the DIP Lenders under the DIP Credit Agreement.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

45.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.

*See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re UGHS Senior Living, Inc.,* No. 15-80399-G3-11, 2015 WL 7307317, at *8 (Bankr. S.D. Tex. Nov. 18, 2015).

46.     Here, the Debtors conducted an exhaustive and competitive marketing process to explore financing options.  As described in greater detail in the Laurinaitis Declaration, the Debtors contacted multiple potential third-party financial institutions to gauge their interest in providing financing to the Debtors, but did not receive any out-of-court short-term or long-term financing proposals from any of the parties contacted.  *See* Laurinaitis Decl. ¶¶ 18-19.  Additionally, the DIP Lenders were not willing to provide the DIP Facility on any other terms (including without the DLP VII Option), and no other existing stakeholder or third party has, taken as a whole, presented a better alternative proposal.  *See id.*

47.     Moreover, the Debtors and their advisors heavily negotiated the DIP Facility with the DIP Lenders in good faith and at arms' length.  Absent access to the DIP Facility, the Debtors will not have the ability and the opportunity to consider and engage with stakeholders, including Bondholders, regarding the potential terms and conditions of the restructuring and reorganization of their businesses and financial affairs.  To date, the Debtors' liquidity situation has been so dire that merely addressing the liquidity crisis has taken the bulk of the Debtors' time and efforts.  Consequently, the Debtors have not had any real opportunity or the resources to meaningfully consider possible restructuring alternatives or otherwise engage with stakeholders.  *See id.* ¶ 15.

48.      Accordingly, the Debtor requests that the DIP Facility be approved on the terms set forth in the DIP Credit Agreement and DIP Orders.

## II.     The Debtors Should Be Authorized to Use Cash Collateral.

49.     As set forth above, the DIP Lenders are being granted liens on the Debtors' Cash Collateral.  Section 363(c)(2) provides that a debtor may not use cash collateral unless each entity

that has an interest in the cash collateral consents or the court, after notice and a hearing, authorizes the debtor's use of cash collateral. The Debtors' use of Cash Collateral will be subject to the terms and conditions of the Interim Order and the DIP Credit Documents and in accordance with the Approved Budget. Accordingly, the Court should authorize the Debtors' use of Cash Collateral.

## III.    The Automatic Stay Should Be Modified on a Limited Basis.

50.    The DIP Credit Agreement and the relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the Debtors to grant the security interests, liens, and superpriority claims described above and to allow the Debtors and DIP Lenders to perform such acts as may be necessary or desirable to perfect such interests and liens.

51.    Subject to any applicable notice and cure period under the DIP Credit Documents and/or the DIP Orders, immediately upon the occurrence and during the continuation of an Event of Default, without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to send a declaration (which may be given by electronic mail) to counsel to the Debtors, the U.S. Trustee, and counsel to any committee appointed in the Chapter 11 Cases (the "Committee") stating that an Event of Default has occurred, the requirements to fund the Carve-Out under paragraphs 13 and 14 of the Interim DIP Order have been triggered, and that (a) the DIP Commitments shall be terminated, reduced, or restricted immediately unless and until the DIP Agent shall reinstate the same in writing, (b) declare the DIP Facility then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared due and payable), and thereupon the principal of the DIP Loans so declared to be due and payable, together with accrued interest thereon and all fees and other DIP Obligations, shall become due and payable immediately, in each case, without presentment,

demand, protest, notice of intent to accelerate, notice of acceleration, or other notice of any kind, which is waived by the Debtors pursuant to the DIP Credit Agreement, (c) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, (d) terminate the DIP Facility, (e) charge the Default Rate under the DIP Facility, and (f) exercise any right or remedy with respect to the DIP Collateral or DIP Liens, or take another action or exercise any other right or remedy permitted under the DIP Credit Documents or applicable law (each such declaration shall be referred to as a "<u>DIP Termination Declaration</u>" and the date on which a DIP Termination Declaration is delivered shall be referred to as the "<u>DIP Termination Date</u>").

