**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GWG Holdings, Inc., *et al.*,[1] | ) | Case No. 22-90032 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

**DECLARATION OF TIMOTHY EVANS, CHIEF FINANCIAL OFFICER OF GWG
HOLDINGS, INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND
FIRST DAY MOTIONS**

I, TIMOTHY EVANS, do hereby declare, under penalty of perjury, that:

1.      Since August of 2019, I have served as the Chief Financial Officer of GWG

Holdings, Inc. ("GWGH"), a corporation duly organized under the laws of the State of Delaware,

that is the ultimate parent holding company for each of the above-captioned debtors and debtors

in possession (together with GWGH, collectively, the "Debtors" and together with their non-debtor

affiliates, "GWG" or the "Company").[2]  Prior to serving as Chief Financial Officer of GWGH, I

was Chief Integration Officer of GWGH from May 2019 and, prior to that, Chief of Staff for The

Beneficient Company Group, L.P. ("Ben LP" and, together with its subsidiaries, "Ben") where I

served as Vice President and Deputy General Counsel.

2.      In my capacity as GWGH's Chief Financial Officer, I am primarily responsible for

overseeing tracking of cash flow and financial planning, including as to the maintenance of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); and GWG Life USA, LLC (5538). The
location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N.
St. Paul Street, Suite 2650 Dallas, TX 75201.  Further information regarding the Debtors and these chapter 11
cases is available at the website of the Debtors' proposed claims and noticing agent:
https://donlinrecano.com/gwg.

[2]    For the avoidance of doubt, the definition of "GWG" and "Company" does not include non-affiliated entities The
Beneficent Company Group L.P., FOXO Technologies, Inc., or their respective direct and indirect subsidiaries.

adequate liquidity, overseeing the preparation of financial reports, analyzing the Company's financial strengths and weaknesses, and proposing strategic directions. As Chief Financial Officer, I am also familiar with the Company's day-to-day operations, businesses, financial affairs, and books and records.

3.       Today (the "Petition Date"), each of the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), to preserve and maximize the value of their chapter 11 estates. The Debtors have also requested a variety of relief in their "first day" motions, declarations, applications, and pleadings (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases and facilitate a smooth transition into these cases. The First Day Motions, summarized below, seek among other things, to (i) ensure financing for the Debtors' chapter 11 cases and avoid a value-destructive liquidation, (ii) ensure the continuation of the Debtors' cash management system and other business operations with minimal disruption or loss of productivity or value, (iii) maintain and preserve the Debtors' valuable assets, and (iv) implement certain administrative procedures that will promote timely and efficient chapter 11 cases. I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases (the "Chapter 11 Cases") and in support of the Debtors' Petitions and First Day Motions. I am familiar with the content of the Petitions and First Day Motions, and it is my belief that the relief sought therein will preserve and maximize the value of the Debtors' estates for the benefit of their creditors.

4.       I am authorized to submit this Declaration on behalf of each Debtor and am above 18 years of age. Except as otherwise indicated, the facts set forth in this Declaration are based

upon my personal knowledge, my review of relevant documents, discussions with and information provided to me by the Debtors' advisors and individuals responsible for the relevant business and corporate matters addressed in the First Day Motions or the Debtors' advisors, or my opinion based upon my experience and knowledge.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

### Preliminary Statement

5.      The Company is a financial services firm with two principal types of assets: (i) secondary life insurance assets; and (ii) economic interests in independent non-affiliated entities that operate in the alternative asset and epigenetics spaces, respectively.  As a preliminary matter, GWG believes that it has valuable, although presently illiquid, assets that, given time, should yield substantial recoveries for the Debtors and their stakeholders.  However, due to a liquidity crisis precipitated by external factors outside of the Debtors' control—principally a temporary and presently ongoing inability to access liquidity from the capital markets beginning in April 2021 and related regulatory issues related to GWGH's securities filings—the Debtors have been forced to seek the protections of chapter 11 of the Bankruptcy Code, in an effort to preserve and maximize the value of their business and assets for the benefit of all of their stakeholders.

6.      Although GWGH began with a focus on secondary life insurance, it has expanded the scope of its financial services through now-passive investments in two entities: Ben LP and FOXO Technologies, Inc. ("FOXO").  Ben LP was formerly a consolidated subsidiary of GWGH that, as a result of a recent series of decoupling transactions with GWGH, is now a fully independent entity in which GWGH retains a substantial, albeit passive, investment.[3]  Following

---

[3]     Specifically, GWGH relinquished the right to appoint directors to Ben LP's board; for the avoidance of doubt, GWGH did not relinquish its economic position in Ben.  Additional information about these decoupling transactions is available here: https://www.globenewswire.com/news-release/2021/11/29/2342243/0/en/The-Beneficient-Company-Group-Announces-Separation-from-GWG-Holdings-Inc.html.

the decoupling, Ben was able to obtain a license to operate as a Kansas Technology Enabled Fiduciary Financial Institution ("Kansas TEFFI") and, as a result, Ben is able to refine and expand the services it provides to its current and future customers, which GWGH anticipates will continue to generate substantial value that will inure to the benefit of the Debtors' estates through GWGH's retained investment.   With respect to FOXO, on February 24, 2022, Delwinds Insurance Acquisition Corp. ("Delwinds") announced that it had entered into a definitive merger agreement with FOXO, which develops epigenetic technology (*e.g.*, technology used to assist in the actuarial modeling of life insurance policy maturities), which, if fully consummated, would allow FOXO to trade publicly.[4]   The unrealized value that GWGH holds in the interests of Ben and FOXO should yield substantial recoveries for the Debtors and their stakeholders.   However, such realization requires proper monetization timing, which cannot be achieved, as a preliminary matter, without the protections of chapter 11.

7.       With respect to their secondary life insurance assets, the Company owns and manages a portfolio, in terms of the expected life expectancies of the insureds, of near-duration, intermediate-duration, and long-duration life insurance policies (each a "Policy" and collectively, the "Policy Portfolio").   As of the Petition Date, the approximate face amount of the Policy Portfolio is $1.732 billion.  Policies with an approximate face amount of $1.313 billion are held by non-Debtor affiliate GWG DLP Funding IV, LLC ("DLP IV") and Policies with an approximate face amount of $419.8 million are held by non-Debtor affiliate GWG DLP Funding VI, LLC ("DLP VI").   The approximate direct monthly cost to maintain the Policy Portfolio is $5 to 7 million, with such costs primarily consisting of premiums payable on the Policies, salaries and

---

[4]    Additional information on this transaction is available here: https://www.globenewswire.com/news-release/2022/02/24/2391999/0/en/FOXO-Technologies-Inc-Enters-Into-Business-Combination-Agreement-with-Delwinds-Insurance-Acquisition-Corp.html.

fees owed to various third-party professionals necessary to maintain and manage the Policy Portfolio, and the cost of software and other infrastructure. Ensuring that the Policy Portfolio is properly maintained is critical to the Debtors' business because the failure to timely pay premiums on a given Policy risks that Policy lapsing and losing all of its value. The Debtors have historically funded the costs to service the Policy Portfolio with (a) death benefits paid to DLP IV or DLP VI, as applicable, when a Policy "matures" and (b) through the issuance of bonds[5] by GWGH and GWG Life or borrowing from DLP IV's and DLP VI's senior creditors. As described in its public filings with the United States Securities and Exchange Commission (the "SEC"), GWGH and GWG Life has, at all times, used proceeds from the issuance of Bonds for various purposes, including (i) to address liquidity in the event that monthly Policy maturities were insufficient to provide the necessary funding to maintain the Policy Portfolio, (ii) to pay required interest on the Bonds and refinance maturing Bonds, and (iii) for additional corporate purposes, including investment in Ben LP.

8.    In October 2020, the Enforcement Division of the SEC served a subpoena on GWGH in connection with an investigation regarding certain accounting matters and GWGH's issuance of Bonds. This investigation is ongoing and has involved the full cooperation of the Company, and, to GWGH's knowledge, has not demonstrated the violation of any accounting standards or securities laws by GWGH or any other wrongdoing. On February 15, 2021, with the concurrence of its prior auditor Grant Thornton, LLP, the Company posed two accounting questions to the SEC's Office of Chief Accountant. This consultation concluded on July 26, 2021, resulting in the late filing of certain financial statements and the voluntary suspension of Bond

---

[5]    As of the date hereof, GWGH the following types of bonds issued and outstanding, as defined in paragraph [39] herein: (i) Public L Bonds and Liquidity Bonds with an approximate face value of $1.3 billion; and (ii) Seller Trust L Bonds with an approximate face value of $367 million (collectively the "Bonds").

sales by GWGH for approximately eight months between April and November of 2021.  The late filings arising from the consultation resulted in the voluntary suspension of Bond sales, which severely constrained the Debtors' liquidity by foreclosing access to the capital markets.  The Company has actively sought sources of ongoing liquidity, but has been unable to secure such funding outside of a chapter 11 case.

