## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GWG Holdings, Inc., et al.,[1] | § | Case No. 22-90032 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## MOTION OF THE OFFICIAL COMMITTEE OF BONDHOLDERS OF GWG HOLDINGS INC., *ET AL.*, FOR STANDING TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' proposed claims and noticing agent: https://donlinrecano.com/gwg.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

    I.    GWG Was Plundered by Heppner and Ben, Resulting in Tremendous Harm to L Bondholders ...........................................................................5

    II.    The Committee Has Requested Standing to Assert the Proposed Claims ...............9

JURISDICTION AND VENUE ...............................................................................12

SUMMARY OF ALLEGATIONS SUPPORTING THE PROPOSED CLAIMS .......................13

    I.    GWG's Failed Business Model ...............................................................13

    II.    GWG's Rapid Descent into Insolvency ......................................................15

    III.    GWG's Founders Sought an Exit Strategy, While Ben Saw an Opportunity ........18

    IV.    Heppner Siphons GWG Money Through the Ben Transactions .........................21

    V.    GWG's Conflicted Directors ................................................................28

    VI.    First Fraud Finally Brought to Light ........................................................36

    VII.    The Committee Has Identified Valuable Estate Claims Related to Ben .............38

    VIII.    The Committee's Ongoing Investigation and Reservation of Rights ..................40

RELIEF REQUESTED ..........................................................................................41

BASIS FOR RELIEF ............................................................................................41

    I.    The Court Has Broad Equitable Authority to Grant Derivative Standing ............41

    II.    The Proposed Complaint Asserts Colorable Claims .......................................42

        A.    The Committee Asserts Colorable Claims that Certain Directors and Officers of GWG Breached Their Fiduciary Duty to the Company and Its Creditors ...............................................................43

            1.    Legal Standard for Breach of Fiduciary Duty ...............................44

            2.    The Proposed Complaint States Colorable Claims for Breach of Fiduciary Duty .................................................47

        B.    The Committee Asserts Colorable Claims that the Challenged Transactions Are Avoidable as Actual and Constructive Fraudulent Transfers .......................................................................50

            1.    Legal Standard for Actual Fraudulent Transfers ...........................50

            2.    Legal Standard for Constructive Fraudulent Transfers ....................54

            3.    The Proposed Complaint States Colorable Claims that the Challenged Transactions Are Actual and Constructive Fraudulent Transfer ...............................................................56

        C.    The Committee Asserts a Colorable Claim that the Defendants Were Unjustly Enriched .......................................................58

ii

|  |  | 1. | Legal Standard for Unjust Enrichment ..........................................59 |
|  |  | 2. | Defendants Were Unjustly Enriched by the Challenged Insider Transactions ........................................................................59 |
|  | D. | The Committee Asserts a Colorable Claim that the Special Dividend Issued by GWG Holdings Was an Illegal Dividend Under Delaware Law ...........................................................................60 |  |
|  |  | 1. | Legal Standard for an Illegal Dividend Under Delaware Law ...................................................................................................60 |
|  |  | 2. | Illegality Under Delaware Statutory Law ......................................61 |
| III. | The Debtors' Inability to Pursue the Proposed Claims Is Unjustified..................62 |  |  |
|  | A. | Legal Standard for Unjustifiable Refusal ..................................................63 |  |
|  | B. | Debtors Are Unable to Bring the D&O Claims Because Doing So Would Risk Losing Millions of Dollars in Recovery for the Estate..........64 |  |
|  | C. | The Committee Should Be Granted Standing to Bring the Remaining Proposed Claims to Maximize Estate Value ...........................67 |  |
| IV. | Exclusive Right and Authority to Negotiate and Settle the Proposed Claims ................................................................................................................69 |  |  |

RESERVATION OF RIGHTS ............................................................................................70

NOTICE...............................................................................................................................70

NO PRIOR REQUEST .......................................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ABC Utils. Servs. Inc.*,
  No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240 (Bankr. N.D. Tex. Oct. 9,
  2001) ...................................................................................................................42

*In re Adelphia Commc'ns Corp.*,
  330 B.R. 364 (Bankr. S.D.N.Y. 2005) ..........................................................42, 64

*In re All Texas Elec. Contractors, Inc. V. NSPS Metals LLC*,
  Case No. 20-34656, 2022 WL 162786 (Bankr. S.D. Tex. Jan. 18, 2022) ...............59

*Am. Cancer Soc'y v. Cook*,
  675 F.3d 524 (5th Cir. 2012) ...................................................................................53

*Am. Gen. Corp. v. Tex. Air Corp.*,
  C.A. Nos. 8390, 8406, 8650 & 8805, 1987 WL 6337 (Del. Ch. Feb. 5, 1987)
  (unpublished) ...........................................................................................................46

*Am. Med. Int'l, Inc. v. Nat'l Union Fire Ins. Co of Pittsburgh*,
  244 F.3d 715 (9th Cir. 2001) ...................................................................................65

*In re Am.'s Hobby Ctr., Inc.*,
  223 B.R. 275 (Bankr. S.D.N.Y. 1998) ......................................................................42

*Ams. Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) .........................................................................................47

*In re BGC Partners, Inc. Derivative Litig.*,
  C.A. No. 2018-0722-LWW, 2022 WL 3581641 (Del. Ch. Aug. 19, 2022)
  (unpublished) ...........................................................................................................47

*Cambridge Ret. Sys. v. Bosnjak*,
  C.A. No. 9178-CB, 2014 WL 2930869 (Del. Ch. June 26, 2014)..........................45

*Carolina Cas. Ins. v. Sowell*,
  603 F. Supp. 2d 914 (N.D. Tex. 2009) ...................................................................65

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) .......................................................................................46

*In re Clear the Air, LLC*,
  631 B.R. 286 (Bankr. S.D. Tex. 2021) .....................................................................64

*In re Connect Transp., L.L.C.*,
    825 F. App'x 150 (5th Cir. 2020) ........................................................59

*In re Cooper*,
    405 B.R. 801 (Bankr. N.D. Tex. 2009)..............................................64

*Digit. Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,
    965 F.3d 365 (5th Cir. 2020) ........................................................59

*In re Dunham*,
    110 F.3d 286 (5th Cir. 1997) ........................................................56

*In re Essential Fin. Educ.*,
    629 B.R. 401 (Bankr. N.D. Tex. 2021)..............................................52

*In re Evergreen Solar, Inc.*,
    Case No. 11-12590-MFW (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382].......................69

*In re First Cap. Holdings Corp.*,
    146 B.R. 7 (Bankr. C.D. Cal. 1992)..............................................3, 63

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009) ........................................................45

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006)..............................................46

*In re Gibson Grp., Inc.*,
    66 F.3d 1436 (6th Cir. 1995) ........................................................63

*Great Am. Ins. Co. v. Primo*,
    512 S.W.3d 890 (Tex. 2017)........................................................65

*Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*,
    143 F.3d 192 (5th Cir. 1998) ........................................................66

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ........................................................52, 53

*Janvey v. Golf Channel, Inc.*,
    834 F.3d 570 (5th Cir. 2016) ........................................................55

*In re Juliet Homes, LP*,
    Bankr. No. 07-36424, Adversary No. 09-03429, 2011 WL 6817928 (Bankr.
    S.D. Tex. Dec. 28, 2011) ........................................................59

*La. World Expo. v. Fed. Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) ........................................................41, 42, 63, 64

*La. World Expo. v. Fed. Ins. Co.*,
  864 F.2d 1147 (5th Cir. 1989) ......................................................................67, 68

*In re Majestic Capital, Ltd.*,
  Case No. 11-36225-CGM (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211] ....................69

*In re Manhattan Inv. Fund Ltd.*,
  397 B.R. 1 (S.D.N.Y. 2007)..........................................................................52

*In re McConnell*,
  122 B.R. 41 (Bankr. S.D. Tex. 1989) ..................................................................42

*In re Musicland Holding Corp.*,
  398 B.R. 761 (Bankr. S.D.N.Y. 2008)..................................................................44

*In re Nat'l Forge Co.*,
  304 B.R. 214 (Bankr. W.D. Pa. 2004), *aff'd*, 326 B.R. 532 (W.D. Pa. 2005).......................63

*In re Nine Sys. Corp. S'holders Litig.*,
  C.A. No. 3940-VCN, 2014 WL 4383127 (Del. Ch. Sept. 4, 2014)........................................47

*In re Old Carco LLC*,
  Case No. 09-50002-AG (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151] ....................69

*Orman v. Cullman*,
  794 A.2d 5 (Del. Ch. 2002)..........................................................................45

*In re Palmaz Scientific, Inc.*,
  Case No. 16-50552, 2018 WL 3343597 (W.D. Tex. June 4, 2018) .......................................65

*In re Racing Servs., Inc.*,
  540 F.3d 892 (8th Cir. 2008) .......................................................................42

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ...........................................................................45

*Ravenswood Inv. Co., L.P. v. Estate of Winmill*,
  C.A. Nos. 3730-VCS, 7048-VCS, 2018 WL 1410860 (Del. Ch. Mar. 21,
  2018) ..............................................................................................47

*Reis v. Hazelett Strip-Casting Corp.*,
  28 A.3d 442 (Del. Ch. 2011).........................................................................45

*In re SI Restructuring, Inc.*,
  714 F.3d 860 (5th Cir. 2013) .......................................................................41

*In re Soza*,
  542 F.3d 1060 (5th Cir. 2008) ......................................................................52

*Sphinx Intern., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    412 F.3d 1224 (11th Cir. 2005) ....................................................................65

*In re STN Enters.*,
    779 F.2d 901 (2d Cir. 1985)........................................................................42

*Telepak v. United Servs. Auto. Ass'n*,
    887 S.W.2d 506 (Tex. App.—San Antonio 1994, writ denied)...............66

*In re Tesla Motors, Inc. S'holder Litig.*,
    C.A. No. 12711-VCS, 2022 WL 1237185 (Del. Ch. Apr. 27, 2022) .....................................44

*Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*,
    300 S.W.3d 348 (Tex. App.—Dallas 2009, pet. denied).........................59

*In re The Brown Schools*,
    386 B.R. 37 (Bankr. D. Del. 2008) ............................................................44

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013)........................................................................45

*In re TransTexas Gas Corp.*,
    597 F.3d 298 (5th Cir. 2010) ....................................................................56

*Unocal Corp. v. Mesa Petroleum Co.*,
    493 A.2d 946 (Del. 1985) ..........................................................................44

*Voluntary Hosps. of Am. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    859 F. Supp. 260 (N.D. Tex. 1993), *aff'd*, 24 F.3d 239 (5th Cir. 1994)...............65

*In re Walt Disney Co. Deriv. Litig.*,
    906 A.2d 27 (Del. 2006) ............................................................................45

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ....................................................................53

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ..........................................................................46

*William Penn P'ship v. Saliba*,
    13 A.3d 749 (Del. 2011) ............................................................................47

## Statutes

11 U.S.C. § 105(a) ............................................................................................1, 41

11 U.S.C. § 544.............................................................................38, 39, 51, 55

11 U.S.C. § 548........................................................................................ *passim*

11 U.S.C. § 1103 .................................................................................................................1, 41

11 U.S.C. § 1109(b) .............................................................................................................1, 41

28 U.S.C. § 157 ........................................................................................................................12

28 U.S.C. § 1334 ......................................................................................................................12

28 U.S.C. § 1408 ......................................................................................................................12

DEL. CODE tit. 8 § 154 .............................................................................................................61

DEL. CODE tit. 8 § 170(a) .........................................................................................................61

DEL. CODE tit. 8 § 173 .......................................................................................................60, 61

DEL. CODE tit. 8 § 174 .......................................................................................................61, 62

TEX. BUS. & COM. CODE §§ 24.001 *et seq.*......................................................................51, 55

TEX. BUS. & COM. CODE § 24.005 ...........................................................................50, 51, 52, 55

TEX. BUS. & COM. CODE § 24.010 ......................................................................................51, 55

**Other Authorities**

Fed. R. Bankr. P. 9019..........................................................................................................1, 69

Fed. R. Civ. P. 12(b)(6).............................................................................................................42

United States Constitution Article III ......................................................................................12

The Official Committee of Bondholders (the "Committee") duly appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of GWG Holdings, Inc. and its affiliated debtors and debtors in possession (the "Debtors"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 1103(c)(2) and (5), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code"), in substantially the form attached hereto (the "Proposed Order"), granting the Committee (i) leave, standing, and authority to commence and prosecute certain claims and causes of action (the "Proposed Claims"), as set forth in more detail in the draft adversary complaint attached hereto as **Exhibit A** (the "Proposed Complaint") on behalf of the Debtors' estates (collectively, the "Estates") against certain current and/or former directors and officers of the Debtors, individuals and corporate entities affiliated with or controlled by Brad Heppner, transferees of certain fraudulent transfers, and key broker-dealers who marketed and sold L Bonds (collectively, the "Proposed Defendants"); and (ii) exclusive authority to compromise and settle the Proposed Claims on behalf of the Estates, subject to this Court's continuing jurisdiction to review any proposed compromise or settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[2] In support of this Motion, the Committee respectfully states as follows.

## PRELIMINARY STATEMENT

1.      The Committee, appointed by the United States Trustee office and with a fiduciary duty to secured L bondholders (the "L Bondholders"),[3] which by and large are the Debtors' largest creditor consistency, brings this Motion for standing to prosecute valuable estate causes of action arising from a multiyear long fraud orchestrated by Brad Heppner to enrich himself and associated

---

[2] This Motion is made without prejudice to the Committee's ability to seek standing to bring other estate claims that are not raised herein.

[3] As noted in paragraphs 76–77 below, the Committee reserves all rights with regard to litigation surrounding the validity of certain L Bonds.

corporate entities by plundering the Debtors.  The resulting harm from this fraud has fallen almost entirely on the shoulders of the L Bondholders—approximately 27,000 primarily retail investors who are collectively owed approximately $1.6 billion, with each individual L Bondholder owning on average less than $45,000 worth of L Bonds.

