# **Exhibit B**

## Seller Trust L Bonds Letter



**ABID QURESHI**
+1 212.872.8027/fax: +1 212.872.1002
aqureshi@akingump.com

**CONFIDENTIAL – PROFESSIONALS' EYES ONLY – DO NOT DISTRIBUTE**
December 15, 2022

VIA EMAIL

L Bond Management LLC
c/o Matthew Okin
Okin Adams LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
mokin@okinadams.com

     Re:    *In re GWG Holdings et al.*, Case No. 22-90032 (MI) (Bankr. S.D. Tex.)

Dear Matthew,

     On behalf of the Official Committee of L Bondholders (the "Committee") in the above referenced cases (the "Chapter 11 Cases"), we write to make L Bond Management LLC ("LBM") and aware that the Committee intends to pursue claims and challenges with respect to the $366.9 million in L Bonds (the "Seller Trust L Bonds") issued by GWG Holdings, Inc. (the "Company," "GWG," or the "Debtors"), pursuant to that certain *Supplemental Indenture dated as of August 10, 2018 to Amended and Restated Indenture dated as of October 23, 2017*, by and between GWG as issuer and obligor, GWG Life, LLC as guarantor, and Bank of Utah as indenture trustee (the "Seller Trust L Bond Indenture"), which Seller Trust L Bonds are held by the Seller Trusts (as defined below) and so-called "Custody Trusts".[1]

     As part its investigation, the Committee has uncovered ample evidence that the Committee has colorable direct claims in respect of the Seller Trust L Bonds for recharacterization, equitable

---

[1] Although LBM purports to represent the Seller Trusts and Custody Trusts through a power of attorney, the Committee believes that LBM has thus far failed to make clear to the Court LBM's connections to various parties in interest in these cases, including that (i) Murray Holland was one of the trust advisors to the Seller Trusts (a "Seller Trust Advisor") from the inception of the Seller Trusts until just prior to the Petition Date, while he served as Chief Executive Officer of the Debtors, and also served as an advisor to Ben starting in 2014, (ii) MHT Financial, L.L.C. ("MHT") is the beneficiary of the Seller Trusts and Holland owns 30% of MHT, (iii) the Custody Trusts are consolidated subsidiaries of The Beneficient Company Group, L.P ("Ben") and hold assets purportedly for the benefit of clients of Ben and (iv) the current Seller Trust Advisor and the trust advisor to the Custody Trusts, John Stahl, a radiologist and fraternity brother of Brad Heppner with no apparent qualifications to serve in such capacity, was appointed by MHT as Seller Trust Advisor just prior to the Petition Date likely in an effort to remedy conflicts of interest suffered by Murray Holland.



December 15, 2022
Page 2

subordination and/or mandatory subordination (the "<u>Seller Trust L Bond Challenges</u>"). These claims arise from, among other things, the calculated and inequitable efforts of GWG, Ben and Holland – parties affiliated with the Seller Trusts and Custody Trusts –  to manipulate the payment terms in the Seller Trust L Bond Indenture in order to prevent the Debtors from defaulting on the *Amended and Restated Indenture dated as of October 23, 2017, as amended March 27, 2018* (the "<u>Primary L Bond Indenture</u>"), to the detriment of all other holders of L Bonds issued pursuant to the Primary L Bond Indenture both before and after the 2019 DCR Amendment (as defined below). To the extent that the validity and priority of the Seller Trust L Bonds are not resolved to the Committee's satisfaction as part of any mediation, the Committee intends to promptly seek to recharacterize and/or subordinate the Seller Trust L Bonds, either separately or in conjunction with the Committee's pursuit of the estate causes of action, as set forth in the Committee's *Motion for Standing to Prosecute Causes of Action on Behalf of the Debtors' Estates* (the "<u>Standing Motion</u>" filed contemporaneously with delivery of this letter).

The facts that give rise to the Seller Trust L Bonds Challenges include, but are not limited to, those set forth below.[2]

## A.  The Paul Capital Transaction and Seller Trusts

As set forth in detail in the Standing Motion, the relationship between GWG and Ben began in December 2017 when GWG "won" a purported auction of substantial equity in Ben, the purpose of which was for Ben to source funding for its first major acquisition of assets (the "<u>Paul Capital Transaction</u>").  After numerous setbacks, GWG ultimately completed the final closing of the Master Exchange Agreement on December 28, 2018, making GWG Ben's largest investor.  Within months of the final closing of the Master Exchange Agreement, Ben completed a buyout of GWG's founders and an effective reverse merger, whereby Ben took control of GWG.  By the end of 2019, GWG's core leadership team included Brad Heppner—founder of Ben—as chairman of GWG's Board of Directors, and Murray Holland—a Trust Advisor of the Seller Trusts and Ben advisor—as GWG's President and CEO.

