IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GWG Holdings, Inc., *et al.*,[1] | § | Case No. 22-90032 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re: Docket No. 1249** |

# OBJECTION OF THE BENEFICIENT COMPANY HOLDINGS, L.P. AND THE BENEFICIENT COMPANY GROUP, L.P. TO THE MOTION OF THE OFFICIAL COMMITTEE OF BONDHOLDERS OF GWG HOLDINGS INC., *ET AL.*, FOR STANDING TO PROSECUTE CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES

Beneficient Company Holdings, L.P. and The Beneficient Company Group, L.P. (collectively, "Beneficient") hereby file this response (the "Response") to the *Motion of the Official Committee of Bondholders of GWG Holdings Inc., et al., for Standing to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Dkt. No. 1242] (the "Standing Motion")[2] and the proposed complaint attached thereto (the "Proposed Complaint") and respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Standing Motion is legally and factually flawed and was filed merely to wrestle control away from the Debtors' independent Chief Restructuring Officer (the "CRO"), the special committee and the investigative committee of the Debtors' board of directors (together,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538) (collectively, the "Initial Debtors"); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955) (collectively, the "Subsequent Debtors," and together with the Initial Debtors, the "Debtors"). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed in the Standing Motion.

the the "Investigations Committee") to pursue a scorched earth, value destructive litigation strategy at the expense of any alternative. For example, the Bondholder Committee refers to GWG as a "classic Ponzi scheme,"[3] a characterization which the Investigations Committee disputes.[4]

2. At base, the Standing Motion is premised on the demonstrably false theory that Brad Heppner ("Beneficient's CEO Heppner") and Beneficient used a "controlling shareholder position"[5] at GWG Holdings, Inc. ("GWG") to cause millions of dollars to be transferred from GWG to Beneficient in return for inadequate consideration. Yet Beneficient's CEO Heppner and Beneficient were *never* controlling shareholders of GWG, and the Debtors not only received adequate compensation, they stand to make a substantial profit from their investments into Beneficient if the false and misleading allegations in the Standing Motion do not destroy the value of Beneficient first. Further, Beneficient's CEO Heppner never purchased a single share of GWG, was not in management at GWG, and only became involved in GWG after GWG independently determined to invest in Beneficient.

3. Moreover, the Bondholder Committee would have this Court believe—without explanation—that over twenty (20) former officers and directors—including two former presidents of federal reserve banks, business icons such as Tom Hicks and Roger Staubach, and numerous other prominent, well-respected, and successful businessmen and women—were complicit in a fraudulent scheme to enrich Beneficient's CEO Heppner, and such parties

---

[3] *See, e.g.*, Proposed Complaint at ¶ 191.

[4] *See Statement of the Independent Committees in Support of Temporarily Continuing the Seal* [Dkt. No. 1346] at ¶ 5 ("The Standing Motion contains only one party's view of the underlying facts. It is beyond doubt that the language in it is sometimes inflammatory and unnecessarily aggressive. For example, the Standing Motion accuses GWG of being a 'classic Ponzi scheme,' **which it is not**.") (emphasis added).

[5] *See, e.g.,* Proposed Complaint ¶ 28.

participated on the board or special committees merely to "avoid strict scrutiny of planned insider transactions."[6]

4. Indeed, without providing specific factual allegations to support their faulty conclusion, the Bondholder Committee repeatedly attacks the GWG special committees as somehow manipulated by Beneficient's CEO Heppner and portrays the special committees as sycophants who shirked their fiduciary duties. The Bondholder Committee alleges these special committees "rubberstamped" decisions and provided a mere "veneer of independence" to cloak Beneficient's CEO Heppner's alleged interference and manipulation. Yet the Bondholder Committee omits that (i) with the exception of Pete Cangany,[7] Beneficient's CEO Heppner had no prior relationship, and had never met, with any member of GWG's special committees prior to such member being nominated to GWG's board of directors; (ii) each special committee was empowered to, and did, hire their own outside legal counsel and third-party valuation firms; and (iii) each special committee met frequently to analyze the terms of various proposed transactions and fulfill their fiduciary obligations to GWG while negotiating such transactions with Beneficient.[8]

5. Indeed, the disputed transactions were the subject of arms' length – at times contentious – negotiations between independent, disinterested parties who were advised by sophisticated counsel and financial advisors. As a result, the Debtors received, among other things,

---

[6] Standing Motion ¶ 52.

