<u>**Exhibit A**</u>

| Committee Standing Motion and Complaint: Chart of General Allegations and Responses | | |
|---|---|---|
| Allegation No. | General Allegation | Response to Allegation |
| 1 | Beneficient's value is "unproven." *See, e.g.*, Standing Motion at ¶¶ 45(c)-(g), 48, 114; Proposed Complaint at ¶¶ 17, 28, 138, 142, 153, 197, 250, 270, 280, 290, 317, 344, 377, 387, 427. | Beneficient's value is not "unproven.," as third parties and independent valuation firms have repeatedly attributed multi-billion-dollar valuations to Beneficient. The allegations in the Standing Motion rely on a single false premise: that Beneficient's value is unproven and therefore GWG did not receive reasonably equivalent value in return for its investments in Ben. To support this false premise, the 316-page motion and proposed complaint never once acknowledge the most significant fact in these cases: Beneficient is progressing towards a transaction to go public through a de-SPAC transaction in the first half of this year that implies a ***$3.3 billion*** enterprise value of Beneficient. The de-SPAC transaction therefore implies a valuation of the Debtors' equity interest in Beneficient at approximately ***$1.4 billion*** based on the Debtors' ownership of approximately 44% of Beneficient's equity on a fully diluted basis, which is far in excess of any cash it transferred to Beneficient in return for such equity. Specifically, on September 21, 2022, Beneficient and Avalon Acquisition Inc. (NASDAQ: AVAC) ("Avalon") publicly announced the execution of a definitive Business Combination Agreement (the "Business Combination Agreement"), which was the culmination of six (6) months of extensive, good faith negotiations between Beneficient and Avalon, the latter of which was represented by Venable LLP and Houlihan Capital, LLC ("Houlihan Capital").[1] Notably, in connection therewith, Houlihan Capital issued a fairness opinion that provided that "the consideration to be issued to Beneficient in the Business Combination was fair, from a financial point of view, to the Avalon stockholders."[2] |
| 2 | GWG was a Ponzi scheme. *See, e.g.*, Standing Motion at ¶¶ 2, 10, 105, 115; Proposed | GWG was not a Ponzi scheme. As the Independent Committees of GWG led by Jeffery S. Stein have stated, "[t]he Standing Motion contains only one party's view of the underlying facts. It is beyond doubt that the language in it is sometimes inflammatory and unnecessarily aggressive. ***For example,*** |

---

[1] *See* S4 at pp. 164-68. The S4 can be viewed at https://www.sec.gov/Archives/edgar/data/1775734/000119312523013419/d406382ds4a.htm.

[2] *See* S4 at xvii; R-1.

| | | |
|---|---|---|
| | Complaint at ¶¶ 1, 4, 249, 298, 325, 353, 407, 435. | *the Standing Motion accuses GWG of being a 'classic Ponzi scheme,' which it is not.*" (emphasis added).[3]<br><br>Here, GWG used L Bond proceeds as disclosed to investors, disclosed the risks of the L Bond program to investors, and did not create a false appearance of profitability in order to obtain new investors. Rather, GWG's audited financial statements and its L Bond prospectus repeatedly disclosed that, among other things, (i) "[w]e have a relatively limited history of operations, *a history of net losses*, and our future earnings, if any, and cash flows may be volatile, resulting in uncertainty about our ability to service and repay our debt when it comes due, redeem preferred stock when requested and uncertainty about our prospects generally;"[4] (ii) "[o]ur indebtedness could have significant effects on our business and the holders of our debt. For example, it could: require us to use a substantial portion of our cash flow from operations to service our indebtedness, which would reduce the available cash flow to fund acquisitions of alternative investments, working capital and other general corporate purposes;"[5] (iii) "[i]nvesting in [GWG's] L Bonds …*involves a high degree of risk, including the risk of losing your entire investment* . . . . *The L Bonds are only suitable for persons* with substantial financial resources and *with no need for liquidity in this investment;*"[6] and (iv) L Bond proceeds could be used to make principal and interest payments on existing and future L Bonds.  For example, GWG's 10-K dated July 19, 2019 states "[o]ur business model relies on continued access to financing to enable us to grow our exposure to alternative assets. Our debt financing also provides funds to pay the attendant premiums and costs of maintaining the life insurance portfolio, *all while satisfying our current interest and principal repayment obligations under* our amended and restated senior credit facility with LNV Corporation*, L Bonds and Seller Trust L Bonds* and our dividend obligations on our preferred stock."[7]  In fact, similar disclosures existed in GWG's public filings *prior to any* |

---

[3] *See Statement of the Independent Committees in Support of Temporarily Continuing the Seal* [Dkt. No. 1346] at ¶ 5.

[4] GWGH 2019 10-K at 18.

[5] GWG 2019 10-K at 18

[6] L Bond Prospectus dated June 5, 2020 at p. 2 (emphasis added).

[7] GWGH 10-K dated July 9, 2019 at p. 19 (emphasis added);  *see also*  GWGH 10-K dated March 27, 2020 at p. 19 ("Our debt facilities and offerings are the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and our investments in Beneficient — as well as service existing debt."); GWGH 10-K Dated Nov. 5, 2021 at p. 61 ("We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient.").

|  |  | *involvement with Beneficient.*[8]   This information was similarly disclosed in GWG's Form S-1 Registration Statements.[9] <br><br> Prior to Beneficient's involvement with GWG, investors were told that "until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on the proceeds from our ongoing securities offerings to satisfy our ongoing financing and liquidity needs."[10]   After Beneficient's involvement with GWG, GWG made similar disclosures.[11] <br><br> In fact, the Securities and Exchange Commission (the "SEC") relied on the accuracy of GWG's disclosures regarding the risks associated with investing in L Bonds as the basis for at least two enforcement actions brought against broker-dealers based upon such broker-dealers' failure to communicate such risks to their clients.[12]   In each of these actions, the SEC explicitly states that GWG disclosed risks associated with investing in L Bonds in its public filings, but the broker-dealers allegedly did not communicate such risks.[13] |

---

[8] *See, e.g.*, GWGH 10-K dated March 29, 2018 ("Our business model relies on continued access to financing to enable us to purchase a large and diversified portfolio of life insurance policies and pay the attendant premiums and costs of maintaining the portfolio, all while satisfying our current interest and principal repayment obligations under our senior credit facility and other indebtedness.").

[9] *See, e.g.*, GWGH S-1 dated Aug. 31, 2017 ("These certain other expenditures, listed in order of priority, include . . . paying principal at maturity, interest and fees to our lenders, including under a senior credit facility, previously issued L Bonds and the L Bonds offered hereby. . . ."); GWGH S-1 dated March 30, 2020 ("We intend to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments and/or loans to Beneficient or related entities, and to meet our other obligations, including . . . paying principal (at maturity or upon earlier prepayment or redemption), interest and fees to our lenders, including under DLP IV's second amended and restated senior credit facility, previously issued L Bonds, Seller Trust L Bonds and the L Bonds offered hereby. . . .").

[10] GWGH 10-K dated March 15, 2017 at p. 24.

[11] *See* GWGH 10-K dated March 29, 2018 at p. 16 ("Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on the proceeds from our ongoing to satisfy our ongoing financing and liquidity needs."); GWGH 10-K dated March 27, 2020 at p. 19 ("Accordingly, until we achieve sufficient cash flows derived from our portfolio of life insurance policies, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering to satisfy our ongoing financing and liquidity needs. Likewise, until interest and dividends from our investments in Beneficient reach a significant size to service our various debt obligations, we expect to rely on advances from our second amended and restated senior credit facility with LNV Corporation and proceeds from our L Bond offering for these amounts.").

[12] *See United States Securities and Exchange Commission v. Liddle*, Case No. 23-00054 (W.D. Wisc. January 24, 2023) (the "Liddle Case"); *United States Securities and Exchange Commission v. Western International Securities, Inc.*, Case No. 22-04119 (C.D. Cal. June 15, 2022) (the "Western Securities Case").

