**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| GWG Holdings, Inc., <u>et al.</u>,[1] | : | Case No. 22-90032 (MI) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

**OBJECTION OF BRAD K. HEPPNER TO MOTION OF OFFICIAL COMMITTEE
OF BONDHOLDERS OF GWG HOLDINGS INC., <u>ET AL.</u>, FOR STANDING
TO PROSECUTE ESTATE CAUSES OF ACTION ON BEHALF OF DEBTORS'
ESTATES AND JOINDER IN OBJECTION OF BENEFICENT COMPANY
HOLDINGS, L.P. AND THE BENEFICIENT COMPANY GROUP, L.P.**

---

[1]   The debtors in these chapter 11 cases (the "**Debtors**"), along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.     PRELIMINARY STATEMENT ........................................................................1

II.    ARGUMENT ................................................................................................8

    A.    COMMITTEE HAS NOT SHOWN BENEFIT TO ESTATES TO WARRANT DERIVATIVE STANDING ........................................................................8

    B.    VIRTUALLY EVERY COUNT IN PROPOSED COMPLAINT FAILS BECAUSE BENEFICIENT WAS SOLVENT AT ALL RELEVANT TIMES ...........................................9

    C.    GWG'S THESIS TO INVEST IN BENEFICIENT THROUGH L BOND PROCEEDS WAS FULLY DISCLOSED ........................................................................13

    D.    HEPPNER IS NOT A "CONTROLLING SHAREHOLDER" OF GWG HOLDINGS AND DID NOT CONTROL GWG HOLDINGS' OR BENEFICIENT'S BOARDS ...............17

    E.    EACH INVESTMENT WAS REVIEWED AND APPROVED BY INDEPENDENT FIDUCIARIES ........................................................................19

    F.    HEPPNER DID NOT DISSOLVE SO-CALLED "THIRD SPECIAL COMMITTEE" FOR "PERFORMING ITS FIDUCIARY DUTIES" ...........................................23

    G.    MARCH 2021 8-K DOES NOT SUPPORT VIABLE CLAIMS AGAINST HEPPNER ...........26

    H.    THERE IS NOTHING INAPPROPRIATE OR FRAUDULENT ABOUT HEPPNER'S TRANSACTIONS WITH BENEFICIENT ...........................................29

CONCLUSION ........................................................................31

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

Bank of Am. Nat. Trust and Sav. Ass'n v. 203 North La Salle P'ship,
    526 U.S. 434 (1999) .................................................................................................... 9, 10

Benihana of Tokyo, Inc. v. Benihana, Inc.,
    906 A.2d 114 (Del. 2006) ................................................................................................ 22

In re Bateman,
    Nos. 10-06206-8-RDD, 11-00397-8-RDD, 2012 WL 3061181 (Bankr. E.D.N.C. July
    26, 2012) ....................................................................................................................... 12

In re Boston Generating, LLC,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) ........................................................................... 9

Cumming on behalf of New Senior Inv. Grp., Inc. v. Edens,
    No. 13007-VCS, 2018 WL 992877 (Del. Ch. Feb. 20, 2018) ................................. 23

In re Crimson Expl. Inc. S'holder Litig.,
    No. 8541–VCP, 2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ................................. 23

In re Ezcorp Inc. Consulting Agreement Deriv. Litig.,
    C.A. No. 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) ............................ 8

In re Hydrogen L.L.C.,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ........................................................................ 18

In re iPCS, Inc.,
    297 B.R. 283 (Bankr. N.D. Ga. 2003) ........................................................................ 8

In re Iridium Operating LLC,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................................................ 10

In re Just Energy Group, Inc., et al.,
    No. 21-4399 (DRJ) (Bankr. S.D. Tex. June 14, 2022) .......................................... 13

In re Nanodynamics, Inc.,
    474 B.R. 422 (Bankr. W.D.N.Y. 2012) ...................................................................... 12

In re Resorts Int'l S'holders Litig. Appeals,
    570 A.2d 259 (Del. 1990) ............................................................................................ 22

In re Resorts Int'l S'holders Litig.,
    Nos. 9470, 8605, 1988 WL 92749 (Del. Ch. Sept. 7, 1988) ................................. 22

In re Sabine Oil & Gas Corp.,
    547 B.R. 503 (Bankr. S.D.N.Y. 2016) ........................................................................ 8

In re STN Enters.,
    779 F.2d 901 (2d Cir. 1985) ........................................................................................ 8

In re Trinsum Grp., Inc.,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ........................................................................ 18

In re W. Nat. Corp. S'holders Litig.,
    No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ........................................................ 8

Louisiana World Exposition v. Fed. Ins. Co.,
    864 F.2d 1147 (5th Cir. 1989) ........................................................................................ 8

New Senior Inv. Grp., Inc. v. Edens,
    No. 13007-VCS, 2018 WL 992877 (Del. Ch. Feb. 20, 2018) .............................................. 22

VFB LLC v. Campbell Soup Co.,
    482 F.3d 624 (3d. Cir. 2007) .......................................................................................... 10

**RULES AND REGULATIONS**

17 C.F.R. § 240.13a-14(a) ................................................................................................. 6

**TREATISES**

R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business
    Organizations, § 4.16 (4th ed. 2023) ............................................................................. 22

**OTHER AUTHORITIES**

Press Release, SEC, "SEC Charges HP Inc. With Disclosure Violations and Control Failures"
    (Sept. 30, 2020) ........................................................................................................... 27

Report of the Joint Committee on Fiduciary Financial Institutions Oversight to the 2023 Kansas
    Legislature p. 4 (Dec. 1, 2022) ...................................................................................... 2

SEC Release No. 10868, Order Instituting Cease-And-Desist Proceedings, In the Matter of HP Inc. (Sept.
    30, 2020) ..................................................................................................................... 27

Brad K. Heppner, in his individual capacity (hereinafter, "**Heppner**"), objects to the Motion Of Official Committee Of Bondholders Of GWG Holdings Inc., et al., For Standing To Prosecute Causes Of Action On Behalf Of Debtors' Estates [ECF No. 1250] (the "**Standing Motion**") as set forth in the proposed complaint attached thereto [ECF No. 1250-1] (the "**Proposed Complaint**");[1] joins in the objection to the Standing Motion submitted by Beneficient Company Holdings, L.P. ("**BCH**") and The Beneficient Company Group, L.P. ("**BCG**," and with BCH, "**Beneficient**") [ECF No. 1451]; and respectfully represents as follows.

## I.      PRELIMINARY STATEMENT

1.      The Committee fails the ultimate test for derivative standing:  the prosecution of its Proposed Complaint promises only to deplete value and impair creditors' recoveries.  The Committee asks the Court to force the Debtors to abandon their most valuable asset—the investment in Beneficient—for a litigation predicated on rhetoric and devoid of merit.  Even the Debtors' Chief Restructuring Officer understands that the benefit to the estates of structuring a chapter 11 plan around Beneficient outweighs the dim prospect for recovery from a scorched-earth litigation option[2] and has engaged with Beneficient and Heppner in mediation to try and avoid it.[3]

---

[1]      Capitalized terms not defined herein have the meanings ascribed to them in the Official Committee Of Bondholders' [Proposed] Adversary Complaint [ECF No. 1250-1] (the "**Proposed Complaint**").

[2]      Tr., Hr'g Dec. 1, 2022, at 23:17-22 ("With Beneficient, there's an enormously long-tailed option. It's the only asset that has the potential to generate full recoveries for our L Bond holders and prospectively for our existing preferred and common stockholders"); ECF No. 1346 (Statement Of the Independent Committees In Support Of Temporarily Continuing Seal) (Jan. 13, 2023), at ¶ 4 ("It cannot be overstated that Ben is potentially the largest source of recovery for GWG's creditors").

