THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE SECOND AMENDED PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| *In re:* | Chapter 11 |
| GWG Holdings, Inc., *et al.*,[1] | Case No. 22-90032 (MI) |
| | (Jointly Administered) |
| Debtors. | |

## DISCLOSURE STATEMENT FOR THE DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN, SUBMITTED BY THE DEBTORS, THE BONDHOLDER COMMITTEE, AND L BOND MANAGEMENT, LLC AS CO-PROPONENTS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding Holdings VI, LLC (6955); and GWG DLP Funding VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these Chapter 11 Cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Email:          kpeguero@jw.com
                     mcavenaugh@jw.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*


**MAYER BROWN LLP**
Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Telephone:    (713) 238-3000
Email:          ckelley@mayerbrown.com

- and -

Thomas S. Kiriakos (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
Jamie R. Netznik (admitted *pro hac vice*)
Lisa Holl Chang
Joshua R. Gross (admitted *pro hac vice*)
Jade Edwards

71 S. Wacker Drive
Chicago, Illinois 60606
Telephone:    (312) 782-0600
Email:          tkiriakos@mayerbrown.com
                     lchiappetta@mayerbrown.com
                     jnetznik@mayerbrown.com
                     lhollchang@mayerbrown.com
                     jgross@mayerbrown.com
                     jedwards@mayerbrown.com

- and -

Adam C. Paul (admitted *pro hac vice*)
Lucy F. Kweskin (admitted *pro hac vice*)
Ashley Anglade
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone:    (212) 506-2500
Email:          apaul@mayerbrown.com
                     lkweskin@mayerbrown.com
                     aanglade@mayerbrown.com


*Counsel for the Debtors*
*and Debtors in Possession*

Dated: March 22, 2023

| IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT |
|---|

**THE DEADLINE TO VOTE ON THE SECOND AMENDED PLAN IS**
**May [2], 2023 at 4:00 p.m. (prevailing Central Time)**

**THE DEADLINE TO OBJECT TO THE SECOND AMENDED PLAN IS**
**May [___], 2023 at 11:59 p.m. (prevailing Central Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY DONLIN, RECANO & COMPANY, INC. ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY INDIVIDUAL OR ENTITY FOR ANY OTHER PURPOSE AND SHALL NOT BE BINDING ON ANY INDIVIDUAL OR ENTITY. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE SECOND AMENDED PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN, THE RELEVANT PROVISIONS OF THE SECOND AMENDED PLAN WILL GOVERN.**

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE SECOND AMENDED PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE SECOND AMENDED PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE SECOND AMENDED PLAN.**

**THE SECOND AMENDED PLAN WAS APPROVED BY THE DEBTORS' MANAGEMENT AND GOVERNING BOARDS, INCLUDING THE CHIEF RESTRUCTURING OFFICER AND THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF GWG HOLDINGS, INC. THAT WAS FORMED IN CONNECTION WITH THE CHAPTER 11 CASES TO, AMONG OTHER THINGS, ANALYZE AND EVALUATE A CHAPTER 11 PLAN.**

**THE SECOND AMENDED PLAN IS SUPPORTED BY THE OFFICIAL COMMITTEE OF BONDHOLDERS THAT WAS APPOINTED BY THE U.S. TRUSTEE**

TO REPRESENT THE INTERESTS OF BONDHOLDERS IN THESE CHAPTER 11 CASES. THE BONDHOLDER COMMITTEE HAS AGREED TO BE A PROPONENT OF THE SECOND AMENDED PLAN AND SUPPORTS THE SECOND AMENDED PLAN, AND RECOMMENDS THAT BONDHOLDERS VOTE TO ACCEPT THE PLAN. NOTWITHSTANDING THE FOREGOING, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS (SUBJECT TO THE DISCLAIMERS AND OTHER QUALIFICATIONS SET FORTH HEREIN), AND THE BONDHOLDER COMMITTEE DOES NOT ADOPT ALL OF THE STATEMENTS CONTAINED HEREIN INCLUDING, BUT NOT LIMITED TO, ANY STATEMENTS REGARDING BENEFICIENT AND ITS AFFILIATES AND RELATED ENTITIES, THE PURPORTED VALUE OF BENEFICIENT AND THE DEBTORS' INTERESTS IN BENEFICIENT OR ANY STATEMENTS REGARDING ANY OF THE DEBTORS' PREPETITION TRANSACTIONS. FOR A DISCUSSION OF THE BONDHOLDER COMMITTEE'S VIEWS ON CERTAIN OF THESE MATTERS, THE BONDHOLDER COMMITTEE REFERS TO THE STANDING MOTION AND THE PROPOSED COMPLAINT ATTACHED THERETO.

L BOND MANAGEMENT, LLC, WHICH REPRESENTS THE INTERESTS OF CERTAIN BONDHOLDERS THAT HOLD SELLER TRUST L BONDS (AS DESCRIBED FURTHER HEREIN), HAS ALSO APPROVED THE SECOND AMENDED PLAN, HAS AGREED TO BE A PROPONENT OF THE SECOND AMENDED PLAN, SUPPORTS THE SECOND AMENDED PLAN, AND URGES ALL BONDHOLDERS TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE SECOND AMENDED PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS AND/OR ARRANGEMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE SECOND AMENDED PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE SECOND AMENDED PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.

ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND ANY FUTURE RESULTS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE SECOND AMENDED PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT AT ANY TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE SECOND AMENDED PLAN OTHER THAN WHAT IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE SECOND AMENDED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OF THE SECOND AMENDED PLAN OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE SECOND AMENDED PLAN, WHO VOTE TO REJECT THE SECOND AMENDED PLAN, OR WHO ARE NOT

ENTITLED TO VOTE ON THE SECOND AMENDED PLAN) WILL BE BOUND BY THE TERMS OF THE SECOND AMENDED PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE SECOND AMENDED PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN <u>ARTICLE IX</u> OF THE SECOND AMENDED PLAN. THERE IS NO ASSURANCE THAT THE SECOND AMENDED PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE SECOND AMENDED PLAN TO GO EFFECTIVE WILL BE SATISFIED OR WAIVED.

YOU ARE ENCOURAGED TO READ THE SECOND AMENDED PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING <u>ARTICLE VIII</u>, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE SECOND AMENDED PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE SECOND AMENDED PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS

**The Debtors intend that the New WDT Interests shall not be "securities" under applicable laws and believe the New WDT Interests should not be deemed to be "securities," but to the extent such instruments are deemed to be "securities," the Debtors believe the issuance of the New WDT Interests under the Plan is exempt, pursuant to section 1145(a) of the Bankruptcy Code. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters to be forward-looking statements. Statements containing words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "project," "target," "model," "can," "could," "may," "should," "will," "would," or similar words or the negative thereof, constitute "forward looking statements." However, not all forward-looking statements in this disclosure statement may contain one or more of these identifying terms. Forward-looking statements are not guarantees of success of the Debtors' or Wind Down Debtors' ability to satisfy all claims or interests to be paid under the Second Amended Plan. There are risks, uncertainties, and other important factors that need to be considered. These risks, uncertainties, and factors may include the following: the Debtors' or Wind Down Debtors' ability to confirm and consummate the Second Amended Plan; the potential that the Debtors or Wind Down Debtors may need to pursue an alternative transaction if the Second Amended Plan is not confirmed; the potential adverse impact of the chapter 11 cases on the Debtors' or Wind Down Debtors' operations, management, and relationships with third parties; the risks associated with operating the Debtors' businesses during the chapter 11 cases; stakeholders' responses to the chapter 11 cases; the Debtors' inability to settle claims during the chapter 11 cases; general economic, business, and market conditions; exposure to litigation; the ability to divest certain assets in an orderly manner; and adverse tax changes.**

v

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................. 1

II.    THE PLAN ......................................................................................................... 2

    A.     The Company ............................................................................................ 2

    B.     The Mediated Settlement ......................................................................... 5

    C.     Summary of the Second Amended Plan ................................................. 11

    D.     Additional Plan Information and Plan Supplement ............................... 18

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
      STATEMENT AND THE SECOND AMENDED PLAN .............................. 19

    A.     What is chapter 11? ................................................................................ 19

    B.     Why are the Debtors sending me this Disclosure Statement? ............. 19

    C.     Am I entitled to vote on the Second Amended Plan? .......................... 19

    D.     What will I receive from the Debtors if the Second Amended Plan is
       consummated? ........................................................................................ 20

    E.     What will I receive from the Debtors if I hold an Allowed Administrative
       Claim, Allowed Accrued Professional Compensation Claim, Allowed
       Chapford DIP Facility Claim, Allowed Vida DIP Claim, Allowed DLP
       Secured Claim, Allowed Indenture Diminution Claim or Allowed Priority
       Tax Claim? .............................................................................................. 25

    F.     Are any regulatory approvals required to consummate the Second
       Amended Plan? ....................................................................................... 29

    G.     What happens to my recovery if the Second Amended Plan is not
       confirmed or does not go effective? ....................................................... 29

    H.     If the Second Amended Plan provides that I get a distribution, do I get it
       upon Confirmation or when the Second Amended Plan goes effective?
       What is meant by "Confirmation," "Effective Date" and
       "Consummation"? ................................................................................... 29

    I.     Is there potential litigation related to confirmation of the Second Amended
       Plan? ....................................................................................................... 30

    J.     Will the final amount of the allowed claims or interests in a particular
       class affect the recovery of holders of allowed claims or interests in such
       class or in other classes under the Second Amended Plan? ................... 30

    K.     Will there be releases and exculpation granted to parties in interest as part
       of the Second Amended Plan? ............................................................... 31

    L.     What is the deadline to vote on the Second Amended Plan? ............... 33

    M.     How do I vote for or against the Second Amended Plan? ................... 33

## TABLE OF CONTENTS
(continued)

Page

N.    What are the consequences of filing a late proof of claim? ................................ 34

O.    Why is the Bankruptcy Court holding a Confirmation Hearing and when is
the Confirmation Hearing set to occur? .................................................... 34

P.    Who do I contact if I have additional questions with respect to this
Disclosure Statement or the Second Amended Plan? ......................................... 35

Q.    Do the Debtors recommend voting in favor of the Second Amended Plan? ....... 35

R.    Does the Bondholder Committee recommend that Bondholders vote in
favor of the Second Amended Plan? ........................................................ 36

IV.    THE COMPANY'S CORPORATE HISTORY, STRUCTURE, AND
PREPETITION BUSINESS OVERVIEW ................................................. 36

A.    The Company's Corporate History and Business Overview .............................. 36

B.    The Company's Prepetition Capital Structure ..................................... 46

V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................ 50

A.    The Company's Financial and Legal Challenges .............................. 50

B.    Defaults Under DLP IV Facility and DLP VI Facility; Amendments and
Waivers ......................................................................... 52

C.    The Company's Proactive Exploration of Strategic Alternatives ...................... 54

VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE
CHAPTER 11 CASES ................................................................ 55

A.    First Day Pleadings and Other Procedural and Administrative Motions ............ 55

B.    Appointment of Bondholder Committee, CRO and Independent
Committees; LBM; Ad Hoc Committee ................................................. 57

C.    Financing Matters; Filing of DLP IV and DLP VI ........................... 61

D.    Exclusivity ............................................................... 69

E.    Schedules and Statements .................................................. 69

F.    Establishment of Claims Bar Dates and Related Claims Procedures ................ 70

G.    Executory Contracts and Unexpired Leases ....................................... 70

H.    Litigation Matters ........................................................... 75

I.    Investigations ............................................................... 78

J.    Compensation Motion ........................................................ 82

VII.    SUMMARY OF KEY TERMS AND CONDITIONS OF THE SECOND
AMENDED PLAN ................................................................ 83

A.    Wind Down Trust .......................................................... 83

# TABLE OF CONTENTS
(continued)

Page

|   |   |   |   |
|---|---|---|---|
| | B. | Litigation Trust | 86 |
| | C. | Priority of Cash Distributions to Holders of New WDT Interests | 89 |
| | D. | Exemption from Registration Requirements | 91 |
| | E. | Releases, Exculpation and Injunction | 92 |
| | F. | Conditions Precedent to the Effective Date | 96 |
| VIII. | | RISK FACTORS | 98 |
| | A. | Bankruptcy Law Considerations | 98 |
| | B. | Risks Related to Recoveries under the Second Amended Plan and to the Wind Down Trust and Wind Down Trust Assets | 102 |
| | C. | Disclosure Statement Disclaimer | 108 |
| IX. | | SOLICITATION, VOTING PROCEDURES AND CONFIRMATION HEARING | 109 |
| | A. | Holders of Claims and Interests Entitled to Vote on the Second Amended Plan | 110 |
| | B. | Voting Record Date | 110 |
| | C. | Voting on the Second Amended Plan | 111 |
| | D. | Ballots Not Counted | 112 |
| X. | | CONFIRMATION OF THE SECOND AMENDED PLAN | 112 |
| | A. | Requirements for Confirmation of the Second Amended Plan | 112 |
| | B. | Confirmation Without Acceptance by All Impaired Classes | 114 |
| | C. | Valuation of the Wind Down Trust Assets | 115 |
| XI. | | CERTAIN SECURITIES LAW MATTERS | 115 |
| XII. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE SECOND AMENDED PLAN | 117 |
| | A. | General | 117 |
| | B. | Consequences to the Debtors | 119 |
| | C. | Consequences to Holders of Claims and Interests | 120 |
| | D. | Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests | 121 |
| | E. | Withholding on Distributions, and Information Reporting | 124 |

## <u>EXHIBITS</u>

EXHIBIT A    Second Amended Plan

EXHIBIT B    Disclosure Statement Order

## I.   INTRODUCTION

On April 20, 2022 (the "Initial Petition Date"), GWG Holdings, Inc. ("GWGH"), GWG Life, LLC ("GWG Life") and GWG Life USA, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Subsequently, on October 31, 2022 (the "DLP Petition Date"[2]), GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"), GWG DLP Funding VI, LLC ("DLP VI") (collectively, the "DLP Entities" and together with the Initial Debtors, the "Debtors") also filed voluntary petitions under chapter 11 of the Bankruptcy Code (such cases, collectively with the Initial Debtors' chapter 11 cases, the "Chapter 11 Cases") for relief under the Bankruptcy Code. The Debtors, as debtors and debtors in possession in the above-captioned cases (together with their non-Debtor subsidiaries, collectively, the "Company")[3] submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes for acceptance of the Debtors' Second Amended Joint Chapter 11 Plan (as may be amended, supplemented, or modified from time to time, the "Second Amended Plan"), submitted by the Debtors, the Official Committee of Bondholders (the "Bondholder Committee"), and L Bond Management, LLC ("LBM") as co-proponents.[4] A copy of the Second Amended Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Second Amended Plan constitutes a separate chapter 11 plan for each of the Debtors for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code, and the Second Amended Plan does not contemplate substantive consolidation of any of the Debtors. The rules of interpretation set forth in Article I.B of the Second Amended Plan govern the interpretation of this Disclosure Statement.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors and equity holders of the Debtors that are entitled to vote on the Second Amended Plan to make an informed decision on whether to vote to accept or reject the Second Amended Plan, as required under section 1125 of the Bankruptcy Code. Holders of Claims and Interests[5] entitled to vote to accept or reject the Second Amended Plan will receive a ballot (collectively, the "Ballots") together with this Disclosure Statement to enable them to vote on the Second Amended Plan in accordance with the voting instructions and make any other elections or certifications required or permitted pursuant to the Second Amended Plan.

---

[2]   As used herein, "Petition Date" shall refer to the applicable Petition Date with respect to such Debtor, whether that be the Initial Petition Date or the DLP Petition Date.

[3]   For the avoidance of doubt, the definition of the "Company" does not include The Beneficient Company Group L.P., FOXO Technologies, Inc., or their respective direct and indirect subsidiaries.

[4]   Capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed to them in the Second Amended Plan.

[5]   The following terms are ascribed the following meanings in the Second Amended Plan:
   "Holder" means any Entity holding a Claim or an Interest.
   "Claim" means any "claim" (as defined in section 101(5) of the Bankruptcy Code).
   "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor outstanding immediately prior to the applicable Petition Date, including any options, warrants, or other rights with respect thereto, or any other instruments evidencing an ownership interest in any of the Debtors and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation, and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidating preferences; and (c) stock options and warrants.

This Disclosure Statement includes, among other things: (1) an overview of the Second Amended Plan; (2) questions and answers regarding the Disclosure Statement and Second Amended Plan, including those relating to the confirmation process and procedures for voting; (3) information pertaining to the Company's corporate history, structure and prepetition business operations; (4) a description of the events leading up to the commencement of the Chapter 11 Cases; (5) a description of the material developments and anticipated events in the Chapter 11 Cases; (6) a summary of certain additional key terms and conditions of the Second Amended Plan; and (7) a discussion of certain risk factors associated with the Second Amended Plan.

**THE DEBTORS BELIEVE THAT THE SECOND AMENDED PLAN MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES WITH THE HIGHEST RECOVERY FOR THE DEBTORS' SECURITY HOLDERS AND OTHER STAKEHOLDERS. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE SECOND AMENDED PLAN.**

**THE BONDHOLDER COMMITTEE BELIEVES THAT THE SECOND AMENDED PLAN REPRESENTS THE BEST AVAILABLE OPTION UNDER THE CIRCUMSTANCES FOR COMPLETING THE CHAPTER 11 CASES AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE SECOND AMENDED PLAN.**

**LBM BELIEVES THAT THE SECOND AMENDED PLAN MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES FOR THE BENEFIT OF BONDHOLDERS, REPRESENTS THE BEST AVAILABLE OPTION UNDER THE CIRCUMSTANCES FOR COMPLETING THE CHAPTER 11 CASES, AND URGES YOU VOTE TO ACCEPT THE SECOND AMENDED PLAN.**

## II.    THE PLAN

### A.    The Company

The Company is a financial services firm with two principal types of assets: (i) life settlement assets, comprised of a portfolio of intermediate-duration and long-duration whole life insurance policies (each a "Policy" and collectively, the "Policy Portfolio") and (ii) passive, non-controlling equity interests in The Beneficient Company Group, L.P. ("Ben LP" and, together with its subsidiaries, "Beneficient") and FOXO Technologies, Inc. ("FOXO"), independent, non-affiliated entities that operate in the alternative assets and epigenetics spaces, respectively. The Policy Portfolio, Beneficient and FOXO are each described briefly below:

- The Policy Portfolio: The Company has built the Policy Portfolio during the last 15 years and it is held by the Company's subsidiaries, DLP IV and DLP VI. The majority of the Policies were acquired through secondary-market purchase transactions with insureds between 2006 and 2018, and no Policies have been acquired since 2019. As of [December 31, 2022], the approximate face amount of the Policy Portfolio was [$1.6 billion]. Of this, Policies with an approximate face amount of [$1.2 billion] are held by DLP IV and Policies with an approximate face amount of [$400.6 million] are held by DLP VI. Mark Venn, an independent expert,

has analyzed the residual equity value of the Policy Portfolio, and has concluded that, assuming a sale of the portfolio after seven years and subject to the other limitations and qualifications set forth in his report (*see* Docket No. 920, Exhibit 1), the residual interest in the Policy Portfolio has a median present value of approximately $93.6 million under a base case model, and a median present value of approximately $42.6 million under a stress case model. However, the timing and amount of recovery on account of such residual equity value is uncertain. The Policy Portfolio is described further in Article IV.A.1 of this Disclosure Statement.

- Beneficient: The Company holds interests in Ben LP and Ben LP's subsidiary Beneficient Company Holdings, L.P. ("BCH"). Beneficient endeavors to provide liquidity options to owners of alternative assets that wish to achieve an early exit from such alternative assets. As of the Initial Petition Date, the Company owned approximately 98% of the issued and outstanding common units (approximately 66 million common units) of Ben LP, prior to dilution, approximately $319 million of preferred limited partnership interests of Ben LP and approximately $205 million of preferred limited partnership interests of BCH. There are other limited partners of Beneficient that own a significant amount of preferred equity and/or debt of Beneficient, senior to the Debtors' common and preferred interests. The Debtors' common and preferred equity of Beneficient is junior to approximately $1.4 billion of senior debt and senior preferred equity held by certain founders of Beneficient (which include Bradley K. Heppner, Thomas O. Hicks, Bruce W. Schnitzer, Richard Fisher, James Silk and Murray Holland (or entities they control)). On September 21, 2022, Beneficient announced that it had signed a business combination agreement with Avalon Acquisition Inc. ("Avalon"), a publicly-traded special purpose acquisition company (such transaction referred to herein as the "Avalon Business Combination"). The press release issued by Beneficient and Avalon announcing the transaction asserted that such business combination agreement attributed an implied enterprise valuation of the combined companies of $3.5 billion.[6] Such valuation may or may not prove to be accurate, but to the extent that such valuation is accurate, the asserted $3.5 billion enterprise valuation would imply that the value of the Company's interests in Beneficient upon completion of the Avalon Business Combination may be approximately $1.4 billion. However, the value of such equity interests is subject to market valuation and could be significantly less. Furthermore, upon completion of the Avalon Business Combination, the Company's equity interests will be junior to approximately $1.2 billion of senior debt and senior preferred equity held by certain founders of Beneficient. The Avalon Business Combination is not yet final and is subject to a number of conditions to closing, including the Company's consent.

In connection with the Avalon Business Combination, Beneficient intends to apply for listing of the shares and warrants of the combined company on The NASDAQ

---

[6]   As noted, this is an implied valuation asserted by Beneficient and Avalon, and it is not the Debtors' valuation. Furthermore, based on information the Bondholder Committee has received to date, the Bondholder Committee neither agrees with nor adopts the purported $3.5 billion valuation, nor the implied valuation of the Company's interests in Beneficient upon completion of the Avalon Business Combination, should it occur.

Stock Market, LLC ("Nasdaq"). The value of publicly traded shares are subject to market fluctuations, which fluctuations could significantly impact the value of the Company's interests in Beneficient depending upon market trading. Beneficient, the Company's prepetition transactions with Beneficient, and the Avalon Business Combination are described further in Article IV.A.2 of this Disclosure Statement.

- FOXO: The Company also holds interests in FOXO, which uses epigenetics technology for the life insurance industry (e.g., biological testing for life insurance applicants that is used to assist in the actuarial modeling of life insurance policy maturities). On September 15, 2022, FOXO merged with Delwinds Insurance Acquisition Corp. ("Delwinds"), a special purpose acquisition company, which was renamed FOXO Technologies Inc. following the merger. FOXO currently is listed on the New York Stock Exchange, and the Company owns approximately 4.6 million common shares of FOXO. The price per share of FOXO's common stock as of market closing on March 21, 2023 was $0.34, which implies that the Debtors' interests in FOXO have a value of $1,564,000, assuming that a purchaser could be found for such interests. FOXO, the Company's interest in FOXO, and the Delwinds merger are described further in Article IV.A.3 of this Disclosure Statement.

In addition to the foregoing assets, the Debtors' assets also include the following:

- Claims and Causes of Action: The Company also holds certain potential claims and causes of action, including, but not limited to, several that the independent Investigations Committee has concluded are colorable. The Creditor Proponents' positions regarding colorable claims and causes of action is further outlined below. The Investigations Committee believes that the Company holds colorable claims against Non-Released Parties arising under the Bankruptcy Code or applicable state law for, among other things and without limitation, constructive and actual fraudulent transfers, breaches of fiduciary duties, and aiding and abetting such breaches of fiduciary duty, which arise from or relate to, among other things, (i) the Company's prepetition investments in Beneficient, including the transactions described in Article IV.A.2.b of this Disclosure Statement, among others; (ii) Beneficient's use of funds received from the Company; (iii) the Beneficient Separation Transactions, as described in Article IV.A.2.b of this Disclosure Statement; and (iv) public disclosures by the Company concerning certain material transactions and events, including certain public disclosures related to the resignation of certain former directors of GWGH, as further described below. The Bondholder Committee has also concluded that the Company holds colorable claims against Non-Released Parties including, among others, potential claims and causes of action for, (i) claims for the avoidance of at least $500 million of prepetition transactions, including in connection with the marketing and sale of Public L Bonds; (ii) claims against broker-dealers related to the payment of commissions and other fees; and (iii) breach of fiduciary duty against former directors and officers, all of which is described in further detail in the Bondholder Committee's Standing Motion (as discussed in Article VI.H.3 of this Disclosure Statement). LBM has received limited information related to the investigations and

4

conclusions of the Investigation Committee and the Bondholder Committee as to the existence of colorable claims. As such, LBM neither joins with nor adopts the positions of any of the Debtors, the Investigations Committee, or the Bondholder Committee. Further, other than to note its previously expressed disagreement with the characterization of certain facts as set forth in the Bondholder Committee's Standing Motion, LBM expresses no opinion regarding the merits of any alleged claims or their potential value to Bondholders. All potential claims and causes of action that are not explicitly released by the Plan or other Final Order shall be Retained Causes of Action and shall be pursued by the Litigation Trust for the benefit of all Holders of Claims and Interests.

- <u>D&O Liability Coverage</u>: The Debtors are beneficiaries of D&O Liability Insurance Policies which provide coverage to the Company, Beneficient and the Company's officers and directors, as described further in <u>Article VI.G.4</u> of this Disclosure Statement. [As of the date hereof], there is approximately [$146] million in available coverage under D&O Liability Insurance Policies for acts occurring prior to the Initial Petition Date.

As of the Initial Petition Date, and as described further in <u>Article IV.B.2</u> of this Disclosure Statement, GWGH and GWG Life had outstanding Public L Bonds in the approximate amount of $1.26 billion, Liquidity Bonds in the approximate amount of $0.8 million ($800,000), and Seller Trust L Bonds (as defined below) in the approximate amount of $367 million (for a total approximate amount of $1.627 billion). The Public L Bonds, Liquidity Bonds, and Seller Trust L Bonds are referred to herein collectively as the "<u>Bonds</u>," and the holders of such Bonds are referred to herein collectively as the "<u>Bondholders</u>."[7] A short, plain-English summary of the treatment of the Bond Claims of Bondholders under the Second Amended Plan is being provided to Bondholders as part of the solicitation materials and is also available free of charge at https://www.donlinrecano.com/Clients/gwg/Index. [Docket No. [●]].[8]

## B.    The Mediated Settlement

The Debtors filed an initial chapter 11 plan on December 1, 2022 (the "<u>Initial Plan</u>") and an amended chapter 11 plan on February 10, 2022 (the "<u>First Amended Plan</u>"), each along with an accompanying disclosure statement. The Debtors filed the Initial Plan and First Amended Plan understanding that, while there was agreement among several of the Debtors' constituencies on the general framework of a chapter 11 plan, significant issues still remained open. Therefore, the Debtors and the Special Committee filed the *Motion of the Debtors and the Special Committee of the Board of GWG Holdings, Inc. for Entry of an Order (I) Appointing a Judicial Mediator, (II) Requiring Parties to Maintain Confidentiality of Mediation Communications and (III) Granting Related Relief* [Docket No. 1128] (the "<u>Plan Mediation Motion</u>") seeking the appointment of the Honorable David R. Jones, United States Bankruptcy Judge for the Southern District of Texas, as judicial mediator (the "<u>Mediator</u>") to assist the Debtors in reaching a consensual chapter 11 plan. The Plan Mediation Motion was entered on January 5, 2023 [Docket No. 1323] and identified the

---

[7]    "<u>Bond Claims</u>" means, collectively: (a) the Allowed Bondholder Claims; (b) any Indenture Fee and Expense Claims; and (c) subject to <u>Article IV.I</u> of the Second Amended Plan, the LBM Subordinated Claims.

[8]    The Bondholder Summary will be filed as soon as practicable and in any event, prior to the hearing on the Disclosure Statement.

following parties that agreed to participate in the Mediation: (a) the Debtors, (b) the Independent Directors, (c) the Bondholder Committee, (d) Beneficient, (e) LBM, (f) the Ad Hoc Committee,[9] (g) the plaintiffs in the Securities Litigation[10] through their counsel, and (h) Paul Capital Advisors, L.L.C. ("Paul Capital") through its counsel.

Although the mediation remains ongoing, it has resulted in a settlement (the "Mediated Settlement") that is supported by the Debtors, the Bondholder Committee and LBM (the Bondholder Committee and LBM being referred to herein as the "Creditor Proponents") and forms the basis for the Second Amended Plan. Pursuant to the Mediated Settlement, the Bondholder Committee and LBM have agreed to be co-proponents of the Second Amended Plan filed on March 22, 2023, and the Bondholder Committee recommends that all Bondholders vote to ACCEPT the Plan.

The material terms of the Mediated Settlement are described below and in Article II.C of this Disclosure Statement.

### 1.    Framework of the Second Amended Plan

The Second Amended Plan provides that the Debtors will be liquidated and two liquidating trusts will be created: (i) the Wind Down Trust and (ii) the Litigation Trust. The Wind Down Trust will take all necessary steps to wind down the business affairs of the Debtors and liquidate the Wind Down Trust Assets, which include the Debtors' equity interests in the Policy Portfolio (i.e., the Policy Portfolio Equity Interests), Beneficient and FOXO, with a view toward maximizing the value of such assets for the benefit of creditors and promptly distributing such liquidation proceeds to creditors. The trustee of the Wind Down Trust will be the Debtors' Chief Executive Officer and Chief Restructuring Officer, Jeffrey S. Stein (or an affiliate of Mr. Stein). The Wind Down Trust will issue trust interests (the New WDT Interests) to Holders of Claims and Interests that are not paid in full in cash on the Effective Date of the Second Amended Plan. Distributions resulting from the monetization of the Policy Portfolio Equity Interests and the Debtors' interests in Beneficient and FOXO will be distributed to holders of New WDT Interests pursuant to the priority of payment waterfall set forth in Article IV.G of the Second Amended Plan.

The Litigation Trust will receive all non-released litigation assets of the Debtors as well as the Debtors' interests in the D&O Liability Insurance Policies. The trustee for the Litigation Trust (i.e., the Litigation Trustee) will have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action, and the Litigation Trust Reconciliation Claims, and shall have the duty to maximize the value of the assets of the Litigation Trust in accordance with the Litigation Trust Agreement. The Litigation Trustee will be appointed by the Bondholder Committee and will be an independent, third-party fiduciary with no affiliation with any Bondholder or member of the Bondholder Committee. All proceeds of the Litigation Trust will be distributed to the Wind Down Trust, as the beneficiary of the Litigation Trust, for further distribution to the holders of New WDT Interests pursuant to the priority of payment waterfall set forth in Article VI.C of the Second Amended Plan.

---

[9]    LBM and the Ad Hoc Committee are described further in Article VI.B.3 of this Disclosure Statement.
[10]   The Securities Litigation is described further in Article V.A.2 of this Disclosure Statement.

The Second Amended Plan is described in more detail in a question and answer format in Article II.C of this Disclosure Statement.

### 2.    LBM Settlement

The Debtors understand that, pursuant to certain powers of attorney, certain trusts (the Seller Trusts and Custody Trusts described in further detail in Article VI.B.3 of this Disclosure Statement) that hold Seller Trust L Bonds and equity interests in GWGH, designated LBM as agent with respect to claims (and related litigation) relating to the Seller Trust L Bonds. LBM is a special purpose entity formed under Delaware law. The trust advisor for each of the Seller Trusts and the Custody Trusts is John A. Stahl. MHT Financial, L.L.C., an entity affiliated with the Debtors' former Chief Executive Officer Murray T. Holland, is the sole beneficiary of each Seller Trust. The powers of attorney also grant LBM authority to act for the Custody Trusts and Seller Trusts in any bankruptcy proceedings affecting the property of such trusts. However, the Debtors understand that LBM has no authority or control over any equity interests held by the Seller Trusts. LBM is represented by Okin Adams Bartlett Curry LLP, as legal counsel, and Gordian Group, as investment banker.

Pursuant to the Mediation Agreement, and subject to the terms set forth in Article IV.H of the Second Amended Plan, LBM has agreed to subordinate 15% of its LBM L Bond Claims to all other existing Allowed Bond Claims in exchange for the full Allowance of the LBM L Bond Claims and the release of any and all civil claims held by the Debtors' Estates against the LBM Released Parties (the "LBM Settlement"). So long as LBM does not withdraw from the LBM Settlement, the 15% subordinated portion of the LBM L Bond Claims would constitute LBM Subordinated Claims (if LBM does withdraw, then the LBM Subordinated Claims would be the portion of the LBM L Bond Claims, if any, that is subordinated pursuant to a Final Order of the Bankruptcy Court). In exchange for the subordination of the LBM Subordinated Claims, the LBM L Bond Claims will be Allowed in the amount of [$377,516,519.13] and the LBM Released Parties will receive a full release of any and all civil claims held by the Debtors' Estates against them. The "LBM Released Parties" means, collectively, and in each case in their respective capacities as such: (a) LBM; (b) LBM's managers, employees, agents, attorneys and representatives solely in such capacity and solely for actions taken in such capacity that are related to the acquisition, holding, or disposition of any Seller Trust L Bonds for which LBM acts as agent including the LBM L Bond Claims; (c) the trusts identified in the definition of LBM L Bond Claims, the trustees and trust advisors of such trusts, current officers, directors, and advisors of such trusts, each solely in such capacity and solely for actions taken on behalf of such trusts; and (d) Richard Schmidt, the restructuring manager of LBM, and his professionals; *provided*, *however*, that any release of the LBM Released Claims are to be narrowly construed, and to the extent any LBM Released Parties serve or have served in multiple capacities, such releases do not extend beyond capacities as described above.

Notwithstanding the foregoing, in the event that the Debtors reach a settlement with the Beneficient Parties (as defined below), LBM may withdraw from the LBM Settlement by filing a written notice with the Bankruptcy Court within three Business Days of the filing of a Settlement Motion (as defined below). In the event that LBM withdraws from the LBM Settlement, (a) all agreements memorialized in the Second Amended Plan with respect to the LBM Settlement shall be deemed withdrawn, including, but not limited to, all subordination agreements and all Claim

allowances; (b) all claims, offsets, credits, objections and challenges of any kind to claims proposed to be settled pursuant to the Second Amended Plan are reinstated in their entirety and shall be transferred to the Litigation Trust on the Effective Date as Litigation Trust Reconciliation Claims; and (c) the LBM L Bond Claims will be deemed Disputed Class 3 Claims without further action, filing, or other request by the Debtors or the Bondholder Committee until the Claim Objection Bar Date at which time the LBM L Bond Claims shall be Allowed; *provided*, that such LBM L Bond Claims shall be considered Allowed only if and to the extent that no objection or other challenge in respect of the LBM L Bond Claims has been Filed on or prior to the Claim Objection Bar Date or such timely objection or other challenge has been Filed and the Claim thereafter has been Allowed by a Final Order. In any case, the LBM L Bond Claims shall be fully Allowed for voting purposes, and LBM agrees to and shall support and shall be deemed to accept the Second Amended Plan on account of the LBM L Bond Claims and be a Creditor Proponent consistent with the Mediation Agreement (it being understood that any settlement with Beneficient shall be set forth in an order approving any such settlement under Bankruptcy Rule 9019 and that LBM's only rights with respect to a settlement with Beneficient are (i) withdrawing from the settlement set forth in <u>Article IV.I</u> of the Second Amended Plan and/or (ii) objecting to such settlement with Beneficient).

The full terms of the LBM Settlement are set forth in <u>Article IV.H</u> of the Second Amended Plan.

### 3.   Agreements related to a potential settlement with Beneficient

As discussed further herein, the Debtors' Investigations Committee and the Bondholder Committee have investigated available Claims and Causes of Action related to, among other things, certain prepetition transactions between the Company and Beneficient that are described further in <u>Article IV.A.2.b</u> of this Disclosure Statement. As noted above, the Investigations Committee believes that the Company holds colorable claims against Beneficient and various Entities affiliated with Beneficient arising under the Bankruptcy Code or applicable state law for, among other things and without limitation, constructive and actual fraudulent transfers, breaches of fiduciary duties, and aiding and abetting such breaches of fiduciary duty. Discussions among the Debtors (through the Investigations Committee), Beneficient, and various Entities affiliated with Beneficient, including Beneficient's officers and directors (collectively with Beneficient, the "<u>Beneficient Parties</u>") remain ongoing. In accordance with the Mediated Settlement, if the Debtors reach a settlement with Beneficient or any of the Beneficient Parties prior to the Confirmation Hearing, the Debtors will file a separate motion pursuant to Bankruptcy Rule 9019 to seek Bankruptcy Court approval of such settlement (a "<u>Settlement Motion</u>"). Such a Settlement Motion, in order to be heard at the Confirmation Hearing, must be filed with at least 21 days' notice unless (a) the Bankruptcy Court, on its own motion, orders otherwise, or (b) the Debtors and the Creditor Proponents agree otherwise.[11]

---

[11]   The Bondholder Committee asserts that it has identified various viable and valuable claims and causes of action that are described in detail in the Bondholder Committee's Standing Motion (as discussed in <u>Article VI.H.3</u> of this Disclosure Statement). LBM has received limited information related to the investigations and conclusions of the Investigations Committee and Bondholder Committee as to the existence of colorable claims. As such, LBM neither joins with nor adopts the positions of any of the Debtors, the Investigations Committee, or the

For the avoidance of doubt, the Debtors have not as of the date hereof reached a settlement with any of the Beneficient Parties. It is possible that the Debtors will not reach any settlement with the Beneficient Parties before the Confirmation Hearing. In any event, the Second Amended Plan can be confirmed and the Effective Date can occur whether or not a settlement is reached with any of the Beneficient Parties. If the Debtors file the Settlement Motion, the Creditor Proponents have each reserved their rights to object to such Settlement Motion. However, regardless of any such objection, the Creditor Proponents have agreed to continue to support and, with respect to LBM, vote in favor of, the Second Amended Plan (so long as it remains consistent with the Mediation Agreement).

