THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE SECOND AMENDED PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| *In re:* | ) | Chapter 11 |
|  | ) |  |
| GWG Holdings, Inc., *et al.*,[1] | ) | Case No. 22-90032 (MI) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |

## DISCLOSURE STATEMENT FOR THE DEBTORS' FURTHER MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN, SUBMITTED BY THE DEBTORS, THE BONDHOLDER COMMITTEE, AND L BOND MANAGEMENT, LLC AS CO-PROPONENTS

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding Holdings VI, LLC (6955); and GWG DLP Funding VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these Chapter 11 Cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Email:            kpeguero@jw.com
                    mcavenaugh@jw.com


*Co-Counsel for the Debtors
and Debtors in Possession*

**MAYER BROWN LLP**
Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Telephone:      (713) 238-3000
Email:            ckelley@mayerbrown.com

- and -

Thomas S. Kiriakos (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
Jamie R. Netznik (admitted *pro hac vice*)
Lisa Holl Chang
Joshua R. Gross (admitted *pro hac vice*)
Jade Edwards
71 S. Wacker Drive
Chicago, Illinois 60606
Telephone:      (312) 782-0600
Email:            tkiriakos@mayerbrown.com
                    lchiappetta@mayerbrown.com
                    jnetznik@mayerbrown.com
                    lhollchang@mayerbrown.com
                    jgross@mayerbrown.com
                    jmedwards@mayerbrown.com

- and -

Adam C. Paul (admitted *pro hac vice*)
Lucy F. Kweskin (admitted *pro hac vice*)
Ashley Anglade
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone:      (212) 506-2500
Email:            apaul@mayerbrown.com
                    lkweskin@mayerbrown.com
                    aanglade@mayerbrown.com


*Counsel for the Debtors
and Debtors in Possession*

Dated: April ~~19~~20, 2023

| IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT |
|---|

**THE DEADLINE TO VOTE ON THE SECOND AMENDED PLAN IS**
**May ~~[24]~~31, 2023 at 4:00 p.m. (prevailing Central Time)**

**THE DEADLINE TO OBJECT TO THE SECOND AMENDED PLAN IS**
~~[_____]~~**May 31, 2023 at 11:59 p.m. (prevailing Central Time)**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY DONLIN, RECANO & COMPANY, INC. ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY INDIVIDUAL OR ENTITY FOR ANY OTHER PURPOSE AND SHALL NOT BE BINDING ON ANY INDIVIDUAL OR ENTITY. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE SECOND AMENDED PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN, THE RELEVANT PROVISIONS OF THE SECOND AMENDED PLAN WILL GOVERN.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE SECOND AMENDED PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE SECOND AMENDED PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE SECOND AMENDED PLAN.

THE SECOND AMENDED PLAN WAS APPROVED BY THE DEBTORS' MANAGEMENT AND GOVERNING BOARDS, INCLUDING THE CHIEF RESTRUCTURING OFFICER AND THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF GWG HOLDINGS, INC. THAT WAS FORMED IN CONNECTION WITH THE CHAPTER 11 CASES TO, AMONG OTHER THINGS, ANALYZE AND EVALUATE A CHAPTER 11 PLAN.

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     THE PLAN ............................................................................................................... 2

    A.      Overview of the Second Amended Plan and Potential Sources of Value to Stakeholders ................................................................................................. 2

    B.      Mediation and Related Resolutions ............................................................ 19

    C.      Summary of the Second Amended Plan ...................................................... 27

    D.      Additional Plan Information and Plan Supplement .................................... 34

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN .................................. ~~35~~34

    A.      What is chapter 11? .................................................................................... ~~35~~34

    B.      Why are the Debtors sending me this Disclosure Statement? .................... 35

    C.      Am I entitled to vote on the Second Amended Plan? ................................. 35

    D.      What will I receive from the Debtors if the Second Amended Plan is consummated? ............................................................................................. 36

    E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, Allowed Accrued Professional Compensation Claim, Allowed Chapford DIP Facility Claim, Allowed Vida DIP Claim, Allowed DLP Secured Claim, Allowed Indenture Diminution Claim ~~or,~~ Allowed Priority Tax Claim, or Allowed Substantial Contribution Claim? .............................. 41

    F.      Are any regulatory approvals required to consummate the Second Amended Plan? .......................................................................................... 45

    G.      What happens to my recovery if the Second Amended Plan is not confirmed or does not go effective? ............................................................ 45

    H.      If the Second Amended Plan provides that I get a distribution, do I get it upon Confirmation or when the Second Amended Plan goes effective? What is meant by "Confirmation," "Effective Date" and "Consummation"? ........................................................................................ ~~46~~45

    I.      Is there potential litigation related to confirmation of the Second Amended Plan? .......................................................................................... 46

    J.      Will the final amount of the allowed claims or interests in a particular class affect the recovery of holders of allowed claims or interests in such class or in other classes under the Second Amended Plan? ........................ 46

    K.      Will there be releases and exculpation granted to parties in interest as part of the Second Amended Plan? .................................................................... ~~48~~47

    L.      What is the deadline to vote on the Second Amended Plan? ...................... 49

## TABLE OF CONTENTS
(continued)

**Page**

M.   How do I vote for or against the Second Amended Plan?......................49

N.   What are the consequences of filing a late proof of claim?......................50

O.   Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?......................50

P.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Second Amended Plan?......................51

Q.   Do the Debtors recommend voting in favor of the Second Amended Plan? ~~52~~51

R.   Does the Bondholder Committee recommend that Bondholders vote in favor of the Second Amended Plan?......................52

S.   Does the Ad Hoc Broker/Dealer Committee recommend voting in favor of the Second Amended Plan?......................~~53~~52

IV.   THE COMPANY'S CORPORATE HISTORY, STRUCTURE, AND PREPETITION BUSINESS OVERVIEW......................53

A.   The Company's Corporate History and Business Overview......................53

B.   The Company's Prepetition Capital Structure......................62

V.   EVENTS LEADING TO THE CHAPTER 11 FILINGS......................67

A.   The Company's Financial and Legal Challenges......................67

B.   Defaults Under DLP IV Facility and DLP VI Facility; Amendments and Waivers......................~~69~~68

C.   The Company's Proactive Exploration of Strategic Alternatives......................~~71~~70

VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES......................71

A.   First Day Pleadings and Other Procedural and Administrative Motions......................71

B.   Appointment of Bondholder Committee, CRO and Independent Committees; LBM; Ad Hoc Broker/Dealer Committee......................74

C.   Financing Matters; Filing of DLP IV and DLP VI......................78

D.   Exclusivity......................~~86~~85

E.   Schedules and Statements......................86

F.   Establishment of Claims Bar Dates and Related Claims Procedures......................86

G.   Executory Contracts and Unexpired Leases......................87

H.   Litigation Matters......................91

I.   Investigations......................~~95~~94

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | J. | Compensation Motion | ~~100~~99 |
| VII. | | SUMMARY OF KEY TERMS AND CONDITIONS OF THE SECOND AMENDED PLAN | 100 |
| | A. | Wind Down Trust | 100 |
| | B. | Litigation Trust | ~~104~~103 |
| | C. | Priority of Cash Distributions to Holders of New WDT Interests | 106 |
| | D. | Exemption from Registration Requirements | 108 |
| | E. | Releases, Exculpation and Injunction | 109 |
| | F. | Conditions Precedent to the Effective Date | 113 |
| VIII. | | RISK FACTORS | 115 |
| | A. | Bankruptcy Law Considerations | 115 |
| | B. | Risks Related to Recoveries under the Second Amended Plan and to the Wind Down Trust and Wind Down Trust Assets | 119 |
| | C. | Disclosure Statement Disclaimer | 125 |
| IX. | | SOLICITATION, VOTING PROCEDURES AND CONFIRMATION HEARING | 127 |
| | A. | Holders of Claims and Interests Entitled to Vote on the Second Amended Plan | 127 |
| | B. | Voting Record Date | 128 |
| | C. | Voting on the Second Amended Plan | 128 |
| | D. | Ballots Not Counted | 129 |
| X. | | CONFIRMATION OF THE SECOND AMENDED PLAN | 130 |
| | A. | Requirements for Confirmation of the Second Amended Plan | 130 |
| | B. | Confirmation Without Acceptance by All Impaired Classes | 131 |
| | C. | Valuation of the Wind Down Trust Assets | 132 |
| XI. | | CERTAIN SECURITIES LAW MATTERS | 132 |
| XII. | | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE SECOND AMENDED PLAN | 134 |
| | A. | General | 134 |
| | B. | Consequences to the Debtors | 136 |
| | C. | Consequences to Holders of Claims and Interests | 137 |
| | D. | Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests | ~~139~~138 |

