## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GWG Holdings, Inc. *et al.*,[1] | ) | Case No. 22-90032 (MI) |
|  | ) |  |
| Debtors | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

**DECLARATION OF JEFFREY S. STEIN IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FURTHER MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN**

I, Jeffrey S. Stein, do hereby declare, under penalty of perjury, that:

1.      I am the Managing Partner of Stein & Holly Advisors Inc., a division of Stein Advisors, LLC, which is a financial advisory firm that provides consulting services to public and private companies and institutional investors.  My prior executive engagements include Chief Restructuring Officer of Whiting Petroleum Corporation, Philadelphia Energy Solutions, LLC and Westmoreland Coal Company, Executive Chairman of Ambac Assurance Corporation and MLR Petroleum LLC, and independent director of Nordic Aviation Capital (NAC) 29, Seadrill North Atlantic Holdings Limited, Intelsat Connect Finance S.A., NMC Health plc and Toys "R" Us, Inc. At the time of my engagement in the Chapter 11 Cases, I also served as Chief Restructuring Officer of Liberty Steel Group Holdings Pte. Ltd., Chairman of the Board of Ambac Financial Group, Inc., Liquidating Trustee for the bankruptcy estate of Ditech Holding Corporation, and Litigation Trustee for the African Minerals Ltd. Creditor Recovery Vehicle.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538) GWG DLP Funding IV, LLC (2598); GWG DLP Funding VI, LLC (6955) and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650, Dallas, TX 75201.  Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

2.     On June 19, 2022, the board of directors (the "Board") of GWG Holdings, Inc. ("GWGH" and together with the other above-captioned debtors, the "Debtors") unanimously adopted resolutions (as subsequently amended and restated on July 13, 2022 and July 17, 2022, the "Resolutions") designating me as Chief Restructuring Officer (the "CRO") of GWGH, effective June 1, 2022, and appointing both myself and Anthony R. Horton as new or additional independent directors of the Board (the "Independent Directors").  On July 18, 2022, the Court approved those designations and appointments through its *Order Authorizing and Approving (I) Designation of Jeffrey S. Stein as Chief Restructuring Officer, (II) the Appointment of Jeffrey S. Stein and Anthony R. Horton as New Independent Directors, and (III) Granting Related Relief* [Dkt. No. 594] (the "CRO Retention Order").  Together with Mr. Horton, I serve on the Special Committee of the Board (the "Special Committee") as well as the Investigations Committee of the Board (the "Investigations Committee" and, together with the Special Committee, the "Independent Committees").  Following the resignation of Murray Holland as CEO of GWGH, the Board appointed me as President and Chief Executive Officer (the "CEO") of the Debtors, and it appointed me to serve as President and board member of the other Debtor subsidiaries of GWGH.

3.     I am generally familiar with the Debtors' day-to-day operations, businesses and financial affairs.  I have previously submitted numerous declarations in the GWG Chapter 11 Cases, including, but not limited to, declarations in support of entry of the CRO Retention Order [Dkt. No. 431], the election of the "Vida Option" [Dkt. Nos. 920-1, 945] and the designation of Michael A. Tucker as Interim Chief Financial Officer [Dkt. No. 1273-1].  I submit this Declaration in support of confirmation of the *Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted By the Debtors, the Bondholder Committee, and L Bond Management, LLC* [Dkt.

No. 1678] (including any exhibits, schedules, or supplements thereto, and as may be amended, modified, or supplemented from time to time thereafter, in accordance with the terms thereof, including the revised version thereof filed contemporaneously herewith as an exhibit to the Confirmation Order, the "Plan"), including without limitation, the agreements and other documents set forth in that certain supplement to the Plan filed May 24, 2023 [Dkt. No 1815] (as may be further modified, amended, or supplemented in accordance with the Plan, together with the revised proposed forms of Wind Down Trust Agreement and Litigation Trust Agreement filed at Docket Nos. 1887 and 1888, respectively, hereafter collectively, the "Plan Supplement").[2]

4.      Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents, information provided to me by individuals working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Mayer Brown LLP ("Mayer Brown"), Jackson Walker LLP ("Jackson Walker"), FTI Consulting, Inc. ("FTI"), and PJT Partners, Inc. ("PJT"), and/or my discussions with the Independent Committees' advisors, including professionals at Katten Muchin Rosenman LLP ("Katten") and Province, LLC ("Province" and, together with Mayer Brown, Jackson Walker, FTI, PJT, and Katten, collectively, the "Advisors"). Although I am being compensated for my services as an officer and director of the Debtors, I am not being compensated separately for providing this Declaration or related testimony. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## THE FORMATION OF THE INDEPENDENT COMMITTEES

5.      The Independent Committees were formed pursuant to the Resolutions.   The Resolutions gave the Special Committee the authority, in consultation with the Debtors' advisors, to examine, investigate, analyze, assess, evaluate and negotiate the terms and conditions of, among other things, any proposed chapter 11 plan to be submitted by the Debtors to the Bankruptcy Court for confirmation.  The Resolutions gave the Investigations Committee the exclusive authority to, among other things, (i) perform an independent investigation (the "Independent Investigation") into potential claims or causes of action arising under or relating to transactions, relationships, or conduct involving the Debtors and any third parties, including Beneficient, and (ii) prosecute, settle, or assign any such claims or causes of action.

6.      In furtherance of the Independent Committees' mandates, GWGH retained Katten, effective as of June 20, 2022, as independent counsel on behalf of and at the sole direction of the Independent Directors, in their capacity as members of the Independent Committees.  Thereafter, GWGH retained Province, effective as of September 16, 2022, as independent financial advisors on behalf of and at the sole direction of the Independent Directors, in their capacity as members of the Investigations Committee.

