1            IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 22-90032-11
                              §      HOUSTON, TEXAS
5   GWG HOLDINGS, INC., ET AL,  §      THURSDAY,
                              §      JUNE 15, 2023
6           DEBTORS.          §      1:29 P.M. TO 2:52 P.M.

7          **MOTION AND CONFIRMATION HEARING (HYBRID)**

8            BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE

9

10

11

12     APPEARANCES:                  SEE NEXT PAGE

13     COURTROOM DEPUTY:             SIERRA THOMAS

14

15        **(RECORDED VIA COURTSPEAK; NO LOG NOTES)**

16

17

18

19

20            TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22            Sugar Land, TX  77478
                  281-277-5325
23            www.judicialtranscribers.com

24
      Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

```
1                        APPEARANCES (HYBRID):

2


3    FOR DEBTOR:                    MAYER BROWN, LLP
                                    Thomas S. Kiriakos, Esq.
4                                   715 S. Wacker Drive
                                    Chicago, IL  60606
5                                   312-701-0600

6                                   MAYER BROWN, LLP
                                    Charles Stephen Kelley, Esq.
7                                   700 Louisiana Street
                                    Suite 3400
8                                   Houston, TX  77002
                                    713-238-2634
9
     FOR FIFTH SEASONS:            CRAVATH, SWAINE AND MOORE
10                                  Paul Zumbro, Esq.
                                    Worldwide Plaza
11                                  825 Eighth Avenue
                                    New York, NY  10019
12                                  212-474-1000

13   FOR WELLS FARGO:              K&L GATES
                                    Brian Kilmer, Esq.
14                                  609 Main Street
                                    Suite 4150
15                                  Houston, TX  77002
                                    713-815-7300
16
     FOR BENEFICENT:               HOLLAND & KNIGHT, LLP
17                                  Steven Levitt, Esq.
                                    Anthony Pirraglia, Esq.
18                                  David Bennett, Esq.
                                    811 Main Street
19                                  Suite 2500
                                    Houston, TX  77002
20                                  713-821-7000

21   FOR AD HOC GROUP OF
     BROKER DEALERS:               PROSKAUER ROSE, LLP
22                                  Brian Rosen, Esq.
                                    Eleven Times Square
23                                  New York, NY  10036
                                    212-969-3000
24

25
```

```
 1                      APPEARANCES (CONT'D):

 2

 3   FOR OFFICIAL COMMITTEE
     OF BOND HOLDERS              AKIN GUMP STRAUSS HAUER FELD
 4                               Jason P. Rubin, Esq.
                                 One Bryant Park
 5                               New York, NY  10036
                                 212-872-1000
 6
     FOR L BOND MANAGEMENT:       OKIN ADAMS BARTLETT CURRY
 7                               Matthew Okin, Esq.
                                 1113 Vine Street
 8                               Suite 240
                                 Houston, TX  77002
 9                               713-228-4100

10   FOR INDEPENDENT DIRECTORS:   KATTEN MUCHIN ROSENMAN, LLP
                                 Steven J. Reisman, Esq.
11                               50 Rockerfeller Plaza
                                 New York, NY  10020
12                               212-940-8800

13   FOR BRAD HEPPNER:            QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP
14                               James Tecce, Esq.
                                 51 Madison Avenue
15                               22nd Floor
                                 New York, NY  10010
16                               212-849-7000

17

18

19   (Please also see Electronic Appearances.)

20

21

22

23

24

25
```

4

1                              INDEX

2

3    WITNESS:           Direct     Cross     Redirect    Recross

4    (None called)

5

6    EXHIBITS:                    Received

7    Debtor's Exhibits 1931-1 to -54     54

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **HOUSTON, TEXAS; THURSDAY, JUNE 15, 2023; 1:29 P.M.**

2            THE COURT:  Please be seated.

3        (Pause in the proceedings.)

4            THE COURT:  All right, it's 1:30.  Good afternoon.

5    We are here for the GWG Holdings Confirmation Hearing.  Case

6    is 22-90032.  Electronic appearances should have been made.

7            Let me ask Mr. Kiriakos to start the hearing and

8    tell me where you believe we need to go today.  And then

9    we'll hear from others.

10           MR. KIRIAKOS:  Thank you, Your Honor.  All right

11   good afternoon, Judge Isgur, Thomas Kiriakos from Mayer

12   Brown on behalf of the Debtors.

13           As you pointed out, we're here today primarily for

14   the Confirmation Hearing on our Second Amended Plan, as

15   modified, which we have proposed with the Bondholder

16   Committee and L Bond Management, which has been

17   overwhelmingly accepted by approximately 11,700 voting

18   bondholders with acceptance rates post numerosity and claim

19   amount in excess of 99 percent, which has no pending

20   confirmation objections and which we believe is fully

21   consensual.

22           Before we get started, however, Your Honor, we'd

23   like to thank Your Honor for making time today and we would

24   also note that at the outset of this hearing, our gratitude

25   to your colleague, Judge Jones, who shepherded and guided

1  the parties through a successful mediation resulting as

2  indicated in a fully consensual plan.

3         Given the circumstances of this case, I know Your

4  Honor knows that that was no small feat.  While I'm sure

5  that you'll be hearing the same from the other mediation

6  parties, I'm confident I speak for all the mediation parties

7  in expressing our gratitude to Judge Jones.

8         If it's all right, Your Honor, I plan to take you

9  quickly through the confirmation standards for our plan.

10  Next, I'll touch on the objections that were filed and have

11  been resolved.  I'll touch again briefly on our compensation

12  motion, which is subject to it's element under the plan, as

13  well as the LBM settlement, which is set forth in the plan.

14  And our -- the plan provisions regarding the substantial

15  contribution claim of the Ad Hoc Committee Bondholders.

16         Then, Your Honor, I'm happy to break and have you

17  hear from other parties before we tender our evidence, if

18  that's acceptable to the Court.

19         THE COURT:  Does anyone object to that process?

20     (No audible response.)

21         THE COURT:  Go ahead, Mr. Kiriakos, thank you.

22         MR. KIRIAKOS:  Thank you.  Your Honor, before I

23  start in the courtroom today, we also have with us in the

24  courtroom, Mr. Jeffery S. Stein, the Debtor's CEO, CRO and

25  Independent Director, who has submitted a Declaration in

1  support of confirmation.

2          Mr. Peter Laurinaitis of PJT Partners, the

3  Debtor's investment banker, who's also submitted a

4  Declaration regarding valuation and the exit facility.

5          Michael Tucker of FTI Consulting, the Debtor's

6  interim CFO, who submitted a Declaration regarding

7  feasibility and best interest.

8          Mr. Mark Ven (phonetic) who submitted a

9  Declaration regarding the valuation of the Debtor's policy

10  portfolio.

11          Virtually we have with us also Mr. John Burlique

12  (phonetic) from Donlin Recano regarding solicitation and

13  voting, who submitted a Declaration regarding solicitation

14  and voting.

15          And Mr. Dewey Imhoff of FTI Consulting, who

16  submitted a Declaration regarding compensation.

17          In addition, Your Honor, virtually we have with us

18  Mr. Tony Horton, who is also the company -- the Debtor's

19  other Independent Director.

20          The Plan represents a comprehensive and what we

21  consider to be the best outcome for the Debtor's

22  constituents given the circumstances and the widespread

23  support of the -- and the widespread support of the Plan

24  speaks to the good faith and extensive efforts that

25  culminated in the Plan.

1          Your Honor, I know you know this, but it's been a

2     long road of 14 months when this case started.  We've worked

3     hard to get to this point, including multiple DIP

4     financings, the appointment of a CRO and two independent

5     director and a new governing structure, the appointment of

6     special Committees and including an investigating Committee

7     that conducted a nine-month investigation.  And as I pointed

8     out, the mediation efforts of Judge Jones.

9          As you may recall, Your Honor, the Debtors have

10    four main assets:  The portfolio of life insurance policies,

11    the interest in companies called Beneficient, the interest

12    in Foxo and the litigation claims and causes of action.

13         Our constituents include over -- L bondholders

14    holding over 26,000 investments issued by the Debtors.  And

15    those constituents have an official Committee appointed for

16    them, the Bondholder Committee.

17         Other constituents include L Bond Management who

18    control -- who's the agent for 367 million of seller trust L

19    bonds, as well as the ad hoc group of broker dealers.

20         As you might recall, the Debtors under went

21    extensive marketing, solicitation process to obtain the DIP

22    financing and our exit financing and the various other

23    financings, and we, as you know, negotiated with several

24    parties through.

25         Our original Plan was filed on December 1st,

1    Docket No. 1134.  We then went through with Judge Jones,

2    several rounds of mediation including the last one that

3    concluded last week.

4         The original mediation agreement was filed at

5    Docket No. 1518.  The mediation agreement provided that we

6    would be with L Bond Management and the Bond Hold Committee,

7    co-proponents of the plan.  And all three groups have worked

8    closely to develop the plan and the Plan Supplement

9    documents.

