**Members of the Official Committee of Bondholders of
GWG Holdings Inc., et al.**
*In re: GWG Holdings, Inc., et al.,*
In the United States Bankruptcy Court
For the Southern District of Texas - Houston Division
Chapter 11 Case No. 22-90032 (MI)

September 5, 2023

VIA EMAIL <tyler_laws@txs.uscourts.gov; sierra_thomasanderson@txs.uscourts.gov>

The Honorable Marvin Isgur
United States Bankruptcy Court
Southern District of Texas
Bob Casey United States Courthouse
515 Rusk Avenue, Courtroom 404
Houston, TX 77002

      Re:    GWG Professional Fees

Dear Judge Isgur,

      This letter is sent by the five individual members of the Official Committee of Bondholders GWG Holdings Inc., et al. (the "Committee") to express our collective concern over the enormous fees sought by all of the estate professionals, which now total over $114 million. In our collective view, that staggering total was driven in large part by efforts on the part of the Debtors and their professionals to perpetuate a myth that GWG's interest in BEN had far more value than ever was credible, including by threatening the Committee and its members who doubted the veracity of that myth, and to seek a settlement designed to obtain releases for the very individuals whose misconduct landed GWG in chapter 11 in the first place.[1] In an effort to avoid bondholders from being victimized a second time, we have shared our views with the Liquidating Trustee, Liz Freeman, and are hopeful that she will address our concerns over the exorbitant fees being requested by the estate professionals.

      The undersigned members of the Committee are individual volunteers who are themselves bondholder creditors of GWG. We have each volunteered hundreds of hours to these cases with the singular goal of maximizing recoveries to holders of the L-bonds. We are cognizant of the fact that chapter 11 bankruptcies are expensive and that a certain level of professional fees is unavoidable. Nevertheless, through our service on the Committee since May 2022, we have witnessed conduct by the Debtors, supported by their representatives and professionals, which we believe contributed to the unnecessary expenditure of professional fees.

---

[1]     Beneficient Company Group, L.P., and its related entities are referred to as "BEN".

The Honorable Marvin Isgur
United States Bankruptcy Court
Southern District of Texas
September 5, 2023
Page 2

  Early in these cases, the Committee was informed that GWG's remaining portfolio of life insurance policies had an approximate net value of $100,000,000. Without these assets available to fund the exorbitant professional fees in these cases, it is highly doubtful such fees would ever have been incurred, as we are fully confident no responsible professionals would be willing to rely on the speculative (and likely illusory) value of GWG's interests in FOXO and BEN to satisfy their fees. Unfortunately, almost all of the value of the life insurance policies is at risk of going to fund the estate professionals' fees, a substantial portion of which was incurred performing tasks that did nothing to increase bondholders' recoveries.[2]

  Before the Committee was even formed, at the First Day Hearing of this chapter 11 proceeding held on April 21, 2022, counsel for BEN represented to this Court that BEN had a letter of intent (LOI) valuing that company at $3.5 billion, which equated to $1.4 billion for GWG's stake in BEN. That representation, while initially received with a heavy dose of skepticism by the Committee and its professionals, became a cudgel used by the Debtors in their efforts to force a settlement—and an excuse to run up excessive fees in the service of trying to force a settlement and secure releases for individuals who were responsible for our losses to begin with.

  The unsupported assertion of a $3.5 billion BEN valuation found positive valence with the designation of Jeffrey S. Stein as Chief Restructuring Officer and his appointment as one of two New Independent Directors. To our dismay, the Debtors and Mr. Stein used this unsupported representation of BEN value to put off the pursuit of litigation claims and justify the pursuit of a settlement strategy for months on end, which substantially delayed the prompt assertion of litigation claims against the BEN and its affiliates, needlessly extended these chapter 11 cases, and resulted in a substantial increase in the amount of professional fees.

  In addition, in what appears to have been a ploy to prevent the individual Committee members from being fully informed by their professionals of the legitimacy and value of pursuing a litigation strategy, the Debtors and their affiliates insisted on identifying the vast majority of their production as "professionals' eyes only" under the protective order. This designation significantly delayed individual members of the Committee from viewing the actual evidence of fraudulent conduct uncovered in discovery, which we believe was an effort to focus the Committee on a settlement with BEN that the Debtors and Mr. Stein desperately desired.

---

[2]  In addition, the absurdity of incurring significant professional fees to preserve the value of the life settlement portfolio in order to satisfy professional fees is not lost on the individual volunteer members of the Committee. Significant estate professional fees have and will be spent to allegedly enhance the value of the life settlement portfolio, including engaging numerous law firms for GWG's web of special purpose entities to "monitor" these cases, hiring of separate independent directors by numerous Debtor entities, insisting on a full-blown evidentiary hearing on the benefit of refinancing the DIP financing and retaining an interest in the life settlements, rather than simply selling the life settlement portfolio, and litigating with the prior bidder of the life settlement portfolio over a break-up fee.

The Honorable Marvin Isgur
United States Bankruptcy Court
Southern District of Texas
September 5, 2023
Page 3

These settlement negotiations were fully anchored in the notions that, but for an SEC inquiry, the prospect of BEN becoming a fabulously successful enterprise was the only thing standing in the way of making the bondholders whole and that chapter 11 had only been necessary due to a liquidity crunch. Yet, throughout this time when the phantom $3.5 billion BEN valuation was touted as a reason to resolve creditor claims in lieu of litigation, the Debtors' and the Committee's financial professionals never obtained enough material information to be able to opine on BEN's valuation. From the perspective of several members of the Committee, this fact alone strongly suggested that a negotiated settlement was always likely to be futile.

