## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| GWG Holdings, Inc., et al.,[1] | : | |
| | : | Case No. 22-90032 (MI) |
| Debtors. | : | (Jointly Administered) |
| | : | |

**MOTION OF BRAD K. HEPPNER, PURSUANT TO FED. R. CIV. P. 26 AND 45, FED. R. BANKR. P. 7026 AND 9016, L.R. BANKR. P. 2004-1 AND 9013-1, EITHER (A) TO QUASH RULE 2004 EXAMINATION AND SUBPOENA DUCES TECUM PROPOUNDED BY GWG LITIGATION TRUSTEE OR, (B) ALTERNATIVELY FOR A PROTECTIVE ORDER**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing on the motion. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

***Note*** **that by agreement of Mr. Heppner and the Litigation Trustee, the Litigation Trustee will file its objection to the Motion on March 22, 2024, and Mr. Heppner will file his reply in support of the Motion on March 29, 2024.**

**The Court will conduct a hearing in connection with the Motion <u>on April 3, 2024 at 1:30 p.m.</u>**

---

[1]     The "**<u>Debtors</u>**" are GWG Holdings, Inc.; GWG Life, LLC; GWG Life USA, LLC; GWG DLP Funding IV, LLC; GWG DLP Funding VI, LLC; and GWG DLP Funding Holdings VI, LLC.

Brad K. Heppner, in his individual capacity ("**Mr. Heppner**"), hereby files this motion (the "**Motion**"), pursuant to Federal Rules of Civil Procedure 26 and 45, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 7026 and 9016, and Rules 2004-1 and 9013-1 of the Bankruptcy Local Rules (the "**Local Rules**"), either (a) to quash the proposed examination pursuant to Federal Bankruptcy Rule 2004 and subpoena duces tecum (the "**Rule 2004 Request**") (attached hereto as **Exhibit 1**) propounded by Michael I. Goldberg, as Litigation Trustee (the "**Litigation Trustee**") of the GWG Litigation Trust (the "**Litigation Trust**"), or, (b) in the alternative, for a protective order limiting his discovery responses as described herein, and respectfully states as follows:

**PRELIMINARY STATEMENT**[2]

1.      The Litigation Trustee propounds what only can be characterized as harassing discovery.  Not only does it lack legal authority to support the requests under Rule 2004 at this stage of the cases, but the discovery's magnitude shows a disregard for the extensive proceedings that already have taken place and other obvious sources of information.  While a respondent typically would rely on objections in written responses to confront the issue, the present circumstances are sui generis and warrant an affirmative request for protection.

2.      As the Court knows, two well-represented estate fiduciaries conducted separate, but equally comprehensive investigations into transactions involving GWG, Beneficient, and HCLP Nominees, including those that took place when Mr. Heppner was a director of GWG and Beneficient.   Both fiduciaries received hundreds of thousands of documents, conducted depositions and interviews (including several of Mr. Heppner), and put their allegations into an 80-page standing motion, a 225-page proposed complaint,[3] and a write-up in the Disclosure-

---

[2]      Capitalized terms not otherwise defined herein have the meanings given to them in the *Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-Proponents* [ECF No. 1924] (the "**Plan**").

[3]      Motion Of Official Committee Of Bondholders Of GWG Holdings Inc., et al., For Standing To Prosecute Causes Of Action On Behalf Of Debtors' Estates [ECF No. 1250] (the "**Standing Motion**"); Official

Statement that purported to ascribe values to those claims.[4]  There is no reason to invoke Rule 2004 when the Litigation Trustee does not need discovery to identify claims or potential defendants or to administer the estates and otherwise has access to multiple other sources.

3.     And, while Mr. Heppner strongly disputes the allegations in the Proposed Complaint and Disclosure Statement, presumably the estate representatives made them based on documents and testimony identified by the Investigations and Bondholder Committees.  So, either that is not true, in which case the Litigation Trustee wants to backfill unsubstantiated claims asserted in what should be considered a pending proceeding, or the Litigation Trustee just wants to fish through an existing litigation target's (Mr. Heppner's) personal materials, including his tax returns, electronic devices, and trusts involving Mr. Heppner and his family members. Neither is a valid use of Rule 2004.

4.     More specifically, GWG flooded both the Investigations and Bondholder Committees and their respective professionals with copious amounts of information.[5]  Broadly defining the scope of their investigation to include "any potential claims and Causes of Action that arise under or relate to any transactions, relationships, or conduct involving the Company, any of its current and former subsidiaries and affiliates, and any third party, including Beneficient," these committees and their retained lawyers and financial advisors received and reviewed over 350,800 documents, conducted at least 33 interviews (including an interview of Mr. Heppner), and deposed eight witnesses (including a two-day, Rule 2004 examination of Mr. Heppner).[6]  The Bondholder Committee and its professionals then assembled a 225-page

---

[  ]   Committee Of Bondholders' [Proposed] Adversary Complaint [ECF No. 1250-1] (the "**Proposed Complaint**").

[4]   Disclosure Statement For Debtors' Further Modified Second Amended Joint Chapter 11 Plan, Submitted By Debtors, Bondholder Committee, And L Bond Management, LLC As Co-Proponents [ECF No. 1698] (the "**Disclosure Statement**") pp. 11-17, 96-98.

[5]   Disclosure Statement p. 96 ("The Debtors have received multiple requests for information, produced their directors and officers for depositions, and gathered and produced a multitude of materials to various parties who have requested such information.").

[6]   Disclosure Statement pp. 96-97 ("In the course of conducting the Independent Investigation, and at the direction of the Investigations Committee, Katten and Province collected and reviewed documents and

Proposed Complaint and 80-page Standing Motion setting forth various transactions between GWG and Beneficient that tried to criminalize GWG's decision to invest in Beneficient to diversify its business. Those pleadings heap attacks on Mr. Heppner, sparing no adjective in placing him at the center of the allegations and accusing him of being the "mastermind" behind a "Ponzi scheme" involving the sale of the L Bonds. Notably, the estates' independent director refused to endorse that outlandish position.[7]

5.      The ensuing Disclosure Statement purported to include valuations of the alleged Retained Causes of Action, and Mr. Heppner set forth his strong dissent that they lack any merit or value in an accompanying letter.[8] Notably, in the Disclosure Statement, only the Bondholder Committee persisted in making the Ponzi-scheme allegations—***not*** the Investigations Committee.[9] Unfortunately, even though an estate fiduciary like the Investigations Committee

---

information from (among other sources) the Debtors, the Debtors' advisors, Beneficient, and certain current and former directors and officers of GWGH, including, among other documents, copies of board materials and minutes, corporate governance documents, intercompany agreements, financial and accounting information, and internal company communications. To date, Katten and Province have received and reviewed over 350,800 documents. Katten has conducted 33 interviews and eight depositions, including interviews and depositions of members of the Debtors' management team, current and former directors, and current and former legal and financial professionals involved with the Company and Beneficient. To minimize cost and avoid duplication of effort, Katten attended additional interviews conducted by the Bondholder Committee, some of which included persons already interviewed by Katten. Katten has also collaborated regularly with the Bondholder Committee's advisors (including in weekly meetings between Katten and the Bondholder Committee's advisors), sought and obtained input from the Bondholder Committee's advisors concerning potential claims and matters of concern to the Independent Investigation, and diligently pursued avenues of inquiry suggested by the Bondholder Committee's advisors.").

