**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GWG HOLDINGS, INC., *et al.*[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 22-90032 (MI) (Jointly Administered) |
| MICHAEL I. GOLDBERG, as Trustee of the GWG LITIGATION TRUST,<br><br>       Plaintiff,<br><br>v.<br><br>FOLEY & LARDNER LLP,<br><br>       Defendant. | Adv. Pro. No. _____ |

**<u>COMPLAINT</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

## TABLE OF CONTENTS

NATURE OF ACTION ............................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 21

PARTIES AND RELEVANT NON-PARTIES ................................................................... 22

   A.   Plaintiff Litigation Trust. ........................................................................................... 22

   B.   Defendant Foley. ......................................................................................................... 22

   C.   Relevant Non-Parties. ................................................................................................ 22

       1.   The GWG Special Committee Represented by Foley ................................. 22

       2.   Other GWG Directors During the Relevant Period. ................................. 23

       3.   GWG's Disloyal Officers ................................................................................ 23

       4.   Heppner and His Affiliated Entities. ........................................................... 24

       5.   Relevant BEN Entities. ................................................................................. 28

FACTUAL BACKGROUND ................................................................................................. 29

   A.   Overview of Heppner's Founding of BEN, BEN's Entanglement with GWG, and Heppner's Looting of GWG via His HCLP-Related Scheme. ........................................ 29

       1.   BEN's Formative Transactions and Introduction to GWG. ..................... 29

       2.   Heppner Induces BEN to Buy Out GWG's Founders to Facilitate His Planned Scheme to Line His Own Pockets (to Both GWG's and BEN's Detriment). ......... 33

       3.   Heppner's Self-Dealing Scheme to Loot GWG (and BEN) Using HCLP as a Front. ........................................................................................................ 35

   B.   Heppner Installed the Special Committee, Selecting Foley as its Counsel, to Try to Shield Himself from Liability. ........................................................................................... 47

   C.   In May 2019, Foley Pushed Through Two Hastily Approved and Unfair Transactions: (a) a $10 Million Acquisition of BEN Equity and (b) a $65 Million Loan to BEN. ........ 52

       1.   Foley Misadvises the Special Committee in Connection with a $10 Million Purchase of BEN LP Common Units from a Third Party. ....................................... 55

       2.   Foley Misadvises the Special Committee in Connection With a $65 Million Loan Made on Below-Market Terms. .............................................................. 63

   D.   Foley Is Presented with Numerous "Red Flags" Surrounding BEN's Business from June 2019 Through December 2019, Yet Remains Focused on Rationalizing Sending Cash to BEN (Rather than Financial Fairness and Reasonableness of GWG Doing So). 80

       1.   Foley Knew or Should Have Known That the Special Committee Had Been Duped in Connection With the $65 Million Loan. ................................... 81

i

2.   Foley Knew or Should Have Known That Chavenson and Mason Did Not Fully Understand BEN's Business Plan and Were Negotiating From an Unfair Position Given the Information Asymmetry in the Negotiations...........................................84

3.   Foley Knew or Should Have Known That Several GWG Directors Resigned Due to Inability to Get Information from Heppner and BEN, and That Holland and Heppner Covered Up the Reasons for Those Resignations. ....................................87

4.   Foley Knew or Should Have Independently Known of the Issues the Resigning Directors Raised..............................................................................................98

5.   Foley Knew or Should Have Known of Numerous Additional GWG and BEN Officer and Director Resignations. ..........................................................................99

6.   Foley Knew or Should Have Known That BEN (and, In Turn, GWG) Faced Significant Issues with Auditors, and That BEN Had Significant Accounting Problems. ..............................................................................................................100

7.   Foley Knew or Should Have Known that BEN's Financial Projections Were Not Reliable. ..............................................................................................................102

8.   Foley Knew or Should Have Known That the Alternative Asset Portfolio Underlying BEN's Business Had Major Question Marks, Casting Further Doubt on BEN's Business Model and Projections. ........................................................106

E.   Due to Foley's Malfeasance, the Special Committee Sends Another $79 Million from GWG to BEN in December 2019. ..........................................................................110

1.   Foley Ignored Many Glaring "Red Flags" of Valuation Issues and Discrepancies Surrounding BEN, Instead Glossing Over Known Problems—and VRC's Refusal to Provide a Formal Fairness Opinion—and Negotiating Unfair Terms. ..............114

2.   Foley Was Grossly Negligent in Connection with HCLP and the $49.8 Million "Change of Control" Payment That BEN Made to HCLP With Funds Advanced by GWG. ............................................................................................................143

3.   Due to Foley's Negligence, the Special Committee Agreed to Illusory Changes to BMLLC's Operating Agreement That Accomplished Nothing for GWG. ............162

4.   Foley's Malfeasance in Connection With the $25 Million GWG Advanced to BEN so That BEN Could Satisfy its Obligations to Sabes....................................172

5.   Foley's Negligence and Knowing Participation in Breaches of Fiduciary Duty Relating to GWG Taking Equity in BEN in Exchange, Rather than Debt. ...........180

F.   Foley Withdraws in Early 2020, While Acknowledging That Problems Existed All Along and Yet Again Failing to Give Any Warning to GWG or the Full GWG Board..182

G.   GWG Sustained Hundreds of Millions of Dollars of Damages as a Result of Foley's Misconduct...............................................................................................................190

1.   BEN Equity Had Minimal Fair Market Value When GWG Acquired it at Prices Implying BEN Was Worth Billions of Dollars.....................................................191

    2.    BEN's Disastrous Stint as a Public Company Further Confirms that BEN's Business Is, and Always Was, Fundamentally Broken, and that BEN Equity Interests Are Almost Worthless. .............................................................................. 204

TOLLING OF LIMITATIONS ..................................................................................... 208

CAUSES OF ACTION ................................................................................................. 210

   COUNT I:  AIDING AND ABETTING/KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTIES. ....................................................................................... 210

   COUNT II:  PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE......................... 215

   COUNT III: BREACH OF FIDUCIARY DUTY.................................................... 223

   COUNT IV: AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(b) AND 550............................................. 225

PRAYER FOR RELIEF ............................................................................................. 227

Michael I. Goldberg, in his capacity as trustee of the GWG Litigation Trust (the "<u>Litigation Trust</u>"), the successor-in-interest to the claims of GWG Holdings, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by and through his undersigned counsel, hereby brings this action against Foley & Lardner LLP ("<u>Foley</u>") and alleges as follows:

## <u>NATURE OF ACTION</u>

1.      This action arises out of Foley's malpractice and knowing participation in breaches of fiduciary duty in its representation of a two-member Special Committee of the board of directors of a Delaware corporation, GWG Holdings, Inc. (together with its wholly owned subsidiaries, "<u>GWG</u>"), the ultimate organizational client for whom Foley's legal services were rendered. Foley's misconduct encompassed a disturbing combination of incompetence, willingness to overlook flagrant fiduciary misconduct and red flags of fraud, and knowing facilitation of patently unfair transactions that were against GWG's best interests.

2.      Foley should have advised the two GWG Special Committee members, Kathleen Mason ("<u>Mason</u>") and David "Dave" F. Chavenson ("<u>Chavenson</u>"), that bedrock Delaware corporate law required them to act in GWG's best interests (and for no other purpose), to negotiate vigorously to protect GWG, to fully inform themselves, and to ensure that any transaction approximated the result of an arm's-length transaction in the marketplace.

3.      But rather than properly advise the Special Committee and ensure that GWG's interests were protected, Foley instead acted as a fixer for corrupt insiders—Foley negotiated, encouraged, and facilitated transactions that were patently unfair to GWG at the behest of GWG's group of controlling shareholders: (a) The Beneficient Company Group, L.P. ("<u>BEN LP</u>," including all affiliates — "<u>BEN</u>"); (b) Bradley K. Heppner ("<u>Heppner</u>"), who was BEN's founder and chairman and served as GWG's chairman during the relevant period; and (c) Murray T. Holland

1

("Holland"), GWG's CEO and President (and who, along with BEN, effectively controlled majority voting rights of GWG stock).

4.      Throughout its representation, Foley was preoccupied with trying to paper the record to deflect responsibility and rationalize GWG sending massive sums of money to BEN, and not on protecting GWG's interests and guiding the Special Committee to properly do its job in accordance with the clear requirements of Delaware law.  By the same token, Foley's efforts were woefully inadequate and negligent.   What minimal diligence Foley did undertake was a performative, box-checking exercise.  And Foley consistently failed to get basic facts right in rendering advice.  Such malfeasance permeated the entirety of Foley's representation from its beginning in May 2019 until its end on March 3, 2020, when Foley resigned.

5.      From the outset of its engagement, Foley was fully aware that Heppner's and Holland's plan all along was to exploit GWG to funnel cash to BEN.  Indeed, on the evening of his first official day on the job (May 15, 2019), lead Foley partner on the engagement, Evan Stone ("Stone"), apprised another Foley partner, as follows:

> [T]hey need an emergency funding approved from GWG to BEN to get a going concern opinion from the BEN auditor (Deloitte) to enable BEN (sub) financials to be issued to GWG so GWG can issue its 10K and sell L bonds. . . . ***Note the whole concept of doing the merger was to tap GWG's cheap 'cash machine' for the benefit of the sub*** and that has ground to a halt right now . . . .
>
> . . .
>
> So the essence of the committee's work we will be reviewing the terms of the proposed loan over the next 24-36 hours.  ***I'm less than thrilled for us to be in this position, though one mitigating factor from a litigation perspective is that the public stub here is small*** . . . .

(Emphases added).   Nevertheless, Foley never seriously considered—or advised the Special Committee of—the possibility that the Special Committee should consider denying the emergency

funding request due to: (a) significant questions over whether BEN could continue as a going concern; and (b) Holland's and Heppner's plan to hijack and abuse GWG as a cash cow for BEN.

6.        Instead, Foley—after cynically handicapping the risk of shareholder derivative litigation—focused on how to paper the record to give cover for moving cash to BEN.  That was a heavy lift, however, because the terms of the proposed funding were patently unfair, as Stone further acknowledged in his May 15, 2019 email assessing the situation:

> The proposed loan is a 5 year, 7% unsecured loan that . . . ***isn't pretty as emergency funding***.  ***To create a reasonable record here, I believe – and told them all, including [Holland] – . . . that the funding should be as short term as the BEN auditors can get comfortable with (to issue the opinion)*** – they preliminarily say that is 13 months – ***and to get liens***.  We have discussed other features, such as escalations and required repayment if the opinion in fact does not materialize (as GWG will need the money).

(Emphases added).

7.        Foley failed miserably in trying to "create a reasonable" record to justify moving cash from GWG to BEN in connection with the loan, achieving none of the objectives laid out in Stone's email.  And on May 31, 2019, Foley recommended, and the Special Committee approved, a $65 million loan from GWG (the "$65 Million Loan"), even though:

- The loan was unsecured (*i.e.,* Foley did not "get liens");

- The loan was not due for over four years, with no interest due until maturity (*i.e.,* Foley did not get a 13-month term, despite Foley internally acknowledging the "need to stick to 13 months"); and

- Foley failed to secure an event of default tied to BEN's audited financial statements (despite Stone's May 15, 2019 email, and subsequent Foley internal emails, indicating that it was an issue "we can't give on" and "feel strongly about").

Moreover, the 7.0% interest rate on the unsecured loan to a risky borrower was below GWG's own borrowing costs, and more favorable than what BEN could obtain from third-party lenders in the marketplace—as Heppner admitted to Foley.

8.      Despite every indication that the $65 Million Loan was a sweetheart deal for BEN, with substantially below-market terms far below what any lender would agree to under the circumstances, Foley advised the Special Committee to approve the loan anyway.  Moreover, Foley pushed for approval, even though the Special Committee had not yet retained a financial advisor, and neither Foley nor the Special Committee had performed any financial analysis or market-check on the terms of the loan.  And Foley did so even though Foley knew that BEN was in such dire straits that the loan structure "was designed to . . . increase the likelihood that the proceeds of the Loan would . . . not be captured or swept" by BEN's other creditors.

9.      Under the circumstances, the GWG Special Committee's approval of the patently unfair $65 Million Loan on May 31, 2019, constituted breaches of their fiduciary duties of care. But Foley never advised them as such, nor advised them of the myriad ways in which the Special Committee's process and approach fell far short of that required of special committees under Delaware law to protect GWG's interests.  Instead, Foley tried to smooth things over and rationalize an objectively indefensible transaction.

10.     And yet despite all that, Foley's misconduct in connection with the $65 Million Loan was not even the worst of its malfeasance in May 2019.  On May 20, 2019, just days after the Special Committee was formed, Foley encouraged the Special Committee to approve a $10 million acquisition of BEN common units from third-party Essex Capital (the "Essex Transaction"), while conducting woefully inadequate due diligence, no substantive negotiations, and no financial analysis, all just to appease Heppner and Holland and show progress.

11.     Foley's malpractice in connection with the Essex Transaction was egregious.  Foley advised the Special Committee based on the flawed assumption that the $10 million payment

would satisfy BEN's pre-existing obligations to Essex,[2] even though no such obligation existed. Specifically, as reflected in Foley-prepared minutes for Special Committee meetings, Foley and the Special Committee repeatedly discussed that the $10 million payment would "satisf[y] a near term obligation of BEN," "was intended…to satisfy outstanding obligations," and was warranted because of the "desirability of BEN fulfilling certain outstanding obligations to Essex Capital (which had a due and payable claim on BEN cash)."  Further, Foley also advised the Special Committee that advancing $10 million was a good means of improving BEN's liquidity "due to the relative simplicity of stepping into the obligation of BEN substantially in accordance with its terms (i.e., an acquisition of units) as diligenced" by Foley.

12.     But contrary to Foley's negligent advice, ***BEN owed no obligation to Essex***, Essex had no "due and payable claim on BEN cash," and GWG did not simply step into some agreement. All of that should have been obvious to Foley.  Foley never asked for, or received, a single document evidencing any obligation owed by BEN to Essex.  And any such obligation was conspicuously absent from all materials provided to Foley, including BEN financial statements, BEN payables schedules, and BEN cash flow projections.

13.     Not only did Foley get the basic facts wrong, Foley negotiated the $10 million purchase of BEN common units in the Essex Transaction: (a) with no substantive negotiations of the price to be paid; (b) without any financial or valuation analysis of BEN whatsoever; and (c) while wholly failing to consider implications of BEN's complex capital stack and waterfall (a critical error, as Foley later recognized that BEN common units might be "worthless" given the "overhang" of senior preferred interests).  At the same time, Foley failed to properly advise the GWG Special Committee on the need to ensure that the price paid by GWG to Essex in exchange

---

[2] The focus on satisfaction of *BEN's obligations* is an illustration of the improper "what's good for BEN is good for GWG" mindset that Foley fostered with the Special Committee.

5

for BEN LP units was within the range of commercial reasonableness and what a third-party purchaser would have paid for those BEN LP units in an arm's-length transaction.

14.    Due to Foley's failures, the Essex Transaction was approved at a price of $10 per BEN common unit.  The price paid implied that total BEN equity was worth well over a billion dollars.  But that was nonsensical based on the information known to Foley.  Indeed, based on the information it received (and/or as Foley admitted), Foley knew that BEN had no history of profits, that BEN had not yet obtained the trust charter necessary for its business to launch, that BEN faced going concern issues, that BEN faced liquidity challenges and "operational cash needs," that BEN had repeatedly defaulted on—and was unable to repay—its debts, and that BEN was only forecasting $10 million in revenue over the next year.

15.    Nevertheless, Foley recommended that the Special Committee approve the Essex Transaction at a grossly unfair price anyway (despite no financial diligence or substantive price negotiations).  Foley did so to appease Heppner, Holland, and BEN, and because it enabled Foley to show progress and give them something in the interim before Foley was ready to sign off on the $65 Million Loan.  According to Foley, the Essex Transaction "required significantly less documentation," could be approved "within a short period of time," and "the overall size" was a more modest $10 million, making it easier to paper over than the parallel request for the $65 Million Loan.

16.    For its part, the Special Committee felt uncomfortable with what was happening. Indeed, on the same day that the Essex Transaction was approved, Chavenson requested a meeting with Foley for guidance on "what exactly the Special Committee's responsibilities are and how it should go about" its responsibilities, while at the same time expressing concerns to Stone like: "*I don't think it was the intention of the GWG BOD* to set up an ad-hoc Special Committee, although

I will admit it felt like that," "*I have felt some pressure*," and "*I have little desire for another 'fire drill'*." (Emphases added).  Stone indicated that he "*agree[d] with those sentiments*," but did not advise that what had just happened was improper.  Nor did Stone (or Foley) advise the Special Committee that they were required to negotiate vigorously, act on full information, not allow themselves to be bullied into hasty decisions, and ensure that GWG's interests were protected.

17.     In December 2019, Foley once again misadvised the Special Committee and papered over a transaction in which GWG sent an additional $79 million to BEN in exchange for BEN equity interests at grossly inflated prices.  In this transaction, GWG gave: (a) $69 million in exchange for a preferred capital account in the stated (but largely made up) amount of $319 million; and (b) $10 million in exchange for BEN common units at a price of $15 per unit (and an agreed-upon $3.5 billion total equity valuation for BEN).  Once again, as in the Essex Transaction, the consideration that GWG received in exchange for the $79 million it sent to BEN on December 31, 2019, was patently unfair to GWG; no third-party in the marketplace would have paid anything close to what GWG paid under the circumstances.

18.     By this time, moreover, problems with BEN's claimed valuation had become obvious to Foley.  The Special Committee had retained a financial advisor, Valuation Research Corporation ("VRC"), and VRC sounded the alarm regarding BEN.  Indeed, VRC refused to provide a fairness opinion or formal valuation opinion for the December 2019 transactions due to "*major concerns about Ben*," including "*significant issues in Ben's financials*," and because VRC was "*extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition*."  (Emphases added).  Upon later resigning, the principal on the engagement further explained that it was "*one of few times in my 15 years*" at his firm "*where I have actually resigned from an engagement which is an indication of my level of concern*."

(Emphases added).  VRC conveyed its concerns to Foley, including the existence of a "***very very large logic/math mistake***" embedded in BEN's valuation and accounting.

19.     Beyond VRC's concerns, there were many other reasons why it should have been clear to Foley—and therefore confirmed VRC's view—that BEN was not worth billions of dollars. Foley knew that BEN still had not obtained its trust charter or fully launched its business, and that it was continuing to burn cash.  Foley knew that, for months, BEN had struggled to deliver coherent financial projections.  When BEN finally provided them in November 2019, the projections were based on statistical simulation, and BEN refused to stand by them (instead including highly unusual disclaimers).  Foley also knew that BEN needed cash at year-end because it was unable to pay its debts as they came due, including a $25 million obligation due January 3, 2020 (that Foley knew had already been extended once in October 2019).  Foley knew that the alternative asset portfolio underpinning BEN's business was full of stale investments in private equity funds that predated the 2008 financial crisis.  And Foley knew of media reports suggesting that one fund (representing 27% of the total portfolio) was "racing to keep lights on as investors flee," was "desperate for cash" and "deep in crisis mode."

20.     Those facts reflected that BEN was financially distressed and cast serious doubt on whether BEN had any meaningful value.  And on top of that, Foley was aware of many other red flags suggesting that BEN's business was in disarray—and certainly not worth billions—such as two recent auditor departures, billion-dollar financial statement restatements, resignations of several directors (including those who implored Foley to get a handle on what was happening at BEN), and high turnover of senior BEN legal and finance personnel.

21.     Nevertheless, Foley negotiated, and recommended, the December 31, 2019 transaction in which: (a) a largely made up $1.57 billion valuation was assigned to BEN's senior

preferred security, non-unitized "NPC-A" capital accounts; and (b) a $3.5 billion overall equity value was assigned to BEN. Those agreed-upon figures were nonsensical given the information known to Foley and the issues raised by VRC. And the prices that Foley negotiated and GWG paid were even more ludicrous given the surrounding circumstances.

22.     Specifically, the NPC-A unit account that GWG received in exchange for $69 million was grossly unfair to GWG given the dilutive effects of Heppner's much larger NPC-A position (which increased in the transaction). Foley, based on questions raised by the Special Committee and its discussions with VRC, knew full well that Heppner (via his affiliates) effectively enjoyed a $1 billion NPC-A capital account based on a purchase price accounting exercise and a related report as of May 2018 that had been issued by Ankura Capital Advisors, LLC ("Ankura").[3] Foley likewise knew that Ankura's analysis was entirely unreliable for several reasons, including because VRC specifically told Foley that Ankura's analysis was wrong. Putting two and two together, therefore, Foley knew or reasonably should have known that Heppner's NPC-A account credited at $1 billion was based on a combination of accounting gimmicks and a fundamentally flawed Ankura report—not real value provided by Heppner.

23.     Nevertheless, Foley negotiated and recommended a "compromise" in which Heppner kept his $1 billion phantom NPC-A account—for which he had contributed almost nothing—and increased it by approximately $235 million to $1.25 billion, all while providing no new consideration whatsoever. GWG, meanwhile, contributed $69 million of actual funds in exchange for a NPC-A account with an ascribed, nominal "value" of $319 million. It was grossly unfair for GWG to contribute $69 million of real money in exchange for an NPC-A account with

---

[3] Prior to the purchase price accounting exercise and Ankura's related analysis, Heppner's NPC-A account had a nine-figure debt balance, *i.e.,* reflected negative equity. The "write-up" of the NPC-A account from a negative number to ~$1 billion was a focal point of the Special Committee's discussions, and an issue known to Foley.

a made up "value" while at the same time agreeing that Heppner would receive a $235 million increase to his made-up NPC-A account despite contributing nothing (and allowing Heppner to keep his $1 billion starting phantom NPC-A account).

24.     Likewise, it was grossly unfair for GWG to receive BEN common units (at a price of $15 per unit) in exchange for $10 million—and Foley knew it.  Nevertheless, Foley negotiated for GWG to acquire BEN common units at a price of $15 per unit (and at an agreed-upon $3.5 billion total valuation of BEN) even though Foley knew that BEN common units were worth far less.  Foley itself recognized (on December 20, 2019) that common units might be "***worthless***" absent a recapitalization of BEN, in part due to the "overhang" in BEN's capital structure related to the NPC-A.  For those reasons, Foley and the Special Committee repeatedly discussed— throughout December 2019—the need to "remain firm that any funding would need to occur as a senior BEN security," and that it would be "***problematic***" for GWG to "receive common units as consideration" for cash funding. (Emphasis added).  At one point, when BEN was pushing for all funding to be in exchange for common units, Foley even contemplated quitting—"***we can't approve this***" and "***we're done***." (Emphases added).  Yet, in the end, Foley caved, because $10 million was just a "small amount," in Foley's warped view.

25.     Making the price paid for common units even worse, Foley did not settle on the $15 per unit price for BEN common units and $3.5 billion agreed-upon valuation for BEN until the counsel closing call on December 31, 2019, the same day the transaction was approved and closed. There were no substantive negotiations over price.  The valuation was at least four times higher than what any preliminary analysis provided by VRC would or could support.  And Ankura ***never*** supported a $3.5 billion valuation for BEN either.

10

26. In short, Foley negotiated, and knowingly papered over, GWG's funding of BEN for speculative BEN equity that Foley knew was worth far less than the prices GWG paid. That alone constituted Foley's knowing participation in and facilitation of the Special Committee's breaches of their fiduciary duties of care to GWG. But Foley's malfeasance in connection with the December 2019 transactions encompassed several other wrongs as well (each of which, standing alone, is an actionable wrong).

27. <u>First</u>, Foley was shockingly negligent in conducting due diligence surrounding BEN's primary use of the proceeds advanced by GWG. Specifically, BEN immediately sent $49.8 million of the $79 million it received from GWG on December 31, 2019, to BEN's purported senior lender, HCLP Nominees, LLC ("<u>HCLP</u>"), an entity affiliated with Heppner. BEN did so on the basis of an extortionist demand by HCLP that BEN make the payment in exchange for HCLP agreeing to waive an event of default under the credit agreement that was to occur due to planned year-end changes in contractual rights to designate BEN directors (discussed below). But HCLP's supposed demand was a total sham; Heppner controlled HCLP and promptly siphoned all $49.8 million advanced from GWG to BEN to HCLP into Heppner's network of affiliated trusts and entities, effectively lining his own pockets. In essence, Heppner looted the $49.8 million—and he was only able to do so because Foley was completely asleep at the wheel.

28. Foley's incompetence in connection with due diligence into HCLP, its relationship with Heppner, and its supposed payment demand was staggering. In particular:

- Foley knew, as a result of the May 2019 transactions, that HCLP had repeatedly waived BEN's defaults under the credit agreement, without demanding significant—or any—payments in exchange.

- Foley knew that there was a "***cozy relationship***" between HCLP and Heppner, and at one point, suspected that "***affiliated trusts of Brad [Heppner] are owners of [the] debt*** (indirectly)."

- Foley knew of the existence of a memorandum drafted by William "Bill" Banowsky ("Banowsky"), one of Heppner's co-conspirators in his HCLP fraud against GWG, yet never asked to see that memorandum or any other documents that would have blown apart Heppner's scheme (due to many contradictions between those documents and other information provided to Foley previously). Instead, Foley held a call with Banowsky, which Banowsky summarized to Heppner as "*very much . . . a 'check the box' call*" at a "very *high level*," as Foley "*did not push me for information*" or "*ask for any documents* or anything in writing."

- In December 2019, when HCLP supposedly increased the amount of the demand from around $40 million to nearly $50 million, Foley caught Heppner, Holland, and BEN in a lie over the status of supposed negotiations with HCLP. When Chavenson asked for "Help!" to confirm his recollection regarding inconsistencies with what the Special Committee had been told, Foley replied that he was "*100% right*" that the story had changed.

- Foley included "*documentary support on BEN debt default/demand from lender (NOT [HCLP's counsel]) that the $40mm payment is necessary*" in its "List of Key Items" to enable year-end funding.

- Foley-prepared minutes for Special Committee meetings in December 2019 reflected that "*clear written documentation as to any demand from HCLP*" was "*key item and issue*," and that a "*key diligence item*" was "*documentation evidencing that HCLP [] was requiring a loan repayment of over $40 million*," in particular because of "the importance of [GWG] not funding voluntary prepayments given liquidity constraints on both BEN and [GWG]."

(Emphases added).

29. Yet despite all that, in the end, the *only* documentary support that Foley ever obtained for HCLP's supposed payment demand was a *draft letter* on letterhead from HCLP's supposed manager with a *blank number* for the amount of the requested payment. Foley obtained that draft letter from BEN, not HCLP or HCLP's counsel (whom Foley never directly interfaced with regarding the supposed change of control demand). And the letter was purportedly on behalf of David Wickline (whom Foley subsequently discovered was a colleague of Heppner when both worked at Goldman Sachs), even though Foley had previously negotiated documents signed by Keith Martens and had been told that Martens was HCLP's ultimate controller. In other words,

Foley obtained no documentary evidence that HCLP's supposed demand was legitimate, despite Foley recognizing the critical importance of obtaining such support (as the Special Committee had instructed).

30.    <u>Second</u>, compounding Foley's negligence in connection with the $49.8 million advanced to BEN based on HCLP's supposed demand for a change of control payment, Foley negligently failed to ensure that GWG obtained meaningful control rights over BEN as part of the overall transaction that triggered HCLP's supposed demand in the first place.  The purported change of control in question involved changes to the operating agreement of BEN's ultimate parent entity, Beneficient Management, L.L.C. ("<u>BEN Management</u>"), giving GWG certain board designation rights as had been negotiated between Foley and BEN.  But Foley negligently failed to ensure that GWG obtained meaningful, substantive rights.

31.    Instead, the purported changes in control were illusory.  Foley did nothing to ensure that Holland and Heppner could not and would not usurp GWG's board designation rights to simply re-appoint currently serving BEN directors back to BEN's board.  And this is exactly what happened, just as Foley knew it would even prior to the finalization of the December 31, 2019, transactions.

32.    More broadly, the BEN Management agreement preserved Heppner's de facto control over BEN through a laundry list of sweeping consent rights.  Foley recognized the problem during negotiations: "***The bottom line is that Brad [Heppner]'s consent is needed for anything meaningful and he continues to control all process***. I suspect they asked the accountants what is the minimum needed to consolidate BEN (who said a simple majority of the larger BEN GP board) but substantively ***they maintain Brad's control of BEN***."  (Emphases added).  And Foley was upset about it, as the consent rights "veered materially away from what we thought we were

discussing with them (***turning our 'process' into m[e]re optics***)." (Emphasis added).  Yet Foley did almost nothing to address the problem.

33.     As a result, and due to Foley's other malfeasance, GWG ended up paying $49.8 million to obtain HCLP's consent to a change of control that substantively changed nothing.  And to add further insult to GWG's injury, the dubious nature of the supposed change of control created future problems for GWG with its auditors and with the SEC's Office of the Chief Accountant, resulting in delayed issuance of GWG securities filings.

34.     <u>Third</u>, and finally, Foley engaged in further misconduct in connection with the December 31, 2019 transaction by papering over the fact that $25 million of the $79 million advanced by GWG to BEN would be used to satisfy BEN's obligations stemming from the April 2019 buyout of GWG's founders.  Foley knew that BEN's contractual payment obligation— extended and modified in October 2019—initially had a restriction prohibiting BEN from using GWG funds to make the payments that had been "put in place at the specific request of the former special committee [of GWG] for the benefit of GWG."  And Foley had specific concerns regarding advancing funds from GWG to BEN solely in order to enable BEN to make payments to GWG's founders and former controllers, which it relayed to BEN's counsel.

35.     To address Foley's "***reservations about referencing the specific pay down***," BEN resorted to a wink and a nod, tweaking its funding request memo to describe the purpose of the request as one to "build BEN's capital reserves" instead.  This was all semantics; BEN could not make the $25 million payment on its own, and Foley knew full well that the funds advanced by GWG in December 31, 2019, would be used for making the payment, not to "build BEN's capital reserves."  But it was good enough for Foley to recommend, and paper over, the transaction anyway.

36.     In short, Foley's malfeasance in connection with the $79 million December 31, 2019 transaction was far-reaching and multi-faceted.  The same was true of Foley's misconduct in connection with the $10 million Essex Transaction and $65 Million Loan in May 2019.  In all three transactions, in which GWG sent an aggregate $154 million to BEN, Foley displayed an unusual combination of incompetence and negligence, willingness to sweep known problems under the rug, haste in pushing through transactions on incomplete information, and corrupt willingness to paper over transactions that were patently unfair to GWG.

37.     Accordingly, this was no ordinary special committee representation.  Foley did not merely negotiate bad deals while acting in good faith to look out for GWG's best interests.  Rather, Foley acted as a corrupt fixer and facilitator, concerned only with giving Heppner, Holland, and BEN what they wanted while simultaneously trying to minimize litigation risk associated with transactions that Foley knew were unfair to GWG.  Foley was indifferent to GWG's best interests, so long as Foley thought it could adequately paper the record to reduce risk of a shareholder derivative suit against the Special Committee members who would breach their fiduciary duties in approving the transactions.

38.     By the same token, Foley's culpability was farther reaching than negotiating and papering over the Essex Transaction, the $65 Million Loan, and the $79 million December 31, 2019 transaction.  Throughout the course of its representation, Foley looked the other way in the face of glaring red flags and significant concerns that created a duty to speak up, by neither bringing issues to the full GWG board's attention or otherwise advising the Special Committee to do so (even when Mason and Chavenson asked Foley if they should).

39.     For instance, in August 2019, Shelly Stein, dual-director of both GWG and BEN at the time, suggested to the Special Committee that they take steps to get a better understanding of

15

what was happening at BEN.  In turn, Chavenson emailed Foley, seeking guidance and writing that both he and Mason "*have expressed concern that they do not have a good feel for what is going on at BEN*," trying to brainstorm on ways of improving the information asymmetry. (Emphasis added).  Stone agreed that obtaining BEN information would help "level[] the playing field," and "it's likely incumbent on us to get the information to do the job.  *This is the reality of what we are feeling, i.e., we are negotiating from a position of informational weakness*." (Emphasis added).  Yet when Heppner threw a temper tantrum over the Special Committee's requests for additional information regarding BEN, Foley advised the Special Committee to stand down and forego an informational meeting (that had been urged by Stein and another dual-director of GWG and BEN, David Glaser, who likewise had significant questions regarding what was happening at BEN).

40.     Over the ensuing weeks, Stein along with fellow dual-directors Bruce Zimmerman and Glaser, grew increasingly troubled, raising significant questions and expressing opposition to more money moving from GWG to BEN and from BEN to Heppner's affiliates.  For instance, Stein observed:

- "Cash flow is a major problem and *it is unacceptable to make payments from GWG to BEN to related parties.  This is a major liability issue at the GWG level and I am totally opposed to such payments*."

- "*[N]o money can go out of GWG to B[EN] or to be used in any way to pay [HCLP and its affiliates]* or any related party unless we have a long term financial plan and better understanding how to protect the interests of all constituencies."

- Heppner "has been so non responsive that we never saw really understandable financials," and "*since the middle of July, we have been asking for a viable long term plan and so far have not received one* from management."

(Emphases added).  Stein was somewhat limited in what he could say to non-BEN board members like the Special Committee and Foley, however, due to confidentiality restrictions placed on him by BEN.

41.     Nevertheless, Stein, who had a long-standing relationship with Foley and had recommended Foley as counsel in the first place,[4] implored Foley and the Special Committee to pay closer attention.  Indeed, on October 6, 2019, Stein emailed Stone for his input on how best procedurally to invite Mason and Chavenson to attend the next BEN board meeting, writing: "***I believe it is critical that Chavenson and Mason be invited as observers at the BEN board meeting in a few weeks so they can appropriately understand the interrelation between BEN and GWG so they can perform their duties on the special committee of GWG with full facts***."  (Emphasis added).  Stone responded later that afternoon, agreeing with Stein's assessment:

> From the Committee's perspective, we would like Dave and Kathleen to attend as observers.  ***I believe it's important for the reasons you state.  Given the dynamics here*** (where the BEN directors have access as a practical matter to all GWG information at the GWG board level), ***I also believe that access to BEN information for Dave and Kathleen "levels the playing field", which is important process-wise*** as the Committee evaluates GWG-BEN transactions for GWG.

(Emphases added).  Yet when Heppner bristled at the suggestion, Foley dropped the issue.  And Foley did nothing else to "level[] the playing field" or otherwise ensure that the GWG Special Committee knew what was going on at BEN and could adequately protect GWG's interests.

42.     Foley continued to look the other way and failed to remedy the situation even after learning just five days later (on October 11, 2019), that Stein, Glaser, and Zimmerman all intended to resign from both GWG's and BEN's boards.  And even worse, Foley stood silent even upon learning that Holland and Heppner were attempting to mislead GWG's board regarding the timing

---

[4] Stein had originally recommended Mason and Chavenson as potential new GWG board members and Special Committee members and had likewise recommended Foley to serve as counsel.

and reasons behind that mass wave of departures.  Foley pushed for changes to the board resolution that were "consistent with our understanding of reality (i.e., the directors resigned on their own and not in connection with an agreement to reduce the board)."  But Holland and Heppner balked, "**giving [Foley] the proverbial Heisman**," in Stone's words.  Although Foley internally recognized "**[t]his is bad**," Foley did nothing to ensure that GWG's full board knew the truth.

43.    Foley likewise failed to do anything to alert GWG's full board in early 2020, when Foley's concerns over Heppner's attempt to stack the Special Committee with Pete Cangany ("Cangany"), chairman of BEN's audit committee, prompted Mason and Foley to resign.  Foley became aware that even prior to his official appointment to the Special Committee, Cangany had already pushed to replace VRC with a different financial advisor chosen by Heppner, Holland, and BEN, which troubled Foley—Foley had "**concerns about removing VRC after they have raised issues**."  (Emphasis added).

44.    More broadly, Foley had significant other concerns regarding Cangany given his "long relationship" with Heppner, thinking that it would be better to appoint "additional 'clean' (no BEN ties) directors" to help in "**not having all liability/onus on [Chavenson] and [Mason]**" and to "**improve the negotiating dynamic/leverage vis a vis BEN, which is problematic here as we have seen**."  (Emphases added).  Foley was also concerned that "**the pressure may get worse now with [Cangany] in the mix, as he is now present in the 'room' (with the posture/back channeling he brings - the initial preview from him isn't constructive as we have seen)**."  (Emphasis added).    Foley listed other concerns as well, observing that such "**process dynamics/qualifications also matter a lot** in light of the substantive matters the Committee is likely to take up," including "**downstreaming large sums**," including to HCLP.  (Emphasis added).

45. Mason promptly resigned upon hearing those concerns and learning that Foley "continue[d] to believe that this is a ***high risk situation*** for the current Special Committee directors going forward (both in their Special Committee and GWG director roles generally)." (Emphasis added). And Foley resigned the following day, once Cangany was officially added to the Special Committee.

46. Before leaving and on its way out the door, however, Foley never relayed its concerns regarding Cangany—including that he would irredeemably taint the Special Committee and turn it into even more of a farce—to GWG or GWG's full board. Foley failed to speak up even though Stone privately acknowledged to a Foley colleague that Heppner, Holland, and BEN "***really want this committee to conveniently keep the rest of the board (including Lockhart and Staubach) blissfully ignorant (and they believe Pete [Cangany] won't raise issues)***." (Emphasis added).

47. Foley's utter disregard for GWG's best interests and failure to speak up—to its ultimate organizational client—paved the way for further abuse of GWG. As Foley had feared and predicted, Cangany back-channeled information to Heppner, Holland, and BEN and pressured the subsequent iteration of the Special Committee (consisting of Chavenson, Cangany, and a new director, Roy Bailey) into approving an unfair agreement to purchase additional BEN equity in 2020. And pursuant to that agreement, GWG "downstream[ed] large sums" to BEN, including $130.2 million in 2020 and $14.8 million in 2021, of which $84 million flowed directly into Heppner's affiliates' pockets as part of his HCLP-related fraud. GWG's "blissfully ignorant" board was none the wiser—all because Foley did nothing before or when it resigned, after having first negligently failed to put a stop to Heppner's HCLP-related scheme in 2019.

48.     In short, for the reasons summarized above and detailed at length below, Foley played a major role in directly or indirectly facilitating unfair transactions involving $300 million of GWG's funds.  GWG would have either received much more consideration in exchange for its funds, or eschewed funding BEN altogether, had Foley acted competently, diligently, and in GWG's best interests.  But instead, due to Foley's misconduct, GWG suffered substantial damages from those transactions, and suffered substantial additional harm in massive professional fees associated with securities investigations and its contentious bankruptcy filing.

49.     Had Foley acted competently and in good faith towards looking out for GWG's best interests, rather than acting as a disloyal Heppner/BEN fixer, GWG would have avoided hundreds of millions of dollars of losses.  The GWG Special Committee never would have approved the transactions had Foley done its job.  For instance, unanimity was required (due to the Special Committee's two-person composition) and Mason, who consistently tried to do the right thing but was led astray by Foley, never would have signed off had Foley properly conveyed to her the requirements of Delaware law and all material facts.

50.     Moreover, beyond the Special Committee, GWG's board was full of highly distinguished directors—such as legendary Dallas Cowboys quarterback and famed investor Roger Staubach, former Federal Reserve regional presidents Richard Fisher and Dennis Lockhart, CNBC contributor Michelle Caruso-Cabrera, and several prominent members of the Dallas business community.  The majority of GWG's board could and would have put a stop to Heppner's misconduct and looting of GWG had they known what was happening.  But Heppner (and his cronies like Holland) outright lied to GWG's board and otherwise kept them in the dark.  And Foley (and the Special Committee), failed to alert them that anything was amiss, instead providing

20

a false sense of assurance (due to the involvement of a respected firm like Foley in negotiating GWG's transfers to BEN).

51.     The Litigation Trust now seeks to hold Foley accountable for its egregious misconduct—including through an award of exemplary damages pursuant to Texas Civil Practice & Remedy Code § 41.003.  And the Litigation Trust seeks to avoid and recover fees paid to Foley as fraudulent transfers under Chapter 5 of the Bankruptcy Code, as GWG did not receive any value—let alone reasonably equivalent value—in exchange for paying fees to Foley given the pervasive nature of Foley's misconduct.

## JURISDICTION AND VENUE

52.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b), in that the Complaint asserts causes of action arising in, arising under, and/or related to the above-captioned bankruptcy case.  This matter is a core proceeding pursuant to 28 U.S.C. § 157.

53.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1409 because GWG's bankruptcy case is pending in this District.

54.     This Court has personal jurisdiction over Foley in this proceeding because Foley had sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004, and Foley has a Dallas, Texas office, home to a partner (Evan Stone) who was responsible for most of the misconduct alleged herein.

55.     The Litigation Trust consents to the entry of final orders or judgments pursuant to Federal Rule of Bankruptcy Procedure 7008.  Pursuant to Bankruptcy Local Rule 7008-1, the Litigation Trust further consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND RELEVANT NON-PARTIES

**A.     Plaintiff Litigation Trust.**

56.     On April 20, 2022 (the "Petition Date"), GWG and its subsidiaries GWG Life, LLC, GWG Life USA, LLC, GWG DLP Funding IV, LLC, GWG DLP Funding VI, LLC, and GWG DLP Funding Holdings VI, LLC filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), Case No. 22-90032 (MI).   On June 20, 2023, the Court confirmed Debtors' Chapter 11 plan of liquidation (the "Plan") (ECF No. 1952).

57.     Plaintiff Michael I. Goldberg is the Litigation Trustee of the GWG Litigation Trust, which was created pursuant to the Plan (Goldberg, in his capacity as the Litigation Trustee, defined herein as the "Litigation Trust").   Under the Plan and the Litigation Trust Agreement (ECF No. 1910), certain claims and causes of action belonging to Debtors, including the claims asserted in this action, were assigned to the Litigation Trust as a representative of the bankruptcy estate pursuant to 11 U.S.C. § 1123(a)(5), (a)(7), and (b)(3)(B).   The Litigation Trust is the successor-in-interest of Debtors and their respective bankruptcy estates for the purpose of pursuing the assigned claims and therefore has standing to pursue the claims asserted in this action.

**B.     Defendant Foley.**

58.     Defendant Foley is an international full-service law firm, with offices in Austin, Texas, Houston, Texas, and Dallas, Texas.   Foley is a limited liability partnership organized under the laws of Wisconsin.

**C.     Relevant Non-Parties.**

***1.     The GWG Special Committee Represented by Foley.***

59.     Kathleen J. Mason served as a GWG director from May 13, 2019 until she resigned on March 2, 2020.   Throughout her tenure on GWG's board, she served on the Special Committee formed on May 13, 2019 that was represented by Foley.

22

60. David "Dave" F. Chavenson served as a GWG director from May 13, 2019 through the time of GWG's bankruptcy filing in April 2022 until he resigned in November 2022. Chavenson served on the two-member Special Committee formed on May 13, 2019 along with Mason. Chavenson subsequently served on a three-member iteration of a different special committee along with Roy W. Bailey and Peter "Pete" T. Cangany, Jr. ("Cangany") in 2020.

### 2. Other GWG Directors During the Relevant Period.

61. During Foley's representation of the Special Committee, all GWG directors other than Mason and Chavenson were conflicted, dual-directors who also served on BEN's board. The following individuals, each of whom was already a BEN director, became GWG directors as a result of a designation by BEN in April 2019: (1) Heppner; (2) Cangany; (3) Michelle Caruso-Cabrera ("Caruso-Cabrera"); (4) Richard W. Fisher ("Fisher"); (5) David H. Glaser ("Glaser"); (6) Sheldon "Shelly" I. Stein "Stein"); (7) Bruce E. Zimmerman ("Zimmerman"); (8) Thomas O. Hicks ("Hicks"); (9) Bruce W. Schnitzer ("Schnitzer"); (10) Roger T. Staubach ("Staubach"); and (11) David H. de Weese. An additional dual-director, Dennis P. Lockhart ("Lockhart"), was appointed to both GWG's board and BEN's board on May 13, 2019, at the same time that Chavenson and Mason became new directors of GWG only.

62. None of GWG's directors during this time period—other than Heppner himself—was involved in Heppner's fraudulent scheme involving HCLP. And at all times, a majority of GWG's directors would have put a stop to outflows from GWG to BEN had they been presented with the full picture regarding HCLP, Highland Consolidated, and the nine-figure sums—advanced by GWG—that Heppner effectively extracted for his affiliated trusts and other entities.

### 3. GWG's Disloyal Officers.

63. Murray T. Holland served as GWG's President and CEO from April 26, 2019, through GWG's bankruptcy filing in April 2022 until ultimately resigning in November 2022.

Holland was also appointed to GWG's board of directors and appointed as chairman of the board on June 14, 2021, and served in that role until resining in November 2022 during GWG's bankruptcy case.  Throughout the relevant period, Holland—along with a BEN designee—possessed effective voting control over GWG as a decision-maker for several "Seller Trusts." Holland was part of a control group—that included BEN and Heppner—of controlling stockholders of GWG.

64.     Timothy L. Evans ("Evans") joined GWG as its "Chief Integration Officer" on May 6, 2019.  He was appointed as GWG's Chief Financial Officer and Treasurer, effective August 15, 2019.  He remained in those officer roles through GWG's bankruptcy filing until resigning in November 2022.  Evans also served as a GWG director from June 14, 2021 until resigning in November 2022.  Prior to joining GWG as an officer (and later director), Evans was "Chief of Staff" for BEN, where he had also served as Vice President and Deputy General Counsel since February 2018.  Throughout his tenure as a GWG officer, Evans acted disloyally to GWG and worked in concert with Heppner and Holland to favor BEN's interests over GWG's.

### 4.     *Heppner and His Affiliated Entities.*

65.     Bradley K. Heppner is BEN's founder, chairman, and CEO.  Heppner became a GWG director on April 26, 2019, and GWG's chairman on April 29, 2019.  Heppner remained in those roles until he resigned from GWG's board effective June 14, 2021.

66.     Beneficient Holdings, Inc. ("BHI") is a Delaware corporation.  BHI is the principal entity through which Heppner (indirectly) holds his interest in BEN's business.  BHI is solely owned and controlled by The Highland Business Holdings Trust.

67.     The Highland Business Holdings Trust (the "HBH Trust") is the sole owner and controller of BHI.  Heppner is the "Family Trustee" of the HBH Trust and, in that role or otherwise, effectively wields control over HBH Trust and, in turn, BHI.  Specifically, BEN's securities filings,

24

signed by Heppner, attribute voting power for BEN shares held by BHI to Heppner because "BHI is an entity held by The Highland Business Holdings Trust of which Mr. Heppner is a beneficiary and a trustee and, in such capacity, has the sole power to vote and direct the disposition of such shares. Therefore, such shares are deemed to be beneficially owned by Mr. Heppner and The Highland Business Holdings Trust." During the relevant period, the HBH Trust was also a limited partner of Highland Consolidated Business Holdings, L.P.

68.    Bradley Capital Company, L.L.C. ("Bradley Capital") is a Delaware limited liability company whose manager during the relevant period was Highland Counselors, L.L.C. Bradley Capital entered into a "Services Agreement" with certain BEN entities, effective June 1, 2017, pursuant to which Heppner received compensation. Bradley Capital was the entity through which Heppner billed private air travel—including for personal purposes—that was paid for by BEN and GWG. Bradley Capital, directly or indirectly, was one of the primary recipients of funds transferred by GWG to BEN and/or HCLP.

69.    Highland Consolidated, L.P. ("Highland Consolidated") is a Texas limited partnership. Highland Consolidated was formed in December 1996 by Heppner, a family member, and Highland Consolidated Investments, LLC, which Heppner managed at the time. Initially, Heppner held: (a) 50% of the Class A limited partnership interest (with his family member holding the remaining 50%); and (b) 99.0% of the Class B limited partner interests, with Highland Consolidated Investments, LLC holding the remainder. According to section 2.06 of its Limited Partnership Agreement, some of the stated purposes of Highland Consolidated were: "[t]o consolidate the management of certain property of the family of Bradley K. Heppner" and "to promote efficient and economical management of certain properties of the family of Bradley K. Heppner." Highland Consolidated functioned as Heppner's personal slush fund, as alleged herein.

70.    HCLP Nominees, L.L.C. ("HCLP") is a Delaware limited liability company formed on July 21, 2017.  The sole member of HCLP during the time period described herein was HCLP Credit (defined below).  Highland Counselors (defined below) was the manager of HCLP at its formation, as well as at various points in time thereafter.  On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and appoint CMH (defined below) as successor manager, effective as of April 1, 2019.  HCLP received over $163 million, mostly originating from GWG, during the relevant period.  HCLP immediately transferred almost all funds it received through an intermediary, HCLP Credit Company, L.L.C., to Highland Consolidated.

71.    HCLP Credit Company, L.L.C. ("HCLP Credit") is a Delaware limited liability company formed on July 21, 2017.  The initial and sole member of HCLP Credit was and remains, on information and belief, Highland Consolidated.  Highland Counselors, L.L.C. was the manager of HCLP Credit at its formation, as well as at various points in time thereafter.  On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019.  HCLP Credit served as a waypoint between HCLP and Highland Consolidated for funds transferred by HCLP.  All funds that HCLP Credit received from HCLP were immediately transferred to Highland Consolidated.

72.    Highland Consolidated Investments, L.L.C. ("HCI") is a Texas limited liability company.  HCI was formed in December 1996 by Heppner, Marcy Heppner Thiesen, and Jeffrey K. Hinkle in his capacity as Trustee of the Bradley K. Heppner 1996 Family Trust, the three of whom where HCI's initial members.  Heppner was named as HCI's manager in its initial operating agreement dated December 20, 1996.  At the time, HCI managed Highland Consolidated.  In later years, HCI served as general partner of Highland Consolidated.

73.     Crossmark Master Holdings, L.L.C. ("CMH") is a Delaware limited liability company formed on December 30, 1999.  Upon formation, CMH was named Crossroads Principals, L.L.C.  Heppner, as ultimate human controller, changed the entity's name to Crossroads Master Holdings, L.L.C. on June 24, 2002, and further changed its name to CMH on December 15, 2003.  On or around October 3, 2019, Heppner purported to remove HCIC as manager of CMH and appoint David Wickline as successor manager, effective as of October 3, 2019.  On or around October 3, 2019, Heppner also purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager of those entities, effective as of April 1, 2019.

74.     Highland Counselors, L.L.C. ("Highland Counselors") is a Delaware limited liability company formed on September 16, 2003.  Highland Counselors was manager to Beneficient Holdings GP, L.L.C. (the general partner of Beneficient Company Holdings, L.P., the sole member of Beneficient Capital Company, L.L.C.) in 2017.  Highland Counselors was also manager to HCLP and HCLP Credit at the formation of those entities in 2017, as well as at various points in time thereafter.  On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019.

75.     The Bradley K. Heppner Family Trust ("Brad Heppner Family Trust") is a trust organized under the laws of the State of Texas whose trustee during the relevant period was Brad Heppner.  The Brad Heppner Family Trust was one of the ultimate recipients of funds sent through HCLP and Highland Consolidated.

76.     Elmwood Bradley Oaks, L.P. ("Elmwood Bradley Oaks"), a limited partnership organized under the laws of the State of Delaware whose general partner.  Elmwood Bradley Oaks

was one of the ultimate recipients of funds sent through HCLP and Highland Consolidated. Elmwood Bradley Oaks is associated with Heppner's family ranch, the 1,500 acre Bradley Oaks Ranch in Texas.

### 5.    Relevant BEN Entities.

77.    Beneficient Management, L.L.C. ("BEN Management" or "BMLLC") is a Delaware limited liability company.  During the relevant period, BEN Management served as the top control entity in BEN's organizational structure, as the general partner of BEN LP.  BEN LP was controlled by, and the exclusive and complete authority to manage the operations and affairs of BEN LP was granted to, BEN Management's board of directors. Because BEN Management was the top organizational entity within BEN's business, BEN Management's directors were the ultimate human controllers of BEN, were referred to in contemporaneous documents as BEN's directors, and are described herein as BEN's directors.

78.    Beneficient, f/k/a The Beneficient Company Group, L.P. ("BEN LP"), is a Nevada corporation.  During the relevant time period, BEN LP was a Delaware limited partnership, and its general partner was BEN Management.

79.    Beneficient Company Holdings, L.P. ("BCH") is a Delaware limited partnership. BCH was the primary holding company of BEN's operating subsidiaries during the relevant time period.  During the relevant time period, BEN LP was the general partner of BCH and held all of the limited partnership interests in BCH.

80.    Beneficient Capital Company, L.L.C. ("BCC") is a Delaware limited liability company formed in 2017 (its name was amended on December 30, 2020 to Beneficient Capital Company II, L.L.C.).  BCC's sole member and manager during the relevant time period was BCH. BCC was the original borrower on two credit facilities related to HCLP.  BCC also obtained

28

approximately 2.5 million shares of GWG stock, representing approximately 7.6% voting control, following an April 2019 transaction.

## FACTUAL BACKGROUND

**A.      Overview of Heppner's Founding of BEN, BEN's Entanglement with GWG, and Heppner's Looting of GWG via His HCLP-Related Scheme.**

### 1.      BEN's Formative Transactions and Introduction to GWG.

81.      After more than a decade of futility and losing money running a "family office" investment business, Heppner developed a new business idea in the mid-2010's that ultimately gave rise to BEN in its current form.

82.      Heppner's business plan for BEN was for BEN to serve as a "liquidity provider" to mid-to-high net worth individuals and smaller institutions holding alternative assets (*e.g.,* limited partnership interests in private equity funds), effectively functioning as a buyer to allow those investors to sell their otherwise illiquid alternative assets.  BEN would then earn revenue—from various fees and interest on intercompany loans—via a complicated network of related trusts designed to hold the alternative assets, as those alternative assets were gradually monetized or otherwise liquidated over time.

83.      BEN's business idea was inherently capital intensive; it could only generate revenue to the extent its related trusts could acquire an underlying portfolio of alternative assets that, in turn, generated cash with which to pay fees and interest.  BEN itself, however, had very little capital at its inception.  Consequently, Heppner's hope for BEN was that it could obtain illiquid alternative assets in "liquidity transactions" in exchange for BEN equity, in particular BEN common units.

84.      This business plan was dubious from the start.  BEN was a new entity with no operating history or track record of profitability, and there was no market for illiquid, privately

held BEN equity.  This meant that an investor seeking to obtain "liquidity" for an alternative asset would merely be exchanging one illiquid investment for another by accepting BEN equity in exchange (making any such exchange undesirable from the investor's perspective).  Moreover, given the highly unproven and speculative nature of BEN's business, it made no rational economic or business sense for a holder of a quality—albeit illiquid—alternative asset to trade that asset for BEN common units.  Accordingly, few—if any—investors holding quality alternative assets could be expected to swap them in exchange for illiquid, speculative BEN equity.

85.     Because BEN faced difficulty convincing investors to exchange their alternative assets for BEN common units (and BEN did not have cash to otherwise pay them), Heppner and BEN concocted a convoluted scheme to obtain capital from third parties that BEN would then provide to sellers of alternative assets in so-called "liquidity transactions."  BEN did so with the aid of a middleman, MHT Financial, L.L.C. ("MHT Financial"), led by Murray Holland.  BEN and MHT Financial structured the transactions such that MHT Financial, as buyer, could purchase assets from a seller and immediately settle them in an "Exchange Trust" (aka "Seller Trust") whose first act would be to exchange the economic interests in those assets for BEN common units.  The Exchange Trusts, or Seller Trusts, would then try to sell—or, more specifically, auction off—the BEN common units in exchange for consideration that the beneficiaries of the trusts, the original sellers of alternative assets, found acceptable (unlike the BEN common units).

86.     The first such "liquidity transactions" involving BEN occurred on or about September 1, 2017, when fund manager Paul Capital Advisors, L.L.C. ("Paul Capital") contributed alternative assets from its liquidating funds to the Seller Trusts formed specifically to facilitate the exchange.  Pursuant to a Purchase and Sale Agreement between MHT Financial and Paul Capital and a Transaction Agreement among Paul Capital and its affiliated funds, MHT Financial, BEN

LP, and certain BEN affiliates, MHT Financial acquired alternative assets from Paul Capital at a cost of $489.2 million, representing the Net Asset Value ("NAV") as of the closing dates, and settled the Seller Trusts with those assets. The Paul Capital asset exchange was soon followed by similar exchanges of alternative assets by other "co-sellers" with purported NAV totaling $244.0 million. The Seller Trusts assigned the economic interests in those secondary assets to BEN in exchange for BEN common units, which were to be "auctioned off" to pay Paul Capital (and later, the co-sellers, also dubbed "bulk sellers") up to 110% the NAV of their assets in cash.

87.    These transactions were the result of a corrupt bargain between BEN and MHT Financial on one side, and the sellers of alternative assets on the other. On paper, the planned transactions gave rise to a huge windfall for Paul Capital and the other initial "bulk sellers" of alternative assets, as the price to be paid—over 100% of NAV—significantly exceeded the fair market value of the alternative assets (which was far less than NAV). The sellers' alternative assets were highly illiquid. Most were stale investments that pre-dated the great financial crisis of 2008-2009. And the NAV reported by Paul Capital and the bulk sellers was based on rosy estimates that were largely untethered from what a third-party would contemporaneously be willing to pay for those alternative assets in an arm's-length transaction in the marketplace.

88.    On the other side of the bargain, this arrangement favored Heppner's and BEN's interests in two key respects. First, by artificially inflating the supposed value of the alternative assets acquired, these initial formative transactions allowed BEN to imply a higher value for BEN common units (and, in turn, BEN's total equity value) than what BEN equity was really worth. Second, as described below, Heppner was able to layer debt owed to his affiliates into BEN's capital stack—while Paul Capital looked the other way.

89.     In effect, therefore, the transaction involved Paul Capital and other sellers receiving above-market nominal prices for their alternative assets in exchange for agreeing to above-market nominal prices for BEN equity (and not asking questions about BEN's purported senior debt to Heppner's affiliates).

90.     For this plan to work, however, BEN and MHT Financial still needed to find the perfect mark willing to provide real value in exchange for BEN common units (or other valueless consideration).  They found their mark in GWG, which had historically been engaged in the secondary life insurance business but was looking to deploy its capital into alternative investments.

91.     In December 2017, GWG—apparently the only bidder—was announced as the winner of the "auction" of BEN common units.  Shortly thereafter, a Master Exchange Agreement was drafted to capture the terms of GWG's winning bid, which consisted of $150 million cash, $250 million in L Bonds (issued by GWG), and $150 million of GWG common stock.  On or around January 12, 2018, GWG executed the Master Exchange Agreement among GWG Holdings, GWG Life, LLC ("GWG Life"), BEN LP, MHT Financial SPV, L.L.C., and the Seller Trusts.  The Master Exchange Agreement anticipated, among other things, that BEN would incur a substantial debt to GWG.

92.     Thereafter, a series of "Exchange Transactions" took place in multiple steps throughout 2018 (the "2018 Exchange Transactions").  The net effect of these transactions, by year end, was that: (a) GWG loaned $192.5 million to BEN pursuant to a Commercial Loan Agreement (the "CLA") and received approximately 30 million common units of BEN LP; (b) certain "Seller Trusts," effectively controlled by two Trust Advisors (Defendant Holland and a BEN designee, first Jeff Hinkle, and later, James Turvey), obtained majority ownership of GWG stock and also obtained L Bonds representing $366.9 million in debt owed by GWG to the Seller Trusts; and (c)

BEN obtained equity interests in GWG, and trusts affiliated with BEN ended up with secondary private equity investments (originally belonging to third parties, like Paul Capital).

93.     Accordingly, through the 2018 Exchange Transactions, GWG took on massive debt and equity exposure to BEN.  GWG's substantial exposure to BEN paved the way for Heppner to subsequently exploit GWG for his personal interest and to GWG's detriment.  Heppner and BEN had an easy path to buying out GWG's founders the following year, when BEN underperformed. And at multiple points thereafter, Heppner used the threat of further value destruction to GWG's substantial 2018 investments in BEN as a means of siphoning additional cash from GWG to BEN in future years—all to line his pockets at GWG's expense, as alleged below.

### 2.     Heppner Induces BEN to Buy Out GWG's Founders to Facilitate His Planned Scheme to Line His Own Pockets (to Both GWG's and BEN's Detriment).

94.     By early 2019, nearly eighteen months after BEN's initial liquidity exchange transaction with Paul Capital, BEN was badly underperforming.  BEN had still not obtained a state trust bank charter to launch BEN's business in earnest (which Heppner had previously deemed necessary, primarily in order to exempt BEN from the requirements of the Investment Company Act of 1940).  BEN was bleeding cash and losing money.  And BEN was facing challenges and questions from its auditor, which resulted in the delayed issuance of BEN's audited financial statements—an event of default under the CLA between GWG and BEN.

95.     Heppner's solution to BEN's troubles was to buy out GWG's founders, Jon Sabes and Steven Sabes (who were motivated sellers due in part to serious outstanding questions regarding GWG's substantial debt and equity exposure to BEN).  Buying out the Sabes helped mitigate problems with BEN's default under the CLA (due to BEN's inability to procure audited financial statements) and provided BEN with a potential capital-raising partner going forward. Historically, GWG raised capital for its secondary life insurance policies by selling L Bonds to

investors through a network of brokers.  GWG's established capital-raising machinery and infrastructure (raising over $100 million from L Bond sales per year) made it an attractive target for BEN and Heppner (and Holland) because BEN had no capital or readily available means of raising capital on its own.

96.     In April 2019, Heppner's and BEN's plan to buy out the Sabes brothers came to fruition.  In connection with an April 15, 2019 Purchase and Contribution Agreement and related transactions, by the end of the month: (a) GWG's entire pre-existing board resigned and was replaced with a new board designated by BEN (effective April 26, 2019), consisting entirely of dual-directors who served on the boards of both GWG and BEN; and (b) the Seller Trusts obtained effective voting control over GWG stock (through an amended GWG stockholders agreement, which removed restrictions on voting related to the GWG shares that the Seller Trusts had obtained in connection with the exchange transactions that occurred during 2018).  The Seller Trusts' voting control was effectively exercised through two "Trust Advisors"—Holland and a BEN designee who worked in lockstep with Holland, Heppner, and BEN.  At the same time, Heppner became GWG's chairman of the board, and Holland became GWG's President and CEO.

97.     Following the April 2019 transactions, GWG's new board  included the following individuals (each of whom was also a pre-existing BEN director): (1) Heppner; (2) Peter T. Cangany, Jr.; (3) Michelle Caruso-Cabrera; (4) Richard W. Fisher; (5) David H. Glaser; (6) Sheldon I. Stein; (7) Bruce E. Zimmerman; (8) Bruce W. Schnitzer; (9) Roger T. Staubach; (10) Thomas O. Hicks; and (11) David H. de Weese.  Dennis T. Lockhart was added as a twelfth dual-director of both BEN and GWG on May 13, 2019.  And as alleged in more detail below, two independent directors, Kathleen Mason and David F. Chavenson, were added to GWG's board to serve on the GWG Special Committee on May 13, 2019.

98.     Throughout the relevant time period, the majority of GWG's board consisted of highly respected leaders of the Dallas business community and/or distinguished individuals with national reputations.  None of those individuals owed any personal loyalty to Heppner or would have otherwise allowed their sterling reputations to be tarnished had they had known of Heppner's misconduct alleged herein, and they could and would have put a stop to it had they learned of Heppner's misdeeds.  But instead, Heppner—enabled by Foley's misconduct and failures to bring issues to the full GWG board's attention or sound the alarm—was able to keep GWG's directors in the dark.  Heppner consistently siloed information and/or outright lied to the GWG board.

99.     Unbeknownst to GWG's full board (and even to the handful of corrupt directors like Schnitzer, Hicks, and Cangany, whom were part of Heppner's inner circle), Heppner's real motivation for BEN's ensnarement of GWG had little to do with BEN's business.  Rather, Heppner intended to tap GWG funds to line his own pockets by first fraudulently inducing GWG to advance funds to BEN, then fraudulently inducing BEN to transfer such funds to HCLP.  From HCLP, Heppner then immediately transferred such funds—received from GWG/BEN—into his closely held trusts and entities, as alleged in more detail below.

### 3.     Heppner's Self-Dealing Scheme to Loot GWG (and BEN) Using HCLP as a Front.

100.     From June 2019 through June 2022, Heppner effectively siphoned $155 million out of GWG and/or BEN to his affiliated trusts and entities via Highland Consolidated, L.P. ("Highland Consolidated"), an entity that had functioned for more than two decades as Heppner's personal slush fund.  The vast majority of the funds that sloshed through Highland Consolidated's bank accounts first originated from GWG before passing through the bank accounts of several other Heppner-affiliated entities and landing at Highland Consolidated.  From Highland Consolidated, Heppner then diverted the funds primarily into his personal family trust, The Bradley K. Heppner

Family Trust (the "Brad Heppner Family Trust") and to an entity that served as his corporate piggy bank, Bradley Capital Company, L.L.C. ("Bradley Capital").  In effect, Heppner looted GWG (and BEN) to line his pockets through his personal trust and corporate slush fund.

101.    Heppner perpetrated this fraudulent, corporate looting scheme against GWG through several steps.  First, he layered two sham debts to HCLP Nominees, L.L.C. ("HCLP") into the top of BEN's capital stack in September 2017 and December 2018. Second, Heppner took various steps to conceal his relationship with and distance himself from HCLP and its affiliated entities (even though Heppner continued to call the shots for HCLP behind the scenes).  He did so by: (a) enlisting the aid of two long-time friends, Keith Martens (from Heppner's hometown of Hesston, Kansas) and David Wickline (who worked with Heppner at Goldman Sachs) to serve as nominal human managers of entities supposedly in control of HCLP; (b) repeatedly and rampantly backdating HCLP-related organizational documents; and (c) conspiring with a corrupt lawyer, William "Bill" Banowsky, to provide materially false and misleading letters describing HCLP's ownership and control structure.  Third, and finally, Heppner conspired with Banowsky and Wickline to arrange for HCLP to make various threats and demands to procure funds (which were inevitably sourced from GWG), all while pretending HCLP was acting as a legitimate third-party lender and fraudulently disclaiming ties to Heppner.  Once HCLP received funds under false pretenses from GWG and BEN, Heppner immediately transferred the funds upstream to his affiliates and entities.

### a.    BEN's Purported First and Second Senior Debts to HCLP.

102.    In connection with BEN's re-formative transactions on September 1, 2017, Heppner re-shuffled assets, liabilities, and limited partnership ownership interests as part of a $141 million new senior debt facility purportedly owed by BEN to HCLP (the "BEN-HCLP First Debt"). The BEN-HCLP debt was not a legitimate financing transaction, but rather involved Heppner

saddling BEN with purported debt that had little to do with BEN's business and largely amounted to Heppner trying to repay previous "IOUs" to his affiliates (or otherwise recoup monies lost).

103.   BEN's incurrence of the purported $141 million BEN-HCLP First Debt was a non-cash transaction—*i.e.,* HCLP did not advance funds to BEN.  Instead, the obligation stemmed primarily from a purported "refinancing" of the outstanding approximately $121 million of supposed debt owed by BEN on six related-party "loans" with entities affiliated with Heppner. The refinanced supposed loans were largely shams; there was no refinancing of legitimate obligations owed by BEN to a third-party lender.  The supposed loans from Heppner's affiliates dated back over a decade (to between 2005 and 2007) and had nothing to do with BEN's new planned business idea (which Heppner did not develop until years later).  The "refinanced" sham loans had non-commercial interest rate terms and did not require any periodic payments; no principal payments were made for over a decade.

104.   The remaining $20.2 million balance of the $141 million BEN-HCLP First Debt likewise consisted of a "refinancing" of purported obligations BEN owed to Heppner affiliates that were not legitimate debts owed by BEN.  Monies that had been spent to develop BEN's business idea—in effect, capital expenditures—were instead accounted for as debt owed to Heppner's affiliates and rolled into the BEN-HCLP First Debt.  And consequently, Heppner saddled BEN with an additional $20.2 million of debt to obtain "technology assets" that BEN's auditors would later determine were worth a small fraction of that amount, as alleged below.

105.   Jeff Hinkle, BEN's former Chief Administrative Officer and Treasurer, confirmed that the BEN-HCLP First Debt was not the product of an arm's-length transaction with a third-party lender, but instead the product of Heppner trying to recoup previous sums advanced. According to Hinkle, the credit agreement evidencing the BEN-HCLP First Debt was executed to

"create a credit agreement for past moneys that had been spent by Highland Consolidated and [to] memorializ[e] that into this loan agreement or refinancing, . . . or whatever you want to call it."

106.    To make matters worse, at the same time Heppner saddled BEN with $141 million in debt to HCLP to "refinance" sham debts to his affiliates (that were illegitimate, unenforceable, and largely unrelated to BEN's business going forward), Heppner took assets out of BEN as part of the same corporate reshuffling of BEN assets and liabilities.  Specifically, BEN distributed to Heppner certain limited partnership interests associated with net assets of approximately $59.1 million related to Heppner's family ranch and ranch-related business activities, primarily held within Highland Real Assets, LLC, that would not be involved in the continuing operations of BEN.

107.    Consequently, the net effect of the interrelated September 1, 2017 paper reshuffling of BEN assets and liabilities was that: (a) Heppner obtained net assets of approximately $59.1 million related to entities owning the family ranch; (b) Heppner and his affiliates had a negative capital account in BEN; and (c) BEN was saddled with $141 million in purported debt in connection with the BEN-HCLP First Debt, while receiving minimal real benefit in exchange.  The BEN-HCLP First Debt, at the top of BEN's capital stack, positioned Heppner—via HCLP—to extract cash from BEN as funds became available, regardless of when (or if) BEN ever turned a profit.  From inception, therefore, the BEN-HCLP First Debt was part of Heppner's plan to enrich himself (via his affiliated trusts and entities).

108.    In 2018, Heppner once again self-servingly layered debt into BEN's capital stack. In August 2018, Heppner grumbled to Martens about "major headaches" in negotiations with GWG regarding the Exchange Transactions, complaining that GWG was "taking a pound of flesh" in cutting into his share of equity.  In turn, Heppner indicated that his entity would "negotiate for

an early conversion of $72 million it has a right to convert, but instead of conversion into common [stock], it will want conversion into a note much like the HCLP note."[5]

109.    Thereafter, according to BEN's audited financial statements, on December 28, 2018, BEN and Beneficient Holdings, Inc. ("BHI")—Heppner's primary holding vehicle for his interest in BEN[6]—"entered into a promissory note for $72 million in return for the relinquishment by BHI of $72 million of NPC Series A Subclass 1 Units of BCH."  In other words, BHI exchanged $72 million in preferred units in BCH for secured debt in BEN without advancing any funds to BEN or BCH, even though Heppner had no contractual right to convert his preferred equity into debt (at the top of BEN's capital stack) instead of common stock (at the bottom of BEN's capital stack).  The note, dated December 28, 2018, was originally due on March 31, 2019.

110.    In May 2019 (on or after May 17, 2019), that promissory note was replaced when BEN and BHI executed a credit agreement (backdated to December 28, 2018) with an initial principal balance of $72 million (the "BEN-HCLP Second Debt").  Hinkle, a BEN officer, signed this agreement as Secretary of BHI, and BHI's notice address in the agreement was the same as BEN's address (and the same as HCLP's notice address for the BEN-HCLP First Debt).

111.    Heppner subsequently caused BHI to "assign" the BEN-HCLP Second Debt to HCLP in August 2019 via an amended operating agreement for HCLP that was back-dated and made retroactively effective as of April 1, 2019.  BHI received a 34% membership interest in

---

[5] Heppner further wrote that he would call Martens to "discuss priority of payment or possibly an intercreditor [agreement] with HCLP."  Martens, manifesting a lack of commercial sophistication, replied: "Someone will need to educate me on an intercreditor agreement."

[6] BEN's Form 10-K for the fiscal year ended March 31, 2023, signed by Heppner, admits that "Heppner is a beneficiary of the trust that is the sole shareholder of BHI," that Heppner indirectly holds interests in BEN through BHI (including various forms of BCH preferred units), that those equity interests "represent [Heppner]'s interests originally received by BHI in connection with the formation" of BEN, and that "Heppner receives financial benefits from our business" through "equity interests  of BCH held by BHI."  *See* BEN's Form 10-K for the fiscal year ended March 31, 2023 (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ben-20230331.htm), at pgs. 151, 152, 156.

HCLP in exchange for assigning the BEN-HCLP Second Debt to HCLP.  Accordingly, the entity that Heppner utilizes as his primary (indirect) holding vehicle for his interest in BEN's business (BHI) obtained a 34% membership interest in HCLP.[7]

112.    In sum, neither the BEN-HCLP First Debt nor the BEN-HCLP Second Debt involved legitimate, arm's-length transactions with a third-party lender.  BEN received no meaningful value in exchange for incurring either purported obligation.  Rather, Heppner foisted both supposed debts upon BEN so that Heppner could later enrich himself and his affiliates by demanding repayment of the sham loans, using HCLP as a front.

### b.    Heppner's Steps to Distance Himself from HCLP.

113.    By layering the $141 million BEN-HCLP First Debt and $72 million BEN-HCLP Second Debt into the top of BEN's capital stack, Heppner provided himself and his affiliates with a means of extracting cash from BEN (before BEN ever turned a profit, if it ever did).  But Heppner's plan to enrich himself faced potential pitfalls.  BEN was undercapitalized and faced significant liquidity challenges, meaning that BEN's directors—if they knew Heppner controlled HCLP—would ask HCLP to either extend the maturity date, forego payments, or even forgive the debt altogether until BEN's financial condition improved.  Likewise, GWG would request similar concessions and/or never agree to advance funds to BEN for BEN to "repay" loans to HCLP if GWG knew that those funds were merely going to Heppner.

114.    Accordingly, Heppner knew that he could only effectively extract cash for his affiliates through HCLP as repayments on the BEN-HCLP First Debt and BEN-HCLP Second Debt to the extent that he could convince GWG and BEN that: (a) Heppner was not in control of

---

[7] From June 2019 through January 2020, BEN made interest payments on the BEN-HCLP Second Debt to another Heppner-controlled entity, Bradley Capital, not to BHI (the supposed original lender) or to HCLP.  And BEN continued to make such interest payments to Bradley Capital even after BHI assigned the Second Debt to HCLP in 2019.

HCLP's actions and could not control HCLP; and (b) Heppner did not stand to benefit from "repayments" made to HCLP. To that end, Heppner enlisted the aid of several long-time colleagues and friends to distance himself from HCLP and engaged in rampant backdating of organizational documents related to HCLP and its affiliated entities.

115.    HCLP's initial indirect human manager was Jeff Hinkle, who had worked in Heppner's "family office" investment firm for many years and served as trustee of certain of Heppner's family trusts. At the same time, Hinkle was BEN's Chief Administrative Officer and Treasurer (answering to Heppner, BEN's CEO and Chairman). Hinkle later admitted that:

- Heppner "ultimately … had the power of appointment" with respect to Highland Counselors (HCLP's former manager) and thus HCLP;

- Hinkle "serv[ed] at the pleasure of Brad" and "ultimately [his] administrative task was to take that direction" from Heppner; and

- Heppner had access to HCLP's bank accounts, had the power to extend the BEN-HCLP First Debt's maturity, and had discretion to waive reporting requirements under that loan.

116.    In February 2019, BEN's then-auditor (Deloitte & Touche) began asking questions regarding Heppner's and BEN's relationship with HCLP. Given Hinkle's simultaneous roles as a BEN officer and HCLP's indirect human manager, Heppner tried to further distance HCLP from BEN (and himself) by enlisting the aid of Keith Martens to serve as trustee or manager of several trusts and entities related to HCLP. (Martens had been a close friend of Heppner's since growing up together in Hesston, Kansas.)

117.    At the time the BEN-HCLP First Debt was incurred in September 2017, the relevant organizational relationships pertaining to HCLP and Highland Consolidated were as follows:

- HCLP's sole member was HCLP Credit Company, LLC ("HCLP Credit") and its manager was Highland Counselors, L.L.C. ("Highland Counselors");

- HCLP Credit's sole member was Highland Consolidated and its manager was Highland Counselors;

- Jeff Hinkle was the manager of Highland Counselors and, consequently, the ultimate indirect human manager of HCLP;

- Highland Consolidated Investments, L.L.C. ("HCI") managed Highland Consolidated.  Because HCI managed Highland Consolidated, which was the direct sole member of HCLP Credit and indirect sole member of HCLP, HCI effectively had the ability to replace the manager of HCLP; and

- Heppner was the manager of HCI.

This created a problem for Heppner, as HCLP's manager was a BEN officer (Hinkle) who answered to Heppner, and Heppner himself—as manager of HCI—enjoyed a position of ultimate control by having the ability to remove and replace Hinkle as HCLP's manager.

118.    To solve the problem, Heppner coordinated with Martens on or around February 13, 2019 for Martens to sign three backdated signature pages on organizational documents that made it appear that Martens—not Heppner—had served as HCI's manager since July 2017.[8] Among those documents was a written consent of HCI's sole member backdated to July 7, 2017 that purported to show that Heppner had resigned as HCI's manager and been replaced by Martens as of that date.

119.    A week after procuring these backdated organizational documents (on February 21, 2019), Heppner drafted a letter for Martens to send to HCLP's counsel (to pass on to BEN's auditor).  In this letter, Martens (as dictated by Heppner) represented that:

> Highland Counselors, L.L.C. ("Highland") is Nominees' manager, and Nominees' sole member is HCLP Credit Company, L.L.C. ("Credit Company").  Credit Company's sole member is Highland Consolidated, L.P. ("HCLP") and Credit Company's manager is Highland.  Highland Consolidated Investments, L.L.C. ("HCI") is HCLP's general partner, and I am HCI's manager.  The sole member of

---

[8] This backdating scheme was ill-conceived in that Heppner had contemporaneously signed documents as HCI's manager in 2017, including the "Transaction Agreement" related to BEN's initial transactions, which was dated September 1, 2017.

> HCI is a trust for which I serve as trustee ("Trust").  No party has the ability to remove and replace me as trustee of the Trust or as manager of HCI.
>
> I have served as the Trust's trustee, and as HCI's manager, since July 7, 2017.  See Exhibit A.  As manager of HCI, I have the authority to remove and replace the manager of both Credit Company and Nominees ("Manager").

This fraudulent letter was then passed off to Deloitte.

120.    Several months later, Heppner again faced questions surrounding his relationship to HCLP, this time from certain dual-directors of BEN and GWG concerning BEN's payments to related parties affiliated with Heppner.  Once again, Heppner and Martens coordinated to backdate HCLP-related organizational documents to try to conceal Heppner's ties to HCLP (as well as glossing over the historical role of Hinkle, who resigned from all roles related to HCLP and BEN on or about August 23, 2019).

121.    Specifically, Heppner coordinated with Martens to revise HCLP's governance documents and sign an Amended and Restated Limited Liability Company Agreement of HCLP "entered into as of April 1, 2019."  Martens signed this document as manager of Crossmark Master Holdings, L.L.C. ("CMH"), which in turn was listed as HCLP's manager. Through this agreement, BHI assigned the $72 million BEN-HCLP Second Debt to HCLP as a capital contribution, and received a 34% interest in HCLP, as described above.

122.    The Amended and Restated LLC Agreement of HCLP and the organizational changes reflected therein were backdated.  CMH was not HCLP's manager in April 2019.  Rather, on or about October 3, 2019, Heppner signed a unanimous written consent (back-dated to August 23, 2019)—as Trustee of The Highland Partners Holdings Trust—to change HCLP's manager from Highland Counselors (for which BEN officer Hinkle had been manager) to a new manager entity, CMH, retroactively effective as of April 1, 2019.  The signature block on this written consent was as follows:

```
MEMBER:

BY: HCLP CREDIT COMPANY, L.L.C.
Its sole member

By: HIGHLAND CONSOLIDATED, L.P.
Its sole member

By: HIGHLAND CONSOLIDETED INVESTMENTS, LLC
Its general partner

By: THE HIGHLAND PARTNERS HOLDINGS TRUST
Its sole member

By: [signature]
Name: Bradley K. Heppner
Title:  Trustee
```

123.    Thus, through his role as Trustee of The Highland Partners Holdings Trust, Heppner

was able to effectively change HCLP's manager.  Heppner likewise wielded his control over The

Highland Partners Holdings Trust to change the manager of HCLP Credit (the sole member of

HCLP), executing an identical written consent of the member of HCLP Credit to remove Highland

Counselors as manager and replace it with CMH, again retroactively effective as of April 1, 2019.

124.    These backdated organizational changes, initiated by Heppner, made it appear as

though: (a) CMH, an entity not managed by Hinkle, had been HCLP's manager since April 2019

(the date after which the related party payments began); and (b) the BEN-HCLP Second Debt—

previously owed to BHI, which Heppner controlled—had been owed to HCLP since April 2019.

125.    To further distance himself from HCLP and make HCLP appear like a hard

bargaining third-party (rather than a subsidiary of Highland Consolidated, which had a 25-year

history of transferring all its capital to Heppner-affiliates), Heppner took two additional steps in

early October 2019 to mask his control.

126.    First, because Martens (who worked in medical equipment sales) was

unsophisticated and was not a credible manager of a senior secured lender with nine-figure loans

44

outstanding, Heppner installed David Wickline—who had worked alongside Heppner at Goldman Sachs and reported to Hepper's mentor, Charles Harmon—as manager of CMH (and thus indirect manager of HCLP) on or about October 3, 2019.  To do so, Heppner signed—as Trustee of The Highland Partners Holdings Trust and The Highland Management Trust, respectively—unanimous written consents that: (a) installed Wickline as CMH's new manager; and (b) replaced Martens with Wickline as HCI's new manager.

127.    The same day (October 3, 2019), Heppner requested that Wickline provide wiring instructions for $25,000 quarterly payments to be paid in advance from HCLP as purported management fees.  Notably, BEN itself had control over HCLP's bank account, and Heppner personally directed BEN's corporate treasury to have HCLP make the quarterly management fee payments to Wickline.  (HCLP made the quarterly $25,000 transfers to Wickline every quarter through GWG's bankruptcy filing in April 2022.)

128.    Second, in addition to replacing Martens with Wickline, Heppner enlisted the aid of Banowsky, who served as counsel to HCLP, to draft another fraudulent letter describing HCLP's control structure, this time to be provided to counsel for BEN's executive risk committee (Glenn West at Weil Gotshal) tasked with investigating the relationship between Heppner and HCLP.  Over the course of several days in early October 2019, Heppner and Banowsky exchanged drafts of the letter—with Heppner providing line-edits.  Once Heppner was satisfied, Banowsky transmitted the final version of the letter (dated October 5, 2019) on his law firm's letterhead to West (wholly omitting Heppner's role in drafting the letter).

129.    The letter that Heppner and Banowsky drafted and Banowsky thereafter provided to West setting out the relationship between BEN, Heppner, and HCLP was materially misleading. It stated that "Heppner cannot control HCLP" because: (a) only Wickline, as manager of HCI, had

45

the ability to remove and replace CMH as manager of HCLP; and (b) "neither Mr. Heppner nor any member of his Family have the power to remove and replace the manager of CMH." But those assertions misleadingly omitted that Heppner had just two days before: (a) installed Wickline in place of Martens as manager of HCI; (b) installed Wickline as manager of CMH; and (c) changed HCLP's manager from Highland Counselors to CMH.

130.    The October 5, 2019 Heppner/Banowsky letter likewise represented that Heppner "cannot control the distribution of proceeds from . . . loan repayments to HCLP." But that statement misleadingly omitted the 25-year history of HCLP's ultimate parent entity, Highland Consolidated, transferring all its capital to Heppner-affiliated trusts and entities. It ignored that Heppner enjoyed control over HCLP's bank account. And it conveniently omitted that Heppner intended to funnel almost all sums received by HCLP through HCLP Credit to Highland Consolidated and, from there, to Heppner's other affiliated trusts and entities.

> ### c.    Heppner Uses HCLP Demands to Extract Cash from GWG for His Affiliates.

131.    After layering the BEN-HCLP First Debt and BEN-HCLP Second Debt into BEN's capital stack and engaging in rampant backdating of organizational documents to disguise his control over HCLP, Heppner then coordinated with Banowsky (and Wickline) behind the scenes to have HCLP make various demands for payments from BEN. HCLP's demands on BEN were then conveyed to GWG, inducing GWG to advance money to BEN—or to HCLP directly—so that BEN could satisfy HCLP's demands and avoid foreclosure.

132.    In essence, Heppner—through HCLP—held BEN hostage. HCLP's threats to foreclose on BEN and/or otherwise destroy BEN's business—thereby threatening GWG's investments in BEN—if HCLP's demands for substantial cash payments and other concessions were not met induced GWG to transfer approximately $140 million to HCLP (or Highland

Consolidated). Heppner subsequently transferred almost all of those funds—and an additional $15 million HCLP obtained from BEN—to HCLP Credit, to Highland Consolidated, and then to Heppner's affiliates—mostly the Brad Heppner Family Trust and Bradley Capital. Specifically, Heppner caused Highland Consolidated to transfer $53.6 million directly to the Brad Heppner Family Trust and $92.6 million directly to Bradley Capital (which then transferred $72.8 million of those proceeds to the Brad Heppner Family Trust).

**B.      Heppner Installed the Special Committee, Selecting Foley as its Counsel, to Try to Shield Himself from Liability.**

133.    Heppner's multi-faceted plan to loot GWG through BEN and purported demands from HCLP as BEN's "senior lender," described above, depended on moving cash from GWG to BEN in the first instance. To help facilitate movement of cash from GWG to BEN, Heppner took two steps immediately upon the buyout of GWG's founders in April 2019.

134.    First, Heppner, BEN, and Holland appointed a new slate of BEN-designated directors over GWG who were pre-existing BEN directors (and hence predisposed to believe in BEN's business plan), while at the same the same time limiting information flow to those directors.

135.    Second, to further keep those dual-directors in the dark and to minimize obvious liability risks associated with the dual-fiduciary status of GWG's new directors, Heppner sought a new GWG Special Committee to utilize as a shield. At the very first board meeting of the new BEN-designated GWG board, held April 29, 2019, the board discussed "the need to form a special committee comprised of independent and disinterested directors to review and approve the terms and conditions of the strategic transactions contemplated to be completed between the Company and BEN."

136.    From the start, the to-be-formed GWG Special Committee was never intended to approximate arm's-length bargaining on GWG's behalf in transactions with BEN, with the ability

47

to say "no" to all proposed transactions and otherwise explore alternatives.  Rather, Heppner, Holland, and BEN envisioned that the GWG Special Committee would serve as a mere rubber stamp for transactions between GWG and BEN that they would put before the committee.  To maximize the odds that the Special Committee would approve the transactions, they: (a) carefully vetted Special Committee members to find individuals who they could pass off as "independent," yet were likely to be pliable and malleable; (b) defined the Special Committee's mission as if it were a foregone conclusion that money needed to go from GWG to BEN; and (c) last but not least, pre-arranged for Foley to serve as the Special Committee's counsel.

137.    The two new directors appointed to the GWG board to serve as Special Committee members, Kathleen Mason and Dave Chavenson, both came recommended (to Heppner) from Shelly Stein, who was a conflicted dual-director of both BEN and GWG.

138.    Holland and Heppner personally vetted Chavenson, meeting him for drinks on May 2, 2019.  The next day (May 3, 2019), Holland followed up with Chavenson in an email with the subject "Business Plan of BEN," attaching BEN's business plan, and various BEN valuations, amongst other materials.  In response, Chavenson wrote: "I am more convinced than ever that *BEN* is on the cusp of an outstanding business opportunity, and I look forward to assisting you and contributing in whatever way that I can."  (Emphasis added).  Thus, even though Chavenson was being asked to join GWG's board and serve on a GWG Special Committee, Chavenson was immediately receptive to Heppner's and Holland's plan to use GWG as a tool to further BEN's interests.  Heppner was so pleased with Chavenson that he instructed GWG counsel to designate Chavenson as chair of the Special Committee in the written consent of GWG's board creating the Special Committee.  (Subsequently, Chavenson was appointed chair by a vote of Chavenson and Mason at the Special Committee's first meeting).

48

139.    The other prospective new director to serve on the Special Committee, Kathleen Mason, likewise came highly recommended (to Heppner) from Stein, who had known her for 20 years.  Heppner and Holland did not personally meet with Mason, as she lived on the east coast (unlike Chavenson, who lived in Plano, Texas, near BEN's headquarters in Dallas).  Nevertheless, having an out-of-state director who lived on the east coast (Mason) as one of only two members on a committee chaired by Chavenson, a Dallas-area local, created a dynamic in which Chavenson would presumably lead the Special Committee's efforts.

140.    After settling upon Chavenson and Mason as prospective members of the Special Committee (but before they were formally appointed to GWG's board), Holland sought to ensure that they were focused on getting money to BEN by providing them with additional background materials.  For example, in a May 8, 2019 email, Holland provided Chavenson and Mason with some "homework" to bring them up to speed, which included BEN's business plan and a presentation from the April 29, 2019 GWG board meeting that outlined "Strategic Initiatives with BEN" and the vision and goals of Heppner and the BEN-dominated GWG board going forward.

141.    The next day (May 9, 2019), Holland provided Chavenson and Mason with a valuation analysis that "contains a sensitivity analysis of the GWG cash flows," which he explained "is important in that GWG is going to be a major cash source to B[EN] from L Bond sales."  He further explained that BEN was in the process of running risk analyses that "will help us fine tune the algorithm of how much cash can be sent down" to BEN.

142.    Thereafter, Chavenson and Mason were officially appointed to GWG's board through a unanimous written consent that was dated May 10, 2019, became effective on May 13, 2019, and formally created the Special Committee.  Consistent with prior messaging from Holland and Heppner to Chavenson and Mason, recitals to the written consent made clear that the Special

Committee was being formed because the BEN-dominated GWG board had "determined" that GWG should "explore an expansion of its business relationship with" BEN.

143.     In addition to defining the Special Committee's mission for them, Holland, Heppner, and BEN also attempted to steer the Special Committee's efforts by pre-wiring an engagement of counsel for the Special Committee who would not push back too hard—Evan Stone at Foley.  Holland reached out to Foley to procure Foley as Special Committee counsel no later than May 7, 2019, before the full GWG board had formed the Special Committee or appointed Mason and Chavenson to the board.  On May 9, 2019, Holland then informed prospective board and committee members Mason and Chavenson that Foley was "prepared to be legal counsel to the special committee," and had come "recommended by Shelly [Stein]."

144.     Although Holland's May 9, 2019 email also indicated that the Special Committee could choose alternative counsel, both Chavenson and Mason deferred to Holland's and Stein's recommendation, thereby effectively allowing conflicted fiduciaries to select Special Committee counsel for them.  Chavenson asked Holland for his thoughts on Evan Stone (the lead Foley partner on the engagement), then concluded that he was "fine with" Foley after Holland replied: "I am close friends with one of his partners" and that Stein "knows him and has used [Stone] before." Mason was even more agreeable, indicating that she was fine with Stone, in part, because she: "d[id]n't see a need to complicate timing by engaging new counsel" and was sure Stein had brought Stone "up to speed as much as is possible."

145.     For its part, Foley was fully aware that it had been pre-selected to serve as Special Committee counsel at the recommendation of conflicted GWG fiduciaries, and not by the Special Committee itself through a rigorous interview process.  Foley began discussions with Holland *before* the prospective committee members were finalized and the Special Committee was formed.

146.     Moreover, Foley knew that its pre-selection was based on the recommendation of Foley's client, Shelly Stein.  Specifically, in a May 9, 2019 email, prospective committee member Mason informed Foley that Stein had reached out to her about serving on the GWG Special Committee, further writing: "I've known Shelly [Stein] for about 20 years and have served on several boards with him" and indicating that Foley had "been recommended as counsel."  Foley responded: "Shelly is terrific and a nice advocate for us (amongst other things, we handled a special committee assignment last year where he headed the committee)."  Thereafter, Foley disclosed its prior representations of Stein first to Holland (not the Special Committee) on May 12, 2019, before subsequently discussing its potential conflict with the Special Committee during a May 15, 2019 meeting.  That attitude and approach of serving Holland's, Heppner's, and BEN's wishes first permeated the entirety of Foley's subsequent representation of the Special Committee.

147.     In sum, by mid-May 2019, Heppner, Holland, and BEN had installed a Special Committee consisting of two directors (Chavenson and Mason) and counsel (Foley) that they fully expected to be accommodating, pliable, and supportive of their plan to use GWG as a vehicle to funnel cash to BEN.  Not only that, Holland and Heppner had already largely convinced the Special Committee and Foley that it was a foregone conclusion that GWG should continue to pour money into BEN and otherwise broadly support BEN's business.

148.     Thereafter, Holland, Heppner, and BEN exploited those dynamics and ran roughshod over the Special Committee and Foley in several transactions from May 2019 through December 2019, as alleged below.  The weak and mis-advised Special Committee's efforts fell far short of approximating arm's-length and vigorous negotiations, as required by Delaware law.  Instead, the Special Committee acted timidly and hastily.  In doing so, Mason and Chavenson approved transactions without being fully informed (thereby breaching their duty of care), and in

Chavenson's case while being fully cognizant that the transactions served BEN's—not GWG's—interests (thereby breaching his duty of loyalty).

149.    The Special Committee breached their fiduciary duties and approved transactions harmful to GWG in large part because Foley never advised them on the stringent requirements of Delaware law, in particular the need to act on a fully informed basis, to protect GWG's best interests, and to negotiate vigorously and approximate an arm's-length transaction in the marketplace.  Instead, Foley itself acted as a facilitator, trying to rationalize the transactions and paper the record rather than looking out for GWG's best interests or otherwise properly advising the Special Committee.  Moreover, Foley acted extremely negligently in conducting due diligence surrounding the transactions, compounding Foley's errors in the bad advice it rendered and exacerbating Foley's repeated failures to properly advise the Special Committee regarding the requirements of Delaware law.  The GWG Special Committee would not have approved the unfair transactions had it been represented by competent and diligent counsel looking out for GWG's best interests, rather than a corrupt facilitator serving Heppner's and BEN's ends.

**C.    In May 2019, Foley Pushed Through Two Hastily Approved and Unfair Transactions: (a) a $10 Million Acquisition of BEN Equity and (b) a $65 Million Loan to BEN.**

150.    From the outset, the Special Committee's and Foley's efforts fell far outside the norm.  Indeed, even before Chavenson and Mason were officially board members or the Special Committee's first meeting, they were presented with an immediate and urgent request to approve large transfers of cash from GWG to BEN.

151.    Holland scheduled an initial call with Chavenson and Mason held on Saturday, May 11, 2019, during which Holland told them it was critical that GWG move either $50 million to BEN—or $40 million to BEN and $10 million to third-party Essex—by Friday of the upcoming week (May 17, 2019).  By the time the Special Committee and Foley held their initial meeting on

May 15, 2019 and initial substantive discussions on May 16, 2019, the request had increased to a $60 million loan (with $50 million funded immediately) plus an additional $10 million to Essex. And by May 17, 2019, the request increased further still to a $65 million loan (with $50 million funded immediately) plus an additional $10 million to Essex.

152.    The extreme urgency, size, and increasing amount of the funding request were all highly unusual, by themselves, and should have given the Special Committee and Foley some pause.  But the explanation given by GWG and BEN management was even more alarming, as it revealed that BEN needed the money—and quick—because of serious questions over its financial wherewithal.  The minutes—prepared by Foley and signed by Stone—for the Special Committee's initial meeting, held May 15, 2019 (at BEN's offices) reflect that: "based on discussions with GWG and BEN management, the funding was critical to enable Deloitte, BEN's auditor, to issue its opinion on BEN's financials without a going concern qualification."  The minutes for meetings held on May 16 and May 17, 2019, likewise reflect that BEN's auditor's going concern issues were the principal reason for the urgency of the funding request.

153.    None of this was lost on Foley.  From the outset of its engagement, Foley was fully aware of what was going on—and that the plan all along was to use GWG as a means of funneling cash to BEN.  Indeed, Stone wrote to apprise Foley partner Steve Good of the situation on Foley's first day on the job (May 15, 2019):

> *[T]hey need an emergency funding approved from GWG to BEN to get a going concern opinion from the BEN auditor (Deloitte) to enable BEN (sub) financials* to be issued to GWG so GWG can issue its 10K and sell L bonds. . . . *Note the whole concept of doing the merger was to tap GWG's cheap 'cash machine' for the benefit of the sub* and that has ground to a halt right now . . . .
>
> …
>
> So the essence of the committee's work we will be reviewing the terms of the proposed loan *over the next 24-36 hours.  I'm less than thrilled for us to be in this position, though one mitigating factor from a litigation perspective is that the*

*public stub here is small* . . . . The proposed loan is a 5 year, 7% unsecured loan that . . . *isn't pretty as emergency funding*.  **To create a reasonable record here, I believe – and told them all, including [Holland] – that a key process issue will be for the committee to improve the terms.  I am likely to advise the committee that the funding should be as short term as the BEN auditors can get comfortable with (to issue the opinion) – they preliminarily say that is 13 months – and to get liens**.  We have discussed other features, such as escalations and required repayment if the opinion in fact does not materialize (as GWG will need the money).

(Emphases added).

154.    The highly unusual circumstances and the existence of substantial doubts over whether BEN could continue as a going concern absent a massive, immediate injection of $50 million from GWG should have led the Special Committee and Foley to question whether it was in GWG's best interests to send *any* money to BEN, let alone large sums on short notice.  At a minimum, BEN's going concern issues should have heightened scrutiny and the need for vigorous negotiations to ensure that GWG was protected and not just throwing good money after bad.

155.    Instead, the Special Committee and Foley tried to rationalize the funding request at their initial May 15, 2019 meeting.  The Special Committee "discussed with Foley [GWG's] strong interest in making the financing available to BEN, as communicated by [GWG] management." Foley and the Special Committee then fell victim to the sunk cost fallacy, rationalizing giving money to BEN because of GWG's prior investments in BEN through the Exchange Transactions in 2018.  From the date of their first meeting, therefore, Foley fostered a "what's good for BEN is good for GWG" mindset that was fundamentally at odds with the Special Committee's and Foley's duties.

156.    This improper, BEN-focused mindset permeated Foley's and the Special Committee's thinking in subsequent Special Committee meetings, both internally and with members of GWG and BEN management.  During several meetings held on May 16, 2019, and May 17, 2019, the Special Committee and Foley remained focused on whether the requested

funding would enable issuance of BEN financials.  (They also focused on whether the proposed funding would enable BEN to satisfy capital requirements under Texas Department of Banking regulations and lead to issuance of a trust charter for BEN.)

157.    On May 20, 2019, after just days on the job, the Special Committee approved the proposed $10 million acquisition by GWG of BEN LP common units from Essex.  And on May 31, 2019, the Special Committee approved a $65 million loan from GWG[9] to trusts affiliated with BEN, with the understanding that the proceeds would ultimately flow through to benefit BEN.  Both transactions were grossly unfair to GWG; the terms for GWG were far below what an arm's-length third party would have agreed to in an arm's-length transaction in the marketplace.

158.    Nevertheless, the Special Committee approved the grossly unfair transactions, emboldened and spurred on by Foley's terrible advice.  As described below, Foley gave bad advice on the substance of the transactions as a result of its due diligence failures.  And more broadly, Foley failed to advise the GWG Special Committee that Delaware law required them to protect GWG's interests and: (1) negotiate vigorously, not to appease Holland, Heppner, and BEN; and (2) approximate arm's-length bargaining in the marketplace, and not fall captive to an improper "what's good for BEN is good for GWG" mindset.  Instead, Foley acted as facilitator, papering the transactions to appease Heppner, Holland, and BEN.

### 1.    *Foley Misadvises the Special Committee in Connection with a $10 Million Purchase of BEN LP Common Units from a Third Party.*

159.    Within a week of Mason and Chavenson becoming board members (on May 13, 2019) and within just five days of their first Special Committee meeting (held May 15, 2019) at BEN's offices, the Special Committee—acting with Foley's guidance—approved the spending of $10 million of GWG funds to acquire BEN LP common units from Essex (the "Essex

---

[9] The loan was made by GWG Holdings's wholly-owned subsidiary, debtor GWG Life, LLC.

Transaction"). The Special Committee did so due to, among other things, Foley's: (a) gross negligence in conducting even basic due diligence surrounding the transaction; and (b) failures to properly advise the Special Committee's members on the proper role of the committee and their responsibilities in managing GWG's affairs with respect to the transaction.

160.    As described below, the condensed timeline for the Essex Transaction reflects that Foley and the Special Committee: (1) consistently operated under the (flawed) assumption that approving a transfer of $10 million to Essex would satisfy an immediately due and payable BEN obligation (thereby helping BEN's immediate liquidity needs); and (2) hurriedly approved the Essex Transaction in order to appease Holland, Heppner, and BEN, not because the transaction was in GWG's best interests.

161.    The rationale for the Essex Transaction was first discussed at the Special Committee's second meeting, which commenced at 11:00 a.m. on May 16, 2019. The minutes for that meeting, prepared by Foley and signed by Stone, reflect that Foley "[gave] a presentation summarizing the proposed" transaction, including that the $10 million acquisition of BEN LP units would "improv[e] liquidity as it satisfied *a near term obligation of BEN* to provide liquidity to the relevant limited partner(s)." (Emphasis added).

162.    Foley and the Special Committee reconvened later that day (May 16) at approximately 2:15 pm. The Foley-prepared minutes for that meeting likewise reflect that the Special Committee believed the proposed $10 million acquisition of BEN LP common units "was intended . . . to *satisfy outstanding obligations* to Essex Capital, a seller which contributed illiquid assets in connection with the launch of BEN's business." (Emphasis added). The Foley-prepared minutes further provide:

> It was discussed that such funding was requested to occur as [a] repurchase of the BEN limited partnership interests held by Essex *consistent with the relevant*

> *obligation to Essex*. The Committee discussed that such funding would not have the same level of protection for [GWG] (i.e., an additional junior equity investment in BEN vs debt) but that certain considerations, such as facilitating the ***satisfaction of the Essex obligation*** in a manner that did not trigger other obligations as well as the relative size of the request, appeared reasonable.

(Emphases added).  In other words, the Special Committee and Foley sought to rationalize an equity investment in BEN—while knowing it was less desirable than debt financing—on the bases that it satisfied an outstanding BEN obligation (a mistaken assumption) and that it was only $10 million (even though that was obviously a material sum, especially for GWG).

163.    By the end of the day on Thursday, May 16, 2019, less than 36 hours into their substantive efforts and with no meaningful substantive discussions or evaluation, the Special Committee and Foley were ready to sign-off on GWG's $10 million acquisition of BEN LP units from Essex.  But BEN, Holland, and Heppner had also requested simultaneous approval of a $60-$65 million loan as part of an overall package, and the Special Committee and Foley were not quite ready to approve the loan.  To push the entire transaction across the finish line, the Special Committee met with Heppner and members of GWG management on Friday, May 17 and with BEN's audit committee chairman on Saturday, May 18.  Foley worked through the weekend (Sunday, May 19) reviewing materials (including various forbearance and waiver agreements related to BEN's defaults on several of its debts).

164.    On May 20, 2019, the Special Committee held a Monday morning meeting to discuss the proposed $65 million loan to BEN and proposed $10 million acquisition of BEN LP common units from Essex.  Foley and the Special Committee were still not ready to sign off on the loan due to issues with the loan documents, so they decided to bifurcate the overall transaction and go forward with the Essex acquisition prior to approving the loan.  The Foley-prepared meeting minutes reflect that Foley and the Special Committee discussed the "rationale for the bifurcation," including that because the acquisition "required significantly less documentation and was not

subject to additional approvals/waivers (e.g., documentation with BEN's senior lender)," it meant that "there was a possibility of proceeding with the Acquisition the same day."

165.   The Committee then "determined to move forward with its approval" of the acquisition of BEN units from Essex, and approved a resolution dated May 20, 2019, to authorize the acquisition (a resolution that Foley had started preparing on May 17, 2019, just one day after the details had been provided to Foley).  The Committee did so due to the "desirability of *BEN fulfilling certain outstanding obligations* [] to Essex Capital (which *had a due and payable claim on BEN cash*)" and "the relative simplicity of stepping into the *obligation of BEN* substantially in accordance with its terms (i.e., an acquisition of units) as diligenced by the Committee and its advisers."  (Emphases added).

166.   Yet the Special Committee's critical underlying assumptions in approving the transaction were erroneous.  Foley had not "diligenced" the terms of a pre-existing obligation from BEN to Essex; *BEN had no such obligation*.  Nor did GWG simply "ste[p] into the obligation of BEN substantially in accordance with its terms."  Instead, later in the day on May 20, 2019 (after the Special Committee had already approved the acquisition), GWG's general counsel provide Foley with a draft agreement—originally prepared by BEN—for an assignment and transfer of Essex's units to GWG, which Foley then marked up to add purchase price terms. This agreement made no mention of any obligation of BEN to Essex, let alone the terms of any such obligation.

167.   More broadly, BEN *had no obligation* to Essex, let alone any "near term obligation" or other "outstanding obligations" to Essex that gave Essex a "due and payable claim on BEN cash," as the Special Committee erroneously believed based on discussions with Foley. This should have been obvious to Foley from the information it received.  *No* documents evidencing any such obligation were ever provided to Foley.

168.     Rather, the documents provided to Foley indicated that no such obligation existed. None of the BEN financial materials provided to Foley made any reference to any obligation to Essex, any other $10 million obligation, or any planned payment—near-term or long-term—of $10 million or of any other amount to Essex.  BEN's purported obligation to Essex was nowhere to be found on the BEN financial statements that Foley received on May 19, 2019.  Likewise, any obligation to Essex or planned $10 million payment was glaringly absent from other materials provided to Foley later that day, such as: (a) a BEN "Payables Schedule – May 2019"; and (b) a "Cash Sources & Uses" spreadsheet of BEN cash projections from May 16, 2019, through May 31, 2020.

169.     In short, BEN had no obligation to Essex; Foley not only wholly failed to confirm the obligation existed or to examine its terms, but it failed to do so despite being presented with several sources of BEN financial information that all indicated there was no such obligation.

170.     Foley's due diligence failures, and resulting terrible advice to the Special Committee, were extremely negligent (and grossly negligent).  Foley knew that the Special Committee's primary rationale for the Essex Transaction centered on BEN's purported obligation to Essex and that satisfaction of that obligation would improve BEN's liquidity.  Indeed, BEN's purported obligation was raised every time the Special Committee discussed the $10 million transaction during its various meetings, as alleged above. Nevertheless, Foley failed to obtain ***any*** documentation evidencing an obligation of BEN to Essex, while simultaneously receiving numerous documents showing that ***no such obligation existed***.

171.     Beyond that egregious malpractice, Foley failed to properly advise the Special Committee in several other respects surrounding the Essex Transaction.  For instance, Foley failed to properly advise the Special Committee that Delaware law required that they act solely in GWG's

best interests, not BEN's.  Even if BEN had in fact owed a due and payable obligation to Essex (which it did not), paying BEN's third-party obligations on its behalf was intended to benefit BEN, not GWG.

172.   Moreover, Foley failed to properly advise the Special Committee of the need to ensure that the price paid by GWG to Essex in exchange for BEN LP units was fair, *i.e.,* within the range of commercial reasonableness and what a third-party purchaser would have paid for those BEN LP units in an arm's-length transaction.  Due to Foley's failures to properly advise the Special Committee, no such analysis was undertaken.  The Special Committee instead approved the Essex Transaction even though it had not yet hired a financial advisor, had conducted no financial analysis whatsoever of the value of BEN equity as a whole, had performed no analysis of BEN's complex capital stack to attribute value to BEN LP common units (a critical error given the "overhang" of NPC-A preferred equity interests held by Heppner/BEN founders, as Foley later acknowledged), and had otherwise made no effort to value BEN LP common units before approving the Essex Transaction.

173.   Foley's malpractice and the Special Committee's resulting failure to obtain or conduct any independent financial analysis of the value of BEN LP common units before authorizing GWG to spend $10 million to purchase such units was particularly problematic given the surrounding circumstances.  Specifically, through Stone:

- Foley *knew* that BEN had not yet obtained its required trust charter (one of the given reasons for the funding request was to help BEN meet regulatory requirements to obtain the charter);

- Foley *knew* that BEN faced going concern issues; satisfying BEN's auditors was the main reason given for BEN's request for the funding and immediate injection of $50 million cash from GWG;

- Foley *knew* that BEN faced liquidity challenges and had "operational cash needs" (another reason given for the urgent funding request);

- Foley *knew* that BEN faced difficulties in repaying its other obligations (BEN's rationalization for the structure of the Essex Transaction was that GWG paying Essex would "not trigger other obligations" owed by BEN to others, like Paul Capital and HCLP);

- Foley *knew*—no later than May 17, 2019—that BEN faced difficulties in repaying its purported senior lenders, HCLP and BHI (as Foley reviewed and provided comments to a draft waiver and extension agreement between BEN and HCLP); and

- Foley *knew* based on cash projections it received (on May 19, 2019) that BEN projected it would receive a paltry $10 million of cash from its operations for the entire year from June 2019 through May 2020.

Given those many glaring red flags, there was ample reason to doubt whether *any* investment in BEN equity made sense. To pay $10 million for BEN LP common units at a $10/unit price made no rational business sense whatsoever. (A $10/unit price implied a total BEN equity value of well over a billion dollars, wholly implausible for a distressed entity that projected a paltry $10.03 million in revenue over the next twelve months.)

174.    Moreover, the Special Committee and Foley made no effort whatsoever to try to negotiate a better, fairer price for GWG. Nor did they meaningfully discuss the price to be paid, or what GWG would receive in exchange for the $10 million paid to Essex at the time the Essex Transaction was approved.

175.    Specifically, none of the detailed Special Committee meeting minutes—prepared by Foley—make any mention of any discussions of the consideration to be received, *i.e.* what GWG was receiving in exchange for its $10 million. There does not appear to have been any Special Committee discussion of: (a) the number of BEN LP units that GWG was to acquire from Essex: (b) the per-unit price; or (c) what percentage ownership in BEN LP would be obtained for the $10 million GWG was to spend. Nor is there any mention of any discussion concerning any actual or contemplated attempts to negotiate a better price (*i.e.,* lower per-unit price or more units for the same amount of money).

61

176.    The only reference to unit pricing in the Special Committee meeting minutes, *coming after* "the Committee determined to move forward with its approval" of the Essex Transaction, is that "Stone discussed that Foley had completed some additional *bringdown diligence* with [GWG's then-CFO] concern[ing] the valuation/price of the units to be acquired." But neither Foley nor the Special Committee ever conducted any independent financial analysis (or tried to negotiate a better price).  And critically, Foley never relayed the import of such an analysis to the Special Committee or advised them that approving the transaction absent such an analysis was contrary to GWG's best interests (and the fiduciary duties they owed to GWG).

177.    Under the circumstances, Foley should have advised the Special Committee that approving the Essex Transaction was improper under Delaware law.  The Special Committee was not fully informed, having conducted no financial or valuation analysis whatsoever.  And Delaware law required that Mason and Chavenson act in GWG's interests, not BEN's interests.

178.    Nor did Foley advise Mason and Chavenson of the impropriety of allowing themselves to be bullied by and/or acting to appease GWG's controllers.  Instead, acting under Foley's guidance, the Special Committee hastily approved the Essex Transaction—less than five days after it was first presented—to show progress of some kind in order to appease Heppner, Holland, and BEN.  While Foley and the Special Committee thought they needed more time to examine the parallel request for a $65 million loan, "there was a possibility of proceeding with the [Essex Transaction] the same day or within a short period of time."

179.    Foley and the GWG Special Committee sought to appease Heppner, Holland, and BEN to alleviate some of the pressure they were feeling.  Indeed, the same day that the Special Committee approved the Essex Transaction, the Special Committee's chairman, Chavenson, wrote

to Foley to express concerns over the "pressure" he had felt and his hope to avoid another "fire drill."  Specifically, Chavenson wrote:

> Despite all of our activities last week ***I don't think it was the intention of the GWG BOD to set up an ad-hoc Special Committee, although I will admit it felt like that***. Now that the dust has settled a bit on our first transaction (or will settle in the next hour), would either of you be interested in a lunch meeting . . . just to have a discussion on exactly what the Special Committee's responsibilities are and how it should go about executing those responsibilities.  Myself, ***I have felt some pressure from, shall we say, competing interests*** and given that there is likely to be some more work in the near term, I would just like to get your views on such issues.  Additionally, we can discuss how to go about hiring a financial advisor, since we are likely to need one soon and ***I have little desire for another "fire drill."***

(Emphases added).  Stone responded that he "agree[d] with those sentiments."

180.    Despite knowing full well that the Special Committee had hastily approved the Essex Transaction—in breach of their fiduciary duties—due to "pressure" from Heppner, Holland, and BEN in a "fire drill," and despite Chavenson's plea for help and guidance, Foley yet again failed to properly advise the Special Committee on the requirements for special committees under Delaware law.  As a result, nothing changed, and the Special Committee approved an unfair $65 million loan just a few days later (on May 31, 2019).

### 2. *Foley Misadvises the Special Committee in Connection With a $65 Million Loan Made on Below-Market Terms.*

181.    In order to further alleviate the pressure they were feeling and to show progress towards giving Heppner and Holland what they wanted, the Chavenson/Mason Special Committee's May 20, 2019 resolution approving the Essex Transaction also expressly stated that the "Special Committee anticipates taking formal action on the Loan in a subsequent resolution following substantial finalization of certain outstanding documentation [items] relating thereto."  (Stone had relayed to the Special Committee the day before (May 19, 2019), "we are simply awaiting" the promissory note and confirmation from HCLP that it would not sweep funds "prior

to meeting for the formal approval," and "[w]e could approve the loan for instance subject to some minor finalization of the note.")

182.    In essence, Foley set the tone in the resolution that it drafted just days into the Special Committee's process.  Both before and after the May 20, 2019 resolution, Foley's diligence efforts were primarily directed at papering the file—trying "[t]o create a reasonable record," as Stone put it in his May 15, 2019 email.  Foley's approach, and advice to the Special Committee, fell far short of the vigorous negotiations approximating arm's-length bargaining required of special committees under Delaware law.

183.    Due to Foley's failures to properly advise Chavenson and Mason regarding the requirements of Delaware law, along with its negligent due diligence efforts, the Special Committee ultimately approved the $65 million loan from GWG[10] to liquid trust entities affiliated with BEN (the "$65 Million Loan") on May 31, 2019.

184.    The terms of the $65 Million Loan were materially unfavorable to GWG. Specifically, the loan: (a) was unsecured; (b) was subordinated to senior first debt (to HLCP) and second debt (to BHI); (c) was not due for over four years (on June 30, 2023); (d) bore interest at a rate of only 7.00%, which was not payable until the maturity date; and (e) was made to risky borrowers with no demonstrated track record of generating income sufficient to repay the loan. No third-party lender was willing to extend BEN credit on such below-market terms (as Heppner admitted to Foley and the Special Committee on two separate occasions).  And the Special Committee approved such unfair terms without the benefit of any independent financial analysis and without conducting any sort of market check or even retaining a financial advisor.

_____

[10] The lender entity was GWG's wholly-owned subsidiary, debtor GWG Life.

185.    Moreover, it made no sense for GWG to make a loan with such unfavorable terms given that: (a) the loan's interest rate was lower than GWG's rate on its L Bond financing; and (b) the interest on the $65 Million Loan was not payable until maturity, yet GWG had to pay monthly interest on its L Bond borrowings.  In other words, GWG was losing money on the interest differential between the real money it sent out the door to pay its L Bond obligations and BEN's accrued interest obligations to be paid in the distant future.

186.    Nevertheless, the Special Committee hastily approved the grossly unfair $65 Million Loan.  It did so because: (a) Foley failed to properly advise the Special Committee on the clear requirements under Delaware law regarding what is expected of special committees; (b) Foley failed to advise the Special Committee that approving the $65 Million Loan under the circumstances was improper and inadequate to protect GWG's interests; (c) Foley negligently failed to conduct adequate due diligence and bring "red flags" to the Special Committee's attention; and (d) Foley was focused on pushing through the transactions, even though Foley knew that the Special Committee members were breaching their fiduciary duties in approving the $65 Million Loan.  In other words, the $65 Million Loan stemmed from a combination of Foley's incompetence and its willingness to paper over unfair transactions (to appease BEN, Heppner, and Holland).

      a.      **Foley Failed to Advise the Special Committee That the Terms of the $65 Million Loan Were Unfair to GWG and Against GWG's Best Interests.**

187.    From the start, Foley recognized that the proposed loan was unfair to GWG and that approving it would expose the Special Committee members to liability associated with breaching their fiduciary duties.  At the outset of Foley's engagement, Stone observed in his May 15, 2019 email that the initially proposed five-year, 7% unsecured terms of the loan "***isn't pretty as emergency funding***."  And Stone further expressed exasperation that he was "***less than thrilled***

*for [Foley] to be in [the] position*" of trying to justify it (while cynically noting that GWG's small public float was a "mitigating factor from a litigation perspective").

188.     Rather than advise the Special Committee that they should not approve a loan with such unfair terms, Foley instead focused on trying to rationalize it and provide cover for rubber-stamping an unfair transaction.  To that end, Stone noted in the same May 15, 2019 email that "creating a reasonable record" would require an improvement of the terms, such as to 13 months, "to get liens," and "escalations and required repayment" if BEN was unable to procure an audit opinion from its auditors.

189.     Thereafter, however, Foley accomplished *none* of the three improvements that Stone suggested would be necessary to "creat[e] a reasonable record" to justify the "[not] pretty" proposed loan.  First, Foley and the Special Committee got nowhere close to the 13-month maturity date that Stone suggested (and Foley asked for), instead landing at four years (in part because the borrowing liquid trusts' counsel expressed concerns over cash flow and ability to repay the loan in the near term).  Foley caved, even though it recognized on more than one occasion that a far shorter term was warranted.  For example, Stone emailed his Foley colleagues on May 23, 2019, writing: "we need to stick to 13 months."  (In the same email, Stone complained: "GT/Ben is actually making this harder and negotiating this loan – that isn't helpful.")

190.     Even worse, Foley did not advise the Special Committee that it needed "to stick to 13 months" despite believing a lengthy four- or five-year term on the note was unfair and unreasonable.  When Chavenson asked on May 27, 2019, "what's the story with the final maturity date?," Foley did not advise the Special Committee that it should insist on 13 months, but instead merely responded: "[w]e are waiting to see what the lawyer says," and reporting that the borrower liquid trusts' counsel had "indicated that it was nearer the 5 year mark and not the 13 month mark,

and so was not enthusiastic about going much shorter than 4 years."  In other words, Foley essentially allowed borrower's counsel to dictate terms, without advising the Special Committee of Foley's serious reservations regarding, and the problems with, a lengthy maturity date for a low-interest-rate, unsecured loan with no interest due or paid until maturity.

191.    Second, Foley and the Special Committee did not "get liens," as Stone had deemed important in his May 15, 2019 email.  The $65 Million Loan was unsecured.  Even though the $65 Million Loan was unsecured, the Special Committee and Foley still agreed that GWG should enter into intercreditor agreements with HCLP and BHI.  They did so even though a corporate finance partner out of Foley's Houston office, Hoang Quan Vu—who Stone enlisted to help review loan documents—thought it was "overkill" and seemed odd given the difference in borrowers and that the GWG loan would be "unsecured anyway."

192.    Third, and finally, Foley and the Special Committee failed to ensure that BEN's failure to obtain a clean audit opinion would constitute an event of default triggering acceleration of the note.  Foley failed to procure that protection for GWG, even though Foley repeatedly recognized it was important.  On May 24, 2019, Vu emailed Evans (copying Stone and others at Foley) to emphasize the need for a "financials/Deloitte [Event of Default]" because procuring the clean audit opinion was "the whole purpose of the loan, and the special committee is focused on that issue" and "would be very reluctant to permit that EofD to be removed."  In the early morning hours of May 27, 2019, Vu again reiterated to Stone: "***we can't give on the EofD***" related to financial statements.  (Emphasis added).  And Vu likewise wrote to Evans: "***we feel strongly about the . . . Deloitte EofD***."  (Emphasis added).

193.    Nevertheless, Foley ultimately caved on this issue later that day (May 27, 2019), accepting Evans' suggestion that cross-default language tied to HCLP should suffice because if the

audit opinion did not come through then HCLP would "com[e] in with all due haste to shut it all down," leading to "the same result at the end of the day."  Foley had ample reason to doubt that HCLP would in fact "shut it all down," as alleged below (section C.2.d).  Regardless, Foley did not specifically advise the Special Committee that Vu had previously indicated that the event of default language was something that "we can't give on."

194.     In sum, Foley failed to procure improvements to terms that Stone recognized from the outset would be necessary to create a "reasonable record" to provide even minimal cover for rubber-stamping the unfair transaction.  The only modest improvement was shortening the term of the loan from five years to four, still far longer than the 13-month term that Foley thought was necessary.

195.     Moreover, the modest improvement in term length was offset by two other changes to the original proposal of the $65 Million Loan that made the final version even worse: (1) the principal amount increased by $5 million (from $60 million to $65 million); and (2) all interest was accrued to maturity, whereas the original proposal had contemplated 50% of interest paid quarterly and 50% accrued to maturity.  In other words, the "[not] pretty" original proposed terms that had left Stone "less than thrilled" became even uglier in the final $65 Million Loan.

196.     Even though Foley knew that the terms of the $65 Million Loan were unfair, Foley never advised the Special Committee that the terms were unfair to GWG.  Nor did Foley advise the Special Committee that approving such unfair terms, especially without the benefit of any independent financial analysis—or even retaining a financial advisor—was improper and inconsistent with the requirements of Delaware law.  And because Foley never rendered that advice, the Special Committee caved, approving the unfair terms of the $65 Million Loan when Foley's lackluster efforts to bargain for a better deal failed.

b.      **Foley Failed to Advise the Special Committee That the Committee Was Required to Approximate Arm's-Length Bargaining, Negotiate Vigorously, and Drive a Hard-Bargain—Not Bend Over Backwards.**

197.    Before the Special Committee approved the $65 Million Loan, Foley never advised Chavenson and Mason that Delaware law requires special committees to negotiate vigorously, exercise real bargaining power, and approximate arm's-length negotiations. *See In re Loral Space & Commc'ns Inc.*, No. CIV.A. 2808-VCS, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008) (An "effective special committee must function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length."); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1148 (Del. Ch. 2006) (special committee discussions and negotiations "should be conducted in a way that is consistent with arm's-length negotiations," should be "vigorous and spirited," and evidence a lack of collusion).  Nor did Foley advise them that Delaware law required that they act "with a truly independent mindset" and seek to drive a hard bargain, rather than act timidly. *See Loral*, 2008 WL 4293781, at *25.

198.    Because Foley failed to properly advise the Special Committee on the need to bargain vigorously to approximate an arm's-length transaction and to utilize any negotiating leverage at its disposal, the Special Committee failed to do so.  Foley's failures and the resulting failures of the Special Committee were especially egregious given that GWG was well-poised to bargain from a position of strength to drive the best possible deal (for GWG) given BEN's desperation and financial weakness.

199.    Specifically, Foley and the Special Committee knew that BEN was in dire financial straits.  The main purpose of the $65 Million Loan was "to enable Deloitte, BEN's auditor, to issue its opinion on BEN's financials without a going concern qualification," as stated in the Foley-prepared minutes for the May 15, 2019 Special Committee meeting.  The Foley-drafted minutes

for meetings held on May 16 and May 17, 2019, likewise reflect that BEN's auditor's going concern issues were the principal reason for the urgency of the funding request.

200.    Moreover, Foley and the Special Committee also knew that BEN faced liquidity challenges more generally. For instance, the Foley-prepared minutes of the initial May 15, 2019 Special Committee meeting reflect that the loan was "to address BEN liquidity issues in particular." Similarly, the Foley-prepared minutes for the May 22, 2019 meeting reflect that Foley and the Special Committee discussed that the funding would "provid[e] BEN with the relevant liquidity to operate."

201.    On top of that, Foley and the Special Committee knew that BEN faced challenges vis-à-vis its other purported creditors. Indeed, while BEN was the intended ultimate recipient of funding from GWG, the $65 Million Loan was structured with the liquid trusts as the named borrowers in order to prevent BEN's other actual creditors (Paul Capital) or purported creditors (HCLP and BHI) from sweeping the proceeds. Specifically, as explained in the Foley-prepared minutes for the Special Committee's 11:00 am May 16, 2019 meeting: "BEN had identified that the complexity of the Loan structure (including a loan being made to the LiquidTrusts) was designed to, among other things, increase the likelihood that the proceeds of the Loan would be usable for the benefit of BEN and not captured or swept by creditors or other investors if made directly to a BEN operating company."

202.    Thereafter, the risk that BEN's creditors would sweep loan proceeds remained at the forefront of Foley's mind. For instance, the Foley-prepared minutes for the 2:15 pm May 16, 2019 Special Committee meeting reflect that one of the "key concerns" discussed was "whether the loan proceeds were certain to arrive at their intended target without getting swept by other lenders to BEN or other constituents." Foley and the Special Committee discussed the issue again

during the May 17, 2019 evening meeting, the May 20, 2019 meeting, and the May 27, 2019 meeting. Yet it apparently never occurred to Foley—and Foley never advised the Special Committee—that BEN's apparent efforts to keep funds beyond the reach of other creditors was a reason to doubt whether it was in GWG's interest to advance funds to BEN in the first place.

203.   Regardless, given all the known, significant financial problems BEN faced and its financial desperation, any arm's-length third party in GWG's shoes would have struck a hard bargain before advancing financing to BEN (if agreeing to fund a loan at all). The surrounding circumstances made it a risky loan, requiring adequate compensation for the lender to take on that risk. And any arm's-length party would have been well-positioned to leverage BEN's weakness into obtaining favorable terms for the lender.

204.   But rather than try to obtain negotiating leverage over BEN to obtain the best possible terms for GWG, the Special Committee and Foley acted as if BEN's desperation was a reason to be even more accommodating. For example, on May 21, 2019, Chavenson reached out to Stone for an update, writing: "Given the overall liquidity situation as well as Deloitte's position on finishing the audit, I think we really need to have all involved finish their work quickly so we can move the $10 million and $50 million."

205.   Similarly, Foley and the Special Committee bent over backwards to appease Holland, Heppner, and BEN and rush towards approving the loan on their requested timeline. For example, on Saturday, May 25, 2019, Foley emailed Heppner and Holland to set up a call for the following Thursday (May 30) or Friday (May 31) to "review and discuss . . . financial reporting generally, observations relating to this most recent funding process[,] and upcoming committee deliverables." Holland demanded that the Special Committee meet the next day instead (Sunday, May 26), and the Committee acquiesced.

206.    In advance of the Sunday meeting, Chavenson prepared remarks—which he circulated in advance to Foley and Mason—aimed at ensuring Holland, Heppner, and BEN that "[n]othing has changed – [the Committee was] very supportive" of getting money to BEN, but that the committee needed to "simply deal with the open issues associated with moving the $60 million to BEN." Chavenson then explained the Special Committee had worked very hard and hoped that its "weekend efforts will accelerate" approval, but that there were open issues with loan documents due to delays in negotiating terms with HCLP. Even still, Mason chimed in to express that she was "[c]oncerned that [Holland] will hear only 'nothing has changed' and possibly misconstrue," and suggested that Chavenson say instead "[w]e support, or continue to support," and Chavenson agreed and made that change.

207.    Thus, instead of focusing on vigorous negotiations and trying to achieve the best possible bargain for GWG, Mason and Chavenson were apologetic and focused on how to appease Holland, Heppner, and BEN. Foley was fully aware that Mason and Chavenson were approaching their assignment with a flawed mindset, acting timidly in favor of appeasing Holland, Heppner, and BEN, rather than negotiating in the spirited and vigorous manner that Delaware law requires. Yet Foley did nothing to set them straight and advise them that their actions and approach were inconsistent with the requirements of Delaware law and GWG's best interests.

   c.    **Foley Failed to Properly Advise the Special Committee Regarding Alternatives and Failed to Conduct Due Diligence into Terms Offered by Third Parties to BEN.**

208.    Under Delaware law, the Special Committee was required to consider alternatives to the proposed loan to explore if there were more favorable uses of GWG's funds from GWG's perspective. That included the possibility of refusing to fund the loan altogether.

209.    But Foley did not properly advise the Special Committee of the need to explore alternatives that would have been more favorable to GWG, nor did Foley advise the Special

72

Committee that it should at least consider the possibility of saying "no" if BEN refused to agree to arm's-length, commercially reasonable terms for the proposed loan.

210.     Instead, Foley twisted the analysis around and focused on *whether BEN* could find a better deal elsewhere.  For example, the Foley-prepared minutes for the May 17, 2019 Special Committee meeting reflect that exploring "commercial alternatives" to the proposed loan "was a critical issue."  But rather than focus on alternatives for GWG, Foley and the Special Committee focused on whether there were better alternatives *from BEN's perspective*.  The minutes reflect: "Heppner stated that he had pursued various alternative strategies on behalf of BEN, including arrangements with third-party financing sources, but had determined that terms required of such arrangements" were unacceptable, "including by virtue of their cost."

211.     Similarly, on May 26, 2019, the Special Committee and Foley met with Heppner, who again—according to the Foley-prepared minutes—"provided a summary of the team's discussions with third party lenders as alternative financing options for BEN," and "represented that due to the timing issues and existing senior debt obligations of BEN, there was no feasible alternative financing providers at this time."

212.     Thus, Foley and the Special Committee improperly assessed alternatives through the lens of *whether BEN could get a better deal* elsewhere, not on better alternatives for GWG. That was fundamentally inconsistent with the Special Committee's fiduciary duties to act loyally and in good faith in furtherance *of GWG's best interests*, not BEN's.

213.     Not only did Foley fail to properly advise the Special Committee on the proper framework for analysis, but Foley also conducted no due diligence into what terms third-party lenders were willing to offer BEN.  Notably, even though Heppner specifically told them that Heppner/BEN had approached third-party lenders and that such lenders had offered terms that

73

were cost prohibitive, Foley never requested to see such proposals.  Nor did Foley conduct any due diligence into the supposed impediments posed by BEN's purported senior debt with HCLP (despite several glaring "red flags" indicating a less than arm's-length relationship, as described below).

214.    Due to Foley's negligent advice and total lack of diligence efforts, the Special Committee approved the $65 Million Loan while knowing that BEN could not obtain similar terms from third-party lenders (according to Heppner) and yet without knowing how the terms of the $65 Million Loan compared to those available in the marketplace.  Neither Foley nor the Special Committee otherwise performed any sort of "market check" regarding the reasonableness of the terms of the $65 Million Loan (and never retained a financial advisor to advise them), let alone conducted any other substantive financial due diligence.  Rather, due to Foley's negligent advice, the Special Committee ultimately approved the $65 Million Loan based on Heppner's say-so that these terms were the best available from BEN's perspective (wholly disregarding that GWG's perspective is what should have mattered to the Special Committee).

### d.    Foley Ignored "Red Flags" Surrounding BEN's Related Party Debt to HCLP and BHI and Failed to Conduct Adequate Due Diligence.

215.    Foley's failures to conduct due diligence into the terms that third parties were willing to offer BEN were made worse by Foley's grossly inadequate due diligence efforts surrounding BEN's purported related-party debts to HCLP and BHI.

216.    During Foley's and the Special Committee's telephonic meeting with Heppner on May 26, 2019, Heppner specifically blamed "existing senior debt obligations of BEN" as one of the reasons why "there were no feasible alternative financing providers" to BEN—besides GWG—at the time.

217.     As discussed above, that GWG was supposedly the only entity willing to extend financing to BEN on the proposed terms was a strong reason to doubt the fairness of the proposed terms from GWG's perspective.  But setting that aside, that HCLP was a hindrance—according to Heppner—was a major red flag by itself.  Foley should have questioned whether Heppner was telling the truth to the Special Committee because Foley should have known or, at a minimum, suspected that BEN's purported senior debt obligations were not arm's-length, third-party debts, but rather purported obligations to affiliates of Heppner.

218.     <u>First</u>, Foley knew that BEN's second lien debt was owed to a related party of Heppner.  Indeed, Foley was specifically informed on May 16, 2019, that any sweep of loan proceeds by BHI was unlikely because BHI was "an ***affiliate of BEN controlled by Mr. Heppner***." (Emphasis added).

219.     <u>Second</u>, Foley had ample reason to believe that HCLP and BHI were under common control.  Specifically, on May 19, 2019, Foley was provided with: (a) a "loan statement" from BHI; (b) a "loan statement" from HCLP; and (c) draft BEN financial statements and footnotes.  The HCLP and BHI loan statements should have raised serious questions over whether HCLP was truly an arm's-length lender, free from Heppner's and BEN's influence.  The HCLP loan statement listed HCLP's address as the same address as BEN's address.

220.     Moreover, the forms used for both the HCLP loan statement and BHI loan statement were identical, revealing that they were likely prepared by the same person(s) or within the same system (in fact, both were prepared by Jeff Hinkle).  Specifically, both BHI's and HCLP's respective loan statements had the same rudimentary formatting, the same address, and the same colorful header:





Because: (a) it should have been obvious to Foley that the BHI and HCLP loan statements came from the same source; and (b) Foley knew that Heppner controlled BHI, those loan statements— by themselves—put Foley on inquiry notice that HCLP was not an arm's-length lender but was instead related in some way to Heppner. That was especially true given other "red flags" on the face of the loan statements, such as substantial amounts of accrued and unpaid interest and overall formatting that looked like someone had just whipped something together (inconsistent with what would be expected for purported $141 million and $72 million loans).

221.   <u>Third</u>, the draft BEN financial statements that Foley received the same day (May 19, 2019) likewise should have raised serious questions in Foley's mind over whether HCLP was a legitimate, arm's-length, third-party lender.  Note 15, "***Related Parties***," expressly ***identified***

***HCLP as a related party***, noting it was an indirect subsidiary of Highland Consolidated, "the limited partners of which include trusts for which ***BEN's CEO and founder serves as an investment trustee*** or which he or his family are in the class of possible beneficiaries." (Emphasis added). That footnote further stated that the BEN-HCLP First Debt had purportedly "refinanced . . . a series of six loan agreements issued by other entities ***related to BEN's founder*** between 2005-2007." (Emphasis added). Note 11, "***Debt Due to Related Parties***," similarly stated that the BEN-HCLP Debt has purportedly been incurred by BEN "***to refinance its prior existing loans . . . and other payables with our founder*** or related entities formed by our founder." (Emphasis added). And relatedly "Debt Due to Related Parties" footnote also addressed BEN's purported debt to BHI, Heppner's main holding vehicle in BEN.

222.   Fourth, during the last week of May 2019, Foley negotiated intercreditor agreements with HCLP and BHI. During those negotiations, Foley interacted with the same counsel representing both HCLP and BHI. That HCLP and BHI were represented by the same counsel was further reason to suspect that both HCLP and BHI were under common control (and, in turn, that Heppner controlled HCLP, given his known control over BHI).

223.   Fifth, the underlying loan documents between BEN and HCLP provided Foley with an additional reason to doubt that HCLP was an arm's-length lender. On May 27, 2019, Foley was provided with the credit agreement dated September 1, 2017, between BCC and HCLP. The signature block for HCLP reflected that Highland Counselors, L.L.C. was HCLP's manager, and Jeff Hinkle signed as manager of Highland Counselors on behalf of HCLP. But Jeff Hinkle was a BEN officer, and Schedule 9.02 "Certain Addresses for Notices" showed the same mailing address and "beneficient.com" email domain for Hinkle as it did for Heppner (who signed for the borrowing BEN entity).

224.    Foley was also made aware that Hinkle was HCLP's then-manager—via Highland Counselors—through an organization flow chart that Evans provided to Foley on May 30, 2019. While the flow chart indicated that Keith Martens "exercises ultimate control over HCLP" because "he has the authority to remove and replace Highland Counselors" as manager and "[n]o party has the ability to remove and replace Martens as the manager of Highland Consolidated Investments," that should have merely raised additional questions (*i.e.,* who is actually controlling HCLP, and who is Keith Martens).  But Foley apparently never asked any follow-up questions.[11]

225.    <u>Sixth</u>, and finally, HCLP's apparent willingness to overlook multiple events of default should have indicated to Foley that there was no arm's-length relationship between HCLP and BEN.  Foley was aware of numerous defaults and waivers between BEN and HCLP, suggesting that HCLP was more than willing to be accommodating when it furthered Heppner's interests.  For instance, on May 19, 2019, Foley was also provided with "a waiver provided by BEN's sr. lender addressing the relevant defaults."  The "Extension and Waiver Agreement" dated as of May 10, 2019, between BEN and HCLP contained a waiver of certain defaults, primarily related to BEN's failure to procure timely financial reporting.  At the same time, the agreement retroactively—as of March 31, 2019—amended the "Scheduled Maturity Date," changing it to June 30, 2020.

226.    Moreover, two other apparent events of default should have been obvious to Foley.  First, the BEN-HCLP First Debt was several months past due; the scheduled maturity date set forth in the credit agreement evidencing the purported BEN-HCLP First Debt was December 31, 2018.  Second, the incurrence of debt section 7.03 of the credit agreement contained negative covenants regarding incurrence of additional indebtedness, yet BEN had incurred the debt to BHI, an entity affiliated with Heppner.

---

[11] As detailed below, information that Foley later received in December 2019 was fundamentally inconsistent with the information that Foley was provided in May 2019.

227.     In sum, Foley had ample reason to suspect that BEN's purported senior lenders, HCLP and BHI, were not an arm's-length third parties, but instead acted under Heppner's influence.  Yet Foley negligently failed to advise the Special Committee of that fact or even raise the possibility.  And, in turn, Foley likewise negligently failed to advise the Special Committee that BEN's supposed difficulties in obtaining third-party financing due to HCLP and BHI (at least according to Heppner) was not a legitimate reason to agree to the $65 Million Loan on terms unfair and unfavorable to GWG.

**e.**     **Foley Knew That the Negotiations and Circumstances Surrounding the $65 Million Were Highly Unusual in Other Respects, Yet Papered Over the Transaction Anyway.**

228.     Stone's and Foley's malfeasance in papering over the unfair $65 Million Loan was even more egregious in light of the overall dynamics surrounding the negotiation of the loan.

229.     Vu, the corporate finance partner in Foley's Houston office enlisted to help in connection with the loan, highlighted for Stone several of the unusual aspects of the loan negotiations.  For example, on May 23, 2019, Vu questioned why GWG was subordinating loans to BHI and HCLP in the intercreditor agreements given that "[t]hose entities made loans to BCC," "GWG is not making loans to BCC but is instead making a loan to the Liquid Trusts," and "the GWG loans are unsecured anyway."  Stone responded to suggest that they have a call with Evans and GWG's in-house counsel "to let them know this is an unhelpful posture at this point (particularly *after all of the 'go, go, go' that we went along with*)."  (Emphasis added).  Yet Foley continued working on the intercreditor agreements, and the Special Committee approved them.

230.     Similarly, Vu flagged that the borrower liquid trusts were making highly unusual asks.  On May 26, 2019, counsel to the borrower liquid trusts requested a side letter to the effect that GWG would "use reasonable commercial efforts to facilitate future transactions to enable the Trusts to repay or refinance" the loan.  The next morning (May 27, 2019), Vu told Stone that he

79

had "never seen a lender agree to help the borrower repay or refinance the lender," and "***there's no way we have the side letter***." (Emphasis added). Later that day, Vu reiterated again that he had "***never seen that before and it seems ridiculous***," although he noted that rejecting it could potentially be a "deal killer" and thus it may be acceptable if "watered down to GWG considering proposals without the obligation of undertaking them." (Emphasis added). Nevertheless, Foley and the Special Committee ultimately agreed to a side letter.

231.    Thus, although Vu sounded alarm bells over loan negotiations that should have heightened Foley's suspicions regarding other problems surrounding the transaction (as alleged above), those concerns largely fell on deaf ears. Stone—due to obliviousness and/or conscious disregard for his duty to inquire—was focused on getting a deal done to appease BEN, Holland, and Heppner, not on negotiating the best deal for GWG.

**D.    Foley Is Presented with Numerous "Red Flags" Surrounding BEN's Business from June 2019 Through December 2019, Yet Remains Focused on Rationalizing Sending Cash to BEN (Rather than Financial Fairness and Reasonableness of GWG Doing So).**

232.    Due to Foley's malfeasance, the Special Committee approved the $65 Million Loan and the $10 million Essex Transaction in May 2019 without the benefit of a financial advisor or independent financial analysis, without fully understanding BEN's business and while knowing that BEN faced financial difficulties, and without fully informing themselves in other ways. Chavenson and Mason acted hastily to appease Heppner, Holland, and BEN, and without realizing their actions constituted breaches of the fiduciary duties they owed to GWG.

233.    Given the "fire drill" that occurred in May 2019 and Foley's lack of adequate due diligence before the Special Committee approved the Essex Transaction and the $65 Million Loan, Foley should have been particularly attuned to new information learned about BEN in the following weeks and months. To the extent such new information was inconsistent with what

Foley and the Special Committee had previously been told, it should have, at a minimum, raised significant concerns and doubts about approving any more transfers from GWG to BEN.  From June 2019 through December 2019, however, Foley was presented with one glaring, BEN-related "red flag" after another, yet failed to act on any of them (instead pushing through an additional $79 million transfer to BEN on December 31, 2019, as alleged below in section E).

> **1.      Foley Knew or Should Have Known That the Special Committee Had Been Duped in Connection With the $65 Million Loan.**

234.    As part of Foley's efforts to paper the record with purported due diligence efforts, Foley and the Special Committee met with Pete Cangany, chairman of BEN's Audit Committee, and Heppner to seek assurances that the proposed $65 Million Loan would alleviate BEN's liquidity needs and otherwise satisfy BEN's auditor (Deloitte) as to BEN's going concern issue.

235.    The Foley-prepared minutes for a meeting with Cangany held on May 18, 2019, reflect that Cangany reassured the Special Committee that the proposed transaction "would resolve the issue of a possible going concern qualification" for BEN, which the Special Committee viewed as "a key rationale for the funding."  The minutes further reflect Cangany stated that the $65 million requested loan amount "was driven by the management team's judgment for a reasonable cushion to manage [] *all* upcoming liquidity, regulatory, licensing and accounting issues, including operational cash needs and restricted capital levels in connection with the approval process for BEN's trust charter applications under Texas" regulations, and "was intended to address BEN's cash needs for 13 months based on conservative projections."  Cangany further explained that BEN management's projections were "very conservative," and that "the funding would be sufficient [to] address *all* necessary operating requirements, including better positioning BEN to satisfy banking commission requirements in respect of trust company restricted capital." (Emphasis added).

236.     Thereafter, on May 26, 2019, the Special Committee sought similar assurances from Heppner.  The Foley-prepared minutes for a committee meeting held that day, which Heppner jointed by invitation, reflect that Heppner "provided further analysis regarding BEN cash flows, including the assumptions underlying the Loan size in respect of operating cash needs (including satisfying relevant regulatory requirements)."  The Special Committee questioned Heppner over whether the proposed $65 Million Loan was "reasonably likely to satisfy" BEN's auditor "under a 'worst case' scenario for BEN," and whether the loan "would better position BEN to satisfy applicable regulatory" requirements.

237.     Then on May 29, 2019, in response to Chavenson's separate attempt to show some diligence efforts, Holland emailed Chavenson and Mason regarding cash flow projections for the liquid trust borrowers, asserting that the projections were "prepared by [BEN]'s risk management team and signed off by the Risk Management Committee of the board of directors of [BEN]," headed by Bruce Zimmerman, whom they "should consider . . . one of the world's experts in risk analysis."  Holland further wrote that BEN's projections were risk-adjusted and prepared by a BEN "risk team that uses industry leading systems and assessment tools."

238.     Based on the foregoing representations and assurances, Foley and the Special Committee should not have expected to receive near-term funding requests from BEN once the $65 Million Loan was approved on May 31, 2019.  Yet almost immediately, they learned that the $65 Million Loan was not a cure-all that would satisfy BEN's cash needs for the next 13 months, directly contrary to the assurances Foley and the Special Committee had just sought and received.

239.     Indeed, on June 1, 2019, the *very next day* after the loan was approved and funded, Heppner circulated a memorandum addressing proposed "Strategic Initiative Transactions" with BEN, intended to be part of a Strategic Initiative Transactions Agreement referred to as SITA.

Heppner circulated this memorandum to the Special Committee and members of the executive committee of GWG's board (which then included Heppner, Hicks, Schnitzer, Glaser, and Stein).

240.    Heppner's cover email and memorandum outlined a process through which the GWG executive committee would decide on the material terms for the various transactions with BEN's counsel drafting the terms for each agreement, then present them to the Special Committee for approval.   In other words, Heppner's SITA memorandum envisioned that the Special Committee itself would not negotiate in the first instance, but instead largely play a rubber-stamping role.

241.    Consistent with that approach, on June 4, 2019, Holland provided the Special Committee with a table setting forth proposed terms for the "Strategic Initiative Transactions" agreements to give them "a good roadmap of our plans," and indicated that he would circulate the agreements to the Special Committee "[w]hen these are drafted."

242.    Amongst many other proposals oriented towards further ensnaring GWG and draining its cash, several of Heppner's SITA proposals involved transferring vast additional sums of money into BEN on patently unreasonable terms.   For example, Heppner proposed amending the pre-existing commercial loan agreement (CLA) between GWG and BEN to increase BEN's borrowing capacity from $192.5 million to $3 billion, extend the maturity date by ten additional years, accrue all interest until maturity, and give BEN the option of repaying GWG in units of BEN's common equity (upon BEN obtaining a state trust bank charter).   Similarly, an additional proposed "strategic initiative" was an arrangement whereby GWG would provide to BEN "monthly funding of GWG's net available cash after necessary reserves," either through increased borrowing capacity of the CLA or by purchasing units in BEN, "in either case at BEN's sole discretion."

243.     These proposals were inconsistent with Cangany's and Heppner's assurances to the Special Committee—made just days before—that the $65 Million Loan would satisfy BEN's needs for the next year and place BEN on the path to obtaining its charter.  In addition, these proposals were inconsistent with Holland's reassurance regarding BEN's supposedly fully vetted and risk-adjusted cash flow projections, relayed in his May 29, 2019 email to the Special Committee.

244.     That Foley and the Special Committee received information contradicting the reassurance they received just days before was a major red flag that should have led Foley to question whether the Special Committee had been lied to and duped, and/or whether the Special Committee adequately understood BEN's business and needs.

**2.     Foley Knew or Should Have Known That Chavenson and Mason Did Not Fully Understand BEN's Business Plan and Were Negotiating From an Unfair Position Given the Information Asymmetry in the Negotiations.**

245.     In fact, the Special Committee did not adequately understand BEN's business or business plan.  On June 2, 2019, two days *after* they had approved the $65 Million Loan, Chavenson reached out to Mason to express concern over the number of items covered in the "SITA" memorandum that Heppner had provided them the day before, on June 1, 2019.  Chavenson observed: "it appears as though there will be a lot of work for us and I must admit that some of the material appears quite complicated."  Accordingly, Chavenson wrote, "in an effort to better understand the plan and ultimate goal, I began to review my email in the hopes of finding a projection for the GWG/BEN combination as well as a business plan for the combined entities, or in other words, the rationale for the combination" but "I couldn't seem to find that."  Mason replied: "You are absolutely right.  I am confused.  To help me understand, I was looking for a projection of when they expect the life insurance portfolio to reach what they consider to be its limit and what that would look like under the combined entity.  No such plan that I can find."

246.    Upon hearing that Mason shared his confusion, Chavenson forwarded the email chain to Foley to ask if Foley thought it would be: "OK if we ask for this?"  Thus, Foley was fully aware that Chavenson and Mason did not fully understand BEN's business, even though they had *already approved* the Essex Transaction and $65 Million Loan.

247.    The next day (June 3, 2019), Chavenson and Mason reached out to Evans and Holland to request a "copy of the cash flow projections for the combined entities (BEN + GWG) along with a business plan for these combined entities, or in other words, the business rationale for the combination" so that they could "work more efficiently" and "meet the timeline outlined in Brad's memo."  In response, Evans indicated that Heppner "want[ed] to put something together that is more comprehensive," but provided two slides with projected Q3/Q4 2019 income statements from the prior board presentation.  Chavenson then forwarded the email chain (with the two rudimentary slides) to Foley.  Thus, Foley was aware that as of early June 2019, cash flow projections and a business plan were still under development (even after the Special Committee had already approved significant transfers of GWG funds to BEN and the purchase of BEN equity interests).

248.    Chavenson's and Mason's confusion and lack of any grasp on BEN's business continued over the following months.  For instance, on August 11, 2019, Chavenson emailed Foley to again express his concerns and seek Foley's input, writing:

> ***Both Kathleen and Dave have expressed concern that they do not have a good feel for what is going on at BEN***, yet to both of us the companies (GWG and BEN) are inexorably intertwined. We also feel that the other GWG BOD members, who are also BEN BOD members, have an additional forum (BEN BOD) to discuss GWG, its integration with BEN and related matters at the BEN BOD. We both independently mentioned this to Murray, who told us that he has spoken to Brad Heppner about this and Murray claims that they both will develop some ideas to help us.
>
> My concern is that they may come back to us and ask us what we think we need to function better. We are of course sensitive to our role as independent directors of

GWG and don't want to do anything to jeopardize this, but we have had a few discussions about possible solutions to this concern. Of course, we would need Foley to weigh in on whether these ideas would compromise our independence, which we do not wish to do.

(Emphasis added).  Chavenson then proposed ideas to help address the information asymmetry, such as observing BEN board meetings.  Mason chimed in to emphasize that "[w]e need to know what could compromise our independence," using as an example if they were to "reach out to a Ben Board member and receive inside info that we didn't ask for," and asking if there is "anything we should avoid?"

249.    Later that evening (August 11, 2019), Stone responded that Foley would "consider and come back to you on the larger issues" Chavenson raised, while noting that he did not think obtaining additional information about BEN would compromise independence.   Stone further reasoned:

> *[T]he reality is that the executive committee – giving direction to BEN management – has both sides' information as well, so it seems to me we are simply leveling the playing field and it's likely incumbent on us to get the information to do the job. This is the reality of what we are feeling, i.e., we are negotiating from a position of informational weakness*. Against that backdrop and given the structure, I don't believe inadvertent BEN disclosures should be a problem here Kathleen but we will reflect on this precise issue (I'll discuss with Chris and some of the good minds at the firm) and come back to you if we have additional thoughts there or issues to avoid.

(Emphasis added).  Mason responded to thank Stone, who largely confirmed her thinking, since "obviously we rely on your advice" and it was "[d]angerous to assume much of anything these days."

250.    Thus, Foley was both fully aware that the Special Committee did not understand BEN's business or what was happening at BEN, that Foley and the Committee were "negotiating from a position of informational weakness," and that it was "incumbent on [them] to get the information to do the job."   Yet Foley failed to ensure that the Special Committee obtained

86

adequate information, even after Shelly Stein—the BEN/GWG dual-director who initially recommended Foley, Mason, and Chavenson—strongly encouraged Foley to do so, and then abruptly resigned as a director, as alleged below.

### 3. Foley Knew or Should Have Known That Several GWG Directors Resigned Due to Inability to Get Information from Heppner and BEN, and That Holland and Heppner Covered Up the Reasons for Those Resignations.

251.    Foley's knowledge that Foley and the Special Committee had apparently been misled in connection with the Essex Transaction and the $65 Million Loan, along with its knowledge of the Special Committee's difficulties in understanding BEN's business and obtaining reliable information from BEN, provided ample reason for concern and significant skepticism of BEN.  Those concerns should have been heightened further still when several dual-directors of GWG and BEN—including Stein—resigned after stressing the need for the Special Committee to understand what was happening at BEN.

252.    By mid-July 2019, Stein—who had prior relationships with the Special Committee and Foley—and two other outside dual-directors with some visibility to both GWG and BEN, Bruce Zimmerman and David Glaser, began asking questions about GWG's and BEN's cash flow projections and substantial related party payments that BEN made to Heppner affiliates, including HCLP.  Previously, within days of GWG's June 3, 2019 funding of the first $50 million tranche[12] of the $65 Million Loan to several liquid trusts affiliated with BEN, a substantial portion of the proceeds flowed to BEN.  BEN, in turn, paid $7.6 million to related parties—including $5.1 million in interest on the BEN First and Second Debts and $401,056 to Bradley Capital, another Heppner-affiliated entity, which provided private air travel to Heppner and his family.

---

[12] GWG funded the second $15 million tranche of the $65 Million Loan on November 22, 2019.

253.     Upon learning of those payments in July 2019, Zimmerman, Stein, and Glaser were troubled, especially given the lack of reliable cash forecasts for either GWG or BEN, and significant questions over both companies' business models.   Over the following weeks, Zimmerman, Stein, and Glaser grew increasingly concerned due to lack of forthcoming information and reliable projections from BEN.   And by late August, they thought that GWG should stop sending money to BEN and that BEN should cease all payments to related parties (including HCLP) for the time being.

254.     Specifically, on August 23, 2019, Zimmerman wrote to Heppner, Hicks, and Schnitzer: "I am not good with GWG sending anything more to BEN until at least January of 2020 . . . .  I am also not good with BEN making any more related party payments."  Stein chimed in to express his "total agreement," stating that "Cash flow is a major problem and *it is unacceptable to make payments from GWG to BEN to related parties.  This is a major liability issue at the GWG level* and I am totally opposed to such payments."  (Emphasis added).

255.     Later that morning, Heppner/BEN loyalist Bruce Schnitzer tried to smooth things over, suggesting that "questions related to [HCLP and associated trusts], [its] history, nature, governance and our respective rights are fundamental to…taking any view of best, next steps," and suggested that they commission counsel "to thoroughly examine the matter for our review." Glenn West (at Weil Gotshall) was tasked with this mission.

256.     Upon realizing that HCLP and related entities were about to be put under the microscope, Heppner undertook several steps to cover his tracks.  As alleged in more detail above, Heppner: (a) coordinated with Martens, his hometown friend in Hesston, Kansas, to backdate HCLP governance documents to April 1, 2019; (b) installed Wickline as HCLP's indirect manager (replacing Martens) on October 3, 2019; and (c) coordinated with Banowsky, HCLP's counsel, to

draft a materially false and misleading letter on Banowsky's letterhead, dated October 5, 2019. This letter was provided to West, the counsel tasked with investigating the matter per Schnitzer's suggestion, who then forwarded the letter to Stein, Glaser, and Zimmerman on October 8, 2019, in advance of an upcoming board meeting.

257. Despite Heppner's efforts to cover his tracks, Glaser, Stein, and Zimmerman still had other concerns leading up to the combined October 10, 2019 GWG-and-BEN board committee meetings.  For example, in an October 5, 2019 email to Glaser, Stein wrote that he, Glaser, and Zimmerman "are totally aligned that *no money can go out of GWG to B[EN] or to be used in any way to pay [HCLP and its affiliates]* or any related party unless we have a long term financial plan and better understanding how to protect the interests of all constituencies."  (Emphasis added). Stein further observed that Heppner "has been so non responsive that we never saw really understandable financials," and "*since the middle of July, we have been asking for a viable long term plan and so far have not received one* from management."  (Emphasis added).

258. For his part, Glaser was concerned enough over payments from GWG to BEN to HCLP and other related parties that, in a testy email exchange with Heppner on October 7 and 8, 2019, Glaser indicated that there should be a discussion of "recent developments and decisions in Delaware corporate law," and then (when prompted by Heppner) referred Heppner to the Delaware Supreme Court's recent discussion of *Caremark* liability in *Marchand v. Barnhill*.

259. The testy exchanges between Glaser, a director looking out for GWG's interests, and disloyal GWG fiduciaries favoring BEN's interests (*i.e.*, Holland, Heppner, and Schnitzer) continued the next day.   In an October 8, 2019 email exchange, Glaser asked Schnitzer for long-term projections for GWG and BEN in advance of an upcoming meeting.  Schnitzer responded that he was trying, but there are "in fact issues of *accounting process controls and mitigation of*

*material weaknesses*. . . .  In ***an immature company with systems in development that spew out errors***, a deep fear has developed around distributing information that 'keeps changing' to detail-oriented (or habitually negative, which is different from detail-oriented) directors."  (Emphases added).  In response, Glaser wrote that the requested cash flow projections are unrelated to BEN's accounting problems for prior financial periods and noted: "***Public company directors asking reasonable questions should not be viewed as habitual negativity, especially when a number of prior representations have not be[en] realized, but a fulfillment of their duties under Delaware law***."  (Emphasis added).

260.   Shortly thereafter, at an October 10, 2019 BEN-and-GWG-combined committee meeting (attended by Stein, Glaser, and Zimmerman), Zimmerman resigned as a GWG and BEN director by handing out a resignation letter and then walking out of the room.  Stein submitted his resignation shortly after the meeting concluded.  But at the urging of Holland, they temporarily "withdrew" their resignations so that GWG could vote to reduce the size of the board.  Following the board vote, Stein, Glaser, and Zimmerman resigned officially on October 15, 2019.  When the GWG press release announcing their departures hit the wire, Zimmerman remarked: "***Free at last, free at last, thank God almighty, we're free at last***."  (Emphasis added).  Stein replied: "***I think the rest of them have lost their marbles***."  (Emphasis added).

261.   Notably, Stein, Glaser, and Zimmerman resigned after expressing frustration over several key issues that were known to Foley (or that should have been known to Foley), such as related-party payments to HCLP and other Heppner affiliates, the inability to obtain information from Heppner and BEN, and the lack of coherent financial projections and a business plan.

262.   Moreover, Stein and Glaser tried to get Foley and the Special Committee to pay attention to these issues (although they were limited in what they could say due to non-disclosure

obligations owed to BEN).  But rather than take the hint or respond appropriately to numerous red flags indicating something was amiss, Foley instead misadvised the Special Committee and convinced them to look past the issues—once again to avoid upsetting Heppner and Holland.

263.    For instance, "Shelly [Stein] suggested to Dave [Chavenson] that Kathleen and Dave have a telephone call with David Glaser (lead independent director of GWG and a BEN BOD member," as Chavenson relayed to Foley in his August 11, 2019 email asking for advice on how to improve their understanding of BEN.  Thereafter, on August 30, 2019, Chavenson and Mason held a call with Glaser to discuss work efforts to date and their "desire to observe the BEN BOD meeting."  Following the call, Glaser wrote to Heppner (copying Stein and others):

> I just received in my role as lead director of GWG a call from the Special Committee of GWG. They expressed concern[] that they would not meet the October 1 deadline ***because of a lack of responsiveness to their, their financial advisor's and legal advisor's repeated requests for information relating to BEN***. Specifically, they have not received (i) detailed term sheets of all BEN securities and interests that are [] or might be dilutive to GWG shareholders and (ii) while they appreciated and were complimentary of BEN's BEAST model of BEN's future performance which they were provided access to this week, they need senior BEN management to provide more detail on the basis for achievability and the source of the $120mm cash equity inflow in '20. ***They also requested that they sit in as observers to BEN Board meetings*** which they said their and GWG's legal counsel do not have an issue with. I told them I would communicate their issues and requests to you.

(Emphases added).  Heppner was outraged: "***Maybe best if Kathleen would simply call me instead of this telephone game***.  I spent a full day Wednesday with Kathleen and she made absolutely no mention of these requests to me.  ***What's going on here***?" (Emphases added).  In response (to Heppner), Glaser suggested that the Special Committee "work with their financial and legal advisors to create a detailed list of the information they need, and feel has not yet been provided, and then follow up with a call with them and their advisors and the appropriate people at BEN and GWG."

264.     This full email chain was forwarded to Foley later that evening (August 30, 2019). Glaser's attempt to try to get information to the Special Committee, as well as Heppner's over-the-top reaction, were clear red flags calling out for further investigation into what was happening at BEN and GWG.  But rather than dig in, Foley encouraged the Special Committee to play nice and move on to mitigate tension and conflict.  Specifically, Foley prepared a draft email for Chavenson to send to Glaser, turning down the call or meeting:

> David,
> We appreciate the offer for a call or meeting. I've sent Murray a list of the most significant open items from our end; and our advisors can work to chase those points down. Given the significant strides in sharing information we made in Minneapolis this week, ***I don't think a meeting is necessary at this time***. For now, I think it's probably better to have our financial advisor focus on working through their analysis rather than pulling them into a call or meeting. In addition, it's possible that there may be additional requests as our financial advisor works through the projected financials, and so open and constant communication at the lower levels may be more effective than a meeting of more senior folk. We might save the meeting request unless things start to slow down, ***but at the moment a meeting may be more distracting that productive***.

(Emphases added).  In response, Mason thanked Foley for "its 'ear' and counsel," noting that "those 'social' issues are the most difficult and I never seem to stop needing to learn."  Thus, rather than take the hint from Glaser and push for information, the Special Committee instead—based on Foley's advice—stood down to avoid ruffling Holland's and Heppner's feathers.

265.     Thereafter, Stein even more assertively tried to get Foley and the Special Committee to dig into what was happening at BEN.  On October 6, 2019, Stein wrote to Stone (and Glenn West, who represented BEN's Executive Risk Committee):

> I would like each of your thoughts on this. ***I believe it is critical that Chavenson and Mason be invited as observers at the BEN board meeting in a few weeks so they can appropriately understand the interrelation between BEN and GWG so they can perform their duties on the special committee of GWG with full facts***. I am not sure of procedure to invite them so would like legal input on whether to invite and how.

(Emphasis added).  Stone responded later that afternoon, agreeing with Stein's assessment:

Shelly – Glenn and I have discussed. ***From the Committee's perspective, we would like Dave and Kathleen to attend as observers. I believe it's important for the reasons you state. Given the dynamics here (where the BEN directors have access as a practical matter to all GWG information at the GWG board level), I also believe that access to BEN information for Dave and Kathleen "levels the playing field", which is important process-wise as the Committee evaluates GWG-BEN transactions for GWG.*** Glenn will have a view but I wasn't thinking anything particularly formal is needed for this invitation. . . .

(Emphasis added).

266.    The next day (October 7, 2019), Chavenson then emailed Heppner's assistant to request BEN board meeting materials, noting that "[t]he lawyers have informed us that it is OK for Kathleen Mason and I (the members of the GWG Special Committee) to attend the BEN BOD meeting as observers."

267.    But Heppner was once again outraged: "Which lawyer representing Ben informed you that this is okay?  I am completely unaware of this.  Please email me the lawyer contact." Chavenson then forwarded Heppner's email to Foley, asking for help on how to respond, before informing Heppner that Stone had spoken with West on the issue.

268.    The next day (October 8, 2019), Foley fielded a call from BEN's counsel at Potter Anderson and Glenn West regarding the possibility of the Special Committee attending the BEN meeting.  Stone characterized the call as an "[i]nteresting call to say the least," *i.e.,* he received a stern talking to.  And thereafter, Foley once again shied away from conflict and upsetting Heppner and BEN, dropping the board observer issue altogether (notwithstanding Foley's recognition that such rights were important to help "level the playing field" in negotiating with BEN and Heppner). Due to Foley backing down, Mason and Chavenson were not in attendance at the joint GWG-BEN board committee meeting held two days later (October 10, 2019), where Zimmerman handed out copies of his resignation letter and walked out of the room.

269.     Nevertheless, Foley promptly learned of Zimmerman's, Stein's, and Glaser's resignations.  It was a major red flag that Stein and his fellow directors resigned mere days after Stein had insisted that it was "critical" that Chavenson and Mason attend BEN board meetings "so they can perform their duties on the special committee of GWG with full facts."  Yet Foley once again failed to investigate, instead proceeding forward as if there were no cause for alarm.

270.     Indeed, Foley failed to rigorously investigate the circumstances surrounding Stein's (and Glaser's and Zimmerman's) resignations even after having an additional reason for concern upon learning of Holland's attempt to paint a misleading, counterfactual narrative surrounding the mass board departures.

271.     Holland proactively reached out to Chavenson on October 11, 2019, to do damage control surrounding the pending resignations.  Later that day, the Special Committee held a meeting to discuss.  According to the Foley-prepared minutes:

> The Committee discussed that, according to Mr. Holland, Bruce Zimmerman, David Glaser and Sheldon Stein ***were planning on resigning from the board of directors of [GWG]*** and BEN and that Richard Fisher ***was planning to resign from the board of directors of [GWG]*** but would stay on as a member of the board of directors of BEN.  The members noted that they asked questions throughout the discussion with Mr. Holland focusing on the rationale for the various resignations and Mr. Holland explained that the resignations stemmed from a variety of reasons, including outside obligations and commitments of the resigning directors and the general desirability for a smaller board of directors.  The Committee requested that Foley follow-up with . . . further diligence ***on the impending board departures***.

(Emphasis added).  (Foley did little, if any, "further diligence on the impending board departures.")

272.     Despite Holland's statements (on October 11, 2019) that Stein, Glaser, Zimmerman and Fisher were already planning to resign, GWG's in-house counsel circulated a draft GWG written consent on October 15, 2019, making it appear as if the resignations were purely a result of board discussions to reduce the size of the board.  The discrepancy caught Foley's attention,

leading to parallel discussions between: (a) Foley and GWG's in-house counsel; and (b) Chavenson and Holland.

273.    On October 16, 2019, Chavenson emailed Foley in follow-up to a call Chavenson had just had with Holland, noting (amongst other items) that Holland stated the "sequencing of events in BOD resolution is correct as drafted but that the press release and securities filing will be different and will be circulated.  What do you know about all this?"  Stone responded later that evening:

> [GWG's in-house counsel] sent me an updated reso[lution] that read consistent with *our understanding of reality (i.e., the directors resigned on their own and not in connection with an agreement to reduce the board)* but he caveated that Murray/Brad would need to review – *it sounds like Murray is vetoing the change.*  Kathleen mentioned that Murray says that we approved the initial version of the consent, *which is not true.*  We were successful at getting the 8K to read consistent with our understanding of reality.  I am assuming that is the reason it "will be different," as we stressed the importance that the securities filings be accurate above all.

(Emphases added).

274.    Later that evening, an in-house GWG paralegal emailed Foley to inform them that he had "just been advised by Murray Holland that we will be proceeding with the Written Consent as submitted to the board yesterday evening," *i.e.,* the version that did not reflect reality, but instead made it appear that Stein, Glaser, and Zimmerman (and Richard Fisher) had resigned after, and as a result of, the GWG board's decision to reduce the size of the board.  Foley associate Chris Babcock immediately forwarded the email to Stone, writing: "*This is bad.*"  (Emphasis added).  And Stone forwarded the email from GWG's paralegal to Mason and Chavenson, writing: "FYI: *They are giving us the proverbial Heisman*.  Not sure if you have signed or not.  We can talk after 8 or so this evening if you would like." (Emphasis added).

275.    But Foley did not advise Chavenson and Mason to stand their ground and refuse to sign a written consent that was inaccurate.  Nor did Foley inform GWG's full board of the

inaccuracy of the recitals in the written consent.  Nor did Foley advise Chavenson and Mason to inform their fellow GWG board members.  As a result, following Foley's lead in once again going along to get along, Chavenson and Mason signed the resolution dated October 15, 2019.  They did so even though the recitals to that board resolution were misleading and inaccurate and contradicted Foley's "understanding of reality (i.e., the directors resigned on their own and not in connection with an agreement to reduce the board)."

276.    Moreover, Foley likewise failed to ensure that the final version of the Form 8-K (and accompanying press release) that GWG filed with the SEC was consistent with reality, despite Foley's recognition of "the importance that the securities filings be accurate above all."  Foley acquiesced to various revised versions of the Form 8-K, including the final version.  And the final version misleadingly stated that: "[a]s a result of discussions among members of the Board of Directors (the 'Board') of GWG Holdings, Inc. (the 'Company'), and based in part on a determination that a Board comprised of fewer directors would facilitate that Board's ability to oversee future Company activities in an efficient and effective manner, Messrs. Richard W. Fisher, David H. Glaser, Sheldon I. Stein and Bruce E. Zimmerman resigned from the Board and the size of the Board was reduced from 14 to ten directors."  The press release, attached thereto, similarly stated that the resignations were made "in regard" to the board's determination "that it is in the best interests of the Company to reduce the GWGH board membership from fourteen members to ten," so that GWG could be a "more nimble and action-oriented organization."

277.    Thus, both final versions of the Form 8-K and press release misleadingly created the impression that the resignations were due to a decision to reduce the size of the board, even though Foley knew that the "reality" of the sequence of events was different.  Yet Foley signed off on the final version of both the Form 8-K and the press release anyway.

278.    Moreover, Foley signed off on GWG's press release announcing the board changes even though it contained misleading statements regarding the Special Committee's own efforts. Specifically, GWG's press release misleadingly stated "that in preparing for the future *following the finalization of a number of initiatives* between [BEN] and [GWG], it has made a decision to reduce the size of the GWG Board." (Emphasis added). The press release further claimed that: "[t]he complicated process of working toward a closer strategic relationship between GWG and [BEN] *ha[d] been accomplished*" through efforts of the departing directors (amongst others). (Emphasis added).

279.    Contrary to those statements, as Foley knew full well, the Special Committee's efforts towards the laundry-list of SITA transactions proposed by BEN, Heppner, and Holland (in early June 2019) were still in the early stages of the approval process. The Special Committee had not taken any recent action or approved any "initiatives" that would warrant a board reduction in October 2019. And nothing meaningful had changed in the relationship between GWG and BEN since May 2019. Indeed, as of the date of the October 21, 2019 press release, not a single SITA transaction had yet been approved by the Special Committee. Yet Foley did nothing to correct those inaccuracies, nor to bring them to the attention of GWG's full board.

280.    In short, Foley both failed to adequately investigate glaring red flags surrounding the departures of Stein, Glaser, and Zimmerman, and also buried its head in the sand even though Foley knew (or should have known) that Holland and Heppner were improperly glossing over the circumstances of those directors' departures. Foley did not bring the discrepancies to the attention of GWG's full board, thereby indirectly helping Heppner, Holland, and BEN cover up the truth surrounding the mass director departures in October 2019.

### 4. *Foley Knew or Should Have Independently Known of the Issues the Resigning Directors Raised.*

281.   Before they resigned in October 2019, Stein, Glaser, and Zimmerman all raised issues concerning BEN's payments to related parties and BEN's inability to provide coherent financial projections and a business plan.  As directed by the Special Committee, Foley should have diligenced the reasons for their departures and tried to interview those departing directors, which would have brought those issues to Foley's attention.  Despite its failure to act, however, Foley independently knew or should have known of issues with BEN's related-party payments and the lack of financial projections, given the other information known to Foley by that point.

282.   <u>First</u>, Foley knew or should have known that BEN had made related-party payments, including with money obtained from GWG.  On September 10, 2019, Foley received a BEN statement of cash flows for the quarter ended June 30, 2019, which reflected that BEN had made $9.6 million in "payments on debt due to related parties" in the three months ended June 30, 2019.  And Foley was apparently loosely aware of the problem.  On October 23, 2019, Babcock emailed Stone with a list of "Proposed Items Needed for SC to fund anything to BEN," noting that "we should make sure we have requested," amongst other items, "***[d]etails concerning all leakage at BEN, including all payments to Affiliates***."  (Emphasis added).

283.   <u>Second</u>, as alleged in more detail herein (sections D.2, D.7), Foley was fully aware of repeated difficulties and delays in obtaining a coherent business plan and reliable and usable financial projections from BEN.  Because such information had not yet been provided, Babcock's October 23, 2019 email to Stone of items needed for additional funding likewise indicated that he and Stone "should make sure we have requested" related items, such as "information still needed for VRC to finish its analysis," "[a] detailed discussion of proposed uses for the cash, as well as a current balance sheet," and "a recapitalization plan."

284.    Accordingly, Foley had ample reason to be aware of the issues and concerns that had been raised by Stein, Glaser, and Zimmerman before they resigned.  Yet Foley recognized the warning signs and disregarded them and/or negligently failed to appreciate the issue.

**5.    *Foley Knew or Should Have Known of Numerous Additional GWG and BEN Officer and Director Resignations.***

285.    Foley also knew or should have known that—in addition to Stein, Zimmerman, and Glaser—numerous other GWG and BEN officers and directors resigned during its watch.

286.    For instance, Foley knew that Richard Fisher, a pre-existing BEN director who became a GWG director on April 26, 2019, resigned from GWG's board on October 15, 2019, as part of the mass-wave of resignations involving Stein, Glaser, and Zimmerman.

287.    Notably, Fisher had expressed concern regarding "worrisome" resignations of GWG's auditors (described below) before stepping down.   Fisher likewise shared many of Zimmerman's concerns.  On September 21, 2019, Zimmerman and Fisher sent a joint email to Heppner addressing: (a) Heppner's use of private air travel; (b) the need for financial projections and monthly cash flows anchored in actual results; and (c) "need[ed] clarity on the Related Parties," in particular, "who are the Related Party trustees and beneficiaries, and how [are] distributions to beneficiaries [] determined."

288.    Foley could and should have reached out to Fisher to ask him why he was resigning as a GWG director and to inquire whether he had any concerns surrounding BEN.  Foley was made aware of Fisher's intention to resign on October 11, 2019.  And according to the Foley-prepared meeting minutes for the October 11, 2019 Special Committee meeting, the Special Committee specifically "requested that Foley follow-up with . . . further diligence on the impending board departures."  Yet Foley did nothing to explore why Fisher intended to resign.

289.    Foley also knew or should have known that several other GWG officers and BEN officers—several of whom interfaced directly with Foley—resigned during 2019, including:

- GWG's William Acheson, who had served as GWG's CFO prior to installation of Evans into that role;

- GWG's in-house general counsel, Craig Opp (who abruptly announced his resignation on Christmas Eve 2019);

- BEN's long-standing Chief Administrative Officer and Treasurer, Jeff Hinkle;

- BEN's CFO, Tiffany Kice (who only learned of the debt to HCLP after joining the company and began contemplating resigning just two months into her nine-month tenure, in part due to "not understand[ing] the future business purpose of why that debt would be on [BEN's] balance sheet");

- BEN's in-house general counsel, Jessica Magee; and

- BEN's in-house counsel, Michael Andrews (who, after Magee resigned, had been "seconded" to GWG to work as the central point of contact for all Special Committee due diligence requests).

That mass exodus of high-level legal and finance personnel from both GWG and BEN was a glaring red flag that something was amiss, or at the very least, that BEN was not on the cusp of becoming a flourishing business worth billions. Yet Foley apparently did nothing to investigate those departures, nor did Foley heighten its scrutiny of BEN as a result of them.

### 6. *Foley Knew or Should Have Known That BEN (and, In Turn, GWG) Faced Significant Issues with Auditors, and That BEN Had Significant Accounting Problems.*

290.    As alleged above, at the outset of its engagement, Foley was fully aware that BEN faced challenges in convincing its then-auditor, Deloitte, that BEN could continue as a going concern. Indeed, the $50 million initial advance on the $65 Million Loan—and the hurried timeline for that transaction—was specifically made to help satisfy Deloitte. Against that backdrop, Foley should have been particularly attuned to issues that BEN (and/or GWG) had with auditors thereafter.

100

291.   Less than three weeks after the $65 Million Loan was approved and just days after Deloitte issued the fiscal year 2018 audited financial statements for BEN, additional troubles with auditors surfaced.  Specifically, on June 20, 2019, Holland informed GWG's full board (including Mason and Chavenson) that GWG's auditor of seven years, Baker Tilly, would be resigning. Holland initially gave two reasons for the departure: (a) that Deloitte would step in; and (b) "[t]hey expressed concern over risks in the combined company."  Mason forwarded the full email chain, including Holland's subsequent dubious explanation of Baker Tilly's concerns, to Foley on June 21, 2019.

292.   A few weeks later, on August 6, 2019, Holland emailed Mason and Chavenson to inform them that Deloitte had informed them the day before that it "w[as] declining to take GWG as a client."  Holland's spin—at odds with what he had said in June regarding Baker Tilly's departure—was that Heppner, Evans, and Cangany "[t]wo months ago" had proactively "decided to contact Whitley Penn, the accounting firm [BEN] originally hired, to see if they would accept GWG as a client" and "started the acceptance process with them then and continued to work with them on client acceptance."  Consequently, Holland further explained, the prior "effort with Whitley Penn paid off and today GWG's audit committee agreed to hire them" as GWG's auditor. Chavenson immediately forwarded Holland's email to Stone.

293.   That GWG's auditor had resigned and the planned successor had declined the engagement in less than two months was yet another red flag known to Foley of possible issues surrounding GWG and BEN.  That was especially true given: (a) the timing of the resignations (*i.e.,* shortly after the May 2019 transactions and the other troubling facts Foley learned in June and August 2019); (b) Foley's knowledge of Deloitte's pre-existing concerns over whether BEN

could continue as a going concern; and (c) contradictory information and assurances given by Holland, Heppner, and Cangany regarding Deloitte's planned role as GWG's auditor.

294.    Moreover, that BEN's auditor, Deloitte, declined the GWG engagement was yet another reason to scrutinize BEN's recently issued audited financial statements.  And those financial statements, which Foley received and reviewed no later than August 2019, reflected that BEN had significant accounting issues.

295.    Specifically, Deloitte's audit opinion, dated June 14, 2019, included an "Emphasis of Matter" explaining that BEN's "financial statements for the period from January 1, 2018 to May 31, 2018 (Predecessor) and as of and for the year ended December 31, 2017 (Predecessor) have been *restated to correct errors*."  (Emphasis added).  Those "errors" were significant; the notes to the financial statements indicate that:

- "[A]s discussed in Note 5, the Company applied the accounting guidance related to business combinations on June 1, 2018. Originally, the Company allocated value to separately identifiable intangible assets related to a trust platform and developed technology. Subsequently, the Company determined that the trust platform did not meet the criteria for separate recognition under the business combinations guidance. For the developed technology, *the Company determined that the initial allocation of value was incorrect and that the value of the developed technology was not significant*."

- An *$882 million* adjustment of the "trust platform" intangible asset, restating it at $0; and

- A *$60.5 million* adjustment to "technology related" intangible assets, reducing the total to a paltry $1.3 million.

(Emphases added).  Those and other accounting reclassifications should have raised significant questions over the value of BEN's business for the reasons alleged below in section E.1.c.

### 7.    *Foley Knew or Should Have Known that BEN's Financial Projections Were Not Reliable.*

296.    Before approving the Essex Transaction and $65 Million Loan in May 2019, Foley

and the Special Committee did not ask for—and BEN did not provide—customary financial projections from which a valuation could be drawn.

297.     Thereafter, the Special Committee, Foley, and the Special Committee's financial advisor, VRC (retained in late June 2019) struggled to obtain coherent and usable financial projections from BEN.  In large part, this was because BEN did not develop conventional financial projections drawn from historical operating results or otherwise tethered to reality.  Instead, BEN developed a convoluted model—dubbed "the Beast"—based on speculative assumptions regarding BEN's addressable market, forecasts about BEN's ability to capture a percentage of that market in the future, academic theory, and statistical simulations.  As alleged in more detail below, the assumptions fed into this model were fundamentally flawed and, in turn, "the Beast" spit out patently absurd results.

298.     At an even more basic level, however, projections derived from "the Beast" were not readily usable because the model assumed that BEN was already fully operational (*i.e.*, that BEN had already obtained and was operating under a charter, that it was well-capitalized, that the underlying alternative asset portfolio was already generating cash, etc.).  Consequently, the projections were not necessarily tied to any given year or BEN's current financial state, but instead were based on some hypothetical starting point in the future, *i.e.*, year zero.

299.     This basic problem was made known to Foley once the Special Committee's financial advisor, VRC, began digging in model in late August 2019 and September 2019.  Specifically, in a September 6, 2019 email responding to VRC's questions about BEN's financial projections (and copying Foley), Evans explained: "please note that the Beast model is a strictly annualized model.  Because BEN was not 'in business' at January 1, 2019, the years represented in the columns on the 'Projections Sum All' tab are better read as 12-month periods, rather than

calendar year ends."  In other words, the projections were all based on a starting point, or year zero, that had not yet occurred because BEN did not yet have its charter.

300.    VRC (copying Foley), immediately questioned the appropriateness of this year zero approach, especially "with respect to the balance sheet."  VRC observed "it would be important to show from a June 30, 2019 balance sheet (beginning balance sheet, adjustments, and the pro forma balance sheet) and have the appropriate flow through in the financial model."  More broadly, VRC requested a follow up meeting "to take a very deep dive through [the] BEN financial model and assumptions," noting that "the model is extremely complicated and difficult to follow."

301.    Weeks later, this was still a gating issue.  On October 8, 2019, Foley emailed BEN's counsel with a list of VRC questions regarding BEN's financial model.  The cover page to the VRC request list (which Foley and the Special Committee helped edit) "note[d] one other critical matter," explaining "it is critical that the BEN model have a current actual balance sheet as a starting point" and "[i]t appears to VRC that this has yet to be done.  A few days later, on October 13, 2019, VRC provided Foley with a streamlined wish list for "the main things [VRC] would need," noting that "[i]t is likely they may not have all of them, but we really need the model."

302.    A month later (on November 12, 2019), BEN finally delivered and presented a somewhat more coherent financial model with projections, which was initially presented to Foley, VRC, and the Special Committee at an onsite meeting at BEN's offices that day.  Following the onsite meeting, the Special Committee met separately that afternoon and discussed, according to the Foley-prepared minutes, "that the BEN team developed and presented a more user friendly updated financial model for the BEN business in lieu of the prior 'beast' model."  Later that evening, BEN forwarded the financial model, which contained five-year projections, to VRC.

303.    Notably, however, BEN itself was unwilling to stand by its revised financial model and projections.  After providing the model to VRC, BEN sent an email a few days later on November 18, 2019, including the following highly unusual disclaimers:

- "Neither [BEN] nor any of its affiliates or representatives . . . makes any express or implied representation or warranty as to the accuracy or completeness of any information directly or indirectly provided to the special committee of GWG and its advisors."

- "Neither [BEN] nor any of its affiliates or representatives undertakes any obligation to update or revise any of the information . . . or to correct any inaccuracies which may become apparent."

- "The Materials contain certain estimates, projections and forward-looking statements that contain substantial risks and uncertainties."

- "The estimates, projections and forward-looking statements . . . may or may not be realized, accurate, or complete, and differences between estimated results and those realized may be material."

- "Such estimates, projections and forward-looking statements are illustrative only."

Given that BEN itself was unwilling to stand behind the reasonableness of the projections, there was no basis for Foley, VRC, and the Special Committee to assume that those projections were reliable and trustworthy.

304.    Beyond the unusual disclaimers, delays and difficulties in obtaining financial projections, there were ample other reasons to doubt the reliability of the projections.  Although the revised financial projections responded to VRC's request and contained a starting balance sheet, the projections still made a fundamental error by implicitly assuming that BEN would obtain its charter and be fully operational on January 1, 2020.  The projections still largely depended on flawed outputs from "the Beast."  And as described below (section E.1), the projections were based on what VRC would later identify as material logic and math errors related to failures to properly

account for equity issuances in the assumed growth.  All of these glaring problems were known or reasonably knowable to Foley, as alleged below.

### 8. *Foley Knew or Should Have Known That the Alternative Asset Portfolio Underlying BEN's Business Had Major Question Marks, Casting Further Doubt on BEN's Business Model and Projections.*

305.    BEN's business model depended on its related trusts acquiring quality—albeit illiquid—alternative assets at a price below the expected cash flows to be generated from those alternative investments.  After all, BEN could only collect the fees and interest—its primary revenue sources—to the extent the underlying assets were performing and generating cash.

306.    During the fourth quarter of 2019, however, Foley learned troubling facts indicating that the underlying assets previously obtained by BEN-related trusts were stale and otherwise distressed assets (casting doubt over BEN's business model and lofty projections).

307.    On October 28, 2019, BEN provided Foley, VRC, and the Special Committee with a table listing each of the underlying fund investments, the description of the fund, the supposed NAV of each fund, and the vintage of each fund.  The listed "vintage" for the vast majority of the funds was the late 1990's and early 2000's, *pre-dating* the financial crisis of 2008-2009.  The stale vintage of those funds called into question whether the reported NAVs were even remotely reflective of the real value—*i.e.*, cash flow—that those assets would generate (which BEN depended on to earn income in the form of interest and fees).

308.    At the time it sent the list of fund investments, BEN did not send a list of NAV info for the portfolio company investments within the underlying alternative asset portfolio.  And Foley, apparently oblivious to the risk that the investment funds may have concentration risks with respect to individual portfolio companies, did not immediately ask for it.

309.    A few weeks later, however, Foley received a list of portfolio company investments after negative publicity surfaced surrounding one of them, Proteus Digital Health ("Proteus").   On

December 10, 2019, Mason forwarded Stone a CNBC article discussing Proteus, noting that she believed that "this is a significant asset in Ben's portfolio." The title of the article indicated that Proteus was "***racing to keep lights on as investors flee***." (Emphasis added). The text of the article was equally alarming, stating:

- "***Proteus has struggled to turn its vision into reality and is now desperate for cash*** after an expected $100 million funding round recently fell through;"

- "To preserve enough money to stay afloat, the company furloughed the majority of its employees;"

- "As 2019 wraps up, Proteus has become the latest Silicon Valley company that's gone from a one-time high flyer, raising a total of over $500 million, ***to deep in crisis mode*** after its partnership with a large pharmaceutical company ***failed to materialize in a way that could justify its valuation***;" and

- "The company has experienced a wave of high-level departures in the past few years," and "[r]aising additional money also became a bigger challenge."

(Emphases added).

310. Two days later, at VRC's request, BEN provided Foley, VRC, and the Special Committee a spreadsheet with portfolio company investments and NAV. The spreadsheet reflected that BEN reported Proteus's NAV at nearly $118.7 million, representing more than a quarter of the purported NAV of the entire alternative asset portfolio. Foley immediately spotted the problem in an email sent later that day (December 12, 2019): "***Does look like Proteus is huge ($120mm mark) and clearly a huge chunk of the Essex Woodlands interest (which is the very dated 2004 VC fund we have asked about - $159mm mark)***." (Emphasis added). Thereafter, VRC asked BEN follow-up questions, and BEN confirmed (copying Foley) that the trusts were significantly exposed, for the full $118.7 million reflected in the spreadsheet.

311.    The next day (December 13, 2019), the Special Committee met to discuss the "recent news reports regarding a large venture capital holding of one of the largest private equity fund holdings" within BEN, and "the potential impact of such reports" on the proposed year-end transactions between GWG and BEN.  According to the Foley-prepared minutes, Foley and the Special Committee "discussed the possible effect of a haircut in valuation of such company" on the proposed transactions, and directed "Mason to follow up with Murray Holland regarding the news reports."

312.    Later that day (December 13, 2019), Holland forwarded an email chain to the Special Committee—who forwarded it to Foley—from BEN's Chief Underwriting Officer, Scott Wilson, relaying recent conversations he had with Essex regarding Proteus.  Essex self-servingly portrayed the situation as "not as dire as the recent CNBC article would imply." Nevertheless, Wilson relayed several points indicative of substantial risk, and that the investment in Proteus was worth nowhere near the $118 million NAV recorded by BEN.  Specifically, Wilson observed:

- "There's a lot going on that needed to be fixed," and "key problems" included "less revenue, more costs than expected, management that has strained relationships with key partners;"

- The $118.7 million NAV reported by Essex was stale and based on a historical funding round;

- Wilson thought that Essex gave "*a flippant and illogical answer*" in using that over-a-year old stale funding round as a basis for not updating the listed valuation for Proteus;

- "Proteus has limited liquidity, and furloughed employees;"

- Proteus had engaged a Chief Restructuring Officer;

- There was a deal on the table to potentially save the company, but if the contemplated "*deal doesn't pan out, that would be a really bad scenario . . .*"

(Emphasis added).  At a minimum, and despite Essex's attempts to put a positive spin on the unfolding disaster, Wilson's notes revealed that it was patently unreasonable for BEN to still record an investment in a plainly distressed company based solely on a dated funding round.  Yet Foley did not sound the alarm bell, nor did it give proper weight to this information when advising the Special Committee on further transactions with BEN, as described below.

313.    Despite Foley's apparent lack of concern, Wilson's notes did not alleviate Chavenson's and Mason's worries regarding Proteus.  On December 14, 2019, Chavenson wrote to Foley:

> [O]ur information about Proteus Digital Health came to us through our Special Committee work. However **both Kathleen and I believe that it is potentially a material matter, given that it is the largest position by far in the BEN portfolio. So if this matter is not brought up in the GWGH BOD meeting on Tuesday, do you think Kathleen and I should bring this up** (maybe it will be discussed in the BEN BOD where we won't be present)? If so, how do you think we should do it and what should we say? Thanks. Dave

(Emphasis added).  Foley did not respond to Chavenson's question or otherwise advise him and Mason to bring the issue to the full GWG board's attention.  And apparently the issue was never brought to the full board's attention; the minutes for the December 17, 2019 GWG board meeting do not reflect any discussion of Proteus.

314.    Nor did Foley advise the Special Committee that substantial questions over Proteus (which eventually filed for bankruptcy in June 2020) and the stale nature of the other assets in the portfolio underpinning BEN's business raised questions about BEN's projections and its business model.  These questions cast doubt over BEN's wildly aggressive—and unrealistic—projections.  Nevertheless, Foley pushed unfair transactions through the Special Committee a few weeks later, despite VRC's significant reservations regarding BEN's business and valuation.

E.    **Due to Foley's Malfeasance, the Special Committee Sends Another $79 Million from GWG to BEN in December 2019.**

315.    Based on what had transpired and all the red flags uncovered during its first six months on the job, it should have been obvious to Foley by December 2019 that its representation of the GWG Special Committee was no ordinary special committee assignment.  And, as alleged below, Foley and the Special Committee were presented with additional, glaring red flags during December 2019.  Foley, the Special Committee, and VRC should have had, and did have, reservations about GWG sending any more money to BEN.

316.    Nevertheless, on December 31, 2019, the Special Committee approved an additional $79.03 million transfer from GWG to BEN that Foley negotiated and blessed. Approximately $69 million of GWG's funds went towards obtaining a non-unitized NPC-A capital account in BCH with an assigned, nominal paper value of $319 million, and the remaining $10 million was to obtain 666,667 common units in BEN LP at a price of $15.00 per unit.   The transaction was memorialized in a Preferred Series A Unit Account and Common Unit Investment Agreement dated December 31, 2019 (the "$79 Million Investment Agreement").

317.    Foley papered over the December 31, 2019 transaction even though it was unsupported by independent financial analysis and even though it knew, or should have known, that the transaction was grossly unfair to GWG.  Notably, the Special Committee's financial advisor, VRC, refused to provide a fairness opinion—or other formal valuation opinion—for the transaction.  As Chad Rucker, VRC's principal on the engagement, later admitted, he had "***major concerns about B[EN]***," he was "***extremely uncomfortable with BEN's financial and valuation policies and BEN's overall financial condition***," and he did not want to expose his firm to risk "when I believe there ***are serious fundamental issues***." (Emphases added).

318.    Nevertheless, at Foley's urging, VRC provided an eleventh-hour PowerPoint presentation of Discussion Materials—with inputs supplied directly by Foley—to try to justify the transaction.  And as a result of Foley's malfeasance, the Special Committee ultimately approved the transaction, despite VRC's refusal to provide a fairness opinion (and despite VRC expressing its many concerns).  The Special Committee did so at an agreed-upon valuation for BEN that was several times higher than all indications of value available to them.

319.    The unjustifiable—and patently unfair—$79 million cash price GWG paid in exchange for speculative BEN equity interests was even more indefensible given the surrounding circumstances.  The $79 million GWG advanced to BEN was *not* intended to be used for purposes directly related to driving BEN's value or launching BEN's business, such as funding "liquidity transactions" in BEN's supposed pipeline, making capital improvements, etc.  Instead, BEN used GWG's funds to pay pre-existing obligations that BEN could not pay on its own due to its operating losses and cash burn, undercapitalization, insolvency, and liquidity challenges.

320.    That BEN needed large sums from GWG to remain afloat was reason alone to doubt why GWG should take BEN equity in exchange for hard cash.  BEN's poor financial condition and highly speculative business plan presented a significant risk that BEN equity might ultimately prove worthless.  Yet under Foley's guiding hand, the Special Committee inexplicably agreed to exchange cash for BEN equity at prices that valued BEN at a whopping $3.5 billion, even though Foley and the Special Committee knew that BEN was worth far less.

321.    Foley's blessing of these patently unfair terms and its utter disregard for the significant valuation issues surrounding BEN were made even worse given the surrounding circumstances.  The $79 million that GWG advanced was not used to kickstart BEN's business,

but rather to repay pre-existing (purported) BEN obligations that Foley, at a minimum, had reason to know inured to Heppner's benefit.

322.     First, $49.8 million of the funds advanced by GWG to BEN in December 2019 were sent to HCLP to pay principal (and fees, including an approximately $960,000 pre-payment penalty), purportedly on the basis that HCLP demanded that payment in exchange for its consent to a purported change of control of BEN that otherwise would have constituted an event of default under the BEN-HCLP First Debt. This supposed change of control payment was not a legitimate demand from a legitimate third-party lender, but rather a pretext orchestrated by Heppner to extract more GWG money for HCLP and, in turn, Heppner's network of affiliates.

323.     The Special Committee's willingness to sign off on the purported $49.8 million "change of control" payment to HCLP stemmed from shocking incompetence on Foley's part. Foley knew or should have known in May 2019 that Heppner was pulling HCLP's strings behind the scenes, as alleged above (section C.2.d). In connection with the December 2019 transaction, as detailed below, Foley: (a) was provided with information relating to HCLP that contradicted the information it received in May 2019; and (b) caught Heppner in a lie regarding supposed negotiations with HCLP. And throughout December 2019, the Special Committee repeatedly emphasized that obtaining clear documentary support for the supposed "change of control" payment was a key due diligence item. Yet Foley, completely asleep at the wheel, ultimately signed off on an *unsigned, draft* letter *with the dollar amount requested left blank* as the sole documentary support for the $49.8 million payment to HCLP.

324.     Moreover, the purported change of control was illusory, as alleged in more detail below. Although GWG obtained a theoretical right to appoint a slim majority of BEN's board (in an organizational document that Foley negotiated), Foley did nothing to prevent Holland, Heppner,

and BEN from usurping that designation right.  Predictably, Holland, Heppner, and BEN ensured that BEN's same preexisting directors were promptly re-appointed to their BEN board seats following the purported change in control.  And the agreement that gave GWG its theoretical right to designate BEN directors was further illusory in that Heppner was given sweeping consent rights, meaning that no substantive transactions could occur at the BEN level without his approval.  In other words, nothing of substance in BEN's control structure changed, yet the supposed change of control gave Heppner and HCLP a pretextual reason to extract a pound of flesh from GWG.

325.    Foley, despite recognizing during those change-of-control-related negotiations that Heppner was trying to maintain control over BEN such that GWG's purported right to appoint BEN board members was illusory, negligently failed to ensure that GWG received substantive and meaningful rights.  Foley's attempts to rationalize the purported benefits to GWG from related financial statement consolidation were baseless.  And GWG later faced significant accounting and securities filing issues in part due to the illusory change of control that Foley negligently negotiated.

326.    Second, in addition to the $49.8 million sent to HCLP (and from there to Heppner's affiliates), over $25 million of the funds advanced by GWG on December 31, 2019, were used to repay BEN's obligations to an entity associated with GWG's founders and prior controlling stockholders, Jon Sabes and Steven Sabes.  This too was an obligation that had little to do with BEN's core business, but rather served Heppner's ends.  The underlying obligation was incurred to finance BEN's purchase of GWG stock to buy out the Sabes brothers in April 2019.  By advancing funds in December 2019 so that BEN could pay $25 million to the Sabes brothers' entity, therefore, GWG essentially provided after-the-fact funding for Heppner and BEN's buyout of GWG's founders.

327.     Under Foley's guidance and as a result of Foley's willingness to paper these transactions, the Special Committee agreed to advance funds so that BEN could satisfy its buy-out obligations to GWG's former controllers, despite concerns over the propriety of advancing funds to BEN for that purpose.  And they did so even though a prior special committee of GWG's old board in April 2019 had insisted that BEN not use GWG funds for such purposes (a restriction which the Chavenson/Mason Special Committee waived due to Foley's bad advice).

328.     At bottom, for all the reasons alleged more fully below, Foley's actions in connection with the December 2019 transaction constituted both gross negligence and knowing participation in Mason's and Chavenson's breaches of the fiduciary duties they owed to GWG. Foley knew that, in light of the surrounding circumstances, Mason breached her duty of care and that Chavenson breached his duties of care and loyalty in approving the December 2019 transaction, yet Foley encouraged them to approve the transaction anyway.  The transaction never would have been approved if not for Foley's misconduct, and had Foley instead properly advised the Special Committee on: (a) the requirements of Delaware law; and/or (b) the many troubling facts that Foley should have known and would have known had it acted competently in conducting even basic due diligence into key issues surrounding the transactions (in particular in regard to valuation issues and Heppner's relationship with HCLP).

   1.     *Foley Ignored Many Glaring "Red Flags" of Valuation Issues and Discrepancies Surrounding BEN, Instead Glossing Over Known Problems—and VRC's Refusal to Provide a Formal Fairness Opinion—and Negotiating Unfair Terms.*

329.     Foley acted negligently and knowingly participated in the Special Committee's breaches of fiduciary duties in negotiating and advising the Special Committee on the BEN equity

interests that GWG received in exchange for the $79 million it transferred to BEN on December 31, 2019.

330.    Foley helped negotiate—and recommended to the Special Committee—a transaction structure in which GWG would pay $69 million in exchange for a nominal $319 million NPC-A account, while agreeing that the Heppner/BEN founder NPC-A account would increase by over $225 million (to $1.25 billion) with them paying nothing (and having previously contributed little, if any, money in exchange for the first $1 billion assigned to their account).  Foley did so even though Foley knew or should have known that the Heppner/BEN founder purported $1 billion NPC-A account was based on an accounting exercise and a wholly unreliable valuation report. And Foley tried to paper over the grossly unfair consideration through after-the-fact Discussion Materials, as VRC refused to provide a fairness opinion or formal valuation opinion due to its many significant concerns.

331.    Moreover, Foley negotiated and recommended that GWG purchase $10 million worth of BEN LP common units at an agreed-upon BEN valuation of $3.5 billion, which Foley knew was several times higher than what could reasonably be supported.  Foley did so despite knowing that common units were potentially "worthless" given the NPC-A overhang, despite VRC raising significant concerns, and based on a known-to-be-flawed draft from BEN's valuation firm that included disclaimers providing that it was not purporting to represent an opinion of value.

        **a.**        **After Delays and Foot-Dragging by BEN, Foley Learned of Problems with BEN's Prior Valuation Reports and Heppner's Supposed NPC-A Account.**

332.    Throughout the fall of 2019, Foley, the Special Committee, and VRC struggled to obtain financial information from BEN that would allow them to make meaningful progress towards financial analysis and valuation work related to certain proposed "SITA" transactions.

115

Indeed, as alleged in more detail below, VRC did not even commence meaningful valuation efforts until the last week of December 2019.

333.    As alleged above, after several months, BEN finally delivered and presented, according to Foley-prepared minutes, "a more user friendly updated financial model for the BEN business in lieu of the prior 'beast' model" on November 12, 2019 (while disclaiming any responsibility for its own model and projections and refusing to stand behind "the accuracy or completeness" of the information provided).  Around the same time, "BEN also introduced – through its modeling - the concept of a proposed recapitalization of BEN and [GWG], whereby the existing NPC-A holder would exchange into L Bonds for the purpose of eliminating the preferred unit 'overhang' at BEN (which the Committee had expressed was an impediment to realizing returns for [GWG] stockholders through BEN)."

334.    According to Foley-drafted minutes, Foley and the Special Committee took the proposal as "a clear effort to respond to the Committee's expressed concern that the existence of the BEN level NPC-A preferred potentially frustrated the ability of [GWG] to achieve meaningful returns from any additional investments into the BEN business through the 'SITA' transactions." (In addition, according to the same Foley-prepared Special Committee minutes, a "significant benefit of the contemplated exchange was the possibility of mitigating potential conflicts between [GWG] and BEN, since affiliates of Mr. Heppner and certain other directors would no longer be holders of BEN equity.")

335.    Upon receiving the new plan, Foley, the Special Committee, and VRC spent the next several weeks primarily focusing on the potential recapitalization transaction.  Ascertaining the fair value of NPC-A equity was a critical issue for the proposed recapitalization.  Foley and VRC, from their review of BEN's audited financial statements for the year ended December 31,

2018, knew that BEN's recorded value of NPC-A equity on its balance sheet (over $1 billion) was the result of a purchase price accounting analysis that had been performed as of May 31, 2018, as a result of a purported change in control of BEN.  Because that accounting exercise purported to allocate fair value to NPC-A equity, a related valuation report, prepared by Ankura Capital Advisors, LLC ("Ankura"), was of critical importance to Foley, the Special Committee, and VRC.

336.    For nearly three weeks during November 2019 and December 2019, Foley and VRC repeatedly tried to obtain a copy of Ankura's May 31, 2018 report from BEN, but BEN made various excuses and Ankura dragged its feet, demanding non-reliance letters with non-standard indemnification terms before sharing its report.

337.    As the delay mounted, Foley and VRC grew increasingly desperate.  On December 10, 2019, VRC followed up with BEN on the status of the non-reliance letters and emphasized that "to meet our deadlines, we need to get this information as soon as possible." The same day, Foley encouraged Chavenson to remind Holland "again that the whole process will be affected if they don't get the report across to us asap," while also noting that BEN's counsel had indicated: "they are now *making revisions to the Ankura report, which is a bit disconcerting*."  (Emphasis added).

338.    Later that day (December 10, 2019), Stone reached out to BEN's in-house legal counsel to check on the status of the Ankura report.  BEN confirmed that Ankura was "doing a 'bringdown' of the report at BEN's request, which was raised over the last few days."  Stone then asked why Ankura's report wasn't "already current *since it was a key piece*" of information for BEN's recently finalized audited financial statements, and likewise asked whether the report "really need[ed] to be updated."  (Emphasis added).  In response, BEN's in-house counsel told Stone: "My understanding is that the accountants ultimately reached their conclusion without the report so it wasn't necessary to be updated and that's about all I know."

339.   The answer that Foley received was nonsensical and was yet another red flag that something was amiss with BEN's claimed valuation.  Just a few days before (on December 6, 2019), VRC had written to BEN (copying Foley) to push back on Ankura's insistence to include indemnification language in a non-reliance letter before sharing its reports, writing:

> [A] material part of [BEN's] financial reporting is dependent upon or derived from the values in the [BEN] valuation report. ***More specifically, the values of the NPC-A are derived from that report***. Although we will not be relying upon the reports directly, we certainly will be relying upon the financial reporting matters including NPC-A values that [BEN] has derived from the report.

(Emphasis added).

340.   As VRC had observed (and Foley knew), BEN's audited financial statements made clear that the billion-dollar NPC-A preferred equity account was based on a dubious purchase price accounting exercise in mid-2018 that Heppner and BEN tried to defend with Ankura's flawed report.  Yet BEN's counsel was now (on December 10, 2019) telling Foley that the value of the NPC-A was ***not*** supported by the Ankura report.  That inconsistency, by itself, was alarming. But even worse, the information relayed to Foley indicated that the Heppner/BEN Founder NPC-A account—which originally had a negative balance yet grew to over $1 billion—was based on accounting gimmicks that lacked underlying substantive support (in that there was no purported basis other than BEN's dubious accounting entries and analysis and the Ankura report to support the supposed value of the NPC-A account).

341.   Eventually, BEN transmitted Ankura's prior May 31, 2018 valuation report to Foley and the Special Committee on December 19, 2019.  The Ankura report itself, however, gave Foley further reason to doubt the reported value of the Heppner/BEN Founder NPC-A account.  Indeed, it confirmed VRC's skepticism that something was broken in Ankura's analysis and BEN's claimed equity value.  VRC immediately wrote to Foley: "exactly what I thought.  ***They did not take into***

***account the equity that had to be issued to produce those values.  I see why they did not want to send***."  (Emphasis added).

342.    Later that afternoon (December 19, 2019), BEN provided a different version of the Ankura report, also dated May 31, 2018, writing in the cover email that the subsequently provided version was the "final version" and that "[t]he values are the same in both reports, the only difference is in the wording."  This second, final version contained the same fundamental error that VRC had identified; that is, the failure to account for dilutive equity issuances and related costs that would be necessary for the growth modeled in BEN's dubious projections.

343.    In addition to that fundamental error identified by VRC, there were other glaring flaws and shortcomings with Ankura's valuation analysis—flaws that should have been obvious to Foley.[13]  The first version of Ankura's report provided to Foley (dated October 10, 2018, but valuing BEN as of May 31, 2018) incorrectly stated that "BEN has obtained the regulatory charters and approvals required," and that BEN "owns a charter in Texas."  In other words, Ankura did not even understand the basic status of BEN's business—BEN did not even submit its application for a trust charter to Texas Department of Banking until late September 2018, well after the valuation date—providing Foley with ample reason to cast aside its analysis as unreliable.

344.    The revised version of Ankura's report as of May 31, 2018 (dated November 12, 2018) provided to Foley, in contrast, stated that "BEN expects to obtain certain regulatory charters and approvals required . . . ."  But eighteen months later, in December 2019, BEN still had not obtained its charters, as Foley was well aware.  And this updated version of Ankura's analysis, which claimed a small probability discount by assuming a 95% probability that BEN would obtain

---

[13] Ankura's report made clear that its analysis was "for financial reporting purposes only and should not be used for . . . any other purpose," and that it relied upon BEN's projections without independent verification.

the charters, inexplicably assigned a slightly higher value ($883 million) to "charters" than the prior version ($882 million), even though total enterprise value remained unchanged.

345.    Moreover, Ankura's analysis—in both versions of its report—was so non-sensical that BEN's auditor (Deloitte) forced BEN to restate its previously issued financial statements as of June 1, 2018, making: (a) an $882 million adjustment to reduce the non-existent intangible asset of charters and "trust platform" to $0; and (b) a $60.5 million reduction to technology-related intangibles.  Thus, whereas Ankura—in both versions of its May 31, 2018 report—had attributed over $950 million of value to intangible assets associated with (non-existent) charters and technology, BEN later restated its financial statements to record only $5 million in intangible assets.  (The $942.5 million-total downward adjustments were offset by a corresponding increase in goodwill).  Those changes were reflected in the restated BEN financial statements that Foley obtained and reviewed in mid-2019.

346.    In short, it should have been obvious to Foley that Ankura's valuation reports were completely unreliable (even setting aside that Ankura had merely taken BEN's dubious projections at face value with no independent verification).  And on top of that, Foley knew or should have known that those reports—and a related purchase price accounting exercise as of May 31, 2018— were the basis for Heppner's and the other BEN founders' purported billion-dollar NPC-A account. Accordingly, Foley knew or should have known by December 19, 2019, that there were major problems with BEN's prior valuation report, and that, in turn, real questions surrounded the purported $1 billion balance of the Heppner/BEN founder NPC-A account.

347.    In turn, given that Heppner's NPC-A account was based on an utterly unreliable Ankura report and accounting smoke and mirrors, Foley knew or should have known that it was unfair for GWG to invest real money in BEN to receive an NPC-A account that would merely

stand *pari passu* with Heppner, who obtained a billion-dollar NPC-A account **while providing little, if any, cash to BEN** (and instead extracting cash from BEN through HCLP). Yet Foley never advised the Special Committee of the inherent unfairness of GWG giving real money for a small fraction of the total NPC-A account of which Heppner enjoyed the vast majority based on accounting gimmicks and unreliable Ankura reports. While Foley correctly noted that investing in BEN LP common units would be even worse for GWG, Foley never advised the Special Committee of the inherent unfairness of GWG making any equity investment in BEN that gave credence to the bogus reported value of the Heppner/BEN Founder NPC-A accounts.

> **b.**   **Foley Continued to Play Along in Trying to Justify Cash Transfers to BEN, as Heppner Changed the Transaction and Colluded with GWG's Outside Corporate Counsel.**

348.   On December 19, 2019, the same day that Foley and VRC were finally provided with Ankura's deeply flawed analysis, the proposed BEN recapitalization transaction suddenly was taken off the table. Specifically, Holland informed Chavenson on December 19, 2019, that the Texas Department of Banking had indicated that "they are not prepared at present to approve the NPCA exchange," as it would involve a change in the capital structure of BEN.

349.   The next day (December 20, 2019), GWG's outside corporate counsel provided Foley and the Special Committee with an updated schedule of proposed year-end transactions. In this new proposal, BEN had increased the amount of funding required, while at the same time moving away from giving GWG any NPC-A equity in exchange for funding. Foley was dismayed, conveying to Chavenson (and Mason):

- "They just made life a lot harder. . . . Brad is essentially saying to us . . . 'you want changes to BEN Management LLC, you are going to pay for it'";

- "[T]he change to GWG now funding as common (vs NPC-A, whether now or upon reversion) is" a "big tactical move;"

- "***This is indeed a big change and particularly not appropriate*** in a circumstance where we have even less certainty that the recap may occur (since the banking commission can/may stop [it]) and ***they have admitted to the GWG common investment largely being worthless without the recap***."

(Emphasis added).

350.    Foley's internal concerns were even more pronounced.  Foley was fully aware of not just the unfairness to GWG of Heppner's gamesmanship, but also that GWG's primary corporate counsel was acting to further BEN's and Heppner's interest.  Stone confided to Babcock that the proposal was so lopsided that it was "[p]retty ***embarrassing for them sending that document out***…"  And Stone immediately reached out to GWG's general corporate counsel to set up a call over the weekend to discuss the "evolution" in the proposal; as Stone explained to Babcock: "***we should talk to [them] about why they are so willingly doing Brad's bidding here***…" (Emphasis added).  Babcock responded: "I almost think we should tell [BEN's counsel] (after talking [to] Dave and Kathleen) that, ***in light of the new changes, we can't approve this.  So either come and talk, or let the rest of the board approve the conflict transactions, because we're done***. If we deliver that early enough, it could be productive."  (Emphasis added).

351.    But Foley did not threaten to withdraw or actually withdraw.  Instead, it plowed forward, figuring out how to help paper the record in an attempt to rationalize the Special Committee sending tens of millions of dollars to BEN.  The Foley-prepared minutes for the December 21, 2019 Special Committee meeting reflect discussions on requirements to move forward, such as the need to "remain firm that any funding would need to occur as a senior BEN security, e.g., in the form of NPC-A preferred, to avoid any subordination to the current NPC-A holders to avoid value from such funding accruing [to] the current NPC-A preferred holders."  But there was no discussion of a potential walkway or refusal to provide additional funding to BEN at year-end.

352.    Instead, the Special Committee concluded the December 21, 2019 committee meeting by noting, according to the Foley-prepared minutes, that one of the "outstanding key items and issues" remained "the evaluation and financial analysis of the consideration to be received by [GWG] from the Committee's financial adviser," VRC.  Over the following week, VRC and Foley interfaced with BEN regarding the fundamental flaws with Ankura's approach and BEN's projections, while VRC went to work, quickly crunching some numbers to provide Foley with something to paper the record.

        **c.**     **Despite Obvious Problems with Ankura's Report and VRC's Concerns and Unwillingness to Provide a Formal Valuation, Foley Negotiated a Transaction that Assigned a $1.25 Billion Value to the Heppner/BEN Founder NPC-A Accounts.**

353.    VRC did not send its initial rough draft of a discounted cash flow valuation of BEN to Foley until December 24, 2019, noting that it was "not for distribution to the committee because it is a rough draft."  Following the Christmas holiday, Foley set up a call to discuss the draft with VRC, then asked if VRC was willing to share it with Chavenson and Mason while noting that it was "very draft…"  At Foley's urging, VRC provided a "very rough draft" of a discounted cash flow model "for illustrative purposes to primarily show . . . the approach," late in the evening of December 26, 2019.  This initial analysis, which unrealistically assumed BEN's business was ready to launch and that its projected growth was achievable, guesstimated total BEN equity of approximately $840 million.

354.    The next day (December 27, 2019), Foley and the Special Committee discussed valuation issues with VRC, with particular focus on the problems with Ankura's analysis and the differences between VRC's approach and Ankura's.  The Special Committee then directed VRC "to follow-up with BEN and Ankura to request such information as soon as possible."

355.    Later that day (December 27, 2019), VRC tried to arrange a call with Ankura.  But BEN responded via email to inform VRC—copying Foley—that "[d]ue to the nature of the relationships and *a professional liability issue*, any questions need to come through BEN and BEN will work with Ankura."  (Emphasis added).  Ankura's refusal to speak directly with VRC due its concerns over "professional liability" was yet another red flag known to Foley, casting further doubt on the reliability of Ankura's analysis.

356.    Nor did Foley otherwise obtain satisfactory answers from Ankura and BEN regarding VRC's serious questions.  Forced to use BEN as an intermediary, VRC asked BEN to "ask" Ankura "how they factor in the preferred in the preferred and common equity issuances needed to acquire new assets in their valuation, particularly the DCF."  But no answer was provided by BEN.

357.    Foley and VRC did not receive an answer to that critical question because there was none.  Indeed, when BEN passed on that question, Ankura responded by prefacing the email: "Reminder – no comment sent to VRC or GWG should be attributed to us."  Ankura then wrote to BEN:

- "With regard to VRC's specific question below, this is a question for Beneficient, not Ankura, as the projections were prepared by Beneficient.  BEN has always represented to Ankura . . . that the model reflects fully funded assumptions . . . ."

- "Further, BEN's representation to us has always been that no additional equity is contemplated in the projections, and that if additional equity were raised, there would be upside in the projections."

- "Beyond that, VRC should be aware that the enterprise value for both our 2018 and 2019 reports was determined by Ankura using the $10 per share transaction price for the Class A common, backsolving for the other securities based on that price.  The [BEN] calculations shown were purely corroborating . . . ."

And Ankura later reiterated to BEN that it refused to speak with VRC based on instruction of counsel, and that Ankura was "willing to answer your questions, not theirs."

358.    Nor did Foley and VRC otherwise get acceptable answers from BEN.  Rather, the discussion that Foley, VRC, and the Special Committee had with BEN and its legal team on Saturday, December 28, 2019, prompted VRC to write to Mason: "[c]omplete craziness."  Mason responded: "I'm speechless."  Following the call, the Special Committee held a meeting, at which (amongst other topics), the Committee, Foley, and VRC "discussed the Ankura Report at length and *determined that the Ankura approach did not appear to take into account the additional funds or equity necessary to support BEN's business*."  (Emphasis added).

359.    Nevertheless, reassured by Foley's guidance, the Special Committee determined at the same meeting that it was still willing to value the existing founders' NPC-A in the $1 billion range.  Shockingly, it did so even though Ankura's fundamentally flawed analysis as of May 31, 2018—which VRC had repeatedly explained was unreliable—was part of the basis for the $1 billion value attributed to the NPC-A in the first place (which had been recorded at *negative* nine figure sums prior to the purchase price accounting exercise).  And Foley and the Special Committee settled on a $1 billion valuation for the NPC-A, even though they knew or should have known that VRC's initial analysis had shown a lower value for *total* BEN equity, that BEN was financially distressed and unable to pay its debts as they matured, and that BEN had faced repeated delays in obtaining its charter.

360.    After Foley and the Special Committee determined that they would propose a valuation of around $1 billion for the NPC-A, despite those and many other problems, the Special Committee's thinking was conveyed by Chavenson to Holland, and by Foley to BEN's counsel.

361.     The next afternoon (Sunday, December 29, 2019), BEN's counsel emailed Heppner, Evans, Holland, and BEN officers to update them on a call he had just had with Foley, writing: "there's still a meaningful gap with the SC between the numbers in the Ankura report and the numbers that they are coming up with." BEN's counsel further indicated that, based on his call with Foley, "we'll be able to get to a number with the SC that's north of $1 billion but I'm not confident the SC will get comfortable with the $1.5B or so reflected in the Ankura report. Chavenson may ultimately agree, but it sounds like Mason may not get there."

362.     Evans then proposed a potential solution to bridge the gap, suggesting a "relative percentage" approach that would result in a write-up of both the assigned paper value attributed to the NPC-A held by BEN's founders (including Heppner via his affiliates) and an assigned paper value to the NPC-A that GWG would obtain in an amount beyond the actual amount contributed by GWG. Heppner approved: "This is the right way to look at the math." BEN's counsel then chimed in:

> I get the sense that **the SC will work with some creative solutions** so long as they can pin the number back to the valuation report they need to rely on.   So I believe Tim [Evans]'s approach of first getting to a percentage based on one (lower) valuation then issuing what we need to get them to that percentage based on a higher valuation would work.

(Emphasis added).  In other words, it was obvious to BEN's counsel based on discussions with Foley that Foley was still willing to play along.  Thereafter, Evans, Heppner, and Holland worked with BEN's team to crunch the numbers and figure out a proposal that was acceptable to Heppner, yet still might pass muster with Foley and the Special Committee.

363.     Once Heppner, Evans, Holland, and BEN had all settled on the approach and analysis, Evans asked Holland to "call Dave [Chavenson] with this." Holland called Chavenson, who dutifully responded late in the evening at 10:21 p.m. on a Sunday (December 29, 2019) by

email setting forth his understanding of the terms dictated by Holland, with the subject line "*Is this what you wanted me to write up?*"  (Emphasis added).

364.    Holland forwarded this email to Evans, who indicated that what Chavenson wrote was "close" but should be "restate[d]" as GWG advancing $79 million to BEN, with $69 million being contributed in exchange for a nominal $319 million NPC-A unit account, and $10 million purchasing BEN LP common units at a price of $15.00 (based on a valuation provided by BEN's valuation firm).  Following the transaction, Evans suggested, the BEN founders' NPC-A would be at made-up $1.25 billion and GWG's NPC-A account would be at a nominal $319 million.

365.    At the Special Committee meeting the next day (December 30, 2019), the basic terms articulated by Evans were presented and discussed, according to the Foley-prepared minutes, as a "compromise proposal pursuant to which the Committee would agree to a valuation of the NPC-A ($1.25 billion) substantially half way between the valuation sought by the [] Committee and BEN's desired valuation ($1.5 billion or higher), provided that [GWG] would receive a capital account credit in an amount equal to approximately $320 million."  With Foley's reassurances, the Special Committee determined that this "compromise approach" was acceptable.

366.    Notably, Foley and the Special Committee approved this transaction even though its financial advisor, VRC, would not expressly support it (and VRC's preliminary analysis reflected a far lower total equity value for BEN, even under unrealistic, BEN-favorable assumptions).  Although VRC had been engaged to provide a fairness opinion, VRC **refused to provide a fairness opinion** for that component of the transaction or the $79 million transfer as a whole.  VRC refused to do so because, as VRC principal Chad Rucker later admitted, he had "**major concerns about B[EN]**," he was "**extremely uncomfortable with BEN's financial and**

*valuation policies and BEN's overall financial condition*," and he did not want to expose his firm to risk "when I believe there are *serious fundamental issues*." (Emphasis added).

367.    Indeed, Rucker was so troubled by the circumstances surrounding GWG's $79 million transfer to BEN on December 31, 2019, in exchange for BEN equity, that he wrote a cautionary email to his fellow VRC principals, just two days later, on January 2, 2020. Specifically, Rucker wrote:

> Ankura had performed several valuations that also been through an audit where Ankura had performed a valuation that was used for a purchase price allocation valuation exercise for a transaction with an affiliated party. . . . *I had not seen the valuation report, but for months had told the Special Committee that there was no way that the current value of the Company was anywhere near $2.6 billion and that something had to be wrong*. The Special Committee members told me that Ankura was a very large and reputable firm, and that their valuation reports had to be reliable.   *After signing the non-reliance letter, I got the reports and the underlying data that was provided to Ankura.   There were significant issues. Essentially they had forgot[ten to] add in all of the working capital needs in their DCF and they did not take into account the billions of equity that would need to be issued to fund the business.   Therefore, [their] value was at least $500 million to $1.0 billion too high*.   The bad thing is that the company had booked all this goodwill, valued the intangible assets with the math errors and issued preferred securities to the affiliated party based on these valuations.   And this was the second and third report in this valuation series and no one caught these errors.   Basically, *the people that outsourced the work never dug into the outsourced work, and more importantly never took a step back and asked does this make sense given the Company's business and stage of development*.   It will be very interesting to see how they solve this problem.   *The CFO acknowledged that there [are] problems, but I think the CFO will try to bury it and hope that the auditors don't raise questions in the future*.

(Emphases added). Rucker previously expressed similar—and additional—concerns to Foley and was particularly adamant about Ankura's and BEN's failures to adequately account for equity issuances and related costs, which Rucker viewed as a "*very very large logic/math mistake*." (Emphasis added).

368.    Nevertheless, and despite VRC's significant concerns, Foley did not advise the Special Committee against approving a transaction that valued the Heppner/BEN founder NPC-A

account at $1.25 billion.  Foley failed to do so even though that value flew in the face of VRC's preliminary analysis, was higher than the value assigned in Ankura's wholly unreliable reports, and resulted in an increase to the Heppner/BEN founder NPC-A account of over $235 million even though Heppner provided nothing.  It was grossly unfair to GWG for GWG to invest $69 million of real cash in exchange for a nominal $319 million NPC-A account when: (a) Heppner *gave nothing* and yet received an increase of over $235 million to his NPC-A account; and (b) the Heppner/BEN founder NPC-A account pre-existing balance of $1+ billion was already largely made up (given Heppner's minimal contribution of sweat equity or other value to BEN).

> **d.  Foley Knew of VRC's Concerns and Unwillingness to Provide a Formal Valuation, But Convinced VRC to Provide "Discussion Materials" Purely to Paper the Record and Try to Cover Up Significant Valuation Issues.**

369.    Although Rucker and VRC refused to offer a formal opinion, Foley nevertheless persuaded Rucker to provide various PowerPoint presentations with "Discussion Materials" and various estimates, so that Foley could better paper the record.  Those presentations were provided in the 24 hours before the transaction closed and were primarily designed to provide cover for a transaction that Foley and the Special Committee had, in effect, already negotiated and agreed to. The PowerPoint presentations that VRC provided were never intended to be, nor did they purport to be, a formal valuation opinion or analysis, however, because VRC was only willing to go so far in providing cover.

370.    VRC circulated the initial "rough draft" of its PowerPoint to the Special Committee late in the day on December 30, 2019.  This draft offered no express opinions of any kind, let alone a specific opinion regarding the market value of the NPC-A unit account in BCH that GWG would receive in exchange for $69 million (of the total $79 million funding).  VRC was only willing to a "estimate a range" of values, while carefully noting that in "estimating a range of values," VRC

had "used financial forecast and data provided by GWG and Beneficient without any independent verification." The initial estimate for the aggregate value of all holders' NPC-A was $608.6 million to $1,015.4 million, a range far below the aggregate $1.57 billion paper value effectively attributed to the NPC-A by Foley and the Special Committee in the transaction.

371. When Chavenson received the draft, the lack of any opinion and direct discussion of the transaction made it unclear to him whether it would provide adequate cover for him. Thus, he asked: "will it support the valuation we in effect agreed to?" VRC replied "[y]es, we are putting together a page that will show that."

372. Later that evening (December 30, 2019), Foley sent an email to VRC, titled "Valuation Issues," that included a list of suggested bullet points for VRC to include: "[f]or the valuation issues." Specifically, Foley dictated the following points for VRC to add to its Discussion Materials:

- "Our understanding is the current NPC is just over $1B: $1.015"

- "We agree to a valuation of the current NPC (net of capital account credit to GWG) of $1.250B," with GWG to be "granted a capital account of $320mm"

- "GWG will have just over 20% of the NPC issuance for liquidation purposes," as "the math is: (70 funded into NPC-A+250 step up)/[1.25 + 320 GWG capital account] = 20.4%"

- "The effective valuation pre-money is approximately $280mm (70/.2 – 70)."

(Foley's instructions included slight rounding errors, as the transaction contemplated a $69 million investment in exchange for a nominal $319 million NPC-A capital account.)

373. VRC then input Foley's points, almost verbatim, into a new slide added to an updated draft that was circulated at 11:13 pm (on December 30, 2019). This draft contained an additional page that made a comparison between: (a) the amount of cash provided by GWG in

exchange for the NPC-A account and (b) the "estimated value" of GWG's NPC-A unit account, which was based on multiplying GWG's proportionate share of the total NPC-A account (approximately 20.4%) times the total NPC-A liquidation value, assumed to be $1.015 million as instructed by Foley (and relayed by BEN earlier that day).

374.   VRC circulated the final version of its PowerPoint presentation mid-afternoon on December 31, 2019, *after* the Special Committee had already formally voted to approve the transaction and after GWG had already wire transferred the $79 million to BEN.

375.   The after-the-fact final version of VRC's presentation, dubbed "Discussion Materials," again contained broad disclaimers regarding the reliability of the BEN-provided projections utilized, indicating that VRC used that data "without any independent verification." The final "Discussion Materials" presentation, once again, did not contain an opinion or purport to opine on fairness or valuation.  Rather, it provided "estimates" of BEN's aggregate equity value, then "used a waterfall analysis to allocate that value to the NPC-A," in aggregate.

376.   In the final presentation, the estimated range of total BEN equity value was $477.6 million to $1.302 billion.  VRC then "estimated waterfall allocated value" to NPC-A using an assumed NPC-A liquidation preference of $1.015 billion.  And then VRC multiplied that figure by GWG's proportionate share of the total NPC-A to arrive at an "estimated value" of $97.3 million to $206.9 million for GWG's NPC-A unit account, comparing it to GWG's $70 million cash transfer in exchange.[14]

377.   This crude comparison—provided at Foley's instruction after the Special Committee had already decided to approve the transaction—was merely intended (and directed by Foley) to paper the file, creating the illusion of process for a transaction that was already *fait*

___
[14] VRC's calculation utilized $70 million, although the cash component exchanged for the NPC-A unit account was slightly over $69 million.

*accompli*.  It was provided in response to Chavenson's question of whether VRC's presentation would "support the valuation we in effect agreed to?"  And the slide comparison was added at Foley's direction.  The Special Committee did not actually rely upon the Discussion Materials VRC provided, as those materials were merely prepared—at Foley's insistence—to help paper the record and cover up that the Special Committee had approved a transaction unfair to GWG without supporting financial or valuation analysis.

378.     Moreover, even if VRC's Discussion Materials had been provided before—rather than after—the Special Committee had approved GWG's transfer of $79 million to BEN, Foley should have: (a) advised the Special Committee that the materials did not support the transaction; and/or (b) known that the Special Committee could not have reasonably relied on those materials in approving the transaction for several reasons.

379.     First, VRC had refused to provide a formal fairness opinion or valuation opinion due to serious concerns regarding BEN and BEN's valuation.  And the Discussion Materials VRC provided did not purport to offer an opinion either, just rough "estimates" that took BEN's unreasonable projections at face value, with no independent verification.

380.     Second, VRC's "estimated waterfall allocated value" did not purport to estimate what a third party in an arms-length transaction would have paid for GWG's NPC-A account.  The market for such an unusual non-unitized security in a financially distressed, speculative business like BEN was highly uncertain.  Moreover, the $1.25 billion largely made up paper value assigned to the NPC-A account associated with the BEN founders was not based on actual value the founders provided, but rather: (a) resulted from purchase price accounting gimmicks and Ankura's related valuation report of May 2018, which attributed over $1 billion to the NPC-A; and (b) the Special Committee's own agreement to increase the assigned paper value by approximately $235

132

million as part of the December 31, 2019 transaction.  Under such circumstances, no third party in the marketplace would have paid anywhere close to $69 million for GWG's non-unitized NPC-A account in BCH.

381.  <u>Third</u>, although the VRC Discussion Materials did some number crunching for a comparable companies analysis, VRC expressly cautioned: "In reviewing the implied PE multiples, it is important to note that substantial equity issuances will be needed by either Beneficient or GWG to acquire assets that would generate the projected 2021 and 2022 net income. Therefore, ***the 2021 and 2022 implied P/E ratios might not be meaningful***."  (Emphasis added). And while VRC also provided an estimate based on 2020 estimated net income, the earnings estimate BEN provided (of $86.9 million) was unvetted by VRC, inconsistent with BEN's history of losses, and based on the flawed assumption that BEN had its trust charter and was ready to launch in early 2020.

382.  <u>Fourth</u>, VRC's discounted cash flow (DCF) calculation was patently unreasonable for several reasons.  Due to VRC's recognition that BEN's financial projections failed to adequately build in the costs of rapidly growing the business, through dilutive equity issuances or otherwise, VRC made adjustments to build in those costs.  The result was that BEN had negative cash flow in years one through five of the projections, with a present value of *negative* $2.4 billion.

| Adjusted Free Cash Flow to the Equity | (5,420,362) | (111,360,635) | (1,336,464,386) | (1,172,102,319) | (1,174,723,660) | (1,833,620,012) |
|---|---|---|---|---|---|---|
| Partial Period Adjustment [1] | 1.00 | | | | | |
| Adjusted Free Cash Flow | (5,420,362) | | | | | |
| Period | 0.500 | 1.500 | 2.500 | 3.500 | 4.500 | 5.500 |
| 25.00% PV Factor | 0.8944 | 0.7155 | 0.5724 | 0.4579 | 0.3664 | 0.2931 |
| Present Value of Net Cash Flows | $  (4,848,120) | $  (79,683,184) | $  (765,036,856) | $  (536,760,415) | $  (430,368,679) | $  (537,408,175) |
| Present Value Sum of Net Cash Flows | $ (2,354,105,428) | | | | | |

VRC then assumed an exit multiple of $12.2 billion in 2024 (10x times 2024E net income of $1.22 billion), applied a present value factor, and then subtracted the negative cash flows in the interim to arrive at an estimated overall DCF valuation:

**Exit Multiple Approach**

| | |
|---|---:|
| 2024E Net Income | $ 1,218,835,025 |
| Exit Multiple | 10.0x |
| Terminal Value | 12,188,350,250 |
| PV Factor | 0.2621 |
| PV of Terminal Value | 3,195,102,888 |
| Sum of Forecasted Cash Flows | (2,354,105,428) |
| **Equity Value** | **$ 840,997,460** |

| | | Exit Multiple | | |
|---|---|---|---|---|
| | | 9.5x | 10.0x | 10.5x |
| Discount Rate | 22.00% | 932,443,435 | 1,117,266,406 | 1,302,089,376 |
| | 25.00% | 681,242,315 | 840,997,460 | 1,000,752,604 |
| | 28.00% | 477,564,122 | 616,129,622 | 754,695,122 |
| **Equity Value Range** | **$ 477,564,122** | | – | **$ 1,302,089,376** |

Setting aside the unreasonableness of BEN's projected growth and future earnings, it was unreasonable and unrealistic to assume that a financial services company like BEN that had five straight years of *negative* cash flow, burning over $5.5 billion in cash, would somehow sell for $12 billion at the end of that period.

383.    Moreover, VRC utilized a 22.0% to 28.0% discount rate in this analysis, based on studies for "mezzanine / bridge / IPO companies."  But much higher discount rates would be appropriate for companies at an earlier stage, which VRC's presentation expressly acknowledged:

| Stage of Development | Stage Description | QED Research[1] | Fin. Entrep. Ventures[2] | Scherlis & Sahlman[3] |
|---|---|---|---|---|
| Start-up or Seed | Early product development. Incomplete management team. Limited expense history. | 50-70% | 50-100% | 50-70% |
| First | Product development continues. Business challenges understood. Cash burn rate history. | 40-60% | 40-60% | 40-60% |
| Second | Product development complete, management team is likely in place. Have shipped initial products and getting feedback from market. | 35-50% | 30-40% | 30-50% |
| Third | Sales growth is rapid, may have achieved profitability. Lenders may finance fixed assets and receivables. | 30-50% | na | na |
| Fourth | Sales growth and profit margins have reduced much of the investment risk. May seek to use debt financing to reduce equity dilution. | 30-40% | 20-30% | na |
| Bridge / Mezzanine / IPO | Exit, via IPO or sale, and timing are likely known. Need capital to sustain rapid growth. | 25-35% | 20-30% | 20-35% |

Foley knew or should have known that BEN was more fairly classified as a "First" stage company (at best), warranting a 40-60% discount rate, because BEN faced challenges in obtaining its trust charter, had failed to conduct any meaningful liquidity transactions during 2019, was still developing its systems, and had sustained significant cash burn.

384.    Fifth, and finally, VRC's calculations depended on information provided by BEN and BEN's projections.  But BEN's projections erroneously assumed that the trust charter had already been obtained and the business was immediately ready to launch in the first year of the projections, *i.e.,* that there was no risk of delay or in failing to obtain the charter altogether.  BEN's projections were wildly unrealistic for the reasons alleged elsewhere herein.  And VRC's allocation analysis was based on a liquidation preference for the NPC-A of $1.015 billion supplied by BEN, whereas Heppner apparently believed that the liquidation preference for the NPC-A was only around $200 million at the time.

385.    Accordingly, VRC's PowerPoint "Discussion Materials," circulated at the eleventh hour, in no way justified GWG sending $69 million to BEN in exchange for a NPC-A account. While the NPC-A non-unitized account that GWG received was assigned a paper value of $319 million, that paper value bore no relation to what a third-party would have paid for that interest in an arm's-length transaction in the marketplace.

135

386.    Foley and the Special Committee undertook no effort whatsoever to market check the value of the NPC-A account.  The sum total of their market analysis consisted of discussions with VRC, which consistently sounded the alarm and raised concerns about BEN, and procuring the after-the-fact VRC Discussion Materials that addressed the NPC-A unit account.  In short, Foley knew that the Special Committee approved an equity investment that made no sense and was not reasonably supported by any financial or valuation analysis by VRC (or otherwise).  But rather than advise the Special Committee that they should not approve the transaction under the circumstances and/or advise Mason and Chavenson that approving the transaction was inconsistent with GWG's best interests and the requirements of Delaware law, Foley focused its efforts on covering up their fiduciary duty of care breaches.

        **e.**      **Foley Disregarded VRC's Significant Concerns Because Foley Never Cared About the Substance of the Transactions or Fairness to GWG, Only Papering the Record to Give BEN, Heppner, and Holland What They Wanted (While Trying to Protect the Transaction From Attack).**

387.    Foley's utter disregard of VRC's serious concerns over BEN's business and valuation was a direct byproduct of Foley's improper focus on papering the record instead of looking out for GWG's best interests.

388.    The Special Committee did not retain VRC until late June 2019, after the Special Committee had already approved the Essex Transaction and $65 Million Loan in May 2019 and after several red flags surrounding BEN were known to Foley.  The circumstances known to Foley should have heightened the need for ensuring that the Special Committee's efforts were supported by vigorous, thorough analysis from a financial advisor.

389.    Foley, however, took the opposite approach.  Foley, apparently already aware of potential issues surrounding BEN, negotiated VRC's engagement letter in late June 2019 to provide as much flexibility as possible—recognizing from the outset that a conventional fairness

opinion might not be supportable.  Upon receiving Foley's proposed edits to VRC's engagement letter, VRC's principal on the engagement, Rucker, wrote: "we can only opine on economic based issues with terms with respect to fairness opinions," and only provide "a fairness opinion from a financial point of view."  Stone responded later that evening, indicating that he would give Rucker a call because Stone "want[ed] to ensure we are on the same page *as to the type of written analysis the Committee may want/need short of an opinion*."  (Emphasis added).  In other words, Stone wanted to ensure that VRC would give them something to help rationalize unfair transactions even if VRC refused to opine that the transaction was fair from a financial point of view (which did happen several months later in December 2019).

390.    Once VRC's efforts got under way in late July 2019, Evans reached out to Rucker and "*gave him a low key speech* about us all *being creative about how [he] gets info and that the conventional lists/expectations won't work here*."  (Emphasis added).  Thus, Foley recognized that obtaining information from BEN would be difficult.   But rather than view that as a cause for concern, Foley instead instructed VRC to make do with what it could get, so as to avoid rocking the boat.  Again, Foley remained focused on facilitating approval of transfers from GWG to BEN, not on fulsome, rigorous financial analysis to ensure that GWG's interests were protected.

391.    Foley continued this pattern of behavior in late August 2019, when BEN's finance team was finally ready to meet with VRC and go over BEN's financial model, dubbed "the Beast." On August 25, 2019, VRC sent an email with a detailed list of questions regarding "the Beast," and asked Evans whether it would be okay for VRC to record the audio from the detailed modeling discussion to refer to later.  Foley interjected, with Stone writing that the meeting should not be recorded because "*there is more risk to us (Special Committee, Board) to create a verbatim record here*."  (Emphasis added).  In turn, while acknowledging "*that a recording would be*

*helpful for [VRC] for review/analytical purposes*," Stone nevertheless instructed VRC to just take notes instead.  (Emphasis added).  Yet again, Foley remained focused on papering the record, not objective financial analysis.

392.     Thereafter, Foley's improper approach permeated the remainder of VRC's efforts, including those in December 2019.  Accordingly, Foley's disregard of VRC's concerns in December 2019 and glaring problems surrounding BEN's business and valuation were not merely a careless oversight.  Foley simply did not care; Foley's focus remained on pushing transactions through, instead of ensuring objective financial analysis or advising the Special Committee to act consistently with GWG's best interests.

> **f.      Foley Negotiated and Recommended an Indefensible Purchase of BEN Common Units for $10 Million, at an Agreed-Upon Price of $15 Per Unit and $3.5 Billion Valuation for BEN.**

393.     For all of the reasons alleged above and elsewhere herein, Foley acted negligently in advising the Special Committee in connection with the $69 million transfer of GWG funds in exchange for a nominal $319 million NPC-A account, and knowingly participated in the Special Committee's breaches of fiduciary duties in approving that grossly unfair transaction.  But Foley's malfeasance was even worse in connection with the simultaneous transfer of $10 million of GWG funds in exchange for 666,667 BEN LP common units (at a price of $15.00 per unit).

394.     Foley and the Special Committee performed and obtained no independent analysis whatsoever, from VRC or otherwise, regarding the market value of the 666,667 BEN LP common units that GWG agreed to purchase for $15.00 per unit.  Shockingly, Foley agreed to that purchase price, as well as an overall equity of BEN of ***$3.5 billion,*** during and after the closing call held on December 31, 2019, even though Foley had previously recognized that common units were potentially "worthless" given the NPC-A overhang in BEN's capital structure, and even though

VRC had specifically "recommend[ed] that any new funding only occur with interest[s] that are very senior or secured in B[EN]'s capital structure."

395.    The $15.00 per unit price paid for BEN LP common units was grossly unfair to GWG.  It implied a total BEN equity value at least 3-4 times higher than what VRC's Discussion Materials supported, even setting aside that VRC's presentation itself was wildly optimistic for the reasons alleged above in section E.1.d.  Moreover, almost no value could be expected from BEN LP common units given that: (a) BEN LP was merely a holding company for BCH: (b) NPC-A holders at BCH had preferential distribution rights and claims on profits of its operating subsidiaries; and (c) the NPC-A account at BCH held a substantial liquidation preference (which BEN told the Special Committee and its advisors was $1.015 billion).

396.    For weeks, Foley and the Special Committee had discussed the challenges posed by the NPC-A "overhang" in BEN's capital stack and had tried to negotiate a recapitalization transaction with BEN that would eliminate it.  Indeed, eliminating known problems posed by the NPC-A "overhang" was a frequent discussion at Special Committee meetings, as memorialized in the Foley-prepared minutes for those meetings.  For example:

- The "elimination of the NPC-A 'overhang'" was discussed as a benefit of capital structure improvement at a December 4, 2019 Special Committee meeting;

- During a December 10, 2019 meeting, the Special Committee discussed potential benefits, "in particular the elimination of the NPC-A 'overhang' which" would "significantly improve the chance that the common stockholders of [GWG] will achieve value from the initial deal between [GWG] and the BEN Group" and "eliminate or mitigate conflicts of interest arising from [GWG] and BEN which was hampering governance;" and

- During a December 17, 2019 meeting, the Special Committee discussed "the desirability of pursuing consideration in the form of preferred equity or debt of BCH rather than common units of BEN" for any year-end funding.

397.    And even after learning that the proposed recapitalization had been delayed indefinitely, Foley and the Special Committee determined that it "***would remain firm that any funding would need to occur as a senior BEN security***, e.g., in the form of NPC-A preferred, to avoid any subordination to the current NPC-A holders [and] to avoid value from such funding accruing [to] the current NPC-A preferred holders."  (Emphasis added).  The Committee likewise discussed on December 21, 2019, that "***any cash funding would occur in the form of a security that would be preferred in the BEN Group capital structure for protection*** and to enhance returns."  (Emphasis added).  And during a subsequent meeting held on December 23, 2019, Foley and the Special Committee again "re-emphasized the need for any funding to be effected in the form of NPC-A preferred (pari passu with the existing preferred holders, including affiliates of Mr. Heppner)," and discussed that it would be "***problematic***" if GWG were to "***receive common units as consideration to provide***" funding.  (Emphasis Added).

398.    Nevertheless, once BEN eventually indicated that it would exchange NPC-A for the majority of the funding, Foley and the Special Committee changed their tune beginning on December 28, 2019, and expressed a willingness to accept a "small amount of consideration in the form of common units."  Thus, much like the Essex Transaction in May 2019, Foley and the Special Committee agreed to fund $10 million to BEN in exchange for common units—at a grossly inflated price—largely because $10 million was merely a "small amount," in their warped view.

399.    Even worse, the final price of $15.00 per unit was not the subject of rigorous or meaningful negotiations, but rather was raised and agreed upon during the closing call between Foley and BEN's counsel on December 31, 2019.  Moreover, that price was based on expectations—as relayed by BEN—of where Ankura's final valuation would land.  Given the many known problems with Ankura's analysis, there was no legitimate reason for Foley to

accept—and recommend to the Special Committee—a unit price based on Ankura's forthcoming valuation of total BEN equity, thereby casting aside VRC's analysis and significant concerns and ignoring the myriad of red flags surrounding Ankura.

400.    On top of that, the $15.00 price and agreed-upon $3.5 billion valuation for BEN was not based on what Ankura's analysis would actually support, but rather stemmed from Foley's negligence (and Foley allowing itself to be played by BEN).  Around the same time as the closing call, BEN's counsel sent an email to Foley on December 31, 2019, to "confirm" the final price of $15 per unit equating to an agreed-upon "overall equity value of $3.5B," noting that it was "likely that the final Ankura report will show a higher overall equity valuation (the current draft Ankura report . . . shows a higher overall equity valuation)."

401.    But Foley had ample reason to question the veracity of the representations received from BEN's counsel.  Just four days before (on December 27, 2019), Foley received a draft Ankura analysis reflecting total BEN equity value of $2.29 billion (suggesting common unit price of around $10 per unit).  It was highly suspect—and unlikely—that Ankura's analysis was now supposedly coming in *50% higher*, just a few days later.  And that massive change was a red flag that BEN was not being forthright in describing where Ankura's analysis was heading.

402.    In fact, not even Ankura—despite the many flaws in its analysis—was willing to support either a $3.5 billion total BEN equity value or a $15 per unit price for BEN common units.  Indeed, Ankura had told BEN (just days before) that Ankura "will not be able to support" a $3.5 billion valuation because it represented a 54% increase from the earlier valuations and was "driven almost entirely by the significant increase in [BEN's] terminal year projection."

403.    Because Ankura was unwilling to support those values, Heppner, Evans, and BEN's CFO worked with Ankura to procure a sensitivity analysis at different unit prices as the input (to

ascertain total BEN equity value), not as an output.  A $15.00 per unit price—which spit out a $4 billion total equity value for BEN—was merely one iteration of a "sensitivity analysis" that Ankura had "executed extremely quickly," at the direction of BEN's CFO (in consultation with Heppner and Evans).

404.    Ankura never intended for this "sensitivity analysis" to be a statement of its opinion.  Indeed, Ankura explained in its cover email to BEN that it "***included the disclaimer that this is for illustration purposes only . . . so as not to imply that [this] is Ankura's opinion of Fair Value***" because "[w]e don't want to interfere with the negotiating process by suggesting" what the units were worth.  (Emphasis added).

405.    On December 31, 2019, BEN's counsel forwarded the Ankura sensitivity analysis to Foley, characterizing it as "the report referenced in [his] prior email."  On its face, however, the document provided that it was a "Draft for Discussion Purposes" and "***only for illustration purpose[s] and does not represent Ankura['s] opinion***."  Nevertheless, it was apparently good enough for Foley; Foley asked no follow-up questions.

406.    In short, Foley advised the Special Committee on and negotiated the purchase of $10 million of BEN LP common units in a transaction that assigned a $3.5 billion total equity valuation to BEN, even though:

- The only purported support for that figure was a document prepared as part of a sensitivity analysis that, on its face, provided it was a "***Draft for Discussion Purposes***" and "***only for illustration purpose[s] and does not represent Ankura['s] opinion,***"

- Foley should have known that Ankura was not actually willing to support a $3.5 billion valuation for BEN (given that the Ankura draft Foley received just four days before reflected a $2.3 billion valuation);

- Foley knew that VRC viewed Ankura's approach as fundamentally flawed and containing "***very very, large math/logic***" errors;

- Foley knew or should have known of many other reasons why Ankura's analysis and approach was unreliable;

- Foley knew that VRC, even using unrealistic, BEN-favorable assumptions, pegged BEN's total equity value at around $800 million;

- Foley knew that BEN was financially distressed, was unable to pay its debts as they came due, and had struggled to obtain its charter;

- Foley knew that BEN had no significant assets of its own (as reflected in the purchase price accounting exercise and restated financial statements allocating almost all value to goodwill);

- Foley knew that BEN LP common units were essentially "***worthless***" absent a recapitalization of BEN, due to the substantial "overhang" of NPC-A in BEN's capital stack; and

- Foley knew of significant problems with BEN's business model: in particular the alternative assets that trusts affiliated with BEN had previously obtained, as alleged above in section D.8.

The price negotiated by Foley and approved by the Special Committee—due to Foley's bad advice and knowing participation in their breaches of their fiduciary duty of care—was indefensible.

### 2. *Foley Was Grossly Negligent in Connection with HCLP and the $49.8 Million "Change of Control" Payment That BEN Made to HCLP With Funds Advanced by GWG.*

407.    The gross unfairness of GWG transferring $79 million to BEN in exchange for BEN equity interests was made worse by BEN's subsequent use of the proceeds. Almost none of the proceeds were used by BEN to grow its business. To add insult to injury, $49.8 million went from BEN to HCLP and, from there, through Highland Consolidated and on to Heppner's network of trusts and affiliated entities. The Special Committee never would have approved sending GWG funds to BEN had they known how the proceeds would ultimately be used, or that HCLP was merely a front that Heppner utilized to line his pockets.

408.    In effect, the Special Committee was duped by Heppner. But Heppner got away with it because Foley wholly failed to do its job in looking out for GWG's interests or even

conducting the most basic, rudimentary due diligence.  Because Foley was merely trying to go through the motions and paper the file to justify BEN's request for funding, Foley ignored myriad red flags surrounding HCLP.  Foley acted grossly negligently in advising the Special Committee that sending $49.8 million to BEN to pay to HCLP as a purported "change of control" payment was warranted or appropriate, despite being presented with red flags calling into question whether HCLP's demand was a farce and/or whether the funds GWG transferred would inure to Heppner's benefit.

### a.    Foley Was Aware of Red Flags Surrounding Heppner's Relationship with HCLP.

409.    In connection with the May 2019 transactions, Foley was presented with reasons to suspect that Heppner exercised de facto control over HCLP.  As alleged in more detail above in section C.2.d:

- Foley knew that BHI, the purported lender on the BEN-HCLP Second Debt, was affiliated with and controlled by Heppner;

- Foley knew that BHI and HCLP used the same counsel in negotiating intercreditor agreements with GWG, which were substantially similar (reflecting that BHI and HCLP were under common control—Heppner);

- Foley knew or should have known that the same person prepared "loan statements" for BHI and HCLP, both of which also shared BEN's address, further reflecting that BHI and HCLP were under common control (*i.e.,* under Heppner's control);

- Foley knew that HCLP had agreed to waive defaults for BEN or modify loan documents to avoid defaults;

- Foley knew or should have known—upon receiving draft BEN financial statements—that HCLP was a related party, that it was owned by entities affiliated with Heppner, and that the original debt to HCLP was supposedly related to prior transactions between Heppner and BEN; and

- Foley knew or should have known that loan documents for HCLP reflected that HCLP's address was BEN's address, and that the signatory for HCLP was a BEN officer (Jeff Hinkle).

144

Under those circumstances, Foley was on inquiry notice that HCLP was not a legitimate, third-party lender but was instead related to Heppner.

410.    Thereafter, Foley was presented with additional facts casting further doubt on whether HCLP was truly an arm's-length, third-party lender.  In its role as counsel advising the GWG Special Committee on the advisability of making equity investments in BEN, Foley should have reviewed BEN's audited financial statements (especially given the many other red flags known to Foley regarding BEN's business).  BEN's audited financial statements were issued in June 2019 and made available to Foley: (a) indirectly, when publicly filed as attachments to GWG's Form 10-K in July 2019 and again as attachments to GWG's Form 8-K/A in August 2019; and (b) directly, when specifically provided to Foley in an electronic data room no later than August 23, 2019.

411.    A review of BEN's financial statements, the most basic and rudimentary of due diligence items for the contemplated transactions, would have raised additional flags that HCLP was not wholly independent of BEN and Heppner.  Note 15 to the Deloitte-audited BEN financial statements specifically identifies HCLP and Highland Consolidated as "***Related Parties***" of BEN, further explaining that HCLP "is an indirect subsidiary of [Highland Consolidated], ***the limited partners of which includes trusts for which BEN's CEO and founder [i.e., Heppner] serves as investment trustee*** or which he or his family are in the class of possible beneficiaries."  (Emphases added).

412.    Moreover, Note 11 to the BEN financial statements specifically characterized BEN's debt to HCLP as "Debt Due to Related Parties," and further provided:

- "On September 1, 2017, the Company, through its BCC subsidiary, entered into a loan agreement ('New Loan Agreement') with HCLP Nominees, L.L.C. (see Note 15 for further discussion of this entity) to refinance its prior existing loans ("Old Loan Agreements") and ***other payables with our founder or related***

*entities formed by our founder*. The aggregate principal amount refinanced by the Company, including $20.2 million related to the purchase of certain assets, totaled $141.0 million on a total advance commitment amount of $146.0 million."

- "The Old Loan Agreements include a series of six loan agreements issued by entities associated with BEN's founder between 2005 and 2007... The balance of the Old Loan Agreements and other payables to the founder were refinanced into the New Loan Agreement on September 1, 2017."

- "[A]ll interest that was paid in kind from December 16, 2018 to May 15, 2019 was paid in June 2019 and regular monthly interest payments will commence subsequent to this payment."  (It was a red flag that BEN started making interest payments immediately after it received the first $50 million advance from GWG on the $65 Million Loan).

- "The New Loan Agreement had a scheduled maturity of December 31, 2018. In December 2018, [HCLP] approved the extension of the maturity date to March 31, 2019, and then in March 2019, the maturity was extended to June 30, 2020 but allows for further extensions at the discretion of [HCLP] if requested by BEN through March 31, 2022."

Based on those disclosures, there was reason to suspect that Heppner had influence over HCLP's relationship with BEN (which Foley itself later characterized as "cozy").

413.   When considered in conjunction with the other information known to Foley, the Deloitte-audited BEN financial statements also should have raised concerns over the BEN-HCLP Second Debt, originally owed to BHI (and then later assigned to HCLP).  Note 11 provided:

- "In December 2018... Beneficient Holdings, Inc. ("BHI"), *a related party to our founder*, agreed to certain conditions related to its holding of NPC Series A Subclass 1 Units of BCH in exchange for obtaining a right to receive early liquidity. Under the then existing governing documents, BHI had an early liquidity option to convert $72 million of NPC Series A Subclass 1 Units of BCH into Common Units of BEN. BEN agreed instead to provide the early liquidity in the form of a note issued by BCC."

- "On December 28, 2018, BEN and BHI entered into a promissory note for $72 million in return for the relinquishment by BHI of $72 million of NPC Series A Subclass 1 Units of BCH. The promissory note...was due on March 31, 2019."

- "The promissory note required that within 30 days of execution or such later date as BHI may agree that the parties enter into a credit agreement

146

evidencing a secured credit facility consistent with the terms and provisions of the New Loan Agreement."

- "A credit agreement replacing the promissory note was executed in May 2019."  (This was another red flag for Foley because the credit agreement between BEN and BHI *was not executed* until Foley was already in negotiations regarding an intercreditor agreement with BHI).

- "Prior to the execution of the credit agreement, BHI approved the extension of the maturity date of this debt to June 30, 2020."

Those disclosures cast doubt over the legitimacy of the BEN-HCLP Second Debt and, at a minimum, revealed that it was not the result of an arm's-length lending relationship, that the supposed debt had been incurred in a non-cash transaction, and that Heppner's main holding entity in BEN was the supposed lender.

414.    In short, the notes to BEN's audited financial statements—in conjunction with other information Foley should have known–provided reason to suspect that HCLP was a related party to BEN, that HCLP was affiliated with Heppner's entities and trusts, that Heppner stood behind HCLP, and that BEN's supposed debts to HCLP and BHI were not given in exchange for cash received but rather for convoluted transactions with Heppner.   Collectively, those and other circumstances known or reasonably knowable by Foley should have led Foley to question whether payments made to HCLP might inure to Heppner's ultimate benefit.

415.    Foley reviewed the audited BEN financial statements it received. And Foley apparently recognized that trusts or entities related to Heppner had at least some interest in HCLP. Specifically, in an August 25, 2019 email, Stone answered Mason's questions regarding whether Heppner held any interest in BEN through HCLP, writing: "I believe Highland is solely a debt holder but that one or more of Brad's affiliated trusts is an LP of Highland. *In other words, affiliated trusts of Brad are owners of debt (indirectly) and preferred*."  (Emphasis added).

416.     Accordingly, even prior to the December 2019 transaction, Foley had reason to be aware of the potential risk that if GWG sent money to BEN, then payments made by BEN to HCLP might ultimately flow to Heppner's affiliated trusts and entities. Yet Foley did nothing to mitigate against this risk in conducting due diligence, or in negotiating the year-end transactions in December 2019.

###### b.     Foley Should Have Known of Heppner's Reshuffling of HCLP During the Fall of 2019 and Noticed Inconsistencies in Representations Subsequently Made to Foley.

417.     As alleged above, once Stein, Glaser, and Zimmerman (amongst others) started asking questions about related-party payments from BEN, Heppner attempted to cover his tracks to disguise his relationship with HCLP and his obvious interest in BEN's purported debts to HCLP. First, on or after August 23, 2019, Heppner caused BHI to assign the $72 million BEN-HCLP Second Debt to HCLP as a capital contribution (with BHI receiving a 34% membership interest in HCLP) through an amended HCLP operating agreement backdated to April 1, 2019. Second, from August 2019 through October 2019, Heppner executed various written consents that changed the entities that directly or indirectly controlled HCLP. Third, Heppner replaced Martens with David Wickline, a former colleague of Heppner from his Goldman Sachs days, as the human manager of those entities in early October 2019. Fourth, and finally, Heppner procured—and helped edit—a materially misleading letter from Banowsky that contained several material misrepresentations and omissions regarding Heppner's control and affiliation with HCLP.

418.     All those activities occurred during Foley's watch as Special Committee counsel. Had Foley conducted reasonable due diligence efforts to explore HCLP's relationship with Heppner (as it should have done in investigating the legitimacy of HCLP's supposed demand for a $40+ million change of control payment in December 2019), Foley would have come across Heppner's attempts to cover his tracks raising additional red flags (at a minimum) and potentially

leading to the unraveling of Heppner's entire HCLP-related scheme.  Indeed, Foley was uniquely positioned to spot the glaring inconsistencies between Heppner's attempted cover-up and the actual facts (many of which were previously known or reasonably knowable to Foley).

419.   In particular, Foley knew that the $72 million BEN-HCLP Second Debt had originally been owed to BHI, an affiliate of Heppner.  In May 2019, Foley was told that the risk of BHI sweeping proceeds of the $65 Million Loan were minimal because BHI was "an affiliate of BEN controlled by Mr. Heppner."  Moreover, Foley negotiated a separate intercreditor agreement with BHI regarding that debt in May 2019.  And Foley subsequently received BEN's audited financial statements, which further disclosed the purported incurrence of the $72 million debt to BHI and BHI's affiliation with Heppner.

420.   Given that pre-existing knowledge, BHI's disappearance from the scene in December 2019 should have raised questions.  Had Foley asked about BHI's status as a senior lender, or even simply asked for a copy of HCLP's operating agreement, Foley would have seen that BHI assigned the loan to HCLP in exchange for a 34% membership interest (meaning that Heppner held an indirect 34% interest in HCLP through BHI, his main holding entity for BEN).  Separate and apart from Heppner's ties to other entities higher up in HCLP's organizational chain, Heppner's indirect (through BHI) 34% interest alone—which would have been revealed had Foley asked for and been provided with HCLP's amended operating agreement—would have been reason for Foley to realize that Heppner would receive—indirectly—an economic benefit from any payments made by BEN to HCLP.

421.   Similarly, Foley was uniquely positioned to observe HCLP's change in managers (which Heppner pushed through to make HCLP seem more legitimate).  In May 2019, Foley was provided with a flow chart indicating that Hinkle was HCLP's manager (via Highland Counselors)

and that Keith Martens "exercises ultimate control over HCLP" because "he has the authority to remove and replace Highland Counselors" as manager, and that "[n]o party has the ability to remove and replace Martens as the manager of Highland Consolidated Investments." Moreover, Martens signed the Intercreditor Agreement dated May 31, 2019, on behalf of HCLP, which Foley negotiated on behalf of GWG. Yet in December 2019, Foley was told that Wickline was HCLP's manager, without any explanation for the change. That managerial change should have sparked questions, especially given the inconsistency with representations made to Foley in May 2019.

422.   Had Foley inquired into the circumstances surrounding HCLP's change in managers and asked for organizational documents reflecting those changes, such documents would have revealed that Heppner had played a role because such managerial changes were made by written consents signed by Heppner, as alleged above. Yet Foley apparently never asked to see such documents, asked any questions regarding the change in manager, or apparently even realized that HCLP's manager had changed.

423.   Instead, Foley took subsequent representations regarding Heppner's relationship with HCLP at face value, despite glaring inconsistencies with information previously relayed to Foley (and without doing any other diligence besides going through the motions on calls with HCLP's counsel).

424.   Upon first learning of a potential payment to HCLP in mid-November 2019, Foley reached out to Evans to request a memo regarding HCLP that Evans had "referenced on the BEN debt (trust relationships, Brad's powers etc.)." Evans replied that he did not have a copy of the memo, but suggested that Foley instead speak with Banowsky, and provided his contact information.

425.   The next day (Friday, November 15, 2019), Foley connected with Banowsky.  Foley relayed the substance of that call to the Special Committee during a meeting the following Monday (according to the Foley-prepared minutes), as follows:

> Foley discussed that, as part of its due diligence efforts, it had initiated a call the prior Friday with Bill Banowsky of the Thompson Knight firm who represents BEN's senior lender, HCLP . . . . Foley *explained that the purpose was to gain comfort that the senior lender was unaffiliated with BEN (i.e., not controlled by Mr. Heppner or other affiliates)* – such lack of affiliation had been previously represented to the Committee by BEN management – and that *Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender, which was an important issue to confirm for the Committee*.  Foley explained that Mr. Banowsky explained the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates) and represented that Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender and *that unequivocally no debt repayment would be received by Mr. Heppner or his affiliates*.

(Emphases added).  Banowsky's representations were untrue.  Heppner had exercised de facto control over HCLP, twice swapping out its managers in 2019.  And almost all sums transferred from BEN to HCLP were quickly transferred out of HCLP's bank account through various intermediaries and on to Heppner's affiliates.  Foley did not realize that Banowsky—in coordination with Heppner—was lying to Foley and the Special Committee, however, because Foley failed to conduct reasonable due diligence and scrutinize the transaction.

426.   Had Foley reasonably tried to conduct due diligence and scrutinize the transaction, the falsity of those representations would have come to light in that: (a) Heppner, through BHI, had assigned the BEN-HCLP Second Debt to HCLP in exchange for a 34% interest in HCLP; and (b) Heppner had instituted multiple manager changes.

427.   But conducting reasonable, good faith due diligence and scrutinizing the relationship was not the purpose of Foley's call; Foley was merely going through the motions to paper the file.  That was obvious to Banowsky, who reported back to Heppner (after speaking with

Foley):  "Call is over.  ***Very high level . . . . [Foley] did not push me for information*** like Glen[n] West did.  ***Very much sounded like a 'check the box' call***. . . .They wanted to know more details about the Harmon trust, but I told them I [did] not [know] them and the Harmon's valued their financial privacy like most wealthy people.  ***They did not ask for any documents or anything in writing from me***."  (Emphasis added).

428.    Later in December 2019, Foley held a subsequent due diligence call with Glenn West, who had been the recipient of the materially misleading October 5, 2019 memorandum that Banowsky and Heppner wrote regarding HCLP's connections to Heppner.  But once again, Foley did not ask for, or receive, the memorandum.

429.    Had Foley done so, that memorandum would have raised additional red flags given discrepancies between the October 5, 2019 memorandum provided to West and information known or reasonably knowable to Foley.  For example, the May 2019 flow chart provided to Foley reflected that Highland Counselors, L.L.C. (then managed by Hinkle) was HCLP's manager, whereas the October 5, 2019 memorandum provided to West reflected that Crossmark Master Holdings, L.L.C. was HCLP's manager.  Moreover, the May 2019 flow chart provided to Foley reflected that Highland Consolidated Investments, L.L.C., was managed by Martens and stated that "[n]o party has the ability to remove and replace Martens as the manager of Highland Consolidated Investments."  Yet the October 5, 2019 memorandum reflected that Wickline was HCI's manager.  But since Foley never bothered to ask for the October 5, 2019 memorandum or any other documents from West, Foley never flagged the issue for the Special Committee.

430.    In short, Foley failed to adequately advise the Special Committee regarding Heppner's relationship with HCLP because Foley consistently failed to ask for even basic

documents and information concerning that relationship.  Foley's failures enabled Heppner and Banowksy to effectively lie to the Special Committee.

        **c.**        **Foley Knew or Should Have Known of Glaring Red Flags Surrounding HCLP's Supposed Demand for a Change of Control Payment.**

431.    Just based on the facts known or reasonably knowable to Foley regarding Heppner's relationship with HCLP and the prior course of dealing between HCLP and BEN, Foley should have been skeptical of, and thoroughly scrutinize, any request by BEN for funds to send to HCLP.  Leading up to and throughout the month of December 2019, Foley was presented with many additional red flags, including: (a) changes in the purported reason for BEN sending money to HCLP; (b) the unreasonable size of the request, especially in light of BEN's and HCLP's prior course of dealing; (c) changing explanations for the reason why BEN needed to send funds to HCLP; and (d) inconsistencies in representations made by Heppner regarding HCLP.

432.    Foley and the Special Committee were first made aware of a potential BEN request to paydown HCLP in mid-November 2019.  Specifically, on November 14, 2019, BEN circulated (to Foley and the Special Committee) a "working draft" of a term sheet for interim SITA funding to be used "as the 'strawman' for" a meeting—planned at Heppner's initiation—a few days later, and involving Heppner, Evans, Holland, and the Special Committee.  The contemplated funding included "$41 million to pay down enough of Ben's senior debt to be in compliance with leverage requirements under the Texas Finance Code."  No other explanation was given for the request for $41 million to pay down HCLP.

433.    On December 18, 2019, Holland emailed Chavenson and Mason to request a meeting later that day to address various issues, including funding requests for BEN outlined in an attached memo.  The memo relayed by Holland to the Special Committee—which Heppner had previously provided to Holland—contemplated that GWG would purchase BEN LP common units,

with BEN using "$41 million to pay down enough of Ben's senior debt to be in compliance with leverage requirements under the Texas Finance Code."   In referring to the contemplated $41 million payment to HCLP, again, no mention was made of any change of control payment demanded by HCLP.

434.   Later that day, however, the narrative began to shift.  When Foley and the Special Committee held a meeting to discuss BEN's funding requests, the Foley-prepared minutes reflect a discussion regarding the request for "a payment of approximately $40-45 million to HCLP, the senior lender to BEN, which BEN indicated" both "would support a reduction in indebtedness for purposes of satisfying trust company charter approval requirements" and "*was being demanded by the lender to waive a covenant breach that would occur as a result of the change of control of BEN* contemplated" in the year-end transactions.  (Emphasis added).

435.   Moreover, later that day (December 18, 2019), Chavenson, Mason, and Foley met with Heppner and BEN representatives in a meeting that the Foley-prepared minutes characterized as "constructive but somewhat contentious."   Those Foley-prepared minutes further reflect that "*Heppner discussed at some length BEN's negotiations with the manager (David Wickline)* of the control party of HCLP [] and represented that, *while such negotiations were on-going*, he was not optimistic . . . *that a change of control early repayment of the magnitude requested could be avoided*."  (Emphases added).   In other words, Heppner indicated that negotiations were "on-going" and that there was little that Heppner or BEN could do to reduce the amount of the $40-45 million payment requested, as if Wickline was some hard-bargaining third-party.

436.   That the reasons for the funding request had changed was cause for suspicion.  And that HCLP was now supposedly demanding a "change of control" payment of at least $40 million was highly suspect.  In connection with negotiations over the intercreditor agreement for the $65

Million Loan in May 2019, Foley knew that HCLP had caved during the course of negotiations over different change of control issues.

437.    Moreover, Foley knew or should have known that HCLP had a long history of waiving events of default or otherwise amending the credit agreement to avoid defaults (such as extensions of the maturity date), when it served Heppner's and BEN's interests to do so.  For instance, HCLP had previously agreed to:

- An Amendment No. 1 to the BEN-HCLP first lien credit agreement, dated as of March 31, 2019, which retroactively cured BEN/BCC's failure to timely repay the BEN-HCLP First Debt by extending the due date for payment.[15]

- An Amendment No. 2 to the BEN-HCLP first lien credit agreement, dated as of April 30, 2019, which changed the date of interest payments to avoid an event of default from BCC/BEN's failure to make required interest payments.

- A 2019 Extension and Waiver Agreement dated as of May 10, 2019, which both: (a) expressly waived certain specified defaults by BEN related to failure to timely deliver financial statements and certifications; and (b) retroactively changed the scheduled maturity date to avoid a default.

- An Amendment No. 3 dated May 20, 2019, an Amendment No. 4 dated May 22, 2019, and an Amendment No. 5 dated May 31, 2019, that allowed for BEN's other borrowings—including the BEN-HCLP Second Debt and the $65 Million Loan from GWG—without triggering any defaults.

Foley likewise knew or should have known that in none of these instances did HCLP demand or receive a substantial fee—let alone extract a payment anywhere close to $49.8 million—from BEN in exchange for granting concessions to avoid events of default.

---

[15] Specifically, the "Scheduled Maturity Date" under the original credit agreement was December 31, 2018, but Amendment No. 1 retroactively: (a) amended the "Scheduled Maturity Date" in the original first lien credit agreement from December 31, 2018 to "March 31, 2019, unless automatically extended  pursuant to" section 2.05 of the credit agreement; and (b) added terms to section 2.05 of the credit agreement that provided for automatic extensions of the Scheduled Maturity Date (unless HCLP denied the extension).

438.   Yet despite the shift in BEN's narrative and HCLP's prior history of accommodation (and many other red flags regarding HCLP's relationship with Heppner), Foley did not seriously question the legitimacy of HCLP's supposed demand for a change of control payment.

439.   Instead, Foley, along with Chavenson, remained preoccupied with obtaining documentation of the supposed demand—they cared little if the demand was legitimate or not, so long as they had something to put in the file.  To that end, Chavenson met with Holland on December 19, 2019, after which Holland relayed to Heppner that: "Chavenson would like for his file an ugly email" from HCLP's lawyer "saying pay or lawsuit," so that the Special Committee "will then have enough to fund."  Holland later reiterated to Heppner: "Dave [Chavenson] needs some documentation for the file.  Is there a default now? Need something to put in file showing dire need."   Holland likewise previewed the issue for BEN's counsel in its upcoming call with Foley: "[t]he SC is ready to fund.  They want for their records a copy of correspondence demanding payment from the senior lender," *i.e.,* HCLP.

440.   Shortly thereafter (on December 21, 2019), the Special Committee met and discussed that it "understood that a change of control payment to HCLP [] might be required to facilitate the lender's consent."  Nevertheless, according to the minutes, the Special Committee also "discussed ensuring that management was doing everything possible to minimize such current cost."  And, in turn, one of the "outstanding key items and issues" discussed by the Special Committee and Foley was the "need for BEN to provide clear written documentation as to any demand from HCLP Nominees regarding a payment in connection with the change of control of BEN effected by the Consolidation and a confirmation that efforts were exhausted to minimize

156

such payment."  At the conclusion of the meeting, "[i]t was agreed that [Chavenson] would call [Holland] to express the importance and urgency" of that issue (amongst other outstanding issues).

441.    Just hours after the Special Committee meeting concluded on December 21, 2019, and presumably after Chavenson and Holland connected, BEN's counsel circulated an updated draft letter purportedly from Wickline on behalf of HCLP to BEN, demanding the change in control payment, with the idea that the letter "would be provided to the special committee."  BEN's counsel further indicated that the draft letter "should not be forwarded to the senior lenders yet."  This draft of the purported Wickline letter—circulated for review by Evans, Holland, and Heppner—requested a change of control premium of $50 million.

442.    Based on prior discussions and representations made to the Special Committee, the increase in the demand to $50 million troubled Holland, who cautioned in a December 23, 2019 email response (copying Heppner and Evans):

> We have been telling the special committee for some time that the number is $40 million.  In the memo prepared for the[m] this last week the number was $41 [million].  I've had a number of calls with them over the weekend and they have $40-41 [million] in their heads.  Dave [Chavenson] is onboard but Kathleen [Mason] is not.  Dave thinks he can get her there.  If we increase to $50 [million], we run the risk that they throw up on it.

Before Heppner and BEN, along with GWG's disloyal officers Holland and Evans, decided amongst themselves how to proceed, however, Foley provided an update regarding the Special Committee's current thinking on overall willingness to fund.  Specifically, later that same day (December 23, 2019), Foley communicated to BEN that the Special Committee was contemplating approving $65 million in cash funding prior to year-end, with the funding "in the form of NPC-A" with a double conversion feature.

443.    Dissatisfied, Heppner then coordinated with Holland to provide the Special Committee with a new wish list for year-end items, which included "$50.2 million for loan

paydown for consent of change of control" to be paid to HCLP, amongst other items.  Chavenson, despite his disloyalty to GWG and general willingness to please Heppner, Holland, and BEN was taken aback by the significant increase, responding to Holland minutes later: "Why did the [HCLP loan] repayment increase by 10 mill?  *I am hoping it was just a typo!!!!*"  (Emphasis added).  But it was no typo; Holland responded: "Brad [Heppner] had said to everyone that the $40 million was the regulatory requirement *but that no one had negotiated with the senior lender yet.  This was their requirement to consent to all this*."  (Emphasis added).

444.    Chavenson then forwarded Holland's response to Mason and Foley, writing: "*Help! This is not what [BEN's counsel] said on last Friday*," asking for confirmation that his recollection was correct.  (Emphasis added).  Foley responded: "You are 100% right – *they have repeated multiple times to us that the approx. $40mm was the amount requested to approve the change of control*."  (Emphasis added).  Foley further observed that "*Brad [Heppner] was in fact clear they were talking with the lender and the lender had made its demands (putting aside the issue of the coziness of that relationship)*."  (Emphasis added).  Thus, Foley was well aware of the glaring inconsistencies between what the Special Committee was now hearing and what it had been told only a few days prior.

445.    After Chavenson asked how to "handle" the situation "without creating unnecessary ruckus," Foley innocuously emailed BEN's counsel to "see if we get a consistent story," intentionally not including specific figures in the email, but rather writing: "Dave Chavenson passed on that he heard from Murray [Holland] this afternoon that [] there was an increase in the HCLP loan payment demand affecting BEN cash requirements.  Any color?"

446.    Later that day (during the evening hours of Christmas Eve), BEN's counsel responded that "[t]he senior lender is now asking for something closer to $45-50 million instead

of $41 million.  But there has been push back on our side."  Foley took this explanation at face value, without any further follow-up on that incomplete response.  Instead, Foley responded to BEN's counsel to encourage BEN to "push its hardest and get the number to $41 mm – or extremely close – that would significantly facilitate things on our end."  Foley also encouraged him to "keep the support documentation on the front burner as well, as we will need that."

447.    Thus, even after Foley was aware of inconsistencies in Heppner's representations, the "coziness of th[e] relationship" between Heppner and BEN, and the lack of explanation from BEN's counsel, Foley remained preoccupied on papering the file—not the legitimacy of the request or the substance of the underlying transaction.

> **d.    Foley Recognized the Importance of Confirming that HCLP's Supposed Demand for a Change of Control Payment Was Legitimate, Yet Nevertheless Accepted a Draft Letter with a Blank Number as the Only Documentary Evidence of the Demand.**

448.    Even if not for the right reasons (*i.e.,* Foley was focused on papering the record, not looking out for GWG's best interests), Foley nevertheless still recognized the critical importance of confirming—through documentary evidence—that the supposed change of control payment purportedly demanded by HCLP was a real demand from a legitimate lender.

449.    The Foley-prepared minutes for the December 18, 2019 Special Committee meeting reflect a discussion of, amongst other matters, "a payment of approximately $40-45 million to HCLP . . . which BEN indicated . . . was being demanded by the lender to waive a covenant breach that would occur as a result of the change of control of BEN" under contemplation.  Following the discussion, "the Committee tasked Foley with preparing a list of key diligence items," such as "documentary support for the current BEN obligations necessitating capital infusions" by GWG into BEN.

450.    The next day (December 19, 2019), Stone sent an email, titled "List of Key Items" that identified as one issue for funding, obtaining "***documentary support on BEN debt default/demand from lender (NOT Sidley) that the $40mm payment is necessary***." (Emphasis added).

451.    The Foley-prepared minutes for the next Special Committee meeting held on December 21, 2019, reflect that one of the "outstanding ***key items and issues*** with respect to the year-end items" included "the need for BEN to provide the support documentation," "including a need for BEN to provide ***clear written documentation as to any demand from HCLP [] regarding a payment in connection with the change of control*** of BEN . . . and a confirmation that efforts were exhausted to minimize such payment." (Emphases added).

452.    The Foley-prepared minutes for the next Special Committee meeting, held on December 23, 2019, likewise reflect a discussion of "***key diligence*** and review items," including "***documentation evidencing that HCLP [] was requiring a loan repayment of over $40 million in order to approve a change of control of BEN*** arising from the Consolidation, which represented the largest portion of the proposed [GWG] investment into BEN." (Emphases added). Moreover, "***the Committee emphasized the importance of [GWG] not funding voluntary prepayments given liquidity constraints on both BEN and [GWG]***," although "***a payment to a third party lender demanding*** such amount to effect the control rights and Consolidation desired by [GWG] had more merit." (Emphases added).

453.    Nevertheless, because Foley was more concerned about papering the record than the actual legitimacy of the demand, Foley ultimately accepted a ***draft letter*** with a ***blank number*** as the only documentary support for HCLP's supposed payment demand. Specifically, late in the evening of December 26, 2019, BEN's counsel sent an email to Foley and the Special Committee,

sharing a BEN funding request memo—which Evans helped draft—and supporting documentation. The BEN funding memo changed the request to "$49.8 million to obtain change-of-control consent from Senior Lender," *i.e.,* HCLP, and attached a draft letter purportedly from Wickline as support. The attached draft letter had a large "draft" watermark, was unsigned, and left a blank for the specific amount of the payment demanded.

454. After receiving the draft Wickline letter (with amounts left blank), Foley conducted no additional diligence into the legitimacy of the purported demand from HCLP, even to verify if the $49.8 million figure included in BEN's funding request memo was the precise figure. The minutes for a Special Committee meeting held on December 27, 2019, reflect that a discussion occurred regarding "communications between Mr. Chave[n]son and Mr. Murray T. Holland regarding the BEN Group senior lender's (HCLP['s]) letter regarding its demand for a change-of-control early principal payment to permit the change of control," but no details regarding the substance of that discussion were provided. No further due diligence efforts were undertaken by Foley (or the Special Committee) regarding the letter or HCLP's demand (and supposed lack of movement), and a final version of the letter was never requested or provided.

455. In short, due to Foley's extreme negligence, incompetence, and improper focus on papering the record and facilitating the transaction rather than looking out for GWG's best interests, Foley and, in turn, the Special Committee, accepted a draft letter with a blank number as proof of HCLP's supposed $49.8 million demand, even though: (a) the explanations given for the payment changed over time; (b) they were given conflicting information regarding the status of discussions with HCLP; (c) the amount of the demand increased by approximately $10 million—on Christmas Eve—to $50 million (with minimal subsequent movement); and (d) the sheer size of HCLP's demand was highly unusual, especially when juxtaposed against HCLP's track record of

accommodating BEN without demanding similar payments.  And making it all even worse, Foley had reason to know that the letter had been prepared by BEN's counsel—not HCLP—because Foley was inadvertently copied on an email chain discussing an earlier draft of the letter.

### 3. Due to Foley's Negligence, the Special Committee Agreed to Illusory Changes to BMLLC's Operating Agreement That Accomplished Nothing for GWG.

456.    As alleged above, Foley acted negligently and knowingly participated in breaches of fiduciary duty in connection with GWG advancing funds to BEN: (a) in exchange for grossly inadequate BEN equity; and (b) based on a supposed, but illegitimate, change in control demand from HCLP.  Foley's malfeasance was compounded by Foley's additional negligence surrounding the supposed "change of control" of BEN that triggered HCLP's supposed ability to demand a payment in exchange for waiving a change of control default.  Specifically, Foley failed to ensure that the control rights obtained by GWG that triggered the supposed payment were substantive and meaningful.  As a result of Foley's malpractice, the board designation rights that GWG obtained were illusory, meaning that, in effect, the $49.8 million payment to obtain HCLP's consent was for nothing.

457.    Giving GWG theoretical—but ineffective—rights to designate a bare majority of BEN's board had been one of Heppner's and Holland's long-planned objectives.  Indeed, amending the limited liability company agreement of Beneficient Management, L.L.C. (also referred to as BMLLC or BEN Management), the general partner in control of BEN, was the very first item on Heppner's original SITA memorandum transmitted to the Chavenson/Mason Special Committee on June 1, 2019.  As indicated in that original SITA memorandum, Heppner wanted to give GWG board rights because, among other reasons, it would result in financial statement consolidation and "remov[e] limits imposed by the 40 Act on the amount of BEN Common Units that GWG can hold

on its balance sheet." Heppner and BEN viewed giving GWG board designation rights as the means to the end of obtaining more money for BEN from GWG.

458. At the same time, however, Heppner had no intention of giving up substantive control over BEN itself. While he wanted to give GWG rights to designate a bare majority of BMLLC's board to exploit accounting rules and permit financial statement consolidation (and, in turn, get more money from GWG for BEN), Heppner was not about to give GWG substantive control over BEN's business.

459. Heppner had two means of ensuring that giving GWG theoretical board designation rights for BMLLC's board would not interfere with his control over BEN. First, GWG was already under his and Holland's influence, given that: (a) GWG's entire board had been designated by pre-existing BEN directors or selected by them; and (b) Heppner, Holland, and BEN exercised effective voting control over GWG (through Holland's and BEN's designee roles as Trust Advisors of the Seller Trusts that controlled GWG's majority voting interest). This meant that, in practice, Heppner and Holland could steer GWG into exercising any board designation rights in a way that benefited BEN, *i.e.,* by re-appointing BEN directors right back on to BEN's board.

460. Second, Heppner wanted to ensure that the amended version of BMLLC's operating agreement included sweeping consent rights that all but guaranteed the new BEN board could not take any substantive action without Heppner's blessing. Such provisions would function as a safeguard to make sure GWG's board designation rights over BMLLC's board never stripped Heppner of his ability to control BEN, just in case Heppner ever lost control—through his, Holland's, and BEN's collective ability—of influencing how GWG would exercise its board designation rights in BEN. In effect, building such provisions into the agreement would make GWG's board rights ineffective in changing or exercising substantive control over BEN.

163

461.    Consistent with Heppner's desired ends, BEN's initial draft of the amended and restated limited liability company agreement of Beneficient Management, L.L.C. included all sorts of provisions that ensured that GWG would not effectively gain control over BEN, notwithstanding the proposed right for GWG to appoint a bare majority of BEN's board.  This draft was provided to Foley on December 13, 2019, along with drafts of several SITA-related transaction documents.

462.    Problems with the agreement—and Heppner's sought-after ends—were immediately obvious to Foley.  In an email to Chavenson and Mason sent the next day (December 14, 2019), Foley noted:

> They ostensibly grant GWG ("Principal LP") a majority of the board, but they reserve all real rights in the Executive Committee and the Nominating Committee, each for which Brad's affiliate gets 50% of the seats. Brad's affiliate also expressly names the chairman of the board, all committees and meetings, which have meaningful control (agendas, who can attend, notice etc). *The bottom line is that Brad's consent is needed for anything meaningful and he continues to control all process*. I suspect they asked the accountants what is the minimum needed to consolidate BEN (who said a simple majority of the larger BEN GP board) *but substantively they maintain Brad's control of BEN*. The doc even provides that the board isn't permitted to "debate or discuss" anything without the affirmative approval of the Executive Committee (would need Brad to OK it).

(Emphases added). In addition, Foley cautioned, "it appears BEN is veering materially away from what we thought we were discussing with them (*turning our 'process' into more optics*)." (Emphasis added).

463.    Chavenson acknowledged the problems but wondered aloud "whether they were just the product of an overzealous associate" within BEN's legal team.  Mason strongly disagreed, however, writing to set the record straight:

> I'm sure Brad [Heppner] steers the response on any documents released to [Foley] or the Special Committee. I would suspect there is little or no independent latitude with respect to an overzealous employee.  *This assures a rubber stamp environment that may not be readily apparent to the existing board.  Dangerous. Certainly not in sync with governance or transparency*.

(Emphases added).

464.   Later that day (December 14, 2019), the Special Committee and Foley held a meeting to further discuss the problems with BEN's proposed draft amended BMLLC operating agreement.  According to the Foley-prepared meeting minutes, "two key issues" discussed were that: (1) "many key actions would continue to require the consent of an affiliate of Mr. Brad K. Heppner," and (2) "it appeared that the BEN Nominating Committee (if it was stalemated and did not affirmatively approve the Company nominees to the BMLLC Board) could ultimately cause [GWG] to lose its rights to appoint a majority of the BMLLC directors."

465.   Foley then relayed concerns regarding the proposed operational changes to BEN's counsel, writing in a December 14, 2019 email: "We read through the BEN Management agreement and it's inconsistent with our discussions as to GWG control.  As you know this was a core premise of the Special Committee's entire approach and our discussions (with view to putting the GWG board in a position to make funding decisions in a traditional parent-sub framework)."  Foley wrote in a follow-up email later that day that the proposed "composition and powers/consents of committees, chair appointments, chair rights, director related trigger for loss of parent rights, et al, are different than traditional majority parent rights."

466.   Following discussions with BEN's counsel, Foley reported back to the Special Committee during a December 17, 2019 meeting to provide an update.  According to the Foley-prepared minutes for that meeting:

> Previously, the Committee expressed concern that [GWG's] majority control of the board of BMLLC would be supplanted by various provisions in the **_BMLLC operating agreement that provided for substantial control/veto rights for Beneficient Counselors (for which the ultimate control party is Mr. Brad K. Heppner)_**.  Foley noted provisions of the proposed operating agreement would in effect give Beneficient Counselors (and ultimately Mr. Heppner) the rights to equal representation on all committees, appointment of chairmen, agenda and attendance control.  Foley provided an update that it had meaningful discussions with BEN

lawyers regarding potential changes with respect to the BMLLC operating agreement . . . .

(Emphasis added).

467.    During a subsequent Special Committee meeting held December 21, 2019, Foley again noted—according to the Foley-prepared minutes—that the terms of "the BMLLC operating agreement . . . required additional changes" and "reasonable other adjustments to the items that were perceived as heavy handed and off market." And the Special Committee further "discussed," as one of the "outstanding key items and issues," "the importance of implementing proper protections for [GWG] with respect to its majority governance rights in BMLLC."

468.    Over the following days, Foley continued to negotiate with BEN's counsel over the terms of the amended BMLLC operating agreement. But Foley largely became preoccupied with the increase in HCLP's supposed "change-of-control" payment demand to $50 million, BEN's other specific funding requests, myriad valuation issues and problems, and negotiations over the equity that GWG would receive in exchange for funding BEN. In effect, while the changes to the BMLLC operating agreement remained important, the issue was put on the backburner as Foley dealt with other crises.

469.    A week later, during a Special Committee meeting held on December 28, 2019, Foley and the Special Committee once again turned their attention back to control issues, discussing a forthcoming draft of the BMLLC operating agreement from BEN. According to the Foley-prepared meeting minutes, the Special Committee again "emphasized the importance of the BMLLC operating agreement and the fact that such agreement was critical to [GWG's] control of the board of directors of BMLLC to help mitigate conflicts of interest and streamline decision-making between [GWG] and BEN."

470.    Thereafter, Foley and BEN (along with GWG's outside counsel) continued to negotiate over the BMLLC operating agreement up until the eleventh hour, including on closing day, December 31, 2019, amidst a flurry of other ongoing negotiations and activity.  Foley finally signed off on the final version of the amended BMLLC operating agreement shortly before 2 pm on December 31, 2019, just hours before GWG's $79 million were transferred to BEN.  But the final version of this agreement failed to address many of the Special Committee's significant concerns; it did nothing to change control dynamics, let alone "mitigate conflict of interests" involving Heppner.

471.    Before the transaction even closed, Evans, Heppner, and Holland coordinated to re-appoint six individuals who were already BEN directors to effectively remain on, or be re-appointed to, BEN's board, as GWG's supposed designees pursuant to the amended and restated BMLLC operating agreement.   Three of those six BEN directors—Hicks, Schnitzer, and Cangany—were part of Heppner's inner circle.  Thus, nothing changed.  No new directors were appointed to BEN's board to counterbalance Heppner and those loyal to him.

472.    Foley knew or should have known that no changes would be made to BEN's board, even prior to the closing and finalization of the transactions on December 31, 2019.  Earlier that morning (December 31, 2019), GWG's outside counsel had circulated a draft of the letter appointing the BMLLC directors (*i.e.*, with GWG's picks for BEN's board).  But Foley raised no objection and expressed no concerns over the fact that GWG's soon-to-be-acquired board designation rights would in reality change nothing, as BEN's current directors would simply remain as BEN's directors.

473.    Nor did Foley take any steps previously to ensure that GWG's board designation rights would be enjoyed by GWG, rather than wholly usurped by Heppner and BEN.  Foley never

167

bargained for any protections to safeguard against the obvious risk that Heppner, Holland, and BEN would usurp GWG's designation rights to simply reappoint existing BEN directors. Nor did Foley otherwise ensure that board designation rights would be exercised independently by GWG, such as by insisting that GWG's nominees be selected by an independent committee of GWG directors or otherwise. In short, Foley did nothing to prevent GWG's disloyal fiduciaries from simply reappointing BEN directors—including Heppner loyalists—to their current BEN board seats.

474.    In effect, therefore, GWG did not obtain any real control, practically speaking, as a result of the amendments to BMLLC operating agreement as part of the December 31, 2019 transactions. The hypothetical control right that GWG obtained was illusory because it would be wielded by Heppner and Holland (with Evans assistance), not independently for GWG. And, in turn, the board designation rights that GWG obtained provided no real value to GWG.

475.    Moreover, although some minor improvements were made, the final version of the amended BMLLC operating agreement failed to address the significant issue Foley identified regarding control that Heppner could wield over BEN—despite GWG's board designation rights— via consent rights. Specifically, section 3.4 of Third Amended and Restated Limited Liability Company Agreement dated December 31, 2019, set forth an extensive list of matters that required prior approval of BEN's executive committee, enumerated in sections 3.4(a) to 3.4(s). GWG's Form 8-K with the SEC that described the December 31, 2019 transaction described those sweeping rights as follows:

> The Beneficient Management executive committee has the right to approve certain transactions on behalf of Beneficient Management and Beneficient LP and its subsidiaries, including: (i) the incurrence of debt; (ii) the issuance of equity interests of Beneficient LP or any subsidiary equal to 5% or more of the fully diluted equity of such entity or that have preferred terms to the common equity of Beneficient LP, except in connection with any trust instrument or product offered by Beneficient

LP or its affiliates; (iii) the adoption of a shareholder or unitholder rights plan by Beneficient LP or any subsidiary thereof; (iv) the amendment, supplement, waiver, or modification of Beneficient LP's limited partnership agreement, the BCH limited partnership agreement or the organizational documents of any subsidiary of the foregoing other than any common law or statutory trusts created to facilitate the financing, acquisition, contribution, assignment or holding of alternative assets; (v) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient LP or any subsidiary thereof in a single transaction or a series of related transactions; (vi) the exchange or disposition of a majority or more of the assets, taken as a whole, of Beneficient Management or any subsidiary thereof in a single transaction or a series of related transactions; (vii) the execution by Beneficient LP, Beneficient Management or any subsidiary thereof of any contracts or of any amendment, supplement, waiver or modification of any existing contract, which would materially change the nature of the business of Beneficient Management and its affiliates; (viii) materially or commercially substantive changes to or creation of an employee incentive or benefit plan of Beneficient Management, Beneficient LP or any subsidiary thereof; (ix) the merger, sale or other combination of Beneficient LP, Beneficient Management or any subsidiary thereof with or into any other person or entity; (x) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient LP or any subsidiary thereof; (xi) the transfer, mortgage, pledge, hypothecation or grant of a security interest in all or substantially all of the assets of Beneficient Management or any subsidiary thereof; (xii) the removal without cause of a chief executive officer or any other executive officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xiii) the termination of employment of any other officer of Beneficient Management, Beneficient LP or any operating subsidiary thereof or the termination of the association of a partner, member, manager or director of any subsidiary of Beneficient LP, in each case, without cause; (xiv) the liquidation or dissolution of Beneficient Management, Beneficient LP or any operating subsidiary thereof; (xv) the withdrawal or removal of Beneficient Management as the general partner of Beneficient LP or the direct or indirect transfer of beneficial ownership of all or any part of a general partner interest in Beneficient LP; (xvi) any determination by Beneficient Management, acting as general partner of Beneficient LP, related to the removal or replacement of the general partner under Beneficient LP's limited partnership agreement; (xvii) the entry into any material or commercially substantive agreement with a related party; (xviii) the creation of any new and materially or commercially substantively different trust instrument or product, or any materially or commercially substantive change, amendment, supplement, waiver or modification to the terms or provision of any existing trust product, offered by Beneficient LP or any of its affiliates to the extent regulated by the Texas Finance Commission or other state, federal or non-U.S. regulator with direct or indirect jurisdiction over Beneficient LP or such affiliate or such product, other than any change or modification to any exhibit or schedule to any trust instrument or product; or (xix) the bankruptcy of Beneficient LP.

Those extensive consent rights meant that Heppner, who chaired and dominated BEN's executive committee, would continue to call the shots for BEN, and that neither GWG nor its board designees could do practically anything substantive without Heppner's blessing and approval.

476.     As such, the final version of BMLLC's operating agreement did not meaningfully address Foley's and the Special Committee's concerns, such as the reservation of "all real rights in the Executive Committee," "that Brad [Heppner's] consent is needed for anything meaningful and he continues to control all process," and that "substantively they maintain Brad's control of BEN." Yet Foley signed off on it anyway.

477.     Accordingly, the purported board designation rights that GWG obtained on December 31, 2019, did not support the Special Committee's approval of the transactions as a whole. The right that GWG obtained was illusory, in practical effect. Yet that same illusory right— which provided no real benefit to GWG—formed the basis for HCLP's demand for a $49.8 million payment from BEN, which GWG funded, and, due to Foley's negligent advice as its counsel, the Special Committee also approved.

478.     Nor did the resulting financial statement consolidation of BEN's financial statements with GWG's financial statements make payment of the $49.8 million change of control payment to HCLP any more justifiable. Foley attempted to paper the record, playing up the benefits of financial statement consolidation in various Special Committee minutes. But each of the rationales offered by Foley was logically and factually flawed—further establishing Foley's negligence and incompetence as Special Committee counsel.

479.     For instance, Foley-prepared meeting minutes (such as those for the December 21, 2019 committee meeting) reflect that financial statement consolidation would "improve debt capacity." Foley likewise told the Special Committee, according to Foley-prepared minutes for

the December 29, 2019 meeting, that financial statement consolidation included "improving debt capacity, which ultimately would improve Company liquidity." But this was not factually accurate; financial statement consolidation with BEN did not improve borrowing capacity under GWG's L-Bond facility or otherwise. Foley apparently did not review the underlying debt documents before offering that factually incorrect rationalization for the transaction.

480. Similarly, the Foley-prepared minutes for the December 21, 2019 committee meeting reflect a discussion that financial statement consolidation would "increase transparency for [GWG] investors with respect to BEN." And Foley likewise told the Special Committee during the December 29, 2019 committee meeting that financial statement consolidation would "provid[e] greater transparency with respect to the BEN Group to [GWG] shareholders through financial reporting." But this was untrue. GWG had previously included separate, BEN-audited financial statements in its securities filings, and there is no reason it could not continue to do so. And keeping GWG's and BEN's financial statements separate provided far greater transparency and insight into BEN than consolidating them. Yet again, however, Foley completely ignored the actual facts and circumstances, instead trying to paper the record with unsupportable rationalizations.

481. Ultimately, Foley's negligent advice regarding the supposed—but illusory—change of control had consequences for GWG far beyond the $49.8 million sent to BEN and on to HCLP on the basis of the supposed change of control demand. In early 2021, GWG's new auditor refused to sign off on GWG's Form 10-K until the SEC's Office of Chief Accountant ("OCA") reviewed GWG's previous financial statement and blessed GWG's accounting treatment on two issues— including whether GWG had obtained control over BEN for accounting purposes on December 31, 2019. As a result, on April 1, 2021, GWG filed a Form 12b-25, indicating that it would not be

able to timely file its Form 10-K annual report. For the same reason, on May 25, 2021, GWG filed a Form 12b-25, indicating that it would not be able to timely file its Form 10-Q quarterly report for the first quarter of 2021 either. And consequently, GWG was forced to halt L-Bond sales, exacerbating its liquidity problems and creating additional pressure that was one of several factors leading to GWG's ultimate bankruptcy filing.

### 4. Foley's Malfeasance in Connection With the $25 Million GWG Advanced to BEN so That BEN Could Satisfy its Obligations to Sabes.

482.   BEN's other primary use of the $79 million advanced by GWG on December 31, 2019, was to repay obligations that BEN owed to an affiliate of Jon Sabes and Steven Sabes, GWG's founders and controlling stockholders prior to April 26, 2019. The Special Committee's approval of funding for that purpose likewise was the product of an unfair process stemming from Foley's negligence and knowing participation in multiple fiduciary duty breaches.

483.   Approximately $25.1 million of the total funding package approved on December 31, 2019, was used by BEN to repay an obligation it incurred in April 2019 to GWG's founders and former controlling stockholders when BEN effectively seized control of GWG. Specifically, pursuant to an April 15, 2019 Purchase and Contribution Agreement (the "Sabes PCA"), BCH owed $25 million to Sabes AV Holdings, LLC ("Sabes AV") in exchange for 2,500 GWG shares that BCH had obtained from Sabes AV.

484.   Under the terms of the original Sabes PCA, BEN's $25 million payment was originally due six months after the closing date, in October 2019. In an amendment to the agreement dated October 25, 2019 (but executed thereafter), the due date for BCH's obligation to make a $25 million payment to Sabes AV was extended to January 3, 2020 (with interest accruing from October 26, 2019, until the date of payment).

485.    Notably, the Sabes PCA specifically provided that BCH could not use funds originating, directly or indirectly, from GWG or its subsidiaries to pay its $25 million obligation to Sabes AV.  The earlier iteration of a GWG special committee tasked with reviewing the Sabes PCA (and its provisions affecting GWG, such as appointing new GWG directors nominated by BEN) insisted on this restriction on the use of GWG funds to pay Sabes AV throughout negotiations over the Sabes PCA's terms.

486.    For example, the minutes from one of the prior special committee's first meetings after its formation noted that its chairman had spoken with Jon Sabes and requested assurances that "payment was coming from BEN and not [GWG]."  Three days later, the special committee's chairman relayed to other committee members notes from a call he had with Heppner, noting that Heppner "confirmed they were not going to use GWG cash to fund the deal."  And later, when BEN's counsel stated that the "transaction agreements do not contemplate any restrictions on funding source," the special committee chair immediately emailed Heppner, noting that "[t]his seems to directly contradict our discussion and your assurance this morning that no GWG funds will be used to finance the transaction with the Sabes."  Heppner responded, "It is being cleared up as we speak.  You will receive an email from me further confirming that no GWG funds will be used to finance the purchase of the Sabes stock."

487.    Notwithstanding that restriction—and Heppner's promises to the special committee that "no GWG funds will be used to finance the purchase of the Sabes stock"—BEN, Holland, and Heppner collaborated and then subsequently reached out to the Chavenson/Mason Special Committee to obtain a waiver or modification of the restriction, thereby allowing BEN to satisfy its $25 million obligation to Sabes AV using funds that BEN planned to obtain from GWG.

488.     Specifically, on September 24, 2019, Holland asked Heppner for "a memo describing that we need to make a $25 million payment to Paul Capital out of funds from distributions and later a $25 million payment to Jon [Sabes] from GWG loans." Shortly thereafter, Holland emailed Chavenson and Mason with a "memo at the request from Ben" for their approval, noting that he didn't "see any GWG issue with it but we will need your approval."

489.     The memo forwarded by Holland to the Special Committee, and ultimately to Foley, explained:

> We would like the Special Committee to consent to an amendment of the Purchase and Contribution Agreement ("PCA") dated April 15, 2019 to allow for Beneficient to use $25 million of cash provided by GWG to Ben, either from a loan or equity contribution, sometime in the future to pay the Sabes' for the purchase of their stock under the PCA. ***The PCA restricted the use of these funds so that Ben could not use them to pay for the Sabes' stock-Ben is required to use cash from distributions from underlying alternative asset investments***. Ben currently has $25 million in such cash but is required to use this cash first to pay Paul Capital. Ben is requesting that GWG allow it to use the existing cash to pay Paul Capital and later as it receives cash from GWG use that cash to pay the Sabes'.

(Emphasis added).

490.     To obtain further clarity on the specific request to the Special Committee, Foley reached out to BEN's counsel.  After conferring with BEN's counsel, Foley reported back to Chavenson and Mason in a September 25, 2019 email that the restriction in the Sabes PCA "***was put in place at the specific request of the former special committee for the benefit of GWG***." (Emphasis added).  Thus, Foley was fully cognizant that the restriction had been bargained for by the prior special committee for GWG's benefit.

491.     On September 30, 2019, Holland reached out to Chavenson, providing him with proposed language for the Special Committee to adopt in waiving the restriction.  Chavenson then emailed Mason and Foley for their thoughts, informing them that Holland had called him "at noon

today and said [that] BEN needs a consent from the Special Comm today (I am not kidding).  So I asked him to send me some language to provide some guidance."

492.    In laying out potential options on how to respond, Foley laid out various pros and cons.  One option, asking for more information, "is obviously stalling and could backfire," although it would have the benefit of "let[ting] us avoid a position for a bit longer."  Another option, granting the waiver, was problematic because it would require "***be[ing] able to articulate how this benefits the public shareholders and why the waiver of this right is appropriate***."  (Emphasis added).  Another option was to "explain our precise concerns," such as "we're not sure why we should waive a right before the transfer is requested," "***we're not sure the benefit to [GWG]*** of this payment," and "***the issue that the whole Board has had about needing transparency to permit funding***."  (Emphases added.)  But the downside was explaining those concerns "will not make Murray [Holland] happy," and it could lead to delay.

493.    Ultimately, Foley and the Special Committee did not address those issues or its concerns head-on, instead acting to appease Holland, Heppner, and BEN while attempting to rationalize their actions.  To that end, Foley reached out to BEN's in-house counsel for generic due diligence items to help paper the record and provide some rationalization for approving the waiver, primarily relating to BEN's obligations to Paul Capital (and other "bulk sellers"), BEN's financial projections, the status of BEN's trust charter application, and conversations to date with the Sabes.  But it was clear to Holland that Foley's efforts were not intended as vigorous due diligence; Foley "***just need[ed] to paper the file***." (Emphasis added).

494.    In mid-October 2019, the Special Committee approved the waiver without reaching out to their predecessor special committee (or the predecessor committee's counsel), without directly addressing concerns they had discussed with Foley, and without negotiating for GWG to

175

receive any consideration in exchange for agreeing to waive the restriction (which Foley and the Special Committee knew would inevitably lead to future funding requests from BEN to GWG).

495.    They did so due to Foley's failures to advise the Special Committee on the requirements of Delaware law.  Foley rationalized the waiver primarily on the flawed and improper, "what's good for BEN is good for GWG" way of thinking that permeated the Special Committee's analysis of other transactions.  And just as they had rationalized the hasty approval of the Essex Transaction in May 2019, Foley and the Special Committee rationalized that the waiver "required less documentation" and that GWG could proceed "within a short period of time," albeit with the understanding that the "Committee was not approving and had not approved any additional capital infusion and reserved the right to further diligence, review and approve any such capital infusion."

496.    Foley's and the Special Committee's attempt at can-kicking accomplished little, as BEN sought funding from GWG for the $25 million payment to Sabes AV just two months later when BEN's due date to make the payment neared.  Specifically, a funding request—drafted by Heppner and relayed by Holland to the Special Committee on December 18, 2019—sought "$25.5 million for Ben to pay obligations owing to the Sabes Parties."  And Holland's December 24, 2019 email to Chavenson—that copied and pasted Heppner's funding wish list and increased the amount of the payment to HCLP—likewise earmarked "$25 million for Sabes payment."

497.    The proposed $25 million funding of BEN's obligations to Sabes continued to trouble Foley, however.  Privately, Foley asked VRC whether it made sense to bargain for BEN to transfer the GWG shares (that BEN had obtained from Sabes) back to GWG, essentially "a buyback," as that "***probably looks better*** as an essentially at-the-market acquisition of shares ***and [GWG shareholders] more immediately benefit from this . . . rather than extending more funds***

*to BEN*." (Emphases added).  But even though Foley identified that preferable alternative to paying off BEN's debts in exchange for additional (dubious) equity in BEN, Foley never seriously pursued it (or apparently recommended it to the Special Committee).

498.   Instead, a few days later, BEN's counsel collaborated with Evans to alter the messaging regarding the payment of BEN's obligation to Sabes AV to make it more palatable to Foley and, therefore, easier to paper over in the record and rationalize.  Specifically, in a December 26, 2019 email to Evans—who had "the pen" and was working on BEN's funding request memo— BEN's counsel instructed:

> ***The SC had reservations about referencing the specific pay down of the Sabes***. What we should do is put $30 million under the category of operating capital.  We then include the $1.8, $2.2 and $500K with a ***fourth bullet of $25 million to build Ben's capital reserves pending payment of certain obligations***.  For support just indicate that the exhibit includes documents supporting certain obligations, but don't reference the Sabes.

(Emphasis added).  Evans obliged, writing that he would "push" through those and other changes to the BEN funding memo.

499.   The BEN funding request memo—that Evans had primarily drafted—was circulated to the GWG Special Committee later that evening (December 26, 2019).  Consistent with the conversations between Evans and BEN's counsel, the memo requested "[a]pproximately $30 million for operating capital," including "$27 million ***to build Ben's capital reserves*** pending payment of certain obligations." (Emphasis added). The memo made no specific mention of the Sabes—presumably due to Foley's and the Special Committee's previously expressed "reservations about referencing the specific pay down of the Sabes," although it did refer to the supporting exhibit binder that included the underlying contract.

500.   Ultimately, the semantic messaging employed by Evans—in collusion with BEN— did the trick in convincing Foley to play along.  The Foley-prepared minutes for the Special

Committee meeting held on December 30, 2019, reflect that the Special Committee discussed that one of two main "components" of the proposed total funding was "*an amount to bolster BEN reserves following a payment* in satisfaction of a payment obligation to the Sabes." (Emphasis added). And a recital set forth in the December 31, 2019 Special Committee resolution—drafted by Foley—approving the overall $79 million transfer from GWG to BEN likewise indicated that the money would be used (in addition to a $49.8 million payment to HCLP) to accommodate BEN's "need for approximately $30 million for *additional operating capital*, including approximately $27 million *to build BEN's capital reserves* pending payment of certain obligations." (Emphases added).

501.    In reality, however, the purported justification of building BEN's "capital reserves" *after* it made the payment to Sabes was a smokescreen because BEN had no ability to make the payment in the first place. BCH was the obligor on the required $25 million payment to Sabes AV under the terms of the October 25, 2019 amendment to the purchase and contribution agreement, but held only $67,076.80 in its bank account at Texas Capital Bank. BCH's parent, BEN LP, held a whopping $0.02 at the start of December 31, 2019. Thus, BCH—and BEN, more broadly— lacked the means to pay over $25 million to Sabes AV.

502.    Accordingly, the money advanced by GWG to BEN was not to build up BEN's "capital reserves" *after* BEN made the payment, but rather enabled BEN to pay Sabes AV in the first place. Indeed, the funds that BEN used to pay Sabes AV directly originated from GWG. Specifically, GWG wire transferred $79.03 million into BEN LP's JPMorgan bank account on December 31, 2019 (of which $49,804,538.82 was immediately wire transferred out to HCLP for the change of control payment). BEN LP then cut a check for $25,093,055.56 that same day (December 31, 2019) to Sabes AV, while Heppner personally emailed Jon Sabes and Steve Sabes—

178

copying Holland—to inform them that "[t]he proverbial 'check is in the mail'!" and to provide a Federal Express tracking number.  The check cleared on January 2, 2020, right before the due date for payment.

503.    Had it not been for the incoming wire transfer from GWG, BCH—and BEN, more broadly—never would have been able to satisfy its preexisting obligation to Sabes AV as it came due on January 3, 2020.  In other words, GWG's funds were not used to build capital reserves, as erroneously stated in the Special Committee minutes and resolution drafted by Foley to paper the record and attempt to disguise the real reason for the payment.  Instead, GWG's funds saved BCH from defaulting on a material, due, and payable obligation.

504.    That BEN was unable to pay its $25 million debt to Sabes AV as it came due should have been a major red flag to Foley and the Special Committee.  Moreover, BEN's liquidity problems and cash burn were a recurring problem.  Indeed, the Special Committee had previously approved the $65 Million Loan in May 2019 due to BEN's immediate need for $50 million to avoid a going concern problem with its auditors and to cover its operational cash burn.  The Special Committee previously (in October 2019) approved a waiver of the restriction on BEN's source of repayment of Sabes AV to enable BEN to pay its (past due) obligations to Paul Capital.  And Foley and the Special Committee had spent the last several weeks hearing about one funding request after another from BEN related to numerous BEN cash needs, all while BEN continuously burned cash.

505.    Accordingly, Foley's attempted rationalization of the funding "to build BEN's capital reserves" was an utter farce.  Foley knew or should have known that the funds were to be used to pay BEN's obligation to Sabes AV.  Foley had several concerns—that were never resolved—about GWG giving money to BEN to fund BEN's buyout of GWG equity from GWG's

founders (which was only possible in the first place because of the Special Committee's waiver of the restriction put in place by a predecessor special committee). Yet the Special Committee approved the Sabes-related component of the $79 million overall funding anyway because they and Foley: (a) failed to fully inform themselves of BEN's financial condition before agreeing to fund the advance, thereby breaching its fiduciary duty of care; (b) knew that the stated reason for the funding was pretextual, or (c) some combination of the two. Foley both negligently failed to advise the Special Committee on the requirements of Delaware law, and actively and knowingly participated in Mason's breach of her duty of care and Chavenson's breaches of his duties of care and loyalty by trying to paper the record and cover up known problems.

### 5. *Foley's Negligence and Knowing Participation in Breaches of Fiduciary Duty Relating to GWG Taking Equity in BEN in Exchange, Rather than Debt.*

506. Foley further compounded its errors in advising the Special Committee by rendering deficient advice on alternative transaction structures and the requirement of Delaware law that special committees consider potential alternatives.

507. Based on all the information known or reasonably knowable to Foley, it made no sense for GWG to make an equity investment in BEN. It was against GWG's best interests to transfer any additional funds to BEN in December 2019, thereby throwing good money after bad. And at a minimum, GWG should have insisted on receiving debt in exchange for any such transfers so as to ensure that GWG was near the top of BEN's capital stack.

508. At one point, Foley and the Special Committee briefly considered possible debt financing as opposed to a further equity investment in BEN. But this idea was quickly discarded, as the Foley-prepared minutes for the December 21, 2019 Special Committee meeting reflect a discussion of "the pros and cons of debt vs preferred units," the latter of which included "that

*increased* BEN Group debt was disfavored in relation to the charter approval process." (Emphasis added).

509.    In casting aside debt financing for that reason, however, Foley acted negligently in three respects.  First, other than word of mouth from BEN's counsel (who relayed constantly shifting narratives), Foley never conducted any diligence into whether debt to GWG actually made any difference on the regulatory front.

510.    Second, despite knowing or having a reasonable basis to know BEN's senior debt was to affiliates of Heppner, Foley never explored—or advised the Special Committee to explore—the possibility that HCLP could forgive or exchange some portion of the debt in exchange for BEN equity.  There was no reason why HCLP could not have forgiven the debt supposedly owed by BEN to HCLP, waived the change of control default in exchange for equity in BEN, or agreed to waive the change of control default altogether without demanding anything in return (as HCLP had done in the past when BEN was in default under the credit agreements with HCLP).   Yet Foley inexplicably and negligently acted as if GWG paying $49.8 million to BEN for BEN to immediately give the money to HCLP was the only path forward.

511.    Third, and finally, Foley acted negligently by failing to advise the Special Committee that insisting on debt from BEN, instead of equity, would not have actually increased BEN's overall debt load (contrary to the discussions between Foley and the Special Committee) but instead would have been largely balance sheet neutral.  The vast majority of the funds that GWG advanced ($75 million) were used by BEN to repay BEN's purported debts to HCLP and to Sabes AV.  GWG could have refinanced those BEN debts by providing cash to BEN in exchange for debt (instead of equity), without any increase in BEN's net debt.

512.    In effect, therefore, Foley—like the Special Committee it misadvised—improperly fell victim to a controlled mindset, allowing Heppner and BEN (and Heppner's pawn, HCLP) to dictate the transaction structure in a way that exacerbated the overall unfairness of the December 2019 transactions to GWG.

## F.    Foley Withdraws in Early 2020, While Acknowledging That Problems Existed All Along and Yet Again Failing to Give Any Warning to GWG or the Full GWG Board.

513.    Despite the fact that Foley misadvised the Special Committee into approving unfair transactions, and despite Foley's efforts to facilitate those transactions while papering the record, the Special Committee still did not blindly rubber stamp all of Heppner's plans for BEN on a timeline that was satisfactory to Heppner.  And Heppner was particularly dissatisfied with Mason, given her propensity to ask questions.  Consequently, he groused about her in a "Year-End Update" email he sent to Hicks and Schnitzer on December 31, 2019, and suggested:

Moving into January, I propose the following:

- GWG presses Kathleen to resign from the Board.
- We dissolve the SC.
- GWG forms a new Finance Committee including Dave Chavenson, Pete Cangany and the 3 of us. Pete to serve as Chair. Pete and Dave would make up a sub-committee of the Finance Committee responsible for decisions in which the 3 of us are conflicted. A specific sub-committee format is recommended by Delaware Counsel.
- The Finance Committee is going to need its own independent counsel. We could engage Foley since they advised SC and know everything that SC completed, or we could consider replacing Foley - since Foley was Stein's plant. I might be fine with Foley staying on. They did get us this far. We need to think about this over the next few days and make a decision.  I subscribe to the advice that times the devil we know is better than bringing in a new counsel we don't know. On the other hand, we may want to remove all of Stein's plants and cut out that cancer. It hasn't worked well for us thus far. The new Finance Committee will also need to hire a valuation agent that's smart with strong technical skills.
- The new Finance Committee should immediately take up the items that were not completed as planned and which I listed above. Would be great to have these items done by mid January.
- The new Finance Committee needs to immediately move forward with the GWG restructuring plan. This plan will spin out un-levered Ben, LLC and exchange list it's Ben Common units on the NYSE and the former NPC-A units on the NYSE. Then our master plan is in motion and we can just focus on selling products.

In effect, Heppner wanted to stack future committee efforts with Cangany—ideally, with him serving as chair—due to his extensive prior history with and loyalty to BEN.  Heppner was fine with Chavenson staying on, and he was also open to "Foley staying on" too, since Foley "***did get***

182

*us this far*" and Foley was a known commodity.  (Emphasis added).  But he wanted Mason out, to remove even modest dissent or questioning of his plans.

514.    During January and February 2020, Evans worked with GWG's outside counsel towards implementing Heppner's plan to install Cangany as a tool to approve conflicted transactions between GWG and BEN and eliminate any potential roadblocks.

515.    As relayed by BEN's counsel to Foley in a January 17, 2020 email, the "plan remain[ed] to create a Finance Committee with a similar mandate to the Special Committee but with . . . revised/expanded membership," with Cangany to "chair that committee."  The plan "would include the dissolution of the Special Committee" consisting of Mason and Chavenson. BEN's counsel further explained to Stone that the new committee would engage "Foley, assuming both you and the committee are good with that."

516.    After Evans involved GWG's outside Delaware counsel (at Richards, Layton & Finger), however, the plan changed over the following weeks to instead expand the Special Committee and add Cangany.

517.    Consistent with Heppner's initial plan, Cangany volunteered to fill the new position on the Special Committee, and the full board held a conference call on February 7, 2020, to discuss expanding the Special Committee.  A unanimous written consent to expand the Special Committee was posted to the "Diligent Boards" platform on February 11, 2020.  Before that unanimous written consent was fully executed, however, dual-director of GWG/BEN Michelle Caruso-Cabrera resigned from GWG's board.

518.    A new unanimous written consent to expand the Special Committee was circulated to all of GWG's directors, including Mason and Chavenson, on February 24, 2020.  When Mason

forwarded it to Stone, however, he instructed her later that evening (February 24, 2020): "Please do NOT sign."

519.     Foley advised Mason against signing the written consent because concerns regarding Cangany's potential appointment to the Special Committee had recently come to light. In the days before, Cangany had already begun injecting himself into the Special Committee process.  Cangany met with the Special Committee and Foley for dinner on February 17, 2020, and met with them again at Foley's offices on February 18, 2020.

520.     Shortly thereafter, Cangany began pushing: (a) for the Special Committee to retain Duff & Phelps as a new financial advisor to replace VRC, at the urging of Heppner, Holland, Evans, and BEN; and (b) for the Special Committee to just go along with Ankura's approach to valuation, in particular its DCF calculation.  Chavenson forwarded his email exchanges with Cangany on these topics to Foley on Saturday, February 22, 2020.  Chavenson and Mason were both very concerned by those developments, as was Foley, which advised Chavenson: "*[w]e do feel very strongly that . . . the committee should absolutely be making its own decisions on advisers*," and "*[w]e also have concerns about removing VRC after they have raised issues on the Ankura approach*." (Emphases added).

521.     With those new developments, Mason had finally had enough and intended to resign.  Over the course of that weekend (February 22 and 23, 2020), Chavenson and Mason had separate calls with Foley, and with each other to discuss their concerns.  Mason called Foley on Sunday evening, February 23, 2020, to relay that Chavenson was "really upset with her for wanting to step away" and that he "threw a bunch of stuff at her including [that] Brad will be really upset with her."  Mason told Foley that she would not change her view about resigning but indicated a willingness to stay for the upcoming planned full GWG board meeting in early March.

522.     In the midst of the drama, Stone and Babcock exchanged emails on February 23, 2020, regarding the best way to handle Chavenson's and Mason's concerns about Cangany's further corruption of the Special Committee process.  Babcock suggested that "maybe, after we talk to Dave/Kathleen, our advice is not to resign, but to disband the committee.  That seems to be the best way to protect Dave if he wants to stay on and Kathleen wants out," although "BEN will hate that."  Stone responded:

> Your approach (the board handling the decisions, with the necessary abstentions) really was what we had pushed for initially and they essentially rejected it.  Let's talk about it tomorrow.  It would help Dave I agree – spread the risk – but ***my guess is they really want this committee to conveniently keep the rest of the board (including Lockhart and Staubach) blissfully ignorant (and they believe Pete [Cangany] won't raise issues)***.

(Emphasis added).  Babcock clarified: "I know we lost that battle, but I think we can reattack."  Moreover, "if Kathleen resigns, it really does change the dynamic (***can tell a story that she resigned when her work was done; rather than having a plaintiff's attorney ask what she saw that caused her to leave and why Dave stayed on***)."  (Emphasis added).

523.     A few days later, Evans continued to prod Mason and Foley, writing to Mason on February 25, 2020 (which Mason forwarded to Foley) and separately to Foley on February 26, 2020, to request that Mason cast her vote on the expansion of the Special Committee.  Holland likewise emailed Mason on February 26, 2020, to prod her into signing the consent (which Mason forwarded to Foley).  Foley and Mason discussed, and Mason continued to refuse to sign the written consent to expand the Special Committee.

524.     The next day (February 27, 2020), Evans and BEN's in-house counsel held a call with Foley to discuss.  Following the call, Evans shared with Foley (and BEN's counsel) the memo and proposed resolutions that had been transmitted to GWG's board.  The memorandum indicated that elimination of BEN fiduciary duties owed by certain dual-directors would arguably permit

185

certain BEN directors to serve on GWG's special committee. And the proposed resolution circulated to the full board included a recital that BEN Management's operating agreement had been amended to (temporarily) eliminate fiduciary duties owed by certain dual-directors to BEN "as part of the transactions approved by the Special Committee on December 31, 2019."

525.    In effect, therefore, Foley's earlier, negligent representation of the Special Committee in connection with the BMLLC operating agreement opened the door for Heppner's plan to stack the Special Committee with Cangany. As part of the December 31, 2019 amendments to that agreement, BEN slipped in a change to temporarily limit Cangany's and other BEN directors' fiduciary duties to BEN (although those duties would eventually spring back later), which Heppner and BEN had intended all along as a justification to allow Cangany—despite his long-term relationship with BEN and role as chairman of BEN's audit committee—to serve on the GWG Special Committee. Foley was apparently oblivious to the reasons why those changes were made. (Foley was likewise oblivious to the import of an "exchange agreement" circulated in early 2020, that was further used to justify Cangany's inclusion on the GWG Special Committee.)

526.    By February 2020, however, Foley was—rightfully—skeptical that changes to the BMLLC operating agreement (made on Foley's watch at year-end 2019) were enough to make Cangany sufficiently disinterested to serve on the Special Committee. Due to Foley's apparent skepticism, Evans emailed GWG's outside counsel the next day (February 28, 2020) to set up a call for them to discuss with Foley. Evans explained that Mason was "withholding" her "vote from the written consent to expand the Special Committee with Pete Cangany," and Evans further indicated that he wanted them to explain—to Foley—the "analysis" that changes to BEN Management's governing documents would support an argument that Cangany was sufficiently

independent to serve on the Special Committee.  That afternoon (February 28, 2020), Foley held the call with GWG's outside counsel and Evans.

527.    But Foley remained skeptical, growing even more concerned.  The next day, Saturday, February 29, 2020, Foley relayed to Chavenson and Mason the substance of what transpired on the call, as well as Foley's overall dire assessment of the situation, noting that:

- "[W]e strongly encouraged the appointment of additional 'clean' (no BEN ties) directors to achieve what they want and achieve the goals we espoused," such as "not having all liability/onus on [Chavenson] and [Mason]" and, amongst other reasons, to "*improve the negotiating dynamic/leverage vis a vis BEN, which is problematic here as we have seen*."

- GWG's Delaware counsel "was not aware of the long relationship that [Cangany] and [Heppner] have and acknowledged that this is a risk factor and could be an issue for [Chavenson] and [Mason]," although Evans tried to downplay the issue (inconsistent with what Cangany himself had said).

- The other "lawyers had no good answer as to whether the small committee could arguably be tainted by [Cangany]'s presence."

- "[F]rom a committee/approval structure perspective," the dynamic was unlikely to change and "[a]s a practical matter *the pressure may get worse now with [Cangany] in the mix, as he is now present in the 'room' (with the posture/back channeling he brings – the initial preview from him isn't constructive as we have seen)*."

- "[T]he likelihood of the pressure on the committee to take action for BEN on an expedited basis ramping up as time elapses, based on experience from last year," remained a concern.

- "[W]e learned that [Cangany] was a key E&Y partner involved with the Life Partners situation, which as you probably know *was a big mess and subject to a major SEC investigation and prosecution*.  This needs to be better understood . . . ."

- "We have expressed our reservations before as to what we [have] seen to date from [Cangany] generally (albeit limited) in terms of him digging into and appreciating the risks and details here."

- "*These process dynamics/qualifications also matter a lot in light of the substantive matters the Committee is likely to take up*," including "*downstreaming large sums*," including to *HCLP* that "*we collectively*

187

*have new questions about – as to control/interest/affiliation with [Heppner].*"

(Emphases added).  Foley's "overall" conclusion was that Foley "continue[d] to believe this is *a high risk situation* for the current Special Committee directors going forward (both in their Special Committee and *GWG director roles generally*)."  (Emphases added).

528.    Upon reading that, Mason opted to resign before, as opposed to waiting until after, the upcoming board meeting.  Indeed, that same day (Saturday, February 29, 2020), Foley provided Mason with a draft of her resignation email/letter.  On the ensuing Monday (March 2, 2020), Mason resigned as a GWG director.  And the following day (March 3, 2020), the GWG Board met without Mason and passed resolutions expanding the Special Committee to include Cangany and a new board member, Roy Bailey (who had previously served as the Executive Vice President of Hicks Holdings, LLC, which was the family office of Thomas Hicks in Dallas, Texas, and held preferred and common interest in BCH).  Foley resigned that evening; Cangany's official appointment to the Special Committee was the final straw.

529.    Before leaving and even on its way out the door, Foley failed to relay its concerns regarding Cangany or regarding the overall situation to GWG or GWG's full board.  Nor did Foley otherwise convey to GWG or GWG's full board that Foley knew the Special Committee had not been well-functioning in the past, and that it was "a high-risk situation."  Even though Foley knew that the new iteration of the Special Committee, irredeemably tainted by Cangany, would favor Heppner's and BEN's interests to GWG's detriment, Foley said and did nothing.

530.    Moreover, Foley failed to sound the alarm, even though changes made to the BMLLC operating agreement in December 2019—on Foley's watch—were the main justification utilized by Heppner, Holland, and BEN (and their pawn Evans) for Cangany to serve on the Special Committee, and even though Foley disagreed that those changes justified inclusion of Cangany.

(In early 2020, Foley also failed to oppose a proposed "exchange agreement" by which Cangany would exchange interests in BEN for GWG stock, additional window-dressing to make it appear that Cangany was not interested in BEN.)

531.     Foley's negligence and subsequent failures to speak up once Cangany was installed as a new Special Committee member paved the way for further abuse of GWG.  Predictably, Cangany and Chavenson subsequently foisted an unfair Preferred Series C Unit Purchase Agreement on GWG (the "UPA") in July 2020.  In connection with the UPA, GWG transferred $130.2 million during the second half of 2020, and an additional $14.8 million in 2021.

532.     Over $84 million of the funds GWG transferred in connection with the UPA flowed to HCLP and Highland Consolidated, and on to Heppner's vast network of affiliated trusts and entities.  Heppner never would have been able to extract those funds via HCLP if not for Foley's negligence in failing to put a stop to Heppner's HCLP-related fraud, Foley's negligence in connection with the BMLLC operating agreement in December 2019, and Foley's failures to alert GWG and GWG's full board regarding Foley's significant concerns over inclusion of Cangany on the Special Committee (that approved the UPA).

533.     In addition to funneling additional funds to BEN and to HCLP, the Cangany-led Special Committee agreed to forgive the $65 Million Loan—along with the accrued and unpaid interest—in exchange for inferior BEN equity interests in late July 2020 (which was ultimately documented in November 2020 and backdated to September 30, 2020).  Foley made this possible both by failing to take any action to stop Cangany from tainting the Special Committee, and by failing to negotiate for commercially reasonable terms on the $65 Million Loan in the first place.  Indeed, one of the rationales given for the relinquishment of the $65 Million Loan was that: "***GWG is not sacrificing any near term cash payments***" because "the payment of the interest is deferred

until the maturity." (Emphasis added). In other words, the unfair terms that Foley bargained for were themselves used as justification for GWG abandoning the $65 Million Loan altogether, taking BEN equity instead.

## G.   GWG Sustained Hundreds of Millions of Dollars of Damages as a Result of Foley's Misconduct.

534.   GWG suffered substantial out-of-pocket losses as a direct and foreseeable consequence of Foley's misconduct, including: (a) over $130 million in professional fees associated with responding to SEC investigations and inquiries (many of which centered on transactions that occurred during Foley's watch in 2019) and a litigious bankruptcy proceeding; and (b) the substantial difference in value between the gives and gets in unfair transactions— involving $300 million in GWG funds—that Foley either negotiated or indirectly enabled.

535.   Specifically, during Foley's watch and in connection with transactions Foley negotiated from May 2019 through December 2019, GWG: (a) transferred $10 million to purchase BEN LP units in the Essex Transaction; (b) advanced $65 million in connection with the $65 Million Loan (which was subsequently exchanged for BEN equity); and (c) advanced more than $79 million in December 2019 in exchange for a non-unitized NPC-A account and additional BEN common units. In addition to that cash out the door, GWG transferred an additional $130.2 million in exchange for BEN equity in 2020 and an additional $14.8 million in March 2021, none of which would have occurred if not for Foley's negligence surrounding HCLP during 2019, Foley's negligence surrounding amendments to the BMLLC operating agreement in December 2019 that enabled Heppner to stack the Special Committee with Cangany, and Foley's failure to bring its concerns surrounding Cangany to the full GWG board's attention when Foley resigned—over Cangany's appointment—in early March 2020.

536.    For the reasons alleged below, the harm suffered by GWG in connection with sending funds to BEN is close to the total amount of funds transferred because the fair market value of BEN equity is, and always was, minimal.

> **1.    *BEN Equity Had Minimal Fair Market Value When GWG Acquired it at Prices Implying BEN Was Worth Billions of Dollars.***

537.    The BEN equity interests that GWG received were worth nowhere close to the amounts GWG paid at the time of the relevant transactions.  And the BEN equity interests that GWG ended up with are now nearly worthless, as BEN's business has crashed and burned. Accordingly, GWG has suffered close to a total loss on the $300 million it sent to BEN (or for BEN's benefit), of which $154 million was sent directly under Foley's watch and $145 million was enabled by Foley's misconduct.

538.    While Heppner touted BEN as a business worth $2-3+ billion even before it obtained a trust charter, that was not remotely true from 2019 through 2021 in the marketplace. No arm's-length, third party during that timeframe would, or did, pay cash for BEN equity implying a valuation anywhere near that high.   BEN was undercapitalized from the start, burned cash, and was frequently unable to pay its debts as they came due (therefore often requiring cash from GWG).  And BEN's claimed value was a house of cards built on: (a) a fundamentally flawed business plan that defied economic reality; (b) wildly unrealistic projections, which BEN itself refused to stand behind; and (c) wholly unreliable, "garbage in, garbage out" analyses provided by Ankura that took BEN's unrealistic projections at face value and compounded the misstatements of BEN's value by making several fundamental conceptual errors in its analyses.

> **a.    BEN's Business Was Undercapitalized.**

539.    Although start-up companies sometimes burn cash at inception until achieving profitability after growth, BEN—which lacked its charter and was still developing and

implementing systems—was in much worse shape than normal start-up companies for three reasons.

540.   <u>First,</u> BEN did not have valuable technology or intellectual property.  Rather, as of December 31, 2018, the fair value of all its intangible assets was only approximately $5 million (and BEN was forced to make over $950 million in downward adjustments and restate its previously issued financial statements for that reason).  In other words, the value of the ideas or sweat equity contributed by Heppner was modest.

541.   <u>Second</u>, beyond not contributing ideas or sweat equity of meaningful value, BEN's founders had not contributed much—if any—cash into the business.  Rather, the founder NPC-A capital accounts held a debit balance of ($132.6 million), reflecting *negative equity*, prior to a purchase price accounting exercise conducted in 2018 (that stemmed from a sham change of control transaction on May 31, 2018).[16]  This accounting exercise resulted in a write-up of the NPC-A account of approximately $1.16 billion, leaving a balance of approximately $1.03 billion as of June 1, 2018.  In other words, the founders' NPC-A billion-dollar capital account was based on accounting smoke and mirrors, *not* on prior capital contributed to the business or allocation of earnings (for which there were none, as BEN only suffered losses).  Notably, this accounting mark-up was based on BEN's own shoddy accounting and Ankura's May 31, 2018 valuation reports, the same reports that VRC recognized contained "very very, large math/logic errors," as alleged above.  And beyond the flaw that VRC recognized, Ankura's May 31, 2018 analysis was utterly unreliable for the many reasons alleged herein.

---

[16] BEN Management's operating agreement was amended to give Paul Capital hypothetical BEN board designation rights, resulting in a technical change of control.  This change of control is what triggered the purchase price accounting exercise, requiring allocation of fair value across BEN's assets, liabilities, and equity.  Much like the sham change of control on December 31, 2019, however, Heppner remained firmly in control of BEN.

542.     Third, unlike most start-ups, BEN owed significant debts (and purported debts) at inception.  Heppner had layered massive additional purported debt into BEN's capital stack from the outset, via the $141 million BEN-HCLP First Debt and the $72 million BEN-HCLP Second Debt, to enrich himself and his affiliated trusts and entities via HCLP and Highland Consolidated. And BEN owed nine-figure debt to GWG under the CLA.

543.     Under those circumstances, it is implausible that the total value of BEN's equity was anywhere close to the values attributed by Ankura and, in turn, Heppner and BEN, at that stage in BEN's development.  That was especially true given the speculative, unproven nature of BEN's business, and BEN's ongoing financial problems.

**b.    BEN's Business Plan Had Fundamental Conceptual and Logical Flaws, Which Made its Projections Unrealistic.**

544.     BEN's business plan largely depended on two wholly untested assumptions: (1) that customers in need of "liquidity transactions," *i.e.*, cash in exchange for illiquid and not readily saleable alternative assets, would be willing to accept (illiquid) equity in BEN—not cash—in exchange for their alternative assets; and (2) that BEN's equity price would increase over time. But these assumptions defied logic and economic reality.

545.     It was doubtful whether BEN's prospective customers would have much appetite for BEN equity—instead of cash—in exchange for their alternative assets.  An investor willing to sell an alternative asset to BEN at an appropriate discount to fair value—for lack of liquidity of that asset—would only rationally sell that asset at a discount if that investor needed liquidity, *i.e.*, cash.  If the investor/BEN customer did not need cash now, then the investor would be better off holding the alternative investment and obtaining its full value over time.  Therefore, most prospective customers willing to sell their alternative assets to BEN at a discount could be expected to have immediate cash needs.

546. Accordingly, even to the extent that customers were willing to accept BEN equity units in exchange for their alternative assets as a first step, there would be strong reason to believe that such customers would rapidly try to sell those BEN equity units—in exchange for cash—assuming BEN's equity units were liquid. In other words, for the very reason that BEN's customers would come to BEN for a "liquidity transaction" in the first place (immediate cash needs), those customers could be expected to immediately sell any BEN equity they obtained from BEN (to obtain cash).

547. The likelihood that a large portion of BEN customers would quickly sell any BEN equity they received in "liquidity transactions" directly undercut BEN's second key assumption, that BEN's stock price would increase over time. In fact, market forces made the opposite likely to happen. BEN's stock price would face immediate selling pressure every time new acquirers of BEN shares sold them to acquire the "liquidity," *i.e.,* cash. Making matters worse, such equity issuances could create additional downward selling pressure due to the dilutive effect of such new equity issuances on pre-existing BEN equity holders (at least with respect to short-term earnings per share). And on top of that, if those sources of selling pressure became sufficiently high, it could have a cascading effect as the market for BEN's stock grew increasingly imbalanced between buyers and sellers, causing additional holders to sell their BEN equity and cut their losses before the equity became worthless.

548. Accordingly, BEN's assumptions that: (1) it could grow its business through issuing BEN equity in exchange for alternative assets in "liquidity transactions;" and (2) BEN's stock price would somehow simultaneously grow over time were internally inconsistent. The economic law of supply and demand apparently did not factor into BEN's financial model. BEN's financial projections were unreasonable and unrealistic for that reason.

c.      **BEN's Wildly Unrealistic Projections Were Untethered from Reality.**

549.    In addition to the foregoing conceptual, logical, and economic flaws, BEN's financial projections were wildly unrealistic and unreasonable because they were not based on historical results, but instead speculatively assumed—while making additional conceptual and economic errors—that: (a) BEN would achieve rapid growth; and (b) BEN would be able to acquire high quality assets at opportune times.

550.    First, BEN's financial projections assumed rapid growth, with annual revenue growth rate assumptions of over 60% (and as high as 96% in some iterations of its projections). But BEN's projections did not provide a realistic path to achieve such growth, instead relying on two flawed assumptions regarding: (a) BEN's ability to fuel growth through cash flow generated from operations; and (b) BEN's ability to fuel growth through additional issuances of BEN equity to customers.

551.    BEN's projected growth rate assumed that it would generate significant cash flows in early years that would be reinvested in the business.  But this was a dubious assumption because most of the net alternative assets BEN obtained through so-called "liquidity transactions" would be unlikely to generate cash in the near-term because of the nature of the assets that BEN acquired. BEN's target market was customers who needed cash quick and were hence willing to sell their alternative assets to BEN at a steep discount to fair value.  But if the alternative assets BEN acquired were likely to generate a significant return in the short-term, then it is doubtful that the customer would need liquidity from BEN (as opposed to just waiting for the return from the investment itself), let alone sell that asset to BEN at a discount.  In other words, the assets that BEN would likely acquire were not the types of assets that would generate cash quickly. Nevertheless, BEN's projections unrealistically assumed that a substantial portion of the *illiquid* assets would yield cash returns in the near term.

552.   BEN's other assumed path to growth, that investors would exchange alternative assets for BEN equity, was likewise problematic.  As discussed above, it was dubious that customers desiring "liquidity transactions" would be willing to take BEN equity—rather than cash—in exchange for alternative assets.  And BEN also ignored that any customers who were so willing would likely try to sell the BEN equity they received almost immediately, thereby creating downward pressure on BEN's stock price, which would make future investors even less likely to accept BEN stock in exchange for their alternative assets.

553.   Moreover, BEN's assumption that it could rapidly grow by issuing BEN equity to acquire illiquid assets defied economic theory and practical market reality in other ways.  At a fundamental level, BEN's financial performance depended on the alternative assets it obtained through "liquidity transactions" generating a return.  Cutting through BEN's convoluted business structure, accounting gimmicks, and myriad of intercompany fees and transactions, therefore, in substance BEN's business model was similar to a "fund of funds"-type hedge fund business model (although BEN's income depended on fees and interest, and not carry like a typical fund).  There is no reason why an economically rational holder of BEN equity would value BEN equity as worth more than a proportionate claim on net future cash flows associated with returns from the alternative asset portfolio.

554.   Yet BEN's projections implicitly assumed that it would "beat the market" and, in turn, that its equity would skyrocket in value over time, despite dilutive equity issuances in exchange for alternative assets and downward selling pressure.  And on top of those problems with BEN's projected growth, BEN's financial projections did not adequately account for the dilutive effects and costs of such equity issuances (the "very very, large math/logic error" that VRC identified).  The implausible end-result of such compound errors was that BEN projected that it

would exceed the size of established firms like Apollo, Ares, and Carlyle within a few short years of launch.

555.   <u>Second</u>, BEN's projections were untethered from actual historical results or the existing alternative asset portfolio, but rather were based on financial modeling of *hypothetical* market share capture giving rise to a purely *hypothetical* portfolio of high-quality alternative assets that: (a) BEN did not actually have; and (b) BEN did not have a realistic means of acquiring.  Those untested assumptions, fed into "the Beast," made the financial model's output even less reasonable and reliable.

556.   BEN's projections were, in part, derived from speculative assumptions regarding: (a) the size of the addressable market for BEN's liquidity-providing services; and (b) the share of that market that BEN would capture each year by supposedly providing liquidity.  BEN's assumed addressable market was dubious because its "pawn shop for the rich" business model assumes that the rich frequently need pawn shops, *i.e.,* that there are large numbers of mid-to-high net worth individuals so desperate for cash that they would be willing to unload alternative assets to BEN at a steep discount.  And BEN's assumptions regarding the share of that market captured each year were likewise dubious because BEN assumed that rich-but-cash-strapped individuals willing to sell their alternative assets at a discount would be willing to take something instead of cash in exchange for those assets.

557.   Even more problematic, BEN assumed that the assets that it acquired would perform in line with industry averages.  Its past portfolio underperformed private equity industry averages.  Nevertheless, BEN apparently thought that it would do better in the future.  And thus, BEN based its projections not on past performance of the existing portfolio, but rather on future performance of a simulated, hypothetical portfolio.

558.    Specifically, BEN's projections were primarily based on a private equity "cash flow simulation model" derived mostly from academic literature and statistical simulation techniques. As BEN explained it in 2019:

> A key component of BEN's fair valuation approach is the "PE cash flow simulation model". In our model, investment value (NAV) is modeled as a function of the expected systematic and idiosyncratic volatility of private equity fund returns. This relationship is captured in the form of modified version of the Fama-French 3-factor model.  Using fitted estimates of the risk-free rate, beta and alpha across PE sub-asset classes, we develop an expectation NAV returns by simulation. Returns on the NAV of a fund are randomly generated from a normal distribution with constant mean, constant volatility, and a constant correlation with aggregate stock market returns. . . .

As BEN further explained, "BEN's models of cashflows is based on . . . academic work," Preqin's database of private equity funds across sub-asset classes, and then "calibration" of BEN's model through "statistical goodness-of-fit" analysis.  BEN's cash flow model also "use[d] Monte Carlo simulations to generate cash flow projections for each PE fund in a given portfolio. Randomness in market dynamics and in fund dynamics is achieved using standard Brownian motions."

559.    Because BEN's projections were based on academic theory and statistical simulation, they were entirely theoretical and speculative and wholly untethered to BEN's prior track record.  That was reason enough to make them unreliable.  Even more unrealistic, however, BEN's projections assumed that BEN would perform in line with average private equity investment performance.  But BEN itself was not making average private equity investments, instead seeking to pick up assets from those eager to sell.

560.    This meant that BEN's business faced an enormous moral hazard problem: the investors most willing to exchange their alternative assets to BEN—especially for BEN equity— were those holding sub-par assets.  And because BEN might serve as a dumping ground for those trying to unload junk assets, it was highly likely that the alternative assets BEN acquired in

"liquidity transactions" would perform below industry average (as was the case for the portfolio dumped by Paul Capital and the initial bulk sellers).

561.    The inherent moral hazard problem BEN's business faced was exacerbated by timing dynamics surrounding private equity and venture capital investments.  Potential customers would be more likely to engage in "liquidity transactions" with BEN—especially in exchange for BEN equity—to exchange older, stale investment assets because: (a) such investments were more likely to have little remaining upside; and/or (b) the odds of an investor having some other reason to sell would increase as time passed (*e.g.,* due to divorce, death, an institutional investor winding down a fund, etc.).  Predictably, this dynamic was pervasive in the alternative assets that the exchange trusts acquired in connection with BEN's initial transactions; the vast majority of fund investments were 10-15+ years old when acquired.

562.    Yet BEN's business plan unrealistically did not account for the likelihood that it would obtain a disproportionate amount of old, stale alternative asset investments.  Indeed, BEN apparently thought that it would obtain alternative assets at the perfect time and vintage:



And due to its expected impeccable market timing, BEN assumed it would enjoy high returns.  But again, it was wildly unrealistic to assume that rational economic actors would exchange their alternative assets to BEN—especially in exchange for BEN equity—at the least opportune time for those investors to sell and at the most opportune time for BEN to buy.

563.    In sum, BEN's speculative projections ignored what happened and what was likely to happen, instead unrealistically predicting what *might* happen in a *hypothetical* scenario based on a statistical simulation that failed to account for the economic realities facing BEN's business and the economic incentives of its customers.  And all of this was known or readily knowable to Foley, as BEN disclosed its methodology for forming projections to Foley (and the other problems were a function of basic economic theory and common sense).

        **d.    Contemporaneous Valuation Analyses of BEN Were Utterly Unreliable, and BEN Equity Had Minimal Value.**

564.    Although several different financial services firms evaluated BEN from 2018 to 2021, *none* of those firms undertook any independent testing or analyses of BEN's projections.

While some made adjustments by reclassifying certain items (such as VRC), all contemporaneous valuations or financial analyses of BEN during the relevant time period relied upon BEN's projected revenue and income growth in their analyses.  Because all contemporaneous valuations relied on BEN projections—without verification or analysis—and those projections were unrealistic and unreliable, it was all "garbage in, garbage out" analysis.

565.    Moreover, the problems with using unreliable projections were compounded and exacerbated by numerous conceptual problems with the assumptions underpinning the valuation methodologies employed.

566.    <u>First</u>, every contemporaneous valuation analysis of BEN assumed, for purposes of its analysis, that: (a) BEN had already obtained its charter; and (b) BEN was fully ready to launch its business.  But those assumptions were fundamentally flawed because neither was true.  And both BEN's lack of operating history and regulatory challenges posed material risks.

567.    Indeed, both BEN's lack of operating history and its regulatory challenges were identified as "risk factors" in GWG's securities filings.  Specifically, GWG's securities filings expressly acknowledged that "Beneficient does not have operating history under its current business plan," "Beneficient's proposed trust company subsidiaries have no operating history," and "companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties."   Those securities filings likewise admitted that "Beneficient's proposed trust company subsidiaries may not commence trust company operations until those subsidiaries receive the necessary trust charters," "[t]here is no assurance that Beneficient will be able to satisfy" all regulatory conditions, impositions of regulatory "conditions could delay the anticipated time for commencement of trust operations," and failure to obtain the charters could "compromise" BEN's "ability to implement its current business plan."  Yet those

material risks were not adequately accounted for in the valuation analyses conducted by Ankura and others.

568.   <u>Second</u>, and relatedly, the discounted cash flow (DCF) analyses performed by Ankura and others contained several methodological errors.  The DCF analyses all used discount rates in the 20-28% range, which would only have been appropriate if BEN had already obtained its charters, had at least some history of operating its new business plan, and was immediately ready to launch into the starting point in the projections.  Since none of those things were true, a discount rate in the 40-60% range should have been utilized (or some other risk adjustment applied if using a lower discount rate).

569.   Moreover, several valuation analyses—most notably Ankura's—failed to spot the mathematical errors and inconsistencies in the projections BEN provided.  For example, Ankura failed to apprehend the "very very, large math/logic" error identified by VRC in BEN's projections, namely, the failure to account for equity dilution and related costs in the projections.  Similarly, Ankura's DCF analysis assigned all value to the terminal year projections provided by BEN, which unrealistically assumed over $1 billion in cash flow in perpetuity—while failing to provide for the necessary maintenance capital expenditures to make that possible.

570.   <u>Third</u>, the comparable companies analyses of BEN performed at different times were flawed for similar reasons.  Those analyses took BEN's projected income estimates at face value, ignoring execution risk, and then applied multiples based on established, publicly traded companies in the banking and finance industry.  It was unreasonable to assume that BEN would generate nearly $90 million of net income in year one—after having never turned a profit before— and rapidly grow to $1.2 billion in net income by year five.  And the valuation multiples utilized in the comparable analyses were derived from established companies that were not fairly

comparable to BEN.  Because such comparable companies analyses used unrepresentative multiples and unrealistic BEN estimates, the valuations they spit out were wildly inaccurate.

571.  <u>Fourth</u>, valuations of BEN that occurred in 2019 depended on BEN financial statements and financial reporting based on dubious purchase price accounting analysis and Ankura's flawed reports dated May 31, 2018, and the subsequent reporting of $1 billion of NPC-A capital in BEN's capital stack.  That $1 billion figure for NPC-A capital was not based on capital contributed or retained earnings, but instead on a convoluted accounting exercise.

572.  Ankura's purported valuations of the NPC-A capital account were primarily based on an option pricing method (OPM) backsolve approach.  In an OPM backsolve approach, the price paid for an equity security in a recent transaction is used to extrapolate a value for each class of equity and the total equity as a whole (utilizing various assumptions involving time to payment and volatility).  Such an analysis is necessarily a relative valuation, not an intrinsic valuation, because it depends entirely on the initial transaction that is used to "backsolve" from.

573.  Ankura's OPM backsolve approach was unreliable because its crucial inputs were prices of BEN equity in transactions with GWG (and Paul Capital), which Ankura assumed were simple arm's-length transactions in which BEN units were purchased for $10 per unit.  But that was not an accurate assumption given the convoluted nature of those transactions.  First, Paul Capital and the other "bulk sellers" did not pay cash for BEN units, but instead exchanged alternative assets at the NAV the seller reported to BEN—which significantly exceeded the fair value of those assets.  Second, the $10 price per unit was an assumed "book value" of the units, not an actual purchase price.  The governing agreements assumed that the BEN units would be auctioned off to generate cash to pay the various participating sellers the NAV of the interests they were selling.  Because not even the parties knew what BEN units would fetch from third parties

through the auction, BEN issued units that, using the assumed book value, equaled 120% of the NAV reported by the sellers—and BEN's founders even agreed to kick in another 30% as additional protection—in the event that the auction did not result in the sellers receiving cash equal to their reported NAV.  As Heppner explained in one email, this structure was negotiated so that "the Sellers would receive cash Purchase Payments totaling 100% of NAV upon the block trade occurring at values of $5.00 per MLP Unit of Ben and above."  Accordingly, the $10 per unit price used by Ankura was not an arms-length market price that a third party paid for BEN Units, and therefore not a proper input for its OPM backsolve analysis.

574.    In short, Ankura's valuations and other contemporaneous valuation analyses of BEN during the relevant period—which, other than Ankura's, were not reduced to formal written opinions—were not reliable.  These valuation analyses had a "garbage in, garbage out" problem due to the unreliability and unreasonableness of BEN's projections.  And the many flawed methodologies applied to inaccurate projections merely compounded the errors.

### 2.    BEN's Disastrous Stint as a Public Company Further Confirms that BEN's Business Is, and Always Was, Fundamentally Broken, and that BEN Equity Interests Are Almost Worthless.

575.    After its parasitic relationship with GWG came to an end and GWG filed for bankruptcy in April 2022, BEN found a new means to access the public capital markets: a de-SPACing transaction with Avalon Acquisition Inc. ("Avalon").  In Avalon, BEN and Heppner found another counterparty willing to agree to transactions that implied an inflated value for BEN, far above what any third party would have paid for BEN equity—especially in cash— in an arm's-length transaction.

576.    Avalon was led by Don Putnam, founder of Grail Partners LLC ("Grail Partners"), who had long-standing relationships with Heppner and BEN.  Heppner respected Putnam "a lot," having done business with him since the 1990s.  And the feeling was mutual.  Putnam was the self-

proclaimed "most enthusiastic booster of the BEN strategy there could ever be" and "want[ed] to still be part of Brad's 'business family' in ten years as [he had] been for the last twenty."

577.    Moreover, Putnam's fund, Grail Partners, had significant entanglements with BEN. It had been involved in exchange transactions with BEN in the 2017-2018 timeframe.  And Grail Partners held a substantial amount of BEN LP common units, and outstanding L Bonds.  From 2019 to 2021, Putnam had engaged in various brainstorming sessions with Holland and Heppner regarding possible strategic transactions involving BEN and its relationship with GWG, including advocating for the decoupling transaction in the fall of 2021.

578.    In February 2022, Putnam reached out to Heppner and BEN to propose a de-SPACing merger between BEN and Avalon, a SPAC entity that Putnam led that was going nowhere.  In March 2022, just a few weeks before GWG's bankruptcy filing, Putnam and Heppner signed an offer letter between Avalon and BEN, in which Avalon proposed allocating shares to holders of BEN equity "establishing an equity value well in excess of $3.0 billion at signing of definitive agreements."  This transaction allowed Putnam's main entity, Grail Partners, to significantly increase the holding value of the BEN common equity on its books.

579.    Accordingly, the merger between BEN and Avalon was not a true arm's-length transaction.  Rather, it was the product of Heppner's and Putnam's mutual admiration and willingness to help each other because of their longstanding relationship that dated back decades. The merger was also mutually beneficial, allowing them to engage in a transaction that would inflate the paper value of their pre-existing holdings.

580.    BEN's merger transaction with Avalon closed on June 7, 2023.  The first few days of trading post-merger saw heavy trading volume and progressively lower closes.  Moreover, the

closing price of BEN's stock went down every single day for over two weeks, losing two-thirds of its value almost immediately:

| Trading Day | Closing Price |
|---|---|
| 06/07/23 | $9.10 |
| 06/08/23 | $9.00 |
| 06/09/23 | $8.27 |
| 06/12/23 | $6.63 |
| 06/13/23 | $5.70 |
| 06/14/23 | $5.52 |
| 06/15/23 | $5.31 |
| 06/16/23 | $5.12 |
| 06/20/23 | $4.57 |
| 06/21/23 | $4.31 |
| 06/22/23 | $3.90 |
| 06/23/23 | $3.87 |
| 06/26/23 | $3.09 |
| 06/27/23 | $2.74 |

From there, BEN's stock price continued to decline.  On October 16, 2023, it closed at $0.9580. BEN's stock price never traded above $1 thereafter (when accounting for a subsequent reverse stock split), meaning that BEN effectively lost approximately 90% of its wildly over-inflated initial market cap within just four months of trading.

581.    From there, matters got even worse for BEN and its unfortunate bag-holders like GWG.  BEN's stock price ended 2023 at $0.4860, and it did not close above $0.50 thereafter.  After BEN's stock traded below $0.10 for at least ten consecutive trading days, on March 22, 2024, NASDAQ sent a letter to BEN under Listing Rule 5810(c)(3)(A)(iii) (the "Low Priced Stocks Rule"), advising that NASDAQ staff had made the determination to delist BEN unless it timely requested a hearing before the NASDAQ hearings panel.

582.    BEN regained compliance on or about May 3, 2024, as a result of a highly unusual, 80-to-1 reverse stock split.   After a temporary blip, BEN's stock price has resumed its downward descent (and is still down over 95%).

583.    Operationally, BEN has also crashed and burned.  BEN's Form 10-Q for the quarter ended December 31, 2023, reflects that BEN has recognized nearly $2.3 billion in total impairment charge to goodwill in the nine months ending that date.  Most of that goodwill impairment related to BEN's key operating units, its "Ben Liquidity" and "Ben Custody" segments.  Indeed, BEN took a total write-off to goodwill of its bread-and-butter unit, "Ben Liquidity," writing it down from $1.73 billion on March 31, 2023, to *$0* by December 31, 2023.

584.    Those impairment charges stemmed from BEN's lack of revenue and continued operational losses, amongst other reasons.  BEN has continued to burn cash in operations, as it has since inception.  BEN burned through $49.6 million in cash in operations (*i.e.,* had negative operating cash flow) during the nine months ended December 31, 2019.

585.    Those and other problems raise substantial doubts over BEN's ability to continue as a going concern, which BEN itself has acknowledged in securities filing.  Nevertheless, BEN maintains that "based on management's plan…such substantial doubt has been alleviated."  That plan entails borrowing more money or refinancing existing obligations, dilutive equity financing efforts, and "workforce reductions."  And to that end, BEN borrowed $25 million (from an entity affiliated with Hicks) in October 2023, furloughed 20% of its workforce on July 11, 2023 (just a month after the merger), and terminated the furloughed employees and laid off an additional 10% of its workforce on November 3, 2023.  While such can-kicking measures may stave off total collapse for a bit longer, BEN's business remains an unmitigated financial disaster (as it always has been, since inception).

586.    All of this was entirely predictable—if not inevitable—due to the many fundamental problems with BEN's business described above.  BEN is now effectively a penny stock.  BEN was never worth billions of dollars.  And the BEN equity that GWG obtained was not

worth anything close to the prices GWG paid, meaning that GWG has suffered a near-total loss on the $300 million it transferred, directly or indirectly, for BEN equity.

## **TOLLING OF LIMITATIONS**

587. From the date of GWG's bankruptcy filing (April 20, 2022) to present, all applicable limitations periods have been tolled as a matter of law pursuant to 11 U.S.C. § 108 and/or otherwise. Any of the Litigation Trust's claims against Foley could only be time-barred to the extent that any such claim was time-barred as of the Petition Date.

588. Neither GWG, nor the Litigation Trust, could have reasonably discovered Foley's malpractice and/or the resulting injury GWG suffered prior to when GWG filed for bankruptcy (or several years prior to the Petition Date, as would be required for limitations to have run before the Petition Date) on any professional negligence claim.

589. The Trust only learned of Foley's malpractice through its post-petition investigation into the estate's potential claims, which entailed review of materials that were not readily accessible to GWG prior to the Petition Date, such as Special Committee meeting minutes and Foley's internal communications, communications with the Special Committee, and communications with VRC. Most such materials had previously been withheld from GWG (and the SEC) on attorney-client privilege grounds, and the Litigation Trust was only able to obtain such documents post-petition pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004").

590. Likewise, the Litigation Trust uncovered Heppner's HCLP-related fraud as a result of the Trust's post-petition investigation. Through its Rule 2004 discovery efforts, the Litigation Trust obtained bank statements that revealed the flow of funds through HCLP to Heppner's

affiliates, organizational documents related to HCLP, and other HCLP-related communications that had not been previously provided to GWG or the SEC.

591.    Finally, the Litigation Trust discovered GWG's injury—*i.e.,* the substantial difference in value between the funds advanced by GWG and the minimal value of what GWG received in exchange in the relevant transactions—following the Petition Date.  While BEN was, in fact, a doomed entity with nearly worthless equity all along, that was not fully known until: (a) BEN completely collapsed once going public after the Petition Date; and (b) documents obtained through the Trust's Rule 2004 discovery efforts revealed the utter unreliability of purported valuations of BEN and BEN's projections during the 2019 to 2021 period.

592.    In short, the Litigation Trust discovered both Foley's malpractice and the injury suffered by GWG through information uncovered through the bankruptcy process and under bankruptcy law, none of which was available or reasonably accessible to GWG prior to the Petition Date.

593.    Nor could GWG have otherwise reasonably discovered Foley's malpractice or the injury that GWG suffered through other means.  The Special Committee itself did not realize that it had been misadvised, and the substance of the negligent advice rendered by Foley in connection with the Essex Transaction, $65 Million Loan, and December 2019 transactions was not otherwise disclosed to GWG or GWG's full board.  GWG and GWG's full board was kept in the dark regarding BEN's valuation issues, and GWG's auditors effectively signed off on BEN's valuation by giving clean audit opinions on financial statements reflecting no impairment to billion-dollar goodwill associated with BEN.  And Heppner did not begin making any disclosures pertaining to HCLP's use of the proceeds it received from GWG/BEN until mid-2021, and only did so then by

giving vague responses to SEC investigations that did not fully disclose that funds sent to Highland Consolidated had been funneled into Heppner's affiliates.

## CAUSES OF ACTION

**COUNT I:       AIDING AND ABETTING/KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTIES.**

594.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

595.    GWG was a Delaware corporation.  Delaware law provides that "the business and affairs of every corporation…shall be managed by or under the direction of a board of directors," and further provides that the board may delegate its powers to a committee, which "shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation" to the extent delegated.  8 Del. C. § 141(a).  The two-person Special Committee of Mason and Chavenson was delegated with the GWG board's powers to manage the business and affairs of GWG, with respect to the Essex Transaction, the $65 Million Loan, and the December 2019 transactions.  Because GWG's business and affairs were delegated to the GWG Special Committee: (a) the GWG Special Committee's and GWG's interests were coaligned in connection with the Essex Transaction, $65 Million Loan, and the December 2019 transactions; and (b) GWG and the GWG Special Committee were not in an adversarial posture with respect to those transactions (as GWG Special Committee acted for GWG).

596.    Mason served as a GWG director from May 13, 2019, through March 2, 2020. Chavenson served as a GWG director from March 13, 2019, until resigning during GWG's bankruptcy case in November 2022.  As GWG directors, Mason and Chavenson owed fiduciary duties of care and of loyalty to GWG.  Their fiduciary duty of care required them to fully inform themselves before making decisions on GWG's behalf, amongst other things.  Their fiduciary duty

210

of loyalty encompassed, amongst other things, a duty to act in good faith, *i.e.,* to act solely in GWG's best interests and for no other purpose. Because Mason and Chavenson owed such fiduciary duties to act in GWG's best interests, the GWG Special Committee did not occupy an adversarial posture with respect to GWG but instead was tasked with furthering GWG's interests.

597. In approving the Essex Transaction, Mason breached her fiduciary duty of care and Chavenson breached his fiduciary duties of care and loyalty. Both Mason and Chavenson breached the fiduciary duty of care by approving GWG's purchase of $10 million of BEN common units: (a) without the benefit of any independent financial analysis or valuation analysis of BEN equity or BEN common units; and (b) at a price that implied a valuation of BEN of billions of dollars, even though BEN faced a liquidity crisis and questions over whether it could continue as a going concern. Chavenson (and not Mason) breached the fiduciary duty of loyalty (specifically, the subcomponent duty of good faith) by acting for a purpose other than GWG's best interests, namely, to alleviate some of the "pressure" he was feeling from Heppner and Holland and to appease them by showing progress, despite recognizing it was a "fire drill."

598. Foley knowingly participated in, substantially assisted, encouraged and induced, and otherwise facilitated Mason's breach of the duty of care and Chavenson's breaches of both the duty of loyalty and duty of care in connection with the Essex Transaction. Foley was fully aware of the facts establishing the underlying breaches of fiduciary duty. Indeed, Foley knew that Chavenson had been pressured into approving the transaction in a "fire drill," failing to act in GWG's best interests and instead acting to show progress and appease Heppner and Holland. Foley likewise knew that the BEN equity units that GWG received in exchange for its $10 million were not subject to substantive negotiations over price, that no independent financial analysis or valuation analysis had been obtained to support the price paid, and that BEN was a financially

distressed entity.  Yet Foley encouraged the Special Committee to approve the Essex Transaction anyway, tried to rationalize it and paper the record, and drafted the authorizing resolution and advised the Special Committee to sign it.

599.    Mason also breached her fiduciary duty of care and Chavenson breached his fiduciary duty of loyalty and fiduciary duty of care in connection with approving the $65 Million Loan.  Both Mason and Chavenson breached the fiduciary duty of care by approving GWG's extension of credit on substantially below market terms: (a) without first obtaining any independent financial analysis of the commercial reasonableness of the terms or conducting any sort of market check; (b) without otherwise analyzing the commercial reasonableness of the terms; and (c) without obtaining any third-party proposals to compare terms, even though Heppner had informed the Special Committee that third-party lenders had been approached but were too costly for BEN to consider.  And as Chavenson and Mason would admit just days later, they approved the $65 Million Loan even though they did not understand the business plan going forward.  In approving the $65 Million Loan, Chavenson also breached the duty of loyalty (specifically, the subcomponent duty of good faith) by acting for a purpose other than GWG's best interests: going along to get along (with Heppner and Holland) and falling victim to an improper, "what's good for BEN is good for GWG" mindset.

600.    Foley knowingly participated in, substantially assisted, encouraged and induced, and otherwise facilitated Mason's breach of the duty of care and Chavenson's breaches of both the duty of loyalty and duty of care in connection with the $65 Million Loan.  Foley was fully aware of the facts establishing the underlying breaches of fiduciary duty.  Foley knew that the Special Committee had approved commercially unreasonable terms, which Foley knew "[were]n't pretty," and that the Special Committee had done so without fully conducting or obtaining any analysis of

the terms or conducting any sort of market check. Foley also knew that Chavenson acted for improper motives. Yet Foley encouraged the Special Committee to approve the $65 Million Loan anyway, tried to rationalize it and paper the record, negotiated loan documents, and drafted the authorizing resolution for the $65 Million Loan and advised the Special Committee to sign it.

601.    Finally, Mason breached her fiduciary duty of care and Chavenson breached both his fiduciary duty of loyalty and his fiduciary duty of care in approving the $79 million transfer of GWG funds in exchange for additional BEN equity on December 31, 2019. They breached the fiduciary duty of care by approving GWG's transfer of funds in exchange for equity without obtaining any independent financial analysis or valuation that supported the grossly inflated prices of BEN equity that they agreed for GWG to pay. The Special Committee's own financial advisor, VRC, refused to provide a formal fairness opinion or valuation opinion for the transaction. And the "Discussion Materials" provided by VRC indicated that the prices paid far exceeded the fair value of BEN equity, even under dubious, BEN-friendly assumptions. In connection with the $79 million transfer to BEN in December 2019, Chavenson also breached his fiduciary duty of loyalty (specifically, the subcomponent duty of good faith) by acting for a purpose other than GWG's best interests, and by coordinating with Holland behind the scenes to try to facilitate getting a deal done.

602.    Foley knowingly participated in, substantially assisted, encouraged and induced, and otherwise facilitated Mason's breach of the duty of care and Chavenson's breaches of both the duty of loyalty and duty of care in connection with their approval of the $79 million transfer to BEN in December 2019. Foley was fully aware of the facts establishing the underlying breaches of fiduciary duty. Foley knew that VRC's financial analysis did not support the prices paid for BEN equity (just the opposite), and was aware of myriad surrounding circumstances establishing

that the prices paid grossly exceeded the fair value of BEN equity units.   Yet Foley tried to paper the record by, amongst other things, dictating a summary sheet for VRC to include in its analysis (but that was not provided until after the key terms had already been approved).   Foley likewise knew of Chavenson's back-channel communications with Holland; in fact, Foley encouraged Chavenson to grease the wheels to get a deal done.

603.   Foley encouraged the Special Committee to approve the $79 million transfer in exchange for BEN equity, tried to rationalize it and paper the record through non-sensical statements included in Special Committee meeting minutes and the resolution approving the transaction, drafted and negotiated the transaction document, and drafted the authorizing resolution for the $79 million advance of GWG funds and advised the Special Committee to sign it.

604.   Foley's knowing participation, substantial assistance, encouragement and inducement, and other facilitation of the Special Committee members' breaches of fiduciary duties in connection with the $10 million Essex Transaction, $65 Million Loan, and $79 million transfer in December 2019 was a substantial factor in the harm that GWG suffered in connection with those transactions.  As a result of Foley's misconduct, the consideration GWG received in exchange for the $154 million it transferred to BEN was worth drastically less than the amounts GWG spent at the time of those transactions and is now nearly worthless.  Accordingly, GWG suffered damages in an amount close to the entire $154 million it sent to BEN due to Foley's actions.  And GWG suffered additional harm as a result of incurring legal fees and costs related to SEC investigations and a contentious bankruptcy proceeding that those transactions precipitated.

605.   The GWG Special Committee would not have approved the Essex Transaction, $65 Million Loan, and the December 2019 transactions on such unfair terms, and the GWG would not have suffered related substantial harms, had it not been for Foley's knowing participation and

encouragement of the Special Committee's breaches of those fiduciary duties (*i.e.,* Mason's breach of the duty of care and Chavenson's breaches of both the duty of loyalty and duty of care).  For instance, Mason tried to ask questions and do the right thing, but she relied heavily on Foley's advice and deferred to Foley for guidance because she was out of her depth; her prior career experience centered on home furnishings and clothing retail businesses.  Had Foley properly advised Mason on the requirements of Delaware law for special committees, rather than consistently downplaying her concerns and gaslighting her into believing that it was appropriate to approve the transactions, she never would have approved them (and the transactions would not have been approved because Mason's vote was required as one of only two members on the GWG Special Committee).

606.    Because of the egregiousness of Foley's misconduct in knowingly participating in and encouraging breaches of fiduciary duty, exemplary damages should be awarded pursuant to Texas Civil Practice & Remedies Code § 41.003.  When viewed objectively from the standpoint of a lawyer in Foley's position, there was an extreme degree of risk that GWG would be harmed by advancing funds to a highly distressed entity on terms substantially worse than what any third-party would have agreed to in the marketplace.  Foley was aware of the substantial risks involved to GWG, but nevertheless proceeded with encouraging and papering over the transactions, manifesting a conscious indifference to GWG's interests.  Accordingly, exemplary damages should be awarded.

**COUNT II:                PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE.**

607.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

608.    GWG was a Delaware corporation.  Delaware law provides that "the business and affairs of every corporation…shall be managed by or under the direction of a board of directors," and further provides that the board may delegate its powers to a committee, which "shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation" to the extent delegated.  8 Del. C. § 141(a).

609.    The two-person Special Committee of Mason and Chavenson was delegated with the GWG board's powers to manage the business and affairs of GWG, with respect to the Essex Transaction, the $65 Million Loan, and the December 2019 transactions.  The Special Committee managed GWG's affairs in connection with those transactions and was in privity with GWG in connection with GWG's delegation of powers to the Special Committee.  Accordingly, Foley owed a professional duty of care to GWG in connection with those transactions.   Moreover, the GWG Special Committee—to which Foley rendered services—was coaligned with GWG and did not occupy an adversarial posture vis-à-vis GWG, but instead acted for GWG in connection with the Essex Transaction, the $65 Million Loan, and the December 2019 transactions.

610.    Foley breached its professional duty of care by failing to act in the manner in which a reasonably prudent transactional attorney would have acted in the same or similar circumstances.

611.    In connection with the $10 million Essex Transaction, Foley egregiously failed to perform basic, confirmatory diligence to ensure the accuracy of its understanding of the facts and circumstances surrounding BEN's funding request.  Contrary to Foley's understanding and advice to the Special Committee, BEN did not owe any obligation to Essex, let alone a "near term obligation" that gave Essex "a due and payable claim on BEN cash" (as Foley and the Special Committee mistakenly understood and discussed).  Foley failed to request or obtain any documents or agreements evidencing the purported obligation.  And Foley failed to do so even though other

216

documents received by Foley all failed to reflect any such obligation. A reasonably prudent transactional lawyer in Foley's position would have conducted basic due diligence and realized—and advised—that BEN owed no such obligation to Essex..

612.    Foley also departed from the professional standard of care in connection with the Essex Transaction by failing to take any action to ensure that GWG paid a fair price for the BEN common units it received in exchange for $10 million. Foley did not engage in any substantive price negotiations—*i.e.,* price per unit or total number of units—that GWG would receive in exchange for its $10 million (presumably because Foley mistakenly assumed that GWG would simply step into BEN's shoes under a non-existent agreement). Nor did Foley advise the Special Committee to retain a financial advisor, or otherwise undertake any independent financial analysis or valuation analysis related to BEN or BEN common units, even though Foley knew that BEN faced severe financial distress (which cast doubt on the value of BEN equity). Finally, Foley failed to conduct any due diligence or ask any questions regarding BEN's capital stack, thereby failing to appreciate at that time—and advise the Special Committee—that BEN common units were almost worthless due to the "overhang" of senior preferred equity (indirectly owned predominantly by Heppner through his affiliate, BHI).

613.    In connection with the $65 Million Loan, Foley failed to conduct adequate due diligence surrounding critical issues, including the commercial reasonableness of the terms of the loan. At the outset of Foley's engagement, Stone recognized that a lengthy term for an unsecured loan at a modest 7% interest rate "isn't pretty as emergency funding." Foley likewise knew—based on representations by Heppner—that no third-party lender was willing to extend credit on the terms BEN requested of GWG. Nevertheless, Foley failed to obtain or conduct—or advise the Special Committee to obtain or conduct—any analysis of market terms for comparable, distressed

finance transactions, or even ask what terms other lenders were willing to offer to BEN. And more broadly, Foley failed to advise the Special Committee that Foley recognized that the terms were unfair to GWG, and that Foley had failed to ensure that improvements were made to "create a reasonable record," in Stone's words (as described in section C.2.a).

614.    Relatedly, Foley also failed to conduct adequate due diligence regarding supposed obstacles posed by HCLP on BEN's ability to obtain financing from third party lenders. Heppner specifically blamed "existing senior debt obligations of BEN" as one of the reasons why "there were no feasible alternative financing providers" to BEN—besides GWG—at the time the $65 Million Loan was entered into. Foley accepted that statement at face value, without asking any follow-up questions or conducting any follow-up due diligence to confirm Heppner's statements, even though Foley knew or should have known that BEN's purported senior debts were with affiliates of Heppner (for the many reasons alleged in section C.2.d). And as an outgrowth of Foley's failure to conduct any due diligence or investigate glaring red flags concerning Heppner's relationship with HCLP and BHI, Foley negligently failed to advise the Special Committee of those relationships and that the supposed difficulties created by Heppner-affiliated senior lenders—according to Heppner—were not a legitimate reason for GWG to agree to the proposed $65 Million Loan (especially on such unfair terms).

615.    Foley also departed from the professional standard of care in numerous respects in connection with the $79 million additional transfer GWG made to BEN in exchange for additional BEN equity interests on December 31, 2019.

616.    First, from June 2019 through December 2019, Foley became aware of numerous red flags of irregularities and significant problems with BEN's business and possible fiduciary misconduct regarding Heppner (as alleged in section D). By year-end, Foley knew (and/or had

inquiry notice) of facts indicating that it was against GWG's best interests to transfer any additional funds to BEN in exchange for BEN equity interests of any kind, or otherwise.  But Foley consistently failed to investigate or follow-up, instead burying its head in the sand.

617.  Second, Foley failed to act competently and diligently in ensuring that GWG paid a fair price for either: (a) the NPC-A capital account received in exchanged for $69 million; or (b) the BEN common units—at a price of $15 per unit—received in exchange for $10 million.  As alleged in section E.1, Foley ignored many problems with BEN's valuation that were known or reasonably knowable to Foley, such as concerns raised by VRC and myriad red flags surrounding Ankura's analysis of BEN, Heppner's NPC-A account, BEN's accounting practices, the lack of reliability of BEN's projections, and BEN's financially distressed condition.  Foley did not investigate or conduct diligence when presented with obvious reasons for concern, but instead looked the other way, tried to paper the transactions, and failed to advise the Special Committee that the consideration GWG received in exchange for its $79 million was grossly unfair.

618.  Third, Foley was grossly negligent with respect to its due diligence efforts surrounding the $49.8 million portion of the funds GWG advanced so that BEN could make a change of control payment to HCLP.  As detailed in sections E.2, Foley should have known of Heppner's control over HCLP and was aware of red flags indicative of the risk that Heppner would benefit from payments made to HCLP (yet Foley failed to reasonably investigate), Foley should have known that it had been lied to by Heppner and others concerning HCLP and Heppner's relationship with HCLP, Foley had reason to doubt that HCLP's supposed demand was real, and Foley recognized that a key diligence item was to confirm that HCLP's supposed demand was legitimate.  Yet despite all that, Foley never obtained any documentation for HCLP's supposed demand other than a draft letter—provided by BEN—that had a blank number for the demand that

was supposedly addressed from someone whom Foley had not previously dealt with in its earlier negotiations with HCLP.

619.   Fourth, and relatedly, Foley failed to ensure that GWG obtained substantive control rights in BEN, even though the supposed board designation rights GWG received on December 31, 2019, were the trigger for HCLP's supposed demand for a change of control payment.  As alleged in more detail in section E.3, Foley failed to recognize the risk that GWG's board designation rights in BEN would be usurped by Heppner and Holland, Foley failed to negotiate for any protections against that risk, and Foley was aware that Heppner and Holland intended to simply re-designate BEN's existing directors back to BEN's board.  Foley recognized that Heppner's sweeping consent rights meant that he would retain de facto control over BEN, yet failed to take any steps to mitigate that known risk in negotiating the BMLLC operating agreement.  And after failing to negotiate for protections for GWG or to ensure that GWG would obtain substantive rights, Foley nevertheless signed off on the BMLLC operating agreement anyway.

620.   Finally, as alleged in section E.5, Foley negligently advised the Special Committee that it should not insist on receiving debt—as opposed to equity—from BEN in exchange for GWG's cash because an increase in debt would supposedly make it more difficult for BEN to obtain its charter.  Foley conducted little to any diligence to confirm the veracity of that assertion.  Regardless, Foley failed to recognize that there would be almost no net increase in BEN's total debt because the vast majority of the funds GWG advanced ($75 million) were used by BEN to repay pre-existing debt.  And Foley failed to recognize that HCLP—which Foley should have known was affiliated with and controlled by Heppner—could forgive all or some portion of its debt in exchange for equity, and to advise the Special Committee to push for that in negotiations.

621.    In all three transactions (the Essex Transaction, the $65 Million Loan, and the December 2019 transactions), and throughout its representation more broadly, Foley further breached its professional duty of care by failing to properly advise the Special Committee on the applicable requirements of Delaware law.  Foley failed to advise that, under Delaware law, the Special Committee was required to: (a) negotiate vigorously and in a spirited manner; (b) approximate an arm's-length bargain in the marketplace; (c) conduct a market check and ensure that the consideration GWG received in any transaction was within the range of commercial reasonableness and what a third-party would have agreed to pay; (d) consider alternatives, including the possibility of saying "no" to any further funding; (e) make fully informed decisions; and (f) act solely in a manner that was in GWG's best interests, and for no other purpose.

622.    GWG suffered substantial harm directly in connection with the $10 million Essex Transaction, $65 Million Loan, and $79 million transfer in December 2019.  As a result of Foley's negligence and malpractice, the consideration GWG received in exchange for the $154 million it transferred to BEN was worth drastically less than the amount transferred at the time of those transactions and is now nearly worthless.  Accordingly, GWG suffered damages in an amount close to the entire $154 million it sent to BEN due to Foley's actions.  And GWG suffered additional harm as a result of incurring legal fees and costs related to SEC investigations and a contentious bankruptcy proceeding that those transactions precipitated.

623.    GWG also suffered additional harm as a foreseeable result of Foley's negligence in connection with failing to investigate Heppner's ties to HCLP, and in connection with the BMLLC operating agreement.  Heppner used changes to the BMLLC operating agreement—made under Foley's watch on December 31, 2019—as the prior justification to stack the Special Committee with Cangany in 2020.  And as a result of Cangany's addition to the Special Committee, Foley's

failures to speak up over its significant concerns related to Cangany, and Foley's failures to investigate HCLP, large additional sums were transferred from GWG to BEN (and on to HCLP and Heppner's other affiliates).  Because the BEN equity GWG received in exchange was worthless, GWG suffered damages in nearly the full amount of the $130.2 million it sent to BEN and/or HCLP during 2020.

624.    Foley's negligence and breach of its professional duties of care caused GWG to suffer those substantial damages.  For instance, had Foley competently and adequately advised the Special Committee of the requirements of Delaware law, and had Foley—after conducting reasonable due diligence—conveyed all material facts known or reasonably knowable to Foley, then Mason would not have approved the Essex Transaction, $65 Million Loan, or the December 2019 transactions (meaning that the transactions would not have occurred, as unanimity was required due to the two-person composition of the Special Committee).

625.    Because Foley was grossly negligent in its failures to properly advise the Special Committee, exemplary damages should be awarded pursuant to Texas Civil Practice & Remedies Code § 41.003.  When viewed objectively from the standpoint of a lawyer in Foley's position, there was an extreme degree of risk that GWG would be harmed by advancing funds to a highly distressed entity on terms that were substantially worse than what any third-party would have agreed to in the marketplace.  Foley was aware of the substantial risks involved to GWG, but nevertheless repeatedly failed to conduct even the most rudimentary diligence efforts.  Instead, Foley concerned itself merely with papering over the transactions, thereby manifesting a conscious indifference to GWG's interests.  Accordingly, exemplary damages should be awarded pursuant to Texas Civil Practice & Remedies Code § 41.003.

**COUNT III:**  **BREACH OF FIDUCIARY DUTY.**

626.    The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

627.    GWG was a Delaware corporation.  Delaware law provides that "the business and affairs of every corporation…shall be managed by or under the direction of a board of directors," and further provides that the board may delegate its powers to a committee, which "shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation" to the extent delegated.  8 Del. C. § 141(a).

628.    The two-person Special Committee of Mason and Chavenson was delegated with the GWG board's powers to manage the business and affairs of GWG, with respect to the Essex Transaction, the $65 Million Loan, and the December 2019 transactions.  Because the Special Committee managed GWG's affairs in connection with those transactions and was in privity with GWG in connection with GWG's delegation of powers to the Special Committee, Foley owed a fiduciary duty of loyalty to GWG in connection with those transactions.   Moreover, the GWG Special Committee did not occupy an adversarial posture to GWG, and was tasked with furthering GWG's best interests.

629.    Foley breached its fiduciary duty of loyalty to GWG by consistently acting against GWG's best interests, instead favoring the interests of Heppner, Holland, and BEN.  Foley only cared about GWG's interests to the limited extent that Foley did not think it could paper over transactions with BEN without creating unacceptable litigation risk.  Indeed, throughout its tenure as counsel for the GWG Special Committee, Foley was focused on balancing the need to accommodate Heppner's, Holland's and BEN's requests from GWG against litigation risk for Foley, Mason, and Chavenson.  What was fair to GWG and in GWG's best interests was only an

afterthought, and GWG's best interests only mattered to Foley to the extent that Foley thought covering up and papering over fiduciary misconduct created unacceptable litigation risk.

630.     As a result of Foley's corrupt and disloyal mindset, Foley consistently failed to bring known problems and significant concerns to GWG's and the full GWG board's attention. For instance, Foley remained silent when it suspected that Holland and Heppner were deceiving the full board regarding the circumstances surrounding Stein's, Zimmerman's, and Glaser's resignations in October 2019.  Foley never told GWG and/or the full GWG board about the "cozy[]" relationship between HCLP and Heppner, that it suspected that Heppner's affiliated trusts and entities owned HCLP, and that Foley and the Special Committee had caught Heppner in a lie regarding HCLP in December 2019.  And Foley never relayed its myriad concerns regarding Cangany to GWG or the full GWG board, even though Foley knew that Heppner, Holland, and BEN "really want[ed] this committee to conveniently keep the rest of the board (including Lockhart and Staubach) blissfully ignorant (and they believe Pete [Cangany] won't raise issues)."

631.     Heppner's self-dealing scheme continued into 2020 and early 2021, in large part because Foley stood by and never communicated known problems with HCLP and Cangany and the irredeemably tainted Special Committee that Foley knew would be "downstreaming large sums" of GWG cash to BEN and ultimately HCLP.

632.     Because Foley remained silent, failing to communicate the real reasons for its resignation when resigning over Cangany's appointment to the Special Committee in March 2020, Foley paved the way for an additional $130.2 million in transfers from GWG to BEN in 2020 (of which at least $84 million flowed through HCLP or Highland Consolidated into Heppner's affiliates).  Had Foley relayed known problems surrounding Cangany to GWG or GWG's full board (or advised the Special Committee to do so) and otherwise not breached its fiduciary duties

to GWG, then GWG's full board would have put a stop to transfers of GWG funds to BEN on unfair terms, and of transfers of GWG funds to HCLP and Highland Consolidated (via BEN as an intermediary).

**COUNT IV:**     **AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544(b) AND 550.**

633.     The Litigation Trust repeats and realleges each and every allegation contained above as if fully set forth herein.

634.     GWG made the following transfers of money to Foley (collectively, along with any other similar transfers made to Foley, the "Foley Transfers"):

| Invoice No. (if known) | Amount Paid | Payment Date |
|---|---|---|
| 40220048 | $197,636.75 | July 22, 2019 |
| | $57,435.00 | September 23, 2019 |
| | $79,879.00 | October 15, 2019 |
| 40277790 40290515 | $184,846.67 | December 23, 2019 |
| 40304204 | $93,313.88 | December 30, 2019 |
| 40317096 | $136,269.50 | January 21, 2020 |
| 40336584 | $37,608.00 | March 9, 2020 |
| 40352646 | $74,457.90 | April 6, 2020 |
| **Total:** | **$861,446.70** | |

635.     GWG did not receive any value, let alone reasonably equivalent value, in exchange for the Foley Transfers.  Although Foley owed a fiduciary duty of loyalty to GWG and a professional duty of care to GWG, Foley consistently acted against GWG's best interests in providing legal services to the Special Committee.  Foley acted grossly negligently, acted to favor Heppner's and BEN's interests (not GWG's), and actively and knowingly participated in, and otherwise encouraged and facilitated, Mason's breach of the fiduciary duty of care and Chavenson's breaches of his fiduciary duties of care and loyalty.  Foley's misconduct caused GWG to suffer significant damages, as alleged above.  Accordingly, GWG did not receive any economic

benefit or value in exchange for making payments to Foley, but instead suffered significant harm from Foley's grossly negligent and intentional misconduct.

636.    In large part due to the harmful transactions that Foley pushed through, GWG was insolvent at the time of the Foley Transfers.  GWG was insolvent because the amount of its liabilities exceeded the fair value of its assets (including the assets of its subsidiaries).  Specifically, because GWG's equity investment in BEN was effectively worthless (or worth at most a small fraction of the book amount) and its note receivable in BEN was effectively uncollectable, GWG's principal assets were its cash on hand and the fair value of the life insurance policies.  But the fair value of these and other non-BEN-related assets was materially less than the amount of GWG's total liabilities (such as its debt to third-party lenders and L-Bond holders).  GWG was also undercapitalized.

637.    Accordingly, a creditor of GWG could have avoided the Foley Transfers as fraudulent transfers under applicable law, including, but not limited to, Texas Business & Commerce Code ("TUFTA") §§ 24.005, 24.006, 24.008 & 24.009.  GWG had one or more creditors with allowable unsecured claims as of the petition date (*e.g.,* claims asserted by holders of L Bonds, tax claims by the IRS and state tax authorities, trade creditor claims, and unsecured litigation claims) that could have avoided the Foley Transfers.  In turn, the Foley Transfers are avoidable fraudulent transfers pursuant to 11 U.S.C. § 544(b), which allows the Litigation Trust to avoid a transfer of an interest in property by GWG that would be voidable under other applicable law by any creditor holding an unsecured, allowable claim.

638.    Because the Foley Transfers are avoidable pursuant to 11 U.S.C. § 544(b), the Litigation Trust may recover the transfers or the values thereof from Foley as an initial transferee pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

WHEREFORE, the Litigation Trust prays for relief and judgment as follows:

a.      entering judgment against Foley for aiding and abetting/knowingly participating in Mason's breach of the fiduciary duty of care and Chavenson's breaches of the fiduciary duties of care and loyalty; breaching its own fiduciary duties; and professional negligence/legal malpractice;

b.      awarding monetary damages in an amount to be determined at trial;

c.      awarding exemplary damages pursuant to Texas Civil Practice & Remedies Code § 41.003 in the maximum amount allowable;

d.      holding Foley jointly and severally liable for Chavenson's breaches of his fiduciary duty of loyalty (as an aider and abettor of, and knowing participant in, such breaches) and awarding rescissory damages in an amount to be determined at trial;

e.      ordering disgorgement of fees paid by GWG to Foley;

f.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

g.      avoiding the Foley Transfers pursuant to 11 U.S.C. § 544(b) and awarding monetary recovery of the amount of the Foley Transfers pursuant to 11 U.S.C. § 550;

h.      awarding reasonable attorney's fees and expenses, together with all costs of court, in connection with this action; and

i.      awarding such other and further relief as the Court deems just.

**Dated**: September 27, 2024

**REID COLLINS & TSAI LLP**

By: */s/        William T. Reid, IV*
William T. Reid, IV
Tex. Bar No. 00788817
S.D. Tex. Bar No. 17074
Nathaniel J. Palmer (admitted *pro hac vice*)
Tex. Bar No. 24065864
Michael J. Yoder (admitted *pro hac vice*)
Tex. Bar No. 24056572
Joshua J. Bruckerhoff
Tex. Bar. No. 24059504
S.D. Tex. Bar No. 1049153
Morgan M. Menchaca
Tex. Bar No. 24103877
S.D. Tex. Bar No. 3697565
Dylan Jones (admitted *pro hac vice*)
Tex. Bar No. 24126834
Emma G. Culotta
Tex. Bar No. 24132034
S.D. Tex. Bar No. 3862661
Taylor A. Lewis
Tex. Bar No. 24138317 (admitted *pro hac vice*)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
(512) 647-6100
wreid@reidcollins.com
npalmer@reidcollins.com
myoder@reidcollins.com
jbruckerhoff@reidcollins.com
mmenchaca@reidcollins.com
djones@reidcollins.com
eculotta@reidcollins.com
tlewis@reidcollins.com

Tarek F.M. Saad (admitted *pro hac vice*)
Tex. Bar No. 00784892
420 Lexington Avenue, Suite 2731
New York, NY 10170
(212) 344-5203
tsaad@reidcollins.com

*Counsel for the GWG Litigation Trustee*