**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GWG HOLDINGS, INC., *et al*.<br><br>Debtors. | Chapter 11<br><br>Case No. 22-90032 (MI) (Jointly Administered) |

| | |
|---|---|
| MICHAEL I. GOLDBERG, as Trustee of the GWG LITIGATION TRUST,<br><br>       Plaintiff,<br><br>v.<br><br>HOLLAND & KNIGHT LLP and WILLIAM ("BILL") BANOWSKY,<br><br>       Defendants. | Adv. Pro. No. _____ |

**<u>COMPLAINT</u>**

## TABLE OF CONTENTS

I.    NATURE OF ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ................................................................ 10

III.  PARTIES .................................................................................................... 10

IV.  FACTUAL BACKGROUND ...................................................................... 20

    A.  GWG's Historical Secondary Life Insurance Policy Business and Public Capital-Raising Machinery. ............................................................ 20

    B.  Overview of BEN's Founding and Heppner's HCLP-Related Scheme. ...................... 20

        1.  BEN's Formative Transactions and Introduction to GWG. ..................... 20

        2.  Summary of Heppner's Self-Dealing Scheme to Loot GWG Using HCLP as a Front. ................................................................... 24

    C.  With Defendants' Aid, Heppner Induces BEN to Buy Out GWG's Founders to Facilitate His Planned Scheme. ................................................ 35

        1.  Defendants' False Representations in February 2019 Create the Foundation for Heppner's Fraud. ............................................. 36

        2.  After Obscuring Heppner's Control Over HCLP, Banowsky Acts at Heppner's Direction to Make False Demands on BEN in March 2019. ................................................... 44

        3.  Heppner and BEN Implement a Plan to Siphon Cash from GWG. ......... 48

    D.  Heppner Again Uses HCLP to Defraud GWG of $49.8 Million in December 2019. ..... 54

        1.  After GWG's Directors Get Suspicious, Heppner Attempts to Cover His Tracks With Defendants' Aid. ........................................... 54

        2.  GWG Pays $79 Million—Nearly $50 Million of Which was Earmarked for HCLP. .................................................................... 77

    E.  GWG Continues to Send Money to BEN Throughout 2020 in Reliance on Defendants' False Representations. .......................................... 84

        1.  The May 2020 Term Sheet. ...................................................... 85

        2.  The July 2020 UPA. .................................................................. 86

        3.  Banowsky and HK Continue to Take Direction from Heppner in Representing HCLP. ................................................................... 93

    F.  GWG Invests a Further $14.8 Million in BEN in March 2021 After Banowsky Makes New Threats to Foreclose. .......................................... 97

    G.  GWG and BEN "Deconsolidate" and GWG Declares Bankruptcy a Few Months Later. ................................................................................... 103

        1.  Heppner Tries to Sever Ties Between GWG, BEN, HCLP, and Himself to Thwart an SEC Investigation. ............................................... 103

i

2. GWG Discloses in Its 2020 Form 10-K That Money It Paid to BEN Wound Up in Heppner's Pockets. ........................................................................ 110

3. Banowsky and HK Make Further Misrepresentations in 2022 as GWG Prepares to File Bankruptcy. .................................................................... 115

H. The BEN Equity GWG Received Had Minimal Fair Market Value. .......................... 121

1. BEN's Business Was Undercapitalized. ........................................... 122

2. BEN's Business Plan Had Fundamental Conceptual and Logical Flaws, Which Made Its Projections Unrealistic. ............................................. 123

3. BEN's Projections Were Unrealistic. ............................................ 124

4. Valuation Analyses of BEN Were Unreliable, and BEN Equity Had Minimal Value. ............................................................................ 126

V.  Allegations Relating to Anticipated Defenses ........................................... 126

A. The Trustee's Claims Are Not Barred by the Attorney Immunity Doctrine. .............. 126

1. GWG Justifiably Relied on Banowsky's Misrepresentations. ..................... 126

2. Banowsky's Actions Were Not Done to Discharge Any Duty Owed to HCLP; Instead, He Participated in Heppner's Fraudulent Scheme. ................... 127

B. Tolling of Limitations. ............................................................. 130

1. The Discovery Rule Tolls the Statute of Limitations. ......................... 130

2. The Statute of Limitations Should Be Tolled for Defendants' Fraudulent Concealment. ................................................................. 131

3. The Parties Have Entered Into a Series of Tolling Agreements. ............... 132

C. HK Is Vicariously Liable for Banowsky's Conduct. ................................... 133

CLAIMS ................................................................................. 134

Count I: Civil RICO *(18 U.S.C. § 1962(c))* ............................................ 134

Count II: RICO Conspiracy *(18 U.S.C. § 1962(d))* ..................................... 142

Count III: Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty ...... 145

Count IV: Civil Conspiracy ............................................................. 147

Count V: Fraud  *(November 2019 Call)* ................................................ 150

Count VI: Negligent Misrepresentation  *(November 2019 Call)* ......................... 153

PRAYER FOR RELIEF ...................................................................... 155

JURY DEMAND ............................................................................ 156

ii

Michael I. Goldberg, as Litigation Trustee (the "**Trustee**") of the GWG Litigation Trust (the "**Trust**"), which owns the causes of action belonging to the Debtors[1] or their Estates,[2] hereby brings this action by and through his undersigned counsel against Holland & Knight LLP ("**HK**") and William "Bill" Banowsky ("**Banowsky**" and with HK, "**Defendants**") and respectfully alleges the following:

## I.     NATURE OF ACTION

1.      This action arises out of Defendants' knowing participation with Bradley K. Heppner ("**Heppner**") in a fraudulent looting scheme and associated criminal enterprise perpetrated against GWG Holdings, Inc. (together, with its wholly owned subsidiaries, "**GWG**"). Through this fraudulent and unlawful activity, Defendants aided Heppner, GWG's former chairman of the board, in defrauding GWG out of over $100 million.

2.      In essence, Defendants and Heppner fraudulently induced GWG into advancing nine figure sums to The Beneficient Company Group, L.P. ("**BEN LP**," including all affiliates— "**BEN**") under the guise that such advances were necessary for BEN to repay its purported senior lender and stave off collapse (which would have jeopardized GWG's prior investments in BEN). Unbeknownst to GWG, however, the senior lender was a front for Heppner, and the funds GWG advanced immediately flowed in-and-out of bank accounts of various Heppner-controlled intermediaries into an entity that had for two decades functioned as Heppner's personal slush fund, Highland Consolidated, LP ("**Highland Consolidated**"). From there, the funds flowed into

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GWG Holdings, Inc. (2607); GWG Life, LLC (6955); GWG Life USA, LLC (5538); GWG DLP Funding IV, LLC (2589); GWG DLP Funding VI, LLC (6955); and GWG DLP Funding Holdings VI, LLC (6955). The location of Debtor GWG Holdings, Inc.'s principal place of business and the Debtors' service address is 325 N. St. Paul Street, Suite 2650 Dallas, TX 75201. Further information regarding the Debtors and these chapter 11 cases is available at the website of the Debtors' claims and noticing agent: https://donlinrecano.com/gwg.

[2] Estate means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

1

Heppner-affiliated trusts and entities for his and his family's personal gain, directly contrary to representations Defendants made to GWG's decision-makers that Heppner could not control HCLP and would not benefit from GWG's advances.

3. Defendants played a critical role in this fraudulent scheme and unlawful enterprise. Heppner needed a willing accomplice because, at its core, the fraudulent scheme entailed two key components, neither of which Heppner could have pulled off on his own: (1) portraying BEN's supposed senior lender, HCLP Nominees, LLC ("**HCLP**") as an independent, hard-bargaining third-party lender eager to collect on loans made to BEN (the "**BEN-HCLP First and Second Debts**"); and (2) having HCLP make various threats and demands for payment from BEN on the debts it was purportedly owed. In other words, Heppner needed someone else to both: (a) authoritatively and independently downplay his relationship with HCLP and Highland Consolidated when questions were asked; and (b) act as a mouthpiece for HCLP to make demands and threats so that such threats would be credible (as Heppner himself could not credibly threaten BEN). Heppner found his man in Defendant Banowsky, whom Heppner had known since at least 2003.

4. In particular, Banowsky knowingly played a pivotal role in concealing Heppner's relationship with HCLP during the critical time period from early 2019 through late 2020, when GWG was fraudulently induced into advancing at least $128 million earmarked to pay down BEN's purported debt to HCLP. Banowsky intentionally and fraudulently disguised Heppner's relationship with HCLP in three critical respects, none of which were in the ordinary course of providing professional legal services or discharging any professional duties he owed to HCLP.

5. <u>First</u>, in February 2019, Banowsky conspired with Heppner and one of Heppner's longtime friends, Keith Martens, to perpetrate an accounting fraud in BEN's audited financial

statements (which BEN was required to provide to GWG).  At that time, BEN's auditor was asking for information regarding Heppner's connection with HCLP for purposes of related party disclosures in notes to BEN's financial statements. If BEN's auditor had been told the truth, BEN's fiscal year 2018 financial statements would have disclosed the full extent of Heppner's relationship with HCLP and Highland Consolidated and, in turn, Heppner's planned looting scheme never would have gotten off the ground.

6.     To instead conceal Heppner's relationship with HCLP, Heppner, Banowsky, and Martens conspired to fraudulently backdate several organizational documents for entities in HCLP's control structure in mid-February 2019, while representing that Martens—not Heppner— ultimately controlled HCLP.  As part of that effort, Banowsky penned a "litigation opinion" letter[3] dated February 11, 2019, which falsely represented that Martens "ultimately controls" HCLP, had been in a position to do so (as manager of Highland Consolidated's general partner) "since at least September 1, 2017," and disclaimed that Martens had any connection to Heppner. Banowsky knew that those representations were false. Specifically, Banowsky knew that: (a) Heppner, not Martens, had been (since 2017) and still was the manager of Highland Consolidated's general partner as of the time of the letter; (b) Martens took marching orders from Heppner and had a close relationship with him; and (c) the planned, backdated changes to the relevant organizational documents had not even been made yet as of the date of the letter. Yet Banowsky, who always did as Heppner asked, knowingly spouted such falsehoods.

7.     Moreover, just days later, Banowsky collaborated with Heppner and drafted a false and misleading letter for Martens to send *to Banowsky*. Banowsky and Heppner did so with the

---

[3] This opinion letter was given in the context of other accounting questions surrounding BEN's ability to remove Holland as co-trustee of certain funding trusts affiliated with BEN. In part by falsely portraying HCLP as a third-party lender, Banowsky opined that BEN could not unilaterally remove Holland because HCLP "would have to approve" and thus BEN "does not have, and never has had, the sole authority to remove and replace Holland as a trustee."

understanding and intent that this letter would be subsequently provided to BEN's auditors to further mislead them regarding Heppner's relationship with HCLP and HCLP's control structure. The letter that Banowsky—along with Heppner—drafted for Martens (to send to Banowsky) parroted many of the same falsehoods set forth in Banowsky's February 11, 2019 "litigation opinion." In particular, the Martens letter: (a) falsely stated that Martens had served as manager of Highland Consolidated "since July 7, 2017;" and (b) falsely stated that "no party has the ability to remove and replace [Martens]" in that role.

8.      As a result of fraudulent backdating and the misrepresentations made to BEN's auditors in Banowsky's litigation opinion letter and the Banowsky-drafted Martens letter in February 2019, BEN's fiscal year 2018 audited financial statements (provided to GWG in mid-2019) contained materially misleading disclosures of Heppner's relationship with HCLP. Those financial statements disclosed that HCLP "is an indirect subsidiary of Highland Consolidated, and that Highland Consolidated is "controlled by affiliates of BEN, the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries." But those disclosures were misleading because they did not suggest that Heppner in fact exercised control over the relevant general partner entities that controlled Highland Consolidated and, in turn, HCLP. Nor did those disclosures provide any indication that Highland Consolidated had or would transfer the funds it received to Heppner's other affiliated trusts and entities.

9.      Second, in October 2019, Banowsky again conspired with Heppner to fraudulently backdate organizational documents pertaining to HCLP's control structure and make related misrepresentations. The reason for those fraudulent efforts was that, in August and September 2019, three dual-directors of GWG and BEN had begun to question Heppner's relationship with

4

HCLP. In turn, counsel to a subcommittee of BEN's board of directors was tasked with investigating the relationship. That investigation threatened to reveal Heppner's relationship with HCLP and Highland Consolidated, which would have unraveled the scheme.

10.    To get ahead of the investigation, Heppner and Banowsky together developed a plan through which: (a) David Wickline, a colleague of Heppner's from his prior tenure at Goldman Sachs, would replace Keith Martens as HCLP's nominal human manager; and (b) the various entities in HCLP's control structure would undertake a "restructuring" to be accomplished through revised organizational documents backdated to April 1, 2019.  That date was no accident, but rather was intended to fraudulently make it appear that Wickline—not Martens or Heppner— had been in place at the time certain GWG funds were funneled through BEN to HCLP in early June 2019, thereby creating the illusion that HCLP had been managed by a former investment banker with no readily apparent ties to Heppner (as opposed to Martens, a commercially unsophisticated salesman who was Heppner's hometown friend).

11.    In addition to helping develop this "restructuring" plan, Banowsky further knowingly participated in the plan to thwart the committee's investigation by authoring a misleading letter directed to committee counsel, dated October 5, 2019 (the "**October 2019 Letter**"). The October 2019 Letter was replete with falsehoods. Specifically, the October 2019 Letter:

- Falsely stated that "Brad Heppner cannot control HCLP," even though Banowsky knew full well that Heppner: (a) had and continued to exercise de facto control over HCLP; and (b) had already twice and could again replace HCLP's manager at will by executing written consents by trusts Heppner controlled that were higher in the organizational control structure;

- Falsely stated that Heppner did not "have the power to remove and replace the manager of" Highland Consolidated's general manager, even though Banowsky knew that Heppner had done so twice in the past eight months

(replacing himself with Martens in February 2019 and replacing Martens with Wickline in October 2019);

- Falsely stated that the "manager of" Highland Consolidated's general partner "controls HCLP," even though Banowsky knew that both Martens and Wickline were mere puppets and that Heppner called the shots;

- Falsely stated that "Heppner cannot control the distribution of proceeds from…loan repayments to HCLP," even though Heppner had full control over HCLP's bank accounts and directed transfers of such proceeds to Highland Consolidated and from there to Heppner's trusts and affiliates; and

- Contained several misleading statements regarding trusts that owned Highland Consolidated that were both: (a) factually inaccurate; and (b) ignored that Heppner had and could divert funds from Highland Consolidated to his other trusts and entities as "investments," "advances," or "loans" instead of transferring funds upstream to Highland Consolidated's ultimate owners.

Accordingly, the October 2019 Letter was an instrument of fraud, intended all along to downplay Heppner's relationship with HCLP and enable the corporate looting scheme.

12.     Ultimately, Banowsky's false and misleading October 2019 Letter directly furthered the scheme to fraudulently induce GWG to advance funds to BEN to repay HCLP. BEN's counsel, in reliance on the letter, repeated the false statements contained therein, almost verbatim, to counsel for a Special Committee of GWG's board of directors in December 2019 in connection with a payment demand from HCLP.  And as a result of the "restructuring" that Banowsky and Heppner pushed through in October 2019, BEN's fiscal year 2019 financial statements—provided to GWG in March 2020—falsely stated that HCLP was not a "related party or affiliate," instead characterizing it as an entity which "may have previously been under the control of our founder but ha[s] subsequently come under the control of a third party who is independent and unrelated to our founder."

13.     Third, and finally, Banowsky knowingly and directly assisted in concealing Heppner's relationship with HCLP by making affirmative misstatements to the GWG Special

6

Committee's counsel (Foley & Lardner LLP) in November 2019 when asked about the relationship. Specifically, on or about November 15, 2019, Banowsky "explained the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates)" to Special Committee counsel, and further "represented that Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender and ***that unequivocally no debt repayment would be received by Mr. Heppner or his affiliates***." (Emphasis added). These statements were patently false because: (a) Heppner exercised de facto control and installed frontmen for HCLP and (b) Heppner immediately directed almost all funds HCLP received—through a Heppner-controlled intermediary—to Heppner's slush fund, Highland Consolidated, and from there to his other affiliated trusts and entities.

14.     As a result of Banowsky's fraudulent activities in February 2019, October 2019, and November 2019 and the related misleading disclosures in BEN's financial statements, the GWG Special Committee in 2019 and 2020 was deceived regarding Heppner's relationship with HCLP. The GWG Special Committee never would have approved GWG funds being used to pay down BEN's supposed debts to HCLP had they known the truth of Heppner's relationship with HCLP and/or that advanced funds would immediately move in-and-out of HCLP's bank accounts and ultimately into Heppner's other affiliated trusts and entities. But instead, the GWG Special Committee was fraudulently induced into approving $49.8 million of GWG funds being used to pay down BEN's purported debt with HCLP in December 2019, and a payment schedule pursuant to which $78.2 million of GWG funds flowed directly or indirectly to HCLP from July 2020 to December 2020 as addition paydowns of the purported debt.

15.     In addition to knowingly participating in the fraudulent backdating of documents, BEN's accounting fraud, and making related misrepresentations to GWG, Banowsky also

7

conspired with Heppner and knowingly furthered the fraudulent scheme by serving as HCLP's mouthpiece and attack dog. Over the course of a two-year period from March 2019 to March 2021, Heppner repeatedly turned to Banowsky to make threats—purportedly on behalf of HCLP—to pressure GWG into approving transactions with BEN on terms that were unfavorable to GWG. By threatening that HCLP would declare a default and foreclose on BEN and, thereby, destroy GWG's pre-existing investments in BEN, Banowsky—in cahoots with Heppner—effectively browbeat GWG's decision-makers into approving transactions with BEN on terms demanded by Heppner.

16.     HCLP's supposed demands and threats resulted in: (a) GWG wire transferring $49.8 million for BEN to send to HCLP as a supposed "change of control" premium in December 2019; (b) GWG wire transferring $28.2 million directly to HCLP in July 2020 and agreeing to unfair terms under a Unit Purchase Agreement, pursuant to which GWG sent another $50 million to BEN earmarked for HCLP during 2020; and (c) GWG transferring an additional $14.8 million to BEN in March 2021. Those payments would have been made if not for: (a) HCLP's bogus threats to foreclose, demands for immediate payment, and claims that HCLP would not extend the loans, all of which would effectively end BEN's business (and, in turn, negatively impact GWG's investment in BEN); and (b) Banowsky's participation in other fraudulent activities disguising Heppner's relationship with HCLP.

17.     Moreover, Heppner never would have been able to utilize threats from HCLP as a cudgel without Banowsky's malfeasance. In essence, negotiations between GWG and BEN amounted to hostage negotiations, with HCLP holding a gun to BEN's head and threatening to pull the trigger if GWG did not cough up tens of millions of dollars for BEN to pay down its supposed debts to HCLP or otherwise acquiesce to HCLP's purported demands (as conveyed by Banowsky).

Heppner himself, as BEN's founder, CEO, chairman, and largest equity holder, never could have credibly threatened to destroy BEN if GWG failed to pay up. But with Banowsky making the threats (*i.e.*, holding the gun) and falsely portraying HCLP as a hard-bargaining third party, the danger appeared credible, and GWG's decision-makers ultimately caved.

18.     In making threats and demands on HCLP's behalf, Banowsky knew full well that HCLP would never actually carry through with those threats. Indeed, Banowsky sought direction from Heppner and knew that Heppner controlled HCLP, and Banowsky likewise knew that Heppner would never actually kill BEN, his brainchild. Yet Banowsky—following Heppner's lead—made such bogus demands anyway, knowing full well that they were false, in order to induce GWG's decisionmakers to cave to Heppner's demands.

19.     In sum, Banowsky was a knowing and active participant in both fraudulently concealing Heppner's relationship with HCLP (and its ultimate parent, Highland Consolidated) and making sham demands for payment, both of which fraudulently induced GWG into advancing funds to BEN to pay HCLP (and, on one occasion, directly to HCLP on BEN's behalf). And on top of that, Banowsky helped Heppner cover up that wrongdoing throughout 2021 and early 2022, including by: (a) coordinating with Heppner and giving evasive responses to a Securities and Exchange Commission subpoena; (b) helping Heppner coordinate and paper over (again, with backdated documents) a supposed "repayment" of the "loans" that Heppner's affiliated trusts and entities had received from Highland Consolidated; (c) agreeing to step in as the trustee of trusts that owned Highland Consolidated; (d) sending a misleading letter that he knew GWG would rely upon in making more fulsome, but still incomplete and misleading, disclosures of Heppner's relationship with HCLP in its fiscal year 2020 financial statements; and (e) making false statements to GWG's debtors' counsel in advance of GWG's bankruptcy filing. Accordingly, the Litigation

9

Trustee seeks to hold Banowsky liable—and Defendant HK vicariously liable—for his misconduct.

## II.    JURISDICTION AND VENUE

20.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

21.    On April 20, 2022, Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, thereby commencing the above-captioned bankruptcy case.

22.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334 because it is related to the above-captioned bankruptcy case and the outcome of this proceeding affects the Debtors' Estates.

23.    Venue for the action is proper pursuant to 28 U.S.C. § 1409 because Debtors' bankruptcy case is pending in this District.

24.    This Court has personal jurisdiction over Defendants in this proceeding because each Defendant has sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004.

25.    Plaintiff does not consent to the entry of final orders or judgments pursuant to Federal Rule of Bankruptcy Procedure 7008. Pursuant to Bankruptcy Local Rule 7008-1, Plaintiff does not consent to the entry of final orders or judgments by the Court.

## III.    Parties

26.    On April 20, 2022, GWG Holdings, Inc. ("**GWG**") and its subsidiaries GWG Life, LLC ("**GWG Life**"), GWG Life USA, LLC (collectively, the "**Initial Debtors**"), and on October 31, 2022, GWG DLP Funding IV, LLC, GWG DLP Funding Holdings VI, LLC, and GWG DLP Funding VI, LLC (collectively, the "**DLP Entities**," together with the Initial Debtors, the

"**Debtors**"), filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), Case No. 22-90032 (MI).

27.     Plaintiff Michael I. Goldberg ("**Trustee**") is the Trustee of the GWG Litigation Trust (the "**Litigation Trust**"), which was formed on June 20, 2023, pursuant to Debtors' Further Modified Second Amended Joint Chapter 11 Plan (the "**Plan**"). The Plan assigned to the Litigation Trust certain assets, including "all Avoidance Actions, all Causes of Action set forth on a schedule in the Plan Supplement … and any other Causes of Action belonging to the Debtors or their Estates that are not released pursuant to this Plan or other Final Order, and … all entitlements, proceeds and rights to payments with respect to any of the foregoing." The Litigation Trust is obligated to investigate and prosecute causes of action belonging to Debtors and distribute the proceeds thereof to its sole beneficiary, the GWG Wind Down Trust, which will distribute such proceeds to Debtors' creditors.

28.     Defendant Holland and Knight LLP ("**HK**") is a limited liability partnership incorporated in Florida with offices throughout the United States, including in Texas. HK is the successor-in-interest to Thompson & Knight LLP ("**TK**"), which merged with and into HK effective August 1, 2021. HK includes TK where context so requires.

29.     Defendant William "Bill" Banowsky ("**Banowsky**") is an individual residing in Texas. Banowsky is an attorney admitted to practice in the state of Texas, but is listed as non-practicing by the state bar. Banowsky was a partner at TK and is currently a partner at HK. Banowsky served as counsel to GWG, BEN, HCLP, and Bradcos during the relevant time period.

## Relevant Non-Parties

### 1. *GWG Directors During the Relevant Period.*

30.     Twenty different individuals served on GWG's board during the period between BEN's takeover of GWG's board on April 26, 2019 through GWG's bankruptcy filing in April 2022.

31.     During this time, six independent directors served on GWG's board. Each of them served on some iteration of the Special Committee: (1) Kathleen Mason (May 13, 2019 to March 2, 2020); (2) David Chavenson (May 13, 2019 to November 16, 2022); (3) Roy Bailey (March 16, 2020 to March 6, 2021); (4) Daniel Fine (September 3, 2020 to March 6, 2021); (5) David Gruber (September 3, 2020 to October 27, 2020); and (6) Jeffrey MacDowell (January 6, 2021 to March 6, 2021). As detailed below, these independent directors asked questions about HCLP's control and ownership structure and would have put a stop to payments to BEN in respect of the BEN-HCLP First and Second Debts had they known Heppner controlled and benefitted from money paid to HCLP, and that funds sent to HCLP ultimately were transferred into Heppner's trusts and entities. However, these directors were misled by Banowsky's false or misleading statements and backdated organizational changes designed to obscure Heppner's control over HCLP.

32.     GWG's other directors during the relevant period were dual directors of both GWG and BEN.  These directors likewise would have put a stop to payments made by GWG as paydowns of BEN's debts to HCLP had they known the truth surrounding Heppner's relationship with HCLP and that funds transferred would end up in Heppner's affiliated trusts and entities. Such dual GWG-BEN directors were prominent members of the Dallas business community and/or experienced and sophisticated businesspeople, and they would not have approved of Heppner's fraudulent—and criminal—activity had they known the whole truth. These directors included the following: (1) Sheldon ("Shelly") Stein (April 26, 2019 to October 15, 2019); (2) David Glaser (April 26,

12

2019 to October 15, 2019); (3) Bruce Zimmerman (April 26, 2019 to October 15, 2019); (4) Richard Fisher (April 26, 2019 to October 15, 2019); (5) Michelle Caruso-Cabrera (April 26, 2019 to February 21, 2020); (6) Roger T. Staubach (April 26, 2019 to June 15, 2020); (7) Dennis P. Lockhart (May 13, 2019 to June 14, 2021); (8) David H. de Weese (April 26, 2019 through GWG's bankruptcy filing); (9) Peter T. Cangany, Jr. (April 26, 2019 to June 20, 2022); (10) Thomas O. Hicks (April 26, 2019 to June 14, 2021); and (11) Bruce W. Schnitzer (April 26, 2019 to June 14, 2021).

33.     These directors had substantial power over GWG and served on GWG's Executive Committee, GWG's Audit Committee, and several BEN committees. As described below, many of these dual-directors (Glaser, Stein, Zimmerman, and Fisher) also attempted to investigate the BEN-HCLP First and Second Debts and HCLP's ownership and control structure but were thwarted by Banowsky's misrepresentations and obfuscation. These directors likewise would have put a stop to GWG investment in BEN or at the very least demanded better terms for GWG had they known the truth about HCLP.

### 2.     *Heppner and Affiliated Entities.*

34.     Bradley K. Heppner ("**Heppner**") is BEN's founder, chairman, and CEO. Heppner became a GWG director on April 26, 2019, and GWG's chairman on April 29, 2019. Heppner remained in those roles until he resigned from GWG's board on June 14, 2021.

35.     Beneficial Holdings, Inc. ("**BHI**") is a Delaware corporation. BHI is the principal entity through which Heppner (indirectly) holds his interest in BEN's business. BHI is solely owned and controlled by the Highland Business Holdings Trust.

36.     The Highland Business Holdings Trust (the "**HBHT**") is the sole owner and controller of BHI. Heppner is the "Family Trustee" of HBHT and, in that role or otherwise, effectively wields control over HBHT and, in turn, BHI. Specifically, BEN's securities filings,

13

signed by Heppner, attribute voting power for BEN shares held by BHI to Heppner because "BHI is an entity held by The Highland Business Holdings Trust, of which Mr. Heppner is a beneficiary and a trustee and, in such capacity, has the sole power to vote and direct the disposition of such shares. Therefore, such shares are deemed to be beneficially owned by Mr. Heppner and The Highland Business Holdings Trust."[4]

37.     Bradley Capital Company, LLC ("**Bradley Capital**") is a Delaware limited liability company whose manager during the relevant period was Highland Counselors, L.L.C. Bradley Capital entered into a "Services Agreement" with certain BEN entities, effective June 1, 2017, pursuant to which Heppner received compensation. Bradley Capital was the entity through which Heppner billed private air travel—including for personal purposes—that was paid for by BEN and GWG. Bradley Capital, directly or indirectly, was one of the primary recipients of funds transferred by GWG to BEN and/or HCLP.

38.     Highland Consolidated, L.P. ("**Highland Consolidated**") is a Texas limited partnership. Highland Consolidated was formed in December 1996 by Heppner, a family member, and HCI, which Heppner managed at the time. Initially, Heppner held: (a) 50% of the Class A limited partnership interest (with his family member holding the remaining 50%); and (b) 99.0% of the Class B limited partner interests, with HCI holding the remainder. According to section 2.06 of its Limited Partnership Agreement, some of the stated purposes of Highland Consolidated were: "[t]o consolidate the management of certain property of the family of Bradley K. Heppner" and "to promote efficient and economical management of certain properties of the family of Bradley

---

[4]     BEN's Form 10-K for the fiscal year ended March 31, 2024 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000177573424000029/ben-20240331.htm).

K. Heppner." Highland Consolidated functioned as Heppner's personal slush fund, as alleged herein.

39.     HCLP Nominees, L.L.C. ("**HCLP**") is a Delaware limited liability company formed on July 21, 2017. The initial sole member of HCLP was HCLP Credit (defined below). In August 2019 (but made retroactive to April 1, 2019), BHI received a 34% interest in HCLP in exchange for an assignment of the BEN-HCLP Second Debt. Highland Counselors (defined below) was the manager of HCLP at its formation, as well as at various points in time thereafter. On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and appoint CMH (defined below) as successor manager, effective as of April 1, 2019. HCLP received over $163 million, mostly originating from GWG, during the relevant period. HCLP immediately transferred almost all funds it received through an intermediary, HCLP Credit, to Highland Consolidated.

40.     HCLP Credit Company, L.L.C. ("**HCLP Credit**") is a Delaware limited liability company formed on July 21, 2017. The initial and sole member of HCLP Credit was and remains, on information and belief, Highland Consolidated. Highland Counselors (defined below) was the manager of HCLP Credit at its formation, as well as at various points in time thereafter. On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019. HCLP Credit served as a waypoint between HCLP and Highland Consolidated for funds transferred by BEN and HCLP. All funds that HCLP Credit received from HCLP were immediately transferred to Highland Consolidated.

41.     Highland Consolidated Investments, L.L.C. ("**HCI**") is a Texas limited liability company. HCI was formed in December 1996 by Heppner, Marcy Heppner Thiesen, and Jeffrey

15

K. Hinkle in his capacity as Trustee of the Bradley K. Heppner 1996 Family Trust, the three of whom were HCI's initial members. Heppner was named as HCI's manager in its initial operating agreement dated December 20, 1996. At the time, HCI managed Highland Consolidated. In later years, HCI served as general partner of Highland Consolidated.

42.     Crossmark Master Holdings, L.L.C. ("**CMH**") is a Delaware limited liability company formed on December 30, 1999. Upon formation, CMH was named Crossroads Principals, L.L.C. Heppner, as ultimate human controller, changed the entity's name to Crossroads Master Holdings, L.L.C. on June 24, 2002, and further changed its name to CMH on December 15, 2003. On or around October 3, 2019, Heppner purported to remove HCIC as manager of CMH and appoint David Wickline as successor manager, effective as of October 3, 2019. On or around October 3, 2019, Heppner also purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager of those entities, effective as of April 1, 2019.

43.     The Highland Management Trust ("**HMT**") is the sole owner and controller of CMH. Heppner served as trustee of HMT until June 2021, when he was replaced by Banowsky.

44.     Highland Counselors, L.L.C. ("**Highland Counselors**") is a Delaware limited liability company formed on September 16, 2003. Highland Counselors was manager of Beneficient Holdings GP, L.L.C. (the general partner of Beneficient Company Holdings, L.P., the sole member of Beneficient Capital Company, L.L.C.) in 2017. Highland Counselors was also manager to HCLP and HCLP Credit at the formation of those entities in 2017, as well as at various points in time thereafter. On or around October 3, 2019, Heppner purported to remove Highland Counselors as manager of HCLP and HCLP Credit and appoint CMH as successor manager, effective as of April 1, 2019.

16

45.     The Bradley K. Heppner Family Trust ("**Brad Heppner Family Trust**") is a trust organized under the laws of the State of Texas whose trustee during the relevant period was Brad Heppner. The Brad Heppner Family Trust was one of the ultimate recipients of funds sent through HCLP and Highland Consolidated.

46.     Elmwood Bradley Oaks, L.P. ("**Elmwood Bradley Oaks**"), a limited partnership organized under the laws of the State of Delaware whose general partner, Elmwood Bradley Oaks, was one of the ultimate recipients of funds sent through HCLP and Highland Consolidated. Elmwood Bradley Oaks is associated with Heppner's family ranch, the 1,500-acre Bradley Oaks Ranch in Texas.

47.     FYI Partners, LLC ("**FYI Partners**") is a Delaware limited liability company formed in in 2004. FYI Partners is beneficially owned by Heppner's sister and brother-in-law, Marcy and Jeffrey Thiesen, and Heppner's mother, Alma Heppner. Highland Consolidated "advanced" approximately $286,000 to FYI Partners during the relevant time period. FYI Partners transferred that obligation to the Brad Heppner Family Trust in a June 2021 series of transactions by which Highland Consolidated purportedly released approximately $104 million in obligations it was owed by Bradcos.

48.     Highland Real Assets, LLC ("**HRA**") is a Delaware limited liability company formed in 2002. HRA was a subsidiary of BEN LP, defined below, until BEN's formative transactions in September 2017, at which time HRA was distributed to the Highland Business Holdings Trust. Highland Consolidated "advanced" approximately $10.8 million to HRA during the relevant time period. HRA transferred that obligation to the Brad Heppner Family Trust in a June 2021 series of transactions by which Highland Consolidated purportedly released approximately $104 million in obligation it was owed by Bradcos.

