# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF LUMINA ALABASTRO, by Its Personal Representative, Daphne Alabastro Benitez, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO BANK, N.A.; LIFE RECOVERY FUND, LLC; VIDA INSURANCE CREDIT OPPORTUNITY FUND III GP, LLC; and JOHN DOES 1-10, <br><br> Defendants. | C.A. No. 1:25-cv-954-RGA |

## FIRST AMENDED COMPLAINT

Plaintiff, the Estate of Lumina Alabastro, by its Personal Representative, Daphne Alabastro Benitez (the "Estate"), brings this Complaint against Defendants Wells Fargo Bank, N.A. ("Wells Fargo"), Life Recovery Fund, LLC ("Life Recovery Fund"), Vida Insurance Credit Opportunity Fund III GP, LLC ("Vida"), and John Does 1-10 (collectively, the "Defendants"), and in support thereof alleges as follows.

## INTRODUCTION

1.      This action involves a stranger-originated life insurance ("STOLI") policy, which, upon information and belief, was manufactured in and under

Delaware law on the life of Lumina G. Alabastro (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

2.      The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million-dollar STOLI policies, including the Policy here.

3.      Ms. Alabastro (the "Insured") has now passed away, and the proceeds and benefits under the Policy were paid to and received by Wells Fargo, in its capacity as the Policy's beneficiary of record and owner of record. Thereafter, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, some or all of the proceeds and benefits were paid to and received by one or more of the other Defendants.

4.      According to Delaware's long-standing common law, as clearly codified by 18 *Del. C.* § 2704(b), Delaware statute, and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate is entitled to require Defendants to pay to the Estate the amount of the Policy's proceeds that they received, together with substantial pre-judgment interest. *See* 18 *Del. C.* § 2704(b); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12-13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of insured on policy lacking insurable interest and awarding death benefit and interest

to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (on remand, awarding, on summary judgment, the policy's death benefit to family of insured, plus substantial pre-judgment interest); *see also Estate of Malkin v. Wells Fargo Bank*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin II*") (affirming district court decision finding on summary judgment that Coventry-procured policy was a void *ab initio* human life wager, and certifying remaining questions to the Delaware Supreme Court, which confirmed that estate of insured was entitled to policy proceeds, in *Wells Fargo Bank v. Estate of Malkin*, 278 A.3d 53 (Del. 2022) ("*Malkin*")).

## **PARTIES**

5.      Lumina G. Alabastro was a citizen of California at the time of her death. Ms. Alabastro's granddaughter, Daphne Alabastro Benitez, was appointed by a California probate court to serve as Personal Representative of the Estate.

6.      Defendant Wells Fargo is a national banking association organized and existing under federal law with its main office located in South Dakota. Wells Fargo

is named as a defendant because, as set forth below, it was the owner of record and beneficiary of record of the Policy, was a payee of the Policy's proceeds in its capacity as the Policy's beneficiary of record, and received the death benefit proceeds of the Policy from the insurance company that issued it.

7.     Defendant Life Recovery Fund is a limited liability company organized under the laws of the State of Delaware, with its registered office located in Lewes, Delaware. Life Recovery Fund was the beneficial owner of the Policy. It is named as a defendant in this action because, as beneficial owner, it had certain rights to the Policy's proceeds, and, on information and belief formed after reasonable inquiry, may have received some or all of the Policy's proceeds.

8.     Defendant Vida is a limited liability company organized under the laws of the State of Delaware, with its registered office located in Wilmington, Delaware. Under a Securities Account Control and Custodian Agreement, Credit Agreement and/or other contracts and agreements, Vida had certain rights with respect to the Policy's proceeds. It is named as a defendant in this action because, by virtue of those rights, and on information and belief formed after reasonable inquiry, it may have received some or all of the Policy's proceeds.

9.     John Does 1-10 are named fictitiously and refer to any other person or entity that, whether as a beneficiary, assignee, or other payee of the Policy or its proceeds, received some or all of the Policy's proceeds, and that thus may be liable

4

under 18 *Del. C.* § 2704(b). John Does 1-10 include, without limitation, some or all of the entities defined as "Lenders" in the agreements mentioned in the foregoing paragraph. After reasonable inquiry, the Estate has not yet ascertained the identities of the persons or entities named as John Does 1–10. Upon identification of any such person or entity, the Estate will seek to amend this complaint in order to specifically name that person or entity.

## JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Estate, a citizen of California, and the Defendants, which, on information and belief formed after reasonable inquiry, are not citizens of California.

11.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Estate's claims occurred in the District of Delaware. Specifically, as set out in further detail below, this litigation concerns the issuance of a Delaware life insurance policy that, upon information and belief, was applied for via an application that was signed in Delaware, and that was delivered to a trust in Delaware.

12.    This Court has personal jurisdiction over Wells Fargo because, among other things, the Estate's Complaint arises out of Wells Fargo's transaction of

business in Delaware and its contracts to supply services in Delaware. *See* 10 *Del. C.* § 3104(c)(1), (2). Wells Fargo purposefully availed itself of the rights and privileges of doing business in Delaware.

13.    This Court has personal jurisdiction over Life Recovery Fund and over Vida because, among other things, Life Recovery Fund and Vida are Delaware limited liability companies formed under Delaware law with their registered offices located in Delaware.

14.    There is an actual controversy between the parties, which is ripe for judicial resolution. The Policy at issue in this case was an illegal human life wager that is void *ab initio* and lacks an insurable interest under the applicable law.

15.    The parties therefore have an actual controversy over whether the Policy was void *ab initio* and whether, under applicable law, the Estate is entitled to the proceeds paid on the Policy.

## **BACKGROUND**

16.    This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal

place of business in this State." § 2704(e)(4). The Delaware insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Notably, here, on information and belief, the Policy was issued for delivery to the Lumina Alabastro 2005 Insurance Trust dated December 7, 2005, a Delaware statutory trust, in Delaware, and on information and belief, was signed for by Wilmington Trust Company ("Wilmington Trust") as trustee, which has (and had) its principal place of business in Delaware.

17.     As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

18.     Although speculators have existed for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than recently. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to

other investors. *See*, *e.g.*, Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

19.     It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

20.     One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

21.     Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

22.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

23.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

24.     STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

25.     The role of Coventry and Wells Fargo in connection with the origination, maintenance, and/or maturation of the Policy dates back many years.

26.     Beginning in 2001, Coventry, U.S. Bank, and Lavastone Capital LLC (which was formerly known as AIG Life Settlements LLC and is referred to herein as "Lavastone") entered into a series of requirements contracts through which Coventry agreed to "originate" a large number of Delaware life insurance policies

that, from the start, were intended to be transferred to Lavastone and other investors, with U.S. Bank serving in various roles, including as trustee, fiscal agent, and/or securities intermediary (the "U.S. Bank Origination Agreements").[1] Beginning in or about 2008, Coventry, Wells Fargo, and Lavastone entered into a series of requirements contracts that were effectively identical to the U.S. Bank Origination Agreements and through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with Wells Fargo serving in various roles including as trustee, fiscal agent, and/or securities intermediary (the "Wells Fargo Origination Agreements").

27.    More specifically, pursuant to the U.S. Bank Origination Agreements and the Wells Fargo Origination Agreements (collectively, the "Origination Agreements") and related contracts, Coventry, as the "Originator," was obligated to create large numbers of life insurance policies that (subject to certain exceptions that rarely applied) Lavastone was required to purchase from Coventry. Lavastone's purchase from Coventry would, in all or virtually all cases, be facilitated by U.S. Bank or Wells Fargo, which served in many different roles, including as trustee of

---

[1] Lavastone is an affiliate of the American International Group (often referred to as "AIG").

various trusts and/or as fiscal agent, and as securities intermediary for Coventry, Lavastone, and other investors.

28.    To manufacture such life insurance policies intended for transfer on the secondary life insurance market, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

29.    Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

30.    Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

31.    Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life

expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, Lavastone, and U.S. Bank or Wells Fargo.

32.    Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how profitable to Coventry and its cohorts a particular policy (if procured) might be.

33.    Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

34.    Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of

boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

35.     Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

36.     With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust Company, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

37.     Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the

Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

38.    The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

39.    The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

40.    Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to

conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

41.     But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the Origination Agreements (which, on information and belief, is what occurred in the majority of Coventry's transactions) and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the Origination Agreements) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by the Coventry through the Origination

Agreements ended up, in almost all instances, on the secondary life insurance market, just as intended, and usually with Coventry (and then Lavastone and then others) as the investors, with U.S. Bank or Wells Fargo as the owners and beneficiaries, and with the investors either keeping the policies until maturity or reselling them to yet other investors.