52.     The Interim Order also provides that, in the case of the enforcement of liens or other remedies with respect to DIP Collateral, the DIP Agent shall provide the Debtors with notice (with a copy to counsel for the Committee and the U.S. Trustee, and a copy filed with the Court), requesting an emergency hearing (the "<u>Stay Relief Hearing</u>").  The Court shall conduct the Stay Relief Hearing upon no less than five business days' notice to determine whether an Event of Default has occurred.  The Court may fashion any appropriate remedy at the Stay Relief Hearing that is consistent with the terms of the DIP Orders (the "<u>Stay Remedy Order</u>"), and subject to the Stay Remedy Order, (i) the DIP Agent may proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Credit Documents and under applicable law including the right to foreclose on, or otherwise exercise its rights with respect to all or any portion of the DIP Collateral, including by applying the proceeds thereof to the DIP Obligations, or to effectuate any set off (all of which such rights and remedies of the DIP Agent and DIP Secured Parties shall be cumulative and not exclusive of any rights or remedies that the DIP Agent and the DIP Secured Parties may have under the DIP Credit Documents or otherwise, and (ii) the Debtors shall (at the

expense of the DIP Agent) cooperate fully with the DIP Agent and the DIP Secured Parties in their

exercise of rights and remedies, whether against the DIP Collateral or otherwise

53.     Because the proposed modification to the automatic stay is both reasonable and fair

under the circumstances, the Debtors request that the Court approve the modification.

**IV.     Interim Relief is Necessary to Avoid Immediate and Irreparable Harm to the Debtors' Estates.**

54.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit

may not be commenced earlier than 14 days after the service of such motion.  Upon request,

however, the Court is empowered to conduct a preliminary expedited hearing on the motion and

authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm

to a debtor's estate pending a final hearing.  The Debtors request that the Court conduct an

expedited preliminary hearing on this Motion to approve the DIP Facility on an interim basis,

pending entry of a final order, in order to maintain and finance the Debtors' ongoing operations.

55.     As discussed above, the Debtors do not have sufficient funds with which to operate

their businesses on an ongoing basis and, specifically, to meet postpetition operating expenses,

including to pay Policy Premiums and critical vendors who provide essential services in

connection with maintaining the Policy Portfolio.  Absent immediate authorization from the Court

to obtain secured credit on an interim basis, the Debtors will be forced to cease operations.

Expedited consideration of the Motion and interim approval of the DIP Facility will enable the

Debtors to continue operations pending the Final Hearing, preventing the immediate and

irreparable harm that would occur if the Debtors were unable to continue operating.  Accordingly,

the interim relief requested is critical to preserving and maintaining the Debtors' value as a going

concern.

**V.      The DLP VII Option Should Be Approved Upon Entry of the Final Order.**

56.      Under the DLP VII Option, the DIP Lender may elect to refinance the outstanding obligations under the respective DLP Agreements and transfer the Policy Portfolios to a newly formed wholly-owned non-debtor subsidiary of GWG Life.  The SPV Lenders currently hold valid, perfected, first priority liens in the Policy Portfolios, and the face value of the Policy Portfolios are significantly in excess of the outstanding respective obligations under the SPV Credit Facilities. By refinancing the SPV Credit Facilities and transferring the Policy Portfolios to DLP VII free and clear of all claims, liens, and encumbrances, the Debtors will have access to substantial additional liquidity.  DLP VII's term loan agreement will permit Policy premiums to be paid from Policy maturities and the DIP Lenders have agreed to a structure allowing for lending at higher LTV ratios.  Also, the value of the structure is a drastic improvement for the Debtors compared to the terms of the existing SPV Credit Facilities–under which the Debtors currently have no ability to use cash generated by Policy maturities outside of a straight waterfall.  If the DLP VII Option is exercised by the DIP Lender, the DIP Facility will cease to be an obligation of the Debtors' estates and instead the proceeds of the DIP Facility will be obligations under the DLP VII Facility provided to non-debtor DLP VII.  As a result, the Debtors will have $65 million (less a paydown of the Initial DIP Loan and all related fees and expenses in connection therewith) to fund their Chapter 11 Cases without ongoing budget testing, security interests in the Debtors' other assets, or other requirements under the DIP Credit Documents.  The Debtors will have the liquidity on an unfettered basis to pursue the broader restructuring for the benefit of all stakeholders.