9.     Accordingly, the Debtors commenced these chapter 11 cases (these "Chapter 11 Cases") in order to obtain both (a) necessary short and medium-term financing to operate that can be facilitated only through the use of debtor-in-possession financing and (b) through the automatic stay and other provisions of the Bankruptcy Code, the benefit of being able to address the Debtors' present financial issues in a single forum, which, in each instance, will enable the Company to preserve and maximize the value of its business and restructure the Company's obligations.

10.    To familiarize the Court with the Debtors, their business, the circumstances leading to the Chapter 11 Cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, this Declaration is organized as follows:

a.     **Part I** provides a general overview of the Company's history, corporate structure, and business operations;

b.     **Part II** addresses the Company's prepetition debt;

c.     **Part III** provides an overview of the events leading to the Chapter 11 Cases and the Company's prepetition efforts to resolve the issues that have necessitated an in-court restructuring; and

d.     **Part IV** summarizes the relief requested in, and the legal and factual basis supporting, the Debtors' First Day Motions.

## PART I

**Overview of the Company's History, Corporate Structure, and Business Operations**

I.      **The Company's History and Business Overview.**

11.     The Debtors' business was originally organized in February of 2006, with GWGH formed as the ultimate parent holding company in March of 2008.  In September of 2014, GWGH consummated an initial public offering of its common stock on The Nasdaq Capital Market. GWGH's stock trades under the ticker symbol "GWGH."

12.     In relevant part, GWGH conducts its secondary market life insurance business through a wholly-owned subsidiary, GWG Life, LLC ("GWG Life"), and GWG Life's wholly-owned direct and indirect non-debtor subsidiaries, DLP IV, DLP VI, and GWG DLP Funding Holdings VI, LLC ("DLP Holdings VI").  DLP Holdings VI is the sole member of DLP VI.  Each of these three entities is structured to be a bankruptcy remote entity that is separate and distinct from its ultimate parents.  A copy of the Company's relevant pre-petition organizational chart, including certain non-debtor affiliates discussed herein, is included below.



13.     In addition to the Policy Portfolio, the Debtors also holds valuable passive equity interests in Ben and FOXO.  Ben offers a variety of liquidity products to owners of alternative assets and, following consummation of recent separation transactions with the Debtors and Ben's receipt of the Kansas TEFFI license, is now strategically positioned to expand its business and, in turn, increase the value of GWGH's economic interest in Ben.  While presently illiquid, the Debtors' investments in Ben LP has substantial value, which is expected to increase and, if allowed the time to be properly monetized, should yield positive results for all the Debtors' stakeholders. FOXO and its subsidiaries operate a life sciences and technology company that employs epigenetic science and artificial intelligence to assist life insurance companies with underwriting and selling their products by offering insights into disease and aging considerations for individuals seeking to obtain insurance policies.  FOXO recently entered into a definitive merger agreement with Delwinds that, if fully consummated, will allow FOXO to trade publicly and ultimately yield an economic recovery for the Debtors. While also presently illiquid, the Debtors' investments in FOXO have substantial value, which is expected to increase and, if allowed the time to be properly monetized, should yield positive results for the Debtors' stakeholders.

II.     **The Debtors' Business Operations.**

    A.     **Secondary Life Insurance.**

14.     With respect to their secondary life insurance business, operated, as noted, through non-Debtor special purposes entities, the Debtors seek to earn yields from the Policy Portfolio.  As noted in paragraph 7 above, non-debtors DLP IV and DLP VI hold the Policies that comprise the Policy Portfolio.  The majority of the Policies were acquired through secondary-market purchase transactions with insureds between 2006 and 2018 (each, a "Settlement Policy Transaction"). Settlement Policy Transactions are a secondary market within the life insurance sector and provide

an attractive alternative means of monetizing a life insurance policy for individual policyholders. Settlement Policy Transactions involve the sale of a life insurance policy to a third-party at a discount to the ultimate death benefit, but at a price that is typically higher than the insured would receive in other transactions available to monetize the policy.[6]

15.     The buyer of a life insurance policy, here DLP IV or DLP VI, becomes the policy's beneficial owner and takes responsibility for making the premium payments and the cost of servicing the policy in exchange for becoming the beneficiary of the death benefit when the insured dies (referred to in the industry as a "maturity" of the underlying life insurance policy).  When life insurance policies are purchased via numerous Settlement Policy Transactions and pooled, such as those owned and serviced by DLP IV and DLP VI, the owner must have significant capital available to pay the premiums and servicing costs necessary to maintain the underlying life insurance policies. While there is additional capital invested monthly into the pool of policies, over time and as premiums are paid, the value of the pool generally increases as maturities are likely to occur more frequently with the passage of time.

16.     The capital required to maintain a portfolio of life insurance policies is typically obtained in one of two ways:  (i) from policies that have matured—in other words—policies that have paid out their death benefits because the insured has died or (ii) from monies raised from the

---

[6]     Outside of a Settlement Policy Transaction, when an insured no longer requires the protections of a life insurance policy, there are a variety of options the insured may employ to cancel or otherwise monetize the policy.  The insured may elect to surrender the policy to the insurance company in exchange for a payment equal to the premium payments previously made on the policy and any earnings on the policy, with the costs or insurance protection and surrender charges deducted (a "Surrender Transaction").  A Surrender Transaction can be disadvantageous from a tax perspective because the insured must pay capital gains taxes on profits received from the cash surrender value of the policy.  The insured may also cease making payments under the policy and allow it to lapse (a "Voluntary Lapse").  A Voluntary Lapse results in the insured receiving no death benefits and the loss of a potentially significant portion of the premiums paid to the insurer prior to the lapse.  Finally, if permitted by the terms of the policy, the insured may cancel their policy and receive a cash payment from the insurer, typically of a *de minimis* amount.  In light of the foregoing, insureds in such a situation typically pursue a Settlement Policy Transaction because it can result in the realization of more significant value for the insured than the available alternatives.

capital markets.  With respect to the first option, a purchaser of policies via a Settlement Policy Transaction must be able to predict how long a given insured will live—a prediction that can never be done with absolute certainty, but is predicted with actuarial modeling.  With respect to the second option, the purchaser must have consistent and predictable access to the capital markets, which access may be subject to external factors largely outside of the purchaser's control.

17.     Presently, the approximate, direct monthly cost to maintain the Policy Portfolio is $5 to 7 million and, as discussed above, if premiums are not paid, a Policy can enter a grace period and ultimately lapse, resulting in a total loss of death benefits upon the death of an insured.  The importance of making timely payments to maintain the Policies cannot be overstated.  Unlike other types of assets, the Policy Portfolio does not depreciate by a certain percentage if it is not maintained; rather, whether the Policy Portfolio retains value is a zero-sum game—either the Policy Portfolio is serviced and retains its value or the Policies in the Policy Portfolio lapse and lose all value.  In short, the timely payment of premiums and servicing costs is critical to ensure that the Policy Portfolio is not rendered valueless.

18.     DLP IV and DLP VI have historically made monthly premium payments from both collections on maturities from Policies after the death of an insured and from proceeds realized from the sale by their ultimate parent Debtors, GWGH and GWG Life, of Bonds.  GWGH's network of approximately 145 member firms and registered investment advisors (the "Broker Firms") facilitate these Bond sales.  In addition to servicing the Portfolio, DLP IV, DLP VI, and the other Debtors also have approximately $2.5 million in monthly operating expenses that have historically been funded from the collection of death benefits and the sale of the Bonds.  DLP IV and DLP VI have historically been able to fund the costs of maintaining the Portfolio and their

monthly operating expenses through collection of death benefits, proceeds from the sale of the Bonds, and, when permitted, advances under their respective credit facilities.

### B.    Ben.

19.    Ben, an independent third-party entity based in Dallas, Texas, operates various financial services companies.  Ben markets an array of liquidity and trust administration products to alternative asset investors (such as holders of interests in private equity, venture capital, and feeder funds) primarily comprised of mid-to-high-net-worth individuals having a net worth between $5 million and $30 million and small-to-midsize institutional investors and family offices with less than $1 billion in investable assets.  Ben is able to offer liquidity and trust administration services to its customers primarily through two of Ben LP's operating subsidiaries, Ben Liquidity, L.L.C. ("Ben Liquidity") and Ben Custody, LLC  ("Ben Custody Admin"), respectively.  Ben Liquidity offers simple, rapid and cost-effective liquidity products to its customers through the use of customized trust vehicles, referred to as ExAlt Trusts, that facilitate the exchange of a customer's alternative assets for consideration using a unique financing structure through which Ben Liquidity generates interest and fee income.[7]  Ben Custody Admin provides trust administration services to the trustees of certain of the ExAlt Trusts that own the customer's exchanged alternative assets following liquidity transactions for fees payable quarterly.

20.    For example, if the holder of an illiquid interest in a private equity investment wishes to monetize its interest in that asset, Ben provides a variety of products to allow the holder to convert its illiquid asset into cash, equity, or debt securities.  The first step in this process is for

---

[7]    Under the financing structure employed by Ben, a subsidiary of Ben Liquidity makes loans (each, an "ExAlt Loan") to certain of the ExAlt Trusts which employ the loan proceeds to acquire agreed upon consideration, which certain of the ExAlt Trusts deliver to customers in exchange for their alternative assets.  Ben Liquidity generates interest and fee income earned in connection with the ExAlt Loans, which are collateralized by a portion of the cash flows from the exchanged alternative assets.

the holder to open a custody account with Ben, after which Ben conducts underwriting and provides the holder with proposed terms and liquidity product options. The holder of the asset then has the option to select its preferred product, place all or part of its asset into a Ben ExAlt Trust, and receive in exchange cash, equity, or debt securities.