2.      Through no fault of their own, many of these L Bondholders face financial ruin because GWG Holdings, Inc.,[4] through a group of select broker-dealers, aggressively and misleadingly marketed and sold L Bonds even after it became clear that its business was failing and the only way to repay those bondholders was to continue to sell yet more L Bonds to existing and additional retail investors.  Put simply, GWG was a classic Ponzi scheme.  Heppner then caused GWG to funnel *hundreds of millions* ███████████████████████████ to the Beneficient Company Group, LP ("Ben")—Heppner's fledgling and nascent company—and Ben's affiliates, notwithstanding Ben's persistent failure to develop a viable business plan or come even remotely close to meeting any of its fanciful projections.  Ben and Heppner were able to siphon funds out of GWG through a series of deeply conflicted, related-party transactions in which Ben and Heppner stood on both sides via their controlling shareholder position at GWG.  And the board of directors of GWG Holdings (the "GWG Board"), which was both conflicted and complicit, allowed them to do so.  Ben used most of the funds it received from GWG to ████████
████████████████████████████████████████████████████
████████████████████████████████████

3.      The Committee's constituents invested their savings with the expectation that GWG's L Bonds were safe investments that would provide periodic interest payments and satisfaction of their principal at maturity.  This expectation was thwarted by the vast misconduct

---

[4] "GWG Holdings" and, together with its Debtor and non-Debtor affiliates, "GWG" or the "Company."

committed by the Proposed Defendants.  At the heart of this Ponzi scheme was Heppner—he was the chairman of both the Ben and GWG boards, appointed many of their members, hand-selected high-level employees, and took pains to resist or circumvent any guardrails that should have existed to protect GWG and its creditors from manifestly unjust insider dealings.

4.      The Proposed Complaint was drafted after an extensive investigation by the Committee, which included interviews, depositions, and hundreds of thousands of pages of document discovery, and extensive financial analysis.  It sets forth detailed, serious, and well-founded claims against a number of parties, including virtually all of the former officers and directors of GWG.  As will be detailed herein, the Proposed Claims (defined below) are more than colorable, and their pursuit now will provide a massive benefit to the Estates in the form of the recovery of potentially hundreds of millions of dollars of looted value.

5.      While the Committee's investigation into potential claims arising from GWG's prepetition activities is ongoing, the Committee engaged in careful deliberation and concluded that developments in the Chapter 11 Cases made the filing of the present Motion now imperative.  *First*, the Debtors have filed a proposed plan of reorganization and disclosure statement that, among other deficiencies, (1) contains proposed releases and exculpations that may be entirely inappropriate given the facts and circumstances of these Chapter 11 Cases (the scope of which the Debtors have reserved their right to expand), (2) fails to address a variety of issues that are critical to the Committee and its constituents, and (3) makes clear the Debtors' belief that L Bondholder recoveries will come almost entirely from the highly speculative value of Ben equity that the Debtors will receive as part of the Avalon Transaction (as defined below).  Indeed, at a recent hearing, the Debtors' Chief Restructuring Officer and now Chief Executive Officer, Jeff Stein, publicly signaled that his primary intention is to preserve the extremely questionable value of the

3

Debtors' interests in Ben, stating that those interests have the "potential to generate full recoveries" for L Bondholders. In doing so, Mr. Stein gave inappropriately short shrift to, and appeared to downplay, the benefits of the pursuit of the valuable causes of action set forth in the Proposed Complaint. The Committee is gravely concerned by this posture.

6.       **Second**, the Debtors have filed a Motion for Mediation[5] in which they seek to commence a confidential mediation process in the hopes of arriving at a consensual plan of reorganization. The Committee is supportive of and will participate in the mediation process with the hope of achieving consensus. But in light of the nature and seriousness of the allegations revealed by the investigation and set forth in the Proposed Complaint, the Committee firmly believes that it would be inappropriate and unfair to the 27,000 L Bondholders who were victims of this scheme to commence a confidential mediation without bringing these allegations to light. Similarly, if their recoveries are to come primarily in the form of the inherently speculative future value of Ben equity, L Bondholders are entitled to know what the Committee's investigation has revealed as it relates to Heppner, who will continue to be the CEO of Ben.

7.       **Third**, as Ben progresses towards the potential consummation of the Avalon Transaction, it is equally critical that the Proposed Claims be disclosed now. In order for Ben to consummate the Avalon Transaction, GWG must provide its consent in its capacity as a Ben equity holder, and the Committee believes the allegations in the Proposed Complaint must be given due and appropriate consideration in connection with any consent that the Debtors may consider providing—so as to ensure that the rights of the Debtors' constituents are preserved and the value of the claims set forth in the Proposed Claim are maximized.

---

[5] *Motion of the Debtors and the Special Committee of the Board of GWG Holdings, Inc. for Entry of an Order (I) Appointing a Judicial Mediator, (II) Requiring Parties to Maintain Confidentiality of Mediation Communications, and (III) Granting Related Relief* [Docket No. 1128].

8.      While the Proposed Defendants may attempt to dispute or explain away certain of the Committee's allegations, L Bondholders should not be solicited to vote on any proposed plan of reorganization, much less a plan that includes a settlement of claims and causes of action achieved in a confidential mediation (which is the Debtors' objective) without L Bondholders having the benefit of understanding the scope and nature of the alleged fraudulent conduct that led to the financial ruin of many of them.  Accordingly, the Committee seeks standing to commence litigation on behalf of the Estates and to assert causes of action for fraudulent conveyance (actual and constructive), breach of fiduciary duty, unjust enrichment, and issuance of an illegal dividend. The Committee intends to bring these claims against the following Proposed Defendants: (1) Ben and certain of its affiliated entities; (2) Ben's founder, Brad Heppner; (3) certain broker-dealers; (4) various officers and directors of GWG Holdings; and (5) other named and unnamed persons and entities that were the initial or subsequent transferees of the alleged fraudulent transfers described below and in the Proposed Complaint.  Given that the Committee alone is the only estate fiduciary able to bring all of the counts in the Proposed Complaint, the claims are clearly colorable, and the benefit to the Estate of pursuing the claims now is evident, the Committee has satisfied the standard in this Circuit for derivative standing, and the Motion should be granted.

## I.      GWG Was Plundered by Heppner and Ben, Resulting in Tremendous Harm to L Bondholders

9.      For most of its existence, GWG invested in life insurance policies purchased through the secondary market.  To fund its business, GWG raised debt in the form of debentures called L Bonds, which since 2012 were marketed to individual investors across the country through a nationwide network of broker-dealers.  Several years and hundreds of millions of dollars in acquired policies later, GWG's founders could no longer escape the fact that their business was unsustainable, unprofitable, and likely insolvent from the very outset.  By the end of 2018, GWG

had become insolvent ███████████████████████, and its insolvency would only deepen

as its eventual relationship with Ben intensified between 2019 and 2021.

10.     To make matters worse, the L Bond—GWG's primary source of cash for acquiring

additional life insurance policies (and paying premiums on existing policies)—was exceedingly

expensive.  Indeed, since April 2018, GWG has paid its top 12 broker-dealers ████████████

████████████████ (the "Broker-Dealer Commissions").  The more L Bonds GWG sold,

the more cash the Company needed to make interest and maturity payments on L Bonds.  ████████

████████████████████████████████████████████████████

███████, GWG opted (from at least 2018 onward) to double-down and simply sell more L Bonds,

and therefore incur more and more debt, just to pay its old investors and avoid defaulting on its

existing obligations.  At base, GWG became a classic Ponzi scheme in which new L Bonds needed

to be sold in order to generate proceeds to pay the interest and principal obligations on existing L

Bonds.

11.     Facing a clearly unsustainable business model, GWG looked to pivot as its founders

looked to exit.  It is at this stage that Heppner and Ben entered the picture.  Prior to 2017, Ben

operated as part of a series of trusts controlled by Heppner and his family office.  However, in

2017, Ben ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████. As its founder Heppner described it, Ben was

intended to operate as "a pawn shop for rich people," although instead of cash, the customer would

receive equity in Ben.  However, Ben's theoretical business model faced a number of challenges,

including whether this market even existed, whether these high-net-worth individuals would take

a steep discount on their assets, and whether they would accept Ben equity in lieu of cash for their liquidity needs.

12.    But all Ben had was this untested idea.  It lacked what GWG had to offer—a ready stream of cash that Ben needed to acquire a portfolio of alternative investments purportedly to jumpstart its nascent business and otherwise provide cash for the various corporate entities affiliated with Heppner.  GWG had become adept over the years at operating with negative cash flow by partnering with its established network of broker dealers to sell L Bonds to "mom and pop" investors.  Ben wanted to co-opt this fundraising infrastructure.

13.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████    GWG—an insolvent and cash-flow-negative company involved in an unrelated business████████████████████    now owned a large segment of Ben. ██████████████████████████████████████. Following the closing of the auction transaction, GWG's equity immediately sat behind over $1 billion in debt and preferred equity owned mostly by Heppner, ensuring that no matter what occurred with Ben's business, Heppner operated without risk.

14.    This was the beginning of a complex series of transactions between GWG and Ben, which started with the use of L Bonds and equity in GWG to purchase securities from Paul Capital Advisors for Ben's benefit,[6] which culminated in Ben taking effective control of GWG and then executing a number of transfers to siphon cash out of GWG.  Those transactions, identified within as the Challenged Insider Transactions, led to the transfer of hundreds of millions of dollars in

---

[6] Upon information and belief, Paul Capital Advisors refused initial offers from Ben to purchase their secondary assets with Ben equity.

cash and non-cash assets for the benefit of Heppner and Ben, and at the expense of the Debtors and the L Bondholders. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████. These actions occurred despite GWG's insolvency during all relevant times.

15.     GWG gained no meaningful consideration in exchange for the Challenged Insider Transactions, which generally consisted of receiving only equity in Ben that was subordinate to other substantial existing debt and preferred equity.  Indeed, GWG did not receive cash repayments for virtually any loans made to Ben, which were eventually almost always converted into capital contributions.  When the few non-conflicted directors of GWG's Board raised concerns that continually providing cash in exchange for Ben equity of dubious value was not in GWG's interests, those board members were either ignored or challenged by insiders beholden to Heppner—if not by Heppner himself.  Those board members then resigned, which in at least one instance was covered up by the remaining GWG directors and officers through the filing of a materially false and misleading March 2021 8-K.  Each of GWG's auditors since 2018 also resigned or declined to seek reappointment—none lasting longer than a year.

16.     Notwithstanding the fact that neither GWG nor Ben had a viable business plan, let alone positive cash flow, Heppner, and the associated broker-dealers, were all too happy to keep the scheme alive by continuing to sell L Bonds that had no prospect for repayment.  And, in fact, this scheme would likely have continued but for the fact that the Securities and Exchange Commission ("SEC") commenced an investigation, which ultimately became public.  As a result, L Bond sales abruptly stopped.  Once GWG could no longer sell new L Bonds to pay off its old L

Bond liabilities, the house of cards collapsed and bankruptcy was the only option.  GWG filed for chapter 11 protection on April 20, 2022 (the "Petition Date").

17.     Unsurprisingly, Ben escaped unscathed.  Mere months before GWG was forced to file for bankruptcy, Ben "de-coupled" from GWG, becoming an independent company.  GWG again received nothing but Ben equity interests that were indisputably exchanged for far less than reasonably equivalent value.  The result of this spin-off, like all of Heppner's actions, was to ensure that Heppner (a purported billionaire) came out ahead and maintained his fortune.  Heppner's gains come at the expense of approximately 27,000 L Bondholders—in many cases "mom and pop" retail investors lured by overconfident and misleading sales pitches by broker-dealers working at the ultimate direction of Heppner.  Instead of providing a comfortable income stream for their retirement, the L Bondholders' investments in GWG became the piggybank for Ben's speculative business plans and the massive array of trusts and entities under Heppner's control.

## II.     The Committee Has Requested Standing to Assert the Proposed Claims

18.     A Committee has standing to prosecute estate causes of action where the claims are colorable and the debtors have unjustifiably refused to bring the claims.  Both requirements are satisfied here.

19.     Through its investigation to date, the Committee has identified certain colorable and valuable causes of action.  The claims fall into the following categories:  (1) actual fraudulent transfers; (2) constructive fraudulent transfers; (3) breach of fiduciary duties; (4) illegal dividend; and (5) unjust enrichment.  If litigated, the claims may result in profound benefits to the Estates and L Bondholder recoveries and could have a fundamental impact on the posture of these cases. While the Committee is continuing to investigate the financial impacts of the Proposed Claims, the Committee estimates, at this time, that through the Proposed Complaint and other related

litigation,[7] the Committee will be seeking in excess of $500 million worth of additional value to the Estates.