---

[2] In the event that the Court orders mediation in connection with these cases, the Committee plans to present the issues set forth herein for consideration by the mediator.  The Committee expressly reserves all rights to assert any additional direct or derivative causes of action not included in this letter or in the Standing Motion against Ben, the Seller Trusts, LBM, MHT, Murray Holland, or any other party or person connected with the events described herein, including claims that the issuance of the Seller Trust L Bonds and GWG equity to the Seller Trusts are avoidable fraudulent transfers.



To facilitate the Paul Capital Transaction, Murray Holland, who served as the "middle man" and Ben's informal investment banker in the deal, established a series of trusts in 2017 (the "Seller Trusts"), which served as intermediary vehicles to hold assets transferred in connection with the Master Exchange Agreement, including the Seller Trust L Bonds.

While the terms of the originally contemplated transaction suggested that hundreds of millions of dollars of value would change hands, ultimately the majority of the "consideration" supporting the Paul Capital Transaction was non-cash. Pursuant to the Master Exchange Agreement, GWG transferred approximately $616 million of non-cash consideration to the Seller Trusts. This consideration consisted of: (i) ***$366 million of Seller Trust L Bonds***; and (ii) $250 million of GWG's own common stock. In exchange, GWG received (i) 40.5 million common equity units in Ben; (ii) a $192.5 million loan payable to GWG Life from Ben; (iii) $50 million in cash; and (iv) the right to acquire additional common equity units in Ben. GWG came to own 90% of Ben's common equity upon consummation of the 2018 Master Exchange Agreement. The Committee understands that in September 2020, the Seller Trusts transferred $95 million of the Seller Trust L Bonds, as well as a portion of GWG's equity, to the Custody Trusts, in exchange for transfer of alternative assets purportedly valued at $94.3 million.

### B. The Payment Terms of the Seller Trust L Bonds Were Payable in Non-Cash Consideration and Intentionally Distinct from Those of the Other L Bonds

Initially, GWG's issuance of L Bonds to the Seller Trusts was anticipated to be governed by GWG's then-existing Primary L Bond Indenture, which provided that the L Bonds would be settled by cash at maturity. However, fearing a liquidity crisis, GWG, MHT and Ben caused the Seller Trusts to consent to a fundamental change in the character of the Seller Trust L Bonds. As a result, the final Seller Trust L Bonds Indenture includes the following language that allows for the Seller Trust L Bonds to be repaid in non-cash consideration:

> Section 1.5(c): So long as the Final Closing has not occurred, the Redemption Price payable in respect of a redemption effected by the Company pursuant to Section 3.1(a) of the Indenture after January 31, 2019 may be paid, at the option of the Company, in the form of cash, the **PIK Payoff Consideration**,[3] or a combination of any such cash or property, in

---

[3] "PIK Payoff Consideration" is defined as "a pro rata portion (based on the ratio of the principal amount of Seller Trust L Bonds to be redeemed, repurchased or retired on the Maturity Date, as applicable, bears to the total principal amount of Seller Trust L Bonds outstanding at the Initial Transfer) of (i) the outstanding principal amount of, and accrued and unpaid interest on, the Beneficient Loan, (ii) the outstanding principal amount of, and accrued and



December 15, 2022
Page 4

each case as determined by the Company in its sole discretion, in full satisfaction of the Seller Trust L Bonds to be redeemed.

The evidence reflects that GWG and Ben viewed the addition of a non-cash repayment option as critical because removal of "the mandatory cash repayment of this series of L Bonds" would "provide for the option of PIK payment for both GWG and Ben [and] relieve the balance sheet pressures…." MHT further explained in statements regarding the Seller Trust L Bond Indenture that they "negotiated a PIK feature to these bonds" because GWG needed "to be able to pay these bonds in-kind in case of a liquidity crisis." Holland himself, in a deposition with the Securities and Exchange Commission, described the Seller Trust L Bond Indenture amendment as "making a provision to convert debt to equity . . . ." Thus, from the inception of the Seller Trust L Bonds, GWG retained the right to satisfy the Seller Trust L Bonds by means other than cash, removing a central character of a debt security and rendering the Seller Trust L Bonds an equity-like security entirely distinct from all other L Bonds.