[7] Companies associated with Beneficient's CEO Heppner had engaged Mr. Cangany and his prior audit firm prior to his appointment to GWG's Board of Directors, but Mr. Cangany was determined by GWG, based on advice of counsel, to satisfy the SEC and NASDAQ independence requirements necessary to serve of GWG's audit committee. Upon information and belief, Mr. Cangany's qualification to serve on the special committee, including his independence and disinterestedness, was also reviewed by the relevant special committee counsel.

[8] As discussed in **Exhibit A**, the Standing Motion is full of these and other false and materially misleading allegations that the Bondholder Committee either knew or should have known were false and/or misleading, and making such allegations publicly was, at best, extremely reckless.

a substantial amount of equity in Beneficient, which is supported by third party valuations ascribing an enterprise value to Beneficient in the billions of dollars at the time each transaction took place. The efforts of the special committees and the veracity of the valuations upon which GWG's board relied are further legitimized by Beneficient's execution of a definitive business combination agreement (the "Business Combination Agreement") with an independent third party—Avalon Acquisition Inc. (NASDAQ: AVAC) ("Avalon")—which contemplates Beneficient going public in a de-SPAC transaction (the "Avalon Transaction").[9] The Bondholder Committee knows—but fails to disclose—that the Business Combination Agreement ascribes a **$3.3 billion** enterprise value to Beneficient, which implies a $1.4 billion value to the Debtor's interest in Beneficient ***and a return on GWG's investments in the hundreds of millions of dollars***. These facts alone would defeat virtually every claim alleged by the Bondholder Committee.

6. Further, just two weeks before filing the Standing Motion, the Bondholder Committee stated that it was satisfied with the steps that the Court took to create "honest governance and management of the Debtor," and "unequivocally" agreed that that the Court has "done the best that can be done to put in place management and governance with integrity."[10] The Bondholder Committee further stated "with respect to the board changes that the Court was

---

[9] Standing Motion ¶ 21 ("As explained in the November 21 Demand, time is of the essence in bringing the Proposed Claims because Ben is contemplating a business combination with Avalon Acquisition Inc. (the 'Avalon Transaction'), which is expected to close in the first quarter of 2023."); *see also Update Regarding The Beneficient Company Group, L.P.* [Dkt. No. 939] (Bankr. S.D. Tex. October 27, 2022) (the "Ben Update") ¶ 8 (citing *Press Release, The Beneficient Company Group, a Leading Technology-Enabled Provider of Liquidity and Related Services to Investors in Alternative Assets, to Go Public via Combination with Avalon Acquisition Inc.* (September 21, 2022) (the "Press Release") annexed to the Ben Update as Exhibit A. The Press Release is publicly available at https://www.globenewswire.com/news-release/2022/09/21/2520037/0/en/The-Beneficient-Company-Group-a-Leading-Technology-Enabled-Provider-of-Liquidity-and-Related-Services-to-Investors-in-Alternative-Assets-to-Go-Public-via-Combination-with-Avalon-Ac.html.

[10] Hr'g Transcript, Dec. 1, 2022 at 38:22-39:8.

informed about today and the governance that is in place, we have no issues with that, your Honor."[11]

7. Now, in an about face, the Bondholder Committee takes the position that it is "gravely concerned" about the business judgment of the Debtors' independent CRO and Investigations Committee.[12] Yet, the Bondholder Committee cannot show that the CRO unjustifiably refused to purse the claims asserted by the Bondholder Committee; rather, the CRO has been vigorously pursuing a settlement of such claims—including through multiple days of mediation—for months.

8. Simply put, the Standing Motion is rife with falsehoods, inflammatory misrepresentations and omissions necessary to perpetuate the Bondholder Committee's false narrative, and the Bondholder Committee's tactics should not be endorsed by the Court.

9. Accordingly, the Standing Motion should be denied.

## BACKGROUND

10. On April 20, 2022 (the "Petition Date"), GWG Holdings, Inc., GWG Life, LLC and GWG Life USA, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code").

11. On July 18, 2022, the Court entered its *Order Authorizing and Approving (i) Designation of Jeffrey S. Stein as Chief Restructuring Officer, (ii) the Appointment of Jeffrey S. Stein and Anthony R. Horton as New Independent Directors, and (iii) Granting Related Relief* [Dkt. No. 594] (including all attachments thereto, the "Independent Fiduciary Order"). The Independent Fiduciary Order was a negotiated order between the Debtors (as defined below) and

---

[11] *Id*. at 39:11-39:14.

[12] *See* Standing Motion ¶ 5.