[13] *See, e.g.*, Liddle Case at Dkt. No. 1, ¶ 17 ("Beginning in at least March 2020, Liddle lied to many of his advisory clients about the risk of GWG L Bonds. Liddle knew, or was recklessly unaware, that GWG disclosed in their offering document used for the fourth L Bond offering (the '2020 Prospectus') that investing in L Bonds involved a 'high degree of risk, including the risk of losing [one's] entire investment[,]' and an L Bond investment 'may be considered speculative.' GWG further disclosed on the second page of the 2020 Prospectus, '**L Bonds are only suitable for persons with substantial financial resources and with no need for**

| | | |
|---|---|---|
| | | Accordingly, GWG did not create a false sense of profitability to induce investments; rather, GWG fully disclosed the risks relating to the investments and investors were fully apprised of GWG's financial situation and how the money raised through L Bond offerings was being used. |
| 3 | GWG was insolvent at all relevant times. *See, e.g.,* Standing Motion at ¶¶ 47, 84; Proposed Complaint at ¶¶ 5, 265, 276, 287, 313, 340, 371, 381, 393, 422. | GWG was solvent on each of the dates on which GWG invested cash for Beneficient equity. |
| | | As an initial matter, GWG was balance sheet solvent on each of the dates that GWG invested cash in return for Beneficient equity.[14]  Further, the transactions at issue date back as early as 2019, with the last cash invested in Beneficient in March 2021 (which March 2021 investment was fully redeemed in cash only months later), while GWG did not default on its payment obligations until January 15, 2022.[15]  Prior to the March 2021 investment, the last cash invested into Beneficient by GWG was in December 2020, **over one year** prior to GWG defaulting on its payment obligations and over fifteen months prior to GWG filing for restructuring. |
| | | The solvency evaluation considers the fair value of a company's assets and liabilities in making such determination and is not strictly based on values reported on a company's balance sheet under GAAP. Based on valuations prepared by third-party professionals, including those engaged by GWG's independent special committees, as it relates to GWG's holding in Beneficient, such valuations supported that GWG was solvent at each of the dates that GWG invested cash in Beneficient. |
| | | GWG is required under FASB ASC 205-40 to assess its ability to continue as a going concern for each set of financial statements that are issued, which would include all of its interim and annual financial statements issued during 2019-2021. Such evaluation required GWG to assess whether it is probable that it would be able to meet its obligations for the 12 months subsequent to the dates such financial statements were issued.  ASC 205-40 is prescriptive in outlining what can and cannot be considered by a company in evaluating whether it can continue as a going concern by establishing a high threshold of only allowing items that are been deemed "probable" to be considered in the going concern analysis. |

**liquidity in this investment**.'") (emphasis in original);  Western Securities Case at Dkt. No. 1, ¶ 81 ("As described above and as disclosed in the 2020 Prospectus, investing in L Bonds involves a 'high degree of risk,' including the risk of losing one's entire investment. The 2020 Prospectus further states investing in L Bonds 'may be considered speculative.' Notwithstanding these disclosures, several of the Registered Representative Defendants did not understand the risk of L Bonds.")
[14] *See* GWGH 10-K dated Jul. 9, 2019 (listing assets of $1.48 billion against liabilities of $1.19 billion); GWGH 10-K dated Mar. 27, 2020 (listing assets of $3.635 billion against liabilities of $1.764 billion); GWGH 10-K dated Nov. 5, 2021 (listing assets of $3.564 billion against liabilities of $1.891 billion).
[15] *See* 8-K filed on January 18, 2022

|   |   | In that regard, consideration of probability focuses on (i) whether and to what extent, an item is within or beyond management's control and (ii) management's history in forecasting and executing similar items.  Items that are considered beyond management's control generally cannot be included in the going concern assessment. |
|---|---|---|
|   |   | GWG completed a going concern assessment for each set of financial statements that were issued during 2019-2021. As part of the GWG's governance process such assessments were routinely reviewed by its independent audit committee.  Further, as part of its annual audits or quarterly reviews related to its financial statements, such evaluations were provided to GWG's independent external auditors and subjected to their audit procedures.   GWG was audited at least annually by respected firms such as Baker Tilly, Whitley Penn, and Grant Thornton.  And GWG did not have a going concern warning until November 2021, which was precipitated by (i) the protracted period during 2021 when GWG could not sell L Bonds, which necessitated the use of other available capital sources to meet operating requirements, and (ii) the anticipated reduced L Bond origination due to SEC subpoenas to many of the large third-party selling broker-dealers. |
|   |   | Further, in determining the value of GWG's assets, the Bondholder Committee completely ignores the value of GWG's investments in Beneficient, which are further discussed herein.[16]  Taking GWG's interests in Beneficient into account, as would be required under any test for solvency, GWG was not insolvent on any of the dates on which GWG invested cash for Beneficient equity.[17] |
| 4 | GWG was not adequately compensated for its investments in Beneficient.  *See, e.g.*, Standing Motion at ¶¶ 17, 45, 48, 74; Proposed Complaint at ¶¶ 16, 17, 20, 28. | GWG received more than fair value in exchange for its investments in Beneficient. |
|   |   | Over the relevant time period, GWG invested approximately $230 million of net cash in transactions with Beneficient in return for equity in Beneficient. GWG's equity in Beneficient attributed to these cash investments is now worth approximately $650 million based upon the enterprise value of Beneficient in its go-public transaction with Avalon.[18]   Additionally, as discussed in the response to general allegation 5, the value of the consideration GWG received in return for its transactions with |

---

[16] *See* Proposed Complaint at ¶ 13 (comparing GWG's L Bond Sales to *only the value of GWG's Policy Portfolio*).

[17] *See, e.g.*, GWGH 2020 10-K dated Nov. 5, 2021 (listing assets of $3.564 billion against liabilities of $1.891 billion); GWGH 10-K dated March 27, 2020 (listing assets of $3.635 billion against liabilities of $1.764 billion).

[18] While not at issue in the Standing Motion or Proposed Complaint, GWG obtained the majority of its interests in Beneficient (*i.e.*, in excess of $700 million) in a transaction among GWG, Paul Capital Advisors and MHT in 2018, which brings the total value of GWG's interests in Beneficient to $1.4 billion.  GWG's cash investment in Beneficient represents a minority of its total investment in Beneficient.

Beneficient were supported by multiple valuations performed by independent valuation firms during the relevant period, including valuation agents such as Valuation Research Corporation who were retained by, and reported solely to, the relevant GWG special committees.

In addition to GWG's investments in Beneficient, in consummating the Decoupling Transaction (as defined below), Beneficient transferred 19,250,795 common units of Beneficient Company Group, LP to GWG in satisfaction of a commercial loan in the then-outstanding amount owing of $208,096,743. The implied value of those common units under Beneficient's proposed go-public transaction is approximately $240.6 million, or more than $21 million more than what Beneficient owed under the commercial loan.  Further, the transfer of such stock effectively represented the assets underlying the commercial loan that GWG would have been entitled to under the terms of the CLA; the acceleration simply affords GWG with the ability to benefit from any appreciation in those assets without affecting GWG's downside protection.[19]

In fact, in the Decoupling Transaction as a whole, GWG and its shareholders benefitted tremendously. In addition to the approximately $21 million in incremental value received through the payoff of the commercial loan agreement: (i) GWG's conversion of its Preferred Series A-1 equity in Beneficient to Preferred Series B-2 generated over $76 million in value; (ii) GWG had no further funding expectations from Beneficient; and (iii) in the initial transaction where GWG gained control of Beneficient, it paid $0 net control premium, but as a result of giving back control to Beneficient, GWG converted various securities in Beneficient which provided an additional approximately $200 million in incremental potential value to GWG.  Further, Beneficient was able to operate fully under its bank charter from the State of Kansas due to the Decoupling Transaction, and the mandatory redemption clause of certain preferred securities of the relevant Beneficient organizational documents was removed, both of which benefitted all GWG shareholders.[20]

Finally, each cash investment in Beneficient was made pursuant to agreements approved by a special committee of GWG's board.  These special committees were comprised of independent directors who retained their own legal counsel and valuation firms who reported only to the special committee.