[3]      ECF No. 1428 (Debtors' Fifth Motion To (I) Extend the Debtors' Exclusivity Periods To Solicit Plan Acceptances And (II) Granted Related Relief) (Feb. 13, 2023), at ¶ 17 ("[W]ith the assistance of the Mediator, the Debtors and the Investigations Committee pursued, at that initial [Mediation] session and in subsequent one-on-one negotiations that have continued into February 2023, a resolution of the Estates' claims against Beneficient and related parties as the potential cornerstone

2.      Though just in its early phases, the proposed lawsuit already has caused significant and palpable harm.  Among other things, the press associated with the Proposed Complaint has perpetuated its false and defamatory narrative and led one strategic investor to put its investment in the special-purpose-acquisition-company ("**SPAC**") transaction with Avalon Acquisition Inc. (NASDAQ: AVAC) ("**Avalon**") on hold; there are various state regulatory agencies, such as those associated with the State of Kansas, _e.g._, the Office of the State Bank Commissioner ("**OSBC**"), that are monitoring the bankruptcy cases closely;[4] and, at least one legislator is relying on the Committee's libelous allegations to introduce legislation that would harm Beneficient.[5]  Simply put, if the Committee is allowed to proceed with its Proposed Complaint, the casualties surely will include the estates, their creditors, and any prospect for real recoveries in these cases.

3.      Turning to the Proposed Complaint's lack of merit, the Committee predicates each count on the made-for-litigation theory that Beneficient was insolvent when GWG Holdings made

---

of a plan.  The Debtors remain willing to continue with the Mediation in hopes of reaching an agreement, as well as global consensus, and avoiding protracted, costly litigation.").

[4]      See Report of the Joint Committee on Fiduciary Financial Institutions Oversight to the 2023 Kansas Legislature p. 4 (Dec. 1, 2022), available at http://www.kslegresearch.org/KLRD-web/Publications/CommitteeReports/2022CommitteeReports/Fiduciary-Financial-Institutions-Oversight-report-to-2023-Legislature.pdf ("The [Bank] Commissioner also indicated that the OSBC continues to monitor business connections and interlocking management between Beneficient and a former affiliate, GWG Holdings, Inc.  The OSBC is following … [a] bankruptcy filing, which will be acted upon if Beneficient or its principal are adversely impacted.").  The principal referred to by the Bank Commissioner is Heppner, and the expected action by the OSBC would adversely impact Beneficient and Heppner.

[5]      See Senate Bill No. 199 (By Senator Holland) (Session of 2023) ("An Act concerning financial institutions; relating to the technology enabled fiduciary financial institutions act; authorizing the state banking board to deny, suspend or revoke the charter of a fiduciary financial institution in certain circumstances; providing procedures therefor; requiring fiduciary financial institutions to purchase a surety bond; establishing a civil money penalty for violations").  Senator Holland also has raised concern that the overzealous Committee could pursue claims against the State of Kansas.  While any such claim would be devoid of merit—especially given that no funds originating at GWG Holdings were ever, or will ever be transferred by Beneficient to the State of Kansas—this is but one example of the kind of trouble that the Proposed Complaint has stirred up for Beneficient and, by extension, GWG Holdings.

its investments in the company and that Beneficient's Chairman, Heppner, orchestrated the investments.  But, Beneficient's solvency was and is established by far superior indicators, e.g., contemporaneous valuations performed by reputable firms and actual, third-party transactions.  At least two transactions negotiated at arm's length have validated Heppner's initial investment thesis, and they bookend the period covered by the Proposed Complaint.  The first occurred in December 2018, when GWG Holdings, which had no affiliation with Heppner or Beneficient, decided to invest in Beneficient to "expand [the Debtors'] business to include a greater, more diversified portfolio of assets."[6]  The second is the Avalon SPAC transaction that implies the Debtors' interest in Beneficient is worth $1.4 billion.[7]  Because Beneficient was solvent at all relevant times, GWG Holdings received reasonably equivalent value in exchange for each of the (fully-disclosed) transfers it made to Beneficient, defeating not only the fraudulent transfer claims but also those alleging breach of fiduciary duty.

4.    The Proposed Complaint also suffers from various inaccuracies, substituting shock and hyperbole for substance.  As the Committee would have it, "the mastermind" Heppner teamed up with highly successful, and truly independent individuals, including two former presidents of Federal Reserve Banks, to perpetuate a "Ponzi scheme" involving the sale of L Bonds.  The critical details of how these individuals defrauded investors or converted assets are glaringly absent from the Proposed Complaint.  Note, the Debtors' Chief Restructuring Officer considers allegations about a Ponzi scheme to be inaccurate and has satisfied himself after extensive diligence that

---

[6]    GWG Holdings Inc., 2017 Annual Report (Form 10-K) (Mar. 29, 2018), at p. 3, <u>available at</u> <u>https://www.sec.gov/Archives/edgar/data/1522690/000121390018003608/f10k2017_gwgholding s.htm</u>.

[7]    <u>See</u> Beneficient Registration Statement (Form S-4) ("**Beneficient S-4")** (Dec. 9, 2022), <u>available at</u> <u>https://www.sec.gov/Archives/edgar/data/1775734/000119312522301885/d406382ds4.htm</u>.

Beneficient "is a functioning, viable business."[8]  The Committee does not allege anything was "stolen" or that investors were "defrauded."  Instead, it tries to criminalize one company's (GWG Holdings') decision to invest in another (Beneficient) with a different business line to diversify its portfolio.  This is perfectly legal and was disclosed to L Bond investors in myriad SEC filings.  Claims relating to breach of fiduciary duty based on this factual predicate[9] fail as a matter of law—particularly with respect to Heppner.  Among other things:

- Heppner was neither the "controlling shareholder"[10] of GWG Holdings nor in control of the GWG Holdings' or Beneficient's boards of directors;

- Each of GWG Holdings' investments in Beneficient was made either (i) prior to Beneficient's and Heppner's involvement with the Debtors, (ii) with the approval of an independent special committee whose members that engaged their own attorneys and financial advisors, or (iii) by a majority of disinterested directors;

- GWG Holdings' investments in Beneficient—and more generally its pivot away from the life settlement business in order to diversify its business lines—were both well known to L Bond investors, having been disclosed in multiple filings with the Securities and Exchange Commission (the "**SEC**");

- The Committee falsely accuses Heppner of benefitting personally and inappropriately by GWG Holdings' investments in Beneficient[11] and paying related parties through

---

[8]   ECF No. 1346 (Statement Of The Independent Committees In Support Of Temporarily Continuing The Seal) (Jan. 13, 2023), at ¶ 5 ("[T]he Standing Motion accuses GWG of being a 'classic Ponzi scheme,' which it is not.  It characterizes the actions of certain individuals in highly charged terms, like 'siphoning,' 'looting,' and 'funneling.'  None of this language was necessary, and it is reasonable to believe that it could seriously harm an entity, like Ben, that is in the middle of negotiating a SPAC transaction, and attempting to attract investors"); Tr., Hr'g Dec. 1, 2022, at 26:1-26:16 ("[W]e have done a tremendous amount of due diligence with respect to Beneficient.  I have conducted extensive meetings with the Board, with the management team, have toured the infrastructure and related facilities numerous times, have interviewed other members of the management team, have [had] our professionals engage[] extensively with their professionals, who are top tier.  So I believe we are as comfortable as we can be … that this is a functioning, viable business").

[9]   Heppner is named in the following breach of fiduciary duty counts:  Count 3 (Heppner), Count 4 (Heppner), Count 8 (Heppner), Count 11 (Heppner), Count 14 (Heppner), Count 15 (Heppner), and Count 16 (Heppner).  (Heppner also is named in Count 22 for unjust enrichment).

[10]   Proposed Compl. ¶¶ 150, 194, 198.

[11]   Proposed Compl. ¶¶ 14, 109, 111, 113.

concealed transactions.[12]  But, payments to related parties were disclosed clearly in GWG Holdings' SEC filings.  And, the compensation Heppner received from Beneficient was for the performance of executive services, reviewed by independent consultants, and also disclosed in the GWG Holdings' SEC filings;

- The Committee's attack on the payments Beneficient made to its senior lender HCLP Nominees, L.L.C. ("**HCLP Nominees**") is unfounded.  HCLP Nominees issued valid senior debt that predates GWG Holdings' investment in Beneficient—another fact disclosed in GWG Holdings' SEC filings.