If the Debtors reach a settlement with any of the Beneficient Parties, the Debtors will file a Settlement Motion and, if approved, the terms of such settlement will be implemented without any resolicitation of the Second Amended Plan. In connection with a Settlement Motion, if any, the Debtors would seek Bankruptcy Court approval to grant releases by the Debtors to the settling parties of settled Claims and Causes of Action in exchange for agreed upon consideration from such settling parties. In any Settlement Motion, the Debtors would describe the terms of the proposed settlement, the parties either giving or receiving releases, the scope of such releases, and explain why the proposed settlement is in the best interests of the Debtors' Estates in lieu of litigating the claims that are proposed to be settled. The provisions of the Second Amended Plan expressly recognize the effectiveness of any releases granted pursuant to a separate order of the Bankruptcy Court entered on or before the Effective Date. Accordingly, the Debtors do not intend to amend the Second Amended Plan to include additional parties as "Released Parties" under the Second Amended Plan, meaning that only those Entities that are party to a settlement agreement would grant releases thereunder.

In addition, in connection with a Settlement Motion, if any, or in a separate motion if there is no settlement of claims, the Debtors may seek Bankruptcy Court approval to consent to the Avalon Business Combination, which consent must be obtained in order for Beneficient to consummate the merger. The Debtors have agreed pursuant to the Mediation Agreement that they will not consent to the Avalon Business Combination without Bankruptcy Court approval, with the understanding that such approval may be sought in conjunction with a Settlement Motion or on its own if there is no settlement.

Under the Mediation Agreement, the Debtors have agreed to provide all written settlement proposals either made to or received from the Beneficient Parties to the Creditor Proponents. The Debtors will also notify the Creditor Proponents within 24 hours of any settlement being reached and a term sheet or mediation agreement being signed, and will, in any event, provide notice of such settlement to the Creditor Proponents at least two days prior to filing a Settlement Motion. Additionally, under the Mediation Agreement, in connection with the adjudication of any Settlement Motion, the Debtors and LBM have agreed that the Bondholder Committee is a significant creditor constituency for purposes of the Fifth Circuit's requirement that the Bankruptcy Court consider the reasonable views of creditors set forth in *In re: Foster Mortgage*, 68 F.3d 914 (5th Cir. 1995).

---

Bondholder Committee. LBM expresses no opinion regarding the merits of any alleged claims or their potential value to Bondholders.

### 4. Broker Dealer Settlement Election

Pursuant to the Second Amended Plan, each of the Broker Dealers (certain broker/dealers and registered investment advisors who sold Public L Bonds) may elect to receive a release from the Wind Down Debtors and their Estates pursuant to Article VIII.C of the Second Amended Plan only in exchange for a Cash payment equal to 30% of all value received by such electing Broker Dealer from the Debtors on account of the sale of Public L Bonds and a mutual release of all Claims held by such Broker Dealer against the Debtors (the "Broker Dealer Settlement"). Any Broker Dealer may opt in to the Broker Dealer Settlement by submitting the Broker Dealer Settlement Election Notice and Broker Dealer Settlement Payment by 90 calendar days after the Effective Date. Any Broker Dealer Settlement Payments received will be allocated to the Litigation Trust and distributed pursuant to the Litigation Trust waterfall set forth in Article VI.C the Second Amended Plan.

### 5. The Indenture Trustee's Fees and Expenses

Pursuant to the Indenture, GWGH and GWG Life are obligated to pay the reasonable compensation, disbursements, advances and expenses of the Indenture Trustee, its agents and counsel (as defined in the Second Amended Plan, the Indenture Fee and Expense Claim), and the Indenture Trustee's right to payment of the Indenture Fee and Expense Claim has first priority with respect to distributions of the assets of GWGH and GWG Life. Pursuant to the Mediation Agreement, the Debtors and Creditor Proponents will seek to reach an agreement with the Indenture Trustee on the amount of the Indenture Fee and Expense Claim, and to the extent they reach an agreement on part or all of the Indenture Fee and Expense Claim, such Indenture Fee and Expense Claim will be paid in cash on the Effective Date to the extent of available Portfolio Proceeds. If an agreement cannot be reached on the amount of the Indenture Fee and Expense Claim, the parties will submit the dispute for further mediation to the Mediator and to the extent agreement cannot be reached after such further mediation, the Debtors may submit the dispute to the Bankruptcy Court. Pursuant to the Second Amended Plan, the Indenture Trustee, an account of the Indenture Fees and Expense Claim, will look first to the Portfolio Proceeds Amount for payment and, to the extent not satisfied thereby, the Indenture Trustee will receive New Series A1 WDT Interests having senior priority over the other New Series A1 WDT Interests.

### 6. Additional Mediated Settlement Terms

Additionally, pursuant to the Mediation Agreement, the Creditor Proponents have the right, acting separately (the "Proponents Consent Right") to review and consent to the form and substance of the Second Amended Plan, this Disclosure Statement and the forthcoming Plan Supplement, including trust agreements and other applicable documents, to ensure that it is consistent with, and can effectuate the settlement memorialized in the Mediation Agreement, and to address issues not explicitly covered by the Mediation Agreement but that are customary and required for a chapter 11 plan. Pursuant to Article I.G of the Second Amended Plan, following the filing of the Second Amended Plan, in the event the Debtors and the Creditor Proponents cannot agree to the form and substance of any documents in connection with the Second Amended Plan (and such document is subject to the Proponents' Consent Rights or other consent rights under the Second Amended Plan) or any decision which requires the consent of the Creditor Proponents, by the applicable deadline for filing such document thereunder, any such dispute shall be submitted

to the Mediator. To the extent of any remaining disputes following such mediation, then, pending final resolution thereof, any of the Debtors and the Creditor Proponents may file its own version of any such disputed document by the applicable deadline therefor. In such event: (1) the filing of competing versions of any such disputed document shall be deemed to have satisfied any such filing deadline thereunder, (ii) the Debtors and Creditor Proponents shall continue as co-proponents of the Second Amended Plan for all purposes, and (ii) the final form of any such disputed document will be subsequently resolved through either mediation with the Mediator or by order of the Bankruptcy Court.

The Mediation Agreement also includes certain agreements that are described in other sections of this Disclosure Statement as follows:

- the Creditor Proponents' agreement not to object to certain extensions of the Debtors' exclusive period to solicit a chapter 11 plan through the earlier of the Confirmation Hearing and May 31, 2023 is described in Article VI.D;

- the Bondholder Committee's agreement to adjourn the hearing on the Bondholder Committee's Standing Motion until the earlier of the Confirmation Hearing and May 31, 2023 (or the first available date on the Bankruptcy Court's calendar after May 31, 2023) is described in Article VI.H.3;

- the Debtors' agreement to adjourn the hearing on the Debtors' Compensation Motion to the Confirmation Hearing is described in Article IV.J; and

- the Creditor Proponents' agreement not to object to a mid-range valuation for the Debtors' assets, solely for purposes of the Plan, within certain parameters is described further in Article X.C.

### C.    Summary of the Second Amended Plan

Key aspects of the Second Amended Plan, in addition to those described in the above Article II.B, are described in the following chart in a question and answer format.

| Question | Answer |
|---|---|
| *Will the Debtors continue to operate after they have emerged from bankruptcy?* | No. The Debtors will ***not*** continue to operate as going concerns following the Effective Date, and will instead be liquidated at such time (or a later time, if agreed to by the Debtors and Creditor Proponents to promote tax efficiencies).<br><br>Pursuant to the Second Amended Plan, two liquidating trusts will be created. These liquidating trusts are referred to as the **Wind Down Trust** and the **Litigation Trust**, and all of the Debtors' assets will be transferred to one of those two liquidating trusts. As described below, a Portfolio Co. will also be created to hold the Policy Portfolio.<br><br>*For more information, see Article IV.C of the Second Amended Plan.* |

| THE WIND DOWN TRUST | |
|---|---|
| *What will the purpose of the Wind Down Trust be and what assets will be transferred to the Wind Down Trust?* | The Wind Down Trust will be established for the purpose of liquidating the Wind Down Trust Assets, with a view towards maximizing the value of such assets, for the benefit of New WDT Interest holders and distributing such liquidation proceeds to New WDT Interest holders.<br><br>The Wind Down Trust Assets include the Policy Portfolio Equity Interests, the Debtors' interests in Beneficient and FOXO, all reversionary and beneficial interests in the Litigation Trust and any remaining Assets of the Debtors, other than the Initial Litigation Trust Assets. The Wind Down Trust will be initially funded with the Wind Down Amount, which is an amount that will be agreed to by the Debtors and the Creditor Proponents, subject to the Proponents' Consent Right, and will be set forth in the Plan Supplement.[12]<br><br>*For more information, see Article IV.A of the Second Amended Plan.* |
| *What is role of the Wind Down Trustee?* | The Wind Down Trustee will have the sole authority to make decisions and take action with respect to the Wind Down Trust in accordance with the Second Amended Plan and the Wind Down Trust Agreement. The Wind Down Trustee, on behalf of the Wind Down Trust, will have discretion to enter into, consummate, settle, or otherwise resolve any transaction or dispute with respect to each of the Wind Down Trust Assets that have an economic value of less than $5 million (in the Wind Down Trustee's good faith determination) as of the date of the consummation, settlement, or resolution of such transaction or dispute. The Wind Down Trustee will submit all other matters to the Bankruptcy Court for approval after notice and an opportunity for a hearing.<br><br>The Wind Down Trustee will have the sole authority with respect to claims administration, including the sole authority to File, withdraw, or litigate to judgment objections to Claims or Interests, other than with respect to the Litigation Trust Reconciliation Claims, which are Claims or Interests held or filed by any defendant in any litigation initiated by the Litigation Trust or, in consultation with the Wind Down Trustee, Entity against whom the Litigation Trustee expects to initiate litigation, any Broker Dealer or Holders of LBM L Bond Claims, in the event LBM withdraws from the LBM Settlement.<br><br>The Wind Down Trustee will be Jeffrey S. Stein or any Affiliate of Jeffrey S. Stein that is identified in the Plan Supplement. |

---

[12]   Pursuant to the Mediation Agreement, if the Debtors and Creditor Proponents are unable to agree on the Wind Down Budget, then the Debtors will seek approval from the Bankruptcy Court of the Wind Down Budget.

| | |
|---|---|
| | *For more information, see Article IV.A and Article VII.B of the Second Amended Plan.* |
| *What does the Second Amended Plan provide with respect to selling the interests in Ben and FOXO?* | All determinations regarding the monetization of the Wind Down Trust's interests in Beneficient and FOXO will be subject to the reasonable business judgment of the Wind Down Trustee, subject to compliance with any applicable lock-up agreement or securities law requirements and subject to the requirement that the Wind Down Trustee seek and obtain Bankruptcy Court approval of any transaction with an economic value in excess of $5 million, as set forth in the Second Amended Plan.<br><br>*For more information, see Article IV.A.3 of the Second Amended Plan.* |
| *What will happen with the Policy Portfolio?* | The Company will establish a new entity, pursuant to the Vida DIP Financing Facility and Vida Exit Financing Facility, referred to as "Portfolio Co." The DLP Entities will transfer the Policy Portfolio to Portfolio Co. The equity interests in this new entity (the "Policy Portfolio Equity Interests") will be issued and transferred to the Wind Down Trust.<br><br>*For more information, see Article IV.C of the Second Amended Plan.* |
| | **THE LITIGATION TRUST** |
| *What will the purpose of the Litigation Trust be and what assets will be transferred to the Litigation Trust?* | The Litigation Trust will be established on the Effective Date to retain and hold all Retained Causes of Action. The proceeds of the Retained Causes of Action will be distributed to the Wind Down Trust for ultimate distribution in accordance with the waterfall described below and set forth in Article VI.C of the Second Amended Plan. Retained Causes of Action include all Avoidance Actions, all Causes of Action set forth on a schedule in the Plan Supplement (the form and substance of which being subject to the Proponents' Consent Right), and any other Causes of Action belonging to the Debtors or their Estates that are not released pursuant to the Second Amended Plan or other Final Order.<br><br>A non-exclusive list of the Retained Causes of Action will be Filed with the Plan Supplement. The Debtors' inclusion or failure to include any Retained Cause of Action in the Plan, this Disclosure Statement, or the Plan Supplement will not be deemed an admission, denial or waiver of any Retained Cause of Action that the Debtors or Estates may hold against any Entity.<br><br>The Initial Litigation Trust Assets will be vested in the Litigation Trust on the Effective Date. The Initial Litigation Trust Assets include the following assets: (a) the Initial Litigation Trust Funding Amount (an amount equal to $3 million in Cash); (b) the Retained Causes of Action; (c) the Debtors' interests in the D&O Liability |

| | Insurance Policies that provide coverage prior to April 20, 2022; (d) the Debtors' interests in the proceeds of such policies and the Debtors' entitlements and rights to payments thereunder; and (e) any Broker Dealer Settlement Payments received as of the Effective Date.<br><br>*For more information, see Article IV.D of the Second Amended Plan.* |
|---|---|
| *What is the role of the Litigation Trustee?* | The Litigation Trustee shall have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action, and the Litigation Trust Reconciliation Claims, and shall have a duty to maximize the value of the assets of the Litigation Trust in accordance with the Litigation Trust Agreement. The Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation in respect of such assets, provided that the ultimate decision with respect to whether to commence any litigation shall be in the sole discretion of the Litigation Trustee. For the avoidance of doubt, in exercising such sole discretion, the Litigation Trustee shall be entitled to consider and may take such actions in connection with the exercise of such discretion that promote the greatest recovery to the holders of the New WDT Interests. The Litigation Trustee shall seek Bankruptcy Court approval, after notice and an opportunity for a hearing, of (1) any settlements with respect to the Retained Causes of Action and (2) any other transaction with respect to any assets of the Litigation Trust, in each case, that has an economic value of $5 million or more (in the Litigation Trustee's good faith determination) as of the date of such transaction.<br><br>The Litigation Trustee will be an independent, third-party fiduciary selected by the Bondholder Committee and identified in the Plan Supplement, although pursuant to the Mediation Agreement, the Bondholder Committee may make known the identity of the Litigation Trustee earlier. The Litigation Trustee will not have any affiliation with any Bondholder Committee member and will not own any Public L Bonds, New WDT Interests or other Interests in or Securities issued by the Debtors.<br><br>*For more information, see Article IV.D and Article IV.P of the Second Amended Plan.* |
| **INTERESTS IN THE LIQUIDATING TRUSTS** ||
| *What securities will Holders of Allowed Bond Claims receive?* | Bondholders will receive New Series A1 WDT Interests, which will be entitled to Cash distributions pursuant to the priority of payment waterfalls set forth in <u>Article IV.G</u> and <u>Article VI.C</u> of the Second Amended Plan. |

| | |
|---|---|
| | With respect to LBM, LBM will receive New Series A2 WDT Interests with respect to the LBM Subordinated Claim and will receive New Series A1 WDT Interests with respect to the remaining portion of their LBM L Bond Claims.<br><br>*For more information regarding the New Series A1 WDT Interests and the New Series A2 WDT Interests, see Article III.B.3, Article IV.E.2 and Article IV.G of the Second Amended Plan.* |
| *What securities will Holders of certain other Allowed Claims (other than Bond Claims) or Interests receive?* | The following Holders of Allowed Claims or Interests will receive beneficial interests under the Second Amended Plan:<br>• Class 4(a) – General Unsecured Claims – will receive New Series B WDT Interests.<br>• Class 8 – Series 1 Preferred Interests – will receive New Series C WDT Interests.<br>• Class 9 – Series 2 Preferred Interests – will receive New Series D WDT Interests.<br>• Class 10 – Common Stock in GWGH – will receive New Series E WDT Interests.<br><br>*For more information regarding each series of the New WDT Interests, see Article III.B, Article IV.E.2 and Article IV.G of the Second Amended Plan.* |
| **DISTRIBUTIONS FROM THE LIQUIDATING TRUSTS** ||
| *How will proceeds of the Vida DIP Financing Facility and the Vida Exit Financing Facility be used?* | The Vida DIP Financing Facility and the Vida Exit Financing Facility will fund the Portfolio Proceeds Amount, the Initial Litigation Trust Funding Amount, and the Wind Down Budget. Each of these is described further below:<br>• The Portfolio Proceeds Amount is an amount consisting of the expected net Cash proceeds from the Vida DIP Financing Facility, *less* the sum of the three following amounts:<br>  o The Estimated Effective Date Shortfall Amount, which is an amount, if any, necessary to satisfy Allowed Claims that are required to be paid in full in Cash on the Effective Date less the amount of Cash the Debtors expect to have available for such purpose (excluding net Cash proceeds from the Vida DIP Financing Facility), in each case, as estimated by the Debtors (in consultation with the Creditor Proponents);<br>  o The Initial Litigation Trust Funding Amount, which is $3 million in Cash; and<br>  o The Wind Down Amount, the amount of which will be set forth in the Plan Supplement. |

| | The Portfolio Proceeds Amount, if any, will be distributed to Holders of Allowed Bond Claims (other than the LBM Subordinated Claims) in accordance with the Second Amended Plan on the Effective Date. |
|---|---|
| | The proceeds from the Vida Exit Financing Facility shall be used to refinance the Vida DIP Financing Facility. |
| | *For more information, see Article III.B.3 and Article IV.E.1 of the Second Amended Plan.* |
| *What is the priority of distributions to holders of New WDT Interests with respect to Net Cash Proceeds of the Wind Down Trust Assets?* | The distribution of any proceeds from the Wind Down Trust Assets is described in <u>Article VII.C</u> of this Disclosure Statement and follows the following order of priority among Holders of Claims and Interests: <ul><li>*first*, to Indenture Fee and Expense Claims;</li><li>*second*, to the prepetition amount of Allowed Bondholder Claims (other than the LBM Subordinated Claim);</li><li>*third*, to the prepetition amount of the LBM Subordinated Claim;</li><li>*fourth*, to postpetition interest on all Allowed Bondholder Claims at a rate of 9% per annum;</li><li>*fifth*, to the prepetition amounts of Allowed General Unsecured Claims;</li><li>*sixth*, to postpetition interest on Allowed General Unsecured Claims calculated at the Federal Judgment Rate</li><li>*seventh*, to Existing Preferred Interests holders on a *pari passu* basis;</li><li>eighth, to common stock holders.</li></ul> *For more information, see Article IV.G of the Second Amended Plan.* |
| *What is the priority of distributions to holders of New WDT Interests with respect to net proceed realized by the Litigation Trust?* | The distribution of any proceeds from the Litigation Trust assets is described in <u>Article VII.C</u> of this Disclosure Statement and follows the following order of priority among Holders of Claims and Interests: <ul><li>*first*, to Indenture Diminution Claims;</li><li>*second*, *pro rata* to holders of Allowed Bondholder Claims (subject to the intercreditor arrangements established in the waterfall with respect to Wind Down Trust Assets) and Allowed General Unsecured Claims, up to the aggregate outstanding prepetition amounts of such Claims;</li><li>*third*, *pro rata* to holders of Allowed Bondholder Claims (subject to the intercreditor arrangements established in the waterfall with respect to Wind Down Trust Assets) and Allowed General Unsecured Claims, with respect to interest that accrues under the Second Amended Plan;</li><li>*fourth*, to Existing Preferred Interests holders on a *pari passu* basis;</li></ul> |

|  | • *fifth*, to common stock holders.<br><br>The Indenture Dimination Claims are any Claims of the Indenture Trustee asserted on account of the decrease in the value of the Indenture Trustee's interest in the collateral securing the obligations under the Indenture, arising from the "Adequate Protection Liens" granted to the Indenture Trustee pursuant to the Chapford Final DIP Order and the Final Vida Order. On the Effective Date, the Indenture Dimination Claims shall be deemed an Allowed Administrative Claim in the amount as agreed by the Debtors, the Indenture Trustee, and the Creditor Proponents, or as determined by the Court, in the event such parties are unable to reach an agreement as to the amount during further mediation.<br><br>*For more information, see Article VI.C of the Second Amended Plan.* |
|---|---|
| **ADDITIONAL PROVISIONS** | |
| *Will the New WDT Interests issued in connection with the reorganization be freely transferable?* | Not initially. The Second Amended Plan will provide that the New WDT Interests are not transferable except by will, intestacy or operation of law. The Wind Down Trustee will be permitted to determine in its sole discretion to take such actions that are necessary or reasonably advisable (including, without limitation, completing a registration under the Securities Exchange Act) to modify or remove any contractual restrictions on transferability of the New WDT Interests, with any such determination by the Wind Down Trustee, and all costs associated therewith, to be deemed a determination with respect to the monetization of the Wind Down Trust Assets subject to Bankruptcy Court approval to the extent provided pursuant to <u>Article IV.A.3</u> of the Second Amended Plan and to be evaluated solely under a reasonable business judgment standard.<br><br>Even if the New WDT Interests are made transferrable, the New WDT Interests will not be listed on any national securities exchange and no assurance can be given that an active trading market for the New WDT Interests will develop. In addition, in such a case the Wind Down Trust will not engage the services of a market maker or otherwise facilitate the development of an active trading market.<br><br>*For more information, see Article VIII.B.6 of this Disclosure Statement and Article IV.I of the Second Amended Plan.* |
| *Does the Second Amended Plan contain releases?* | Yes. The Second Amended Plan contains releases by the Debtors, the Wind Down Debtors or their Estates of claims that arose on or before the Effective Date. Additionally, certain Exculpated Parties are released from Exculpated Claims, which are certain claims relating to an act or omission from the Petition Date to the Effective Date in connection with these Chapter 11 Cases. |

|  | Importantly, other than to the extent provided in the Debtor release or the exculpation provisions, the Second Amended Plan does not include third party releases.<br><br>*For more information, see Article III.K and Article VII.E of this Disclosure Statement and Article VIII of the Second Amended Plan.* |
| --- | --- |

### D.    Additional Plan Information and Plan Supplement

The information regarding the Second Amended Plan, the New WDT Documents and other Wind Down Documents contained in this Disclosure Statement is a summary and the Debtors encourage Holders of Claims and Interests to review the Second Amended Plan, the New WDT Documents and other Wind Down Documents for an understanding of the terms and conditions thereof, which Second Amended Plan, the New WDT Documents and other Wind Down Documents shall govern in the event of any inconsistency with this Disclosure Statement. The Wind Down Documents includes the Second Amended Plan, this Disclosure Statement, the Confirmation Order and the Plan Supplement, and the various agreements and other documentation formalizing the Second Amended Plan. The Debtors will file the Plan Supplement no later than five Business Days before the Voting Deadline. Prior to the Effective Date and in accordance with the terms of the Second Amended Plan and subject to the Proponents' Consent Right, the Plan Supplement may be modified, amended, supplemented, restated, or withdrawn after it is filed and such changes shall be made publicly available. The Plan Supplement will include the following information and documents, which shall be subject to the Proponents' Consent Right:

- the identity of the Wind Down Trustee;

- the identity of the Litigation Trustee;

- a schedule of the known Retained Causes of Action;

- a Schedule of Assumed Executory Contracts and Unexpired Leases;

- the form of Litigation Trust Agreement;

- the form of Wind Down Trust Agreement;

- the Wind Down Amount;

- the form of New WDT Documents, if any;

- the form of notice of Effective Date;

- the form of the Broker Dealer Settlement Election Notice;

- the Valuation Analysis;

- the Liquidation Analysis; and

- any other documentation necessary to effectuate or that is contemplated by the Second Amended Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN

### A.   What is chapter 11?

Chapter 11 refers to chapter 11 of title 11 of the United States Code and is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Consummating a chapter 11 plan and making distributions to holders of claims and interests is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Second Amended Plan. Before soliciting acceptances of the Second Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Second Amended Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Second Amended Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.   Am I entitled to vote on the Second Amended Plan?

Your ability to vote on, and your distribution (if any) under, the Second Amended Plan depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Second Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Deemed to Accept |

| Class 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 3 | Bond Claims | Impaired | Entitled to Vote |
| Class 4(a) | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4(b) | GUC Convenience Claims | Unimpaired | Deemed to Accept |
| Class 5 | DLP Entity General Unsecured Claims | Unimpaired | Deemed to Accept |
| Class 6 | Intercompany Claims | Impaired | Deemed to Reject |
| Class 7 | Intercompany Interests | Impaired | Deemed to Reject |
| Class 8 | Series 1 Preferred Interests | Impaired | Entitled to Vote |
| Class 9 | Series 2 Preferred Interests | Impaired | Entitled to Vote |
| Class 10 | Existing Common Interests | Impaired | Entitled to Vote |

**D.     What will I receive from the Debtors if the Second Amended Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Second Amended Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Second Amended Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Second Amended Plan.

For certain Classes, the anticipated recoveries set forth herein are also tied to liquidating trust interests that will receive distributions based on the priority of such interests and the monetization of assets or realization of profits over time. Accordingly, cash distributions on account of such interests will not be paid immediately on the Effective Date.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Second Amended Plan the treatment described below in full and final satisfaction, compromise, settlement, release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE SECOND AMENDED PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Allowed Claims or Interests / Projected |

| | | | Recovery Under the Second Amended Plan |
|---|---|---|---|
| | | **Classified Claims and Interests** | |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' option: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | <u>Estimated Allowed Claim Pool Amount</u>: [$0]<br><br><u>Estimated Recovery</u>: 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | <u>Estimated Allowed Claim Pool Amount</u>: [$0]<br><br><u>Estimated Recovery</u>: 100% |
| 3 | Bond Claims | Except to the extent that a Holder of a Bond Claim agrees to a less favorable treatment of its Allowed Claim, each such Holder shall receive, as applicable, as follows:<br><br>a. each Holder of an Allowed Bond Claim (other than the LBM Subordinated Claims) shall receive, on the Effective Date, its pro rata share of the Portfolio Proceeds Amount, if any; *provided, however*, that the Indenture Fee and Expense Claim shall be satisfied first from the Portfolio Proceeds Amount prior to any such further pro rata distributions in accordance with this subsection of the Second Amended Plan;<br><br>b. each Holder of an Allowed Bond Claim (other than the LBM Subordinated Claims) shall receive, on the Effective Date (or as soon as practicably thereafter), its pro rata share of the New Series A1 WDT Interests. The New Series A1 WDT Interests may be redeemed at any time without penalty at stated value and, pending any such redemption, shall be entitled to Cash | <u>Estimated Allowed Claim Pool Amount</u>: [$1,672,852,358]<br><br><u>Estimated Recovery</u>: [●] |

| | | distributions pursuant to the priority of payment waterfalls described in <u>Article IV.H</u> and <u>Article VI.C</u> of the Second Amended Plan. Any New Series A1 WDT Interests issued to the Indenture Trustee on account of any outstanding Indenture Fee and Expense Claims shall be expressly senior in all respects to any New Series A1 WDT Interests issued to Holders on account of their respective Allowed Class 3 Bond Claims; and<br><br>c. each Holder of an Allowed LBM Subordinated Claim shall receive, on the Effective Date, its pro rata share of the New Series A2 WDT Interests. The New Series A2 WDT Interests may be redeemed at any time without penalty at stated value and, pending any such redemption, shall be entitled to Cash distributions, but only pursuant to the priority of payment waterfalls described in <u>Article IV.H</u> and <u>Article VI.C</u> of the Second Amended Plan.<br><br>The pro rata distributions on account of the Allowed Class 3 Bond Claims shall be calculated based upon the sum of the aggregate amount of Allowed Class 3 Bond Claims (less any LBM Subordinated Claims) as of the Petition Date with respect to subsections (a) and (b) above, and the sum of the aggregate amount of Allowed LBM Subordinated Claims as of the Petition Date with respect to subsection (c) above, and after accounting for each Holder's receipt of its pro rata share of the Portfolio Proceeds Amount, as applicable. | |
|---|---|---|---|
| 4(a) | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the New Series B WDT Interests. The New Series B WDT Interests may be redeemed at any time without penalty at stated value and, pending any such redemption, shall be entitled to Cash distributions, but only pursuant to the priority of | <u>Estimated Allowed Claim Pool Amount</u>: [$20,253,401]<br><br><u>Estimated Recovery</u>: [●] |

| | | payment waterfalls described in <u>Article IV.H</u> and <u>Article VI.C</u> of the Second Amended Plan. | |
|---|---|---|---|
| 4(b) | GUC Convenience Claims | Except to the extent that a Holder of a GUC Convenience Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed GUC Convenience Claim, each Holder thereof shall receive, and the option of the applicable Debtor, either:<br><br>(i) payment in full in Cash of the due and unpaid portion of its Allowed GUC Convenience Claim on the later of (x) the Effective Date (or as soon thereafter as reasonably practicable), or (y) as soon as practicable after the date such Claim becomes due and payable; or<br><br>(ii) such other treatment rendering its Allowed GUC Convenience Claim Unimpaired.<br><br>Pursuant to the Second Amended Plan, a "<u>GUC Convenience Claim</u>" means an Allowed Claim in an amount greater than $0.01 but less than or equal to $10,000.00, that would otherwise qualify as a General Unsecured Claim; *provided*, that any Holder of an Allowed General Unsecured Claim may elect to have such Claim reduced to $10,000.00 and treated as an Allowed GUC Convenience Claim for purposes of the Second Amended Plan; *provided*, *further*, that notwithstanding the foregoing, the total GUC Convenience Claims shall not exceed $150,000 in the aggregate. | <u>Estimated Allowed Claim Pool Amount</u>: [$124,169]<br><br><u>Estimated Recovery</u>: 100% |
| 5 | DLP Entity General Unsecured Claims | On the Effective Date or as soon thereafter as such Claim becomes an Allowed Claim, each Holder of an Allowed DLP Entity General Unsecured Claim shall receive payment in full in Cash. | <u>Estimated Allowed Claim Pool Amount</u>: [$0]<br><br><u>Estimated Recovery</u>: 100% |
| 6 | Intercompany Claims | Other than the Policy Portfolio Equity Interests, which shall be transferred to the Wind Down Trust as set forth in the Second Amended Plan, on the Effective Date, any Debtor's Claim | <u>Estimated Allowed Claim Pool Amount</u>: N/A |

| | | | |
|---|---|---|---|
| | | against any other Debtor shall be deemed satisfied except to the extent necessary to effectuate the other terms of the Second Amended Plan. | Estimated Recovery: N/A |
| 7 | Intercompany Interests | On the Effective Date, any Debtor's equity Interests in any other Debtor shall be deemed cancelled except to the extent necessary to effectuate the other terms of the Second Amended Plan. | Estimated Allowed Claim Pool Amount: N/A<br><br>Estimated Recovery: N/A |
| 8 | Series 1 Preferred Interests | On the Effective Date, and in all instances, each Holder of a Series 1 Preferred Interest shall receive its pro rata share of the New Series C WDT Interests. The New Series C WDT Interests may be redeemed at any time without penalty at stated value and, pending any such optional redemption, shall be entitled to Cash distributions, but only pursuant to the priority of payment waterfalls described in Article IV.H and Article VI.C of the Second Amended Plan. The New Series C WDT Interests shall rank junior in right of payment to the New Series A1 WDT Interests, the New Series A2 WDT Interests, and the New Series B WDT Interests, *pari passu* with the New Series D WDT Interests, and senior to the New Series E WDT Interests. | Estimated Allowed Claim Pool Amount: [$42,622,169]<br><br>Estimated Recovery: [0-100%] |
| 9 | Series 2 Preferred Interests | On the Effective Date, and in all instances, each Holder of a Series 2 Preferred Interest shall receive its pro rata share of the New Series D WDT Interests. The New Series D WDT Interests may be redeemed at any time without penalty at stated value and, pending any such optional redemption, shall be entitled to Cash distributions, but only pursuant to the priority of payment waterfalls described in Article IV.H and Article VI.C of the Second Amended Plan. The New Series D WDT Interests shall rank junior in right of payment to the New Series A1 WDT Interests, the New Series A2 WDT Interests, and the New Series B WDT Interests, *pari passu* with the New Series C WDT Interests, and senior to the New Series E WDT Interests. | Estimated Allowed Claim Pool Amount: [$88,140,766]<br><br>Estimated Recovery: [0-100%] |

| 10 | Common Stock in GWGH | On the Effective Date, each Holder of Common Stock in GWGH shall receive its pro rata share of the New Series E WDT Interests. The holders of the New Series E WDT Interests shall only be entitled to Cash distributions upon the satisfaction and redemption of all other classes of New WDT Interests, pursuant to the priority of payment waterfalls described in Article IV.H and Article VI.C of the Second Amended Plan. | Estimated Allowed Claim Pool Amount: N/A  Estimated Recovery: N/A |

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, Allowed Accrued Professional Compensation Claim, Allowed Chapford DIP Facility Claim, Allowed Vida DIP Claim, Allowed DLP Secured Claim, Allowed Indenture Diminution Claim or Allowed Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, Chapford DIP Facility Claims, Vida DIP Claims, DLP Secured Claims, Priority Tax Claims and Indenture Diminution Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Second Amended Plan.

**1.     Administrative Claims**

Except as otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Wind Down Debtors or as provided in the Second Amended Plan, on the Administrative Claims Payment Date (or within a reasonable period of time after such Claims become Allowed Claims), each Holder of an Allowed Administrative Claim shall receive payment in full in Cash in full and final satisfaction, settlement, discharge, and release of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the applicable Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**EXCEPT AS OTHERWISE PROVIDED BY THE SECOND AMENDED PLAN, THE CONFIRMATION ORDER, OR A FINAL ORDER PREVIOUSLY ENTERED BY THE BANKRUPTCY COURT (INCLUDING THE FINAL VIDA ORDER), UNLESS PREVIOUSLY FILED, REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS**

**MUST BE FILED AND SERVED ON THE DEBTORS (OR THE WIND DOWN DEBTORS, AS APPLICABLE) NO LATER THAN THE CLAIMS BAR DATE APPLICABLE TO ADMINISTRATIVE CLAIMS PURSUANT TO THE PROCEDURES SPECIFIED IN THE CONFIRMATION ORDER AND THE NOTICE OF THE EFFECTIVE DATE;** *PROVIDED*, **THAT THE FOREGOING SHALL NOT APPLY TO ACCRUED PROFESSIONAL COMPENSATION CLAIMS, INDEPENDENT DIRECTOR FEE CLAIMS, THE INDENTURE DIMINUTION CLAIMS, OR CLAIMS ARISING UNDER SECTION 503(b)(1)(D) OF THE BANKRUPTCY CODE.**

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE CLAIMS BAR DATE APPLICABLE TO ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE CLAIMS BAR DATE APPLICABLE TO ADMINISTRATIVE CLAIMS SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE WIND DOWN DEBTORS, THE DEBTORS' ESTATES, OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE. ALL SUCH CLAIMS SHALL BE SUBJECT TO THE PERMANENT INJUNCTION SET FORTH IN <u>ARTICLE VIII.G</u> OF THE SECOND AMENDED PLAN.**

2. **Accrued Professional Compensation Claims**

(a) *Professional Fee Escrow Account.*

No later than one Business Day prior to the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with the Debtors' Cash on hand in the amount of the aggregate Professional Fee Escrow Amount for all Professionals; *provided* that each Professional's respective share of the Professional Fee Escrow Account shall be reduced, on a dollar-for-dollar basis, by any unused retainer held by such Professional as of the Effective Date.[13] The Professional Fee Escrow Account shall be maintained in trust for the Professionals and the funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates or any successor to the Debtors; *provided* that, notwithstanding the foregoing, the Wind Down Trust shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow Account over the aggregate Allowed Accrued Professional Compensation Claims to be paid from the Professional Fee Escrow Account, and such excess shall be paid to the Wind Down Debtors

---

[13]   For the avoidance of doubt, nothing contained in the Second Amended Plan shall be deemed to resolve any of the issues relating to the payment of fees and expenses for services rendered by Willkie Farr & Gallagher, LLP prior to the Petition Date, including with respect to all Cash held as a retainer by the Debtors or Willkie Farr & Gallagher, LLP pursuant to the *Order Modifying the Automatic Stay and Authorizing the Use of Estate Property, to the Extent Applicable, to Allow Payment, Reimbursement and/or Advancement of Defense Costs Under the Insurance Policies* [Docket. No. 754] (the "<u>D&O Insurance Order</u>") and the *Stipulation and Agreed Order Regarding the Order Modifying the Automatic Stay and Authorizing Use of Estate Property, to the Extent Applicable, to Allow Payment, Reimbursement and/or Advancement of Defense Costs Under Insurance Policies* [Docket. No. 825]. In accordance with the D&O Insurance Order, any and all such issues remain subject to resolution through either (i) further order of the Bankruptcy Court or (ii) agreement between the Debtors (or, if after the Effective Date, the Wind Down Trustee), Willkie Farr & Gallagher, LLP, and the Bondholder Committee (or, if after the Effective Date, the Litigation Trustee).

(and distributed to the Wind Down Trust, if determined by the Wind Down Trustee) without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

> (b)  *Final Fee Applications and Payment of Accrued Professional Compensation Claims.*

All final requests for payment of Claims of a Professional for services rendered and reimbursement of expenses incurred prior to the Confirmation Date shall be Filed no later than the first Business Day that is 60 days after the Confirmation Date. After notice and an opportunity for a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court. The amount of Accrued Professional Compensation Claims owing to the applicable Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order. After all Accrued Professional Compensation Claims have been paid in full, the Final Order Allowing such Accrued Professional Compensation Claims shall direct the escrow agent to return any excess amounts to the Wind Down Trustee without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

> (c)  *Estimate of Professional Fee Compensation Claims.*

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall provide a reasonable and good faith estimate of their Accrued Professional Compensation Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than three Business Days before the Confirmation Date; *provided*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional; *provided, further,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.