~~749013138.53~~749013138.54

## **EXHIBITS**

EXHIBIT A    Second Amended Plan

EXHIBIT B    Disclosure Statement Order

EXHIBIT C    Valuation Analysis

EXHIBIT D    Letter from Bradley K. Heppner

EXHIBIT ~~D~~E  Liquidation Analysis

i

## I.    INTRODUCTION

On April 20, 2022 (the "Initial Petition Date"), GWG Holdings, Inc. ("GWGH"), GWG Life, LLC ("GWG Life") and GWG Life USA, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Subsequently, on October 31, 2022 (the "DLP Petition Date"[2]), GWG DLP Funding IV, LLC ("DLP IV"), GWG DLP Funding Holdings VI, LLC ("DLP VI Holdings"), GWG DLP Funding VI, LLC ("DLP VI") (collectively, the "DLP Entities" and together with the Initial Debtors, the "Debtors") also filed voluntary petitions under chapter 11 of the Bankruptcy Code (such cases, collectively with the Initial Debtors' chapter 11 cases, the "Chapter 11 Cases") for relief under the Bankruptcy Code. The Debtors, as debtors and debtors in possession in the above-captioned cases (together with their non-Debtor subsidiaries, collectively, the "Company")[3] submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes for acceptance of the Debtors' Further Modified Second Amended Joint Chapter 11 Plan (as may be amended, supplemented, or modified from time to time, the "Second Amended Plan"), submitted by the Debtors, the Official Committee of Bondholders (the "Bondholder Committee"), and L Bond Management, LLC ("LBM") as co-proponents.[4] A copy of the Second Amended Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Second Amended Plan constitutes a separate chapter 11 plan for each of the Debtors for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code, and the Second Amended Plan does not contemplate substantive consolidation of any of the Debtors. The rules of interpretation set forth in Article I.B of the Second Amended Plan govern the interpretation of this Disclosure Statement.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors and equity holders of the Debtors that are entitled to vote on the Second Amended Plan to make an informed decision on whether to vote to accept or reject the Second Amended Plan, as required under section 1125 of the Bankruptcy Code. Holders of Claims and Interests[5] entitled to vote to accept or reject the Second Amended Plan will receive a ballot (collectively, the "Ballots") together with this Disclosure Statement to enable them to vote on the Second Amended Plan in accordance with the voting instructions and make any other elections or certifications required or permitted pursuant to the Second Amended Plan.

---

[2]   As used herein, "Petition Date" shall refer to the applicable Petition Date with respect to such Debtor, whether that be the Initial Petition Date or the DLP Petition Date.

[3]   For the avoidance of doubt, the definition of the "Company" does not include The Beneficient Company Group L.P., FOXO Technologies, Inc., or their respective direct and indirect subsidiaries.

[4]   Capitalized terms used but not defined in this Disclosure Statement shall have the meaning ascribed to them in the Second Amended Plan.

[5]   The following terms are ascribed the following meanings in the Second Amended Plan:
   "Holder" means any Entity holding a Claim or an Interest.
   "Claim" means any "claim" (as defined in section 101(5) of the Bankruptcy Code).
   "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor outstanding immediately prior to the applicable Petition Date, including any options, warrants, or other rights with respect thereto, or any other instruments evidencing an ownership interest in any of the Debtors and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation, and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidating preferences; and (c) stock options and warrants.

as part of the solicitation materials and is also available free of charge at https://www.donlinrecano.com/Clients/gwg/Dockets. [Docket No. ~~1651~~1661].

### 1. Potential Value from the Company's Interests in the Policy Portfolio

The Wind Down Trust will liquidate the Policy Portfolio with a view toward maximizing the value of the Policy Portfolio for the benefit of holders of the New WDT Interests. The Policy Portfolio has a *face* value of approximately $1.6 billion as of April 14, 2023. However, because of the need for ongoing premium payments, among other things, the *actual* present value of the Policy Portfolio is significantly less than the face value. In addition, the entire Policy Portfolio is currently collateral for the Vida DIP Facility and is expected to be collateral for the Vida Exit Financing Facility. Therefore, the Wind Down Trust will only be able to realize value from the Policy Portfolio as the Vida Exit Financing Facility is paid down over time. This long-term potential cashflow from the Policy Portfolio is referred to as "residual equity interest." As the Vida Exit Financing Facility is paid down over time, the Wind Down Trust may have an opportunity to monetize the residual equity interest of the Policy Portfolio. For example, a sale of the balance of the Policy Portfolio could result in sufficient proceeds to first pay off the balance of the Vida Exit Financing Facility and then inure to the benefit of holders of New WDT Interests.

Based on the Debtors' estimates (which are subject to significant uncertainty as they are based upon a number of variables and assumptions), the residual equity interest in the Policy Portfolio has a present value ranging from approximately $0 to $78 million per an analysis of reasonably projected outcomes.

The Policy Portfolio is described further in <u>Article IV.A.1</u> of this Disclosure Statement.

### 2. Potential Value from the Company's Interests in FOXO

The Company holds interests in FOXO, which uses epigenetics technology for the life insurance industry (e.g., biological testing for life insurance applicants that is used to assist in the actuarial modeling of life insurance policy maturities). On September 15, 2022, FOXO merged with Delwinds Insurance Acquisition Corp. ("<u>Delwinds</u>"), a special purpose acquisition company, which was renamed FOXO Technologies Inc. following the merger. FOXO currently is listed on the New York Stock Exchange, and the Company owns approximately 4.6 million common shares of FOXO. The price per share of FOXO's common stock as of market closing on April 14, 2023 was $0.71, up $0.38 per share for the week, which implies that the Debtors' interests in FOXO have a value of $3,266,000, assuming that a purchaser could be found for such interests. The FOXO stock price is entirely outside of the Company's control. It is possible that the FOXO stock price will increase, which could result in greater recoveries for the holders of New WDT Interests on account of this asset. It is also possible that the FOXO stock price will decrease and/or that the Wind Down Trust will be unable to monetize the stock, leading to less or no recovery for the holders of New WDT Interests on account of this asset.

FOXO, the Company's interest in FOXO, and the Delwinds merger are described further in <u>Article IV.A.3</u> of this Disclosure Statement.

### 3.    Potential Value from the Company's Interests in Beneficient

The Company holds interests in Ben LP and Ben LP's subsidiary Beneficient Company Holdings, L.P. ("BCH"). Beneficient endeavors to provide liquidity options to owners of alternative assets that wish to achieve an early exit from such alternative assets. As of the Initial Petition Date, the Company owned approximately 98% of the issued and outstanding common units (approximately 66 million common units) of Ben LP (prior to dilution), approximately $319 million of preferred limited partnership interests of Ben LP and approximately $205 million of preferred limited partnership interests of BCH. The Debtors' common and preferred equity of Beneficient currently is junior to approximately $1.4 billion of senior debt and senior preferred equity held by certain founders of Beneficient (which include Bradley K. Heppner, Thomas O. Hicks, Bruce W. Schnitzer, Richard Fisher, James Silk and Murray Holland (or their affiliates or entities they control)).

Beneficient, the Company's prepetition transactions with Beneficient, and the Avalon Business Combination are described further in Article IV.A.2 of this Disclosure Statement.

### (a)    Impact of Potential Avalon Business Combination

On September 21, 2022, Beneficient announced that it had signed a business combination agreement with Avalon Acquisition Inc. ("Avalon"), a publicly-traded special purpose acquisition company (such business combination transaction referred to herein as the "Avalon Business Combination," and the combined entity resulting from the Avalon Business Combination referred to herein as "New Beneficient"), as described in Ben LP's Registration Statement on Form S-4, dated ~~March 6~~April 19, 2023 (as amended, the "Ben S-4").[12] The press release issued by Beneficient and Avalon announcing the transaction asserted that the terms of the business combination agreement implied an enterprise valuation of the combined companies of $3.5 billion, with such enterprise value based upon and relying on certain assumptions and circumstances existing on the date of such announcement (the "SPAC Implied Valuation").[13] The Avalon Business Combination is not yet final and may or may not be completed on the terms announced or at all. The transaction is subject to certain conditions set forth in the business combination agreement that must either be satisfied or waived prior to closing. Further, the asserted $3.5 billion implied enterprise valuation with respect to the SPAC Implied Valuation may or may not prove to be accurate. To the extent the Avalon Business Combination is consummated, and to the extent the SPAC Implied Valuation is accurate, the Company's

---

[12]   The Ben S-4 is available on the SEC's website by using the following weblink: https://www.sec.gov/Archives/edgar/data/1775734/~~000119312523061528~~000119312523106636/d406382ds4a.htm.

[13]   The Debtors have not reviewed any non-public projections or business plans underlying the Avalon Business Combination and, therefore, cannot address their accuracy or veracity, and as a result, also cannot opine on the accuracy or veracity of the SPAC Implied Valuation, or the likelihood that such SPAC Implied Valuation will be achieved in a timely manner or ever. As noted, this is an implied valuation asserted by Beneficient and Avalon, and it is not the Debtors' valuation. Furthermore, based on information the Bondholder Committee has received to date, the Bondholder Committee neither agrees with nor adopts the purported $3.5 billion valuation, nor the implied valuation of the Company's interests in Beneficient upon completion of the Avalon Business Combination, should it occur. Further, for the avoidance of doubt, no statements contained herein shall be deemed binding on the Litigation Trust in any respect.

company. For example, as a publicly listed company with equity securities listed on a nationally recognized exchange, New Beneficient may be able to attract additional investment that would be otherwise unavailable to it as a private company, and such additional investment may be accretive to the Wind Down Debtors if such investment allows New Beneficient to execute on any proposed business plans, refinance existing debt or other securities, and/or generally continue as an ongoing enterprise. In addition, if the Avalon Business Combination is consummated such that the Company would hold equity securities listed on a nationally recognized exchange, it could improve the ability of the Wind Down Trust to monetize the Company's interests in New Beneficient.

There are, however, numerous risk factors disclosed by Beneficient in the Ben S-4 that could materially impact the value of the Company's interests in Beneficient and/or Beneficient's ability to consummate the Avalon Business Combination, including the following:

- The Avalon Business Combination contemplates that each existing Avalon share of common stock will effectively convert into 1.25 shares of Beneficient common stock at a price of $10.00 per share.[16] The Avalon common stock traded at $10.48 as of market close on April 14, 2023. Avalon warrants, which provide the warrant holder with the right to purchase shares of Beneficient after the closing of the Avalon Business Combination for $11.50 per share and are not subject to any cash redemption feature in connection with the closing of the Avalon Business Combination, traded at $0.09 as of market close on April 14, 2023.