## THE INDEPENDENT INVESTIGATION

7.      At the direction of the Investigations Committee, Katten and Province collected and reviewed over 350,800 documents, including copies of board materials and minutes, corporate governance documents, intercompany agreements, financial and accounting information, and internal company communications.  Katten has conducted 33 interviews and eight depositions, including interviews and depositions of members of the Debtors' management team, current and former directors, and current and former legal and financial professionals involved with the

4

Company and Beneficient.  To minimize cost and avoid duplication of effort, Katten attended additional interviews conducted by the Bondholder Committee, some of which included persons already interviewed by Katten.

8.      Pursuant to the Independent Investigation, Katten and Province analyzed potential claims and causes of action held by the Debtors' estates arising from or relating to, among other things: (i) the series of transactions that resulted in the separation or "decoupling" of GWGH and Beneficient; (ii) GWGH's prepetition investments in Beneficient; (iii) Beneficient's use of funds received from GWGH; and (iv) public disclosures by GWGH concerning certain material transactions and events, including certain public disclosures related to the resignation of certain former directors of GWGH.

9.      The Investigations Committee concluded that such litigation claims and causes of action should be retained by the litigation trust established under the Plan (the "Litigation Trust") and addressed as set forth in the Plan, Litigation Trust Agreement, and Wind Down Trust Agreement.

## DEVELOPMENT OF THE PLAN

10.      The Plan is the result of extensive good-faith negotiations among the Debtors and key parties in interest, including, but not limited to, the Bondholder Committee, LBM, and the Ad Hoc Committee of Broker/Dealers (the "AHC"), as well as myself and Anthony R. Horton, in our capacity as the members of the Independent Committees.  Further, the Debtors, the Independent Committees, the Bondholder Committee, LBM, and AHC[3] participated in arm's length and good faith mediation, overseen by and under the guidance of the Court-appointed judicial mediator, Judge David R. Jones (the "Mediator").  Following multiple mediation sessions with the Mediator,

---

[3]      The AHC participated in the first of several mediation sessions with the other parties, and was responsible, in part, for the proposal and formulation of the settlement with LBM reflected in the Plan and Mediation Agreement.

the Debtors, the Independent Committees, the Bondholder Committee, and LBM executed the Mediation Settlement Term Sheet dated March 9, 2023 (the "Mediation Agreement").[4]   The Mediation Agreement set forth the general terms and provisions of a chapter 11 liquidating plan that were ultimately reflected in the filed version of the Plan.   The Debtors, the Independent Committees, the Bondholder Committee, and LBM continued to mediate open plan issues through June 8, 2023, including pursuant to the Court order [Dkt. No. 1881], and have resolved the primary open Plan issues. In addition to the Mediation Agreement, the Debtors, the Investigations Committee, the Bondholder Committee, L Bond Management and Beneficient resolved the compensation motion, pursuant to the stipulation (the "Compensation Stipulation") attached hereto as Exhibit A. As set forth in the Compensation Stipulation, all of the aforementioned parties agreed to increase my and Mr. Horton's compensation in light of our increased roles following the resignation of the Debtors' previous management and board, which is further described in the *Declaration of Dewey Imhoff in Support of Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents*, filed contemporaneously with this motion.

11.     The Debtors own four main categories of assets: (a) economic interests in The Beneficient Company Group, L.P. (now known as Beneficient, a Nevada Corporation) ("BCG") and in its subsidiary Beneficient Company Holdings, L.P. ("BCH" and, together with BCG and their affiliates, "Beneficient"); (b) economic interests in Foxo Technologies, Inc. ("Foxo"); (c) a portfolio of life insurance policies purchased on the secondary market (the "Policy Portfolio"); and (d) certain litigation claims, including claims against Beneficient and related parties.

---

[4]     A copy of the Mediation Agreement is attached as Exhibit A to the statement filed with respect thereto [Dkt. No. 1518.]

12.     The Plan, as contemplated by the Mediation Agreement, provides for the orderly wind-down of the Debtors and liquidation of the Debtors' assets through the creation of two separate trusts to receive the foregoing assets and monetize such assets over time.  On the Effective Date, the first trust (the "Wind Down Trust") will be vested on the Effective Date with assets including cash, the Debtors' interests in Beneficient and Foxo, and 100% of the equity interests in a new entity that will created to hold the Policy Portfolio, which assets will vest in the Wind Down Trust free and clear of all liens, claims, encumbrances, and other interests, including the liens of the Indenture Trustee, except that the Policy Portfolio will be encumbered by liens securing exit financing to be provided by the Debtors' existing DIP financing lender.  The second trust (the Litigation Trust) will be vested with the "Retained Causes of Action" identified in the Plan Supplement, as well as the Debtors' interests in the D&O Liability Insurance Policies and certain other assets. Under the Plan, the Wind Down Trustee will distribute proceeds from both the Litigation Trust and Wind Down Trust to certain of the Debtors' existing creditors and equityholders in a manner consistent with the Plan.

13.     The Special Committee was directly involved in negotiating, analyzing, and assessing the terms and conditions of the Plan.  The Special Committee concluded that the Plan is in the best interests of the Debtors' estates, maximizes the value of the Debtors' assets, and represents the best available option for completing the Chapter 11 Cases with the highest or maximum recovery for the Debtors' creditors and other stakeholders.

## PLAN REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE

14.     I am aware that the Debtors must demonstrate that the Plan satisfies the requirements of section 1129 of title 11 of the United States Code (the "Bankruptcy Code").  Below, I set out facts with respect to certain of those requirements.  Other facts supporting these

requirements are reflected in the Plan, the Plan Supplement, and the other declarations submitted substantially contemporaneously with my own.