10        As you might recall, Your Honor, from our earlier

11   hearings, the plan contemplates a two trust structure.  The

12   wind-down trust will operate as a primarily trust into the

13   plan and will be responsible for making distributions to

14   holders of claims and interest under the Plan and otherwise

15   generally perform wind-down administrative functions.

16        The wind-down trust will own the life insurance

17   policy portfolio, the Beneficient interest and the Foxo

18   Interest.

19        The litigation trust will hold and prosecute the

20   Debtors claims and causes of action and also receive the

21   Debtors' interest in the D&O policies.

22        Holders of Class III Bond claims, Class IV General

23   Unsecured Claims, and all other classes of interest under

24   the plan will receive interest in the wind-down trust in

25   exchange for such claims.

1          As we've noted before, the bondholders and the

2   L Bond Indenture Trustee will receive the most senior

3   interest and they will be the first to receive cash proceeds

4   to the monetization of these assets.

5          Holders of the new wind-down trust interest will

6   receive payments over time in accordance with the waterfall

7   set forth in the agreement.

8          The wind-down trust will make periodic cash

9   distributions to holders over time.  But, as we've noted

10  before, certain assets may take longer to liquidate and have

11  an inherent uncertainty.

12         Similarly, the wind-down trustee will be seeking

13  to monetize the Debtor's stake in Beneficient, which we are

14  pleased to report completed its fee back process and began

15  trading on June 8th.  The closing share price as of last

16  night was $5.52 a share.  The Debtors own, after the de-back

17  (phonetic) the Debtor's own over 125 million shares.

18         The initial term of the both trusts is three years

19  with the built-in flexibility to extend the life span of the

20  trust in two-year interim -- increments.

21         Turning to solicitation and voting:  We began,

22  pursuant to the order you entered approving the Disclosure

23  Statement and the solicitation procedures, we began

24  solicitation of votes on April 25th with the voting deadline

25  set at 4:00 p.m. Central Time on May 31st.

1        We solicited Class III, which were the

2   bondholders; Class IVa, general unsecured claims; Class

3   VIII, Series one Preferred; Class IX, Series two preferred;

4   Class X, Common Stock.

5        Where, as I mentioned at the top, we're pleased to

6   report overwhelming acceptance by Class III, the

7   bondholders.  We had 11,646 bondholders cast, which

8   represents 99.19 percent of those voting, holding claims in

9   excess of a billion dollars and representing the claim

10  amounts of 99.43 percent voting in favor of the plan with

11  rejection only from roughly six million, a little more than

12  half a percent in amount and 95, almost one percent in

13  number.

14       With respect to the Class IV, where we also have

15  acceptance, 4(a), based on both the provisions of the

16  solicitation order and the order you entered on Tuesday,

17  been cast as vote for a dollar.  In light of that vote

18  amount, we were able to still have a consenting and

19  accepting Class IV.

20       All other classes initially accepted with the sole

21  exception of Class X, the Common Stock Interest.  Since then

22  and what you'll hear later, Your Honor, from Beneficient,

23  Beneficient has agreed to change its vote to an abstention.

24  That emergency motion will before you.  We've built it into

25  the form of the confirmation order, which has been uploaded

1   at Docket No. 1932.

2          Beneficient has agreed, as part of it's overall,

3   our overall resolution to now abstain with respect to

4   Class X -- its Class X vote.  With that abstention, we will

5   now have a completely consensual plan that's been accepted

6   by all classes.

7          We filed our original Plan Supplement on May 24th.

8   We have since updated it by filing amended litigation trust

9   agreements and amended form of litigation trust agreements

10  and amended form of wind-down trust agreement and updated

11  retained cause of action schedule.

12         Both the forms of the trust agreements -- which

13  were mediated again with Judge Jones' help -- are acceptable

14  to the plan proponents as well as Beneficient and they are

15  the final forms.

16         They've been uploaded.  They will also be attached

17  to the Confirmation Order that we will tender to Your Honor.

18         Your Honor, the Plan satisfies all the

19  requirements of 1129 of the Bankruptcy Code.  In 1129(a)

20  we've satisfied the Plan complies with all the provisions of

21  the Bankruptcy Code including with respect to the inclusion

22  of the plan settlements, exculpation, and release

23  provisions.

24         We've satisfied 1129(a)(2) as reflected in the

25  solicitation ballot with respect to good faith.  As noted in

1   the Plan is a product of a mediated settlement among the

2   Debtors, the Bondholder Committee, and L Bond Management.

3          The Plan proponents believe that it represents the

4   best available option for completing the Chapter 11 cases

5   with the highest and maximum recovery from creditors and

6   stakeholders.  As such, the Plan has been proposed in good

7   faith and not by any means prohibited by law.

8          We have satisfied the requirements of 1129(a)(4),

9   as the professional fees are subject to Court approval.

10          With respect to 1129(a)(5), we have disclosed the

11   directors and officers in the Plan Supplement including

12   Ms. Elizabeth C. Freeman as the proposed wind-down trustee

13   and Mr. Michael I. Goldberg as the proposed litigation

14   trustee.

15          In addition, as pointed out in Mr. Steins'

16   Declaration, we have disclosed that Mr. Bryan Bailey, who is

17   the only other officer of the Debtors, likely may be

18   retained by the wind-down trustee, although it has not been

19   finalized and accordingly his compensation hasn't been

20   finalized, but we've made those disclosures.

21          With respect to 1129(a)(7), the best interest test

22   is reflected both in the Declaration of Mr. Tucker and

23   Mr. Tucker, we have satisfied the best interest test.

24   Stakeholders and creditors are likely to receive more under

25   the Plan than they would received in a Chapter 7 case.

1        With respect to 1129(a)(8) and assuming the Court

2   approves Beneficient's proposed change of ballot, we have --

3   not only do we have -- we have entire accepting classes.

4        The Plan's provisions are consistent with

5   1129(a)(9) particularly now as we take into account our

6   resolution with Fifth Season, which I will get to shortly.

7   The Plan satisfies (a)(10), as has been accepted by all the

8   classes.

9        The Plan is not likely to be filed by -- followed

10  by any subsequent liquidation not contemplated by the Plan,

11  which is a liquidating Plan.  And Mr. Tucker's Declaration

12  speaks to that, as does our resolution now with Fifth

13  Season.

14        The Plan provides for the payment of statutory

15  fees.  So we've satisfied 1129(a)(12) and we do -- since we

16  have a fully consensual plan with Beneficient's abstention,

17  we don't touch the cram down requirements of 1129(b).  But

18  if we did, we would, in fact, -- we in fact would satisfy

19  those cram down standards.

20        Going to the objections and the resolution, Your

21  Honor.

22        THE COURT:  Before we get there.

23        MR. KIRIAKOS:  Yep.

24        THE COURT:  Look, I think it's remarkable the vote

25  that you got on the Plan.  But I want to be sure that we

1  have, as part of your opening statement, a clear statement

2  on the issue that's always been the underside of every

3  hearing we've had.

4  And that is there are allegations that have been

5  fully voiced that pre-bankruptcy there was wrongdoing by

6  management, directors and others.  Those matters, as I

7  understand it, are being turned over to the litigation trust

8  to deal with.

9  MR. KIRIAKOS:  That's correct.

10  THE COURT:  And I think it's, by the way for

11  anyone listening, highly unlikely that they'll ever get

12  litigated before me.  Those are almost surely going to get

13  litigated not in the Bankruptcy Court.  Some possibility

14  that they're here, but I think it's so low that it doesn't

15  matter much.

16  So my inquiry isn't to educate myself about what's

17  going to happen in the future on those.  As I read the

18  definitions of released parties and non-released parties --

19  MR. KIRIAKOS:  Yes.

20  THE COURT:  -- I thought they worked and maybe

21  more importantly, 99 percent of the voters thought they

22  worked.  But I want you to make a clear statement on the

23  Record so that people who are listening to you today,

24  understand who might get sued.

25  There's no guarantee that anyone in particular

1  gets sued.  But there are some people that are getting

2  released and I will say primarily those are people that were

3  hired to be sure that the bankruptcy case worked out.

4          But in terms of who is getting released for any

5  pre-petition alleged misconduct, I just want there to be a

6  clear statement on the Record about that and I'm not

7  expressing any disapproval of that at all.  I've read it and

8  I think it works.

9          But as you're making your opening statement, I

10 think that's what people are going to want to hear.  I also

11 want you to correct if some of my assumptions are wrong

12 about, you know, that will all be turned over to the

13 litigation trust, things like that, so that people know your

14 position on that.

15          MR. KIRIAKOS:  Sure, let me start there, Your

16 Honor.  First, you are correct on all accounts.  Those

17 causes of action will be -- are within the definition of

18 retained causes of action.

19          Under the Plan, on the effective date, they'll

20 be -- those causes of action will be transferred from the

21 estates to the wind-down trust, where they will stay for a

22 nanosecond, and then they'll be transferred to the

23 litigation trust.