Moreover, it was easy for the volunteer members of the Committee to understand that the absence of any legitimate business plan by BEN rendered any attempt to value it nonexistent. This dynamic (lack of material information for formal valuation) never materially changed throughout the over a year-long service by the committee. Yet, the proof that the putative valuation of BEN as a vehicle to maximize bondholder value was a nonstarter lies in the trading value of BEN's post-SPAC successor at approximately $2 a share, which represents less than 20% of the previously advertised value of BEN only weeks after going public.[3]

Yet, when the individual members of the Committee voiced their strong desire to preserve valuable estate claims against BEN and its affiliates, doing so was met with accusations by the Debtors and their representatives that members of the Committee were breaching their fiduciary duties by endorsing such claims. Nevertheless, the undersigned members continued to advocate for the investigation and examination of potential litigation claims culminating in the standing motion and proposed complaint eventually filed on December 22, 2022.[4] It is noteworthy that the standing motion and proposed complaint were not unsealed and available in their unredacted forms until February 2023. Thus, as a result of efforts by the Debtors and the independent directors to keep this information confidential, bondholders were not informed about the transactions that led to GWG's bankruptcy cases until almost ten months after the chapter 11 cases were filed.

Unfortunately, by the time the standing motion was filed, the matter became so entrenched in a settlement posture that the Committee was presented with the Debtors' request for mediation that was reluctantly ordered by this Court. Members who listened to the hearing on the proposed mediation could not miss your Honor's statement that you could not fathom how parties could settle around putatively "criminal" conduct, a sentiment shared by members of the Committee. Nevertheless, we reluctantly relented to the need to negotiate an adoption of a plan that settlement on the merits had unnecessarily delayed in our view.

---

[3] It should be noted that GWG's interests in FOXO are likely worthless.

[4] The undersigned wishes to convey that the professional fees incurred by the Committee for the work investigating and evaluating the litigation claims was money well-spent and we are effusive in our praise for the caliber and depth of professional work done in this regard.

The Honorable Marvin Isgur
United States Bankruptcy Court
Southern District of Texas
September 5, 2023
Page 4

It is our collective view that, as Committee members who were charged with looking out for the interests of all bondholders as fiduciaries, the tactics of the Debtors and their appointed representatives and professionals unnecessarily delayed these cases. The veiled threats of personal liability to individual committee members, however hollow, were intended to pressure the Committee into supporting a cheap settlement. We were also constantly reminded that our position was not one to pursue "justice," but to maximize value to the bondholders – which a settlement was purportedly going to accomplish without any realistic basis that BEN and their affiliates had anywhere near the liquidity necessary to make an acceptable settlement a possibility.

Put simply, it appears to the undersigned members of the Committee that the Debtors and their professionals used these bankruptcy cases to engage in conduct that was ostensibly intended to salvage the Debtors' business interests in BEN, which is nothing more than the frivolous defense of their original conduct that led it to these bankruptcy cases. It is our view that this was an unnecessary cost that should not have been borne by the bondholders. Had it not been for the resilience of individual volunteer members of the Committee, a very probable outcome would have been a chapter 11 plan without a litigation trust. Such a result would have been a travesty.

Our criticisms are not confined to the Debtors and their professionals. We believe all the professionals involved share some blame in the outcome. Professionals are not simply hired for their expertise. They are also to act as gatekeepers. We were repeatedly admonished by our own professionals that we were not charged with seeking justice, but instead to maximize bondholder value. Yet, despite these professionals repeatedly expressing concern over the professional fee "burn," our professionals did little to prevent it and, in many ways, contributed to it through appeasement of the Debtors and their professionals.

Bankruptcy is designed for the honest, but unfortunate, debtor who needs protection from creditors. Where, as here, the Debtors and their professionals sought to use chapter 11 to extract a settlement that would result in waivers of liability over their wrongdoing, the incentives that led to professional fee "burn" became perverse. Some of us regret having to bear witness to it and all of us are disgusted by it.

It is our view that equity and fairness, not to mention common decency, requires a significant across-the-board reduction of professional fees. It is simply not fair for the professionals, some of whom caused the unnecessary diminution of the value of the bankruptcy estate, be rewarded with exorbitant fees, while bondholders are left waiting for a protracted period of time to realize recovery in litigation.

We remain in constructive negotiations with the professionals for the Committee regarding a voluntary reduction of their fees, but we have not been directly involved in negotiations over fees incurred by the Debtors or the independent directors. The undersigned respectfully present these concerns to Your Honor and request that the hearing and objection deadline for the allowance of Final Fee Applications be adjourned to facilitate discussions regarding the estate professional fees.

The Honorable Marvin Isgur
United States Bankruptcy Court
Southern District of Texas
September 5, 2023
Page 5

      We understand that the Liquidating Trustee is currently reviewing the estate professionals Final Fee Applications and believe she will be able to best ensure that our concerns are adequately recognized. However, we hope to avoid causing the estate to incur additional professional fees by forcing litigation over the concerns we have raised and suggest the parties may benefit from the appointment of a mediator. We ask that you keep in mind our concerns when you ultimately rule on the reasonableness of the fees requested by the estate professionals.

Respectfully,

*Frank S. Moore*
Frank S. Moore (Sep 4, 2023 10:25 PDT)

Frank S. Moore

Signature: *Thomas Horton* (Sep 4, 2023 18:45 MDT)
Email: thomas@stratcomponent.com

Thomas Horton

*Donald W. Rhodes*
Donald W. Rhodes (Sep 4, 2023 17:39 EDT)

Donald W. Rhodes

Matthew Pearce (Sep 4, 2023 16:48 PDT)

Matthew Pearce

*Ali Danesh*
Ali Danesh (Sep 4, 2023 11:38 PDT)

Ali Danesh