[7]    See, e.g., Proposed Compl. ¶¶ 1, 4, 9, 11, 14, 18, 109, 111, 113; Standing Mot. pp. 2-3, 6, 39, 50-54; see January 13, 2023 Statement Of The Independent Committees In Support Of Temporarily Continuing The Seal [ECF No. 1346], ¶ 5 ("[T]he Standing Motion accuses GWG of being a 'classic Ponzi scheme,' which it is not. It characterizes the actions of certain individuals in highly charged terms, like 'siphoning,' 'looting,' and 'funneling.' None of this language was necessary, and it is reasonable to believe that it could seriously harm an entity, like Ben, that is in the middle of negotiating a SPAC transaction, and attempting to attract investors"); December 1, 2022 Hearing Transcript [ECF No. 1160], 26:1-16 ("[W]e have done a tremendous amount of due diligence with respect to Beneficient. I have conducted extensive meetings with the Board, with the management team, have toured the infrastructure and related facilities numerous times, have interviewed other members of the management team, have [had] our professionals engage[] extensively with their professionals, who are top tier. So I believe we are as comfortable as we can be … that this is a functioning, viable business…").

[8]    Discl. St. pp. 5-17; see also Discl. St. Ex. D ("Letter from Brad K. Heppner").

[9]    See Discl. St. pp. 15-16 ("'Ponzi Scheme' Allegations by the Bondholder Committee").

declined to press the outrageous assertion, it remains reported in the media.[10]   The Plan transferred the Retained Causes of Action to the Litigation Trust along with all the Debtors' documents and privileges, including communications with their outside counsel.[11]

### A.   SUBPOENA SHOULD BE QUASHED IN ITS ENTIRETY BECAUSE RULE 2004 IS NO LONGER AVAILABLE TO LITIGATION TRUSTEE

6.      Legally, Rule 2004 does not authorize the requested discovery.  *First,* Rule 2004 serves to aid in *identifying* assets and litigation targets.  Two independent fiduciaries represented by a cadre of professionals already have done that.  While the legal efficacy of those claims will be challenged and is strongly disputed, they have been "unearthed" in a Proposed Complaint that puts forth 23 different Counts against Mr. Heppner and approximately 70 other defendants under myriad legal theories, including fraudulent transfer, breach of fiduciary duty, unjust enrichment,

---

[10]    See, e.g., Tim Carpenter, "'Classic Ponzi scheme': Angry creditors lambaste CEO of Kansas asset-swap business in court records," Kansas Reflector (Mar. 1, 2023), https://kansasreflector.com/2023/03/01/classic-ponzi-scheme-angry-creditors-lambast-ceo-of-kansas-asset-swap-business-in-court-records/; Alexander Gladstone, "2 Billion Default Followed Warnings To Everyone but Investors," Wall Street Journal (July 28, 2023), https://www.wsj.com/articles/2-billion-default-followed-warnings-to-everyone-but-investors-fbf13873 (stating "[i]n separate bankruptcy and federal class-action lawsuits, investors accused board directors—including Fisher, former Atlanta Fed President Dennis Lockhart, private-equity mogul Tom Hicks and insurance executive Bruce Schnitzer—of facilitating a Ponzi scheme orchestrated by Heppner").

[11]    See GWG Litigation Trustee's Emergency Motion For Confidentiality And Protective Order And Request For Emergency Hearing [ECF No. 2370] ¶ 6 ("The Litigation Trustee received tens of thousands of documents that were previously produced by the Debtors to the Official Committee of Bondholders"); id. ¶ 7 ("[T]he Litigation Trust Agreement provides that the Litigation Trustee 'shall have the power, right, and responsibility to access or take possession of all' the Debtors' books and records independent of any prior protective order"); id. ¶ 15 ("Following the Effective Date, the Litigation Trustee obtained hundreds of thousands of documents previously produced to the Bondholder Committee and Investigations Committee"); Plan pp. 41-42 ("[T]he Litigation Trustee … [(a)] shall step into the shoes of the Debtors as it relates to either communications that occurred prior to, or documents prepared before, April 20, 2022 with respect to Debtors' right to assert attorney-client privilege or any other privilege or immunity Debtor possesses, if any, and the Litigation Trustee shall be entitled to preserve, assert, access, or waive such privilege or immunity of the Debtors as it relates to such documents or communications …. [and (b)] shall have the power, right and responsibility to access or take possession of all books, files and records of the Debtors or Wind Down Debtors, as applicable, for purposes of carrying out the purpose of the Litigation Trust …. [T]he Wind Down Trustee shall provide the Litigation Trustee with any of the Debtors' or the Wind Down Debtors' books, records, and files … [including] such privileged information of the Debtors as is in the Wind Down Trustee's possession that relates to the evaluation and prosecution of the Retained Causes of Action[.]").

and dividend recovery.  Because the estates already expended considerable time and energy assembling the list of claims and targets, Rule 2004 discovery is no longer appropriate.

7.      ***Second,*** the pending-proceeding rule should apply with full force given the record adduced and the Proposed Complaint on file.  That requires application of the Federal Rules of Civil Procedure, including its requirements for a Rule 16 scheduling conference before discovery.  That rule affords defendants like Mr. Heppner an opportunity to first challenge the legal sufficiency of the Complaint through a motion to dismiss and request a discovery stay.  What is more, a different court may decide a stay request pending motions to dismiss should either the Litigation Trustee file suit in another forum or file the suit before this Court—but the reference be withdrawn.  And with the Federal Rules, Mr. Heppner would be entitled automatically to reciprocal discovery should the presiding court deny his request for a stay.  To the extent the Litigation Trustee argues the pending-proceeding rule does not apply because the Proposed Complaint was never filed, then the Court's Case Management Order governs and independently requires application of the Federal Rules.  They do not authorize pre-complaint discovery—or any discovery given there is no pending contested matter.  The Federal Rules also include Rule 26 and its requirement that the Litigation Trustee exhaust other sources and refrain from intrusive discovery into personal devices.[12]

8.      ***Third,*** the scope of relief available under Rule 2004 narrows significantly after plan confirmation and is limited to facilitating estate administration.  Re-writing a 225-page complaint and mining text messages on personal devices in the hope of finding "spicy" quotes does not satisfy that description.

9.      ***Finally***, Rule 2004 is not a vehicle for the Litigation Trustee to probe into non-debtors' private affairs, <u>e.g.</u>, Mr. Heppner's tax returns and the so-called Related Entities, which

---

[12]      Case Management Order [ECF No. 2373] ¶ 1; <u>see</u> Fed. R. Civ. P. 26(b)(2)(B), (b)(2)(C).

are trust structures involving family members that have been in existence for 25 years—and more than 15 years before Beneficient and GWG had any connection.[13]

**B.   ALTERNATIVELY, A PROTECTIVE ORDER SHOULD BE ENTERED**

10.   Assuming only for the sake of argument that discovery is legally authorized at this stage, and should the Court deny the Motion to quash, any discovery authorized should be extremely narrow.  Federal Rule 26(b)(2)(B), applicable under either the pending proceeding rule or the Court's Case Management Order, requires the Litigation Trustee to exhaust its various other sources of information.