17

49.     Jeffrey Hinkle ("**Hinkle**") was a BEN officer from the date BEN was capitalized through August 23, 2019. Hinkle was also a trustee of various liquid trusts implicated in the relevant transactions and manager for Highland Counselors. Hinkle previously worked in Heppner's "family office" and was trustee of the Brad Heppner Family Trust, manager of HCIC, and manager of Highland Counselors.

50.     Keith Martens ("**Martens**") is a long-time acquaintance of Heppner's from Hesston, Kansas. Heppner installed Martens as trustee of The Great Plains Trust, defined below, and as manager of HCI in February 2019. In 2021, Martens became a Managing Director and Co-Head of Fiduciary Financial Institutions at a BEN subsidiary.

51.     David Wickline ("**Wickline**") is an investment banking and real estate development professional who held the role of Vice President at Goldman Sachs from 1982 to 1988. While at Goldman Sachs, Wickline reported to Charles M. Harmon, Jr., who was also Heppner's mentor. Harmon's widow settled the Harmon Trust, defined below. Heppner installed David Wickline as the indirect manager of HCLP in October 2019.

52.     The Highland Investment Holdings Trust, aka the "**Harmon Trust**" is a trust settled by the widow of Charles Harmon, Heppner's mentor. The Harmon Trust holds an 89.1% limited partnership interest in Highland Consolidated. Heppner serves as "Family Trustee" of the Harmon Trust. Martens served as the Harmon Trust's "Independent Trustee" until June 2021 when he was replaced by Banowsky.

53.     The Highland Great Plains Trust ("**Great Plains Trust**") is a trust holding a 9.9% limited partnership interest in Highland Consolidated. Heppner served as trustee of the Great Plains Trust until February 2019, when he replaced himself with Martens. Martens served as trustee of the Great Plains Trust until June 2021 when he was replaced by Banowsky.

18

### 3.   *Relevant BEN Entities.*

54.   Beneficient Management, L.L.C. ("**BEN Management**") is a Delaware limited liability company. During the relevant period, BEN Management served as the general partner of BEN LP, the top control entity in BEN's organizational structure. BEN LP was controlled by, and the exclusive and complete authority to manage the operations and affairs of BEN LP was granted to, BEN Management's board of directors. Because BEN Management was the top organizational entity within BEN's business, BEN Management's directors were the ultimate human controllers of BEN, were referred to in contemporaneous documents as BEN's directors, and are described herein as BEN's directors.

55.   Beneficient, f/k/a The Beneficient Company Group, L.P. ("**BEN LP**"), is a Nevada corporation. During the relevant time period, BEN LP was a Delaware limited partnership, and its general partner was BEN Management.

56.   Beneficient Company Holdings, L.P. ("**BCH**") is a Delaware limited partnership. BCH was the primary holding company of BEN's operating subsidiaries during the relevant time period. During the relevant time period, BEN LP was the general partner of BCH and held all of the limited partnership interests in BCH.

57.   Beneficient Capital Company, L.L.C. ("**BCC**") is a Delaware limited liability company formed in 2017 (its name was amended on December 30, 2020 to Beneficient Capital Company II, L.L.C.). BCC's sole member and manager during the relevant time period was BCH. BCC was the original borrower on two credit facilities related to HCLP. BCC also obtained approximately 2.5 million shares of GWG stock, representing approximately 7.6% voting control, following an April 2019 transaction.

## IV.   Factual Background

**A.   GWG's Historical Secondary Life Insurance Policy Business and Public Capital-Raising Machinery.**

58.      Prior to its entanglement with BEN, GWG had been in the secondary life insurance business. It raised capital to purchase life insurance policies on the secondary market through debt financing in the form of bonds, dubbed "**L Bonds**," sold to investors through a network of brokers. GWG's established capital-raising machinery and infrastructure (raising over $100 million from L Bond sales per year) made it an attractive target for BEN and Heppner because BEN—then mostly a conceptual stage start-up—needed capital to get its new business idea fully launched.

**B.   Overview of BEN's Founding and Heppner's HCLP-Related Scheme.**

*1.      BEN's Formative Transactions and Introduction to GWG.*

59.      After more than a decade of losing money running a "family office" investment business, Heppner developed a new business idea in the mid-2010s that ultimately gave rise to BEN in its current form.

60.      Heppner's business plan was for BEN to serve as a "liquidity provider" to mid-to-high net worth individuals and smaller institutions holding alternative assets (*e.g.*, limited partnership interests in private equity funds), effectively functioning as a buyer to allow those investors to sell their otherwise illiquid alternative assets. BEN would then earn revenue—from various fees and interest on intercompany loans—via a complicated network of related trusts designed to hold the alternative assets, as those alternative assets were gradually monetized or otherwise liquidated over time.

61.      Banowsky and HK were involved with Heppner's early efforts to capitalize BEN. For example, Banowsky and the firm (then-TK) were listed as the company's counsel in various pitch decks for "Project Blitz," a 2017 effort to find investors willing to contribute capital to BEN.

By that point, Banowsky and HK had also been involved with Heppner and his bespoke web of trusts and entities for years. For example, in 2003, Banowsky authored an opinion regarding Heppner's control over Highland Consolidated and related entities in a transaction with Lehman Brothers. And since at least 2010, another HK (then-TK) partner represented BEN in its attempts to obtain a Texas trust banking charter.

62.     Heppner's business idea was inherently capital intensive; it could only generate revenue to the extent its related trusts could acquire an underlying portfolio of alternative assets that, in turn, generated cash with which to pay fees and interest. BEN itself, however, had very little capital at its inception. Consequently, Heppner's hope for BEN was that it could obtain illiquid alternative assets in "liquidity transactions" in exchange for BEN equity, in particular BEN common units.

63.     This business plan was dubious from the start. BEN was a new entity with no operating history or track record of profitability, and there was no market for illiquid, privately held BEN equity. This meant that an investor seeking to obtain "liquidity" for an alternative asset would merely be exchanging one illiquid investment for another by accepting BEN equity in exchange (making any such exchange undesirable from the investor's perspective). Moreover, given the highly unproven and speculative nature of BEN's business, it made no rational economic or business sense for a holder of a quality—albeit illiquid—alternative asset to trade that asset for BEN common units. Accordingly, few—if any—investors holding quality alternative assets could be expected to swap them in exchange for illiquid, speculative BEN equity.

64.     Because BEN faced difficulty convincing investors to exchange their alternative assets for BEN common units (and BEN did not have cash to otherwise pay them), Heppner and BEN concocted a convoluted scheme to obtain capital from third parties that BEN would then

21

provide to sellers of alternative assets in so-called "liquidity transactions." BEN did so with the aid of a middleman, MHT Financial, L.L.C. ("**MHT Financial**"), led by Murray Holland. BEN and MHT Financial structured the transactions such that MHT Financial, as buyer, could purchase assets from a seller and immediately settle them in an "Exchange Trust" (aka "**Seller Trust**") whose first act would be to exchange the economic interests in those assets for BEN common units. The Exchange Trusts, or Seller Trusts, would then try to sell—or, more specifically, auction off—the BEN common units in exchange for consideration that the beneficiaries of the trusts, the original sellers of alternative assets, found acceptable (unlike the BEN common units).

65.     The first such "liquidity transactions" involving BEN occurred on or about September 1, 2017, when fund manager Paul Capital Advisors, L.L.C. ("**Paul Capital**") contributed alternative assets from its liquidating funds to the Seller Trusts formed specifically to facilitate the exchange. Pursuant to a Purchase and Sale Agreement between MHT Financial and Paul Capital and a Transaction Agreement among Paul Capital and its affiliated funds, MHT Financial, BEN LP, and certain BEN affiliates, MHT Financial acquired alternative assets from Paul Capital at a cost of $489.2 million, representing the Net Asset Value ("**NAV**") as of the closing dates, and settled the Seller Trusts with those assets. The Paul Capital asset exchange was soon followed by similar exchanges of alternative assets by other "co-sellers" totaling $244.0 million. The Seller Trusts assigned the economic interests in those secondary assets to BEN in exchange for BEN common units, which were to be "auctioned off" to pay Paul Capital (and later, the co-sellers, also dubbed "bulk sellers") up to 110% the NAV of their assets in cash.

66.     These transactions were the result of a corrupt bargain between BEN and MHT Financial on one side, and the sellers of alternative assets on the other. On paper, the planned transactions gave rise to a huge windfall for Paul Capital and the other initial "bulk sellers" of

22

alternative assets, as the price to be paid—over 100% of NAV—significantly exceeded the fair market value of the alternative assets (which was far less than NAV). The sellers' alternative assets were highly illiquid. Most were stale investments that pre-dated the great financial crisis of 2008-2009. And the NAV reported by Paul Capital and the bulk sellers was based on rosy estimates that were largely untethered from what a third-party would contemporaneously be willing to pay for those alternative assets in an arm's-length transaction in the marketplace.

67.      On the other side of the bargain, this arrangement favored Heppner's and BEN's interests in two key respects. First, by artificially inflating the supposed value of the alternative assets acquired, these initial formative transactions allowed BEN to imply a higher value for BEN common units (and, in turn, BEN's total equity value) than what BEN equity was really worth. Second, as described below, Heppner was able to layer debt owed to his affiliates into BEN's capital stack—while Paul Capital looked the other way.

68.      In effect, therefore, the transaction involved Paul Capital and other sellers receiving above-market nominal prices for their alternative assets in exchange for agreeing to above-market nominal prices for BEN equity (and not asking questions about BEN's purported senior debt to Heppner's affiliates).

69.      For this plan to work, however, BEN and MHT Financial still needed to find the perfect mark willing to provide real value in exchange for BEN common units. They found their mark in GWG, which had historically been engaged in the secondary life insurance business but was looking to deploy its capital into alternative investments.

70.      In December 2017, GWG—apparently the only bidder—was announced as the winner of the "auction" of BEN common units. Shortly thereafter, a Master Exchange Agreement was drafted to capture the terms of GWG's winning bid, which consisted of $150 million cash,

$250 million in L Bonds (issued by GWG), and $150 million of GWG common stock. On or around January 12, 2018, GWG executed the Master Exchange Agreement among GWG Holdings, GWG Life, BEN LP, MHT Financial SPV, L.L.C., and the Seller Trusts.

71.     Thereafter, a series of "Exchange Transactions" took place in multiple steps throughout 2018 (the "**2018 Exchange Transactions**"). The net effect of these transactions, by year end, was that: (a) GWG loaned $192.5 million to BEN pursuant to a Commercial Loan Agreement (the "**CLA**") and received approximately 30 million common units of BEN LP; (b) certain Seller Trusts, effectively controlled by two Trust Advisors (Murray Holland and a BEN designee, first Jeff Hinkle, and later, James Turvey), obtained majority ownership of GWG stock and also obtained L Bonds representing $366.9 million in debt owed by GWG to the Seller Trusts; and (c) BEN obtained equity interests in GWG, and trusts affiliated with BEN ended up with secondary private equity investments (originally belonging to third parties, like Paul Capital).

72.     Accordingly, through the 2018 Exchange Transactions, GWG took on massive debt and equity exposure to BEN. GWG's substantial exposure to BEN paved the way for Heppner— with Defendants' advice and assistance—to subsequently exploit GWG for his personal interest and to GWG's detriment. And at multiple points thereafter, Heppner used the threat of further value destruction to GWG's investments in BEN as a means of siphoning additional cash from GWG to BEN in future years—all to line his pockets at GWG's expense, as alleged below.

**2.      Summary of Heppner's Self-Dealing Scheme to Loot GWG Using HCLP as a Front.**

73.     In connection with establishing BEN, Heppner ensured that he would be able to extract significant money from the business regardless of whether it was ever profitable. Pursuant to this scheme, Heppner siphoned approximately $140 million out of GWG and/or BEN to his affiliated trusts and entities via Highland Consolidated, an entity that had functioned for more than

24

two decades as his personal slush fund. The vast majority of the funds that sloshed through Highland Consolidated's bank accounts first originated from GWG before passing through the bank accounts of several other Heppner-affiliated entities (such as HCLP and HCLP Credit) and landing at Highland Consolidated. From Highland Consolidated, Heppner then diverted the funds primarily for the benefit of him and his family via the Brad Heppner Family Trust, and to an entity that served as his corporate piggy bank, Bradley Capital. In effect, Heppner looted GWG (and BEN) to line his pockets through a web of interrelated entities, including his personal trust and corporate slush fund, with Banowsky acting as their enforcer and spokesperson.

74.     Heppner perpetrated this fraudulent, corporate looting scheme against GWG through several steps. First, Heppner layered two sham debts to HCLP into the top of BEN's capital stack in September 2017 and December 2018. Second, Heppner and Banowsky conspired to conceal Heppner's relationship with HCLP and its affiliates (even though Heppner continued to call the shots for HCLP behind the scenes). They did so by: (a) enlisting the aid of two long-time friends of Heppner, Martens and Wickline, to serve as nominal human managers of the entities that supposedly managed HCLP; (b) repeatedly and rampantly backdating HCLP-related organizational documents; and (c) providing materially false and misleading letters describing HCLP's ownership and control structure. Third, and finally, Heppner conspired with Banowsky to arrange for HCLP to make a series of threats and demands to procure funds (which were inevitably sourced from GWG), all while pretending HCLP was acting as a legitimate third-party lender and fraudulently disclaiming ties to Heppner. Once HCLP received funds under false pretenses from GWG and BEN, Heppner immediately transferred the funds upstream to his affiliates and other entities.

a.    BEN's Purported First and Second Senior Debts to HCLP.

75.    As part of BEN's initial transactions that occurred on or about September 1, 2017, Heppner re-shuffled assets, liabilities, and limited partnership ownership interests. In effect, these transactions gave Heppner assets related to his ranch while saddling BEN with nine figures of debt that had little to do with BEN's business and largely amounted to Heppner trying to repay previous "IOUs" to his affiliates (or otherwise recoup monies lost).

76.    Prior to BEN beginning commercial operations as a "liquidity lender," its "primary operations" had focused on "the success of Heppner's ranch and ranch-related activities" conducted through what Heppner and his family office called the "Highland entities." But with BEN's transition to liquidity lending came a spinoff of the Highland entities and a distribution of such entities to Heppner or affiliated trusts. As part of this spinoff, BEN distributed to Heppner certain interests associated with net assets of approximately $59.1 million related to the ranch and ranch-related business activities, primarily held within HRA, that would not be involved in the continuing operations of BEN.

77.    The spinoff also involved what BEN has characterized in its audited financial statements and SEC filings as a "refinancing" of approximately $121 million of existing debt (plus an additional $20.2 million for the purchase of certain technology assets) into a loan agreement with related party HCLP for a total of $141 million (the "**BEN-HCLP First Debt**"). This was entirely a non-cash transaction—*i.e.*, HCLP did not advance funds to BEN. Instead, the existing debt was composed of six related-party "loans" with entities affiliated with Heppner. The refinanced, supposed loans were largely shams; there was no refinancing of legitimate obligations owed by BEN to a third-party lender. The supposed loans from Heppner's affiliates dated back over a decade (to between 2005 and 2007) and had nothing to do with BEN's new planned business idea (which Heppner did not develop until years later). The "refinanced" sham loans had non-

26

commercial interest rate terms and did not require any periodic payments, and no principal payments were made for over a decade.

78.     Consequently, the net effect of the interrelated September 1, 2017 paper reshuffling was that: (a) Heppner obtained net assets of approximately $59.1 million related to entities owning the family ranch; (b) Heppner and his affiliates had a negative capital account in BEN; and (c) BEN was saddled with $141 million in purported debt while receiving minimal real benefit in exchange. The BEN-HCLP First Debt was at the top of BEN's capital stack and positioned Heppner—via HCLP—to extract cash from BEN as funds became available, regardless of when (or if) BEN ever turned a profit.

79.     In late 2018, Heppner once again self-servingly layered debt into BEN's capital stack. In August 2018, Heppner grumbled to Martens about "major headaches" in negotiations regarding the Exchange Transactions, complaining that GWG and Paul Capital were "taking a pound of flesh" in cutting into his share of equity. In turn, Heppner indicated that his entity would "negotiate for an early conversion of $72 million it has a right to convert, but instead of conversion into common [stock], it will want conversion into a note much like the HCLP note."[5] Negotiations continued into December, at which point Heppner used threats from HCLP to foreclose on the BEN-HCLP First Debt to create extra leverage, a tactic Heppner would repeat with Banowsky's aid many times over the next years.

80.     Thereafter, according to BEN's audited financial statements, on December 28, 2018, BEN and BHI—Heppner's primary holding vehicle for his interest in BEN[6]—"entered into

---

[5] Heppner further wrote that he would call Martens to "discuss priority of payment or possibly an intercreditor [agreement] with HCLP." Martens, manifesting a lack of commercial sophistication, replied: "Someone will need to educate me on an intercreditor agreement."

[6] BEN's Form 10-K for the fiscal year ended March 31, 2024, signed by Heppner, admits that "Heppner is a beneficiary of the trust that is the sole shareholder of BHI," that Heppner indirectly holds interests in BEN through BHI (including

a promissory note for $72 million in return for the relinquishment by BHI of $72 million of NPC Series A Subclass 1 Units of BCH." In other words, BHI exchanged $72 million in preferred units in BCH for secured debt in BEN without advancing any funds to BEN or BCH, even though Heppner had no contractual right to convert his preferred equity into debt (at the top of BEN's capital stack) instead of common stock (at the bottom of BEN's capital stack). The note, dated December 28, 2018, was originally due on March 31, 2019.

81.     In May 2019 (on or after May 17, 2019), that promissory note was replaced when BEN and BHI executed a credit agreement (backdated to December 28, 2018) with an initial principal balance of $72 million (the "**BEN-HCLP Second Debt**"). Hinkle, a BEN officer, signed this agreement as Secretary of BHI, and BHI's notice address in the agreement was the same as BEN's address (and the same as HCLP's notice address for the BEN-HCLP First Debt).

82.     Heppner subsequently caused BHI to "assign" the BEN-HCLP Second Debt to HCLP in August 2019 via an amended operating agreement for HCLP that was backdated and made retroactively effective as of April 1, 2019. BHI received a 34% membership interest in HCLP in exchange for assigning the BEN-HCLP Second Debt to HCLP. Accordingly, the entity that Heppner utilizes as his primary (indirect) holding vehicle for his interest in BEN's business (BHI) obtained a 34% membership interest in HCLP.[7]

83.     In sum, neither the BEN-HCLP First Debt nor the BEN-HCLP Second Debt involved legitimate, arm's-length transactions with a third-party lender. BEN received no

---

various forms of BCH preferred units), that those equity interests "represent [Heppner]'s interests originally received by BHI in connection with the formation" of BEN, and that "Heppner receives financial benefits from our business" through "equity interests of BCH held by BHI." *See* BEN's Form 10-K for the fiscal year ended March 31, 2024 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000177573424000029/ben-20240331.htm), at pg. 151.

[7] From June 2019 through January 2020, BEN made interest payments on the BEN-HCLP Second Debt to another Heppner-controlled entity, Bradley Capital, not to BHI (the supposed original lender) or to HCLP. And BEN continued to make such interest payments to Bradley Capital even after BHI assigned the Second Debt to HCLP in 2019.

meaningful value in exchange for incurring either purported obligation. Rather, Heppner foisted both supposed debts upon BEN so that he could later enrich himself and his affiliates by demanding repayment of the sham loans, using Banowsky and HCLP as his puppets.

> b.   Heppner's Initial Steps to Distance Himself from HCLP.

84.     This plan to enrich Heppner would only work to the extent BEN and GWG could be convinced that HCLP was a legitimate third-party lender. BEN was undercapitalized and faced significant liquidity challenges, meaning that BEN's directors—if they knew Heppner controlled HCLP—would ask HCLP to either extend the maturity date, forego payments, or even forgive the debt altogether until BEN's financial condition improved. Likewise, GWG would request similar concessions and/or never agree to advance funds to BEN for BEN to "repay" loans to HCLP if GWG knew that those funds were ultimately going to Heppner.

85.     To help disguise Heppner's influence over HCLP and related entities, Heppner and Banowsky enlisted the aid of Hinkle and Martens, two long-time allies. Hinkle, who worked in Heppner's family office and served as trustee of certain of Heppner's family trusts, served as manager of Highland Counselors, HCLP's manager. At the time, Hinkle was BEN's Chief Administrative Officer and Treasurer (answering to Heppner, BEN's CEO and chairman). Martens, a close friend of Heppner's since they were in high school together, was enlisted to serve as trustee or manager of several trusts and other entities related to HCLP. Martens did not operate HCLP as a third-party lender at arm's-length and instead functioned as Heppner's stand-in.

86.     At the time the BEN-HCLP First Debt was incurred in September 2017, the relevant organizational relationships pertaining to HCLP and Highland Consolidated were as follows:

- HCLP's sole member was HCLP Credit and its manager was Highland Counselors;
- HCLP Credit's sole member was Highland Consolidated and its manager was Highland Counselors;

- Jeff Hinkle was the manager of Highland Counselors and, consequently, the indirect manager of HCLP;

- HCI managed Highland Consolidated. Because Highland Consolidated was the direct sole member of HCLP Credit and indirect sole member of HCLP, HCI had the ability to replace the manager of HCLP; and

- Heppner was the manager of HCI.

87.     Thus, despite installing Martens and Hinkle as HCLP's nominal controllers, Heppner remained in total control of HCLP. HCLP's manager was a BEN officer (Hinkle) who answered to Heppner, and Heppner himself—as manager of HCI—enjoyed a position of ultimate control by having the ability to remove and replace Hinkle as HCLP's manager. Indeed, Hinkle later admitted that:

- Heppner "ultimately … had the power of appointment" with respect to Highland Counselors and thus HCLP;

- Hinkle "serv[ed] at the pleasure of Brad" and "ultimately [his] administrative task was to take that direction" from Heppner; and

- Heppner had access to HCLP's bank accounts, had the power to extend the BEN-HCLP First Debt's maturity, and had discretion to waive reporting requirements under that loan.

88.     From the start, HCLP and BEN did not treat the BEN-HCLP First Debt as a true third-party obligation, unbeknownst to GWG. For example, on September 1, 2017, when BEN's formative transactions occurred (and the date of the BEN-HCLP First Debt), Martens wrote to congratulate Heppner, asking him to "[l]et me know if there were any changes I should know about" and expressing that Martens was "relieved that HCLP's note is ***finally earning a more commercial rate of interest***." (Emphasis added).

89.     A few months later, shortly before BEN made a $25 million transfer to HCLP in February 2018, Heppner wrote to Martens to inform him that: "***For the first time in over a decade***, a principal payment will be made on the note tomorrow. Just wanted to give you a heads up. It will

be $25 million note pay down of principal to $116 million." (Emphasis added). Martens responded: "Now when does the remaining $116[mm] get paid? ***Just kidding***." (Emphasis added).

c.   <u>Defendants' Early Involvement in Heppner's Scheme.</u>

90.     Banowsky and HK understood this scheme early on. They knew that Heppner ultimately controlled HCLP and would use the BEN-HCLP First and Second Debts as leverage in negotiations with GWG and other parties not aware of Heppner's control over HCLP. Yet, time and time again, they represented to GWG and others that Heppner could not control HCLP, that Heppner would not benefit from money paid to HCLP, and that HCLP was a true third-party lender that would willingly foreclose on the loans.

91.     In early 2019, Apollo was considering making an investment in BEN and wanted to retain the law firm of Sidley Austin LLP ("**Sidley**") to represent it in connection with the possible investment. Sidley had previously been counsel to HCLP,[8] requiring the firm to obtain a conflict waiver before representing Apollo. Jessica Magee, a former HK lawyer and then-BEN GC (who would later return to HK as a partner), asked Banowsky to "advise whether [HCLP] will waive … any conflict presented by Sidley working with Apollo vis-a-vis a possible investment in BEN." Banowsky responded: "I will check with my client" and then ***emailed Heppner***, not Hinkle or Martens, to ask whether HCLP would waive the conflict.

92.     Heppner responded: "my only question is will Sidley be permitted disclose ***certain concerns they have advised me about the enforceability of the security liens in our [HCLP's] favor*** if claims are made that the loan and liens were made between related parties and may not

---

[8] Like Defendants, Sidley understood that Heppner controlled HCLP. However, Sidley was evidently not in on Heppner's scheme to hide that control and almost blew Heppner's cover in 2020, writing in a conflict letter to GWG's newly hired General Counsel "we represented HCLP Nominees, LLC … ***which we understand to be controlled by Brad Heppner*** and Bradley Capital Company, L.L.C., and then Beneficient Holdings, Inc. … as lender, in connection with several financing transactions…" (emphasis added). GWG's General Counsel forwarded the email to BEN's General Counsel, a trusted Heppner ally, who quickly put an end to any inquiry.

31

have had full 3rd party disclosure/ negotiations/ terms/ etc." (Emphasis added). Heppner continued: "If Apollo becomes an equity investor and we need to enforce our rights as secured lender, could Sidley not knowingly lead Apollo to learn that Apollo could challenge the security interest we have?" Heppner further noted, "We (as lender) could be opposite Apollo (as equity investor) just as we were opposite Paul Capital. ***Our security interest worked in our favor in that squabble***." (Emphasis added).

93.     In sum, by at least January 2019,[9] Defendants knew that Heppner controlled HCLP, that Heppner had used the dubious debts as leverage in negotiations, and that Heppner planned to use the debts as leverage again in the future. Nevertheless, Defendants told auditors, BEN and GWG directors, GWG's Special Committee, outside counsel, and the SEC the exact opposite on multiple occasions between February 2019 and March 2021. Banowsky claimed that Heppner could not control HCLP and would not benefit from money paid to HCLP. Banowsky also made false threats of foreclosure to induce GWG to continue to send money to BEN to pay HCLP. Defendants knew, however, that Heppner was ultimately in control of HCLP, was transferring money paid to HCLP to his affiliated entities and trusts, and would never foreclose on BEN—his brainchild. Banowsky not only kept up the ruse that HCLP was unrelated to Heppner, but affirmatively helped Heppner cover his tracks and obscure his control over and ownership of HCLP once auditors, BEN and GWG directors, and the SEC began asking questions.

        d.    <u>Highland Consolidated Procures Over $190 Million from GWG and BEN, Then Advances Large Sums to Heppner Affiliates.</u>

94.     After layering the BEN-HCLP First and Second Debts into BEN's capital stack and disguising his control over HCLP through puppet managers, Heppner worked with Banowsky

---

[9] Given their involvement with Heppner and his web of related trusts and entities for years, it is likely Defendants understood this dynamic at least from the time the BEN-HCLP First Debt was incurred.

behind the scenes to have HCLP make various demands for payment from BEN, just as they had done in December 2018. HCLP's demands on BEN were then conveyed to GWG, inducing GWG to advance money to BEN—or to HCLP directly—so that BEN could satisfy HCLP's demands and avoid foreclosure. In essence, Heppner, through Banowsky, held BEN hostage. Banowsky's threats to foreclose on BEN and/or otherwise destroy BEN's business—and thereby GWG's investment in BEN—if HCLP's demands for substantial cash payments and other concessions were not met induced GWG to transfer hundreds of millions of dollars to HCLP (or Highland Consolidated).

95.     From May 2019 through March 2021—the same time period Banowsky consistently represented that Heppner could not control HCLP and would not benefit from money sent to HCLP—GWG transferred approximately $300 million to or for the benefit of BEN.

96.     From February 2018 through June 2022, BEN entities (and in one case, GWG directly) paid over $190 million to HCLP or Highland Consolidated as purported payments of principal, interest, and fees on the BEN-HCLP First and Second Debts, as set forth below:

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 2/16/2018 | BCC | HCLP | $25,000,000.00 |
| 6/4/2019 | BCC | HCLP | $3,440,500.10 |
| 6/20/2019 | BCC | HCLP | $704,554.29 |
| 8/23/2019 | BCC | HCLP | $673,290.84 |
| 9/10/2019 | BCC | HCLP | $666,729.94 |
| 9/17/2019 | BCC | HCLP | $658,257.57 |
| 10/18/2019 | BCC | HCLP | $626,143.09 |
| 11/18/2019 | BCC | HCLP | $625,278.11 |
| 12/17/2019 | BCC | HCLP | $596,983.05 |
| 12/31/2019 | BEN LP | HCLP | $49,804,539.89 |
| 1/17/2020 | BCC | HCLP | $380,912.36 |
| 2/20/2020 | BCC | HCLP | $358,247.33 |
| 2/20/2020 | BCC | HCLP | $339,196.84 |

33

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 3/16/2020 | BCC | HCLP | $324,979.22 |
| 3/16/2020 | BCC | HCLP | $302,778.42 |
| 4/17/2020 | BCC | HCLP | $322,410.22 |
| 4/17/2020 | BCC | HCLP | $300,384.92 |
| 5/18/2020 | BCC | HCLP | $278,625.87 |
| 5/18/2020 | BCC | HCLP | $259,591.68 |
| 6/17/2020 | BCC | HCLP | $274,773.15 |
| 6/17/2020 | BCC | HCLP | $256,002.16 |
| 7/16/2020 | GWG | HCLP | $28,196,915.00 |
| 7/16/2020 | BCH | Highland Consolidated | $5,591,757.00 |
| 7/22/2020 | BCC | HCLP | $247,671.14 |
| 7/22/2020 | BCC | HCLP | $175,892.93 |
| 7/31/2020 | BCC | HCLP | $50,000.00 |
| 8/7/2020 | BCC | HCLP | $50,000.00 |
| 8/19/2020 | BCC | HCLP | $279,442.70 |
| 8/19/2020 | BCC | HCLP | $202,903.72 |
| 9/10/2020 | BCC | HCLP | $25,000,000.00 |
| 9/18/2020 | BCC | HCLP | $505,876.90 |
| 9/18/2020 | BCC | HCLP | $339,540.12 |
| 10/21/2020 | BCC | HCLP | $488,817.60 |
| 10/21/2020 | BCC | HCLP | $188,264.45 |
| 11/20/2020 | BCC | HCLP | $504,816.92 |
| 11/20/2020 | BCC | HCLP | $194,326.03 |
| 12/10/2020 | BCC | HCLP | $25,000,000.00 |
| 12/18/2020 | BCC | HCLP | $489,053.88 |
| 12/18/2020 | BCC | HCLP | $150,321.09 |
| 3/11/2021 | BCH | HCLP | $504,643.42 |
| 3/11/2021 | BCH | HCLP | $503,423.84 |
| 3/11/2021 | BCH | HCLP | $15,975.45 |
| 3/11/2021 | BCH | HCLP | $15,936.84 |
| 3/17/2021 | BCH | HCLP | $100,000.00 |
| 3/24/2021 | BCH | HCLP | $454,158.60 |
| 3/24/2021 | BCH | HCLP | $14,377.26 |
| 4/21/2021 | BCH | HCLP | $502,845.18 |
| 4/21/2021 | BCH | HCLP | $24,371.78 |

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 5/27/2021 | BCH | HCLP | $492,935.91 |
| 5/27/2021 | BCH | HCLP | $15,607.58 |
| 6/29/2021 | BCH | HCLP | $509,644.89 |
| 6/29/2021 | BCH | HCLP | $19,408.51 |
| 3/25/2022 | BCH | HCLP | $15,445,131.74 |
| 5/20/2022 | BCH | HCLP | $929,014.11 |
| 5/20/2022 | BCH | HCLP | $270,627.56 |
| **Total** | | | **$ 193,667,881.20** |

97.     The majority of the funds transferred by BEN entities—BCC, BCH, and BEN LP—during that time period originated from GWG.

98.     Heppner subsequently transferred those funds first to HCLP Credit, then to Highland Consolidated, and thereafter to Heppner's affiliates—mostly the Brad Heppner Family Trust and Bradley Capital. In all, Heppner caused Highland Consolidated to transfer $53.6 million directly to the Brad Heppner Family Trust and $92.6 million directly to Bradley Capital (which then transferred $72.8 million of those proceeds to the Brad Heppner Family Trust). Heppner then used that money for his and his family's benefit. The Brad Heppner Family Trust, for instance, paid for Heppner's children's private school tuition and other "ancillary expenses" and "sundry purchases and activities" from 2018 through 2022.[10]

**C.     With Defendants' Aid, Heppner Induces BEN to Buy Out GWG's Founders to Facilitate His Planned Scheme.**

99.     After establishing BEN and saddling it with debt, Heppner sought to take advantage of GWG's capital-raising infrastructure to pour more money into BEN, which would flow through HCLP and into Heppner-affiliated companies and trusts. To accomplish this, Heppner hatched a plan to induce GWG to advance funds to BEN on false pretenses, all while planning to then siphon

---

[10] *See, e.g.*, Original Petition filed in *Heppner v. Brennan*, No. DC-22-04337 (116th Jud. Dist., Dallas County).

35

the funds advanced to BEN through HCLP, HCLP Credit, and Highland Consolidated. Defendants were a crucial part of this scheme. BEN retained Banowsky to draft a memo regarding HCLP's purported control structure. That memo and its numerous false and/or misleading representations about who controlled HCLP would serve as the foundation for Heppner's fraud over the next several years. In addition, Banowsky reprised his role as Heppner's enforcer, jumping into action to threaten foreclosure so that Heppner could obtain better terms for himself.

1.    *Defendants' False Representations in February 2019 Create the Foundation for Heppner's Fraud.*

100.    In February 2019, BEN's then-auditor (Deloitte & Touche) was investigating whether the Seller Trusts needed to be consolidated in BEN's financial statements. As part of this process, Banowsky drafted a memo to BEN's General Counsel regarding BCH's power, or lack thereof, to remove Holland as Trustee of the Seller Trusts. In working on the memo, Banowsky relied on former HK lawyer and then-BEN Chief of Staff Evans for information about HCLP's ownership and control structure.