42.     Coventry and others were often also engaged by Lavastone or other investors to "service" each policy until the insured died, which required that Coventry or these others pay ongoing policy premiums on behalf of the policy's actual owner, and Coventry or these others would contact the insured or their family on a regular basis to confirm whether the insured had died yet. Once Coventry or these others learned an insured had died, they would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

43.     Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that: (i) the Coventry program was a STOLI program; and (ii) policies produced by the program are void *ab initio*. *See, e.g.*, *Estate of Barotz*, 320 A.3d 212 (affirming grant of summary judgment for estate of insured on Coventry STOLI policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'g* 2022 WL 16833545; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3 (C.D. Cal. July 23, 2024) (declaring Coventry policy void *ab initio* on summary judgment under Delaware law); *U.S. Bank v. Estate of Albart*,

16

2023 WL 7491131 (Fla. 5th Cir. Ct. Oct. 23, 2023) ("*Estate of Albart*") (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct. Sept. 15, 2023) ("*Estate of Diamond*") (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) ("*Estate of Malkin I*") (same); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

44.     On November 16, 2021, in *Estate of Berland I*, the Delaware Supreme Court issued a unanimous *en banc* decision, which involved certified questions of law arising out of a Coventry-procured life insurance policy. 266 A.3d at 970-74. In that decision, the Delaware Supreme Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force." *Id.* at 968 (quoting *Price Dawe*, 28 A.3d at 1065).

45.     In so holding, the Delaware Supreme Court reaffirmed its prior unanimous, *en banc* decision in *Price Dawe*, which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can

"never" be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 266 A.3d at 1068 n.25, 1071.

46.     In *Estate of Berland I*, the Delaware Supreme Court also confirmed that, when a life insurance company pays on a STOLI policy that lacks an insurable interest, then the estate of the insured is entitled to sue the payee for the proceeds, plus substantial prejudgment interest. 266 A.3d at 970-74; *see also Estate of Berland II*, 2022 WL 15023450.

47.     On May 26, 2022, after the Eleventh Circuit certified questions in *Estate of Malkin*, the Delaware Supreme Court, in yet another unanimous *en banc* decision, confirmed that, if a life insurance policy governed by Delaware law (like the Coventry policy at issue in *Estate of Malkin*) is deemed to be a void *ab initio* human life wager, whatever policy proceeds were paid must be paid to the estate of the insured as a matter of Delaware's "longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit," pursuant to Section 2704(b) of Delaware's insurable interest statute, which codified that common law cause of action and provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Malkin*, 278 A.3d at 60-61 (*quoting* Section 2704(b)).

48.   The Delaware Supreme Court further held, *inter alia*, that various UCC defenses do not apply in the context of insurable interest claims, and further explained that a defendant in such a case is allowed to obtain a credit for premiums only under limited circumstances. *Id.* at 56, 60, 63-67; *see also Estate of Barotz*, 320 A.3d 212 (Delaware Supreme Court affirming award of death benefit, plus interest, to estate where policy procured through Coventry program).

## The Application and Issuance of the Policy

49.   In or around December 2005, AXA Equitable Life Insurance Company ("AXA") received an application for life insurance (the "Application") seeking a universal life insurance policy on the life of Ms. Alabastro, who was then 74 years old.

50.   The Application identified the owner and beneficiary of the proposed policy as the Trust.

51.   The Application identified the Trust as a Delaware trust, formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

52.   The Application was signed by a senior financial services officer for Wilmington Trust, as trustee of the Trust and owner and beneficiary of the purported policy.

53.   The Application was signed in Wilmington, DE.

54.     In reliance upon the representations contained in the Application, and other documents and information submitted to AXA in connection with the Application, AXA issued the Policy, bearing policy number 155231755 for $5,000,000 of coverage.

55.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, AXA received a delivery receipt for the Policy executed by a financial services officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

### The Policy Lacked Insurable Interest and Was Procured Illegally on Ms. Alabastro's Life

56.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy lacked an insurable interest at its inception, and was procured on the life of Ms. Alabastro as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions. Any appearance of insurable interest was superficial only.

57.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry (or third parties lacking an insurable interest in the Insured's life) paid the Policy's premiums; and, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, neither the Insured nor anyone else with an insurable interest in her life

paid the premiums or were at risk that their funds would be used to pay the premiums.