57.      Approval of the DLP VII Option will: (a) allow the Debtors to receive essential post-petition financing; (b) result in incremental liquidity to fund the Policy Portfolios, thus

reducing reliance on the Debtors existing cash for funding Policy premiums; and (c) streamline the Chapter 11 Cases.

58.     Section 363(b)(1) of the Bankruptcy Code provides that the Debtors "after notice and a hearing, may use…other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides the Court the power and authority to carry out the provisions of section 363(b).

59.     In addition, section 363(f) permits the Debtors to "sell property under subsection (b)…of this section free and clear of any interest in such property of an entity other than the estate" if "such entity consents" or "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."  11 U.S.C. §§ 363(f)(2), 363(f)(3).  Here, the SPV Lenders will be repaid in full and no lender consent is required to transfer the Policy Portfolios from non-debtors DLP IV and DLP VI to Debtor GWG Life USA and then free and clear to non-debtor DLP VII Parent.

60.     As demonstrated in the Laurinaitis Declaration, the DIP Facility, including the DLP VII Option, is the best available financing for the Debtors.  Having the Policy Portfolio housed in a new bankruptcy remote subsidiary (DLP VII) and ensuring that the Policy Portfolio is transferred free and clear of all liens, claims, interests and encumbrances allows for the provision of the financing to be on the most favorable terms available to the Debtors.  Given the structure of the DIP Facility and the DLP VII Option, the Debtors are receiving the highest and best financing option for the Policy Portfolio in the form of the DIP Facility after an extensive financing marketing process by PJT and therefore protection under section 363 of the Bankruptcy Code is appropriate.  Additionally, all parties in interest are being put on notice of the relief being sought

at the Final Hearing (including that the DLP VII Transaction will be free and clear of all liens, claims, interests and encumbrances) and are afforded the opportunity to object.

61.     The DLP VII Option is a critical component and condition of the DIP Facility and represents the Debtors' best chance of maximizing the value of the Policy Portfolios.  Absent the Court's approval of the DLP VII Option upon entry of the Final Order, the Debtors would be unable to continue accessing the DIP Facility (including the Final Amount) and likely could not continue as a going concern.  Accordingly, the DLP VII Option, when taken as a whole together with the other terms of the DIP Facility, is in the best interests of the Debtors given the circumstances of the Chapter 11 Cases.  For these reasons, the DLP VII Option is appropriate and necessary and should be approved by the Court.

## EMERGENCY CONSIDERATION

62.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations, and any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 25 days of the Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors have satisfied both (a) the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and (b) the requirements of Bankruptcy Local Rule 9013-1(i) and request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

63.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

64.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rule 4001, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties in interest, including: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the Southern District of Texas; (d) the Internal Revenue Service; (e) counsel to the DIP Lender; (f) counsel to CLMG Corp. and LNV Corporation; (g) counsel to National Founders LP; (h) counsel to Bank of Utah, in its capacity as Indenture Trustee for the Bonds; (i) counsel to the plaintiffs in the Putative Securities Class Action Suit; (j) counsel to the plaintiffs in the California Collection Suit; (k) the U.S. Securities and Exchange Commission; (l) the Attorney General of each state in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders and grant such other and further relief as is appropriate under the circumstances.

Houston, Texas
April 20, 2022

Respectfully Submitted,

 /s/ Charles S. Kelley _____

**MAYER BROWN LLP**

Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone:      (713) 238-3000
Email:          ckelley@mayerbrown.com

-and-

Thomas S. Kiriakos (*pro hac vice* pending)
Louis S. Chiappetta (*pro hac vice*
pending)
71 S. Wacker Drive
Chicago, IL 60606
Telephone:      (312) 701-0600
Email:
tkiriakos@mayerbrown.com

lchiappetta@mayerbrown.com

-and-

Adam C. Paul (*pro hac vice* pending)
Lucy F. Kweskin (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone:      (212) 506-2500
Email:          apaul@mayerbrown.com

lkweskin@mayerbrown.com

*Proposed Counsel for the Debtors and
Debtors in Possession*

**JACKSON WALKER LLP**

Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          kpeguero@jw.com
                mcavenaugh@jw.com

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

42

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Charles S. Kelley

**Certificate of Service**

I certify that on April 20, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Charles S. Kelley