21.     Through these liquidity solutions and trust administration services, Ben seeks to capitalize on approximately $20 to 40 billion of untapped, estimated annual market demand for alternative asset liquidity solutions by mid-to-high-net-worth individuals and small-to-midsize institutional investors and family offices. Ben is currently seeking to expand the liquidity solutions that it offers to owners of alterative assets in order to grow its market share in what Ben believes is currently an underserved market with substantial growth opportunities.

22.     In furtherance of this goal, Ben Liquidity intends to operate as a Kansas TEFFI. Kansas TEFFIs are regulated fiduciaries providing financing, custody, and trustee management services to investors and managers of alternative investments. Ben Liquidity's recently obtained ability to operate as a Kansas TEFFI is critical to its ability to fully capitalize on the substantial untapped value that exists in the alternative asset liquidity solutions market.

23.     In order for Ben Liquidity to obtain the necessary licenses to operate as a Kansas TEFFI, GWGH determined that it was necessary for Ben to cease being a subsidiary of GWGH and, instead, to operate independently. To that end, in August 2021, Ben and GWGH announced that the companies would be engaging in a series of transactions that would ultimately separate Ben and GWGH and allow Ben Liquidity to obtain the necessary licenses to operate as a Kansas TEFFI, with the final vote occurring in mid-November 2021 and with the transactions effective as of November 29, 2021 (the "Ben Separation Transactions"). The centerpiece of the Ben Separation Transactions was GWGH relinquishing its ability to appoint the majority of the board of directors

of Ben LP's general partner.   The Ben Separation Transactions have been substantially consummated and Ben Liquidity has obtained the necessary license to operate as a Kansas TEFFI.[8]

24.     The Debtors currently hold a substantial amount of Ben LP's common equity, which, even prior to the Ben Separation Transactions had substantial value, but is presently illiquid.   The Debtors believe that the substantial consummation of the Ben Separation Transactions, the subsequent steps taken to allow Ben Liquidity to begin operating as a Kansas TEFFI, and the substantial value that Ben anticipates realizing as a result of completing that step in its business plan will allow it to realize substantial current value on its investment in Ben LP and that such realization of value will yield notable recoveries for the Debtors and their stakeholders.

25.     Additionally, although the companies are separate, while the parties were consolidated, they placed all of the employees of both companies under Ben LP to provide for improved and uniform benefits and to promote efficiency.   As a result, on May 27, 2020, GWGH and Ben LP entered into a Shared Services Agreement (the "Shared Services Agreement"). Pursuant to the Shared Services Agreement, Ben LP provides certain services to GWGH, including access to certain Ben employees who then act at the direction of GWGH senior management, with service fees paid on a quarterly basis in accordance with the cost allocation methodology.   The Shared Services Agreement is discussed further herein.

---

[8]     GWG Life, as lender, and Ben LP, as borrower, were parties to that certain *Commercial Loan Agreement* dated as of August 10, 2018. The original amount of the loan thereunder was approximately $192.5 million and the sole recourse for the nonpayment of the loan was acceleration of the remaining balance due and owing at the time of acceleration. On or about December 28, 2020, Ben LP repaid such loan by issuing additional equity in Ben LP to GWG Life, satisfying such loan through the conveyance of the sole recourse therefor to GWG Life.

## C.    FOXO.

26.    GWGH also has passive and non-controlling interest in FOXO which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs") and FOXO Life LLC ("FOXO Life"), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology (*e.g.* technology used to assist in the actuarial modeling of life insurance policy maturities).   As noted, GWGH's economic interest in FOXO is not a control position although it is the majority shareholder and owns approximately 80% of the economic interests of FOXO.   FOXO Labs was formed to commercialize epigenetic technology for the longevity industry.   FOXO Life seeks to offer life insurance directly to customers utilizing epigenetic technology.   The Chief Executive Officer of FOXO is Jon R. Sabes, who was previously Chairman and Chief Executive Officer of GWGH.

27.    On or about February 24, 2022, FOXO entered into a definitive merger agreement (the "FOXO Merger") with Delwinds, a special purpose acquisition company.   In connection with announcing the FOXO Merger, the combined company also announced that its estimated enterprise value is $369 million and that it anticipates becoming listed on the New York Stock Exchange in the near term.   GWGH anticipates that it will ultimately realize value on its economic interest in FOXO as a result of the FOXO Merger and, similar to its investment in Ben, and as noted in paragraph 13 above, if allowed the time to be properly monetized, should yield positive results for all of the Debtors' stakeholders.

## D.    Shared Services Agreement.

28.    As of the Petition Date, the Debtors have two full-time employees, Murray Holland, Chief Executive Officer, and myself.   Neither of the Debtors' employees are represented by a labor union.   Most individuals who regularly perform services for the Debtors are employed by Ben.

Those individuals perform services for the Debtors under the direction and control of GWGH senior management pursuant to the aforementioned Shared Services Agreement.  Ben does not have the right under the Shared Services Agreement or otherwise to direct or operate the business or affairs of the Debtors.

29.     Pursuant to the Shared Services Agreement, Ben and its subsidiaries provide services to the Debtors, DLP IV and DLP VI, in the following categories: Accounting & Finance; General & Administrative; Human Resources; Sales & Marketing; Underwriting & Risk Management; Information Technology; Legal; and any additional services as mutually agreed upon in writing (the "Shared Services").

30.     In the ordinary course of business, and pursuant to the Shared Services Agreement, the Debtors compensate Ben for the Shared Services by paying a quarterly fee (the "Service Fee"). The Service Fee is computed by Ben at the end of each calendar quarter and is payable by the Debtors, subject to audit rights, within 30 days after the end of each such quarter.  As of the Petition Date, the unpaid amount of the Service Fee is $2,992,411.97, which is the Service Fee for the fourth quarter of 2021.  Additionally, although the first quarter of 2022 has ended, the Debtors have not yet received an invoice for the amount of the Service Fee accrued or other amounts accrued in 2022 prior to the Petition Date; however, the Debtors estimate that such amount will be comparable to the prior quarter's Service Fee.  For the avoidance of doubt, and pending any assumption during the Chapter 11 Cases, the Debtors will not be seeking authority to pay any of these pre-petition amounts, and will pay amounts relating to postpetition Shared Services on a monthly basis.

31.     The Service Fee is computed, in part, by analyzing the records kept by Ben employees as to the percentage of their working hours spend performing services for the Debtors.

As of December 31, 2021, Ben and its subsidiaries had approximately 163 total employees. Of that amount, ninety-six Ben employees spent at least 5% of their working time performing services for the Debtors. Of those employees, forty five spent at least 50% of their working time performing services for the Debtors.

## PART II

### Overview of the Company's Prepetition Equity and Debt Structure

32.      As of the Petition Date, GWGH had issued and outstanding common shares, redeemable preferred shares, and series 2 redeemable preferred shares as summarized below:

| Equity Interest | Total Shares Outstanding |
|---|---|
| Common Equity | 33,102,273.250 ($2.04/share trading price)[9] |
| Redeemable Preferred Stock | 41,681 ($42,229,858.35 liquidation preference)[10] |
| Series 2 Redeemable Preferred Stock | 86,707 ($87,329,485.55 liquidation preference)[11] |

33.      Ben or parties related to Ben own approximately 12% of GWGH's common stock. Certain trusts owning Ben common units (the "Seller Trusts") acquired approximately 78% of the common stock of GWGH on December 28, 2018 pursuant to that certain *Master Exchange Agreement* dated as of December 2017 or early 2018 by and between GWGH, GWG Life, and these Seller Trusts. Certain custody trusts established by Ben in connection with its liquidity transactions subsequently acquired from the Seller Trusts a portion of that 78% of GWGH's common stock representing 30% of GWGH's common stock and have agreed to vote their shares in the same proportion as other stockholders vote. Thus, the Seller Trusts control the vote of GWGH's common stock, but do not control Ben. Excluding the Seller Trusts, the above-

---

[9]      Share trading price as of April 19, 2022.
[10]     Liquidation preference as of March 31, 2022.
[11]     Liquidation preference as of March 31, 2022.

referenced custody trusts, Ben, and GWGH board members, the percentage of GWGH's common equity held by independent stockholders is approximately 10% (or approximately 3.3 million shares).  The current GWGH common stock ownership can be summarized as follows:

| Stockholder | Percentage of GWGH Common Stock Ownership |
|---|---|
| Ben or parties related to Ben | 12% |
| Seller Trusts | 48% |
| Custody Trusts | 30% |
| Independent stockholders | Apx. 10% |