20.     On November 21, 2022, counsel for the Committee submitted a letter (the "November 21 Demand") to counsel for the Investigations Committee of the GWG Board (the "Investigations Committee").  In the November 21 Demand, the Committee requested standing to pursue the Proposed Claims on behalf of the Company.  As discussed below in paragraphs 135–140, the Committee conveyed that the Investigations Committee was not in a position to pursue the Proposed Claims because doing so ███████████████████████████████████ ██████████████████████████████ director and officer insurance policies (the "D&O Policies"). ████████████████████████████████████████████████████████ ████████████████████████

21.     In the November 21 Demand, the Committee requested authorization to pursue the Proposed Claims from the Investigations Committee no later than December 1, 2022.  As explained in the November 21 Demand, time is of the essence in bringing the Proposed Claims because Ben is contemplating a business combination with Avalon Acquisition Inc. (the "Avalon Transaction"), which is expected to close in the first quarter of 2023.  Before the Avalon

---

[7] In a letter dated December 15, 2022 (the Seller Trust L Bonds Letter), the Committee notified L Bond Management LLC ("LBM") that it intends to pursue direct claims and challenges with respect to the $366.9 million in L Bonds (the "Seller Trust L Bonds"), issued by GWG Holdings, pursuant to that certain Supplemental Indenture dated as of August 10, 2018 to the Amended and Restated Indenture dated as of October 23, 2017, by and between GWG Holdings as issuer and obligor, GWG Life, LLC as guarantor, and Bank of Utah as indenture trustee (the "Seller Trust L Bond Indenture"), which Seller Trust L Bonds are held by the Seller Trusts and the Custody Trusts (both as defined in the Seller Trust L Bonds Letter).  LBM purports to represent the Seller Trusts and the Custody Trusts through a power of attorney.  As set forth in the Seller Trust L Bonds Letter, based on the distinguishing features of the Seller Trust L Bond Indenture and related misconduct by GWG, Ben, and other parties affiliated with the Seller Trusts, the Seller Trust L Bonds should not be treated *pari passu* with the claims held by the other L Bondholders.  The Seller Trust L Bonds must be (i) recharacterized from debt to equity and/or (ii) subordinated (equitably and/or mandatorily) to all other L Bonds.  The Committee is prepared to pursue all claims and challenges seeking such relief, either separately or in conjunction with the Committee's litigation of the Proposed Claims set forth in this Motion.  The Seller Trust L Bonds Letter is attached hereto as **Exhibit B**.

Transaction can close, however, Ben must secure GWG's consent.   Further, the Committee anticipates that Ben, Heppner, and Heppner-related entities will be seeking releases.   The Committee accordingly believes it is imperative that the Proposed Claims be brought to light prior to any Company consent, in order to pursue the rights of its constituents before, during, and after consummation of the Avalon Transaction.

22.     On November 30, 2022, the Investigations Committee sent a response letter (the "November 30 Response") informing the Committee that the Investigations Committee declined to assign any potential estate claims "at this time."   In its November 30 Response, the Investigations Committee disputed ███████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████. this position disregards the Committee's reason for raising the claims in the first place:  to preserve and pursue the Proposed Claims *before* closing of the Avalon Transaction and prior to voting on any plan.
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[8] ███████████████████████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████.

23.      In light of the Debtors' unwillingness and inability to pursue timely what are indisputably colorable and valuable causes of action, the Committee therefore seeks standing to bring the Proposed Claims.  For the foregoing reasons, as well as the significant impact of the Proposed Claims on secured bondholder recoveries and the confirmability of the Debtors' proposed plan of reorganization, the Committee respectfully submits that it is just and proper for it to be granted standing to prosecute the Proposed Claims and exclusive settlement authority with respect to such claims.[9]

## JURISDICTION AND VENUE

24.      The District Court has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157.

25.      Venue is proper in this District under 28 U.S.C. § 1408.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are sections 105(a) and 1109(b) of the Bankruptcy Code.

26.      The Committee consents to the entry of a final order or judgment by this Court in connection with this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[9] The Committee reserves its right to assert causes of action, objections, or challenges with regard to any claims or issues not encompassed herein.

## SUMMARY OF ALLEGATIONS SUPPORTING THE PROPOSED CLAIMS

27.     The fact allegations underlying the Proposed Claims are set forth in the Proposed

Complaint, which is incorporated herein by reference.[10]

### I.     GWG's Failed Business Model

28.     For most of its history, GWG's business model focused on purchasing life

insurance policies (the "Policies") through the secondary market in the hopes that the Policies

would pay out at a profit when the insured passes away.  To fund this venture, GWG marketed and

sold renewable secured debentures it eventually branded as "L Bonds."  L Bonds offered outside

investors the opportunity to purchase secured debt in GWG and receive regular interest payments

(typically around 7% per year) for a period of time until the L Bond matured and the principal was

either returned to the investor or renewed (which renewals typically occurred automatically).  L

Bonds were also a necessary source of liquidity that allowed GWG to purchase additional Policies

and make premium payments to maintain GWG's portfolio of Policies (the "Life Portfolio").

29.     L Bonds proved to be an effective means of quickly raising capital.  Shortly after

first offering the securities in 2012, GWG was able to increase the face value of its Life Portfolio

from around $572 million at the end of 2012 to over $740 million by the end of 2013,

corresponding with sales of around $84 million in L Bonds during the same time period.

Unfortunately, GWG's ability to utilize L Bond sales to acquire Policies and maintain its Life

Portfolio proved irrelevant, as the Company's business model was fundamentally flawed in two

respects.

30.     *First*, the Policies purchased by GWG failed to generate the income needed for the

acquisitions to be profitable.  People were living longer than GWG had forecast, which resulted

---

[10] All facts included in this Motion are in summary fashion and, to the extent any statements conflict with those in the Proposed Complaint, the allegations in the Proposed Complaint shall control.

not only in delayed payouts but also increased Policy premium payments.  **Second**—and far more egregiously—GWG failed from the outset to account for key costs in calculating its expected profitability.  GWG reported an expected internal rate of return ("IRR") on its Life Portfolio above 10% from 2015 through 2017.  However, the cash flows used to compute GWG's IRR on its Life Portfolio included *only* the acquisition cost of the Policies, premium payments, and the maturities of the Policies.  The cash flows *did not* include operating expenses, interest expenses, preferred stock dividends and other costs of capital, or brokers' commissions.  Had GWG properly accounted for the additional costs, it would have been readily apparent that the Company was underwater even before it got off the ground.

31.     As noted above, a significant expense related to GWG's sale of L Bonds was commissions and related payments made to broker-dealers.  GWG sold L Bonds through a vast network of broker-dealer firms that, at its peak, included approximately 145 broker-dealers across the United States.  In the four years leading up to the Petition Date, GWG paid ███████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████  GWG engaged with these broker-dealers through its "dealer manager" Emerson Equity LLC ("Emerson").  Emerson agreed to offer and sell L Bonds on a "best-efforts" basis and entered into Soliciting Dealer Agreements with certain other Financial Industry Regulatory Authority ("FINRA") member broker-dealers (the "Seller Group Members").

---

[11] Although the Broker-Dealer Defendants were not the only recipients of commission payments over this period, ███ ████████████████████████████████████████████████████████████████████████.  At this time, the Committee does not believe a cost-benefit analysis favors pursuing fraudulent transfer claims against each and every broker-dealer receiving commissions, although the Committee reserves its right to seek leave to pursue claims against additional broker-dealers in the future.

32.     GWG Holdings paid the Broker-Dealer Defendants a selling commission ranging from 0.75% to 6% of the principal amount of L Bonds they sold (the exact commission depended on the L Bonds' maturity date, which ranged from six months to seven years).  The Seller Group Members were also entitled to "additional compensation" (also paid by GWG Holdings) of up to 3% of gross offering proceeds as reimbursement for accountable out-of-pocket expenses incurred in offering and selling L Bonds.  █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

33.     Clearly, GWG's model for marketing and selling L Bonds was bloated.  But it was not designed to be efficient—it was designed to drive maximum L Bond sales.  At an October 29, 2020 meeting, the GWG Board ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

## II.      **GWG's Rapid Descent into Insolvency**

34.     GWG's increasingly aggressive approach to selling L Bonds only served to rapidly plunge the Company into insolvency—especially given its business model had no prospects for

profitability.  One former GWG director retrospectively characterized his task as "████████ ████████████████████████████████████████."  In 2019, GWG's flawed business model and problematic relationship with L Bonds was succinctly described in a ██████████████████████ ██████████████████



35.     Given these factors, it should have quickly become apparent to GWG that it could do nothing but delay an inevitable bankruptcy filing.  The Committee's analysis to date indicates that GWG was insolvent by 2018, if not much earlier.  As a result—and as GWG acknowledged in its Form 10-K for the years ended 2018—the Company had to rely "heavily" on the issuance of new L Bonds to continue operations, make interest and maturity payments on *existing* L Bonds, and remain a viable going concern.

36.     Instead of squarely facing the consequences of the Life Portfolio's failure and its attendant liquidity crisis, GWG elected to continue funding its operations and debt payments by issuing new L Bonds to cover the ever-increasing shortfall.  As a result, GWG had to devote increasingly large percentages of L Bond proceeds to pay other obligations of the Company, including on the L Bonds themselves, which were expensive to maintain through interest payments, commission fees, and other costs necessary to maintain GWG's sizeable L Bond sales force.  Simply put:  the more L Bonds GWG sold, the more cash the Company needed in order to make interest and maturity payments on L Bonds.  As illustrated below, this pattern held true each year from 2018 all the way up to the Debtors' filing voluntary petitions for chapter 11 relief:



37.     In late 2019, GWG's debt was approaching (and might have already exceeded) the 90% debt coverage ratio covenant (the "DCR") in the indenture governing L Bonds (the "L Bond Indenture"), which would have led GWG to default and deprived Ben of access to hundreds of millions of dollars in L Bond proceeds.  ██████████████████████████████████



. In December 2019, the Company amended the L Bond Indenture to provide that L Bonds subject to repayment in equity would be excluded from the DCR's calculation (the "DCR Amendment"). The Company sought approval from L Bondholders on **negative notice**, over Thanksgiving weekend, and L Bondholders were **only** told that **future indebtedness** repayable in equity would be excluded from the DCR's calculation. However, following the amendment, ████████████████████████████████ ████████████████████████████████████████████. Then, in connection with its 2019 Investment Agreement with Ben (described below), Ben recognized a deemed dividend of $250 million to the Company ("Deemed Dividend"), ████████████████████████████ ██████████████████. Due to this financial chicanery and misdirection, the Company was able to avoid a declaration of default and continue down its ill-fated path for an additional two-plus years, █████████████████████████████████████████████ ████████████████.[12]

## III.   GWG's Founders Sought an Exit Strategy, While Ben Saw an Opportunity

38.     Given the foregoing, GWG and its founders, Jon and Steven Sabes, should have known early on that GWG's business model was unsustainable and that the Company was hopelessly insolvent no later than 2018. And while it is unclear when GWG's controllers *actually* knew GWG was destined for bankruptcy,[13] the evidence strongly indicates that they were aware of this fact no later than December 2017.

---

[12] The SEC is also investigating the rationale and disclosures associated with the DCR Amendment.

[13] The Committee's investigation on this and a number of other issues is ongoing.

39.     In or around December 2017, Ben was still looking to get off the ground.  For its first major acquisition, Ben targeted a portfolio of private equity "secondaries" from third party Paul Capital Advisors, L.L.C. and its affiliates ("Paul Capital").  However, Ben needed an outside investor to provide the cash necessary to acquire the secondaries, and it apparently was unable to secure conventional financing through a bank or institutional investor.  Heppner had previously tried to use Ben equity as consideration for the purchase, but Paul Capital refused.  It wanted cash, something Ben did not have.  █████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

40.     GWG, upon information and belief ██████████████████████████, as a result, now owned a large segment of Ben:  a nascent and perennially unproven company focused on providing liquidity to entities and high-net-worth individuals who held illiquid but otherwise valuable assets.  In the contemplated transaction, GWG would pay over $600 million in the form of $366 million in L Bonds designated as "Seller Trust L Bonds" and 27 million common shares with a face value of approximately $250 million.  In exchange, GWG was to receive (i) ████ ██ common equity in Ben, (ii) $50 million in cash,[14] (iii) an option agreement pursuant to which GWG was subsequently granted additional Ben common equity, and (iv) an approximate $200 million promissory note payable by Ben to GWG that was subsequently converted into yet more Ben common equity.  Following the transaction, GWG's common equity immediately sat behind over $1 billion in preferred equity owned by Heppner, ensuring that no matter what occurred with Ben's business, Heppner operated it without risk.  ████████████████████████████

---

[14] Approximately half of the $50 million received by GWG was distributed to common shareholders (of which the Sabes brothers were, directly or indirectly, the largest holders) via special interest dividend on September 5, 2018. The remaining amount was expected to be utilized primarily for other Sabes brother initiatives.



41.     At first glance, it is puzzling why GWG—a company that for over a decade had focused exclusively on monetizing life insurance policies purchased through the secondary market—would make such a dramatic pivot toward investing in Ben.  However, the decision makes sense when considered in the broader context.  Within months of GWG submitting the "winning bid," GWG and Ben began negotiating a buyout of GWG's founders, Jon and Steven Sabes, through an effective reverse merger whereby Ben would take control of GWG.  Ultimately, this is exactly what happened.  In April 2019, the Sabes brothers sold their controlling interest in GWG to Ben for at least $25 million in cash and resigned their officer positions.  As part of that transaction, Ben was permitted to direct the appointment of a new slate of directors to the GWG Board.  In addition, Heppner, the CEO of Ben and Chairman of the Ben board, became Chairman of the newly appointed GWG Board.  Within a few months of GWG's investment in Ben, Heppner and Ben had assumed complete control of GWG.  This would become even more evident in another eight months when the Ben-controlled GWG Board caused GWG to merge with Ben, fully entrenching GWG under Ben's, and thus Heppner's, control.  By the end of 2019, GWG's core leadership team included Brad Heppner—founder of Ben—as chairman of GWG's Board, and Murray Holland—the person primarily responsible for facilitating the auction whereby GWG agreed to provide $366 million of L Bonds and $250 million of GWG's own common stock to the Seller Trusts in exchange for Ben equity—as GWG's President and CEO.