## C. The Late 2019 Efforts to Side-Step a Breach of the Debt Coverage Ratio and Obscure GWG's Dire Financial Condition

The sole financial covenant in the Primary L Bond Indenture, and the principal protected afforded to the L Bondholders, was an asset coverage test, known as the Debt Coverage Ratio ("DCR"). The DCR was intended to act as a governor for the amount of L Bonds that GWG could issue. Prior to GWG's acquisition of its equity interests in Ben, if GWG's indebtedness exceeded 90% of the value of certain assets, it would constitute a default under the Primary L Bond Indenture. In March 2018, likely in anticipation of the significant issuance of Seller Trust L Bonds by GWG in connection with the Paul Capital Transaction and GWG's acquisition of Ben stock, the DCR was amended so as to include in the calculation the value of other assets held by GWG, including the stated GAAP value of GWG's interests in Ben (the "March 2018 Amendment").

The March 2018 Amendment, however, was not enough for GWG and Ben. The ramp up of the L Bond sales in 2019 put significant pressure on GWG's ability to comply with the DCR.

---

unpaid interest on, the Beneficient Exchangeable Note, and (iii) the lesser of (A) all of the Beneficient MLP Units owned by the Company as of the Initial Transfer (and, if applicable, the Beneficient MLP Units issued to the Company in exchange for the Exchangeable Note) and (B) such number of the Beneficient MLP Units owned by the Company that, based on the value of such Beneficient MLP Units (valued as provided below), together with the amounts in clauses (i) and (ii) and any cash payment that constitutes a part of the amounts to be paid to the Holders in connection with such redemption, repurchase or retirement, equals the principal amount of, and accrued and unpaid interest on, the Seller Trust L Bonds to be redeemed, repurchased or retired." Seller Trust L Bond Indenture, § 2.1 (Definitions).



December 15, 2022
Page 5

For the quarter ending September 30, 2019, GWG calculated the DCR to be 84.7%.[4] GWG was projected to breach the DCR before year end and, thus, GWG was required to publicly report that it was nearly in default.  Moreover, because GWG was selling millions of dollars of L Bonds every week, the inevitability of tripping the DCR covenant only accelerated.  Any default under the Primary L Bond Indenture and consequent suspension of L Bonds sales would have brought what was a Ponzi scheme to an abrupt halt and stripped GWG of its ability to stay afloat and raise more funds to funnel to Ben.  As such, GWG and Ben needed to take further action in order to keep their scheme going and avoid breaching the DCR, and this was accomplished through the execution of three interrelated documents, the result of which was that the Seller Trust L Bonds became payable entirely in GWG equity.

First, in November 2019, GWG hastily sought a second amendment to the Seller Trust L Bond Indenture (the "2019 DCR Amendment"), "primarily to modify the calculation of the Debt Coverage Ratio in the Indenture to ***provide GWG with the ability to incur indebtedness*** (directly or through a subsidiary of GWG) ***that is payable in capital stock of GWG or mandatorily convertible into or exchangeable for capital stock of GWG that would be excluded from the calculation of the DCR***."  The DCR Amendment contained the following change that excludes debts repayable in GWG equity from the DCR, thus allowing GWG to side-step a near-term breach of the DCR:

> (a) Section 1.1 is amended to include the following term: "Excluded Indebtedness" means Indebtedness or any portion thereof (A) the principal and accrued but unpaid interest of which is payable at the Company's option, pursuant to the terms of such Indebtedness or otherwise, in Capital Stock of the Company or securities mandatorily convertible into or exchangeable for Capital Stock of the Company, or (B) any Indebtedness that is reasonably expected to be converted or exchanged, directly or indirectly, into Capital Stock of the Company, provided that under the terms of such Indebtedness in the event any such conversion or exchange does not occur in accordance with the terms of such transaction, such Indebtedness would be cancelled and any assets received in exchange for such Indebtedness would be returned (a "Repurchase Transaction").

---

[4] Importantly, had GWG properly included the indebtedness of Ben when calculating the DCR (as required by the terms of the Primary L Bond Indenture, as amended), the true DCR percentage was most certainly higher than 84.7% and possibly greater than 90%.



December 15, 2022
Page 6

Simultaneous with the DCR Amendment—and ***without any known public disclosure***—(i) GWG (through Murray Holland) and Ben entered into the so-called Exchange Agreement, dated as of December 31, 2019 (the "Principal LP Exchange Agreement") and (ii) Ben amended its limited partnership agreement (the "LP Amendment" and together with the 2019 DCR Amendment and the Principal LP Exchange Agreement the "2019 Amended Documents"). Together, the 2019 Amended Documents memorialized and solidified GWG's ability to repay the Seller Trust L Bonds with GWG equity.  GWG then excluded the Seller Trust L Bonds from the DCR calculation pursuant to the 2019 DCR Amendment.