5

the Bondholder Committee, and among other things, appointed Jeffrey S. Stein as the independent CRO, and appointed Jeffrey S. Stein and Anthony R. Horton as new Independent Directors of GWG (the "Independent Directors"). The Independent Fiduciary Order gave the CRO and the Independent Directors broad authority to act on behalf of the Debtors and to investigate and pursue claims on behalf of the Debtors.

12. On October 31, 2022, GWG DLP Funding IV, LLC; GWG DLP Funding VI, LLC; and GWG DLP Funding Holdings VI, LLC (collectively, the "Subsequent Debtors," and together with the Initial Debtors, the "Debtors").

13. The Debtors' board is currently comprised solely of independent and disinterested directors who were appointed after the Petition Date.[13]

14. On November 30, 2022, the Debtors filed the *Motion of the Debtors and the Special Committee of the Board of GWG Holdings, Inc. for Entry of an Order (i) Appointing a Judicial Mediator, (ii) Requiring Parties to Maintain Confidentiality of Mediation Communications, and (iii) Granting Related Relief* [Dkt. No. 1128] (the "Mediation Motion") seeking the appointment of Judge David R. Jones as judicial mediator to mediate potential claims the Debtors may have against, *inter alia*, Beneficient.

15. On December 1, 2022, the Debtors filed their *Joint Chapter 11 Plan* [Dkt. No. 1134] (the "Original Plan"). The Original Plan did not purport to release Beneficient, or Beneficient's CEO Heppner, and stated "[t]he addition of any other Entity, including Beneficient,

---

[13] On November 13, 2022, Murray Holland resigned as both President and Chief Executive Officer of the Debtors. *See* GWG Form 8-K dated Nov. 13, 2022. On November 14, Timothy Evans resigned as Chief Financial Officer of the Debtors. *See* GWG Form 8-K dated Nov. 22, 2022. On November 15, 2022, David De Weese resigned from the Debtors' board of directors. *See id*. On November 16, Timothy Evans resigned from the Debtors' board of directors. *See id*. On November 25, 2022, Murray Holland resigned from the Debtors' board of directors, leaving only the Independent Directors on the Debtors' board of directors. *See* GWG Form 8-K dated Dec. 1, 2022; GWG Form 8-K dated Dec. 1, 2022, Item 99.1.

6

to the definition of 'Released Party' is subject to approval of the Investigations Committee and, if necessary, subject to filing a motion seeking Bankruptcy Court approval of a settlement with such Entity. The Debtors and the Investigations Committee intend to engage in discussions with Beneficient regarding any potential releases of claims and Causes of Action." Original Plan at p.16, n.3.

16. At a December 1, 2022 hearing, counsel to the Bondholder Committee responded "unequivocally yes" when asked whether the Court and parties-in-interest have "in [the Bondholder Committee's] mind done the best that can be done to put in place management and governance with integrity?" Hr'g Transcript, Dec. 1, 2022 at 38:22-39:8. The Bondholder Committee went on to state "with respect to the board changes that the Court was informed about today and the governance that is in place, we have no issues with that, your Honor." *Id.* at 39:11-39:14.

17. Fourteen days later, on December 15, 2022, the Bondholder Committee filed the Standing Motion seeking standing to pursue, and exclusive authority to settle, causes of action held by the Debtors' estates, and stating that it was "gravely concerned" about the decisions and positions of the CRO. *See* Standing Motion at p.1; Standing Motion ¶ 5.

18. On January 5, 2023, the Court entered the *Order (i) Appointing a Judicial Mediator (ii) Requiring Parties to Maintain Confidentiality of Mediation Communications, and (iii) Granting Related Relief* [Dkt. No. 1323] (the "Mediation Order") appointing Judge David R. Jones as mediator. Mediation Order ¶ 10.

19. On January 30, 2023, mediation began between the Debtors, the Bondholder Committee, Beneficient, Beneficient's CEO Heppner and other parties-in-interest. As

of the date hereof, no final settlement agreement has been reached, but negotiations are ongoing and the Debtors and Beneficient have made progress on a potential resolution.

20. On February 10, 2023, the Debtors filed the *Amended Joint Chapter 11 Plan* [Dkt. No. 1421] (the "Amended Plan") and a related disclosure statement [Dkt. No. 1422] (the "Amended Disclosure Statement"). The Amended Plan expressly includes Beneficient and its current and former directors and officers in the definition of "Non-Released Parties." *See* Amended Plan at Art. I(A)(126). The Amended Disclosure Statement states "[t]he mediation remains ongoing and the Debtors and the Special Committee continue to work towards a consensual plan of reorganization. To the extent a global resolution is achieved amongst the mediation parties, the Debtors will file a further amended plan and seek approval of an amended disclosure statement prior to the hearing set for this Disclosure Statement." Amended Disclosure Statement at Art. II(B).