---

[19] *See* Commercial Loan Agreement dated Aug. 10, 2018 at § 6.02.
[20] *See* GWG 10-Q dated Nov. 19, 2021 at 47 ("The Amendments to the BCH limited partnership agreement reflect certain of the agreements contemplated by the Term Sheet, including, among other things, (1) eliminating the mandatory redemption rights of the holders of Preferred Series A Subclass 1 Unit Accounts following a public listing. . . .").

| | | |
|---|---|---|
| | | Further, with the exception of Pete Cangany,[21] Beneficient's CEO Heppner had no prior relationship, and had never met, with any member of GWG's special committees prior to such member being nominated to GWG's board of directors. |
| 5 | The valuations of Beneficient were based on unrealized cash flow projections. *See, e.g.*, Standing Motion at ¶¶ 2, 42, 45. 48, 49, 63; Proposed Complaint at ¶¶ 19, 142, 165, 172. | Multiple valuations performed by one respected, global valuation firm, with one exception,[22] did not rely on discounted cash flow projections to determine Beneficient's value; rather, discounted cash flow projections were typically used only to corroborate the valuation arrived at using other methods.[23] For example, two of the valuations used the OPM Backsolve Method, which does not rely on discounted cash flow projections when determining the value of a company.[24]  Further, the management projections provided by Beneficient for corroborative purposes were based on a beginning year defined as the period after the company both received its trust company charter, and would be permitted to issue registered securities.  These projections were significantly discounted in the corroborative analysis to reflect the risk associated with the timing of these events.<br><br>In fact, in a December 1, 2021 valuation report, which the Bondholder Committee has in its possession, the relevant valuation firm expressly disclaimed the notion that cash flow projections formed the basis for its prior valuations, clearly stating that the Beneficient's cash flow projections were only considered in a corroborating Income Approach analysis intended to demonstrate the reasonableness of the firm's actual conclusions.  In that report, the firm specifically stated that it was issuing the disclaimer to provide clarification on the matter and would omit such Income Approach corroboration analysis from future reports.[25] |

---

[21] Companies associated with Beneficient's CEO Heppner had engaged Mr. Cangany and his prior audit firm prior to his appointment to GWG's Board of Directors, but Mr. Cangany was determined by GWG, based on advice of counsel, to satisfy the SEC and NASDAQ independence requirements necessary to serve of GWG's audit committee.  Upon information and belief, Mr. Cangany's qualification to serve on the special committee, including his independence and disinterestedness, was also reviewed by the relevant special committee counsel.

[22] The valuation of Beneficient performed by such firm in 2020, which was performed to determine whether impairment of Beneficient's goodwill had occurred, used Beneficient's cash flow projections as part of its calculations. This valuation was clearly denoted as being prepared solely for goodwill impairment testing required under FASB ASC 350 and should not be used or relied upon in any other manner.

[23] *See, e.g., Valuation Services in Connection with FASB ASC 805* dated Dec. 31, 2019 at p. 20 ("In order to determine the Fair Value of the business enterprise of the Company as of the Valuation Date, we relied on the OPM Backsolve Method, a form of the Market Approach . . . .").

[24] The OPM Backsolve Method uses the Black-Scholes option pricing model to calculate the implied equity value of the firm such that the implied price of the recent round of financing is equal to its issuance price.  The resulting equity value is then allocated across investors.

[25] *Valuation Under FASB Accounting Standard Codification 820* dated Dec. 1, 2021 at p. 8-9.

| | | |
|---|---|---|
| 6 | GWG's Board of Directors and/or its Special Committees rubberstamped transactions between Beneficient and GWG without fulfilling their fiduciary duties. *See, e.g.,* Standing Motion at ¶¶ 52-67; Proposed Complaint at ¶¶ 28-32, 195, 198-233. | Each of GWG's cash investments in Beneficient were made pursuant to an agreement that was vetted and approved by independent special committees represented by independent counsel and independent financial advisors.<br><br>Through a series of transactions beginning in 2018, GWG obtained a substantial amount of common units and preferred equity in Beneficient entities, and thus had, and continues to have, a compelling and aligned interest in maximizing the value of Beneficient for the benefit of its stakeholders, including L Bondholders.  Notably, the decision to first pivot GWG's business from focusing on investing in life settlement policies to investing in Beneficient was made by a fully independent board that included ***no*** overlapping directors or officers of, or any business relationship between, GWG and Beneficient.<br><br>Following the initial transaction, which was fully disclosed in GWG's SEC filings, GWG engaged in a series of additional fully disclosed transactions with Beneficient.  A brief explanation of these transactions, including Beneficient's response, is below.  They reveal that the special committees met dozens of times, were advised by their own lawyers and financial advisors, and documented their meetings through hundreds of pages of meeting minutes:<br><br>    a.  **Transaction**: On May 31, 2019, GWG Life agreed to loan certain Liquid Trusts[26] associated with Beneficient $65 million (the "2019 LiquidTrust Loan").[27]<br>          **Response**:  This transaction was approved by a special committee of GWG's board of directors.  The special committee at this time consisted of Kathleen Mason and David Chavenson, was represented by Foley & Lardner and Valuation Research Corporation, and met approximately sixty times in fulfilling its fiduciary obligations to GWG.  Beneficient's CEO Heppner had no prior relationship with, and had never met, Ms. Mason and Mr. Chavenson prior to their nomination to GWG's board of directors.  Neither Ms. Mason nor Mr. Chavenson ever served on Beneficient's board of directors. |

---

[26] The Liquid Trusts are The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust.
[27] *See* GWGH 2020 10-K at F-16. This loan was ultimately repaid on or about September 30, 2020 with a Preferred Series C Unit Account of BCH of $75 million. *Id*.

b. **Transaction**:  On June 12, 2019, GWG Holdings purchased $10 million of equity interests in Beneficient from Essex Woodlands Health Ventures Fund IV LP and Essex Woodlands Health Ventures Fund VI LP (the "Essex Transaction").
**Response**:  This transaction was approved by the Mason-Chavenson special committee of GWG's board of directors.

c. **Transaction**: On December 31, 2019, GWG transferred $79 million to Beneficient in return for (i) 666,667 common units of Beneficient Company Group, LP, (ii) a Preferred Series A Subclass 1 Unit Account of Benficient Company Holdings, LP ("BCH") of $319 million, and (iii) the right to appoint a majority of the board of directors of Beneficient Management, LLC, which controls Beneficient (the "2019 Change of Control Transaction").[28]
**Response**:  This transaction was approved by the Mason-Chavenson special committee of GWG's board of directors.

d. **Transaction**:   The appointment of Peter Cangany to GWG's special committee on or about April 15, 2020.
**Response**:   Mr. Cangany was, at all relevant times for purposes of his service on a special committee of GWG's board of directors, an independent and disinterested director under relevant Delaware law and was determined by GWG, based on advice of counsel, to satisfy the SEC and NASDAQ independence requirements necessary to serve of GWG's audit committee. Further, upon his appointment to GWG's special committee, Mr. Cangany agreed to forgo any equity participation in ***Beneficient*** (such that his only equity participation was through GWG stock), and, upon information and belief, Mr. Cangany's qualification to serve on the special committee, including his independence and disinterestedness, was also reviewed by the relevant special committee counsel.

---

[28] *Id.*

e.  **Transaction**: On July 1, 2020, GWG entered into a Unit Purchase Agreement (the "UPA") whereby GWG agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH.[29]

    **Response**: The UPA was approved by a special committee of GWG's board of directors consisting of David Chavenson, Roy Bailey and Peter Cangany. This special committee was represented by the law firm of Gibson Dunn, and the valuation firm Murray Devine. This special committee met nineteen times in fulfilling its fiduciary obligations to GWG. Neither Mr. Bailey nor Mr. Chavenson ever served on Beneficient's board of directors.

f.  **Transaction**: On March 11, 2021, GWG filed the Disputed 8-K (as defined below).