5.     For all its length and bluster, the Proposed Complaint lacks the requisite legal precision to state viable claims against each of the more than 60 Defendants.  Decisions and transfers are not tied to individuals with dates and times.  The specific debtor entities that made the offending transfers and supposedly were rendered insolvent are not identified on a debtor-by-debtor basis.  Instead the Committee broadly defines "GWG" to encompass all Debtors and then relies on that imprecise definition throughout the Proposed Complaint.[13]  And, the Committee resorts to a nebulous "upon-information-and-belief" qualifier 38 separate times,[14] mostly in connection with allegations relating to Heppner or entities affiliated with him.  Count 22 provides just one example:[15]  in four short paragraphs, the Committee accuses nearly sixty (60) defendants, including Heppner, of being unjustly enriched with little to no explanation.  The Committee's pervasive lack of specificity as it relates to Heppner is especially telling considering it had access to wide-ranging Rule-2004 discovery, including several interviews with Heppner and a two-day deposition.

---

[12]     Proposed Compl. ¶¶ 111, 113, 114, 156, 158.

[13]     Proposed Compl. ¶ 2 & n. 4.

[14]     Proposed Compl. ¶¶ 12, 16 & n. 5, 18, 19 & n. 7, 45, 47, 48, 50, 51, 55, 56, 57, 59, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 110, 111, 113, 144, 145, 156, 157, 165 & n. 18, 243, 463.

[15]     Proposed Compl. ¶¶ 454-57.

6.      Finally, the maelstrom the Committee whipped up around GWG Holdings' March 11, 2021 Form 8-K (the "**March 2021 8-K**")[16] is an unwarranted installment in its smear campaign against Heppner.  The Committee alleges that the March 2021 8-K was "authorized" to be filed by "the GWG Board, including its chair Heppner."[17]  That is wrong.  As is typical, the March 2021 8-K was signed by company management—not the company's directors, e.g., Heppner.  As a legal matter, Forms 8-K do not require certifications by an issuer's board of directors.[18]  And, Heppner did not review a draft of the March 2021 8-K before it was filed, did not provide any input on the disclosures in the March 2021 8-K, and did not "authorize" GWG Holdings to file the March 2021 8-K.

7.      The Committee also characterizes the March 2021 8-K as "materially false"[19] but concedes it was issued on "advice of counsel."[20]  That is borne out in correspondence from the Debtors' former President and Chief Executive Officer that has never been furnished to the Court.  GWG Holdings attached the correspondence to its Amended Form 8-K filed on November 14, 2022 and a subsequent Form 8-K filed on December 2, 2022.[21]  The correspondence  shows there

---

[16]     GWG Holdings, Inc. Current Report (Form 8-K) (Mar. 11, 2021), available at https://www.sec.gov/Archives/edgar/data/1522690/000121390021014849/ea137489-8k_gwgholdings.htm.

[17]     Proposed Compl. ¶¶ 30-31.

[18]     Cf. 17 C.F.R. § 240.13a-14(a).

[19]     Proposed Compl. ¶¶ 30-31.

[20]     Proposed Compl. ¶ 30.

[21]     See GWG Holdings, Inc. Amended Current Report (Form 8-K/A) (Nov. 14, 2022) ("**Amended March 2021 8-K**"), Ex. 99.2, available at https://www.sec.gov/Archives/edgar/data/1522690/000119312522284071/0001193125-22-284071-index.htm (amending the March 2021 8-K and attaching correspondence from the former CEO and President to the Special Committee) (attached hereto as **Exhibit 1**); GWG Holdings, Inc. Current Report (Form 8-K) (Dec. 2, 2022) ("**December 2, 2022 8-K**"), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1522690/0001193125222967

is a significant dispute about whether the March 2021 8-K is "materially false."  According to

GWG's former CEO (i) while members of the Third Special Committee resigned after reviewing

a proposed $14.8 million capital contribution to Beneficient, in point of fact, GWG Holdings had

accepted the Third Special Committee's recommendation that GWG Holdings receive a more

senior security in Beneficient in exchange for that contribution;[22] and (ii) management had a

reasonable and good faith belief, based on the advice of counsel—which, again, the Committee

concedes—that no disclosable disagreement with the resigning members of the Third Special

Committee existed.[23]

8.      Critically, while the subsequent statements by former management differ materially

from the assertions in GWG Holdings' "amended" Form 8-K filed nearly twenty months later, and

while the Committee (and GWG Holdings) contest the former CEO's position, it bears emphasis

that the parties have ***a purely commercial dispute***.  That has not stopped these events from being

described with more severe adjectives that have no application but have been bandied about

without regard for business and personal reputations.

9.      Nevertheless, the bankruptcy cases have arrived at a crucial point.  GWG Holdings

and Beneficient stand on the verge of consummating the Avalon SPAC transaction that will enable

Beneficient to become a public company, execute on its business plan, and unlock significant value

that will inure directly to the benefit of GWG Holdings and its creditors.  The Committee's dubious

---

56/d415864d8k.htm (attaching former President and CEO's resignation letter and letter to the
Board of Directors) (attached hereto as **Exhibit 2**).

[22]     **Exhibit 1**, Amended March 2021 8-K.

[23]     **Exhibit 2**, December 2, 2022 8-K.

lawsuit risks imperiling that transaction and substituting it for a lengthy, uncertain, and expensive lawsuit.  Accordingly, the Standing Motion should be denied.

## II.     ARGUMENT

### A.     COMMITTEE HAS NOT SHOWN BENEFIT TO ESTATES TO WARRANT DERIVATIVE STANDING

10.     The Committee cannot carry its burden of showing that prosecution of the Proposed Complaint will benefit the Debtors' estates or provide creditors with a better alternative to the value they can realize from Beneficient.  Here, even a cursory assessment of the Proposed Complaint's allegations—and the extent to which Heppner (and Beneficient) will contest those allegations—confirms that litigation over disputed factual issues, including notoriously time-consuming matters like valuation, is in prospect.

11.     By definition, the outcome of any litigation is highly uncertain.  And, under the circumstances, it cannot yield the same immediate value for the Debtors' estates and creditors that a consensual chapter 11 plan structured around GWG Holdings' Beneficient equity promises.  See, e.g., Louisiana World Exposition v. Fed. Ins. Co., 864 F.2d 1147, 1153 (5th Cir. 1989) (noting "complete agreement with the cost-benefit analysis mandated by the Second Circuit in In re STN Enters., 779 F.2d 901, 905-06 (2d Cir. 1985)"); In re iPCS, Inc., 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (analysis "is designed to ensure that the expected benefit to the estate will be reasonably sufficient to 'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'"); In re Sabine Oil & Gas Corp., 547 B.R. 503, 515 (Bankr. S.D.N.Y. 2016) ("While courts have commented that, under STN, the required showing is a relatively easy one to make … the court may nevertheless engage in some review of disputed facts to determine if there is some factual support for the Committee's allegations and to determine that the proposed litigation would be a sensible application of estate resources"); cf., id.

at 516 (when assessing whether debtor unjustifiably refused to bring claims, "court should weigh the 'probability of success and financial recovery' as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate.").