> (d)  *Post-Confirmation Fees and Expenses.*

Except as otherwise specifically provided in the Second Amended Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Second Amended Plan incurred by the Debtors or the Bondholder Committee; *provided*, that each Entity seeking such payment shall promptly provide copies of its invoices to the Debtors or the Wind Down Trustee, as applicable, and the Bondholder Committee, and the Bankruptcy Court shall have exclusive jurisdiction over any objections raised to the amount of the fees and expenses proposed to be paid, which objections may only be raised within 14 days after receipt thereof. In the event that within 14 days from receipt of such invoices, the Debtors or the Wind Down Trustee, as applicable, or the Bondholder Committee raises an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the fees and expenses included in such invoice, the Bankruptcy Court shall hear and determine such dispute. Upon the Confirmation Date, any requirement that Professionals and Ordinary Course

Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code, the Interim Compensation Order, or the Ordinary Course Professionals Order, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Wind Down Trustee, as applicable, may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. Furthermore, as of the date one day prior to the Effective Date, the obligation of any Ordinary Course Professional to File a fee application pursuant to the Ordinary Course Professionals Order shall be deemed waived, and, on the Effective Date, the Debtors or the Wind Down Trustee, as applicable, may pay any Ordinary Court Professional for fees incurred or accrued after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.  Chapford DIP Facility Claims

On or prior to the Effective Date, and to the extent each such Chapford DIP Facility Claims have not previously been satisfied in full in connection with the consummation of the Vida DIP Financing Facility or otherwise, each Holder of an Allowed Chapford DIP Facility Claim shall receive payment in full in Cash; *provided, however*, for the avoidance of doubt, the Chapford DIP Facility Claims shall not include the purported Alternate Stalking Horse Fee, as defined and referenced in the Chapford Final DIP Order (including any professional fees and expenses relating in any manner to the assertion of the purported Alternate Stalking Horse Fee).

### 4.  Vida DIP Claims

No later than the Effective Date, the Vida DIP Claims will be deemed satisfied in connection with the Debtors' exercise of the exit financing option and upon the closing under the Vida Exit Financing Facility Documents.

### 5.  DLP Secured Claims

All Allowed DLP Secured Claims will be satisfied by payment in full in Cash on or prior to the Effective Date from proceeds of the Vida DIP Financing Facility; *provided*, that, notwithstanding the foregoing, to the extent that all Allowed DLP Secured Claims are not paid in full in cash before the Effective Date, they shall be treated as Other Secured Claims. Any Disputed portion of the DLP Secured Claims shall be treated in accordance with <u>Article VII</u> of the Second Amended Plan.

### 6.  Indenture Diminution Claims

Any Allowed Indenture Diminution Claims will be satisfied by one or more payments in Cash after the Effective Date from proceeds realized by the Litigation Trust, pursuant to and in accordance with <u>Article VI.C</u> of the Second Amended Plan.

### 7.  Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for

each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 8.      Substantial Contribution Compensation and Expenses

Any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5) must File an application and serve such application on counsel to the Debtors or the Wind Down Debtors, as applicable, and the Bondholder Committee and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Claims Bar Date applicable to Administrative Claims.

### F.      Are any regulatory approvals required to consummate the Second Amended Plan?

To the extent any governmental approval or consent is necessary in connection with the transactions to be consummated in connection with the Effective Date of the Second Amended Plan, such governmental approval or consent, if any, will be obtained in order for the Second Amended Plan to become effective on the Effective Date.

### G.      What happens to my recovery if the Second Amended Plan is not confirmed or does not go effective?

In the event that the Second Amended Plan is not confirmed or does not go effective, there is no assurance that the Company will be able to implement the liquidating trusts pursuant to the Second Amended Plan and any other Wind Down Transactions, and therefore there can be no assurances that any creditors will receive the recovery from the estates described herein. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Second Amended Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article X.A.1 of this Disclosure Statement, entitled "Best Interests of Creditors" and the Liquidation Analysis that will be filed as part of the Plan Supplement.

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a very possible event if the Second Amended Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Second Amended Plan. Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

### H.      If the Second Amended Plan provides that I get a distribution, do I get it upon Confirmation or when the Second Amended Plan goes effective? What is meant by "Confirmation," "Effective Date" and "Consummation"?

"Confirmation" of the Second Amended Plan refers to approval of the Second Amended Plan by the Bankruptcy Court. Confirmation of the Second Amended Plan does not guarantee that you will receive the distribution indicated under the Second Amended Plan. After Confirmation of the Second Amended Plan by the Bankruptcy Court, there are conditions that must be satisfied or

waived so that the Second Amended Plan can go effective. Initial distributions to Holders of Allowed Claims or Allowed Interests will only be made on the date the Second Amended Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Second Amended Plan. *See* Article VII.F of this Disclosure Statement entitled "Conditions Precedent to the Effective Date" for a discussion of the conditions precedent to Consummation of the Second Amended Plan. "Consummation" refers to "substantial consummation" of the Second Amended Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (i) the transfer of all or substantially all of the property proposed by the Second Amended Plan to be transferred; (ii) assumption by the Debtors or by the successors to the Debtors under the Second Amended Plan of the business or of the management of all or substantially all of the property dealt with by the Second Amended Plan; and (iii) commencement of distributions under the Second Amended Plan.

**I.     Is there potential litigation related to confirmation of the Second Amended Plan?**

Parties in interest may object to Confirmation of the Second Amended Plan, which objections potentially could give rise to litigation. In addition, if it becomes necessary to confirm the Second Amended Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Second Amended Plan notwithstanding the dissent of such rejecting Classes pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Second Amended Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.3 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Second Amended Plan."

**J.     Will the final amount of the allowed claims or interests in a particular class affect the recovery of holders of allowed claims or interests in such class or in other classes under the Second Amended Plan?**

The chart provided above (*see* Article III.D of this Disclosure Statement entitled "What will I receive from the Debtors if the Second Amended Plan is consummated?") sets forth the Debtors' estimates of the aggregate amount of Allowed Claims or Interests in each Class. In particular, the Debtors estimate that Class 3 Claims (i.e., Bond Claims) will be Allowed in an aggregate amount of approximately $[1,673,037,275], Class 4(a) Claims (i.e., General Unsecured Claims) will be Allowed in an aggregate amount of approximately $[20,253,401], Class 8 Claims (i.e., Series 1 Preferred Interests) will be Allowed in an aggregate amount of approximately $[42,622,169], and Class 9 Claims (i.e., Series 2 Preferred Interests) will be Allowed in an aggregate amount of approximately $[88,140,766]. Although the Debtors' estimate of Allowed Claims or Interests in the foregoing classes is the result of the Debtors' and their advisors' careful analysis of available information, the actual Allowed Claims or Interests may be materially higher or lower than the Debtors' estimates provided herein.

Holders of Allowed Claims or Interests in the Classes described in the above paragraph (Classes 3, 4(a), 8 and 9) and in Class 10 (GWGH Common Stock) each receive interests in the Wind Down Trust that will receive distributions pursuant to a waterfall structure in which the Class(es), if any, that are senior to any particular Class are paid in full before such Class receives

distributions. The final amount of Allowed Claims or Interests could affect recoveries to Holders of a particular Class in a few different ways. First, if Allowed Claims or Interests in Class(es) that are senior to your Class are greater than the Debtors' estimate, then more distributions will go to such senior Class(es) before distributions begin to be made to your Class. On the other hand, if Allowed Claims or Interests in Class(es) that are senior to your Class are less than the Debtors' estimate, then fewer distributions will go to such senior Class(es) and your Class will be entitled to distributions sooner. Second, if Allowed Claims or Interests in the same Class as your Class and any *pari passu* Classes are greater than the Debtors' estimate, then, once your Class is entitled to distributions, those distributions will be shared pro rata among all the Claims or Interests in your Class and any *pari passu* Classes and your pro rata share of such distributions will be less. On the other hand, if Allowed Claims or Interests in the same Class as your Class and any *pari passu* Classes are less than the Debtors' estimate, then your pro rata share of such distributions will be greater.

The projected amount of Allowed Claims or Interests in each Class set forth herein is subject to change. For example, any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the applicable Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the applicable Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Allowed Claims or Interests could change as well, and such changes could be material.

Finally, the Debtors, the Bondholder Committee, or other parties in interest may object to Proofs of Claim, and the results of such objection proceedings ultimately could cause the total amount of Allowed Claims or Interests in a particular Class to change. These changes could affect recoveries to Holders of Allowed Claims or Interests in such Class, and such changes could be material.

**K.**     **Will there be releases and exculpation granted to parties in interest as part of the Second Amended Plan?**

Yes, the Second Amended Plan contains releases by the Debtors and exculpation of certain parties. **However, other than to the extent provided in the Debtor release or exculpation provisions, the Second Amended Plan does not contain third party releases, including releases by Holders of Claims or Interests. Accordingly, Holders of Claims or Interests will not be requested to "opt in" or "opt out" of any releases under the Second Amended Plan.**

Only those entities specifically included in the definition of Released Parties and Exculpated Parties shall be released or exculpated, respectively, pursuant to the Second Amended

31

Plan. In addition, the Second Amended Plan specifically identifies certain Non-Released Parties who shall not be released or exculpated pursuant to the Second Amended Plan. The Debtors' releases and exculpation provisions included in the Second Amended Plan are an integral part of the Debtors' overall restructuring efforts.

Under the Second Amended Plan, the Debtors, the Wind Down Debtors, their Estates, and certain related parties, release the "Released Parties" from claims that arise before the Effective Date in accordance with the provisions of Article VIII.C therein. "Released Party" means, collectively, and in each case in their respective capacities as such and subject to the limitations set forth in Article VIII.C of the Second Amended Plan: (a) (i) the Debtors and the Wind Down Debtors, (ii) Vida, (iii) the Bondholder Committee and each of its members, (iv) Anthony R. Horton, in his capacities as an Independent Director and director of the Debtors, (v) Jeffrey S. Stein, in his capacities as an officer, an Independent Director, and a director of the Debtors, (vi) Michael A. Tucker, in his capacity as an officer of the Debtors, (vii) the DLP Independent Directors, (viii) FTI Consulting, Inc., (ix) PJT Partners LP, and (x) any other Professional retained by the Debtors, the Independent Directors, the DLP Independent Directors, or the Bondholder Committee by order of the Bankruptcy Court in the Chapter 11 Cases or any professional retained by any of the members of the Bondholder Committee, each in such capacity; and (b) solely to the extent and on the terms and conditions set forth in the Second Amended Plan, (i) the LBM Released Parties, and (ii) the Broker Dealers that timely submit a Broker Dealer Settlement Election Notice and Broker Dealer Settlement Payment by the Broker Dealer Settlement Deadline.

The Second Amended Plan makes clear that any Entity that is not a Released Party is a "Non-Released Party," including, without limitation, Beneficient, its current and former directors and officers (including, without limitation, Bradley K. Heppner, Thomas O. Hicks, Bruce W. Schnitzer, Dennis P. Lockhart, and Peter T. Cangany), HCLP Nominees, L.L.C., the Debtors' former directors and officers (including, without limitation, Murray Holland and Timothy Evans) in their capacity or capacities as such, and any Entities affiliated with or otherwise related to the foregoing.

The releases set forth in Second Amended Plan do not release the Debtors' prepetition legal counsel solely with respect to claims or causes of action arising from such counsel's prepetition advice to the Debtors and/or any former directors or officers of the Debtors other than advice directly relating to the preparation and filing of the Chapter 11 Cases (it being understood any prepetition advice to the Debtors relating to prepetition transactions between the Debtors and Beneficient shall not constitute advice directly relating to the preparation and filing of the Chapter 11 Cases).

The Second Amended Plan also provides that Exculpated Parties will be deemed released and exculpated from Exculpated Claims, as set forth in Article VIII.E therein. An "Exculpated Party" means, collectively, and in each case, in their respective capacities as such: (a) Jeffrey S. Stein, in his capacities as an officer, an Independent Director, and a director of the Debtors; (b) Anthony R. Horton, in his capacities as an Independent Director and director of the Debtors; (c) Michael A. Tucker, in his capacity as an officer of the Debtors; (d) the Non-Management Directors, in their capacity as such; (e) the DLP Independent Directors, in their capacity as such; (f) the members of the Bondholder Committee, in their capacity as such; (g) any Professional retained by the Debtors, the Independent Directors, the DLP Independent Directors, the Bondholder

32

Committee, in such Professionals' capacity as such; and (h) any professional retained by any of the members of the Bondholder Committee, each in such professionals' capacity as such.

An "Exculpated Claim" means any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of: (a) the Chapter 11 Cases; (b) the formulation, preparation, dissemination, or negotiation of any document in connection with the Chapter 11 Cases; (c) any contract, instrument, release, and/or other agreement or document created or entered into in connection with the Chapter 11 Cases; (d) the pursuit of Consummation; and/or (e) the Filing, administration, and/or implementation of the Chapter 11 Cases, or the distribution of property in connection therewith or thereunder; *provided*, that, for the avoidance of doubt, any prepetition advice provided by any legal professionals in connection with prepetition transactions between the Debtors and Beneficient shall not constitute any act or omission that is covered by this definition of Exculpated Claim; *provided*, *further*, that, notwithstanding the foregoing, Exculpated Claims shall not include anything related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Second Amended Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Second Amended Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Second Amended Plan are copied in Article VII.E of this Disclosure Statement.

**L.      What is the deadline to vote on the Second Amended Plan?**

The Voting Deadline is **May [2], 2023 at 4:00 p.m.** (prevailing Central Time).

**M.      How do I vote for or against the Second Amended Plan?**

Detailed instructions regarding how to vote on the Second Amended Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Second Amended Plan. For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that your Ballot including your vote is **actually received** by Donlin, Recano & Company, Inc. ("DRC" or the "Notice and Solicitation Agent") **on or before the Voting Deadline,** *i.e.*, **May [2], 2023 at 4:00 p.m. prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled "SOLICITATION, VOTING PROCEDURES AND CONFIRMATION HEARING."

### N.    What are the consequences of filing a late proof of claim?

Pursuant to the Bar Date Order,[14] the Bankruptcy Court established July 29, 2022 as the general claims bar date and October 17, 2022 (which was extended solely with respect to the SEC by stipulation to November 30, 2022) as the governmental claims bar date. Additionally, pursuant to the Bondholder Claim Procedures Order,[15] the Bankruptcy Court established November 4, 2022 at 11:59 p.m. (prevailing Central Time) as the Bondholder Bar Date. Other than Bond Claims (including claims of the Indenture Trustee) and certain other claims as agreed with the Debtors, Claims that were not received by the dates set forth in the Bar Date Order may be disallowed and the Holders of such Claims may not be entitled to vote on the Second Amended Plan.

Pursuant to the Bondholder Claim Procedures Order, the Debtors have provided to Bondholders who hold their Bonds directly individualized notices that identify, with respect to each Bond or Bondholder, the amount of principal and interest that is owing with respect to such Bond or to such Bondholder, as reflected in the Debtors' books and records as of the Initial Debtors' Petition Date. Such Bond Claims are deemed allowed secured claims following the Bondholder Bar Date, except to the extent a Bondholder has filed a Proof of Claim disputing such amount. Bondholders who hold their Bonds indirectly through The Depository Trust Company ("DTC") were provided notices indicating that their Bond Claims would be Allowed upon entry of the Bondholder Claim Procedures Order without the need to file a Proof of Claim.

Subject to, and as set forth in more detail in, the procedures set forth in Exhibit 3 of the Disclosure Statement Order (the "Solicitation Procedures"), Holders of Interests (preferred stock and equity) in Debtor GWGH will be entitled to vote to accept or reject the Second Amended Plan irrespective of whether they have filed proofs of interest.

### O.    Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Second Amended Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for **[●] at [●] [a.m./p.m.]** (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Section 1128(b) of the Bankruptcy Code also provides that any party in interest may object to Confirmation of the Second Amended Plan. The Bankruptcy Court has established **May [  ], 2023 at 11:59 p.m. (prevailing Central Time)**, as the deadline to object to Confirmation of the Second Amended Plan (the "Plan Objection Deadline"). All objections to the Second Amended Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline. Any objection to the Second Amended Plan must (1) be in writing; (2) conform to the Bankruptcy

---

[14]   See Order Setting Bar Dates for Filing Proofs of Claim [Docket No. 126] (the "Bar Date Order").

[15]   See Order (I) Modifying Bar Date Order, (II) Establishing Procedures for Allowance of Bondholder and Indenture Trustee Claims, and (II) Granting Related Relief [Docket No. 739] (the "Bondholder Claim Procedures Order"). Capitalized terms used but not defined in this section shall have the meaning ascribed to them in the Bondholder Claim Procedures Order.

Rules, the Bankruptcy Local Rules, and any orders of the Bankruptcy Court; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Second Amended Plan (or related materials) that would resolve such objection; and (5) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so to be *actually received* on or before the Plan Objection Deadline. Unless an objection to the Second Amended Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

> **P.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Second Amended Plan?**

If you have any questions regarding this Disclosure Statement or the Second Amended Plan, please contact the Notice and Solicitation Agent, via one of the following methods:

*By electronic mail to:* gwginfo@donlinrecano.com

*By telephone (toll free) at:* 1 (888) 508-2507.

*If sent by regular mail, send to:*
>> Donlin, Recano & Company, Inc.
>> Re: GWGH Holdings, Inc., et al.
>> P.O. Box 199043
>> Blythebourne Station
>> Brooklyn, NY 11219

*If sent by Overnight Courier or Hand Delivery, send to:*
>> Donlin, Recano & Company, Inc.
>> Re: GW Holdings, Inc., et al.
>> 6201 15th Avenue
>> Brooklyn, NY 11219

Copies of the Second Amended Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Notice and Solicitation Agent at https://www.donlinrecano.com/Clients/gwg/Index (free of charge) or the Bankruptcy Court's website at http://ecf.txsb.uscourts.gov (for a fee).

> **Q.      Do the Debtors recommend voting in favor of the Second Amended Plan?**

**Yes, the Debtors recommend that Holders of Claims and Interests vote in favor of the Second Amended Plan**. The Debtors believe that the Second Amended Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Second Amended Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Second Amended Plan.

R.     Does the Bondholder Committee recommend that Bondholders vote in favor of the Second Amended Plan?

**Yes, the Bondholder Committee recommends that Bondholders vote in favor of the Second Amended Plan**. As explained in this Disclosure Statement and the Bondholder Summary, the Second Amended Plan provides for the creation of two trusts: (i) the Wind Down Trust and (ii) the Litigation Trust.

The Wind Down Trust will liquidate and monetize the Policy Portfolio Equity Interests and the Debtors' interests in Beneficient and FOXO, and hold reversionary and beneficial interests in the Litigation Trust. On the Effective Date, the Bondholders will receive the senior most beneficial interests in the Wind Down Trust in an amount equal to the Bondholders' prepetition unpaid principal and interest.

The Litigation Trust will hold, for pursuit and prosecution, all Retained Causes of Action, including but not limited to Estate claims and causes of action against entities that are Non-Released Parties (including, without limitation, (i) Bradley K. Heppner, Thomas O. Hicks, Bruce W. Schnitzer, Dennis P. Lockhart, and Peter T. Cangany, (ii) HCLP Nominees, L.L.C., (iii) any entity associated with Beneficient, Heppner, or HCLP Nominees, L.L.C., (iv) any advisor or professional connected with Beneficient, (v) the Debtors' former directors and officers (including, without limitation, Murray Holland and Timothy Evans), in their capacity as such, and (vi) the Debtors' prepetition legal counsel with respect to any prepetition advice to the Debtors and/or any former directors or officers of the Debtors relating to prepetition transactions between the Debtors and Beneficient). All proceeds recognized by the Litigation Trust will be distributed by the Wind Down Trustee in accordance with the waterfall set forth in the Plan.

Although the Debtors retain the right to settle certain claims and causes of action against Beneficient and the Beneficient Parties in advance of Confirmation of the Plan, importantly, the Bondholder Committee retains any and all rights to object to any such settlement if the Bondholder Committee determines that any such settlement is not in the best interests of the Bondholders.

**If Bondholders have any questions regarding the Second Amended Plan, the Disclosure Statement, the Voting Procedures, your Ballot or any other matters, Bondholders may contact the Bondholder Committee's counsel by email at GWGBondholders@akingump.com, online at https://www.donlinrecano.com/GWGBondholders or otherwise by contacting counsel to the Bondholder Committee via the contact information contained on that website.**

IV.    THE COMPANY'S CORPORATE HISTORY, STRUCTURE, AND PREPETITION BUSINESS OVERVIEW

A.     The Company's Corporate History and Business Overview

The Company is a financial services firm that has historically specialized in life settlement assets. Life settlement assets are whole life insurance policies (with only a minority being variable) acquired directly or indirectly from the insured person or other owners of a life insurance policy. The Company also has interests in Beneficient, which endeavors to provide liquidity solutions to holders of alternative assets (assets that are not traditional stocks, bonds or cash equivalents), and

FOXO, an epigenetics technology company developing products for the life insurance industry. The Company's business was originally organized in February of 2006, with GWGH formed as the ultimate parent holding company in March of 2008. GWGH is a corporation organized under the laws of the state of Delaware. In September of 2014, GWGH consummated an initial public offering of its common stock on the Nasdaq stock market. GWGH's stock was delisted from Nasdaq in May 2022 as a result of the filing of the Chapter 11 Cases of the Initial Debtors.

Initially, the Company's business model centered on the acquisition of life settlement assets. Over the course of several years, GWGH acquired, through its subsidiaries DLP IV and DLP VI, the Policy Portfolio consisting of approximately 1,405 intermediate-duration and long-duration Policies. The majority of the Policies were acquired through secondary-market purchase transactions with insureds between 2006 and 2018. As of [February 8, 2023], [878] of these Policies are still active, and of this amount, [571] Policies are held at DLP IV, and [307] Policies are held at DLP VI. As of [December 31, 2022], the approximate face amount of the Policy Portfolio was [$1.6 billion]. This life settlement business was conducted through GWGH's wholly-owned subsidiary, GWG Life, and GWG Life's wholly-owned direct and indirect subsidiaries, DLP IV, DLP VI, and DLP VI Holdings. DLP VI Holdings is the sole member of DLP VI. The DLP Entities were structured to be bankruptcy remote entities that are separate and distinct from their ultimate parents. Following the vote and approval of their respective boards, as further described in Article VI.C.7 of this Disclosure Statement, the DLP Entities each filed petitions for bankruptcy under Chapter 11 of the Bankruptcy Code on October 31, 2022. However, notwithstanding such bankruptcy filings, the assets and liabilities of the DLP Entities remain separate and distinct from the assets of GWGH and GWG Life.[16]

A copy of the Company's relevant prepetition organizational chart, including certain non-debtor affiliates discussed herein, is included below.

---

[16] With the filing of the DLP Chapter 11 Cases, the Debtors filed the Debtors' Emergency Motion for an Order (I) Directing Joint Administration of the DLP Chapter 11 Cases Together with the Initial Chapter 11 Cases and (II) Applying Certain Orders in the Initial Chapter 11 Cases to the DLP Chapter 11 Cases [Docket No. 962] (the "DLP Entities' Joint Administration Motion") seeking to have the DLP Entities' Estates jointly administered with these Chapter 11 Cases. This motion sought procedural joint administration and not the substantive consolidation of the assets and liabilities of the DLP Entities with those of the Initial Debtors and the application to the DLP Debtors of certain orders previously entered in the Chapter 11 Cases. On October 31, 2022, the Bankruptcy Court approved joint administration of the Chapter 11 Cases. [Docket No. 970].



**Organizational Chart Key**

Non-Debtor Affiliates

DLP Debtors

Initial Debtors

Beginning in 2018, the Company entered into a distinct but related line of business through owning interests in and making loans to Beneficient, which markets an array of liquidity and trust administration products and services to owners of alternative assets.

The Company's life settlement business and interests in Beneficient and FOXO are described in further detail below.

### 1.    Life Settlement Business

The secondary life settlement business model is to earn yields from the Policy Portfolio, net of premium payments and other costs. The majority of the Policies were acquired through secondary-market purchase transactions directly and indirectly from insureds between 2006 and 2018. Life settlements involve the sale of a life insurance policy to a third party at a discount to the face value, but at a price that is typically higher than the cash surrender value of a whole life or universal life insurance policy. The buyer of a life insurance policy, in this case DLP IV or DLP

VI,[17] becomes the policy's beneficial owner and takes responsibility for making the premium payments and the cost of servicing the policy in exchange for becoming the recipient of the death benefit when the insured passes away (referred to in the industry as a "maturity" of the underlying life insurance policy). Over time, the value of Policies increases as maturities are likely to occur more frequently with the aging of the insured and fewer premium payments need to be made relative to the life of the insured. Valuation models discount the expected maturity amounts to the current date. The shorter the term of the discount (i.e., the sooner the maturities are expected to occur), the more valuable the Policy Portfolio becomes.

When life insurance policies are purchased via numerous life settlements and pooled, such as those owned by the DLP Entities, the owner must have significant capital available to pay the premiums and servicing costs necessary to maintain the underlying life insurance policies. When Policies are acquired, the expected time before payout on the Policy can be 10, 20, or even 30 years. The capital required to maintain a portfolio of life insurance policies is typically obtained in one of two ways: (i) cash flow from operations, generally associated with proceeds from policies that have matured—in other words—policies that have paid out their death benefits because of a maturity or (ii) from monies raised from the capital markets. With respect to the first option, a purchaser of policies via a life settlement must be able to predict how long before a maturity occurs—a prediction that can never be done with absolute certainty, but can be predicted with actuarial modeling (assuming that a sufficient number of policies are owned), thus enabling an owner to project revenues for the entire portfolio. With respect to the second option, the purchaser must have consistent and predictable access to the capital markets, which access may be subject to external factors largely outside of the purchaser's control. During the first ten years of building the Policy Portfolio, the Company relied on access to the capital markets through the sale of Bonds for cash necessary to pay premiums and expenses.

In addition to the cash required to pay monthly insurance premiums, a business managing a portfolio of life settlement assets also has operating costs and must make payments of interest and principal on debt, if applicable. In 2023, the average estimated monthly premium payments required to maintain the Policy Portfolio is expected to be approximately $7 million. If premiums are not paid, a Policy can enter a grace period and ultimately lapse, resulting in an immediate total loss of death benefits upon the death of an insured. Unlike other types of assets, the Policy does not depreciate by a certain percentage if it is not maintained; rather, whether the Policy retains value is a binary outcome—either the Policy is properly serviced and retains its full value or the Policy lapses and loses *all* value. Therefore, the timely payment of premiums and servicing costs is critical to ensure that every Policy, and the Policy Portfolio as a whole, is not rendered valueless. Mark Venn, an independent expert, has analyzed the residual equity value of the Policy Portfolio, and has concluded that, assuming a sale of the portfolio after seven years and subject to the other limitations and qualifications set forth in his report (*see* Docket No. 920, Exhibit 1), the residual interest in the Policy Portfolio has a median present value of approximately $93.6 million under a base case model, and a median present value of approximately $42.6 million under a stress case model. However, the timing and amount of recovery on account of such residual equity value is uncertain.

---

[17] Certain Policies were initially purchased by an Initial Debtor and then transferred to DLP IV or DLP VI, as applicable.

The DLP Entities have historically made monthly premium payments from both collections on Policy maturities after the death of an insured and from proceeds of Bonds and other financing sold or incurred by GWGH and GWG Life.

### 2.      Beneficient

#### (a)      Overview of Beneficient's Business

Beneficient is a financial services holding company that (together with its subsidiaries) endeavors to provide what it describes as simple, rapid, and cost-effective liquidity solutions and related trust, custody and administrative services to participants in the alternative asset industry and owns certain alternative assets in connection therewith. It is headquartered in Dallas, Texas, and was a consolidated subsidiary of GWGH prior to the Beneficient Separation Transactions (as defined herein). For more information regarding Beneficient's business, Holders of Claims and Interests are encouraged to review the Registration Statement on Form S-4 that was filed with the SEC, including the section titled "Business of Beneficient".[18]

#### (b)      Certain prepetition transactions with Beneficient[19]

As noted above, the Company historically specialized in life settlements, which is a method of providing liquidity solutions to owners of generally illiquid assets, in such case, life insurance policies. During the period from 2018 to 2021, the Company engaged in a series of transactions with Beneficient which purported to give the Company exposure to alternative assets, another type of asset that is generally illiquid. The Company's transactions in which it invested in Beneficient prior to the Initial Petition Date are further described in detail below.

#### The Exchange Transaction

On January 12, 2018, GWGH and GWG Life entered into a *Master Exchange Agreement* (the "Master Exchange Agreement") with Ben LP and certain other parties pursuant to which the Company agreed to a series of strategic exchanges of assets (the "Exchange Transaction"). The purported purpose of the Exchange Transactions was to further the Company's relationship with Beneficient. A significant portion (but not all) of the alternative assets that were purchased through the Exchange Transaction constituted limited partnership interests originally held by Paul Capital.

To facilitate the Exchange Transaction, Murray Holland, who served as Ben's informal investment banker in the deal, established a series of trusts in 2017 (the "Seller Trusts"),[20] which served as intermediary vehicles to hold assets transferred in connection with the Master Exchange Agreement, including the Seller Trust L Bonds.

---

[18]   The Registration Statement on Form S-4 is available on the SEC's website by using the following weblink: https://www.sec.gov/Archives/edgar/data/1775734/000119312523013419/d406382ds4a.htm.

[19]   The below does not purport to be a complete description of all transactions with Beneficient and its affiliates and related parties, and the foregoing shall not be deemed to prejudice or waive in any respect any claims or causes of action that may be pursued with respect thereto. The Bondholder Committee believes that the below described transactions, and potentially other transactions, give rise to valuable and viable claims and causes of action, and the Bondholder Committee shall not be deemed to adopt or support any of the descriptions contained herein.

[20]   The Seller Trusts are further described in Article VI.B.3 of this Disclosure Statement.

The Exchange Transaction was completed via a series of two closings, with the first occurring on August 10, 2018 and the second on December 28, 2018. On the August 10, 2018 closing, Ben LP, as borrower, entered into a *Commercial Loan Agreement* (the "Commercial Loan Agreement") with GWG Life, as lender, pursuant to which GWG Life made a loan to Ben LP. Upon the completion of the Exchange Transaction, the principal amount of the loan outstanding under the Commercial Loan Agreement was approximately $192.5 million. The loan under the Commercial Loan Agreement had a maturity of August 9, 2023, which maturity could potentially be extended to August 9, 2028 or August 9, 2033, provided that certain conditions were met.

The Exchange Transaction was completed on December 28, 2018. As a result of the Exchange Transaction, a number of securities were exchanged between the parties, the majority of which was non-cash, including the following securities as of the December 28, 2018 closing: (i) the Seller Trusts acquired Bonds due 2023 in the aggregate principal amount of $366.9 million (the "Seller Trust L Bonds"); (ii) the Seller Trusts acquired 27,013,516 shares of GWGH's common stock, which was 83% of the outstanding common stock at that time; (iii) GWGH acquired 40,505,279 Ben LP common units; and (iv) GWGH acquired the option, pursuant to an *Option Agreement* (the "Ben Option Agreement") to obtain additional Ben LP common units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH. BCH is a Delaware limited partnership of which Ben LP owns all of the outstanding common units and acts as its general partner. In addition, GWGH used proceeds that resulted from the Exchange Transaction to issue a $25.7 million special dividend to its shareholders, including Jon R. Sabes (former Chief Executive Officer and director of GWGH and founder and current Chief Executive Officer of FOXO) and Steven F. Sabes (former Executive Vice President and director of GWGH).

The Seller Trusts now hold approximately $272 million of the $367 million outstanding Seller Trust L Bonds.[21] Following the Exchange Transaction, on April 26, 2019 David De Weese, a principal at Paul Capital and existing Board Member of Ben, was appointed to GWG's Board of Directors and served as a Board Member through 2022.

The Seller Trust L Bonds were issued pursuant to that certain *Supplemental Indenture to Amended and Restated Indenture*, dated as of August 10, 2018 (the "2018 Supplemental Indenture") with GWGH, GWG Life and Bank of Utah as indenture trustee.

The Bondholder Committee believes that there may be viable challenges, including challenges for subordination or recharacterization of the Seller Trust L Bonds, which LBM disputes. These potential challenges are proposed to be settled pursuant to the LBM Settlement. However, in the event LBM exercises its right to withdraw from the LBM Settlement, the Litigation Trust will have the right to pursue any such challenges. GWGH exercised the Ben Option Agreement, which exercise was effective August 11, 2020. Upon such exercise, GWGH received $57.5 million of Ben LP common units at a price per unit equal to $12.50.

---

[21]   Approximately $95 million of Seller Trust L Bonds were transferred to the Custody Trusts in September 2020 in exchange for alternative assets purportedly valued at $94.3 million.

### *Promissory Note with certain LiquidTrusts*

On April 15, 2019, Jon R. Sabes (former Chief Executive Officer and director of GWG and founder and current Chief Executive Officer of FOXO) and Steven F. Sabes (former Executive Vice President and director of GWGH) entered into that certain Purchase and Contribution Agreement (the "Purchase and Contribution Agreement") with, among others, Ben, under which Messrs. Sabes and Sabes (1) transferred all of their directly or indirectly held shares in GWGH's outstanding common stock to BCC and AltiVerse Capital Markets LLC ("AltiVerse") in exchange for $25 million in cash (the "Sabes Buyout Obligation") and (2) resigned from substantially all of their officer positions with the Company. Under the Purchase and Contribution Agreement, Beneficient also received the right to appoint the members of the board of GWGH and utilized that right.

On May 31, 2019, certain trusts affiliated with Beneficient (the "LiquidTrusts") executed a *Promissory Note* (the "LiquidTrust Promissory Note") with GWG Life for a principal amount of $65 million, maturing on June 30, 2023. GWG made an initial $50 million advance on the LiquidTrust Promissory Note on June 3, 2019 and funded the remaining $15 million no later than November 27, 2019. Shortly thereafter, the Company approved a limited waiver under the Purchase and Contribution Agreement that would allow Beneficient to use $25 million of the proceeds from the LiquidTrust Promissory Note to satisfy the Sabes Buyout Obligation.

On September 30, 2020, GWGH, GWG Life and the LiquidTrusts agreed to accept in full satisfaction of the LiquidTrust Promissory Note and any related accrued interest a $75 million Preferred Series C Subclass 1 Unit Account of BCH that Ben LP issued to the LiquidTrusts.

### *Purchase of Additional Beneficient Equity*

On June 12, 2019, GWGH purchased 1,000,000 limited partnership units in Ben LP from Essex Woodlands Health Venture Fund IV LP and Essex Woodlands Health Venture Fund VI LP at a price of $10 per limited partnership unit for a total purchase price of $10 million (the "June 2019 Acquisition"). The $10 million purchase price also satisfied certain of Beneficient's purported obligations to the foregoing Essex entities.

### *Investment Agreement and UPA*

On December 31, 2019, GWGH, Ben LP, BCH, and Beneficient Management, L.L.C. ("Beneficient Management") entered into a *Preferred Series A Unit Account and Common Investment Agreement* (the "Investment Agreement"). Pursuant to the Investment Agreement, GWGH transferred $79 million to Ben LP to acquire 666,667 Ben LP common units and a Preferred Series A Subclass 1 Unit Account of BCH (the "2019 Capital Contribution"). In connection with the Investment Agreement, GWGH, which as part of the April 15, 2019 transaction had its board appointed by Beneficient, obtained the right to appoint a majority of the board of directors of Beneficient Management, which is the general partner of Ben LP. As a result, GWGH obtained control of Ben LP, resulting in the consolidation of the two corporate groups for accounting and financial reporting purposes.

On July 15, 2020, GWGH entered into a *Preferred Series C Unit Purchase Agreement* ("UPA") with Ben LP and BCH. During the years ended December 31, 2021 and December 31,

2020, GWGH provided Beneficient with $14.8 million and $130.2 million in capital in exchange for Preferred Series C of BCH pursuant to the UPA (collectively, the "2020 and 2021 Capital Contributions"). A portion of the funds provided by GWGH were used to pay back indebtedness incurred by HCLP Nominees and other entities.

### Beneficient separation transactions and subsequent developments

On August 13, 2021, GWGH, Ben LP and BCH entered into a non-binding term sheet pursuant to which the companies agreed to engage in a series of transactions that would ultimately separate Beneficient and the Company.

These transactions (the "Beneficient Separation Transactions") were effective as of November 29, 2021. Specifically, on November 12, 2021, the GWGH and Ben Management boards approved amendments to the organizational documents of Ben LP, BCH and Ben Management. The centerpiece of the Beneficient Separation Transactions was GWGH relinquishing its ability to appoint the majority of the board of directors of Ben Management, Ben LP's general partner, via amendment to Ben Management's limited liability company agreement. GWGH also approved the creation of securities that Ben LP would issue in connection with capital raising activities and product offerings and the conversion of GWGH's capital account balance in Preferred Series A Subclass 1 Unit Accounts in BCH to Preferred Series B Subclass 2 Unit Accounts in Ben LP. Finally, on November 26, 2021, GWGH and Ben LP entered into a payoff letter for the Commercial Loan Agreement (described above) pursuant to which Ben LP repaid the entire outstanding principal balance of the Commercial Loan Agreement of $202.3 million plus accrued interest of $5.8 million by issuing GWG Life 19,250,795 Ben LP common units.