- There can be no assurance as to the market value of the Company's interests in Beneficient following the Avalon Business Combination (if consummated). The Debtors believe it is important to note that Beneficient disclosed that, as part of its business plan, it "expects to issue additional equity securities . . . resulting in the dilution of the ownership interests of its present stockholders," which would include the Company. *See* Ben S-4, at 47.

- Beneficient disclosed that its business "may be negatively impacted by changes in general economic and market conditions including, but not limited to, changes in interest rates." *See* Ben S-4, at 83 86.

- Beneficient disclosed that it has "not historically generated positive cash flow from operations" and "believe[s] that [it] will need substantial additional capital to fund [its] business plan." *See* Ben S-4, at 87 90-91. The Debtors are unaware of any third parties that have agreed to make a significant cash investment in Beneficient and, therefore, it is uncertain whether Beneficient will be able to obtain the "substantial additional capital" it needs. Beneficient disclosed that if it is "unable to obtain capital . . . [Beneficient] may be unable to continue building [its] business and as a result may be required to scale back or cease operations for

---

[16]   Each existing Avalon share of common stock automatically will be converted into one share of Beneficient common stock, and as additional merger consideration, each holder of Avalon Class A common stock will also receive one share of Beneficient Series A Convertible Preferred Stock, which will be convertible into 0.25 shares of Beneficient common stock.

[its] business, the result of which may be that you could lose some or all of your investment." *See* Ben S-4, at ~~87~~91.

- Beneficient disclosed that the Company is under an active investigation by the SEC, which has sought information related to, among other things, the issuance of Bonds, the consolidation for financial reporting purposes of Beneficient and the Company, goodwill valuation, accounting related to the trusts through which Beneficient operates its business, related party transactions, and the calculation of the debt-coverage ratio. *See* Ben S-4, at ~~58~~60. The Debtors believe it is important to note that many of the matters under investigation by the SEC occurred while certain individuals expected to serve as New Beneficient's executive officers and directors were directors of GWGH, including Brad K. Heppner, who was Chairman of the Board of GWGH from April 2019 through July 2021. According to Beneficient, Avalon may terminate the Avalon Business Combination if the SEC investigation results in the "reasonable likelihood" that Avalon Business Combination cannot occur. *Id.* Specifically, Beneficient disclosed that, "[i]f the SEC were to seek an injunction, the closing of the Business Combination could be delayed or may not occur." *Id.* The Debtors believe it is important to note that national stock exchanges in the United States have discretionary authority to deny listing applications in certain circumstances, including for regulatory or other concerns regarding an applicant, and listing on such a national stock exchange is a condition to the closing of the Avalon Business Combination. Furthermore, even if the Avalon Business Combination is consummated, any perceived "overhang" from such SEC investigations, pending or threatened litigation, or other regulatory matters may result in a materially depressed share price until any or all such matters are resolved. If such matters are conclusively determined in an adverse manner subsequent to the consummation of the Avalon Business Combination, it could potentially result in the de-listing, removal, or prohibition on trading of New Beneficient common stock on a nationally recognized stock exchange or in the "over-the-counter" market, or monetary and/or other penalties imposed by the SEC or other regulators, which may include injunctions or enforcement actions which prevent key members of management from serving as officers or directors of New Beneficient and/or related enterprises.

- Beneficient disclosed that "it is possible that the Kansas legislature could adopt further amendments" to relevant legislation "that may adversely affect [Beneficient's] business plans and operations which could adversely affect [its] financial performance and prospects." *See* Ben S-4, at 53.

- Beneficient disclosed the possibility that claims or causes of action arising from Beneficient's prepetition transactions and business dealings with the Company (for example, the Retained Causes of Action) "could be advanced against [Beneficient] as part of the Chapter 11 Cases or in separate litigation." *See* Ben S-4 at ~~56-57~~57-58. According to Beneficient, such litigation, or even the mere "potential for such litigation" to be pursued, "could have a material adverse effect on [Beneficient's] operations, financial condition, or ability to close the Business Combination Agreement, and could result in a decline of the perceived value of

9

[Beneficient], which could ultimately be reflected as a reduction in the market price of [Beneficient's] securities." *Id.* at ~~57~~58. The Debtors believe it is important to note that litigation against Beneficient relating to its prepetition transactions with the Company is already being pursued. For example, on March 30, 2023, Plaintiffs David Scura and Clifford Day filed a putative class action lawsuit in the United States District Court for the Northern District of Texas (Dallas Division) against, among other defendants, Ben LP, Brad K. Heppner, and other former directors of GWGH affiliated with Beneficient, asserting that such defendants violated federal securities laws. The Debtors believe that such litigation, and/or the pursuit of the Retained Causes of Action by the Litigation Trust, could adversely impact the value of the Company's interests in Beneficient to the extent the value of those interests is material.

For more information regarding risk factors associated with Beneficient, Holders of Claims and Interests are encouraged to review the Ben S-4 filed with the SEC and any further amendments thereto, including, but not limited to, the section titled "Risk Factors."

(c)    *Range of Value and Relevance of the SPAC Implied Valuation*

As set forth in more detail in the Valuation Analysis, the Debtors estimate the value of the Debtors' interests in Beneficient ranges from $0 to $1.428 billion. The Debtors recognize this is a large range but believe it is warranted given the uncertainty and lack of information regarding Beneficient. The potential for the Avalon Business Combination to be consummated, while relevant, does not necessarily provide any additional certainty regarding the value of the Debtors' interests in Beneficient. Although the Debtors have used the SPAC Implied Valuation as the high end of the range of potential value, the Debtors believe it is important to note that the SPAC Implied Valuation was the result of negotiations between Beneficient and Avalon. The Debtors do not have sufficient information to perform an independent valuation analysis. Based upon current information available, the Bondholder Committee believes that no weight should be given to the SPAC Implied Valuation.

Furthermore, notwithstanding the potential nominal value of the Company's interests in Beneficient, the Wind Down Trust's ability to monetize such interests in an amount that approximates that nominal value will be determined by the market's valuation of those interests at the time of monetization and, to the extent a third-party buyer can be found, will be limited by trading restrictions and the difficulty of monetizing such a large percentage of the equity interests in Beneficient. This will likely result in a substantial delay before the Wind Down Trust can realize any distributable value from the Company's interests in Beneficient.[17]

The Debtors' investment banker PJT has prepared the following sensitivity which shows the impact to the recovery of Class 3 Bondholder Claims from various hypothetical future realized per share values for New Beneficient. This analysis shows the impact on recovery solely

---

[17]    For the avoidance of doubt, the valuation of the Debtors' interests in Beneficient is for Second Amended Plan purposes only, does not purport to reflect the value of Beneficient at the time of any prepetition transaction and shall not in any way be binding on the Litigation Trust or in any way prejudice, or be deemed an admission by, the Litigation Trust in connection with the pursuit of any Retained Causes of Action or any other litigation.

~~749013138.53~~749013138.54

Accordingly, the Investigations Committee and the Bondholder Committee believe that distributable value to the estate from litigation of the Retained Causes of Action (excluding potential damages associated with Ponzi Scheme allegations), in the form of recoveries from the D&O Liability Insurance Policies and from putative third-party defendants, could result in between $155 million and $399 million assuming a "Low" valuation of Beneficient and $99 million and $382 million assuming a "High" valuation of Beneficient. The Bondholder Committee further believes that, taking into account the potential damages associated with Ponzi Scheme allegations, the distributable value from the litigation may be up to $585 million assuming a "Low" valuation of Beneficient.

Importantly, neither the Investigations Committee nor the Bondholder Committee makes any representation as to whether the Litigation Trust will ultimately be successful or unsuccessful in pursuit of any of the Retained Causes of Action. Litigation is inherently uncertain and the ability of the Litigation Trust to collect the potential damages set forth herein will depend upon a number of factors, including the probability of success in litigation, the difficulties in collection, and the expense and delay of litigation. These factors are not entirely within the Litigation Trust's control and, notwithstanding the estimates contained herein, litigation of the Retained Causes of Action may not result in any incremental distributable value to the Estates.

Mr. Brad K. Heppner, Beneficient Company Holdings, L.P., and the Beneficient Company Group, L.P., each of whom is a potential defendant in litigation that may be pursued by the Litigation Trust, vigorously dispute the merits of the allegations made with respect to the Retained Causes of Action and in the Bondholder Complaint as well as the valuations ascribed to those alleged claims in the Disclosure Statement. Mr. Heppner's counsel has put forth Mr. Heppner's position, in which Beneficient Company Holdings L.P. and Beneficient Company Group, L.P. join, in a letter attached hereto as **Exhibit D**. For the avoidance of doubt, the Debtors, the Investigations Committee, and the Bondholder Committee do not adopt or agree in any way with the statements or arguments contained in that letter. However, as directed by the Bankruptcy Court in order to resolve certain objections to this Disclosure Statement, such letter is attached hereto as **Exhibit D**.

### 5.    Recoveries Under a Hypothetical Chapter 7 Liquidation

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a very possible event if the Second Amended Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Second Amended Plan. Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority and the statutory compensation that a chapter 7 trustee is entitled to.