## I.    <u>Section 1129(a)(1): Plan Compliance with Bankruptcy Code Provisions</u>

15.    The Plan provides for the following eleven (11) Classes of Claims and interests: Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); Class 3 (Bond Claims); Class 4(a) (General Unsecured Claims); Class 4(b) (GUC Convenience Claims); Class 5 (DLP Entity General Unsecured Claims); Class 6 (Intercompany Claims); Class 7 (Intercompany Interests); Class 8 (Series 1 Preferred Interests); Class 9 (Series 2 Preferred Interests); and Class 10 (Existing Common Interests).[5]

16.    The classification structure of the Plan is rational and appropriate because all Claims and Interests within a Class have the same or similar rights against the Debtors.  The Plan provides for separate Classification of Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests:

- *Class 1 (Other Secured Claims)*.  Class 1 comprises all Secured Claims against any of the Debtors that are not: (a) a Chapford DIP Facility Claim; (b) a Vida DIP Claim; (c) a DLP Secured Claim (otherwise paid in full in Cash before the Effective Date); or (d) a Bond Claim.

- *Class 2 (Other Priority Claims)*.  Class 2 comprises all Claims against any Debtor entitled to priority in right of payment under section 507 of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

---

[5]    Administrative Claims, Accrued Professional Compensation Claims, Chapford DIP Facility Claims, Vida DIP Claims, DLP Secured Claims, Priority Tax Claims, Indenture Diminution Claims and the Allowed AHC Substantial Contribution Claim have not been classified and are separately treated under the Plan.

- ***Class 3 (Bond Claims)***.  Class 3 comprises (a) the Allowed Bondholder Claims; (b) any Indenture Fee and Expense Claims; and (c) subject to Article IV.I of the Plan, the LBM Subordinated Claims.

- ***Class 4(a) (General Unsecured Claims)***.  Class 4(a) comprises all Claims that are not Secured and that are not: (a) an Administrative Claim; (b) a Chapford DIP Facility Claim; (c) a Vida DIP Claim; (d) a DLP Secured Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) a Bond Claim; (i) a DLP Entity General Unsecured Claim; or (j) an Intercompany Claim; *provided*, that any Claim in the amount of $2,750.00 or less that would otherwise be a General Unsecured Claim is treated as a GUC Convenience Claim for purposes of the Plan.

- ***Class 4(b) (GUC Convenience Claims)***.  Class 4(b) comprises all Allowed Claims in an amount greater than $0.01 but less than or equal to $2,750.00, that would otherwise qualify as General Unsecured Claims, including any Allowed General Unsecured Claims as to which the holder thereof has elected to have such Claim reduced to $2,750.00 and treated as an Allowed GUC Convenience Claim (up to an aggregate cap of $150,000 of GUC Convenience Claims).

- ***Class 5 (DLP Entity General Unsecured Claims)***.  Class 5 comprises all Claims against any of the DLP Entities that are not Secured and that are not: (a) an Administrative Claim; (b) a Chapford DIP Facility Claim; (c) a Vida DIP Claim; (d) a DLP Secured Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) a Bond Claim; or (i) an Intercompany Claim.

- ***Class 6 (Intercompany Claims)***.  Class 6 comprises all Claims against a Debtor held by another Debtor.

- ***Class 7 (Intercompany Interests)***.  Class 7 comprises all Interests in one Debtor held by another Debtor.

- ***Class 8 (Series 1 Preferred Interests)***.  Class 8 comprises all redeemable preferred shares issued by Debtor GWGH pursuant to that certain Registration Statement on Form S-1 filed pursuant to the Securities Act and declared effective by the SEC on October 30, 2015, with an initial stated value of $1,000.00 per share.

- ***Class 9 (Series 2 Preferred Interests)***.  Class 9 comprises all redeemable preferred shares issued by Debtor GWGH pursuant to that certain Registration Statement on Form S-1 filed pursuant to the Securities Act and declared effective by the SEC on February 14, 2017, with an initial stated value of $1,000.00 per share.

- ***Class 10 (Existing Common Interests)***.  Class 10 comprises all shares of common stock issued by Debtor GWGH.

II.   <u>Section 1129(a)(2): Debtors' Compliance with the Bankruptcy Code</u>

17.   Each of the Debtors has a domicile, a place of business, and property in the United States, faced significant debt maturities and other financial challenges prior to and following the commencement of the Chapter 11 Cases, and therefore each Debtor is eligible for relief under chapter 11 of the Bankruptcy Code.

18.   On April 21, 2023, the Bankruptcy Court entered an order (as supplemented, the "<u>Disclosure Statement Order</u>") approving the Debtors' disclosure statement for the Plan (the "<u>Disclosure Statement</u>") as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code and approved the Debtors' solicitation, voting tabulation, and related procedures (the "<u>Solicitation Procedures</u>").  As set forth in the *Affidavit of Donlin Recano and Company, Inc. Regarding Service of Solicitation Packages With Respect to Disclosure Statement for the Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents* [Dkt. No. 1790] (the "<u>Solicitation Declaration</u>"), I understand that, in accordance with the Solicitation Procedures, the Debtors solicited votes from holders of Claims and Interests in the voting Classes.  *See* Solicitation Declaration ¶¶ 3-14.

19.   Although the Debtors have filed, and may file additional, modifications to the Plan and/or Plan Supplement, I do not believe that any such modifications require additional disclosures.  The original filing of the Plan Supplement, as well any subsequent filings of agreed trust agreements and Plan modifications, is consistent in all respects with the procedures contemplated in the Mediation Agreement, Plan, Disclosure Statement, and Disclosure Statement

Order, and I do not believe any such filings or modifications adversely affect the treatment of any Claim or Interest under the Plan.