24          The list of non-released parties include, without

25 limitation, Beneficient, its current and former directors

1   and officers including without limitation Bradley K.

2   Heppner, Thomas O. Hicks (phonetic), Brad W. Schnitzer

3   (phonetic), Dennis P. Lockhart (phonetic), and Peter T.

4   Kanley (phonetic).  I've never been able to pronounce his

5   name.  My apologies there.

6            H.C.L.P. Nominees, LLC, the Debtor's former

7   directors, but for the purpose of clarity not the directors

8   serving on the date of confirmation order is entered.  And

9   officers, including without limitation, Murray Holland

10  (phonetic) and Timothy Evans (phonetic) in their capacity or

11  capacities as such.

12           And any entities affiliated with or otherwise

13  related to the foregoing and the Debtor's pre-petition legal

14  counsel.  Such causes of action include, but are not limited

15  to, all causes of action, relief available under Sections

16  105, 510(c), 542 through 551, and 553 of the Bankruptcy Code

17  and analogous state and common law, including without

18  limitation avoidance actions, which is a defined term under

19  the Plan, and claims for breach of fiduciary duty, aiding

20  and abetting, breach of fiduciary duty, unlawful dividend,

21  and unjust enrichment.

22           That is set forth in document -- it was the

23  retained cause of action was filed as part of the original

24  Plan Supplement.  It's been updated.  Anyone can find it at

25  Document No. 1917.

1          It goes on, Your Honor, over a page and a half to

2    list examples of causes of action that are, in fact,

3    retained and will be transferred to the litigation trust.

4    I'm happy to read through those or let people refer to

5    Document No. 1917.

6               THE COURT:  Let me just ask a couple of questions.

7               MR. KIRIAKOS:  Sure.

8               THE COURT:  I think I know the answers to them,

9    but I want a nice Record on this.  If someone

10   inappropriately took money from the Debtor that was

11   unauthorized, can they be sued for that?

12              MR. KIRIAKOS:  Yes.

13              THE COURT:  If they diverted money to one of their

14   other interests, not in the best interest of -- but did so

15   not acting in the best interest of GWG, could they be sued

16   for that?

17              MR. KIRIAKOS:  Yes.

18              THE COURT:  If they invested in stocks and shares

19   of affiliated companies without appropriate authority, could

20   they be sued for that?

21              MR. KIRIAKOS:  Yes.

22              THE COURT:  Okay.  I spent quite a bit of time --

23              MR. KIRIAKOS:  Your Honor, my answers -- and I

24   took for granite your questions assumed this -- in the sense

25   of they're not released from any of those claims, I'm not --

1          THE COURT:  No, I'm not suggesting any -- we've

2   made zero determination --

3          MR. KIRIAKOS:  Right, right.

4          THE COURT:  -- any was liable for anything and I

5   didn't use any names there.  I'm just making clear that the

6   Plan doesn't effect their liability.

7          MR. KIRIAKOS:  Their plan doesn't -- that's

8   exactly right.

9          THE COURT:  They may have no liability to begin

10  with.

11         MR. KIRIAKOS:  The Plan would not be an impediment

12  to brining any of those hypothetical suits, Your Honor.

13         THE COURT:  So, I spent quite a bit of time

14  looking to see if there might be any overlap between the

15  definition of who was released and who was not released so

16  that we could have a conflict.

17         I actually couldn't find a problem there.  My best

18  read of the Plan is, is that if there ever was a conflict,

19  where somebody was listed on both the released and the

20  non-released group, that the provisions of the Plan would

21  make them not released, as opposed to released.

22         Do you agree with that?

23         MR. KIRIAKOS:  Yeah, I can speak that -- I can

24  speak to the fact that the intent was to limit the released

25  parties to those parties that were specifically mentioned

1  and who were released for the things that they were released

2  for.  And that if there ever was such an ambiguity, I would

3  reach -- I would make the same assumption that you would

4  make, Your Honor.

5          THE COURT:  Finally, in this area, are there any

6  provisions of the Plan that would prohibit someone who held

7  a claim individually?  In other words, not a claim that is

8  actually owned by the Debtor but held their own claim that

9  would stop them from prosecuting their own claim other than

10  the exculpated parties -- which are essentially the people

11  that administered the bankruptcy case?

12          MR. KIRIAKOS:  Your Honor, that was -- there are

13  no third-party releases at all.  And that was one of the

14  first things that was established during mediation.  So

15  you're correct in that supposition also.

16          THE COURT:  Okay.  I just wanted all that out

17  there so that --

18          MR. KIRIAKOS:  I should have anticipated and we

19  should have brought it up at the front, Your Honor.

20          THE COURT:  It sounds like you did anticipate it

21  because you knew all the answers.  That's fine, thank you.

22          MR. KIRIAKOS:  Thank you.

23      (Pause in the proceedings.)

24          MR. KIRIAKOS:  Your Honor, turning to the

25  confirmation objections, which we have resolved.  We had

1  Mr. Duran from the U.S. Trustee's Office had several

2  comments and concerns regarding the exculpation provisions

3  and the Plan references to discharge in the plan.

4           And we've worked with him to make those

5  amendments, those revisions.  We thank him for working with

6  us and they had been resolved in the version of the Plan

7  that's now on file.  So that's been successfully resolved.

8           With respect another informal objection was from

9  the Texas Comptroller of Public Accounts.  And we've

10 resolved his objection in paragraph -- the Comptroller's

11 objection in paragraph 66 of the Confirmation Order, which

12 is at 1932.

13          THE COURT:  Let me put that up on the screen just

14 so that --

15          MR. KIRIAKOS:  Sure.  We just filed it to clean up

16 one more thing right before the hearing, Your Honor.  So I

17 don't know if it's hit your screen yet or not.  But it's --

18          THE COURT:  I've got something that was filed --

19 the one that I'm showing you is 1932.  And it was filed

20 today at 1:13 p.m.

21          MR. KIRIAKOS:  Right.  That is the current version

22 of the Confirmation Order and the Texas Comptroller of

23 Public Accounts informal objection was resolved, pursuant to

24 paragraph 66.

25      (Pause in the proceedings.)

1          MR. KIRIAKOS:  Your Honor, moving on to Fifth

2   Season.  As you --

3          THE COURT:  Do you want me to look at that or?

4          MR. KIRIAKOS:  Pardon me.

5          THE COURT:  I don't know how you want to go about

6   these changes.  Do you want me to look at 66?

7          MR. KIRIAKOS:  I'm happy to take you through them.

8   They're -- frankly they're self contained.  They're

9   essentially a reservation of rights and clarity as to what's

10  not discharged and what is.

11         I'm happy to go through it.  But as I said --

12         THE COURT:  I'm going to leave that up to you.  I

13  can take this back and read it after the hearing to be sure

14  that I'm okay with everything.  You can take me through

15  things now.

16         Here's the Comptroller's provision, for example.

17         MR. KIRIAKOS:  Yep.

18         THE COURT:  What's best for everyone?  Do you want

19  me to just take it back and read it later?

20         MR. KIRIAKOS:  Your Honor, it's so -- from where I

21  sit, it's so non-controversial that I don't think we need to

22  take the time with it this on the Record, but.

23         THE COURT:  That's fine.

24         MR. KIRIAKOS:  Okay.  Moving on to Fifth Season,

25  Your Honor.  As you know, we filed a motion to estimate

1    Fifth Seasons claim for asserted administrative claim for a

2    breakup fee regarding the earlier DIP financing facility and

3    their fee letter.

4            We filed a motion to estimate their claim for

5    administrative claim purposes because of our feasibility

6    concerns.  That was frankly before the De-SPAC closed.  Once

7    the De-SPAC closed, we were convinced that we did not have

8    the same feasibility issues regarding Fifth Season.

9            Although Fifth Season has worked with us to make

10   sure that if and when their claim is adjudicated, there will

11   be assets there to satisfy them.

12           As a result and the key provision here is

13   paragraph 62 of the Confirmation Order that you just had on

14   the screen.  I'm happy to go through it in detail, but the

15   basic premise -- and Mr. Zumbro for Fifth Season is here and

16   he'll speak to it later also, I'm sure.

17           The basic premise is in light of the fact that our

18   Beneficient shares we believe are very valuable, but they're

19   not presently liquid, we will set aside Beneficient shares

20   with a value of $2 based on a volume weighted 10-day trading

21   average.

22           We'll set aside shares $2 for every $1 of the

23   asserted administrative breakup fee claim.  We have the

24   right under this arrangement to substitute when we're able

25   to and we want to, substitute $1 cash for $2 set aside

1  shares with two exceptions where we are obligated to deposit

2  cash.

3         Those two exceptions are if we are able to sell

4  any new Beneficient shares between now and the effective

5  date that cash would be substituted in the manner I just

6  described.

7         Also to the extent that the Fifth Season breakup

8  fee claim is allowed, we would then be obligated or the

9  wind-down trust would be obligated to seek the liquidation

10  of sufficient shares to pay the judgment.