11.   The documents the Requests demand can be supplied from other sources like GWG, Beneficient, and HCLP Nominees.  The Plan gives the Litigation Trustee access to all GWG documents (including privileged communications).  That includes documents Beneficient provided to GWG from Mr. Heppner's "beneficient.com" account in connection with GWG's SEC investigation and any additional documents Beneficient has provided to GWG or will provide to the Litigation Trustee.  While the Litigation Trustee demands that Mr. Heppner produce documents concerning the Related Entities spanning a 25-year period, he does not control those trusts.

12.   Separately, the Litigation Trustee's requests know no limitation and ignore the admonition in Federal Rule 26(b)(2)(C) against intrusive discovery into sensitive personal materials and electronic devices.  For example, the Requests demand highly confidential documents, that is, Mr. Heppner's personal income tax returns and all documents concerning the Related Entities which involve family members.  And, even if Mr. Heppner did have control over

---

[13]   <u>See</u> Rule 2004 Request, Exhibit A p. 3 (¶ 21) (defining "Related Entity" or "Related Entities" as "those 'certain trusts that are directly or indirectly controlled by, or operate for the benefit of, Mr. Heppner or his family, and those entities directly or indirectly held by, or that are under common control with, such trusts, and in which he and his family members are among classes of economic beneficiaries, whether or not Mr. Heppner is entitled to economic distributions from such trusts'") (citing The Beneficient Group, L.P. Annual Report on Form 10-K for the Year Ended March 31, 2023, at p. 151).

the Related Entities (which he does not) and could produce those documents, once those and his tax returns are produced, they are susceptible to public disclosure under the Case Management Order.[14]  Similarly, the Litigation Trustee asks for all Mr. Heppner's text messages on personal devices that are a tertiary level of discovery that is unjustifiable given the case status and admonitions in the Federal Rules.

13.     The Litigation Trustee also wants Mr. Heppner's communications with HCLP Nominees' various managers, but it bears emphasis that Mr. Heppner does not control HCLP Nominees; HCLP Nominees loaned money to Beneficient **before** GWG and Beneficient had any relationship; that loan was disclosed to GWG before the merger and in GWG's publicly-filed financial statements; the Litigation Trustee can ask HCLP Nominees independently to provide the Litigation Trustee with documents; and the Proposed Complaint brings subsequent-transferee claims against HCLP Nominees under section 550 of the Bankruptcy Code which only become relevant after (and if ever) transfers from GWG to Beneficient are avoided.[15]

14.     Finally, the Proposed Complaint and Disclosure Statement have cast aspersions against Mr. Heppner for over a year without any opportunity for Mr. Heppner or any other defendant to challenge the legal sufficiency of those claims and otherwise defend itself.  Instead of seeking yet more discovery, the estates should either abandon the claims or pursue them in a way that lets parties like Mr. Heppner respond.

15.     Accordingly, Mr. Heppner requests that the Rule 2004 Request be quashed in its entirety.  Alternatively, he requests that if the Court does not quash the Rule 2004 Request outright, that he be protected from examination with the exception of the searches he agreed to perform in his Responses and Objections attached hereto as **Exhibit 2**.  As set forth therein, Mr.

---

[14]     Case Management Order [ECF No. 2373] ¶¶ 3, 4.

[15]     See Proposed Compl. ¶¶ 322-38, 349-69 (Counts 9, 10, 12, 13).

Heppner will agree to produce correspondence from his own personal email account concerning GWG and Beneficient documents in response to certain Requests.[16]

## JURISDICTION

16.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334.  Venue is proper under 28 U.S.C. § 1409.

## RELIEF REQUESTED

17.     By this Motion, Mr. Heppner seeks an order, substantially in the form attached hereto, quashing the Rule 2004 Request in its entirety pursuant to Federal Rule of Civil Procedure 45, made applicable by Federal Bankruptcy Rule 9016, and Federal Rule of Civil Procedure 26(c)(1)(A), made applicable by Federal Bankruptcy Rule 7026 and the Case Management Order.  Alternatively, if the Court declines that request, Mr. Heppner asks that he be protected from discovery pursuant to Federal Rule of Civil Procedure 26(c)(1)(B) and (D), made applicable by Federal Bankruptcy Rule 7026, the Case Management Order, and Federal Bankruptcy Rule 9018, and entitled to respond to the Rule 2004 Request in a manner consistent with the Responses and Objections.

## BASIS FOR RELIEF REQUESTED

I.     LITIGATION TRUSTEE'S RULE 2004 REQUEST SHOULD BE QUASHED IN ITS ENTIRETY

   A.     RULE 2004 DOES NOT APPLY WHEN ESTATE CLAIMS AND LITIGATION TARGETS ALREADY HAVE BEEN IDENTIFIED

18.     "'[T]he one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks.'  Generally, good cause requires a showing that

---

[16]     As set forth in the Responses and Objections, Mr. Heppner maintains one personal email account that he will search to provide documents responsive to certain of the Requests.  Nearly all Mr. Heppner's communications relating to Beneficient and GWG are accomplished through his "beneficient.com" email address on the Beneficient server.  Thus, a significant number of those emails have been or will be provided to the Litigation Trustee—either because Beneficient already provided them to GWG in connection with GWG's SEC investigation or otherwise or will provide them through productions to the Litigation Trustee.

the examination sought ***is necessary to establish the claim*** of the party seeking the examination, or the denial of such request would cause the proposed examiner undue hardship or prejudice." In re Express One Int'l, Inc., 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (emphasis added) (quoting In re Eagle–Picher Industries, Inc., 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994); see also, e.g., In re SunEdison, Inc., 572 B.R. 482, 489 (Bankr. S.D.N.Y. 2017) (same); In re 2435 Plainfield Ave., Inc., 223 B.R. 440, 456 (Bankr. D.N.J. 1998) ("A Rule 2004 exam has been explained as a broad investigation into the financial affairs of the debtor ***for the purpose of the discovery of assets*** of the estate and the exposure of fraudulent conduct") (emphasis added); In re Bennet Funding Group, Inc. 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ("The purpose of such a broad discovery tool is to assist the trustee in revealing the nature and extent of the estate, and to ***discover the assets*** of the debtor which may have been intentionally or unintentionally concealed.  It is properly used as a pre-litigation device ***to determine whether there are grounds to bring an action*** to determine a debtor's right to discharge or the dischargeability of a particular debt.") (emphasis added); In re Sun Med. Mgmt., Inc., 104 B.R. 522, 524 (M.D. Ga. 1989) ("Bankruptcy Rule 2004 examinations are allowed for the ***purpose of discovering assets and unearthing*** frauds") (emphasis added); In re Cinderella Clothing Indus., 93 B.R. 373, 377 (Bankr. E.D. Pa. 1988) ("The primary purpose of a Rule 2004 examination is 'to permit the trustee ***to quickly ascertain the extent and location of the estate's assets***'") (emphasis added) (quoting Matter of Wilcher, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985); In re Mittco, Inc., 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984) ("Where there is a showing that the purpose of the examination is to enable a party to probe into matters which may lead ***to the discovery of assets*** by examining not only the debtor, but also other witnesses, such inquiry is allowed") (emphasis added).