101.    The final version of the memo, titled "Litigation Opinion Regarding Power to Remove Trustee," was dated February 11, 2019, and signed by Banowsky on HK letterhead (the "**February 2019 Litigation Opinion**"). The February 2019 Litigation Opinion contained a number of demonstrably false statements about HCLP, its debt, and its relationship with Heppner.

102.    In describing the ownership of HCLP, the February 2019 Litigation Opinion stated:

> [T]he manager of [HCLP] is [Counselors], and its member is [HCLP Credit]. The member of [HCLP Credit] is [Highland Consolidated] and its manager is [Counselors]. The general partner of [Highland Consolidated] is [HCI]. ***The manager of HCI since at least September 1, 2017, is an individual named Keith Martens***, who, as manager of HCI, has the authority to remove and replace the manager of both [HCLP Credit] and [HCLP]. Thus, ***Martens ultimately controls HCLP Nominees***.

(Emphases added).

36

103.     This statement was incorrect and materially misleading for several reasons. First, and most significantly, Martens was not HCI's manager as of February 11, 2019. Heppner was. On February 13, 2019, two days after Banowsky delivered the February 2019 Litigation Opinion, Heppner asked Martens to sign three backdated signature pages to HCLP-related organizational documents that made it appear that Martens—not Heppner—had served as HCI's manager since July 2017.[11] Among these documents was a written consent of HCI's sole member backdated to July 7, 2017, that purported to show that Heppner had resigned as HCI's manager and been replaced by Martens as of that date.[12]

104.     Thus, Banowsky's statement on February 11, 2019, that "The manager of HCI since at least September 1, 2017, is an individual named Keith Martens" was not only untrue, but also presaged backdated, retroactive changes to HCLP's management and ownership structure that Heppner would make days later. And Banowsky knew who was really in control; just weeks earlier, Banowsky had looked to Heppner, not Martens, for direction in his representation of HCLP.

105.     These backdated signature pages erased the fact that Heppner served as manager of HCI, and thus "ultimately control[led] HCLP Nominees," during the period of BEN's formative transactions and the execution of the BEN-HCLP First Debt. By replacing existing signature pages

---

[11] This backdating scheme was ill-conceived in that Heppner had contemporaneously signed documents as HCI's manager in 2017, including the "Transaction Agreement" related to BEN's initial transactions, which was dated September 1, 2017.

[12] These documents also included: (1) a signature page installing Martens as the Trustee of the Great Plains Trust (the apparent sole member of HCI as of July 2017); and (2) a signature page to the Limited Liability Company Agreement of HCLP Credit dated July 21, 2017, which Heppner asked both Martens and Hinkle to sign. Hinkle signed this HCLP Credit signature page as manager of Highland Counselors—the actual manager of HCLP Credit both at its formation and in February 2019. But Martens signed it using his new title of manager of HCI, the general partner of HCLP Credit's sole member, Highland Consolidated.

Notably, the document installing Martens as Trustee of the Great Plains Trust appears to be the product of outright notary fraud. Late in the evening of February 13, 2019, Hinkle circulated a partially executed packet of signature pages. This included a copy of Martens's acceptance of appointment as Trustee of the Great Plains Trust that *had not been signed by Martens, but was pre-notarized as of July 7, 2017*. Martens sent Heppner a signed version of that document later that evening.

that linked Heppner to HCI (HCLP's indirect controller) with ones indicating Martens had been running the show since July 2017, Heppner, with Banowsky's assistance, could present BEN's auditor (who was at the time focused on determining whether and to what extent HCLP was affiliated with BEN and what should be disclosed in related party disclosures in BEN's financial statements) with an HCLP organizational structure that did not end with Heppner (or BEN-employee Hinkle).

106.    But even if Martens was the manager of HCI as of February 11, 2019 (which he was not), the February 2019 Litigation Opinion's statement that "Martens ultimately controls HCLP Nominees" was materially misleading. As Banowsky and HK knew, Heppner was calling the shots for HCLP in every practical way. Just one month earlier, Banowsky had sought direction from Heppner, not Martens, in his representation of HCLP. Moreover, Heppner had selected and installed Martens to replace himself as manager of HCI, and thus had the power to change HCI's manager.

107.    In addition, if Martens was installed as manager of HCI prior to the February 2019 Litigation Opinion being drafted, the Memo should have mentioned that Martens was only recently installed and that Heppner was in Martens's place when the BEN-HCLP First Debt was incurred.

108.    The statement that "Martens … as manager of HCI, has the authority to remove and replace the manager of both [HCLP Credit] and [HCLP]" was also false because Heppner in fact retained that power as Trustee of HPHT. And just a few months later, after BEN and GWG directors began asking questions about HCLP, Heppner worked with Banowsky to further obscure his control over HCLP by replacing HCLP Credit and HCLP's manager. As discussed in more detail in Section IV.D.1, *infra*, Heppner signed a unanimous written consent in fall 2019—as Trustee of

38

HPHT—replacing Hinkle and Highland Counselors with Martens and CMH, once again through backdated documents.

109.    The February 2019 Litigation Opinion next claimed that Martens was independent from Heppner and BEN, stating that:

> Martens is a resident of Kansas, has no relationship to BEN, has conducted no commercial transactions with BEN, and is not related to any BEN employee, member of management, or director (other than a distant third cousin by marriage). Martens is not controlled by, or related to, BEN or BCH.

110.    That Martens was "not controlled by, or related to, BEN or BCH" was false. Martens had been a trusted friend of Heppner's—the ultimate human controller of BEN and BCH—for decades. In fact, Martens was so close with Heppner that he would be named trustee of trusts holding tens of millions of dollars of assets for Heppner and his family's benefit. Indeed, the packet of backdated signature pages Martens signed just days after Banowsky completed the February 2019 Litigation Opinion also replaced Heppner with Martens as Trustee of the Highland Great Plains Trust, the beneficiaries of which included Heppner and his family.

111.    The February 2019 Litigation Opinion was further misleading in that it omitted Martens's close personal relationship with Heppner, as well as the fact that Martens's authority to transact business on behalf of HCI and its subsidiaries had been designated by Heppner, who could revoke that authority if Martens exercised it in a way Heppner didn't like.[13] The February 2019 Litigation Opinion also failed to state which member of BEN Martens was related to by marriage. That it was BEN's founder, CEO, chairman, and largest stockholder was a highly relevant fact.

112.    The February 2019 Litigation Opinion also omitted the extensive, decades-long lending relationship between HCLP affiliates and Heppner, one in which affiliates of Highland

---

[13] As discussed in more detail in Section IV.D.1, *infra*, Heppner later personally replaced Hinkle and Martens in HCLP's control structure and directed BEN—which had control over HCLP's bank account—to make payments to the new manager for the new manager's services.

Consolidated loaned or invested amounts often representing all of their available capital to or in entities affiliated with Heppner. This longstanding relationship was not known to GWG's board until late 2021, after GWG had sent hundreds of millions of dollars to BEN for purported payments of principal, interest, and fees on the BEN-HCLP First and Second Debts.

113.     The February 2019 Litigation Opinion continued, "The Credit Agreement between [HCLP] Nominees and BCC created a secured interest on behalf of [HCLP] Nominees in the certificates that signify the LiquidTrusts' ownership of the right to the cash distributed to the Custody Trusts from the underlying assets." This was also incorrect or deeply misleading because, just one month earlier, Heppner told Banowsky directly that Sidley advised him that HCLP's security interest might not be enforceable because it was made between related parties.

114.     Perhaps aware that this particular statement was not true, the February 2019 Litigation Opinion included a healthy footnote on this point:

> For the purpose of this opinion, BEN management represented a number of facts to me *and I am assuming that the facts represented to me by BEN management are true*. I have read and analyzed the relevant documents and drawn my own conclusions as to their meaning. *I have not independently verified any fact not determinable from the relevant documents*.

(Emphases added). However, Banowsky could not have reasonably relied on representations from BEN management when he had actual knowledge those representations were or might be incorrect based on an email exchange he had with Heppner just a few weeks earlier.

115.     Finally, that Banowsky must have known of Heppner's significant control over HCLP and its affiliates in February 2019 is very evident from all the glaring red flags in front of him. In opining on HCLP's control structure, Banowsky presumably would have analyzed who had the authority to appoint and replace HCLP's manager (Heppner), who the manager of HCI was when the memo was drafted and dated (Heppner), who had the authority to change HCI's manager (Heppner), and who controlled HCLP's bank account (BEN and Heppner). And

40

reviewing the relevant agreements for HCLP and its parent entities necessarily would have shown that Heppner was Manager of HCI as of February 11, 2019.

116.    Although the February 2019 Litigation Opinion was drafted for BEN and its auditors for purposes of preparing BEN's audited financial statements, Banowsky and Heppner knew full well that those financial statements would be provided to GWG and relied upon by GWG. In fact, the CLA expressly obligated BEN to provide GWG with audited financial statements. Accordingly, Banowsky prepared the February 2019 Litigation Opinion at Heppner's urging, to conceal the extent of Heppner's relationship with HCLP in financial statements that Banowsky and Heppner knew would be shared with, and relied upon, by GWG. In other words, Banowsky was a willing participant in accounting fraud.

117.    More broadly, beyond finding their way into fraudulent financial statements shared with GWG (and publicly filed by GWG with the SEC), the false and misleading statements and omissions contained in the February 2019 Litigation Opinion formed the basis for other false statements made to GWG in the months and years that followed. For instance, in May 2019, Evans prepared for the Special Committee's counsel a diagram showing control over HCLP. That diagram repeated verbatim many of the conclusions and claims from the February 2019 Litigation Opinion, including the misrepresentations that "Martens exercises ultimate control over HCLP Nominees because he has the authority to remove and replace Highland Counselors as the manager of the HCLP Credit Company and HCLP Nominees," and "No party has the ability to remove and replace Martens as the manager of Highland Consolidated Investments." Those same false statements originating in the February 2019 Litigation Opinion were also repeated in accounting memoranda prepared by Evans for BEN and GWG audits and shared with GWG's General Counsel in his analysis of related party transactions in July 2020.

41

118.     Approximately one week after finalizing the February 2019 Litigation Opinion, Banowsky drafted a letter purportedly from Martens to Banowsky describing Martens's role and powers as manager of HCI. Banowsky worked on the letter with significant aid from Magee and Evans—HK alumni at BEN and GWG. Banowsky's correspondence with Magee in preparing the letter shows that she knew at least that Heppner had some affiliation with HCLP. At the outset, after providing Banowsky with a timeline of Martens's involvement with HCLP, Magee wrote, "I let brad [Heppner] know you'll put something together he can review and possibly add to. Please copy Tim and me when you do." At one point, Banowsky asked Magee, "Who signed the Credit Agreement on behalf of HCLP Nominees, LLC? Brad signed for the Borrowers. My copy of the Credit Agreement that I got from Tim does not have a signature page for the Lender. ***Hopefully Marten[s] signed it***." (Emphasis added). Banowsky hoped that Martens had signed the credit agreement because the claims in his February 2019 Litigation Opinion that Martens had controlled HCLP since the debt was incurred would be called into serious question if the credit agreement was signed by someone else, particularly someone associated with Heppner or BEN. The credit agreement was in fact signed by Hinkle, the BEN employee who answered to Heppner.

119.     After incorporating comments from Magee and Evans, Banowsky sent the letter, which parroted verbiage from the February 2019 Litigation Opinion regarding HCLP's family tree and Martens's purported lack of affiliation with Heppner, to Heppner for review and approval. Heppner and Magee made extensive edits to the letter, which Banowsky accepted almost word-for-word. After Banowsky accepted the changes, Heppner sent the letter to Martens, his hometown friend and newly installed figurehead of HCLP's control structure, for execution, copying Banowsky. Martens, who like Hinkle was "serving at the pleasure of Brad," signed the letter and sent it back to Banowsky without making a single substantive edit other than adding his address.

120.    The final version of this letter (the "**Martens Letter**") was provided to Deloitte and was part of the basis for the related party note to BEN's restated audited financial statements for the fiscal year ended December 31, 2018. That letter set out HCLP's basic chain of ownership and claimed that Martens "ha[d] served … as HCI's manager, since July 7, 2017" and that "no party has the ability to remove and replace [Martens] … as manager of HCI." Both of these statements were false. As discussed above, Martens had not been HCI's manager since July 2017, and had only recently been installed as HCI's manager in connection with Banowsky's drafting the February 2019 Litigation Opinion and Deloitte's audit. And, as discussed in Section D.1, *infra*, Heppner would use his control over Highland Consolidated to personally sign documents replacing Martens as manager of HCI just a few months later.

121.    The Martens Letter also claimed that he and Heppner "have never received any loans or borrowings from one another or any of the other's affiliates, have never personally invested in or with one another or any of the other's affiliates, and have never exchanged more than nominal gifts with one another." This statement was completely false because it obscured the decades-long relationship whereby Highland Consolidated (with which Martens was indisputably "affiliated" as manager of its general partner, HCI) poured money into entities affiliated with Heppner and his family in the form of investments, advances, and/or loans.

122.    These misrepresentations were incorporated into the discussion of Highland Consolidated and HCLP in BEN's restated 2018 financial statements. Those financial statements referenced Highland Consolidated, but stated only that HCLP "is an indirect subsidiary of Highland Consolidated," and described Highland Consolidated as "controlled by affiliates of BEN, the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries." This did

43

not disclose that Highland Consolidated had a decades-long history of giving money to Heppner's affiliated entities. If anything, disclosing only that Highland Consolidated's limited partners were "trusts for which [Heppner] serves as an investment trustee or which he or his family are in the class of possible beneficiaries" merely obfuscated the truth, as it created the impression that Heppner's interest was contingent and remote.

123. In sum, the misrepresentations in the Martens Letter, which was prepared with substantial assistance from Banowsky, led to incomplete and misleading related party notes in BEN's 2018 financial statements, on which GWG's Special Committee relied in sending money to BEN to pay HCLP in 2019. And as discussed in more detail in Section E, *infra*, further misrepresentations from Banowsky in late 2019 would lead to even more blatant misrepresentations and non-disclosures in BEN's 2019 financial statements, thus keeping GWG's Special Committee, investors, and others in the dark for years.

### 2. *After Obscuring Heppner's Control Over HCLP, Banowsky Acts at Heppner's Direction to Make False Demands on BEN in March 2019.*

124. By March 2019, BEN had still not obtained audited financial statements. BEN's failure to provide audited financial statements to GWG by that time breached a covenant in the CLA. This was particularly problematic given GWG's reporting requirements as a public company. GWG communicated to BEN that it might have to give formal notice of default under the CLA and presented BEN with a draft forbearance agreement. On cue, Banowsky jumped into action using the BEN-HCLP First Debt as leverage and made several incorrect or misleading statements in the process.

125. On March 15, 2019, Banowsky emailed GWG's CFO, writing, "Last night, BEN updated me with regards to the status of the audit and GWG's position with regard to the audit," which he claimed would be completed "on [or] before April 30, 2019." "Based upon this

44

information," Banowsky claimed, "th[e] senior lender has agreed in principal [sic] to extend the March 31, 2019 maturity of its note by one year." However, Banowsky "reviewed the draft forbearance agreement presented by GWC [sic] to BEN. That agreement is unacceptable to the senior lender … If a resolution with the forbearance agreement cannot be resolved satisfactorily to the senior lender, ***the senior lender will call its note on March 31, 2019***." (Emphasis added). Less than a minute later, Banowsky forwarded his email to Magee and Heppner.

126.     GWG's CFO forwarded the email to outside counsel, who asked Banowsky to deal with him, rather than executives at GWG. After a call with GWG's outside counsel (and another call with his HK-BEN backchannel of Magee and Evans), Banowsky followed up by email, writing to GWG's outside counsel, "As I told you on the phone, the senior lender has one interest and one interest only-that is being paid. GWG, in my opinion, is threatening action against BEN that will likely impair BEN's ability to execute its business plan which includes paying off the senior lender." Banowsky reiterated the threat from his earlier email, "If the senior lender becomes concerned that actions are being taken against BEN … it will not extend the note past March 31, 2019 and it will foreclose on its collateral." In closing, Banowsky emphasized that GWG and HCLP had a shared interest in seeing BEN succeed, writing, "It is in the best interest of GWG and my clients to come to a practical resolution with BEN."

127.     Outside counsel forwarded Banowsky's email to GWG's CFO and Chief Accounting Officer, and the group discussed a draft response. GWG's CFO commented that it was "customary for a lender … to require audited financial statements of the borrower," noted that the loan agreement between HCLP and BEN contained a similar covenant, and questioned whether HCLP had or would waive that provision. In fact, unbeknownst to GWG, BEN had not provided financial statements to HCLP *at any point* since the BEN-HCLP First Debt was incurred a year-

45

and-a-half earlier. Approximately two months later, perhaps as a result of GWG's pointing out the provision, BEN and HCLP executed an amendment to the BEN-HCLP First Debt Credit Agreement waiving BCC's failure to deliver financial statements and investment reports at any point throughout the life of the loan and numerous other breaches.

128.    After sending the second email, Banowsky immediately forwarded the chain to Heppner, who he understood controlled HCLP:

> I have sent the following emails today to GWG. I understand that the senior lender has the same concerns that the senior lender had with regard to Paul Capital's demands in December.[14]
>
> As you recall, the senior lender does not want any unreasonable restrictions that prevent BEN management from executing its business plan. The senior lender has confidence in BEN management and its Board of Directors and is relying on them to communicate their concerns with any restrictions placed in the forbearance agreement proposed by GWG.
>
> ***Please confirm that the senior lender agrees with this strategy.*** As in the past, ***I have relied upon you to speak to Keith [Martens] because of your long-term relationship and your ability to communicate BEN's concerns to him.***
>
> Of course, the decision to call the note is ultimately the senior lender's decision. If such a decision is to be made, I would like to be included in the discussions with Keith [Martens].

(Emphases added).

129.    Although paying lip service to Martens's role as HCLP's nominal controller, the fact that Banowsky sent the email to Heppner—not Martens—is telling. Banowsky had Martens's (his nominal client's) contact information and exchanged emails with him just weeks earlier. And by claiming that he would rely on Heppner to communicate with Martens, Banowsky allowed Heppner to interject himself in the process to call the shots for HCLP while attributing those decisions to Martens. And even if Martens was actually included in any discussion regarding the

---

[14] Banowsky and Heppner were already well-versed in using HCLP and its purported debt for additional leverage, having previously used threats of foreclosure to procure the BEN-HCLP Second Debt.

management of HCLP, he was beholden to Heppner, commercially unsophisticated, and did not provide the type of disinterested judgment and incentives to make HCLP truly independent from Heppner.

130.    The statements in Banowsky's March 15, 2019 emails to GWG's CFO and outside counsel (the "**March 2019 Emails**") that HCLP would call its loan by March 31, 2019 were false and materially misleading, and used by Banowsky to perpetuate Heppner's scheme to defraud and obtain money by means of false pretenses and misrepresentations. These emails were entirely empty threats designed to give GWG the impression that HCLP was actually a hard-bargaining, third-party lender whose note would need to be paid in cash (thus requiring GWG to send money to BEN immediately and on unfavorable terms). In reality, however, Heppner could cause HCLP to extend its loan and waive covenants and other requirements (as HCLP had done for BEN for over a year-and-a-half at that point, unbeknownst to GWG). Moreover, Heppner would not have foreclosed on a new business he had been developing for years and which he hoped to use to enrich himself and his affiliates to the tune of hundreds of millions of dollars.

131.    Banowsky was or should have been aware of the 25-year history of HCLP's ultimate parent entity, Highland Consolidated, "investing" or "loaning" substantially all of its assets to Heppner and his affiliated entities and non-commercial terms and repeated extensions of those supposed "loans," but GWG was not. Of note, just a few months later, BEN's auditor concluded that "the related party, long-term nature of the [BEN-HCLP First Debt] would not cause obligations that would impact [BEN's] ability to continue as a going concern" in part because "debt is held by entities controlled by the founder [Heppner], and it has been extended several times during the course of our audit. *We believe that the founder will continue to extend the debt as necessary to support [BEN]*." (Emphasis added). Moreover, BEN management represented to

47

the auditor "that the related parties at which the Company's debt is held **would not impose debt obligations on BEN that would jeopardize the Company's ability to continue as a going concern.**" (Emphasis added). These facts were not known to GWG at the time of the March 2019 emails and would not be discovered for several more years.

132.     Around this same time, GWG's then-current executives were also asking questions about HCLP. GWG's CEO unknowingly repeated Heppner's false story regarding HCLP and Banowsky to GWG's CFO and General Counsel on March 17, 2019, telling them:

> When I asked Brad Heppner about who HC[L]P is, he said that: "HC is a credit company held by the Harmon's who loaned money to get the company going." Jeff Hinkle had a POA from "it" to execute the original docs.  Since the Change of control of BEN, the new "person" is Martens who "I" (Brad) have to deal with and Banowsky is the lawyer for it."

133.     Shortly after the March 2019 Emails, HCLP and BCC executed an amendment to the BEN-HCLP First Debt Credit Agreement extending the maturity date. This amendment was also the first of several that added provisions exempting equity contributions to BCC or its affiliates from the calculation of mandatory prepayments due to HCLP. These amendments contemplated that GWG would soon invest substantial capital in BEN.

### 3.     *Heppner and BEN Implement a Plan to Siphon Cash from GWG.*

134.     By early 2019, nearly eighteen months after its initial liquidity exchange transaction with Paul Capital, BEN was badly underperforming. BEN had still not obtained a state trust bank charter, which Heppner had previously deemed necessary to launch BEN's business in earnest (primarily to exempt BEN from the requirements of the Investment Company Act of 1940). BEN was bleeding cash and losing money. And, as discussed above, BEN was facing challenges and questions from its auditor, which resulted in the delayed issuance of BEN's audited financial statements—an event of default under the CLA.

135.     Heppner's solution to BEN's troubles was to buy out GWG's founders. Doing so would mitigate problems with BEN's default under the CLA (due to BEN's inability to procure audited financial statements) and provide BEN with a potential capital-raising partner going forward.

136.     In April 2019, Heppner's solution came to fruition. By the end of the month: (a) GWG's entire pre-existing board resigned and was replaced with a new board designated by BEN (effective April 26, 2019), consisting entirely of dual-directors who served on the boards of both GWG and BEN; and (b) the Seller Trusts became entitled to full voting rights with respect to the shares of GWG common stock they owned, amounting to approximately 79% of outstanding GWG voting securities at the time. The Seller Trusts' voting control was effectively exercised through two "Trust Advisors"—Holland and a BEN designee. At the same time, Heppner became GWG's chairman of the board, and Holland became GWG's President and CEO.

137.     After these transactions and additions to the board made by resolution dated May 10, 2019 and effective May 13, 2019, GWG's new board included 12 dual GWG-BEN directors and two independent directors, who served on a Special Committee to approve transactions between GWG and BEN. Throughout the relevant time period, GWG's board included highly respected leaders of the Dallas business community and/or distinguished individuals with national reputations. None of those individuals would have otherwise allowed their sterling reputations to be tarnished had they possessed any inkling of Heppner's misconduct alleged herein, and they could and would have put a stop to it had they learned of Heppner's misdeeds. But instead, Heppner—aided by Banowsky's fraud, misrepresentations, and other actions—was able to keep GWG's directors in the dark.

49

138.     Shortly after the April 2019 transaction, Heppner, Holland, and BEN immediately began plotting to funnel cash from GWG to BEN. Within days of BEN board members taking their place on GWG's board, the new GWG board held its first board meeting on April 29, 2019 (at which Heppner was unanimously elected GWG's new chairman of the board). At the meeting, Heppner led a discussion of GWG's "financial objectives" and "the timeline for implementing a number of strategic initiatives" with BEN during 2019, including GWG funding of BEN in May 2019. Thereafter, the board formed a Special Committee of the two independent directors, Kathleen Mason and Dave Chavenson, to bless transactions between BEN and GWG.

139.     Heppner quickly got to work requesting that the Special Committee approve GWG moving tens of millions of dollars to BEN. Over a series of calls and meetings between May 11 and May 17, 2019, the Special Committee was presented with a series of ever-increasing funding requests. GWG eventually requested that the Special Committee approve GWG loaning BEN $65 million, with $50 million to be funded immediately. GWG explained that BEN needed the money—and quick—so that its auditor could issue its opinion on BEN's financials without a going concern qualification.

140.     Around this time (on or after May 17, 2019),[15] the BEN-HCLP Second Debt promissory note was replaced when BEN and BHI executed a Second Lien Credit Agreement (backdated to December 28, 2018) with an initial principal balance of $72 million. Hinkle, a BEN officer, signed this agreement as secretary of BHI, and BHI's notice address in the Agreement was the same as BEN's address (and HCLP's notice address for the BEN-HCLP First Debt).[16] Drafting

---

[15] BEN's board did not even authorize BEN to enter into the Credit Agreement until on or after April 25, 2019, and presentations for BEN's May 17, 2019, Audit Committee meeting indicate that the "[f]ormal credit agreement is currently being finalized."

[16] 325 N. Saint Paul Street, Suite 4850, Dallas, Texas.

the Second Lien Credit Agreement appears to have been prompted by questions from BEN's auditor, Deloitte, which requested a copy of the Credit Agreement for the BEN-HCLP Second Debt (which did not exist at the time).

141.    BCC and HCLP also made several amendments to the BEN-HCLP First Debt Credit Agreement during this time in anticipation of BEN receiving funding from GWG. BCC and HCLP removed from the BEN-HCLP First Debt Credit Agreement a provision allowing interest above available distribution amounts to be deemed paid-in-kind. BCC and HCLP likewise amended the Credit Agreement to provide that all interest accrued on the loan since December 16, 2018 would be due and payable June 30, 2019. Stated differently, this amendment made interest beyond what BCC was able to pay due in cash to HCLP, rather than PIK, as it had been in the past, and set BCC up to owe HCLP an interest payment in the near future. This amendment not only contemplated BEN having a new source of funds with which to pay HCLP interest, but also set up a future interest payment to HCLP beyond BEN's cash-on-hand that would need to be funded somehow.

142.    Then, on May 20, 2019, BCC and HCLP executed a third amendment to the First Lien Debt Credit Agreement which added "Exempted Funding Trust Proceeds" as a defined term and an item that would be excluded from calculations of monthly interest payments due to HCLP. Like the earlier amendments, the third amendment to the First Lien Debt Credit Agreement was intended to facilitate GWG sending cash to BEN by giving GWG comfort that proceeds would not immediately be swept by HCLP, which GWG believed, based on representations made by Heppner and Evans, was a hard-bargaining, true third party. These representations were buttressed by an organizational chart purporting to set out HCLP's "control structure" that Evans, recently named GWG's Chief Integration Officer, provided to the Special Committee in late May 2019. The

document repeated verbatim many of the misrepresentations and misleading statements in the February 2019 Litigation Opinion prepared by Banowsky. Thus, Heppner was able to give the Special Committee the impression that BEN urgently needed capital to pay HCLP (including an upcoming June 30, 2019 interest payment that HCLP and BCC teed up in anticipation of receiving cash from GWG).

143.    On May 31, 2019, the Special Committee met and approved a $65 million loan to BEN, to be funded to affiliated liquid trusts, (the "**$65 Million Loan**") and two related intercreditor agreements with BEN's senior lenders, HCLP and BHI. Holland signed all three documents on behalf of GWG, while Heppner personally signed the intercreditor agreement between GWG and BHI as BHI's President.[17] Martens signed the intercreditor agreement between GWG and HCLP as an "Authorized Person" for HCLP,[18] and Hinkle signed the loan documents on behalf of the liquid trusts.[19]

144.    The terms of the $65 Million Loan were materially unfavorable to GWG. Specifically, the loan: (a) was unsecured; (b) was subordinated to senior first debt (to HCLP) and second debt (to BHI); (c) was not due for over four years (on June 30, 2023); (d) bore interest at a rate of only 7.00%, which was not payable until the maturity date; and (e) was made to risky borrowers with no demonstrated track record of generating income sufficient to repay the loan.

145.    Moreover, it made no sense for GWG to make a loan with such unfavorable terms given that GWG itself faced liquidity challenges, which the $65 Million Loan worsened, in that:

---

[17]   Intercreditor Agreement dated May 31, 2019 between BHI, Inc. and GWG Life, LLC (https://www.sec.gov/Archives/edgar/data/1522690/000121390019010247/f8k053119ex10-3_gwghold.htm).

[18]   Intercreditor Agreement dated May 31, 2019 between HCLP Nominees and GWG Life, LLC (https://www.sec.gov/Archives/edgar/data/1522690/000121390019010247/f8k053119ex10-2_gwghold.htm).

[19]   Promissory Note dated May 31, 2019 between GWG Life, LLC and HCLP Nominees. (https://www.sec.gov/Archives/edgar/data/1522690/000121390019010247/f8k053119ex10-1_gwghold.htm).

(a) the loan's interest rate was *lower*[20] than on the L Bonds that GWG relied upon to fund its operations and to fund the $65 Million Loan; and (b) the interest on the $65 Million Loan was not payable until maturity, yet GWG had to pay monthly interest on its L Bond borrowings. In other words, GWG was losing money on the interest differential between the real money it sent out the door to pay its L Bond obligations and BEN's accrued interest obligations to be paid in the distant future.

146.     Nevertheless, the Special Committee approved the below-market terms of the $65 Million Loan based at least in part on their false impressions of HCLP's ownership and control structure and willingness to foreclose on BEN.

147.     The $65 Million Loan was to be funded in two tranches: $50 million to be distributed immediately, with the remaining $15 million to be released at a later date. Within days of GWG funding the first $50 million tranche,[21] a substantial portion of the proceeds flowed to BEN. In turn, BEN paid $7.6 million to related parties—including $5.1 million in interest on the BEN-HCLP First and Second Debts.[22] Heppner also quickly set about using the funds from GWG to finance his lifestyle. Shortly after GWG funded the first tranche, BEN sent $401,056 to Bradley Capital, a Heppner affiliate which provided private air travel to Heppner and his family.

---

[20] In its audited financial statements and Form 10-K filing for the fiscal year ended December 31, 2019, GWG reported that the weighted average interest rate on L Bonds was 7.15% and 7.10% as of December 31, 2019, and December 31, 2018, respectively. Similarly, the L Bonds given by GWG to certain Seller Trusts in connection with its original formative transaction with Ben bore interest at 7.5%. *See* GWG's Form 10-K for the fiscal year ended December 31, 2019 (https://www.sec.gov/Archives/edgar/data/1522690/000121390020007722/f10k2019_gwgholdings.htm#b_013), at pg. 64.

[21] The second $15 million tranche on the $65 Million Loan was funded on November 22, 2019.

[22] Beginning shortly after the first tranche of the $65 Million Loan was funded and continuing through January 2020, BEN made interest payments on the BEN-HCLP Second Debt to Bradley Capital, not to BHI (the supposed original lender) or to HCLP (which, as discussed below, would later assume the Second Debt "effective" as of April 2019).

**D.    Heppner Again Uses HCLP to Defraud GWG of $49.8 Million in December 2019.**

148.    Although the $65 Million Loan was supposed to satisfy BEN's capital needs for over a year, Heppner began devising ways for GWG to send additional money to BEN almost immediately after the Special Committee approved the loan. Heppner outlined Strategic Initiative Transactions ("**SITA**") that involved transferring large sums of money from GWG to BEN on below-market terms. But before Heppner could transfer further money to BEN, he would have to deal with questions from a group of dual GWG-BEN directors who were growing suspicious about HCLP and the BEN-HCLP First and Second Debts.

*1.    After GWG's Directors Get Suspicious, Heppner Attempts to Cover His Tracks With Defendants' Aid.*

a.    Heppner and Banowsky Make More Backdated Organizational Changes.

149.    GWG's Special Committee had a strong negative reaction to Heppner's demands for additional BEN funding. The Special Committee requested that GWG management "work with BEN and provide the Committee with credible analytical justification to approve any [GWG] funding of BEN (including, but not limited to, returns to [GWG] holders taking into account the BEN capital structure, ***including BEN debt*** and existing BEN preferred) before any type of funding protocol of the proposed magnitude (or any ad hoc funding of consequence) would be established or provided." (Emphasis added).

150.    At the same time, three dual GWG-BEN directors, Bruce Zimmerman, Sheldon "Shelly" Stein, and David Glaser, began asking questions about related-party payments that BEN made to Heppner affiliates, including those made with proceeds from the first tranche of the $65 Million Loan. These payments troubled Zimmerman, Stein, and Glaser given GWG's liquidity issues, the lack of reliable cash forecasts for either GWG or BEN, and the timing mismatch

between when GWG would monetize its assets in the long term (~8 years) and when it would be forced to make payments to L Bond holders (~3 to 4 years).

151.    This alarmed Heppner, who did not want his related entities, including BHI, Bradley Capital, and HCLP, to be scrutinized. Heppner first enlisted the help of Evans, who was named GWG's CFO in August 2019, to determine what sort of paper trail had been created regarding HCLP and BHI. On August 15, 2019, Evans sent BEN's Chief Accounting Officer an email with the subject "Docs needed (semi urgent)" asking for documents including the February 2019 Litigation Opinion, which described HCLP's control structure.

152.    In the meantime, Heppner and Schnitzer tried to smooth things over with Stein, Glaser, and Zimmerman, writing, "questions related to [HCLP and associated trusts], [its] history, nature, governance and our respective rights are fundamental to…taking any view of best, next steps" and suggesting that they commission counsel "to thoroughly examine the matter for our review." Heppner knew that retaining counsel and getting them up to speed would take at least several days, buying him and Banowsky some time to make changes and throw Stein, Glaser, and Zimmerman off the scent.