58.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, to induce the Insured to allow the Policy to be procured on her life, Coventry and those acting on its behalf may have represented that the Policy was being procured through a legitimate and legal transaction, or further induced the Insured with the promise of financial compensation if she permitted the Policy to be procured.

59.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry acted through its agent(s) to have the application for the Policy submitted to AXA.

60.     To facilitate this transaction, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry created the Trust as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

61.     The Trust was a sham and used as a cover because, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, it was nominally funded and created as a means to conceal from the insurance carrier the fact that it was being used to feign technical compliance with

Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

62.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry further created a sub-trust to the Trust. The sub-trust was also established as a mere cover to procure the Policy without a valid insurable interest.

63.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy was issued for delivery in Delaware to the Trust and was delivered in Delaware to the Trust, as described above.

64.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

65.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

66.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as a result of the purported "loan," neither the Insured nor anyone with an insurable interest in her life ever paid any premiums on

the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating a wager on the Insured's life.

67.  Moreover, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purpose of the Policy was not to provide estate protection for the Insured, but rather, the Insured was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on the Insured's early demise.

68.  As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Policy was issued, stranger investors unrelated to Ms. Alabastro took formal control of the Policy, and, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Wells Fargo was engaged by Coventry, Lavastone, or subsequent investors, including but not limited to Defendant Life Recovery Fund, LLC, to serve as the Policy's owner of record and beneficiary of record, and to perform other duties regarding the Policy.

69.  As noted, since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. However, since at least 2016—before the Insured passed away and

Defendants sought the Policy's death benefit here—Defendants knew or should have known that the Policy lacked insurable interest. Yet Defendants continued to pay premiums and collect the proceeds of the Policy anyway.

70.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Defendants, their principals or agents, and/or others working in concert with Defendants, repeatedly invaded the Insured's privacy and that of her family by contacting the Insured and her family frequently to determine whether she was still alive and, if so, to check on the status of her health.

71.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Defendants, their principals or agents, and/or others working in concert with Defendants further invaded the Insured's privacy by procuring the Insured's confidential medical records on a regular basis, and then providing those records to third parties to obtain up-to-date life-expectancy reports so as to assess the current value of their wager, as well as to allow potential purchasers to assess the value of the Policy based on when these strangers believed the Insured would die.

72.     Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive

contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

73.    On July 12, 2023, Ms. Alabastro passed away.

74.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, AXA subsequently received a claim for the Policy's death benefits to be paid to Wells Fargo as the Policy's beneficiary, and thereafter paid the Policy's death benefit proceeds to Wells Fargo, which received those proceeds. The death benefits were paid to and received by Wells Fargo because Wells Fargo was the Policy's beneficiary of record.

75.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, one or more of the other Defendants had certain rights with respect to the Policy and its proceeds, and, after Wells Fargo's receipt thereof, accordingly received some or all of the Policy's proceeds, whether as a beneficiary, assignee, or other payee of the Policy or its proceeds.

## COUNT I
### RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST
### (AGAINST  ALL DEFENDANTS)

76.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

77.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy was applied for and signed for in

Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

78.     For the reasons set forth above, the Policy lacked an insurable interest. *Price Dawe*, 28 A.3d 1059; *Estate of Berland I*, 266 A.3d 964.

79.     Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b). *See, e.g.*, *Estate of Berland I*, 266 A.3d 964; *Estate of Malkin I*, 379 F. Supp. 3d 1263.

80.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the death benefit proceeds of the Policy were paid, transferred, assigned, or otherwise received by one or more of the Defendants, their principals or agents, or others working in concert with them.

81.     As a consequence, the Estate is entitled to receive the amount of those death benefit proceeds (plus applicable interest, attorneys' fees, and other costs and damages) from or through the Defendants that received them.

## PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment against Defendants in an amount equal to the amount of the death benefits received plus pre-judgment interest, costs, attorneys' fees, and any such other relief as the Court deems just and proper.

**COZEN O'CONNOR**

Dated: September 4, 2025

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Ste. 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

- and -

Michael J. Miller (*pro hac vice*)
Gregory J. Star (*pro hac vice*)
Matthew Bleich (*pro hac vice*)
Duncan R. Becker (*pro hac vice*)
Carlynne Wagner (*pro hac vice*)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

*Attorneys for Plaintiff,*
*The Estate of Lumina Alabastro*