34.     As of the Petition Date, the Company's prepetition capital structure included approximately $2,016,338,711 billion in funded debt, as summarized below:

| Indebtedness | Funded Debt |
|---|---|
| Bonds | $1,626,741,210 |
| Non-Debtor DLP IV Loan Facility | $271,213,144 |
| Non-Debtor DLP VI Loan Facility | $111,126,464 |
| *Total Secured Debt* | *$2,009,080,818* |
| Unsecured Debt | $7,257,893 |
| *Total Funded Debt* | *$2,016,338,711* |

35.     GWGH's Bond debt is summarized in more detail below:

| Breakdown of Bonds (Principal Only) | Funded Debt |
|---|---|
| Public L Bonds | $1,259,045,830 |
| Liquidity Bonds | $803,440 |
| Seller Trust L Bonds | $366,891,940 |
| *Total Bond Debt* | *$1,626,741,210* |

## I.    DLP IV Facility.

36.     Non-Debtor DLP IV is the borrower under that certain *Fifth Amended and Restated Loan and Security Agreement* (the "DLP IV Facility") dated as of December 14, 2021, by and between DLP IV, as borrower, LNV, and CLMG Corp. as administrative agent ("CLMG").  LNV and CLMG are subsidiaries of Beal Bank.  The DLP IV Facility is scheduled to mature on February 1, 2027, and the obligations thereunder are secured by a first priority lien on substantially all of DLP IV's assets—*i.e.*, Policies with an approximate face amount as of the Petition Date of $1.313 billion held by DLP IV.  As of the Petition Date, approximately $271,213,144 in principal amount remains outstanding under the DLP IV Facility.  Outside of LNV, DLP IV does not have any additional creditors who are presently owed any material amounts.

## II.   DLP VI Facility.

37.     Non-Debtor DLP VI is the borrower under that certain *Credit Agreement* dated as of August 11, 2021, with DLP VI, as borrower, and National Founders LP ("National Founders" and, together with LNV, the "Senior Secured Lenders") as the lender and administrative agent (the "DLP VI Facility").  The DLP VI Facility is scheduled to mature on August 11, 2031, and the obligations thereunder are secured by a first priority lien on substantially all of DLP VI's and DLP Funding VI's assets—*i.e.*, Policies with an approximate face amount of $419.8 million held by DLP VI.  The DLP VI Facility is guaranteed by GWGH upon the occurrence of certain events,

including a bankruptcy filing.  As of the Petition Date, approximately $111,126,464 in principal amount remains outstanding under the DLP VI Facility.  Outside of National Founders, DLP VI does not have any additional creditors who are presently owed any material amounts.

**III.    Bonds: Public L Bonds, Liquidity Bonds, and Seller Trust L Bonds.**

38.    GWGH issued Bonds pursuant to the (i) *Amended and Restated Indenture* dated as of October 23, 2017, by and between GWGH, as issuer and obligor, GWG Life, as guarantor, and Bank of Utah as indenture trustee (the "A&R Indenture"), (ii) *Supplemental Indenture* dated as of December 31, 2020 (the "2020 Supplemental Indenture"), by and between GWGH, as guarantor, GWG Life, as issuer and obligor, and Bank of Utah as indenture trustee (the "Liquidity Bonds"), and (iii) *Supplemental Indenture to Amended and Restated Indenture*, dated as of August 10, 2018 (the "2018 Supplemental Indenture" and collectively with the A&R Indenture and 2020 Supplemental Indenture, the "Indenture"), by and between GWGH, as issuer and obligor, GWG Life, as guarantor, and Bank of Utah as indenture trustee (the "Seller Trust L Bonds").  Bonds issued under the A&R Indenture that do not constitute Liquidity Bonds or Seller Trust L Bonds are referred to herein for ease of reference as "Public L Bonds").  The A&R Indenture governs the terms of all of the issued Bonds except to the extent expressly provided in the Supplemental Indentures.  Neither the 2018 Supplemental Indenture nor the 2020 Supplemental Indenture alters the subordination and related provisions of the A&R Indenture.  For example, Section 1.6 of the 2018 Supplemental Indenture provides that "[t]he Seller Trust L Bonds shall be senior secured obligations of [GWGH], ranking junior only to all Senior Debt of [GWGH], *pari passu* in right of payment and in respect of collateral with all 'L Bonds' of [GWGH], and senior in right of payment

to all subordinated indebtedness of [GWGH]." The 2020 Supplemental Indenture expressly provides the same with respect to the Liquidity Bonds.[12]

39.     As of the Petition Date, there are approximately 27,700 direct and indirect active investments by holders of Bonds (each a "Bondholder" and collectively the "Bondholders"). Approximately 10,300 investments by Bondholders are via direct subscription with GWGH. Approximately 17,400 investments by Bondholders are via subscriptions through various securities intermediaries, such as The Depository Trust Company. The average individual Bondholder owns approximate $45,000 worth of Bonds. The weighted-average maturity of the L Bonds is 2.8 years from the date they are issued. As of the Petition Date, there were approximately $1.3 billion in L Bonds and related Liquidity Bonds issued and outstanding.

40.     The Seller Trust L Bonds mature on August 9, 2023. As of the Petition Date, there were approximately $367 million in Seller Trust L Bonds issued and outstanding. In the event, *inter alia*, of a redemption request by the holders of the Seller Trust L Bonds, including maturity, GWGH in its sole discretion has the ability to satisfy the principal in the form of (i) cash, (ii) any outstanding principal amount and accrued and unpaid interest under that certain *Commercial Loan Agreement* dated as of August 10, 2018 by and between GWG Life, as lender, and Ben LP, as borrower (which has since been repaid through the issuance of additional equity in Ben LP), or (iii) Ben common units, or (iv) a combination of any such cash or property.

41.     The Bonds are secured by substantially all of GWGH's and GWG Life's assets— including their direct and indirect interests in Ben LP (including through GWG Life's equity interest in GWG Life USA, LLC) —and certain stock pledged by Beneficient Capital Company, L.L.C., which was formerly a main operating subsidiary of Ben LP but, as of December 31, 2020

---

[12] See §1.8 of the 2020 Supplemental Indenture.

no longer holds any assets and AltiVerse Capital Markets, L.L.C., an entity with certain overlapping investors with Ben LP.

42.     The Public L Bonds have historically been sold by a seller network most recently comprised of approximately 145 Broker Firms.  Prior to the January 2022 voluntary suspension of Bonds sales, the Broker Firms were marketing and selling Bonds.

43.     The Bonds are completely and entirely subordinated (both as to lien and payment) to the debt held by the Senior Secured Lenders and any future Senior Debt (as expansively defined in the A&R Indenture) incurred by GWGH, including any debtor-in-possession financing.[13] Moreover, the Indenture Trustee's rights are limited as set forth in the A&R Indenture, including that the Indenture Trustee may exercise remedies only "as directed in writing to the Trustee by the Holders of at least 25% in principal amount of the then outstanding [Bonds]",[14] and the holders of the Bonds and the Indenture Trustee further: (i) are restricted from exercising remedies during the pendency of a chapter 11 case filed by GWGH;[15] (ii) cannot challenge the validity, priority, or extent of the Senior Secured Lender's liens;[16] and (iii) cannot seek relief from the automatic stay, appointment of a chapter 11 trustee, or adequate protection without the Senior Secured Lenders' consent.[17]

## IV.    Unsecured Debt.

44.     The Debtors' have approximately $7,257,893 in unsecured debt as of the Petition Date.  This unsecured debt was incurred primarily in connection with maintaining and servicing the Policy Portfolio as well as through obligations owing on account of the Shared Services

---

[13]     *See* A&R Indenture at § 4.9.
[14]     *See* A&R Indenture at § 6.3
[15]     *See* A&R Indenture at § 10.5.
[16]     *See* A&R Indenture at § 10.15(a)(i).
[17]     *See* A&R Indenture at § 10.15(a)(iv).

Agreement, vendor claims, and professional fee claims.  The primary policy servicing costs include annual securities intermediary fees as well as policy administration and tracking costs. According to my most recent review of the Debtors' books and records, the Debtors owe less than $250,000 to prepetition general unsecured creditors who are neither professionals nor contract counterparties.

## PART III

### Events Leading to the Chapter 11 cases

**I.    Suspension of Bond Sales; SEC Investigations; Bondholder Lawsuit.**

45.    Between 2019 and the Petition Date, GWGH has periodically voluntarily suspended the sale of the Bonds, including when current financial information has not been available in the market.  GWGH recently suspended sales of the Bonds on April 16, 2021, and again on January 10, 2022.  The April 2021 suspension of Bond sales occurred after GWGH submitted two accounting questions to the Office of the Chief Accountant ("OCA") of the SEC— GWGH's original expectation was that the two questions would take approximately three to six weeks to resolve after which GWGH would be able to promptly issue its financial statements.  This consultation, however, concluded with a final response from OCA on July 26, 2021.  As a result, GWGH was unable to timely file certain financial statements, pending resolution of those questions.  During this period, the Company did not have access to the liquidity typically afforded to it by Bond sales and, ultimately, elected to enter into the DLP VI Facility, and other financings, in order to obtain critical supplemental liquidity until Bond sales could be resumed.