42.     Why Ben would be interested in taking over a failing company also may appear odd, at least initially.  But GWG's and Ben's subsequent course of dealing makes clear that Ben was not interested in turning GWG into a viable business.  Ben's (at best) aspirational business plan and unfounded projections did not create the cash that Ben needed.  Tellingly, there was no support for Ben's inflated valuation, the vast majority of which was suspiciously categorized as "goodwill," an accounting gimmick considering Ben had yet to do anything.  But Heppner saw a way around these issues.  As described above, GWG had a robust and expansive mechanism in place to sell L Bonds.  Ben and Heppner needed those L Bond sales and the attendant funds to flow into Ben to prop up its business and, perhaps most importantly, ensure that trusts related to Heppner received a constant stream of cash despite the fact that such expenditures provided no benefit to GWG and saddled GWG—and more accurately, its investor L Bondholders—with well over $1 billion in debt.

43.     The end result was a win for the Sabes brothers, who were able to exit the Company with cash in their pocket and without fighting creditors through bankruptcy.  Ben and Heppner also came out ahead by using cash raised by GWG for their own business and personal uses.  Unfortunately, both of these gains came at dramatic expense to GWG, with the L Bondholders ultimately shouldering the vast majority of GWG's over $1.6 billion in debt at the time of the Petition Date.

## IV.    **Heppner Siphons GWG Money Through the Ben Transactions**

44.     The actual means by which Ben accomplished its takeover of GWG—and ultimate conversion into Heppner's personal piggybank—involved several complex steps, summarized below:



45.     These "<u>Ben Transactions</u>" include:

a.      ***GWG's Acquisition of Ben***:  In December 2018, pursuant to the Master Exchange Agreement, GWG acquired the majority of Ben common shares and an Option Agreement, in exchange for the transfer of $366 million of L Bonds and more than 27 million GWG common shares (worth approximately $250 million based on public trading price at the time) to Seller Trusts controlled by Ben affiliates, ████████████████████ ████████████████████████████████ (the "<u>2018 GWG Acquisition</u>"), and an approximately $192.5 million commercial loan with GWG Holdings' wholly owned subsidiary GWG Life, LLC ("<u>GWG Life</u>") as the lender (though it does not appear that any cash was provided in exchange for Ben's commercial loan obligation).  At the time, the value of common shares of Ben acquired by GWG had little to no value given Ben's highly speculative and (to this day) entirely unrealized "business plan."

In connection with the 2018 GWG Acquisition, Ben acquired $50 million of preferred equity in GWG, and GWG Holdings used the proceeds to issue a $25.7 million special dividend to its shareholders (defined as the "<u>2018 Special Dividend</u>" below), including its largest shareholders Jon and Steven Sabes.

b.      ***Ben's Takeover of GWG***:  Shortly thereafter in April 2019, Ben obtained control of GWG by buying out the Sabes brothers (Jon Sabes, former CEO of the Company, and Steven Sabes, former Executive VP of the Company) pursuant to the April 2019 Purchase and Contribution Agreement (the "<u>2019 Ben Takeover</u>").  Under that agreement, the Sabes brothers (1) sold or contributed all of their shares in the Company to Ben subsidiary Beneficient Capital Company, LLC ("<u>BCC</u>"), and another entity called AltiVerse Capital Markets LLC ("<u>AltiVerse</u>"), in exchange for $25 million in cash[15] and (2) resigned from all of their officer positions at the Company except for two of its subsidiaries.  Under the Purchase and Contribution Agreement, Ben designated the appointment of the entire GWG Board, naming Heppner as chair of the GWG Board.  After Ben acquired control of the Company, the Company ramped up its L Bond sales despite being insolvent, and proceeds of those L Bond sales were used to fund the subsequent Challenged Insider Transactions, including multiple cash transfers to Ben.

c.      ***GWG's Promissory Note to Ben***:  On May 31, 2019, GWG entered into a Promissory Note with certain trusts affiliated with Ben.  Pursuant to the Promissory Note, GWG Life made two loans for a total of $65 million (the "<u>2019 Insider Loans</u>") to Ben.  In the months following the 2019 Insider

---

[15] According to a presentation prepared for Beneficient Management, L.L.C., ████████ ████████████████████████████████████████████████.

Loans, GWG would also waive certain financial restrictions in place under the April 2019 Purchase and Contribution Agreement to enable Ben to use cash proceeds of the 2019 Insider Loans to satisfy obligations Ben owed to the Sabes brothers from the 2019 Ben Takeover. The Company funds transferred to Ben pursuant to the 2019 Insider Loans, including an initial advance of $50 million on June 3, 2019, and a second advance of $15 million on November 22, 2019, ████████████████. These loans were repaid in September 2020, not in cash but in additional equity interests in Ben (the "Ben Equity Repayment"). Given the unproven value of Ben at the time (and to this day), the Ben Equity Repayment provided far less than reasonably equivalent value in exchange for the Company's transfer of $65 million in 2019 Insider Loans.

d.   ***GWG's $10 Million Purchase of Additional Ben Equity***: On June 12, 2019, GWG Holdings purchased an additional $10 million of equity interests in Ben (the "June 2019 Acquisition")



the Company received yet more equity interests in Ben. The value of these equity interests in Ben was far less than reasonably equivalent to the $10 million transferred by GWG, given Ben's unproven value at the time.

e.   ***GWG's Investment Agreement with Ben***: On December 31, 2019, the Company entered into an Investment Agreement with Ben (the "2019 Investment Agreement"), whereby GWG transferred $79 million to Ben in exchange for Ben common units, a Beneficient Company Holdings, LP ("BCH") Preferred Series A Subclass 1 Unit Account, and the right to make director appointments (the "2019 Capital Contribution"). This ***appeared*** to give the Company effective control over Ben, but this "control" was illusory given Heppner's domination of both the GWG Board and Ben. At this time, Heppner served concurrently as the CEO of Ben and chair of the boards of directors of GWG and Ben. Ben used a significant portion of the proceeds to ████████████████████████████████████. The value of interests in Ben and BCH was (and remains) unproven given Ben's persistent unprofitability and, therefore, did not amount to reasonably equivalent value for the Company's transfer of $79 million.

f.   ***The Company's Preferred Series C Unit Agreement (Unit Purchase Agreement)***: On July 15, 2020, the Company entered into a Preferred Series C Unit Purchase Agreement (the "Unit Purchase Agreement" or "UPA") with Ben affiliate BCH. Under this agreement, from July 2020 through December 2020, the Company made $130.2 million in capital contributions

to BCH in exchange for interests in BCH (the "2020 Capital Contribution").



The value of interests in BCH that were provided in return was (and remains) unproven given Ben's persistent unprofitability (and thus did not amount to reasonably equivalent value for either the 2020 or 2021 Capital Contribution). These interests also sit behind more than $1 billion in preferred equity primarily held by Heppner.

g. ***Ben Spins Off from GWG***: On November 29, 2021—less than four weeks after belatedly filing audited financials for 2020 that included a going concern warning and roughly seven weeks before announcing that it could not pay interest on L Bonds—the Company (1) relinquished control of Ben for no direct consideration, (2) agreed to forgive $202 million of debt Ben owed GWG Life, in exchange for Ben common equity (which also sits behind more than $1 billion of Ben preferred equity that is held not by GWG but by Heppner and other Ben founders), and (3) had the rights for $319 million in existing preferred equity modified such that GWG's equity was subordinated to other equity (the "2021 Ben Spinoff"). This was the culmination of Ben's fraudulent scheme to extract value from GWG ██████████████████████ ) in exchange for equity interests in Ben and its affiliates whose value was (and still is) unproven given Ben's purely speculative business plans and repeated failures to realize its revenue projections (and which, therefore, did not amount to reasonably equivalent value in exchange for the consideration provided by GWG).

The 2019 Insider Loans, the June 2019 Acquisition, the 2019 Capital Contribution, the 2020 Capital Contribution, the 2021 Capital Contribution, and the 2021 Ben Spinoff are referred to collectively as the "Challenged Insider Transactions."

46.     Upon information and belief, each of the foregoing Ben Transactions was negotiated in, consummated in, and/or performed in Texas, where GWG Holdings and Ben are each headquartered. For each step in the Ben Transactions, Ben's and GWG's founders worked to ensure that—at least on paper—procedures were documented and boxes were checked in a way that passed muster. As discussed below in Section V, however, these processes in many cases

were flawed if not outright shams.  Moreover, there were two problems that process could not cure.

47.    ***First***, GWG was insolvent at all relevant times.  ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

48.    ***Second***, the only consideration Ben had to offer in the Ben Transactions was its own equity, which was (and remains) of unproven value.  In order for the Ben Transactions to make any rational business sense, Ben had to be over a billion-dollar company.  At the time of each Ben Transaction, however, Ben had not demonstrated its business was even viable, much less

valuable.   The apparent solution was to simply *say* Ben was valuable.   Ben's management assembled fanciful projections that, when plugged into the right financial model, indicated Ben was worth almost $2 billion.  But nearly all of that $2 billion valuation had to be characterized as "goodwill" on Ben's balance sheet because there was no other justification for the astronomical figures.

49.     As described in the Proposed Complaint, Ben has never demonstrated it is worth the billions of dollars it had to be worth in order to offer reasonably equivalent value for the Ben Transactions, which all parties either knew or should have known at the time of the transactions. Even if it was not apparent from the outset, any reasonably prudent company, officer, or director would have concluded ███████████████████████████████████████████████ ██████████████████████████████████████████:

████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

**V.    GWG's Conflicted Directors**

50.    The Challenged Insider Transactions were made possible by a GWG Board that was self-interested and/or beholden to Heppner.  Each of them were classic insider deals, with Ben standing on both sides of the transactions given its controlling shareholder interest in GWG.  Since the 2019 Ben Takeover—when all of the Company's directors were replaced by Ben designees—until the 2021 Ben Spinoff, Heppner effectively controlled the GWG Board.  This enabled Heppner to dominate the GWG Board as its chairperson and control the governance of both the Company and Ben.

51.    Indeed, a majority of the GWG Board simultaneously sat on the board of directors of Ben during nearly all of the Challenged Insider Transactions.



52.     Given the clearly conflicted nature of the GWG Board, Heppner and the GWG Board soon recognized that they needed some veneer of independence to avoid strict scrutiny of planned insider transactions between GWG and Ben.   In May 2019, the GWG Board ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████"

53.     The veneer of independence offered by the newly formed Second Special Committee was just that:   a surface-level display.   Heppner and other conflicted directors undermined the Second Special Committee's independence every step of the way, including with respect to the following transactions.

54.     ***2019 Promissory Note and $63 Million Installment***.   Days after its formation, the Second Special Committee ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████. First, Ben loyalist Peter Cangany (then a member of both the GWG Board and Ben's Board ████████████████████ █████████████████████

████████████████████████████████████████████████. Second, before

the Second Special Committee had the opportunity to make a recommendation one way or the

other, ███████████████████ ▪ ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████. GWG Life subsequently made the 2019 Insider Loans pursuant to the 2019

Promissory Note, for an initial advance of $50 million on June 3, 2019, and a second advance of

$15 million on November 22, 2019. ████████████████████████████

███████████████████████████████.

     55.    ***June 2019 Acquisition***. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

     56.    ████████████████████████████ In August of 2019,

████████████████████████████████████████████████

---

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

████████████████████████████. Zimmerman—*in 2019*—stated that ████████████████████████████████████████████████████████. Stein concurred, ████████████████████████████████████████████████████████,

Glaser, Stein, and Zimmerman each resigned their positions by October 15, 2019.[17]  The Company disclosed these resignations in an 8-K filed October 21, 2019, ████████████████████ ██████████ stating that "the board has determined that it is in the best interests of the Company to reduce the GWG board membership from fourteen members to ten," in order to "make itself a more nimble and action-oriented organization." ████████████ is particularly troubling given the events unfolding with other director resignations disclosed in the March 2021 8-K (defined below).

57.     *2019 Investment Agreement*.  On December 31, 2019, the Company entered into an Investment Agreement with Ben (the "2019 Investment Agreement").  Under the 2019 Investment Agreement, GWG transferred $79 million to Ben in exchange for Ben common units and a BCH Preferred Series A Subclass 1 Unit Account (the "2019 Capital Contribution").  GWG Holdings also obtained the right to appoint directors of Ben.  This appeared to give GWG Holdings purported control over Ben, but the "control" was illusory given Heppner's domination of both the GWG Board and Ben.  At this time, Heppner served concurrently as the CEO of Ben and chair of the boards of directors of GWG and Ben.  Ben used a significant portion of the proceeds of the 2019 Capital Contribution to ████████████████████████████████████████ ██████████.

---

[17] Fisher also resigned from GWG, but remained a Ben board member.

58.     ***Addition of Cangany to the Second Special Committee***.  On March 3, 2020, the Company's Board ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ and added Roy Bailey and Peter Cangany ████████████ ███████████████████████████████████████████. ███████████████████ ██████████████, the Company's Board added Cangany to the Second Special Committee on the basis that he was "disinterested and independent" with respect to a potential transaction involving restructuring between GWG and Ben.  This was false.  Cangany was (and remains today) a member of the Ben Board ████████████████████████████.  Besides Heppner, few individuals could have been more conflicted than Cangany.  ██████████████████████████████ ████████████████████████████████████████████████████████ █████████████.

59.     ***Unit Purchase Agreement***.  ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████  Ultimately,  the  Second  Special Committee approved the UPA, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███.

60.    ***Ben Equity Repayment***.  In September 2020, the Liquid Trusts[18] repaid the $65 million in 2019 Insider Loans not with cash but with additional equity interests in Ben.

61.    ***The Third Special Committee's Dissolution***.  In anticipation of yet another related-party transaction, GWG formed a new Special Committee (the "Third Special Committee") in October 2020.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ appointed Roy Bailey, David Gruber, and Daniel Fine to the reconstituted Third Special Committee.  Gruber, however, resigned shortly after his appointment, and Jeffrey MacDowell was appointed in January 2021.  ████████████████████

██████████████████████████████████████████████████.