The LP Amendment added the following language providing that any Ben securities used by GWG to satisfy its debt obligations (as was permitted under the Seller Trust L Bond Indenture) would automatically be converted into GWG common stock:

> Section 4.11 Common Units held by [GWG].  To the extent that a Principal LP Exchange Agreement is in effect, any Common Units beneficially owned by [GWG] that are transferred, sold, assigned, distributed or otherwise disposed of or conveyed by [GWG] to another Person in respect of any debt or equity (including but not limited to preferred stock or other forms of equity) obligations of [GWG], shall automatically be converted upon such transfer, sale, assignment or distribution, without any further action on the part of such Person, into common stock of the [GWG] pursuant to the terms of such Principal LP Exchange Agreement.

In turn, the Principal LP Exchange Agreement provided as follows:

> On the date BEN units are surrendered for Exchange, all rights of the exchanging BEN Unitholder as holder of such BEN Units shall cease, such exchanging BEN Unitholder shall be treated for all purposes as having become the record holder of shares of GWG Common Stock, and GWG shall become the record holder of BEN Units surrendered by such exchanging BEN Unitholder.

As noted above, the result and intention of the 2019 Amended Documents was that the Seller Trust L Bonds could, and were anticipated to, be repaid not in cash but in equity of GWG, and the other L Bondholders were kept in the dark about GWG's serious financial distress because the 2019 Amended Documents allowed GWG to calculate the DCR without factoring in the Seller Trust L Bonds.  Indeed, the Committee understands that in an invite for a webinar to be hosted by GWG regarding the 2019 DCR Amendment, GWG stated that "[t]hese Seller Trust L Bonds…will



December 15, 2022
Page 7

be payable in GWGH common stock upon approval of" the Principal LP Exchange Agreement and the LP Amendment. Moreover, Holland, as CEO of GWG and a Trust Advisor to the Seller Trusts, viewed the Seller Trust L Bonds as junior to all other L Bonds, testifying that L Bonds would be paid first in a liquidation event because the Seller Trust L Bonds could be converted to equity.  In other words, GWG, Holland (at all relevant times the GWG CEO and a Trust Advisor to the Seller Trusts) and Ben (whose affiliate, the Custody Trusts, subsequently acquired Seller Trust L Bonds) all considered, and intentionally structured, the Seller Trust L Bonds as junior to all other L Bonds once the 2019 Amended Documents were in effect.

Further compounding this grossly inequitable conduct, GWG chose not to disclose publicly and explicitly the fact that the Seller Trust L Bonds were now payable in GWG equity and excluded from the DCR calculation under the 2019 DCR Amendment.  Instead, GWG's public filings continued the narrative that the Seller Trust L Bonds were payable, at GWG's option, with assets held by GWG, including GWG's interests in Ben.  Thus, existing L Bondholders and, just as importantly, prospective L Bond investors, were led to assume that their asset coverage and GWG's equity cushion was significantly greater than it actually was because, based upon public disclosures, it was reasonable for L Bondholders to expect that GWG's obligations reflected by Seller Trust L Bonds remained part of the DCR calculation when, in fact, they were not.  For the holders of Seller Trust L Bonds to reverse course now and seek *pari passu* treatment with all other L Bondholders would (i) be contrary to the terms and purpose of the 2019 Amended Documents and (ii) lead to the inequitable result of the holders of Seller Trust L Bonds diluting the recoveries of all other L Bondholders.

Ultimately, the 2019 Amended Documents were effectuated in a clandestine manner and intentionally drafted in such an obfuscating way that they rendered it effectively impossible for L Bondholders, both existing and prospective, to appropriately evaluate GWG's financial condition and the safety of their investment in L Bonds—***all in the name of GWG's ability to further its Ponzi scheme by continuing to churn sales of L Bonds to even more unwitting investors and continue to prop up its "house of cards."***  Each of GWG, Ben and Holland were participants, if not the driving force, at each stage of this purposeful and inequitable scheme.

### D.  Challenges to The Seller Trust L Bond Claims

The foregoing facts are damning to any efforts of holders of Seller Trust L Bonds to be treated *pari passu* with all other L Bonds that were issued in exchange for cash and payable at maturity in cash.  Indeed, GWG, Ben, and Holland went to great pains, both publicly and privately, to distinguish the character of the Seller Trust L Bonds from those of all other L Bonds.  And those critical and dispositive distinguishing features, and the calculated steps and inequitable conduct



December 15, 2022
Page 8

that those parties engaged in to take advantage of those distinguishing features, must have consequences.  As such, the Committee believes that the Seller Trust L Bonds must be (i) recharacterized from debt to equity and/or (ii) equitably and/or mandatorily subordinated to all other L Bonds, and the Committee intends to pursue all such challenges.

The Committee expressly reserves all rights and remedies with respect to the foregoing, none of which are waived.

Sincerely,

*/s/ Abid Qureshi*

Abid Qureshi

Cc:    Steven J. Reisman
       sreisman@katten.com