21. Also on February 10, 2023, the Debtors filed the *Motion for Entry of an Order (i) Approving the Adequacy of the Disclosure Statement, (ii) Approving the Solicitation Procedures, (iii) Approving the Forms of Ballots and Notices on Connection Therewith, (iv) Approving the Confirmation Timeline, and (v) Granting Related Relief* [Dkt. No. 1423] (the "Disclosure Statement Motion"). A hearing on the Disclosure Statement Motion is set for March 10, 2023 at 9:30 a.m. *See Notice of Disclosure Statement Hearing* [Dkt. No. 1424].

## OBJECTION

22. A creditor may be granted standing to pursue estate causes of action only if it establishes that (i) the debtor has unjustifiably refused to pursue claims of the estate; and (ii) the claims are colorable. *See In re SI Restructuring Inc.*, 714 F.3d 860, 863–64 (5th Cir. 2013) (citing *In re La. World Exposition, Inc.*, 858 F.2d 233, 247 (5th Cir. 1988)); *see also In re Packer*, 816

F.3d 87, 92 (5th Cir. 2016) (citing same standard for derivative standing). Here, the Bondholder Committee does not, and cannot, satisfy its burden.

> A. **The Bondholder Committee Has Not Met Its Burden of Demonstrating That the CRO and Investigation Committee Have Unjustifiably Refused to Pursue the Claims.**

23. When weighing whether a refusal is unjustified, courts in the Fifth Circuit "must look to whether the interests of creditors were left unprotected as a result." *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988). Because derivative standing extends rights to a parochial stakeholder, it is reserved for narrow circumstances "when the Bankruptcy Code's envisioned scheme breaks down." *See In re Weyandt*, 544 F. App'x 107, 110 (3rd Cir. 2013) ("A derivative action is one that a bankruptcy court may authorize . . . when the Bankruptcy Code's envisioned scheme breaks down.") (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003)). The burden is on the party seeking derivative standing to prove that the debtor has unjustifiably refused to pursue valuable estate causes of action. *See, e.g.*, *In re Copperfield Investments, LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010) (emphasizing that "[t]he party seeking derivative standing bears the burden of establishing, by competent evidence, that . . . the trustee unjustifiably refused to bring suit") (citing *In re Racing Servs., Inc.*, 540 F.3d 892, 900 n. 8 (8th Cir. 2008)).

24. Here, the Bondholder Committee cannot satisfy its burden because the Debtors **have not refused** to pursue the claims at issue in the Proposed Complaint. As an initial matter, the Debtors are continuing their months-long efforts to negotiate a potential value-maximizing resolution with, *inter alia*, Beneficient, including participating in multiple days of mediation. *See* Amended Disclosure Statement at Art. II(B) ("The mediation remains ongoing and the Debtors and the Special Committee continue to work towards a consensual plan of reorganization. To the extent a global resolution is achieved amongst the mediation parties, the

Debtors will file a further amended plan and seek approval of an amended disclosure statement prior to the hearing set for this Disclosure Statement."); *see generally In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 457, 470 (Bankr. N.D. Ill. 2016) ("That the litigation could prove unnecessary given the parties' settlement discussions is justification enough for the debtors' not to pursue it."); *In re Milazzo*, 450 B.R. 363, 371 (Bankr. D. Conn. 2011) (stating that the filing of an avoidance action and subsequent settlement of such claims was not an unjustified refusal sufficient to support derivative standing); *In re Cooper*, 405 B.R. 801, 815 (Bankr. N.D. Tex. 2009) ("[T]he Trustee is not 'unable or unwilling to fulfill her obligations.' The Trustee merely thought that a compromise of the adversary proceeding was fair and equitable, and made more sense than litigating."). If such negotiations fail, the Amended Plan contemplates the relevant causes of action being assigned to a litigation trust to be appropriately monetized for the benefit of the estates. *See* Amended Plan at Art. IV(D) ("The Litigation Trust will be established on the Effective Date to retain and hold all Retained Causes of Action, the proceeds of which shall be deemed distributed to the Wind Down Debtors for ultimate distribution by the Wind Down Trustee."). Accordingly, the Debtors have been pursuing, and continue to pursue, potential claims against Beneficient and have never given any indication that such claims would be released absent a settlement.