    **Response**: Unlike Form 10-Ks, which are signed by all directors, Form 8-Ks are executed by a single member of management, as was the case with respect to the Disputed 8-K, as required under the federal securities laws. Further, as set forth more fully below in the response to allegation number 12, the parties directly involved in the events of March 2021 dispute the conclusions reached by the Investigations Committee regarding the Disputed 8-K, especially because those parties were advised by GWG's disclosure counsel at the time.

g.  **Transaction**: In November of 2021, in order to maximize the Debtors' investments in Beneficient by facilitating Beneficient's ability to operate under its valuable Kansas TEFFI trust banking charter, Beneficient and GWG consummated a series of transactions whereby GWG and Beneficient were de-linked, and GWG relinquished control over Beneficient (the "Decoupling Transaction",[30] and together with the 2019 LiquidTrust Loan, the 2019 Change of Control Transaction, and the UPA, the "Challenged Transactions").

---

[29] *See* GWGH 2020 10-K at p. 4-5.
[30] *See* GWGH 8-K, dated Dec. 3, 2021. *See also* GWGH 8-K, dated Nov. 15, 2021.

| | | |
|---|---|---|
| | | **Response**:  A majority of GWG's board that approved this transaction consisted of directors who did not have any direct equity interest or other equity participation in Beneficient.  Further, the Decoupling Transaction was a necessary and required step that allowed Beneficient to be fully operational under its trust charter, thus ***maximizing*** the value of GWG's assets. |
| 7 | Beneficient and Beneficient's CEO Heppner were the "controlling shareholder" of GWG.  *See, e.g.*, Standing Motion at ¶¶ 3-4, 17; Proposed Complaint at ¶¶ 150, 194, 198. | Beneficient and Beneficient's CEO Heppner are not, and never have been, a controlling shareholder of GWG.  They did not use a "controlling shareholder position" at GWG to transfer millions of dollars to Beneficient for inadequate consideration.[31]

As set forth in GWG's public filings, Beneficient's CEO Heppner was only ever deemed to beneficially own the 7.6% of GWG's common shares that was held by Beneficient Company Holdings, LP– far from a controlling position.[32]

All relevant transactions between Beneficient and GWG were not made by Beneficient or Beneficient's CEO Heppner as purported "controlling shareholder" and instead were approved by either boards of directors that were fully or a majority independent or special committees of independent directors acting with the guidance of independent legal and financial professionals, and aided by independent third-party valuations.

In 2018, when GWG's board was comprised entirely of directors who were independent of Beneficient, GWG made the independent initial decision to invest in Beneficient to "expand [the Debtors'] business to include a greater, more diversified portfolio of assets" through the execution of a master exchange agreement (the "MEA").[33]  Importantly, as part of that 2018 transaction Beneficient ***paid GWG $50 million in cash***, of which $25.7 million went out to GWG's shareholders, of which GWG's former CEO and his brother represented the overwhelming majority. |

---

[31] *See, e.g.*, Standing Motion at ¶ 2.
[32] *See, e.g.*, GWGH 2019 10-K at p. 87.  Beneficient's CEO Heppner, as chief executive officer of Beneficient, was attributed indirect beneficial ownership of Beneficient's ownership of GWG under relevant SEC guidance.  See Allegation 7 for additional information.  As further disclosed in GWG's filings, Beneficient's CEO Heppner also has a passive limited member interest in Altiverse Capital Markets, L.L.C., which holds, in addition to equity in Beneficient, certain GWG common shares contributed by Jon Sabes, the former CEO of GWG and Mr. Sabes' brother.
[33] GWGH 2017 10-K at p. 3.

In April 2019, as part of a transaction where the Sabes brothers sold their remaining interests in GWG, GWGH agreed to appoint persons nominated by Beneficient to the GWG board.[34]  At the time, board designees appointed by Paul Capital Advisers (or Paul Capital Adviser's designees), through proxy agreements, could approve or block the appointment of the majority of the board of Beneficient, not Beneficient's CEO Heppner.

Moreover, a special committee was formed to evaluate the buyout because GWG's former CEO was involved.  This special committee was made up of GWG directors Thomas Donahue, David Abramson, Shawn Gensch, Mark Schwartzman and Jeffery McGregor, all of whom were wholly independent of Beneficient. The committee was represented by attorneys McGuire Woods and financial adviser Houlihan Lokey.

Finally, in all instances, Beneficient's selling of a stake in itself to a related party required the approval of Beneficient's audit committee (consisting of independent directors), who had sole authority to recommend such a transaction to Beneficient's board of directors. Beneficient's CEO Heppner was never a member of Beneficient's audit committee.  If the audit committee determined to make a recommendation to undertake a transaction with GWG, it was then voted on by Beneficient's full board, for which Beneficient's CEO Heppner did not control the appointment of the majority of the members.  Accordingly, Beneficient's CEO Heppner did not control and could not have controlled whether Beneficient entered into any transaction with GWG.

The allegations in the Standing Motion and Proposed Complaint omit material background facts illustrating the diligence with which the former board members of GWG exercised their duties, and the reputation and integrity of such members, which included:

- Tom Hicks, Founder and Chairman of Hicks Holding and a 30 plus year private equity pioneer;

- Richard W. Fisher, former President and CEO of the Federal Reserve Bank of Dallas;

---

[34] *Id.*

|  |  |  |
|---|---|---|
|  |  | <ul><li>Dennis Lockhart, former President and CEO of the Federal Reserve Bank of Atlanta;</li><li>Bruce Schnitzer, former President and CEO of Marsh, Inc., the world's leading insurance broker and risk advisor with offices in 130 countries;</li><li>Pete Cangany, former partner of Ernst & Young and current chair of the Board of Trustees of Franklin College;</li><li>Michelle Caruso-Cabrera, CEO of MCC Productions and former chief international correspondent for CNBC;</li><li>David de Weese, General Partner of Paul Capital Advisors and former Chairman of the Board of Capacitor Sciences, Inc.;</li><li>David Chavenson, former Treasurer of Alon USA Energy Co., a preeminent downstream energy company and former Treasurer of Flowserve Corp, one of the largest suppliers of machinery in the energy industry;</li><li>Kathleen Mason, a consultant with the international advisory firm Third Bridge and former President and Chief Executive Officer of Tuesday Morning Corporation;</li><li>Roger Staubach, American Icon and real estate magnate;</li><li>Sheldon Stein, president and CEO of Southern Glazer's Wine & Spirits, the largest wine and spirits distributor in the United States and former Vice Chairman and Head of Southwest Investment Banking for Bank of America Merrill Lynch;</li><li>Bruce Zimmerman, former CEO and Chief Investment Officer of UTIMCO, the investment corporation overseeing investments for the University of Texas and Texas A&M University systems; and</li><li>David H. Glaser, former Chief Operating Officer of Bank of America Merrill Lynch's Global Corporate and Investment Bank.</li></ul> |

| | | |
|---|---|---|
| | | Further, MHT, not Beneficient, as counterparty to the purchase agreement with PCA for the initial formational transactions of Beneficient, was the party obligated to identify GWG as a potential investor in Beneficient with the help of Credit Suisse, and GWG's decision to consummate this transaction was made by GWG's board of directors at the time, which was comprised entirely of directors that were wholly independent of Beneficient. |
| 8 | Beneficient's CEO Heppner was improperly, and surreptitiously, paying related parties. *See, e.g.,* Standing Motion at ¶¶ 40, 45, 57, 63; Proposed Complaint at ¶¶ 111, 113, 114, 156, 158. | All of Beneficient's CEO Heppner's related-party connections and transactions were fully disclosed in public filings. Notwithstanding extensive Rule 2004 discovery, which includes multiple interviews with Heppner and a two-day deposition, the Committee is left to resort to the articles written by Alex Gladstone for the Wall Street Journal (WSJ) to support its allegations that Beneficient was improperly benefitting from related-party payments.[35] From the outset, all of Beneficient's CEO Heppner's connections, including his connections to HCLP Nominees, Beneficient's senior lender, have been properly and repeatedly disclosed in filings with the Securities & Exchange Commission, including (all emphasis added): <ul><li>GWGH Schedule 14C dated Dec. 3, 2018 at F-27 ("[Beneficient Capital Company, LLC] is the borrower of up to $146 million under Old Loan Agreements entered into December 23, 2005, and refinanced on September 1, 2017, ***with HCLP Nominees, L.L.C., a Delaware limited liability company affiliated with Beneficient Holdings, Inc.***");</li><li>GWGH 10-K dated July 9, 2019 at F-44 ("The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ('HCLP') and Beneficient Holdings, Inc. ('BHI', and together with HCLP, the 'Senior Lenders'), as lenders) and events of default. ***The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors***.");</li></ul> |

---

[35] *See* Standing Motion at ¶¶ 1-2.