### B. VIRTUALLY EVERY COUNT IN PROPOSED COMPLAINT FAILS BECAUSE BENEFICIENT WAS SOLVENT AT ALL RELEVANT TIMES

12.     Nearly all of the Committee's proposed claims are predicated on the allegation that Beneficient was insolvent at all relevant times, and that, as a result, GWG's investments in Beneficient constitute fraudulent transfers, give rise to claims for breach of fiduciary duty, and support the notion that GWG was a "Ponzi scheme."  With respect to Heppner in particular, all but two of the claims against him are premised on the conclusory allegation that he breached his fiduciary duty to GWG by approving cash transfers for which GWG received equity interests in Beneficient, the value of which, the Committee alleges, "was (and remains) unproven given Ben's inability to actualize its business plan."[24]

13.     But, a nascent company is not worthless simply because its business plan has not yet come to fruition.  And, the Committee's after-the-fact, made-for-litigation position regarding Beneficient's value is belied by contemporaneous valuations performed by reputable third-party valuation firms and actual transactions involving third-party market participants.  These present the best evidence of Beneficient's value at the time of the challenged transactions.  See, e.g., In re Boston Generating, LLC, 440 B.R. 302, 325 (Bankr. S.D.N.Y. 2010) ("It is generally accepted, however, that absent a showing that there has been a clear market failure, the behavior in the

---

[24]     See Proposed Compl. ¶¶ 270, 280, 317, 344, 377, 387.  Heppner is named individually in the following counts, all of which allege breach of fiduciary duty:  Count 3, Count 4, Count 8, Count 11, Count 14, Count 15, and Count 16.  He also is named in Count 22 (unjust enrichment).

marketplace is the best indicator of enterprise value"); <u>Bank of Am. Nat. Trust and Sav. Ass'n v.</u> <u>203 North La Salle Street P'ship</u>, 526 U.S. 434, 457 (1999) (acknowledging "the best way to determine value is exposure to a market" rather than a determination by a bankruptcy judge); <u>VFB</u> <u>LLC v. Campbell Soup Co.</u>, 482 F.3d 624, 633 (3d. Cir. 2007) ("[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'"); <u>In re Iridium Operating, LLC</u>, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[T]he public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view.").

14.     For example, from 2017 to the present, Beneficient was valued at least annually by an outside third-party firm. As shown below, these valuations concluded that Beneficient's equity value ranged from a midpoint of $1.25 billion as of December 23, 2017, to $2.7 billion as of December 12, 2021:

| As of Date | Date of Report | Company | Value of Ben |
|---|---|---|---|
| 12/23/2017 | 12/23/2017 | ██████████ | $1.18 to $1.32 billion |
| 05/31/2018 | 11/12/2018 | ████ | $2.196 billion |
| 12/31/2019 | 03/10/2019 | ████ | $2.39 billion |
| 10/01/2020 | 05/26/2021 | ████ | $2.82 billion |
| 10/01/2021 | 09/28/2022 | ████ | $2.48 billion |
| 12/01/2021 | 09/28/2022 | ████ | $2.7 billion[25] |

15.     Moreover, the internal work papers from Beneficient auditors Grant Thornton and Whitley Penn show that both firms, as part of preparing their audit documentation, conducted a

---

[25]     This value is implied by the value of various classes of equity that were valued by ████ in the valuation report.

review of the ████████████████████████████████ and concluded that
████████████████████████████████████.   Indeed, in
2021, a Grant Thornton internal Valuation and Modeling Team ████████████████
████████████████████████████████████████████
████████████████████████████   After documenting their
procedures in a twenty-five page memorandum, Grant Thornton's Valuation and Modeling Team
concluded ███████████████████████████████████████
███████████

16.     The Committee's primary criticism of these contemporaneous third-party valuations is that they are predicated on projections that assume Beneficient will ultimately secure a state charter and the ability to sell public securities.[26]   This is ironic given that Beneficient has secured a state charter and is on the verge of consummating the Avalon SPAC transaction that will enable it to become a public company.  The Committee's assertion that these assumptions render the valuations unreliable simply cannot stand in the face of these developments.  It also ignores that the valuations specifically discounted for the risk associated with these predicates.  Indeed, as things currently stand, it is the *Committee* that poses the greatest threat to Beneficient's ability to go public.

17.     Further, a far more reliable indicator of Beneficient's value than the Committee's ex post contention is the amount third-party market participants ascribed to Beneficient in arm's-length transactions.   Two such transactions are present here, each of which confirms the reasonableness of GWG Holdings' investments in Beneficient.  *First*, GWG Holdings' original

---

[26]     See, e.g., Proposed Compl. ¶ 167.

decision to invest approximately $616 million in non-cash consideration in exchange for 90% of Beneficient's common equity was made by a GWG Holdings' board of directors that had no connection whatsoever to Beneficient or Heppner.[27]   **Second**, the definitive Business Combination Agreement governing the Avalon SPAC transaction that Beneficient entered into with Avalon on September 21, 2022, following six months of hard-fought, arm's-length negotiations in which Avalon was represented by Venable LLP and Houlihan Capital, LLC, ascribes an enterprise value of $3.3 billion to Beneficient.   That valuation implies that the Debtors' approximately 44% common equity interest in Beneficient is worth approximately $1.4 billion, on a fully diluted basis. Based on this value, GWG Holdings received far more than reasonably equivalent value in exchange for its investments in Beneficient.

18.     More generally, the insolvency allegations relating to the Debtors, including that they were "insolvent as early as 2018"[28] are overly ambitious and require more focus.  Four years before a bankruptcy is a long time to be insolvent—including through a global pandemic.  Nor does the Proposed Complaint indicate which transfer was made by which entity or and how that particular transfer rendered that particular entity insolvent.  See, e.g., In re Bateman, Nos. 10-06206-8-RDD, 11-00397-8-RDD, 2012 WL 3061181 (Bankr. E.D.N.C. July 26, 2012), at *4-5, 5 n.1 (rejecting plausibility of allegations of insolvency 1½ years before petition date: "[t]he Amended Complaint fails on its face ... under the Twombly and Iqbal standards .... [t]he petition date was over a year and a half after the transfer date."); In re Nanodynamics, Inc., 474 B.R. 422, 427-28, 427 n.5 (Bankr. W.D.N.Y. 2012) (rejecting plausibility of allegations of insolvency 1-2 years before petition date; dismissing avoidance claims challenging management consulting fees

---

[27]     Proposed Compl. ¶¶ 137, 140.

[28]     Proposed Compl. ¶¶ 173-187.

paid under consulting agreement to former officer; noting "Twombly and Iqbal call upon a court to use its 'experience.'"); In re Trinsum Grp., Inc., 460 B.R. 379, 388, 392 (Bankr. S.D.N.Y. 2011) (dismissing fraudulent transfer claim when, among other things, insolvency allegations were insufficient and where transfers pre-dated bankruptcy filing by 2 years); June 9, 2022 Hr'g on Mot. to Dismiss Tr., In re Just Energy Group, Inc., et al., No. 21-4399 (DRJ) (Bankr. S.D. Tex. June 14, 2022), at p. 53 (evaluating avoidance claims and requesting that forthcoming amended complaint make clear "that on X date … Y dollars was paid by Z debtor")).

## C.   GWG'S THESIS TO INVEST IN BENEFICIENT THROUGH L BOND PROCEEDS WAS FULLY DISCLOSED

19.    The Bondholders claim that Heppner conducted a "fraudulent" "Ponzi scheme" that "siphoned hundreds of millions in value out of the Debtors in the years immediately preceding the Chapter 11 Cases."[29]   However, the Committee did not supply the Proposed Complaint with a single allegation that Heppner made any false statement to any L Bondholders (or anyone else) or otherwise defrauded them.  Nor can the Committee claim that Heppner or anyone affiliated with either Beneficient or GWG Holdings concealed the so-called "Challenged Insider Transactions."[30] The decision by GWG Holdings to pivot its business from focusing on life settlement policies to investing in Beneficient more generally was made by a fully independent board that included no overlapping directors or officers of, or any business relationship between GWG and Beneficient. In addition to the initial investment decision, the subsequent transactions GWG Holdings entered into with Beneficient were well-known to L Bondholders through SEC disclosures and approved by independent special committees of the Board who had their own legal and financial advisors.

---

[29]    Proposed Compl. ¶ 1.

[30]    See, e.g., Standing Motion  ¶ 45; Proposed Compl. ¶¶ 28-32, 198-233.