On December 31, 2021, one of Ben LP's subsidiaries, Beneficient Fiduciary Financial, L.L.C. ("BFF") obtained a license to operate as a Kansas Technology Enabled Fiduciary Financial Institution ("TEFFI").

As discussed in further detail in Article VI.I.3 of this Disclosure Statement, the potential Causes of Action arising from or relating to each of the prepetition transactions with Beneficient described above, among other transactions, are the subject of the Independent Investigation (as defined herein) conducted by the Investigations Committee.

As discussed in further detail in Article VI.H.3 of this Disclosure Statement, the Bondholder Committee has sought the Bankruptcy Court's approval for standing to prosecute Causes of Action on behalf of and for the benefit of the Debtors' Estates arising from, among other things, the prepetition transactions with Beneficient described above.

### (c)    Shared Services Agreement

GWGH and Ben LP entered into a *Shared Services Agreement* on May 27, 2020 (the "Shared Services Agreement"). Pursuant to the Shared Services Agreement, Beneficient agreed to provide certain services to the Company, including access to certain Beneficient employees who then acted at the direction of the Company's senior management, with service fees paid on a quarterly basis in accordance with a certain cost allocation methodology. Specifically, Beneficient provides services to the Company in the following categories: Accounting & Finance; General & Administrative; Human Resources; Sales & Marketing; Underwriting & Risk Management;

Information Technology; Legal; and any additional services as mutually agreed upon in writing (the "Shared Services"). Pursuant to the Shared Services Agreement, the Company compensated Beneficient for the Shared Services by paying a quarterly fee (the "Service Fee"). Pursuant to the Shared Services Agreement, the Service Fee is computed by Beneficient at the end of each calendar quarter and is payable by the Company, subject to audit rights, within 30 days after the end of each such quarter.

The treatment of the Shared Services Agreement under the Second Amended Plan is described in Article VI.G.2 of this Disclosure Statement.

> (d)   *Certain postpetition developments—the Avalon Business Combination*

Following the Initial Petition Date, on September 21, 2022, Beneficient announced that it had entered into a business combination agreement with Avalon, which is a special purpose acquisition company (SPAC). The business combination announcement by Beneficient stated that the combined companies would have an implied enterprise value of $3.5 billion, which includes $200 million in proceeds from Avalon's cash in trust (assuming no public stockholders in Avalon exercise their redemption rights in connection with the consummation of the business combination). This valuation, conducted by Avalon, ascribes a value of $1.4 billion to the Company's interests in Beneficient, assuming that a purchaser could be found for such interests. The Bondholder Committee notes, however, that this value has yet to be proven by any other market evidence. The Bondholder Committee does not adopt this valuation for any purposes.

The Avalon Business Combination is scheduled to close in the first half of 2023, subject to satisfaction of closing conditions in the merger agreement, including the Company's consent. On January 5, 2023, Avalon, issued a press release announcing that Ben LP had deposited an aggregate of $2,070,000 in cash into Avalon's trust account for Avalon's public stockholders, representing $0.10 per public share, which enabled Avalon to extend the period of time it has to consummate its initial business combination by three months from January 8, 2023 to April 8, 2023 (the "Extension"). The Extension is the first of up to two three-month extensions permitted under Avalon's governing documents.

If the Avalon Business Combination is consummated, the combined company is expected to be listed on the Nasdaq stock market. On January 11, 2023, Avalon received a notice from the Listing Qualifications Department of Nasdaq stating that Avalon failed to hold an annual meeting of stockholders within 12 months after its fiscal year ended December 31, 2021, as required by Nasdaq Listing Rule 5620(a). In accordance with Nasdaq Listing Rule 5810(c)(2)(G), Avalon had 45 calendar days (or until February 27, 2023) to submit a plan to regain compliance and, if Nasdaq accepts the plan, Nasdaq may grant Avalon up to 180 calendar days from its fiscal year end, or until June 29, 2023, to regain compliance. Avalon has not announced whether Nasdaq has accepted its plan to regain compliance.

Pursuant to Article IV.U of the Second Amended Plan, prior to the Effective Date, any consents necessary in connection with approval of a special purpose acquisition company (SPAC) transaction of Beneficient shall require the consent of the Debtors and the Special Committee and shall be subject to Bankruptcy Court approval. For the avoidance of doubt, the required

Bankruptcy Court approval may be contained in an order approving a proposed settlement with Beneficient. After the Effective Date, any such consents shall require the consent of the Wind Down Trustee and shall be subject to Bankruptcy Court approval. For the avoidance of doubt, after the Effective Date, such consent (and request for Bankruptcy Court approval by the Wind Down Trustee) may not include any releases or compromises of any Retained Causes of Action that are transferred to the Litigation Trust on the Effective Date without the consent of the Litigation Trustee.

### 3. FOXO

#### (a) Overview of FOXO

As of the Initial Petition Date, the Company held a non-controlling interest in FOXO which, through its wholly-owned subsidiaries FOXO Labs Inc. ("FOXO Labs") and FOXO Life LLC ("FOXO Life"), seeks to commercialize epigenetic technology for the longevity industry and offer life insurance directly to customers utilizing epigenetic technology. FOXO Labs was formed to commercialize epigenetic technology for the longevity industry. FOXO Life seeks to offer life insurance directly to customers utilizing epigenetic technology. On February 24, 2022, FOXO entered into a merger agreement (the "FOXO Merger") with Delwinds, a special purpose acquisition company. In connection with announcing the FOXO Merger, FOXO also announced the combined company had an estimated enterprise value of $369 million and that it anticipated becoming listed on the New York Stock Exchange.

#### (b) Postpetition developments – merger with Delwinds

The FOXO Merger was consummated on September 16, 2022. The combined company operates under the name FOXO Technologies, Inc. and common stock in the combined company trades on the NYSE American under the symbol FOXO. As of March 21, 2023, the combined company had a market capitalization of approximately $9.335 million, which implies that the Debtors' interests in FOXO have a value of $1,564,000.

Since FOXO's incorporation but before the FOXO Merger, the Company's equity ownership of FOXO was diluted from 80% to 23% due to several significant events over which the Company did not have veto rights, which included FOXO's issuance of (a) convertible debentures; (b) stock options/restricted stock to employees; (c) equity to Bespoke Capital Partners in exchange for consulting services in connection with the FOXO Merger; and (d) equity to the lead institutional investor in one of the convertible debenture placements. After significant due diligence, the Company concluded the FOXO Merger itself further diluted their full pre-FOXO Merger ownership, resulting in a dilution of the Company's ownership from 23% to 13%, or 4.6 million Class A shares. Moreover, the Delwinds merger proxy discloses that Delwinds entered into a voting agreement with certain FOXO stockholders that provided sufficient votes to approve the FOXO Merger without the Company's vote.

In connection with the FOXO Merger, FOXO has requested that the Company execute a *Letter of Transmittal to Surrender Shares of Common Stock of FOXO Technologies Inc.* (the "FOXO Letter") in order for the Company to receive its pro rata share of consideration from the FOXO Merger. The initial draft of the FOXO Letter included a release of Delwinds and FOXO.

Following discussions with FOXO's counsel, FOXO has agreed to remove the release from the FOXO Letter.

### B.     The Company's Prepetition Capital Structure

#### 1.     Prepetition Equity Holdings

As of the Initial Petition Date, GWGH had issued and outstanding common shares, Series 1 Preferred Interests, and Series 2 Preferred Interests as summarized below:

| Equity Interest | Total Shares Outstanding |
|---|---|
| Common Equity | 33,102,273.250 ($2.04/share trading price)[22] |
| Redeemable Preferred Stock | 41,681 ($42,662,169 liquidation preference) |
| Series 2 Redeemable Preferred Stock | 86,707 ($88,140,766 liquidation preference) |

Beneficient or parties related to Beneficient own approximately 12% of GWGH's common stock. As described above, the Seller Trusts acquired approximately 83% of the common stock of GWGH pursuant to the Exchange Transaction (as of the Initial Petition Date, such portion would constitute 78% of GWGH's common stock). Thereafter, certain common law trusts (the "Custody Trusts")[23] subsequently acquired from the Seller Trusts a portion of GWGH's common stock representing 30% of GWGH's common stock and, as described above, have agreed pursuant to the Stockholders Agreement to vote their shares in the same proportion as other stockholders vote. Thus, the Seller Trusts control the vote of GWGH's common stock, but do not control Beneficient, and the parties who ultimately benefit from the economics of the GWGH common stock held by the Seller Trusts and Custody Trusts are clients of Beneficient who are otherwise unaffiliated with GWGH or Beneficient. The Seller Trusts, the above-referenced Custody Trusts, Beneficient, and former GWGH board members collectively own approximately 90% of the outstanding GWGH common stock (or approximately 29.8 million shares). Approximately 10% (or approximately 3.3 million shares) is owned by primarily independent stockholders. The current GWGH common stock ownership can be summarized as follows:

---

[22]   Share trading price as of April 19, 2022. The shares have since been delisted from the Nasdaq stock market.

[23]   The Custody Trusts are further described in Article VI.B.3 of this Disclosure Statement.

| Stockholder | Percentage of GWGH Common Stock Ownership |
|---|---|
| Beneficient or parties related to Beneficient | 12% |
| Seller Trusts | 48% |
| Custody Trusts | 30% |
| Other stockholders | Approx. 10% |

GWGH made two public offerings of preferred stock in 2015 and 2017, raising $99 million and $150 million, respectively. Series 1 Preferred Interests were issued to investors in a public offering of up to 100,000 shares of Series 1 Preferred Interests at $1,000 per share that was declared effective on November 30, 2015. Holders of the Series 1 Preferred Interests are entitled to cumulative dividends at the rate of 7% per annum. Dividends on the Series 1 Preferred Interests are recorded as a reduction to additional paid-in capital, if any, then to the outstanding balance of the preferred stock if additional paid-in capital has been exhausted. In certain circumstances, additional shares of Series 1 Preferred Interests may be issued in lieu of cash dividends. The Series 1 Preferred Interests rank senior to GWGH's common stock and pari passu with the Series 2 Preferred Interests (collectively, with the Series 1 Preferred Interests, the "Existing Preferred Interests"), and entitle its holders to a liquidation preference equal to the stated value per share (i.e., $1,000) plus accrued and unpaid dividends. On February 14, 2017, GWGH's public offering of up to 150,000 shares of Series 2 Preferred Interests at $1,000 per share was declared effective. The terms of the Series 2 Preferred Interests are largely consistent with those of the Series 1 Preferred Interests. In the first quarter of 2022, GWGH paid a dividend on the Existing Preferred Interests in kind, resulting in an increase in the stated value per share of the securities of approximately $5.83.

### 2.    Prepetition Debt

As of the Initial Petition Date, the Company's prepetition capital structure included approximately $2,075,445,367 in funded debt, as summarized below:

| Indebtedness | Funded Debt |
|---|---|
| Bonds | $1,672,852,358 |
| DLP IV Loan Facility | $271,213,144 |
| DLP VI Loan Facility | $111,126,464 |
| *Total Secured Debt* | *$2,055,191,966* |
| Unsecured Debt | $20,253,401 |
| *Total Funded Debt* | *$2,075,445,367* |

47

(a)      *Bond Debt*

GWGH issued Bonds pursuant to the (i) *Amended and Restated Indenture* dated as of October 23, 2017, by and between GWGH, as issuer and obligor, GWG Life, as guarantor, and Bank of Utah as indenture trustee (the "A&R Indenture"), (ii) *Supplemental Indenture* dated as of December 31, 2020 (the "2020 Supplemental Indenture"), by and between GWGH, as guarantor, GWG Life, as issuer and obligor, and Bank of Utah as indenture trustee (the "Liquidity Bonds"), and (iii) 2018 Supplemental Indenture (collectively with the A&R Indenture and 2020 Supplemental Indenture, the "Indenture"). Bonds issued under the A&R Indenture that do not constitute Liquidity Bonds or Seller Trust L Bonds are referred to herein for ease of reference as "Public L Bonds". The A&R Indenture governs the terms of all of the issued Bonds except to the extent expressly provided in the Supplemental Indentures. The Bonds are secured by substantially all of the assets of GWGH and GWG Life pursuant to the *Amended and Restated Pledge and Security Agreement* among GWGH, GWG Life and Bank of Utah.[24]

GWGH began publicly offering and selling the Public L Bonds through registered broker/dealers and registered investment advisers (the "Broker Dealers") in January 2012 under various registration statements. On December 1, 2017, an additional public offering was declared effective permitting GWGH to sell up to $1.0 billion in principal amount of Public L Bonds on a continuous basis until December 2020, and GWGH reached the maximum capacity permitted for that offering during the third quarter of 2020. On June 3, 2020, a registration statement relating to an additional public offering was declared effective permitting GWGH to sell up to $2.0 billion in principal amount of Public L Bonds on a continuous basis through June 2023. As described in further detail below, GWGH suspended the offering of Public L Bonds prior to the Initial Petition Date, initially on April 16, 2021 as a result of GWGH's delay in filing certain periodic reports with the SEC, and later in early 2022 as a result of the financial difficulties that precipitated the filing of the Chapter 11 Cases. As of the Initial Petition Date, there were approximately $1.26 billion in Public L Bonds issued and outstanding.

The Liquidity Bonds were issued under the 2020 Supplemental Indenture which permitted the issuance of up to $1.0 billion in aggregate principal amount. The Liquidity Bonds were offered and sold to accredited investors in transactions that are exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Regulation D thereof. The Liquidity Bonds were issued as part of the Company's strategy to expand its exposure to a portfolio of loans collateralized by cash flows from illiquid alternative assets. Holders of alternative assets would contribute their alternative assets to trusts established by Ben LP in exchange for Liquidity Bonds. The Liquidity Bonds bear interest rates determined at the time of issuance by the Company and the holders of the alternative assets being contributed and generally have a maturity of four years from issuance. As of the Initial Petition Date, there were approximately $0.8 million ($800,000) in Liquidity Bonds issued and outstanding.

---

[24]    On April 26, 2019, in connection with transactions related to the Purchase and Contribution Agreement described in Article IV.B.2.b of this Disclosure Statement, BCC and AltiVerse entered into that certain *Consent and Joinder to Amended and Restated Pledge and Security Agreement* (the "Consent and Joinder"), under which BCC and AltiVerse replaced Messrs. Sabes and Sabes as grantors under the security agreement collateralizing the Bonds. Per the Consent and Joinder, the shares of GWGH common stock BCC and AltiVerse acquired pursuant to the Purchase Agreement will continue to be pledged as collateral for the Bonds.

As described above, the Seller Trust L Bonds were issued under the 2018 Supplemental Indenture in the amount of approximately $366.9 million as part of the Exchange Transaction and remained outstanding as of the Initial Petition Date. The Seller Trust L Bonds mature on August 9, 2023.

As of the Initial Petition Date, there were approximately 27,700 direct and indirect active accounts held by Bondholders. Approximately 10,300 of such investments by Bondholders were purchased via subscription agreements directly with the Company, and approximately 17,400 of such investments by Bondholders were purchased through various securities intermediaries, such as The Depositary Trust Company. The average individual Bondholder owns approximately $45,000 worth of Bonds.

The Company used proceeds from the issuance of Bonds for various purposes, which, as disclosed in its public filings with the SEC, included: (i) servicing the Policy Portfolio (i.e., paying life insurance premiums and operating costs), (ii) paying required interest on the Bonds and other debt and repaying maturing Bonds, (iii) paying dividends and redemption amounts on the Company's preferred stock, (iv) furthering its relationship with Beneficient, (v) operating expenses, and (vi) additional corporate purposes.

The Company's Bond debt as of the Initial Petition Date is summarized in more detail below:

| Breakdown of Bonds (Principal Only) | Funded Debt |
|---|---|
| Public L Bonds | $1,258,856,830 |
| Liquidity Bonds | $803,440 |
| Seller Trust L Bonds | $366,891,940 |
| *Total Bond Debt* | *$1,626,552,210* |

The Bonds are secured by substantially all of GWGH's and GWG Life's assets—which include (a) the equity interests in the DLP Debtors (who themselves own the Policy Portfolio) and (b) certain interests in Ben LP (including through GWG Life's equity interest in GWG Life USA, LLC) and certain stock pledged by Beneficient Capital Company, L.L.C. ("BCC"), which was formerly a main operating subsidiary of Ben LP, but, as of December 31, 2020 no longer holds any assets, and AltiVerse Capital Markets, L.L.C. ("AltiVerse"), an entity with certain overlapping investors with Ben LP. The Bonds are completely and entirely subordinated (both as to lien and payment) to secured debt held by the DLP Entities (including the new repaid DLP IV Facility and DLP VI Facility) and any future Senior Debt incurred by GWGH, including any debtor-in-possession financing. Additionally, the Bonds are *pari passu* in right of payment and in respect of collateral with other Bonds and senior in right of payment to all subordinated indebtedness of GWGH.[25]

---

[25]   *See* § 1.6 of the 2018 Supplement Indenture and §1.8 of the 2020 Supplemental Indenture.

(b)    *DLP IV and DLP VI Facilities*

On the DLP Petition Date, DLP IV was the borrower under that certain *Fifth Amended and Restated Loan and Security Agreement* (the "<u>DLP IV Facility</u>") dated as of December 14, 2021, by and between DLP IV, as borrower, LNV Corporation ("<u>LNV</u>"), as lender, and CLMG Corp. ("<u>CLMG</u>"), as administrative agent (the "<u>DLP IV Agent</u>" and collectively with LNV, the "<u>DLP IV Lender Parties</u>"). LNV and CLMG are subsidiaries of Beal Bank. The DLP IV Facility had a scheduled maturity date of February 1, 2027, and the obligations thereunder were secured by a first priority lien on substantially all of DLP IV's assets—*i.e.*, Policies with an approximate face amount as of the DLP Petition Date of $1.27 billion held by DLP IV. As of the DLP Petition Date, approximately $275 million in principal amount remained outstanding under the DLP IV Facility, in addition to interest and certain fees. On December 15, 2022, the DLP IV Facility was paid in full in connection with the Debtors' entering into the Vida DIP Facility. Following the payoff of the DLP IV Facility, DLP IV does not have any additional creditors who are presently owed any material amounts.

On the DLP Petition Date, DLP VI was the borrower under that certain *Credit Agreement* (the "<u>DLP VI Facility</u>") dated as of August 11, 2021, with DLP VI, as borrower, and National Founders LP, as the lender (collectively with the Secured Parties (as defined in the DLP VI Facility), the "<u>DLP VI Lender Parties</u>" and, together with the DLP IV Lender Parties, the "<u>DLP Senior Secured Parties</u>") and administrative agent ("<u>National Founders</u>"). The DLP VI Facility had a scheduled maturity date of August 11, 2031, and the obligations thereunder were secured by a first priority lien on substantially all of DLP VI's and DLP Funding VI's assets—*i.e.*, Policies with an approximate face amount as of the DLP Petition Date of $400.6 million held by DLP VI. As of the DLP Petition Date, approximately $111.4 million in principal amount remained outstanding under the DLP VI Facility, in addition to interest and certain fees. On December 15, 2022, the DLP IV Facility was paid in full in connection with the Debtors' entering into the Vida DIP Facility. Following the payoff of the DLP VI Facility, DLP VI does not have any additional creditors who are presently owed any material amounts.

(c)    *Unsecured debt*

The Initial Debtors' had approximately $20,253,401 in unsecured debt as of the Initial Petition Date. This unsecured debt was incurred primarily in connection with maintaining and servicing the Policy Portfolio as well as through obligations owing on account of the Shared Services Agreement, vendor claims, and professional fee claims.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Company's Financial and Legal Challenges

### 1.    SEC Investigation and Accounting Questions

On October 6, 2020, the Enforcement Division of the SEC served a subpoena on the Company in connection with an investigation, thus informing the Company of the existence of a

non-public, fact-finding investigation into the Company (the "<u>SEC Investigation</u>").[26] The initial and subsequent subpoenas have requested information related to the Company's securities, including the Bonds (and the marketing, selling, advertising, sellers, and purchasers of such), disclosures, and various accounting matters; information related to documents and statements referenced in GWGH's SEC filings, including consolidation, valuations, retained professionals and related communications; information related to GWGH's relationship and communications with Beneficient and certain other parties, including negotiations and agreements; and information related to firm-wide policies and practices generally. GWGH has cooperated with the SEC throughout the course of its investigation which is ongoing.

In February 2021, with the recommendation and concurrence of its prior auditor, Grant Thornton, LLP, the Company posed two accounting questions to the SEC's Office of Chief Accountant ("<u>OCA</u>"). The questions submitted to OCA were (1) whether the December 31, 2019 transaction reflected in the Investment Agreement and described in <u>Article IV.B.2.b</u> of this Disclosure Statement resulted in GWGH obtaining control of Ben LP (it was determined later by the Company that it did) and (2) whether Ben LP was required to consolidate the Custody Trusts (OCA took the position that it would object to Ben LP not consolidating the Custody Trusts). The Company's original expectation was that these two questions would take approximately three weeks to resolve, after which the Company would be able to timely issue its financial statements. However, the process took almost six months and, as a result, the Company was unable to timely file certain financial statements, pending resolution of those questions. As a result of the delay, GWGH suspended Bond sales on April 16, 2021. The consultation with OCA concluded on July 26, 2021. GWGH began selling Bonds again in December 2021 after Grant Thornton completed its audit work and GWGH filed its 2020 form 10-K and 2021 Form 10-Qs. During this period, the Company used approximately $350 million of cash for operations, premiums on policies, interest on Bonds, maturities on Bonds, dividends on preferred stock and redemptions on preferred stock.

The suspension of Bond sales between April and December 2021 foreclosed access to public capital markets and severely constrained the Company's liquidity. The Company raised no capital from the sale of Bonds during this time yet still had approximately $40 million per month in cash obligations for interest and principal on Bonds, premiums of the Policy Portfolio, operating expenses and dividends and redemptions of preferred stock. During this time period, the Company elected to enter into the DLP VI Facility and other financings in order to obtain critical liquidity until Bond sales could be resumed.

When the Company indicated its intent to restart its Bond sales, the SEC notified many of the Broker Dealers that the SEC would issue subpoenas and document requests to individual Broker Dealers if they sold Bonds. Following that, Bond sales between December 2021 and January 10, 2022 were dramatically lower than anticipated and insufficient to cover the Company's upcoming payment obligations on the Bonds. On January 10, 2022, the Company learned of the dramatically lower bond sales. Knowing that Bond sales would not recover to the traditional levels that were necessary to continue paying interest and maturities on the outstanding Bonds, and not

---

[26]   In accordance with its usual practice, the SEC's communication included the following statement: "This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation and the subpoena do not mean that we have concluded that you or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity or security."

having sufficient liquidity without Bond sale proceeds to continue paying interest and maturities on the Bonds, GWGH defaulted on interest payments of approximately $10.35 million and principal payments of approximately $3.25 million due January 15, 2022. Subsequently, on February 14, 2022, GWGH announced in a Form 8-K securities filing that it would be unable to make principal and interest payments due and owing on the Bonds while the Company evaluated its restructuring options.

### 2.      Bondholder Lawsuit (*Bayati, et. al v. GWG Holdings, Inc.*)

Almost immediately thereafter, on February 18, 2022, Shirin Bayati and Mojan Kamalvand, on behalf of themselves and a proposed class of similarly situated individuals, filed a complaint against GWGH and certain of its past and present directors and officers alleging violations of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933. The case is titled *Bayati, et. al. v. GWG Holdings, Inc., et al.*, bears case number 22-00410, and is pending before the United States District Court for the Northern District of Texas (the "Securities Litigation"). Principally, the plaintiffs allege that GWGH and its co-defendants violated the Securities Act by using funds invested by Bondholders for impermissible purposes (including in connection with the prepetition transactions with Beneficent described in Article IV.A.2.b), filing various misleading documents with the SEC since 2020, and failing to disclose to Bond investors certain investigations by the SEC that could have impacted their decision to invest in the Bonds.

As of the Initial Petition Date, the Securities Litigation was in the pleading stage. The Company denies all of the allegations set forth in the complaint and takes the position that its robust and fulsome securities filings expressly and specifically disclosed the intent that the Bond proceeds would be used for all purposes complained of in the Securities Litigation, including to pay interest on and refinance the principal of existing Bonds and to invest in Beneficient. Except as otherwise described in Article VI.H.1 hereof, the Securities Litigation has been stayed.

### B.      Defaults Under DLP IV Facility and DLP VI Facility; Amendments and Waivers

The Company's continued obligations and the provisions of the DLP IV Facility and DLP VI Facility caused additional constraints on the Company's liquidity prior to the Initial Petition Date. There is a significant delay (typically 60 days but sometimes longer) between when a Policy matures and when DLP IV or DLP VI, as applicable, can collect proceeds from that maturity. Further, proceeds received on account of maturities under a Policy are, pursuant to the terms of DLP IV's and DLP VI's prepetition secured credit facilities, deposited in certain bank accounts at Wells Fargo Bank, N.A. (the "Controlled Accounts") that are subject to certain account control agreements (the "Account Control Agreements") for the benefit of the DLP Senior Secured Parties. By operation of the Account Control Agreements, the DLP Senior Secured Parties were entitled to sweep the respective Controlled Accounts for payment of principal, interest, premiums and fees prior to paying premiums or making other withdrawals. As of the Initial Petition Date, substantially all of the Company's funds were held in the Controlled Accounts, access to which was restricted by the express provisions of the DLP IV Facility and DLP VI Facility.

### 1.     DLP IV Facility

As discussed above, beginning in August of 2021, GWGH commenced negotiating and documenting the Beneficient Separation Transactions, which resulted in Beneficient ceasing to be a consolidated subsidiary of GWGH. LNV subsequently notified DLP IV that it believed the Beneficient Separation Transactions constituted a change of control default under its credit facility with DLP IV (the "CoC Default").

In November of 2021, DLP IV and the DLP IV Lender Parties commenced negotiations whereby certain cash waterfall provisions and cash sweeping rights granted to LNV in connection with the DLP IV Facility would be waived in order to permit DLP IV to access approximately $16,958,377.45 in LNV's cash collateral in the Controlled Accounts. These negotiations led to an executed letter agreement (the "Letter Agreement") that required numerous post-closing deliverables to be provided by DLP IV to the DLP IV Lender Parties, many requiring the cooperation of third parties. DLP IV did not timely provide the post-closing deliverables required by the Letter Agreement, which resulted in an event of default under the DLP IV Facility (the "Letter Agreement Default").

As a result of the purported defaults (the CoC Default and Letter Agreement Default), the DLP Lender Parties determined that, among other available remedies, they had the right under the DLP IV Facility to accelerate the indebtedness due and owing thereunder. Additionally, the DLP IV Lender Parties determined that in connection with any acceleration, a $92,573,481.87 yield maintenance fee would become due and owing. DLP IV requested a waiver of the CoC Default and Letter Agreement Default and a related advance from the DLP Lender Parties in order to, among other things, make certain premium payments due and owing on the Policies that secure the DLP IV Facility.

On November 15, 2021, in consideration for certain cash collateral being released, DLP IV assigned and granted to the DLP IV Agent, for the ratable benefit of the lenders under the DLP IV Facility, an irrevocable beneficial interest in a weighted average of three percent (3.0%) of the U.S. dollar death benefit payable under each pledged Policy under the DLP IV Facility (the "Residual Beneficial Interest"). Such assignment meant that, with respect to a maturity under an applicable pledged Policy after such date, the DLP IV Agent had its own claim with the subject carrier with respect to such residual death benefit, and an average of three percent (3.0%) of the death benefit then paid under any such pledged Policy would be paid directly to the DLP IV Agent.

On December 14, 2021, DLP IV and the DLP IV Lender Parties entered into an amended and restated credit agreement (as described above, the DLP IV Facility), whereby the CoC Default and Letter Agreement Default were waived and LNV made an additional advance of $60,100,000, to be used as follows: (i) $20,000,000 paid in cash to DLP IV to lend to GWG Life pursuant to an intercompany promissory note; (ii) $100,000 paid to CSG Investments as a structuring fee; and (iii) $40,000,000 paid to LNV as a partial settlement of the $92,573,481.87 that would otherwise have been due as a yield maintenance fee upon acceleration. In addition, LNV agreed to a downward adjustment of the interest rate going forward. Pursuant to the terms of the DLP IV Facility, the yield maintenance claim is payable upon the acceleration of the obligations owing thereunder, including an automatic acceleration that occurred as a result of DLP IV filing for Chapter 11 relief.

In that certain *First Amendment to Fifth Amended and Restated Loan and Security Agreement* dated as of February 25, 2022, LNV, as an accommodation, agreed to vary the terms of the DLP IV Facility to make advances on the loan to be used to pay premiums that came due in March and April 2022. After the Initial Petition Date, LNV continued to make accommodations that permitted DLP IV to pay premiums, including agreeing to certain amendments, as described further below.

### 2.  DLP VI Facility

Under the DLP VI Facility, DLP VI was required to maintain Required Reserve Amounts (as defined in the DLP VI Facility) in its Reserve Account (as defined in the DLP VI Facility) for the benefit of the DLP VI Lender Parties, which are to be funded on certain remittance dates. DLP VI anticipated that it would not have sufficient Required Reserve Amounts in its Reserve Account as of the February 2022 remittance date and, as such, negotiated and entered into that certain *Waiver* with National Founders on February 24, 2022, (the "DLP VI February Waiver"). Under the DLP VI February Waiver, National Founders agreed to waive, for a limited period up through March 10, 2022, the February 2022 Reserve Account Deficiency (as defined in the DLP VI February Waiver). Subsequently, on March 10, 2022, DLP VI and National Founders entered into an additional waiver, that extended the aforementioned waiver period through March 15, 2022, with the referenced default subsequently having been cured prior to such March 15th date.

On March 31, 2022, DLP VI and National Founders entered into a *Waiver and Amendment to Credit Agreement* (the "First DLP VI Amendment") to the existing DLP VI Facility. The First DLP VI Amendment waived an event of default under the DLP VI Facility that had resulted due to insufficient funds in a reserve account established under such credit agreement. The First DLP VI Amendment also provided for an additional advance by National Founders of $4 million, of which $1 million was an amendment fee payable to National Founders, with the $3 million balance being available to the Company for the payment of professional fees and other expenses. The First DLP VI Amendment also provided that the prepayment premium payable under the DLP VI Facility would also be due and payable upon an acceleration of the loans under the DLP VI Facility (not just upon a prepayment), in exchange for certain conditions, including the DLP IV Lender's agreement to provide certain debtor-in-possession financing to the Initial Debtors.

### C.  The Company's Proactive Exploration of Strategic Alternatives

As a result of the significant liquidity issues described above, the Company engaged Mayer Brown LLP ("Mayer Brown") as restructuring counsel in January 2022, FTI Consulting as financial advisor in January 2022, and PJT Partners ("PJT") as investment banker in February 2022 in connection with identifying and evaluating restructuring alternatives, as well as available options to best conserve and maximize the value of the Company's assets for the benefit of its stakeholders. In connection with that process, PJT and the Company solicited bridge financing and debtor-in-possession financing proposals, ultimately selecting a debtor-in-possession financing proposal of National Founders and related parties, as described in further detail below. The Initial Debtors determined that it would be necessary to seek chapter 11 relief in order to address their liquidity issues and approve the debtor-in-possession financing proposal, and on April 20, 2022, the Initial Debtors filed voluntary petitions for relief under the Bankruptcy Code.

## VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Pleadings and Other Procedural and Administrative Motions

On the Initial Petition Date, the Initial Debtors filed the Interim DIP Motion (as described below) and several other procedural and administrative motions (the "First Day Motions") intended to stabilize the Initial Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases. The Initial Debtors have continued in their possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases.

The First Day Motions sought authority to, among other things, obtain debtor-in-possession financing on an interim basis, reject burdensome executory contracts and unexpired leases, honor employee related wages and benefits obligations, and ensure the continuation of the Initial Debtors' surety program, insurance, cash management systems, and other business operations without interruption. A brief description of each of the First Day Motions is set forth below, and the evidence in support thereof is set forth in the *Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 17], filed on the Initial Petition Date. The various First Day Motions included:

- Motion for Joint Administration. The Initial Debtors' Chapter 11 Cases sought joint administration for administrative purposes under Case No. 22-90032 with the case caption *In re GWG Holdings, Inc., et al.* [Docket No. 2].

- Motion to Pay Employee Compensation and Benefits. Pursuant to the Shared Services Agreement, a number of individuals perform services for the Company. By this motion, the Initial Debtors sought authority to pay compensation, withholding obligations, health and welfare program-related obligations, stock incentive plan-related obligations and non-management director compensation in the ordinary course of business, whether arising before or after the Initial Petition Date, including some amounts in excess of the $15,150 priority cap mandated under the Bankruptcy Code. [Docket No. 4].

- Motion to Pay Critical Vendors. The Initial Debtors sought to pay prepetition claims of certain vendors that the Initial Debtors deemed critical to being able to smoothly continue their operations postpetition. The motion requested up to $125,000 on an interim basis and up to $250,000 on a final basis. [Docket No. 5].

- Motion to Establish Trading Procedures of Common Stock. By this motion, the Initial Debtors sought to establish trading procedures for their common stock to preserve net operating losses ("NOLs"). The Initial Debtors estimated that they had federal NOLs of approximately $61.1 million as of December 31, 2020. [Docket No. 7].

- <u>Motion to Continue Operating Cash Management System</u>. By this motion, the Initial Debtors sought to maintain a total of 11 existing bank accounts at Bell Bank, The Bank of New York Mellon, and Wells Fargo Bank and 11 non-debtor bank accounts at Wells Fargo as required under DLP IV's and DLP VI's secured credit agreements to maintain the Policy Portfolio. The Initial Debtors also sought to honor certain intercompany obligations. [Docket No. 8].

- <u>Motion to Pay Taxes and Fees</u>. By this motion, the Initial Debtors sought authorization to pay an estimated $469,313 in prepetition taxes and fees that would become due and payable after the Initial Petition Date. [Docket No. 11].

- <u>Motion to Maintain Insurance Programs</u>. By this motion, the Initial Debtors sought the right to pay outstanding obligations that would allow the Initial Debtors to renew, maintain, and/or purchase various insurance policies. [Docket No. 6].

- <u>Motion to Establish Certain Notice Procedures</u>. By this motion, the Initial Debtors sought approval of the form and manner of notifying creditors of the commencement of the Initial Debtors' Chapter 11 Cases. [Docket No. 9].

- <u>Motion to Waive Equity List Requirement and File Consolidated Creditor Matrix</u>. By this motion, the Initial Debtors sought (i) a waiver of the requirement to file a list of each Initial Debtor's equity security holders and (ii) authorization to redact certain personally identifiable information for individual creditors. [Docket No. 16].

- <u>Motion to Extend Schedules Filing Deadline</u>. By this motion, the Initial Debtors sought an extension of the initial 14-day period to file their schedules of assets and liabilities and statements of financial affairs. [Docket No. 10].

- <u>Motion to Appoint Donlin, Recano & Co. as Claims Agent</u>. By this motion, the Initial Debtors sought entry of an order appointing DRC as claims, noticing, solicitation, and administrative agent. [Docket No. 12].

The Initial Debtors also filed several other motions subsequent to the Initial Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- <u>Retention Applications</u>. On May 11, 2022, the Initial Debtors filed several applications seeking to retain certain professionals on a postpetition basis pursuant to sections 327 and 328 of the Bankruptcy Code, including Mayer Brown, as restructuring counsel [Docket No. 222], FTI Consulting, as financial advisor [Docket No. 223], and PJT, as investment banker [Docket No. 224]. Between May 17, 2022 and May 20, 2022, the Initial Debtors filed applications seeking to retain Tran Singh LLP as special conflicts counsel [Docket No. 252], Jackson Walker as co-counsel and conflicts counsel [Docket No. 267], and Willkie Farr & Gallagher LLP ("<u>Willkie Farr</u>") as special counsel [Docket No. 268]. The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Initial Debtors' professionals

retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

- <u>Interim Compensation Motion</u>. On May 12, 2022, the Initial Debtors filed the *Debtors' Motion for Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 228] (the "<u>Interim Compensation Motion</u>") to authorize the Initial Debtors to establish procedures for interim compensation and reimbursement of expenses for legal and other professionals retained to represent the Initial Debtors or any official committee appointed in the Chapter 11 Cases.

- <u>Ordinary Course Professionals Motion</u>. On May 24, 2022, the Initial Debtors filed the *Debtors' Motion for (I) Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 291] (the "<u>OCP Motion</u>") to authorize the Initial Debtors to retain and compensate certain law firms, accountants, tax professionals, and other non-attorney professionals utilized in the ordinary course of business.

On April 22, 2002, the Bankruptcy Court entered a case management order (the "<u>Case Management Order</u>") directing the Initial Debtors to file a status report no later than May 16, 2022 to address the "concrete and particularized steps" that the Initial Debtors took to assure that there would be material inflows of cash from sources other than debtor-in-possession financing. [Docket No. 95]. Thereafter, the Initial Debtors took a number of steps to address the Bankruptcy Court's concerns, including negotiating amendments to the DLP IV and DLP VI Facilities, holding meetings with the boards of the DLP Entities, and appointing additional independent directors. These actions are further described in <u>Article VI.C.2</u> and <u>Article VI.C.3</u>. The Initial Debtors advised the Bankruptcy Court of these actions and addressed other issues identified in the Case Management Order pursuant to a status report filed on May 13, 2022. [Docket No. 248].