---

information, LBM believes that the risk allocation for the remaining factors is significantly understated. In particular, as to any potential damages amounts exceeding the remaining available coverage under the D&O Liability Insurance Policies, LBM believes that there is a substantial likelihood that the Estates will receive as little as $0 in recovery of such potential damages.

749013138.53749013138.54

The Liquidation Analysis attached hereto as **Exhibit ~~D~~E** sets forth the Debtors' advisors estimated recoveries for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' Estates, and compares such estimated recoveries with the estimated recoveries available under the Second Amended Plan. As shown in the below chart comparing those estimated recoveries, the Debtors predict that Holders of Bond Claims and General Unsecured Claims will receive more under the Second Amended Plan than in a hypothetical chapter 7 scenario.

| Asset | Description | Range of Value |
|---|---|---|
| **Policy Portfolio** | Values under the Second Amended Plan | $0 – $78 million |
| | Values in a Chapter 7 Liquidation | $0 – $10.7 million |
| **FOXO** | Values under the Second Amended Plan | $3.3 million |
| | Values in a Chapter 7 Liquidation | $2.9 million |
| **Beneficient** | Values under the Second Amended Plan | $0 – $1.428 billion |
| | Values in a Chapter 7 Liquidation | $0 – $1.285 billion |
| **Retained Causes of Action** | Values under the Second Amended Plan | $155 million – $382 million |
| | Values in a Chapter 7 Liquidation | $139.5 million – $343.8 million |
| **Class** | | **Estimated Recoveries** |
| **Bond Claims[30]** | Estimated Total Recovery under Second Amended Plan | 9.0% – 100% |
| | Estimated Total Recovery under a Chapter 7 Liquidation | 3.9% – 94.2% |
| **General Unsecured Claims** | Estimated Total Recovery under Second Amended Plan | 8.5% – 21.9% |
| | Estimated Total Recovery under a Chapter 7 Liquidation | 4.1% – 19.7% |
| *Chapter 11 Total Recovery in Excess of Chapter 7 Total Recovery* | | **$34.4 million – $314 million** |

### B.     Mediation and Related Resolutions

The Debtors filed an initial chapter 11 plan on December 1, 2022 (the "Initial Plan") and an amended chapter 11 plan on February 10, 2022 (the "First Amended Plan"), each along with an accompanying disclosure statement. The Debtors filed the Initial Plan and First Amended Plan understanding that, while there was agreement among several of the Debtors' constituencies on the general framework of a chapter 11 plan, significant issues still remained open. Therefore, the Debtors and the Special Committee filed the *Motion of the Debtors and the Special Committee of the Board of GWG Holdings, Inc. for Entry of an Order (I) Appointing a Judicial Mediator, (II) Requiring Parties to Maintain Confidentiality of Mediation Communications and (III) Granting Related Relief* [Docket No. 1128] (the "Plan Mediation Motion") seeking the appointment of the Honorable David R. Jones, United States Bankruptcy Judge for the Southern District of Texas, as judicial mediator (the "Mediator") to assist the Debtors in reaching a consensual chapter 11 plan. The Plan Mediation Motion was entered on January 5, 2023 [Docket

---

[30]   The provided estimated recoveries exclude LBM L Bond Claims and the Indenture Trustee's claim for fees and expenses. Please refer to the Liquidation Analysis for estimated recoveries for those Bond Claims.

Debtors; and (2) to Anthony R. Horton, additional compensation to the compensation payable in accordance with Mr. Horton's engagement letter in the amount of $120,000 in Cash.

### 5. The Indenture Trustee's Fees and Expenses

Pursuant to the Indenture, GWGH and GWG Life are obligated to pay the reasonable compensation, disbursements, advances and expenses of the Indenture Trustee, its agents and counsel (as defined in the Second Amended Plan, the Indenture Fee and Expense Claim), and the Indenture Trustee's right to payment of the Indenture Fee and Expense Claim has first priority with respect to distributions of the assets of GWGH and GWG Life. Pursuant to the Mediation Agreement, the Debtors and Creditor Proponents will seek to reach an agreement with the Indenture Trustee on the amount of the Indenture Fee and Expense Claim, and to the extent they reach an agreement on part or all of the Indenture Fee and Expense Claim, such Indenture Fee and Expense Claim will be paid in cash on the Effective Date to the extent of available Portfolio Proceeds. If an agreement cannot be reached on the amount of the Indenture Fee and Expense Claim, the parties will submit the dispute for further mediation to the Mediator and to the extent agreement cannot be reached after such further mediation, the Debtors may submit the dispute to the Bankruptcy Court. Pursuant to the Second Amended Plan, the Indenture Trustee, an account of the Indenture Fees and Expense Claim, will look first to the Portfolio Proceeds Amount for payment and, to the extent not satisfied thereby, the Indenture Trustee will receive New Series A1 WDT Interests having senior priority over the other New Series A1 WDT Interests.

### 6. Resolution of the Ad Hoc Broker/Dealer Committee's Objection to the Disclosure Statement and Potential Objection to the Second Amended Plan

As discussed further in Article VI.B.4 of this Disclosure Statement, an ad hoc committee of certain Broker Dealers who sold Public L Bonds (i.e., the Ad Hoc Broker/Dealer Committee) was formed in connection with these Chapter 11 Cases. The Ad Hoc Broker/Dealer Committee has actively engaged with the Debtors in the Debtors' efforts to reach a value maximizing and consensual chapter 11 plan, including participating in several mediation sessions and working with the Debtors on developing certain elements of the Second Amended Plan. When the Debtors initially filed the Second Amended Plan, the Ad Hoc Broker/Dealer Committee did not agree with certain provisions contained therein, and filed the *Objection of the Ad Hoc Committee of Broker/Dealers to (A) the Adequacy of the Disclosure Statement for the Debtors' Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents, and (B) the Solicitation Procedures in Connection Therewith* (the "AHC Objection").

Following the Ad Hoc Broker/Dealer Committee's filing of the AHC Objection, the Debtors continued to engage with the Ad Hoc Broker/Dealer Committee regarding the Second Amended Plan and related disclosure statement. On April 17, 2023, the Debtors, the Bondholder Committee, and the Ad Hoc Broker/Dealer Committee reached an agreement ~~that fully resolves any and all of the Ad Hoc Broker/Dealer Committee's objections to~~ under the Second Amended Plan ~~or this Disclosure Statement. Pursuant to such agreement,~~ that fully resolves any claims that the Ad Hoc Broker/Dealer Committee ~~will distribute a letter (the "Broker/Dealer Plan Support Letter") to all of its members' clients that hold Public L Bonds, supporting confirmation of the~~

~~Second Amended Plan and encouraging and recommending votes to accept the Second Amended Plan. The members~~ could assert for making a substantial contribution to these Chapter 11 Cases, and in connection therewith, the Debtors have agreed to pay the actual and reasonable fees and expenses of the Ad Hoc Broker/Dealer Committee ~~and/or the Debtors shall distribute the Broker/Dealer Plan Support Letter as soon as reasonably practicable, and in any event, in coordination with the delivery of the solicitation materials. The Debtors have agreed to pay the Ad Hoc Broker/Dealer Committee's reasonable and documented attorneys' fees and expenses in Cash, up to an amount no greater than $1,000,000,~~ not to exceed $1,000,000 on the Effective Date~~; provided that, notwithstanding the foregoing, any such fees shall be payable only in the event that (a) Class 3 votes to accept the Second Amended Plan, (b) the Ad Hoc Broker/Dealer Committee supports confirmation~~ of the Second Amended Plan ~~and encourages all of their clients to vote to accept the Second Amended Plan (including through the dissemination of the above-described letter), and does not otherwise object to the Second Amended Plan, and (c) Consummation of the Second Amended Plan occurs.~~.

## 7. Additional Mediated Settlement Terms

Additionally, pursuant to the Mediation Agreement, the Creditor Proponents have the right, acting separately (the "Proponents Consent Right") to review and consent to the form and substance of the Second Amended Plan, this Disclosure Statement and the forthcoming Plan Supplement, including trust agreements and other applicable documents, to ensure that it is consistent with, and can effectuate the settlement memorialized in the Mediation Agreement, and to address issues not explicitly covered by the Mediation Agreement but that are customary and required for a chapter 11 plan. Pursuant to Article I.G of the Second Amended Plan, following the filing of the Second Amended Plan, in the event the Debtors and the Creditor Proponents cannot agree to the form and substance of any documents in connection with the Second Amended Plan (and such document is subject to the Proponents' Consent Rights or other consent rights under the Second Amended Plan) or any decision which requires the consent of the Creditor Proponents, by the applicable deadline for filing such document thereunder, any such dispute shall be submitted to the Mediator. To the extent of any remaining disputes following such mediation, then, pending final resolution thereof, any of the Debtors and the Creditor Proponents may file its own version of any such disputed document by the applicable deadline therefor. In such event: (1) the filing of competing versions of any such disputed document shall be deemed to have satisfied any such filing deadline thereunder, (ii) the Debtors and Creditor Proponents shall continue as co-proponents of the Second Amended Plan for all purposes, and (ii) the final form of any such disputed document will be subsequently resolved through either mediation with the Mediator or by order of the Bankruptcy Court.