## III.   <u>Section 1129(a)(3): Good Faith</u>

20.     I believe the Plan has been proposed by the Debtors in good faith and for the legitimate and honest purposes of maximizing recoveries to the Debtors' stakeholders in accordance with the requirements of the Bankruptcy Code.   The Plan is the culmination of extensive, good-faith negotiations, and even mediation, among the Debtors, the Independent Committees, and the Debtors' key economic stakeholders, including the Bondholder Committee, LBM, and the AHC.  I have been in direct communications with each of the foregoing stakeholder groups throughout this process, as well as during and following mediation.   As a result, I understand each of their constituencies has agreed to support the Plan solely on the basis that the Plan provides the best available path towards maximizing value and recoveries for the benefit of bondholders and other interested parties.

## IV.   <u>Section 1129(a)(4): Professional Fees Subject to Bankruptcy Court Approval</u>

21.     All payments by the Debtors for services provided to the Debtors during the Chapter 11 Cases will be, subject to approval by the Bankruptcy Court, reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.   In regards to monthly activity and fee applications, a member of Debtors' management (either myself or Michael Tucker, the CFO), would review monthly fee submissions and, as the circumstances would warrant, one of us would work through or discuss questions with such professional before any fee apps were submitted to the Court for review and approval. Further, Article II.B of the Plan provides that provides that Professionals seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Initial Petition Date through the Confirmation Date

must file final applications with respect thereto by the first Business Day that is 60 days after the Confirmation Date, thereby giving interested parties adequate time to review the Accrued Professional Compensation Claims. And, Article XI of the Plan provides that the Bankruptcy Court will "retain exclusive jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases . . . including jurisdiction to . . . decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan[.]" Any other professional fee payments to be made by the Debtors will be made in accordance with the Plan.

**V.      Section 1129(a)(5): Information Regarding Proposed Officers and Managers**

22.      The Plan Supplement provides that the Wind Down Trustee will be Elizabeth C. Freeman and the Litigation Trustee will be Michael I. Goldberg.  *See* Plan Supp. Ex. A, p. 1; Ex. B, p. 1.  Additionally, I understand that the Wind Down Trust or Portfolio Co. may seek to retain independent consultants, including, but not limited to Brian Bailey, to provide advisory services with respect to the management of the Policy Portfolio.  Mr. Bailey is an employee of Beneficient; however, he is designated as the Debtors' Chief Investment Officer.  My understanding is that the terms of Mr. Bailey's compensation have not been agreed, but such terms will necessarily be consistent with the terms of the Plan, Confirmation Order, and Wind Down Trust Agreement in all respects.  The Debtors will cease to operate following the Effective Date and the Wind Down Trust and Litigation Trust will not have any additional officers, managers, or employees.

**VI.     Section 1129(a)(6): Inapplicable Provision**

23.      There are no rates of the Debtors that are subject to any governmental regulatory commission with jurisdiction over such rates and the Plan does not include any provisions with

respect to any such rates (or changes thereto) and, accordingly, Section 1129(a)(6) of the Bankruptcy Code is inapplicable.

## VII.    Section 1129(a)(7): Treatment of Holders of Impaired Classes

24.    As set forth in more detail in the Declaration of Michael A. Tucker in support of confirmation of the Plan (the "Tucker Declaration"), which is being filed substantially contemporaneously herewith, each holder of a Claim or Interest in an impaired Class will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive if the Debtors were liquidated under Chapter 7.

25.    Among other things, the Tucker Declaration indicates that total overall recoveries available for distribution in a Chapter 7 case would likely be significantly lower than the recoveries that are expected to be available under the Plan, and I concur with the analysis and conclusions set forth in the Tucker Declaration.

26.    The Plan's two-trust structure provides for optimal monetization of the Debtors' assets and is superior in all respects to liquidation in a Chapter 7 case.  The Wind Down Trustee and the Litigation Trustee will be aligned in maximizing the value of the Debtors' assets, and under the applicable trust agreements, will cooperate and coordinate their efforts in that regard.  Further, the Wind Down Trustee and the Litigation Trustee were selected for their specific knowledge and expertise in these matters.  I believe that the Wind Down Trustee and the Litigation Trustee will be more effective than a Chapter 7 trustee in monetizing the Debtors' assets.  Moreover, the Wind Down Trustee and the Litigation Trustee will be entitled to aggregate compensation that, based upon estimated recoveries, will likely be less than the statutory compensation afforded to a Chapter 7 trustee pursuant to section 326(a) of the Bankruptcy Code.  My view is consistent with the Tucker Declaration, as well as my understanding of the views of the Creditor Proponents, the AHC, and

presumably, the overwhelming number of bondholders and other stakeholders who voted to accept the Plan.

**VIII.  Section 1129(a)(8): Acceptance by Each Impaired Class of Claims or Interests**

27.      As set forth in the *Declaration of John Burlacu of Donlin, Recano & Company, Inc. Regarding the Solicitation and Tabulation of Votes Cast on the Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents* [Dkt. No. 1893] (the "Voting Report") every voting Class of Claims or Interests that is impaired under the Plan has voted to accept the Plan (including more than 99% of Bondholders who voted, measured by both dollar amount and number), other than Class 10 (Existing Common Interests).

28.      Additionally, Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) are deemed to have rejected the Plan pursuant to the terms of the Plan.

29.      Notwithstanding the rejection or deemed rejection by certain Classes, as set forth below, the requirements of Section 1129(b) are satisfied as to each such Class.

**IX.  Section 1129(a)(9): Payment of Priority Claims**

30.      The Plan provides that all Allowed Claims of the types described in Section 1129(a)(9) of the Bankruptcy Code, to the extent such Claims exist, will be paid as required under Section 1129(a)(9).  To the extent that any such Claims are not Allowed as of the Effective Date, the Plan establishes adequate reserves or other mechanisms for paying such Claims as and when they become Allowed pursuant to a Final Order.