11         That's the settlement in a nutshell, Your Honor.

12  It also does some housekeep -- paragraph 62 does some

13  housekeeping things, including setting a bar date for Fifth

14  Season to file any administrative claim and its answer in

15  any pending adversary.

16         And also, makes it clear that this escrow

17  arrangement is not a cap or on any recovery or from the

18  Debtor's perspective admission that there will be any

19  recovery.  And it also provides that we are, as I mentioned,

20  our motion to estimate the claim for administrative claim

21  purposes is withdrawn.

22         THE COURT:  Thank you.  Mr. Zumbro, did you want

23  to add anything to that?

24         MR. ZUMBRO:  No, thank you, Your Honor.  Can you

25  hear me, Your Honor?

1          THE COURT:  Yes, sir.

2          MR. ZUMBRO:  Thank you.  Paul Zumbro, I'm here

3     with Amanda David and Mike Summers over my back shoulder on

4     behalf of Fifth Season.

5          I think Mr. Kiriakos has accurately reflected that

6     just the motion for estimation being withdrawn.  He hadn't

7     previously mentioned, so I did want to raise my hand.

8          So it's a $40 million.  There's $40 million of

9     Beneficient stock as of the effective date of the Plan will

10    be set aside and reserved with no liens or claims attached

11    to that.

12         And Your Honor, if I may have just one more

13    minute, I'm not trying to highjack this.  But we have

14    proposed a schedule that should be in Mr. Kelley's inbox for

15    the resolution of the claims, subject to the Court's

16    availability for the final hearing on the 30th of August, if

17    you're available that date, which the other thing I would

18    add, Your Honor, just there is a pending, I think, letter

19    brief in front of Your Honor on some discovery issues that

20    we would ask if the Court could either set a hearing on at

21    your convenience, we'd appreciate it.

22         THE COURT:  So, --

23      (Pause in the proceedings.)

24         THE COURT:  -- I don't think August 30th is

25    actually available.

1              MR. KELLEY:  Your Honor, if I may, I think what

2  Mr. Zumbro was indicating is they have submitted a proposed

3  schedule contemplating a hearing at that time.  That we just

4  received.

5              We're going to get back to them tomorrow and I

6  think collectively I believe Mr. Zumbro hope is that we

7  would be seeking a court hearing at the appropriate time.

8              THE COURT:  And let me just ask, about much time

9  are you-all going to need?

10             MR. KELLEY:  I haven't had time a chance to look

11 at the schedule, but I'm guessing --

12             THE COURT:  No, I mean for the actual hearing.

13             MR. KELLEY:  I would guess three-quarters of the

14 day, half a day to three-quarters of a day.

15             THE COURT:  Mr. Zumbro do you think that's about

16 right?

17             MR. KELLEY:  I'm sure he's going to want defer --

18             MR. ZUMBRO:  I apologize Your Honor.  I'm having a

19 hard time hearing Mr. Kelley.

20             THE COURT:  Mr. Kelley was saying that he thinks

21 it's going to take about three-quarters of the day and that

22 the August 30 was more of a target date than a precise date.

23             MR. ZUMBRO:  Correct.  I didn't mean to

24 misrepresent.  We had sent the thing literally while

25 Mr. Kelley's been in the courtroom.  So he hasn't had an

1   opportunity to digest that.  That was our proposal.

2           I think a day or three-quarters of a day is

3   sufficient for the hearing, Your Honor.

4           THE COURT:  Well, why don't you-all -- as you

5   think about what works -- September 12th, 8:00 a.m.  That

6   may not work for you-all, but it will work for me.

7   August 30 doesn't work for me.

8           MR. KELLEY:  I'll make a note of it, Your Honor.

9           THE COURT:  Okay, but we've got lots of other

10  time.  You-all know I don't have much to do these days, but

11  that's the day I'm most free right now.

12          MR. ZUMBRO:  September 12th at 8:00 a.m.  Thank

13  you, Your Honor.

14          THE COURT:  Thank you.

15          MR. KIRIAKOS:  Your Honor, if you don't have any

16  questions on the Fifth Season resolution, I'll move forward.

17          THE COURT:  Thank you.

18          MR. KIRIAKOS:  Wells Fargo, who is our securities

19  intermediary with respect to our Life Settlement Portfolio,

20  also filed a reservation of rights.

21          They worked with us very constructively to resolve

22  all those issues -- all their issues.  The resolution of all

23  those issues can be found in paragraphs 15, 16, and 60 of

24  the proposed confirmation order.

25          I'm happy to walk through some of those, but

1  again, Your Honor, other than a escrow to cover certain

2  possible indemnity claims at the wind-down trust level, one,

3  it doesn't have to be fully -- is funded only initially with

4  100,000 and then doesn't have to be funded with the other

5  2.9 until the Life Settlement Portfolio is less than

6  20 percent in value.

7  　　　　Other than that, there aren't any -- the changes

8  are structural and technical and happy to go through them,

9  but.

10  　　　　THE COURT:  Let me just ask Mr. Kilmer to press

11  five star and let me know whether or not that resolves the

12  reservation of rights that he filed.

13  　　　(Pause in the proceedings.)

14  　　　　THE COURT:  Well, I don't see him.  Mr. Kilmer, if

15  it turns out you have a problem, why don't you buzz in?

16  　　　　Why don't we go ahead?

17  　　　(Pause in the proceedings.)

18  　　　　THE COURT:  Let's move ahead.  I don't see him.

19  　　　　MR. KIRIAKOS:  Oh, I'm sorry, Your Honor.  I

20  didn't hear you.  My apologies.

21  　　　　Beneficient, Your Honor -- also as I mentioned,

22  Beneficient filed a limited objection to confirmation.  We

23  have resolved that objection both in terms of the order you

24  entered last Tuesday and also with respect to reservations

25  of rights and clarity that we built in to the confirmation

1  order.  Specifically at footnote three, footnote four.  And

2  I've forgotten and also a provision in the confirmation

3  order which makes clear that all the Beneficient parties do

4  not waive any of their rights in and to the D&O policies,

5  Your Honor.

6           I'm sorry I don't have -- I will come back with

7  that.  But those -- so with that the Beneficient objections

8  have all been resolved.

9           THE COURT:  Let me just ask Beneficient's Counsel

10 if Mr. Bennett is here, why don't you go ahead tell me

11 whether that resolved the issues?

12          MR. LEVITT:  Thank you, Your Honor.  Steve Levitt

13 with Holland & Knight on behalf of Beneficient.  I've also

14 got Anthony Pirraglia and Mr. Bennett is on the phone as

15 well.

16          As Mr. Kiriakos said, we did have some language

17 that was added to the confirmation order and it was

18 previously entered by this Court in the order that you

19 entered on Tuesday.

20          And I think the paragraph was 27 in the

21 confirmation order, as well as footnotes three and four and

22 maybe K.  I can't remember if there was something in K.

23          THE COURT:  Well, whatever is in the confirmation

24 order, does it resolve your objection?

25          MR. LEVITT:  It does, Your Honor.  We have

1  withdrawn our objection.

2         THE COURT:  Thank you.

3         MR. LEVITT:  Thank you, Your Honor.

4         MR. KIRIAKOS:  Your Honor, another limited

5  objection -- another objection was filed by Mr. Nasareno

6  (phonetic).  Mr. Nasareno asserts unsecured claim against

7  frankly a non-debtor affiliate.

8         We reached out to him, to his lawyer.  His lawyer

9  underscored that the main purpose of his main confirmation

10 objection was to ensure that if his claim should be

11 subsequently allowed, it would be treated under -- could be

12 treated and would be treated under the Plan.

13        We assured him that if that were the case, it

14 would be a general unsecured claim under Class IVa of the

15 Plan.  Based on that representation he has filed a

16 withdrawal of his objection.

17        THE COURT:  Can you tell me where that withdrawal

18 is?  I missed seeing that.

19        MR. KIRIAKOS:  Yes, Your Honor.  I can.

20     (Pause in the proceedings.)

21        MR. KIRIAKOS:  It's at 1914.  Docket No. 1914.

22        THE COURT:  It is here.  Thank you, very much.

23        MR. KIRIAKOS:  And Mr. Hayburn (phonetic), if you

24 wanted to add anything, feel free to press five star;

25 otherwise, I'm going to simply respect what you filed in

1    1914 as having withdrawn your objection to confirmation.

2        (No audible response.)

3            THE COURT:  Okay, thank you.

4            MR. KIRIAKOS:  And, Your Honor, quickly to touch

5    on the other items I mentioned.  I've neglected to mention

6    that one of the other items that's inextricably linked to

7    the Plan, is the approval of our exit facility, which was

8    originally set forth in our motion seeking that the terms

9    were summarized in our motion seeking approval DIP facility.

10           Again, there have been no objections.  There have

11   been no objections to approve the exit facility.  As you

12   might recall, it's provided by our existing DIP lender, OBRA

13   (phonetic).