19.    The supposed claims (i.e., the assets) and litigation targets, including Mr. Heppner, already have been identified in a 225-page Proposed Complaint asserting 23 Retained Causes of Action (including eight against Mr. Heppner) alleging fraud and breach of fiduciary

duty. And importantly, the Investigations and Bondholder Committees and their respective attorneys and financial advisors had enough information to, at the Court's instruction, value these alleged claims in the Disclosure Statement. Because the estates' fiduciaries have developed the Retained Causes of Action in the Proposed Complaint and concluded (rightly or wrongly) they should be pursued, Rule 2004 does not authorize further discovery at this point. See, e.g., In re J&R Trucking, Inc., 431 B.R. 818, 822 (Bankr. N.D. Ind. 2010) ("[O]ne purpose for such an examination is to give the trustee the information needed to determine *whether litigation should be filed*") (emphasis added).

20.     The case of In re Transmar Commodity Group, Ltd. (JLG) (Bankr. S.D.N.Y.) provides instruction. The court had already granted a Rule 2004 examination propounded by a third party (ABN Amro) against another third party (Amerra) seeking information concerning the disappearance of $300 million from the debtor's (Transmar's) accounts. The court denied the second Rule-2004 application seeking "all documents, including emails, text messages, and Bloomberg terminal messages," noting, among other things, that while the pending-proceeding rule technically did not apply "nonetheless it's clear to the Court that ABN Amro has identified Amerra as a litigation target and is seeking to utilize the liberal discovery available under Rule 2004 to further this ultimate litigation. That's not permitted." In re Transmar Commodity Group, Ltd., No. 16-13625 (JLG) (Bankr. S.D.N.Y.) [ECF No. 367] Tr., Hr'g June 9, 2017 pp. 22:7-11 (attached hereto as **Exhibit 3**).

21.     The Litigation Trustee will likely argue it needs discovery to "improve" the Retained Causes of Action. While no amount of new information can save the Retained Causes of Action from various legal and factual impediments, re-writing the Proposed Complaint is not a litigation advantage that Rule 2004 affords. Two committees represented by leading restructuring lawyers and financial advisors taking direction from independent fiduciaries and creditor committees expended significant time and resources coming up with the—vociferously

disputed— Retained Causes of Action and reducing them to the Proposed Complaint, Standing Motion, and Disclosure Statement.  Rule 2004 does not support a re-do of that enormous effort at this stage of the case.  See, e.g., SunEdison, 572 B.R. at 489 ("Relevance alone is not sufficient to justify a Rule 2004 request."); In re Good Hope Refineries, Inc., 9 B.R. 421, 423 (Bankr. D. Mass. 1981) (reviewing predecessor to Rule 2004 and noting "[i]t is not intended to give the rehabilitated debtor post confirmation a strategic advantage in fishing for potential private litigation").

**B.    FEDERAL RULES SHOULD APPLY BECAUSE PROPOSED COMPLAINT CAN BE CONSIDERED A PENDING PROCEEDING**

22.    The Proposed Complaint, its assertion of the Retained Causes of Action, and the treatment of those claims under the Plan should be considered a "pending proceeding" for purposes of Rule 2004.  The amount of discovery that already has taken place is on par in scope and magnitude with an adversary proceeding that matured to summary judgment.  See, e.g., Bennet Funding Group, Inc., 203 B.R. at 28 (declining Rule 2004 discovery of Bennett "in the shadow of a pending adversary proceeding"—specifically a "ninety-seven page Amended Complaint … alleg[ing] the creation [by Bennett] … of what can rightfully be described as a financial superweb").

23.    Rule 2004 Discovery and discovery under the Federal Rules of Civil Procedure serve "far different purpose[s]."  In re Szadkowski, 198 B.R. 140, 141 (Bankr. D. Md. 1996).  Rule 2004 aims to "obtain[] information relevant to the administration of the bankruptcy estate," id., and is "non[-]adversarial in nature and aimed at discovering evidence upon which future causes of action may be based."  In re Bounds, 443 B.R. 729, 732 (Bankr. W.D. Tex. 2010).  In contrast, discovery rules under the Federal Rules of Civil Procedure are designed to lead to the gathering of facts "relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b).  Because they are inherently "adversarial," the Federal Rules of Civil Procedure provide "procedural

12

safeguards" that do not exist in a Rule 2004 examination.  <u>Newby v. Enron Corp.</u>, 2002 WL 32151531, at *1 (S.D. Tex. Dec. 12, 2002).[17]

24.      ***First,*** as is relevant here, Federal Rules 16 and 26 apply and prevent discovery until a Court's Rule 16 conference takes place in the proceeding.  <u>See</u> Fed. R. Civ. P. 16(c)(2); 26(d); 26(f).  Given the effort already expended to investigate him, GWG, and Beneficient, Mr. Heppner has strong grounds to seek a discovery stay before the supervising court while he puts to the test the legal propriety of the Retained Causes of Action.  <u>See</u> <u>In re Beach First Nat. Bancshares, Inc.</u>, 2011 WL 2441501, at *2 (Bankr. D.S.C. Jan. 21, 2011) (no discovery in adversary proceedings "until the issues are joined and the Rule 16 pretrial conference has occurred").  And, that supervising court may have other applications, including removal motions or motions to withdraw the reference, all of which should be decided in the first instance.

25.      ***Second,*** the Federal Rules authorize reciprocal discovery which by definition is not retaliatory.  So, if the supervising court denies a request to stay discovery pending the adjudication of Rule-12(b) motions, then defendants like Mr. Heppner can propound their own requests, including, in particular, seeking the Debtors' internal documents and documents with the Debtors' counsel to which he has not previously had access.

26.      ***Third,*** the Federal Rules of Civil Procedure generally do not authorize pre-complaint discovery.[18]  While the Proposed Complaint has been filed and should be considered a pending proceeding, if the Court does not adopt that view, then pre-complaint discovery is not

---

[17]      <u>See also</u> <u>SunEdison, Inc.</u>, 572 B.R. at 490 (""[O]nce an adversary proceeding or contested matter is commenced, discovery should be pursued under Federal Rules of Civil Procedure and not by Rule 2004' …. The pending proceeding rule … reflects a concern that a party to litigation could circumvent his adversary's rights by using Rule 2004 rather than civil discovery to obtain documents or information relevant to the lawsuit.") (quoting In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002); <u>In re Sunridge Assoc.</u>, 202 B.R. 761, 762 (Bankr. E.D. Cal. 1996) ("The discovery rules available in the adversary proceedings and in contested matters are more restrictive in scope with respect to requirements of relevance and to protections available to the party required to comply").

[18]      <u>See</u> <u>Shuker v. Smith & Nephew PLC</u>, 2015 WL 4770987, at *3 (E.D. Pa. Aug. 13, 2015) (noting Federal Rules only allow pre-complaint discovery "as needed to perpetuate testimony that may otherwise be lost.") (citing Fed. R. Civ. P. 27(a)(3)).

proper because it is not authorized by the Federal Rules that independently are made applicable under the Case Management Order.  That argument is not inconsistent.  Either there is a pending proceeding, in which case the Federal Rules apply, and defendants have the right to seek a stay of discovery pending a decision on forthcoming motions to dismiss.  Or, there is no pending proceeding, in which case the Federal Rules still apply under the Case Management Order but do not authorize pre-complaint discovery—or any discovery because there is no "contested matter."