153.    Understanding that HCLP and related entities were about to be put under the microscope, Heppner and Banowsky coordinated with Martens, Heppner's hometown friend, to revise HCLP's governance documents and sign a backdated Amended and Restated Limited Liability Company Agreement of HCLP "entered into as of April 1, 2019." Martens signed this document as manager of CMH, which in turn was listed as HCLP's manager. Through this agreement, BHI assigned the $72 million BEN-HCLP Second Debt to HCLP as a capital contribution and received a 34% interest in HCLP in exchange.

154.     That Heppner retained control over and would benefit from money paid to HCLP is evident from the terms on which his personal investment vehicle BHI assigned the BEN-HCLP Second Debt to HCLP. In exchange for the assignment, BHI received 72 Class B HCLP units, which were subordinate to the Class A Units held by HCLP Credit. Moreover, the Class B Units BHI received were not entitled to any distributions until HCLP had distributed $213 million—the total balance of the BEN-HCLP First and Second Debts—to HCLP Credit. As accounting memos would later acknowledge, because those loans were HCLP's only significant assets, this arrangement "effectively ***result[ed] in proceeds from repayment of both credit agreements***— $141 first lien credit agreement and the $72 second lien credit agreement—***going to [HCLP] Credit***." No rational economic actor would assign the right to receive $72 million plus interest to another party for a worthless subordinated interest unless the assignor controlled and would receive benefits from the assignee. Such was the case with Heppner and HCLP.

155.     All of these documents were backdated to be effective as of April 1, 2019 to make it appear that: (a) CMH, not an entity managed by Hinkle (BEN's Chief Administrative Officer and Treasurer who answered to Heppner, BEN's CEO and chairman), had been HCLP's manager since April 2019, after which the related party payments had been made; and (b) the BEN-HCLP Second Debt—previously owed to BHI, which Heppner controlled and used as a vehicle for his "carry" interest in BEN—had been owed to HCLP since April 2019. But CMH was not HCLP's manager in April 2019, or in August 2019. Rather, HCLP was managed by Counselors, which was managed by BEN employee Hinkle, who reported to Heppner.

156.     After Stein, Zimmerman, and Glaser continued asking questions about HCLP, Heppner would make further backdated changes to HCLP's governance, including changing HCLP's manager to CMH in October 2019. Again, Heppner used Banowsky to obscure his control

over HCLP and communicate misleading information about HCLP's ownership and control structure to the Special Committee.

157.    In early September 2019, Magee (who would re-join HK as a partner a few months later) introduced Banowsky to Glenn West of Weil Gotshal, who had been retained by the BEN Enterprise Risk Committee to review BEN's borrowings from HCLP and BHI. Banowsky and West initially only had high level discussions about West's investigation, documents West might need, and Banowsky's representation of HCLP, which he explained "has been on an 'as needed' basis over the years usually related to litigation or threatened litigation. Neither TK nor I were lead lawyers on the negotiation and drafting of the Credit Agreement." Heppner purposefully did not put West in contact with the law firm that drafted and negotiated the credit agreements, Sidley, because Sidley was not in on the scheme and would later acknowledge that they "***understand [HCLP] to be controlled by Brad Heppner***." (Emphasis added).

158.    Notably, this was not the first time West investigated Heppner's control over an allegedly related entity, nor Banowsky's first time providing West an opinion letter regarding Heppner's purported lack of control. As Heppner explained, "We had to do something similar back in 2003 for Lehman [in connection with the sale of Heppner's previous company]. Funny thing is that Glenn [West] was Le[h]man's attorney when that was requested. Banowsky delivered it back then, so that's why I think he should be able to do it now."

159.    After responding to West, Banowsky immediately forwarded their email chain to Heppner and explained that he may need authorization to reveal information subject to HCLP's attorney-client privilege in further discussions with West. Heppner made clear that he intended to manage Banowsky's discussions with West, responding "OK. I want to visit before you talk to

Glenn," to which Banowsky replied, "Of course I will let you know when and if he wants to talk to me."

160.    A few days later, presumably after Banowsky and Heppner had a chance to talk offline, Banowsky reached out to a lawyer at Milbank, Tweed, Hadley, & McCloy LLP ("**Milbank**") about representing HCLP. Banowsky explained HCLP's basic ownership structure and information needed to run a conflicts check, writing that HCLP, HCLP Credit, Highland Consolidated, and HCI were "related to an individual named Bradley Heppner." After the Milbank lawyer asked whether the Highland entities were associated with Highland Capital Management, an unrelated financial services company in Dallas, Banowsky was more blunt: "*All the Highland entities here are Brad Heppner entities*." (Emphasis added).

161.    Banowsky kept Heppner apprised of his progress searching for new counsel for HCLP and took direction from Heppner during this time, asking Heppner for permission to meet with the lawyer in person (which Heppner granted). Banowsky also advised Heppner on how to best keep himself at a distance throughout the process, writing, "*I think you should stay in the background and have no communication directly with [the new lawyer]. This may be overly cautious, but I would like HCLP's lawyer to say he has never met or spoken with you*. [The Milbank lawyer] will only communicate with HCLP, Nominees Manager." (Emphasis added).

162.    Banowsky and the Milbank lawyer planned to meet in person in Houston a few days later, on September 18, 2019. Banowsky of course kept Heppner updated regarding his scheduled meeting and worked with his backchannel Magee (including through her personal email) to refine his understanding of HCLP's control structure.

163.    Banowsky reached back out to Glenn West the day after the meeting, which evidently did not result in Milbank representing HCLP. Banowsky kept Heppner up-to-date on

West's inquiry, forwarding Heppner his correspondence with West, proposed talking points for discussion with West, and proposed emails to West for Heppner's review and comment, which Heppner provided and Banowsky accepted. Banowsky also showed a commitment to take direction from Heppner going forward. After Heppner predicted that "[West] will call right away with a battery of questions" after receiving a cagey email Heppner and Banowsky crafted, Banowsky explained that he would "let [West] leave me a message," giving Banowsky time to speak with Heppner before responding to West.

164.    At the same time, Banowsky was working on the promised opinion letter regarding Heppner's relationship with HCLP with substantial input from Heppner, exchanging drafts of the letter with Heppner and BEN-employee Derek Fletcher, and sending Heppner and Fletcher—rather than Martens—lists of HCLP-related documents and information needed to complete his work.

165.    Banowsky continued to advise Heppner on how to make it seem as though HCLP was not functionally under his control, writing on September 24, 2019 that "optically, it might not make sense to replace Keith Martens as Manager at this point, because someone might imply, incorrectly, that Keith was not independent." Banowsky discussed with Heppner a proposed restructuring of HCLP's control structure to take the spotlight off Martens and the trusts that beneficially owned HCLP:

> Brad - I don't think we can avoid having to identify Keith Martens. I think it looks suspicious if suddenly I become the manager of the entities that control HCLP Nominees. It just looks too convenient. *If the restructuring we discussed on the phone is completed*, before my opinion is written, *it will make the need to speak to Martens or review the trust documents even more unnecessary* than it is already.

> Remember, it is Martin [sic] in his capacity as Manager of Highland[] Consolidated Investments, who has power to remove Highland Counselors as Manager of HCLP Nominees. (at least that is what I was told when I wrote the Deloitte letter.). So it is not in his capacity as Trustee of the Great Plains Trust.

(Emphases added).

59

166.    Banowsky and Heppner continued to discuss a "restructuring" over the following days that would be retroactive to April 1, 2019—before the transactions between BEN and GWG. Banowsky advised Heppner "If the Executive [sic] Risk Committee will accept an opinion … where I don't have to name the Manager of HCI, but simply say it's not Brad, we would not have to effectuate the April 1 transactions we discussed yesterday."

167.    While Banowsky was working behind the scenes to get new counsel for HCLP and restructure its control and management, Zimmerman continued to raise concerns throughout September. Hicks emailed Heppner (copying Schnitzer) to suggest that he "[g]et Glenn [West] with [the] Harmon Trust attorney so he can nail that issue." Heppner replied that he would "get Glenn [West] with the right person on the Harmon trust asap." Shortly thereafter, Banowsky (the "right person") got back in contact with West and agreed to draft a letter setting out the relationship between BEN, Heppner, and HCLP.

168.    On October 1, 2019, West emailed Banowsky some new concerns after reviewing BEN's financials: "The HCLP Nominee[s] debt is described as related party debt in the financial statements. See highlighted portion of footnote 15 attached …. The footnote also suggests that Brad serves as either an investment trustee or a is in a class of beneficiaries, which is part of what needs to be nailed down." West attached a highlighted excerpt from BEN's 2018 Financial Statements,[23] which stated:

> Highland Consolidated, L.P., a Texas limited partnership controlled by affiliates of BEN, the limited partners of which includes trusts for which BEN's CEO and founder serves as investment trustee or which he or his family are in the class of possible beneficiaries … [HCLP] is a Delaware limited liability company and is an indirect subsidiary of Highland Consolidated, L.P.

---

[23] As discussed above, even these financial statements did not accurately describe the Heppner-Highland Consolidated relationship.

Later that evening, alarmed by West's discovery that HCLP was ultimately owned by trusts controlled by or for the benefit of Heppner and his family, Banowsky forwarded Heppner a copy of his February 2019 Litigation Opinion with the entire section describing HCLP and its control structure highlighted.

169. After being alerted by Banowsky that West had begun to dig into the details of HCLP's ownership and control structure, Heppner and Banowsky jumped into action to make further backdated changes to HCLP's governance. That same day (October 1, 2019), Banowsky and Heppner coordinated a call with David Wickline, an associate of Heppner's they planned to use to replace Martens in the "restructuring" they had discussed.

170. On or about October 3, 2019, after another conference call between Banowsky, Heppner, and Fletcher, Heppner signed a unanimous written consent (backdated to August 23, 2019, the date of their earlier changes)—as Trustee of HPHT—to change HCLP's manager from Highland Counselors (for which BEN officer Hinkle had been manager) to a new manager entity, CMH, retroactively effective as of April 1, 2019. The signature block shows HCLP's chain of control, with Heppner at the top:

**MEMBER:**

**BY: HCLP CREDIT COMPANY, L.L.C.**
Its sole member

**By: HIGHLAND CONSOLIDATED, L.P.**
Its sole member

**By: HIGHLAND CONSOLIDETED INVESTMENTS, LLC**
Its general partner

**By: THE HIGHLAND PARTNERS HOLDINGS TRUST**
Its sole member

By: _Bradley K. Heppner_
Name: Bradley K. Heppner
Title:  Trustee

171.     Thus, through his role as Trustee of HPHT, Heppner was able to change HCLP's manager. Heppner likewise wielded his control over HPHT to change the manager of HCLP Credit (the sole member of HCLP), executing an identical written consent of the member of HCLP Credit to remove Highland Counselors as manager and replace it with CMH, again retroactively effective as of April 1, 2019.

172.     To further distance himself from HCLP and make HCLP appear like a hard-bargaining third party (rather than an indirect subsidiary of Highland Consolidated, which had a two-decade history of transferring all of its capital to Heppner-affiliates disguised as purported "investments" or "loans"), Heppner took an additional step: because Martens, a small town medical salesman, was not a credible manager of a senior secured lender with nine-figure loans outstanding, Heppner installed David Wickline—who once worked at Goldman Sachs with Heppner and reported to Heppner's mentor, Charles Harmon—as manager of CMH (and thus indirect manager of HCLP) on or about October 3, 2019. To do so, Heppner signed—as Trustee of HMT and HPHT, respectively—unanimous written consents that: (a) replaced HCIC with Wickline as CMH's new manager; and (b) replaced Martens with Wickline as HCI's new manager.

173.     That same day, Heppner requested that Wickline provide wiring instructions for $25,000 quarterly payments to be paid in advance for his services as figurehead of the web of Highland entities. Notably, ***BEN had control over HCLP's bank account***, and ***Heppner personally directed BEN's corporate treasury to make the payments*** to Wickline out of HCLP's account.

           b.     <u>Banowsky Misleads Dual GWG-BEN Directors and Their Counsel in an October 2019 Letter.</u>

174.     As Heppner was making these furtive, backdated changes, Banowsky continued to prepare the letter for West explaining HCLP's control structure and beneficial owners. In drafting

the letter, Banowsky took significant input directly from Heppner and Fletcher, and had those two BEN executives "review for accuracy" several interim drafts.

175.    In their edits, which Banowsky often accepted verbatim and without question, Heppner and Fletcher were very cagey in describing the Harmon and Great Plains Trusts, who had the power to control them, and who their beneficiaries were. Understandably so, as Banowsky observed in a comment that "under the trust agreement [of the Harmon Trust], Brad is the 'Family Trustee' who has broad rights . . . While Brad has been informally referred to as the 'investment trustee' his retain[ed] rights are broader than that."

176.    Heppner's rights as Family Trustee of the Harmon Trust were a crucial piece of Banowsky's analysis. Under the terms of the Harmon Trust agreement, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

177.    Banowsky understood the importance of Heppner's status as Family Trustee of the Harmon Trust to his analysis. Given his essentially unfettered ability to control the trust that owned nearly 90% of Highland Consolidated (to say nothing of Heppner's interest in BHI, HCI, and other entities), Heppner clearly had some degree of control over HCLP. However, Heppner and Fletcher

63

claimed that Heppner had delegated his authority as Family Trustee as it related to Highland Consolidated. Therefore, many of the conclusions in the October 2019 Letter turned on whether Heppner's delegation of his powers as Family Trustee was effective. Accordingly, Banowsky specifically requested documents showing such a delegation "which has not been revoked as of the date of this email."

178.    Fletcher and Heppner, however, could only provide an unsigned delegation form. Banowsky accepted the unsigned form without question. Banowsky did so because he understood that his letter was never intended to be an objective analysis of HCLP's control structure or relationship with Heppner. Rather, Banowsky knew that the job was to craft a letter showing that Heppner did not have control over HCLP (regardless of what the documents he received and reviewed actually said) and to leave no loose strings for the Enterprise Risk Committee or its counsel to pull on and potentially unravel his and Heppner's lies. At the very least, Banowsky's immediate acceptance (without question) of an unsigned version of a document on which all the conclusions in his letter hinged amounted to a significant and entirely unjustified assumption that the document had been signed and not subsequently revoked. That Banowsky did not list this assumption in his letter demonstrates that he understood his assignment—to draft a letter definitively saying that Heppner did not have control and which would not lead to further questions.

179.    The documents reviewed by Banowsky also showed that Heppner may have been able to control the Great Plains Trust. The Great Plains Trust agreement provided that ▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

180.    Banowsky also intentionally ignored and did not mention in his letter other evidence showing that Heppner controlled HCLP through HCI. For instance, Heppner discouraged Banowsky from including a diagram showing HCLP's ownership and control structure with the letter because "[i]t leads to the question of who can remove and replace the manager of Highland Consolidated Investments." The answer, of course, was that ***Heppner had that power*** as trustee of the Highland Partners Holding Trust. And in fact, with Banowsky's aid, Heppner had exercised that power just one day earlier to replace Martens with Wickline as HCI's new manager.

> **UNANIMOUS WRITTEN CONSENT
> OF THE MEMBER OF
> HIGHLAND CONSOLIDATED INVESTMENTS, L.L.C.**
>
> WHEREAS, the undersigned wishes to (i) remove Keith Martens (the "Current Manager") from his position as Manager of the Company, in accordance with the LLC Agreement, and  (ii) appoint David Wickline as the Current Manager's successor as Manager of the Company (the "Successor Manager"), in accordance with the LLC Agreement;
>
> **MEMBER:**
>
> **THE HIGHLAND PARTNERS HOLDINGS TRUST**
>
> By: *Bradley K. Heppner*
> Name: Bradley K. Heppner
> Title:  Trustee

181.    Banowsky clearly understood this issue. In response to Heppner's concern that including a diagram would lead to the question of who had the power to replace HCI's manager, Banowsky quoted a section of HCI's LLC agreement regarding appointment of managers: "A

Majority-in-Interest of the Members shall be entitled to appoint the Manager … The initial Manager is Brad K. Heppner … upon the determination of a Majority-in-Interest of the Members … the Company shall cause a successor participant (a 'Successor Manager') to become a Manager. The Successor Manager shall be selected by a Majority-in-Interest of the Members." Banowsky knew from his involvement in changing HCI's manager the previous day that HCI's sole member was HPHT, which Heppner controlled as Trustee. Moreover, a BEN employee confirmed for Banowsky that day that HPHT was HCI's sole member, meaning that Heppner retained power to change HCI's manager. Banowsky therefore knew or must have known that Heppner had the power to control HCI, which gave him control over Highland Consolidated and HCLP.

182.    Banowsky also intentionally downplayed the likelihood that Heppner would receive a distribution from the Harmon and Great Plains Trusts. As Heppner acknowledged in emails with Banowsky, the terms of the Harmon Trust and Great Plains Trust agreements allowed for distributions to Heppner and his family members for their health, education, maintenance, and support. Heppner urged Banowsky to qualify the fact he was a beneficiary of the Harmon Trust with the statement that "Mr. Heppner's assets other than those of the Harmon Trust … must be considered when deciding whether a distribution should be made" and because "Heppner has substantial other assets … it is highly unlikely a distribution would ever be made from the Harmon Trust to Mr. Heppner for these purposes." Fletcher and Heppner claimed that the original copies of the Harmon Trust agreement included these qualifications and limits on distributions, but that they had redacted them from the versions provided to Banowsky.

183.    Similarly, Heppner asked Banowsky to qualify his status as a beneficiary of the Great Plains Trust with the claim that "Distributions may only be made to [Heppner or his family] … after assets other than those of the Great Plains Trust that are available … have been exhausted."

66

Fletcher pointed out a specific provision of the Great Plains Trust agreement that he claimed supported that assertion. Banowsky did not question these claims, did not ask to see unredacted or original copies, either did not read the provision Fletcher pointed out or ignored that it did not support Fletcher's claim, and dutifully included these qualifications word-for-word. Banowsky knew or must have known that these statements were false because the provisions of the Harmon and Great Plains Trust agreements flatly contradicted these claims, as discussed in more detail below. At minimum, Banowsky would have realized that these statements were untrue had he taken reasonable care in reading the trust agreements, rather than sticking his head in the sand by relying entirely on Heppner and Fletcher's twisted interpretation of them.

184.    More broadly, Banowsky's focus in the letter on distributions from the Harmon and Great Plains Trusts was misleading in and of itself. Whether those trusts could distribute money received on account of the BEN-HCLP First and Second Debts to Heppner or his family was almost entirely irrelevant to how Highland Consolidated used and distributed funds received from BEN. Virtually all of that money flowed up from HCLP, to HCLP Credit, to Highland Consolidated. Implicit in Banowsky's analysis of whether the Harmon and Great Plains Trusts could distribute loan proceeds to Heppner or his family was the premise that those trusts did and would receive loan proceeds from Highland Consolidated. But in practice, Heppner used his control over the Highland enterprise to cause Highland Consolidated to send those funds to various Bradcos under the guise of sham "investments," "advances," or "loans." Thus, Banowsky's near-myopic focus on the Harmon and Great Plains Trusts in the context of discussing distribution of loan proceeds was misleading because it ignored that Highland Consolidated sent virtually every penny it received from HCLP and Highland Credit to Bradcos, without money going to the Harmon or Great Plains Trusts.

185.    Banowsky must have known of Highland Consolidated's decades-long track record of loaning or advancing all its available capital to Heppner. Indeed, in 2003, he wrote a similar opinion letter for Heppner in connection with a transaction with Lehman Brothers. Accordingly, he intentionally did not mention in his letter claiming that "Heppner cannot control the distribution of proceeds from [BEN's] loan repayments to HCLP" the fact that Highland Consolidated would send those loan proceeds to Bradcos, rather than the trusts that held its LP interests. At minimum, Banowsky was willfully blind to the fact that money sent to HCLP as supposed debt payments was consistently funneled through Highland Consolidated, which had long operated as Heppner's slush fund, into the Bradcos.

186.    Banowsky's work drafting the letter was not that of principled legal analysis, but an exercise in working backwards from Heppner's desired conclusion that he could not control and would not benefit from money paid to HCLP. Indeed, when Heppner suggested that Banowsky send a draft of the letter to an accounting firm "to see if they need it to say anything more for their analysis," Banowsky agreed wholeheartedly, writing "Tell me what the GAAP standard is and I will do a legal analysis given those definitions."

187.    Banowsky sent the final version of the letter, dated October 5, 2019 and drafted on TK letterhead, to West on October 6, 2019 (the "**October 2019 Letter**").[24] Banowsky forwarded his email to West and the attached, final letter to Heppner less than a minute later. On October 8, 2019, West forwarded the October 2019 Letter to Stein, Glaser, and Zimmerman, in advance of an upcoming combined BEN board committee and GWG board committee meeting.

188.    The October 2019 Letter contained a number of incorrect and misleading statements, all of which furthered Banowsky and Heppner's fraudulent scheme to defraud and

---

[24] At Heppner's instruction, Banowsky billed all his time for work on the letter to BEN, rather than HCLP.

obtain money by means of false pretenses and misrepresentations. First, the October 2019 Letter stated that in addition to the company agreements of HCLP, CMH, HCLP Credit, HCLP, and HCI, Banowsky had reviewed "Documents related to the appointment and resignation of managers of the subject entities," which would include documents evidencing Heppner's eleventh-hour replacements of Counselors with CMH as manager of HCLP and HCLP Credit, and of Martens with Wickline as manager of CMH and HCI. However, the October 2019 Letter stated that "Heppner cannot control HCLP" because: (a) only Wickline, as manager of HCI "ha[d] the sole authority to remove and replace [CMH] as manager of both [HCLP Credit] and HCLP;" (b) neither Mr. "Heppner nor his family have the power to remove and replace the manager of HCI;" and (c) "neither Mr. Heppner nor any member of his Family have the power to remove and replace the manager of [CMH]." But those assertions omitted that Heppner: (a)(i) had the power to remove and replace the manager of HCLP and HCLP Credit through his position as trustee of HPHT, which controlled Highland Consolidated's general partner, which indirectly controlled HCLP Credit and HCLP, and (ii) used that power days earlier to change HCLP and HCLP Credit's manager from Highland Counselors to CMH; (b)(i) had the power to replace HCI's manager as trustee of the HPHT, HCI's sole member, and (ii) used that power just days earlier to replace Martens with Wickline as HCI's manager; (c)(i) had the power to change CMH's manager as trustee of the trust that owned CMH, and (ii) used that power days earlier to install Wickline in place of HCIC as CMH's manager.

189.    Second, Banowsky's October 2019 Letter stated that Heppner "cannot control the distribution of proceeds from…loan repayments to [HCLP]," while misleadingly omitting the *25-year history* of HCLP's ultimate parent entity, Highland Consolidated, transferring all its capital as purported "loans," "investments," or "advances" to Heppner-affiliated entities. The letter also

69

omitted that Heppner and BEN controlled HCLP's bank account and that two days earlier, Heppner personally directed BEN's corporate treasury to make payments to Wickline out of that account.

190.    Third, Banowsky claimed in the October 2019 Letter that Heppner "cannot control distributions from the Harmon Trust and the Highland Great Plains Trust" and "the Independent Trustee possesses sole authority over the Harmon Trust's ownership in HCLP." These statements were based on Heppner's purported delegation of authority as "Family Trustee" of the Harmon Trust. However, the only evidence Banowsky had of this supposed delegation was an ***unsigned*** delegation form. Banowsky acknowledged in emails to Heppner and Fletcher that the effectiveness of Heppner's delegation of authority over the Harmon Trust was a crucial piece of his analysis, yet he accepted an unsigned form without question, made no efforts to confirm the delegation had actually occurred, wrote the October 2019 Letter assuming it had occurred, and did not note that the conclusions in the October 2019 Letter were premised on a massive, unjustified assumption. In addition, Fletcher promised to send Banowsky a signed version once it was located (or, possibly, executed), but never did so. And Banowsky never followed up with Fletcher to get a signed copy of the document on which much of the conclusions in his October 2019 Letter rested.[25]

191.    Fourth, Banowsky misrepresented the terms of the Harmon and Great Plains Trust agreements in claiming that it was unlikely a distribution would ever be made to Heppner from those Trusts. The October 2019 Letter stated that although Heppner was a beneficiary of the Harmon Trust:

> Mr. Heppner's assets other than those of the Harmon Trust … must be considered when deciding whether a distribution should be made to Mr. Heppner. Mr. Heppner has substantial other assets as reported to the Texas Department of Banking, and

---

[25] To the extent the form was ever signed, it may have been backdated, like numerous other documents concerning control of HCLP. Fletcher acknowledged in sending the unsigned form to Banowsky that he was only able to locate an unsigned version "on our [BEN's] system," but "Brad just brought me a large folder containing a number of executed documents, and I expect they are in this folder." Thus, Heppner may have executed the delegation form contemporaneously with the October 2019 "restructuring."

consequently, it is my opinion that it is highly unlikely a distribution would ever be made from the Harmon Trust to Mr. Heppner….

192.    However, the incomplete version of the Harmon Trust Agreement Banowsky reviewed in drafting the October 2019 Letter contained no such limitation. Heppner and Fletcher claimed to Banowsky that the original trust agreement included that limitation, but that they had redacted it along with other portions of the trust agreement that were "sensitive information." Although limitations on distributions to Heppner were a crucial part of his analysis and conclusions, Banowsky never asked to see unredacted copies of the trust agreement and did not note in his letter that he was relying solely on BEN management's representations when it came to this important point. Moreover, Heppner and Fletcher's claim that distributions were restricted was flatly contradicted by other provisions of the trust agreement █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████

193.    Likewise, the October 2019 Letter claimed that it was highly unlikely Heppner or his family would ever receive a distribution from the Great Plains Trust because "Distributions may only be made to [Heppner's] Family to cover the costs of their health, education, maintenance and support and only after assets other than those of the Great Plains Trust that are available to a Family beneficiary have been exhausted for these purposes." Fletcher directed Banowsky to a specific provision of the trust agreement that he claimed required the trustee to consider

beneficiaries' other assets in making distributions. However, that provision ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ [26]

194.    In sum, the October 2019 Letter contained many misleading statements and omissions and outright misrepresentations. Banowsky knew, must have known, or at the very least should have known from his involvement in Heppner's actions just days earlier that these representations were false. At minimum, he intentionally avoided learning information that would have shown their falsity or acted with reckless disregard for their truth. For instance, had Banowsky read the trust documents Heppner and Fletcher provided him, he would have learned that many of the statements about purported qualifications on distributions from the Harmon and Great Plains Trusts were untrue.

195.    In addition, the October 2019 Letter failed to disclose significant, unjustified assumptions on which its conclusions were based. Banowsky knew that these assumptions were highly material to the analysis and conclusions set out in the October 2019 Letter but purposefully did not mention or otherwise disclose them because doing so would only lead to more questions.

196.    Although the October 2019 Letter's original intended audience was BEN's Enterprise Risk Committee, it was eventually shared with others at or representing GWG and BEN. On December 26, 2019, in discussing HCLP's purported demand for a nearly $50 million payment in connection with a year-end GWG-BEN transaction, BEN's outside counsel mentioned to GWG's counsel "we have a note from Thompson Knight as to the independence/unrelated nature

_____

[26] In reality, it was unlikely that Heppner would receive a distribution from the Harmon or Great Plains Trusts not because those trusts' ability to distribute property to him was circumscribed, but because Heppner used his control over Highland Consolidated to divert money into other entities he controlled, such as his personal family trust, before that money ever reached the trusts at the top layer of the Highland Consolidated enterprise.

of HCLP vis-à-vis the founders which I assume either has been shared or can be shared with the SC." Later that day, BEN's counsel sent GWG's counsel a copy of the October 2019 Letter, which they asserted would obviate the need for the Special Committee to "pars[e] through a series of trust documents and loan documents."

197.     Similarly, at BEN's General Counsel's direction, Evans shared a copy of the October 2019 Letter with GWG's General Counsel in June 2020 "to assist [GWG's GC's] efforts in addressing the RPT [related party transaction] question from GWG's perspective" in connection with negotiating a series of potential transactions between GWG and BEN. Thus, the misstatements in the letter informed BEN's and GWG's perception and knowledge of HCLP in multiple ways during the relevant time period.

c.     Banowsky Misleads GWG's Special Committee and Its Counsel During a November 2019 Call.

198.     Approximately one month later, during a November 12, 2019 Special Committee meeting, Heppner and other BEN executives proposed a recapitalization of BEN and GWG in which BEN's existing NPC-A preferred equity holders (including Heppner) would give up their BEN equity in exchange for L Bonds from GWG. The Special Committee had a positive initial reaction to this proposal, noting that it had "the possibility of mitigating potential conflicts between [GWG] and BEN, since affiliates of Mr. Heppner and certain other directors would no longer be holders of BEN equity." Two days later, on November 14, 2019, BEN transmitted an interim term sheet for the contemplated SITA between GWG and BEN to the Special Committee. In addition to outlining the proposed exchange of BEN NPC-A preferred equity in exchange for GWG L Bonds, this term sheet set forth several other items on BEN's wish list, including $95.1 million in debt financing, part of which would be used to pay down $41 million of BEN's debt to HCLP. The proposed investment was so significant that it would cause GWG to consolidate BEN in its

73

financial statements, and the transaction would be deemed a "change-in-control" under the BEN-HCLP First and Second Debts, requiring the lender's waiver.

199.    Given the size of the funding request and substantial contemplated payment to HCLP, the Special Committee's counsel, Foley & Lardner LLP ("**Foley**") asked for contact information for HCLP's counsel, Banowsky.[27] The next day, November 15, 2019, Foley "initiated a call" (the "**November 2019 Call**") with Banowsky "to gain comfort" that HCLP "was unaffiliated with BEN (*i.e.*, not controlled by Mr. Heppner or other affiliates)—such lack of affiliation had been previously represented to the [Special] Committee by BEN management—and that Mr. Heppner otherwise would not have an economic interest in proceeds received by" HCLP, which was "an important issue to confirm for the [Special] Committee."

200.    Foley relayed the substance of that call to the Special Committee during a meeting the following Monday:

> Foley discussed that, as part of its due diligence efforts, it had initiated a call the prior Friday with Bill Banowsky of the Thompson Knight firm who represents BEN's senior lender, HCLP….Foley explained that the purpose was to gain comfort that the senior lender was unaffiliated with BEN (i.e., not controlled by Mr. Heppner or other affiliates) – *such lack of affiliation had been previously represented to the Committee by BEN management*—and that *Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender, which was an important issue to confirm for the Committee.* Foley explained that Mr. Banowsky explained *the control structure of the lender (which did not include rights for Mr. Heppner or other affiliates)* and represented that Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender and *that unequivocally no debt repayment would be received by Mr. Heppner or his affiliates*.

(Emphases added).

---

[27] Foley initially requested that Evans provide a "memo" that Evans had "referenced on the BEN debt (trust relationships, Brad's powers etc.)" Evans replied that he did not have a copy of the memo, and instead gave Foley contact information for Banowsky, telling Foley on November 14, 2019 that Banowsky was "expecting you to reach out."

201.    Banowsky's representations made during the November 2019 Call were untrue and materially misleading. Banowsky's statement that "the control structure of the lender … did not include rights for Mr. Heppner or other affiliates" was incorrect because Heppner exercised de facto control over HCLP—twice swapping out its managers in 2019. Indeed, Banowsky sought instruction from Heppner, not Wickline, Martens, or Hinkle, in representing HCLP. Banowsky also failed to disclose that BEN controlled HCLP's bank account, and that Heppner instructed BEN treasury to distribute funds out of that account.

202.    Likewise, Banowsky's statements that "Heppner … would not have an economic interest in proceeds received by the lender" and "unequivocally no debt repayment would be received by Mr. Heppner or his affiliates" were untrue. Heppner held a 34% stake in HCLP through BHI, and—because BHI did not have a bank account—payments on the BEN-HCLP Second Debt had been sent to Heppner-affiliate Bradley Capital, and were still sent to Bradley Capital through January 2020—long after that loan was assigned to HCLP. Put differently, BEN was sending money directly to Heppner-affiliate Bradley Capital on account of the BEN-HCLP Second Debt at the time Banowsky represented "unequivocally no debt repayment would be received by Mr. Heppner or his affiliates." Moreover, most of the sums transferred from BEN to HCLP were quickly transferred out of HCLP's bank account through various intermediaries and on to Heppner's affiliates discussed in more detail in Section IV.G.2, *infra*.

203.    As usual, Banowsky reported to Heppner and debriefed the November 2019 Call, writing that the call was "[v]ery high level like the minutes," "Foley "did not push me for information like Glen[n] West did," and thankfully "did not ask for any documents or anything in writing from me." Although Foley "wanted to know more details about the Harmon trust,"

Banowsky "told them [he did] not [represent] them and the Harmon's [sic] valued their financial privacy like most wealthy people."

204.    Banowsky's retelling reveals that he falsely represented that the Harmon Trust was controlled by the Harmon family and that he had very little knowledge or access to information about the trust's control and beneficiaries. However, Banowsky knew that Heppner served as Trust Investment Advisor to the Harmon Trust, and its then-Trustee was Heppner's hometown friend Martens, who Heppner effectively controlled. Indeed, Heppner furtively replaced Martens with Wickline as manager of other HCLP-related entities just over a month earlier because he believed Martens was too closely connected to him. Moreover, Banowsky knew or should have known from the copy of the Harmon Trust agreement that the Trust was centered around Heppner, not the Harmon family. The Harmon Trust agreement, which Banowsky received in drafting the October 2019 Letter, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████     In addition, it was not clear that Heppner had renounced his broad powers as Family Trustee, as neither Fletcher nor Heppner ever provided Banowsky an executed copy of Heppner's delegation of power over the Harmon Trust.