46.    After completion of the OCA consultation in July 2021, related subsequent audit work, and the filing of its 2020 Form 10-K and 2021 Form 10-Qs, GWGH began selling Bonds again in December 2021.  As soon as GWGH indicated its intent to restart its Bond sales, the SEC

as part of its investigation of the Bond sales practices of its selling group members issued subpoenas and document requests to individual Broker Firms that were selling or were considering selling GWGH Bonds.  Following that, Bond sales from December 2021 to January 10, 2022 were dramatically lower than anticipated and insufficient to cover an interest payment of approximately $10.35 million and principal payments of approximately $3.25 million due on January 15, 2022.  January 10, 2022 was a DTC trade date when GWGH learned of the dramatically lower bond sales.  Knowing that Bond sales would not recover to the traditional levels that were necessary to continue paying interest and maturities on GWG Bonds, and not having sufficient liquidity without Bond sales proceeds to continue paying interest and maturities on the bonds, GWGH defaulted on all interest and principal payments due January 15, 2022 and thereafter.

47.    As discussed above, the SEC's investigation, particularly its focus on how the Bonds were sold by selling group firms, has had the effect of significantly impacting the Company's ability to access the capital markets.  As noted, in connection with the SEC's investigation, the SEC has issued subpoenas and document requests to many of GWGH's Broker Firms, in some instances issuing information requests on an ongoing, or even daily, individual transaction-level basis.  As a result, a number of Broker Firms indicated that they would not resume sale of the Bonds until further notice due to concerns of getting involved further in the SEC's investigation.

48.    Historically—and as disclosed in its prospectuses dated December 1, 2017 and June 3, 2020 related to the Bonds—the Debtors have funded amounts owed on Bonds at maturity through both the receipts of death benefits paid under the Policies *and* the sale of additional Bonds. The sale of Bonds in this manner is a common form of liquidity management utilized in industries that have long term assets and shorter term liabilities. The life settlements industry is no exception.

Life insurance proceeds can be very long term assets, sometimes settling 30 years in the future. The life settlements industry uses future capital raises to finance asset/liability mismatches that arise as a result of holding long term assets and being financed by shorter term liabilities. Without access to the capital markets, particularly through Bond issuance, the Debtors have been cut off from a key source of liquidity that it has historically used to fund its operations. This asset/liability mismatch and reliance on the sale of Bonds has been extensively disclosed in GWGH's SEC filings, the Indenture, and the Bond prospectuses.

49.     As a result, and as noted in paragraph 45 above, GWGH and GWG Life have become unable to make principal and interest payments due and owing on the Bonds starting in January of 2022. On January 18, 2022, GWGH announced that it would be unable to make an approximately $10.35 million interest payment and approximately $3.25 million principal payment on the Bonds. Subsequently, on February 14, 2022, GWGH announced in an 8-K securities filing that it would be unable to make principal and interest payments due and owing on the Bonds while the Company evaluated its restructuring options.

50.     Almost immediately thereafter, on February 18, 2022, Shirin Bayati and Mojan Kamalvand ("Plaintiffs"), on behalf of themselves and a proposed class of similarly situated individuals, filed a complaint (the "Complaint") against GWGH and certain of its past and present directors and officers alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1993. The case is titled *Bayati, et al. v. GWG Holdings, Inc., et al.*, bears case number 22-00410, and is currently pending before the United States District Court for the Northern District of Texas (the "Securities Litigation"). Principally, the Plaintiffs allege that GWGH and its co-defendants (including myself) violated the Securities Act of 1933 by using funds invested by Bond purchasers for impermissible purposes (including as part of various transactions in GWGH's investment in

24

Ben), filing various misleading documents with the SEC since 2020, and failing to disclose to Bond investors certain investigations by the SEC that could have impacted their decision to invest in the Bonds.  GWGH vehemently denies all of the allegations set forth in the Complaint and intends to vigorously defend itself in the Securities Litigation.  As of the Petition Date, the Securities Litigation remains in the pleading stage.  Without limiting in any manner GWGH's defenses in the Securities Litigation, GWGH notes that, contrary to what it considers to be the baseless allegations therein, GWGH's robust and fulsome securities filings expressly and specifically disclosed the intent that Bond proceeds would be used for all of the purposes complained of in the Securities Litigation, including to pay interest on and refinance the principal of existing Bonds and to pay related party debt at Ben.  GWGH has not yet filed an answer or other responsive pleading.

## II.     Defaults Under DLP IV Facility and DLP VI Facility; Amendments and Waivers.

### A.     Overview

51.     Unfortunately for the Company, in addition to the strain on liquidity caused by GWGH's voluntary suspension of Bond sales, the logistical aspects of the Company business and the constraints imposed by the provisions of the DLP IV Facility and DLP VI Facility have added additional near-term strain on the Debtors' liquidity and contributed to the distress that precipitated these chapter 11 cases.

52.     There is a significant delay between when a Policy matures and when DLP IV or DLP VI, as applicable, can collect proceeds from that maturity.  When an insured dies, death benefits are not immediately paid to the beneficiary.  Instead, it typically takes approximately 60-days, and sometimes longer following the death of an insured and the resulting maturity of a Policy for DLP IV and DLP VI to collect payment.  Proceeds received on account of maturities under a

Policy are not, however, immediately available to DLP IV and DLP VI to fund the Company's operations. Instead, pursuant to the terms of DLP IV's and DLP VI's existing secured credit facilities, these proceeds are first deposited in certain bank accounts at Wells Fargo Bank, N.A. (the "Controlled Accounts") that are subject to certain account control agreements (the "Account Control Agreements") for the benefit of the Senior Secured Lenders. By operation of the Account Control Agreements, the Senior Secured Lenders sweep the Controlled Accounts for payment of principal, interest, premiums and fees. As of the Petition Date, substantially all of the Company's funds were held in the Controlled Accounts, access to which was restricted by the express provisions of the DLP IV Facility and DLP VI Facility.

**B.      DLP IV Facility.**

53.      As discussed above, beginning in August of 2021, GWGH commenced negotiating and documenting the Ben Transactions to maximize GWGH's investment in Ben and Ben ceasing to be a consolidated subsidiary of GWGH. LNV subsequently notified DLP IV that it believed the Ben Transactions constituted a change of control under the DLP IV Facility, which constitutes a default thereunder (the "CoC Default").

54.      In November of 2021, DLP IV, CLMG, and LNV commenced negotiations whereby certain cash waterfall provisions and cash sweeping rights granted to LNV in connection with the DLP IV Facility would be waived in order to permit DLP IV to access approximately $16,958,377.45 in LNV's cash collateral. These negotiations led to an executed letter agreement (the "Letter Agreement") that required numerous post-closing deliverables to be provided by DLP IV to CLMG and LNV, many requiring the cooperation of third parties. DLP IV did not timely provide the post-closing deliverables required by the Letter Agreement, which resulted in an event of default under the DLP IV Facility (the "Letter Agreement Default").

55.     As a result of the purported CoC Default and Letter Agreement Default, CMLG and LNV determined that, among other available remedies, they had the right under the DLP IV Facility to accelerate the indebtedness due and owing thereunder.  Additionally, CLMG and LNV determined that in connection with any acceleration, a $92,573,481.87 yield maintenance fee would become due and owing.  DLP IV requested a waiver of the CoC Default and Letter Agreement Default and a related advance from CLMG and LNV in order to, among other things, make certain premium payments due and owing on the Policies that secure the DLP IV Facility.

56.     On November 15, 2021, in consideration for certain cash collateral being released, DLP IV assigned and granted to CLMG, for the ratable benefit of the lenders under the DLP IV Facility, an irrevocable beneficial interest in a weighted average of three percent (3.0%) of the U.S. dollar death benefit payable under each pledged policy under the DLP IV Facility.  Such assignment means that, with respect to a maturity under an applicable pledged policy after such date, CLMG has its own claim with the subject carrier with respect to such residual death benefit, and an average of three percent (3.0%) of the death benefit then paid under any such pledged policy is paid directly to CLMG.

57.     On December 14, 2021, DLP IV, CLMG, and LNV entered into that certain *Fifth A&R Loan and Security Agreement*, whereby the CoC Default and Letter Agreement Default were waived and LNV made an additional advance of $60,100,000, to be used as follows: (i) $20,000,000 paid in cash to DLP IV to lend to the GWG Life pursuant to an intercompany promissory note; (ii) $100,000 paid to CSG Investments as a structuring fee; and (iii) $40,000,000 paid to LNV as a settlement of the $92,573,481.87 that would otherwise have been due as a yield maintenance fee upon acceleration. In addition, LNV agreed to a downward adjustment of the interest rate going forward.  As a result of these revisions, the current approximate amount of the

yield maintenance claim in favor of LNV under the DLP IV Facility, which is payable by its terms upon the acceleration of the obligations owing thereunder, is approximately $32 million, calculated on the basis of the current outstanding principal balance of the loans.

58.    In that certain First Amendment to Fifth Amended and Restated Loan and Security Agreement dated as of February 25, 2022, LNV, as an accommodation, agreed to vary the terms of the DLP IV Facility to make advances on the loan to be used to pay premiums coming due in March and April 2022.  LNV has since agreed to further accommodations under this facility, including to make advances on the loan to be used to pay premiums coming due in May 2022.