62.    Before long, the Third Special Committee gave Heppner and the Ben-designated directors an even bigger headache than the Second Special Committee had.  On February 10, 2021, management presented to the Third Special Committee a $48 million capital contribution to Ben under the Unit Purchase Agreement.  The Third Special Committee refused to approve the capital contribution, as presented, ████████████████████████████████████████████████

████████████████████████.

63.    Reprising his role as a lobbyist on behalf of Ben, Cangany ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[18] As defined in the Proposed Complaint.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

64.     ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████.

65.     ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████, Fine, Bailey, and MacDowell sent a memorandum to Holland and Evans stating that "no funds of GWGH, whether contemplated by the February 10, 2021 Funding Request of GWGH Management or otherwise, are to be invested in BEN *without Special Committee approval until further notice to you from the Special Committee*." ████████

████████████████████████████████████████████

████████████████████████████████.

66.     ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████, the Company's Board simply got rid of the Third Special Committee.  At a "special meeting" on March 3, 2021, the GWG Board determined, ████████████████████████████████████████████████████ ████████████████████████████████████████████ that future funding under the UPA therefore did not require Special Committee approval ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████.

67.    ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

## VI.    First Fraud Finally Brought to Light

68.    Bailey, Fine, and MacDowell resigned from the Company's Board on March 6, 2021, ██████████████████████████████████████████.  Bailey testified that he "resigned in protest of GWG management and Board activities," ███████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████.

69.    On March 11, 2021, the Company filed a Form 8-K regarding the resignation.  In the March 2021 8-K, the Company stated that the resignations "were not due to any disagreement

36

with the company known to an executive officer of the company on any matters relating to the operations, policies, or practices of the company." ███████████████████████████████████. In fact, it was a lie.

70.     GWG's characterization that the resignations were not due to any disagreement was not merely a face-saving move—it was a calculated, materially false, and misleading statement to the market and L Bondholders.  On March 5, Holland emailed Bailey regarding Bailey's expressed intention to resign:  "You had previously expressed a desire to resign . . . .  [A]ny resignation before material issues are resolved with management would require public SEC disclosure and would, in all likelihood, have a *dramatic adverse effect on L Bond sales* with a disproportionate negative effect on the common stockholders."  (emphasis added).  A few days later, on March 9, 2021, Holland emailed Bailey, Fine, and MacDowell to inform them of the Company's plan to file a Form 8-K stating that their resignations were "not due to any disagreement with the Company."  The resigning directors responded, "We believe our resignations speak for themselves and decline to advise the Company on its disclosure obligations."

71.     Despite the resigning directors' forceful response—and the Company's own knowledge (through its remaining directors and officers) regarding the basis for the resignations of Bailey, Fine, and MacDowell—GWG filed the March 2021 8-K containing the false representations.  In the short term, the false March 2021 8-K achieved its purpose:  it allowed the resignations of Bailey, Fine, and MacDowell to fly under the radar without arousing further suspicion from investors or investigators.

72.     However, the fraudulent nature of the March 2021 8-K was brought to light over a year later during these Chapter 11 Cases.  On November 14, 2022, the Debtors requested an emergency status conference to inform the Court that GWG knowingly filed the materially

misleading March 2021 8-K and that the Company would be filing an amended 8-K.  Within days

of the status conference, a number of then-serving GWG directors and officers who had been with

the Company at the time of the March 2021 8-K resigned their positions effective immediately.

The resignations included:  (i) Murray Holland (President and CEO since April 2019); (ii) Timothy

Evans (CFO since August 2019, director since June 2021);  (iii) David de Weese (director since

April 2019); and (iv) David Chavenson (director since May 2019).  Holland did not immediately

resign from his position as a director, but eventually did so prior to a hearing set by the Court to

determine whether it should order Holland's removal.

      73.    Incredibly, both the fraudulent March 2021 8-K and the amended 8-K were filed

***while the SEC already was investigating GWG***.  From October 2020 to July 2022, the SEC has

served GWG with no fewer than ██ subpoenas ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████.  The SEC has also served subpoenas

on broker-dealers involved in the marketing and sale of L Bonds.  ████████████████

████████████████████████████████████████████████████████████████

██████████████████████.

## VII.    <u>The Committee Has Identified Valuable Estate Claims Related to Ben</u>

      74.    Through its investigation to date, the Committee has identified certain colorable

and valuable causes of action.  The claims can be described as falling into the following categories

(collectively, the "<u>Proposed Claims</u>"):

        a.    ***Actual Fraudulent Transfer Under Sections 544 and 548 of the Bankruptcy Code and Applicable State Law***:  The Committee is capable of bringing colorable claims that the Company engaged in certain of the Challenged Insider Transactions with the actual intent to hinder, delay, and defraud creditors by virtue of orchestrating and approving the transactions for the purpose of pouring money (particularly funds derived from L Bond sales) into Ben as part of an overall fraudulent scheme.  The intent of

directors and officers of the Company at relevant times should be imputed to the Company and can additionally be inferred under the Ponzi-Scheme Presumption recognized under Fifth Circuit precedent.

The actual fraudulent transfer claims apply to the following Challenged Insider Transactions: (i) the 2019 Insider Loans, (ii) the June 2019 Acquisition, (iii) the 2019 Capital Contribution, (iv) the 2020 and 2021 Capital Contributions, (v) the 2021 Ben Spinoff, and (vi) the Broker-Dealer Commissions.

b.    ***Constructive Fraudulent Transfer Under Sections 544 and 548 of the Bankruptcy Code and Applicable State Law***: The Committee is capable of bringing colorable claims that the Company engaged in the Challenged Insider Transactions while insolvent. Further, nearly all of the Challenged Insider Transactions involve consideration flowing to GWG in the form of Ben equity, which appears to have been vastly overvalued. Thus, the Company did not receive reasonably equivalent value in exchange for any of the Challenged Insider Transactions.

The constructive fraudulent transfer claims apply to the following Challenged Insider Transactions: (i) the 2019 Insider Loans, (ii) the June 2019 Acquisition, (iii) the 2019 Capital Contribution, (iv) the 2020 and 2021 Capital Contributions, (v) the 2021 Ben Spinoff, and (vi) the Broker-Dealer Commissions.

c.    ***Breach of Fiduciary Duty***: The Committee can bring colorable claims that the GWG Board, including Heppner who served as chair of the GWG Board, breached their fiduciary duties, including the duty of care, good faith, and loyalty, to the Company and its creditors by approving (or failing to prevent) certain of the Challenged Insider Transactions and/or the agreements pursuant to which Challenged Insider Transactions were implemented. There is also sufficient evidence that the various nominal special committees of independent directors charged with evaluating the fairness of certain Challenged Insider Transactions were ineffective and therefore did not "cleanse" the full board's approval of the Challenged Insider Transactions. Further, it is now evident that the Company filed a materially false 8-K in March of 2021.

The breach of fiduciary duty claims arise from approval of the following Challenged Insider Transactions and/or the agreements pursuant to which the Challenged Insider Transactions were made: (i) the $63 Million Installment, (ii) the 2019 Promissory Note, (iii) the June 2019 Acquisition, (iv) the Ben Equity Repayments, (v) the 2019 Investment Agreement, (vi) the Appointment of Cangany to the Special Committee, (vii) the UPA, (viii) the March 2021 8-K, and (ix) the 2021 Ben Spinoff.

d.     ***Illegal Dividend***:  The Committee is capable of bringing colorable claims that certain dividends paid to the Company's shareholders pursuant to one or more Challenged Insider Transactions were illegal dividends because they were made to benefit conflicted insiders while the Company was insolvent.

The illegal dividend claim applies to the 2018 Special Dividend (defined below).

e.     ***Unjust Enrichment***:  The Committee can bring colorable claims that it would be unjust to permit any Proposed Defendants to retain any value they have obtained using funds received in connection with, or derived from any proceeds of, the Challenged Insider Transactions.

The unjust enrichment claims apply to all Challenged Insider Transactions and the 2018 Special Dividend.

75.     If litigated, the Proposed Claims are expected to result in profound benefits to the Estates and L Bondholder recoveries and could have a fundamental impact on the posture of these cases.  While the Committee is continuing to investigate the financial impacts of the Challenged Insider Transactions, at this time the Committee estimates that bringing the Proposed Claims could add upwards of $500 million worth of additional value to the Estates.

## VIII.   The Committee's Ongoing Investigation and Reservation of Rights

76.     This factual background is based on the Committee's investigation, which is ongoing and includes information obtained from documents provided by the Debtors and their advisors; publicly available filings, including filings with the SEC; and discussions with the Debtors, the Debtors' professionals, and the Defendants' professionals.  Although the Committee's investigation is ongoing and may reveal other important details, the Committee files this Motion now in order bring to light the serious concerns with Ben, Heppner, and related persons and entities and to preserve and begin pursuing its rights given the rapidly approaching expected close of the Avalon Transaction.

77.     As a result, the Committee reserves its rights to the maximum extent allowable under the law to revise its Proposed Claims, including by seeking to assert claims not currently included in the Proposed Complaint.

## **RELIEF REQUESTED**

78.     The Committee requests entry of an order, substantially in the form attached hereto, pursuant to Bankruptcy Code sections 105(a), 1103(c), and 1109(b), granting the Committee standing to commence and prosecute, and, if appropriate, for exclusive authority to settle the Proposed Claims, substantially in the form of the Proposed Complaint attached as **Exhibit A**.  *See* 11 U.S.C. §§ 105(a), 1103(c), 1109(b).

## **BASIS FOR RELIEF**

## I.     **The Court Has Broad Equitable Authority to Grant Derivative Standing**

79.     Bankruptcy Code section 1109(b) provides that a creditors' committee "may raise and may appear and be heard on any issue in a [chapter 11] case." 11 U.S.C. § 1109(b).  The Fifth Circuit recognizes that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code give creditors' committees the right to prosecute claims on behalf of debtors' estates with the approval of the bankruptcy court where (1) the anticipated claims are colorable and (2) the debtors have unjustifiably refused to pursue them.  *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re SI Restructuring, Inc.*, 714 F.3d 860, 863–64 (5th Cir. 2013).

80.     The Court should grant the Committee standing because both *Louisiana World* conditions are met here:  (1) each of the causes of action in the Proposed Complaint is colorable and (2) the Debtors' refusal to assign the Proposed Claims to the Committee is unjustified because of the likely benefit associated with prosecution of the Proposed Claims to the Estates.[19]  The Fifth

---

[19] A refusal is unjustified if a cost-benefit analysis shows that "the interests of creditors were left unprotected."  *La. World Expo.*, 858 F.2d at 253 n.20 (citations omitted).

Circuit has suggested that where the debtor unjustifiably refuses to pursue colorable claims on behalf of the estate or is otherwise precluded from doing so, the court *must* permit the official committee to pursue the action.  *See La. World Expo.,* 858 F.2d at 250 ("Here, the debtor-in-possession effectively could not act to maximize the value of the estate.  As a result, creditors' interests were not protected.  Far from barring the Committee's action . . . [Fifth Circuit law] command[s] this action to go forward.").

## II.      The Proposed Complaint Asserts Colorable Claims

81.      A claim is colorable if "there is a possibility of success."  *In re McConnell*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989).  In other words, the court examines whether the claim "on appropriate proof would support a recovery."  *See In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985).  The standard for establishing colorability is "a relatively easy one to make."  *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 377 (Bankr. S.D.N.Y. 2005).  Courts generally analogize colorability to the standard for surviving a Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") motion to dismiss.  *See, e.g., In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) (citation omitted) ("Because the creditors' committee is not required to present its proof, the [colorable claim] inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim."); *In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if they would survive a motion to dismiss.").  However, the actual colorability standard has been characterized as even more lenient than stating a claim for Rule 12(b)(6) purposes.  *In re ABC Utils. Servs. Inc.*, No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240, at *27, (Bankr. N.D. Tex. Oct. 9, 2001) (citation omitted) ("[A] colorable claim is one that raises a serious question even if the claim ultimately fails to survive a Rule 12(b)(6) motion to dismiss.").

82.     The Proposed Complaint asserts colorable claims.  Counts 3, 4, 5, 8, 11, 14, 15, 16, and 19 as to breach of fiduciary duty; Counts 2, 7, 10, 13, 18, and 21 as to constructive fraudulent transfers; Counts 1, 6, 9, 12, 17, and 20 as to actual fraudulent transfers; Count 22 as to unjust enrichment; and Count 23 as to issuance of an illegal dividend.  These claims comfortably satisfy the minimal pleading requirements.  As a result of an extensive and far-reaching investigation, the Proposed Complaint pleads detailed factual allegations that satisfy and support each and every element of each count, which far exceeds the pleading requirements necessary to survive a motion to dismiss.  Not a single count is pled in a conclusory manner.  Rather, all counts are supported by specific, factual allegations.

**A.      The Committee Asserts Colorable Claims that Certain Directors and Officers of GWG Breached Their Fiduciary Duty to the Company and Its Creditors**

83.     In at least nine instances, certain directors and officers of the Company breached their fiduciary duties of care, loyalty, and good faith to GWG and its creditors.  Specifically, putative Defendants Heppner, Cangany, Caruso-Cabrera, Chavenson, de Weese, Evans, Fisher, Glaser, Hicks, Holland, Lockhart, Mason, Schnitzer, Stein, Staubach, and Zimmerman (collectively, the "D&O Defendants") abdicated their duties and failed to establish or enforce the necessary guardrails to protect the interests of GWG and its stakeholders, including L Bondholders.  The D&O Defendants breached their fiduciary duties to the Company by approving (or failing to prevent) certain of the Challenged Insider Transactions that were unfair to the Company in process and in price.  The various special committees of independent directors charged with evaluating the fairness of certain Challenged Insider Transactions were woefully ineffective and could not cleanse the D&O Directors' shortcomings.