25. Moreover, debtors in possession are in the best position to make litigation-related decisions in the context of a chapter 11 restructuring because debtors are fiduciaries for ***all*** stakeholders, as opposed to a single constituency. *See, e.g.*, *U.S. for Use of Am. Bank v. C.I.T. Const. Inc. of Texas*, 944 F.2d 253, 260 (5th Cir. 1991) (observing that chapter 11 debtors are fiduciaries for all stakeholders). Courts are thus reluctant to extend derivative standing to creditors' committees, in part because such committees are fiduciaries for their limited constituencies, not for debtors or the estates generally. *See, e.g.*, *In re Balt. Emergency Servs. II,*

10

*Corp.*, 432 F.3d 557, 562 (4th Cir. 2005) ("Even if permitted under the Bankruptcy Code, derivative standing is the exception rather than the rule. If the former were to swallow the latter, creditors could usurp the central role that the trustee or debtor-in-possession plays as the representative of the estate. This state of affairs would be problematic, because the interests of a creditor or creditors' committee may not always align with those of the estate."); *see also In re Committee of Major Funding Corp.*, 109 F.3d 219, 224 (5th Cir. 1997) ("Section 1103 essentially requires the committee to act in the best interest of the creditors it represents.").

26. Further, a debtor in possession has a fiduciary duty to "wisely manage the estate's legal claims." *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005). But wise management does not mean the debtor in possession must always pursue a claim; sometimes the better course is to settle. *See id.* (citing *In re Energy Coop., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989)). "[S]uccessful resolution of disputes . . . is one of the Code's central objectives." *In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1189 (7th Cir. 2015); *see also In re Keck, Mahin & Cate*, 241 B.R. 583, 598–99 (Bankr. N.D. Ill. 1999) (noting that "[c]hapter 11 has as its central goal the resolution of competing claims to scarce resources by a negotiated plan"). "[A] trustee pursuing settlement of a potential claim [is] sufficient to deem [that] the trustee had not unjustifiably refused to pursue it." *In re Diocese of Camden, New Jersey*, at *11 (Bankr. D. N.J. March 24, 2022); *see also In re Manley Toys Ltd.*, 2020 WL 1580244, *8 (Bankr. D.N.J. Mar. 31, 2020) (citing *In re Caesars Entm't Operating Co., Inc.*, 561 B.R. 457, 468 (Bankr. N.D. Ill. 2016) and *In re Milazzo*, 450 B.R. 363, 371 (Bankr. D. Conn. 2011)).

27. The Bondholder Committee cannot establish that the Debtors have unjustifiably refused to pursue any estate causes of action or that the Debtors have done anything other than wisely manage claims. In fact, just over two (2) weeks before filing the Standing

11

Motion, the Bondholder Committee endorsed the independent CRO and Investigation Committee by representing to the public and the Court that it "[u]nequivocally" agreed that the parties had "done the best that can be done to put in place management and governance with integrity."[14] And the Debtors' management has determined that negotiation rather than value-destructive litigation is currently in the best interests of the Debtors' estates. Indeed, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated, and costly." *See In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 354 (5th Cir. 1997) (quoting *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)). Simply put, the Bankruptcy Code's "envisioned scheme" has not broken down in these cases. *See In re Weyandt*, 544 F. App'x at 110.

28. Finally, the "insured v. insured" argument is nothing but a pretextual attempt to satisfy the unjustified refusal element.[15] Even if the Investigation Committee cannot bring certain claims itself, which has not been admitted or determined, the Bondholder Committee seemingly concedes that the Investigation Committee could assign such claims to a litigation trust to pursue or settle such claims, which is exactly what is contemplated under the Amended Plan.[16] Accordingly, the Bondholder Committee cannot establish the "unjustified refusal" element required for standing, and the Standing Motion should be denied.

---

[14] Hr'g Transcript, Dec. 1, 2022 at 38:18-39:21.

[15] *See* Standing Motion ¶¶ 135-140.

[16] *See* Standing Motion ¶ 139 ("While a post-confirmation trust might ***theoretically*** be organized and operated in such a way as to preserve the recoverable amount under the D&O Policies, there would be significant litigation risk with potentially disastrous consequences for the recoveries of L Bondholders and other creditors of the Estate. Granting the Committee standing avoids these risks entirely.") (emphasis original).