- Exh. 99.4 to GWGH 10-K dated July 9, 2019 at 40 ( HCLP Nominees, L.L.C. ('HCLP Nominees'), is a Delaware limited liability company and is an indirect subsidiary of Highland Consolidated, L.P., the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries.");

- GWGH 10-K dated March 27, 2020 at 90 ("The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ('HCLP') and Beneficient Holdings, Inc. ('BHI', and together with HCLP, the 'Senior Lenders'), as lenders) and events of default. At the time Beneficient was consolidated, all existing senior loan obligations were held by HCLP. ***The Senior Lenders are directly or indirectly associated with Brad K. Heppner, who is Chairman of the Company's Board of Directors***.");

- GWGH 10-K dated Nov. 5, 2021 at F-47 ("HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ('Highland'). A long-standing lending and investment relationship of 25 years exists between Highland (and its affiliates or related parties), on the one hand, and certain trusts and entities held by such trusts that are controlled by Ben Founder ('Ben Founder Affiliates'), on the other. From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland or its affiliates, as applicable, both in cash and in kind. ***Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient.***");

For example, in GWG's 10-K dated July 9, 2019, GWG disclosed that on May 31, 2019, GWG Life entered into a promissory note with The LT-1 LiquidTrust, The LT-2 LiquidTrust, The LT-5 LiquidTrust, The LT-7 LiquidTrust, The LT-8 LiquidTrust and The LT-9 LiquidTrust (collectively, the "Borrowers") in the principal amount of $65,000,000 (the "Loan").[36] This 10-K also disclosed that

---

[36] GWGH 10-K dated July 9, 2019 at F-44.

"[t]he Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ('HCLP') and Beneficient Holdings, Inc. ('BHI', and together with HCLP, the 'Senior Lenders'), as lenders) and events of default. The Senior Lenders are directly or indirectly associated with [Beneficient's CEO Heppner], who is Chairman of the Company's Board of Directors. A special committee of the Board of Directors of the Company (the 'Special Committee') composed solely of independent and disinterested directors of the Company, together with the assistance of its independent legal advisors, reviewed, negotiated and approved the terms of the Loan."[37]

Further, Beneficient's payments to HCLP Nominees were similarly disclosed.  For example, GWG's 10-K dated Nov. 5, 2021 stated "[d]uring the years ended December 31, 2020 and 2019, GWG Holdings invested $130.2 million and $79.0 million, respectively, of cash into equity investments in Beneficient. During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest on the First and Second Lien Credit Agreements."[38]

Finally, Beneficient's ability to use funds invested by GWG into Beneficient to pay related-party debt was also disclosed.  For example, GWG's Form S-1 dated March 30, 2020 states that "[GWG] intend[s] to use the net proceeds from this offering to grow our alternative asset exposure, including through investments in Beneficient in the form of equity investments or loans, and to meet our other obligations, including debt obligations. ***Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to fund alternative asset financings, to repay indebtedness, including to related parties, and for general working capital purposes, including operating expenses***."[39]  All amounts and terms of related-party payments were fully disclosed in Beneficient's footnotes on its financial statements and the public filings of those financial statements.

In addition to the numerous fulsome disclosures made across multiple public filings, Beneficient's CEO Heppner cannot and does not authorize the payment of related-party transactions.  Beneficient's audit committee (consisting of independent directors), of which Beneficient's CEO Heppner is not and has never been a member, must first approve related-party transactions, and then recommend approval of such transactions for a vote of Beneficient's full board of directors.  Beneficient's CEO Heppner

---

[37] *Id.*; *see also* GWGH 10-K dated Nov. 5, 2021 ("HCLP is indirectly associated with Ben Founder.").
[38] GWGH 10-K dated Nov. 5, 2021 at F-66.
[39] Form S-1 dated March 30, 2020 at p. 9.

| | | |
|---|---|---|
| | | abstains from voting on these matters. All such payments are made pursuant to contracts that existed before GWG ever invested in Beneficient (and which were disclosed to GWG prior to its investment), and such contracts have been repeatedly audited. Further, these contracts have been vetted by both Beneficient's audit committee and Beneficient's internal control department, which is advised by Ernst & Young. |
| 9 | The HCLP Loan was not incurred for legitimate purposes or was otherwise suspect. *See, e.g.*, Standing Motion at ¶ 40; Proposed Complaint at ¶ 111. | The HCLP Nominees Loan was incurred for legitimate purposes, pre-dates GWG's investment in Beneficient, and was disclosed to GWG prior to GWG's first investment in Beneficient. This investment was made by a wholly independent and disinterested GWG board with no connections to Beneficient.<br><br>Specifically, in 2017, as part of a transaction with Paul Capital, proceeds were loaned by HCLP Nominees, L.L.C. to Beneficient Capital Company, L.L.C. ("BCC").[40]  This amount (and additional funds) ultimately was used by certain exchange trusts to acquire Beneficient common units that in turn were auctioned to GWG through a sale managed by MHT and advised by Credit Suisse.[41] The consideration from that auction was used to close the acquisition of alternative assets from Paul Capital that formed the initial foundation of Beneficient's operating business.[42]<br><br>In sum, the HCLP Nominees loan was used to acquire alternative assets that support Beneficient's operating business, and ***was a contractual requirement of the parties to the transaction***, including Paul Capital Advisors ("PCA"), who is represented by Kirkland & Ellis, LLP, under the relevant transaction documents. While PCA and Beneficient are currently involved in litigation related to certain matters arising from this transaction, PCA has never claimed that this loan is invalid in any way. David De Weese, a partner at PCA, sat on Beneficient's board during the relevant times related to the dispute between PCA and Beneficient<br><br>Finally, counsel to the Bondholder Committee, Akin Gump, did the initial legal work related to setting up the trust structure of HCLP Nominees. |
| 10 | Beneficient's business model is "entirely unrealized." *See* Standing Motion at ¶¶ 42, 45; | Beneficient is an operating business which has generated hundreds of millions of dollars in revenue. |

---

[40] *See* S-4 at 316.
[41] *Id.*
[42] *Id.*

| | | |
|---|---|---|
| | Proposed Complaint at ¶¶ 1, 5, 17, 138. | Beneficient is and has been executing its business plan to provide a unique suite of simple, rapid, and cost-effective liquidity solutions and other services for owners of "alternative assets" such as private equity and hedge fund interests.[43]   To date, Beneficient has financed transactions that delivered liquidity on approximately *$1.1 billion in net asset value* of alternative investment holdings across numerous sectors, geographies and investment types, including private equity and buyout funds, venture capital funds, feeder funds, and fund-of-funds.   This includes *$383 million in the fourth quarter of 2021 and first quarter of 2022* after the Decoupling Transaction, which was a necessary and required step for Beneficient to receive operational status under its valuable TEFFI trust charter in Kansas.[44]   Since Beneficient effectively launched its operations in September 2017, the investments financed by Beneficient have generated over *$440 million in internally generated cash flows* to Beneficient in the form of principal, interest, and fee payments.   And, as noted above, Beneficient is progressing towards a transaction to go public through a de-SPAC transaction in the first half of this year that implies a *$3.3 billion* enterprise value of Beneficient. |
| 11 | Beneficient relied solely on GWG to fund its operations.  *See, e.g*, Standing Motion at ¶ 2. | As discussed in the response to general allegation 10, since 2017, Beneficient realized over $440 million in internally generated cash flows from operating its business, or close to twice the net amount of cash invested by GWG over the same period. |
| 12 | The GWG Board authorized the filing of a Form 8-K with respect to the resignation of three directors in March of 2021 that failed to disclose a disagreement with management.  *See, e.g.*, Standing Motion at ¶¶ 15, 56, 69, 70-73; Proposed Complaint at ¶ 30, 31, 212, 238-239. | GWG's CEO Holland, acting on the advice of legal counsel, not the GWG Board, signed and filed the Form 8-K on March 11, 2021 (the "Disputed 8-K").[45]