20.   ***Sales of L Bonds.***  GWG's 2019 10-K disclosed clearly that:  (i) L bonds involved a "high degree of risk" and were "only suitable for persons with substantial financial resources and with no need for liquidity in this investment"; (ii) GWG had a "history of net losses"; and (iii) L Bond proceeds could be used to make principal and interest payments on existing and future L Bonds, e.g., "Our business model relies on continued access to financing to enable us to grow our exposure to alternative assets.  Our debt financing also provides funds to pay the attendant premiums and costs of maintaining the life insurance portfolio, all while satisfying our current interest and principal repayment obligations under our amended and restated senior credit facility with LNV Corporation, L Bonds and Seller Trust L Bonds and our dividend obligations on our preferred stock."[31]  The possibility that fungible cash used to repay such debts was provided by L Bondholders, rather than from Beneficient's own earnings or other sources—as well as Heppner's relationship to Beneficient's lender (the "**Senior Lender**"), HCLP Nominees—was disclosed to L Bondholders.[32]

---

[31]   See, e.g., GWG Holdings, Inc. 2018 Annual Report (Form 10-K) (July 9, 2019) ("**GWG holdings 2018 10-K**"), at p. 19, available at https://www.sec.gov/Archives/edgar/data/1522690/000121390019012331/f10k2018_gwgholdings.htm (emphasis added); see also GWG Holdings, Inc. 2019 Annual Report (Form 10-K) ("**GWG Holdings 2019 10-K**") (Mar. 27, 2020), at p. 19, available at https://www.sec.gov/Archives/edgar/data/1522690/000121390020007722/f10k2019_gwgholdings.htm ("Our debt facilities and offerings are the most important sources of financing on which our business continues to critically rely to grow and maintain our exposure to alternative assets — which include our portfolio of life insurance policies and our investments in Beneficient — as well as service existing debt."); GWG Holdings, Inc. 2020 Annual Report (Form 10-K) ("**GWG Holdings 2020 10-K**") (Nov. 5, 2021), at p. 61, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1522690/000152269021000008/gwgh-20201231.htm ("We heavily rely on GWG Holdings' L Bond offering to fund our business operations, including, among other things, interest and principal payments on the existing L Bonds and capital allocations to Beneficient.").

[32]   See GWG Holdings, Inc. Prospectus (June 3, 2020), at p. 14, available at https://www.sec.gov/Archives/edgar/data/1456381/000121390020014212/ea122727-424b1_gwgholdings.htm ("Beneficient will have broad discretion to use the proceeds of any such investments and may use such proceeds to acquire alternative assets, to repay indebtedness, including to related parties, and for general working capital purposes, including operating

21.    ***GWG's 2019 Loans to Ben.***   On May 31, 2019, GWG Life agreed to loan certain Liquid Trusts  $65 million (referred to in the Proposed Complaint as "**The 2019 Insider Loans**"). GWG Life paid the loan in two installments:  $50 million on June 3, 2019 and $15 million in November 22, 2019, which was disclosed in GWG Holdings' SEC filings.[33]  GWG Holdings' 2019 Form 10-K reiterated that "[GWG's] loans to Beneficient are contractually and structurally subordinated to the debt and other liabilities of the Beneficient entities that are not obligors on such loans, which means that creditors of such entities will be paid from their assets before [GWG Holdings] would have any claims to those assets."[34]

22.    ***GWG's 2019 Investment Agreement with Ben.***   On December 31, 2019, GWG Holdings transferred $79 million to Beneficient in return for (i) 666,667 common units of BCG, (ii) a Preferred Series A Subclass 1 Unit Account of BCH of $319 million, and the right to appoint a majority of the board of directors of Beneficient Management, LLC, which controls Beneficient (the "**2019 Investment Agreement**").   GWG disclosed the Change of Control transaction in several SEC filings, including its March 27, 2020 annual report.[35]

23.    ***The 2020 Unit Purchase Agreement and Related Transactions.***   The Committee criticizes GWG Holdings' decision to enter into a Unit Purchase Agreement (the "**UPA**") whereby GWG agreed to make capital contributions from time to time to BCH in exchange for Preferred Series C Unit Accounts of BCH.   The Proposed Complaint notes an independent special committee

---

expenses.") (emphasis added); GWG 2019 10-K, at p. F-30 ("The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors.").

[33]    See GWG Holdings 2019 10-K.

[34]    See id., at p. 26.

[35]    See id., at p. 5 (listing "Beneficient Transactions").

of the Board advised by its own lawyers and financial advisors negotiated the UPA.[36]  From the execution of the UPA through March 2021, the Debtors made various capital contributions in return for preferred equity, including the "2020 Capital Contribution" and "2021 Capital Contribution."[37]  As with the 2019 loans and the 2019 Investment Agreement, GWG disclosed the UPA and the subsequent transactions in its public filings.[38]

24.     ***Decoupling Transaction***.  In November of 2021, in order to maximize the Debtors' investments in Beneficient by facilitating Beneficient's ability to obtain a valuable TEFFI trust charter in Kansas, Beneficient and the Debtors consummated a series of transactions whereby the operations of the Debtors and Beneficient were de-linked, and the Debtors relinquished control over Beneficient (the "**Decoupling Transaction**").  At the time of the Decoupling Transaction, Heppner was not a member of the GWG Holdings' board.

25.     According to the Committee, the Decoupling Transaction "was the culmination of Ben's fraudulent scheme,"[39] yet GWG Holdings' contemporaneous disclosures not only explained the change in the GWG-Ben relationship, but also the rational business reason for the change: "returning control of Ben LP was a necessary step to maximize the value of its investment in Ben,

---

[36]     Proposed Compl. ¶¶ 217-23.

[37]     Proposed Compl. ¶ 7; Standing Motion ¶ 45(f).

[38]     See GWG Holdings, Inc. Quarterly Report (Form 10-Q) (Aug. 14, 2020), at 44, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1522690/000152269020000008/gwgh-20200630.htm; March 2021 8-K, at 2; GWG Holdings, Inc. Quarterly Report (Form 10-Q) (Nov. 10, 2021), at 33, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1522690/000152269021000012/gwgh-20210331.htm.

[39]     Proposed Compl. ¶ 17; Standing Mot. ¶ 45(f).

LP by enabling Ben, LP, as an independent company to, among other things, have broader access to funding sources."[40]

### D. HEPPNER IS NOT A "CONTROLLING SHAREHOLDER" OF GWG HOLDINGS AND DID NOT CONTROL GWG HOLDINGS' OR BENEFICIENT'S BOARDS

26. The next chapter in the Proposed Complaint's fiction is that Heppner "controlled" and "dominated" the GWG Holdings' board.[41] That assertion wishes away the facts that Heppner did not purchase a share of GWG Holdings and that the Beneficient and GWG boards were composed of highly accomplished and well-respected leaders who at all times acted as true independents. As set forth in GWG's public filings, Beneficient's subsidiary BCH held only 7.6% of GWG Holdings' common shares—hardly a controlling position.[42] Moreover, Beneficient's board, and then GWG Holdings' board, were composed of "all-star" professionals—a group of seasoned executives with unimpeachable credentials, including:

- ***Tom Hicks***, Founder and Chairman of Hicks Holding and a 30 plus year private equity pioneer;

- ***Richard W. Fisher***, former President and CEO of the Federal Reserve Bank of Dallas;

- ***Dennis Lockhart***, former President and CEO of the Federal Reserve Bank of Atlanta;

- ***Bruce Schnitzer***, former President and CEO of Marsh, Inc., the world's leading insurance broker and risk advisor with offices in 130 countries;

- ***Pete Cangany***, former partner of Ernst & Young and chair of the Board of Trustees of Franklin College;

---

[40] See GWG Holdings Inc. Current Report (Form 8-K) (Nov. 15, 2021), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1522690/000121390021058998/ea150628-8k_gwgholdings.htm.

[41] Proposed Compl. ¶¶ 194, 198.

[42] See, e.g., GWG 2019 10-K, at p. 87 (Heppner, as chief executive officer of Beneficient, was attributed indirect beneficial ownership of Beneficient's ownership of GWG under relevant SEC guidance).