The First Day Motions, the First Day Declaration, all subsequently filed motions, all orders for relief granted in the Chapter 11 Cases, and all other pleadings can be viewed free of charge at https://www.donlinrecano.com/Clients/gwg/Index.

**B.      Appointment of Bondholder Committee, CRO and Independent Committees; LBM; Ad Hoc Committee**

**1.      Appointment of Bondholder Committee**

On May 9, 2022 [Docket No. 214], the U.S. Trustee appointed the Bondholder Committee, at that time constituted as a seven-member official committee of Bondholders in these Chapter 11 Cases. On June 17, 2022 [Docket No. 418], the U.S. Trustee reconstituted the Bondholder Committee to a six-member Bondholder Committee.

The Bondholder Committee selected Akin Gump Strauss Hauer & Feld LLP and Porter Hedges LLP as co-counsel, Piper Sandler & Co., through its restructuring group TRS Advisors, as investment banker, and AlixPartners as financial advisor.

## 2.    Appointment of CRO and Independent Director Committees

On June 19, 2022, the board of directors of GWGH unanimously adopted resolutions (as subsequently amended and restated on July 13, 2022 and July 17, 2022, the "Resolutions"):

a.   designating Jeffrey S. Stein as Chief Restructuring Officer of GWGH, effective June 1, 2022;

b.   appointing Jeffrey S. Stein and Anthony R. Horton as independent directors of the GWGH board;

c.   forming the Investigations Committee of the board of directors of GWGH (the "Investigations Committee") and appointing Jeffrey S. Stein and Anthony R. Horton as the sole members thereof;

d.   forming the Special Committee of the board of directors of GWGH (the "Special Committee," and together with the Investigations Committee, the "Independent Committees") and appointing Jeffrey S. Stein, Anthony R. Horton, and David F. Chavenson (each an "Independent Director" and, together, the "Independent Directors") as the sole members thereof; and

e.   delegating specific authorities to the Investigations Committee and the Special Committee, respectively.

On June 20, 2022, the Initial Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Designation of Jeffrey S. Stein as Chief Restructuring Officer, (II) the Appointment of Jeffrey S. Stein and Anthony R. Horton as New Independent Directors, and (III) Granting Related Relief* [Docket No. 430] (the "CRO and Directors Motion"). Following a hearing held on July 18, 2022, the Bankruptcy Court entered an order approving the CRO and Directors Motion, which authorized the Initial Debtors to, among other things, appoint the Independent Directors on the terms set forth in the Resolutions and retain Mr. Stein as Chief Restructuring Officer [Docket No. 594] (the "CRO and Directors Order").

The Resolutions gave the Investigations Committee the exclusive authority to, among other things:

a.   initiate, design, establish, direct, administer, control and conduct an internal investigation (the "Independent Investigation") of claims, causes of action and defenses to claims and causes of action that arise under or relate to any transaction, group of related transactions, relationships or conduct involving GWGH, any of its current and former subsidiaries and affiliates, and any third party, including, without limitation, Beneficient and current and former directors and officers, that occurred at any point prior to the filing of these Chapter 11 Cases (the "Investigation Matters");

b.   examine, investigate, analyze, assess, and evaluate the terms and conditions of any Investigation Matters, and review, analyze, evaluate, monitor and exercise general oversight of all proceedings and activities of GWGH related to the Independent Investigation;

      c.    prepare a report (the "<u>Independent Report</u>") regarding the results of the Independent Investigation, to be provided to the Investigations Committee, including its conclusions regarding whether any claims or causes of action should be brought regarding the Investigation Matters; and

      d.    on behalf of GWGH or any of its subsidiaries, and at the sole cost and expense of GWGH, with outside legal counsel engaged by the Investigations Committee, assert any claims or causes of action regarding any of the Investigation Matters described in the Independent Report, and/or to prosecute, settle, or assign any claims or causes of action regarding Investigation Matters; and take such other actions as the Investigations Committee may deem, in its sole judgment and discretion, to be necessary, advisable or appropriate for the Investigations Committee to discharge its duties.

The Resolutions gave the Special Committee the exclusive authority to, among other things:

      a.    initiate, design, negotiate, seek Bankruptcy Court approval of and adopt any new compensation arrangements for officers of GWGH in connection with the Chapter 11 Cases;

      b.    examine, investigate, analyze, assess, and evaluate the terms and conditions of the Shared Services Agreement, and the performance by GWGH and Beneficient thereunder, relating, in each instance, to the period following the commencement of these Chapter 11 Cases, and any actions that, in the Special Committee's sole reasonable discretion, may or should be taken by GWGH with respect to the amendment or termination of the Shared Services Agreement and, with legal counsel engaged by the Special Committee, the assertion of any claim or cause of action thereunder, and to prosecute and settle any such claim or cause of action;

      c.    examine, investigate, analyze, assess, evaluate and approve (or reject) the terms and conditions of any transaction or proposed transaction (or any component thereof) between GWGH or any of its subsidiaries, on the one hand, and any of GWGH's or any of its subsidiaries' equityholders, affiliates, subsidiaries, directors, managers, officers, or other stakeholders that presents an actual or potential conflict of interest, as reasonably determined by the Special Committee, between the Company and any such related party;

The Resolutions also gave the Special Committee the authority, in consultation with the Board, management, and the Debtors' advisors, as determined to be necessary or appropriate by the Special Committee in its sole reasonable discretion, to examine, investigate, analyze, assess, evaluate and negotiate the terms and conditions of (the following being referred to herein as the "<u>Special Committee Chapter 11 Actions</u>"):

      a.    any debt financing proposal to be submitted to the Bankruptcy Court for approval in connection with these Chapter 11 Cases;

      b.    any proposed sale of all or a portion of the Policy Portfolio or any of the Company's other assets;

c.   any proposed action to cause the chapter 11 filing of any of the GWGH's subsidiaries;

d.   any proposed plan of reorganization or liquidation to be submitted by the Debtors to the Bankruptcy Court for confirmation in connection with these Chapter 11 Cases; and

e.   any pleadings to be filed by the Company with the Bankruptcy Court requesting approval of the foregoing Special Committee Chapter 11 Actions.

Under the Resolutions, the board of directors of GWGH retained the authority to approve and authorize the Company's entry into any of the Special Committee Chapter 11 Actions, subject to the prior approval of the Special Committee.

The Independent Directors retained independent counsel, Katten Muchin Rosenman LLP ("Katten"), whose work in these Chapter 11 Cases has been at the sole direction of the Independent Directors. The Bankruptcy Court approved this retention on August 23, 2022. [Docket No. 687]. On September 16, 2022, the Investigations Committee retained an independent financial advisor, Province, LLC ("Province"), whose work in these Chapter 11 Cases has been at the sole direction of the Investigations Committee. The Bankruptcy approved this retention on November 8, 2022. [Docket No. 1047]. David F. Chavenson resigned from the Special Committee and the GWGH board on November 15, 2022.

### 3.   Seller Trusts, Custody Trusts and LBM

As described above, as a result of certain prepetition transactions with Ben and the Company, the Seller Trusts acquired Seller Trust L Bonds and equity interests in GWGH. Additionally, on September 30, 2020, the Custody Trusts, at the sole direction of John A. Stahl, trust advisor of each such trust, entered into that certain *Contribution and Exchange Agreement* with certain Seller Trusts (the "Contribution and Exchange Agreement"). Under the Contribution and Exchange Agreement, the parties participated in an exchange of collateral that resulted in the Custody Trusts holding approximately 30% of GWGH's common stock and approximately 26% of the Seller Trust L Bonds.

#### (a)   The Seller Trusts

The trustee of each of the Seller Trusts is Delaware Trust Company. The trust advisors of each trust were initially James E. Turvey and Murray T. Holland, but as of April 18, 2022, Mr. Turvey and Mr. Holland resigned, and the trust advisor is currently John A. Stahl, who has sole decision-making authority with respect to each trust. The sole beneficiary of each of the Seller Trusts is MHT Financial, L.L.C. Murray T. Holland, who is the former Chief Executive Officer of GWGH, has an indirect pecuniary interest in the assets of the Seller Trusts resulting from his ownership interest of 30% of the outstanding membership interests of MHT Financial, L.L.C. Until recently, Mr. Holland also served as the Chairman of the Board of GWGH. In addition to serving in these multiple roles, Mr. Holland acted as an advisor to Beneficient starting in 2014.

#### (b)   The Custody Trusts

The Custody Trusts constitute six common law trusts for whom Delaware Trust Company is the trustee. The sole beneficiary of each Custody Trust is a separate certificate holder referred

to as a liquid trust (the "Liquid Trusts"). John A. Stahl is the trust advisor of each of the six Liquid Trusts and has the sole decision-making authority with respect to each of the Custody Trusts. In connection with the Collateral Swap, on November 3, 2020, GWGH and the Liquid Trusts entered into a *Stockholders Agreement* (the "Stockholders Agreement"), and concurrently, each of the Custody Trusts entered into a joinder to the Stockholders Agreement with respect to the shares held by the Custody Trusts. The Stockholders Agreement limited the voting power of the Liquid Trusts and Custody Trusts. Specifically, until the Seller Trusts beneficially own less than 20% of the total voting power of GWGH's common stock, the Liquid Trusts and Custody Trusts will vote solely in proportion with the votes cast by all stockholders.

<div align="center">(c)   LBM</div>

As discussed in Article II.B.2 of this Disclosure Statement, the Debtors understand that, pursuant to certain powers of attorney, the Custody Trusts and Seller Trusts designated LBM as agent with respect to claims (and related litigation) relating to the Seller Trust L Bonds; however, LBM has not authority or control over any equity interests held by the Seller Trusts or Custody Trusts. LBM is a special purpose entity formed under Delaware law that is charged with maximizing recoveries on the Seller Trust L Bonds. The powers of attorney also grant LBM authority to act for the Custody Trusts and Seller Trusts in any bankruptcy proceedings affecting the property of such trust. John A. Stahl is the sole manager of LBM. Richard Schmidt was appointed by John A. Stahl, in his capacity as the manager of LBM, as the restructuring manager for LBM with the power and authority to act on behalf of LBM including, but not limited to, the Chapter 11 Cases. LBM is represented by Okin Adams Bartlett Curry LLP, as legal counsel, and Gordian Group, as investment banker.

<div align="center">**4.     Ad Hoc Committee of Brokers/Dealers**</div>

As noted herein, the Company sold bonds through a network of 145 registered broker/dealers and registered investment advisers (i.e., the Broker Dealers). A group of these Broker Dealers, having the interests disclosed in the *Verified Statement of Proskauer Rose LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 900], as it may be supplemented from time to time, has formed an ad hoc committee (the "Ad Hoc Committee"). The Ad Hoc Committee is represented by Proskauer Rose LLP.

<div align="center">**C.     Financing Matters; Filing of DLP IV and DLP VI**</div>

<div align="center">**1.     The Interim DIP Facility**</div>

Prior to the Initial Petition Date, PJT initiated a process to raise liquidity on an exigent basis and solicited proposals for bridge financing and debtor-in-possession financing. Despite such efforts, the Company was unsuccessful in its attempts to obtain medium or long-term prepetition bridge financing that it deemed satisfactory. Through PJT's efforts, and despite the time constraints imposed by the Company's extraordinarily difficult liquidity constraints, the Company received four proposals to provide debtor-in-possession financing and ultimately accepted the proposal of National Founders and certain related parties (the "Interim DIP Lenders") for a multi-draw term loan facility (the "Interim DIP Facility").

<div align="center">61</div>

Accordingly, on the Initial Petition Date, among other first-day relief sought, the Initial Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Authorizing the DLP VII Option Upon Entry of the Final Order, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 13] (the "Interim DIP Motion") seeking authorization to enter into the Interim DIP Facility with the Interim DIP Lenders in an aggregate principal amount equal to $65 million, $18 million of which would be available on an interim basis. The Interim DIP Motion also previewed that the Initial Debtors reserved the right to seek Bankruptcy Court approval of an option held by the Interim DIP Lenders (the "DLP VII Option") pursuant to which the Interim DIP Lenders could elect to refinance in full the DLP IV Facility and the DLP VI Facility by (a) entering into a new credit facility at a newly formed non-debtor subsidiary special purpose vehicle, DLP VII; (b) and transferring the entire policy portfolio, pursuant to section 363 of the Bankruptcy Code, to DLP VII. At the time of the negotiation of the Interim DIP Facility, the Initial Debtors expected the DLP VII Option to result in the payment in full of the amounts then owing under the Interim DIP Facility, while allowing the Initial Debtors to retain the Interim DIP Facility proceeds to fund the Chapter 11 Cases.

Following a hearing on the Interim DIP Motion held on April 21, 2022, the Bankruptcy Court entered an order approving the Interim DIP Motion on an interim and modified basis [Docket No. 124] (the "Interim DIP Order"), which order authorized the Initial Debtors to borrow $10 million under the Interim DIP Facility. Thereafter, three stipulations and agreed orders were entered [Docket Nos. 205, 349 and 381], which, among other things, reset the final hearing on the Interim DIP Motion and set and extended other deadlines in connection with the Interim DIP Facility.

## 2. The DLP IV Facility

As set forth in Article V.B.1 herein, prior to the Initial Petition Date, the Company and the DLP IV Lender Parties entered into certain amendments for the DLP IV Facility to, among other things, waive certain defaults, advance additional funds to DLP IV to pay premiums, pay various fees and expenses and adjust the interest rate.

The DLP IV Lender Parties sought clarification from the Bankruptcy Court that DLP IV could borrow under the DLP IV Facility to make premium payments to maintain DLP IV's Policy Portfolio without violating the Case Management Order. By order dated April 28, 2022 [Docket No. 171], the Bankruptcy Court confirmed such clarification.

Thereafter on June 27, 2022, DLP IV and the DLP IV Lender Parties negotiated a second loan agreement amendment (the "Second DLP IV Amendment"), that, among other things, (a) provided that LNV would make advances to cover any shortfall to the extent DLP IV did not have sufficient cash (after reserving in a specified account for two months' worth of premiums) to make payments for premiums, and (b) DLP IV would pay monthly management fees to Debtor GWG Life in the amount of $3,500 per year per Policy for the Policies owned by DLP IV. The Second DLP IV Amendment also reflected revisions to address the Bondholder Committee's concerns. The Second DLP IV Amendment also granted DLP IV the option to purchase the DLP IV Lender Parties' Residual Beneficial Interest at a price equal to or greater than $20,000,000.

Thereafter the DLP IV Lender Parties sought further clarification from the Bankruptcy Court that the terms of the Second DLP IV Amendment did not violate the Case Management Order. By order entered on June 21, 2022 [Docket No. 444], the Bankruptcy Court confirmed that the DLP IV Lender Parties' entry into the Second DLP IV Amendment did not violate the Case Management Order.

On October 12, 2022, the DLP IV Lender Parties entered into a further loan agreement amendment, that, among other things, (a) provided that LNV would continue to make advances for scheduled premium payments through February 1, 2023, to cover any shortfall to the extent DLP IV did not have sufficient cash to make payments for such premiums, and (b) permitted the reasonable and documented fees and expenses of counsel to the independent directors of DLP IV, and certain other expenses set forth in the approved budget, to be paid by DLP IV.

### 3. The DLP VI Facility

As set forth above, prior to the Initial Petition Date, DLP VI and the National Founders entered into certain waivers and amendments to the DLP VI Facility, to, among other things, waive certain defaults, advance additional funds to DLP VI to pay premiums, pay various fees and expenses and revised the terms of a yield maintenance premium.

On June 28, 2022, DLP VI entered into an amendment of the DLP VI Facility (the "Second DLP VI Amendment") that, among other things, (a) provided for the payment of monthly management fees to Debtor GWG Life in the amount of $3,500 per year per Policy for Policies owned by DLP VI through November 1, 2022, and (b) waived any potential default or event of default that may occur as a result of a deficiency in the amount of funds required to be held in the premium reserve account prior to September 16, 2022. The Second DLP VI Amendment also reflected revisions to address the Bondholder Committee's concerns.

National Founders also requested clarification from the Bankruptcy Court that the terms of the Second DLP VI Amendment did not violate the Case Management Order. By order entered on June 21, 2022 [Docket No. 445], the Bankruptcy Court confirmed the Initial Debtors' entry into the Second DLP VI Amendment did not violate the Case Management Order.

On September 14, 2022, the DLP VI Lender Parties entered into a letter agreement which provided for additional protective advances and extended the waiver period set forth in the Second DLP VI Amendment to December 31, 2022. On October 14, 2022, the DLP VI Lender Parties entered into a further loan agreement amendment, pursuant to which National Founders made an advance in October 2022 to DLP VI that permitted DLP VI to make scheduled premium payments.

### 4. The Chapford DIP Facility

Following entry of the Interim DIP Order and the Bankruptcy Court's guidance to invite willing participants to offer alternative financing proposals, PJT and the Initial Debtors immediately commenced an additional postpetition marketing process to determine if there were any offers on terms that were higher or better than the Interim DIP Facility. To that end, PJT, the Initial Debtors and their advisors conducted a robust, comprehensive, and competitive marketing process over the course of more than two months to provide the Initial Debtors with as many potential financing and sale options on the best available terms as possible. In addition, the Initial

Debtors simultaneously created a process by which to oversee and evaluate any bids in connection with this marketing process through the appointment of the CRO and the Independent Directors and the formation of the Independent Committees, as discussed above.

The Initial Debtors and their advisors reached out to over 50 parties, including additional parties recommended by the Bondholder Committee's professionals, to ascertain and solicit interest regarding a potential alternative transaction, whether in the form of a refinancing, an outright sale of the Policy Portfolio, or other monetization alternative. The Initial Debtors ultimately received three potentially-viable financing proposals and concluded the replacement DIP financing offer (the "Chapford DIP Facility") from entities related to Blue Owl Capital Inc., including Chapford SMA Partnership LP and related parties (collectively, "Chapford"), was indisputably the strongest offer, as it, among other things (a) improved upon the Interim DIP Facility by providing $65 million in additional liquidity and eliminated the DLP VII Option; (b) extended the maturity date from October 20, 2022 to December 31, 2022; (c) offered a one-way sale put option (the "Chapford Put Option") at no cost as protection against downside risk in connection with any sale of the Policy Portfolio at a later date, and obligated Chapford to act as a stalking horse bidder for the Policy Portfolio with a $610 million purchase price (subject to adjustments) in the event the Debtors decided to sell the Policy Portfolio; and (d) provided lower interest rates and fees than the Interim DIP Facility. The Chapford DIP Facility also included certain case milestones that remain in effect, including an October 31, 2022 milestone (as extended by stipulation and agreed order from the initial October 15, 2022 date) that required the Debtors to (a) file a chapter 11 plan that would repay the Chapford DIP Facility in full in cash on such plan's effective date or documentation evidencing a financing or other transaction that provided for payment in full in cash of the obligations under the Chapford DIP Facility; or (b) if the Debtors pursued a sale process, and in connection with the DLP Entities' voluntary commencement of chapter 11 cases, exercise the Chapford Put Option and file a motion to approve bid procedures.

In sum, the Debtors concluded that entering into the Chapford DIP Facility was a sound exercise of their business judgment at that time, on the basis that the flexibility and liquidity provided by the Chapford DIP Facility was critical, the Debtors were not obligated to pursue a sale under the Chapford DIP Facility, and the Debtors were not constrained from pursuing higher or better offers.

On July 4, 2022, the Initial Debtors filed the *Supplement to the Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 491], seeking Bankruptcy Court approval of the Chapford DIP Facility. Following the final hearing held on the Chapford DIP Facility on July 18, 2022, the Bankruptcy Court entered the *Final DIP Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 606] (the "Chapford DIP Order") approving the Chapford DIP Facility. The Chapford DIP Order reflected numerous concessions and agreements by and among Chapford, the Debtors, the Bondholder Committee and other parties-in-interest.

5.      **The Vida Replacement Financing Option**

In furtherance of their development of a value maximizing chapter 11 plan, the Debtors procured from VICOF III Acquisition, LLC, an affiliate of Vida Capital, Inc. (collectively, "<u>Vida</u>"), an exercisable option (the "<u>Vida Replacement Financing Option</u>") under which the Debtors had the option to elect to enter into a $630 million replacement debtor-in-possession financing facility (the "<u>Vida Replacement Financing Facility</u>") as well as exit financing. The Vida Replacement Financing Option permitted the Debtors to refinance the Chapford DIP Facility within the required timeframe using proceeds of the Vida Replacement Financing Facility, provided additional liquidity and an extension of the maturity date, and also secure access to exit financing, under certain conditions, for a plan of reorganization in an aggregate amount of up to $630 million. Specifically, the Vida Replacement Financing Facility comprised the following components: (a) (i) a $590 million replacement debtor-in-possession facility, which would replace the Chapford DIP Facility and repay in full the valid claims of the DLP Debtors' secured lenders, and (ii) a $40 million senior secured credit facility upon effectiveness of the Second Amended Plan (collectively, the "<u>Vida DIP Facility</u>"); and (b) exit financing for the Debtors (the "<u>Vida Exit Financing Facility</u>"). The Vida Exit Financing Facility would allow the Debtors to retain and ultimately maximize the residual value of the Policy Portfolio. On October 11, 2022, the Bankruptcy Court approved the Initial Debtors' entry into, but not exercise of, the Vida Replacement Financing Option. [Docket No. 865].

6.      **Election of Vida Replacement Financing Option**

At the October 11, 2022 hearing on the Initial Debtors' motion to approve entry into the Vida Replacement Financing Option, the Bankruptcy Court required that, in advance of exercising either the Vida Replacement Financing Option or the Chapford Put Option, the Initial Debtors file a statement of intent to exercise their chosen option, and, following the filing of such statement, the Bankruptcy Court would evaluate whether the Initial Debtors' determination of which option to exercise was supported by the Initial Debtors' business judgment.

The Initial Debtors ultimately determined that the Vida Replacement Financing Option was superior to any available alternative, including the Chapford Put Option and, accordingly, on October 25, 2022, the Initial Debtors filed their *Statement of Intent to Elect Vida Option and Memorandum in Support Thereof* [Docket No. 920] (the "<u>Vida Election Statement</u>"). As set forth in the Vida Election Statement, the Initial Debtors' determination was based on analysis and information provided by their in-house expert on the Policy Portfolio, a third-party life settlements expert, and the Initial Debtors' advisors, indicating that (1) exercising the Vida Replacement Financing Option is expected to provide more cash up front than the Chapford Put Option, and is highly likely to provide additional value over time, (2) no better financing or purchase offer is likely forthcoming, (3) the Debtors or other successor holders of the Policy Portfolio are unlikely to default on the exit facility contemplated under the Vida Replacement Financing Option if such option were exercised, and (4) the Vida affiliate intended to serve as lender is an investment grade

counterparty that is expected to fully honor its obligations with respect to the Vida Replacement Financing Option.[27]

At the October 27, 2022 hearing to consider the Initial Debtors' intent to exercise the Vida Replacement Financing Option, the Bankruptcy Court confirmed that the Initial Debtors' determination to exercise the Vida Replacement Financing Option was supported by their business judgment and that, accordingly, the Initial Debtors could proceed to exercise the Vida Replacement Financing Option in accordance with its terms. Accordingly, on October 31, 2022, the Debtors exercised the Vida Replacement Financing Option and, in conjunction therewith, filed the voluntary chapter 11 petitions of the DLP Entities, and the motion seeking approval of the Vida Replacement Financing Option, which sought: (1) immediate approval of the Vida DIP Facility; and (2) at a later time, approval of the Vida Exit Financing Facility. [Docket No. 975].

Following the final hearing held on the Vida DIP Facility on December 1, 2022, the Bankruptcy Court entered the *Final Order (A) Authorizing the Debtors to Obtain Replacement DIP Financing from Vida Insurance Credit Opportunity Fund II GP, LLC and its Affiliates and Enter Into and Perform Under the Replacement DIP Credit Documents, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens, and Providing Claims with Superpriority Administrative Expense Status, (D) Authorizing the Refinancing of Prepetition and Postpetition Secured Debt, (E) Authorizing Amending the Option Agreement, (F) Modifying the Automatic Stay, and (G) Granting Related Relief* [Docket No. 1144] (the "Vida DIP Order") approving the Vida DIP Facility. The Vida DIP Facility was entered into on December 15, 2022, and concurrently therewith the Chapford DIP Facility, DLP IV Facility and DLP VI Facility were each paid in full.

### 7.     Developments Leading to the DLP Petition Date

Subsequent to the filing of the Initial Debtors' Chapter 11 petitions, the Bankruptcy Court and various creditor constituents expressed concerns about (a) the use of the Initial Debtors' funds to support the assets of the non-debtor DLP Entities; and (b) the organizational structures of the DLP Entities could allow such entities to inhibit a value maximizing restructuring process for the Initial Debtors by preventing such entities from seeking relief under chapter 11 of the Bankruptcy Code. In response to these concerns, on May 13, 2022, counsel for the Debtors made a presentation to the respective boards of directors of the DLP Entities, which included an emphasis on the fiduciary duties of the directors, particularly in the context of any proposal that would result in payment in full of all of the respective creditors of the DLP Entities and a substantial return to the Initial Debtors on account of their direct and indirect equity interests in the DLP Entities. At the request of the Bankruptcy Court, the Initial Debtors filed a status report with respect to the foregoing, which included a summary of the presentation. [Docket No. 248].

Starting on September 7, 2022, counsel for the Debtors have made weekly presentations to the boards of directors of the DLP Entities. In September 2022, one of the two independent directors for the DLP IV board of directors, Sean Clements, retained independent counsel, Paul

---

[27]   Fifth Season Investments LLC ("Fifth Season"), the successor in interest to Chapford, filed a statement in response to the Vida Election Statement [Docket No. 937] that asserted that Fifth Season is entitled to an alternative stalking horse fee in the amount of $18.3 million on the basis that the Vida Exit Financing Facility is a disguised sale rather than a bona fide financing transaction. The Debtors dispute the allegations asserted by Fifth Season in its statement, and such dispute remains unresolved as of the date of this Disclosure Statement.

Hastings LLP, whose work in connection with these Chapter 11 Cases has been at the sole direction of Mr. Clements in his capacity as independent director at DLP IV. Similarly, in September 2022, Albert Fioravanti, the other independent director for the DLP IV board of directors – who is also the independent director for the DLP VI board of directors – retained independent counsel, Mintz & Gold LLP, whose work in connection with these Chapter 11 Cases has been at the sole direction of Mr. Fioravanti in his capacity as independent director at DLP IV and DLP VI. On October 25, 2022, the boards of directors at DLP Entities each formed a conflicts committee, with the independent directors at each entity being appointed to serve on the respective committees (collectively, the "DLP Conflicts Committees"). The DLP Conflicts Committees were tasked and granted the sole board authority to investigate, among other things, transactions and other matters involving the relevant DLP Entity, on the one hand, and creditors or affiliates of the relevant DLP Entity, on the other. Paul Hastings LLP is counsel to the DLP IV Conflicts Committee, and Mintz & Gold LLP is counsel to the DLP VI Conflicts Committee.

As discussed above, after an extensive marketing process, the Initial Debtors had obtained two viable facilities to fund their exit from chapter 11: the Chapford DIP Facility and the Vida Exit Financing Facility. Importantly, however, both the Chapford Put Option and the Vida Replacement Financing Option required, as a condition precedent to exercising each option, the DLP Entities to commence Chapter 11 cases on or before October 15, 2022 (which was extended in both instances to October 31, 2022).

On October 28, 2022, counsel for the Debtors made another presentation to the boards of directors for the DLP Entities, which described the necessity of the DLP Entities to commence Chapter 11 cases to allow the milestones under the Chapford DIP Order and Vida Replacement Financing Option to be met, which were the only sources of repayment for the credit facilities at each entity. After careful deliberation, the DLP Entities' respective boards of directors each determined that authorizing the DLP Entities to commence Chapter 11 cases was in the DLP Entities' best interests because, in addition to maximizing value for the Debtors and their stakeholders, it would also maximize the value of the Policy Portfolio, satisfying the existing lenders of the respective DLP Entities in full, and provide a substantial return to their respective equity holders. As noted previously, the credit facilities of the respective DLP Entities were paid in full with the closing of the Vida DIP Facility.

### 8.      DLP Entities' Petition Date

The DLP Entities each filed petitions for bankruptcy under chapter 11 of the Bankruptcy Code on October 31, 2022. In connection with their petitions, the DLP Entities also filed motions for joint administration with the Initial Debtors' Chapter 11 Cases, authorization to continue to operate their respective cash management system and maintain their respective existing bank accounts, authorization to use cash collateral of their respective lenders, and an extension of time to file their respective Schedules of Assets and Liabilities and Statement of Financial Affairs. A further description of the matters leading up to the commencement of the DLP Entities' Chapter 11 Cases and their first day motions is set forth in the *Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, Inc. and Board Member of the DLP Debtors, in Support of the DLP Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 976].

More specifically, the DLP Entities filed the *DLP Entities' Emergency Motion for Interim Orders (I) Authorizing the Use of DLP Cash Collateral, (II) Granting Adequate Protection to the Prepetition DLP Secured Parties, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing* [Docket No. 985] (the "DLP Cash Collateral Motion") seeking authorization of the DLP Entities to use the respective DLP Cash Collateral (as defined therein) with the consent of the respective DLP Entities' Senior Secured Parties.

The Bankruptcy Court held a hearing on the DLP Entities' Cash Collateral Motion, among other "first day" motions for the DLP Entities, on November 2, 2022. Following discussions with the DLP Senior Secured Parties and the Bondholder Committee to resolve certain objections of the Bondholder Committee to the DLP Cash Collateral Motion, including adding clarifying language requested by the Court regarding the fiduciary duties of the directors and officers of each of the DLP Entities to the respective DLP Entities' bankruptcy estates, the Bankruptcy Court entered (1) an interim order approving the DLP Cash Collateral Motion with respect to DLP IV's use of cash collateral on November 2, 2022 [Docket No. 1014] (the "DLP IV Cash Collateral Order"), and (2) an interim order approving the DLP Cash Collateral Motion with respect to DLP VI's use of cash collateral on November 4, 2022 [Docket No. 1032] (the "DLP VI Cash Collateral Order").[28]

Additionally, the Bankruptcy Court entered orders (1) extending the time the DLP Entities have to file their Schedules of Assets and Liabilities and Statement of Financial Affairs to December 14, 2022 [Docket No. 1008], and (2) directing the joint administration of the DLP Entities' chapter 11 cases with the chapter 11 cases of the Initial Debtors for procedural purposes only [Docket No. 970] (the "DLP Joint Administration Order").

### 9.      Settlements With the DLP Secured Parties

As a condition to final approval and closing of the Vida DIP Facility (which was required to occur no later than December 15, 2022 under the Vida DIP Facility documentation), the Debtors understood that Vida required the irrevocable release of all liens in favor of the DLP Senior Secured Parties (or that certain arrangements be made to consummate such releases immediately following closing), and DLP IV's purchase of the Residual Beneficial Interest from the DLP IV Agent. However, the December 15, 2022 deadline to close the Vida DIP Facility would occur prior to the Challenge Period Termination Date (under the DLP IV Cash Collateral Order) and the Investigation Termination Date (under the DLP VI Cash Collateral Order). Furthermore, the DLP Senior Secured Parties indicated that they would be unwilling to grant the required lien releases in connection with the Vida DIP Facility unless all obligations under their respective credit facilities are indefeasibly paid in full, the stipulations, releases and indemnities in the DLP IV Cash Collateral Order and the DLP VI Cash Collateral Order were made final, binding and irrevocable, and, as to DLP IV, the Residual Beneficial Interest was repurchased on acceptable terms.

Following extensive negotiations with the Debtors, the Bondholder Committee, the Investigations Committee, the DLP Conflicts Committees, and the DLP Senior Secured Parties, the parties agreed to compromises set forth in the *Debtors' Emergency Motion for Entry of Orders*

---

[28]   Hearings on the interim cash collateral orders were initially set for December 9, 2022. However, because the Vida DIP Facility paid the DLP IV Facility and DLP VI Facility in full, there were no further orders entered with respect to the Debtors' use of cash collateral under these credit facilities.

*(I) Approving Settlements Among the Debtors, the DLP Secured Parties, and Other Parties in Interest, and (II) Granting Related Relief* [Docket No. 1121] (the "<u>DLP Settlement Motion</u>") and related orders (the "<u>DLP Settlement</u>"). Pursuant to the DLP Settlement, in addition to the other terms incorporated therein, (1) the DLP IV Lender Parties agreed to a $2.15 million reduction to the purchase price for the Residual Beneficial Interest, from $20 million to $17.85 million, and (2) the DLP VI Lender Parties agreed to a 10% discount of the amount of the Acceleration Prepayment Premium Amount (as defined in the DLP VI Facility), an approximately $1.5 million reduction. Together, the DLP Settlements provide more than $3.6 million in direct cash benefit to the Debtors, in addition to minimizing professional fees that could potentially be incurred litigating issues relating to the credit facilities. On December 1, 2022, the Bankruptcy Court approved the DLP Settlement, entering orders with respect to each settlement. The DLP Settlement facilitated the timely closing of the Vida DIP Facility on December 15, 2022 which paid the DLP Senior Secured Parties in full.

### D.   Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Bankruptcy Court of a period of up to 18 months from the petition date). Prior to the expiration of the Initial Debtors' initial 120-day exclusive filing period, the Initial Debtors filed a motion, and the Bankruptcy Court entered an order, extending the Initial Debtors' exclusive periods to file and solicit a chapter 11 plan. [Docket 675 and 756]. Since then, the Initial Debtors have filed additional motions to extend such exclusive filing and solicitation periods. [Dockets No. 835, 857, 953, 958, 1035 and 1039]. The most recent order extending the exclusivity deadlines was entered on December 1, 2022, and pursuant to that order, the Initial Debtors' exclusive period to file and solicit a chapter 11 plan was extended to December 1, 2022 and February 14, 2023, respectively. [Docket No. 1146]. The Initial Debtors filed the Initial Plan on December 1, 2022, thereby meeting the milestone required to maintain exclusivity with respect to filing a plan of reorganization. On February 13, 2023, the Initial Debtors filed a motion seeking an extension of the time period to solicit votes on a plan of reorganization by an additional 90 days, to May 15, 2023.

Pursuant to the Mediated Settlement, the Creditor Proponents have agreed to not oppose the extension of the Debtors' exclusive period to solicit a chapter 11 plan through the earlier of (a) the date set for the Confirmation Hearing, and (b) May 31, 2023, with the understanding that the Creditor Proponents may oppose a requested extension by the Debtors beyond the foregoing.

The DLP Entities' initial exclusivity periods, pursuant to 11 U.S.C. § 1121(b), commenced as of the DLP Petition Date.

### E.   Schedules and Statements

On June 18, 2022, the Initial Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs. [Docket Nos. 422-427]. On January 30, 2023, GWGH and GWG Life filed amended States of Financial Affairs. [Dockets Nos. 1397, 1398]. On December 14, 2022,

the DLP Entities filed their Schedules of Assets and Liabilities and Statement of Financial Affairs. [Docket Nos. 1231-1236].

### F.    Establishment of Claims Bar Dates and Related Claims Procedures

On April 22, 2022, upon the Court's own motion during the hearing held on April 21, 2022, the Initial Debtors filed a proposed order setting bar dates for filing proofs of claim. [Docket No. 105]. On April 23, 2022, the Bankruptcy Court approved the order, establishing July 29, 2022 as the general claims bar date and October 17, 2022 as the governmental claims bar date (the "Bar Date Order"). [Docket No. 126].

The Initial Debtors have worked closely with the Bondholder Committee and Indenture Trustee to establish procedures for the full and final resolution of Bondholder claims. To reduce uncertainty and administrative burdens, the Initial Debtors filed their (a) *Emergency Motion for Entry of an Order (I) Modifying Bar Date Order, (II) Exempting Bondholders and Indenture Trustee from Filing Proofs of Claim Prior to Claims Bar Date, and (III) Granting Related Relief* [Docket No. 419], seeking approval of, among other things, exempting Bondholders from filing proofs of claim, which motion was approved by order entered on June 24, 2022 [Docket No. 464]; and (b) *Emergency Motion for Entry of an Order (I) Modifying Bar Date Order, (II) Establishing Procedures for Allowance of Bondholder and Indenture Trustee Claims, and (III) Granting Related Relief* [Docket No. 685], seeking approval of, among other things, notices to Bondholders of their claims and information on the process to dispute such claims, which motion was approved by order entered on August 29, 2022 [Docket No. 739] (the "Bondholder Claim Procedures Order").

Pursuant to the Bondholder Claim Procedures Order, Bondholders are exempt from the requirement to file Proofs of Claim with respect to claims for principal and interest under the Bonds, and other claims held by Bondholders were required to be filed no later than November 4, 2022 (the "Bondholder Bar Date"). The Bondholder Claim Procedures Order also provides for the automatic allowance of principal and interest claims held by Bondholders, (a) with respect to registered holders of Bonds, as of the Bondholder Bar Date, and (b) with respect to beneficial holders of Bonds held through DTC, upon entry of the Bondholder Claim Procedures Order. Additionally, the Bondholder Claim Procedures Order gave the opportunity for registered holders of Bonds to dispute the applicable principal and interest amounts reflected in the Debtors' books and records, as set forth in individualized notices provided to each such registered holder of Bonds.