The Mediation Agreement also includes certain agreements that are described in other sections of this Disclosure Statement as follows:

- the Creditor Proponents' agreement not to object to certain extensions of the Debtors' exclusive period to solicit a chapter 11 plan through the earlier of the Confirmation Hearing and June 23, 2023 is described in Article VI.D; and

- the Bondholder Committee's agreement to adjourn the hearing on the Bondholder Committee's Standing Motion until the earlier of the Confirmation Hearing and

|  | exercising such sole discretion, the Litigation Trustee shall ~~be entitled to~~ consider and may take such actions in connection with the exercise of such sole discretion that promote the greatest recovery to the holders of the New WDT Interests. The Litigation Trustee shall seek Bankruptcy Court approval, after notice and an opportunity for a hearing, of (1) any settlements with respect to the Retained Causes of Action, and (2) any other transaction with respect to any assets of the Litigation Trust, in each case, that has an economic value of $5 million or more (in the Litigation Trustee's good faith determination) as of the date of such transaction.<br><br>The Litigation Trustee will be Michael I. Goldberg, or such other independent, third-party fiduciary selected by the Bondholder Committee and identified in the Plan Supplement. The Litigation Trustee will not have any affiliation with any Bondholder Committee member and will not own any Public L Bonds, New WDT Interests or other Interests in or Securities issued by the Debtors.<br><br>*For more information, see Article IV.D and Article IV.P of the Second Amended Plan.* |
|---|---|
| **INTERESTS IN THE LIQUIDATING TRUSTS** ||
| *What securities will Holders of Allowed Bond Claims receive?* | Bondholders will receive New Series A1 WDT Interests, which will be entitled to Cash distributions pursuant to the priority of payment waterfalls set forth in <u>Article IV.G</u> and <u>Article VI.C</u> of the Second Amended Plan.<br><br>With respect to Holders of LBM L Bond Claims, such Holders will receive New Series A2 WDT Interests with respect to the LBM Subordinated Claim and will receive New Series A1 WDT Interests with respect to the remaining portion of their LBM L Bond Claims.<br><br>*For more information regarding the New Series A1 WDT Interests and the New Series A2 WDT Interests, see Article III.B.3, Article IV.E.2 and Article IV.G of the Second Amended Plan.* |
| *What securities will Holders of certain other Allowed Claims (other than Bond Claims) or Interests receive?* | The following Holders of Allowed Claims or Interests will receive beneficial interests under the Second Amended Plan:<br>• Class 4(a) – General Unsecured Claims – will receive New Series B WDT Interests.<br>• Class 8 – Series 1 Preferred Interests – will receive New Series C WDT Interests.<br>• Class 9 – Series 2 Preferred Interests – will receive New Series D WDT Interests.<br>• Class 10 – Common Stock in GWGH – will receive New Series E WDT Interests. |

| 3 | Bond Claims | Except to the extent that a Holder of a Bond Claim agrees to a less favorable treatment of its Allowed Claim, each such Holder shall receive, as applicable, as follows:<br><br>a. each Holder of an Allowed Bond Claim (other than the LBM Subordinated Claims) shall receive, on the Effective Date, its pro rata share of the Portfolio Proceeds Amount, if any; *provided*, *however*, that the Indenture Fee and Expense Claim shall be satisfied first from the Portfolio Proceeds Amount prior to any such further pro rata distributions in accordance with this subsection of the Second Amended Plan;<br><br>b. each Holder of an Allowed Bond Claim (other than the LBM Subordinated Claims) shall receive, on the Effective Date (or as soon as practicably thereafter), its pro rata share of the New Series A1 WDT Interests. The New Series A1 WDT Interests may be redeemed at any time without penalty at stated value and, pending any such redemption, shall be entitled to Cash distributions pursuant to the priority of payment waterfalls described in <u>Article IV.H</u> and <u>Article VI</u>.C of the Second Amended Plan. Any New Series A1 WDT Interests issued to the Indenture Trustee on account of any outstanding Indenture Fee and Expense Claims shall be expressly senior in all respects to any New Series A1 WDT Interests issued to Holders on account of their respective Allowed Class 3 Bond Claims; and<br><br>c. each Holder of an Allowed LBM Subordinated Claim shall receive, on the Effective Date, its pro rata share of the New Series A2 WDT Interests. The New Series A2 WDT Interests may be redeemed at any | <u>Estimated Allowed Claim Pool Amount</u>: $1,672,852,358<br><br><u>Estimated Recovery</u>:[35] Bond Claims (other than LBM L Bond Claims and Indenture Trustee fees and expenses): 9.0% – 100%[36]<br><br>LBM L Bond Claims: 7.7% –100% |
|---|---|---|---|

[35]   Additional information regarding the valuation of the WDT Interests is set forth in Article II.A of this Disclosure Statement, the Valuation Analysis attached hereto as **Exhibit C**, and the Liquidation Analysis attached hereto as **Exhibit ~~D~~E**.

[36]   At the high end of the range, Bondholders may receive total proceeds in excess of their estimated Allowed Claims due to the potential payment of interest accruing on the New Series A1 WDT Interests at rate of 9% per annum under the Second Amended Plan.

~~749013138.53~~749013138.54

    **E.**    **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Allowed Accrued Professional Compensation Claim, Allowed Chapford DIP Facility Claim, Allowed Vida DIP Claim, Allowed DLP Secured Claim, Allowed Indenture Diminution Claim~~or~~, Allowed Priority Tax Claim, or Allowed Substantial Contribution Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, Chapford DIP Facility Claims, Vida DIP Claims, DLP Secured Claims, Priority Tax Claims and Indenture Diminution Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Second Amended Plan.

    **1.**    **Administrative Claims**

Except as otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Wind Down Debtors or as provided in the Second Amended Plan, on the Administrative Claims Payment Date (or within a reasonable period of time after such Claims become Allowed Claims), each Holder of an Allowed Administrative Claim shall receive payment in full in Cash in full and final satisfaction, settlement, discharge, and release of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the applicable Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

**EXCEPT AS OTHERWISE PROVIDED BY THE SECOND AMENDED PLAN, THE CONFIRMATION ORDER, OR A FINAL ORDER PREVIOUSLY ENTERED BY THE BANKRUPTCY COURT (INCLUDING THE FINAL VIDA ORDER), UNLESS PREVIOUSLY FILED, REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS MUST BE FILED AND SERVED ON THE DEBTORS (OR THE WIND DOWN DEBTORS, AS APPLICABLE) NO LATER THAN THE CLAIMS BAR DATE APPLICABLE TO ADMINISTRATIVE CLAIMS PURSUANT TO THE PROCEDURES SPECIFIED IN THE CONFIRMATION ORDER AND THE NOTICE OF THE EFFECTIVE DATE; *PROVIDED*, THAT THE FOREGOING SHALL NOT APPLY TO ACCRUED PROFESSIONAL COMPENSATION CLAIMS, INDEPENDENT DIRECTOR FEE CLAIMS, THE INDENTURE DIMINUTION CLAIMS, THE ALLOWED AHC SUBSTANTIAL CONTRIBUTION CLAIM, OR CLAIMS ARISING UNDER SECTION 503(b)(1)(D) OF THE BANKRUPTCY CODE.**

Chapford DIP Facility Claims shall not include the purported Alternate Stalking Horse Fee, as defined and referenced in the Chapford Final DIP Order (including any professional fees and expenses relating in any manner to the assertion of the purported Alternate Stalking Horse Fee).

### 4. Vida DIP Claims

No later than the Effective Date, the Vida DIP Claims will be deemed satisfied in connection with the Debtors' exercise of the exit financing option and upon the closing under the Vida Exit Financing Facility Documents.

### 5. DLP Secured Claims

All Allowed DLP Secured Claims will be satisfied by payment in full in Cash on or prior to the Effective Date from proceeds of the Vida DIP Financing Facility; *provided*, that, notwithstanding the foregoing, to the extent that all Allowed DLP Secured Claims are not paid in full in cash before the Effective Date, they shall be treated as Other Secured Claims. Any Disputed portion of the DLP Secured Claims shall be treated in accordance with <u>Article VII</u> of the Second Amended Plan.

### 6. Indenture Diminution Claims

Any Allowed Indenture Diminution Claims will be satisfied by one or more payments in Cash after the Effective Date from proceeds realized by the Litigation Trust, pursuant to and in accordance with <u>Article VI.C</u> of the Second Amended Plan.

### 7. Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### <u>8.</u>    <u>Allowed AHC Substantial Contribution Claim</u>

<u>In full and final resolution of any claims that the Ad Hoc Broker/Dealer Committee could assert for making a substantial contribution to these Chapter 11 Cases, the Debtors agree to pay the actual and reasonable fees and expenses of the Ad Hoc Broker/Dealer Committee not to exceed $1,000,000.</u>

### <u>9.</u>    ~~8.~~ Substantial Contribution Compensation and Expenses

Any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5) <u>(except with respect to the Allowed AHC Substantial Contribution Claim)</u> must File an application and serve such application on counsel to the Debtors or the Wind Down Debtors, as applicable, and the Bondholder Committee and as otherwise required by the Bankruptcy

Court, the Bankruptcy Code, and the Bankruptcy Rules, on or before the Claims Bar Date applicable to Administrative Claims.

     **F.**      **Are any regulatory approvals required to consummate the Second Amended Plan?**

To the extent any governmental approval or consent is necessary in connection with the transactions to be consummated in connection with the Effective Date of the Second Amended Plan, such governmental approval or consent, if any, will be obtained in order for the Second Amended Plan to become effective on the Effective Date.

     **G.**      **What happens to my recovery if the Second Amended Plan is not confirmed or does not go effective?**

In the event that the Second Amended Plan is not confirmed or does not go effective, there is no assurance that the Company will be able to implement the liquidating trusts pursuant to the Second Amended Plan and any other Wind Down Transactions, and therefore there can be no assurances that any creditors will receive the recovery from the estates described herein. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Second Amended Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article X.A.1 of this Disclosure Statement, entitled "Best Interests of Creditors" and the Liquidation Analysis attached hereto as **Exhibit ~~D~~E**.