14

**X.**     <u>Section 1129(a)(10): Acceptance by Impaired Classes</u>

31.     As set forth in the Voting Report, the following impaired Classes of Claims or Interests have voted to accept the Plan: Class 3 (Bond Claims); Class 4(a) (General Unsecured Claims); Class 8 (Series 1 Preferred Interests); and Class 9 (Series 2 Preferred Interests).

**XI.**     <u>Section 1129(a)(11): Feasibility</u>

32.     It is my understanding, based on Mr. Horton and my discussions with the Advisors, that, pursuant to Section 1129(a)(11) of the Bankruptcy Code, the Plan may only be confirmed if the Plan is feasible, *i.e.*, that confirmation of the Plan is not likely to be followed by the liquidation of the Debtors or any successor thereto unless such liquidation is proposed in the Plan. As the Plan provides for the orderly liquidation of the Debtors, my understanding based on discussions with the Advisors is that Section 1129(a)(11) is inapplicable.

33.     To the extent that Section 1129(a)(11) applies, however, I believe, based on my discussions with the Advisors along with Mr. Horton and as set forth in the Declaration of Peter Laurinaitis in support of confirmation of the Plan, filed substantially contemporaneously herewith, that the requirements thereof are satisfied by the fact that the Wind Down Trust and Litigation Trust will be sufficiently funded (be it in cash or liquid securities of Beneficient) to enable each to fulfill the requirements of the Plan and, with respect to the Wind Down Trust, to pay all anticipated and/or asserted Administrative Claims as and when due.

34.     The Debtors have resolved the feasibility objection asserted by Fifth Season Investments LLC ("<u>Fifth Season</u>") with respect to Fifth Season's asserted entitlement to an "Alternate Stalking Horse Fee." Specifically, the Debtors have agreed to set aside Beneficient shares (or, if available, cash) in an amount sufficient to satisfy the Alternate Stalking Horse Fee in the event a Final Order is entered requiring payment of such fee, with a sufficient cushion to

account for potential changes in the market price of Beneficient shares.  I believe that this is a fair and reasonable means of resolving Fifth Season's confirmation objection and is in the best interests of the Estates.

**XII.   Section 1129(a)(12): Payment of U.S. Trustee Fees**

35.     Article XII.B of the Plan provides that all fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or as soon as practicable thereafter, by the Debtors or Wind Down Debtors and provides for the subsequent payment of quarterly fees owed to the U.S. Trustee, and the filing of reports with respect thereto, until the related Debtor's case is closed, dismissed, or converted.

**XIII.   Sections 1129(a)(13)-(a)(16): Inapplicable Provisions**

36.     The Debtors do not owe any retiree benefits (as I understand that term to be used in Section 1114 of the Bankruptcy Code), the Debtors do not have any domestic support obligations, no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code, and the Debtors are each a moneyed, business, or commercial corporation.  Accordingly, my understanding, based on discussions with the Advisors, in consultation with Mr. Horton is that Sections 1129(a)(13)-(a)(16) of the Bankruptcy Code are inapplicable.

**XIV.   Section 1129(b): Cramdown of Non-Accepting Classes**

37.     I understand that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or interests (*i.e.*, "crammed down") so long as the plan is "fair and equitable" and it does not discriminate unfairly as to the non-accepting class. As detailed in the Voting Report, each Voting Class of Claims and Interests (other than Class 10) overwhelmingly voted to accept the Plan. Accordingly, based upon Mr. Horton and my discussions with the Advisors, I understand that the only Classes

16

to which cramdown is relevant are the Classes that have been deemed to reject the Plan or that voted to reject the Plan: Class 6 (Intercompany Claims); Class 7 (Intercompany Interests); and perhaps Class 10 (Existing Common Interests).

### A.      The Plan does not Discriminate Unfairly

38.      Based upon my discussions with the Advisors, along with Mr. Horton I understand that Section 1129(b)(1) of the Bankruptcy Code prohibits unfair discrimination, which occurs when similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  The Plan does not provide for any discrimination, much less unfair discrimination, between classes of similarly situated claims.

39.      As discussed herein, the Debtors have a reasonable basis for separately classifying the Classes of Claims and Interests subject to Section 1129(b)(1) because each holds different rights and entitlements under the governing agreements and/or applicable law.  Further, based on my understanding of the Plan and discussions with Advisors, in consultation with Mr. Horton, the Plan does not skip over any Class of Claims or Interests or otherwise favor any Class of Claims or Interests at the expense of a higher or equivalent priority Class.

40.      Class 4(a) (General Unsecured Claims) and Class 4(b) (GUC Convenience Claims) are properly classified separately because Class 4(b) consists solely of General Unsecured Claims in an amount of no more than $2,750, which would be administratively burdensome to pay over time from the Wind Down Trust and, accordingly, separate classification and payment in full of such GUC Convenience Claims is likely more cost-effective than issuing New WDT Interests with respect thereto.

41.      Class 4(a) (General Unsecured Claims) and Class 5 (DLP Entity General Unsecured Claims) are properly classified separately because creditors in Class 4(a) hold claims against the

Initial Debtors, whereas creditors in Class 5 hold claims against the DLP Entities, which were structured before the Initial Petition Date as special purpose entities. Given the different assets and liabilities of the DLP Debtors, on the one hand, and the Initial Debtors, on the other hand, and principles of corporate separateness, such separate classification and treatment is warranted.