14           It essentially rolls over and extends our DIP

15   financing to a longer term with a $40 million revolver to

16   help us pay premium payments at the Life Settlement

17   entities.

18           And as I said, Your Honor, I'm happy to go into

19   the details more.  We filed a proposed revised credit

20   agreement.  The confirmation order also has a mechanism in

21   it that to the extent we modify the forms of any of those

22   agreements we will file them.

23           If anybody has an objection to them, they'll have

24   five days to object and will be before you.  But we would,

25   in connection of the approval of the Plan, the entry of the

1  Confirmation Order, and as the Confirmation Order provides,

2  we would like the approval of the exit facility.

3          Our settlement with L Bond Management, which is in

4  the Plan, has not changed since the Disclosure Statement

5  Hearing.

6          With respect to -- moving on with respect to the

7  compensation motion, the compensation motion, again, was a

8  subject of the mediation.  It has been built into the Plan.

9  There have been no objections to the motion.

10          Very briefly, before I get into the details, the

11  motion concerns --

12      (Pause in the proceedings.)

13          THE COURT:  I need you to pull the microphones as

14  closer to you.  I thought they wanted me to pull the

15  microphone closer to me and so I moved mine.

16          MR. KIRIAKOS:  Is this better.

17          THE COURT:  Hopefully that will work.

18          MR. KIRIAKOS:  Is that better?

19          THE COURT:  Ms. Thomas?  Okay.

20          MR. KIRIAKOS:  Okay, are we good?

21          THE COURT:  Ms. Thomas, does that work?

22          MS. THOMAS:  Yes.

23          MR. KIRIAKOS:  Are we okay?  Great, thank you.

24          THE COURT:  Thank you.  You should welcome

25  Ms. Thomas she's new to my courtroom and is doing a great

1 job.  She just needs to yell at you more, I think,

2 Mr. Kiriakos and it will be better.

3          MR. KIRIAKOS:  When -- the concerns of

4 compensation for Messrs. Stein and Horton.  When the Debtors

5 retained Jeff Stein and Tony Horton, we had engaged in

6 senior management.  They were in place.

7          We had five legacy directors.  And those were the

8 terms under which they were brought on and we sought

9 approval of their compensation.

10          Since that time, as the Court well knows, we no

11 longer have any member of senior management.  Mr. Stein, who

12 was originally the Chief Restructuring Officer, has now been

13 doing the duties of our Chief Executive Officer.

14          In addition, we have lost -- we've had all of our

15 legacy directors resign.  So, not only have Mr. Stein and

16 Mr. Horton, as independent directors, served as independent

17 directors, they have served as the sole board for the

18 Debtors.

19          As such, the amount of work that they've been

20 required to do has grown exponentially and they've done it

21 for an extended period of time.  Their original compensation

22 terms for Mr. Stein were 100,000 a month and a success bonus

23 of $1,250,000.

24          Under the proposed terms, which have been

25 mediated, as I mentioned, to which there has been no

1  objection, Mr. Stein would now receive a success bonus of

2  1,830,000 and 50,000 shares in Beneficient.

3          Mr. Horton originally received $35,000 per month

4  for serving as an independent director.  In light of the

5  additional amount of work that he's undertaken for the

6  benefit of the estate reaching this largely this -- entirely

7  consensual plan, he would be, if the Plan were confirmed, on

8  the effective date, he would receive an additional 120,000

9  in cash.

10          We think that in light of these circumstances,

11  Your Honor, including the fact that prior to their

12  resignation three board members -- two of the board members

13  were receiving roughly $47,000 a month in compensation.  And

14  this increase for Mr. Horton is roughly an additional

15  $17,000 a month.  The estate actually is coming out -- still

16  comes out ahead on this.

17          In light of that -- in light of these

18  circumstances and lack of objection and as reflected in the

19  Confirmation Order, we would request that the motion be

20  approved.

21          THE COURT:  Under the Governance Procedures, who

22  makes future decision about how long they stay, what their

23  future compensation is, things of that nature

24  post-confirmation?

25          MR. KIRIAKOS:  Post-confirmation, they'll serve

1 until the effective date and then both of them will no

2 longer serve, Your Honor.

3       THE COURT:  So after the effective date, they're

4 gone?

5       MR. KIRIAKOS:  After the effective date they're

6 gone and they are replaced entirely by Ms. Elizabeth

7 Freeman, who will be the wind-down trustee and Mr. Goldberg,

8 who will be the litigation trustee.

9       THE COURT:  So there is, if you will, retroactive

10 recognition of having achieved a good result here.  But not

11 a long term commitment into the future --

12       MR. KIRIAKOS:  That's right, Your Honor.

13       THE COURT:  -- to pay these amounts?

14       MR. KIRIAKOS:  That's right.

15       THE COURT:  Okay.

16       MR. KIRIAKOS:  And then the last thing I'd like to

17 touch on, Your Honor, is that the Plan, again, without

18 objection, provides for the allowance of a substantial

19 contribution claim of up to a million dollars of actual and

20 reasonable fees and expenses of the Ad Hoc Group of broker

21 dealers on the effective date of the Plan, and full and

22 final resolution of any substantial contribution claim the

23 broker dealers could make.

24       I see that Mr. Rosen is here.  We believe that the

25 Committee -- the Ad Hoc Committee of broker dealers, in

1   fact, did make a substantial contribution.  Among other

2   things, Your Honor, in light of how the L Bond's were held,

3   while we had bonds that were held, directly held and we knew

4   who those holders were and how we could reach them.

5          Many bonds were indirectly held through DTC

6   ownership and we had no visibility to them.  And no ability

7   to communicate with them.  And the help that the Ad Hoc

8   Committee gave us in that respect was invaluable in terms of

9   communication and in terms of our solicitation that resulted

10  in 11,700 votes in favor of the Plan.

11         And so, Your Honor, for all those reasons that's

12  my complete presentation on the matter.

13         THE COURT:  So on the broker dealer matter, --

14         MR. KIRIAKOS:  Yes.

15         THE COURT:  -- if we approve that compensation, I

16  want you to assume with me hypothetically that there is a

17  bondholder that believes that they have a claim against

18  their broker dealer arising under the law of their state

19  where they can sue that broker dealer in state court.

20         I want you to assume, also, that the broker

21  dealers believe they have good defenses to any suit that

22  might be filed against them.  What does the Plan do --

23         MR. KIRIAKOS:  Nothing.

24         THE COURT:  -- to anyone's ability to file that

25  state court lawsuit or to the broker dealer's ability to

1  defend it?

2        MR. KIRIAKOS:  Nothing.  It does not purport to

3  release those claims; does not purport to in any way, shape

4  or form.

5        THE COURT:  Thank you.

6        Mr. Rosen, can you confirm that for me?

7      (Pause in the proceedings.)

8        THE COURT:  Good afternoon, Mr. Rosen.

9        MR. ROSEN:  Your Honor, yes, Brian Rosen,

10  Proskauer Rose on behalf of the broker dealers.

11        Yes, Your Honor.  That is absolutely correct.  In

12  fact, there are currently arbitration proceedings going

13  forward with respect to certain broker dealers.  And nothing

14  in the Plan precludes any additional arbitration proceedings

15  with this format that we take from being processed against

16  any broker dealers.

17        THE COURT:  Thank you.

18        Mr. Holly?

19      (No audible response.)

20        THE COURT:  Mr. Holly, if you're speaking you're

21  way, way silent.

22        Mr. Holly, I can't hear you.

23      (No audible response.)

24        THE COURT:  Mr. Holly.  Mr. Holly, can you hear

25  me?  Mr. Holly you sound deep in a cave like you're

1  whispering.  I need you to get right into your phone and

2  speak up, please.

3        (No audible response.)

4             THE COURT:  Mr. Holly, I can't hear you.

5             Mr. Holly, you need to dial back because you are

6  incomprehensible here in the courtroom.

7             I'm going to disconnect him so that he recognizes

8  the problem, not to shut him up.

9             Mr. Holly, I invite you to call back in.  I'm

10  disconnecting your line because we can't hear you.

11        (Pause in the proceedings.)

12             THE COURT:  Okay, all right.  Go ahead, please.

13             MR. KIRIAKOS:  Your Honor, at this point, whatever

14  the Court prefers.  If you'd like to hear from our

15  co-proponents or if you'd like me to -- if you'd like us to

16  tender our Declarations for admission.  We'll proceed

17  however you would like.

18             THE COURT:  So, is there anyone else that wishes

19  to make an opening statement other than one that might thank

20  that Judge Jones, which I'm not going to listen to.

21        (Laughter)

22             THE COURT:  So if anybody wants to make an opening

23  statement, feel free.

24             That might be an opening statement either in

25  support of or against the Confirmation of the Plan, whatever

1   you want to say.

2          MR. RUBI:  Good afternoon, Your Honor.  Jason

3   Rubin from Akin Gump Strauss Hauer & Feld on behalf of the

4   Official Committee of bondholders.

5          Your Honor, as we've been saying since the

6   beginning of these cases, the Committee's North Star has

7   been maximizing the recovery for bondholders.  The members

8   of the Committee, each of them this was a new experience for

9   them and probably took up more time --

10         THE COURT:  I'm going to interrupt you for a

11  second.