### C.  POST-CONFIRMATION RULE-2004 EXAMINATIONS ARE LIMITED TO ESTATE ADMINISTRATION

27.     The Court confirmed the Plan more than eight months ago.  The Litigation Trustee is not acting as an estate administrator.  That appears to be the Wind Down Trustee's mandate.  In any event, Rule 2004 is not available at this stage of GWG's chapter 11 cases beyond an examination "limited to issues that the court still has power to entertain.  'That is, it is restricted to the administration of the case post-confirmation.'"  In re Express One Int'l, Inc., 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (quoting In re Cinderella Clothing Indus., 93 B.R. 373, 377 (Bankr. E.D. Pa. 1988)); In re Good Hope Refineries, Inc., 9 B.R. 421, 423 (Bankr. D. Mass. 1981) (reviewing predecessor to Rule 2004 and noting "[o]ur basic concept of fair play expressed in the constitutional legalese of equal protection and due process should require all litigants to use the same discovery and procedural rules when not directly engaged in those activities that call for the bankruptcy umbrella, namely, that collection of activities characterized as the administration of the estate"); 9 Collier On Bankruptcy ¶ 2004.01[13] (16th ed.) ("A Rule 2004 examination may be taken after a plan is confirmed but should be limited to issues which the court can still entertain, such as post[-]petition administration").

### D.  RULE 2004 IS NOT AVAILABLE TO INVESTIGATE PERSONAL AFFAIRS OF NON-DEBTORS

28.     The Litigation Trustee insists on taking discovery beyond the topics of GWG and Beneficient into personal areas concerning Mr. Heppner's tax returns, his electronic devices

(e.g., text messages) and his relationship with Related Entities that Mr. Heppner does not control. None of this is permitted under Rule 2004.

29.     "While [pre-confirmation] Rule 2004 allows a fishing expedition to some extent, it may not be used to launch into a wholesale investigation of a non-debtor's private business affairs."   In re Countrywide Home Loans, Inc., 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) (noting "the level of good cause required to be established by the UST before she can obtain certain documents or pursue a certain line of inquiry in a Rule 2004 examination involving a creditor will vary depending on the potential intrusiveness involved") (citing, inter alia, In re Express One, 217 B.R. at 217); **Ex. 4** (In re Transmar Commodity Group, Ltd., No. 16-13625 (JLG) (Bankr. S.D.N.Y.) [ECF No. 367] Tr., Hr'g  June 9, 2017 at 15:7-9, 15:13-17, 15:19-23, 18:10-13 (denying request for emails, text messages, and Bloomberg terminal messages from third party when, inter alia, (a) "requests cannot be so broad as to be more disruptive and costly to the examinee than beneficial to the examiner;" (b) "the debtor has produced some 2.6 million pages of documents … [which includes] all Transmar emails with Amerra[,]" and it is "settled that in situations like this one where the party seeking Rule 2004 discovery has access to the information it is seeking from other sources, courts will deny the request for the discovery;" and (c) examinee (Amerra) would have to "expend what it says will be hundreds of thousands of dollars and enormous resources and time providing internal emails and emails with parties other than Transmar [debtor]")).

### E.     GIVEN SUBPOENA'S BREADTH, QUASHING IT COMPLETELY IS APPROPRIATE

30.     The Litigation Trustee's 29 document requests are blatantly overly broad and unduly burdensome.  The vast majority—23 of the 29, that is Request Nos. 1-12, 14, 16-19, 22-24, and 26-28—seek documents that clearly relate to other parties:  Beneficient, GWG, and HCLP Nominees.  Responding to requests that each of these three parties can handle (or already has handled) would be "more disruptive and costly [to Mr. Heppner] than beneficial to [the

Litigation Trustee,] the party seeking discovery." In re Countrywide Home Loans, Inc., 384 B.R. at 393 (citing In re Fearn, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989)). And, the balance of the requests seek information from personal devices and to intrude into matters afield of GWG and Beneficient involving Mr. Heppner's tax returns and family in the wake of a fully-developed record developed by estate representatives and their various lawyers and financial advisors.

31.     Even if Rule 2004 discovery were appropriate (it is not), the Litigation Trustee's Rule 2004 Requests are so overbroad that they justify the exercise of discretion to quash the subpoena in its entirety. See Tiberi v. CIGNA Insurance Co., 430 F.3d 110, 112 (5th Cir. 1994) (affirming district court's order quashing overbroad subpoena as within the district court's "sound discretion"); Couch v. Harmony Sci. Acad.-El Paso, 2009 WL 10669392, at *4 (W.D. Tex. Feb. 10, 2009) ("The Court has a certain amount of discretion to quash a subpoena if it is facially overbroad."); Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 53-54 (S.D.N.Y. 1996) (overbroad subpoena quashed, not modified by court).

## II.   ALTERNATIVELY, A PROTECTIVE ORDER IS WARRANTED

32.     If the Court is not inclined to quash the Rule 2004 Request outright under Federal Rule of Civil Procedure 26(c)(1)(A) (protecting against any "disclosure or discovery") or otherwise, Mr. Heppner respectfully requests that the Court issue a Protective Order under Federal Rule of Civil Procedure 26(c)(1)(B) and (D) ("specifying terms…for the discovery or disclosure" and/or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery into certain matters"). Specifically, the requested Protective Order would authorize Mr. Heppner to respond to the Rule 2004 Request in a manner consistent with the Responses and Objections. See **Ex. 2**.

33.     The Court has broad discretion to protect parties from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). See also Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984) (courts have "broad discretion to decide

when a protective order is appropriate and what degree of protection is required.").  Its exercise is warranted here.

34.     The Litigation Trustee showed no discretion when crafting the Requests.  They demand documents that clearly are in the possession of others, most notably GWG, Beneficient, and HCLP Nominees.   The Requests also launch into personal matters, _e.g._, family-trust arrangements and Mr. Heppner's personal devices; they reflexively demand "***any*** and ***all***" Documents and Communications relating to every transaction—no matter how small.  And, they encompasses entire relationships with no attempt to limit time or topic, _e.g._, ***all*** communications between Mr. Heppner and other officers and directors on any subject; ***all*** documents concerning any distribution Mr. Heppner received during his tenure at Beneficient since he founded the company nearly 20 years ago; and ***all*** documents concerning his association with family trusts that were established 25 years ago:

- **Request No. 1** seeks "[a]ll Documents Your and/or BEN previously produced ***to any Person concerning BEN or GWG***," including Documents "Your and/or BEN produced during or related to the Chapter 11 Cases, the Arbitration, the Paul Capital Litigation, or the SEC Investigation;"

- **Request No. 2** seeks "all transcripts of depositions, testimony, hearings, or proceedings" from the "Chapter 11 Cases, the Paul Capital Litigation, or the SEC Investigation;"

- **Request No. 3** asks for "[a]ll documents produced during" in connection with those matters;