205.    A few weeks later, on December 17, 2019, Foley held a diligence call with West (the "**December 2019 Call**"), the initial recipient of the materially misleading October 2019 Letter. During the call, West unknowingly repeated many of Banowsky's false statements from the October 2019 Letter, including that "the lender was not affiliated with Mr. Heppner," "the manager

of its ultimate control party was not Heppner or an affiliate[,] and Mr. Heppner's relationship to the key trust equity holder in the lender was as a limited contingent beneficiary." These statements, originally made by Banowsky in the October 2019 Letter, buttressed Banowsky's misrepresentations in the November 2019 Call and were likewise false or at the very least materially misleading.

### 2. *GWG Pays $79 Million—Nearly $50 Million of Which was Earmarked for HCLP.*

206.    During the last two weeks of 2019, the Special Committee and its counsel continued to focus on the relationship between HCLP and BEN, and whether a substantial advance from GWG to BEN (so that BEN could pay HCLP) was actually required. Once again, Heppner, Banowsky, and HK wielded dubious demands from HCLP to convince the Special Committee to advance funds from GWG to BEN so that BEN could pay HCLP.

### a.    Heppner and Banowsky Manufacture a False Demand from HCLP.

207.    The Special Committee met on a near-daily basis with one another, their counsel, Heppner, and BEN representatives throughout the final weeks of 2019. By that point, BEN was requesting nearly a $100 million investment from GWG. Earmarked within that amount was "a payment of approximately $40-45 million to HCLP, the senior lender of BEN," which BEN "indicated…was being demanded by the lender to waive a covenant breach that would occur as a result of the change of control of BEN contemplated" by the overall transactions.

208.    During this time, Heppner continued the ruse that HCLP was a hard bargainer ultimately controlled by Wickline. At a December 18 Special Committee meeting, "Heppner discussed at some length BEN's negotiations with the manager (David Wickline) of the control party of HCLP Nominees and represented that, while such negotiations were on-going, he was not optimistic…that a change of control early repayment of the magnitude requested could be

avoided." But, in reality, Wickline had not yet demanded any change of control payment as of December 18, 2019 (and neither had Banowsky).

209.    This purported demand for a change-of-control payment stemmed from Heppner and Banowsky's efforts to exploit the situation.  Heppner discussed with the Special Committee that board designation rights would be beneficial to GWG, as such rights would result in consolidation of BEN on GWG's financial statements. Although Heppner did not want to give GWG any measure of control over BEN beyond the minimum necessary to obtain the desired accounting treatment, he and Banowsky realized that the Special Committee's clear desire for board designation rights could be strategically leveraged. Giving GWG designation rights over BEN's board would constitute a technical event of default under BEN's credit agreement with HCLP. In turn, HCLP could use the threat of default to extract a massive payment from GWG for BEN to then give to HCLP in exchange for consenting to the transaction and waiving the default.

210.    The next day (December 19, 2019), Holland discussed the potential transaction with Chavenson, who made clear that they could not fund such a payment on Heppner's say-so alone and that they needed evidence of HCLP's purported demand. Shortly thereafter, Holland passed the message along to Heppner. Careful to avoid creating too much of a paper trail regarding his control over HCLP, Heppner first suggested that he did not have authority to direct HCLP's lawyers, but then Holland brought up past letters—"Didn't we get one from Banowsk[y]…a demand letter?" When Heppner responded that he would "look," Holland reiterated: "Need something to put in file showing dire need."

211.    Later that day, Banowsky appeared out of the blue and reached out to Heppner to ask basic questions about HCLP's loan documents. And later that evening, Banowsky reached out to Wickline, writing: "I am assuming you have talked to Brad [Heppner] about the need for [HCLP]

Nominees to sign the various loan related documents." Banowsky then forwarded his email to Wickline to Heppner, the man behind the curtain of HCLP, writing "FYI."

212.    Following these backchannel communications, Banowsky, Heppner, Holland, and others began discussing how to best manufacture a demand from HCLP that would satisfy the Special Committee. Banowsky had a call with BEN's counsel and two senior executives to discuss what a demand from HCLP needed to look like in order to satisfy the Special Committee.

213.    On December 20, 2019, BEN's counsel reported to Holland, Heppner, and Evans via email, subject "Call with Banowsky:"

> I spoke with Bill [Banowsky] re: the $40MM obligation to the senior lender. Under the existing Credit Agreement, the control transaction that is occurring on 12/31/19 would be a "Change of Control" and an "Event of Default". We discussed that the Lender would be willing to waive the Event of Default and consent to the Change in Control provided that Ben, as borrower, make a $40 million payment on the loan (plus interest, etc.). (Note that I had understood higher amounts may have been discussed, but Bill thought $40 million got us there.) What we agreed regarding the Special Committee was that the manager of the Lender would send a letter to the Special Committee confirming that they would provide the necessary waiver and consent subject to the $40 MM pay down. The letter would not otherwise reference the status of the loan, which Bill agreed was the preferred approach from the perspective of both the Lender and the Borrower. If there are additional payments that need to be made in January or February, we can resolve them at that time, potentially under a different approval regime (ie, different committee or board approval) – the goal is not to increase the requested amounts from the SC at this time.

> Attached is a draft of the letter that would go to the Special Committee … It is Bill's draft with a few comments from me. ***Do not send this on to the Special Committee***. It has not been shared with Lender, though Bill has discussed the approach so it should not be particularly controversial.

> Let me know of any comments or concerns with this approach or the language. The plan is to socialize the approach with Foley to confirm this would satisfy the SC. Bill and I would then ask the Lender to finalize and send the letter. Obviously, if Foley/SC believes they need something more we will address it.

(Emphasis in original).

214.    The next day (December 21, 2019), the Special Committee met and again discussed that it "understood that a change of control payment to HCLP Nominees might be required to facilitate the lender's consent." Nevertheless, the Special Committee also "discussed ensuring that management was doing everything possible to minimize such current cost." And, in turn, one of the "outstanding key items and issues" discussed by the Special Committee was the "need for BEN to provide clear written documentation as to any demand from HCLP Nominees regarding a payment in connection with the change of control of BEN effected by the Consolidation and a confirmation that efforts were exhausted to minimize such payment." The Committee "emphasized the importance of [GWG] not funding voluntary prepayments given liquidity constraints on both BEN and [GWG]," although "a payment to a third party lender demanding such amount to effect the" transaction GWG was pursuing "had more merit." At the conclusion of the meeting, "[i]t was agreed that [Chavenson] would call [Holland] to express the importance and urgency" of that issue (amongst other outstanding issues).

215.    On December 23, 2019, the Special Committee, via Foley, communicated to BEN that that it was contemplating approving $65 million in cash funding prior to year-end, with the funding "in the form of NPC-A" with a double conversion feature. Heppner forwarded the email chain to Holland, exclaiming: "Ugh!"

216.    Early the next day (December 24, 2019), Holland emailed Heppner to seek instructions on how to proceed, writing: "I need your list of cash needs by year end. The SC wants $65 [million]…you say $93 [million]. Please give details." In response, Heppner, submitted a bullet point wish list of items that included "$50.2 million for loan paydown for consent of change of control" (to be paid to HCLP). Thus, due to his disappointment—"Ugh!"—with the amount of money the Special Committee was willing to approve for GWG to advance to BEN, Heppner once

80

again turned to HCLP and Banowsky as a means of getting more money out of GWG, this time by increasing the amount of HCLP's purported demand. Shortly thereafter, Holland informed the Special Committee that the funding request related to HCLP's supposed change of control demand for payment had increased to $50.2 million.

217.    The day after Christmas, Holland, BEN's legal team, Heppner, and others finalized the letter that had been initially drafted by Banowsky (purportedly from Wickline) with minimal, if any, actual input from Wickline. The final draft of that letter (the "**December 2019 Letter**"), was shared with the Special Committee late in the evening of December 26, 2019. Like the draft initially prepared by Banowsky, the December 2019 Letter stated that the contemplated SITA transaction would constitute an event of default under the BEN-HCLP First Debt, which HCLP would waive in exchange for a payment of approximately $49.8 million.

218.    The claim in the December 2019 Letter that HCLP would declare default unless BEN made a significant payment was false or materially misleading. HCLP had waived numerous other defaults by BEN under the Credit Agreements. For instance, HCLP had previously agreed to:

- An Amendment No. 1 to the BEN-HCLP first lien credit agreement, dated as of March 31, 2019, which retroactively cured BEN/BCC's failure to timely repay the BEN-HCLP First Debt by extending the due date for payment.[28]

- An Amendment No. 2 to the BEN-HCLP first lien credit agreement, dated as of April 30, 2019, which changed the date of interest payments to avoid an event of default from BCC/BEN's failure to make required interest payments.

- A 2019 Extension and Waiver Agreement dated as of May 10, 2019, which both: (a) waived BEN's failure to ever deliver required financial statements and

---

[28] Specifically, the "Scheduled Maturity Date" under the original credit agreement was December 31, 2018, but Amendment No. 1 retroactively: (a) amended the "Scheduled Maturity Date" in the original first lien credit agreement from December 31, 2018 to "March 31, 2019, unless automatically extended pursuant to" section 2.05 of the credit agreement; and (b) added terms to section 2.05 of the credit agreement that provided for automatic extensions of the Scheduled Maturity Date (unless HCLP denied the extension).

certifications from the loan's inception to that date; and (b) retroactively changed the scheduled maturity date to avoid a default.

- An Amendment No. 3 dated May 20, 2019, an Amendment No. 4 dated May 22, 2019, and an Amendment No. 5 dated May 31, 2019 that allowed BEN's other borrowings—including the BEN-HCLP Second Debt and the $65 Million Loan from GWG—without triggering any defaults.

219.    In none of these instances did HCLP demand or receive a substantial fee—let alone extract a payment anywhere close to $49.8 million—from BEN in exchange for granting concessions to avoid events of default. More broadly, HCLP—controlled by Heppner—would never foreclose on Heppner's new business.

    b. <u>The Consideration That GWG Received in Exchange for the Transfer to BEN—of Which $49.8 Million Was for HCLP—Was Grossly Inadequate.</u>

220.    On December 31, 2019, the Special Committee authorized GWG to enter into the Preferred Series A Unit Account and Common Unit Investment Agreement of the same date (the "**December 2019 Transaction**"), pursuant to which GWG advanced $79 million to BEN. $10 million of this amount was for the purchase of 666,667 common units of BEN LP (a $15/share price), with the remaining $69 million allocated to an NPC-A account with an assigned figure of $319 million.[29] This transaction would give GWG the theoretical right to nominate a majority of BEN's board of directors. And, as discussed above, the Special Committee agreed that BEN could send $49.8 million of the proceeds to HCLP as payment for HCLP's waiver of the change-in-control the transaction caused.[30]

221.    The purported control rights GWG gained in the transaction were entirely illusory and little more than an excuse to send nearly $50 million to HCLP. GWG had no practical control

---

[29] GWG's Form 8-K dated December 31, 2019 (https://www.sec.gov/Archives/edgar/data/1522690/000121390020000406/f8k123119_gwgholdingsinc.htm), at pgs. 1–3.

[30] An addition $25 million—nearly the rest of the investment—would be sent to GWG's founders to satisfy an obligation incurred in the April 2019 transaction.

over BEN following the December 2019 Transaction. Although GWG obtained a theoretical right to appoint a slim majority of BEN's board, in reality that designation right would be wielded by Holland, Heppner, and BEN, who ensured that BEN's same preexisting directors were promptly re-appointed to their BEN board seats following the purported change in control. And the agreement that gave GWG its theoretical right to designate BEN directors was further illusory in that Heppner was given sweeping consent rights, meaning that no substantive transactions could occur at the BEN level without his approval.

222.    GWG's Special Committee agreed to the December 2019 Transaction's terms in reliance on Banowsky's misrepresentations regarding HCLP's ownership and control structure, including those made during the November 2019 Call. GWG's Special Committee also relied on misrepresentations originally made by Banowsky and repeated by others, including Evans's May 2019 presentation for the Special Committee that parroted misrepresentations from the February 2019 Litigation Opinion, and the December 2019 Call during which West repeated many of Banowsky's false statements from the October 2019 Letter.[31] Although GWG's board and Special Committee had expressed significant concerns about HCLP's affiliation with Heppner, Banowsky's misrepresentations and misleading statements led them to believe HCLP was not under Heppner's control and was willing to foreclose on the BEN-HCLP First and Second Debts unless its demands were met.

223.    Had GWG and its Special Committee known of Heppner's true ability to control HCLP, Heppner's interest in HCLP—both through BHI and as a beneficiary of the trusts that ultimately owned HCLP, and the benefit Heppner would derive from money paid to HCLP and the

---

[31] The Special Committee may also have received a copy of the October 2019 Letter prior to approving the December 2019 Transaction. On December 26, 2019, BEN's counsel provided GWG's counsel a copy of the October 2019 Letter, claiming that it would answer certain of the Special Committee's questions about HCLP and the BEN-HCLP First and Second Debts.

ultimate disposition of such proceeds—the Special Committee would not have agreed to the December 2019 Transaction or would have at least bargained for terms more favorable than those it accepted. Specifically, had GWG's Special Committee known that Heppner effectively controlled HCLP, could cause HCLP to waive defaults under the Credit Agreements, and would benefit from money paid to HCLP, it would not have sent nearly as much money to BEN. In addition, or in the alternative, GWG's Special Committee would have bargained for better terms in negotiating the December 2019 Transaction had the company known the truth about Heppner's relationship to and interest in HCLP. For example, the Special Committee could have bargained for higher-priority equity or secured debt had it not been under the false impression that HCLP was ready to foreclose on its loans at any moment.

**E.    GWG Continues to Send Money to BEN Throughout 2020 in Reliance on Defendants' False Representations.**

224.    GWG continued to reasonably rely on Banowsky and HK's statements concerning HCLP throughout 2020, during which time it sent over $130 million to BEN, much of which was earmarked for (or paid directly to) HCLP or Highland Consolidated.

225.    In March 2020, GWG and BEN's auditor finished its audit of the companies' 2019 consolidated financial statements. Whereas BEN's previous financial statements identified HCLP and/or Highland Consolidated as related parties (without entirely or accurately explaining the nature of the relationship), GWG and BEN's consolidated 2019 financial statements claimed that BEN "does not consider HCLP Nominees as a related party or affiliate." Similarly, GWG's 2019 Form 10-K disclosed that although HCLP and BHI "are directly or indirectly associated with Brad K. Heppner," "HCLP is not considered a related party of GWG or Beneficient." The February 2019 and October 2019 "restructurings" discussed above were central to HCLP no longer being considered a related party. Although those restructurings did not in fact remove Heppner's ability

84

to control HCLP and Highland Consolidated (and thus HCLP should still have been considered a related party), they provided a pretext for this accounting change. Put differently, thanks to Banowsky's advice and assistance in installing puppet managers, Heppner had an excuse to no longer disclose HCLP as a related party, reducing scrutiny from GWG's Special Committee. Banowsky was thus directly responsible for fraudulent BEN financial statements that were provided to GWG and publicly filed.

### 1. *The May 2020 Term Sheet.*

226.    In March 2020, Mason resigned as a GWG director and was replaced on the Special Committee by Cangany and a new board member, Roy Bailey. The new Special Committee started work in earnest as Holland began sending them new requests for BEN funding and an extension of the BEN-HCLP First and Second Debts, which were set to mature on June 30, 2020.

227.    On May 15, 2020, the Special Committee approved a term sheet for extension of both senior loans (the "**May 2020 Term Sheet**"). In exchange, GWG agreed to assume all of BEN's senior debt and pledge GWG assets as collateral, convert the CLA into BEN common units, pay yet another fee to HCLP, and elevate $50 million of NPC-A held by Heppner-affiliate BHI to super-preferred status upon issuance of a charter from the Texas Department of Banking to BEN. All of this was only in Heppner's and BEN's interests, and was not necessary to obtain an extension of the loans, particularly because, as explained *supra* in Section IV.B.2, BEN management represented to the company's auditors "that the related parties at which the Company's debt is held would not impose debt obligations on BEN that would jeopardize the Company's ability to continue as a going concern." However, as a result of Heppner's misrepresentations about his relationship with HCLP, GWG's Special Committee believed HCLP was a hard-bargaining third party that would require substantial concessions in exchange for extending the maturity of the BEN-HCLP First and Second Debts. This misimpression was bolstered by Banowsky's false

85

statements about HCLP's ownership and control in the November 2019 Call (which were relayed to Chavenson, who remained Special Committee chair during this time).

228.    Under the May 2020 Term Sheet, a payment of $25 million was due to HCLP on June 1, 2020. That date came and went, and on June 10, HCLP and BEN executed retroactive side letters pushing that payment to June 19, or a subsequent date as agreed in writing, in exchange for a 2.5% extension fee. The June 19 date then came and went, and on June 29, BEN's General Counsel, Art Damoulakis, emailed Banowsky requesting yet another extension, this time to July 15 and effective as of June 19, the deadline that BEN had blown ten days earlier. Banowsky conveyed Damoulakis's request to Wickline, who replied that "The requested extension is agreeable … ***appears they missed the prior date*** …" (Emphasis added).

229.    BEN's repeated blowing of payment deadlines, HCLP's total lack of response, and Wickline's lukewarm reaction when alerted to BEN's breaches all demonstrate that the BEN-HCLP First and Second Debts were not between true third parties, as no third-party lender would have allowed an unproven company with outstanding nine-figure loans and a history of repeated extensions to miss payment deadlines without consequence. As a result of observing all these actions (in addition to his being "in on" and a key part of Heppner's plan to use HCLP for his own benefit), Banowsky therefore knew that Wickline would not zealously enforce HCLP's rights with respect to the BEN-HCLP First and Second Debts, would accommodate whatever schedule and terms BEN required, and would not foreclose on the loans if at all possible. Despite this, Banowsky and HK continued the façade that HCLP was a hard-bargainer ready to foreclose immediately if GWG failed to fund BEN to its satisfaction.

### 2.    *The July 2020 UPA.*

230.    During this time, Heppner and Holland were also discussing how to move even more cash from GWG to BEN, including to fund the payment to HCLP in exchange for the

extension. Heppner and BEN had proposed that GWG agree to a Unit Purchase Agreement ("**UPA**") whereby GWG would purchase a new category of Preferred Series C equity, subordinated to Heppner and other founders' NPC-A accounts. But GWG's Special Committee was not satisfied with Preferred Series C, and demanded that it receive Preferred Series A equity, or other units *pari passu* with those held by BEN's founders, for its investment.

231.    On cue, HCLP appeared and once again wielded its senior secured debt to enable Heppner to negotiate better terms for himself and BEN, predicably at GWG's expense. In a July 9, 2020 email to the Special Committee and its counsel, Cangany claimed that just one day earlier, HCLP (fortuitously) had "asked if B[EN] was ready to make the $25M payment in order to get the loan extension done," and "[w]hen B[EN] had to tell them the cash was still up at GWG and we were working through it, [HCLP] began accusing the company of dealing in bad faith." As a result, according to Cangany, HCLP "is expecting some kind of resolution before they will extend [BEN's] note." Cangany concluded that "I have told Dave [Chavenson] over the past several days that I am okay with the junior preferred option, but was willing to push the envelope to see if we could get more NPC-A; however, given that our request for a higher security doesn't look promising, I am not willing to have our entire investment in [BEN] go sideways as both sides flex their muscles." Once again, HCLP was simply acting to further Heppner's interests, and any "flexing" of its "muscles" was an utter farce.

232.    With payments due to HCLP on July 15, 2020, and HCLP supposedly "extremely" displeased, the Special Committee met again on July 14, 2020. The Special Committee agreed to request: (a) that any Preferred Series C Units issued to GWG rank *pari passu* with the NPC-A "with respect to allocations of profit and loss and distributions until the Preferred Series C Units

… convert into Common Units of Beneficient[,]" and (b) "a ceiling of the conversion price for the conversion of the Preferred Series C Units … into Common Units of Beneficient[.]"

233.    The Special Committee's decision to continue negotiating the UPA's terms—rather than cave as Cangany urged—apparently infuriated members of GWG's Executive Committee. On the morning of July 15, 2020, hours before a scheduled Special Committee call, the GWG Audit Committee (comprised of the same members as the Special Committee) held a meeting attended by Heppner, Hicks, and Schnitzer (who comprised GWG's Executive Committee), as well as Holland and Evans. The Audit Committee discussed "the upcoming $25mm loan payment on B[EN]'s senior debt" and the status of the UPA negotiations. According to draft minutes of that meeting, the Special Committee and its counsel's attempts to seek even slightly better terms instigated a "[v]igorous discussion . . . regarding the [HCLP] loan, the Special Committee and its legal counsel[.]"

234.    Following this "vigorous discussion" at the Audit Committee meeting, the Special Committee met a few hours later, noted that that BEN agreed to the Special Committee's July 14 requests, and voted to approve the UPA on those terms.

235.    But that was not the end: Heppner continued to negotiate the UPA's terms, leveraging the Special Committee's ignorance of Heppner's control over HCLP. First, BEN insisted that GWG would not benefit from any increase in BEN's value from the date GWG purchased units under the UPA and the date it converted its Preferred Series C Units into BEN common units. The Special Committee, under the impression that it needed to transfer funds to pay HCLP that day or else risk the destruction of BEN, approved BEN's condition immediately. In fact, Cangany emailed Evans to confirm that GWG could transfer $61 million to BEN under

the UPA *before* the Special Committee's counsel had approved revised drafts of the UPA and associated documents.

236. Second, hours after Cangany had authorized Evans to transfer the funds from GWG to BEN, Heppner demanded another change to the UPA and related documents "to recoup the lost P&L to the Pref A1 class upon liquidation." As BEN's General Counsel explained in an email forwarded to Evans, the change was to ensure "that we get our money back." Evans forwarded those changes to the Special Committee's counsel, and the committee approved the changes.

237. Notwithstanding the pressure on the Special Committee to fund on July 15, 2020, when BEN's payment to HCLP supposedly was due, GWG eventually transferred the $61 million authorized by the Special Committee on July 16, 2020. More than $28 million of that money was transferred directly from GWG to an HCLP bank account at JPMorgan (which BEN controlled and directed payments out of at Heppner's direction). The same day, BCH transferred more than $5.5 million directly to Highland Consolidated. The UPA was executed several days later, on July 22, 2020.

238. Like virtually all of the transactions motivated by the supposed dire need for BEN to pay HCLP, the terms of the UPA were terrible for GWG. It made no sense to invest real dollars in a speculative, non-unitized Preferred C account when: (a) GWG was borrowing funds to make such speculative investments that provided no promise of returns, while paying interest and yield maintenance to its lenders (that GWG could only pay by borrowing even more money); (b) the Preferred Series C Units were inferior to the NPC-A accounts held by Heppner and his affiliates, which were convertible pre-IPO at a price set by BEN LP (*i.e.*, Heppner) (other than the super-senior accounts for Heppner and his associates that GWG agreed to in the May 2020 Term Sheet, which were convertible at $10/unit); (c) Heppner and his cronies obtained their billion-dollar plus

89

NPC-A account without apparently contributing any capital; (d) GWG had previously been able to obtain a $319 million NPC-A account in exchange for $69 million cash (so why invest dollar-for-dollar for an inferior Preferred C?); and (e) there was substantial doubt that the Preferred C investment would ever generate a return given that the superior NPC-A accounts exceeded the total BEN equity estimated in draft valuations provided to the Special Committee.

239.    Banowsky and HK's prior false and misleading statements served as the crucial foundation for Heppner's ability to extract better terms for himself (at GWG's expense) in the May 2020 Term Sheet and UPA. In the summer of 2020, GWG's Special Committee still believed that HCLP was a hard-bargaining third party that would willingly foreclose on BEN if not paid, as had been represented by Banowsky and HK in a half-dozen communications by that point, namely the February 2019 Litigation Opinion, March 2019 Emails, October 2019 Letter, November 2019 Call, and December 2019 letter.

240.    As with the past transactions, had GWG known the true control of HCLP and its relationship to Heppner, it would not have executed the May 2020 Term Sheet and UPA and accepted such unfavorable terms. Or, in the very least, GWG would have bargained for better terms in the May 2020 Term Sheet and UPA. But instead, because GWG lacked knowledge that Heppner was truly the one in control of HCLP and would benefit from money paid to HCLP, it executed the May 2020 Term Sheet and UPA, and invested real dollars in a speculative, non-unitized Preferred C account so that BEN could pay a totally unnecessary fee for extension of the BEN-HCLP First and Second Debts.

241.    Had the Special Committee known that Heppner effectively controlled HCLP and would benefit from money paid on the BEN-HCLP First and Second Debts, it would have either never agreed to the UPA or would have negotiated for very different terms. For example,

Chavenson was clearly concerned about Heppner's relationship with HCLP and made numerous requests around this timeframe for more information about HCLP, who controlled it, and who stood to benefit from repayment of the BEN-HCLP First and Second Debts.

242.    Around that same time, in early August 2020, Banowsky and HK were also involved in collecting comments to the Third Amended and Restated Credit Agreement and GWG Promissory Note (First Lien) to HCLP, which would streamline GWG's assumption of the BEN-HCLP First and Second Debts. Again, they turned on the pressure to force GWG to act quickly and agree to terms, with Banowsky lamenting, in response to comments sent from GWG's counsel, Maslon LLP ("**Maslon**"): "Please do not send anymore [sic] changes your client has not already agreed to we don't have enough time. If GWG wants these changes, GWG needs to tell me it wants these changes. Otherwise we are wasting time." He followed up again on the same thread, noting that, "with regard to Maslon's latest comments on the Third Amended and Restated Credit Agreement and the Note, I need to know by the first thing in the morning if the CEO and CFO of GWG approve of the revisions." Banowsky's pressure frustrated GWG, and GWG's General Counsel responded that "[t]he pressure on GWG to get this assumption closed with these documents and these terms on this timeline is problematic enough, let's please not add to it." GWG's counsel at Maslon questioned why Banowsky was involved and applying so much pressure to get the assumption closed so quickly, writing "What an asshole" and noting that Banowsky was "a litigator, not a transactional guy. ***Why is he even involved. Who does [HK] represent?***" (Emphasis added). The answer to that question was not entirely clear, as HCLP already had its own transactional counsel in Sidley. Complicating matters further was the fact that HK represented GWG, BEN, HCLP, and Bradcos at various points during this time period. But regardless of the nominal client, Banowsky's priority was to look out for Heppner's interests and desires. As a result,

Banowsky was not acting as HCLP's zealous deal counsel, but as Heppner's peddler of serial misrepresentations.

243.    A few days later, GWG began contemplating forming a new Special Committee to approve even further investment in BEN. Once again, Banowsky and HK were deeply involved in these efforts, with Banowsky even being asked to recommend counsel for the new Special Committee.[32] Approximately one week later, GWG formed a new Special Committee composed of Bailey and two new board members (Daniel Fine and David Gruber).

244.    The very next day, September 9, 2020, GWG sent $25 million to BEN under the UPA to pay HCLP. GWG wire transferred $25 million to BCH, which then transferred the $25 million to BCC on September 10, 2020. BCC then immediately wire transferred the $25 million to HCLP that same day.

245.    GWG sent additional funds under the UPA later that month, wiring $19.2 million to BCH on October 2, 2020. Those funds primarily flowed through various BEN entities to BCG (USA), which paid some portions of the funds to Bradley Capital and used others to cover BEN's operational expenses.

246.    Then in December 2020, GWG transferred an additional $25 million to BEN under the UPA to pay HCLP. Specifically, GWG transferred $25 million to BCH on December 9, 2020, which immediately wire transferred the funds to BCC. The next day (December 10, 2020), BCC wire transferred the $25 million to HCLP. GWG did not seek Special Committee approval for the two $25 million payments (directed to HCLP), reasoning that the prior Special Committee

---

[32] Among other firms, Banowsky recommended Foley, the firm he successfully misled regarding Heppner's relationship with and control over HCLP in 2019.

"approved the [HCLP] loan amendment [the May 2020 Term Sheet], which included this payment schedule."

247.    Like the earlier investments under the UPA, the $69.2 million invested in BEN from September to December 2020 made no sense from GWG's vantage point. The investment gave up cash for equity of uncertain value (unsupported by any formal valuation opinion), in an entirely speculative, unproven business. Once again, these payments were premised on Banowsky's misrepresentations that HCLP was a hard-bargaining, true third party that Heppner could not control, and that repayment of the BEN-HCLP First and Second Debts would not benefit Heppner.

### 3.   *Banowsky and HK Continue to Take Direction from Heppner in Representing HCLP.*

248.    In the fourth quarter of 2020, HCLP received a subpoena from the SEC in connection with the Commission's investigation of GWG and payments made to related parties, including HCLP. In early 2021, Banowsky began preparing a response to the SEC on HCLP's behalf, including a document production. In doing so, Banowsky looked to Heppner for direction, despite previously and repeatedly representing to GWG that Martens and/or Wickline—and certainly not Heppner—controlled HCLP.

249.    In drafting HCLP's written response to the SEC's subpoena, Banowsky sought input directly from Heppner, as well as Damoulakis and Evans. For instance, Banowsky asked Heppner, Damoulakis, and Evans—not Wickline, Martens, or Hinkle—to confirm basic facts about HCLP, such as "that the only business of HCLP Nominees is the two credit agreements with BEN."

250.    And in collecting documents requested by the SEC, Banowsky again turned to Heppner, Damoulakis, and Evans, requesting HCLP documents from them, rather than Wickline, Martens, or Hinkle. Banowsky also shared with Heppner, Damoulakis, and Evans the documents

he planned to produce to the SEC and gave them a chance to review and comment on the production before it was sent to the SEC.

251.     Like most of his other statements regarding ownership of HCLP, Banowsky's response to the SEC's subpoena was incorrect or at least materially misleading. In response to a request to "identify HCLP's business, including its main products and services, its subsidiaries and the markets in which it operates," Banowsky responded:

> [HCLP] was formed for the sole purpose of loaning money to Ben to refinanced [sic] Ben's prior existing loans and other payables with Legacy Lenders.… ***In December 2018, BHI assigned a promissory to [HCLP]***. The note was between BHI as lender and Ben as borrower. This note and assignment is described in GWGH's FY 2019 10-K and is referred to by GWGH and [HCLP] Nominees as the Second Lien Credit Agreement.

(Emphasis added).

252.     In claiming that the BEN-HCLP Second Debt had been held by HCLP since December 2018, Banowsky sought to distort the record to make it appear as though HCLP, rather than BHI, Heppner's personal investment vehicle, held the BEN-HCLP Second Debt from the time it was incurred through the period when tens of millions of dollars was paid to HCLP, Highland Consolidated, and Bradley Capital on that loan (all of which came from GWG).

253.     Banowsky's statement that BHI assigned the Second Senior Debt to HCLP "[i]n December 2018" was incorrect and misleading for several reasons. First, BHI did not assign the Second Senior Debt to HCLP until August 2019, after dual GWG-BEN directors—Stein, Glaser, and Zimmerman—recognized the related-party payments issue and began asking questions about the BEN-HCLP First and Second Debts and who benefitted from payments on them. Moreover, the amended operating agreement by which BHI assigned the BEN-HCLP Second Debt to HCLP was only "effective" as of April 1, 2019. In addition, Banowsky failed to disclose that BHI, Heppner's personal carry vehicle, received a 34% membership interest in HCLP in exchange for

94

assigning the BEN-HCLP Second Debt. Banowsky also failed to disclose that payments on the BEN-HCLP Second Debt were sent to Heppner's affiliate Bradley Capital, not BHI (to which the debt was originally owed), and were sent there through January 2020, *even after* the BEN-HCLP Second Debt was assigned to HCLP. In preparing HCLP's document production and written responses to the subpoena, Banowsky thus again acted in furtherance of Heppner's orchestrated plan to obfuscate his control of HCLP, thereby perpetuating Heppner's fraudulent scheme.

254.    Around this same time, Banowsky and HK asked that GWG sign an "update[ed] [HK] engagement letter[] to make sure that our general engagement letter is appropriate for the current status of the business."

255.    The updated HK-GWG letter also set out GWG's broad engagement of HK, which was "***retained to represent GWG generally*** with respect to various legal matters," and stated that Banowsky would be the primary attorney working for GWG. (Emphasis added).

256.    The updated engagement letter included a lengthy conflict waiver, covering HK's representation of HCLP, BEN, and "Brad Heppner and related entities." Regarding HK's representation of HCLP, the letter explained that "the Firm represents HCLP Nominees, LLC with regard to credit agreements with Beneficial [sic] Capital Company." It continued, "[b]ased on the information [GWG] has provided, [HK] have concluded that we can generally represent GWG and HCLP," and "we do not believe that our representation of HCLP will adversely affect our representation of GWG in unrelated matters. We also wish to advise you that ***our representation of HCLP in connection with the with [sic] regard to the Credit Agreements will not in any way adversely affect our independent professional judgment***, which we will exercise and continue to exercise on behalf of each client on its respective matters." (Emphasis added).

Case 22-90032   Document 2531   Filed in TXSB on 02/28/25   Page 99 of 160


257.     As for HK's representation of Heppner, the letter disclosed that the firm "represents Brad Heppner, individually and various entities controlled or affiliated with Brad Heppner," which the letter defined as "Bradcos." However, the engagement letter did not specifically or even generally identify those entities. HK's failure to specifically identify the "Bradcos" was not the sort of fulsome disclosure required by the rules of professional conduct to obtain a client's informed consent to waive a conflict. Specifically, when more than one client is involved, the question of conflict must be resolved as to each client. Accordingly, HK should have given GWG the opportunity to evaluate HK's representation of each of the Bradcos so that GWG could make an informed decision as to whether to waive any potential conflicts.