    **C.    DLP VI Facility.**

59.    Under the DLP VI Facility, DLP VI is required to maintain Required Reserve Amounts (as defined in the DLP VI Facility) in its Reserve Account (as defined in the DLP VI Facility) for the benefit of National Founders on established remittance dates.  DLP VI anticipated that it would not have sufficient Required Reserve Amounts in its Reserve Account as of the February 2022 remittance date and, as such, negotiated and entered into that certain *Waiver* with National Founders on February 24, 2022, (the "DLP VI February Waiver").  Under the DLP VI February Waiver, National Founders agreed to waive, for a limited period up through March 10, 2022, the February 2022 Reserve Account Deficiency (as defined in the DLP VI February Waiver). Subsequently, on March 10, 2022, DLP VI and National Founders entered into an additional waiver, that extended the aforementioned waiver period through March 15, 2022, with the referenced default subsequently having been cured prior to such March 15th date.  On March 31, 2022, DLP VI and National Founders entered into a *Waiver and Amendment to Credit Agreement* (the "Amendment") to the existing DLP VI Facility.  The Amendment waived an event of default under the DLP VI credit agreement that had resulted due to insufficient funds in a reserve account

established under such credit agreement. The Amendment also provided for an additional advance by National Founders of $4.0 million, of which $1.0 million was an amendment fee payable to National Founders, with the $3.0 million balance being available to the Company for the payment of professional fees and other expenses.  The Amendment also provides that a yield maintenance premium will be due and payable under the DLP VI credit agreement upon an acceleration of the loans thereunder (not just upon a prepayment), but the provisions providing for such yield maintenance premium will not become effective unless National Founders or one of its affiliates makes an initial loan of at least $10.0 million under a debtor-in-possession credit agreement with GWGH and/or its subsidiary, GWG Life, and such provision will cease to be effective if a final order of an applicable bankruptcy court approving such debtor-in-possession facility is not entered due to National Founders or such affiliate being unable or unwilling to perform under such debtor-in-possession facility.

## IV. Restructuring Steps.

### A. DIP Financing.

60.     As a result of the significant liquidity issues described above, the Company engaged Mayer Brown, LLP as restructuring counsel, FTI Consulting as financial advisor, and PJT Partners ("PJT") as investment banker in connection with identifying and evaluating restructuring alternatives, as well as available options to best conserve and maximize the value of the Company's assets for the benefit of its stakeholders.  In connection with that process, the Company solicited proposals for bridge financing and debtor-in-possession financing.  Despite its efforts, including the work of its investment banker, PJT, the Company was unsuccessful in its attempts to obtain medium or long-term prepetition bridge financing.  Through PJT's efforts, and despite the time constraints imposed by the Company's extraordinarily difficult liquidity constraints, the Company

received four proposals to provide debtor in possession financing, ultimately accepting the proposal of National Founders, which is a multi-draw term loan facility pursuant to the terms of the *Superpriority Secured Debtor-in-Possession Credit and Guaranty Agreement* (the "DIP Facility")

61.     The principal terms of National Founders' (in its capacity as agent under the DIP Facility, the "DIP Agent") debtor-in-possession financing proposal (the "DIP Proposal") include: (a) a $65 million debtor-in-possession financing facility with $18 million available upon entry of an interim order approving the debtor-in-possession financing (the "Interim DIP Order") and the remaining $47 million available upon entry of a final order approving the debtor in possession financing (the "Final DIP Order"); (b) a six month maturity from the Petition Date; (c) an option period following entry of the Final DIP Order in which National Founders or an affiliate may elect to consummate a transaction that would effectively refinance in full DLP IV's and DLP VI's existing secured credit facilities, respectively, following which the entire Policy Portfolio would be held by a newly created special purpose entity; (d) a single milestone requiring entry of the Final DIP Order no later than 35 days following entry of the Interim DIP Order (with an automatic 30 day extension); (e) interest at the rate of Adjusted Term SOFR (i.e., Term SOFR plus 0.11448%) plus 10.00% per annum; (f) guarantees from certain subsidiaries of GWGH and GWG Life; (g) security in the form of superpriority liens on substantially all assets of the Debtors (subject to certain exceptions); and (h) adherence to an approved budget, with certain testing requirements and variance limits.

62.     The Company believes that the DIP Proposal contains the most advantageous terms available to the Company under the circumstances, and the DIP Proposal is expected to provide the Company with sufficient liquidity to operate, and, most importantly, to best conserve and

maximize the value of its assets for the benefit of its stakeholders, principally by affording GWG the time necessary (i) to turn its attention, which to date it has been unable to do because of its necessary focus on finding the requisite short to medium term liquidity now afforded by the DIP Proposal, to developing and trying to negotiate (and ultimately propose a value-maximizing chapter 11 plan setting forth) a restructuring of its capital structure necessitated by its inability to access the Bond market and (ii) to maximize the value of its Policy Portfolio and investments in Ben and FOXO, the eventual realization of which will form the primary funding mechanism for such restructuring.

### B. Additional Business Ventures

63. The Company may explore two new business ventures as part of shaping its ultimate reorganization.  First, the Company is pursuing the possibility of establishing a new company called Basin Asset Management ("BAM"), a life settlement management firm.  the Company anticipates that, through a co-investment with a strategic partner in BAM, the Company could convert its existing life settlement infrastructure into an asset management platform with both a fee-based income stream and the ability to generate returns on the Company's existing life settlement assets. To date, the Company has identified a lead investor that could assist with this venture.  The Company believes that BAM could successfully expand into other asset classes over time to generate additional revenue.

64. The Company also has an interest in developing a business it presently refers to as Basin Re ("BRE"), which, as presently contemplated, would be a Bermuda Monetary Authority-licensed life reinsurance company. The core competence of the Company is longevity; so, life insurance and reinsurance are its expertise. The Company anticipates that BRE will be able to form a new business entity to purchase blocks of life insurance and annuities on the secondary market

and manage the associated reserve funds. The Company also believes that over time significant synergies between BAM and BRE (both businesses require competence in longevity) can be leveraged for the benefit of both projects ultimate value.

65.     The Debtors are confident that through the DIP Proposal, the opportunity chapter 11 affords free from potential creditor and related actions to develop and attempt to negotiate and pursue a restructuring of its capital structure, the ultimate and eventual monetization of the Debtors' economic interest in Ben LP and FOXO, and the work towards expansion of the Debtors' business through new business lines such as BAM and BRE, that they will be well-positioned to develop and pursue confirmation of a value-maximizing chapter 11 plan that benefits all of their stakeholders.

## PART IV

## First Day Motions[18]

66.     As a result of my first-hand knowledge and experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside legal and financial advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.

67.     I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in connection with these cases and as described below.

68.     I participated in preparing and have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe

---

[18] Terms used but not defined in this Part IV shall have the meaning ascribed to them in the applicable First Day Motion.

the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

69.     The relief sought in the First Day Motions will facilitate a smooth transition into Chapter 11 and thereby minimize the adverse effects of these Chapter 11 Cases on the Debtors' business, operations, and creditors.  As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.  I was involved in the analysis that led to the creation of each of the First Day Motions and the scope and nature of the relief requested therein.

I.      **Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief  (the "<u>DIP Motion</u>").**

70.     Pursuant to the DIP Motion, the Debtors seek approval of a multi-draw term loan facility pursuant to the terms of the DIP Facility and authorization to use Cash Collateral.  The DIP Facility would provide immediate access to $18 million upon entry of the Interim DIP Order with the remaining $47 million available following entry of the Final DIP Order.

71.     The Debtors' ability to immediately access the DIP Facility and use Cash Collateral is critical.  As of the Petition Date, the Debtors' cash on hand is insufficient to operate their enterprise, continue paying their debts as they come due and pay the attendant costs of the Chapter 11 Cases.  As discussed above, if premiums are not paid on a Policy, the Policy will lapse and lose

all value.  Thus, ensuring access to funds to pay Policy premiums and service the Policy Portfolio is critical.

72.     Due to their current limited liquidity, the Debtors require immediate access to postpetition financing to operate their business.  Further, the failure to obtain access to the DIP Facility will result in immediate and irreparable harm to the Debtors and their stakeholders and will diminish the value of the Debtors' estates.

73.     As more thoroughly described in the *Declaration of Peter Laurinaitis in Support of the Debtors' Motion to Obtain Senior Secured Superpriority Financing and Related Relief* (the "Laurinitis Declaration") filed contemporaneously herewith, the Debtors worked with their professionals, including PJT and FTI, to project the amount of postpetition financing necessary to administer the Chapter 11 Cases while operating the Debtors' businesses.  The Debtors and their advisors determined that they would require incremental liquidity of approximately $65 million to operate in the ordinary course of business postpetition, satisfy all administrative costs and expenses, and maintain an adequate liquidity cushion.

74.     As set forth in more detail in the Laurinitis Declaration, PJT reached out to 49 financial institutions.  including existing lenders, regarding providing bridge and/or DIP financing. Of those 49 financial institutions, 27 signed NDAs and received access to the "first round" data room.  The Debtors also discussed with LNV and National Founders the terms by which they would provide short-term or long-term financing, including a potential release of reserves held by LNV and National Founders under the terms of their respective prepetition facilities.  The Debtors ultimately received four proposals for debtor-in-possession financing and spent weeks negotiating terms.