### 1.     Legal Standard for Breach of Fiduciary Duty

84.     Directors and officers of a company typically only owe fiduciary duties to shareholders.  Once a Company is insolvent, however, a Company's fiduciaries owe fiduciary duties to both shareholders and creditors.  The facts set forth above and in the Proposed Complaint more than support a colorable claim that GWG was insolvent at all relevant times.  The Company's fiduciaries therefore owed both the Company and its creditors fiduciary duties of loyalty, care, and good faith, including the duty to act in the best interest of the Company and its creditors and, at all times, to subordinate their personal interests to the interests of the Company and its creditors.  *See In re The Brown Schools*, 386 B.R. 37, 46 (Bankr. D. Del. 2008) (quoting *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 205 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007)) ("directors of an insolvent corporation [must] consider…the interests of the corporation's creditors who, by definition, are owed more than the corporation has the wallet to repay."); *In re Musicland Holding Corp.*, 398 B.R. 761, 788-89 (Bankr. S.D.N.Y. 2008) (holding that a claim for breach of duty of loyalty can be shown when directors of an insolvency subsidiary execute fraudulent conveyances and debt instruments for the benefit of the parent).

85.     The starting point for analyzing a fiduciary breach is to determine the correct standard of review.  "'Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness.'"  *In re Tesla Motors, Inc. S'holder Litig.*, C.A. No. 12711-VCS, 2022 WL 1237185, at *27 (Del. Ch. Apr. 27, 2022) (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).[20]

---

[20] Enhanced scrutiny is irrelevant here.  Enhanced scrutiny attaches in change-of-control transactions, where the "omnipresent specter" exists that the board of the target company will act in its own interests to the detriment of the stockholders.  *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985).

86.     The business judgment rule is the default standard of review.  It presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  "[W]here business judgment [rule] presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose."  *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (citations and internal quotation marks omitted).

87.     "Entire fairness is Delaware's most onerous standard."  *Reis*, 28 A.3d at 459.  "To obtain review under the entire fairness test, the stockholder plaintiff must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority."  *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (citing *Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application")).  "To determine whether the directors approving the transaction comprised a disinterested and independent board majority, the court conducts a director-by-director analysis."  *Id.* at 44-45 (citations omitted) ("[T]he plaintiff proved at trial that six of the seven Trados directors were not disinterested and independent, making entire fairness the operative standard.").[21]  Further, even if entire independence is determined, the transaction at issue could still be evaluated for entire fairness if circumstances were such that the board's independence in the transaction at

---

[21] Under Delaware law, the test for finding a disabling interest on the part of a director is met if (i) the director has a material financial interest in a transaction (i.e., a material personal benefit that is not shared equally by the stockholders), and (ii) a corporate decision has a detrimental impact that applies solely to the director, not the corporation or other stockholders (such as a substantial likelihood of director liability).  *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).  Where the transaction involves self-dealing on the part of the director, no materiality standard applies.  "Self-dealing" transactions include those between companies sharing directors.  *Cambridge Ret. Sys. v. Bosnjak*, C.A. No. 9178-CB, 2014 WL 2930869, at *5 (Del. Ch. June 26, 2014).

issue was impacted by other factors.  *Am. Gen. Corp. v. Tex. Air Corp.*, C.A. Nos. 8390, 8406, 8650 & 8805, 1987 WL 6337, at *4 (Del. Ch. Feb. 5, 1987) (unpublished) (holding that, even if the special committee of a to-be-acquired entity was "truly independent," the transaction at issue could be evaluated for entire fairness because the controlling stockholder issued an ultimatum that the special committee must either accept the transaction at certain price per share or the company would proceed without the special committee's input).

88.     Once a party challenging a board's decision alleges and later proves facts sufficient to overcome the business judgment rule, the burden shifts to the defendants who must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted) (emphases in original).  "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness.  Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

89.     The entire fairness standard has two parts:  fair dealing and fair price.  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).  Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id*.  Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id*.

90.     The entire fairness analysis, however, "is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.*  "Evidence of fair dealing has significant probative value to demonstrate

the fairness of the price obtained," and "[t]he paramount consideration . . . is whether the price was a fair one." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012) (citation omitted). That said, fair price "does not ameliorate a process that was beyond unfair." *In re Nine Sys. Corp. S'holders Litig.*, C.A. No. 3940-VCN, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014); *see also id.* at *3 ("[A]lthough [the transaction at issue] was approved and implemented at a fair price, [it] was not entirely fair because of the Defendants' *grossly unfair* dealing") (emphasis added); *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, C.A. Nos. 3730-VCS, 7048-VCS, 2018 WL 1410860, at *17 (Del. Ch. Mar. 21, 2018) (citations omitted) (observing that the court "arguably could end the [entire fairness] analysis" after holding that "Defendants failed to prove fair process"); *William Penn P'ship v. Saliba*, 13 A.3d 749, 756–57 (Del. 2011) (citation omitted) ("[A] party does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair."). Similarly, "[a] fair process paired with an unfair price may [] cause the court to conclude that defendants have breached their fiduciary duties." *In re BGC Partners, Inc. Derivative Litig.*, C.A. No. 2018-0722-LWW, 2022 WL 3581641, at *29 (Del. Ch. Aug. 19, 2022) (unpublished) (citation omitted).

### 2. The Proposed Complaint States Colorable Claims for Breach of Fiduciary Duty

91.    The Proposed Complaint states colorable claims for breach of fiduciary duty against the D&O Defendants for several instances of actionable misconduct:

| Compl. Count | Actionable Misconduct | Applicable D&O Defendants |
|---|---|---|
| 3 | Initiation of $63 Million Installment | **GWG Executive Committee**: ███████ ███████ |
| 4 | Approval of 2019 Promissory Note and 2019 Insider Loans thereunder | **GWG Board**:  Heppner, Cangany, Caruso-Cabrera, Chavenson, de Weese, Fisher, Glaser, Hicks, Lockhart, Mason, Schnitzer, Staubach, Stein, Zimmerman |

| Compl. Count | Actionable Misconduct | Applicable D&O Defendants |
|---|---|---|
| 5 | Authorization of Ben Equity Repayment | **GWG Officers**: Holland, Evans |
| 8 | Approval of June 2019 Acquisition | **GWG Board**: Heppner, Cangany, Caruso-Cabrera, Chavenson, de Weese, Fisher, Glaser, Hicks, Lockhart, Mason, Schnitzer, Staubach, Stein, Zimmerman |
| 11 | Approval of 2019 Investment Agreement | **GWG Board**: Heppner, Cangany, Caruso-Cabrera, Chavenson, de Weese, Hicks, Lockhart, Mason, Schnitzer, Staubach |
| 14 | Appointment of Cangany to Special Committee | **GWG Board**: Heppner, Cangany, Chavenson, de Weese, Hicks, Lockhart, Schnitzer, Staubach |
| 15 | Approval of Unit Purchase Agreement | **GWG Board**: Heppner, Cangany, Chavenson, de Weese, Hicks, Lockhart, Schnitzer |
| 16 | Authorization to file March 2021 8-K | **GWG Board**: Heppner, Cangany, Chavenson, de Weese, Hicks, Lockhart, Schnitzer, Holland, Evans |
| 19 | Approval of 2021 Ben Spinoff | **GWG Board**: Holland, Cangany, Chavenson, de Weese, Evans |

92.     At the time of each instance of actionable misconduct referenced above and in the

Proposed Complaint, GWG was insolvent and the D&O Defendants knew of, or were recklessly

indifferent to, that insolvency.  As a result, the Company's fiduciaries owed both the Company

and its creditors an independent fiduciary duty of loyalty, including the duty to act in good faith

and in the best interest of the Company and its creditors and, at all times, to subordinate their

personal interests to the interests of the Company and its creditors.

93.     Given Ben's controlling interest in the Company, it stood on both sides of each

transaction referenced above.  In each instance, the applicable D&O Defendants breached their

fiduciary duty of loyalty to the Company and its creditors, including L Bondholders, by acting in

bad faith, failing to act in the best interest of the Company and its creditors, and failing to

subordinate their personal interests to the interests of the Company and its creditors as a whole.

Upon information and belief, the applicable D&O Defendants did not even *consider* whether they

owed fiduciary duties to the Company's creditors, including L Bondholders, prior to taking the actionable misconduct set forth above and in the Proposed Complaint.

94.     Moreover, for actions involving the approval of transactions between the Company and related parties, the applicable D&O Defendants failed to take appropriate steps to ensure that such transactions were entirely fair to the Company.  In nearly every instance, the prices were unfair to the Company because the Company received repayment or consideration in the form of equity interests in Ben, which were (and remain) of dubious value given Ben's inability to actualize its business plan.  The D&O Defendants did not, prior to such approval, conduct, or cause to be conducted, any substantive analysis of the transactions, their impact on the solvency or viability of the Company, or the interests of creditors, including L Bondholders.  And, as discussed above and in the Proposed Complaint, the processes were unfair because the various Special Committees created to purportedly evaluate and approve the different transactions were either tainted or outright ignored.

95.     By the aforementioned breaches of fiduciary duties, the D&O Defendants did not act to maximize the value, or the long-term wealth-creating capacity, of the insolvent Company for the benefit of its creditors, including L Bondholders.  In breaching their fiduciary duties of loyalty and good faith, the D&O Defendants caused substantial harm to the Company and its creditors, including L Bondholders, in an amount to be proven at trial.  But for such breaches, the Company and its creditors, including L Bondholders, would not have suffered such damage.

96.     In light of the applicable legal standard under Delaware law, as well as the facts set forth herein and in the Proposed Complaint to be proven at trial, the Committee has colorable claims for breach of fiduciary duty against the D&O Defendants.

**B.      The Committee Asserts Colorable Claims that the Challenged Transactions Are Avoidable as Actual and Constructive Fraudulent Transfers**

97.      In at least six specific instances, Debtors GWG Holdings and/or GWG Life made transfers or incurred obligations in exchange for less than reasonably equivalent value, at a time when those Debtors were insolvent or were rendered insolvent by the subject transactions.  These Challenged Transactions include (1) the 2019 Insider Loans, (2) the June 2019 Acquisition, (3) the 2019 Capital Contribution, (4) the 2020 and 2021 Capital Contributions, (5) the 2021 Ben Spinoff, and (6) the Broker-Dealer Commissions.

98.      The transactions delineated herein as the Challenged Insider Transactions carry sufficient badges of fraud to establish that they are actual fraudulent transfers under section 548 of the Bankruptcy Code and section 24.005(b) of the Texas Uniform Fraudulent Transfer Act ("TUFTA").  *See* 11 U.S.C. § 548; TEX. BUS. & COM. CODE § 24.005(b).  Moreover, each of the Challenged Transactions occurred at a time when GWG operated as a classic Ponzi scheme.  As a result, fraudulent intent and lack of reasonably equivalent value is presumed with respect to each transaction.

**1.      Legal Standard for Actual Fraudulent Transfers**

**(i)      *General Standard***

99.      Section 548 of the Bankruptcy Code deems actually fraudulent and avoidable any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within two years before the petition date if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  *See* 11 U.S.C. § 548(a)(1)(A).

100.    Likewise, under section 544(b)(1), fraudulent transfers can be avoided under a similar analysis pursuant to applicable state debtor-creditor laws.  Thus, GWG may avoid any transfer of an interest in property and any obligation incurred by GWG that is voidable under other applicable law by a creditor holding an unsecured, allowable claim.  One or more creditors of GWG hold allowed or allowable claims under other applicable law and, therefore, can avoid the Challenged Insider Transactions as actual fraudulent transfers under other applicable law, including but not limited to the fraudulent transfer and fraudulent conveyance laws codified in TUFTA.  *See* TEX. BUS. & COM. CODE §§ 24.001 *et seq.*  Under TUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor."  *See* TEX. BUS. & COM. CODE § 24.005(a)(1).  Under TUFTA, a cause of action with respect to a fraudulent transfer or obligation must be brought "under TUFTA Section 24.005(a)(1) . . . within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."  TEX. BUS. & COM. CODE § 24.010(a), (a)(1).

101.    TUFTA lists 11 non-exclusive factors or badges of fraud to determine "actual intent," including whether:

> (1) the transfer or obligation was to an insider; (2) the debtor
> retained possession or control of the property transferred after the
> transfer; (3) the transfer or obligation was concealed; (4) before the
> transfer was made or obligation was incurred, the debtor had been
> sued or threatened with suit; (5) the transfer was of substantially all
> the debtor's assets; (6) the debtor absconded; (7) the debtor removed
> or concealed assets; (8) the value of the consideration received by
> the debtor was reasonably equivalent to the value of the asset
> transferred or the amount of the obligation incurred; (9) the debtor
> was insolvent or became insolvent shortly after the transfer was

made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b)(1)-(11); *see In re Essential Fin. Educ.*, 629 B.R. 401, 430 (Bankr. N.D. Tex. 2021).

102.    In the Fifth Circuit, courts look to a non-exhaustive list of "badges of fraud" that indicate a transfer was made with the requisite intent to defraud, including:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*See In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (citations omitted).  A majority of these "badges of fraud" need not exist for the court to find actual fraud.  *See id.*

### (ii)    *Ponzi Scheme Presumption*

103.    In some actual fraudulent transfer cases, courts in the Fifth Circuit and elsewhere apply a "Ponzi-scheme presumption" whereby the court presumes that any debtor engaged in a Ponzi scheme acted with intent to hinder, delay, and defraud creditors with respect to each transfer made in connection with the scheme.  In determining whether a business operated as a Ponzi scheme, "courts look for a general pattern, rather than specific requirements."  *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007).  The Fifth Circuit generally defines a Ponzi scheme as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."  *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (citations omitted).