**B.    The Bondholder Committee Has Not Met Its Burden to Show That Its Claims Are Colorable and Outweigh the Costs of Bringing Such Claims**

29.    "For a creditor's claim to be colorable, it must have a possibility of success." *In re Clear the Air*, *LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021) (citing *In re McConnell*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989)). This has been equated to the same pleading standard required to survive a motion to dismiss. *See id.* (stating that because the court previously found the complaint met the *Twombly* and *Iqbal* standard, it met the colorability standard); *In re On-Site Fuel Serv., Inc.*, No. 18-04196-NPO, 2020 WL 3703004, at *12 (Bankr. S.D. Miss. May 8, 2020) (stating that "a creditors' committee seeking derivative standing must assert a 'colorable' claim, defined as a claim that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure"). However, where, as here, "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line . . . of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted); *see also Ashcroft*, 556 U.S. at 679 ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").

30.    As outlined in **Exhibit A**, the Bondholder Committee's premise—that over twenty (20) well-respected officers and directors served as puppets to allow Beneficient's CEO Heppner to siphon money from the Debtors for inadequate consideration for his personal benefit—is implausible and based on numerous factually incorrect or misleading allegations and omissions, such as falsely stating that Beneficient's CEO Heppner and Beneficient were the "controlling shareholder" of the Debtors. Moreover, based on the $3.3 billion enterprise value ascribed to Beneficient in the Avalon Transaction, the Debtors not only received adequate consideration for

their investments in Beneficient, they stand to make a substantial profit, which would defeat virtually every claim in the Proposed Complaint.

31. Accordingly, the allegations in the Standing Motion and Proposed Complaint are conclusory, false, and/or misleading. Even if the claims meet the low threshold of being colorable, these cases should not be viewed in a vacuum; rather, the cost of litigating and the ultimate chance of success may be taken into account as part of the Court's cost-benefit analysis. *See In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 515 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ("While courts have commented that, under *STN*, the 'required showing is a relatively easy one to make,' [*In re Adelphia Commc'ns Corp*., 330 B.R. 364, 375 (Bankr. S.D.N.Y. 2005)], in determining whether to confer standing, the court may nevertheless 'engag[e] in some review of disputed facts' to determine if there is 'some factual support for the Committee's allegations' and to determine that 'the proposed litigation would be a sensible application of estate resources.'"); *La. World Exposition v. Fed. Ins. Co.*, 864 F.2d 1147, 1153, n.10 (5th Cir. 1989) (noting a "complete agreement with the cost benefit analysis mandated by the Second Circuit in *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985)"). Here, granting standing would not be a sensible application of the estates' resources as the Bondholder Committee would incur massive expenses fruitlessly chasing futile claims at the expense of the value maximizing Avalon Transaction, which would destroy value to L Bondholders to whom the Bondholder Committee owe a fiduciary duty.[17] Thus, the Standing Motion should be denied.

---

[17] Even if the claims had merit, which they do not, the Bondholder Committee has not shown that it would be a sensible application of the estates' resources to grant standing at this time rather than assign the claims to a post-confirmation trust, where such claims could be pursued at a fraction of the current burn-rate in these cases, which is what is contemplated by the Amended Plan if a settlement is not reached.

## CONCLUSION

For the reasons set forth above, Beneficient respectfully requests that the Court deny the Standing Motion and grant any such other and further relief deemed just, proper, and equitable.

DATED:  February 22, 2022
        Dallas, Texas

                Respectfully submitted,

                **HOLLAND & KNIGHT LLP**

                By: */s/ David M. Bennett*
                David M. Bennett
                State Bar No. 02139600
                Email: David.Bennett@hklaw.com
                Steven J. Levitt
                State Bar No. 24092690
                Email: Steven.Levitt@hklaw.com
                1722 Routh St., Suite 1500
                Dallas, TX 75201
                Telephone:  (214) 969-1700
                Facsimile:   (214) 969-1751

                -and-

                Anthony F. Pirraglia
                State Bar No. 24103017
                Email: Anthony.Pirraglia@hklaw.com
                811 Main Street, Suite 2500
                Houston, TX 77002
                Telephone:  (713) 654-8111
                Facsimile:   (713) 654-1871

                **COUNSEL FOR BENEFICIENT COMPANY HOLDINGS, L.P. AND THE BENEFICIENT COMPANY GROUP, L.P.**

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 22, 2023, a true and correct copy of the foregoing document was served via email through the Court's Electronic Case Filing System to all registered ECF users appearing in these cases.

                                                      */s/ Steven J. Leveitt*
                                                      Steven J. Levitt