As an initial matter, unlike Form 10-Ks, which are executed by the entire board, under SEC rules, only company management signs Form 8-Ks like the one at issue.  Importantly, the investment at the heart of the Disputed 8-K was for $14.8 million, which investment was redeemed in full, in cash, by Beneficient only months later to help facilitate GWG's then-existing liquidity needs.  In other words, every dollar related to the matters underlying the Disputed 8-K was paid back in cash by GWG within months.  Accordingly, GWG suffered no economic harm.  And unlike Form 10-Ks, which are executed |

---

[43] *See Press Release, The Beneficient Company and Avalon Acquisition Inc. Announce the Satisfaction of a Closing Condition Relating to Their Business Combination Agreement*, which is publicly available at https://www.trustben.com/insights/the-beneficient-company-and-avalon-acquisition-inc-announce-the-satisfaction-of-a-closing-condition-relating-to-their-business-combination-agreement/ (the "Press Release") at p. 5.  To briefly describe Beneficient's business, if the holder of an illiquid interest in an alternative investment such as a private equity investment wishes to monetize its interest in that asset, Beneficient provides a variety of products to allow the holder to quickly and cost-effectively convert its illiquid asset into cash, equity, or debt securities. "Alternative investments" also may include interests in venture capital, fund of funds, non-traded REITs, feeder funds, private debt, and other illiquid assets.

[44] Press Release at p. 2. The Proposed Complaint also falsely alleged that Beneficient's valuable TEFFI trust charter is "conditional."  Proposed Complaint at ¶ 165. However, the charter is not conditional and has not been for months.

[45] *See* GWGH 8-K dated Dec. 2, 2022.

by the entire board, under SEC rules and regulations, only company management execute Form 8-Ks like the one at issue.  Any insinuation that the GWG Board, or any member of the GWG Board, was responsible for the filing of the Disputed 8-K is both factually and legally wrong.

Moreover, the Disputed 8-K was prepared and ***filed on the advice of GWG's disclosure counsel***, who was present at the board meeting which purportedly led to the resignation of the relevant directors.[46] Specifically, in a letter to the Board and Management of GWG addressing the amended 8-K filed by GWG on November 14, 2022, which "corrected" the Disputed 8-K, Murray Holland, former CEO of GWG, stated:

> "[M]ost importantly, the Amended 8-K makes no reference to the written guidance I received from disclosure counsel showing that I had no contemporaneous awareness of a disclosable disagreement related to the resignations of the Special Committee members. On March 5, 2021, a day after the Special Meeting, but prior to his resignation, I emailed former Director Roy Bailey with a notification of proposed funding of Ben in accordance with the resigning Directors' requested funding terms using a senior security. This notification of proposed funding was designed specifically to address the requests of the Special Committee so there would be no disagreement. The notification of proposed funding, which Ben determined to accept, was based, in part, on an email I received two days earlier from the Special Committee's counsel on March 3rd making clear that the Special Committee wanted a senior security in exchange for $14.8 million in funding to Ben. I believed these terms addressed the Special Committee's requests regarding the proposed transaction. My March 5th email to Mr. Bailey made clear this included the senior security Mr. Bailey identified as a priority. Mr. Bailey did not respond to my email.

> The next day the Special Committee Directors resigned without providing any indication that a disagreement still existed in their respective resignation letters. After consulting with disclosure counsel, I emailed all three resigning Directors on March 9th and notified them that GWG would pursue a funding transaction with Ben that addressed their requests and also provided them an opportunity to review and comment on GWG' s proposed language for the Original 8-K, which stated their resignations were 'not due to any disagreement

---

[46] *See Id.*

with the Company.' The response I received from Dan Fine on behalf of all three resigning Special Committee Directors was simply that their 'resignations speak for themselves.'

Based on all of the above, and at the request of management, the Company's disclosure counsel, Mayer Brown, provided written guidance that it was reasonable to conclude that the resignations were not the result of a disagreement with the Company regarding its operations, policies, or practices. Mayer Brown based its written guidance on a full understanding of all the material facts described above. Mayer Brown: 1) was present at the March 4, 2021 Special Meeting where Mr. Bailey expressed his views about the proposed Ben transaction, 2) heard first-hand the basis articulated by the Board for the dissolution of the Special Committee, 3) received the March 3rd funding requests from the Special Committee's legal counsel, 4) received the March 5th funding proposal I provided to Mr. Bailey the day prior to his resignation that addressed Mr. Bailey's requests, 5) received the resignation letters from each of the resigning Directors, and 6) received the March 9th communication to the resigning Directors, including Mr. Fine's response on behalf of the Directors that the 'resignations speak for themselves' and where they declined to comment on the proposed disclosure language the Company filed in the Original 8-K."[47]

The investigation of this event does not appear to have included depositions of all the relevant individuals.  The depositions of two of the three resigning directors were continued without them being subject to cross-examination, remain open even today and have not been rescheduled.   There has also been no evidence presented to the Bankruptcy Court that the Disputed 8-K was filed by GWG management *following its receipt of the advice of GWG's disclosure counsel,* and in fact, the Bankruptcy Court has not even seen the Disputed 8-K itself.[48]

Notwithstanding the more elevated terms that have been used in the cases, this ultimately is a commercial dispute about two events that are separated by nearly 16 months.

---

[47] Item 17.2 to GWGH Form 8-K dated Dec. 2, 2022.
[48] See H'rg Transc Nov. 14, 2022 at 32:12-32:17 ("[The Court:]  So far, I have not even seen the actual original 8-K or the amended 8-K. And that's fine. But I'm not going to reach conclusions about individuals who are being accused of wrongdoing until they have an opportunity to come in and defend themselves.").

| | | |
|---|---|---|
| | | In addition, the Proposed Complaint references the resignations of Messrs. Stein, Zimmerman and Glazer from GWG's board of directors.  As set forth in GWG's 8-K regarding the resignations of these directors, these directors' resignations were not due to any disagreement with GWG.[49] |
| 13 | Beneficient was never close to receiving a trust charter from the state of Texas.  *See, e.g.,* Standing Motion at ¶ 20; Proposed Complaint at ¶ 160. | Beneficient had a good faith belief, based on repeated advice of counsel, that it would obtain a trust charter on a timely basis from the State of Texas, and expended significant effort and resources seeking to obtain that charter because obtaining a trust charter is a key component of Beneficient's business plan.  However, the Proposed Complaint misleadingly focuses solely on the effort to obtain a trust charter from the state of Texas and omits the material fact that ***Beneficient satisfied this key component of its business plan when it received a trust charter from the State of Kansas***.  Specifically, Beneficient has partnered with the State of Kansas to operate the very first pilot trust bank in its industry under the supervision of the Kansas legislature.  Beneficient worked with the Kansas legislature, which drafted legislation to address the specific needs of the industry, and that will provide Beneficient the opportunity to flourish after its go-public transaction takes place.  Accordingly, Beneficient now has the charter it needs. |
| 14 | Decoupling from GWG did not facilitate Beneficient's receipt of its Kansas trust charter.  *See* Proposed Complaint at 162. | The Decoupling Transaction of Beneficient and GWG was a necessary and required step to facilitate Beneficient's ability to be operational under its TEFFI trust charter from the State of Kansas. <br><br> For example, the Kansas Office of the State Banking Commissioner ("OSBC") raised questions about GWG's role with Beneficient even before the TEFFI bill passed the Kansas Legislature.  Specifically, on March 30, 2021, in testimony to the Kansas Senate Financial Institutions and Insurance Committee, Commissioner Herndon of the OSBC noted his concern with GWG's affiliation with Beneficient and cited GWG's poor financial ratings reports as a reason to prevent passage of the legislation.[50]  Subsequently, the OSBC began discussions with Beneficient regarding GWG, raising numerous questions about the relationship between GWG and Beneficient, and specifically focusing on Beneficient's status as a consolidated subsidiary of GWG and GWG's right to appoint directors to Beneficient's board. |

[49] *See* GWGH 8-K dated Oct. 21, 2019 ("As a result of discussions among members of the Board of Directors (the 'Board') of GWG Holdings, Inc. (the 'Company'), and based in part on a determination that a Board comprised of fewer directors would facilitate that Board's ability to oversee future Company activities in an efficient and effective manner, Messrs. Richard W. Fisher, David H. Glaser, Sheldon I. Stein and Bruce E. Zimmerman resigned from the Board and the size of the Board was reduced from 14 to ten directors.").