- **Michelle Caruso-Cabrera**, CEO of MCC Productions and former chief international correspondent for CNBC;

- **David de Weese**, General Partner of Paul Capital Advisors and former Chairman of the Board of Capacitor Sciences, Inc.;

- **David Chavenson**, former Treasurer of Alon USA Energy Co., a preeminent downstream energy company and former Treasurer of Flowserve Corp, one of the largest suppliers of machinery in the energy industry;

- **Kathleen Mason**, a consultant with the international advisory firm Third Bridge and former President and Chief Executive Officer of Tuesday Morning Corporation;

- **Roger Staubach**, Naval Academy graduate, Vietnam veteran, Hall of Fame professional football player, and real estate magnate;

- **Sheldon Stein**, president and CEO of Southern Glazer's Wine & Spirits, the largest wine and spirits distributor in the United States and former Vice Chairman and Head of Southwest Investment Banking for Bank of America Merrill Lynch; and

- **Bruce Zimmerman,** former CEO and Chief Investment Officer of UTIMCO, the investment corporation overseeing investments for the University of Texas and Texas A&M University systems.

27.     The Proposed Complaint cites no facts to support the allegation that these directors were "controlled" or "dominated" by Heppner, and it defies common sense to believe it to be so. See, e.g., In re Hydrogen L.L.C., 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010) (following Twombly and Iqbal to sharpen review of proposed complaints and directing that "'[j]udicial experience and common sense' will be required in determining the plausibility of a claim"); In re Trinsum Grp., Inc., 460 B.R. 379, 387 (Bankr. S.D.N.Y. 2011) ("Plausibility … depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable").

28.     The Proposed Complaint tries unsuccessfully to gain credibly by claiming Beneficient took "effective control" of GWG from its own 40% owner by misstating the timing of

the April 2019 transaction it complains about.[43]  In April 2019, GWG Holdings' former CEO and

his brother negotiated with Heppner and Beneficient to sell their entire stake in GWG Holdings.

As part of that transaction, the existing GWG Holdings' board—the very same, completely

independent board that negotiated with Heppner and Beneficient in the original GWG-Beneficient

transaction in December 2018, agreed to appoint persons nominated by Beneficient to the GWG

Holdings' board.  Again, the Complaint can identify no facts to support a claim that Heppner

somehow wrestled control away from the independent GWG Holdings board that was entirely

unaffiliated with him or Beneficient.  Special Committee I reviewed and approved the buyout

because GWG Holdings' former CEO was involved.  And, Special Committee I consisted of GWG

Holdings' directors Thomas Donahue, David Abramson, Shawn Gensch, Mark Schwartzman and

Jeffery McGregor, all of whom were wholly independent of Beneficient and have no relationship

with Heppner.

  **E.**  **EACH INVESTMENT WAS REVIEWED AND APPROVED BY INDEPENDENT FIDUCIARIES**

  29.  The Challenged Transactions were approved by independent directors having no

affiliation with Beneficient.  The Committee's claim that Heppner controlled GWG is premised

on the unsupportable allegation that GWG's board members failed to fulfill their fiduciary duties

to independently review and vote on matters before the board.  In fact, Heppner and GWG's other

board members acted independently of each other and made independent determinations with

respect to every matter upon which they voted in accordance with their fiduciary duties.  That

included employing an independent auditor to review Mr. Heppner's compensation in connection

---

[43]  Proposed Compl. ¶ 198.

with the services he provided to Beneficient—the terms of which were disclosed in filings with the SEC.[44]

30.     The 2019 Investment Agreement also was the product of an independent process in which Heppner cast no vote and over which he had no influence.  A special committee consisting of independent directors David Chavenson and Kathleen Mason (referred to as "**Special Committee II**") had final review and negotiating authority with regard to the 2019 Investment Agreement.  What is more, Beneficient obtained that funding from the Debtors—which would be transferred to Beneficient's senior lender, HCLP Nominees, and was intended to reduce Beneficient's debt load to improve its chances, in the opinion of management, of obtaining a trust company charter, thereby expanding its commercial prospects.  GWG disclosed in SEC filings both the existence of the HCLP Nominees loan, its priority amongst Beneficient's debts, and the fact that it was secured,[45] as well as Heppner's indirect relationship with HCLP Nominees.[46]  And, this followed two-dozen meetings of GWG's independent special committee, whose members closely studied prior transactions among and between GWG and Beneficient with the aid of their independent legal and financial advisors and concluded GWG's shareholders would benefit from the trust company charter approval.

---

[44]     See, e.g., GWG Holdings 2018 10-K (attaching Beneficient audited financials as an exhibit); GWG Holdings, Inc. Preliminary Proxy (Schedule 14C Information) (Dec. 3, 2018), available at https://www.sec.gov/Archives/edgar/data/1522690/000121390018016849/prer14c1018a4_gwgholdings.htm (same);  GWG Holdings 2019 10-K (discussing compensation); GWG Holdings 2020 10-K.

[45]     See, e.g., GWG Holdings, Inc. Current Report (Form 8-K) (June 6, 2019), available at https://www.sec.gov/Archives/edgar/data/1522690/000121390019010247/f8k053119_gwgholdingsinc.htm.

[46]     See, e.g., GWG Holdings 2018 10-K, Ex. 99.4 (The Beneficient Company Group, L.P. And Subsidiaries Consolidated Financial Statements and Independent Auditor's Report), at p. 28, 40.

31.     So too with the other "Challenged Insider Transactions:"



32.     And as for the 2020 UPA approval, that was subject to the review and signoff of a new Special Committee ("**Special Committee III**")—consisting of David Chavenson, Roy Bailey and Pete Cangany[49] represented by Gibson Dunn, and advised by Valuation Research Corporation— which convened for the first time on April 15, 2020.

---

47

48

49     Heppner understands that Cangany could not be a tie-breaking vote for Special Committee III. In other words, Bailey and Chavenson needed to approve any Special Committee III action.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███ [50]   In other words, Special Committee III was able to preserve rights on par with Beneficient's senior lender HCLP Nominees in order protect the control over Beneficient that GWG had obtained in the 2019 Investment Agreement.  Special Committee III conducted nineteen (19) separate meetings before it entered into the UPA.

33.     These transactions are subject to business-judgment review because they have been approved by special committees or a majority of disinterested directors.  See Benihana of Tokyo, Inc. v. Benihana, Inc., 906 A.2d 114, 121 (Del. 2006) ("After approval by disinterested directors, courts review the interested transaction under the business judgment rule."); In re Resorts Int'l S'holders Litig., Nos. 9470, 8605, 1988 WL 92749, at *5 (Del. Ch. Sept. 7, 1988) ("The Delaware Supreme Court has consistently held that where a disinterested board *or special committee*, fully informed and expertly advised, makes a considered business decision, that decision will be entitled prima facie to the presumptions and protections of the business judgment rule.") (emphasis added), aff'd sub nom., In re Resorts Int'l S'holders Litig. Appeals, 570 A.2d 259 (Del. 1990); In re Crimson Expl. Inc. S'holder Litig., No. 8541–VCP, 2014 WL 5449419, at *20 (Del. Ch. Oct. 24, 2014) ("To successfully rebut the business judgment rule ... a plaintiff must normally plead facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated by a materially interested director."); In re W. Nat. Corp. S'holders Litig., No.