### G.    Executory Contracts and Unexpired Leases

#### 1.    Certain Leases

On April 20, 2022, the Initial Debtors filed their *Motion for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases Effective As of the Petition Date, and (II) Granting Related Relief* (the "Lease Rejection Motion") [Docket No. 45], seeking to reject an unexpired lease for office space in Minneapolis, Minnesota (the "Minnesota Lease") that the Debtors no longer needed. U.S. Bank National Association, the lessor under the Minnesota Lease, objected to the *nunc pro tunc* relief requested in the Lease Rejection Motion. The Debtors and U.S. Bank ultimately entered into a stipulation agreeing to the rejection of the Minnesota Lease and the

allowance of an administrative expense claim for U.S. Bank, which the Court approved following a hearing on the matter on September 20, 2022. [Docket No. 772].

## 2. Shared Services Agreement

As noted above, the Special Committee of the GWGH board has been given authority to examine and investigate the Shared Services Agreement. More specifically, the Special Committee has the exclusive authority to examine, investigate, analyze, assess, and evaluate the terms and conditions of the Shared Services Agreement, and the performance by the Company and Beneficient thereunder, relating, in each instance, to the period following the commencement of the Chapter 11 Cases, and any actions that, in the Special Committee's sole discretion, may or should be taken by the Company with respect to the amendment or termination of the Shared Services Agreement and the assertion of any Claim or Cause of Action thereunder, and to prosecute and settle any such Claim or Cause of Action.

Pursuant to <u>Article IV.V</u> of the Second Amended Plan, on and after the Effective Date, it is expected, whether as the result of the rejection of the Shared Services Agreement or a consensual resolution and termination thereof, that there will be no continuing or other business relationship between the Wind Down Debtors, Wind Down Trust, or Litigation Trust, on the one hand, and Beneficient, on the other, of any nature or type whatsoever, other than the Wind Down Trust's ownership of interests in Beneficient constituting the Wind Down Assets, except as may be necessary or advisable to effectuate a smooth transition of shared services from Beneficient to Portfolio Co. or the Wind Down Trust. The terms of any continued relationship with Beneficient, including any amounts proposed to be paid to Beneficient, necessary to effect such transition shall be subject to the Proponents' Consent Right.

## 3. Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the applicable Petition Date and in the ordinary course of business, the Debtors entered into certain Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, are reviewing the Executory Contracts and Unexpired Leases to determine which contracts and leases they will assume, assume and assign, or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the Executory Contracts and Unexpired Leases, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.

On the Effective Date, except as otherwise provided in the Second Amended Plan, including with respect to the Debtor's D&O Liability Insurance Policies, as described below, all Executory Contracts or Unexpired Leases will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) those that have been previously assumed, assumed and assigned, or rejected by a Final Order; (3) those that are the subject of a motion to assume, assume and assign, or reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (4) those that are subject to a motion to assume, assume and assign, or reject an Executory Contract or Unexpired Lease

71

pursuant to which the requested effective date of such assumption, assumption and assignment, or rejection is after the Effective Date; or (5) those Executory Contracts and Unexpired Leases that expired pursuant to the terms thereof before the applicable Petition Date.

Entry of the Confirmation Order shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as provided under the Second Amended Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Second Amended Plan are effective as of the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date.

Although their analysis is ongoing, and aside from any resolution of the Shared Services Agreement, the Debtors currently estimate that the aggregate amount of Claims arising from the rejection of Executory Contracts and Unexpired Leases will not be significant.

## 4.     D&O Liability Insurance Policies

### (a)     The Debtors' D&O Liability Insurance Coverage

As of the Initial Petition Date, the Debtors were covered under two separate towers of D&O Liability Insurance Policies. A tower of insurance policies refers to a series of insurance policies in which there is a primary policy that is the first policy that the insured looks to, followed by one or more excess policies that provide the same or similar coverage in case the amount of insurance under the primary policy is fully exhausted. Standard D&O (directors standing for "<u>D</u>" and officers standing for "<u>O</u>" in the common abbreviation, "<u>D&O</u>") insurance policies provide one or more of the following three types of coverage:

- <u>Side A "Liability Coverage</u>, which protects only the corporation's directors and officers and only applies when the corporation is unable to indemnify them against a claim;

- <u>Side B "Indemnification" Coverage</u>, which provides insurance only for the corporation and only when it agrees to indemnify its directors and officers against a claim; and

- <u>Side C "Entity" Coverage</u>, which insures only the corporation and typically only when the corporation is a defendant in a "securities action."

Of the Debtors' two separate towers of D&O Liability Insurance Policies, one such tower of policies (the "<u>Shared D&O Policies</u>"), was obtained approximately two years prior to the Initial Petition Date. In addition to the Debtors and their directors and officers, Beneficient and its directors and officers are also covered under the Shared D&O Policies, including though the designation in such policies of BCH and Ben LP as "Additional Parent Companies." The Shared D&O Policies collectively provide a total of $155 million of coverage, including $95 million for coverage of Side A, Side B, or Side C claims and an additional $60 million for coverage only of

Side A claims. Each of the Shared D&O Policies is a "claims made" policy, generally meaning that they provide coverage for claims that were first asserted during the applicable policy period. In addition to paying approximately half of the policy premiums for the Shared D&O Policies, Beneficient acquired tail policies (which provide insurance for an extended reporting period) with respect to the Shared D&O Policies, such that the Shared D&O Policies now provide coverage for claims made by April 14, 2028 with respect to acts occurring prior to April 14, 2022. the Debtors understand that, as of [March 7, 2023], an amount of [approximately $9 million] has been advanced by the insurance carriers under the Shared D&O Policies in payment or reimbursement of covered defense costs.

As described in more detail in the Initial Debtors' *Motion for (I) Entry of an Order Modifying the Automatic Stay and Authorizing Use of Estate Property, to the Extent Applicable, to Allow Payment, Reimbursement, and/or Advancement of Defense Costs Under Insurance Policies and (II) Granting Related Relief* [Docket No. 639] (the "Insurance Motion"), the Debtors, with Beneficient, hold two primary comprehensive policies, the Primary D&O Policy and the Primary Company Policy (each as defined in the Insurance Motion). The Primary D&O Policy provides Side A, Side B, and Side C coverage to the Debtors, Beneficient, and their respective former and current officers and directors and certain other parties, for certain losses, including defense costs arising out of covered claims. The Primary Company Policy supplements the Primary D&O Policy by, among other things, providing direct coverage with respect to certain claims made against, and regulatory investigations involving, the Debtors and Beneficient. The Primary D&O Policy and Primary Company Policy together provide coverage up to a set combined policy limit. However, the remaining Shared D&O Policies provide excess coverage (subject to their own terms and conditions) beyond the primary limit. Some of the excess policies in this tower provide Side A coverage only, i.e., they do not cover the obligations of the Debtors or Beneficient, but rather only provide direct coverage to their respective individual directors and officers. Moreover, each of the Shared D&O Policies that also provides Side B and Side C coverage also contains a priority of payment provision that provides that losses for covered claims for which payment is due are payable first to the insured directors and officers.

Shortly before the Initial Petition Date, the Debtors acquired additional D&O Liability Insurance Policies that cover only the Company and its directors and officers (but not Beneficient and its directors and officers) (the "GWG D&O Policies"). The GWG D&O Policies provide a total of $15,000,000 in coverage for claims relating to acts allegedly committed from and after April 14, 2022 and made by April 14, 2023. As of the date hereof, the Debtors are not aware of any claims covered by or made on the GWG D&O Policies.

(b)     The Insurance Motion

On July 26, 2022, the Initial Debtors filed the Insurance Motion seeking entry of a comfort order for the insurance companies, which order provided that the automatic stay did not bar the Debtors' insurance carriers from paying certain defense expenses under the Shared D&O Policies with respect to the SEC Investigation, the Securities Litigation, and actions filed by Paul Capital and other plaintiffs against Beneficient and other non-Debtor parties.

To address the Bondholder Committee's issues concerning an insurance claim asserted by Willkie Farr against the insurance carriers for $4.3 million in prepetition defense costs in

connection with the SEC Investigation, the Bankruptcy Court entered the D&O Insurance Order on September 7, 2022 (a) directing the insurance carriers to pay to the Debtors the amount of Willkie Farr's prepetition defense costs; (b) ordering the parties, within 30 days, to reach a stipulation on a rational estimate of Side A-covered defense costs of Willkie Farr, with the Debtors to pay such amount to Willkie Farr; (c) ordering the balance of insurance proceeds *less* Side A-defense costs to be paid to Willkie Farr as a retainer for postpetition work, with such postpetition defense costs to constitute administrative expenses, subject to the Bankruptcy Court's approval; and (d) reserving the decision as to whether the retainer can be used to pay additional prepetition defense costs of Willkie Farr for a hearing currently scheduled for [March 23, 2023]. [Docket No. 754].

On October 6, 2022, the Initial Debtors, Willkie Farr, and the Bondholder Committee stipulated that Willkie Farr's Side A-covered prepetition defense costs were $2,268,979.00 and the remainder of the insurance payment, less certain amounts owed to an e-discovery vendor, would be remitted to Willkie Farr to hold as a retainer for security against the nonpayment of its postpetition fees and expenses, subject to further court order as set forth in the September 7, 2022 order. [Docket No. 825]. It is the Debtors' understanding that, in connection with the foregoing payments and other claims made under the Shared D&O Policies, coverage under the Primary D&O Policy, Primary Company Policy, and the first excess policy layer has been exhausted, triggering coverage under the next subsequent excess policy layer.

> (c)    Treatment of the D&O Liability Insurance Policies under the Second Amended Plan

Under the Second Amended Plan, all of the Debtors' D&O Liability Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies and any agreements, documents, and instruments related thereto (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. After the Effective Date, the Wind Down Debtors and the Litigation Trust, as applicable, shall not terminate or otherwise reduce, modify, or restrict in any way the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, including with respect to conduct occurring on or prior to April 20, 2022, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Second Amended Plan and who are covered by any such policy shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date. Without limiting the generality of the other provisions of the Second Amended Plan, and following such assumption, all right, title, and interest of the Debtors (and of the Wind Down Debtors and the Litigation Trust, as applicable) in and to any D&O Liability Insurance Policy (including any such tail coverage liability insurance) in effect as of the Effective Date covering claims relating to conduct occurring on or prior to April 20, 2022 shall be deemed assigned and fully transferred on the Effective Date to the Litigation Trust and shall constitute Initial Litigation Trust Assets for all purposes.

### H.      Litigation Matters

The Company is party to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

The following sets forth certain developments with respect to litigation matters following the Initial Petition Date.

### 1.      Securities Litigation

As set forth above, as of the Initial Petition Date, the Securities Litigation was in the pleading stage. On May 6, 2022, in the Bankruptcy Court, the proposed lead plaintiffs in the Securities Litigation, Thomas Horton and Frank Moore, filed the *Unopposed Motion for Relief from the Automatic Stay to (A) Appoint Lead Plaintiffs in Securities Class Action, (B) Permit Lead Plaintiffs to Serve and Enforce Third-Party Subpoenas, and (C) Take Related Actions* [Docket No. 201]. This motion was granted on May 31, 2022, modifying the automatic stay for the limited purpose of allowing the appointment of the lead plaintiffs in the Securities Litigation and allowing the lead plaintiffs to serve a limited number of third-party subpoenas. [Docket No. 321]. The Northern District of Texas entered its *Order Appointing Lead Plaintiff and Approving Lead Plaintiff's Selection of Counsel* on August 5, 2022, appointing Thomas Horton and Frank Moore as lead plaintiffs, and approving their selection of the law firms of Girard Sharp LLP and Malmfeldt Law Group P.C. as lead counsel for that dispute. Otherwise, as of the present date, the Securities Litigation has been stayed.

### 2.      Claims Objections

Since the Initial Petition Date, parties in interest have filed [5,393] Proofs of Claim against the Estates. The Debtors continue to evaluate Claims that have been asserted against their Estates, and whether, in connection with such evaluation, to object to any such Claims (either in full or in part). If the Second Amended Plan is confirmed, the Debtors will establish a Disputed Claims Reserve and place in such reserve an amount equal to the Disputed Claims Reserve Amount for distributions on account of Claims that may be Disputed (including Claims that the Debtors, Wind Down Debtors or other parties in interest object to). The Disputed Claims Reserve Amount means the amount of assets determined prior to the Effective Date by the Debtors, in consultation with the Creditor Proponents, that would likely have been distributed to the Holders of all applicable Disputed Claims against the Debtors as if such Disputed Claims against the Debtors had been Allowed Claims against the Debtors on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be:  (a) the lesser of (i) the asserted amount of each Disputed Claim against the Debtors as scheduled by the Debtors or, if and solely to the extent a non-duplicative Proof of Claim was Filed in an asserted amount greater than the scheduled amount, the asserted amount

Filed with the Bankruptcy Court as set forth in such non-duplicative Proof of Claim or as provided by the parties to the Debtors as further information with respect to the Proof of Claim, and (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court; or (b) the amount otherwise agreed to by the Debtors and the Holder of such Disputed or unliquidated Claim for reserve purposes. For more information, see Article VII.F of the Second Amended Plan.

### 3.      Bondholder Committee Standing Motion & Proposed Complaint

On December 15, 2022, following an extensive investigation, the Bondholder Committee filed a motion for standing to prosecute certain Causes of Action on behalf of the Debtors' Estates [Docket No. 1250] (the "Standing Motion"). Pursuant to the Standing Motion, the Bondholder Committee seeks the Bankruptcy Court's authorization to file a complaint against dozens of parties including Beneficient and various entities related to Beneficient, such as HCLP Nominees L.L.C., directors and officers of Beneficient including the Chief Executive Officer Bradley K. Heppner, former GWGH directors and officers, broker dealers and other individuals and entities, a copy of which is attached as an exhibit to the Standing Motion [Docket No. 1250-1] (the "Proposed Committee Complaint"),[29] and to prosecute the Causes of Action contained therein on behalf of and for the benefit of the Debtors' Estates. **The Standing Motion with the Proposed Committee Complaint may be found at https://www.donlinrecano.com/gwgbondholders**.

The Proposed Committee Complaint purports to assert 23 separate Causes of Action for fraudulent transfers, breach of fiduciary duties, unjust enrichment, and recovery of improper dividends, which Causes of Action the Bondholder Committee believes are viable and valuable. Among other things, the Proposed Committee Complaint seeks to:[30]

- Avoid and recover $65 million of advances made by GWGH under the LiquidTrust Promissory Note from the applicable LiquidTrusts or subsequent transferees;

- Avoid the June 2019 Acquisition of Ben LP limited partnership units from the Essex Defendants (as defined in the Proposed Committee Complaint) and recover the $10 million in consideration paid by GWGH therefor;

- Avoid the 2019 Capital Contribution, in which GWGH purchased Ben LP common units and a Preferred Series A Subclass Unit 1 Account of BCH, and recover the $79 million in contributions made by GWGH pursuant thereto;

- Avoid and recover $42 million in commissions that were paid to certain of the Broker Firms;

- Avoid the 2020 and 2021 Capital Contributions in which GWGH purchased Preferred Series C for $130.2 million and $14.8 million in the years ending 2020

---

[29]   The Standing Motion and Proposed Committee Complaint were initially filed under seal, but were unsealed and released in unredacted form on February 1, 2023.

[30]   The below is a summary of the causes of action asserted in the Standing Motion and Proposed Committee Complaint and should not be viewed as limiting or in any other way constricting the allegations outlined by the Committee.

and 2021, respectively, and recover the $145 million in contributions made by GWGH pursuant thereto;

- Avoid the Beneficient Separation Transactions and recover the more than $202 million in debt under the Commercial Loan Agreement that was satisfied by equity in Beneficient in connection therewith (the LiquidTrust Promissory Note, June 2019 Acquisition, 2019 Capital Contribution, 2020 and 2021 Capital Contributions, and Beneficient Separation Transactions, collectively, the "<u>Committee Challenged Transactions</u>"); and

- Seek recovery for breaches of fiduciary duty against directors and officers of GWGH.

The Proposed Committee Complaint also seeks to (i) hold former directors and officers of GWGH, including Bradley K. Heppner, Thomas O. Hicks, Bruce W. Schnitzer, Dennis P. Lockhart, and Peter T. Cangany, among others, liable for alleged breaches of fiduciary duties relating to the Committee Challenged Transactions and other transactions, (ii) avoid and recover commissions that were paid to certain Broker Dealers, (iii) hold Beneficient, Mr. Heppner, and other parties liable for unjust enrichment in connection with the Committee Challenged Transactions and other transactions, and (iv) recover from former directors of GWGH $25.7 million on account of a 2018 special dividend they authorized to be paid to GWGH shareholders purportedly in violation of Delaware law.

The Standing Motion also attached a letter to LBM in which the Committee asserted that it had "uncovered ample evidence that the Committee has colorable direct claims in respect of the Seller Trust L Bonds for recharacterization, equitable subordination and/or mandatory subordination."[31]

The Debtors oppose the Standing Motion on, among other things, the grounds that the Investigations Committee is actively pursuing the colorable Causes of Action belonging to the Debtors. Unless otherwise resolved in a settlement approved by the Bankruptcy Court, all Retained Causes of Action – including the Causes of Action that are the subject of the Standing Motion – will be retained by the Litigation Trust and prosecuted or settled by the Litigation Trust for the benefit of all stakeholders in accordance with the Second Amended Plan.

A hearing on the Standing Motion had originally been scheduled for March 10, 2023. However, pursuant to the Mediation Agreement, the Bondholder Committee agreed to adjourn the hearing on the Standing Motion to the earlier of (a) the date of the Confirmation Hearing, and (b) May 31, 2023 (or the first available date on the Bankruptcy Court's calendar). The deadline to object to the Standing Motion has been extended to 4:00 p.m. (prevailing Central Time) on the day that is seven days prior to the Confirmation Hearing.

---

[31]   LBM disputes, (1) that colorable claims for recharacterization, equitable subordination, and/or mandatory subordination exist against the Seller Trust L Bonds, and (2) that the Bondholder Committee holds such claims as direct claims.

Beneficient has filed an objection to the Standing Motion. [Docket No. 1451]. Separately, Heppner has filed an objection to the Standing Motion and joinder to Beneficient's objection. [Docket Nos. 1456 (redacted), 1457 (sealed), **** (redacted)].

## I.   Investigations

### 1.   The SEC Investigation

As set forth above and in the First Day Declaration, the SEC Investigation was commenced prior to the Initial Petition Date and remains ongoing. The Company has complied and cooperated with the investigation. On June 15, 2022, the SEC commenced a lawsuit against a certain Broker Dealer, along with certain individuals affiliated with it (but not against the Company) alleging violations of the SEC's Regulation Best Interest in connection with such Broker Dealer's sale of Public L Bonds.

Prior to the commencement of the Chapter 11 Cases, the Company retained Willkie Farr as Special Counsel in connection with the SEC Investigation and other matters arising under federal securities laws. The Initial Debtors sought and received Bankruptcy Court approval to retain Willkie Farr in the Chapter 11 Cases in connection with the SEC Investigation. [Docket Nos. 268, 450].

On September 21, 2022, the Initial Debtors and the SEC entered into stipulations agreeing to (1) extend the bar date for the SEC to file a Proof of Claim to November 30, 2022, and (2) set November 30, 2022 as the date by which the SEC is required to file a complaint to determine dischargeability of debt pursuant to section 1141(d)(6) of the Bankruptcy Code, subject to further extensions as may be agreed by the parties. The stipulations were so-ordered by the Bankruptcy Court on September 23. [Docket No. 786 and 787].

### 2.   Formal and Information Discovery in Connection with Certain Investigations

As described above, GWGH's board formed the Investigations Committee to, among other things, conduct the Independent Investigation. Concurrent with the Investigations Committee's work, the Bondholder Committee has also undertaken its own investigation into certain alleged claims and causes of action on behalf of the Debtors' Estates. The Debtors have received multiple requests for information, produced their directors and officers for depositions, and gathered and produced a multitude of materials to various parties who have requested such information. The Debtors' document production is ongoing. Throughout the Chapter 11 Cases, the Debtors have engaged with the Independent Committees and the Bondholder Committee by holding weekly meetings and producing tens of thousands of documents to facilitate the Investigations Committee's and Bondholder Committee's respective investigations.

The Debtors and the Bondholder Committee have worked to resolve discovery issues, and have entered into numerous stipulations to that effect. [Docket Nos. 621, 631]. In particular, while the Debtors maintained that discovery requests relating to the SEC Investigation did not relate to any issue or motion before the Bankruptcy Court, in response to discovery motion practice filed by the Bondholder Committee [Docket No. 465], the Debtors and the Bondholder Committee reached an agreement on a process for judicial resolution of the outstanding discovery disputes

among the parties wherein the parties agreed that the Debtors would provide to the Bondholder Committee, on a professional-eyes-only basis, certain materials the Debtors had previously produced to the SEC as part of the SEC Investigation. The Debtors and the Bondholder Committee also agreed that (a) all other outstanding requests will be responded to, with any questions about the scope of production discussed, in a meet and confer process; and (b) a set of streamlined procedures would apply to resolving disputes arising from such discovery. These agreements were memorialized in a stipulation and protective order that was approved by the Bankruptcy Court on July 22, 2022. [Docket Nos. 632, 753].

### 3. Status and Progress of Independent Investigation

As set forth above, pursuant to the Resolutions, the Investigations Committee was delegated the exclusive authority to conduct an internal investigation with respect to, among other things, any potential claims and Causes of Action that arise under or relate to any transactions, relationships, or conduct involving the Company, any of its current and former subsidiaries and affiliates, and any third party, including Beneficient. The Independent Investigation remains ongoing as of the date hereof, but is substantially complete.

In the course of conducting the Independent Investigation, and at the direction of the Investigations Committee, Katten and Province collected and reviewed documents and information from (among other sources) the Debtors, the Debtors' advisors, Beneficient, and certain current and former directors and officers of GWGH, including, among other documents, copies of board materials and minutes, corporate governance documents, intercompany agreements, financial and accounting information, and internal company communications. To date, Katten and Province have received and reviewed over 350,800 documents. Katten has conducted 33 interviews and eight depositions, including interviews and depositions of members of the Debtors' management team, current and former directors, and current and former legal and financial professionals involved with the Company and Beneficient. To minimize cost and avoid duplication of effort, Katten attended additional interviews conducted by the Bondholder Committee, some of which included persons already interviewed by Katten. Katten has also collaborated regularly with the Bondholder Committee's advisors (including in weekly meetings between Katten and the Bondholder Committee's advisors), sought and obtained input from the Bondholder Committee's advisors concerning potential claims and matters of concern to the Independent Investigation, and diligently pursued avenues of inquiry suggested by the Bondholder Committee's advisors.

Pursuant to the Independent Investigation, Katten and Province analyzed potential claims and Causes of Action held by the Debtors' Estates relating to, among other things, (i) the Company's prepetition investments in Beneficient, including the transactions described in Article IV.A.2.b of this Disclosure Statement, among others; (ii) Beneficient's use of funds received from the Company; (iii) the Beneficient Separation Transactions, as described in Article IV.A.2.b of this Disclosure Statement; (iv) the Company's prepetition transactions involving the DLP Senior Secured Parties, including the transactions described in Article V.B of this Disclosure Statement; (v) the Shared Services Agreement; (vi) the Company's prepetition interests in FOXO; and (vii) public disclosures by the Company concerning certain material transactions and events, including certain public disclosures related to the resignation of certain former directors of GWGH, as further described below.

As discussed in further detail in <u>Article VI.I.4</u> of this Disclosure Statement, the Investigations Committee informed the GWGH board of certain issues that it became aware of due to the Independent Investigation, which the GWGH board acted upon.

In addition to this matter, the Investigations Committee is continuing to pursue Causes of Action in accordance with the authority it has been given by the GWGH board. The Investigations Committee has uncovered several colorable Causes of Action belonging to the Debtors that it is actively pursuing. Unless otherwise resolved in a settlement approved by the Bankruptcy Court, in accordance with the Mediation Agreement, the Causes of Action will be retained by the Litigation Trust and prosecuted or settled by the Litigation Trust for the benefit of all stakeholders in accordance with the Second Amended Plan.

### 4.      Filing of Amended 8-K and Related Matters

GWGH is subject to certain reporting requirements pursuant to the United States Securities Exchange Act of 1934, as amended (the "<u>Securities Exchange Act</u>"), including filing current reports on a Form 8-K following the occurrence of certain events. The resignation of directors from the board of directors is an event that triggers an obligation to file a Current Report on Form 8-K.

On March 6, 2021, Roy W. Bailey, Daniel P. Fine, and Jeffrey N. MacDowell (the "<u>Resigning Directors</u>") resigned from the GWGH board of directors (as constituted at that time, the "<u>2021 Board</u>"). The 2021 Board consisted of Bradley K. Heppner, Peter T. Cangany, Jr., David F. Chavenson, David H. de Weese, Thomas O. Hicks, Dennis P. Lockhart, Bruce W. Schnitzer, and the Resigning Directors. Each of the Resigning Directors had been the members of a special committee of the 2021 Board (the "<u>2021 Special Committee</u>"), which was formed to review and approve or reject potential transactions with Beneficent. On March 11, 2021, GWGH filed a Current Report on Form 8-K (the "<u>Original 8-K</u>") to report, among other matters, the resignations of the Resigning Directors. The Original 8-K stated that the resignations of Messrs. Bailey, Fine and MacDowell "were not due to any disagreement with the Company known to an executive officer of the Company on any matter relating to the operations, policies or practices of the Company."

During the course of the Independent Investigation, the Investigations Committee became aware of information that caused it to conclude that the Original 8-K incorrectly stated that the resignations were not due to any disagreement with GWGH. Promptly thereafter, the Investigations Committee informed the board of directors of GWGH (as constituted at that time, the "<u>2022 Board</u>"), which then consisted of Murray T. Holland, Timothy L. Evans, David F. Chavenson, David H. de Weese, and the members of the Investigations Committee, of certain information the Investigations Committee determined regarding the accuracy of the statements in the Original 8-K, which after review and consideration, led the 2022 Board to determine and conclude that the resignations provided by the Resigning Directors resulted from disagreements with the Company relating to certain operations, policies and practices of the Company. Specifically, the Investigations Committee informed the 2022 Board that, at the time of the resignations, the Resigning Directors had objected to certain terms and parameters of a proposed investment the Company was considering in a Preferred Series C Unit Account of Ben (the "<u>Ben Investment</u>"), and certain other related matters, which had been submitted to the 2021 Special

Committee for review and approval pursuant to resolutions of the 2021 Board. Prior to their resignations, the Resigning Directors made their objection to the Ben Investment known to GWGH's Chief Executive Officer and the Chief Financial Officer through written and oral communications. The Investigations Committee further informed the 2022 Board that, after the objections of the Resigning Directors to the Ben Investment were made known to the Company, on March 3, 2021, the then-Chairman of the 2021 Board, Bradley K. Heppner, called for a special meeting of the 2021 Board to consider certain "urgent" matters concerning GWGH's "funding of Ben." The Investigations Committee further informed the 2022 Board that, at a March 4, 2021 special meeting of the 2021 Board, while the disagreements concerning the Ben Investment remained unresolved (a fact that may not have been known to the full 2021 Board), the 2021 Board voted to dissolve the 2021 Special Committee and voted to confirm that the Ben Investment could be made without 2021 Special Committee approval. The 2022 Board has determined and concluded that these disagreements caused, in whole or in part, the Resigning Directors' resignations on March 6, 2021. At the time of the Resigning Directors' resignations, the disagreements remained outstanding, which was known to, at least, the Chief Executive Officer of GWGH.

As a result of these determinations, the 2022 Board resolved to file, and on November 14, 2022, GWGH filed, an amended Form 8-K (the "Amended 8-K"). The Amended 8-K included two exhibits, specifically: (i) the written resignation letters, delivered by the Resigning Directors on March 6, 2021, to the then-Chairman of the 2021 Board, Bradley K. Heppner, and the Chief Executive Officer of GWGH, Murray T. Holland, and (ii) certain e-mail correspondence, dated March 9, 2021, from the Chief Executive Officer and sent to the Resigning Directors, previewing certain language proposed to be included in the Original 8-K regarding the circumstances of the resignations of the Resigning Directors, and subsequent e-mail correspondence from Mr. Fine, dated March 10, 2022 and sent to the Company's Chief Executive Officer on behalf of himself and the other Resigning Directors.

Throughout this time period, Murray T. Holland served as Chief Executive Officer of GWGH and Timothy L. Evans served as Chief Financial Officer of GWGH. On November 13, 2022, Murray T. Holland resigned as President and Chief Executive Officer of GWGH and on November 14, 2022, Timothy L. Evans resigned as Chief Financial Officer of GWGH, in each case, effective as of the date of such resignation. However, Messrs. Holland and Evans did not immediately resign from their positions as directors of GWGH nor from their roles with respect to certain other subsidiaries of GWGH. GWGH issued a press release regarding the resignations of Messrs. Holland and Evans on November 14, 2022.

As a result of these developments, the Debtors requested a status conference to inform the Bankruptcy Court of the matters relating to the filing of the Amended 8-K and resignations of Messrs. Holland and Evans as officers of GWGH. At such status hearing, which was held on November 14, 2022, the Bankruptcy Court scheduled a hearing on November 17, 2022, to determine whether one or more directors of GWGH who acquiesced in or approved of the preparation of the Original 8-K should be removed from the GWGH board of directors, which hearing was rescheduled to December 1, 2022 upon the motion of Mr. Holland. On November 14, 2022, the Bankruptcy Court entered the *Order Temporarily Suspending the Authority of the Board of Directors of GWG Holdings, Inc.* [Docket No. 1061], which (i) prohibited the Debtors from making any monetary transfer except for (a) a monetary transfer approved in writing in advance

by Jeffrey S. Stein, or (b) a monetary transfer made in the Debtors' ordinary course of business in an amount of less than $5,000, (ii) prohibited the Debtors from making any non-monetary transfer, unless the non-monetary transfer has been approved in advance in writing by Jeffrey S. Stein, and (iii) suspended all of the powers of the GWGH board of directors to act on behalf of the Debtors, or to direct the Debtors' officers, agents, attorneys or employees, pending further order of the Bankruptcy Court. [Docket No. 1061].

On November 15, 2022, David H. de Weese resigned from the GWGH board of directors, and on November 16, 2022, Timothy L. Evans and David F. Chavenson resigned from the GWGH board of directors. On November 25, Murray T. Holland resigned from the GWGH board of directors.[32] As all directors of GWGH who were on the board of directors at the time of the preparation of the Original 8-K had resigned from the GWGH board of directors, the hearing rescheduled to December 1, 2022 did not go forward on the matter and the Bankruptcy Court entered the *Order Reinstating the Board of Directors* [Docket No. 1137], reinstating the powers of the Board of Directors of GWGH, comprising Mr. Jeffrey S. Stein and Mr. Anthony R. Horton.

As a result of these developments, the 2022 Board appointed Jeffrey S. Stein as President and Chief Executive Officer of GWGH. The Current Board also granted Mr. Stein the authority to hire a new Chief Financial Officer. On December 21, 2022 the Debtors filed the *Debtors' Motion for Entry of an Order Confirming Expansion of Engagement of FTI Consulting, Inc. and Designation of Michael A. Tucker as Interim Chief Financial Officer, and Granting Related Relief* [Docket No. 1273] (the "CFO Retention Motion"). On January 17, 2023, the Bankruptcy Court entered an order approving the CFO Retention Motion, [Docket No. 1353] designating Michael A. Tucker as interim CFO effective as of December 10, 2022.

### J.      Compensation Motion

On January 25, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Amendments to Consulting Agreement with Jeffrey S. Stein and Independent Director Agreement with Anthony R. Horton and Granting Related Relief* [Docket No. 1392] (the "Compensation Motion") which sought to, among other things (a) accurately reflect Mr. Stein's expanded roles and compensate him accordingly, (b) accurately reflect Mr. Horton's expanded role, given the resignations of the Non-Management Directors, and to compensate Mr. Horton accordingly. Pursuant to the Mediation Agreement, the Debtors have agreed to adjourn the hearing on the Compensation Motion to the Confirmation Hearing, with the objection deadline being set

---

[32]     On November 21, 2022, the Debtors filed the Second Supplemental Declaration of Thomas S. Kiriakos in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Mayer Brown LLP As Attorneys for the Debtors and Debtors in Possession [Docket No. 1091] (the "Second Supplemental Declaration"). As described in the Second Supplemental Declaration, Mayer Brown rendered services to the Debtors prior to the commencement of the Chapter 11 Cases of the Initial Debtors, including relating to GWGH's audited statements and SEC disclosures (including with respect to the Original 8-K). Out of an abundance of caution, Mayer Brown removed itself from the GWGH Board's ultimate deliberations regarding the applicable SEC disclosures, and Jackson Walker LLP advised and will continue to advise (to the exclusion of Mayer Brown) the Debtors and the GWGH Board with respect to any issues regarding the Original 8-K, the Amended 8-K, the treatment of certain officers and directors, as well as any matter that relates directly or follows from the foregoing issues. In addition, and also out of an abundance of caution, a formal screen was put in place to screen those individuals who provided prepetition services to the Debtors in connection with SEC disclosures from any further role in the Chapter 11 Cases.

for 4:00 p.m. (prevailing Central Time) on the date that is seven days prior to the Confirmation Hearing. The Bondholder Committee has informed the Debtors that as of the date of this Disclosure Statement the Bondholder Committee intends to object to the Compensation Motion.

## VII.   SUMMARY OF KEY TERMS AND CONDITIONS OF THE SECOND AMENDED PLAN

### A.   Wind Down Trust

#### 1.   Wind Down Trust Generally

The Confirmation Order shall provide that, upon the occurrence of the Effective Date, the Wind Down Trust shall be deemed established in accordance with the Wind Down Trust Agreement and the Second Amended Plan. On the Effective Date, the Wind Down Trust shall commence the taking of all necessary steps to wind down the business affairs of the Debtors.

The Wind Down Trust Assets shall be deemed disbursed by the Debtors and transferred to the Wind Down Trust on the Effective Date, the proceeds of which shall be distributed in accordance with the waterfall set forth in Article IV.H of the Second Amended Plan. The powers, authorities, responsibilities, and duties of the Wind Down Trust and the Wind Down Trustee are set forth in and shall be governed by the Second Amended Plan and the Wind Down Trust Agreement. The Wind Down Trust Agreement, which shall be part of the Plan Supplement, shall be consistent with the Second Amended Plan and shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Wind Down Trust as a grantor trust. The Wind Down Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Wind Down Trust as a "liquidating trust" for United States federal income tax purposes or as an entity that can fall within the exception from registration in Section 7 of the 1940 Act for activities of companies that are merely incidental to their dissolution.

In accordance with the Second Amended Plan, the Wind Down Trust's sole purpose is to liquidate the Wind Down Trust Assets with a view towards maximizing the value of such assets for the benefit of New WDT Interest holders, and promptly distributing such liquidation proceeds (in accordance with the provisions of the Second Amended Plan) to New WDT Interest holders. The Wind Down Trust will have no going concern operations and will not be permitted to continue or engage in the conduct of a trade or business or to make any investments (other than holding, on a temporary basis (pending distribution to holders or use for payment of permitted expenses) certain short-term, high-quality cash equivalents (as set out in the Wind Down Trust Agreement); instead the Wind Down Trust's activities will be limited to those reasonably necessary to, and consistent with, the Wind Down Trust's liquidating purpose and reasonably necessary to conserve, protect, and/or maximize the value of the Wind Down Trust Assets and provide for the orderly liquidation thereof. The Wind Down Trust Agreement shall contain appropriate provisions for monetizing the Wind Down Trust Assets in an orderly fashion, subject to the Wind Down Trustee's reasonable business judgment. The Wind Down Trustee, on behalf of the Wind Down Trust, will have discretion to enter into, consummate, settle, or otherwise resolve any transaction or dispute with respect to each of the Wind Down Trust Assets that have an economic value of less than $5

million (in the Wind Down Trustee's good faith determination) as of the date of the consummation, settlement, or resolution of such transaction or dispute. The Wind Down Trustee will submit all other matters to the Bankruptcy Court for approval after notice and an opportunity for a hearing.

The Wind Down Trust will have an initial term of three years, which, subject to applicable law, may be extended by the Wind Down Trustee Filing a motion with the Bankruptcy Court prior to the expiration of the existing term and obtaining Bankruptcy Court approval of an extension for up to two years per request (subject, in each instance, to reasonable due consideration being given to implications of tax law and other applicable law of the proposed extension of the term of the Wind Down Trust). The Wind Down Trustee and the Litigation Trustee will cooperate and confer to ensure that the Wind Down Trust does not terminate prior to the Litigation Trust.

### 2.      Transfer of Assets Into the Wind Down Trust

Except as otherwise provided in the Second Amended Plan or the Confirmation Order, on the Effective Date, the Wind Down Trust Assets shall be deemed transferred to the Wind Down Trust by the Debtors, such assets shall vest in the Wind Down Trust on such date, to be administered by the Wind Down Trustee in accordance with the Second Amended Plan and the Wind Down Trust Agreement, and the Debtors and their Estates shall have no further interest with respect to the Wind Down Trust Assets. The Wind Down Trust Assets will vest in the Wind Down Trust free and clear of all Liens, Claims, Interests, encumbrances, etc. The act of transferring the Wind Down Trust Assets, as authorized by the Second Amended Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind Down Trustee as if the asset or right was still held by the relevant Debtor.