     **H.**      **If the Second Amended Plan provides that I get a distribution, do I get it upon Confirmation or when the Second Amended Plan goes effective? What is meant by "Confirmation," "Effective Date" and "Consummation"?**

"Confirmation" of the Second Amended Plan refers to approval of the Second Amended Plan by the Bankruptcy Court. Confirmation of the Second Amended Plan does not guarantee that you will receive the distribution indicated under the Second Amended Plan. After Confirmation of the Second Amended Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Second Amended Plan can go effective. Initial distributions to Holders of Allowed Claims or Allowed Interests will only be made on the date the Second Amended Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Second Amended Plan. *See* Article VII.F of this Disclosure Statement entitled "Conditions Precedent to the Effective Date" for a discussion of the conditions precedent to Consummation of the Second Amended Plan. "Consummation" refers to "substantial consummation" of the Second Amended Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (i) the transfer of all or substantially all of the property proposed by the Second Amended Plan to be transferred; (ii) assumption by the Debtors or by the successors to the Debtors under the Second Amended Plan of the business or of the management of all or substantially all of the property dealt with by the Second Amended Plan; and (iii) commencement of distributions under the Second Amended Plan.

*provided*, that, for the avoidance of doubt, any prepetition advice provided by any legal professionals in connection with prepetition transactions between the Debtors and Beneficient shall not constitute any act or omission that is covered by this definition of Exculpated Claim; *provided*, *further*, that, notwithstanding the foregoing, Exculpated Claims shall not include anything related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Second Amended Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Second Amended Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Second Amended Plan are copied in <u>Article VII.E</u> of this Disclosure Statement.

**L.     What is the deadline to vote on the Second Amended Plan?**

The Voting Deadline is **May [24]31, 2023 at 4:00 p.m. (prevailing Central Time)**.

**M.     How do I vote for or against the Second Amended Plan?**

Detailed instructions regarding how to vote on the Second Amended Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Second Amended Plan. For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that your Ballot including your vote is **actually received** by Donlin, Recano & Company, Inc. ("<u>DRC</u>" or the "<u>Notice and Solicitation Agent</u>") **on or before the Voting Deadline, *i.e.*, May [24]31, 2023 at 4:00 p.m. prevailing Central Time**. *See* <u>Article IX</u> of this Disclosure Statement, entitled "SOLICITATION, VOTING PROCEDURES AND CONFIRMATION HEARING."

**N.     What are the consequences of filing a late proof of claim?**

Pursuant to the Bar Date Order,[39] the Bankruptcy Court established July 29, 2022 as the general claims bar date and October 17, 2022 (which was extended solely with respect to the SEC by stipulation to November 30, 2022) as the governmental claims bar date. Additionally, pursuant to the Bondholder Claim Procedures Order,[40] the Bankruptcy Court established

---

[39]   See Order Setting Bar Dates for Filing Proofs of Claim [Docket No. 126] (the "<u>Bar Date Order</u>").

[40]   See Order (I) Modifying Bar Date Order, (II) Establishing Procedures for Allowance of Bondholder and Indenture Trustee Claims, and (II) Granting Related Relief [Docket No. 739] (the "<u>Bondholder Claim Procedures Order</u>"). Capitalized terms used but not defined in this section shall have the meaning ascribed to them in the Bondholder Claim Procedures Order.

November 4, 2022 at 11:59 p.m. (prevailing Central Time) as the Bondholder Bar Date. Other than Bond Claims (including claims of the Indenture Trustee) and certain other claims as agreed with the Debtors, Claims that were not received by the dates set forth in the Bar Date Order may be disallowed and the Holders of such Claims may not be entitled to vote on the Second Amended Plan.

Pursuant to the Bondholder Claim Procedures Order, the Debtors have provided to Bondholders who hold their Bonds directly individualized notices that identify, with respect to each Bond or Bondholder, the amount of principal and interest that is owing with respect to such Bond or to such Bondholder, as reflected in the Debtors' books and records as of the Initial Debtors' Petition Date. Such Bond Claims are deemed allowed secured claims following the Bondholder Bar Date, except to the extent a Bondholder has filed a Proof of Claim disputing such amount. Bondholders who hold their Bonds indirectly through The Depository Trust Company ("DTC") were provided notices indicating that their Bond Claims would be Allowed upon entry of the Bondholder Claim Procedures Order without the need to file a Proof of Claim.

Subject to, and as set forth in more detail in, the procedures set forth in Exhibit 3 of the Disclosure Statement Order (the "Solicitation Procedures"), Holders of Interests (preferred stock and equity) in Debtor GWGH will be entitled to vote to accept or reject the Second Amended Plan irrespective of whether they have filed proofs of interest.

**O.     Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Second Amended Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for ~~[●] at [●] [a.m./p.m.]~~**June 15, 2023 at 1:30 p.m. (prevailing Central Time)**. The Confirmation Hearing may be adjourned from time to time without further notice.

Section 1128(b) of the Bankruptcy Code also provides that any party in interest may object to Confirmation of the Second Amended Plan. The Bankruptcy Court has established ~~[_____]~~**May 31,** 2023 at 11:59 p.m. (prevailing Central Time), as the deadline to object to Confirmation of the Second Amended Plan (the "Plan Objection Deadline"). All objections to the Second Amended Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline. Any objection to the Second Amended Plan must (1) be in writing; (2) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Bankruptcy Court; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Second Amended Plan (or related materials) that would resolve such objection; and (5) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so to be ***actually received***

Beneficient consummate its contemplated merger with Avalon, the implied enterprise valuation of $3.5 billion suggests a significant return on the Debtors' investment, all for the benefit of the Debtors' creditors and equity interest holders. Separately, the Litigation Trust will retain all non-released causes of action currently held by the Debtors' Estates which, in the event the Debtors do not settle the associated claims against Beneficient, may include such claims. The Litigation Trustee will be empowered to take whatever action is in the best interest of creditors, including the litigation or the compromise and settlement of all causes of action. The Second Amended Plan therefore maximizes all available assets for the benefit of creditors and parties in interest.[41]

## IV.   THE   COMPANY'S   CORPORATE   HISTORY,   STRUCTURE,   AND PREPETITION BUSINESS OVERVIEW

### A.      The Company's Corporate History and Business Overview

The Company is a financial services firm that has historically specialized in life settlement assets. Life settlement assets are whole life insurance policies (with only a minority being variable) acquired directly or indirectly from the insured person or other owners of a life insurance policy. The Company also has interests in Beneficient, which endeavors to provide liquidity solutions to holders of alternative assets (assets that are not traditional stocks, bonds or cash equivalents), and FOXO, an epigenetics technology company developing products for the life insurance industry. The Company's business was originally organized in February of 2006, with GWGH formed as the ultimate parent holding company in March of 2008. GWGH is a corporation organized under the laws of the state of Delaware. In September of 2014, GWGH consummated an initial public offering of its common stock on the Nasdaq stock market. GWGH's stock was delisted from Nasdaq in May 2022 as a result of the filing of the Chapter 11 Cases of the Initial Debtors.

Initially, the Company's business model centered on the acquisition of life settlement assets. Over the course of several years, GWGH acquired, through its subsidiaries DLP IV and DLP VI, the Policy Portfolio consisting of approximately 1,405 intermediate-duration and long-duration Policies. The majority of the Policies were acquired through secondary-market purchase transactions with insureds between 2006 and 2018. As of April 14, 2023, 847 of these Policies are still active, and of this amount, 553 Policies are held at DLP IV, and 294 Policies are held at DLP VI. As of April 14, 2023, the approximate face amount of the Policy Portfolio was $1.6 billion. This life settlement business was conducted through GWGH's wholly-owned subsidiary, GWG Life, and GWG Life's wholly-owned direct and indirect subsidiaries, DLP IV, DLP VI, and DLP VI Holdings. DLP VI Holdings is the sole member of DLP VI. The DLP Entities were structured to be bankruptcy remote entities that are separate and distinct from their ultimate parents. Following the vote and approval of their respective boards, as further described in  Article VI.C.7  of this Disclosure Statement, the DLP Entities each filed petitions for

---

[41]   In connection with the Ad Hoc Broker/Dealer Committee's support of the Second Amended Plan, the Ad Hoc Broker/Dealer Committee (through the members of the Ad Hoc Broker/Dealer Committee and/or the Debtors) are distributing a letter to the clients of the members of the Ad Hoc Broker/Dealer Committee supporting confirmation of the Second Amended Plan and encouraging and recommending Bondholders and other stakeholders to vote to accept the Second Amended Plan.

749013138.53749013138.54

bankruptcy under Chapter 11 of the Bankruptcy Code on October 31, 2022. However, notwithstanding such bankruptcy filings, the assets and liabilities of the DLP Entities remain separate and distinct from the assets of GWGH and GWG Life.[542]

A copy of the Company's relevant prepetition organizational chart, including certain non-debtor affiliates discussed herein, is included below.