42.     With respect to Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), the Claims and Interests reflected in such Classes are properly categorized separately from other Claims and Interests given that they have differing legal attributes from the other classes of Claims and Interests and they are Claims and Interests involving only Debtor entities and no non-Debtor third-parties, which Debtor entities support the cancellation of the Intercompany Claims and Intercompany Interests as set forth in the Plan.

43.     Finally, Class 10 (Existing Common Interests) is the only Class of Claims or Interests relating to Existing Common Stock issued by GWGH, and no other Class of Claims or Interests represents securities of comparable legal priority with the Existing Common Stock and, accordingly, it is properly classified as a separate Class.

**B.     *The Plan is Fair and Equitable***

44.     Based upon Mr. Horton and my discussions with the Advisors, I understand that section 1129(b)(2) of the Bankruptcy Code requires that a plan be fair and equitable with respect to impaired classes of claims or interests and that this is assessed by whether any holder of a claim or interest junior to the impaired creditor will receive or retain property under the plan on account of such junior claim or interest. Distributions by the Wind Down Trustee under the Plan will be made in the order of priority prescribed by the Plan.

45.     With respect to Class 10 (Existing Common Interests), there are no Classes of Claims or Interests with a priority junior to such Class under applicable law, and no Classes senior to such Class are being paid more than the full value of their Claims or Interests under the Plan.

46.     With respect to Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests), the Claims and Interests reflected in such Classes are properly extinguished as Claims and Interests involving only Debtor entities and no non-Debtor third-parties, with the approval of such Debtor entities.

47.     Finally, to the extent relevant, my understanding is that this requirement is satisfied with respect to Class 4(a) (General Unsecured Claims) as well.  With respect to such Class, pursuant to Article IV.H and Article VI.C of the Plan, no Class of Claims or Interests junior to such Class may receive distributions from the Wind Down Trust until the satisfaction in full of the New Series B WDT Interests that will be issued on a dollar-for-dollar basis to holders of Allowed Claims in Class 4(a) (General Unsecured Claims).

## XV.    Section 1129(c): The Plan is the Only Plan Currently On File

48.     The Plan is the only operative Chapter 11 plan currently on file in the Chapter 11 cases.

## XVI.    Section 1129(d): The Principal Purpose of the Plan is Not Avoidance of Taxes

49.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds.

## XVII.    Section 1129(e): Inapplicable Provision

50.     Based on my understanding of the Plan and discussions with the Advisors, the Chapter 11 Cases are not "small business cases" as I understand that term to be defined in the Bankruptcy Code.

XVIII. **LBM Settlement**.

51.     The Plan, consistent with the terms of the Mediation Agreement, provides for the subordination of 15% of the amount of the LBM L Bond Claims to the recoveries of the balance of the LBM L Bond Claims and the other Allowed Bondholder Claims in connection with, among other things, LBM's support of the Plan and the inclusion of the LBM Released Parties as Released Parties under the Plan (the "LBM Settlement").  As further described in the Disclosure Statement, the LBM Settlement, as reflected in the Mediation Agreement and the Plan was negotiated, including through mediation, at arms' length and in good faith and is in the best interests of the Debtors' estates because, among other things, it provided a path to maximizing value for the Debtors' estates under the largely consensual Plan and improves the potential recoveries by public holders of Bonds.

52.     As discussed at length in the Disclosure Statement, the Investigations Committee and the Bondholder Committee analyzed the potential claims and defenses related to the LBM L Bond Claims, including potential claims for subordination or recharacterization of the LBM L Bond Claims.  The Investigations Committee and the Bondholder Committee weighed the strengths and weaknesses of such potential claims and defenses, and concluded that there is significant uncertainty as to whether the either party would prevail on any claims to subordinate or recharacterize the LBM L Bond Claims.  Likewise, litigation concerning the foregoing has the potential to be lengthy and at significant expense, given the fact-intensive, complex nature of such litigation, including pre-confirmation litigation with respect to the classification, estimation, and/or temporary allowance of the LBM L Bond Claims or the designation of LBM's votes on the Plan.

53.     In sum, I believe the LBM Settlement is appropriate because of: (i) the uncertain outcome of litigation, which may have resulted in 0% of the Seller Trust L Bonds being subordinated to the recoveries of all other L Bondholders, (ii) the significant time and expense that would be associated with uncertain litigation in respect of the Seller Trust L Bonds, (iii) the arms'-length nature of the compromise achieved in the context of mediation, (iv) LBM's obligation to vote in favor of the Second Amended Plan in all circumstances, (v) the preservation of the right of the Litigation Trust to pursue any and all claims and challenges in respect of the LBM L Bond Claims in the event LBM withdrew from the LBM Settlement (a factor which is now moot), and (vi) the incremental benefit to other Bondholders' recoveries as a result of the partial subordination of the LBM L Bond Claims.

## XIX.   Exculpation, Release, Injunction, and 1125(e) Provisions

54.     Article VIII of the Plan contains certain exculpation, release, and injunction provisions, as well as provisions granting certain protections to the 1125(e) Parties.   These provisions are essential components of the Plan and I believe such provisions are supported by the Debtors' business judgment.   Among other things, the release provisions contained in Article VIII of the Plan (i) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the Released Parties, (iv) are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's-length, (vi) are fair, equitable, and reasonable, and (vii) failure to implement the Debtor Releases would jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein.

55.     The exculpation provisions and the protections granted to the 1125(e) Parties contained in the Plan are appropriately tailored to the circumstances of these chapter 11 cases and are appropriate because they are supported by proper evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope.  My understanding is that Exculpated Parties and 1125(e) Parties relied upon such provisions as a material inducement to engage in postpetition negotiations with the Debtors that culminated in the Plan, the Mediation Agreement, and all other settlements and compromises therein that maximize value for the Debtors' Estates.  These provisions are supported by the Debtors, the Independent Committees, the Bondholder Committee, and LBM, are appropriately tailored to protect the Exculpated Parties and 1125(e) Parties from unnecessary litigation, and contain appropriate carve outs for actions determined to have constituted an intentional breach of fiduciary duty, actual fraud, willful misconduct, or gross negligence.