12         MR. RUBIN:  Sure.

13         THE COURT:  Hold on.  Mr. Holly, welcome back.  We

14  couldn't hear you before and I wanted to go ahead and

15  interrupt whatever we were doing so we could hear your

16  statement.  But we heard basically nothing before.

17         MR. HART:  I heard everything you said Your Honor.

18  I did not speak because my last is Hart, not Holly.  I

19  thought you were talking to another person.

20         THE COURT:  I apologize.

21         MR. HART:  Hey, I grew up one of nine children.

22  I'm used to people not getting my name right.  That's been

23  for years.

24         THE COURT:  All right, did you have something that

25  you wanted to add?

1           MR. HART:  Yes, sir.  Yes, sir.  You mentioned a

2    few minutes ago that people -- it was mentioned by you and

3    others that people would retain the right to sue in state

4    court.

5           For the most part, people who bought these bonds

6    through a broker dealer, which is just about everybody, did

7    so under an arbitration agreement waiving an almost

8    100 percent guaranteeing their inability to sue in state

9    court.

10          Arbitration is a much weaker process.  For

11   example, there's no appeal.  I just wanted that entered into

12   the Record that few, if any, bondholders are going to have

13   the right to sue.  They're going to be pushed into

14   arbitration through no choice of their own.

15          And that's my only point.  You can silence me

16   again.

17          THE COURT:  I appreciate that clarification and

18   let me just confirm with counsel that your statement about

19   no effect on state court litigation, would include

20   litigation that's referred into arbitration.

21          MR. KIRIAKOS:  No, no, I -- right, I was

22   imprecise.  I should have said there's no effect on anyone's

23   right to pursue any claims against the broker dealers in any

24   form, including in arbitration, Your Honor.

25          THE COURT:  Thank you.  Mr. Hart, thank you for

1   the clarification.

2            MR. HART:  Surely.

3            THE COURT:  All right, sorry, Mr. Rubin, but I

4   wanted to get right back to him since I literally

5   disconnected his line.

6            MR. RUBIN:  Not a problem.  So, Your Honor, as I

7   was saying, recoveries from bondholders that's been our

8   North Star since the beginning.  And the Committee, this was

9   all a new experience for them.  And probably took up more of

10  their time than they anticipated when they signed up for

11  this gig back in April of last year.

12           They took their fiduciary duties seriously.  And

13  they were extremely dedicated to achieving that outcome.

14  And the Committee's professional are grateful for the hard

15  work of the Committee's members.

16           Although it's going to take a little bit of time,

17  as we've discussed in the past before we know what the

18  ultimate recoveries are going to be here for bondholders.

19           We think that by virtue of the Plan, the structure

20  of the Plan, including the two trust structure that's been

21  set up, as well as the very limited releases that Your Honor

22  was highlighting earlier, we believe we have the right

23  structure in place that will lead to the greatest possible

24  recoveries to bondholders under the circumstances.

25           And we have utmost confidence that Elizabeth

1  Freeman, as the wind-down trustee, and Michael Goldberg who

2  will be the litigation trustee, that they will both be

3  guided by that same North Star of maximizing recoveries for

4  bondholders.

5        These cases have been long and they've been

6  contentious and although we did not always see eye-to-eye

7  with the Debtors or the other parties-in-interest in these

8  cases, I think the important thing is that we did reach

9  consensus and a type of consensus that some of us question

10 would be achievable over the course of the last year.

11       But we are here after a lot of hard work and

12 uncontested Confirmation Hearing.  And despite what you said

13 about Judge Jones, I do want to thank him.

14     (Laughter)

15       MR. RUBIN:  None of this -- I think his outcome

16 was made possible by Judge Jones' hard work and dedication.

17 And the Committee and its professionals appreciate all of

18 his hard work and his help to get to this point.

19       We'd also like to thank the almost 11,000

20 bondholders that voted and that participated in this

21 process, leading to over 99 percent of them voting to accept

22 the Plan.  We know the bondholders have been very engaged.

23 We've spoken to many of them over the course of these cases

24 and we appreciate that a very substantial number of them did

25 participate in the process, which we think is very important

1   here.

2          And lastly, Your Honor, the Committee's

3   professionals want to thank Your Honor and the Court and its

4   staff for all the time and attention that you have given to

5   these cases.

6          Your Honor's patience throughout the hearings and

7   the compassion that you've shown for the plight of the

8   individual bondholders, many of whom have participated in

9   prior hearings and I believe are probably listening in now.

10  That's been clear since day one.  And it's something that

11  the Committee greatly appreciates and as should all the

12  other bondholders that have been following these cases.

13         So with that, just to complete the Record, Your

14  Honor, the Committee does believe the Plan satisfies the

15  requirements of the Bankruptcy Code and believes that the

16  Court should confirm the Plan.  Thank you.

17         THE COURT:  Thank you.

18         Look, I should tell people that Judge Jones -- and

19  I'll pitch in here a little bit -- sort of an unusual

20  situation where he frequently traveled out of Houston in

21  order to mediate this case.

22         People may not know, but he gets zero compensation

23  for doing that.  He is on a fixed annual salary, gets no

24  benefit at all by flying on all night flights so he can come

25  back and do hearings the next day.  And spending his time,

1   you know, away from his home and assisting in the mediation

2   of this.

3           So, I joke when I say don't thank him any more,

4   but I want people to know that not only did he work hard and

5   I don't know whether you-all are easy to persuade or

6   difficult to persuade, but knowing you-all probably

7   difficult to persuade.  He did it as a matter of public

8   service and not for any compensation for which there was

9   none.

10          It's important to also note that people who work

11  hard in a bankruptcy case should be paid compensation.  And

12  we are paying a lot of money in compensation to people here.

13  Both to lawyers and to financial advisors and to people that

14  are working.

15          That's appropriate.  There's nothing at all that

16  could be accomplished in a case like this without very high

17  quality professionals working through very difficult issues.

18          The fact that Judge Jones did it for no

19  compensation deserves mentioning so that people understand

20  how the system has been working.

21          So thank you.

22          MR. RUBIN:  Thank you, Your Honor.

23          MR. OKIN:  Your Honor, Matthew Okin on behalf of

24  L Bond Management.  We were the third proponent of the Plan

25  and I don't want to belabor the points that Mr. Rubin or

1  Mr. Kiriakos made.  But we are glad that we finally got here

2  and it was definitely because of the hard work of Judge

3  Jones not giving up on us and getting it done.

4          Our reason for participating as a proponent -- as

5  an agent for 20 percent roughly of the outstanding bonds --

6  was to make sure that there was a fair balance given between

7  the Debtor's investment and the claims identified by the

8  Debtor's Investigations Committee and by the Bondholder

9  Committee.

10          So that we wouldn't work across purposes here.

11  That as Mr. Rubin said, that North Star that making sure

12  that the bonds were covered as much as was humanly possible

13  that that objective was served.

14          I think it was a very difficult road getting to

15  that point.  But I do think and it's our view that the --

16  where we ended up after a lot of pushing back and forth is a

17  good balance between that.

18          I think we've left this estate in good hands in

19  Ms. Freeman and Mr. Goldberg.  And hopefully they can work

20  together to continue that process and make sure that we do

21  actually get that recovery that I think we've at least been

22  able to preserve as a possibility.

23          And we don't really know where we end up.  But the

24  hope is that we can move on and get some recovery here.  I

25  did want to make sure, before I sat down, to the extent

1   anything about the release parties didn't address

2   specifically the LBM release in the Plan.

3           I did just want to -- Mr. Kiriakos talked about

4   the deal --

5           THE COURT:  I think there is a specific LBM

6   release in the Plan and it is separate from the release,

7   non-release parties under the structure.

8           MR. OKIN:  Correct, Your Honor.

9           THE COURT:  And I respect that.

10          MR. OKIN:  Okay, I just wanted to make sure that

11  that was clear on the Record.

12          THE COURT:  Thank you.

13          MR. OKIN:  Thank you very much, Your Honor for

14  your time in this matter and I'm glad we finally got here

15  today.

16          THE COURT:  Thank you.

17          MR. REISMAN:  Your Honor, Steven Reisman with

18  Katten Muchin on behalf of Jeff Stein and Tony Horton in the

19  capacities as independent directors.

20          I'll be short, given where we're at in the Record

21  that's been created so far.  Mr. Stein and Mr. Horton were

22  appointed on June 19th as independent directors.  That's

23  about a year ago.

24          Their duties were expanded with the assistance of

25  the L Bond Committee, pursuant to an Order entered on

1    July 18th.  So about a month after that.  And they've taken

2    their role here very seriously.  They were brought in to

3    instill confidence in the L Bondholders and credibility to

4    the process.