- **Request No. 4** asks for "[a]ll Documents concerning "each loan" "received" by Beneficient, a Related Entity, or Mr. Heppner in which GWG, Beneficient, a Related Entity, or HCLP Nominees was the lender, including documents concerning each payment, loan performance, and changes to the loan;

- **Request Nos. 5 through 10** ask for "[a]ll Documents and Communications" concerning family-related trust entities that have been in existence for 25 years, include ambiguously "[a]ll Documents and Communications concerning the long-standing lending and investment relationship of 25 years" and "various lending and investing arrangements" and "repayments" to Related Entities;"

- **Request No. 11** demands "[a]ll Documents and Communications concerning ***any capital contribution or other consideration***" Mr. Heppner and Related Entity provided to Beneficient for an equity interest;

- **Request No. 12** asks for "[a]ll Documents and Communications concerning ***any distribution*** [Mr. Heppner] or any Related Entities received from BEN or an HCLP Entity;"

- **Request No. 13** asks for "[a]ll Documents (from January 1, 2015 to present)" concerning Mr. Heppner's "federal income tax returns," "state income tax returns," "any K-1's," "tax analyses," "tax information", or "tax forms;"

- **Request No. 14** insists on "[a]ll Documents and Communications concerning any cash You, a Related Entity, an HCLP Entity, or BEN received from GWG (directly or indirectly)" including "the date, form, purpose, and amount of anu such payment, and how the payment was used or allocated;"

- **Request No. 15** demands "[a]ll Documents and Communications concerning ***any payment***, whether in cash or in kind, that You, a Related Entity, an HCLP Entity, or BEN made to any one or more of the HCLP Entities, Bradley Capital, HERO, Research Ranch, Beneficient Holdings, Inc., Highland Business Holdings Trust, or any … Related Entity;"

- **Request No. 16** insists on "[a]ll Documents and Communications concerning ***any*** valuation report, valuation opinion, valuation analysis, fairness opinion, fairness analysis, or other financial analysis related to BEN and/or GWG;"

- **Request No. 17** asks Mr. Heppner to provide "[a]ll Documents and Communications concerning BEN's ability to continue as a going concern;"

- **Request No. 18** insists that Mr. Heppner supply "[a]ll Documents and Communications concerning BEN's financial condition, including … financial projections, financial models, budgets, financial analyses, tax returns, accounting records, business plans, audited and unaudited financial statements, general ledgers, accounting memoranda, or other financial records;"

- **Request No. 19** demands "[a]ll Documents and Communications concerning BEN, a Related Entity, an HCLP Entity, and/or GWG between [Mr. Heppner] and any federal, state, local, public, or private regulatory agency;"

- **Request Nos. 20 and 21** ask for "[a]ll Documents and Communications concerning BEN, a Related Entity, an HCLP Entity, and/or GWG" between Mr. Heppner and either Murray Holland or Tim Evans, including email accounts maintained by Beneficient as well as emails and texts on Mr. Heppner's personal devices, but not including any description limiting the topics of those Communications;

- **Request No. 22** insists on "[a]ll Documents and Communications concerning BEN and/or GWG" between Mr. Heppner and Greg Ezell, Derek Fletcher, Josef Vaculcik, Craig Opp, John Boozer, Tim Harmon, Turo Mishkin, or David Eckian, including email accounts maintained by Beneficient as well as emails and texts on Mr. Heppner's personal devices, but not including any description limiting the topics of those Communications;

- **Request No. 23** seeks "[a]ll Documents and Communications concerning the Seller Trusts, BEN, GWG, MHT, Paul Capital, and/or an HCLP Entity" between Mr. Heppner and "any Trust Advisor of the Seller Trusts … Murray Holland, Jeffrey S. Hinkle, James Turvey, or any other Trust Advisor," including email accounts maintained by Beneficient as well as emails and texts on Mr. Heppner's personal devices;

- **Request No. 24** demands the same from Mr. Heppner as Request No. 23 but with respect to HCLP Nominees various managers;

- **Request No. 25** insists on "[a]ll Documents and Communications concerning BEN or GWG" between Mr. Heppner and various Board members and their Professionals, including email accounts maintained by Beneficient as well as emails and texts on Mr. Heppner's personal devices, but not including any description limiting the topics of those Communications;

- **Request No. 26** seeks "[a]ll Communications concerning GWG, BEN, the Related Entities, or an HCLP Entity" between Mr. Heppner and GWG's outside counsel, Mayer Brown—whose files with GWG were transferred to the Litigation Trustee under the Plan;

- **Request No. 27** demands "[a]ll Documents and Communications concerning the Non-Participating Convertible Series A … reflected on the Beneficient Company Group, L.P.'s Consolidated Financial Statements and Independent Auditor's Report;"

- **Request No. 28** asks Mr. Heppner to produce "[a]ll Documents and Communications concerning the current and historical organizational structure of BEN, including, but not limited to, limited partnership agreements, partnership agreements, limited liability company agreements, company agreements, operating agreements, and organizational charts;" and

- **Request No. 29** demands "All Documents and Communications" concerning Mr. Heppner's "use or disposition of any funds [he] received from BEN."

### A.    DISCOVERY IS AVAILABLE FROM OTHER SOURCES

35.    Under the Federal Rules, which apply either under the pending-proceeding rule or the Court's Case Management Order, "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that (i) the discovery sought is

unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" or "(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."  Fed. R. Civ. P. 26(b)(2)(C).  See, e.g., Crabtree v. Angie's List, Inc., 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017) ("Rule 26 requires the Court to limit discovery if it can be obtained from another source that is more convenient, less burdensome, or less expensive.").

36.     Nearly all the 29 document requests served on Mr. Heppner are aimed at parties other than Mr. Heppner, most notably Beneficient (Req. Nos. 1, 2, 3, 11, 17, 18, 27, 28); GWG (Req. No. 26); Beneficient and GWG  (Req. No. 16); Beneficient and HCLP Nominees (Req. Nos. 5, 6, 7, 8, 9, 10, 12, 16); and Beneficient, GWG, and HCLP Nominees (Req. Nos. 4, 14, 19, 22, 23, 24).  These demands ignore the obvious other sources of documents and what has already been produced and is in the Litigation Trustee's possession, including GWG's entire privileged and non-privileged repository.

### B.     BURDEN OF JUSTIFYING INTRUSION CANNOT BE SATISFIED

37.     Discovery must be "'proportional to the needs of the case'" and be evaluated "with caution" in the case of "requests to inspect a party's electronic devices or systems for ESI, in order to avoid unduly impinging on a party's privacy interests."  Crabtree v. Angie's List, Inc., 2017 WL 413242, at *3-5 (S.D. Ind. Jan. 31, 2017) (citing Rule 26(b)(1)) (request for information from electronic devices was "not proportional to the needs of the case because any benefit the data might provide is outweighed by Plaintiffs' significant privacy and confidentiality interests …. [T]he Court has an obligation to guard against intrusive discovery").

38.     That proportion is lacking.  Instead, the Litigation Trustee seeks to intrude impermissibly into the private affairs of a non-debtor for some perceived tactical advantage and the in terrorem threat that communications and financial arrangements involving family

members will be placed into a publicly filed complaint.  No rules afford the Litigation Trustee that luxury.