258.     Had the engagement letter listed out the "Bradco" entities, that list would (or should) have included BHI (the entity that originally held the Second Senior Loan), Bradley Capital (to which payments on the BEN-HCLP Second Debt were made, along with payments for Heppner's personal private air travel), HCLP (which Banowsky, HK, and Heppner deceived GWG and the SEC into believing was unrelated to Heppner), HCLP Credit (which served no purpose other than as a waypoint for money transferred between HCLP and Highland Consolidated), Highland Consolidated (Heppner's slush fund for at least the past two decades), and the Harmon Trust and Great Plains Trust (which beneficially owned HCLP, for which Heppner served as Trustee or Trust Investment Advisor, and whose classes of beneficiaries included Heppner and his family), among others. As a result, HK's partial disclosure and failure to specifically identify the "entities controlled [by] or affiliated with Brad Heppner" that it represented prevented GWG from discovering the true nature of Heppner's relationship with and control over HCLP.

**F.      GWG Invests a Further $14.8 Million in BEN in March 2021 After Banowsky Makes New Threats to Foreclose.**

259.     GWG transferred an additional $14.8 million to BEN in March 2021, again so that BEN could make payments purportedly due to HCLP. However, this time, the Special Committee stood up to Heppner's demands and attempted to bargain for better terms or stop the payment. To ensure the money was transferred on terms that favored him, Heppner once again called in Banowsky to create additional pressure. As always, Banowsky was happy to oblige.

260.     On February 10, 2021, GWG management sent a memo to the Special Committee to request funding for BEN in the form of a purchase of an additional Preferred C account under the UPA. This initial funding request made no mention of any payments due or owing to HCLP. On February 21, 2021, the Special Committee previewed its negative initial reaction to the funding request to Evans, which prompted Evans to ask the Special Committee to delay a formal response. Two days later, the Special Committee agreed to "refrain from responding to" the February 10 funding "request for 24 hours."

261.     During the ensuing standstill, Banowsky emerged seemingly out of the blue to ask Damoulakis (rather than Wickline) basic questions about the status of HCLP's loans, including whether BEN had made the latest interest payments and planned to make an upcoming $25 million payment due in March. Around this same time, Banowsky had conference calls with other BEN employees (rather than Wickline) to discuss the "Highland Consolidated LPA." After coordinating with BEN, Banowsky drafted a letter addressed to BEN's Chief Accounting officer regarding BEN's missed interest payments and a $25 million payment due in March. Banowsky sent Damoulakis an advance copy on February 24, 2021. Later that day, after giving Damoulakis a chance to comment, Banowsky sent BEN's Chief Accounting Officer a final version of the letter (the "**February 2021 Letter**"), which stated:

The letter confirms that HCLP did not receive an Extension Notice as that term is defined in the Senior Credit Agreement, but even if it had, HCLP declines any such Extension Notice. ***To be clear, HCLP's present intention is to not grant any further extensions of the Loan or any payments due under the Loan***.

This letter is not a formal notice of Default or notice of Event of Default under the Senior Credit Agreement, but HCLP reserves all its rights under the Senior Credit Agreement, including the right to declare a default for non-payment or any other permitted reason.

(Emphasis added).

262.    Notably, either Damoulakis and/or Banowsky added the bolded sentence above to the final version of the February 2021 Letter, making it much more threatening. They did so because they knew that: (1) the lender had no intention of foreclosing or refusing to extend the loan, and (2) the threat was intended to spur action from a party who believed the lender was serious in their threats. This change evidences an understanding among Banowsky, Heppner, and BEN executives that HCLP would not foreclose but was making threats to bully GWG into sending more money to BEN.

263.    Later that evening, perhaps wanting to obtain GWG's waiver to HK's representing HCLP before negotiations ramped up and things got messy, Banowsky emailed Evans asking him again to sign "an updated GWG Engagement letter and conflict waiver."

264.    At the same time, Holland emailed the Special Committee to inform them that "in consultation with members of the Executive Committee," (*i.e.*, Heppner, Hicks, and Schnitzer), GWG was withdrawing its request to the Special Committee for funding. Holland's email troubled the Special Committee, which transmitted a memorandum the next day (February 25, 2021) to Holland and Evans, writing: "On behalf of the Special Committee, and in accordance with its authority pursuant to duly adopted resolutions of the Board of Directors of GWGH, ***no funds of GWGH . . . are to be invested in BEN without Special Committee approval*** until further notice to you from the Special Committee." (Emphasis added).

98

265.    On February 26, 2021, Evans sent the February 2021 Letter to the Special Committee's counsel, the letter's true intended audience. The Special Committee's comments in response to receiving the letter show that they had not been informed that BEN had been missing interest payments or that a $25 million payment was due in a few weeks, writing "What The F? They haven't paid interest the last two months?!?! How do they think they are going to get a maturity extension if the[y] don't pay interest on time?" and "yikes." Of course, the Special Committee had purposefully not been so-informed in order to create an emergency justifying additional investment in BEN on an expedited basis.

266.    Banowsky knew full well that HCLP (controlled by Heppner) had no intention of calling its loans because doing so would effectively destroy BEN's business, which Heppner had been working for years to build. Calling the loans would also bring an abrupt halt to Heppner's scheme to continue siphoning money from GWG to HCLP and on to himself in the form of interest, principle, and bogus pre-payment and change-of-control penalties. And yet Banowsky still wielded fake threats of foreclosure, as had become a pattern, in furtherance of Heppner's scheme.

267.    The Special Committee held firm and demanded that any future financing come in the form of debt with a conversion feature, rather than worthless BEN equity. Determined to have Heppner get his way, Banowsky drafted another letter, this time directly addressed to GWG's Special Committee, making further threats of foreclosure and explaining the dire consequences thereof. After giving Heppner and BEN's General Counsel advance copies of the draft and a chance to comment, Banowsky sent the letter the next day, March 2, 2021, to the Special Committee's counsel (the "**March 2, 2021 Letter**")—of course, forwarding the final letter to Evans and BEN's General Counsel less than a minute later. The letter stated "[HCLP] does *not* consent to this proposed credit facility and does *not* consent to the redeemable equity." (Emphases in original).

Banowsky again used HCLP's debt as a cudgel to ensure that money was advanced on terms approved by Heppner, and not those requested by the Special Committee: "[HCLP] is unwilling to consider new funding facilities where there are existing HCLP … approved funding facilities [the UPA] in place" and "[HCLP] will not consider any funding except through" GWG's prior commercial loan agreement or the UPA.

268.    The March 2, 2021 Letter further claimed "[HCLP] is frankly tired of going through this goat rodeo every time a maturity date approaches."[33] But any "goat rodeo" was organized and orchestrated by Heppner—with the aid of Banowsky—to create a false sense of urgency and give GWG the impression that it urgently needed to send money to BEN in order to avoid imminent default.

269.    The March 2, 2021 Letter repeated HCLP and Banowsky's familiar talking points that GWG and HCLP were really both on the same team as co-lenders to BEN: "we both [GWG and HCLP] have an interest in seeing BEN succeed." Finally, the March 2, 2021 Letter repeated the same hollow threat of foreclosure as previous communications. "If HCLP … does not receive a signed and approved term sheet … addressing payment of past-due interest and acceptable extension terms by 5:00 p.m. March 5, 2021 … HCLP Nominees intends to pursue its rights on the due date under the Secured Credit Agreements, including the right to foreclose on its collateral." This statement, which Banowsky knew to be incorrect, was designed to give GWG the impression that HCLP remained a hard-bargaining third party and that, as a result, GWG would have to send money to BEN to avoid HCLP foreclosing on its collateral. In reality, as Banowsky knew, HCLP was de facto controlled by Heppner, who would not damage his own financial interests by foreclosing on BEN.

---

[33] The term "goat rodeo" appears to have been an inside joke between Banowsky, Damoulakis, and others at BEN.

270.    In a second letter to Special Committee counsel, dated March 3, 2021 (the "**March 3, 2021 Letter**," and with the March 2, 2021 Letter, the "**March 2021 Letters**"), Banowsky again wielded HCLP's consent rights as a cudgel:

> Given the broad consent and approval rights given HCLP Nominees in the Senior Credit Agreements, it is logical that HCLP Nominees be fully aware of any transaction Ben and the Special Committee are negotiating. Wasting the limited time we have for Ben and the Special Committee to negotiate a deal that does not meet HCLP Nominees' approval seems reckless.

> HCLP Nominees will not approve any deal that involves any changes in its priority rights in collateral now or in the future. In the assumption transaction, HCLP Nominees agreed to substitute collateral securing the loans, including the Preferred A currently owned by GWGH, something it did not want to do, to facilitate the issuance of a trust charter. HCLP Nominees will not consent to any transaction that gives GWGH priority over HCLP Nominees in any of the substitute collateral, including the Preferred A. In its SEC filings, GWGH has made it clear that it succeeds only if Ben succeeds. For Ben to succeed, it must timely pay its debt.

271.    This letter continued the façade that HCLP was a hard-bargaining, true third-party in furtherance of Heppner's scheme. And as had become commonplace over the course of Banowsky's work, the letter contained numerous false and misleading statements. For instance, the statement about HCLP "not want[ing] to" agree to substitute collateral—a reference to the May 2020 Term Sheet by which GWG agreed to assume the BEN-HCLP First and Second Debts—was completely false. Heppner and HCLP would have been thrilled for the loans to be secured by property owned by another company, rather than his brainchild, BEN.

272.    The Special Committee refused to budge, remarking amongst themselves that Banowsky "seems like a litigator playing debt counsel and just saying 'No' to anything and everything, but [Preferred C]," *i.e.*, is just "a lawyer programmed to say no," BEN and HCLP "are not at arms length," and raising the question of "whether this currently is an 'inside job.'"

273.    As it became clear that the Special Committee would not budge, Heppner sent an email on March 3, 2021 calling for a special GWG board meeting the following afternoon

(March 4) to address "certain urgent matters" concerning "GWG's funding of B[EN] to meet various capital requirements." At the board meeting the next day, GWG's board voted to disband the Special Committee and concluded that future funding under the UPA could proceed without Special Committee approval. Two days later, the Special Committee members resigned from GWG's board.

274.   Had the Special Committee members been aware of the true nature of Heppner's relationship with HCLP, they would have known that it was extremely unlikely that HCLP would foreclose and/or declare default on the BEN-HCLP First and Second Debts. The Special Committee members also would have very likely documented their concerns with respect to HCLP in greater detail, commissioned further investigation of HCLP, as the previous Special Committee did in the fall of 2019, and/or publicly raised questions about HCLP in their resignations.

275.   Following the Special Committee members' resignations, Heppner and the remainder of GWG's board then approved an additional funding round to BEN in exchange for Preferred Series C units under the UPA. On March 9, 2021, GWG sent a $14.8 million wire to BEN, that amount being based on calculations provided by BEN, Holland, and Evans (rather than Banowsky, HCLP, or Wickline).[34] The amount of the payment was far less than the supposed $25 million due to HCLP, further indicating that the February 2021 Letter and March 2021 Letters were a sham. Moreover, none of that money was immediately paid to HCLP, despite Banowsky's dire threats in the March 2021 Letters, and BEN made only two interest payments totaling approximately $3 million during all of 2021.

276.   With GWG committed to providing the funding Heppner demanded on his preferred terms, HCLP extended the $25 million March 10, 2021 payment by over a year in

---

[34] Based on calculations provided by BEN, Holland and Evans set the funding amount at $14.8 million.

exchange for a modest amendment fee. And with the Special Committee out of the way, and presumably no need for Banowsky to make threats to destroy BEN's business in the near future, HCLP proposed amending the loan documents to provide "a foreclosure option that would also give [HCLP] the ability to continue BEN as a going concern."

277.    At the same time, HCLP and BEN began discussions to significantly amend their relationship, including to give HCLP the ability to nominate 20% of BEN's board of directors and remove the requirement that BEN-only directors would owe fiduciary duties to GWG. BEN employees—including Banowsky's son, who worked in BEN's legal department—worked with Banowsky and other HK attorneys to make amendments to the Highland Consolidated LPA to this end. As usual, it was BEN employees loyal to Heppner handling these matters, rather than Wickline. BEN and HCLP agreed to a term sheet for these changes on March 12, 2021. Although these changes offered significant benefits to HCLP and a true third-party lender would have vigorously pursued them, HCLP abandoned them a few months later when Heppner sought to sever ties with HCLP to thwart an SEC investigation, further demonstrating that HCLP was not an independent third party as Banowsky had repeatedly represented, but rather an instrument of Heppner.

### G.    GWG and BEN "Deconsolidate" and GWG Declares Bankruptcy a Few Months Later.

#### 1.    *Heppner Tries to Sever Ties Between GWG, BEN, HCLP, and Himself to Thwart an SEC Investigation.*

278.    With the advice and assistance of Banowsky and HK, Heppner and BEN caused GWG to transfer approximately $290 million directly to BEN or HCLP over a nearly two-year period from April 2019 through March 2021. In April 2021, however, BEN and Heppner's prior misconduct began catching up to them, creating problems with the SEC on two fronts.

279. First, GWG's new auditor refused to sign off on GWG's Form 10-K until the SEC's OCA reviewed GWG's previous financial statement and blessed GWG's accounting treatment on two issues, including whether GWG had obtained control over BEN for accounting purposes on December 31, 2019 (as attempted in giving GWG illusory board designation rights in the December 2019 Transaction, as described above). As a result, GWG disclosed in April and May 2021 that it would not be able to timely file its Form 10-K annual report for 2020 and its Form 10-Q quarterly report for the first quarter of 2021, respectively.

280. Second, investigatory efforts underway by the SEC's Enforcement Division (dating back to October 2020 and involving approximately a dozen subpoenas) began to pick up steam. On April 30, 2021, the SEC sent a multi-page list of 26 questions to GWG, requesting responses in writing. Several of the SEC's questions zeroed in on GWG's prior transactions with BEN and associated payments to HCLP, transactions involving Bradley Capital, and payments made to Heppner in connection with his affiliation with BEN, GWG, and HCLP.

281. Following those troubling developments, Heppner devised a plan to distance BEN from GWG with Banowsky and HK's advice and assistance. They planned to insulate Heppner from exposure by having GWG relinquish its technical (albeit illusory) right to appoint the majority of the board of directors of BEN Management and severing or further obscuring the many ties between Heppner and HCLP.

a.    Banowsky Helps Heppner Cut Ties Between Himself, GWG, and HCLP.

282. The first stage of this plan was put into motion in June 2021. Heppner and other dual BEN-GWG directors stepped down from GWG's board effective June 14, 2021. At the same time, Heppner and Banowsky worked to sever ties and add layers between Heppner and Highland Consolidated.

283.    Heppner had Banowsky replace Martens as Trustee of the Great Plains Trust and Harmon Trust—the two trusts that, as stated in BEN SEC filings signed by Heppner, "control and are the partners of Highland Consolidated"—effective June 30, 2021.[35] Swapping out a close personal friend of Heppner's with HCLP's lawyer as trustee of the two Trusts that ultimately owned the majority of HCLP (with 34% of the company owned by Heppner's personal investment vehicle, BHI) was yet another step to try and maintain the façade that Heppner did not control HCLP. However, BEN's securities filings admit that Heppner remained a "trust investment advisor" of the Harmon Trust and the Great Plains Trust. And aside from his role as trust investment advisor to HCLP's beneficial owners, Heppner continued to have practical control over HCLP because Banowsky sought Heppner's guidance and direction when it came to HCLP.

284.    Banowsky also replaced Heppner as trustee of HMT, which owned CMH, and HPHT, which owned HCI. These changes too appeared to have been made retroactively. In late October 2021, Banowsky requested reimbursement for a trustee insurance policy he sought to obtain covering his new role as trustee of the trusts that owned and controlled HCLP. Of note, Banowsky sent the reimbursement request to BEN for distribution out of Highland Consolidated's bank account, **which BEN still controlled**. Likewise, a week later, Banowsky asked BEN to exercise its control of HCLP's bank account to pay an HK invoice for "fees incurred in the due diligence process involved in me [Banowsky] accepting appointment as Trustee" of the aforementioned trusts. That invoice showed that Banowsky had numerous calls and emails throughout July and August 2021 with Derek Fletcher, a BEN employee—not Martens, the

---

[35]    *See* BEN's Form 10-K for the fiscal year ended March 31, 2023 (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ben-20230331.htm), at pgs. 65, F-57. BEN's claim that the Great Plains Trust and Harmon Trust "control" Highland Consolidated is yet another misrepresentation resulting from Banowsky's conduct. In practice, as Banowsky was aware, Highland Consolidated was controlled by its general partner HCI (the manager of what Heppner could remove and replace by virtue of his position as trustee of the trust that owned HCI), not the Harmon and Great Plains Trusts.

outgoing Trustee, or Wickline, who Banowsky previously claimed controlled the HCLP enterprise—regarding questions about the trusts, their beneficiaries, and his powers as trustee.

285.    In addition, Heppner and Banowsky sought to further distance Heppner from Highland Consolidated by supposedly "repaying" the money Highland Consolidated sent to trusts and other entities to fund Heppner and his family's lifestyle. Prior to the reshuffling, Highland Consolidated had "advanced" (these transactions were not loans and were not evidenced by credit agreements) approximately $140 million to various entities controlled by Heppner. To "repay" these amounts, Heppner first had the Brad Heppner Family Trust assume certain of those entities' obligations to Highland Consolidated. The Brad Heppner Family Trust, which held Heppner's Dallas home, then assigned to Highland Consolidated all right, title, and interest to the home in satisfaction of approximately $48 million supposedly owed to Highland Consolidated. The assignment was explicitly limited to the home and all personal property therein, and "d[id] not include the real property upon which such structure sits."

286.    Heppner did the same thing with another entity through which he held his ranch. That entity, Highland Real Assets, LLC ("**HRA**"), owned a limited partner interest in Elmwood Bradley Oaks, which owned Heppner's ranch, and supposedly owed Highland Consolidated (or assumed debts to Highland Consolidated from other Bradcos totaling) approximately $56 million. HRA transferred its interest in Elmwood Bradley Oaks to Highland Consolidated in satisfaction of the debt.

287.    The Trustee's preliminary forensic analysis of Highland Consolidated's and Bradcos' bank accounts reveals that the repayment scheme described above (totaling $104 million, as reflected in GWG's 2020 10-K) comes nowhere close to the approximately $140 million that actually made its way to Bradcos via Highland Consolidated. In particular, the Trustee's

preliminary asset tracing work shows: (a) Bradley Capital received at least $78,475,000 from Highland Consolidated; (b) the Brad Heppner Family Trust received at least $55,255,967 from Highland Consolidated; and (c) Elmwood Bradley Oaks received at least $3,620,000 from Highland Consolidated. Bradley Capital then transferred the funds it received from Highland Consolidated as follows: (a) at least $58,855,000 to the Brad Heppner Family Trust; (b) at least $1,924,944 to HBHT; and (c) at least $11,450,000 to Elmwood Bradley Oaks.

288.    After transferring the interests in his home and ranch to Highland Consolidated, Heppner then caused Highland Consolidated to form SPVs to hold those assets. Specifically, Highland Consolidated formed a new company, HCLP TC, LLC ("**HCLP TC**") (TC standing for Turtle Creek, the address of Heppner's home) and then transferred the interest in the home to HCLP TC. Heppner caused Highland Consolidated to do the same thing with the ranch assets: Highland Consolidated formed HCLP EBO, LLC ("**HCLP EBO**") (EBO standing for Elmwood Bradley Oaks) and contributed its LP interest in Elmwood Bradley Oaks to HCLP EBO.

289.    The terms of these transfers show that they were not bona fide third-party transactions but merely a reshuffling of assets to obscure Heppner's relationship with Highland Consolidated: Heppner's Dallas home was appraised at just $8,664,620, independent of the land on which it sat, by the Dallas Central Appraisal District in 2022. Yet Highland Consolidated released *six times* that amount of debt in exchange for the rights to the home and personal property inside, which was almost certainly not worth anywhere near the approximately $40 million delta between the value of the home and amount of debt forgiven by Highland Consolidated. Unless that valuation was off by tens of millions of dollars, the consideration received by Highland Consolidated was worth far less than the debt forgiven (and even that debt understated the total amount Highland Consolidated advanced to Heppner affiliates).

290.     Heppner also ensured that these transactions could be easily unwound once the SEC investigation ceased. As disclosed in GWG's 2020 10-K, the transactions "grant[ed] [Highland Capital] the right to transfer the real property that was transferred … back to certain of the Borrowers, in exchange for a Preferred Series A Subclass 1 capital account balance in Beneficient Company Holdings, L.P."

291.     These transfers were backdated, as Banowsky circulated unsigned and partially signed copies of the transaction documents in early October 2021. Heppner signed the transaction documents on behalf of the Brad Heppner Family Trust and certain of the entities that had received money from Highland Consolidated while Wickline signed on behalf of Highland Consolidated and its newly created subsidiaries.

292.     HCLP TC and HCLP EBO continue to own Heppner's primary residence and an interest in his ranch, respectively. But Heppner's use of those properties does not appear to have changed. Put differently, a purported hard bargaining third party owns Heppner's family home and all the property in it. Yet that entity has allowed Heppner and his family to live in the home and use the property for over three-and-a-half years (apparently rent-free) while taking no steps to monetize that property. These circumstances alone demonstrate that Highland Consolidated and its subsidiaries are not independent of Heppner and the transfer of interests in Heppner's home and ranch was a sham to prevent the relationship from being further scrutinized.

293.     Banowsky continued to take direction from Heppner regarding HCLP throughout 2021. For instance, in September 2021, Damoulakis emailed Banowsky, subject "HCLP," asking if Banowsky was available for a call that day or the next. Banowsky responded in the affirmative and sent Damoulakis a calendar invitation, but also created a reminder to have a call with Heppner just before his call with Damoulakis and categorized the reminder as relating to HCLP Nominees.

| From: | Banowsky, Bill (DAL - X61231)[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4EFA3D5B439E4CFD9D1F9C010F6037D8-USER] |
|---|---|
| **Organizer:** | Banowsky, Bill (DAL - X61231)[Bill.Banowsky@hklaw.com] |
| **Subject:** | Telephone call with B. Hepper |
| **Importance:** | Normal |
| **Categories:** | HCLP Nominees |
| **Start Time:** | Thur 9/16/2021 7:00:00 PM Coordinated Universal Time |
| **End Time:** | Thur 9/16/2021 8:00:00 PM Coordinated Universal Time |

| From: | Banowsky, Bill (DAL - X61231)[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4EFA3D5B439E4CFD9D1F9C010F6037D8-USER] |
|---|---|
| Subject: | TC with A. Damoulakis |
| Organizer: | Banowsky, Bill (DAL - X61231)[Bill.Banowsky@hklaw.com] |
| Importance: | Normal |
| Categories: | HCLP Nominees |
| Start Time: | Thur 9/16/2021 9:00:01 PM (UTC) |
| End Time: | Thur 9/16/2021 10:00:01 PM (UTC) |

b.   <u>GWG "Decouples" From BEN in November 2021.</u>

294.    The second stage of Heppner's plan to insulate himself from liability came to fruition in November 2021, in a series of transactions that, among other things, removed GWG's superficial right to nominate the majority of BEN's directors (the "**Decoupling**"). This resulted in GWG no longer consolidating BEN in its financial statements, which Heppner hoped would reduce SEC scrutiny.

295.    The Decoupling was a change-of-control under the BEN-HCLP First and Second Debts. Unlike in December 2019, where it demanded nearly $50 million for consent to the illusory change of control of BEN, HCLP willingly consented to the change-of control in the Decoupling without demanding any sort of fee or other concession. In fact, BEN knew that HCLP's consent was such a forgone conclusion that it failed to seek such consent until *after* BEN's and GWG's boards had approved the Decoupling.

296.    Like virtually every other transaction between BEN and GWG, the terms of the Decoupling were terrible for GWG. The transactions included a re-classing of equity interests that

elevated Heppner and his allies and subordinated GWG in BEN's capital stack. In addition, the CLA was repaid with essentially worthless BEN common equity. Finally, the transactions included a global release purporting to release all claims between and among BEN, GWG, and their current and former directors and officers.

### 2. GWG Discloses in Its 2020 Form 10-K That Money It Paid to BEN Wound Up in Heppner's Pockets.

297. Banowsky and HK remained counsel to GWG throughout the first half of 2021, but continued to disregard GWG's interests. In August 2021, Banowsky sent emails to his clients—including GWG—announcing TK's merger with and into HK. Consistent with disregarding GWG's interests and only looking out for BEN, Banowsky sent a single email to BEN and GWG personnel announcing the merger. After Evans joked "Come on, man. We don't even rate our own email?" Banowsky replied, "I almost sent separate ones to GWG then I thought, why? It is Charlie Foxtrot [a cluster f***] over here. Kind of like working for Ben :)."

298. Banowsky and HK were also involved in GWG's preparation of its overdue Form 10-K throughout 2021, especially with respect to disclosures regarding HCLP and the BEN-HCLP First and Second Debts, coordinating with Holland and Evans throughout the late summer and early fall.

299. With L Bond sales—BEN's primary funding source—paused until GWG could file its overdue reports with the SEC, BEN began missing payments to HCLP. In late October 2021, Banowsky and Damoulakis began discussing the need to paper up an amendment so that BEN's auditor could release a report without noting BEN's numerous breaches. The amendment waived BEN's failure to make required interest payments from July through October and moved the next principal payment (which BEN missed over a month earlier, on September 10, 2021). Understanding that the GWG gravy train had come to an end, that payments to HCLP were the

subject of an investigation, and that further payments would be subject to heavy scrutiny, HCLP and Banowsky did not threaten a default or otherwise enforce HCLP's rights under the BEN-HCLP First and Second Debts. This stood in stark contrast to Banowsky's behavior earlier that year, where he began threatening foreclosure after just two missed interest payments and claimed HCLP did not intend to grant further extensions.

300.    In negotiating the amendment, Banowsky asked for an amendment fee equal to 3% of the outstanding balance added to the loans and for BEN to pay HCLP's attorneys' fees. Damoulakis, understanding that there was no point in negotiating with HCLP, the proxy of his boss, Heppner, quickly responded "No questions here." The amendment, dated November 3, 2021 but effective as of July 15, 2021 (the date when BEN began missing interest payments), extended the date for payment of all interest and principal to December 10, 2021 in exchange for these minor concessions.[36]

301.    When GWG filed its long-overdue 2020 Form 10-K in early November 2021, the company made several new disclosures regarding HCLP and Highland Consolidated. GWG disclosed not only that BEN paid HCLP with money it received from GWG, but also that HCLP had sent that money to Heppner, his affiliates, and immediate family members:

> During the years ended December 31, 2020 and 2019, **_GWG Holdings invested $130.2 million and $79.0 million, respectively, of cash into equity investments in Beneficient_**. **_During this same period, Beneficient made payments to HCLP, its Senior Lender, totaling $144.6 million in principal and interest_** on the First and Second Lien Credit Agreements. The First Credit Agreement was issued in 2017, while the Second Lien Credit Agreement was issued in 2018. HCLP is an indirect subsidiary of Highland Consolidated, L.L.C. ("Highland").
> …
> Such loans to and investments with or in the Ben Founder Affiliates **_have been and may be made_** by Highland, or its affiliates, as applicable, **_using proceeds from loan_**

---

[36] Consent and Amendment No. 4 to Second Amended and Restated Credit Agreement, dated as of November 3, 2021 and effective as of July 15, 2021 between Beneficient Company Holdings, L.P., The Beneficient Group, L.P., and HCLP                                Nominees,                                L.L.C. (https://www.sec.gov/Archives/edgar/data/1775734/000119312522301885/d406382dex10215.htm).

***repayments made by Beneficient to HCLP*** in its capacity as Senior Lender to Beneficient, ***with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient***. Such loans and investments have ranged between no outstanding balance and $104.0 million.

(Emphases added).

302.    GWG's 2020 Form 10-K also described HCLP and Highland Consolidated very differently than had been presented in previous disclosures. Whereas GWG's previous SEC filings made no mention of Highland Consolidated and stated that HCLP was only "directly or indirectly associated with one of Beneficient's founders" and "is not considered a related party of GWG Holdings or Beneficient,"[37] GWG's 2020 Form 10-K stated:

> ***A long-standing lending and investment relationship of 25 years exists between Highland [Consolidated]*** (and its affiliates or related parties), on the one hand, ***and certain trusts and entities held by such trusts that are controlled by Ben Founder [Heppner]*** ("Ben Founder Affiliates"), on the other. From time to time, Highland [Consolidated] or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates, and such Ben Founder Affiliates have made repayments to Highland [Consolidated] or its affiliates, as applicable, both in cash and in kind.[38]

(Emphases added).

303.    This language may have actually understated Heppner's relationship with Highland Consolidated and HCLP. Earlier drafts of this language acknowledged that Heppner "has had a business relationship with affiliates of [Highland Consolidated]" "***[s]ince 1987***," and that:

> ***[S]ince 1996***, [Highland Consolidated] has made and expects in the future to make cash advances representing loans to and/or equity investments in entities associated with, controlled by, or otherwise affiliated with [Heppner]. Such advances potentially could represent ***substantially all of [Highland Consolidated]'s capital, which includes proceeds from loan repayments*** received by [HCLP] from Beneficient ***using cash from GWG's investments in Beneficient***.

---

[37]    GWG's Form 10-K, for the fiscal year ended December 31, 2019 (https://www.sec.gov/Archives/edgar/data/1522690/000121390020007722/f10k2019_gwgholdings.htm), at F-30.

[38]    GWG's Form 10-K, for the fiscal year ended December 31, 2020 (https://www.sec.gov/Archives/edgar/data/1522690/000152269021000008/gwgh-20201231.htm), at F-66.

(Emphases added).

304.   Finally, GWG's 2020 Form 10-K disclosed that Heppner and his affiliates no longer owed money to Highland Consolidated or its affiliates and would therefore be keeping the money they received, which originally flowed from GWG to BEN to HCLP. As discussed above, with Banowsky's aid, those loans were deemed satisfied through a series of transfers whereby Highland Consolidated received an assignment of certain real property, including Heppner's personal home, in exchange for forgiveness of debt worth far more than the property transferred.

305.   These disclosures were based on a representation letter Banowsky drafted in connection with GWG's preparation of its financials and SEC filings explaining the terms of the June 2021 reshuffling. Earlier drafts of that letter, which Banowsky sent to Evans and Holland for approval and comment, stated that "[e]ffective June 30, 2021, the Borrowers paid the loans in full with valuable consideration *in a bona fide transaction*." (Emphasis added). However, the final version of the letter cut this language in favor of a more cryptic description: "in-kind real property transfers." But this disclosure too may have been misleading, as the "real property" transferred in satisfaction of the loans was only "real property improvements" and personal property therein and an LP interest.

306.   Although these disclosures were significant in that they acknowledged for the first time that Highland Consolidated had advanced Heppner over $100 million "potentially using cash from GWG," they were also deeply misleading for several reasons.

307.   First, Highland Consolidated sent far more than $104 million to entities affiliated with Heppner between 2019 and 2021. Preliminary forensic analysis of Highland Consolidated's and Bradcos' bank accounts reveals that: (a) Bradley Capital received at least $78,475,000 from Highland Consolidated; (b) the Brad Heppner Family Trust received at least $55,255,967 from

113

Highland Consolidated; and (c) Elmwood Bradley Oaks received at least $3,620,000 from Highland Consolidated. And even the incomplete, high-level ledger of obligations between Highland Consolidated and Bradcos on which the $104 million figure was purportedly based shows that that number was at best misleading. $104 million was only the net amount purportedly owed to Highland Consolidated. The gross amount Heppner's entities owed was closer to $115 million (at least according to that particular document). It is unclear whether the approximately $11 million that Highland Consolidated purportedly owed those entities used to offset the $115 million balance came from cash transactions or non-cash "IOUs" similar to the alleged debts the BEN-HCLP First Debt refinanced.

308.    Second, there was no disclosure of which Bradcos were involved. That much of the disbursements and their supposed "repayment" related to Heppner's family home, his family's personal property, and ranch was highly relevant information.

309.    Third, the 10-K only stated that payments to HCLP were "made **_potentially_** using cash from GWG Holdings' and GWG Life's investments in Beneficient." This language left open the possibility that GWG's money might not have been used to pay HCLP. But there could be no uncertainty on this point, as GWG paid HCLP directly to the tune of more than $28 million on one occasion. Moreover, as detailed above, much of the money BEN received from GWG was earmarked specifically for HCLP and transferred from BEN to HCLP the same day it was received and in the same amounts received.

310.    Fourth, the 10-K's disclosures regarding the satisfaction of loans from Highland Consolidated to Bradcos was woefully deficient and misleading. The disclosure stated: "As of June 30, 2021, Highland and the applicable Ben Founder Affiliates mutually agreed to satisfy all obligations under all outstanding loans," but failed to disclose that the transaction was not

formalized until approximately October 2021, a few weeks before the 10-K was filed. The 10-K also failed to disclose that (a) the property transferred was Heppner's home, all the personal property in it, and his ranch; (b) his home had been appraised at a fraction of the debt forgiven; and (c) he continued to occupy and use both those properties just as he did prior to the transaction.

311.    In sum, GWG invested money in BEN for worthless equity so that BEN could pay HCLP, which Banowsky and HK claimed was not controlled by Heppner and would not distribute that money to Heppner. After receiving that money, BEN sent it on to HCLP (often in amounts different or less than that purportedly demanded by HCLP). Unbeknownst to GWG until 2021, HCLP then used that money to "loan" nearly $140 million to Heppner, his family, and related entities. Once the SEC began investigating, Heppner affiliates supposedly "repaid" those loans with a transfer of property worth a fraction of the loans (all while Heppner continued to use and occupy the property), and which could easily be unwound in exchange for preferred equity in BEN.