75.     After a large market canvas, the Debtors initially proceeded with what they deemed the only available option–a third party DIP offer that would provide 9-12 months of liquidity but at a high cost.  The Debtors then, however, received a proposal from the DIP Lenders, which they explored and determined would save the estates approximately tens of millions of dollars.  Accordingly, after determining the offer for financing was viable and achievable, the Debtors' board of directors voted to proceed with the DIP Facility provided by the DIP Lender.

76.     Under the terms of the DIP Facility, the Debtors are required to obtain approval upon entry of the Final DIP Order of the DLP VII Option (as defined in the DIP Motion) – under which, during a period following entry of the Final DIP Order, National Founders or an affiliate may elect to consummate a transaction that would refinance in full the DLP IV Facility and DLP VI Facility by entering into a new credit facility at (and transferring the entire Policy Portfolio, pursuant to section 363 of the Bankruptcy Code, to) a newly formed non-debtor subsidiary special purpose vehicle.  Exercise of the DLP VII Option would also be expected to result in payment in full of amounts then owing by the Debtors under the DIP Facility, thus completely satisfying the Debtors' obligations under the DIP Facility to fund critical expenses in the Chapter 11 Cases, pay post-petition service providers and develop and implement a value-maximizing restructuring transaction to preserve value for the benefit of their stakeholders.

77.     The terms of the DIP Facility are the result of arms' length negotiations between sophisticated parties represented by experienced counsel. In the exercise of the Debtors' business judgment, the Debtors believe that the terms of the DIP Facility are fair, equitable, and in the best interest of the Debtors' estates.

78.     The Debtors believe the proposed DIP Facility (and approval of the DLP VII Option) is critical to operate their businesses and satisfy all administrative costs and expenses

associated with these Chapter 11 Cases as they come due as the Debtors seek to explore value-maximizing restructuring transactions for the benefit of the Debtors' estates.  Accordingly, it is my opinion that the DIP Motion should be approved.

**II.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts, (B) Maintain Existing Business Forms and Books and Records, and (C) Continue to Perform Intercompany Transactions and (II) Granting Related Relief  (the "<u>Cash Management Motion</u>").**

79.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached thereto, authorizing the Debtors to (i) continue to operate their Cash Management System, as described in the Cash Management Motion, and maintain their existing Bank Accounts, including honoring certain prepetition obligations related thereto, (ii) maintain existing Business Forms and Books and Records in the ordinary course of business,  and (iii) continue Intercompany Transactions consistent with historical practice.

80.     Because of the disruption that would result if the Debtors were forced to immediately close their existing bank accounts, I believe it is critical that the existing Cash Management System remains in place as set forth in the Cash Management Motion.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, it is my opinion that the Cash Management Motion should be approved.

**III.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

81.     Pursuant to the Wages Motion, the Debtors seek entry of a final order (i) authorizing, but not directing, the Debtors to (a) pay prepetition salaries, other compensation, and

reimbursable expenses, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

82.     As of the Petition Date, the Debtors have only two employees, Murray T. Holland, Chief Executive Officer and Chairman of the Board of Directors, and myself (collectively, the "Employees"). Each Employee's base compensation is in the form of a fixed salary paid bi-weekly, in arrears, as set forth in a written or oral agreement. Because the Employees are paid in arrears, the Employees will be owed accrued but unpaid salaries as of the Petition Date. As of the Petition Date, the accrued, unpaid amount of the Employees' prepetition salaries is no more than $41,000 (the "Unpaid Salaries"), which includes some amounts in excess of the $15,150 priority expense cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Priority Cap") as to one Employee. Accordingly, the Debtors are requesting the authority to pay such Unpaid Salaries, together with any other prepetition compensation owed to each Employee, up to the Priority Cap for each Employee.

83.     The Debtors are also seeking to pay compensation owed to certain non-management directors that sit on GWGH's board of directors (the "Non-Management Directors"). The Non-Management Directors each receive $100,000 in annual cash compensation for their services paid quarterly in arrears, plus additional compensation for service on board committees ranging from $2,500 to $3,750 per quarter (collectively the "Independent Director Compensation"). The Non-Management Director Compensation has historically been paid from accounts held by GWGH. The Non-Management Director Compensation for the first quarter of 2022 has been paid in the ordinary course of business prior to the Petition Date. The only amounts owing to the Non-Management Directors for services rendered prepetition are thus the amounts that accrued between April 1, 2022 and the Petition Date. Accordingly, the Debtors seek authority

to pay any Non-Management Director Compensation accrued for the period up until the Petition Date, solely up to the amount of the Priority Cap for each Non-Management Director, and to continue paying Non-Management Director Compensation to their Non-Management Directors in the ordinary course of business and consistent with historical practice on a postpetition basis.

84.     Both the Employees and the Non-Management Directors have been working tirelessly to prepare the Debtors for these Chapter 11 Cases, including evaluating financing options and other strategic alternatives to ensure that the Debtors' bankruptcy process proceeds as smoothly as possible for the benefit of the Debtors and their creditors and other stakeholders.  It is my opinion that payment of the amounts owing to the Employees and Non-Management Directors is critical to the Debtors' smooth and efficient transition into bankruptcy.  Accordingly, I believe that the Wages Motion should be approved.

**IV.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Critical Vendors, and (II) Granting Related Relief (the "Critical Vendor Motion")**

85.     Pursuant to the Critical Vendor Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) certain Critical Vendors, in an amount not to exceed $125,000 on an interim basis (the "Interim Amount") and $250,000 on a final basis (the "Final Amount", which amount is inclusive of the interim amount) .  In the ordinary course of business, the Debtors utilize critical services provided at competitive prices by a limited number of specialized vendors and, in many instances, could not operate effectively without access to the services provided by certain of these parties (collectively, the "Critical Vendors").  The Debtors are not able to easily switch service providers on short notice and could potentially face significant risks to their operations if

prepetition amounts owed to the Critical Vendors (collectively, the "Critical Vendor Claims") could not be paid.

86.    The Debtors rely upon the Critical Vendors for a variety of specialized services that are essential to the operations of the Debtors.  For example, a number of the Critical Vendors provide services relating to the evaluation, monitoring, and servicing of the Debtors' Policy Portfolio.  The services provided by certain of these Critical Vendors are highly specialized and enable the Debtors to value the Policy Portfolio and project cash flows, both of which are critical not just to the Debtors' business but to the progress of these Chapter 11 Cases as well.  Other Critical Vendors provide various administrative support services to the Debtors, including software and technology platforms, that are utilized daily in the operations and administration of the Debtors, without which the transition into and administration of these Chapter 11 Cases would be needlessly turbulent.  In other words, disruption of the services provided by the Critical Vendors would not only affect the Debtors and their ability to manage these Chapter 11 Cases, but could impair the ability of creditors and other interested parties to realize the maximum available value from the Debtors' estates.

87.    The Debtors have identified a limited number of Critical Vendors (fewer than 30) and seek authority to pay up to the Interim Amount on a preliminary basis, and up to the Final Amount pursuant to the final order entered on the Critical Vendor Motion, subject to the terms and conditions set forth in the Critical Vendor Motion.  Among other things, the Critical Vendor Motion requires that, prior to receiving payment thereunder, a Critical Vendor must agree to continue to provide services to the Debtors on "Customary Terms."  The requested amounts represent a tiny fraction of the Company's more than $2 billion in funded debt, and are one of the smallest line-items contemplated to be paid under the Debtors' postpetition financing facility.

While payment of the requested amounts to the Critical Vendors will have a negligible impact on the Debtors' finances and any recoveries ultimately obtained by other creditors of the Debtors, nonpayment, or even a delay in payment, of the Critical Vendors could have a significant adverse impact on the Debtors' business and its ability to steer through these Chapter 11 Cases. Accordingly, I believe that the Critical Vendor Motion should be approved.

**V.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

88.      Pursuant to the Insurance Motion, the Debtors seek authorization to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto and (ii) renew, amend, supplement, extend, or purchase insurance policies in the ordinary course of business on a postpetition basis.  In the ordinary course of business, the Debtors maintain numerous insurance policies (the "<u>Insurance Policies</u>") administered by various third-party insurance carriers.  The Insurance Policies provide coverage for both the Debtors and Ben for, among other things, cyber liability, financial institution crimes, and directors and officers liability ("<u>D&O</u>").  Going forward, however, the Debtors intend to obtain certain new Insurance Policies that only cover the Company, but are otherwise consistent with the coverage for the Debtors provided under the existing Insurance Policies.  Specifically, the existing Insurance Policies expire on their own terms on April 26, 2022.  Accordingly, the Debtors have acquired new Insurance Policies covering only the Company for D&O, financial institution crimes, and cyber liability (the "<u>New Insurance Policies</u>"), with such policies providing similar coverage as the Debtors' existing Insurance Policies, at a cost of approximately $2.2 million in premiums and related expenses, to ensure that coverage is continuous throughout these Chapter 11 Cases for a period of one year.