104.     More specifically, the Fifth Circuit has emphasized, "that investor funds were used to issue 'returns' to other investors" is the "*sine qua non* of any Ponzi scheme." *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012) (citation omitted).  In most, if not all, of the Ponzi or Ponzi-like schemes identified by Fifth Circuit courts, the entity operated as an investment scheme. *E.g., Janvey*, 647 F.3d at 590, 597.  Fifth Circuit courts often define a Ponzi scheme as "insolvent from its inception."  *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924)).  However, in the courts' substantive analysis of insolvency, they tend to focus on factors such as (i) how much of the business is legitimate, if any, and (ii) whether the business is perpetuated only, or mostly, by investor funds.  *Cf. Janvey*, 647 F.3d at 597 (citations omitted) (Ponzi scheme evidenced in party by testimony that continued false reporting "created an ever-widening hole between reported assets and actual liabilities, causing the creation of a massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds").

105.     As described above and in the Proposed Complaint, by the time of the Challenged Transactions that are the subject of the proposed avoidance claims, GWG operated like a classic Ponzi scheme.  Beginning in 2011, GWG began to heavily rely on the sale of "L Bonds" to raise capital.  Within just a few years of first offering L Bonds, practically all of the cash coming in to the Company was in the form of debt—the majority of which was raised by sale of L Bonds.  GWG therefore had to devote increasingly large percentages of L Bond proceeds to pay other obligations of the Company, including on the L Bonds themselves.

106.     Combined with the fact that GWG failed at the outset to appropriately value the life insurance policies it acquired, the significant transactional costs associated with marketing L Bonds caused GWG to become hopelessly dependent upon selling increasingly large volumes of

L Bonds just to meet debt obligations as they came due.  Thus, by the time of the first transaction with Ben in 2018, GWG's leadership knew or was recklessly indifferent to the fact that GWG's business had failed.  Rather than improve the Company's position or preserve value for creditors, GWG's founders were singularly focused on cashing out of the Company.

107.    Named defendant Bradley Heppner, founder of Ben, devised a two-pronged scheme to prolong GWG's inevitable bankruptcy while Ben took control of the Company's steady stream of cash raised by L Bonds.  First, Heppner ensured Ben was assigned a massive valuation (propped up by over $2 billion in supposed "goodwill"), which was then reflected on GWG's balance sheet following the 2018 GWG Acquisition to misleadingly suggest that GWG had adequate collateral supporting the L Bonds.  Second, Heppner used GWG's L Bond sales to recruit a steady stream of new investors in order to pay GWG's increasingly large debt service obligations.

108.    The result was a business model with all the hallmarks of a classic Ponzi scheme, whereby L Bonds purchased by later investors generated artificially high returns for earlier L Bondholders, and these "returns" were then marketed to encourage more L Bond purchases by prospective investors.  The Company continuously sold new L Bonds to repay existing L Bondholders—knowing full well that it would have to sell yet more new L Bonds to repay its increasing debt, and without any reason to expect a turnaround in the Life Portfolio or the value of its investment in Ben to materialize.

### 2.    Legal Standard for Constructive Fraudulent Transfers

109.    Section 548 of the Bankruptcy Code deems constructively fraudulent and avoidable any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within two years before the petition date if, in pertinent part, (1) the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and

(2) the debtor was or became insolvent, was unreasonably undercapitalized, or intended to incur

debts beyond its ability to pay upon maturity.  *See* 11 U.S.C. § 548(a)(1)(B).

110.    Likewise, under section 544(b)(1), fraudulent transfers can be avoided under a

similar analysis pursuant to applicable state debtor-creditor laws.  *See* 11 U.S.C. § 544(b)(1).  Thus,

GWG may avoid any transfer of an interest in property and any obligation incurred by GWG that

is voidable under other applicable law by a creditor holding an unsecured, allowable claim.  One

or more creditors of GWG hold allowed or allowable claims under other applicable law and,

therefore, can avoid the Challenged Insider Transactions as fraudulent transfers under other

applicable law, including, but not limited to, the fraudulent transfer and fraudulent conveyance

laws codified in TUFTA.  *See* TEX. BUS. & COM. CODE §§ 24.001 *et seq.*  Under TUFTA, a transfer

made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim

arose before or within a reasonable time after the transfer was made or the obligation was incurred,

if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent

value in exchange for the transfer or obligation, and the debtor:

> (A) was engaged or was about to engage in a business or a
> transaction for which the remaining assets of the debtor were
> unreasonably small in relation to the business or transaction; or (B)
> intended to incur, or believed or reasonably should have believed
> that the debtor would incur, debts beyond the debtor's ability to pay
> as they became due.

TEX. BUS. & COM. CODE § 24.005(a)(2), (a)(2)(A)-(B).  Additionally, under TUFTA, a cause of

action with respect to a fraudulent transfer or obligation must be brought "under Section

24.005(a)(2) . . . within four years after the transfer was made or the obligation was incurred."

TEX. BUS. & COM. CODE § 24.010(a)(2).

111.    In the Fifth Circuit, value is measured by the "tangible economic benefit" conferred

on the debtor, based on the totality of the circumstances.  *Janvey v. Golf Channel, Inc.*, 834 F.3d

570, 573 (5th Cir. 2016) (citations omitted).  The value must be "substantially comparable to the worth of the transferred property."  *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (citation omitted).  This is determined on the facts, on a case-by-case basis.  *In re Dunham*, 110 F.3d 286, 289 (5th Cir. 1997) (citations omitted) ("[W]e recognized that the reasonable equivalency inquiry is ordinarily fact-intensive, as the court bases its determination upon subsidiary fact findings regarding the value of the property transferred and the value received in the exchange.").

### 3. The Proposed Complaint States Colorable Claims that the Challenged Transactions Are Actual and Constructive Fraudulent Transfer

112.    The Proposed Complaint states colorable claims for actual and constructive fraudulent transfer against Ben, the Liquid Trusts, the Collective Collateral Trusts, BCH, BCC, ▉▉▉▉▉▉▉, Jon and Steven Sabes, ▉▉▉▉▉▉▉▉▉▉, CT Risk Management, and the Broker-Dealer Defendants for the following Challenged Transactions:

| Compl. Counts | Challenged Transaction | Transferor(s) | Transferee(s) |
|---|---|---|---|
| 1, 2 | 2019 Insider Loans | GWG Life | Liquid Trusts, Collective Collateral Trusts, Ben, Jon and Steven Sabes |
| 6, 7 | June 2019 Acquisition | GWG Holdings | ▉▉▉▉▉▉▉▉▉ |
| 9, 10 | 2019 Capital Contribution | GWG Holdings | Ben, BCH, and ▉▉▉▉▉▉▉ |
| 12, 13 | 2020 & 2021 Capital Contributions | GWG Holdings | BCH, BCC, ▉▉▉▉▉▉▉, and CT Risk Management |
| 17, 18 | 2021 Ben Spinoff | GWG Holdings, GWG Life | Ben |
| 20, 21 | Broker-Dealer Commissions | GWG Holdings | Broker-Dealer Defendants |

113.    ***The Challenged Transactions Are Constructive Fraudulent Transfers***.  The Proposed Complaint alleges facts sufficient to establish constructive fraudulent transfer with

respect to each of the above Challenged Transactions. *First*, the Proposed Complaint alleges facts sufficient to establish that GWG Holdings and GWG Life were insolvent as early as 2018 due to the failed Life Portfolio business and significant debt obligations (including interest and maturity payments due on L Bonds). *Second*, the Proposed Complaint alleges facts sufficient to establish that GWG Holdings and GWG Life did not receive reasonably equivalent value or fair consideration in exchange for any of the Challenged Insider Transactions because they received repayment and consideration in the form of equity interests in Ben and its affiliates, which were (and remain) of dubious value given Ben's repeated failure to actualize its business plan. With respect to the Broker-Dealer Commissions, GWG Holdings did not receive reasonably equivalent value for such payments as a matter of law because they were paid to facilitate the Broker-Dealer Defendants' perpetuation of a Ponzi scheme, which service cannot be considered "of value" to GWG Holdings. This is true regardless of whether the Broker-Dealers knew they were selling L Bonds to further a Ponzi scheme.

114. ***The Challenged Transactions Are Actual Fraudulent Transfers***. As described above and in the Proposed Complaint, Debtors GWG Holdings and GWG Life made the Challenged Insider Transactions with the intent to hinder, delay, and/or defraud GWG Life and its creditors, to the detriment and harm of such creditors. This intent can be inferred from (among other things) the following "badges of fraud" surrounding the Challenged Insider Transactions, all of which are sufficiently alleged in the Proposed Complaint:

      a.      GWG Holdings and GWG Life made the Challenged Insider Transactions to (or for the benefit of) Ben and its affiliates at a time when Ben controlled GWG and Heppner dominated the GWG Board;

      b.      The five Challenged Insider Transactions were made in the short period from May 2019 through November 2021—just more than two years—and resulted in the transfer of hundreds of millions of dollars of cash, as well as significant non-cash consideration;

      c.        GWG Holdings and GWG Life knew they were insolvent at the time of the Challenged Insider Transactions;

      d.        Ben and its affiliates subsequently used portions of the proceeds of the Challenged Insider Transactions to or for the benefit of Heppner and Heppner's affiliates; and

      e.        The Challenged Insider Transactions were made in exchange for repayment or consideration in the form of equity interests in Ben and BCH, whose value was (and remains) unproven given Ben's repeated failure to actualize its business plan.

115.     Additionally, the Proposed Complaint sufficiently alleges that GWG operated as a classic Ponzi scheme since at least 2018.  GWG Holdings and GWG Life were insolvent as early as 2018.  The L Bond, GWG's primary source of cash for acquiring additional Policies (and paying premiums on existing Policies), was exceedingly expensive.  The more L Bonds GWG sold, the more cash the Company needed to make interest and maturity payments on L Bonds.  Because the Life Portfolio failed to generate enough cash even to cover the servicing costs of L Bonds, GWG opted (from at least 2018 onward) to double-down and simply sell more L Bonds—and therefore incur more and more debt—just to pay its old investors and avoid defaulting on its existing obligations.  Thus, because each Challenged Transaction was made while GWG was operating as a Ponzi scheme, each Challenged Transaction is presumptively fraudulent.

## C.    The Committee Asserts a Colorable Claim that the Defendants Were Unjustly Enriched

116.     Debtors GWG Holdings and GWG Life entered into several transactions that permitted certain Proposed Defendants to retain cash, interests, and other things of value that rightly belong to GWG Holdings, GWG Life, and their creditors.  Count 22 of the Proposed Complaint seeks restitution from all Proposed Defendants who were unjustly enriched as a result of (1) the 2019 Insider Loans, (2) the June 2019 Acquisition, (3) the 2019 Capital Contribution, (4) the 2020 and 2021 Capital Contributions, and (5) the 2021 Ben Spinoff.

### 1. Legal Standard for Unjust Enrichment

117.   "Unjust enrichment occurs when a party wrongfully or passively receives a benefit which would be unconscionable to retain.   To remedy the unjust benefit, a quasicontractual relationship is conferred in cases where no contract exists between the parties." *In re All Texas Elec. Contractors, Inc. V. NSPS Metals LLC*, Case No. 20-34656, 2022 WL 162786, at *11 (Bankr. S.D. Tex. Jan. 18, 2022) (citation omitted).   Unjust enrichment is characterized by the failure "to make restitution of benefits received under such circumstances as to give rise to an implied or quasi-contract to repay." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied) (citation omitted).   It "is based on the equitable principle that one who receives benefits unjustly must make restitution for those benefits." *In re Juliet Homes, LP*, Bankr. No. 07-36424, Adversary No. 09-03429, 2011 WL 6817928, at *18 (Bankr. S.D. Tex. Dec. 28, 2011) (citation omitted).

118.   Under Texas law, an unjust enrichment claim requires showing that one party "has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *See Digit. Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 379-80 (5th Cir. 2020) (citations omitted).   While Texas law does not provide separate elements for an unjust enrichment claim, the standard can be split into two parts:  (1) the defendant must obtain a benefit from the plaintiff and (2) the benefit must be obtained "by fraud, duress, or the taking of an undue advantage." *In re Connect Transp., L.L.C.*, 825 F. App'x 150, 154 (5th Cir. 2020) (citations omitted).

### 2. Defendants Were Unjustly Enriched by the Challenged Insider Transactions

119.   All named defendants obtained a benefit from the Challenged Insider Transactions by fraud, duress, or the taking of an undue advantage.   Defendants include several entities over which defendant Heppner exercised ultimate control, including but not limited to Bradley Capital,

████████████████ The Heppner Endowment for Research Organizations LLC, the Research Ranch Operating Company LLC, and other entities whose identities are presently unknown.



120. ████████████████████████████████████████████

121. ████████████ is a purported senior lender of Ben and received tens of millions of dollars in loan repayments from Ben, ████████████████████████████ ████████████████████

122. Heppner Endowment for Research Organizations LLC and the Research Ranch Operating Company LLC received approximately $9 million from Ben during 2018 and 2019 for no apparent consideration.

123. The Committee asserts a colorable claim in Count 21 that these and other named defendants were unjustly enriched as a result of the Challenged Insider Transactions under Texas common law.

**D.    The Committee Asserts a Colorable Claim that the Special Dividend Issued by GWG Holdings Was an Illegal Dividend Under Delaware Law**

124. In connection with the 2018 GWG Acquisition, GWG Holdings issued a $25.7 million Special Dividend to its shareholders. As GWG Holdings was insolvent on and after the dates of the 2018 Special Dividend, the 2018 Special Dividend constitutes an illegal dividend under Delaware law.

**1.    Legal Standard for an Illegal Dividend Under Delaware Law**

125. Under the Delaware General Corporation Law ("DGCL"), "[n]o corporation shall pay dividends except in accordance with this chapter." DEL. CODE tit. 8, § 173. DGCL permits

that a director of a corporation may declare and make dividends upon the shares of its capital stock either (i) out of its surplus or (ii) in the case where there is no surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.  *Id.* § 170(a), (a)(1)-(2).  However, dividends may not be declared out of net profits if "the capital of the corporation, computed in accordance with sections 154 and 244 of [the DGCL], shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets . . . ."  *Id.* § 170(a)(2).