[50] *See* March 30, 2021 Herndon Testimony (https://www.youtube.com/watch?v=Og2nsQavHIk) (key testimony begins at approximately the 5:00 mark of the video).

In the summer of 2021, the OSBC continued to raise concerns regarding Beneficient's relationship with GWG, again specifically highlighting Beneficient's then-status as a "consolidated subsidiary" of GWG as an ongoing problem.  While the OSBC indicated it understood that the Decoupling Transaction was planned, it raised the possibility of additional regulatory actions should it not occur.

Later that summer, Beneficient and GWG entered into a non-binding term sheet in connection with the Decoupling Transaction and informed the OSBC of the same.  Over the following months, the OSBC had numerous conversations with Beneficient regarding its decoupling from GWG, culminating in a letter to Beneficient from Commissioner Herndon on November 2, 2021 in which he listed the outstanding items that, in his opinion, delayed the promulgation of the TEFFI regulations needed to issue Beneficient a final operational charter.  The OSBC specifically referenced "a divestment by GWG Holdings of Beneficient and removal of board appointment rights," stating that "[t]o date, no formal documentation on the change of this relationship, such as public filings from GWG Holdings, has been provided," and requesting Beneficient "[p]rovide formal documentation showing [the] change in relationship." Based in substantial part on the delay in the Decoupling Transaction, the OSBC indicated it intended to delay issuing Beneficient a full operational charter for an additional six months, which would have been until the end of June 2022.

Correspondence with the general counsel for the OSBC (the "General Counsel") confirmed the seriousness of the OSBC's concern that the decoupling transaction occur before it would issue a full charter to Beneficient. Specifically, the General Counsel stated she understood that the issuance of Beneficient's operational charter was delayed because "another priority [of the OSBC] is separating out the TEFFI from GWG Holdings."  The OSBC once again reiterated that the decoupling transaction was a requirement for the issuance of an operational charter to Beneficient during a meeting between officials from the OSBC and  Beneficient in Dallas on November 10, 2021.

The decoupling transaction was consummated shortly thereafter and, following such consummation, Commissioner Herndon confirmed the vital link between the Decoupling Transaction and the issuance of a final charter to Beneficient in his testimony to the Joint Committee on Fiduciary Financial Institutions Oversight, in which he testified that:

> **A significant issue was the affiliation between Beneficient and GWG Holdings**, a publicly traded company that we determined from our due diligence to be facing

| | | |
|---|---|---|
| | | potentially severe adverse actions by the Securities and Exchange Commission and/or NASDAQ. We first became aware of these issues last spring and were assured this issue would resolve itself through severance of the relationship between Beneficient and GWG. That action--severing the relationship—was completed November 15, 2021, pursuant to actions of each company's board of directors and GWG's subsequent filing of a Form 8-K establishing a November 29th effective date. **Severing the relationship between Beneficient and GWG has overcome a major impediment to the application process.[51]** <br><br> Notably, ***Beneficient received final approval of its TEFFI trust charter just over a month after it decoupled with GWG,*** further confirming that the decoupling had been a major impediment to the final approval of the charter. <br><br> Finally, on December 1, 2022, in testimony made to the Kansas legislature Commissioner Herndon stated that "[t]here are some other influences and matters [the Office of the State Banking Commission (the "OSBC")] is monitoring regarding business connections and interlocking management between [Beneficient] and a former affiliate GWG Holdings, Inc.  OSBC understands that the business relationship between [Beneficient] and GWG has severed but a bankruptcy filing by GWG and an ongoing Securities and Exchange Commission [sic] regarding GWG's business are being followed by OSBC and will be acted upon if [Beneficient] or its principal are adversely impacted."[52] |
| 15 | Beneficient's CEO Heppner was overcompensated and/or misused company property for personal purposes.  *See, e.g.,* Standing Motion at ¶¶ 11, 120; Proposed Complaint at ¶ 14, 109, 111, 113. | Beneficient's CEO Heppner's compensation was within reasonable ranges of peer compensation for similar positions at similarly situated companies. <br><br> Beneficient's CEO Heppner's compensation was evaluated by an independent, third-party compensation report commissioned by the Compensation Committee of Beneficient and prepared by Grant Thornton.  Beneficient's CEO Heppner was not, and has never been, a member of this committee.  Further, ongoing evaluation by Beneficient's current compensation consultant, a global accounting firm, re-confirms the position that Beneficient's CEO Heppner's compensation is within a reasonable range of peer compensation for similar positions at similarly situated companies. |

---

[51] *See* December 7, 2021 Testimony to Join Committee on Fiduciary Financial Institutions Oversight.
[52] Testimony to Joint Committee on Technology Enabled Fiduciary Financial Institutions dated Dec. 1, 2022.

With respect to air travel, the present value of the estimated costs of private travel and other services received by Beneficient's CEO Heppner were determined by third party valuation agents, and Beneficient's CEO Heppner's preferred equity holdings in Beneficient were reduced by such value.[53] Thus, Beneficient's CEO Heppner actually paid for these related-party costs out of his own holdings. Beneficient had a contractual requirement regarding payments for the private use of a private aircraft by Beneficient's CEO Heppner that pre-dated the initial GWG transaction and was disclosed to GWG. Further, the use of this aircraft was available to all Beneficient board members, and board members' families, upon the same terms.

With respect to the ranch owned by affiliates of Beneficient's CEO Heppner, Beneficient transferred the ranch to those affiliates in 2017 pursuant to contractual requirements with a third party as part of Beneficient's formational transactions—transfers predating any investment by a third party and, most notably, predating GWG's investment in Ben by almost two years. Accordingly, GWG knew that the ranch was not a Beneficient asset when it invested in Beneficient.

Indeed, as of 2017, Beneficient was a closely held company—akin to a family office in certain respects—that possessed a variety of operating and investment assets, including the ranch. The ranch was originally purchased in 2003, roughly 15 years prior to GWG's investment in Beneficient.

As Beneficient evolved and started to attract third-party investors, it was necessary to separate the operating and investment assets. Beneficient's third-party investors required and agreed to such a separation. Thus, various assets and investments that were unrelated to Beneficient's business model— including the ranch—were distributed to entities associated with Beneficient's CEO Heppner, but not to Beneficient's CEO Heppner himself. GWG and other investors were made aware that these assets, which were unrelated to Beneficient's operating business, were removed from Beneficient's balance sheet *before* they invested in Beneficient. There was an agreement in place that none of the value of those assets would be represented in the valuation attributable to Beneficient at the time PCA and GWG invested.