---

[50]     ████████████████████████████████████████

15927, 2000 WL 710192, at *26 (Del. Ch. May 22, 2000) ("[B]ecause the absence of a controlling shareholder removes the prospect of retaliation, the business judgment rule should apply to an independent special committee's good faith and fully informed recommendation"); In re Ezcorp Inc. Consulting Agreement Deriv. Litig., C.A. No. 9962-VCL, 2016 WL 301245, at *16 n.6 (Del. Ch. Jan. 25, 2016) (Dictum) ("[W]hen an interested transaction does not involve a controlling stockholder, the use of a special committee or the receipt of disinterested stockholder approval lowers the standard of review from entire fairness to the business judgment rule.").[51]

### F. HEPPNER DID NOT DISSOLVE SO-CALLED "THIRD SPECIAL COMMITTEE" FOR "PERFORMING ITS FIDUCIARY DUTIES"

34.     On September 8, 2020, GWG Holdings' Board unanimously voted to appoint Bailey, Daniel Fine and Gruber to a *fourth* special committee, referred to hereinafter for ease of reference as the "**Third Special Committee**" because that is how the Proposed Complaint defines it.[52]  The Proposed Complaint contends that after it became clear "the Third Special Committee would not approve [a] proposed $48 million capital contribution on the terms presented to it (and likely would not go along with other controlled transactions that stood to harm the Company), the GWG board, led by Heppner:  (i) created a workaround to ensure that Ben (and by extension HCLP

---

[51]     Although the Delaware Court of Chancery has held that business-judgment review requires a majority of the **board** to be disinterested and independent, e.g., Cumming on behalf of New Senior Inv. Grp., Inc. v. Edens, No. 13007-VCS, 2018 WL 992877, at *22 (Del. Ch. Feb. 20, 2018),  the Delaware Supreme Court has not revisited its holding that approval by a majority of **disinterested directors** is, itself, sufficient to trigger business judgment review.  See R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations and Business Organizations, § 4.16 (4th ed. 2023) ("There exists some debate in the cases regarding whether compliance with Section 144 guarantees the benefit of the business judgment rule" and collecting cases).

[52]     This was in fact the fourth special committee formed by GWG Holdings' Board to review transactions involving Beneficient and GWG.  The Proposed Complaint does not acknowledge the **first** special committee, which was formed for the purpose of reviewing GWG Holdings' initial investment in Beneficient—and then dissolved after it served its intended purpose.

Nominees) received the funds they wanted and (ii) then terminated the Third Special Committee."[53]  That is not what happened.

35.     The Original Members of the Third Special Committee were Gruber, Fine and Bailey.  Gruber resigned as a director of GWG Holdings, and MacDowell was appointed to replace him in January 2021.  The Third Special Committee was represented by Winston Strawn, counsel completely independent from GWG, Ben, or Heppner.

36.     Consistent with its mandate, on December 16, 2020, the Third Special Committee met and discussed Project Keystone and authorized and approved a memorandum containing 18 detailed questions regarding Project Keystone to be sent to the former Chief Financial Officer.[54]

37.     The timeline relating to the disputed request that supposedly led to the members of the Third Special Committee to resign is set forth below:

- On February 10, 2021, GWG Holdings' management sent a memorandum to the Third Special Committee requesting funds in an amount not to exceed $48 million for Beneficient.[55]

- On February 24, 2021, GWG Holdings' management *withdrew that request*.[56]

- On February 25, 2021, Fine, on behalf of the Special Committee, sent GWG Holdings' management a memorandum stating that "no funds of GWGH … are to be invested in BEN without Special Committee approval until further notice to you from the Special Committee."[57]

---

[53]     Proposed Compl. ¶¶ 30-31, 224-39.

[54]     See ███████████████████████████████████████████
███████████████████████████████████

[55]     Proposed Compl. ¶ 227.

[56]     Proposed Compl. ¶ 232.

[57]     Proposed Compl. ¶ 233.

- On March 3, 2021, the Third Special Committee's attorney sent an email to GWG management asking GWG Holdings to make an offer for a senior security in exchange for $14.8 million.[58]

- On March 4, 2021, there was a Special Meeting of the Board. As it relates to funding requests through UPA, rather than through the Special Committee, the Board, with the advice of counsel, concluded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[59] Even though the Proposed Complaint alleges that the Third Special Committee was dissolved because of a dispute over a funding request, the minutes of the Special Meeting of the Board flatly contradict that assertion:



- Both the GWG Board and Beneficient ultimately agreed that the GWG Holdings capital contribution would total $14.8 million. And, as the Third Special Committee requested, GWG Holdings would receive in exchange a more senior security in Beneficient, that is, Beneficient Preferred Series C-Zero, which has a higher liquidation priority than specified in the UPA.[61]

- Nonetheless, on March 6, 2021, Bailey, Fine and MacDowell resigned as directors of GWG Holdings. Their resignation letters did not specify that they were resigning due to any disagreement with management and say only that "I hereby resign" with no additional explanation or information.[62]

---

58  See **Exhibit 1**, Amended March 2021 8-K.

59  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

60  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

61  See **Exhibit 1**, Amended March 2021 8-K, Ex. 99-2 (Email of former CEO stating: "I wanted to confirm what I had previously communicated to Roy regarding seniority that, after discussions with those holding approval rights, GWG will be funding Ben using a preferred equity that is senior to both the Preferred C and Preferred A.1.")).

62  The letters are attached hereto as **Exhibit 1**, Amended March 2021 8-K, Ex. 99-1.

38.     As the Debtors' former CEO states, the Board's decision to dissolve the Third Special Committee was not based on any alleged disagreement with the Third Special Committee.[63]  And, the $14.8 million investment has been realized in full in cash within months of the investment being made by GWG Holdings.

### G.     March 2021 8-K Does Not Support Viable Claims Against Heppner

39.     The breach of fiduciary duty claim against Heppner relating to the March 2021 8-K (Count 16) fails as a matter of law.  Consistent with the federal securities laws, GWG Holdings' management—not its directors, e.g., Heppner, signed the March 2021 8-K.  And, the Proposed Complaint does not allege that Heppner reviewed a draft of the March 2021 8-K before it was filed or provide any input on the disclosures in the March 2021 8-K.  Nor could it.

40.     On March 9, 2021, the former GWG CEO contacted Bailey, Fine, and MacDowell regarding the upcoming 8-K disclosure and noted that they would include the following language: "These resignations were not due to any disagreement with the Company on any matter relating to the operations, policies, or practices of the Company."  And, he requested any comment to that language they may have.[64]  In so doing, the Company complied with SEC Form 8-K, which requires the company to "provide the director with a copy of the disclosures it is making in response to this Item 5.02" and "provide the director with the opportunity to furnish the registrant

---

[63]     See **Exhibit 2,** December 2, 2022 8-K ("[T]he Amended 8-K omits a key point relevant to the circumstances of the Board's decision to dissolve the Special Committee.  The Amended 8-K makes no reference to the Board's resolution during a March 4, 2021 special meeting of the Company's Board of Directors (the 'Special Meeting') not to proceed with the Amended and Restated Certificate of Incorporation of the Company (the 'Amended Charter'), or the Board's resolution to withdraw a Form S-4 registration statement and other SEC filings the Company made on July 6, 2020 connected to the Amended Charter.  During the Special Meeting, the Board voted to dissolve the Special Committee because the Board resolved not to pursue the Amended Charter.").

[64]     See **Exhibit 2,** December 2, 2022 8-K, Ex. 17.2 (the Holland resignation letter).

as promptly as possible with a letter addressed to the registrant stating whether he or she agrees with the statements made by the registrant in response to this Item 5.02 and, if not, stating the respects in which he or she does not agree."[65]  Neither Bailey, Fine, nor MacDowell stated any disagreement with or objected to this language.  Instead, they replied glibly that "[o]ur resignations speak for themselves."[66]

41.     SEC guidance requires a filing company provide a draft of the Form 8-K and specifically the Item 5.02(a) disclosure for the resigning directors' consideration.[67]  In the HP Inc. case, the SEC found that HP Inc. was required, when its director resigned in disagreement, by "Item 5.02(a) of Form 8-K to disclose a brief description of the circumstances representing the disagreement and, was required to provide [the director] with a copy of this disclosure no later than the day of the filing …. [and, here HP] failed to provide the director with a copy of such a filing."[68]

42.     Bailey, Fine and MacDowell said only in writing "I hereby resign" without giving any written explanation for that resignation.  And, they had no comment to the proposed 8-K language other than "our resignations speak for themselves."[69]  As directors of a public company, if these individuals had disagreements with GWG Holdings that prompted their resignations, they should have reduced those disagreements to writing and supplied them to GWG Holdings for

---

[65]     SEC Form 8-K, Item 5.02(a)(3)(i) and (ii), available at https://www.sec.gov/files/form8-k.pdf (attached hereto as **Exhibit 3**).

[66]     **Exhibit 1**, Amended March 2021 8-K, Ex. 99.2.