The Wind Down Trustee shall have the authority to create additional sub-trusts within (or other subsidiary Entities under) the Wind Down Trust, which may have a separate legal existence, but which shall be considered sub-trusts (or other subsidiary Entities under, as applicable) of the Wind Down Trust.

### 3.      Wind Down Trustee

The Wind Down Trustee shall have the sole authority to make decisions and take action with respect to the Wind Down Trust in accordance with the terms of the Second Amended Plan and the Wind Down Trust Agreement. The Wind Down Trustee shall be the successor to and representative of the Estates of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. Following the Effective Date, the Wind Down Trust and the Wind Down Trustee shall be deemed a party in interest with standing to appear in the Chapter 11 Cases and object to any pleading Filed thereafter; *provided*, *however*, such standing and right to object does not alter the respective rights or responsibilities of the Wind Down Trustee or the Litigation Trustee under the Second Amended Plan, the Wind Down Trust Agreement, or the Litigation Trust Agreement, alter any governing approval standard under applicable law, or otherwise limit the ability of any party with standing to respond to pleadings Filed, or objections raised, by the Wind Down Trustee. The powers, rights, and responsibilities of the Wind Down Trustee shall be specified in the Second Amended Plan and the Wind Down Trust Agreement, and shall include, within the confines of the stated purpose of the Wind Down Trust, taking all appropriate actions

to maximize the value of and monetize the Wind Down Trust Assets for the benefit of stakeholders, whether by accepting, preserving, receiving, collecting, administering, selling, liquidating, or transferring, as applicable, the Wind Down Trust Assets. All determinations with respect to the monetization of the Wind Down Trust Assets, including the Wind Down Trust's interests in Beneficient and FOXO, will be subject to the reasonable business judgment of the Wind Down Trustee, subject to compliance with any applicable lock-up agreement or securities law requirements and subject to the requirement that the Wind Down Trustee seek and obtain Bankruptcy Court approval of any transaction with an economic value of $5 million or more, as set forth in the Second Amended Plan.

For the avoidance of doubt, the Wind Down Trustee may conduct sales or liquidations of Wind Down Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court (except as provided in the Second Amended Plan). The Wind Down Trustee may also abandon any Wind Down Trust Assets that the Wind Down Trustee determines in its reasonable discretion to be of *de minimis* value or burdensome to the Wind Down Trust.

The Wind Down Trustee shall use the Wind Down Amount (and any subsequent monetization proceeds from the Wind Down Trust) to fund all expenses related to its duties under the Second Amended Plan. The Wind Down Trustee, on behalf of the Wind Down Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously engaged in the Chapter 11 Cases), employees, or other independent contractors to assist in carrying out its duties under the Second Amended Plan, including the Wind Down Trust Agreement, and may compensate and reimburse the expenses of these professionals, employees, or other independent contractors based upon the nature of the work performed by such parties without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Wind Down Trust Agreement.

### 4.       Reports to Be Filed by the Wind Down Trust

Following the Effective Date, and during the existence of the Wind Down Trust, the Wind Down Trust shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Wind Down Trust Agreement), within 90 days after the end of each calendar year during the term of the Wind Down Trust, and within 45 days after the end of each calendar quarter during the term of the Wind Down Trust (other than the fourth quarter) and as soon as practicable upon termination of the Wind Down Trust, the Wind Down Trustee shall make available on its website, a written report including: (a) financial statements of the Wind Down Trust for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Wind Down Trustee) reflecting the result of such agreed-upon procedures relating to the administration of the Wind Down Trust as proposed by the Wind Down Trustee; (b) a summary description of any action taken by the Wind Down Trust which, in the judgment of the Wind Down Trustee, materially affects the Wind Down Trust; (c) a description of the progress of liquidating the Wind Down Trust Assets and making distributions to the holders of the New WDT Interests, which description shall include a written report detailing, among other things, the status of the equity interests in Beneficient and FOXO that are held by the Wind Down Trust, the status of Portfolio Co., the status of the Litigation Trust, the proceeds recovered as of the relevant date with respect to assets of the Wind Down Trust or any of the foregoing, and the distributions made by the Wind Down Trust as

85

of the relevant date; and (d) any other material or significant information relating to the Wind Down Trust Assets and the administration of the Wind Down Trust deemed appropriate to be disclosed by the Wind Down Trustee. In addition, the Wind Down Trust shall provide unaudited financial statements to each holder of the New WDT Interests on a quarterly basis (which may be quarterly operating reports Filed with the Bankruptcy Court). The Wind Down Trustee may post any such report on a website maintained by or on behalf of the Wind Down Trustee and electronically File it with the Bankruptcy Court in lieu of actual notice to each holder of New WDT Interests (unless required by law).

Notwithstanding the foregoing, so long as the Wind Down Trust files periodic reports with the SEC pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act, the Wind Down Trustee shall be deemed to have satisfied its obligations set forth in the preceding paragraph by filing such periodic reports with the SEC, posting a copy of such reports on a website maintained by or on behalf of the Wind Down Trustee, and Filing a copy of such reports with the Bankruptcy Court.

## 5.     1940 Act Matters

The implementation of the Second Amended Plan and the Wind Down Transactions, *inter alia*, via the creation and administration of the Wind Down Trust, the Portfolio Co. and the Litigation Trust, is intended to enable the Wind Down Trust and the Debtors to fall within an exception to registration for companies that are dissolving, in accordance with Section 7 of the 1940 Act and the SEC staff's guidance regarding the same (the "Liquidating Company Exception"). In the event that the Wind Down Trustee determines in its sole and absolute discretion at any time that, notwithstanding such remedial actions undertaken or to be undertaken by the Wind Down Trust and/or the Debtors pursuant to the provisions of the Second Amended Plan, the Wind Down Trust and the Debtors nonetheless are or will be unable to comply with or otherwise qualify for the Liquidating Company Exception or any other exception to or an exemption from registering under the 1940 Act, the Wind Down Trustee shall have the sole discretion and authority to develop another strategy to comply with or otherwise qualify under an exception to or exemption from such requirements of the 1940 Act. If it becomes necessary for 1940 Act compliance purposes to change the organization, operations and/or activities of the Wind Down Trust, the Wind Down Trustee will attempt to do so in a way to preserve the economic benefits of ownership of Wind Down Trust to the maximum extent possible.

## B.     Litigation Trust

## 1.     Litigation Trust Generally

The Litigation Trust will be established on the Effective Date to retain and hold all Retained Causes of Action, the proceeds of which shall be deemed distributed to the Wind Down Trust for ultimate distribution by or at the direction of the Wind Down Trustee in accordance with the waterfall set forth in Article VI.C of the Second Amended Plan. On the Effective Date, the Initial Litigation Trust Assets shall be deemed transferred to the Litigation Trust by the Wind Down Trust and will vest in the Litigation Trust free and clear of all Liens, Claims, interests, encumbrances, etc., with all reversionary and beneficial interests in the Litigation Trust to be held by the Wind Down Trust, subject to the waterfall set forth in Article VI.C of the Second Amended Plan. The

sole beneficiary of the Litigation Trust will be the Wind Down Trust (or the Wind Down Trustee on behalf of the Wind Down Trust, to the extent provided by applicable law), and all proceeds of the Litigation Trust distributed to the Wind Down Trust on account of such reversionary interest shall be for the sole purpose of distributions to the holders of the New WDT Interests issued by the Wind Down Trust; *provided, however*, such proceeds may be otherwise retained and used by the Wind Down Trust only with the consent of the Litigation Trustee or by order of the Bankruptcy Court. The act of transferring the Initial Litigation Trust Assets, as authorized by the Second Amended Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the relevant Debtor. In accordance with the Second Amended Plan, the Litigation Trust may abandon to creditors or otherwise not accept any Retained Causes of Action that the Litigation Trustee believes, in good faith, have no value to the Litigation Trust; *provided*, that the Litigation Trust Agreement shall provide for the assignment by creditors to the Litigation Trust of any such Retained Causes of Action so abandoned to creditors.

For the avoidance of doubt, the Litigation Trustee, on behalf of the Litigation Trust, shall step into the shoes of the Debtors as it relates to either communications that occurred prior to, or documents prepared before, April 20, 2022 with respect to Debtors' right to assert attorney-client privilege or any other privilege or immunity Debtor possesses, if any, and the Litigation Trustee shall be entitled to preserve, assert, access, or waive such privilege or immunity of the Debtors as it relates to such documents or communications. On the Effective Date, the Litigation Trustee shall have the power, right and responsibility to access or take possession of all books, files and records of the Debtors or Wind Down Debtors, as applicable, for purposes of carrying out the purpose of the Litigation Trust. At any time after the Effective Date, upon reasonable request of the Litigation Trustee, the Wind Down Trustee shall provide the Litigation Trustee with any of the Debtors' or the Wind Down Debtors' books, records, and files in the Wind Down Trust's or Wind Down Trustee's possession, custody, or control, and the Wind Down Trustee may, in good faith, provide such privileged information of the Debtors as is in the Wind Down Trustee's possession that relates to the evaluation and prosecution of the Retained Causes of Action; *provided*, that, notwithstanding the foregoing, the privilege of the Independent Directors, the DLP Independent Directors, and David F. Chavenson in his capacity as a former member of the Special Committee, in each case, is hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any person or Entity without the consent of all Independent Directors or all DLP Independent Directors, as applicable. The Wind Down Trustee shall use commercially reasonable efforts to assist the Litigation Trustee by providing additional information based on the books, files, and records in the Wind Down Trust's possession, provided that any such request for assistance is reasonable. Following the Effective Date, the Litigation Trust and the Litigation Trustee shall be deemed a party in interest with standing to appear in the Chapter 11 Cases and object to any pleadings Filed thereafter; *provided, however*, such standing and right to object does not alter the respective rights or responsibilities of the Litigation Trustee or the Wind Down Trustee under the Second Amended Plan, the Wind Down Trust Agreement, or the Litigation Trust Agreement, alter any governing approval standard under applicable law, or

otherwise limit the ability of any party with standing to respond to pleadings Filed, or objections raised, by the Litigation Trustee.

### 2.    Litigation Trustee

The Litigation Trustee shall be an independent, third-party fiduciary selected by the Bondholder Committee and identified in the Plan Supplement, and shall be compensated at market rates; *provided*, that, for the avoidance of doubt, the Litigation Trustee shall have no affiliation with any Bondholder Committee member and must not own any Public L Bonds, New WDT Interests, or other Interests in or Securities issued by any of the Debtors.  The Litigation Trustee shall have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action, and the Litigation Trust Reconciliation Claims, and shall have a duty to maximize the value of the assets of the Litigation Trust in accordance with the Litigation Trust Agreement.  The Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation in respect of such assets, provided that the ultimate decision with respect to whether to commence any litigation shall be in the sole discretion of the Litigation Trustee. For the avoidance of doubt, in exercising such sole discretion, the Litigation Trustee shall be entitled to consider and may take such actions in connection with the exercise of such sole discretion that promote the greatest recovery to the holders of the New WDT Interests. The Litigation Trustee shall seek Bankruptcy Court approval, after notice and an opportunity for a hearing, of (a) any settlements with respect to the Retained Causes of Action, and (b) any other transaction with respect to any assets of the Litigation Trust, in each case, that has an economic value of $5 million or more (in the Litigation Trustee's good faith determination) as of the date of such transaction.

The Litigation Trustee shall use the Initial Litigation Trust Funding Amount to fund all expenses related to its duties under the Second Amended Plan and the Litigation Trust Agreement. Thereafter, the Litigation Trust and the Litigation Trustee may use proceeds from monetizing the Retained Causes of Action and any Broker Dealer Settlement Payments received after the Effective Date (which payments, for the avoidance of doubt, shall be made directly to the Litigation Trust) to fund the reasonable and customary out-of-pocket expenses incurred by the Litigation Trust and Litigation Trustee. Beginning on the Effective Date, the Litigation Trustee shall have customary powers, including the power to employ (without further order of the Bankruptcy Court) professionals (including professionals previously engaged in the Chapter 11 Cases), employees, or other independent contractors to assist in carrying out its duties under the Second Amended Plan, including the Litigation Trust Agreement, and may compensate and reimburse the expenses of these professionals, employees, or other independent contractors based upon the nature of the work performed by such parties without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Litigation Trust Agreement.

### 3.    Reports to Be Filed by the Litigation Trust

Following the Effective Date, and unless otherwise ordered by the Bankruptcy Court, and during the existence of the Litigation Trust, the Litigation Trust shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Litigation Trust Agreement), within 90 days after the end of each calendar year during the term of the Litigation Trust, and within 45 days after the end of each calendar quarter during the term of the

Litigation Trust (other than the fourth quarter), a quarterly report regarding the administration of property subject to its ownership and control pursuant to the Second Amended Plan, receipts, distributions made by it, an update regarding the status of the Retained Causes of Action being prosecuted by the Litigation Trust, and a summary of all major activities during the period.

### 4. Termination of the Litigation Trust

The initial term of the Litigation Trust shall be the lesser of: (a) three years; (b) the date all holders of New Series A1 WDT Interests and New Series A2 WDT Interests receive the full amount to which they are entitled to pursuant to the Second Amended Plan; and (c) the date that all Retained Causes of Action have been fully resolved, as reasonably determined by the Litigation Trustee in its sole determination; *provided*, *however*, that, subject to applicable law, the Litigation Trustee may extend the term of the Litigation Trust solely in the event termination would otherwise occur under subsection (a) of this paragraph by Filing a motion with the Bankruptcy Court prior to the expiration of the initial term and obtaining court approval of such extension, with a maximum extension of two (2) years per request (subject, in each instance, to reasonable consideration being given to implications of tax law and other applicable law of a proposed extension of the term of the Litigation Trust). The Wind Down Trustee and the Litigation Trustee will cooperate and confer to ensure that the Wind Down Trust does not terminate prior to the Litigation Trust. For the avoidance of doubt, no later than the termination of the Litigation Trust, the Litigation Trustee shall transfer all of the Litigation Trust's assets, including any remaining Retained Causes of Action and net proceeds realized therefrom, to the Wind Down Trust. Notwithstanding the foregoing, and for the avoidance of doubt, nothing in the Second Amended Plan (or the Plan Supplement, as applicable) shall prohibit the Litigation Trustee from making interim transfers of Cash realized by the Litigation Trust to the Wind Down Trust for distribution to holders of New WDT Interests in accordance with the Second Amended Plan.

### C. Priority of Cash Distributions to Holders of New WDT Interests

The Wind Down Trustee shall make an initial Cash distribution to holders of New WDT Interests consisting of the Net Cash Proceeds, if any, within 60 days after the Effective Date, and on a semi-annual basis thereafter to the extent of any Net Cash Proceeds; *provided*, that the Wind Down Trustee may, in its sole discretion, make additional special distributions to the extent of any Net Cash Proceeds available; *provided*, *further*, that, in each instance, no distribution shall be required unless the Net Cash Proceeds then held by the Wind Down Trustee is equal to or greater than the Minimum Distribution Amount of $15,000,000 in Cash.

### 1. Distributions From the Monetization of Wind Down Trust Assets

Any Cash distributions, including any distributions consisting of the Net Cash Proceeds realized from the monetization of the Wind Down Trust Assets, including the interests in Beneficient or FOXO, made by the Wind Down Trust to holders of New WDT Interests, after establishment of appropriate reserves for payment of Wind Down Trust expenses to the extent provided in the Wind Down Budget or the Wind Down Trust Agreement (or approved by separate order of the Bankruptcy Court), shall be distributed in the following order of priority (with no distributions to any junior class until all payments are made to senior classes in full):

1.      the New Series A1 WDT Interests (if any) issued to the Indenture Trustee in connection with the Indenture Fee and Expense Claims in Class 3, up to the outstanding amount of such Claims;

2.      all other New Series A1 WDT Interests, up to the Allowed outstanding prepetition amount of Allowed Bondholder Claims in Class 3;

3.      the New Series A2 WDT Interests, up to the Allowed outstanding prepetition amount of Allowed LBM Subordinated Claims in Class 3;

4.      the New Series A1 WDT Interests and the New Series A2 WDT Interests, up to the amount of interest accrued on such New Series A1 WDT Interests and New Series A2 WDT Interests, which interest shall accrue under the New WDT Documents from April 20, 2022 calculated at a 9% per annum interest rate;

5.      the New Series B WDT Interests, up to the Allowed prepetition outstanding amount of Class 4(a) Allowed General Unsecured Claims;

6.      the New Series B WDT Interests, up to the Allowed postpetition balance of Class 4(a) Allowed General Unsecured Claims, comprised of interest on the Allowed prepetition amount of such Claims starting from April 20, 2022 calculated at the Federal Judgment Rate;

7.      the New Series C WDT Interests and the New Series D WDT Interests, on a pro rata *pari passu* basis, per liquidation rights under the New WDT Documents and applicable law, up to the Allowed aggregate outstanding amount of the Class 8 Series 1 Preferred Interests and Class 9 Series 2 Preferred Interests (based on each Series 1 Preferred Interest and each Series 2 Preferred Interest having an initial stated value of $1,000.00 per share); and

8.      the New Series E WDT Interests.

**2.      Distributions of Net Proceeds Realized by the Litigation Trust**

Distributions of net proceeds realized by the Litigation Trust shall be made by the Wind Down Trustee, or by the Litigation Trustee at the direction of the Wind Down Trustee, in the following order of priority (with no distributions to junior classes until each senior class is paid in full):

1.      to holders of New Series A1 WDT Interests (subject to prior payment in full of Indenture Fee and Expense Claims) on account of the Indenture Diminution Claims, up to the Allowed amount of such Claims;

2.      on a *pari passu* pro rata basis (a) holders of the New Series A1 WDT Interests and the New Series A2 WDT Interests (subject to the prior payment in full of the Indenture Fee and Expense Claims and recognizing the intercreditor arrangements described in <u>Article IV.H.1 through H.4</u> of the Second Amended Plan vis-à-vis the New Series A1 WDT Interests and the New Series A2 WDT Interests), on the one hand, and (b) holders of New Series B WDT Interests on the other hand, up to the aggregate outstanding prepetition amounts of Allowed Bondholder

Claims and Allowed LBM Subordinated Claims in Class 3, and Allowed Class 4(a) General Unsecured Claims, calculated in accordance with Article IV.H of the Second Amended Plan;

3.        on a *pari passu* pro rata basis (a) holders of the New Series A1 WDT Interests and the New Series A2 WDT Interests (subject to recognizing the intercreditor arrangements described in Article IV.H.1 through H.4 of the Second Amended Plan vis-à-vis the New Series A1 WDT Interests and the New Series A2 WDT Interests), on the one hand, and (b) holders of New Series B WDT Interests on the other hand, up to the amount of interest accrued on such New Series A1 WDT Interests and New Series A2 WDT Interests as set forth in the New WDT Documents, and Allowed Class 4(a) General Unsecured Claims, calculated in accordance with Article IV.H of the Second Amended Plan;

4.        holders of New Series C WDT Interests and New Series D WDT Interests on a *pari passu* pro rata basis, per liquidation rights under the New WDT Documents and applicable law, up to the outstanding Allowed aggregate amount of the Class 8 Series 1 Preferred Interests and Class 9 Series 2 Preferred Interests (based on each Series 1 Preferred Interest and each Series 2 Preferred Interest having an initial stated value of $1,000.00 per share); and

5.        holders of the New Series E WDT Interests.

## D.        Exemption from Registration Requirements

The Debtors intend that the Wind Down Trust will be organized in compliance with applicable law such that the New WDT Interests will not be deemed to be or treated as securities under applicable law. As a result, the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the New WDT Interests or an exemption from such registration requirements is required. However, to the extent that the New WDT Interests issued under the Second Amended Plan are deemed securities, the issuance and distribution thereof would qualify for issuance without registration under the Securities Act or any similar federal, state, or local law pursuant to section 1145 of the Bankruptcy Code. To the extent that the issuance and distribution of the New WDT Interests issued under the Second Amended Plan is completed pursuant to section 1145 of the Bankruptcy Code, such New WDT Interests would be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Pursuant to section 1145 of the Bankruptcy Code, any such New WDT Interests issued under the Second Amended Plan: (1) would not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act; and (2) as a matter of federal securities law, would be freely tradable and transferrable under the federal securities laws by any holder thereof that (a) is not an "affiliate" of the Wind Down Trust, as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within three months of such transfer, (c) has not acquired the New WDT Interests from an "affiliate" within one year of such transfer, and (d) is not an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

In accordance with the Second Amended Plan, the New WDT Documents will provide that the New WDT Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by will, intestacy or operation of law. The Wind Down Trust will be

organized in compliance with applicable law such that the New WDT Interests will not be treated as securities and under such facts the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the New WDT Interests or an exemption from such registration requirements would be required. The Wind Down Trustee will be permitted to determine in its sole discretion to take such actions that are necessary or reasonably advisable (including, without limitation, completing a registration under the Securities Exchange Act) to modify or remove any contractual restrictions on transferability of the New WDT Interests, with any such determination by the Wind Down Trustee, and all costs associated therewith, to be deemed a determination with respect to the monetization of the Wind Down Trust Assets subject to Bankruptcy Court approval to the extent provided pursuant to Article IV.A.3 of the Second Amended Plan and to be evaluated solely under a reasonable business judgment standard.

### E.  Releases, Exculpation and Injunction

#### 1.  Release of Liens

The Second Amended Plan contains the following provision regarding release of liens:

**Except as otherwise provided in the Second Amended Plan or in any contract, instrument, release, or other agreement or document created pursuant to or in connection with the Second Amended Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Second Amended Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Second Amended Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns (including the Wind Down Debtors, Wind Down Trust, and/or the Litigation Trust, as applicable). Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Wind Down Trust, to release any collateral or other property of any Debtor or their successors and assigns (including the Wind Down Debtors, Wind Down Trust, and/or the Litigation Trust, as applicable), including any cash collateral and possessory collateral, held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind Down Trust to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

#### 2.  Release by the Debtors

The Second Amended Plan contains the following provision regarding releases by the Debtors:

Pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party (but no Non-Released Party) is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Wind Down Debtors, and their Estates, and any person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through or for the Debtors or their Estates, from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence, that the Debtors, the Wind Down Debtors, or their Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure management, ownership or operation thereof), the business or contractual arrangement between the Debtors and any Released Party, any Securities issued by the Debtors and the ownership thereof, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Second Amended Plan (including, for the avoidance of doubt, the Plan Supplement), the Vida DIP Financing Facility, the Vida Exit Financing Facility, or any Wind Down Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Second Amended Plan or the reliance by any Released Party on the Second Amended Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Vida Exit Financing Facility Documents, the Second Amended Plan, or the Plan Supplement, before or during the Chapter 11 Cases, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Second Amended Plan, including the issuance or distribution of Securities pursuant to the Second Amended Plan, or the distribution of property under the Second Amended Plan, or upon any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date related or relating to the foregoing including all relief obtained by the Debtors in the Chapter 11 Cases. For the avoidance of doubt, (1) the LBM Released Parties, to the extent that LBM has not withdrawn

**from the settlement described in** <u>**Article IV.I**</u> **of the Second Amended Plan; and (2) the Broker Dealers that timely submit a Broker Dealer Settlement Election Notice and Broker Dealer Settlement Payment by the Broker Dealer Settlement Deadline, shall constitute Released Parties with respect to this Debtor Release.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) post-Effective Date obligations of any party or Entity under the Second Amended Plan, the Confirmation Order, any Wind Down Transaction, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Second Amended Plan, including the Vida Exit Financing Facility Documents, or any Claim or obligation arising under the Second Amended Plan; (2) the rights of any Holder of Allowed Claims to receive distributions under the Second Amended Plan; (3) the Retained Causes of Action; (4) any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence; (5) the Debtors' prepetition legal counsel solely with respect to claims or causes of action arising from such counsel's prepetition advice to the Debtors and/or any former directors or officers of the Debtors other than advice directly relating to the preparation and filing of the Chapter 11 Cases (it being understood any prepetition advice to the Debtors relating to prepetition transactions between the Debtors and Beneficient shall not constitute advice directly relating to the preparation and filing of the Chapter 11 Cases); or (6) any Non-Released Party.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing Debtor Release, which includes by reference each of the related provisions and definitions contained in the Second Amended Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind Down Transactions and implementing the Second Amended Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Wind Down Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

  3.  **[RESERVED]**

The Second Amended Plan does not contain third party releases other than to the extent provided in <u>Article VIII.C</u> (Releases by the Debtors) or <u>Article VIII.E</u> (Exculpation).

  4.  **Exculpation**

The Second Amended Plan contains the following provision regarding exculpation:

**Except as otherwise expressly stated in the Second Amended Plan or the Confirmation Order, as of the Effective Date, each Exculpated Party shall be deemed to be released and exculpated from any claim, obligation, Cause of Action, or liability for any**

**Exculpated Claim, except for claims related to any act or omission that is determined in a Final Order to have constituted intentional breach of fiduciary duty, actual fraud, willful misconduct, or gross negligence, but in all respects each Debtor and each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Second Amended Plan. The Exculpated Parties have, and upon the Consummation of the Second Amended Plan, shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Wind Down Transactions, the negotiation, formulation, or preparation of the Wind Down Documents or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Second Amended Plan or the reliance by any Released Party on the Second Amended Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Second Amended Plan, and the solicitation of the Second Amended Plan and distributions pursuant to the Second Amended Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Second Amended Plan or such distributions made pursuant to the Second Amended Plan, except for claims related to any act or omission that is determined in a Final Order to have constituted intentional breach of fiduciary duty, actual fraud, willful misconduct, or gross negligence. The Debtors and the Creditor Proponents agree that (1) neither the act itself of Filing or prosecuting a motion to approve a settlement of any Estate Causes of Action with Beneficient, any of its Affiliates or related parties, and/or any other Non-Released Party nor the act itself of Filing or prosecuting any objection to any such settlement in and of itself constitutes an intentional breach of fiduciary duty, and (2) any claims that the Debtors or the Creditor Proponents may seek to bring against any Exculpated Party shall be limited to any actions of such Exculpated Party solely after the date of execution of the Mediation Agreement; *provided* that any such claims must be Filed exclusively in the Bankruptcy Court and in accordance with the Federal Rules of Civil Procedures, and such claims shall be pled with specificity with respect to the who, what, when, where, and how of the alleged wrongful conduct.**

      5.     **Injunction**

The Second Amended Plan contains the following provision regarding injunction:

**Except as otherwise expressly provided in the Second Amended Plan or the Confirmation Order or for obligations or distributions required to be paid pursuant to the Second Amended Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims that have been released pursuant to <u>Article VIII</u> of the Second Amended Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any of the claims or interests released hereunder; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account or in connection with or with respect to any claims or interests released hereunder; (3) creating,**

perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account or in connection with or with respect to any claims or interests released hereunder; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account or in connection with or with respect to any claims or interests released hereunder, unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any claims or interests released or settled pursuant to the Second Amended Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Second Amended Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under the Second Amended Plan shall be deemed to have consented to the injunction provisions set forth in the Second Amended Plan.

### F.    Conditions Precedent to the Effective Date

It shall be a condition to Consummation that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.C</u> of the Second Amended Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, subject to the Proponents' Consent Right, and such order shall have become a Final Order that has not been stayed, modified, or vacated on appeal, subject to the Debtors' right to waive any appeal period (with the reasonable consent of the Creditor Proponents);

(b)    the Debtors shall have assumed the D&O Liability Insurance Policies, which shall include, for the avoidance of doubt, policies that provide coverage for periods and were purchased prior to April 20, 2022;

(c)    the Debtors shall have obtained additional director and officer liability tail insurance coverage for the period from April 20, 2022 to the Effective Date, which insurance coverage must not terminate or otherwise reduce the coverage set forth in the existing D&O Liability Insurance Policies, the form and substance of which being subject to the Proponents' Consent Right;

(d)    the Vida Exit Financing Facility Documents shall have been executed, delivered, be in full force and effect (with all conditions precedent thereto having been satisfied or waived), and any amendments, modifications or supplements to the Vida Exit Financing Facility Documents that were Filed at Docket No. 975 shall be in form and substance subject to the Proponents' Consent Right;

(e)     the Investigations Committee shall have completed its independent investigation with respect to any releases granted pursuant to the Second Amended Plan;

(f)     the Wind Down Trust Agreement shall have been executed and shall be in form and substance subject to the Proponents' Consent Right;

(g)     the Wind Down Budget shall have been delivered to the Creditor Proponents and shall be in form and substance subject to the Proponents' Consent Right;

(h)     the Wind Down Trust Assets shall have been transferred to the Wind Down Trust;

(i)     the Wind Down Trustee shall have accepted the appointment;

(j)     the Litigation Trust Agreement shall have been executed and shall be in form and substance subject to the Proponents' Consent Right;

(k)     the Litigation Trustee shall have been appointed and have accepted the appointment;

(l)     the Initial Litigation Trust Assets shall have been transferred to the Litigation Trust;

(m)     the New WDT Interests shall have been issued;

(n)     the New WDT Documents shall be in form and substance subject to the Proponents' Consent Right;

(o)     any Plan Supplement documents, including any exhibits, schedules, amendments, modifications, or supplements thereto, not otherwise identified in Article IX.A of the Second Amended Plan, shall have been Filed and shall be in form and substance subject to the Proponents' Consent Right;

(p)     all governmental and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Second Amended Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; *provided*, it being understood that any 1940 Act matters in connection with the Wind Down Trust shall be addressed as set forth in Article IV.A of the Second Amended Plan;

(q)     the Professional Fee Escrow Account shall have been funded with Cash in the amount of the aggregate Professional Fee Escrow Amount for all Professionals;

(r)     to the extent of Cash distributions would apply to any such Disputed Claims, and to the extent that Cash is available, the Disputed Claims Reserve shall have been established and funded; and

(s)     any other corporate or related actions necessary or advisable in the reasonable business judgment of the Debtors and subject to the Proponents' Consent Right for the Second Amended Plan to become effective shall have been taken.

## VIII.   RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Second Amended Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Second Amended Plan or its implementation. Holders of Claims and Interests should also refer to the "Risk Factors" sections of the reports filed by GWGH with the SEC.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICLY AVAILABLE SECURITIES FILINGS.[33]**

### A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Second Amended Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Second Amended Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Class.

### 1.     Parties in Interest May Object to the Second Amended Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Second Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.     The Debtors May Fail to Receive Sufficient Votes in Favor of the Second Amended Plan.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Second Amended Plan, the Debtors intend to seek, as promptly as practicable

---

[33]   GWGH's most recent 10-K was filed on November 5, 2021 with respect to the year ending December 31, 2020. This 10-K and additional filings can be found at the following webpage: https://www.sec.gov/edgar/browse/?CIK=0001522690.

thereafter, Confirmation of the Second Amended Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Second Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Debtors' Estates than the Second Amended Plan.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Second Amended Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite votes in favor of the Second Amended Plan are received, there can be no assurance that the Bankruptcy Court will confirm the Second Amended Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court may still decline to confirm the Second Amended Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Second Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what, if anything, Holders of Allowed Claims and Interests would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Second Amended Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Second Amended Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Second Amended Plan or no distribution whatsoever under the Second Amended Plan.

### 4. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with

such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Second Amended Plan meets the requirements for nonconsensual Confirmation. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Second Amended Plan may result in, among other things, increased expenses relating to professional compensation.

### 5.      The Debtors' Exclusivity Period May Expire.

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Second Amended Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Second Amended Plan and solicit votes with respect to the Second Amended Plan as of the date hereof. If the Bankruptcy Court terminates that right, however, or the exclusivity period with respect to plan solicitation expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Second Amended Plan in order to achieve the Debtors' stated goals.

### 6.      Risk of Nonoccurrence of the Effective Date.

As more fully set forth in <u>Article IX</u> of the Second Amended Plan, the Effective Date of the Second Amended Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not occur and the Second Amended Plan will not be consummated. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7.      The Chapter 11 Cases May be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to Holders of Allowed Claims and Interests than those provided for in the Second Amended Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Second Amended Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Second Amended Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to, or may become subject to, an objection. Any Holder of a Claim that is subject to, or becomes subject to, an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Second Amended Plan.**

The distributions available to Holders of Allowed Claims and Interests under the Second Amended Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims and Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Second Amended Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Second Amended Plan or require any sort of revote by the Impaired Class.

The estimated Allowed Claims and Interests and associated recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims and Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims or Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Second Amended Plan.

10.      **The Second Amended Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.**

Article VIII of the Second Amended Plan provides for certain releases, injunctions, and exculpations. The Debtors believe that the releases, injunctions, and exculpations set forth in the Second Amended Plan comply with the requirements for approval of such provisions under applicable law. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

11.      **The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated.**

The amount of cash the Debtors ultimately receive from the Vida Exit Financing Facility and from other sources prior to and following the Effective Date may not be sufficient to pay Allowed Administrative Claims or Allowed Priority Claims, which claims must be paid in full in cash on the Effective Date pursuant to Section 1129(a)(9) of the Bankruptcy Code. Additionally, Allowed Administrative Claims or Allowed Priority Claims may be higher than anticipated.

Accordingly, there is a risk that the Debtors will not be able to consummate a chapter 11 plan. If the Debtors are unable to consummate the Second Amended Plan on a timely basis, the Debtors could become administratively insolvent

### 12. Certain Tax Implications of the Second Amended Plan.

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Second Amended Plan and the Chapter 11 Cases may adversely affect the Debtors, and certain Holders of Claims and Interests.

### B. Risks Related to Recoveries under the Second Amended Plan and to the Wind Down Trust and Wind Down Trust Assets

#### 1. Beneficient May Be Unable to Operate Its Business Successfully, Which Would Negatively Impact the Value of the Wind Down Trust's Interests in Beneficient.

The Wind Down Trust's ability to realize significant value for its interests in Beneficient will depend on Beneficient's ability to operate its business successfully. Beneficient does not have significant operating history. A description of the risks regarding Beneficient's business plan is included under the heading "Risk Factors – Risks Related to Our Liquidity Products" in GWGH's Annual Report on Form 10-K filed with the SEC on November 5, 2021 and is incorporated herein by reference. Ben LP's Registration Statement on Form S-4 that was filed with the SEC in connection with the Avalon Business Combination includes additional and updated risks related to Beneficient, including risks related to Beneficient's organizational structure, limited operating history, relationship with the Debtors, litigation, liquidity products business, broker-dealer business, technology and third parties, intellectual property, proposed insurance business, accounting policies, growth strategy, economic environment and capital markets, regulatory and legal issues, etc.

One potential litigation risk is that Beneficient is unable to resolve potential claims and causes of action that the Debtors (and following the Effective Date, the Litigation Trust) have available against it. As discussed in Article II.B.1, the Debtors (through the Investigations Committee) are in discussions with Beneficient and the Beneficient Parties regarding a potential resolution of the Debtors' available claims and causes of action against such parties, but no such resolution has been reached as of the date of this Disclosure Statement. Beneficient contends that if such potential claims and causes of action are not released or resolved through mediation or otherwise, any attendant litigation, depending on its outcome, or the potential for such litigation, could have a material adverse effect on Beneficient's operations, financial condition, or ability to close the Avalon Business Combination, and could result in a decline of the perceived value of the

post-transaction company, which could ultimately be reflected as a reduction in the market price of the securities to be held in the post-transaction company.[34]

Holders of Claims and Interests are urged to read those sections of Ben LP's Registration Statement on Form S-4 which has been filed with the SEC. If the Avalon Business Combination is consummated and stock of the combined company is listed on Nasdaq, the trading price of the Wind Down Trust's interests in combined company may go up or down based on the performance of the post-transaction entity and other factors. As a result, there can be no assurance that the Wind Down Trust will realize a significant, or any, return on its interests in Beneficient.

<div align="center">

**2.     The Business Combination of Beneficient and Avalon May Not be Consummated.**

</div>

The Avalon Business Combination is subject to various closing conditions, including receipt of regulatory approvals, approval of Avalon's stockholders (including the Debtors), the registration of the securities to be issued in connection with the Avalon transaction under the Securities Act, the listing of such securities on the Nasdaq stock market, and the accuracy of the parties' representations and warranties in the merger agreement and compliance with the covenants set forth therein. There is no assurance that the conditions to closing of the Avalon transaction, including the receipt of the Debtors' consent which, pursuant to the Mediation Agreement, is subject to Bankruptcy Court approval, will occur on a timely basis or at all.

Ben LP has filed a Registration Statement on Form S-4 with the SEC in connection with the proposed Avalon Business Combination, and that document contains risk factors that address the risks associated with the closing of the transaction and the risks associated with the post-transaction business of Beneficient. Holders are advised to review the risk factors in Ben LP's Registration Statement on Form S-4 that has been filed with the SEC, including any amendments thereto. Under the terms of the business combination agreement, interests in BCH that would be transferred to the Wind Down Trust as part of the Second Amended Plan will be converted into more structurally subordinated common equity interests of the combined company, which may reduce their value. In addition, the business combination agreement with Avalon contemplates that certain stockholders of the post-transaction company, including the Debtors (or the Wind Down Trust), will be subject to restrictions on the resale of their shares for a period of time (generally one year from the effective date of the transaction, subject to a quarterly release of 25% of the shares from these restrictions), which would limit the ability of the Wind Down Trustee to dispose of such shares in the combined company during this lockup period.

As discussed in Article IV.A.2.d, Avalon has obtained the Extension extending of the period of time it has to consummate its initial business combination by three months from January 8, 2023 to April 8, 2023. The Extension is the first of up to two three-month extensions permitted under Avalon's governing documents. If the Avalon Business Combination is not consummated within the time period required by Avalon's governing documents, Avalon will be forced to cease operations except for the purpose of winding up and returning any funds that remain in its trust

---

[34]   The Bondholder Committee believes that the pursuit of such potential claims and causes of action may provide for greater value to the Debtors' Estates than the equity interests the Debtors currently hold in Beneficient and are proposed to hold in Beneficient upon completion of the Avalon Business Combination.

account to its public stockholders. In such a case, the Avalon Business Combination would not be consummated.