**Organizational Chart Key**

- Non-Debtor Affiliates
- DLP Debtors
- Initial Debtors

---

[542]   With the filing of the DLP Chapter 11 Cases, the Debtors filed the Debtors' Emergency Motion for an Order (I) Directing Joint Administration of the DLP Chapter 11 Cases Together with the Initial Chapter 11 Cases and (II) Applying Certain Orders in the Initial Chapter 11 Cases to the DLP Chapter 11 Cases [Docket No. 962] (the "DLP Entities' Joint Administration Motion") seeking to have the DLP Entities' Estates jointly administered with these Chapter 11 Cases. This motion sought procedural joint administration and not the substantive consolidation of the assets and liabilities of the DLP Entities with those of the Initial Debtors and the application to the DLP Debtors of certain orders previously entered in the Chapter 11 Cases. On October 31, 2022, the Bankruptcy Court approved joint administration of the Chapter 11 Cases. [Docket No. 970].

749013138.53749013138.54

Beginning in 2018, the Company entered into a distinct but related line of business through owning interests in and making loans to Beneficient, which markets an array of liquidity and trust administration products and services to owners of alternative assets.

The Company's life settlement business and interests in Beneficient and FOXO are described in further detail below.

### 1.  Life Settlement Business

The secondary life settlement business model is to earn yields from the Policy Portfolio, net of premium payments and other costs. The majority of the Policies were acquired through secondary-market purchase transactions directly and indirectly from insureds between 2006 and 2018. Life settlements involve the sale of a life insurance policy to a third party at a discount to the face value, but at a price that is typically higher than the cash surrender value of a whole life or universal life insurance policy. The buyer of a life insurance policy, in this case DLP IV or DLP VI,[643] becomes the policy's beneficial owner and takes responsibility for making the premium payments and the cost of servicing the policy in exchange for becoming the recipient of the death benefit when the insured passes away (referred to in the industry as a "maturity" of the underlying life insurance policy). Over time, the value of Policies increases as maturities are likely to occur more frequently with the aging of the insured and fewer premium payments need to be made relative to the life of the insured. Valuation models discount the expected maturity amounts to the current date. The shorter the term of the discount (i.e., the sooner the maturities are expected to occur), the more valuable the Policy Portfolio becomes.

When life insurance policies are purchased via numerous life settlements and pooled, such as those owned by the DLP Entities, the owner must have significant capital available to pay the premiums and servicing costs necessary to maintain the underlying life insurance policies. When Policies are acquired, the expected time before payout on the Policy can be 10, 20, or even 30 years. The capital required to maintain a portfolio of life insurance policies is typically obtained in one of two ways: (i) cash flow from operations, generally associated with proceeds from policies that have matured—in other words—policies that have paid out their death benefits because of a maturity or (ii) from monies raised from the capital markets. With respect to the first option, a purchaser of policies via a life settlement must be able to predict how long before a maturity occurs—a prediction that can never be done with absolute certainty, but can be predicted with actuarial modeling (assuming that a sufficient number of policies are owned), thus enabling an owner to project revenues for the entire portfolio. With respect to the second option, the purchaser must have consistent and predictable access to the capital markets, which access may be subject to external factors largely outside of the purchaser's control. During the first ten years of building the Policy Portfolio, the Company relied on access to the capital markets through the sale of Bonds for cash necessary to pay premiums and expenses.

In addition to the cash required to pay monthly insurance premiums, a business managing a portfolio of life settlement assets also has operating costs and must make payments of interest and principal on debt, if applicable. In 2023, the average estimated monthly premium payments

---

[643]  Certain Policies were initially purchased by an Initial Debtor and then transferred to DLP IV or DLP VI, as applicable.

required to maintain the Policy Portfolio is expected to be approximately $6.5 million. If premiums are not paid, a Policy can enter a grace period and ultimately lapse, resulting in an immediate total loss of death benefits upon the death of an insured. Unlike other types of assets, the Policy does not depreciate by a certain percentage if it is not maintained; rather, whether the Policy retains value is a binary outcome—either the Policy is properly serviced and retains its full value or the Policy lapses and loses *all* value. Therefore, the timely payment of premiums and servicing costs is critical to ensure that every Policy, and the Policy Portfolio as a whole, is not rendered valueless.

The DLP Entities have historically made monthly premium payments from both collections on Policy maturities after the death of an insured and from proceeds of Bonds and other financing sold or incurred by GWGH and GWG Life.

### 2. Beneficient

#### (a) Overview of Beneficient's Business

Beneficient is a financial services holding company that (together with its subsidiaries) endeavors to provide what it describes as simple, rapid, and cost-effective liquidity solutions and related trust, custody and administrative services to participants in the alternative asset industry and owns certain alternative assets in connection therewith. It is headquartered in Dallas, Texas, and was a consolidated subsidiary of GWGH prior to the Beneficient Separation Transactions (as defined herein). For more information regarding Beneficient's business, Holders of Claims and Interests are encouraged to review the Ben S-4 that was filed with the SEC, including the section titled "Business of Beneficient".

#### (b) Certain prepetition transactions with Beneficient[744]

As noted above, the Company historically specialized in life settlements, which is a method of providing liquidity solutions to owners of generally illiquid assets, in such case, life insurance policies. During the period from 2018 to 2021, the Company engaged in a series of transactions with Beneficient which purported to give the Company exposure to alternative assets, another type of asset that is generally illiquid. The Company's transactions in which it invested in Beneficient prior to the Initial Petition Date are further described in detail below.

#### The Exchange Transaction

On January 12, 2018, GWGH and GWG Life entered into a *Master Exchange Agreement* (the "Master Exchange Agreement") with Ben LP and certain other parties pursuant to which the Company agreed to a series of strategic exchanges of assets (the "Exchange Transaction"). The purported purpose of the Exchange Transactions was to further the Company's relationship with

---

[744] The below does not purport to be a complete description of all transactions with Beneficient and its affiliates and related parties, and the foregoing shall not be deemed to prejudice or waive in any respect any claims or causes of action that may be pursued with respect thereto. The Bondholder Committee believes that the below described transactions, and potentially other transactions, give rise to valuable and viable claims and causes of action, and the Bondholder Committee shall not be deemed to adopt or support any of the descriptions contained herein.

Beneficient. A significant portion (but not all) of the alternative assets that were purchased through the Exchange Transaction constituted limited partnership interests originally held by Paul Capital.

To facilitate the Exchange Transaction, Murray Holland, who served as Ben's informal investment banker in the deal, established a series of trusts in 2017 (the "Seller Trusts"),[845] which served as intermediary vehicles to hold assets transferred in connection with the Master Exchange Agreement, including the Seller Trust L Bonds.

The Exchange Transaction was completed via a series of two closings, with the first occurring on August 10, 2018 and the second on December 28, 2018. On the August 10, 2018 closing, Ben LP, as borrower, entered into a *Commercial Loan Agreement* (the "Commercial Loan Agreement") with GWG Life, as lender, pursuant to which GWG Life made a loan to Ben LP. Upon the completion of the Exchange Transaction, the principal amount of the loan outstanding under the Commercial Loan Agreement was approximately $192.5 million. The loan under the Commercial Loan Agreement had a maturity of August 9, 2023, which maturity could potentially be extended to August 9, 2028 or August 9, 2033, provided that certain conditions were met.

The Exchange Transaction was completed on December 28, 2018. As a result of the Exchange Transaction, a number of securities were exchanged between the parties, the majority of which was non-cash, including the following securities as of the December 28, 2018 closing: (i) the Seller Trusts acquired Bonds due 2023 in the aggregate principal amount of $366.9 million (the "Seller Trust L Bonds"); (ii) the Seller Trusts acquired 27,013,516 shares of GWGH's common stock, which was 83% of the outstanding common stock at that time; (iii) GWGH acquired 40,505,279 Ben LP common units; and (iv) GWGH acquired the option, pursuant to an *Option Agreement* (the "Ben Option Agreement") to obtain additional Ben LP common units or other property that would be received by a holder of Preferred Series A Subclass 1 Unit Accounts of BCH. BCH is a Delaware limited partnership of which Ben LP owns all of the outstanding common units and acts as its general partner. In addition, GWGH used proceeds that resulted from the Exchange Transaction to issue a $25.7 million special dividend to its shareholders, including Jon R. Sabes (former Chief Executive Officer and director of GWGH and founder and former Chief Executive Officer of FOXO) and Steven F. Sabes (former Executive Vice President and director of GWGH).

The Seller Trusts now hold approximately $272 million of the $367 million outstanding Seller Trust L Bonds.[946] Following the Exchange Transaction, on April 26, 2019 David De Weese, a principal at Paul Capital and existing Board Member of Ben, was appointed to GWG's Board of Directors and served as a Board Member through 2022.

---

[845]  MHT Financial, L.L.C., an entity affiliated with the Debtors' former Chief Executive Officer Murray T. Holland, is the sole beneficiary of each Seller Trust. The Seller Trusts are further described in Article VI.B.3 of this Disclosure Statement.

[946]  Approximately $95 million of Seller Trust L Bonds were transferred to the Custody Trusts in September 2020 in exchange for alternative assets purportedly valued at $94.3 million.

covered by any such policy shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date. Without limiting the generality of the other provisions of the Second Amended Plan, and following such assumption, all right, title, and interest of the Debtors (and of the Wind Down Debtors and the Litigation Trust, as applicable) in and to any D&O Liability Insurance Policy (including any such tail coverage liability insurance) in effect as of the Effective Date covering claims relating to conduct occurring on or prior to April 20, 2022 shall be deemed assigned and fully transferred on the Effective Date to the Litigation Trust and shall constitute Initial Litigation Trust Assets for all purposes.

### H.    Litigation Matters

The Company is party to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

The following sets forth certain developments with respect to litigation matters following the Initial Petition Date.