56.     The injunction provisions contained in the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the release and exculpation provisions of the Plan. The injunction provisions are appropriately tailored to achieve those purposes.

57.     Further, the DLP Independent Directors have acted as disinterested parties throughout these Chapter 11 Cases, carefully exercised their fiduciary duties in accordance with the DLP Cash Collateral Orders, and were integral to the Chapter 11 Cases and resolution thereof.

58.     In addition, given the highly contentious nature of the case and numerous parties involved, exculpation is appropriate because, without it, the DLP Independent Directors could otherwise be subjected to frivolous and meritless suits, which could in turn, create indemnification liability for the Debtors, Wind Down Debtors, or Wind Down Trust.  Given the temporal limitations on exculpation already set forth in the plan, and carve-outs for intentional breach of

fiduciary duty, actual fraud, willful misconduct, and gross negligence, extending limited qualified immunity exculpation to the DLP Independent Directors is appropriate.

## XX.   **AHC Substantial Contribution Claim**

59.    The Plan provides for the payment of up to $1,000,000 of actual and reasonable fees and expenses of the AHC on the Effective Date of the Plan in full and final resolution of any claims that the AHC could assert for making a substantial contribution to the Chapter 11 Cases. The AHC has actively engaged with the Debtors and other constituencies in the Debtors' efforts to reach a value maximizing and consensual chapter 11 plan, including participating in mediation sessions and working with the Debtors on developing certain elements of the Plan, including the LBM settlement noted above.   The AHC acted as an essential conduit for disseminating information and communicating with bondholders and preferred stockholders regarding the status and progress of these Chapter 11 Cases.   This was particularly valuable with respect to the bondholders who hold their bonds through custodial accounts that clear through DTC, given that the Debtors generally lacked visibility into the identity of, or contact information for, those specific individuals.  I believe that these actions went far above and beyond what would have been required of the individual members of the AHC to fulfill their duties to their clients.  As set forth in the Voting Report, over 11,700 individual bondholders voted on the Plan.  I believe the AHC and its members were instrumental in generating such high levels of securityholder engagement and participation in the Plan voting process.  Accordingly, I believe that allowance and payment of the actual and reasonable fees and expenses of the AHC for making a substantial contribution to the Chapter 11 Cases is appropriate, up to $1,000,000.

**REQUEST FOR WAIVER OF BANKRUPTCY RULE 3020(E)**

60.    Any significant delay may affect recoveries to creditors under the Plan because delay in the occurrence of the Effective Date will likely result in the continued incurrence of administrative expenses and, in particular, Accrued Professional Compensation Claims that must be paid in full shortly after the Effective Date of the Plan.  I believe that the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible and without delay.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 14, 2023                    /s/ *Jeffrey S. Stein*
                                        Jeffrey S. Stein

                                        Chief   Executive   Officer,   President,   Chief
                                        Restructuring Officer and Independent Director of
                                        GWG Holdings, Inc.

# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GWG Holdings, Inc., *et al.*,[1] | ) | Case No. 22-90032 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**STIPULATION REGARDING MEDIATED RESOLUTION IN CONNECTION
WITH DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
AMENDMENTS TO CONSULTING AGREEMENT WITH JEFFREY S. STEIN AND
INDEPENDENT DIRECTOR AGREEMENT WITH ANTHONY R. HORTON [D.I. 1392]**

This stipulation (the "Stipulation") is made and entered into in connection with the judicial mediation pursuant to the *Order (I) Appointing a Judicial Mediator, (II) Requiring Parties to Maintain Confidentiality of Mediation Communications, and (III) Granting Related Relief* [D.I. 1323] by and among GWG Holdings, Inc., GWG Life, LLC, GWG Life USA, LLC, GWG DLP Funding IV, LLC, GWG DLP Funding VI, LLC, and GWG DLP Funding Holdings VI, LLC (collectively, the "Debtors"), the Official Committee of Bondholders of GWG Holdings, Inc. (the "Bondholder Committee"), L Bond Management, LLC ("LBM"), Beneficient Management, L.L.C. (the "General Partner"), Jeffrey S. Stein, in his capacity as Chief Executive Officer of the Debtors ("Mr. Stein"), and Anthony R. Horton, in his capacity as an Independent Director of the Debtors ("Mr. Horton" and, together with the Debtors, the Bondholder Committee, LBM, the General Partner, and Mr. Stein, collectively, the "Parties").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (none); and GWG DLP Funding Holdings VI, LLC (none). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these Chapter 11 Cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

It is hereby AGREED as follows:

1.      The *Debtors' Motion for Entry of an Order Approving Amendments to Consulting Agreement with Jeffrey S. Stein and Independent Director Agreement with Anthony R. Horton* [D.I. 1392] (the "Compensation Motion") shall be modified and the Debtors shall seek Bankruptcy Court approval in accordance with this Stipulation.  Such approval shall be obtained in connection with the approval of the *Debtors' Modified Second Amended Joint Chapter 11 Plan Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents*, as may be amended from time to time (the "Plan") in accordance with the terms thereof, this Stipulation, and the Mediation Settlement Term Sheet, dated March 9, 2023 [D.I. 1518 Ex. A] (the "Mediation Term Sheet").