5           They were fully independent directors.  They're

6    supportive of the Plan that's before Your Honor.  They're

7    appreciative of the efforts of all the parties in this case

8    to get to where we are.

9           And they're appreciative of the Court's approval

10   or hopefully approval today of their increased compensation

11   for their actions.

12          The investigation we're working with Liz Freeman.

13   We'll work with the litigation trust to convey to them the

14   work that we did on behalf of the Investigation Committee

15   keeping in place privilege in that regard with the

16   Investigation Committee.

17          But I wanted to rise just to thank you on behalf

18   of Messrs. Horton and Stein for your assistance here.

19          As far as Judge Jones is concerned, thank you for

20   training him, for teaching him, for getting him to where he

21   is now.  And his assistance in this process was really

22   invaluable in that regard.

23          I will tell you when this started I saw the door

24   there immediately that Judge Jones would eventually be

25   needed, given where the parties were at.  And I can tell you

1   unequivocally that millions and millions and millions of

2   dollars in fees were saved as a result of Judge Jones'

3   actions in the context of this case.

4          I'd be remiss not to thank everybody else in that

5   regard in the case.  A long list of people, right, but this

6   is not an academy award speech or anything in that regard

7   and there's still quite a lot of work to shop with respect

8   to getting recovery for the L Bondholders here.

9          And the work of the litigation trust and the

10  wind-down trust Ms. Friedman and others will be instrumental

11  in that regard.  And we have every expectation that the

12  L Bondholders will get recovery.  I don't know what that

13  amount is, but I can tell you that the professionals that

14  have been put in place to make sure that that account --

15  that that amount is maximized.  I know them well and they

16  will do their job in that regard.

17         So, with that, those are our comments.  We believe

18  that the Plan meets the requirements of the Bankruptcy Code

19  1129 for confirmation here.  And not to belabor the Record,

20  but we appreciate Your Honor and Your Honor's staff as well

21  in that regard.  Thank you.

22         THE COURT:  Thank you, Mr. Reisman.

23         Does anyone else wish to speak either in favor of

24  or against confirmation of the Plan today?

25         MR. TECCE:  Good afternoon, Judge Isgur.

1          THE COURT:  Good afternoon.

2          MR. TECCE:  For the Record, Your Honor, I'll be

3   brief.  James Tecce of Quinn Emanuel.  I represent Brad

4   Heppner individually.

5          Your Honor, you may have noticed that Mr. Heppner

6   did not file an objection to the Plan.  He did not vote in

7   favor of the Plan, though.

8          His position on these issues has been the subject

9   of pleadings that are filed in the case, including the

10  objection to the standing motion that he filed at ECF 1457

11  and a letter that Your Honor authorized him to submit in

12  connection with the Disclosure Statement, which is

13  Exhibit D.  And I believe that's now Exhibit 47 in this

14  hearing today.

15         He does see an income going in the Plan in that on

16  the one hand there's a distribution of bend stock to fund

17  creditors recoveries.  And it's just disappointing that

18  their incentives are not aligned with his in the sense that

19  there's also Plaintiffs in a lawsuit against the company as

20  well.

21         And so that was one of the reasons why he didn't

22  vote in favor of the Plan.  But to be clear, he did not

23  object, just so the Record is clear.  He didn't raise 1129

24  objections, confirmation objections, and the agreements that

25  Beneficient was able to negotiate -- particularly the

1   provisions of paragraph 27, note four and footnote three in

2   the Confirmation Order, went a long way also to ease support

3   of those as well and keeping his powder dry at confirmation.

4   But his rights are reserved, obviously.  I think you made

5   that clear already.  And the fact that he does dispute the

6   allegations you've also made that clear that that's been

7   recognized.

8           THE COURT:  So just to say it one more time for

9   people listening:  This Plan establishes a mechanism by

10  which your client can be sued.

11          MR. TECCE:  That's correct.

12          THE COURT:  But it does not strip him of any

13  defenses that he might have to that suit, nor does it

14  establish the bonafides to any of the allegations that might

15  be in the suit or any defenses.

16          So it simply provides a liquidation mechanism,

17  which may turn out to be liquidation of zero if your client

18  prevails in everything.  And I don't want anyone misled by

19  what's happening today.

20          I think that's the statement you're making and I

21  want to confirm that.

22          MR. TECCE:  That's correct, Your Honor.

23          THE COURT:  We are making bindings today that bind

24  your client to anything other than a process to liquidate

25  claims against him.  And they don't bind him to any

1   admission or acknowledgment that he has done anything wrong.

2          MR. TECCE:  Thank you very much, Your Honor.  I

3   don't have any questions.  That's the only point I wanted to

4   make.

5          THE COURT:  Thank you, Mr. Tecce.

6          MR. TECCE:  Thank you very much.

7          THE COURT:  If there's anyone on the phone that

8   wishes to make an opening statement, please press five star.

9      (Pause in the proceedings.)

10      (No audible response.)

11         THE COURT:  Sorry, I'm getting some slow response

12  time on my computer and I want to be sure if there is anyone

13  there, they get recognized.

14      (Pause in the proceedings.)

15         THE COURT:  All right, Mr. Kiriakos.  Thank you.

16         Do you want to enter the evidentiary record?

17         MR. KIRIAKOS:  Thank you, Your Honor.  I'll now

18  ask my partner Charles Kelley to come up and tender the

19  Declarations and the exhibits and answer any questions you

20  have regarding the Record.

21         THE COURT:  Thank you.

22         Mr. Kelley, good afternoon.

23         MR. KELLEY:  Good afternoon, Your Honor.  Charles

24  Kelley from Mayer Brown on behalf of the Debtor.  I'm going

25  to try to be as brief as possible since we're here with a

1  fully consensual plan.

2         For the benefit of the Court, we filed our

3  original Witness and Exhibit List on Monday in accordance

4  with the Court's Local Rules, but given that we continued to

5  work through the objections and we continue to build towards

6  a consensual plan, we filed this morning at Docket No. 1931

7  an Amended Witness and Exhibit List.

8         And the significance of it was that we took the

9  Declarations that were filed in the Record -- there's

10 roughly six of them -- and made them exhibits for purposes

11 of the Record so we could work through this efficiently and

12 save the estate some money.

13        And with that, Your Honor, I'd like to tender,

14 pursuant to Docket No. 1931, the exhibits that were

15 identified on the Debtor's Exhibit List, which will be -- I

16 will just do them by number, Judge.

17        Exhibits 1 through 40 --

18        THE COURT:  I've got 54.

19        MR. KELLEY:  Excuse me, I stand corrected.  One

20 through 53 in their entirety.  And I would flag in

21 particular for Your Honor's attention that on that Exhibit

22 List as Exhibit 39, is the Declaration of Mr. Stein, which

23 was also filed on the Record at docket.

24        THE COURT:  I have 54 exhibits.

25        MR. KELLEY:  Fifty-four exhibits.

1          THE COURT:  And you only offered 53.  I just want
2     to make sure that's right.

3          MR. KELLEY:  Did if I misspoke I meant to say 54,
4     Your Honor.

5          THE COURT:  Okay.

6          MR. KELLEY:  Thank you, Your Honor.

7          THE COURT:  Is there any objection to the
8     admission of 1931-1 through 1931-54?

9        (No audible response.)

10         THE COURT:  That will include the admission of the
11    Declarations as substantive evidence of today's hearing.
12    Not -- even if we admit these, though, I will allow
13    cross-examination of the Declarant.

14         MR. LEVITT:  Thank you, Your Honor.  Steve Levitt
15    again with Holland & Knight on behalf of Beneficient.

16         And, Your Honor, we just would like at this point
17    to remind or make the point on the record that the footnote
18    that we added to the confirmation order specifically
19    reserves our right with respect all the evidence.

20         We're not objecting to its admission today solely
21    for the purposes of confirmation.  But we do reserve all
22    rights with respect to any future hearings or proceedings,
23    so.

24         And we appreciate Your Honor also clarifying for
25    the Record that we do dispute the allegations that have been

1  made against us and we appreciate Your Honor making the

2  clarification that none of those allegations have been

3  proven.  Thank you.

4          THE COURT:  Thank you.  One through 54 are

5  admitted for the purposes of confirmation of the Plan.

6      (Debtor's Exhibits 1 through 54 are received.)

7          MR. KELLEY:  With that, Your Honor, unless you

8  have any particular question or follow-up I'll be glad to

9  sit down and try to keep the hearing as short as possible.

10          THE COURT:  Does anyone have any cross-examination

11 of any of the declarants who's Declarations have been

12 admitted?

13     (No audible response.)

14          THE COURT:  Does any party have any additional

15 evidence in support of confirmation of the Plan?

16     (No audible response.)

17          THE COURT:  Does any party wish to introduce any

18 evidence in opposition to Confirmation of the Plan?

19     (No audible response.)

20     (Pause in the proceedings.)

21          THE COURT:  I find that the Plan meets all of the

22 requirements of Section 1129(a) of the Bankruptcy Code.  I

23 will confirm the Plan.