39.     ***Related Entities, Income Tax Returns.***  Request Numbers 4-15, 19-21, 24, and 26 seek documents concerning the Related Entities.  Request No. 13 asks directly for Mr. Heppner's personal income tax information.

40.     The Related Entities are not relevant to Retained Causes of Action challenging various transactions between GWG and Beneficient.  As the Requests concede on their face, the Related Entities were formed nearly 25 years ago and over 15 years before GWG and Beneficient had any relationship.  Mr. Heppner does not control the Related Entities.[19]  The Litigation Trustee's demand for their documents over a 25-year period is overly intrusive, particularly when there can be no assurance documents concerning the Related Entities and the individual members of Mr. Heppner's family will remain confidential.  C.f., Driftless Area Land Conservancy v. Huebsch, 2020 WL 6881585, at *1 (Bankr. W.D. Wis. Nov. 23, 2020) ("[D]efendants oversell the level of intrusiveness to which plaintiffs' discovery subjects them.  Plaintiffs are not seeking information about anyone's family affairs, medical history or personal finances.  The information they seek relates mainly to the friendships and social interactions between commissioners and applicants.  Given the nature of this lawsuit, this information is neither purely personal nor unacceptably invasive"); In re Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. 1152, 1170 (E.D. Va. 1995) ("Extra caution is warranted before infringing on the privacy of, and imposing discovery burdens on, a person with no responsibility for the present proceeding"), aff'd in part and rev'd in part on other grounds, 83 F.3d 660 (4th Cir. 1996).

---

[19]     See Rule 2004 Request, Exhibit A p. 3 (¶ 21) (defining "Related Entities" as "trusts in which he and his family members are among classes of economic beneficiaries, whether or not Mr. Heppner is entitled to economic distributions from such trusts'") (citing The Beneficient Group, L.P. Annual Report on Form 10-K for the Year Ended March 31, 2023, at p. 151).

41.     The same can be argued with respect to Mr. Heppner's tax returns.  "[W]hile tax returns are not privileged, courts have been reluctant to order their routine disclosure as part of discovery."  SEC v. Cymaticolor Corp., 106 F.R.D. 545, 547 (S.D.N.Y. 1985).  Indeed, the Internal Revenue Code reflects an apparent federal policy to severely curtail disclosure of tax returns.   See 26 U.S.C. §§ 6103 (requiring maintenance of confidentiality), 7213(a) (criminalizing unauthorized disclosure).

42.     ***ESI On Personal Devices.***  Request Nos. 20-25 ask for text messages from Mr. Heppner's personal devices, pursuing a level of discovery that is inappropriate now and may never be appropriate.  Hundreds of thousands of documents have already been produced, and Beneficient and HCLP Nominees may provide more, including Mr. Heppner's emails sent and/or received from his Beneficient email address—the account from which he conducts nearly all of his correspondence relating to GWG and Beneficient.

43.     With respect to "personal email," Mr. Heppner maintains one personal email account.  The vast majority of those emails related to Beneficient and GWG were merely Mr. Heppner forwarding an email from his "beneficient.com" email address to his personal address so that he could print locally.  Accordingly, many of those emails were already gathered and produced from the "beneficent.com" side of the communication by Willkie Farr & Gallagher (GWG/Beneficient counsel).

44.     That leaves text messages on Mr. Heppner's personal cell phone.  The Litigation Trustee would have Mr. Heppner search his phone dating back nearly 10 years and then indiscriminately extract any communication with any person relating to Beneficient, GWG, HCLP Nominees, and their affiliated trusts.  The breadth of the request—which would cover every text with anyone at Beneficient relating to Beneficient, a company he founded and has led for years, is patently overbroad.

45.     On this record, the high showing of cause needed for this personal information, and how it justifies the attendant intrusion, burden, and expense, cannot be made.  See Fed. R. Civ. P. 26(c)(1); Crabtree v. Angie's List, Inc., 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017) (denying discovery of electronic communications on plaintiff's personal devices:  "Defendant has not shown how emails, text messages, or social media posts from this one year time period may be more probative as to these issues than other less intrusive data already within its control") (citing Hespe v. City of Chicago, 2016 WL 7240754 at *3 (N.D. Ill. 2016)); Fed. R. Civ. P. 34, Advisory Committee Notes—2006 Amendment ("Inspection or testing of certain types of electronically stored information or of a responding party's electronic information system may raise issues of confidentiality or privacy ….. [Rule 34(a)] is not meant to create a routine right of access to a party's electronic information system …. Courts should guard against undue intrusiveness"); Cornelius v. Rollins Ranches, LLC, 2021 WL 10382763, at *3 (S.D. Fla. June 16, 2021) ("Unlike social media posts, emails, texts, and IMs are inherently private conversations.  'Defendant does not have a generalized right to rummage at will through information that Plaintiff has limited from public view.' [(quoting Davenport v. State Farm Mut. Auto. Ins. Co., 2012 WL 555759, at *1 (M.D. Fla. Feb. 21, 2012)] In this modern era, significant portions of people's lives occur through or are discussed in text and email …. [D]iscovery requests should be carefully scrutinized when they have the potential for 'harassment, embarrassment, and unnecessary invasions into one's private life'") (quoting Pendlebury v. Starbucks Coffee Co., 2005 WL 2105024, *2 (S.D. Fla. Aug. 29, 2005); Devries v. Morgan Stanley, 2015 WL 893611, at *5 (S.D. Fla. Mar. 2, 2015) (finding "overbroad and invasive" an employer's request for production of documents that included text messages the plaintiffs sent or received during their employment).[20]

---

[20]     See also Burdette v. Panola Cnty., 83 F. Supp. 3d 705, 707 (N.D. Miss. 2015) ("text messages and phone calls between plaintiff and his family members and attorney are clearly overly broad and not relevant to the issues at hand"); United States ex rel. Schroeder v. Medtronic, Inc., 2023 WL 3224180, at *3 (D. Kan. May

46.     ***HCLP Nominees Documents.***  Request Numbers 4, 12, 13-15, 19-21, 23, 24 and 26 demand documents concerning HCLP Nominees and its various managers.  To the extent (if any) they are relevant, ample documents already are accessible to the Litigation Trustee concerning these arrangements through GWG and HCLP Nominees.  Indeed, it was GWG that years ago prepared various public filings disclosing ***both*** the Related Entities and the HCLP Nominees loan:

- On September 1, 2017, Beneficient completed its formative transaction with Paul Capital Advisors ("**PCA**"), an independent firm represented in the negotiations by Kirkland & Ellis LLP and Richards Layton & Finger LLP.[21]  At that time, Beneficient was a private company wholly owned by Mr. Heppner, which functioned as his family office and owned many other unrelated assets and investments.  In connection with the PCA transaction, HCLP Nominees was formed for the purpose of extending a $141 senior secured loan to Beneficient to fund the purchase of alternative assets.[22]

- Mr. Heppner does not control HCLP Nominees or the Related Entities.[23]  Instead, HCLP Nominees' ultimate parent entity, Highland Consolidated LP, is controlled by a trust of which Mr. Heppner is one potential beneficiary.[24]

---

3, 2023) ("Realtor has not established how accessing all text communications between these individuals from 2011 to the present would be proportionate to the needs of the case."); Charles Schwab & Co. v. Highwater Wealth Mgmt., LLC, No. 17-CV-00803-CMA-NYW, 2017 WL 4278494, at *7 (D. Colo. Sept. 27, 2017) (granting a motion to quash a subpoena requesting forensic imaging of a cell phone including because "a complete image of [an individual's] mobile phones necessarily will capture information that is not relevant at all to this action.").