### 3.    Banowsky and HK Make Further Misrepresentations in 2022 as GWG Prepares to File Bankruptcy.

312.    In February 2022, GWG disclosed  in public filings that it would default on its L Bond debt and it became clear that the company would soon file for bankruptcy. HK planned to represent BEN in connection with GWG's imminent bankruptcy. However, GWG and BEN directors and officers were concerned that Banowsky's previous representation of HCLP could be a serious conflict.

313.    After Evans shared with Banowsky concerns specifically related to the March 2021 Letters, Banowsky followed up by email to reiterate that he believed there was no conflict:

> I wanted to follow-up our conversation we had yesterday about a letter I sent on March 2, 2021 to the Special Committee of GWGH on behalf of HCLP Nominees.
> …
> At the time, the Special Committee was refusing to advance cash to Ben for its operations pursuant to a pre-existing credit facility itself approved by a Special Committee. The Term sheet proposed by the special committee, had a number of

objectionable terms, including an effective 30% interest rate. My letter simply pointed out the ridiculousness of that offer given an existing facility.

***Subsequent to that letter, GWGH advance[d] cash to [BEN]. NONE OF THAT CASH went to HCLP Nominees***. Effective March 10, 2021, HCLP agreed to push all due dates of the principal and any fees were added to the principal balance. Whatever cash was advanced to Ben after my letter, went to Ben to use for its operating expenses. Any interest payments that came due after that date were simply accrued and not paid. Finally, ***in December of 2021, HCLP advanced an additional $20 million in cash to Ben without charging any fees***.

I believe at the time that management of Ben and GWGH did not believe the terms being offered by the special committee were appropriate and HCLP Nominees shared that opinion.

(Emphases added).

314.    Banowsky's email not only illustrates how his March 2021 Letters were false or materially misleading, but it also demonstrates why it was reasonable for GWG to rely on statements made by Banowsky in evaluating the relationship between BEN, HCLP, and Heppner.

315.    In early March 2021, according to Banowsky's March 2, 2021 Letter, HCLP was ready to declare default "for failure to timely make [the January and February 2021] interest payments" and "intend[ed] to pursue its rights on [March 10, 2021], including the right to foreclose on its collateral" for BEN's non-payment. But HCLP did not raise BEN's missed interest payments or impending principal payment until after GWG's Special Committee asked for better terms. And once the entire Special Committee resigned, HCLP quickly overlooked the missed interest payments and "agreed to push all due dates of the principal," even though none of the cash GWG contributed went to HCLP, at least according to Banowsky. HCLP's mercurial behavior—which changed in direct response to GWG's willingness to invest more money in BEN—demonstrates that HCLP was not interested in getting repaid, only in ensuring that GWG continued to fund BEN on terms acceptable to Heppner.

316.     Banowsky's email contained a number of incorrect statements. First, Banowsky's claim that "in December of 2021, HCLP advanced an additional $20 million in cash to Ben without charging any fees" was not entirely true. BEN's SEC filings discussing the transaction explained that "BCG agreed to pay HCLP an amendment fee of $1 million as well as HCLP's legal fees."[39] As discussed in the previous section, BEN passed that $1 million fee on to GWG, even though GWG had no contractual obligation to pay it.

317.     Second, Banowsky's claims that "Whatever cash was advanced to Ben after my [March 2, 2021] letter, went to Ben to use for its operating expenses. Any interest payments that came due after that date were simply accrued and not paid" and "'NONE OF THAT CASH went to HCLP Nominees" were likewise untrue. As shown below and in the complete chart of payments from BEN to HCLP in Section IV.B.2.d, *supra*, BEN transferred more than $3 million to HCLP from March 11, 2021 through June 29, 2021, including over $1 million on March 11, 2021, nine days after Banowsky's March 2, 2021 Letter.

| Date | Transferor | Transferee | Amount |
|---|---|---|---|
| 3/11/2021 | BCH | HCLP | $504,643.42 |
| 3/11/2021 | BCH | HCLP | $503,423.84 |
| 3/11/2021 | BCH | HCLP | $15,975.45 |
| 3/11/2021 | BCH | HCLP | $15,936.84 |
| 3/17/2021 | BCH | HCLP | $100,000.00 |
| 3/24/2021 | BCH | HCLP | $454,158.60 |
| 3/24/2021 | BCH | HCLP | $14,377.26 |
| 4/21/2021 | BCH | HCLP | $502,845.18 |
| 4/21/2021 | BCH | HCLP | $24,371.78 |
| 5/27/2021 | BCH | HCLP | $492,935.91 |
| 5/27/2021 | BCH | HCLP | $15,607.58 |
| 6/29/2021 | BCH | HCLP | $509,644.89 |
| 6/29/2021 | BCH | HCLP | $19,408.51 |

---

[39]     BEN's Form 10-K for the fiscal year ended March 31, 2023 (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ben-20230331.htm), at 129.

| Date | Transferor | Transferee | Amount |
|------|-----------|-----------|--------|
| **Total** | | | **$3,173,329.26** |

318.     Banowsky and HK took other steps to rewrite the history of their relationship with GWG around this same time. Also in February 2022, Banowsky told Evans, "it is important that GWGH and H&K, clarify their relationship" and sent Evans a CYA letter claiming that HK was not involved in the events that led to GWG's impending bankruptcy. Whereas previous GWG-HK engagement letters stated that HK was retained to represent GWG generally, Banowsky's February 2022 letter claimed GWG "had retained H&K in the past to represent GWG Holdings or its subsidiaries and affiliates, in a limited number of matters," "GWG Holdings is not a current client of H&K," and "GWG Holdings has not sought legal advice with regards to matters recently disclosed by GWG Holdings regarding its default on certain outstanding L Bonds and concerns of GWG Holdings to continue as a going concern."

319.     Having proven their loyalty to Heppner and BEN and willingness to shade or ignore the truth (and dodging potential conflict issues through a re-writing of their representation of HCLP and GWG), HK became BEN's counsel of choice—the motivation behind all of Banowsky's misrepresentations, misleading statements, and orchestration of furtive, backdated organization changes. HK represented BEN in GWG's bankruptcy and a related securities class action lawsuit, a dispute related to BEN's/Heppner's private jet, as well as the company and certain of its directors in a lawsuit filed by Paul Capital, among other engagements. HK also represented Innovation Capital Solutions, a GWG-BEN joint venture that handled staffing and transition services following the Decoupling.

320.     Once again, the HK backchannel at GWG and BEN proved fruitful. Banowsky regularly corresponded with Evans, at GWG, and his son, at BEN, to coordinate strategies in the

GWG-related litigations, give and receive advance notice of actions, and evaluate and collect BEN and GWG documents related to HCLP's demands and Banowsky's misstatements when the BEN-HCLP First and Second Debts were put at issue.

321.    Banowsky and HK were a curious choice to represent BEN in GWG's reorganization, as they also represented one of BEN's largest creditors, which still had nine-figure loans outstanding and a history of making dire threats to torpedo both BEN's business as well as that of GWG if not paid in full. What's more, that entity was the impetus behind millions of dollars of transfers from GWG to BEN, which had a significant role in bringing about GWG's bankruptcy, and on at least one occasion received tens of millions of dollars directly from GWG. HK's relationship with HCLP was different than a normal attorney-client relationship since, by that point, Banowsky served as trustee of the trusts that owned and purportedly controlled Highland Consolidated and HCLP. Moreover, HCLP was represented by Sidley with respect to the BEN-HCLP First and Second Debts during the relevant time period, making HK's role unclear. Of course, once BEN decoupled from GWG and it was no longer to Heppner's advantage to have an angry BEN creditor ready to pounce, HCLP ceased its demands for payment and granted serial extensions of the BEN-HCLP First and Second Debts, further demonstrating that the debts were shams designed to create negotiating leverage over GWG.

322.    All told, GWG contributed approximately $300 million to BEN (or for its benefit) and HCLP between May 2019 and March 2021. In exchange for these cash transfers, GWG received BEN equity directly and indirectly (because the $65 Million Loan was later "repaid" with BEN common equity).

323.    Between February 2018 and June 2022, BEN transferred more than $190 million to HCLP (or to Highland Consolidated) as purported payments of principal, interest, and fees. The

vast majority of that money was transferred after and in reliance on Banowsky's false statements about HCLP's ownership and control structure. For instance, more than $168 million of that money was transferred after Banowsky's misrepresentations in the February 2019 Litigation Opinion were repeated to GWG's Special Committee in Evans's May 2019 chart, and more than $161 million of that money was transferred after the November 2019 Call.

324.     Following its Deconsolidation from GWG, BEN went public through a "de-SPAC" transaction that closed in June 2023. The company is traded publicly on NASDAQ, but its share price has crashed and burned. Shares traded below $0.10 for weeks and the company was in danger of being de-listed before an 80-for-1 reverse stock split on April 18, 2024. The BEN-HCLP First and Second Debts remain outstanding with a collective principal balance of approximately $94.7 million and unpaid interest (accruing at 9.5%) of an additional $16.3 million as of December 31, 2024. BEN and HCLP agreed to a series of amendments to the BEN-HCLP First and Second Debts throughout 2023 and 2024 extending the loans' maturity dates and providing for quarterly $5 million payments on the BEN-HCLP First Debt, but only so long as such payments would not cause a going concern problem. BEN has not made a payment on either debt since an interest payment in March 2023. BEN and HCLP also amended the BEN-HCLP First and Second Debt credit agreements to "amend[] the definition of 'Change of Control'" and "allow[] for the consummation of" BEN's de-SPAC transaction, without HCLP receiving a fee anywhere near the $49.8 million it demanded in December 2019.

325.     BEN's latest Form 10-Q, for the fiscal quarter ended December 31, 2024, explains that BEN is in the process of negotiating yet another extension of the BEN-HCLP First Debt, which was to mature on February 15, 2025: "As of the date of this Quarterly Report [February 14, 2025]

… we are in the process of negotiating a further extension to the … maturity date."[40] The BEN-HCLP Second Debt has a maturity date of September 15, 2027.

326.    Heppner continues to use Highland Consolidated to finance his web of entities and trusts, or Bradcos, as HK referred to them. According to BEN's Form 10-Q for the period ended December 31, 2024, Highland Consolidated made additional "net advances" to Bradcos since the June 2021 reshuffling and had outstanding loans to a Bradco in the principal amount of $11.4 million as of December 31, 2024.

327.    HK also continues to profit from this arrangement, as the amendments to the credit agreements for the BEN-HCLP First and Second Debts obligate BEN to pay "the reasonable and documented fees, expenses, and disbursements invoiced by Holland & Knight LLP (counsel to the Lender) in connection with this Amendment and the other Loan Documents."[41] And as BEN's latest Form 10-Q explains, the company incurred legal fees "on behalf of HCLP pursuant to the indemnification obligations under the HCLP credit agreements" totaling approximately $1.5 million and $0.7 million during the nine months ended December 31, 2024 and 2023, respectively.[42]

## H.    The BEN Equity GWG Received Had Minimal Fair Market Value.

328.    The BEN equity interests that GWG received were worth nowhere close to the amounts GWG paid at the time of the relevant transactions. And the BEN equity interests that GWG ended up with are now nearly worthless, as BEN's business has crashed and burned.

---

[40]    Form 10-Q for the fiscal quarter ended December 31, 2024 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000177573425000010/ben-20241231.htm).

[41]    Amendment to BEN-HCLP First Debt Credit Agreement (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ex101614-033123.htm); Amendment to BEN-HCLP Second Debt Credit Agreement (https://www.sec.gov/Archives/edgar/data/1775734/000177573423000008/ex101615-033123.htm).

[42]    Form 10-Q for the fiscal quarter ended December 31, 2024 (https://www.sec.gov/Archives/edgar/data/1775734/000149315225007024/form424b3.htm).

Accordingly, GWG has suffered close to a total loss on the $300 million it sent to BEN (or for BEN's benefit).

329.    While Heppner touted BEN as a business worth $2-3+ billion even before it obtained a trust charter, that was not remotely true from 2019 through 2021 in the marketplace. No arm's-length, third party during that timeframe would, or did, pay cash for BEN equity implying a valuation anywhere near that high. BEN was undercapitalized from the start, burned cash, and was frequently unable to pay its debts as they came due (therefore often requiring cash from GWG). And BEN's claimed value was a house of cards built on: (a) a fundamentally flawed business plan that defied economic reality; (b) wildly unrealistic projections, which BEN itself refused to stand behind; and (c) wholly unreliable, "garbage in, garbage out" analyses that took BEN's unrealistic projections at face value and compounded the misstatements of BEN's value by making several fundamental conceptual errors in its analyses.

### 1.    BEN's Business Was Undercapitalized.

330.    Although start-up companies sometimes burn cash at inception until achieving profitability after growth, BEN—which lacked its charter and was still developing and implementing systems—was in much worse shape than normal start-up companies for three reasons.

331.    First, BEN did not have valuable technology or intellectual property.  Rather, as of December 31, 2018, the fair value of all its intangible assets was only approximately $5 million (and BEN was forced to make over $950 million in downward adjustments and restate its previously issued financial statements for that reason).  In other words, the value of the ideas or sweat equity contributed by Heppner was modest.

332.    Second, beyond not contributing ideas or sweat equity of meaningful value, BEN's founders had not contributed much—if any—cash into the business. Rather, the founder NPC-A

capital accounts held a debit balance of ($132.6 million), reflecting ***negative equity***, prior to a purchase price accounting exercise conducted in 2018 (which stemmed from a sham change of control transaction on May 31, 2018). This accounting exercise resulted in a write-up of the NPC-A account of approximately $1.16 billion, leaving a balance of approximately $1.03 billion as of June 1, 2018. In other words, the founders' NPC-A billion-dollar capital account was based on accounting smoke and mirrors, ***not*** on prior capital contributed to the business or allocation of earnings (for which there were none, as BEN only suffered losses).

333.    Third, unlike most start-ups, BEN owed significant debts (and purported debts) at inception. Heppner had layered massive additional purported debt into BEN's capital stack from the outset, via the $141 million BEN-HCLP First Debt and the $72 million BEN-HCLP Second Debt. And BEN owed nine-figure debt to GWG under the CLA.

### 2.    *BEN's Business Plan Had Fundamental Conceptual and Logical Flaws, Which Made Its Projections Unrealistic.*

334.    BEN's business plan largely depended on two wholly untested assumptions: (1) that customers in need of "liquidity transactions," *i.e.*, cash in exchange for illiquid and not readily saleable alternative assets, would be willing to accept (illiquid) equity in BEN—not cash—in exchange for their alternative assets; and (2) that BEN's equity price would increase over time. But these assumptions defied logic and economic reality.

335.    It was doubtful whether BEN's prospective customers would have much appetite for BEN equity—instead of cash—in exchange for their alternative assets.  An investor willing to sell an alternative asset to BEN at an appropriate discount to fair value—for lack of liquidity of that asset—would only rationally sell that asset at a discount if that investor needed liquidity, *i.e.*, cash.  If the investor/BEN customer did not need cash now, then the investor would be better off holding the alternative investment and obtaining its full value over time. Therefore, most

123

prospective customers willing to sell their alternative assets to BEN at a discount could be expected to have immediate cash needs.

336.    Accordingly, even to the extent that customers were willing to accept BEN equity units in exchange for their alternative assets as a first step, there would be strong reason to believe that such customers would rapidly try to sell those BEN equity units—in exchange for cash— assuming BEN's equity units were liquid. The likelihood that a large portion of BEN customers would quickly sell any BEN equity they received in "liquidity transactions" directly undercut BEN's second key assumption, that BEN's stock price would increase over time. In fact, market forces made the opposite likely to happen. BEN's stock price would face immediate selling pressure every time new acquirers of BEN shares sold them to acquire the "liquidity," *i.e.,* cash.

### 3.    *BEN's Projections Were Unrealistic.*

337.    In addition to the foregoing conceptual, logical, and economic flaws, BEN's financial projections were wildly unrealistic and unreasonable because they were not based on historical results, but instead speculatively assumed—while making additional conceptual and economic errors—that: (a) BEN would achieve rapid growth; and (b) BEN would be able to acquire high quality assets at opportune times.

338.    First, BEN's financial projections assumed rapid growth, with annual revenue growth rate assumptions of over 60% (and as high as 96% in some iterations of its projections). But BEN's projections did not provide a realistic path to achieve such growth, instead relying on two flawed assumptions regarding: (a) BEN's ability to fuel growth through cash flow generated from operations; and (b) BEN's ability to fuel growth through additional issuances of BEN equity to customers.

339.    At a fundamental level, BEN's financial performance depended on the alternative assets it obtained through "liquidity transactions" generating a return. Cutting through BEN's

convoluted business structure, accounting gimmicks, and myriad of intercompany fees and transactions, therefore, in substance BEN's business model was similar to a "fund of funds"-type hedge fund business model (although BEN's income depended on fees and interest, and not carry like a typical fund). There is no reason why an economically rational holder of BEN equity would value BEN equity as worth more than a proportionate claim on net future cash flows associated with returns from the alternative asset portfolio.

340.    Yet BEN's projections implicitly assumed that it would "beat the market" and, in turn, that its equity would skyrocket in value over time, despite dilutive equity issuances in exchange for alternative assets and downward selling pressure. And on top of those problems with BEN's projected growth, BEN's financial projections did not adequately account for the dilutive effects and costs of such equity issuances. The implausible end-result of such compound errors was that BEN projected that it would exceed the size of established firms like Apollo, Ares, and Carlyle within a few short years of launch.

341.    Second, BEN's projections were untethered from actual historical results or the existing alternative asset portfolio. Rather, they were based on financial modeling of *hypothetical* market share capture giving rise to a purely *hypothetical* portfolio of high-quality alternative assets that: (a) BEN did not actually have; and (b) BEN did not have a realistic means of acquiring.

342.    BEN's projections assumed that BEN would perform in line with average private equity investment performance. But BEN itself was not making average private equity investments, instead seeking to pick up assets from those eager to sell. This meant that BEN's business faced an enormous moral hazard problem: the investors most willing to exchange their alternative assets to BEN—especially for BEN equity—were those holding sub-par assets. And because BEN might serve as a dumping ground for those trying to unload junk assets, it was highly

likely that the alternative assets BEN acquired in "liquidity transactions" would perform below industry average.

343.     In sum, BEN's speculative projections ignored what happened and what was likely to happen, instead unrealistically predicting what ***might*** happen in a ***hypothetical*** scenario based on a statistical simulation that failed to account for the economic realities facing BEN's business and the economic incentives of its customers.

### 4.     Valuation Analyses of BEN Were Unreliable, and BEN Equity Had Minimal Value.

344.     Although different financial services firms evaluated BEN from 2018 to 2021, *none* of those firms undertook any independent testing or analyses of BEN's projections. Because all contemporaneous valuations relied on BEN projections—without verification or analysis—and those projections were unrealistic and unreliable, it was all "garbage in, garbage out" analysis.

### V.     Allegations Relating to Anticipated Defenses

### A.     The Trustee's Claims Are Not Barred by the Attorney Immunity Doctrine.

### 1.     GWG Justifiably Relied on Banowsky's Misrepresentations.

345.      GWG's reliance on Banowsky's representations was reasonable and justifiable— and the attorney immunity doctrine therefore does not apply—because his representations were not made in an adversarial context or a context in which HCLP and GWG did not share the same interests. In particular, HCLP was not involved in any actual or threatened litigation against GWG itself.

346.     Moreover, Banowsky and HK were retained to represent GWG generally during the relevant time period. Accordingly, they owed duties of loyalty and candor to GWG, even if they did not represent the company with respect to certain transactions or matters, such as the BEN-HCLP First and Second Debts.

347.     Aside from their role as GWG's lawyers, Defendants were trusted advisors to GWG and its executives. Evans, GWG's Chief Integration Officer from May through August 2019 and thereafter GWG's CFO was a former HK attorney who remained close to the firm, attending baseball games with HK lawyers and regular events at the firm and even volunteering for the firm's mock trial program. In addition, Holland, GWG's CEO from April 2019 through its bankruptcy, was a long-time HK client. Although HK was not GWG's counsel with respect to the BEN-HCLP First and Second Debts, HK represented GWG in other contexts during the relevant time period, including on employment matters, real estate negotiations, and a state tax audit. For instance, GWG personnel exchanged over 1,000 emails with HK lawyers regarding various matters between February 2020 and February 2021. HK also represented BEN, with which GWG had become entangled, during this time, and BEN's General Counsel was a former HK lawyer until approximately December 2019, when she re-joined the firm as a partner. Many of GWG's directors also served as BEN directors during this time and were accustomed to working with and relying on HK.

348.     Accordingly, it was reasonable and justifiable for GWG to rely on Banowsky's representations regarding ownership and control of HCLP, including those in the March 2019 Emails, November 2019 Call, February 2021 Letter, and March 2021 Letters.

**2.     *Banowsky's Actions Were Not Done to Discharge Any Duty Owed to HCLP; Instead, He Participated in Heppner's Fraudulent Scheme.***

349.     Banowsky's advice and assistance restructuring Highland Consolidated and HCLP did not discharge any duties he owed those entities as their lawyer. Instead, this conduct amounted to Banowsky's participation in a fraudulent scheme with Heppner.

350.     Although Banowsky represented Heppner and various Bradcos in other contexts, HCLP and Highland Consolidated were his purported clients when it came to the BEN-HCLP First

127

and Second Debts. However, much of Banowsky's conduct was not in HCLP and Highland Consolidated's best interests. For instance, the changes to HCLP and Highland Consolidated's ownership structure did not directly benefit those entities, such as through streamlined governance, tax advantages, or operational efficiencies. Instead, those changes only inured to HCLP and Highland Consolidated's benefit to the extent they made GWG and BEN directors incorrectly believe that Heppner could not control those entities and would not benefit from money paid to them. In contrast, those changes were a tremendous benefit to Heppner, a non-client, because they allowed him to secretly retain control over HCLP and pave the way for Heppner to benefit himself through his other trusts and entities.

351.    Moreover, HCLP itself did not retain any benefit from the funds it received from GWG, directly or indirectly via BEN.  Rather, HCLP immediately emptied its bank account by almost immediately transferring all funds it received to HCLP Credit, which in turn transferred the funds to Highland Consolidated (from which Heppner further transferred the funds into his other Bradcos).

352.    If Banowsky truly intended to maximize the likelihood that HCLP would be paid, or at least remove the impediment that Heppner's association with HCLP posed to such payment, he could and should have advised HCLP and Highland Consolidated to completely sever all ties with and influence from Heppner and then give GWG and BEN directors a complete picture of HCLP's ownership and control structure. Doing so would have been a greater benefit to those entities because it would have: (a) assuaged GWG and BEN directors' fears about contributing money to a Heppner-controlled entity and thereby increased the likelihood of payment; and/or (b) enabled HCLP to keep some of the money it obtained, as opposed to immediately transferring it—through several intermediaries—to Heppner's Bradcos.

128

353.    Instead, Banowsky repeatedly advised and assisted with restructurings of half-measures that only obscured, but did not eliminate, Heppner's control over Highland Consolidated. Banowsky then gave GWG's and BEN's boards an incomplete and misleading picture of HCLP's ownership and control structure. This work ultimately benefited Heppner and perpetuated his fraudulent scheme by giving GWG and BEN directors the false impression that Heppner did not control HCLP while simultaneously allowing Heppner to retain control over HCLP. Thus, Banowsky's work was not done to discharge his duty to act in HCLP or Highland Consolidated's best interest, but furthered Heppner's fraudulent scheme to divert money for his own benefit.

354.    In addition, HCLP already had deal counsel with respect to the BEN-HCLP First and Second Debts in Sidley. Sidley—not Banowsky or HK—was representing HCLP in negotiating, modifying, extending, and documenting the BEN-HCLP First and Second Debts. Banowsky admitted as much in his fall 2019 correspondence with Glenn West, stating that he did not have original copies of many of the loan documents. Banowsky's lack of true involvement with the loans also became apparent by the end of 2021, as he had to coordinate with his son, then working in BEN's legal department, to track down copies of essential documents related to the loans, a time period in which Banowsky again directly admitted that Sidley—not Banowsky or HK—had served as HCLP's transactional counsel from the beginning through at least August 2020. Banowsky was not overzealous deal counsel, but was play-acting as HCLP's counsel to peddle half-truths and outright misrepresentations. Those actions served Heppner's ends, not those of Banowsky's purported client.

355.    Banowsky's involvement in restructuring HCLP and related entities' ownership and control structure in early 2019, fall 2019, and June 2021, and his false statements about that structure in the February 2019 Litigation Opinion, October 2019 Letter, and November 2019 call

were outside the scope of his representation of HCLP and Highland Consolidated, did not discharge duties owed to those entities, and are not protected by the attorney immunity doctrine.

**B.     Tolling of Limitations.**

*1.     The Discovery Rule Tolls the Statute of Limitations.*

356.    The statute of limitations for GWG's claims against Banowsky and HK should be tolled because GWG was unable to discover the harm caused by Banowsky and HK's conduct for years. This harm was inherently undiscoverable because, until beginning discovery in its bankruptcy, GWG was presented with false information regarding HCLP's ownership and control structure as a result of Banowsky and HK's misrepresentations. As a result, GWG was unable to discover that Heppner controlled HCLP and would benefit from money paid to HCLP. Moreover, GWG did not discover that money it paid to BEN for purported payments of interest, principal, and fees on the First and Second BEN-HCLP Loans was advanced by Highland Consolidated to entities affiliated with Heppner and his family until fall 2021. And even then, GWG did not learn that HCLP was controlled by Heppner until receiving discovery and beginning its investigation following its bankruptcy.

357.    GWG could not have discovered this harm with the exercise of reasonable diligence. On multiple occasions, GWG's board of directors, GWG's Special Committee, and BEN's Enterprise Risk Committee (made up of dual GWG-BEN directors) tried to investigate the relationship between HCLP and Heppner. In each instance, these investigations were stymied by Banowsky's backdated changes, misrepresentations, and misleading statements or half-truths. For example, in fall 2019, BEN's Enterprise Risk Committee retained counsel to investigate that relationship. As detailed above in Section IV.D.1, Banowsky and HK assisted Heppner in making backdated changes to obscure Heppner's control over HCLP and made misleading statements to

the Enterprise Risk Committee's counsel and the Special Committee's counsel in the October 2019 Letter and November 2019 Call, respectively.

358.    The injury to GWG caused by Banowsky and HK's conduct is objectively verifiable. As admitted in BEN's and GWG's SEC filings, GWG contributed money to BEN for purported principal, interest and fee payments to HCLP, BEN paid some of that money to HCLP, and HCLP—via Highland Consolidated and other entities—transferred that money to Heppner. In return for contributing that money to BEN, GWG received equity that was and remains essentially worthless.

359.    As a result, the statute of limitations for GWG's claims against Banowsky and HK should be tolled until GWG, in the exercise of reasonable diligence, was first able to learn of the harm, which was not until after it filed for bankruptcy in April 2022. Therefore, the statute of limitations on GWG's claims against Banowsky and HK should be tolled at least through the date of GWG's bankruptcy filing.

**2.    *The Statute of Limitations Should Be Tolled for Defendants' Fraudulent Concealment.***

360.    The relevant statutes of limitations for GWG's claims should also be tolled as a result of Banowsky and HK's fraudulent concealment.

361.    GWG suffered an underlying wrong as the result of Banowsky and HK's fraud, negligent misrepresentations, aiding and abetting or knowing assistance of breaches of fiduciary duty, and civil conspiracy.

362.    Defendants Banowsky and HK were aware that GWG had been harmed.

363.    Banowsky and HK concealed that fact to deceive GWG. Banowsky and HK consistently and falsely claimed to GWG that HCLP was a hard-bargaining, third-party lender not under Heppner's control.

364.     Banowsky and HK's purpose in making these representations was to conceal their wrongful conduct and the harm that conduct caused to GWG. Even after the Decoupling, when there was no prospect of GWG investing more money in BEN, Banowsky and HK continued to make misrepresentations regarding HCLP, including claiming that BEN had not paid any of the money GWG contributed to BEN in March 2021 to HCLP. Banowsky and HK made these representations to induce GWG to believe that GWG's interests remained aligned with those of HCLP and to maintain the façade that HCLP was a true third-party lender not under Heppner's control.

365.     It was reasonable for GWG to rely on Banowsky and HK's representations. As discussed in the preceding section, Banowsky and HK served as trusted advisors to GWG, and represented GWG in other contexts. In addition, key GWG and BEN executives were former HK lawyers and maintained close relationships with the firm.

366.     Banowsky and HK's misrepresentations could not reasonably have been discovered until GWG, through the Trustee, was able to take discovery from Heppner, Martens, Hinkle, Wickline, and others in connection with its bankruptcy. GWG did not become aware that Heppner ultimately controlled and derived benefit from HCLP until after the company filed for bankruptcy in April 2022.

367.     Therefore, the statute of limitations on GWG's claims against Banowsky and HK should be tolled at least through the date of GWG's bankruptcy filing.

###     *3.     The Parties Have Entered Into a Series of Tolling Agreements.*

368.     In addition to the bases for tolling outlined above, the Trustee and Defendants have entered into a series of agreements tolling all applicable statutes of limitations. The parties' Fourth Amended Standstill and Tolling Agreement (the "**Operative Tolling Agreement**") provides that "all statutes of limitations, statutes of repose, laches periods, and other time deadlines" relating to

the Trustee's causes of action against Defendants "are hereby tolled during and including the period from April 15, 2024 until March 1, 2025." The Operative Tolling Agreement further provides that the parties agree they will not include the entirety of that period as part of their calculations in determining any applicable limitations period or asserting any other time-related defense.  Because the Trustee's claims were tolled from the Petition Date through April 15, 2024 pursuant to 11 U.S.C. § 108, the tolling agreements mean that none of the Trustee's claims would be time-barred to the extent that such claims were not time barred prior to the Petition Date.

## C.    HK Is Vicariously Liable for Banowsky's Conduct.

369.    All of Banowsky's conduct as detailed herein was done in the course and scope of his employment as an HK partner, and that conduct is therefore attributable to HK.  At all relevant times, Banowsky held himself out as acting as an HK partner.

370.    The February 2019 Litigation Opinion, October 2019 Letter, February 2021 Letter, and March 2021 Letters were all written on HK (then-TK) letterhead. Likewise, Banowsky sent the March 2019 emails from his HK (then-TK) email address, and those emails bore the firm's signature block. Other emails Banowsky sent in furtherance of the scheme also came from his HK or TK email account and bore an HK or TK signature block. And various actions Banowsky took to obscure Heppner's control over HCLP involved HK or TK. For instance, when Banowsky met with the Milbank lawyer he was considering retaining to represent HCLP, he did so at TK's Houston offices.

371.    HK and Banowsky had been involved with Heppner and his web of related entities for years. For instance, in 2003, Banowsky (then a lawyer at HK predecessor TK) drafted a letter regarding Heppner's relationship with Highland Consolidated and related entities—much like the February 2019 Litigation Opinion and October 2019 Letter—in connection with a transaction with Lehman Brothers.

133

372.     Other HK lawyers performed work in furtherance of the scheme. HK associates assisted Banowsky in drafting documents related to the BEN-HCLP First and Second Debts. In addition, Highland Consolidated and HCLP retained HK as a firm, not just Banowsky, to represent their interests with respect to the BEN-HCLP First and Second Debts.

373.     HK benefitted from the actions of Banowsky and its other lawyers in furtherance of Heppner's scheme. HK billed and was paid (often by BEN) for its lawyers' work done on behalf of Highland Consolidated and HCLP. In addition, HK's participation in and advice and assistance in support of Heppner's fraudulent scheme won Heppner's trust. As a result, the firm obtained new work from Heppner and BEN, including representing BEN in GWG's bankruptcy, representing BEN and Heppner in a securities class action, and other litigations.

374.     HK is the legal successor to TK and is therefore liable for Banowsky's actions as a TK partner as alleged above. According to HK's website, "Holland & Knight LLP and Thompson & Knight LLP completed their merger effective August 1, 2021. The combined firm … operate[s] under the Holland & Knight name."[43] HK is also TK's de facto successor. Following the merger, TK's business continued on at HK: HK absorbed nearly all of TK's attorneys, including Banowsky, TK's offices, including the Dallas office where Banowsky worked, and TK's clients, including BEN and HCLP.

## CLAIMS

### Count I: Civil RICO
*(18 U.S.C. § 1962(c))*

375.     The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[43] https://www.hklaw.com/en/news/pressreleases/2021/08/holland-knight-and-thompson-knight-complete-merger

376.     Heppner and Banowsky operated and continue to operate a network of affiliated entities and trusts for the purpose of siphoning money from BEN and GWG, transferring or using that money for Heppner's and his family's benefit, and obscuring Heppner's control over the structure (the "**Enterprise**"). Highland Consolidated served and serves as the effective center of the Enterprise. The Enterprise contains a purported lending arm, made up of HCLP Credit and HCLP, which are direct and indirect subsidiaries of Highland Consolidated, respectively, and BHI, the entity Heppner uses for his personal "carry" and other equity holdings in BEN and which owns 34% of HCLP. Heppner exercised and obscured his control through the Enterprise's management arm, which includes Counselors and CMH, which served as HCLP Credit's and HCLP's managers at various times, and HCI, Highland Consolidated's general partner. Heppner's control is further obscured by a series of trusts at the top level of the organizational structure, which are the ultimate owners of the other Enterprise entities: the Harmon Trust and Great Plains Trust (which own Highland Consolidated's LP interests), HPHT (which owns HCI, Highland Consolidated's manager), and the Highland Management Trust, which owns CMH. The Enterprise also includes entities that hold property for the benefit of Heppner and his family, including Bradley Capital, HRA, the Brad Heppner Family Trust, and FYI Partners. In June 2021, the Enterprise added at least two new entities, HCLP TC and HCLP EBO, as part of a restructuring to extinguish debt entities including HRA, the Brad Heppner Family Trust, and FYI Partners owed Highland Consolidated. HCLP TC and HCLP EBO were formed as subsidiaries of Highland Consolidated to hold Heppner's primary residence and ranch property, respectively, the rights to which were transferred to Highland Consolidated as consideration for extinguishing the debt owed by other Bradcos.