89.     However, the Debtors must pay the premiums for such policies shortly after the Petition Date in order to ensure that coverage is uninterrupted.  Accordingly, the Debtors seek authority to pay the full unpaid premiums on the New Insurance Policies, in the amount of approximately $2.2 million, in order to ensure the Debtors' continued coverage under such policies.

90.     Continuation of the Insurance Policies and honoring all prepetition obligations with respect to the New Insurance Policies is essential to preserving the value of the Debtors' businesses.  In many instances, insurance coverage is mandated by, among other things, the United States Trustee requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, I believe that the Insurance Motion should be approved.

## VI.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief (the "NOL Motion").

91.     In the NOL Motion, the Debtors seek entry of an order approving certain notification and hearing procedures related to certain transfers of the existing common stock of Debtor GWGH, or any beneficial ownership therein (any such record or beneficial ownership of common stock, the "Common Stock"), and directing that any purchase, sale, or other transfer of Common Stock in violation of such procedures shall be null and void ab initio.  These procedures generally apply only to holders of 4.5% or more of the outstanding Common Stock, approximately 90% of which is held by a small number of known entities, and the remainder of which trades on the NASDAQ stock exchange.

92.     The relief sought in the NOL Motion is intended to, among other things, protect the potential value of the Debtors' tax net operating loss carryforwards ("NOLs") and certain other tax attributes (collectively, the "Tax Attributes") by minimizing the risk of an "ownership change"

as defined in the Internal Revenue Code.  The Debtors possess certain Tax Attributes, including, as of December 31, 2020, estimated NOLs of approximately $61,160,695 and approximately $2,022,305,677 of total asset basis, and additional Tax Attributes expected to have been generated thereafter.  Given the significance of maximizing the value of the Debtors' estates, I believe that it is critical that these valuable Tax Attributes be preserved.  The Tax Attributes are valuable property of the Debtors' estates and should be protected from actions that would diminish or eliminate their value.  Accordingly, I believe that the NOL Motion should be approved.

VII.    **Debtors' Emergency Motion for (I) Entry of an Order Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

93.    Pursuant to the Taxes Motion, the Debtors seek entry of an order  authorizing, but not directing, the Debtors to remit and pay  (a) certain taxes and fees incurred for prepetition periods that become due after the commencement of these chapter 11 cases and (b) taxes and fees that accrue or are incurred in the ordinary course of business postpetition.  The Debtors estimate that approximately $469,313 relating to the pre-petition period will become due and payable after the Petition Date.  The Taxes Motion includes a table listing both the taxing authorities the Debtors seek authority to pay and the approximate amounts the Debtors anticipate will become due and payable to each respective taxing authority after the Petition Date.  The relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it, and will enable the Debtors to continue to operate their businesses in chapter 11 without the disruption that would ensue from failure to pay the various taxing authorities the amounts due to them.  Accordingly, I believe that the Taxes Motion should be approved.

**VIII.  Debtors' Emergency *Ex Parte* Application for Entry of an Order Appointing Donlin, Recano & Company, Inc. as Claims, Noticing, Solicitation, and Administrative Agent (the "<u>Application to Appoint a Claims and Noticing Agent</u>").**

94.     In the Application to Appoint Claims and Noticing Agent, the Debtors seek entry of an order appointing Donlin, Recano & Company ("<u>DRC</u>") as claims, noticing, solicitation, and administrative agent (the "<u>Claims and Noticing Agent</u>") for the Debtors in the Chapter 11 Cases, effective as of the Petition Date.  As the Claims and Noticing Agent, DRC will assume full responsibility for serving notice of the Debtors' filings and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.

95.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of DRC to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that DRC's rates are competitive and comparable to the rates charged by their competitors for similar services.

96.     The Debtors anticipate that there will be thousands of individuals and entities to be noticed in the Chapter 11 Cases.  In light of the number of parties in interest, the Debtors submit that the appointment of the Claims and Noticing Agent is in the best interests of the Debtors' estates and their creditors because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.  Accordingly, it is my opinion that the Court should approve the Application to Appoint a Claims and Noticing Agent.

IX.     **Debtors' Emergency Motion for an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

97.     By the Joint Administration Motion, the Debtors seek to have their cases jointly administered because many of the motions, hearings, and orders in these Chapter 11 Cases will affect all Debtor entities.  Joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.

X.      **Debtors' Emergency Motion For Order Pursuant to Bankruptcy Code Section 105, Bankruptcy Rules 1015, 2002, 9007, and 9036, Local Bankruptcy Rule 2002-1, and the Complex Case Procedures Authorizing the Modification and Establishment of Certain Notice Procedures (the "<u>Notice Procedures Motion</u>").**

98.     By the Notice Procedures Motion, the Debtors seek the approval and implementation of certain procedures with respect to serving notice of the various court filings made in connection with the Chapter 11 Cases on the thousands of parties in interest to the Chapter 11 Cases.  Such interested parties include the holders of Debtor GWGH's common and preferred stock and the holders of the approximately 27,700 investments in Bonds and beneficial owners.  Specifically, the Notice Procedures Motion seeks to modify certain of the notice procedures provided for under the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules for the Southern District of Texas, and the U.S. Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Bankruptcy Cases (the "<u>Complex Chapter 11 Procedures</u>"), balancing the need to provide adequate notice to interested parties with the burdens and high cost of providing notice to such an expansive number of parties in interest.  The notice

44

procedures contained in the Notices Procedures Motion will be served on the Debtors' Master

Service List and also made available on the case website maintained by DRC.  Accordingly, it is

my opinion that the Notice Procedures Motion should be approved.

**XI.  Debtors' Emergency Motion For Entry of an Order (I) Waiving the Requirement to File a List of Equity Security Holders, and (II) Authorizing the Debtors to Redact Certain Personal Identification Information, and (III) Granting Related Relief (the "Consolidated Creditor Matrix Motion").**

99.     Pursuant to the Consolidated Creditor Matrix Motion, the Debtors seek entry of an

order (a) waiving the requirement to file a list of the Debtors' equity security holders; (b)

authorizing the Debtors to redact certain personal identification information; and (c) granting

related relief.

100.    First, GWGH is a publicly-traded company with approximately 33,102,273.250

outstanding shares of common stock and 128,388 outstanding shares of preferred stock held by

registered and non-registered holders.[19]  GWGH does not maintain a list of its non-registered

holders of common equity and preferred equity and therefore must obtain the names and addresses

of its non-registered shareholders from a securities intermediary.  Preparing and submitting such

a list with last known addresses for each such non-registered equity security holders would be

expensive, time-consuming, and serve little or no beneficial purpose in this case.  Instead, the

Debtors seek authority to file a list that contains only registered holders of common and preferred

stock, as the Debtors maintain this information.

101.    Second, it is appropriate to authorize the Debtors to redact from any paper (a) filed

or to be filed with the Court or (b) otherwise made publicly available upon request in these Chapter

---

[19]     Additionally, the Debtors seek modification of the notice requirements to GWGH's holders of common and preferred equity in the *Debtors' Emergency Motion for Order Pursuant to Bankruptcy Code Section 105, Bankruptcy Rules 1015, 2002, 9007, and 9036, Local Bankruptcy Rule 2002-1, and the Complex Case Procedures Authorizing the Modification and Establishment of Certain Notice Procedures* filed contemporaneously herewith.

11 Cases, including the Creditor Matrix, Master Service List, and Schedules and Statements, (i) the names and home addresses of individual creditors, including, but not limited to, the Debtors' employees, former employees, and all registered holders of common equity, preferred equity, and Bonds, and (ii) the names and addresses of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state, because (x) such information could be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking, and (y) disclosure risks violating the GDPR, exposing the Debtors to potential civil liability and significant financial penalties.

102.    Third, the Debtors seek approval of the notice of commencement in the form attached to the proposed order to the Consolidated Creditor Matrix Motion as **Exhibit 1**. Furthermore, through DRC, the Debtors propose to serve the notice of commencement in the manner set forth in the Notice Procedures Motion.

**XII.    Debtors' Emergency Motion for (I) An Order Extending Time to File (a) Schedules of Assets and Liabilities, (b) Schedules of Current Income and Expenditures, (c) Schedules of Executory Contracts and Unexpired Leases, and (d) Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules and SOFA Extension Motion").**

103.    Pursuant to the Schedules and SOFA Extension Motion, the Debtors request entry of an order extending the initial fourteen (14) day period to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by forty-five (45) days, to allow the Debtors a total of fifty-nine (59) days after the Petition Date to file their Schedules and Statements (the "Schedules and Statements Deadline"), without prejudice to the Debtors' right to request additional time if necessary.

104.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, their assets, and numerous contracts.  Additionally, collection of the necessary information required to be included in the Schedules and Statements will require a significant expenditure of time and effort on the part of the Debtors.  In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for the Chapter 11 Cases.  Focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of the Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.  Accordingly, I believe that the Schedules and SOFA Motion should be approved.

### Conclusion

105.     In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[Remainder of page intentionally left blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  April 20, 2022

/s/ Timothy Evans
Name: Timothy Evans
Title: Chief Financial Officer

**Certificate of Service**

I certify that on April 20, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles S. Kelley*
Charles S. Kelley