126.    "In case of any willful or negligent violation of § 160 or § 173 of [the DGCL], the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued."  *Id.* § 174(a).

### 2.    Illegality Under Delaware Statutory Law

127.    Concurrent with the initial closing of the 2018 GWG Acquisition, GWG Holdings issued the $25.7 million 2018 Special Dividend to its shareholders.  GWG Holdings was insolvent on and after the dates of the 2018 Special Dividend.  Also, at the time of the 2018 Special Dividend, GWG Holdings had no "surplus" as that term is defined in DGCL.  *See* DEL. CODE tit. 8, § 154.

128.    The 2018 Special Dividend was approved in violation of DGCL § 173 by Defendants Jon Sabes, Steven Sabes, David Abramson, Jeffery McGregor, Shawn Gensch, Mark Schwarzmann, and Thomas Donohue—each of whom was a member on the GWG Board at the time of the approval.  *See id.* § 173.

61

129.     Pursuant to DGCL § 174, Jon Sabes, Steven Sabes, Abramson, McGregor, Gensch, Schwarzmann, and Donohue are jointly and severally liable for the full amount of the unlawful 2018 Special Dividend they approved.  *See id.* § 174.  The Committee therefore has a colorable claim against Defendants Jon Sabes, Steven Sabes, David Abramson, Jeffery McGregor, Shawn Gensch, Mark Schwarzmann, Thomas Donohue, and John and Jane Does 1–100 in the amount of $25.7 million for their approval of the 2018 Special Dividend.

**III.     The Debtors' Inability to Pursue the Proposed Claims Is Unjustified**

130.     The Committee satisfies the second prong for standing—that the debtor in possession "refused unjustifiably" to pursue the Proposed Claims—because the Debtors (including through their Investigations Committee) cannot pursue the Proposed Claims without jeopardizing a substantial source of recovery for the Estates.[22] ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

---

[22] The Investigations Committee has been delegated the exclusive authority of the GWG Board to assert any claims or causes of action regarding any of the "Investigation Matters," which is defined to include "claims, causes of action and defenses to claims and causes of action that arise under or relate to any transaction, group of related transactions, relationships or conduct involving the Company, any of its current and former subsidiaries and affiliates, including GWG DLP Funding IV, LLC and GWG DLP Funding VI, LLC, and any third party, including, without limitation, Ben and current and former directors and officers, that occurred at any point prior to the filing of the Chapter 11 Cases." *See Order Authorizing and Appointing (i) Designation of Jeffrey S. Stein as Chief Restructuring Officer, (ii) the Appointment of Jeffrey S. Stein and Anthony R. Horton as New Independent Directors, and (iii) Granting Related Relief*, Dkt. 594 at 9.

A.      **Legal Standard for Unjustifiable Refusal**

131.    The phrase "refused unjustifiably" is a misnomer, as courts have clarified that this prong of derivative standing can be satisfied even in instances where (i) a claim has not explicitly been refused or (ii) the debtor has a facially reasonable excuse for not pursuing the claim.

132.    On the first point, the Fifth Circuit has stated that a proposed claim may be considered unjustifiably refused not only where a debtor in possession is *unwilling* to bring the claim but also where it is *unable* to do so, "due, for instance, to a conflict of interest." *La. World Exposition*, 858 F.2d at 252 (emphasis added).  Other courts considering the issue have held that a formal demand is not required where a committee can demonstrate that such demand would be unproductive.  *See, e.g.*, *In re Nat'l Forge Co.*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) ("[I]t cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required."), *aff'd*, 326 B.R. 532 (W.D. Pa. 2005); *In re First Cap. Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) ("The Court finds that . . . it has the discretion to excuse a demand upon First Capital's board of directors as futile and to authorize the creditors' committee to proceed to prosecute the claims against the officers, directors and controlling shareholder of the debtor.").

133.    On the second point, derivative standing may be appropriate even where a debtor provides a "facially justifiable reason for failing to file an avoidance action."  *In re Gibson Grp., Inc.*, 66 F.3d 1436, 1443 (6th Cir. 1995); *see also La. World Expo.*, 858 F.2d at 247 & n.15, 253 (holding that debtor's inability to bring action due to conflict of interest satisfied the "unjustified refusal" requirement, despite noting that "the debtor-in-possession's refusal was understandable").  What matters is not whether a debtor failed to act with *any* justification, but whether the debtor impaired the interests of an estate and its creditors by failing to initiate adversary proceedings.  *Id.* at 253.  The Fifth Circuit has held that this consideration ultimately amounts to "little more than a

cost-benefit analysis." *Id.* at 253 n.20; *see also In re Clear the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021) (citation omitted); *In re Cooper*, 405 B.R. 801, 810 (Bankr. N.D. Tex. 2009) (citation omitted).

134.    In evaluating the potential benefit to the estate, courts should not conduct "a *de facto* mini-trial on the merits to determine whether" the claims have a probability of success.  *In re Adelphia*, 330 B.R. at 375 (citation omitted).  A court need only assure itself that the proposed litigation is not a "hopeless fling" and that the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost."  *See id.* at 386.

**B.      Debtors Are Unable to Bring the D&O Claims Because Doing So Would Risk Losing Millions of Dollars in Recovery for the Estate**

135.    With respect to the D&O Claims, the Committee satisfies the "unjustified refusal" standard because ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

136.    As described above and in the Proposed Complaint, the D&O Claims are valuable. The Proposed Complaint includes nine causes of action against current or former GWG directors and officers alleging that they improperly approved transactions involving consideration in the hundreds of millions of dollars.  While the Debtors, through the Investigations Committee, are theoretically capable of pursuing the D&O Claims, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



137.

the Investigations

Committee argued in its November 30 Response that

23

24

138. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

139.   The Investigations Committee also misses the mark in its argument that ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ At the same time, the

Committee believes that the Estates are best served by bringing any available Proposed Claims

before closing of the Avalon Transaction, which is currently expected to occur in the first few

months of 2023.  As a result, time is of the essence to bring the D&O Claims and preserve the full recoverable value for the Estates.

140.  ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████  The only way to bring the D&O Claims in a way that clearly maintains the potential recovery pool from the D&O Policies is for an outside appointee to pursue the claims on the Company's behalf.  No outsider is better positioned for that appointment than the Committee, ████████████████████████████████████████████

██████

C.  **The Committee Should Be Granted Standing to Bring the Remaining Proposed Claims to Maximize Estate Value**

141.  Because the Committee must bring the D&O Claims for the reasons discussed above, a cost-benefit analysis favors the Committee bring the remaining Proposed Claims as well. The benefit side of the analysis is straightforward:  As discussed in greater detail above and in the Proposed Complaint, the Proposed Claims have the potential to add substantial value to the Estates.

142.  On the cost side, any litigation concerning the Proposed Claims would be far more efficiently managed by one claimant rather than splitting the claims between the Committee and the Investigations Committee of the Debtors.  The rates for attorneys' fees are comparable as compared between counsel for the Committee, the Debtors, and the Investigations Committee.  *Cf. La. World Expo. v. Fed. Ins. Co.*, 864 F.2d 1147, 1153 n.10 (5th Cir. 1989) (quoting *In re STN*, 779 F.2d at 905) (noting that the cost-benefit analysis should consider "the terms relative to attorneys' fees on which suit might be brought").  However, having multiple claimants would necessarily result in far more hours spent pursuing the Proposed Claims, even if the Committee coordinated with the Debtors every step of the way.

143.     Such inefficiencies would be particularly pronounced in this case because there is near complete overlap between the proposed fraudulent conveyance causes of action against certain transferees and the proposed breach of fiduciary duty causes of action against GWG directors and officers.  Specifically, the Proposed Complaint alleges that the Challenged Insider Transactions are avoidable fraudulent conveyances because they were entered into (i) while GWG was insolvent, (ii) not for reasonably equivalent value, and (iii) with the either knowing or reckless participation of GWG's directors in approving the Challenged Insider Transactions to the detriment of GWG and its creditors.  At the same time, the Proposed Complaint alleges that the Challenged Insider Transactions form the basis of breach of fiduciary duty claims against various GWG directors and officers because they were entered into (i) at an unfair price and (ii) through an unfair process.

144.     The facts to prove each set of claims are practically identical.  As a result, bifurcating standing to pursue the Proposed Claims between the Committee and the Investigations Committee would place an unnecessary drain on Estate resources—weighing against litigating the Proposed Claims on multiple fronts.  Because litigation by the Committee of all the Proposed Claims would be much more cost-effective, the Court should grant the Committee standing to pursue all the Proposed Claims—not just the D&O Proposed Claims.  *Cf. La. World Expo.*, 864 F.2d at 1153 (noting the cost-benefit analysis "is critical to the efficient and economical administration of the debtor's estate").

145.     As a matter of judicial efficiency, it does not make sense to split the D&O Proposed Claims from the remaining Proposed Claims.  With facts that overlap across all Proposed Claims, the Proposed Claims must all be brought together; otherwise, significant resources would be wasted in bringing claims separately.  Further, not only can the Debtors not even bring all the

Proposed Claims without sacrificing the value of potential recoveries to the Estates as a result of the D&O Policies, the Debtors have also proposed a plan that includes a settlement of claims and causes of action achieved in a confidential mediation (which is the Debtors' objective).  As previously stated, these claims need to be brought to light before L Bondholders are solicited to vote on any proposed plan of reorganization and before any consent by the Debtors is given in connection with the Avalon Transaction.

IV.     **Exclusive Right and Authority to Negotiate and Settle the Proposed Claims**

146.     The Committee further requests that it have the exclusive right and authority to negotiate and enter into settlements on behalf of the Estates, solely with respect to the Proposed Claims.  Bankruptcy courts often authorize committees to retain such an exclusive right and authority upon conferring derivative standing.  *See, e.g., In re Evergreen Solar, Inc.*, Case No. 11-12590-MFW (Bankr. D. Del. Oct. 28, 2011) [Docket No. 382] (granting derivative standing to unsecured creditors' committee and providing that the committee "shall have the exclusive right and authority to negotiate and enter into settlements on behalf of the Debtor's estate" with respect to certain causes of action); *In re Majestic Capital, Ltd.*, Case No. 11-36225-CGM (Bankr. S.D.N.Y. Dec. 12, 2011) [Docket No. 211] (granting derivative standing to unsecured creditors' committee and providing that it "shall have the exclusive right, without further order of the Court, to move for authority, pursuant to Bankruptcy Rule 9019, to compromise any of the [e]state Claims"); *In re Old Carco LLC*, Case No. 09-50002-AG (Bankr. S.D.N.Y. Aug. 13, 2009) [Docket No. 5151] (granting creditors' committee derivative standing, including "exclusive right to prosecute and settle these claims on behalf of CarCo estate").

147.     Based on the foregoing, the Committee has satisfied the requirements to obtain authority to prosecute, address, litigate, and, if appropriate, settle the Proposed Claims against the Defendants and to pursue all other actions, objections, and rights with respect to same.

## RESERVATION OF RIGHTS

148.     The Committee reserves its right to seek authority to commence and prosecute other claims and/or causes of action against any of Ben, the Debtors' directors, managers, officers, and/or other entities or individuals on behalf of the Debtors' Estates.

## NOTICE

149.     Notice of the hearing on the Motion is being provided consistent with the Notice Procedures ordered by this Court pursuant to the *Order Granting Debtors' Emergency Motion for Order Pursuant to Bankruptcy Code Section 105, Bankruptcy Rules 1015, 2002, 9007, and 9036, Local Bankruptcy Rule 2002-1, and the Complex Case Procedures Authorizing the Establishment of Certain Notice Procedures*, Dkt. 125.  The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

150.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that the Court (i) enter the Order attached hereto granting the Committee authority to commence, prosecute and, if appropriate, propose settlements of the Causes of Action and (ii) grant the Committee such other and further relief and is just, proper, and equitable.

*[Remainder of page intentionally left blank]*

Houston, Texas
Dated: December 15, 2022

By:___/s/ Eric M. English_____

**PORTER HEDGES LLP**
Eric M. English (TX Bar No. 24062714)
M. Shane Johnson (TX Bar No. 24083263)
1000 Main Street, 36th Floor
Houston, Texas 77002-2764
Telephone:  (713) 226-6000
Facsimile:  (713) 226-6255
eenglish@porterhedges.com
sjohnson@porterhedges.com

*On behalf of the Official Committee of*
*Bondholders for GWG Holdings, Inc. et al. for*
*claims against all defendants, including Richard*
*Fisher, Thomas Hicks, and Roger Staubach*

-and-

**AKIN GUMP STRAUSS HAUER & FELD**
**LLP**
Lacy M. Lawrence
State Bar No. 24055913; S.D. Tex. No. 995675
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343
llawrence@akingump.com

Michael S. Stamer (admitted pro hac vice)
Abid Qureshi (admitted pro hac vice)
Jason P. Rubin (admitted pro hac vice)
David M. Giller (admitted pro hac vice)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
jrubin@akingump.com
dgiller@akingump.com

-and-

Scott L. Alberino (admitted pro hac vice)
Benjamin L. Taylor (admitted pro hac vice)
Robert S. Strauss Tower

2001 K Street, N.W.
Washington, DC 20006-1037
Phone:  (202) 887-4000
Fax:  (202) 887-4288
salberino@akingump.com
taylorb@akingump.com

*On behalf of the Official Committee of
Bondholders for GWG Holdings, Inc. et al. for
claims against all defendants except Richard
Fisher, Thomas Hicks, and Roger Staubach*

*Counsel to the Official Committee of Bondholders
of GWG Holdings, Inc., et al.*