---

[53] *See, e.g.*, Form S-4 at p. 343 ("Each class of the Company's equity was then recorded at its fair value as set forth in valuation analysis, with the capital account balances of the preferred equity held by Ben's founders, including BHI, reduced for, among other things, (i) the balance of outstanding debt of Ben, including related party debt, and (ii) any decrease in the value of Ben, up to the entire founders' preferred equity amount outstanding, including decreases arising from the present value of the estimated costs of the related party contracts, including estimated costs related to private travel under the terms of the Bradley Capital Agreement.").

| | | |
|---|---|---|
| 16 | Ben had a "revolving door of auditors." *See, e.g.,* Standing Motion at ¶¶ 15, 73; Proposed Complaint at ¶ 22, 178, 179, 182, 186. | The Bondholder Committee attempts to create smoke from the changes in Beneficient's auditors, but the simple fact is that these changes were driven by evolving business needs. Specifically:<br><br>• Beneficient switched from Whitley Penn to Deloitte, because, as a "Big 4 Firm," Deloitte had the expertise needed in light of Beneficient's then-current plans regarding a potential underwritten public listing;<br>• Deloitte was later replaced with Whitley Penn, as the Beneficient and GWG relationship required a group auditor and Deloitte elected not to seek appointment as GWG's auditor;<br>• Whitley Penn later indicated to GWG that it was contemplating moving their practice away from public company audits, particularly in the financial services industry, resulting in the retention of Grant Thornton as group auditor for both of GWG and Beneficient;<br>• Grant Thornton elected not to stand for re-appointment at GWG and disengaged as Beneficient's auditor in connection with such election.<br><br>In no case did any auditor indicate to GWG that the auditor had any disagreements with GWG management at the time of any such resignation or decision not to stand for re-appointment.[54] These changes in auditors were primarily a matter of evolving business needs, and any insinuation to the contrary is demonstrably false.[55] |
| 17 | GWG's intentionally and inappropriately used improper accounting methods upon | Beneficient has always endeavored to prepare its financial statements and similar documents in an appropriate manner. These efforts include using technical accounting consultants from some of the |

---

[54] *See, e.g.*, Exh. 16.1 to GWGH Form 8-K dated Sept. 23, 2020 (Ltr. From Whitley Penn) (agreeing with the Sept. 23, 2020 Form 8-K's statement that "[t]he Audit Committee's decision to replace Whitley Penn] was not the result of a disagreement between Whitley Penn and the Company on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure and the Company thanks Whitley Penn for its professionalism and quality of services rendered over the past year."); Exh. 16.1 to GWGH Form 8-K dated Jan 6, 2022 (Ltr. From Grant Thornton) (agreeing with the Jan. 6, 2022 Form 8-K's statement that "[d]uring the year ended December 31, 2020 and through January 6, 2022, there were (i) no disagreements between the Company and Grant Thornton on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure which, if not resolved to Grant Thornton's satisfaction, would have caused Grant Thornton to make reference to the subject matter of the disagreement in connection with its report for such year and (ii) no 'reportable events' as defined in Item 304(a)(1)(v) of Regulation S-K for such year and through January 6, 2022, except for the two material weaknesses in the Company's internal control over financial reporting as reported in the Company's Annual Report on Form 10-K for the year ended December 31, 2020.").

[55] *See id.*

| | | |
|---|---|---|
| | consolidating Beneficient. *See* Proposed Complaint at ¶¶ 24, 185. | nation's largest accounting advisory practices to advise on the application of accounting standards in situations that involve complex transactions or those that require a high level of judgment.<br><br>Through discussions between the SEC's Office of Chief Accountant ("OCA") and GWG during 2021, Beneficient and its then-current auditor Grant Thornton (which had previously concurred with management that its position on these accounting matters was reasonable) were informed that the OCA believed that Beneficient should be accounting for the firm's loans to certain charitable trusts as consolidated subsidiaries, not as unaffiliated trusts, in its financial statements.  OCA provided this guidance because GWG proactively reached out to the SEC for answers to certain complicated accounting questions.<br><br>As a result of the OCA's guidance, both GWG and Beneficient amended their accounting practices accordingly.  Importantly, this resulted in only a *de minimus* net effect on GWG's shareholders as, while the consolidation of the charitable trusts impacted the presentation of GWG's and Beneficient's financial statements, it did not materially impact any of the assets, liabilities, revenues or expenses attributable to any of Ben's equity holders, including GWG. |
| 18 | Beneficient and Beneficient's CEO Heppner manipulated GWG's Debt-Coverage-Ratio for improper purposes. *See* Proposed Complaint at ¶¶ 12, 175-76. | As disclosed in GWG's public filings, the indenture that governed GWG's L Bonds prohibited GWG from incurring debt in an amount greater than 90% of its assets.[56]  This debt coverage ratio ("DCR") was designed to provide some assurance to the holders of the L Bonds that the value of GWG's total assets exceeded its total interest-bearing obligations.  In early 2018, GWG, under the then sitting board and management wholly unaffiliated with Beneficient, solicited and received approval from the L Bond holders to amend the DCR such that all assets that were reflected on the GAAP balance sheet of GWG would be included in the assets in the DCR calculation.  On information and belief, this amendment was solicited to ensure that the anticipated investments in Beneficient securities would be included in the calculation, as the prior definition did not include assets other than the life portfolio and cash.[57]  This is the definition GWG used to calculate the DCR beginning with relevant filings in early 2018. |

[56] *See, e.g.,* GWG 424B1 Prospectus dated December 12, 2017 at 15 ("Under the indenture governing the L Bonds, the maximum amount of L Bonds we may issue at any time is limited to an amount such that our debt coverage ratio does not exceed 90%."); GWG 424B1 Prospectus dated May 11, 2019 at 14 ("Our L Bonds borrowing covenants require us to maintain a Debt Coverage Ratio of less than 90%.").

[57] *Compare* GWG 424B1 Prospectus dated December 12, 2017 at 8 ("The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money (including the L Bonds), over (B)the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts.") *with* GWG 424B1 Prospectus dated March 3, 2018 ("The indenture defines the debt coverage ratio as a percentage calculated by the ratio of (A) obligations owing by us and our subsidiaries on all outstanding debt for borrowed money

As a result of a series of transactions culminating on December 31, 2019, GWG obtained the right to appoint a majority of the Board of Directors of Beneficient, and was thus required by GAAP to consolidate Beneficient in its GAAP financial statements because GWG now had a controlling financial interest in Beneficient.  Under the above-discussed amendment, the assets and indebtedness of Ben appearing on the face of GWG's consolidated GAAP financial statements would have been included in the DCR calculation, even though GWG would not have been liable for Ben's indebtedness or able to use Ben's assets to satisfy GWG's indebtedness.  Accordingly, just as in March of 2018, GWG solicited and received approval for another amendment to the DCR with the purpose of aligning the calculation with the economic reality in light of the required GAAP presentation for GWG to consolidated Beneficient for financial reporting purposes.

As a result of the amendment, which was effective on December 31, 2019, GWG's DCR calculation would exclude the indebtedness and assets of Beneficient, including those that would otherwise appear on the face of GWG's GAAP financial statements.[58]  Thus, under this amendment, the assets included in the DCR were those assets owned by GWG that it could use to satisfy its indebtedness.  Likewise, the indebtedness included in the DCR was only the indebtedness of GWG, and not the indebtedness of Beneficient.  In addition to these changes, the amendment also excluded any debt that could be paid, at GWG's option, in GWG's equity, as that indebtedness would no longer place a burden on GWG's assets.

Had GWG not amended the DCR, all of Beneficient's assets, including over $2 billion of goodwill and hundreds of millions of dollars of other Beneficient receivables, would have been included in the calculation, even though GWG did not have the ability to use those assets to satisfy GWG's indebtedness.  Indeed, if no amendment had occurred, the DCR as of December 31, 2019 through September 30, 2021 would have been approximately between 23%-30% lower than the reported DCR after the amendment for the same period, making clear that the most effective way to manage the DCR for improper purposes would have been to simply leave the calculation as the prior, wholly unaffiliated

---

(including the L Bonds), over (B) the net present asset value of all life insurance assets we own, directly or indirectly, plus any cash held in our accounts, *plus, without duplication, the value of all other assets of the Company as reflected on our most recently available balance sheet prepared in accordance with GAAP*.") (emphasis added).

[58] *See* GWG 424B1 Prospectus dated December 18, 2019 at 26 ("[O]ur Debt Coverage Ratio is calculated in relation to the interest rate on all of our debt financing, exclusive of our Seller Trust L Bonds.").

| | | Board of GWG had left it following the initial amendment.  Accordingly, the DCR definition was not amended to manipulate the calculation or to manage the DCR for improper purposes, but rather to provide a more accurate calculation of GWG's economic position in light of the required GAAP presentation. |
|---|---|---|