[67]     See **Exhibit 3**, SEC Form 8-K, Item 5.02(a)(3)(i) and (ii).

[68]     SEC Release No. 10868, Order Instituting Cease-And-Desist Proceedings, In the Matter of HP Inc. (Sept. 30, 2020); Press Release, SEC, "SEC Charges HP Inc. With Disclosure Violations and Control Failures" (Sept. 30, 2020). A copy of the HP Inc. cease-and-desist order and related press release are attached hereto as **Exhibit 4**.

[69]     See **Exhibit 1**, Amended March 2021 8-K, Exs. 99.1, 99.2.

inclusion in an SEC filing.  That is what is contemplated by the SEC (per HP Inc.) and Item 5.02(a) in Form 8-K, specifically in its provisions requiring that correspondence from the directors be attached to the Form 8-K and that directors be given an opportunity to comment on it.  The resigning directors here chose not to do so.  According to the former CEO, on March 9, 2021, Bailey, Fine, and MacDowell were given an opportunity to comment on the language in the Form 8-K, and GWG Holdings then issued the March 2021 8-K without their objection.  Thus, on March 11, 2021, the Company disclosed in its March 2021 8-K that "these resignations were not due to any disagreement with the Company known to an executive officer of the Company on any matter relating to the operations, policies or practices of the Company."

43.    Also according to the former CEO, GWG Holdings' management issued the March 2021 8-K after consulting with counsel.[70]  The Committee concedes this point, as it must.[71]  The former CEO contends management had a reasonable and good faith belief, based on the advice of counsel, that no disclosable disagreement with the resigning members of the Third Special Committee existed.

---

[70]    **Exhibit 2**, December 2, 2022 8-K, Ex. 17.2 at 3 ("[A]t the request of management, the Company's disclosure counsel, Mayer Brown, provided written guidance that it was reasonable to conclude that the resignations were not the result of a disagreement with the Company regarding its operations, policies, or practices.  Mayer Brown based its written guidance on a full understanding of all the material facts described above. Mayer Brown: 1) was present at the March 4, 2021 Special Meeting where Mr. Bailey expressed his views about the proposed Ben transaction, 2) heard first-hand the basis articulated by the Board for the dissolution of the Special Committee, 3) received the March 3rd funding requests from the Special Committee's legal counsel, 4) received the March 5th funding proposal I provided to Mr. Bailey the day prior to his resignation that addressed Mr. Bailey's requests, 5) received the resignation letters from each of the resigning Directors, and 6) received the March 9th communication to the resigning Directors, including Mr. Fine's response on behalf of the Directors that the 'resignations speak for themselves' and where they declined to comment on the proposed disclosure language the Company filed in the Original 8-K.  Based on all this information, Mayer Brown provided legal guidance on the Company's disclosure obligations, and on which I reasonably relied in good faith to support my understanding that there was no disclosable disagreement that needed to be included in the Original 8-K").

[71]    Cf. Proposed Compl. ¶¶ 30-31.

### H. THERE IS NOTHING INAPPROPRIATE OR FRAUDULENT ABOUT HEPPNER'S TRANSACTIONS WITH BENEFICIENT

44. Heppner is the Founder, Chief Executive Officer and Chairman of Beneficient. He founded the predecessor to BCG in 2003, launched its current business plan under BCH in 2010, completed its formational transactions in 2017, and has invested more than $130 million of his own money into the company. The Proposed Complaint incorrectly contends Heppner was overcompensated and tries to make much of the terms relating to private air travel. But, throughout the relevant time period, Heppner's compensation was reasonable, in line with that of similarly situated peers, and properly disclosed.[72] And, with respect to the private travel, Heppner paid for these related-party costs with his own equity holdings in Beneficient.

45. Specifically, the Compensation Committee of Beneficient's Board—of which Heppner has never been a member—commissioned an independent, third-party consultant report by Grant Thornton, to review Heppner's compensation.[73] It found Heppner's compensation consistent with his peer group. As part of that compensation, Heppner was entitled to reimbursement for private air travel, at least three-quarters of which were for Beneficient business. And, in exchange, Heppner's Beneficient equity holdings were correspondingly reduced. This arrangement, along with Mr. Heppner's compensation agreements, pre-dated GWG Holdings' investment in Beneficient in December 2018 and were fully disclosed to GWG at the time of its investment in Beneficient. In any event, third-party valuation agents determined the present value of the costs of private travel as well as other services received by Heppner and his Beneficient

---

[72] See GWG Holdings 2020 10-K, at p. 89.

[73] Grant Thornton Executive Compensation Benchmarking and Incentive Plan Review (October 2020).

preferred equity holdings were correspondingly reduced as disclosed in the Form S-4.[74]  And, EY Consulting Services recently confirmed that Heppner's contractual compensation is within a reasonable range of peer compensation for similar positions at similarly situated companies.[75]

46.     Finally, there is nothing improper about the loan from HCLP Nominees to Beneficient.[76]  In 2017, as part of a transaction with Paul Capital Advisors ("**Paul Capital**"), HCLP Nominees loaned funds to Beneficient Capital Company, L.L.C. ("**BCC**") that, along with additional funds, was used by certain exchange trusts to acquire Beneficient common units that, in turn, were auctioned to GWG Holdings through a sale managed by MHT and advised by Credit Suisse.  The consideration from that auction was used to acquire alternative assets from Paul Capital that formed the initial foundation of Beneficient's operating business.  The HCLP Nominees loan was incurred for legitimate purposes, pre-dates GWG's investment in Beneficient, and was fully disclosed prior to that investment.  And, while Paul Capital and Beneficient are currently involved in litigation related to this transaction, Paul Capital has never challenged the HCLP Nominees loan as invalid in any way.  Notably, David De Weese, a Paul Capital partner,

---

[74]     See, e.g., Beneficient Form S-4, at p. 343 ("Each class of the Company's equity was then recorded at its fair value as set forth in valuation analysis, with the capital account balances of the preferred equity held by Ben's founders, including BHI, reduced for, among other things, (i) the balance of outstanding debt of Ben, including related party debt, and (ii) any decrease in the value of Ben, up to the entire founders' preferred equity amount outstanding, including decreases arising from the present value of the estimated costs of the related party contracts, including estimated costs related to private travel under the terms of the Bradley Capital Agreement.").

[75]     Separately, the Proposed Complaint alleges "upon information and belief" that existing Beneficient indebtedness included "expenses tied to Heppner's ranch [that] … had little or no direct connection to [Beneficient's] current business."  Proposed Compl. ¶ 111.  But, that too tries to raise the specter of suspicion without substance.  Among other things, affiliates of Heppner own the ranch and have held it since 2017, before any third-party investment and, most notably, predating GWG Holdings' investment in Beneficient, and a required divestment as part of the Paul Capital/MHT transaction. So the ranch was not an asset of Beneficient at the time of GWG's investment.  And, when Beneficient – which was essentially a family office at the time – transferred the ranch in 2017, it do so as part of the Paul Capital/MHT investment.

[76]     See Proposed Compl. ¶ 111.

sat on Beneficient's Board during the relevant times related to the dispute between Paul Capital and Beneficient.  Yet, the efficacy of the HCLP Nominees loan has not been challenged in the Paul Capital litigation.

## CONCLUSION

The Standing Motion should be denied.

**DATED:**  February 22, 2023
Houston, Texas

Respectfully submitted,

By: /s/ *Christopher Porter*
   QUINN EMANUEL URQUHART & SULLIVAN, LLP

Christopher Porter
Tx. Bar No. 24070437
711 Louisiana Street
Houston, Texas 77002
Telephone: (713) 221-7000
Email: chrisporter@quinnemanuel.com

-and-

James C. Tecce
Deborah Newman
Alex Zuckerman
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone: (212) 849-7000
Email: jamestecce@quinnemanuel.com
Email: deborahnewman@quinnemanuel.com
Email: alexzuckerman@quinnemanuel.com

Michael Liftik
Kristin Casey
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: michaelliftik@quinnemanuel.com
Email: kristincasey@quinnemanuel.com

*Counsel to Brad K. Heppner*