On January 11, 2023, Avalon received a notice from the Listing Qualifications Department of Nasdaq stating that Avalon failed to hold an annual meeting of stockholders within 12 months after its fiscal year ended December 31, 2021, as required by Nasdaq Listing Rule 5620(a). In accordance with Nasdaq Listing Rule 5810(c)(2)(G), Avalon had 45 calendar days (or until February 27, 2023) to submit a plan to regain compliance and, if Nasdaq accepts the plan, Nasdaq may grant Avalon up to 180 calendar days from its fiscal year end, or until June 29, 2023, to regain compliance. Avalon has not announced whether Nasdaq has accepted its plan to regain compliance. If the Avalon Business Combination is consummated, there can be no assurance that the combined company maintains its listing on Nasdaq. Any projected valuations of Beneficient in connection with this Disclosure Statement and Second Amended Plan are predicated on Beneficient being publicly listed. If Beneficient is not publicly listed, there is no assurance that the projected valuations will be accurate.

Furthermore, Beneficient and Avalon do not intend to close the Avalon Business Combination unless the combined company is able to fall outside of the definition of "investment company" for purposes of the 1940 Act and, therefore, the provisions of the 1940 Act, after the Registration Statement is effective. The post-transaction company intends to rely on the Section 3(c)(3) exception under the 1940 Act applicable to banks and insurance companies as Ben LP's subsidiary, BFF, is operating under a trust company charter from the Kansas State Bank Commissioner as a fiduciary financial institution within the state of Kansas. If Beneficient loses its Kansas trust company charter for any reason, then the combined company may not fall outside of the definition of "investment company" for 1940 Act purposes, and as a result, the Avalon Business Combination may not be closed.

If the Avalon Business Combination is not consummated for any of the foregoing reasons or otherwise, or the combined company is delisted from Nasdaq, the Wind Down Trustee's ability to monetize the Wind Down Trust's interests in the combined company could be materially impaired.

### 3. The Wind Down Debtors May Not Realize a Significant Return on Their FOXO Interests.

The Company has contributed approximately $20 million to FOXO. Based on the closing price of the FOXO shares on March 21, 2023 of $0.34 per share, the Debtors' ownership interest in FOXO had a market value of approximately $1.564 million. In addition, FOXO's business and prospectus are subject to numerous risks and uncertainties, which are described in the Joint Proxy Statement/Consent Solicitation Statement/ Prospectus filed by FOXO with the SEC on August 30, 2022, which Holders of Claims and Interests are urged to read. The trading price of the FOXO shares may further decline based on the performance of the company and other factors. As a result, there can be no assurance that the Wind Down Trust will realize a significant return on its interests in FOXO.

4.      **The Wind Down Debtors May Remain Under Investigation by the SEC and the Debtors are Unable to Predict the Outcome of Such Matter.**

As discussed in <u>Article V.A.1</u>, on October 6, 2020, the Company received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into the Company. Since the initial subpoena, the Company has received fifteen subsequent subpoenas from the SEC for additional information. The requested information from the SEC has primarily related to the Company's securities, including the Bonds (and the marketing, selling, advertising, sellers, and purchasers of such), disclosures, and various accounting matters; information related to documents and statements referenced in the Company's SEC filings, including consolidation, valuations, retained professionals and related communications; information related to the Company's relationship and communications with Beneficient and certain other parties, including negotiations and agreements; and information related to firm-wide policies and practices generally. The Debtors are cooperating with the SEC in connection with its investigation. Investigations of this nature are inherently uncertain, and their results cannot be predicted. Regardless of the outcome, the SEC Investigation may have an adverse impact on the Debtors or Wind Down Debtors, including because of fines, legal costs, other expenses, diversion of management resources, and other factors.

5.      **Failure to Comply with Applicable Federal Securities Laws Could Materially and Adversely Affect the Wind Down Trust.**

(a)      *Transfer of Assets Into a Newly-Formed Liquidating Trust*

The Second Amended Plan provides that the Debtors' interests in the Wind Down Trust Assets, including the Debtors' interests in Beneficient and FOXO, will be transferred to the Wind Down Trust, which will be a newly-formed liquidating trust, and such transfer is intended to enable the Wind Down Trust and the Debtors to fall within an exception to registration for companies that are dissolving, in accordance with the Liquidating Company Exception. Such companies' activities are restricted to those that are "merely incidental" to their dissolution. Accordingly, the purpose of the Wind Down Trust, including the Portfolio Co. and the Litigation Trust, is to liquidate the assets and distribute the same to interest holders. In addition, the Wind Down Trust will have a term restricted to the timeframe necessary to liquidate the assets, which could be, relative to the assets held by the Portfolio Co., until all of the Policies mature. Holding the Policies until maturity could be necessary to liquidate the assets without incurring a significant reduction in the total gross amount, and net present value, of the liquidation proceeds that are realizable from the Policies. Based on the SEC Staff's guidance, additional restrictions will be placed on the Wind Down Trust's activities and operations. For example, in granting relief from registration requirements in the past where the interests in the dissolving company will be freely transferrable, the staff of the SEC has imposed various conditions on the company and the interests. In order to satisfy these conditions, should the interests in the Wind Down Trust become freely transferable, none of the interests issued by the Wind Down Trust (including the Litigation Trust and the Portfolio Co.) will be listed on any securities exchange or quoted on Nasdaq or similar platform. Further, the Wind Down Trust will not engage the services of a market maker or otherwise facilitate the development of an active trading market for or promote sales of its interests or the interests in the Liquidation Trust or the Portfolio Co., or collect or publish information regarding the prices at which any of those securities are traded (other than to the extent required to be disclosed in any required public

filings or in reports required to be submitted to interest holders under applicable law or pursuant to the Plan or the Wind Down Trust Agreement).

As a general matter, the 1940 Act's registration requirements do not apply to a company's activities that are merely incidental to its dissolution. The SEC Staff has issued guidance regarding the use of liquidating trusts and similar entities for this purpose. Although the Second Amended Plan is intended to be generally consistent with the spirit of SEC Staff's guidance regarding liquidating trusts, this guidance is based in large part on specific factual situations, which differ, in some ways significantly, from the factual situations relevant to the Wind Down Trust and the Second Amended Plan. Further, much of this guidance was published years ago, and there appears to be no guidance from the SEC Staff that applies directly to the present factual situation. No assurance can be given that the SEC or the SEC Staff will concur with the Second Amended Plan's approach, or the Debtors' analysis, conclusions or approach, regarding the Wind Down Trust's compliance with the 1940 Act, and if the SEC or the SEC Staff disagrees with any of the foregoing, the SEC or the SEC Staff might take the position that the Wind Down Trust or relevant portions of the Second Amended Plan do not comply with, or do not contemplate activities that are or would be in compliance with, the 1940 Act, which could have material adverse consequences on the Wind Down Trust. In light of this, the Second Amended Plan provides that, if it becomes necessary for 1940 Act compliance purposes to change the organization, operations and/or activities of the Wind Down Trust, the Wind Down Trustee will attempt do so in a way to preserve the economic benefits of ownership of Wind Down Trust to the maximum extent possible. Such changes may include restrictions that would affect the transferability of the New WDT Interests.

If the Wind Down Trust is not deemed to fall within the Liquidating Company Exception, then it may be required to register under the 1940 Act, which imposes significant legal and operational restrictions on investment companies and would prevent the Wind Down Trust from operating as described in the Second Amended Plan.

### (b)     Compliance with the 1940 Act

The Wind Down Debtors and Wind Down Trust have no current intention to register as an investment company or be required to do so. A determination that GWGH, the Wind Down Debtors or Wind Down Trust are unregistered investment companies under the 1940 Act would have serious adverse consequences. If at any time it were established that GWGH, the Wind Down Debtors or Wind Down Trust had been operating as an investment company or plan to operate as such in violation of the registration requirements of the 1940 Act, there would be a risk, among other material adverse consequences, that GWGH, the Wind Down Debtors or Wind Down Trust: (i) could become subject to SEC investigation and enforcement actions, including monetary penalties, disgorgement, injunctive relief, industry bars, and receivership or similar action, (ii) would be unable to enforce contracts with third parties or that third parties could seek to obtain rescission of transactions with such company undertaken during the period in which it was established that such company was an unregistered investment company, (iii) would face adverse action from other regulatory authorities; and (iv) potentially be subject to related litigation (which could include a private right of action for 1940 Act violations). Such developments would have material and adverse consequences for GWGH, the Wind Down Debtors or Wind Down Trust, resulting in, among other things, a breach of applicable contracts.

Further, on occasion, the SEC has attempted to regulate the purchase of non-variable universal life insurance policies as transactions in securities under federal securities laws. In July 2010, the SEC issued a Staff Report of its Life Settlement Task Force. In that report, the SEC Staff recommended that certain types of purchased insurance policies be classified as securities. The SEC has not taken any position on the Staff Report, and there is no indication if the SEC will take any action to implement the recommendations of the Staff Report. In addition, there have been several federal court cases in which transactions involving the purchase and fractionalization of life insurance policies have been held to be transactions in securities under the Securities Act.

The Debtors believe that the matters discussed in the Staff Report and existing case law do not impact its current business model because the life insurance policies the Debtors hold are distinguishable from those cases that have been held by courts, and advocated by the Staff Report, to be transactions in securities. For example, the Debtors are not involved in the fractionalization of life insurance policies.

<p align="center">(c)      <em>Enforcement of Securities Laws</em></p>

The federal securities laws grant the SEC broad administrative powers, including the power to limit or restrict a company from conducting activities in the event it fails to comply with applicable federal securities laws. Additional sanctions that may be imposed for failure to comply with applicable requirements include the prohibition of individuals from associating with an unregistered investment company, or participating in the financial services industry, the revocation of registrations and licenses, significant monetary penalties, disgorgement of gains, receivership or similar action, cease-and-desist orders and other censures. The SEC may bring civil actions against companies that violate the federal securities laws, and seek injunctions, damages or other relief, in a U.S. district court or before an administrative law judge. State regulators have the authority to conduct investigations and bring proceedings against unregistered investment companies and other companies that violate applicable state securities laws in certain circumstances. Even if an investigation or proceeding does not result in a sanction or the sanction imposed against an unregistered investment company or its personnel by the SEC or other authority, or resulted in relatively small monetary penalties and similar sanctions, the costs of responding to the investigation and/or the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm the company's reputation and could materially and adversely affect its financial condition.

In addition, even in the absence of a regulatory proceeding or similar action, any perceived or actual breach of compliance with the federal securities laws by a person could have a significant impact on that person's reputation, require the person to expend significant funds to remedy problems caused by breaches and to avert further breaches or to defend against allegations of the same, and expose the person to legal risk, including litigation, and potential liability, which could materially and adversely affect its financial condition.

**6.      The New WDT Interests Will Not Be Transferrable Initially And May Not Become Transferrable in the Future.**

Historically, securities of GWGH have been listed on Nasdaq or traded over the counter. In an effort to fall within the Liquidating Company Exception, none of the interests issued by the

Wind Down Trust will be listed on any securities exchange or quoted on Nasdaq or similar platform. To the contrary, the Wind Down Trust Agreement will provide that the New WDT Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by will, intestacy or operation of law. Although the Wind Down Trustee may determine in its sole discretion to take such actions that are necessary or reasonably advisable (including, without limitation, completing a registration under the Securities Exchange Act) to modify or remove any contractual restrictions on transferability of the New WDT Interests, the Wind Down Trustee will be under no obligation to take any of these actions and no assurance can be given that the New WDT Interests will become transferrable in the future.

## C.    Disclosure Statement Disclaimer

### 1.    Information Contained in This Disclosure Statement Is Solely for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting votes on the Second Amended Plan and may not be relied upon for any other purpose.

### 2.    This Disclosure Statement Was Not Approved by the United States SEC or Any Other Regulatory Authority.

This Disclosure Statement was not filed with the SEC under the federal securities laws or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement. Any representation to the contrary is unlawful.

### 3.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement. This Disclosure Statement Is Not Legal Advice to You.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any tax advice.

### 4.    No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Second Amended Plan on the Debtors, the Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 5.    Failure to Identify Litigation Claims or Projected Objections.

No individual should rely on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate Claims and Interests and may object to Claims or Interests after the

Confirmation or Effective Date of the Second Amended Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 6. No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of a Claim or Interest for or against the Second Amended Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 7. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The Debtors make the statements contained in this Disclosure Statement as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Second Amended Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9. No Representations Outside this Disclosure Statement Are Authorized.

Neither the Bankruptcy Court nor the Bankruptcy Code authorizes representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Second Amended Plan are, other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Second Amended Plan that are other than as contained in, or included with, this Disclosure Statement. You should promptly report unauthorized representations or inducements to counsel for the Debtors.

## IX. SOLICITATION, VOTING PROCEDURES AND CONFIRMATION HEARING

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Second Amended Plan, is being distributed to the Holders of Claims and Interests in Classes 3,

4(a), 8, 9 and 10, which are entitled to vote to accept or reject the Second Amended Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit B**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Second Amended Plan.

<div style="border:1px solid black; padding:10px;">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO AS EXHIBIT B FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### A.    Holders of Claims and Interests Entitled to Vote on the Second Amended Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Second Amended Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Second Amended Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Second Amended Plan only from Holders of Claims or Interests in Classes 3, 4(a), 8, 9 and 10 (the "Voting Classes"). The Holders of Claims and Interests in the Voting Classes are Impaired under the Second Amended Plan and may, in certain circumstances, receive a distribution under the Second Amended Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Second Amended Plan.

The Debtors are *not* soliciting votes on the Second Amended Plan from Holders of Claims or Interests in Classes 1, 2, 4(b), 5, 6, and 7. Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been Disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Second Amended Plan.

### B.    Voting Record Date

**The Voting Record Date is February 24, 2023**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Second Amended Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Second Amended Plan as the Holder of a Claim or Interest in Classes 3, 4(a), 8, 9 and 10.

### C.    Voting on the Second Amended Plan

**The Voting Deadline is May [2], 2023 at 4:00 p.m. (prevailing Central Time)**. To be counted as votes to accept or reject the Second Amended Plan, all Holders of Allowed Claims and Interests entitled to vote on the Second Amended Plan must complete, execute, and return their Ballots so that they are **actually received** by the Notice and Solicitation Agent pursuant to the Solicitation and Voting Procedures on or before **May [2], 2023 at 4:00 p.m. prevailing Central Time** (the "Voting Deadline").

To vote, complete, sign, and date your Ballot and return it (with an original signature) *promptly* in the reply envelope enclosed with your Ballot or to one of the below addresses, via eBallot portal, or via electronic mail as set forth below. Certain beneficial holders of Claims and Interests will receive separate voting instructions from their respective banks and/or brokerages.

**Via E-Ballot Portal. Ballots may be submitted via an electronic Ballot through the Voting Agent's on-line electronic Ballot submission portal at www.DonlinRecano.com/clients/gwg/vote by no later than the Voting Deadline. Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote.**

<div align="center">

**OR**

| |
|---|
| **By First Class Mail to:** |
| |
| **GWG HOLDINGS, INC., ET AL. Balloting Center** |
| **c/o Donlin Recano Company** |
| **Attn: Voting Department** |
| **P.O. Box 199043 Blythebourne Station** |
| **Brooklyn, NY 11219** |
| |
| **By Hand Delivery or Overnight Mail to:** |
| |
| **GWG HOLDINGS, INC., ET AL. Balloting Center** |
| **c/o Donlin Recano Company** |
| **Attn: Voting Department** |
| **6201 15th Ave** |
| **Brooklyn, NY 11219** |

**OR**

</div>

**Via Electronic Mail. Complete, sign, and date the Ballot and email a scanned copy of the Ballot in a universally viewable file format such as .PDF to GWGVote@donlinrecano.com.**

PLEASE SELECT JUST ONE OPTION TO VOTE.

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND SOLICITATION AGENT TOLL FREE AT (888) 508-2507 (TOLL-FREE) OR VIA ELECTRONIC MAIL TO GWGINFO@DONLINRECANO.COM.

### D.      Ballots Not Counted

**The following Ballots shall not be counted in determining the acceptance or rejection of the Second Amended Plan**: (a) any Ballot (other than a Master Ballot) that partially rejects and partially accepts the Second Amended Plan; (b) any Ballot (other than a Master Ballot) that both accepts and rejects the Second Amended Plan; (c) any Ballot not marked to accept or reject the Second Amended Plan, (d) any Beneficial Holder Ballot (other than a Pre-Validated Beneficial Holder Ballot) submitted directly to the Notice and Solicitation Agent; (e) any Ballot sent to the Debtors, the Debtors' agents (other than the Notice and Solicitation Agent) the Debtors' advisors, or any other party other than the Notice and Solicitation Agent; (f) any Ballot that is not actually received by the Notice and Solicitation Agent by the Voting Deadline (unless the Debtors determine otherwise or as permitted by the Bankruptcy Court); (g) any Ballot sent via facsimile or other unapproved means of delivery; (h) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest, or the Claim or Interest being voted; (i) any Ballot cast by a party that does not hold a Claim or Interest in the Class indicated on the Ballot; (j) any Ballot submitted by a Holder not entitled to vote pursuant to the Second Amended Plan; (k) any Ballot superseded by a later, timely submitted valid Ballot; and (l) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed). The method of delivery of Ballots to be sent to the Notice and Solicitation Agent is at the election and risk of each Holder. Except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Solicitation Agent actually receives the properly executed Ballot. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Second Amended Plan**.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL **NOT** BE COUNTED.

## X.      CONFIRMATION OF THE SECOND AMENDED PLAN

### A.      Requirements for Confirmation of the Second Amended Plan

The requirements for Confirmation of the Second Amended Plan pursuant to section 1129 of the Bankruptcy Code include: (1) the Second Amended Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Second Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Second Amended Plan is feasible; and (3) the Second Amended Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Second Amended Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Second Amended Plan satisfies, or will satisfy, all of the necessary

statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Second Amended Plan has been proposed in good faith.

### 1.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors, with the assistance of the Debtors' advisors, are preparing a liquidation analysis (the "Liquidation Analysis") that will be filed with the Plan Supplement. The Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims and Interests as compared to distributions contemplated under the Second Amended Plan. Consequently, the Debtors believe that Confirmation of the Second Amended Plan will provide a substantially greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### 2.    Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan. The Second Amended Plan provides for the orderly liquidation and distribution of the Debtors' remaining assets over time. Accordingly, the Debtors believe that all Second Amended Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims or Interests will have voted to accept the Second Amended Plan only if two-thirds in amount and a majority in number of the Allowed Claims or Interests in such Class that vote on the Second Amended Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in

that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Second Amended Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Second Amended Plan actually cast their ballots in favor of acceptance.

Pursuant to <u>Article III.E</u> of the Second Amended Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Second Amended Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Second Amended Plan.

### B.  Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Second Amended Plan, the Debtors reserve the right to seek to confirm the Second Amended Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Second Amended Plan or is deemed to have rejected the Second Amended Plan, the Debtors may request Confirmation of the Second Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Second Amended Plan or any Plan Supplement document, including the right to amend or modify the Second Amended Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

C.       **Valuation of the Wind Down Trust Assets**

In conjunction with the Second Amended Plan, the Debtors have determined to estimate the post-Confirmation value of the Wind Down Trust Assets. Accordingly, the Debtors, with the assistance of their advisors, will produce a valuation analysis of the Wind Down Trust Assets (the "Valuation Analysis") that will be filed with the Plan Supplement.

As part of the Mediation Agreement, the Creditor Proponents agreed not to object to a value of the Wind Down Trust Assets, for Plan purposes only and not for any other purpose, if such mid-range valuation does not exceed $1 billion. If the mid-range valuation of the Wind Down Trust Assets is greater than $1 billion, then the Creditor Proponents (and other parties in interest) may choose to object or not to object, as the case may be. For the avoidance of doubt, the Bondholder Committee does not adopt, or express any position, with respect to any portion of the Debtors' Valuation Analysis and the Bondholder Committee's lack of objection shall in no way be deemed in any way to prejudice or otherwise impair (i) any claims or causes of action that may be pursued by the Litigation Trust or (ii) the Bondholder Committee's right or ability to object to any settlements with respect to which the Debtors may seek approval of the Bankruptcy Court.

# XI.     CERTAIN SECURITIES LAW MATTERS

The Debtors intend that the Wind Down Trust will be organized in compliance with applicable law such that the New WDT Interests will not be treated as securities. As a result, the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the New WDT Interests or an exemption from such registration requirements is required. However, to the extent that the  issuance and distribution of the New WDT Interests pursuant to the Second Amended Plan are deemed securities, the issuance and distribution thereof would be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S., state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, Section 1145 of the Bankruptcy Code and to the extent such exemption was not available, then such New WDT Interests would be offered, issued and distributed under the Second Amended Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Section 1145(a) of the Bankruptcy Code exempts securities issued pursuant to a plan from registration under the Securities Act, or any state law requiring registration for the sale or offering of securities, provided certain conditions are met, except for securities issued to an "underwriter," as defined in Section 1145(b) of the Bankruptcy Code. Subsequent transfers of the securities by holders that are not "underwriters" would, as a matter of federal securities law, generally be exempt from federal securities registration requirements.

Section 1145(a) of the Bankruptcy Code generally exempts from federal and state registration requirements the issuance of securities if the following conditions are satisfied:

(i)       the securities are offered or sold under a chapter 11 plan by (x) a debtor, (y) one of its affiliates participating in a joint plan with the debtor, or (z) a successor to a debtor under the plan; and

(ii)     the securities are issued in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" as one who (A) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (B) offers to sell securities issued under a plan for the holders of such securities, (C) offers to buy securities issued under a plan from the holders receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (D) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act.

Section 2(a)(11) of the Securities Act defines an "issuer" to include any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. "Control," as defined in Rule 405 under the Securities Act, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Section 1145(b)(1)(D) therefore applies to persons considered "affiliates" of the issuer, as defined in Rule 144 under the Securities Act.

Were the New WDT Interests to be deemed securities, the Debtors believe that the exchange of New WDT Interests for Claims against the Debtors under the circumstances provided in the Second Amended Plan would generally satisfy the requirements of Section 1145(a) of the Bankruptcy Code. Any subsequent transfers of securities not issuable pursuant to Section 1145(a) of the Bankruptcy Code, because of the applicability of Section 1145(b) of the Bankruptcy Code, would require registration under the Securities Act or an exemption from registration under the Securities Act.

Were the New WDT Interests to be deemed securities, the New WDT Interests issued pursuant to the Second Amended Plan would be deemed to have been issued in a public offering, except to holders who meet the Section 1145(b) definition of an "underwriter." In such case, the New WDT Interests would, as matter of federal securities law, be permitted to be resold by a holder, other than such an underwriter, without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) of the Securities Act.

Securities held by persons deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code, as a matter of federal securities law would not be permitted resold under the Securities Act or applicable state securities laws absent an effective registration statement under the Securities Act, or pursuant to an applicable exemption from registration such as Rule 144, and pursuant to applicable exemptions under state securities laws. Under certain circumstances, such persons might be able to resell their securities pursuant to Rule 144, and in compliance with applicable state securities laws. Generally, Rule 144 provides that persons who are affiliates may resell securities, without being deemed underwriters under the Securities Act, if certain conditions are met. These conditions include: the availability of current public information with respect to the issuer; a limitation as to the amount of securities that may be sold in any three-month period; the

requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker"; and the filing of a notice of resale with the SEC.

Notwithstanding the foregoing or anything to the contrary in this Disclosure Statement, the Wind Down Trust Agreement will provide that the New WDT Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by will, intestacy or operation of law. As noted above, the Wind Down Trust will be organized in compliance with applicable law such that the New WDT Interests will not be treated as securities and under such facts the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the New WDT Interests or an exemption from such registration requirements would be required. The Wind Down Trustee will be permitted to determine in its sole discretion to take such actions that are necessary or reasonably advisable (including, without limitation, completing a registration under the Exchange Act) to modify or remove any contractual restrictions on transferability of the New WDT Interests, with any such determination by the Wind Down Trustee, and all costs associated therewith, to be deemed a determination with respect to the monetization of the Wind Down Trust Assets pursuant to Article IV.A.3 of the Second Amended Plan and to be evaluated solely under a reasonable business judgment standard.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE SECOND AMENDED PLAN

### A.   General

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Second Amended Plan to the Debtors and to certain Holders. The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Second Amended Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Second Amended Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to Non-U.S. Holders (as defined below) or such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method Holders (as defined below) that prepare an "applicable financial statement" (as

defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons liable for Medicare tax, alternative minimum tax or minimum tax on book income, persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims or Interests in a single Class and holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also generally assumes, except as discussed below, that the various debt and other arrangements to which the Debtors and Wind Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than that of a Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims or Interests are unimpaired or otherwise entitled to payment in full under the Second Amended Plan, or (b) that are deemed to reject the Second Amended Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including a beneficial owner of Claims or Interests) that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim or Interest that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims or Interests should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE SECOND AMENDED PLAN.

**B.    Consequences to the Debtors**

**1.    Cancellation of Debt**

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the issue price of any new debt instruments of the taxpayer issued, (ii) the fair market value of other non-cash consideration (including stock of the taxpayer or a party related to the taxpayer), and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce its NOLs and certain other tax attributes (collectively, "Tax Attributes") and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in Tax Attributes and aggregate tax basis occurs only after the tax for the year of the debt discharge has been determined. In general, Tax Attributes and aggregate tax basis will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets, which includes the stock of subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC, in which case such reduction would not be subject to the limitation described in section (e) of the prior sentence. Interest expense deductions allowable under section 163(j) of the Code (and carryforwards of any such deductions) ("163(j) Deductions") are not subject to reduction under these rules. Any excess COD Income over the amount of available items described in clauses (a) through (g), above, will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The Debtors may realize COD Income in connection with the Second Amended Plan, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the

Effective Date). The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the value of non-cash consideration (including the New WDT Interests), which cannot be determined until after the Second Amended Plan is consummated. As a result, the total amount of reduction in Tax Attributes and aggregate tax basis as a result of the Plan cannot be determined until after the Effective Date.

### 2.      Transfer of Assets to the Wind Down Trust

The Debtors' transfer of assets to the Wind Down Trust will be treated as a fully taxable sale or exchange of the Wind Down Trust Assets. As a result, the Debtors will recognize gain or loss with respect to the Wind Down Trust Assets. The amount of the Debtors' gain or loss on account of such transfer has not been determined, and will depend on the value of such assets on the date of such transfer to the Wind Down Trust relative to the Debtors' adjusted tax basis in such assets on such date.

### C.      Consequences to Holders of Claims and Interests

### 1.      Realization and Recognition of Gain or Loss, In General

The federal income tax consequences of the implementation of the Second Amended Plan to a Holder of a Claim or Interest will depend, among other things, upon the origin of the Holder's Claim or Interest, when the Holder receives payment in respect of such Claim or Interest, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim or Interest at a discount, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Interest, and whether (as intended and herein assumed) the Second Amended Plan is treated as a plan of liquidation for federal income tax purposes. A Holder of an Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a Holder of an Allowed Claim or Interest will realize gain or loss on the exchange under the Second Amended Plan of its Allowed Claim or Interest for Cash or other property (including any New WDT Interests), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, including, as discussed below, its respective share of the Wind Down Trust Assets and Initial Litigation Trust Assets (consistent with its economic rights in the trust) (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim or Interest exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Interest disposed of is a capital asset in the hands of the Holder and the Holder's holding period in the Claim or Interest exceeds one year. Each Holder of an Allowed Claim or Interest should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

As discussed below, each Holder of an Allowed Claim or Interest that receives a beneficial interest in the Wind Down Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Wind Down Trust Assets and Initial Litigation Trust Assets (consistent with its economic rights in the trust). Pursuant to the Second Amended Plan, the Wind Down Trustee will in good faith value the assets transferred to the Wind Down Trust, and all parties to the Wind Down Trust or Litigation Trust (including Holders of Claims or Interests receiving New WDT Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A Holder's share of any proceeds received by the Wind Down Trust or Litigation Trust upon the sale or other disposition of the assets of such liquidating trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim or Interest but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the liquidating trust.

A Holder's tax basis in its respective share of the Wind Down Trust Assets or Initial Litigation Trust Assets will equal the fair market value of such respective share, and the Holder's holding period generally will begin the day following the establishment of such liquidating trust.

### 2.    Allocation of Consideration to Interest

In general, to the extent any amount received (whether stock, Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim or Interest is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### D.    Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests

### 1.    Classification of the Wind Down Trust and Litigation Trust

The Wind Down Trust and Litigation Trust are each intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the holders of New WDT Interests). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Wind Down Trust and Litigation Trust will be structured to comply with such general criteria. Pursuant to the Second Amended Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Wind Down Trustee, Holders of Allowed Claims or Interests, and the holders of New WDT Interests) will be required to treat, for U.S. federal income tax purposes, the Wind Down Trust as a grantor trust of which the holders of New WDT Interests are the owners and grantors. The following discussion assumes that the Wind Down

Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Wind Down Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Wind Down Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Wind Down Trust, the U.S. federal income tax consequences to the Wind Down Trust, the holders of New WDT Interests and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Wind Down Trust).

## 2.   General Tax Reporting by the Wind Down Trust and Holders of New WDT Interests

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Wind Down Trustee, Holders of Allowed Claims or Interests, and the holders of New WDT Interests) must treat the transfer of the Wind Down Trust Assets and the Initial Litigation Trust Assets to the Wind Down Trust or Litigation Trust, as the case may be, in accordance with the terms of the Second Amended Plan. Pursuant to the Second Amended Plan, the Wind Down Trust Assets and the Initial Litigation Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the Holders of the respective Claims or Interests receiving New WDT Interests (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the Holders of such assets to the Wind Down Trust or Litigation Trust, as the case may be, in exchange for the New WDT Interests. Accordingly, all parties must treat the Wind Down Trust as a grantor trust of which the Holders of New WDT Interests are the owners and grantors, and treat the holders of New WDT Interests as the direct owners of an undivided interest in the Wind Down Trust Assets and the Initial Litigation Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Wind Down Trust among the holder of New WDT Interests is expected to be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Wind Down Trust and Litigation Trust had distributed all their assets (valued at their tax book value) to the holders of New WDT Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Wind Down Trust or Litigation Trust. Similarly, taxable loss of the Wind Down Trust or Litigation Trust is expected to be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Wind Down Trust Assets and Initial Litigation Trust Assets. The tax book value of the Wind Down Trust Assets and Initial Litigation Trust Assets for this purpose shall equal their fair market value on the date of the transfer of such assets to the Wind Down Trust or Litigation Trust, as the case may be, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Wind Down Trust Assets and Initial Litigation Trust Assets to the Wind Down Trust or Litigation Trust, as the case may be, the Wind Down Trustee shall make a good faith valuation of the Wind Down Trust Assets and Initial Litigation Trust Assets. All parties to the Wind Down Trust (including, without limitation, the

Debtors and the holders of New WDT Interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of New WDT Interests will be treated as income or loss with respect to such holder's undivided interest in the Wind Down Trust Assets and Initial Litigation Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of New WDT Interests.

The U.S. federal income tax obligations of a Holder with respect to its New WDT Interest are not dependent on the Wind Down Trust or Litigation Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Wind Down Trust or Litigation Trust income even if the Wind Down Trust or Litigation Trust does not make a concurrent distribution to the Holder. In general, a distribution of Cash by the Wind Down Trust or Litigation Trust will not be separately taxable to a holder of New WDT Interests since the holder is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Wind Down Trust or Litigation Trust).

The Wind Down Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any holders of New WDT Interests that are not U.S. persons, the Wind Down Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Second Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Second Plan, including owning an interest in the Wind Down Trust.

The Wind Down Trustee will file with the IRS tax returns for the Wind Down Trust consistent with its classification as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Wind Down Trustee also will send annually to each holder of a New WDT Interest a separate statement regarding the receipts and expenditures of the Wind Down Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

### 3.      Non-U.S. Holders of New WDT Interests

As discussed above, all Holders (including Non-U.S. Holders) are required to treat the holders of New WDT Interests as the direct owners of an undivided interest in the Wind Down Trust Assets and the Initial Litigation Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes. Non-U.S. Holders may be subject to adverse U.S. federal income tax consequences as a result of holding New WDT Interests, including (1) being subject to U.S. federal withholding tax on distributions or allocations of income with respect to the Wind

Down Trust Assets or the Initial Litigation Trust Assets, and (2) being treated as engaged in a trade or business in the United States and, as a result, being required to make U.S. income tax return filings and pay U.S. federal income tax on a net basis with respect to income that is effectively connected with such trade or business. Non-U.S. Holders of Allowed Claims or Interests are urged to consult with their tax advisors regarding the U.S. federal income tax consequences of holding New WDT Interests generally, including the possibility of being treated as engaged in a trade or business in the United States and any potential U.S. federal withholding tax on distributions by the Debtors or payments from the Wind Down Trustee.

### E.    Withholding on Distributions, and Information Reporting

All Distributions to Holders of Allowed Claims or Interests under the Second Amended Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims or Interests are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Second Amended Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

In addition, a Holder of an Allowed Claim or Interest or a holder of a New WDT Interest that is a Non-U.S. Holder may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims or Interests, it is possible that withholding may be required with respect to distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A Non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Second Amended Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Second Amended Plan does not generally address the consequences to Non-U.S. Holders. Holders are urged to consult their tax advisors regarding potential withholding on distributions by the Debtors or payments from the Wind Down Trustee.

Dated: March 22, 2023
Houston, Texas

GWG HOLDINGS, INC.
on behalf of itself and its Debtor affiliates.

/s/ *Jeffrey S. Stein*
Jeffrey S. Stein as
Chief Restructuring Officer, President, Chief
Executive Officer and Independent Director of
GWG Holdings, Inc.

/s/
Bondholder Committee Representative

/s/
L Bond Management, LLC Representative

Prepared by:

**JACKSON WALKER LLP**
Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:   (713) 752-4200
Email:         kpeguero@jw.com
                  mcavenaugh@jw.com

*Co-Counsel for the Debtors and Debtors in
Possession*

**MAYER BROWN LLP**
Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone:   (713) 238-3000
Email:         ckelley@mayerbrown.com

-and-

Thomas S. Kiriakos (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
Jamie R. Netznik (admitted *pro hac vice*)
Lisa Holl Chang
Joshua R. Gross (admitted *pro hac vice*)

Jade Edwards
71 S. Wacker Drive
Chicago, IL 60606
Telephone:   (312) 782-0600
Email:         tkiriakos@mayerbrown.com
                  lchiappetta@mayerbrown.com
                  jnetznik@mayerbrown.com
                  lhollchang@mayerbrown.com
                  jgross@mayerbrown.com
                  jedwards@mayerbrown.com

-and-

Adam C. Paul (admitted *pro hac vice*)
Lucy F. Kweskin (admitted *pro hac vice*)
Ashley Anglade
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone:   (212) 506-2500
Email:         apaul@mayerbrown.com
                  lkweskin@mayerbrown.com
                  aanglade@mayerbrown.com

*Counsel for the Debtors
and Debtors in Possession*

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman (pro hac vice)
Cindi M. Giglio (pro hac vice)
Marc B. Roitman (pro hac vice)
Jerry L. Hall (pro hac vice)
50 Rockefeller Plaza
New York, NY 10020
Telephone: (212) 940-8800
Email: sreisman@katten.com
  cgiglio@katten.com
  marc.roitman@katten.com
  jerry.hall@katten.com

-and-

Daniel Barnowski (pro hac vice)
2900 K Street NW, Suite 200
Washington, DC 20007
Telephone: (202) 625-3500
Email: dan.barnowski@katten.com

*Counsel to Jeffrey S. Stein and Anthony R. Horton,*
*in their capacity as members of the*
*Investigations Committee and Special Committee of*
*the Board of Directors of GWG Holdings, Inc.*

Creditor Proponents:

**PORTER HEDGES LLP**
Eric M. English (TX Bar No. 24062714)
M. Shane Johnson (TX Bar No. 24083263)
1000 Main Street, 36th Floor
Houston, Texas 77002-2764
Telephone:  (713) 226-6000
Facsimile:  (713) 226-6248
eenglish@porterhedges.com
sjohnson@porterhedges.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD**
**LLP**
Lacy M. Lawrence
State Bar No. 24055913; S.D. Tex. No. 995675
2300 N. Field St., Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
llawrence@akingump.com

-and-

Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Jason P. Rubin (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
jrubin@akingump.com

-and-

Scott L. Alberino (admitted *pro hac vice*)
Benjamin L. Taylor (admitted *pro hac vice*)
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006-1037
Phone:  (202) 887-4000
Fax:  (202) 887-4288
salberino@akingump.com
taylorb@akingump.com

*Counsel to the Official Committee of Bondholders*
*of GWG Holdings, Inc., et al.*

**OKIN ADAMS LLP**

Matthew S. Okin (Texas Bar No. 00784695)
David L. Curry, Jr. (Texas Bar No. 24065107)
Edward A. Clarkson, III (Texas Bar No. 24059118)
mokin@okinadams.com
dcurry@okinadams.com
eclarkson@okinadams.com
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158

*Counsel to L Bond Management, LLC*

**<u>Exhibit A</u>**

**Second Amended Plan**

[separately filed]

## **Exhibit B**

**Disclosure Statement Order**

[separately filed]