### 1.    Securities Litigation

As set forth above, as of the Initial Petition Date, the Securities Litigation was in the pleading stage. On May 6, 2022, in the Bankruptcy Court, the proposed lead plaintiffs in the Securities Litigation, Thomas Horton and Frank Moore, filed the *Unopposed Motion for Relief from the Automatic Stay to (A) Appoint Lead Plaintiffs in Securities Class Action, (B) Permit Lead Plaintiffs to Serve and Enforce Third-Party Subpoenas, and (C) Take Related Actions* [Docket No. 201]. This motion was granted on May 31, 2022, modifying the automatic stay for the limited purpose of allowing the appointment of the lead plaintiffs in the Securities Litigation and allowing the lead plaintiffs to serve a limited number of third-party subpoenas. [Docket No. 321]. The Northern District of Texas entered its *Order Appointing Lead Plaintiff and Approving Lead Plaintiff's Selection of Counsel* on August 5, 2022, appointing Thomas Horton and Frank Moore as lead plaintiffs, and approving their selection of the law firms of Girard Sharp LLP and Malmfeldt Law Group P.C. as lead counsel for that dispute. Otherwise, as of the present date, the Securities Litigation has been stayed.

### 2.    Claims Objections

Since the Initial Petition Date and as of April 20, 2023, parties in interest have filed [5,393]5,402 Proofs of Claim against the Estates. The Debtors continue to evaluate Claims that have been asserted against their Estates, and whether, in connection with such evaluation, to object to any such Claims (either in full or in part). If the Second Amended Plan is confirmed,

For the avoidance of doubt, the Litigation Trustee, on behalf of the Litigation Trust, shall step into the shoes of the Debtors as it relates to either communications that occurred prior to, or documents prepared before, April 20, 2022 with respect to Debtors' right to assert attorney-client privilege or any other privilege or immunity Debtor possesses, if any, and the Litigation Trustee shall be entitled to preserve, assert, access, or waive such privilege or immunity of the Debtors as it relates to such documents or communications. On the Effective Date, the Litigation Trustee shall have the power, right and responsibility to access or take possession of all books, files and records of the Debtors or Wind Down Debtors, as applicable, for purposes of carrying out the purpose of the Litigation Trust. At any time after the Effective Date, upon reasonable request of the Litigation Trustee, the Wind Down Trustee shall provide the Litigation Trustee with any of the Debtors' or the Wind Down Debtors' books, records, and files in the Wind Down Trust's or Wind Down Trustee's possession, custody, or control, and the Wind Down Trustee may, in good faith, provide such privileged information of the Debtors as is in the Wind Down Trustee's possession that relates to the evaluation and prosecution of the Retained Causes of Action; *provided*, that, notwithstanding the foregoing, the privilege of the Independent Directors, the DLP Independent Directors, and David F. Chavenson in his capacity as a former member of the Special Committee, in each case, is hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any person or Entity without the consent of all Independent Directors or all DLP Independent Directors, as applicable. For the avoidance of doubt, neither the Independent Directors nor the DLP Independent Directors may waive Mr. Chavenson's personal privilege. The Wind Down Trustee shall use commercially reasonable efforts to assist the Litigation Trustee by providing additional information based on the books, files, and records in the Wind Down Trust's possession, provided that any such request for assistance is reasonable. Following the Effective Date, the Litigation Trust and the Litigation Trustee shall be deemed a party in interest with standing to appear in the Chapter 11 Cases and object to any pleadings Filed thereafter; *provided*, *however*, such standing and right to object does not alter the respective rights or responsibilities of the Litigation Trustee or the Wind Down Trustee under the Second Amended Plan, the Wind Down Trust Agreement, or the Litigation Trust Agreement, alter any governing approval standard under applicable law, or otherwise limit the ability of any party with standing to respond to pleadings Filed, or objections raised, by the Litigation Trustee.

## 2.    Litigation Trustee

The Litigation Trustee shall be an independent, third-party fiduciary selected by the Bondholder Committee and identified in the Plan Supplement, and shall be compensated at market rates; *provided*, that, for the avoidance of doubt, the Litigation Trustee shall have no affiliation with any Bondholder Committee member and must not own any Public L Bonds, New WDT Interests, or other Interests in or Securities issued by any of the Debtors. The Litigation Trustee shall have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action, and the Litigation Trust Reconciliation Claims, and shall have a duty to maximize the value of the assets of the Litigation Trust in accordance with the Litigation Trust Agreement. The Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation in respect of such assets, provided that the ultimate decision with respect to whether to commence any litigation shall be in the sole discretion of the Litigation Trustee. For the avoidance of doubt, in exercising such sole discretion, the Litigation Trustee shall be entitled to consider and may take such

As shown in the table, the Debtors are soliciting votes to accept or reject the Second Amended Plan only from Holders of Claims or Interests in Classes 3, 4(a), 8, 9 and 10 (the "Voting Classes"). The Holders of Claims and Interests in the Voting Classes are Impaired under the Second Amended Plan and may, in certain circumstances, receive a distribution under the Second Amended Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Second Amended Plan.

The Debtors are **not** soliciting votes on the Second Amended Plan from Holders of Claims or Interests in Classes 1, 2, 4(b), 5, 6, and 7. Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been Disallowed or are subject to a pending objection (including objections filed by the April 26 deadline set forth in the Disclosure Statement Order), are not entitled to vote to accept or reject the Second Amended Plan.

### B.      Voting Record Date

**The Voting Record Date is February 24, 2023**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Second Amended Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Second Amended Plan as the Holder of a Claim or Interest in Classes 3, 4(a), 8, 9 and 10.

### C.      Voting on the Second Amended Plan

**The Voting Deadline is May ~~[24]~~31, 2023 at 4:00 p.m. (prevailing Central Time)**. To be counted as votes to accept or reject the Second Amended Plan, all Holders of Allowed Claims and Interests entitled to vote on the Second Amended Plan must complete, execute, and return their Ballots so that they are **actually received** by the Notice and Solicitation Agent pursuant to the Solicitation and Voting Procedures on or before **May ~~[24]~~31, 2023 at 4:00 p.m. prevailing Central Time** (the "Voting Deadline").

To vote, complete, sign, and date your Ballot and return it (with an original signature) **promptly** in the reply envelope enclosed with your Ballot or to one of the below addresses, via eBallot portal, or via electronic mail as set forth below. Certain beneficial holders of Claims and Interests will receive separate voting instructions from their respective banks and/or brokerages.

**Via E-Ballot Portal. Ballots may be submitted via an electronic Ballot through the Voting Agent's on-line electronic Ballot submission portal at www.DonlinRecano.com/clients/gwg/vote by no later than the Voting Deadline. Any failure to follow the voting instructions included with the Ballot may disqualify your Ballot and your vote.**

**OR**

| **By First Class Mail to:** |
| :---: |
| **GWG HOLDINGS, INC., ET AL. Balloting** |

Except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Solicitation Agent actually receives the properly executed Ballot. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Second Amended Plan**.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.

## X.    CONFIRMATION OF THE SECOND AMENDED PLAN

### A.    Requirements for Confirmation of the Second Amended Plan

The requirements for Confirmation of the Second Amended Plan pursuant to section 1129 of the Bankruptcy Code include: (1) the Second Amended Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Second Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Second Amended Plan is feasible; and (3) the Second Amended Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Second Amended Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Second Amended Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Second Amended Plan has been proposed in good faith.

### 1.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors, with the assistance of the Debtors' advisors, have prepared a liquidation analysis (the "<u>Liquidation Analysis</u>") attached hereto as **Exhibit ~~D~~E**. The Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims and Interests as compared to distributions contemplated under the Second Amended Plan. Consequently, the Debtors believe that Confirmation of the Second Amended Plan will provide a substantially greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

Dated: April ~~19~~20, 2023
Houston, Texas

GWG HOLDINGS, INC.
on behalf of itself and its Debtor affiliates.

/s/ *Jeffrey S. Stein*
Jeffrey S. Stein, as Chief Restructuring
Officer, President, Chief Executive Officer
and Independent Director of GWG
Holdings, Inc.

/s/ *Kade Baird*
Kade Baird, as designated representative
of Bank of Utah, as Indenture Trustee and
solely in its capacity as Chair of the
Official Committee of Bondholders of
GWG Holdings, Inc., *et al.*

/s/ *Richard S. Schmidt*
Richard S. Schmidt, as Restructuring
Manager of L Bond Management, LLC

**Exhibit B**

**Disclosure Statement Order**

[separately filed]

**Exhibit D**

**Letter from Brad K. Heppner**

[*To come*]

**Exhibit E**

**Liquidation Analysis**

## 1) Introduction[1]

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

To demonstrate that the Second Amended Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisors, have prepared a hypothetical liquidation analysis (this "Liquidation Analysis"), based upon certain assumptions discussed in the Disclosure Statement and these accompanying notes. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims and Interests as compared to distributions contemplated under the Second Amended Plan. Consequently, the Debtors believe that Confirmation of the Second Amended Plan will provide a greater return to Holders of Claims and Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis sets forth estimated computed recoveries for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' Estates. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation and wind-down related costs, which are projected to be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code and under the assumptions set forth herein.

Underlying the Liquidation Analysis are numerous estimates and assumptions that, although developed and considered reasonable by the Debtors' management and its advisors, are inherently subject to significant business, economic, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Accordingly, there can be no assurance that the computed recoveries reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation, and actual results could materially differ from the results herein. The underlying financial information in the

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtors' Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC, as Co-Proponents (as may be amended, modified, or supplemented from time to time, the "Second Amended Plan") or the Disclosure Statement for the Debtors' Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement"), as applicable.