2.      As approved by the Parties and Mr. Horton on behalf of the Debtors, the "Success Bonus" payable to Mr. Stein in accordance with the Consulting Agreement, dated June 1, 2022 [D.I. 430 Ex. B], shall be (a) $1,830,000 in cash, and (b) 40,000 common units of The Beneficient Company Group, L.P. ("BCG") owned by the Debtors, in each case to be paid on the effective date of the Plan; *provided, however*, that if BCG has consummated the Avalon business combination prior to confirmation of a chapter 11 plan for the Debtors, Mr. Stein shall be entitled to receive 50,000 shares of Class A common stock, par value $0.001 per share, of Beneficient, a Nevada corporation.

3.      As approved by the Parties and Mr. Stein on behalf of the Debtors (such approval given subsequent to approval of the agreement set forth in paragraph 2 above), Mr. Horton shall receive additional compensation in addition to the compensation payable to Mr. Horton in accordance with the Independent Director Agreement, dated June 2, 2022 [D.I. 430 Ex. D], of $120,000 in cash, to be paid on the effective date of the Plan.

4.      Notwithstanding any applicable provision of the Mediation Term Sheet, the Debtors shall not agree to any settlement of potential estate claims or causes of action with Ben (as defined in the Mediation Term Sheet) without the consent of the Bondholder Committee and L Bond Management.

5.      Notwithstanding any applicable provision of the Mediation Term Sheet, the Liquidating Trustee of "Trust A" (as described in the Mediation Term Sheet) shall be Elizabeth Carol Freeman or any affiliate of Ms. Freeman, subject to agreement by Ms. Freeman, the Debtors, the Bondholder Committee, and LBM to the terms of engagement, which shall provide for compensation as agreed.

6.      All other terms of the Mediation Term Sheet shall remain in effect.

7.      Counsel by their signatures below have been authorized to execute this Stipulation on behalf of their respective clients.

Dated: April 17, 2023
New York, New York

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE,
SOLELY IN HIS CAPACITY AS MEDIATOR

AGREED:

**JACKSON WALKER LLP**

_____

Kristhy M. Peguero (TX Bar No. 24102776)
Matthew D. Cavenaugh (TX Bar No. 24062656)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Email:          kpeguero@jw.com
                mcavenaugh@jw.com

*Co-Counsel for the Debtors and Debtors in
Possession*

**MAYER BROWN LLP**

_____

Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone:      (713) 238-3000
Email:          ckelley@mayerbrown.com

-and-

Thomas S. Kiriakos (admitted *pro hac vice*)
Louis S. Chiappetta (admitted *pro hac vice*)
71 S. Wacker Drive
Chicago, IL 60606
Telephone:      (312) 701-0600
Email:          tkiriakos@mayerbrown.com
                lchiappetta@mayerbrown.com

-and-

Adam C. Paul (admitted *pro hac vice*)
Lucy F. Kweskin (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1001
Telephone:      (212) 506-2500
Email:          apaul@mayerbrown.com
                lkweskin@mayerbrown.com

*Counsel for the Debtors and Debtors in
Possession*

**KATTEN MUCHIN ROSENMAN LLP**

Steven J. Reisman (admitted *pro hac vice*)
Cindi M. Giglio (admitted *pro hac vice*)
Marc B. Roitman (admitted *pro hac vice*)
50 Rockefeller Plaza
New York, NY 10020
Telephone:    (212) 940-8800
Email:          sreisman@katten.com
                    cgiglio@katten.com
                    marc.roitman@katten.com

-and-

Daniel Barnowski (admitted *pro hac vice*)
2900 K Street NW, Suite 200
Washington, DC 20007
Telephone:    (202) 625-3500
Email:          dan.barnowski@katten.com

*Counsel to Jeffrey S. Stein and Anthony R.
Horton, in their capacities as members of the
Special Committee and the Investigations
Committee of the Board of Directors of GWG
Holdings, Inc.*

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Lacy M. Lawrence
State Bar No. 24055913; S.D. Tex. No. 995675
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
llawrence@akingump.com

-and-

Michael S. Stamer (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Jason P. Rubin (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone:     (212) 872-1000
Facsimile:     (212) 872-1002
mstamer@akingump.com
aqureshi@akingump.com
jrubin@akngump.com

-and-

Scott L. Alberino (admitted *pro hac vice*)
Benjamin L. Taylor (admitted *pro hac vice*)
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006-1037
Phone:     (202) 887-4000
Fax:     (202) 887-4288
salberino@akingump.com
taylorb@akingump.com

*Counsel to the Official Committee of
Bondholders of GWG Holdings, Inc., et al*

**OKIN ADAMS LLP**

Matthew S. Okin (Texas Bar No. 00784695)
David L. Curry, Jr. (Texas Bar No. 24065107)
Edward A. Clarkson, III (Texas Bar No. 24059118)
mokin@okinadams.com
dcurry@okinadams.com
eclarkson@okinadams.com
1113 Vine Street, Suite 240
Houston, TX 77002
Tel: (713) 228-4100
Fax: (346) 247-7158

*Counsel to L Bond Management*

**Beneficient Management L.L.C. agreement to the Stipulation is limited to agreeing that Beneficient Management, LLC consents to the Debtors transferring 40,000 BCG common units owned by the Debtors, or 50,000 shares of Class A common stock, par value $0.001 per share, of Beneficient, a Nevada corporation consistent with the terms of the Stipulation.**

**HOLLAND & KNIGHT LLP**

William  L. Banowsky
State Bar no. 01697125
Email: Bill.Banowsky@hklaw.com

1722 Routh St., Suite 1500
Dallas, TX 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

-and-

Anthony F. Pirraglia
State Bar No. 24103017
Email: Anthony.Pirraglia@hklaw.com
811 Main Street, Suite 2500
Houston, TX 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

*Counsel for Beneficient Management, L.L.C.*