24          I have not read the actual proposed Confirmation

25 Order.  I will do that over night tonight.  And if I see

1  changes that I believe might upset people, I'll call a

2  little hearing so we can work through them.

3          If I see things that are more ministerial, I'm

4  just going to fix them the way I need to and I'll get the

5  Order entered probably over night or first thing in the

6  morning.

7          Can I ask if there's any difference between doing

8  it at 5:00 o'clock today or --

9          MR. KIRIAKOS:  No, Your Honor.

10          THE COURT:  -- or at noon tomorrow?

11          MR. KIRIAKOS:  No, there's not, Your Honor.  We

12  don't have any financing we need to close or anything else.

13          We do have a waiver of the automatic stay on the

14  entry, but that waiver goes into effect whenever you enter

15  it.  It won't matter to us.

16          THE COURT:  I never dreamed we would get to this

17  hearing where you wouldn't have opposition to it.

18          Mr. Kiriakos?

19          MR. KIRIAKOS:  Your Honor, before you do if I

20  could just amend one thing that Mr. Kelley asked of you.

21  Could we have the exhibits admitted not only with respect to

22  confirmation of the plan but just for a clear Record with

23  respect to our motion for the approval of the exit financing

24  as well as the compensation motion.

25          THE COURT:  They are admitted for the purposes of

1   each of the motions that are up for hearing today.  But

2   they're not admitted for any future purposes beyond today.

3   And I'll amend my admission to encompass all of those

4   motions.

5           MR. KIRIAKOS:  Thank you, Your Honor.  I apologize

6   for interrupting.

7           THE COURT:  No, my fault.  Okay I never thought we

8   would end up at this kind of a hearing.  And as you know,

9   Mr. Kiriakos, from day one -- one of the people you were

10  fighting the hardest was me.  And I'm well aware that I gave

11  you a hard time.

12          I did it because I wanted to be sure that

13  everyone's rights were fully vindicated and that we got this

14  done right.  Your firm, despite the fact I was giving you a

15  hard time, got it done right and it's very much appreciated

16  by me.

17          I think I made clear on a number of occasions that

18  I might be giving you a hard time, but that realistically

19  you're the lawyer for the client that I was giving a hard

20  time, too.

21          I took the allegations against your client that

22  were made very seriously.  And you and your firm did a great

23  job keeping those allegations separate from where we were

24  trying to go, which was to maximize the recover for the

25  holders of claims in this case.

1              So, I very much thank the approach that you've

2    taken to the case throughout -- you and your whole team, as

3    well as, really, all of the other participants here.  It's

4    been very impressive to watch.

5              Unfortunately it's not uncommon in bankruptcy

6    cases that we see allegations of wrongdoing that have

7    occurred on a pre-bankruptcy basis.  Sometimes those turn

8    out to be real and sometimes they don't turn out to be real.

9              The important part is that the Bankruptcy Court

10   shouldn't run over those objections in a way that they can't

11   be determined and vindicated one way or the other.  And I

12   think that what you have done is allowed that to occur.

13             You've been lead counsel throughout.  I give you

14   some gratitude for getting all that done.

15             So thank you, Mr. Kiriakos.

16             MR. KIRIAKOS:  No, thank you, Your Honor.

17             THE COURT:  All right.  Going to recess the

18   hearing unless someone has anything else?

19             MR. KIRIAKOS:  Your Honor, I do.  If I could

20   and --

21             THE COURT:  So long as it's not about Judge Jones,

22   you go right ahead.

23        (Laughter)

24             MR. KIRIAKOS:  Again, thank you for those

25   comments, Your Honor.  They're completely unnecessary, but

1    everybody on the Mayer Brown end appreciates them.

2            And we -- there are just too many people on the

3    Mayer Brown that I could thank and that I ought to thank and

4    I'm afraid to thank by name because I'll invariably forget

5    someone who's worked unbelievably hard.

6            So our thanks to them and also in terms of

7    everybody we worked with on the Debtor's side,

8    professionals, PJT, FTI, Katten, Jackson Walker, and

9    Ms. Freeman.  All of us, our gratitude to them.  We really

10   can't put into words and the cooperation of everybody

11   getting to this point.

12           We're incredibly grateful for it and again, I'm

13   very appreciative for your comments and we absolutely

14   understood what -- where you were coming from and how you

15   took -- how seriously you took your responsibilities for all

16   the constituents in this case.

17           And there was never any question on our end about

18   where we were all trying to get to.

19           THE COURT:  Thank you, sir.

20           All right, we are in recess until in the morning.

21           MR. KIRIAKOS:  Your Honor, if I could?  We did

22   have two housekeeping things.

23           THE COURT:  Oh, I'm sorry.  I thought we were

24   done.

25           MR. KIRIAKOS:  I almost was done.  With respect to

1  the Committee's motion for standing under the Plan, that is

2  deemed withdrawn on the effective date.  So as an

3  administrative matter, it should be carried over.  We would

4  suggest, you know, July 15th or whatever works for the

5  Court's calendar.

6          Also, with respect to the insurance motion and the

7  unresolved amount of Willkie Farr's fees, that too will be

8  dealt with after the effective date of the Plan.  So again

9  whatever works for the Court's calendar around or after

10  July 15th for a status hearing would be appreciated.

11          Finally, with respect to our emergency motion to

12  sell Beneficient shares.  You might recall we continued that

13  hearing to today.  The parties are still discussing the

14  issues that we've been discussing and we would respectfully

15  request a further continuance.

16          We're before you next Monday on another

17  stipulation.  If that time works for the Court to continue

18  that motion until then, we'd be appreciative or any other --

19  Wednesday, yeah.

20          THE COURT:  So can you give me the ECF numbers of

21  the matters you need carried to July the 15th is a Saturday.

22          MR. KIRIAKOS:  Oh, I'm sorry.

23          THE COURT:  So we'll go to the 17th at

24  11:00 o'clock in the morning?

25          MR. KIRIAKOS:  Yeah, the 17th will be fine, Your

1    Honor.

2         THE COURT:  7/17 at 11:00 o'clock.

3         MR. KIRIAKOS:  The motion relating to Willkie is

4    Document No. 639.

5         THE COURT:  Okay.

6         MR. KIRIAKOS:  The motion of the official

7    Bondholders Committee for standing is Document No. 1250.

8         THE COURT:  Okay.

9         MR. KIRIAKOS:  And then our emergency motion that

10   we would like to continue, not to July 17th, but instead to

11   Wednesday, June 21st, is Docket No. 1885, Your Honor.

12        THE COURT:  Okay, is there any objection to

13   carrying 639 and 1250 to 11:00 o'clock on the 17th?

14       (No audible response.)

15        THE COURT:  Is there any objection to carrying

16   1885 until the 21st at 1:30 p.m.?

17       (No audible response.)

18        THE COURT:  Okay, those are done.

19        MR. KIRIAKOS:  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        Mr. Levitt?

22        MR. LEVITT:  Thank you, Your Honor.  Sorry, one

23   more housekeeping matter.

24        As Mr. Kiriakos had said earlier today, we had

25   filed a motion shortly before the hearing to change our

1   vote.  I think that the confirmation order essentially

2   effectuates that, but we just didn't want -- didn't know if

3   Your Honor needed to enter the order first so that the

4   confirmation order properly reflected it.  So we just wanted

5   to raise that.

6          THE COURT:  What is that ECF number?

7          MR. LEVITT:  That is ECF No. 1929.

8      (Pause in the proceedings.)

9          THE COURT:  This is a chicken and an egg problem.

10  So I'm just going to take out this language, I think.  I'm

11  going to leave in your --- the language that you're worried

12  about, but I don't think I have both dependent on one

13  another.

14         Any problem with that?

15         MR. LEVITT:  No, Your Honor.  As long as it's in

16  the Confirmation Order, we don't need it separately

17  referenced here.

18         THE COURT:  Thank you.

19     (Pause in the proceedings.)

20         THE COURT:  That's been signed and Ms. Thomas is

21  going to get that docketed before you get home.

22         MR. LEVITT:  Thank you, Your Honor.  I just want

23  to add one last thank you to Your Honor and your staff.  I

24  know you accommodated a number of emergency hearings in this

25  case, including on our behalf, including when you were out.

1  And we appreciate that.  Thank you, Your Honor.

2          THE COURT:  Thank you.  All right, we're going to

3  go ahead and recess until in the morning unless somebody has

4  anything else.

5      (No audible response.)

6          THE COURT:  Thank you.  Good night.

7          Thank you-all.

8      (Hearing adjourned at 2:52 p.m.)

9                          * * * * *

10          *I certify that the foregoing is a correct*

11  *transcript to the best of my ability due to the condition of*

12  *the electronic sound recording of the ZOOM/video/telephonic*

13  *proceedings in the above-entitled matter.*

14  */S/ MARY D. HENRY*

15  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

16  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

17  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

18  *JTT TRANSCRIPT #67400*

19  *DATE FILED:  JUNE 29, 2023*

20

21

22

23

24

25