[21]     See Beneficient Amendment No. 2 to Form S-4 Registration Statement ("Amended Ben S-4") (Mar. 6, 2023), at F-09, available at https://www.sec.gov/Archives/edgar/data/1775734/000119312523061528/d406382ds4a.htm.

[22]     See GWG Holdings July 7, 2019 Form 10-K ("GWG 2018 10-K"), Ex. 99.4 at 18 (Beneficient Consolidated Financial Statements), available at https://www.sec.gov/Archives/edgar/data/1522690/000121390019012331/f10k2018ex99-4_gwghold.htm; see also Amended Ben S-4, at Ex. 10.21.8 (Security and Pledge Agreement (BCH) (First Lien) dated as of September 1, 2017, by and among Beneficient Company Holdings, L.P. (as successor to Beneficient Capital Company II, L.L.C. (f/k/a Beneficient Capital Company, L.L.C.) and HCLP Nominees, L.L.C.).

[23]     See GWG 2019 10-K, Ex. 99.4 at 40 ("HCLP Nominees, L.L.C. … is a Delaware limited liability company and is an indirect subsidiary of Highland Consolidated, L.P., the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries").

[24]     See id. ("Highland Consolidated, L.P., a Texas limited partnership controlled by affiliates of BEN, the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries.").

- The loan from HCLP Nominees to Beneficient was disclosed to GWG before the parties merged and by GWG in its public filings.[25]

- The Proposed Complaint brings subsequent transferee claims against HCLP Nominees in four counts, alleging GWG funds transferred to Beneficient were subsequently distributed to HCLP Nominees.[26] Those claims are premature unless and until transfers from GWG to Beneficient are avoided in the first instance.[27]

### C. ABSENT ORDER QUASHING, MR. HEPPNER WILL PRODUCE CERTAIN DOCUMENTS FROM HIS PERSONAL EMAIL ACCOUNT

47. If the Court does not quash the Rule 2004 Request outright, subject to the Reponses and Objections, Mr. Heppner will produce documents responsive to Request Nos. 20, 21, 22 and 25 that can be found in his personal email account to the extent they relate to GWG and Beneficient and have not already been provided to GWG, e.g., in connection with GWG's SEC investigation.  See **Ex. 2**.  Mr. Heppner submits any other documents, including documents concerning the Related Parties or HCLP Nominees and its managers; text messages; and

---

[25]   See e.g., GWG Holdings November 9, 2018 8-K/A, Ex. 99.3, available at https://www.sec.gov/Archives/edgar/data/0001522690/000121390018015323/f8k081018a1ex99-3_gwghold.htm ("As of September 1, 2017, Beneficient Capital Company, L.L.C. entered into a credit agreement with HCLP Nominees, L.L.C. and all pre-existing debt was refinanced. The pro forma adjustment is calculated using 3.75% of the average outstanding debt at the beginning and end of the period."); GWG Holdings June 6, 2019 Form 8-K, at https://www.sec.gov/Archives/edgar/data/1522690/000121390019010247/f8k053119_gwgholdingsinc.htm ("The Loan is unsecured and is subject to certain covenants (including a restriction on the incurrence of any indebtedness senior to the Loan other than existing senior loan obligations to each of HCLP Nominees, L.L.C. ("HCLP") and Beneficient Holdings, Inc. ("BHI", and together with HCLP, the "Senior Lenders"), as lenders) and events of default. The Senior Lenders are directly or indirectly associated with one of Beneficient's founders, who is also Chairman of the Company's Board of Directors.").

[26]   Proposed Compl. ¶¶ 322-338, 349-369 (Counts 9, 10, 12, 13).

[27]   See In re Enron Creditors Recovery Corp., 388 B.R. 489, 490 (S.D.N.Y. 2008) ("[A]ppellants have no practical ability to effect a recovery under 11 U.S.C. § 550(a)(2), unless a declaration of avoidance against the initial transferee can be made simultaneously, or prior to, with a declaration authorizing a recovery against a subsequent transferee."); cf., Just Energy Texas LP, et al. v. Electric Reliability Council of Texas, Inc., et al., Adv. Proc. No. 21-4399 (MI) (Bankr. S.D. Tex.) [ECF No. 105], Order on Turnover Claim (Feb. 24, 2022) (dismissing count under section 542(a) of Bankruptcy Code without prejudice as premature unless and until payment transactions to ERCOT were declared illegal; "Just Energy Texas, L.P. is granted leave to replead its complaint to seek § 542 turnover if the turnover claim ripens") (attached hereto as **Exhibit 4**); In re Maxim Truck Co., Inc., 415 B.R. 346, 357 n.4 (Bankr. S.D. Ind. 2009) ("remedy under § 542 for turnover … only ripens upon a determination by the Court that the property in dispute is, in fact, property of the estate.").

personal income taxes, should not be searched for or produced for the various reasons argued in the Motion.

## CERTIFICATION

48.     Undersigned counsel conferred in good faith via video conference with counsel to the Litigation Trustee on February 16, 2024.   Email correspondence followed, in which undersigned counsel, on behalf of Mr. Heppner, made a good faith offer with respect to the Rule 2004 Request that the Litigation Trustee rejected on February 22, 2024.

## CONCLUSION

WHEREFORE, for the forgoing reasons, the Motion should be granted, and Mr. Heppner should be awarded such other, further relief as is appropriate.

Dated: March 1, 2024
      Houston, Texas

Respectfully submitted,

By: /s/ *Christopher Porter*
    **QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Christopher Porter
Tx. Bar No. 24070437
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone: (713) 221-7000
Email: chrisporter@quinnemanuel.com

-and-

/s/ *James C. Tecce*
James C. Tecce
Katherine Scherling
51 Madison Avenue, 22nd Floor
New York, New York  10010
Telephone: (212) 849-7000
Email: jamestecce@quinnemanuel.com
Email: katescherling@quinnemanuel.com

Michael Liftik
Kristin Casey
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: michaelliftik@quinnemanuel.com
Email: kristincasey@quinnemanuel.com

*Counsel to Brad K. Heppner*

**CERTIFICATE OF SERVICE**

I, Christopher Porter, certify that on March 1, 2024, I caused a true and correct copy of the Brad K. Heppner's Motion, Pursuant To Fed. R. Civ. P. 26 And 45, Fed. R. Bankr. P. 7026 And 9016, L.R. Bankr. P. 2004-1 And 9013-1, Either (A) To Quash Rule 2004 Examination And Subpoena Duces Tecum Propounded By GWG Litigation Trustee Or, (B) Alternatively For Protective Order to be served by the Court's CM/ECF system on all parties entitled to notice.

*/s/ Christopher Porter*