377.     The Enterprise used and uses its purported lending arm to demand payment and collect funds, including from the BEN-HCLP First and Second Debts. That money is then transferred to Highland Consolidated, which transfers the funds under the guise of purported "advances," "investments," or "loans" to entities for the benefit of Heppner and his family, including HRA, the Brad Heppner Family Trust, and FYI Partners. The management entities were and are used to accomplish these transactions and obscure Heppner's control over and benefit from the Enterprise, including by nominating and appointing new managers and management entities, reshuffling assets to extinguish intra-Enterprise debts and obligations, and creating new entities, such as HCLP TC and HCLP EBO, to hold assets.

378.     The Enterprise involves entities and property in different states and therefore affects interstate commerce. For instance, Heppner's home and ranch—held by HCLP TC and HCLP EBO, respectively—are in Texas, but the Enterprise is made up of Delaware entities. In addition, during the relevant time period, managers of entities within the Enterprise were located in different states: Martens lives in Kansas and Wickline lives in California. The Enterprise also sought and obtained services in interstate commerce: the Milbank lawyer HCLP retained or attempted to retain in late 2019 was based in Washington, D.C., and the Sidley lawyers retained as HCLP's counsel with respect to the BEN-HCLP First and Second Debt credit agreements were based in California and Illinois.

379.     Banowsky is part of or associated with this Enterprise, having been retained to represent Highland Consolidated, HCLP, and certain other unidentified Bradcos—all entities within the Enterprise. Banowsky is involved in the Enterprise's operations and management in several ways. First, Banowsky facilitated the Enterprise's operation by re-structuring management entities and offering advice on the same, identifying and appointing new managers, and, since June

2021, serving as Trustee of the Harmon and Great Plains Trusts. Banowsky also acted as a mouthpiece for the Enterprise, authoring opinion letters and memoranda and making statements that purport to explain the Enterprise's ownership and control structure, including the February 2019 Litigation Opinion, October 2019 Letter, and November 2019 Call. Finally, Banowsky acted and acts as the Enterprise's debt collector, making demands for payment on BEN and GWG.

380.    Banowsky agreed to, participated in, and continues to participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding GWG and others. Banowsky knowingly and intentionally made false statements in making demands for payment and threats of foreclosure on GWG and BEN. These included the March 2019 Emails, December 2019 Letter, February 2021 Letter, and March 2021 Letters. Banowsky knew that HCLP (controlled by Heppner) would never foreclose on the BEN-HCLP First and Second Debts and could easily waive any defaults or technical breaches, but maintained the façade that HCLP was an independent, hard-bargaining lender. These strategic demands also serve to give Heppner and entities in the Enterprise more negotiating leverage. Banowsky also knowingly and intentionally made multiple false statements in communications purporting to describe HCLP's ownership and control structure, including the February 2019 Litigation Opinion, October 2019 Letter, November 2019 Call, and in a February 2021 response to an SEC subpoena. These false statements created and perpetuated the misimpression at GWG and BEN that HCLP was not affiliated with or controlled by Heppner and allowed the Enterprise's scheme to continue. Many of the false statements in these documents were unknowingly repeated by others and incorporated into accounting memoranda and other documents used by GWG and BEN personnel to evaluate the relationship between Heppner and HCLP.

381.     Banowsky's acts knowingly and intentionally perpetuated a scheme to defraud and obtain money by means of false pretenses, representations, or promises and involved use of interstate wires. The February 2019 Litigation Opinion, March 2019 Emails, October 2019 Letter, November 2019 Call, December 2019 Letter, February 2021 Letter, and March 2021 Letters each constituted an instance of wire fraud in violation of 18 U.S.C. § 1343.

382.     Pursuant to and in furtherance of the fraudulent scheme, Banowsky also obstructed justice in violation of 18 U.S.C. § 1503 in responding to a subpoena from the SEC on behalf of HCLP in February 2021. Banowsky gave incomplete, misleading, and incorrect answers in HCLP's response. For instance, Banowsky claimed "In December 2018, BHI assigned a promissory to [HCLP]." This was incorrect in several respects. BHI only assigned the BEN-HCLP Second Debt Promissory note to HCLP in fall 2019 after BEN's Enterprise Risk Committee, made up of dual GWG-BEN directors, began asking questions about the BEN-HCLP First and Second Debts. Even then, the transfer was backdated to April 1, 2019, not December 2018. Thus, Banowsky's response to the SEC made it appear as though the BEN-HCLP Second Debt had been owed to HCLP, not Heppner's personal investment vehicle, BHI, since that debt was incurred and before the April 2019 Transaction between GWG and BEN.

383.     Banowsky also furthered the fraudulent scheme by conspiring with Heppner to violate 18 U.S.C. §§ 1956 and 1957. Banowsky and Heppner layered entities in the Enterprise's structure and routed money through those entities in an attempt to conceal the flow of funds and Heppner's control over the Enterprise through needless complexity. For instance, HCLP Credit served only as a waypoint between HCLP and Highland Consolidated for proceeds of the Enterprise's fraud and did not appear to serve any legitimate business purpose. As set forth above, Banowsky conspired with Heppner to cause HCLP to make false demands on BEN and GWG for

repayment of the BEN-HCLP First and Second Debts. Banowsky knew and intended that upon receiving payments in respect of those loans, HCLP would immediately transfer the money to HCLP Credit, which would transfer the money to Highland Consolidated, which would then loan or "advance" that money to various Bradcos. Meanwhile, Banowsky represented or implied to the outside world that money Highland Consolidated received would be distributed to the Harmon and Great Plains Trusts, rather than through Highland Consolidated. Money was transferred in this manner in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of repayments of the BEN-HCLP First and Second Debts. By diverting money through Highland Consolidated, Heppner could claim that he and his family had not and likely would not receive distributions from the Harmon and Great Plains Trusts as a result of repayments of the BEN-HCLP First and Second Debts while simultaneously using that money to fund his and his family's lifestyle. Because these transfers (from HCLP to HCLP Credit to Highland Consolidated and ultimately to Bradcos) involved more than $10,000, Banowsky's conspiracy to accomplish them also violates 18 U.S.C. § 1957(a).

384.   Banowsky's conduct was not merely done on behalf of or at the direction of the Enterprise: Banowsky was involved in high level strategic decisions of how to structure and re-structure the Enterprise to obscure Heppner's control; how to describe the Enterprise, its component entities, and the relationships and rights among those entities in communications to GWG, BEN, their boards, auditors, the SEC, and others; how to amend the BEN-HCLP First and Second Debts in anticipation of GWG's entanglement with BEN and planned assumption of those debts; and how to restructure and purportedly repay obligations owed between entities in the Enterprise in an effort to evade SEC scrutiny. Banowsky was a crucial and necessary part of the Enterprise and was aware of its history (a more-than-25-year lending relationship with Heppner),

139

scope (*i.e.*, he knew that HCLP was part of the Enterprise), and objective (to enrich Heppner at others' expense). In addition, Banowsky had long been a trusted advisor to the Enterprise. In 2003, he authored an opinion letter similar to the February 2019 Litigation Opinion and October 2019 Letter regarding Heppner's purported lack of affiliation with Highland Consolidated or a related entity in connection with a transaction involving Lehman Brothers.

385.    Banowsky's acts are attributable to HK for the reasons outlined in Section V.C, above. Banowsky's predicate acts of wire fraud and obstruction of justice were done in his capacity as an HK partner. His communications constituting wire fraud were on HK letterhead or from his HK email account. And Banowsky's false or misleading responses to the SEC's subpoena were given in his capacity as counsel to HCLP and on HK letterhead.

386.    These repeated acts occurred over a period of years and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). That pattern continues today. The BEN-HCLP First and Second Debts remain outstanding, and BEN paid HCLP approximately $8.7 million in respect of those obligations in 2023. And Highland Consolidated has continued to "loan" or advance money to an entity affiliated with Heppner following the Decoupling: according to BEN's most recent SEC filings, Highland Consolidated has approximately $11.4 million in loans outstanding to an entity affiliated with Heppner as of December 31, 2024. Although BEN "Decoupled" from GWG, BEN went public in a June 2023 SPAC transaction and now has thousands of investors, in addition to customers who receive BEN equity in exchange for alternative assets. In other words, the Enterprise is still in place and could be used to extract further value for Heppner if BEN were to find a new capital partner or generate material revenue.

387.    GWG has been injured as a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c). As a result of Defendants' conduct, GWG invested

money in BEN under false pretenses that BEN needed the money in order to avoid a catastrophic default on the BEN-HCLP First and Second Debts and that that money would not go to benefit Heppner. As a result, GWG was fraudulently induced into agreeing that nearly half of the money it invested in BEN between May 2019 and March 2021 could be used to pay HCLP. Specifically, GWG made the following investments in BEN, all or portions of which were earmarked for and paid to HCLP rather than being used to acquire alternative assets or operate BEN's business:

- GWG invested approximately $79 million in BEN in the December 2019 Transaction, $49,804,539.89 of which was earmarked to be paid to HCLP as a purported change-of-control penalty. BEN transferred that amount to HCLP immediately following GWG's investment on December 31, 2019.

- GWG invested approximately $61 million in BEN under the UPA in July 2020, more than $33 million of which was earmarked go to HCLP. Specifically, on July 16, 2020, GWG transferred $28,196,915 directly to HCLP. GWG transferred the remaining approximately $33 million to BEN that same day, and BEN transferred $5,591,757 of that money to Highland Consolidated immediately thereafter.

- GWG invested an additional $25 million in BEN under the UPA on September 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent that entire amount to HCLP the next day.

- GWG invested an additional $25 million in BEN under the UPA on December 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent that entire amount to HCLP the next day.

- GWG invested $14.8 million in BEN in early March 2021, purportedly to be used to pay a $25 million principal payment BEN owed HCLP. BEN paid HCLP $3,173,329.26 between March 11, 2021 and June 29, 2021.

388.   All told, GWG transferred approximately $300 million to or for the benefit of BEN between May 2019 through March 2021. GWG was fraudulently induced into agreeing that at least $148,393,211.89 of that money could be paid to HCLP or Highland Consolidated, and those entities received at least that amount: between June 4, 2019 and June 29, 2021, BEN (and in one case, GWG) paid a total of $168,667,881.20 to HCLP or Highland Consolidated. The BEN equity GWG received in exchange for its investments was worth nowhere near the prices GWG paid.

That equity was and is essentially worthless, and GWG has suffered a near-total loss on its investment in BEN. Accordingly, GWG has been damaged in the amount of at least $148,393,211.89.

## Count II: RICO Conspiracy
### *(18 U.S.C. § 1962(d))*

389.    The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

390.    As set forth above, Banowsky agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Banowsky conspired with Heppner to operate a RICO Enterprise, defined in the preceding count, and make false demands on BEN and GWG for payment, including through the March 2019 Emails, December 2019 Letter, February 2021 Letter, and March 2021 Letters. Banowsky also conspired with Heppner to obscure Heppner's practical and legal control over the Enterprise by advising Heppner on how to structure and manage the Enterprise in a way that made it appear independent from him and in making false and/or misleading statements regarding the Enterprise's ownership and control structure, including in the February 2019 Litigation Opinion, October 2019 Letter, November 2019 Call, and in response to a subpoena from the SEC.

391.    Banowsky knowingly facilitated the conduct of the Enterprise through a pattern of racketeering activity. Banowsky knew that the predicate acts listed above were part of a pattern of racketeering activity and agreed with Heppner to the commission of those acts to further the scheme described above. For instance, Banowsky knew that the statements in his February 2019 Litigation Opinion, October 2019 Letter, and November 2019 Call regarding HCLP's control and ownership structure were not correct. In preparing those communications, Banowsky did not perform an objective analysis of the rights to control HCLP and benefit from money paid to the company. Rather, he prepared those communications to reach the pre-determined conclusion that

142

Heppner did not control and would not benefit from money paid to HCLP, and thus to give the recipients of those communications that misimpression. Further, Banowsky knew that GWG, BEN, and others would rely on his misrepresentations in evaluating the relationship between Heppner and HCLP. Banowsky made those misrepresentations with the intent to induce such reliance, prevent BEN, GWG, and others from learning the truth about HCLP's control structure, and continue the flow of money to HCLP and the Enterprise. Likewise, Banowsky knew in making his various demands for payment on BEN and GWG that HCLP had no intention of declaring default and/or foreclosing. However, he included threats of foreclosure and default in his communications related to the BEN-HCLP First and Second Debts to induce GWG to invest more money in BEN. Banowsky's conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

392.    Banowsky's acts are attributable to HK for the reasons outlined in Section V.C, above. All of Banowsky's predicate acts were done in his capacity as an HK lawyer and partner. All of his predicate communications were sent on HK letterhead or via his HK email, and HK billed and was paid for Banowsky's and other lawyers' work on behalf of Highland Consolidated and HCLP.

393.    GWG has been injured as a direct and proximate result of Defendants' conspiracy with Heppner and the overt acts taken in furtherance of that conspiracy. As a result of Defendants' conduct, GWG invested money in BEN under false pretenses that BEN needed the money in order to avoid a catastrophic default on the BEN-HCLP First and Second Debts and that the money would not go to benefit Heppner. As a result, GWG was fraudulently induced into agreeing that nearly half of the money it invested in BEN between May 2019 and March 2021 could be used to pay HCLP. Specifically, GWG made the following investments in BEN, all or portions of which

143

were earmarked for and paid to HCLP rather than being used to acquire alternative assets or operate

BEN's business:

- GWG invested approximately $79 million in BEN in the December 2019 Transaction, $49,804,539.89 of which was earmarked to be paid to HCLP as a purported change-of-control penalty. BEN transferred that amount to HCLP immediately following GWG's investment on December 31, 2019.

- GWG invested approximately $61 million in BEN under the UPA in July 2020, more than $33 million of which was earmarked to go to HCLP. On July 16, 2020, GWG transferred $28,196,915 directly to HCLP. GWG transferred the remaining approximately $33 million to BEN that same day, and BEN transferred $5,591,757 of that money to Highland Consolidated immediately thereafter.

- GWG invested an additional $25 million in BEN under the UPA on September 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent that entire amount to HCLP the next day.

- GWG invested an additional $25 million in BEN under the UPA on December 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent that entire amount to HCLP the next day.

- GWG invested $14.8 million in BEN in early March 2021, purportedly to be used to pay a $25 million principal payment BEN owed HCLP. BEN paid HCLP $3,173,329.26 between March 11, 2021 and June 29, 2021.

394.    All told, GWG transferred approximately $300 million to or for the benefit of BEN between May 2019 through March 2021. GWG was fraudulently induced into agreeing that at least $148,393,211.89 of that money could be paid to HCLP or Highland Consolidated, and those entities received at least that amount: between June 4, 2019, and June 29, 2021, BEN (and in one case, GWG) paid a total of $168,667,881.20 to HCLP or Highland Consolidated. The BEN equity GWG received in exchange for its investments was worth nowhere near the prices GWG paid. That equity was and is essentially worthless, and GWG has suffered a near-total loss on its investment in BEN. Accordingly, GWG has been damaged in the amount of at least $148,393,211.89.

**Count III: Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty**

395.    The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

396.    Heppner owed fiduciary duties to GWG during the relevant time period by virtue of his status as GWG's chairman from April 2019 through June 2021.

397.    Heppner breached his fiduciary duty of loyalty to GWG by acting to further BEN's interests rather than GWG's. Heppner also engaged in self-dealing by siphoning funds (with Banowsky's aid) indirectly through BEN or directly, to HCLP, Highland Consolidated, and ultimately his affiliated trusts and entities.

398.    Banowsky knew that Heppner owed fiduciary duties to GWG for the reasons set forth above.

399.    Banowsky knowingly participated in Heppner's breaches of fiduciary duty by making false statements about HCLP's ownership and control structure to obscure the fact that Heppner at all times had legal and practical control over HCLP and would personally benefit from money paid to HCLP. Banowsky also made false statements about HCLP's willingness to foreclose to induce GWG to send money to BEN on unfavorable terms so that BEN could pay HCLP. Specifically, Banowsky made false or misleading statements in the February 2019 Litigation Opinion, March 2019 Emails, the October 2019 Letter, the November 2019 Call, the December 2019 Letter, the February 2021 Letter, and the March 2021 Letters.

400.    Banowsky was aware he was knowingly participating in these breaches. At all relevant times, Banowsky understood Heppner's scheme to use HCLP to extract money from GWG and BEN for Heppner's benefit. Banowsky was aware that Heppner controlled HCLP, would benefit from money paid to HCLP, and would never foreclose on his new business which he planned to use to enrich himself.

145

401.   Banowsky's actions are attributable to HK for the reasons set forth in Section V.C, above.

402.   GWG suffered damages as a result of the concerted action of Heppner and Banowsky. This concerted action fraudulently induced GWG to agree that significant portions of the money it invested in BEN could be used to pay HCLP, rather than be used to purchase alternative assets or operate BEN's business. Specifically, GWG made the following investments in BEN, all or portions of which were earmarked for and paid to HCLP:

- GWG invested approximately $79 million in BEN in the December 2019 Transaction, $49,804,539.89 of which was earmarked to be paid to HCLP as a purported change-of-control penalty. BEN transferred that amount to HCLP immediately following GWG's investment on December 31, 2019.

- GWG invested approximately $61 million in BEN under the UPA in July 2020, more than $33 million of which was earmarked to go to HCLP. On July 16, 2020, GWG transferred $28,196,915 directly to HCLP. GWG transferred the remaining approximately $33 million to BEN that same day, and BEN transferred $5,591,757 of that money to Highland Consolidated immediately thereafter.

- GWG invested an additional $25 million in BEN under the UPA on September 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent the entire amount to HCLP the next day.

- GWG invested an additional $25 million in BEN under the UPA on December 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent the entire amount to HCLP the next day.

- GWG invested $14.8 million in BEN in early March 2021, purportedly to be used to pay a $25 million principal payment BEN owed HCLP. BEN paid HCLP $3,173,329.26 between March 11, 2021 and June 29, 2021.

403.   All told, GWG transferred approximately $300 million to or for the benefit of BEN between May 2019 through March 2021. GWG was fraudulently induced into agreeing that at least $148,393,211.89 of that money could be paid to HCLP, and BEN paid at least that much: BEN (and in one case, GWG) paid $168,667,881.20 to HCLP or Highland Consolidated between June 4, 2019 and June 29, 2021.

404.     The BEN equity GWG received in exchange for its investments was worth nowhere near the prices GWG paid. GWG would not have entered into these transactions or would have done so on far better terms but for Heppner and Defendants' conduct. The BEN equity GWG received in exchange was and is essentially worthless, and GWG has suffered a near-total loss on its investment in BEN. Accordingly, GWG has been damaged in the amount of at least $148,393,211.89 as a result of Defendants' aiding and abetting or knowing participation in breaches of fiduciary duties owed to GWG.

## Count IV: Civil Conspiracy

405.     The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

406.     Banowsky and Heppner had a meeting of the minds and shared objective to deceive GWG about Heppner's affiliation with HCLP and Highland Consolidated. They intended to fraudulently lead GWG to believe that HCLP and Highland Consolidated were not under Heppner's control and that Heppner would not benefit from repayments of the BEN-HCLP First and Second Debts. In addition, Heppner and Banowsky had a shared understanding that HCLP would make various fraudulent demands for payment and threats of foreclosure on BEN (and often directly to GWG). Having been led to believe that HCLP was a legitimate third-party lender that would not extend payment deadlines or waive possible breaches, Heppner and Banowsky intended that GWG would send money to BEN so that BEN could pay HCLP. After receiving money from GWG by way of BEN, HCLP would send that money to Highland Consolidated, which would "advance" those funds to other entities affiliated with Heppner and his family.

407.     Banowsky performed multiple unlawful, overt acts in furtherance of this conspiracy to commit fraud. For instance, Banowsky made false statements to GWG's Special Committee's counsel during the November 2019 Call regarding HCLP's ownership and control structure,

147

including that "[HCLP] was unaffiliated with BEN (i.e., not controlled by Mr. Heppner or other affiliates)," "Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender," "the control structure of [HCLP] … did not include rights for Mr. Heppner or other affiliates," and "unequivocally no debt repayment would be received by Mr. Heppner or his affiliates." For the reasons discussed in Section IV.D.1, Banowsky knew or must have known that all of those statements were all false when he made them.

408.    Banowsky also made false demands for payment and threats of foreclosure to GWG and BEN in furtherance of the conspiracy to defraud GWG. Banowsky claimed in the February 2021 Letter that "HCLP's present intention is to not grant any further extensions of the Loan or any payments due under the Loan." Likewise, Banowsky claimed in the March 2, 2021 Letter that, "If HCLP … does not receive a signed and approved term sheet … addressing payment of past-due interest and acceptable extension terms by 5:00 p.m. March 5, 2021… HCLP Nominees intends to pursue its rights on the due date under the Secured Credit Agreements, including the right to foreclose on its collateral." Banowsky knew, however, that HCLP was controlled by Heppner and therefore would never foreclose on or declare a default on the BEN-HCLP First and Second Debts, as discussed in more detail in Section IV.F.

409.    Banowsky's actions are attributable to HK for the reasons set forth in Section V.C, above.

410.    GWG suffered damages as a proximate result of the conspiracy between Heppner and Banowsky. As a result of Heppner and Banowsky misleading GWG's Special Committee regarding Heppner's affiliation with HCLP, GWG not only invested significant sums of money in BEN but was also fraudulently induced into agreeing that BEN could use large portions of that money to pay HCLP, rather than purchase alternative assets or operate its business. Specifically,

GWG made the following investments in BEN, all or portions of which were earmarked for and paid to HCLP:

- GWG invested approximately $79 million in BEN in the December 2019 Transaction, $49,804,539.89 of which was earmarked to be paid to HCLP as a purported change-of-control penalty. BEN transferred that amount to HCLP immediately following GWG's investment on December 31, 2019.

- GWG invested approximately $61 million in BEN under the UPA in July 2020, more than $33 million of which was earmarked to go to HCLP. On July 16, 2020, GWG transferred $28,196,915 directly to HCLP. GWG transferred the remaining approximately $33 million to BEN that same day, and BEN transferred $5,591,757 of that money to Highland Consolidated immediately thereafter.

- GWG invested an additional $25 million in BEN under the UPA on September 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent the entire amount to HCLP the next day.

- GWG invested an additional $25 million in BEN under the UPA on December 9, 2020, all of which was earmarked to be paid to HCLP. BEN sent the entire amount to HCLP the next day.

- GWG invested $14.8 million in BEN in early March 2021, purportedly to be used to pay a $25 million principal payment BEN owed HCLP. BEN paid HCLP $3,173,329.26 between March 11, 2021 and June 29, 2021.

411.    All told, GWG transferred approximately $300 million to or for the benefit of BEN between May 2019 through March 2021. GWG was fraudulently induced into agreeing that at least $148,393,211.89 of that money could be paid to HCLP, and BEN paid at least that much: BEN (and in one case, GWG) paid $168,667,881.20 to HCLP or Highland Consolidated between June 4, 2019 and June 29, 2021.

412.    The BEN equity GWG received in exchange for its investments was worth nowhere near the prices GWG paid. GWG would not have entered into these transactions or would have done so on far better terms but for Heppner and Banowsky's conspiracy. The BEN equity GWG received in exchange was and is essentially worthless, and GWG has suffered a near-total loss on

its investment in BEN. Accordingly, GWG has been damaged in the amount of at least $148,393,211.89 as a result of Banowsky's conspiracy with Heppner.

**Count V: Fraud**
*(November 2019 Call)*

413.   The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

414.   Banowsky made the following material misrepresentations during the November 2019 Call:

- "[T]he control structure of the lender … did not include rights for Mr. Heppner or other affiliates;"

- "Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender;"

- "Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender and … unequivocally no debt repayment would be received by Mr. Heppner or his affiliates;" and

- The Harmon Trust was controlled by and established for the benefit of the Harmon family.

415.   Banowsky's statements about Heppner's control of HCLP were false because Heppner had functional control of HCLP by virtue of his position as Trustee of the HPHT, HMT, Harmon Trust, and Great Plains Trust. In addition, Heppner was the manager of HCI at the time the BEN-HCLP First and Second Debts were incurred. Heppner also exercised de facto control over HCLP—twice swapping out its managers in 2019. Recognizing this, Banowsky sought instruction from Heppner, not Wickline, Martens, or Hinkle, in representing HCLP. Moreover, BEN, controlled by Heppner, controlled HCLP's bank account.

416.   Banowsky's statements about Heppner's interest in loan repayments was false because Heppner ██████████████████████████████████████ and there was no evidence that Heppner ever delegated that power. Heppner could also use his

150

control to keep money at the Highland Consolidated level, rather than distribute it to the trusts, and in fact did, causing Highland Consolidated to advance approximately $140 million to entities he controlled. In addition, Heppner had an interest in HCLP via his personal investment vehicle, BHI, which owned 34% of HCLP. Moreover, payments on the BEN-HCLP Second Debt had been sent to Bradley Capital, which was controlled by Heppner.

417.     Banowsky's statements representing or implying that the Harmon Trust was controlled by and for the benefit of the Harmon family were false because Heppner had broad powers as Family Trustee of that Trust and Heppner's hometown friend Martens, who Heppner effectively controlled, served as the other Trustee. Banowsky also knew the Harmon Trust was not centered around the Harmon family, but ████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████

418.     When Banowsky made these statements during the November 2019 Call, he knew that they were false or, at a minimum, he made them recklessly without knowledge of the truth.

419.     Banowsky made these statements with the intent that GWG rely and act on them, including by investing money in BEN so that BEN could pay HCLP.

420.     GWG relied on Banowsky's statements during the November 2019 Call and suffered injury as a result. Specifically, GWG was fraudulently induced into agreeing to send $49.8 million to BEN that BEN would then pay to HCLP to waive the purported change-of-control that occurred in the December 2019 Transaction. GWG would not have sent money to BEN and would not have allowed BEN to pay that money to HCLP had GWG's Special Committee known the truth about Heppner's affiliation with and control over HCLP.

421.    Banowsky's actions and statements during the November 2019 Call are attributable to HK. As set forth in more detail in Section V.C, *supra*, Banowsky made the misrepresentations during the November 2019 Call in his capacity as an HK partner.

422.    As discussed in Section V.A.1, GWG's reliance on the November 2019 Call was reasonable. At the time of the call and at all times thereafter, HK served as a trusted advisor to GWG by virtue of the fact that key GWG and BEN personnel were former HK employees, HK represented GWG in other matters, and GWG's CEO was a long-time HK client. Moreover, HK and Banowsky consistently represented that HCLP's interests were aligned with those of GWG.

423.    As discussed in Section V.A.2, Banowsky's misrepresentations during the November 2019 Call were independently fraudulent and outside the scope of his representation of HCLP. In making these misrepresentations, Banowsky participated with Heppner in a fraudulent scheme, not on HCLP's behalf as its counsel. For instance, many of the misrepresentations concerned managerial and organizations changes related to HCLP and Highland Consolidated that Banowsky helped Heppner engineer and accomplish approximately one month earlier. The only conceivable benefit those changes offered to HCLP and/or Highland Consolidated was that they increased the likelihood Banowsky and Heppner would be able to mislead GWG's Special Committee regarding Heppner's affiliation with HCLP, and thereby increased the likelihood GWG would earmark money to be paid to HCLP. Moreover, HCLP already had deal counsel with respect to the BEN-HCLP First and Second Debts in the form of Sidley. Banowsky's actions were not those of a zealous advocate representing his client in a commercial transaction, but amounted to peddling misleading statements, half-truths, and outright misrepresentations on behalf of Heppner and his scheme.

152

424.    GWG suffered injury as a result of its reliance on Banowsky's misrepresentations during the November 2019 Call. As a result of Banowsky's misrepresentations, GWG was fraudulently induced into agreeing to send $49.8 million to BEN, which money BEN would pay to HCLP to waive the purported breach of a change-of-control covenant, rather than to purchase alternative assets or otherwise execute its business plan.

**Count VI: Negligent Misrepresentation**
*(November 2019 Call)*

425.    The Trustee repeats and realleges each and every allegation contained above as if fully set forth herein.

426.    Banowsky participated in the November 2019 Call in the course of his business, profession, or employment.

427.    During that call, Banowsky supplied false information for the guidance of others. Specifically, Banowsky made the following false statements during the November 2019 Call:

- "[T]he control structure of the lender … did not include rights for Mr. Heppner or other affiliates;"

- "Mr. Heppner retained solely a limited contingent interest in distributions from the ultimate equity holder in the lender;"

- "Mr. Heppner otherwise would not have an economic interest in proceeds received by the lender and … unequivocally no debt repayment would be received by Mr. Heppner or his affiliates;" and

- The Harmon Trust was controlled by and established for the benefit of the Harmon family.

428.    For the reasons described in the preceding count, these statements were false when made.

429.    Banowsky did not exercise reasonable care or competence in obtaining or communicating the information during the November 2019 Call.

153

430.    It was foreseeable to Banowsky that GWG would rely on the representations made during the November 2019 Call. Banowsky made those representations directly to counsel for GWG's Special Committee, who Banowsky knew was responsible for authorizing transactions between GWG and BEN. Banowsky also knew that the Special Committee's counsel had no insight into HCLP's ownership and control structure and no way to gain that knowledge, and was relying entirely on Banowsky in assessing the relationship between BEN, Heppner, and HCLP.

431.    Banowsky's statements during the November 2019 Call are attributable to HK. As set forth in more detail in Section V.C, above, Banowsky made the misrepresentations during the November 2019 Call in the course and scope of his role as an HK partner.

432.    As discussed in Section V.A.1, GWG's reliance on the November 2019 Call was reasonable. At the time of the call and at all times thereafter, HK served as a trusted advisor to GWG by virtue of the fact that key GWG and BEN personnel were former HK employees, HK represented GWG in other matters, and GWG's CEO was a long-time HK client. Moreover, HK and Banowsky consistently represented that HCLP's interests were aligned with those of GWG.

433.    As discussed in Section V.A.2, Banowsky's misrepresentations during the November 2019 Call were independently fraudulent and outside the scope of his representation of HCLP. In making these misrepresentations, Banowsky participated with Heppner in a fraudulent scheme, not on HCLP's behalf as its counsel. For instance, many of the misrepresentations concerned managerial and organizations changes related to HCLP and Highland Consolidated that Banowsky helped Heppner engineer and accomplish approximately one month earlier. The only conceivable benefit those changes offered to HCLP and/or Highland Consolidated was that they increased the likelihood Banowsky and Heppner would be able to mislead GWG's Special Committee regarding Heppner's affiliation with HCLP, and thereby increased the likelihood GWG

154

would earmark money to be paid to HCLP. Moreover, HCLP already had deal counsel with respect to the BEN-HCLP First and Second Debts in the form of Sidley. Banowsky's actions were not those of a zealous advocate representing his client in a commercial transaction, but amounted to peddling misleading statements, half-truths, and outright misrepresentations on behalf of Heppner and his scheme.

434. GWG justifiably relied on the false information communicated during the November 2019 Call in sending $49.8 million to BEN and agreeing that BEN could pay that money to HCLP, rather than use it to purchase alternative assets or otherwise execute its business plan.

435. GWG suffered pecuniary loss as a result of its reliance. GWG would not have sent that money to BEN, would not have allowed BEN to pay that money to HCLP, or at the very least would have done so on better terms had GWG's Special Committee known the truth about Heppner's affiliation with and control over HCLP.

## PRAYER FOR RELIEF

WHEREFORE, the Trust prays for relief and judgment as follows:

a.   entering judgment against Defendants for RICO violations, conspiracy to violate the RICO Act, aiding and abetting or knowing participation in certain GWG directors' breaches of their fiduciary duties, civil conspiracy, fraud, and/or negligent misrepresentation;

b.   awarding damages against Defendants in an amount to be determined at trial;

c.   awarding treble damages against Defendants;

d.   awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

e.   awarding reasonable attorney's fees and expenses, together with all costs of court, in connection with this action; and

f.   awarding such other and further relief as the Court deems just.

## **JURY DEMAND**

GWG demands a trial by jury with respect to all claims and causes of action.

**Dated**: February 28, 2025

**REID COLLINS & TSAI LLP**

By: */s/ Dylan Jones*
William T. Reid, IV
Tex. Bar No. 00788817
S.D. Tex. Bar No. 17074
Nathaniel J. Palmer (admitted pro hac vice)
Tex. Bar No. 24065864
Michael J. Yoder (admitted pro hac vice)
Tex. Bar No. 24056572
Joshua J. Bruckerhoff
Tex. Bar. No. 24059504
S.D. Tex. Bar No. 1049153
Morgan M. Menchaca
Tex. Bar No. 24103877
S.D. Tex. Bar No. 3697565
Dylan Jones (admitted pro hac vice)
Tex. Bar No. 24126834
Emma G. Culotta
Tex. Bar No. 24132034
S.D. Tex. Bar No. 3862661
Taylor A. Lewis (admitted pro hac vice)
Tex. Bar No. 24138317
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
(512) 647-6100
wreid@reidcollins.com
npalmer@reidcollins.com
myoder@reidcollins.com
jbruckerhoff@reidcollins.com
mmenchaca@reidcollins.com
djones@reidcollins.com
eculotta@reidcollins.com
tlewis@reidcollins.com

Tarek F.M. Saad (admitted pro hac vice)
Tex. Bar No. 00784892
420 Lexington Avenue, Suite 2731
New York, NY 10170
(212) 344-5203
tsaad@reidcollins.com

*Counsel for the GWG Litigation Trustee*

157